**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Hudson 1701/1706, LLC, *et al.*,[1] | Case No. 25-11853 (KBO) |
| Debtors. | (Jointly Administered) |

**MOTION OF THE DEBTORS
FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE
CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION LENDER; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "**Debtors**"), by and through their proposed general bankruptcy counsel, Chipman Brown Cicero & Cole, LLP, and proposed special counsel, DLA Piper LLP (US), hereby submit this motion (this "**Motion**") for entry of an order, substantially in the form attached as **Exhibit A** (the "**Interim Order**"), and, following a final hearing (the "**Final Hearing**"), a final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"), granting the relief described below. In support of this Motion, the Debtors rely upon the *Amended and Restated Declaration of Alan Tantleff in Support of Debtors' Chapter 11 Petitions and First Day Motions* ("**First Day Declaration**").[2] In further support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' headquarters and the mailing address for the Debtors is 11440 San Vicente Boulevard, 2nd Floor, Los Angeles, CA 90045.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration or DIP Term Sheet (as defined below), as applicable.

## PRELIMINARY STATEMENT

1.      The Debtors filed these Chapter 11 Cases to effectuate a restructuring, conclude efforts to cure regulatory issues with the SRO Tenants and lift a stop-work order that New York City Department of Buildings issued with respect to the Hudson, and complete construction at the Hudson.  This decision was also driven by the Ground Lessor's asserted defaults and repeated threats to terminate that certain 99-year *Ground Lease* dated as of May 4, 2022 (as amended, the "**Ground Lease**"), including defaults predicated on construction delays and mechanics' liens, an increase in base rent under the Fourth Amendment to the Ground Lease, and the Ground Lessor's refusal to forbear from exercising termination remedies.   To address these issues, the Debtors require immediate access to postpetition incremental financing and cash collateral, which will also allow them to continue operations and administer their Chapter 11 Cases.

2.      As set forth in further detail in the First Day Declaration, the Debtors were formed in March 2022 to operate the historic Hudson Hotel as a multifamily residential property originally anticipated to include approximately 440 market rate rental units complete with commercial space and a penthouse.  Redevelopment and construction at the Hudson commenced quickly after the Company's formation and was expected to conclude in May 2024. Regulatory issues, construction delays, and attendant litigation and liquidity constraints have impacted the project since its inception.  As a result, the Debtors have been unable to complete their development of the project, and construction is currently subject to a New York City Department of Buildings stop-work order stemming from disputes with certain of the Hudson's 32 single room occupancy tenants.

3.      Parkview Financial REIT, LP, the Debtors' prepetition lender (in such capacity, the "**Prepetition Lender**") has agreed to provide the Debtors with a postpetition senior secured, priming, first-lien and superpriority multi-draw debtor-in-possession term loan credit facility

2

(the "**DIP Facility**") on an arm's-length, good faith basis and on market terms.  The Debtors' need for postpetition financing arises from a series of events, including the November 2024 maturity default under the Prepetition Loan Agreement (as defined below), the Prepetition Lender's UCC foreclosure on July 25, 2025, and the transfer of ownership interests to the Prepetition Lender's affiliate, PV Hudson LLC, through an $80,000,000 credit bid.  The Debtors faced these challenges in parallel with ongoing disputes with the Ground Lessor concerning asserted events of default under the Ground Lease.  These circumstances, together with regulatory challenges and liquidity limitations, left the Debtors without access to third-party credit and necessitated a consensual, priming debtor-in-possession facility from the Prepetition Lender.  The Debtors determined, in their business judgment, that there was no proposal for debtor-in-possession financing available on terms better than those provided by the Prepetition Lender. With the assistance of their advisors, the Debtors evaluated their financing options and determined that no actionable third-party proposals were available on terms superior to or competitive with the DIP Facility.  In addition, on the terms available from inbound third party inquiries, the Prepetition Lender would not consent to another lender providing funding and "priming" its prepetition liens or obtaining *pari passu* liens, and the Debtors do not believe that any other party would have provided additional funding on a junior basis or unsecured basis.

4.      The DIP Facility and access to the cash collateral of the Prepetition Lender is critical to the Debtors' ability to fund its operations while providing sufficient liquidity throughout the Chapter 11 Cases.  The DIP Facility is an essential component of a successful path forward while the Debtors expeditiously conduct the chapter 11 process.  The Debtors respectfully submit that the proposed DIP Facility, and the Debtors' immediate access to the cash collateral of the

Prepetition Lender, is therefore in the best interests of, and necessary to avoid irreparable harm to, the Debtors and their estates, and should be approved.

## **RELIEF REQUESTED**

5.     By this Motion, the Debtors request entry of an Interim Order providing the following relief:

(a)     authorizing the Debtors to obtain and enter into the DIP Facility pursuant to that certain Senior Secured Priming Superpriority DIP Term Sheet (the "**DIP Term Sheet**"), by and among the Debtors and Parkview Financial REIT, LP (in its capacity as such, the "**DIP Lender**"), attached as **Exhibit 1** to the Interim Order, which will include up to a maximum principal amount of $32,762,104 of new-money funding (such funds, the "**DIP Loans**") to be loaned pursuant to the terms of the DIP Orders and the DIP Term Sheet and the agreements, instruments, certificates, and other documents executed in connection therewith (as further identified in the DIP Term Sheet, collectively, the "**DIP Loan Documents**"), to enable the Debtors to pay the costs and expenses in the initial DIP loan budget (attached as **Exhibit 2** to the Interim Order) and any subsequent budget approved in accordance with the provisions of the DIP Term Sheet (each, an "**Approved Budget**");

(b)     authorizing the Debtors to execute and deliver the DIP Loan Documents and to perform the obligations thereunder and to perform such other and further acts as may be required in connection with the DIP Loan Documents and DIP Orders;

(c)     authorizing the Debtors to borrow (i) up to $12,270,387 of new money DIP Loans pursuant to the Interim Order (the "**Interim DIP Amount**") and roll-up an equal amount of Prepetition Secured Obligations upon entry of the Interim Order and (ii) up to the full amount of the DIP Loans, inclusive of the Interim DIP Amount, and roll-up an equal amount of Prepetition Obligations on a dollar-for-dollar basis as and when the Debtors borrow additional DIP Loans, pursuant to the Final Order;

(d)     granting liens, security interests, and superpriority claims pursuant to 11 U.S.C. § 364(c)(1) ("**Superpriority DIP Claims**") and liens and priming liens pursuant to 11 U.S.C. §§ 364(c)(2), 364(c)(3), and 364(d) (the "**DIP Liens**") to the DIP Lender in, on and against substantially all of the Debtors' assets (as further identified in the DIP Term Sheet, collectively the "**DIP Collateral**") and all proceeds thereof, subject to the Carve Out and the other priorities set forth in the DIP Loan Documents and pursuant to the terms of the Interim Order, to be followed by the Final Order;

(e)     authorizing the Debtors to use Cash Collateral of the Prepetition Lender in accordance with the Approved Budget, pursuant to the terms of the Interim Order, to be followed by the Final Order;

(f)     granting adequate protection in favor of the Prepetition Lender pursuant to the terms of the DIP Loan Documents and Interim Order, to be followed by the Final Order;

(g)     subject to entry of the Final Order, authorizing the waiver by the Debtors of (i) the right to assert claims to surcharge against the DIP Collateral pursuant to 11 U.S.C. § 506(c), (ii) the right to seek marshaling with respect to the DIP Collateral, and (iii) the application of the "equities of the case" exception in section 552(b) of the Bankruptcy Code to the Prepetition Lender and/or Prepetition Collateral;

(h)     modifying the automatic stay imposed under 11 U.S.C. § 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and Interim Order, to be followed by the Final Order;

(i)     scheduling a Final Hearing to consider entry of the Final Order; and

(j)     granting related relief.

## JURISDICTION, VENUE AND STATUTORY PREDICATES

6.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

7.     Under rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection with this Motion consistent with article III of the United States Constitution.

8.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     The statutory and legal bases for the relief requested in this Motion are sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c),

and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, and 9013.

## BACKGROUND

10.    On October 22, 2025 (the "**Petition Date**"), each of the Debtors commenced a voluntary case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Debtors are authorized to operate their business and manage their property as debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

11.    No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

12.    Additional information regarding the Debtors' business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First Day Declaration, which is incorporated in this Motion by reference.

## PREPETITION CAPITAL STRUCTURE AND NEED FOR DIP FINANCING

### A.    **Prepetition Loan Agreement and Secured Obligations**.

13.    As discussed more fully in the First Day Declaration, the Debtors are party to the (i) that certain *Building Loan Agreement*, dated as of May 4, 2022, as amended by Amendment to Building Loan Agreement dated as of May 1, 2023, (as amended, restated or modified from time to time, the "**Building Loan**"), together with (ii) that certain *Project Loan Agreement*, dated as of May 4, 2022, by and among the Debtors and the Prepetition Lender (as amended, restated or modified from time to time, the "**Project Loan**" and, together with the Building Loan, the "**Prepetition Loan Agreement**").  The Building Loan is secured by that certain *Building Loan Mortgage Note*, by and among the Debtors and the Prepetition Lender, dated as of May 4, 2022. The Project Loan is secured by that certain *Project Loan Mortgage Note*, by and among the

Debtors and the Prepetition Lender, dated as of May 4, 2022, and secured by all assets of the Debtors.  On July 25, 2025, the Prepetition Lender exercised its right to conduct a UCC foreclosure sale of the certain pledged collateral.  At a public sale, the Prepetition Lender obtained the pledged collateral in the Company in exchange for a credit bid in the amount of $80,000,000 of existing prepetition indebtedness (the "**Credit Bid**").  The Prepetition Lender then assigned the interests it acquired to its wholly owned subsidiary, PV Hudson LLC.  PV Hudson is currently the sole Member of each Debtor.

14.     Prior to the chapter 11 filing, the Debtors and the Prepetition Lender negotiated that certain *Cash Collateral Agreement* dated as of October 22, 2025 (the "**Cash Collateral Agreement**"), which is annexed as Exhibit 1 to the First Day Declaration.  Through the Cash Collateral Agreement, the Prepetition Lender extended, on an emergency bridge loan basis, up to $1,000,000 (the "**New Advance**") prior to the Petition Date to be used by the Debtors solely in accordance with the budget attached thereto. The Cash Collateral Agreement will be terminated and superseded by the DIP Term Sheet and Interim Order, once entered.

15.     As of the Petition Date, after giving effect to the Credit Bid and the New Advance, the Debtors were obligated to the Prepetition Lender in the aggregate amount of approximately $146 million (plus accrued and unpaid interest and fees, expenses, charges, indemnities, and other obligations) of prepetition obligations (collectively, the "**Prepetition Obligations**").

### B.     Unsecured Indebtedness.

16.     In the ordinary course of business, the Debtors incur unsecured indebtedness to various suppliers, trade vendors, utility providers, and services providers, among others.

C.     **Equity Interests**.

17.     All of the Debtors' equity interests are owned by PV Hudson, which is wholly owned by the Prepetition Lender.

D.     **Debtors' Need for Postpetition Financing**.

18.     As set forth more fully in the First Day Declaration, the Debtors commenced these Chapter 11 Cases after extensive efforts to recommence construction at the Hudson.  Without certain regulatory approvals, the Debtors have been unable to complete the project.  Because the improvements to the Hudson are incomplete, the Debtors have been unable to generate substantial income and have had to rely on cash infusions from the Prepetition Lender.  The Debtors believe that chapter 11 will provide a forum to effectuate a restructuring and complete construction at the Hudson.

19.     The Debtors currently have approximately $570,000 in cash on hand, including cash from the New Advance, all of which is encumbered by the Prepetition Liens, and are unable to borrow additional amounts under the existing Prepetition Loan Agreement. Therefore, the Debtors have an urgent need for post-petition funding to sustain operations and pay for the costs of these Chapter 11 Cases, including effectuating a comprehensive restructuring.  The DIP Facility is the best and only path forward to ensure that the Debtors can successfully administer the Chapter 11 Cases and ensure administrative solvency.

E.     **Debtors' Efforts to Obtain Postpetition Financing**.

20.     Prior to the Petition Date, the Debtors, the DIP Prepetition Lender, and the DIP Lender began materially advancing negotiations regarding the terms of proposed DIP financing. Such good faith and arm's length negotiations led to the Debtor and DIP Lender agreeing to the terms of the DIP Facility as set forth in the DIP Term Sheet. The Debtors determined, in their

business judgment, that there was no proposal for debtor in possession financing available to the

Debtors on terms better than those provided by the Prepetition Lender.  In particular, the Debtors

and their advisors determined, in their business judgement, that no other party would be willing to

extend debtor-in-possession financing to the Debtors on an unsecured or junior basis.

Accordingly, the Debtors are seeking this Court's approval of DIP Facility on the terms and

conditions set forth in the DIP Term Sheet, which is attached to the Interim Order as <u>Exhibit 1</u>,

and the DIP Orders.

## <u>SUMMARY OF TERMS OF DIP FINANCING</u>[3]

21.     As required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule

4001-2, the Debtors submit the following concise statement of the material terms of the DIP

Facility:

| Summary of Material Terms of DIP Facility | |
| --- | --- |
| **Parties to the Proposed DIP Facility**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | <u>Borrowers</u>: Hudson 1701/1706, LLC, a Delaware limited liability company and Hudson 1702, LLC, a Delaware limited liability company<br><br><u>DIP Lender</u>: PARKVIEW FINANCIAL REIT, LP a Delaware limited partnership (together with all other lenders and agents from time to time parties to this DIP Term Sheet and/or any other DIP Loan Documents (as defined below), the "**DIP Lender**" or "**Parkview**"), or its designee or assignee. |
| **DIP Facility & Borrowing Limits**<br><br>*Bankruptcy Rule 4001(c)(1)(B);*<br><br>*Local Rule 4001-2(a)(i)* | A priming, first-lien and superpriority multi-draw debtor-in-possession term loan credit facility in the original principal amount of up to $32,762,104.<br>The DIP Facility provides for the following:<br>• $12,270,387 shall be available upon entry of the Interim Order;<br>• an additional $20,491,717 shall be available upon entry of the Final Order.<br><br>*See* DIP Term Sheet, "DIP Facility and DIP Loan Documents". |
| **Initial Approved Budget**<br><br>*Bankruptcy Rule 4001(c)(1)(B);* | A copy of the Initial Budget is attached as <u>Exhibit 2</u> to the Interim Order. |

---

[3]     This summary is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents. To the extent there exists any inconsistency between this summary (and this Motion generally) and the provisions of the DIP Loan Documents or the DIP Orders, the provisions of the DIP Loan Documents or the DIP Orders, as applicable, shall control. Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the DIP Loan Documents and/or the Interim Order, as applicable. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

| Summary of Material Terms of DIP Facility | |
|---|---|
| *Local Rule 4001-2(a)(iii)* | |
| **Interest Rates**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loans, including all Roll Up DIP Loans, shall bear an interest rate of 12% per annum, with such interest payable monthly in arrears in kind (*i.e.*, by adding the amount of such outstanding interest to the aggregate principal amount of the DIP Loans) on the first day of each month, computed based on a 365/366-day year; provided that any and all accrued and unpaid interest shall be due and payable in cash upon the Maturity Date (whether by acceleration or otherwise).<br><br>Default Rate. Notwithstanding anything to the contrary herein, upon the occurrence and during the continuance of an Event of Default, the DIP Loans and all other DIP Obligations shall bear interest at an additional 2% per annum above the non-default rate, upon written notice from the DIP Lender to the Debtors, which notice may be given at any time by the DIP Lender and which notice shall have retroactive effect to the date of the Event of Default.<br><br>*See* DIP Term Sheet, "Interest Rate; Default Rate". |
| **Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | In the event of a Voluntary Repayment, a fee equal to 2% shall be paid by the Debtors in cash to the DIP Lender (the "Early Termination Fee"). The Early Termination Fee shall be fully earned upon entry of the Interim DIP Order and non-refundable once paid at Maturity.<br><br>*See* DIP Term Sheet, "Early Termination Fee"; Interim Order ¶ 7. |
| **Termination Date**<br><br>*Bankruptcy Rule 4001(c)(1)(B);*<br><br>*Local Rule 4001-2(a)(i)* | The Debtors may borrow DIP Loans and use Cash Collateral from the date of entry of this Interim Order until the earliest to occur of the following (the "Termination Date"):<br><br>i.   the occurrence of an Event of Default that is not cured within the time allotted, if any;<br>ii.  twelve (12) months from the Petition Date (as such date may be extended with the prior written consent of the DIP Lender);<br>iii. the date of consummation of a sale of all or substantially all of the assets of any or all of the Debtors; and<br>iv.  the effective date of a chapter 11 plan with respect to any or all of the Debtors.<br><br>Upon the Termination Date, subject to the Carve Out, the Debtors shall repay to the DIP Lender all outstanding DIP Obligations, without any setoff or deduction. If the Termination Date occurs as a result of the closing of a sale of all or substantially all of the assets of any of the Debtors, all outstanding DIP Obligations shall be paid in full prior to or simultaneous with the closing of such transaction either (i) directly from the buyer in such transaction or (ii) directly from the escrow account, via the escrow agent, established for the consummation of such transaction. Such payment shall be made by wire transfer of immediately available funds to an account designated in writing by the DIP Lender to the Debtors prior to the closing of such transaction.<br><br>*See* Interim Order ¶ 30. |
| **Prepayments**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001- 2(a)(i)(I)* | Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to payment of the Early Termination Fee, and subject in all respects to compliance with the "Negative Covenants" below and other provisions of this DIP Term and the DIP Orders ("Voluntary Prepayments").<br><br>The following amounts shall be indefeasibly paid in cash in full or partial satisfaction of the DIP Obligations within two (2) business days of receipt, except as such |

| Summary of Material Terms of DIP Facility | |
|---|---|
| | amounts are set forth in the Approved Budget and are necessary to satisfy the expenditures set forth in the Approved Budget:<br><br>i.      100% of the net proceeds of the disposition of the DIP Collateral, including, without limitation, asset sales at the closing of any such disposition or sale; provided that any sale of Collateral that does not satisfy the DIP Obligations in full shall require the prior written consent of the DIP Lender;<br>ii.     100% of the net proceeds of insurance and condemnation awards;<br>iii.    100% of the net proceeds of any debt issuance or equity issuance; and<br>iv.    Following entry of the Final DIP Order 100% of proceeds of Debtors' claims and causes of action.<br><br>*See* DIP Term Sheet, "Prepayments". |
| **Covenants**<br><br>*Bankruptcy Rule 4001(c)(1)(B);*<br><br>*Local Rule 4001-2(a)(i)(E)* | Usual and customary covenants for debtors in possession financings of this type, including certain financial reporting, which are set for in the "Affirmative Covenants" and "Negative Covenants" sections of the DIP Term Sheet. |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | The DIP Term Sheet contains customary events of default for financing of this type, which are set forth in the "Events of Default" section of the DIP Term Sheet. |
| **Roll Up**<br><br>*Local Rule 4001-2(a)(i)(O)* | Effective immediately upon entry of the Interim Order, $12,270,387 of the Prepetition Secured Obligations will be automatically "rolled up" on a 1:1 basis, converted into, and treated for all purposes as DIP Loans and DIP Obligations. Subject to entry of the Final Order, simultaneous with the borrowing of any Subsequent DIP Loans by the Debtors under the DIP Facility, there shall be a dollar-for-dollar roll up of Prepetition Secured Obligations to Subsequent DIP Loans when and as funded by the DIP Lender to the Debtors. The outstanding aggregate amount of Prepetition Secured Obligations shall be automatically and irrevocably deemed reduced by the amount of Prepetition Secured Obligations included in the Roll Up.<br><br>*See* DIP Term Sheet, "Roll Up"; Interim Order ¶ 6. |
| **Carve-Out**<br><br>*Bankruptcy Rule 4001(b)(l)(B)(ii)*<br><br>*Local Rule 4001- 2(a)(ii)* | "Carve-Out" means the sum: (i) to the extent allowed at any time, all unpaid professional fees and disbursements incurred at any time prior to and including the day of the delivery of the Carve-Out Trigger Notice (as defined below) ("Allowed Professional Fees") by the Debtors and any Committee for any of their respective retained professionals (the "Case Professionals"), in an aggregate amount not to exceed the amounts set forth in the then existing Approved Budget in the applicable line for such Case Professionals prior to the Carve-Out Effective Date; and (ii) all allowed and unpaid professional fees and expenses incurred by the respective Case Professionals after the first day following the delivery of the Carve-Out Trigger Notice in an aggregate amount not in excess of $1,000,000; (iii) all reasonable fees and expenses up to $25,000 incurred by a trustee under Section 726 of the Bankruptcy Code; plus (iv) all fees pursuant to 28 U.S.C. §1930(a) and all fees required to be paid to the Clerk of the Court for the Debtors for the time period beginning on the Petition Date and ending on the date of any dismissal or conversion of the Chapter 11 Cases, which fees described in this clause (iv) shall not be limited to amounts that may be set forth in any Approved Budget. |

| Summary of Material Terms of DIP Facility | |
|---|---|
| | "Carve-Out Trigger Notice" means a written notice, delivered by email or U.S. Mail, receipt acknowledged, by the DIP Lender to the Debtors, their Chief Restructuring Officer, their counsel, the U.S. Trustee, and counsel to any Committees, of any default under the DIP Loan Documents. *See* Interim Order ¶ 35. |
| **Priority of Claims and Liens; Collateral** *Bankruptcy Rule 4001(c)(1)(B)(i); Local Rule 4001-2(a)(i)(G)* | To secure the prompt payment and performance of all DIP Obligations, including, without limitation, all principal, the Roll Up, interest, premiums, payments, fees, costs, expenses, indemnities, and/or other amounts, effective as of the Petition Date, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition liens on and security interests in the DIP Collateral (collectively, the "DIP Liens").  The DIP Collateral consists of all assets and properties of each of the Debtors and their estates, including, without limitation, whether tangible or intangible, real, personal, or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, the Debtors, whether prior to or after the Petition Date, including, without limitation, all of the Debtors' rights, title, and interests in (1) all Prepetition Collateral; (2) all money, cash, DIP Loan proceeds, and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts, deposits or other accounts (together with all money, cash, and cash equivalents, instruments, and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including, without limitation, those generated by intercompany transactions); (5) all contracts and contract rights including, without limitation, landlord's rights under residential real property leases; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests and attendant rights, licenses, certifications and permits; (10) all interests in leaseholds; (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds; (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) subject to entry of the Final Order all commercial tort claims, without regard to any description of any such commercial tort claims; (19) all claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds of or property recovered, whether by judgment, settlement or otherwise, from such actions, subject to entry of the Final Order; (20) all permits, licenses, employment contracts, and license agreements, books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records), certifications, approvals, and permits; (21) to the extent not covered by the foregoing, all other goods, inventories, supplies, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including, without limitation, any and all proceeds of any insurance (including, without limitation, any business interruption and property insurance), indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing, now owned or hereafter acquired. DIP Term Sheet, "DIP Liens and Priority"; *See* Interim Order ¶ 9. |
| **Release, Waivers or Limitation on any** | The Interim Order provides for customary releases, subject to Challenge and entry of the Final Order, if provided for therein. |

| Summary of Material Terms of DIP Facility | |
|---|---|
| **Claim or Cause of Action**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | *See* Interim Order ¶ 45. |
| **Indemnification**<br><br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | Customary for similar debtor in possession financing and consistent with the DIP Facility.<br><br><br>*See* DIP Term Sheet, "Indemnity"; *See* Interim Order ¶ 38. |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral**<br><br>*Bankruptcy Rule 4001(c)(l)(B)(ii); (b)(1)(B)(i), (iv);*<br><br>*Local Rule 4001-2(a)(i)(K) & (P)* | Subject only to a successful Challenge, the Prepetition Lender shall have and is hereby granted (effective upon the entry of the Interim Order and without the necessity of the execution of mortgages, deeds of trust, security agreements, pledge agreements, control agreements, financing statements or otherwise), the following adequate protection (collectively, "Adequate Protection") with respect to (i) (a) the priming of the Prepetition Liens securing the Prepetition Secured Obligations to be effectuated by the DIP Liens and DIP Facility, (b) the use of the Prepetition Collateral, including, without limitation, Cash Collateral, and (c) all of the other transactions contemplated by the DIP Facility; and (ii) for any diminution in the value of the Prepetition Collateral securing the Prepetition Secured Obligations, including, without limitation, Cash Collateral, the priming of the Prepetition Liens securing the Prepetition Secured Obligations or the stay of enforcement of any Prepetition Lien securing the Prepetition Secured Obligations arising from sections 105 or 362 of the Bankruptcy Code, or otherwise ("Diminution of Value"):<br>　　　　a.　　Adequate Protection Liens. Continuing valid, binding, enforceable, and perfected postpetition replacement liens under sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which will be subject and subordinated only to the Carve-Out, the DIP Liens, the Permitted Liens, and the DIP Superpriority Claims (the "Adequate Protection Liens") and which (a) shall otherwise be senior to all other liens on, security interests in, or claims against the DIP Collateral, and (b) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case and will be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, and will not be subject to sections 510, 549, or 550 of the Bankruptcy Code.<br>　　　　b.　　Adequate Protection Superpriority Claims. Administrative superpriority expense claims in the Chapter 11 Cases under section 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claims"), which will be subject and subordinated only to the Carve-Out, the DIP Liens, the Permitted Liens, and the DIP Superpriority Claims, and shall have priority over any and all other administrative expenses and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.<br><br>*See* Interim Order ¶¶ 31(a), (b). |
| **Determination Regarding Prepetition Claims**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)* | The Interim Order contains stipulations of fact by the Debtors, including those related to the extent, validity, perfection and enforceability of the Prepetition Liens, subject to Challenge.<br><br><br>*See* Interim Order ¶ K. |

| Summary of Material Terms of DIP Facility | |
|---|---|
| **Effect of Debtor's Stipulations on Third Parties**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)*<br><br>*Local Rule 4001-2(a)(i)(B)* | The agreements, stipulations and findings contained in the Interim Order shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, any Committee, except to the extent that (i) a party in interest with standing, has timely commenced an adversary proceeding or contested matter asserting any claims or causes of action against the Prepetition Lender, objecting to the Prepetition Lender's claims or liens, or challenging any of the admissions set forth in Paragraph K of the Interim Order (a "Challenge") no later than 75 days after the date of entry of the Interim Order (the "Challenge Period"), and (ii) the Court has ruled in favor of the party who timely commenced such Challenge. If no Challenge is timely commenced within the Challenge Period, (a) all of the stipulations, admissions, acknowledgements and agreements in Paragraph K of the Interim Order shall be binding and preclusive on the Debtors and their estates and their respective creditors, the Committee (if any), equity holders, and all other parties in interest in these Chapter 11 Cases, (b) the claims of the Prepetition Lender shall constitute allowed claims for all purposes in these Chapter 11 Cases and any Successor Case, (c) the Prepetition Liens shall be deemed legal, valid, binding, perfected and otherwise unavoidable, (d) the Prepetition Liens and Prepetition Secured Obligations shall not be subject to subordination, counterclaims, set-off, defense, avoidance or any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto, and (e) as a result of the foregoing, the repayment of any Prepetition Secured Obligations (including, but not limited to, by means of the Roll-Up Loans) in accordance with the terms of the Interim Order and the Prepetition Loan Documents shall constitute an indefeasible payment and shall be final and binding for all purposes. If a Challenge is timely commenced within the Challenge Period, the agreements, stipulations and findings contained in Paragraph K of the Interim Order shall nonetheless remain binding and preclusive on the Debtor and its estate and its creditors, the Committee (if any), equity holders, and all other parties in interest in these Chapter 11 Cases, except to the extent that such findings or admissions were expressly and successfully disputed in such Challenge.<br><br>Nothing in the Interim Order confers on any person or entity, including, but not limited to any Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including without limitation, claims and defenses with respect to the Prepetition Secured Obligations. However, a Challenge shall be deemed made, for purposes of the Challenge Period if a party in interest without standing files with the Court, and properly and timely serves the same, a request for standing to pursue a Challenge which attaches a draft complaint prior to the end of the Challenge Period.<br><br>*See* Interim Order ¶¶ 42 - 44. |
| **Provision Limiting the Court's Power or Discretion to Enter Future Orders**<br><br>*Local Rule 4001-2(a)(i)(C)* | None. |
| **Waiver/Modification of the Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Lender and/or the Prepetition Lender to accomplish the transactions contemplated by the Interim Order.<br><br>*See* Interim Order ¶ 23. |

| Summary of Material Terms of DIP Facility | |
|---|---|
| **Milestones**<br>*Bankruptcy*<br>*Rule 4001(c)(1)(B)(vi);*<br><br>*Local Rule 4001-*<br>*2(i)(a)(H)* | The Debtors shall comply with the following milestones (the "DIP Milestones"), provided that if any such Milestone falls on a date that is not a business day, such Milestone automatically shall be extended to the first business day thereafter:<br><br>i.    Within three days after the execution of this final DIP Term Sheet, the Debtors shall file the DIP Motion, in form and substance satisfactory to the DIP Lender;<br>ii.   No later than three (3) business days after the DIP Motion is filed, the Bankruptcy Court shall have entered the Interim DIP Order (subject to the Bankruptcy Court's availability), in form and substance satisfactory to the DIP Lender;<br>iii.  No later than thirty (30) calendar days after entry of the Interim DIP Order, the Bankruptcy Court shall have entered the Final DIP Order (subject to the Bankruptcy Court's availability) in form and substance satisfactory to the DIP Lender; and<br>iv.   Any other milestones which may be agreed upon by the Debtors and DIP Lender and included in a DIP Order.<br><br>*See* DIP Term Sheet, "DIP Milestones"; Interim Order ¶ 28. |
| **506(c) Waiver / Section 552(b) Wavier**<br>*Bankruptcy*<br>*Rule 4001(c)(l)(B)(x)*<br><br>*Local Rule 4001-*<br>*2(a)(i)(C)* | In no event will the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Lender or Prepetition Collateral.<br><br>Subject to entry of the Final Order, the Debtors waive any right to surcharge the DIP Collateral and/or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, and the 'equities of the case' exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or the Prepetition Lender with respect to the DIP Collateral or Prepetition Collateral.<br><br>*See* Interim Order ¶ 46(c). |
| **Liens on Avoidance Actions**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(xi)* | The DIP Liens include all claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds of or property recovered, whether by judgment, settlement or otherwise, from such actions, subject to entry of the Final Order.<br><br>*See* Interim Order ¶ 9. |
| **No Marshaling**<br>*Local Rule*<br>*4001-2(a)(i)(X)* | In no event will the DIP Lender or the Prepetition Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, or the Prepetition Collateral, as applicable, and all proceeds will be received and applied in accordance with the Interim Order, the DIP Credit Agreement, and the Prepetition Loan Documents, as applicable.<br><br>*See* Interim Order ¶ 46(b). |

## BASIS FOR RELIEF REQUESTED

### A.     **Entry into DIP Facility is a sound exercise of Debtors' business judgment.**

22.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor in possession considerable deference to act in accordance with their business judgment in

obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. Indeed, "courts will almost always defer to the business judgment of a debtor in the selection of the lender." *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").

23.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

24.     Further, considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. Courts may also appropriately take into consideration non-economic benefits to the debtor offered by a proposed postpetition facility. For example:

> Although all parties . . . are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That

16

> which helps foster consensus may be preferable to a notionally
> better transaction that carries the risk of promoting unwanted
> conflict.

*In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. Jul. 6, 2009).

25.     The Debtors' decision to enter into forward with the DIP Facility is an exercise of their sound business judgment following arm's-length negotiations and careful evaluation of available alternatives.  As further discussed in the First Day Declaration, the DIP Facility reflects the Debtors' operational challenges and prepetition capital structure and was the product of arm's-length, good faith negotiations.  Moreover, no other financing was offered or otherwise available.  Importantly, the DIP Facility has favorable economic and noneconomic terms.  The DIP Facility provides enough funding to continue the regulatory cure process and recommence construction at the Hudson.  The Debtors reasonably believe that they have obtained the best financing available and that the proposed DIP Facility will best position the Debtors to complete construction and recommence its operations.

26.     Accordingly, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' estates, necessary to preserve the value of their estates, and is a reasonable exercise of their business judgement.

**B.     The Debtors should be authorized to grant liens, including priming liens, and Superpriority DIP Claims**.

27.     The Debtors propose to grant the DIP Liens on and security interests in the DIP Collateral as set forth in the DIP Loan Documents and the proposed Interim Order pursuant to section 364(c) and 364(d) of the Bankruptcy Code.  More specifically, the Debtors propose to provide to the DIP Lender continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition liens on and security interests in the DIP

Collateral. The Debtors also seek authority to grant the DIP Superpriority Claims. The Debtors are unable to obtain secured credit without granting to the DIP Lender the DIP Liens and without granting to the Prepetition Lender the Adequate Protection Lien and other adequate protection set forth in the Interim Order, on the terms and subject to the conditions set forth in the Interim Order and in the DIP Term Sheet.

28.  The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code:

    a.  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—i.e., by allowing a lender only an administrative claim;

    b.  the credit transaction is necessary to preserve the assets of the estate; and

    c.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544 at 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers LLC*, 457 B.R. 308 at 312–13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. 34 at 37–40 (Bankr. S.D.N.Y. 1990).

29.  Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is

proposed to be granted." 11 U.S.C. § 364(d)(1). Consent of the secured creditors to liens priming their interests in collateral obviates the need to show adequate protection. *See Anchor Says. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Lender consents to the priming or (b) the Prepetition Lender's interests in collateral are adequately protected.

30.    Here, the Debtors satisfy section 364(d) because (i) they are unable to obtain financing on an unsecured or junior secured basis and (ii) the Prepetition Lender has consented to the priming liens granted to the DIP Lender, subject to the adequate protection set forth in the DIP Orders..

31.    The Debtors are unable to obtain unsecured credit due to their lack of unencumbered assets. Thus, the Debtors determined that the DIP Facility provided the best— and, in fact, the only—opportunity available to the Debtors under the circumstances to fund these Chapter 11 Cases. No unsecured or junior financing is available. The DIP Facility was negotiated in good faith, at arm's-length among the proposed DIP Lender and its counsel and the Debtors and their proposed counsel and advisors. Further, financing on a postpetition basis is not available without granting the DIP Lender the DIP Liens on the DIP Collateral and the DIP Superpriority Claims, as more fully described in and pursuant the DIP Term Sheet and DIP Orders. The Prepetition Lender has consented to the Debtors incurring debtor-in-possession financing, the priming of its Prepetition Liens, and the use of its Cash Collateral, only on the terms of, and subject to, the conditions set forth in the DIP Loan Documents and DIP Orders, including the granting of adequate protection as more fully described in and pursuant to the DIP Term Sheet and DIP Orders.

32.     Without access to the DIP Facility and Cash Collateral, which will provide the Debtors with necessary funds to continue their efforts to cure regulatory issues and lift the stop-work order and administer the Chapter 11 Cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Under the circumstances, the Debtors believe that the terms of the proposed DIP Facility and use of Cash Collateral are fair and reasonable.  For the reasons discussed in this Motion, including the terms of the proposed DIP Facility, as well as the unavailability of actionable alternative sources of financing, the Debtors respectfully submit that they satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**C.      The Debtors should be authorized to use Cash Collateral and provide adequate protection to the Prepetition Lender**.

33.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) conditions use of Cash Collateral upon (a) obtaining consent of each party that has an interest in the Cash Collateral or (b) "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  Further, the use of cash collateral may be prohibited or conditioned, upon proper request, as is necessary to adequately protect any interest in cash collateral.  *See* 11 U.S.C. §363(e).

34.     If a secured creditor does not consent to the debtor's proposed use of cash collateral, the court must ensure that the creditor's interests are adequately protected.  *See id*.  Thus, courts are required to balance the protection offered to a secured creditor against the debtor's need to use cash in its reorganization effort.  *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).  In determining whether a creditor is adequately protected, courts "will generally permit the business operation to continue, at least to the point of plan formulation,

20

if the debtors make a solid evidentiary showing to support their projections." *In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

35.     "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in § 361." *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).  This can include a cash payment or periodic cash payments, additional liens, replacement liens or the "indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

36.     After arm's-length and good faith negotiations, the Prepetition Lender has consented to the use of the Prepetition Collateral, including Cash Collateral, subject to its receipt of adequate protection as set forth in the DIP Term Sheet and DIP Orders.  Among other things, the adequate protection contemplated by DIP Orders is designed to protect the Prepetition Lender's interests in the Debtors' property from any diminution in value caused by the automatic stay, by the Debtors' use of the Cash Collateral during the pendency of these Chapter 11 Cases, and by the priming of the Prepetition Lender's liens by the DIP Liens.

37.     The Debtors submit that they have provided the Prepetition Lender with fair and reasonable adequate protection sufficient to protect the Prepetition Lender from any diminution in value of the Cash Collateral and Prepetition Collateral.  The Debtors' provision of the adequate protection is not only necessary to protect against any such diminution in value, but is also fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to

continue using the Cash Collateral, subject to the terms and limitations set forth in the DIP Orders, for the benefit of its estate and all parties in interest.

### D.   **The Roll-Up is appropriate**.

38.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).   The business judgment rule shields a debtor's management from judicial second-guessing*.  In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

39.     Repaying prepetition debt with funds borrowed postpetition (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this District and others, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Franchise Group, Inc.*, Case No. 24-12480 (JTD) (Bankr. D. Del. December 11, 2024) (approving a $750 million DIP Credit Facility with a 2:1 ratio consisting of $500 million of prepetition debt and $250 million of new money); *In re Restoration Forest Products Group, LLC*, Case No. 24-10120 (KBO) (Bankr. D. Del. Feb. 1, 2024) (authorizing an approximately $93 million DIP Credit Facility, including a $64 million roll-up of the prepetition bridge facility on an interim basis); *In re DeCurtis Holdings LLC*, Case No. 23- 10548 (JKS) (Bankr. D. Del. June 23, 2023) (authorizing

an approximate $27 million DIP Credit Facility, including a $20.5 million roll-up of prepetition loans); *In re SiO2 Medical Prods., Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) [Docket No. 216] (authorizing an approximately $120 million DIP Credit Facility, including a $60 million roll-up of the prepetition term loan); *In re Phoenix Servs. Topco LLC*, Case No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) [Docket No. 73] (approving a $100 million interim DIP Credit Facility with a 3:1 roll-up ratio consisting of $75 million of prepetition debt and $25 million of new money); *In re TPC Group Inc.*, Case No. 22- 10493 (CTG) (Bankr. D. Del. June 3, 2022) [Docket No. 147] (authorizing an approximately $323 million DIP Credit Facility, including a $238 million roll-up of prepetition secured notes, of which approximately $59 million rolled up on an interim basis); *In re Nine Point Energy Holdings, Inc.*, Case No. 21-10570 (MFW) (Bankr. D. Del. Mar. 17, 2021) [Docket No. 100] (approving a $13 million interim DIP Credit Facility with a 3:1 ratio consisting of $39 million of prepetition debt and $13 million of new money); *In re Blackhawk Mining LLC*, Case No. 19-11595 (LSS) (Bankr. D. Del. July 23, 2019) [Docket No. 81] (authorizing DIP facilities in the aggregate amount of $240 million, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re Charlotte Russe Holding, Inc.*, Case No. 19-10210 (LSS) (Bankr. D. Del. Feb. 5, 2019) [Docket No. 92] (approving a $50 million interim DIP Credit Facility with a 2.57:1 roll-up ratio consisting of $36 million of prepetition debt and $14 million of new money).

40.     As described above, effective immediately upon entry of the Interim Order, $12,270,387 of the Prepetition Secured Obligations will be automatically "rolled up" on a 1:1 basis with the Interim DIP Loan and converted into and treated for all purposes as DIP Loans and DIP Obligations.  Subject to entry of the Final Order, simultaneous with the borrowing of any Subsequent DIP Loans by the Debtors under the DIP Facility, there will be a dollar-for-dollar roll

up of Prepetition Secured Obligations to Subsequent DIP Loans when and as funded by the DIP

Lender to the Debtors. The outstanding aggregate amount of Prepetition Secured Obligations will

be deemed reduced by the amount of Prepetition Secured Obligations included in the Roll Up.

41.     The Roll Up is a sound exercise of the Debtors' business judgment and is a material

component of the structure of the DIP Facility. Without continued access to the additional liquidity

provided under the DIP Facility, the Debtors will be unable to fund the administration of these

Chapter 11 Cases and recommence construction at the Hudson.

42.     The Roll Up was the subject of arm's-length good faith negotiations between the

Debtors, the DIP Lender and the Prepetition Lender and is an integral component of the overall

terms of the DIP Facility. Additionally, the Roll Up is a necessary and integral condition for the

DIP Lender to agree to the DIP Facility. Upon information and belief, the Debtors believe the

prepetition obligations are secured by valid, enforceable and perfected, first priority liens and

security interests. For these reasons, and because no other party has put forward an actionable

financing proposal, the Roll Up is reasonable, on market terms approved in other cases in this

District, appropriate, a sound exercise of the Debtors' business judgment, and ultimately in the

best interests of all stakeholders given the lack of any viable alternatives.

### E.     The scope of the Carve-Out is appropriate.

43.     The DIP Term Sheet and DIP Orders provide that the DIP Liens, Prepetition Lender

Adequate Protection Liens, Prepetition Liens, Adequate Protection Superpriority Claims, and DIP

Superpriority Claims are subject and subordinate to the Carve-Out.

44.     The Carve-Out is necessary to ensure that the Debtors and other parties in interest

are not deprived of certain rights and powers by ensuring their professionals are compensated for

the services they provide in these Chapter 11 Cases. *See In re Ames Dep't Stores, Inc.*, 115 B.R.

34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of amounts to the Clerk of the Court and U.S. Trustee fees and professional fees of the Debtors.

F.    **The DIP Lender is and should be deemed a good-faith lender under section 364(e) of the Bankruptcy Code.**

45.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's rights to collect on loans extended to a debtor and its rights in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

46.    Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C § 364(e).

47.    As explained in this Motion and the First Day Declaration, the terms of the DIP Facility are the result of (a) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms available on which to obtain vital postpetition financing, and (b) arm's-length, good-faith negotiations between the Debtors and the DIP Lender and their respective advisors.

48.     The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the DIP Term Sheet, Approved Budget, and DIP Orders.  Further, no consideration is being provided to the DIP Lender other than as described in this Motion.  Accordingly, the Debtors respectfully request that the Court find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code that is entitled to all of the protections afforded thereunder.

**G.      Modification of the Automatic Stay is warranted**.

49.     This Motion contemplates a modification of the automatic stay to permit (a) the Debtor to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (*as defined in the DIP Loan Documents*), subject to the "Remedies Notice Period" as set forth in the proposed DIP Orders, for the DIP Lender to exercise any remedies available to it; and (c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Loan Documents. In the Debtors' business judgment, such relief is reasonable and fair under the circumstances.

50.     Stay modifications of this kind are common features of debtor in possession financing arrangements and, in the Debtors' business judgment, are appropriate in this case as well.  *See, e.g.*, *In re Azzur Group Holdings LLC, et al.*, Case No. 25-10342 (KBO) (Bankr. D. Del. Apr. 14, 2025) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an Event of Default); *In re PGX Holdings, Inc.*, Case No. 23-10718 (CTG) (Bankr. D. Del. Aug. 4, 2023) (same); *In re SiO2 Medical Prods., Inc.*, Case No. 23-10366

(JTD) (Bankr. D. Del. Apr. 26, 2023) (same); *In re Carestream Health, Inc.*, Case No. 22-10778

(JKS) (Bankr. D. Del. Aug. 24, 2022) (same).[4]

> **H.**  **Failure to obtain immediate access to the DIP Facility would cause immediate and irreparable harm to the Debtors and Stakeholders**.

51.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit under section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  However, Bankruptcy Rules 4001(b)(2) and (c)(2) allow the Court to (a) hold a preliminary expedited hearing on the motion and authorize the Debtor to obtain credit and use of cash collateral if so requested and (b) authorize, to the extent necessary to avoid immediate and irreparable harm to the estate, the use of cash collateral or the obtaining of credit.

52.     The Debtors respectfully request that the Court hold a hearing to consider entry of the proposed Interim Order authorizing the Debtors—in the period from and after entry of the Interim Order until the Final Hearing—to borrow funds under the DIP Facility and use Cash Collateral in accordance with the Approved Budget, DIP Term Sheet and Interim Order.  The Approved Budget was developed by the Debtors and their professionals, together with the DIP Lender, to ensure that the Debtors have sufficient funds to continue the regulatory cure process, recommence construction at the Hudson, and pay their administrative expenses.  Further, the Approved Budget contemplates that, in the period from and after entry of the Interim Order until the Final Hearing, the Debtors will use only those funds necessary to avoid immediate and irreparable harm.

---

[4]     Because the orders are voluminous, they have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

## WAIVER OF STAY UNDER BANKRUPTCY RULES 6004(a) AND (h)

53.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As explained above and in the First Day Declaration, the Debtors face substantial liquidity challenges that threaten their ability to continue as a going concern.  It is therefore imperative for the Debtors to obtain immediate access to funds to facilitate the regulatory cure and construction process.  Accordingly, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

54.     For this reason and those set forth above, the Debtors respectfully request that the Court waive the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply in these Chapter 11 Cases.

## RESERVATION OF RIGHTS

55.     Nothing contained in this Motion (i) is intended or may be deemed to constitute an assumption of any agreement under section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) impairs, prejudices, waives, or otherwise affects the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates (provided that the DIP Orders will contain stipulations, agreements and acknowledgements required by the DIP Lender and Prepetition Lender); (iii) impairs, prejudices, waives, or otherwise affects the rights of the Debtors and their estates with respect to any and all claims or causes of action against any third party or (iv) may be construed as a promise to pay a claim.

## NOTICE

56.     Notice of this Motion will be provided to: (i) the U.S. Trustee; (ii) the Debtors' top twenty (20) unsecured creditors; (iii) counsel to the DIP Lender and the Prepetition Lender; (iv) all other known holders of prepetition liens, encumbrances or security interests against the Debtors' property; (v) the Internal Revenue Service; (vi) New York Secretary of State; (vii) New York City Department of Housing Preservation and Development; (viii) the Delaware Secretary of State; (ix) the Delaware Secretary of the Treasury; (x) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (xi) any other party required to be provided notice under Local Rule 9013-1.  The Debtors respectfully submit that such notice is sufficient, and no other or further notice of this Motion is required.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and Final Order, in stages, granting the relief requested in this Motion and such other and further relief as the Court may deem just and proper.

Dated: November 12, 2025
Wilmington, Delaware

Respectfully submitted,

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Aaron J. Bach (No. 7364)
Alison R. Maser (No. 7430)
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email: chipman@chipmanbrown.com
          olivere@chipmanbrown.com
          bach@chipmanbrown.com
          maser@chipmanbrown.com

*Proposed Counsel to the Debtors*

**DLA Piper LLP (US)**
Stuart M. Brown (DE No. 4050)
DLA Piper LLP (US)
1201 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@us.dlapiper.com

-    and -

Neal Kronley (admitted *pro hac vice*)
David M. Riley (admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: neal.kronley@us.dlapiper.com
david.riley@us.dlapiper.com

*Proposed Special Counsel to the Debtors*