## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Hudson 1701/1706, LLC, *et al.*,[1] | Case No. 25-11853 (KBO) |
| Debtors. | (Jointly Administered) |

## AMENDED AND RESTATED
## DECLARATION OF ALAN TANTLEFF IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Alan Tantleff, hereby declare, under penalty of perjury, that the following is true to the best of my knowledge, information, and belief:

1.    I am the co-Chief Restructuring Officer ("**CRO**") of Hudson 1702, LLC ("**Hudson 1702**") and Hudson 1701/1706, LLC ("**Hudson 1701/1706**" and, together with Hudson 1702, the "**Company**" and the subject property of the Debtors' estates, the "**Hudson**"), the debtors and debtors in possession (the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I submit this Declaration to amend and restate my prior declaration.[2] I am authorized to submit this Declaration by the Debtors' managing member, PV Hudson LLC ("**PV Hudson**" or, the "**Member**") and the Debtors' independent manager, Robbin Itkin (in this capacity, the "**Independent Manager**"). Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my observation of the Hudson based on my physical tour on October 24, 2025, my discussions with those reporting directly to me, my review of relevant documents and contemporaneous business records regularly kept and maintained by the Debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1702, LLC (0190) and Hudson 1701/1706, LLC (0281). The Debtors' headquarters and the mailing address for the Debtors is 11440 San Vicente Boulevard, 2nd Floor, Los Angeles, CA 90045.

[2] *See Declaration of Alan Tantleff in Support of Debtors' Chapter 11 Petitions, Joint Administration, and Critical Vendors Motion* [D.I. 16].

(to the extent they remain in the Debtors' possession), my experience and knowledge of the industry and of the Debtors' operations and financial condition, and the information provided to me by the Debtors' and their affiliates' management, advisors, counsel, agents, employees, or other representatives.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

2.      I am a Senior Managing Director, and a senior leader in the Real Estate Restructuring practice and the leader of the Hospitality, Gaming, and Leisure industry practice of FTI Consulting, Inc. ("**FTI**"), a leading global business advisory firm with over 50 offices worldwide and over 5,000 professionals, where I specialize in, among other things, workouts and financial restructurings of lodging, hospitality, and commercial real estate businesses.  I have over 35 years of diverse, hands-on experience in areas of commercial real estate development, workouts and restructuring, asset management, structured debt and equity financing, and acquisitions and dispositions.

3.      Before joining FTI, I was a Managing Director at Hotel Asset Value Enhancement, a boutique asset management and advisory practice dedicated to the hospitality industry.  I also worked at BlackRock Financial Services, assisting the efforts in workouts and restructuring of the financial manager's $6 billion sub debt portfolio.  I have previously held senior management positions at Jones Lang LaSalle, Granite Partners (Savills), The Prudential Insurance Company of America, and Sands Casino in Atlantic City.

4.      I have earned numerous awards and accolades throughout my career, including GlobeStreet's 2025 "Rainmaker in CRE Debt, Equity & Finance," Crain's New York Business's 2023 Notable Leaders in Real Estate, Real Estate New York's Top "40 under 40" influential people in New York real estate and RealShare New York's "Commercial Broker All-Stars."  Recently, I

was named to Turnaround and Workout Magazine's "People to Watch," and National Real Estate Investor named me "Exit Strategy Guru" in an article about the timely disposition of hotel assets. I have authored numerous articles and columns in various trade and industry publications.

5.      I hold an M.S. in Real Estate Investment and Development from New York University (1991) and a B.S. in Hotel Management, School of Hotel Administration, Cornell University (1987).  I am a licensed real estate broker in The State of New York, a Certified Insolvency and Restructuring Advisor, and a Certified Turnaround Professional.

6.      I became co-CRO of the Debtors, effective as of November 7, 2025.  In my capacity as CRO of the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, to the extent in the possession of the Debtors, their books and records, and financial condition of the Debtors.  Further, I have reviewed with Debtors' counsel certain prior, pending and potential litigation and certain contractual relationships of the Debtors.

7.      On October 22, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions (the "**Petitions**") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), commencing these Chapter 11 Cases.  The Debtors operate their business and manage their property as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

8.      To minimize the immediate and exigent effects on their business and properties, the Debtors have filed motions and pleadings seeking various forms of "first day" relief to facilitate the success of the Chapter 11 Cases (collectively, the "**First Day Motions**").  I am familiar with the contents of each First Day Motion, and I submit this Declaration to assist the Court and parties in interest in understanding the circumstances leading to these Chapter 11 Cases and in support of the Debtors' Petitions and First Day Motions.

## PRELIMINARY STATEMENT

9.      The Company was formed in March 2022 to redevelop and operate certain condominium units within the historic Hudson Hotel as a multifamily residential property originally anticipated to include approximately 440 market rate rental units together with commercial and amenity space and a penthouse.  Redevelopment and construction of the Hudson commenced quickly after the Company's formation and was expected to conclude in May 2024. Unfortunately, regulatory issues, construction delays, and attendant litigation and liquidity constraints have impacted the project since its inception.  As a result, the Debtors have been unable to complete their development of the Hudson, and construction is currently subject to a stop-work order due to regulatory issues stemming from complaints by certain of the Hudson's 32 single room occupancy tenants (the "**SRO Tenants**").

10.     The Debtors occupy the property under that certain 99-year *Ground Lease* dated as of May 4, 2022 (as amended, the "**Ground Lease**") with 356W58 Ground Lessor, LLC (the "**Ground Lessor**").   Under the Ground Lease, substantial completion of the project was required by May 4, 2024.  Because the project was subject to a stop-work order, construction was not completed, and, on May 7, 2024, the Ground Lessor sent a notice of default under the Ground Lease.  The Ground Lessor sent additional notices of event of default (primarily for events occurring while the Company was under the control of prior ownership and management), including with respect to over $8,000,000 in mechanics' liens filed against the Hudson.  The Ground Lessor has since threatened on more than one occasion to terminate the Ground Lease.

11.     The Debtors' rent under the Ground Lease was increased by the Ground Lessor from $6,400,000 per year to $8,750,000 per year as part of the Fourth Amendment of Ground Lease, dated March 29, 2024.  The rent increase was effectively abated for one year, or until March 29, 2025, because the Fourth Amendment included a $2,350,000 rent credit.

12.     In connection with the development of the Hudson, the Company and its prepetition secured lender, Parkview Financial REIT, LP (the "**Prepetition Lender**") entered into that certain (i) *Building Loan Agreement* dated as of May 4, 2022 (as amended, restated, or modified from time to time, the "**Building Loan**") in the maximum principal amount of $81,782,527.00 and (ii) *Project Loan Agreement* dated as of May 4, 2022 (as amended, restated, or modified from time to time, the "**Project Loan**" and, together with the Building Loan, the "**Prepetition Loan Agreement**") in the maximum principal amount of $125,217,473.00.  The aggregate total amount initially available under the Prepetition Loan Agreement was $207 million.

13.     The Debtors were unable to pay amounts due under the Prepetition Loan Agreement by the November 1, 2024 maturity date.  After agreeing to forbear from enforcing its remedies and attempting to reach a consensual arrangement on several occasions, the Prepetition Lender foreclosed on the Company's pledged Collateral as defined in the Pledge Agreement (as defined below), pursuant to a public sale under the New York Uniform Commercial Code ("**UCC**").  The Prepetition Lender assigned its equity interests to its wholly owned subsidiary, PV Hudson LLC, now the sole Member of the Debtors.  As described more fully herein, in connection with the foreclosure, the Prepetition Lender credit bid $80 million of the then-outstanding obligations.

14.     Around that time, the Prepetition Lender also commenced litigation in New York state court against Alberto Smeke Saba and Salomon Smeke Saba (together, the "**Smekes**").  The Smekes formed the Company's original sole member, managed the project, and guaranteed the obligations under the Prepetition Loan Agreement.  The Smekes also executed a separate guaranty with respect to the lien-free completion of the improvements to the Hudson.  In its complaint, the Prepetition Lender alleged among other things that the Smekes mismanaged the project, leading

to the entry of the stop-work order that halted construction at the Hudson and that the Smekes caused the Company to default under the Prepetition Loan Agreement. As described below, the Debtors, Prepetition Lender, and Smekes entered into a settlement agreement with the aim of lifting the stop-work orders.

15.     Altogether, however, the challenges at and distress occasioned upon the Hudson and the Debtors necessitated the commencement of these Chapter 11 Cases. The Debtors are working tirelessly to address regulatory issues and obtain approval to recommence redevelopment of, and construction at, the Hudson, all while continuing negotiations with various stakeholders, including governmental authorities, unions, contractors and materialmen, as well as the Ground Lessor with respect to the asserted defaults and increased rent under the Ground Lease. To this end, the Debtors and their advisors have engaged with key stakeholders, including the Prepetition Lender, to continue in chapter 11 with a maximum principal amount of $32,762,104 in senior secured, first-lien and superpriority multi-draw priming debtor-in-possession financing (the "**DIP Facility**"). The DIP Facility will provide the Debtors with sufficient liquidity to complete efforts to lift the stop-work order and recommence redevelopment of and construction at the Hudson, and to effectuate a restructuring.

16.     To familiarize the Court and parties in interest with the Debtors and the relief sought in the First Day Motions, this Declaration is organized into four parts, as follows:

    i.     **Part I** provides an overview of the Debtors' history and corporate structure;
    ii.    **Part II** provides an overview of the Debtors' prepetition debt and capital structure;
    iii.   **Part III** provides a description of the circumstances leading to the commencement of these Chapter 11 Cases;
    iv.    **Part IV** provides a description of the proposed DIP financing; and
    v.     **Part V** provides an overview of the relief requested in the First Day Motions and sets forth the evidentiary basis for each First Day Motion.

I.    **Description of the Debtors' History and Corporate Structure**.

    *A.    Formation and Initial Development*.

    17.    The Company was formed on March 12, 2022, to redevelop certain condominium units within the real property known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 358-366 West 58th Street, New York, New York.

    18.    The Hudson was first constructed in 1929 as the American Women's Association clubhouse and residence for young women. It contained 1,250 rooms, along with a swimming pool, restaurant, and gymnasium. Following the American Women's Association's bankruptcy in 1941, the building was converted into the Henry Hudson Hotel.



    19.    In 1997, the building was purchased by the Morgans Hotel Group. Following a three-year, $125 million renovation, it was converted to hotel use by renown hotelier Ian Schrager

and renamed "The Hudson."  Construction to convert the Hudson back to residential use began in or around June 2022.

20.     At that time, the Company's sole member was CSC Hudson, LLC ("**CSC**").  CSC was formed by the Smekes, and I understand that the Smekes also controlled the Company and the project during the period from inception through July 25, 2025.  CSC claims to "specialize in value-driven real estate strategies" that "unlock potential and deliver strong, risk-adjusted returns across urban markets."  CSC also holds itself out as the developer of other New York City projects, including 300 East 42 Street in Midtown Manhattan, and 2045 Madison Avenue in the Harlem neighborhood of Manhattan.

21.     In connection with the improvements at the Hudson, the Company obtained up to $207,000,000 in senior secured financing from the Prepetition Lender under the Prepetition Loan Agreement.[3]  The Smekes were guarantors under the Loan (*as defined and discussed below*) and separately executed a completion guaranty, jointly and severally guaranteeing the lien-free completion of the improvements to the Hudson in accordance with the Loan and Ground Lease requirements.

**B.     Ground Lease**.

22.     The Company entered into the Ground Lease with the Ground Lessor on May 4, 2022, contemporaneously with the Company's purchase of the Hudson and entry into the Prepetition Loan Agreement with the Prepetition Lender.  Under the Ground Lease, the Debtors hold an undivided interest in the leased premises, which include Units 1, 2, and 6 of the 353 West 57th Street Condominium.  The Ground Lease has been amended four times, most recently on March 29, 2024, (the "**Fourth Amendment**").  Under Section 3 of the Fourth Amendment, base

---

[3] The prepetition financing is discussed more fully in Section II.B.

rent under the Ground Lease was increased from $6,400,000 (payable at a rate of $533,333.13 per month) to $8,750,000 (payable at a rate of $729,166.67 per month).  The rent increase was effectively stayed for one year, however, because the Fourth Amendment also included a one-year rent credit in the amount of $2,350,00, or the difference between the amount of rent due before and after the Fourth Amendment.  On the sixth and eleventh years of the Ground Lease, the base rent will increase once more to 110% of the prior year and is subject to additional increases over time.

23.     Section 21 of the Ground Lease sets forth the events of default.  Under Section 22 of the Ground Lease, the Ground Lessor may without notice terminate the Debtors right to possession as tenants and the Ground Lease upon the occurrence of an event of default.  Although, prior to the Petition Date, the Debtors had been in extensive discussions with the Ground Lessor with respect to a cure of the asserted events of default, the Ground Lessor would not agree to forbear from terminating the Ground Lease.

24.     In addition, under the Ground Lease, the Ground Lessor is bound by that certain *Memorandum of Agreement* dated March 8, 2022 (the "**Union MOA**") by and between CSC and EC 58th Street LLC.  Under the Union MOA, the Company must satisfy certain Union MOA obligations, including satisfying certain hotel union pension fund obligations by the Hotel Union Pension Fund Obligation Date (as defined therein).  Although the Ground Lessor is bound by the Union MOA pursuant to a Union MOA assumption, section 57(c) of the Ground Lease provides that the Company is obligated to indemnify the Ground Lessor for any losses incurred pursuant to the Company's failure to satisfy the Union MOA during the term of the Ground Lease.

25.     On September 29, 2022, the Company received the *Hotel Union Pension Fund Demand Letter*, which provided that the aggregate Hotel Pension Fund Obligations (*as defined*

*therein*) were $17,285,224 and that such Hotel Union Pension Fund Obligations could be paid in quarterly payments (each, a "**Withdrawal Liability Installment Payment**"), rather than in a lump-sum as described in the Union MOA.

26.     Ultimately, the Union, Company, CSC, Ground Lessor, and Prepetition Lender entered into that certain *Settlement Agreement* dated as of January 25, 2024, whereby the Company agreed to continue paying the quarterly installment payments in exchange for the union forbearing from exercising its rights under the Union MOA.  The Prepetition Lender funded each Withdrawal Liability Installment Payment on the Company's behalf up and until the Withdrawal Liability Installment Payment of $490,888.25 due on November 1, 2024.  Thereafter, on or around December 29, 2024, the Union agreed to accept a liquidated payment in the amount of $4,582,005.75 for all future pension fund withdrawal liability under the Union MOA and to release all parties from the Union MOA if payment was made by December 31, 2024, and thereafter the payment was made, and the releases became effective.

### C.     *Construction Delays and Stop Work Orders*.

27.     When the Company commenced development and then construction, the Hudson contained 32 single room occupancy ("**SRO**") units, many of which were and continue to be occupied by the SRO Tenants, who are beneficiaries of rent-stabilization under New York City law.  Because the Hudson is also located within the Clinton Special District, New York City zoning regulations require that the New York City Department of Housing and Preservation Development ("**HPD**") issue a Certificate of No Harassment ("**CONH**") following an investigation and survey of tenants residing at the Hudson.  The Company therefore required a CONH from the HPD before making alterations to the Hudson.  The CONH certifies that a building owner is not harassing

tenants by, among other things, offering money, threatening the use of force, disrupting essential services such as heat and water, or negligently creating an unsafe living environment.

28.     On December 2, 2022, HPD sent a letter to the SRO Tenants seeking information in connection with Hudson's CONH application.   On September 7, 2023, the SRO Tenants presented to Manhattan Community Board four alleged incidents of harassment including: (i) inadequate notice of water and electricity shutdowns, (ii) inadequate pest control, (iii) positive testing for lead, and (iv) exposed wiring and cables.

29.     The HPD made an initial determination finding (the "**Determination**") that there was reasonable cause to believe that harassment occurred and on September 25, 2023, issued a notice of hearing and petition for the Company to be heard before the Office of Administrative Trials and Hearings (the "**Administrative Office**").   The HPD also recommended that the Administrative Office deny the Company's application for a CONH.

30.     When the HPD issued its Determination, the Company was still controlled by the Smekes and, rather than contesting the HPD's determination of harassment, the Company opted instead to pursue an application (the "**Cure Application**") for a cure agreement with HPD to clear the record and allow redevelopment and construction to continue.

31.     As of February of 2024, construction on the existing residential floors was subject to a partial stop work issued by the New York City Department of Buildings (the "**Stop Work Order**") order that remains in place.

     ***D.***     ***UCC Foreclosure Sale of Equity Interests***.

32.     As additional security for the Company's prepetition debt to the Prepetition Lender, CSC, as pledgor and the then-sole member of the Company, entered into a pledge and security agreement (the "**Pledge Agreement**").   Under the Pledge Agreement, CSC as collateral pledged

100% of the equity interests in the Company along with certain other rights and interests, and as specifically defined in the Pledge Agreement (the "**Pledged Collateral**") for the Prepetition Debt (*as defined below*) with the Prepetition Lender.  Upon an event of default, the Prepetition Lender had the right to conduct a UCC sale of the Pledged Collateral.

33.    The obligations due under the Prepetition Loan Agreement matured on November 1, 2024.  The Company was unable to make payment by that time, and the Prepetition Lender subsequently agreed to forbear from exercising any remedies on two occasions through November 22, 2024.  Ultimately, on November 23, 2024, the Prepetition Lender sent the Company a notice of default under the Prepetition Loan Agreement.  On or around November 25, 2024, the Prepetition Lender served upon CSC, the Company, and the Smekes a notice of public disposition of collateral, scheduling a UCC foreclosure sale of the Pledged Collateral scheduled for March 24, 2025 (the "**UCC Sale**").  On February 11, 2025, the Prepetition Lender served a second notice of disposition and publicized the adjusted date of the UCC foreclosure for April 10, 2025.

34.    I understand that throughout this time, the Prepetition Lender and Smekes were involved in negotiations to resolve issues arising from the Smekes' management of the project in order to allow the redevelopment and construction to continue at the Hudson.  Those efforts were at least partially successful, and, on April 10, 2025—the date scheduled for the UCC Sale—the Prepetition Lender and the Smekes, as guarantors of the Loan, entered into an agreement (the "**Financial Agreement**"), which, among other things, adjourned the UCC Sale.  The Financial Agreement obligated the Smekes to cause the Company to submit all necessary regulatory materials to appropriate state and city regulatory authorities to resolve the issues with the SRO Tenants and cause the Stop Work Order to be lifted by May 30, 2025.  The Financial Agreement

also provided that the Smekes must submit all materials for review and approval by the Prepetition Lender before submission.

35.    The Financial Agreement obligated the Prepetition Lender to deposit incentive payments into escrow if the Smekes completed certain milestones by dates certain, including obtaining "Cure Approval and Lifting of the Stop Work Order".  The Stop Work Order was not lifted before May 30, 2025.  Because the milestones were not satisfied, the Prepetition Lender was therefore not obligated to deposit incentive payments to escrow.

36.    On June 30, 2025, the Prepetition Lender filed a verified complaint (the "**Complaint**") against the Smekes in the Supreme Court for the State of New York, asserting causes of action for breach of contract and declaratory judgment.  In particular, the Prepetition Lender asserted that the Smekes mismanaged construction of the project, leading to the regulatory issues with the SRO Tenants.  The Prepetition Lender also asserted that the Smekes caused the Company to default on the Loan by failing to pay all amounts owed by the Loan's maturity date.

37.    On July 25, 2025, the Prepetition Lender exercised its right to conduct a UCC foreclosure sale of the Pledged Collateral.  At a public sale, the Prepetition Lender obtained the Pledged Collateral in the Company in exchange for a credit bid in the amount of $80,000,000 of existing prepetition indebtedness (the "**Credit Bid**").  The Prepetition Lender then assigned the interests it acquired to its wholly-owned subsidiary, PV Hudson LLC.  PV Hudson is currently the sole Member of each Debtor.

38.    Following the filing of the Complaint, I understand that the Smekes and Prepetition Lender engaged in additional negotiations with respect to the allegations arising under the Complaint.  Eventually, those negotiations expanded to include the Company and CSC and led to entry into that certain *Settlement and Release Agreement* dated August 7, 2025 (the "**Settlement**")

among (i) the Company, (ii) Prepetition Lender; (iii) Smekes, and (iv) CSC.  The Settlement provides that the Smekes and Prepetition Lender will enter into an escrow agreement whereby the Prepetition Lender would deposit a cure delivery fee of $4,637,500 (the "**Cure Delivery Fee**") into escrow for the benefit of the Smekes and CSC if the Smekes do not breach, and fully perform under, the Settlement.  The Smekes were entitled to $3,000,000 of the Cure Delivery Fee upon delivering certain documents to the Prepetition Lender.  The remaining $1,637,500.00 will be released upon the earlier of (x) receipt of the Cure Approval and Lifting of the Stop Work Order and granting of all approvals, permits and licenses required to complete the construction and development of the Project or (y) 90 days from the Effective Date of the Settlement.  The Settlement also included a release by the Smekes, in their capacity as guarantors, of claims against the Prepetition Lender with respect to the Prepetition Loan Agreement.  To date, $4,637,500 has been funded into escrow and $3,000,000 has been released to the Smekes.  The Company released no claims under the Settlement Agreement.  On November 4, 2025, the Debtors advised the escrow agent not to release the remaining funds under the escrow agreement due to the filing of these Chapter 11 Cases.

## II.     **Description of the Debtors' Prepetition Debt and Capital Structure**.[4]

### A.     *Prepetition Debt*.

39.     The Debtors are party to the (i) Building Loan with the Prepetition Lender in the maximum principal amount of $81,782,527 and (ii) Project Loan with the Prepetition Lender in the maximum principal amount of $125,217,473.00.  The obligations under the Building Loan Agreement are evidenced by that certain Building Loan Mortgage Note, dated as of May 4, 2022.

---

[4] The financial figures presented in this Declaration are unaudited and potentially subject to change but reflect the Debtors' most recent review of its books and records.  The Debtors reserve all rights to revise and supplement the figures presented in this Declaration.

The obligations under the Project Loan are secured by that certain Project Loan Mortgage Note, dated as of May 4, 2022, and secured by all assets of the Debtors.

40.    Prior to the chapter 11 filing, the Debtors and the Prepetition Lender negotiated that certain *Cash Collateral Agreement* dated as of October 22, 2025 (the "**Cash Collateral Agreement**"), which is annexed as **<u>Exhibit 1</u>** to this Declaration.  Through the Cash Collateral Agreement, the Prepetition Lender extended, on an emergency bridge loan basis, up to $1,000,000 (the "**New Advance**") prior to the Petition Date to be used by the Debtors solely in accordance with the budget attached thereto.

41.    As of the Petition Date, after giving effect to the Credit Bid and the New Advance, the Debtors were obligated to the Prepetition Lender in the aggregate amount of approximately $146,108,651.25 (plus accrued and unpaid interest and fees, expenses, charges, indemnities, and other obligations) of prepetition obligations.

42.    The Debtors incur unsecured obligations to various suppliers, trade vendors, utility providers, and services providers, among others.  Certain of the Debtors' suppliers and vendors filed mechanic's liens following the failure of the Debtors and the general contractor to pay such suppliers and vendors in connection with their work on the project.  The Debtors have settled some of these claims and are engaged in discussions with other suppliers and vendors with respect to additional potential settlements.  The mechanics' liens are junior in priority to the mortgage securing the Prepetition Indebtedness.  However, any remaining amounts available to pay "costs of improvements" (as such term is defined in the New York Lien Law), as determined in accordance with the Building Loan Agreement and by reference to an affidavit filed by the Debtors in connection with the Building Loan Agreement, must be applied to pay such suppliers and

vendors. The Debtors believe there are no funds remaining from the Prepetition Indebtedness to pay such "costs of improvements".

### C.    Cash on Hand

43.    As of the Petition Date, the Debtors had approximately $570,000 in available cash, all of which constitutes cash collateral of the Prepetition Lender.

### D.    Equity Interests

44.    All of the Debtors' equity interests are owned by PV Hudson.  A chart reflecting the organizational structure of the Debtors is attached to this Declaration as **Exhibit 2**.

## III.    Description of the Circumstances Leading to these Chapter 11 Cases.

45.    The Debtors commenced these Chapter 11 Cases after extensive efforts to recommence construction at the Hudson and resolve issues with the Prepetition Lender, Ground Lessor and mechanics and materialmen.  Without certain regulatory approvals, the Debtors have been unable to complete the project within the time required by the Ground Lease.  Because the improvements to the Hudson are not complete, the Debtors have been unable to generate revenue and have had to rely on cash advances from the Prepetition Lender.

46.    Moreover, the Debtors were exposed to the risk that the Ground Lessor might terminate the Ground Lease at any time by virtue of the existing defaults.  Termination of the Ground Lease could have eliminated the Debtors' property interests and all efforts to redevelop the property.  The Debtors believe that chapter 11 will provide a forum to effectuate a restructuring,

and with additional advances, investment and capital, the Debtors can seek appropriate relief with respect to the Ground Lease and complete the redevelopment and construction at the Hudson.

### A.   *Enhanced Corporate Governance*.

47.   In light of the Company's challenges and resulting liquidity constraints, in late October 2025 the Member determined to appoint Robbin Itkin as Independent Manager of the Company.  Following the Petition Date, on November 7, 2025, Ms. Itkin was appointed as Independent Manager.  Additionally, on October 17, 2025, the Company retained FTI and on November 7, 2025, appointed Andrew Hinkelman and me as co-CRO's.

### B.   *Regulatory Issues*.

48.   Redevelopment at the Hudson has been halted since 2023 due to the Stop Work Order preventing any further progress on the project.  As noted above, when HPD issued its Determination of the finding of harassment, the Company was still controlled by the Smekes and, rather than contesting the HPD's determination of harassment, the Company opted instead to pursue the Cure Application to clear the record of harassment and allow redevelopment and construction to continue.

49.   On April 25, 2025, the Company submitted to the New York City Department of Buildings and the New York City Department of Housing Preservation and Development reconfigured building plans.  Efforts to obtain building permits were not completed before the Prepetition Lender foreclosed on the Pledged Collateral, and the Debtor is working to address outstanding issues with the regulators to ensure that permits are issued and the Stop Work Order is lifted.

50.   The Debtors require additional time and capital to obtain a cure agreement with HPD, recommence construction, and reinstate the development plan.

### C.      *Ground Lease Defaults*.

51.      The Ground Lessor has noticed several events of default under the Ground Lease, with the majority of the alleged events of default occurring before the Member took control of the Company.  Among other things, the Ground Lessor asserted that Substantial Completion of the project (*as defined in the Ground Lease*) did not occur by May 4, 2024, and certain rent payments were not received.  Due to the alleged events of default, the Ground Lessor asserted that it was entitled to terminate the Ground Lease at any time.

52.      Since the Member took control of the Company, the Debtors have worked expeditiously to cure existing defaults and avoid further potential events of default.  The Debtors requested assurances that the Ground Lessor would not terminate the Ground Lease while efforts to rehabilitate the project are ongoing, however, the Ground Lessor declined to grant such assurance.

### D.      *UCC Foreclosure and Post-Foreclosure Stabilization*.

53.      The Prepetition Lender foreclosed on the Pledged Collateral on July 25, 2025, or 105 days ago.  Since that time, PV Hudson has endeavored to assist to stabilize the Debtors, and on behalf of the Debtors negotiate with the Ground Lessor and recommence the process to resolve issues with the HPD.  In particular, PV Hudson for the benefit of the Debtors has worked to secure vendors and contract employees on the project to ensure continuity of security and services for the property and its tenants, entered into a new property management agreement with a third party company to oversee property management and ensure that building operations and security remain intact, engaged a for-profit development partner to advance efforts to remobilize construction and address regulatory issues, resolved certain outstanding mechanic's liens against the Hudson by virtue of the prior general contractor's conduct, including abandoning the project in April 2025,

terminated the prior general contractor for cause due to its conduct and abandonment of the project, resolved disputes with the Smekes following the UCC foreclosure, amended the Company's governing documents and retained the Independent Manager and FTI.

54. Following the UCC Sale, the Company also shared a proposal to restructure the Ground Lease with the Ground Lessor. The Ground Lessor rejected the proposal in its entirety.

55. In addition, and by virtue of its new management, the Company could be considered a "Successor Tenant" under the Ground Lease with the Ground Lessor. As a consequence, the Company was required to submit a "Fallback Business Plan" within 90 days of the UCC Sale, or by October 23, 2025 (the "**Fallback Business Plan Deadline**"). I understand that the Ground Lessor would terminate the Ground Lease if the Company did not submit a Fallback Business Plan by the Fallback Business Plan Deadline.

56. Fallback Business Plan is defined in the Ground Lease as follows:

> "Fallback Business Plan" means the fallback business plan prepared by Tenant and approved by Landlord (in its sole and absolute discretion) with respect to the construction of the Fallback Project. The Fallback Business Plan shall include (i) any proposed modifications to the Project Plans and Specifications, Project Budget and Construction Schedule, (ii) a list of and, if applicable, drafts of any additional construction contracts to be entered into in connection with implementing the Fallback Business Plan, (iii) an updated sources and uses, including any additional financing sources needed to Complete the Fallback Project, (iv) an updated memorandum or legal opinion reasonably acceptable to Landlord, prepared by Tenant's Architect or zoning counsel reasonably approved by Landlord, which memorandum or opinion shall set forth updated zoning calculations, relevant authority from Legal Requirements and such other information as is reasonably necessary to determine that the Fallback Business Plan can be achieved by the Required Substantial Completion Date under Legal Requirements, (v) if such Fallback Project is a Hotel Project, a proposed Hotel Flag and Hotel Operator, together with a draft Hotel Management Agreement, proposed room rates (and such other details pertaining to the proposed management and branding of the Hotel as Landlord shall reasonably request), (vi) any proposed revisions to the applicable Tenant Protection Plan needed to complete the work for the Fallback Project (if applicable), (vii) a memorandum or legal opinion reasonably acceptable to

Landlord, prepared by Tenant's labor and employment counsel (which counsel shall be reasonably acceptable to Landlord, it being agreed that Jackson Lewis P.C. is acceptable to Landlord), which memorandum or opinion shall provide a summary and analysis of any obligations of Tenant (and potential liability to Landlord reasonably ascertainable under the circumstances) under the IWA, 32BJ Agreement, L94 Agreement and Union MOA, together with an estimate of labor costs prepared by Tenant that may be incurred by Tenant during the construction of the Fallback Project and following Substantial Completion of the Fallback Project, and (viii) such other information as Landlord may reasonably request with respect to the Fallback Project.

57.     The Company worked to finalize all aspects of the Fallback Business Plan by the Fallback Business Plan Deadline, however, it was not possible to provide certain components of the Fallback Business Plan by the deadline, including, *inter alia,* the project budget and construction schedule, as well as a final set of project plans.  In order to provide this information, the Company must identify and engage a new general contractor, and the new general contractor needs to work with potential subcontractors to bid out the job.  Given the current status of the project, including the Stop Work Order, and the time involved with these efforts, this was not possible by October 23, 2025.  Nonetheless, the Company delivered a fulsome draft Fallback Business Plan to the Ground Lessor on October 23, 2025, and continues to advance the Project.

    **E.      *The Chapter 11 Filing and Postpetition Events*.**

58.     The Debtors and their advisors determined that a chapter 11 process was the only viable solution to address these issues.  To that end, the Debtors filed chapter 11 petitions on the Petition Date.

59.     The circumstances surrounding the filing of these Chapter 11 Cases are extraordinary.  Since the foreclosure, in connection with the transition of ownership and the administration of the Debtors' estates, the Debtors and PV Hudson have sought the turnover of Debtors' books and records in the possession, custody or control of CSC and the Smekes.  As

detailed more fully in the *Emergency Motion of the Debtors for Entry of an Order Authorizing the Debtors to Conduct Rule 2004 Examinations* [D.I. 18], the Debtors sought, by way of subpoenas, of its books and records.  At the hearing held on November 3, 2025 (the "**First Day Hearing**"), the Court ordered the parties to work cooperatively to transfer the Debtors' books and records in the possession, custody or control of CSC and the Smekes, without the need for subpoenas at this time.

60.     Prior to the First Day Hearing, the Court entered an order granting joint administration of the Debtors Chapter 11 Cases [D.I. 41].  Following the First Day Hearing, the Court entered an order appointing Kurtzman Carson Consultants, LLC dba Verita Global as claims and noticing agent in the Chapter 11 Cases [D.I. 49] and an interim order authorizing the Debtors to pay certain prepetition claims of life safety critical vendors pursuant to an interim order in an amount not to exceed $250,000 in the aggregate on a postpetition basis in the ordinary course of business [D.I. 50].

## IV.     Proposed DIP Facility.[5]

61.     As set forth in greater detail in the DIP Motion, the Debtors seek authorization to enter into the DIP Facility, which contemplates a senior secured, first-lien and super-priority and priming debtor-in-possession delayed draw term loan facility in a maximum principal amount of $32,762,104.  The proposed DIP Facility will provide the Debtors with liquidity to fund efforts to cure the regulatory issues and recommence construction at the Hudson.

---

[5] Capitalized terms used but not otherwise defined in this Section IV have the meaning given to them in the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Lender; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing and (V) Granting Related Relief* (the "**DIP Motion**").

62.     The terms and conditions of the DIP Facility, including the dollar-for-dollar roll up are fair and reasonable under the circumstances, especially in light of the Debtors' need for postpetition financing and their capital structure, among other factors.  The Debtors, their legal and financial advisors, and the DIP Lender's counsel engaged in arm's-length negotiations regarding the terms offered by the DIP Lender.  Over the course of several weeks, the Debtors and the DIP Lender, with the assistance of their respective legal and financial advisors, worked to negotiate the most favorable terms and provisions of the DIP financing available to the Debtors given the Debtors' lack of alternative third-party financing.

63.     The proposed DIP Facility is expected to provide the Debtors with access to an amount of capital that the Debtor, in consultation with its advisors, believes will allow it to fund its operation and pursue.  FTI conducted a market test to determine if third-party alternative financing was a feasible option for the Debtors.  FTI solicited three third-party lenders seeking alternative funding.  I understand that substantially all of the Debtors' assets are subject to the Prepetition Lender's liens and the Prepetition Lender expressed that it would not consent to another lender providing funding and "priming" its prepetition liens on any terms that have been discussed.  None of the prospective financing sources was willing to provide DIP financing under either of the circumstances.

64.     The Debtor and its advisors focused their primary efforts towards developing and negotiating an actionable DIP financing proposal with the DIP Lender.  Based on my understanding of the Debtors' capital structure and need for postpetition financing, as well as the facts and circumstances of these Chapter 11 Cases, I believe that the Debtors used their business judgment to obtain the best financing terms possible with the DIP Lender, which offers the Debtors access to much-needed liquidity on reasonable or favorable terms.  The contemplated terms of the

DIP Facility were the subject of arm's-length and good faith negotiations.  Given my experience, I believe the terms are reasonable in light of the circumstances.

65.     The DIP Facility also contains certain milestones (the "**DIP Milestones**") that the Debtors must meet throughout the Chapter 11 Cases, the failure of which would constitute an Event of Default under the DIP Term Sheet.  Given the financial and operating condition of the Debtors, I believe these milestones are the best executable terms available to the Debtors as of the Petition Date and are therefore reasonable under the circumstances.

66.     The Debtors require immediate access to additional liquidity to ensure continued operation during these Chapter 11 Cases and maximize the value of their estates for the benefit of all parties in interest.  Accordingly, based upon my experience, I believe that (i) the proposed DIP Facility represents the best and only possible postpetition financing option currently available to the Debtors, (ii) the terms of the proposed DIP Financing are fair and customary for this type of financing; and (iii) absent approval of the proposed DIP Financing, the Debtors will be unable to complete efforts to obtain regulatory approvals and recommence construction.

67.     Accordingly, I believe that the DIP Facility, taken as a whole, is fair and reasonable under the circumstances, was negotiated at arm's-length and in good faith, and is the Debtors' best and only currently available option.  Without immediate access to the DIP Facility as provided for in the DIP Motion, the Debtors would not have sufficient funding to administer these Chapter 11 Cases or operate their respective businesses.  Therefore, I believe that approval of the DIP Facility, as described herein and in the DIP Motion, is in the best interest of the Debtors' estates.

68.     Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

**V.** **Description of, and Evidentiary Basis for, the Remaining First Day Motions**.

69.     To ensure smooth and successful Chapter 11 Cases, the Debtors have requested certain relief that the Debtors believe is necessary to enable them to efficiently administer their estate with minimal disruption and preserve value.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.

70.     Among other things, the First Day Motions seek authority to ensure sufficient liquidity to run the Debtors' business, and uninterrupted business operations.  Specifically, the Debtors have filed the following:

          (a) Creditor Matrix Redaction Motion;

          (b) Insurance Motion; and

          (c) Utilities Motion.

71.     I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief and are incorporated herein by reference.

72.     I believe that the relief sought in each First Day Pleading is vital to enable the Debtors' transition into Chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value, is necessary to avoid immediate and irreparable harm, and constitutes a critical element in maximizing value during these Chapter 11 Cases.

73.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in their entirety.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 12th day of November, 2025.

Hudson 1701/1706, LLC and Hudson 1702, LLC
Debtors and Debtors in Possession

By: */s/ Alan Tantleff*_____
    Alan Tantleff
    Co-Chief Restructuring Officer

# EXHIBIT 1

**Cash Collateral Agreement**

## CASH COLLATERAL AGREEMENT

This **CASH COLLATERAL AGREEMENT** (this "Agreement") is entered into as of October 22, 2025, by and between Parkview Financial REIT, LP (the "Lender"), and Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190) (each, a "Borrower" and collectively, the "Borrowers"). The Lender and Borrowers are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

**WHEREAS**, the Borrowers and Lender entered into (i) that certain Building Loan Agreement, dated as of May 4, 2022, as amended by that certain Amendment to Building Loan Agreement dated as of May 1, 2023 (as further amended, restated, renewed, replaced, supplemented or otherwise modified from time to time, the "Building Loan Agreement"), and (ii) that certain Project Loan Agreement, dated as of May 4, 2022, by between the Borrowers and Lender (as amended, restated, renewed, replaced, supplemented or otherwise modified from time to time, the "Project Loan Agreement" and, together with the Building Loan Agreement, the "Loan Agreement");

**WHEREAS**, the obligations under the Building Loan Agreement are secured by that certain Building Loan Mortgage Note, by and between the Borrowers and the Lender, dated as of May 4, 2022.  The obligations under the Project Loan Agreement are secured by that certain Project Loan Mortgage Note, by and among the Borrowers and the Lender, dated as of May 4, 2022.   The Loan Agreement and all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Lender in connection with, evidencing, securing or perfecting the Secured Obligations (as defined below), each as the same may be amended, restated, renewed, replaced, supplemented or otherwise modified from time to time, are referred to herein as the "Loan Documents";

**WHEREAS**, on the date hereof and after giving effect to the New Advance (as defined below), the Borrowers are jointly and severally, justly and lawfully indebted and liable to the Lender, without defense, counterclaim or offset of any kind, in an amount not less than $146,108,651.25 in aggregate principal amount of loans outstanding, plus accrued and unpaid interest and fees, expenses, charges, indemnities and all other obligations owing, arising under, or in connection with the Loan Documents (together with the New Advance, and as more fully set forth in the Loan Documents, collectively, the "Secured Obligations");

**WHEREAS**, as more fully set forth in the Loan Documents, the Borrowers granted to the Lender liens on and security interests in (collectively, the "Liens") all of the Borrowers' right, title and interest in and to the Collateral (as defined in the Loan Documents) as security for the Secured Obligations (including, without limitation, the New Advance);

1

**WHEREAS**, the Secured Obligations owing to the Lender constitute legal, valid, and binding obligations of the Borrowers, jointly and severally, enforceable against them in accordance with their terms, and no portion of the Secured Obligations owing to, or any transfers made to the Lender on account of the Secured Obligations, is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other legal or equitable challenges under the Bankruptcy Code (as defined below) or applicable non-bankruptcy law or regulation by the Borrowers or any other person or entity;

**WHEREAS**, the Liens granted to the Lender (i) constitute legal, valid, binding, enforceable, unavoidable and perfected security interests in and liens on the Collateral (including the proceeds thereof), at any time owned by the Borrowers and thereafter acquired, (ii) were granted to, or for the benefit of, the Lender for fair consideration and reasonably equivalent value, and (iii) are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery under the Bankruptcy Code or applicable non-bankruptcy law or equitable remedies or regulation by any person or entity;

**WHEREAS**, no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Loan Documents, Secured Obligations or Liens exist, no facts or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the Loan Documents, Secured Obligations or Liens exist, and no portion of the Loan Documents, Secured Obligations or Liens or are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) under the Bankruptcy Code or applicable non-bankruptcy law or equity;

**WHEREAS**, the Borrowers have no valid or meritorious Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action or basis for any equitable relief against the Liens or other property of the Lender, or the Lender or any of its affiliates, successors, predecessors, agents, attorneys, advisors, professionals, officers, managers, directors, and employees with respect to the Loan Documents, the Secured Obligations, the Liens, the business relationship between the Lender and Borrowers, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other Claims arising under sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable non-bankruptcy law equivalents;

**WHEREAS**, certain defaults and events of default have occurred and are continuing under the Loan Documents;

**WHEREAS**, the Borrowers intend to file voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy

Court for the District of Delaware (the "<u>Bankruptcy Court</u>") on or before October 22, 2025 (the "<u>Bankruptcy Case</u>");

**WHEREAS**, the Borrowers have requested that the Lender extend them additional financing under the Loan Documents in the amount of $1 million (the "<u>New Advance</u>") in order to fund certain critical obligations of the Borrowers immediately prior to, and following the commencement of, the Bankruptcy Case in accordance with the budget attached hereto as <u>Exhibit A</u> (the "<u>Budget</u>"; as may be amended from time to time with the Lender's prior written consent), and the Lender has agreed to fund the New Advance on the terms and conditions set forth herein; and

**WHEREAS**, all of the Borrowers' cash and cash equivalents, including the New Advance and all cash on deposit in any account, securities or other property, wherever located, whether as original collateral or proceeds of other Collateral, constitute Cash Collateral, as defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>"), of the Lender.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

<u>**AGREEMENTS AND ACKNOWLEDGEMENTS**</u>

1.      <u>Recitals</u>. The Borrowers acknowledge and agree that the recitals set forth above are true and correct in all respects, are binding on the Parties, and form an integral part of this Agreement.

2.      <u>New Advance</u>. On the date hereof, the Lender agrees to extend on an emergency bridge loan basis the New Advance to the Borrowers under and subject to the provisions of the Loan Documents to be used by the Borrowers solely in accordance with the Budget. The New Advance is, and shall be deemed to be, secured by the Collateral on the same basis as all other Secured Obligations. Borrowers shall seek to roll up this New Advance, and other Secured Obligations, into any post-petition DIP obligations.

3.      <u>Effect on Loan Documents</u>. The Loan Documents shall be deemed amended by this Agreement solely and to the limited extent necessary to give effect to the provisions of this Agreement. This Agreement relates only to the specific matters expressly covered herein, shall not be considered to be a waiver of any provisions of the Loan Documents or any rights, claims or remedies that the Lender has or may have under the Loan Documents or applicable law and shall not be considered to create a course of dealing or to otherwise obligate, in any respect, the Lender to extend any additional financing to the Borrowers, or to enter into any additional agreements or arrangements under the same, similar or other circumstances in the future, or after the commencement of the Bankruptcy Case. To the extent that any provisions of any of the Loan

Documents are inconsistent with the provisions of this Agreement, the provisions of this Agreement shall control.

4.      Authorization to Use Cash Collateral. Subject to the provisions of this Agreement, the Lender hereby consents, pursuant to section 363(c)(2)(A) of the Bankruptcy Code, to the Borrowers' use of Cash Collateral solely for the purposes and in the amounts set forth in the Budget, and for no other purpose and to no greater extent, as to purpose or extent without the Lender's prior written consent. The Borrowers shall not use Cash Collateral for any purpose or to any extent not specified in the Budget without the Lender's prior written consent or pursuant to an order of the Bankruptcy Court. The Parties agree that the Borrower is not required to seek Bankruptcy Court approval of this Agreement.

5.      Defaults and Remedies. If the Borrower fails to comply with the terms of this Agreement, including, but not limited to, failing to comply with the Budget, this Agreement shall automatically terminate and the Lender shall be entitled to pursue any or all of its rights and remedies hereunder, under the Loan Documents, and applicable law.

6.      Term. This Agreement shall be effective upon the execution and delivery of counterparts to this Agreement by each Party in accordance with Section 8(f). The Borrower's right to use Cash Collateral under this Agreement shall terminate upon the earliest to occur of (i) termination by written agreement of the Parties; (ii) a default by the Borrowers under this Agreement; (iii) the entry of an order of the Bankruptcy Court prohibiting the Borrowers from using Cash Collateral without an order of the Bankruptcy Court authorizing such use pursuant to section 363(b)(1); (iv) the expiration of the Budget; (v) the failure of the Borrowers to commence the Bankruptcy Case by October 24, 2025, or such later date agreed as may be agreed to in writing by the Lender; and (vi) the termination prior to the commencement of the Bankruptcy Case by the ground lessor of the Borrowers' ground lease of the property and premises known as the "Hudson Hotel."

7.      No Waiver or Forbearance. Nothing contained in this Agreement shall be deemed a waiver of or forbearance from (or otherwise affect the Lender's ability to enforce) any defaults or events of default under any of the Loan Documents.

8.      Miscellaneous:

   a.   Representations. Each Party hereby represents to each of the other Parties, severally but not jointly, that (i) the execution, delivery and performance of this Agreement by such Party has been duly authorized by all necessary corporate or other organizational action, and does not contravene the terms of the organizational documents of such Party, and (ii) no approval, consent, exemption,

4

authorization, or other action by, or notice to, or filing with, any governmental authority or any other person or entity is necessary or required in connection with the execution, delivery or performance by such Party of this Agreement.

b. *Adequate Protection*: Nothing in this Agreement shall be construed as a prohibition on, or waiver of, the Lender's rights at any time and from time to time in the Bankruptcy Case to seek adequate protection pursuant to the provisions of the Bankruptcy Code including, without limitation, with respect to the New Advance.

c. *Entire Agreement*: This Agreement and the Loan Documents constitute the entire agreement between the Parties regarding the use of Cash Collateral and supersedes all prior understandings. This Agreement shall be deemed to be a Loan Document.

d. *Amendments*: Any amendment or waiver to this Agreement must be in writing and signed by all Parties, except that any amendments to the Budget may be made solely with the Lender's prior written consent.

e. *Governing Law*: This Agreement shall be governed by the laws of the State of New York, except as may be superseded by the Bankruptcy Code.

f. *Counterparts*: This Agreement may be executed in counterparts, each of which shall be deemed an original. Any signature delivered by a Party by facsimile or electronic transmission (including email transmission of a .pdf image or via DocuSign or similar system) shall be deemed to be an original signature hereto.

[*Signature Pages Follow*]

5

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first written above.

**BORROWERS:**

**HUDSON 1701/1706, LLC (0281)**

By: _____
Name: Paul Rahimian
Title: Authorized Signer

**HUDSON 1702, LLC (0190)**

By: _____
Name: Paul Rahimian
Title: Authorized Signer

[*Signature Page to Cash Collateral Agreement*]

\\4146-6905-4817 v2

**LENDER:**

**PARKVIEW FINANCIAL REIT, LP**

By: _____
Name: Paul Rahimian
Title:   CEO

*[Signature Page to Cash Collateral Agreement]*

**EXHIBIT A**

**BUDGET**

8

| DESCRIPTION | 2-week Budget |
|---|---|
| **Operations** | |
| Insurance | 139,214.47 |
| Con Ed | 210,000.00 |
| Operating Expenses | 10,000.00 |
| Legal/HPD | 20,000.00 |
| Local Law 11 Contractor/Architect | 50,000.00 |
| **SubTotal Operations** | **429,214.47** |
| | |
| **A/R Balance Settlements/Liens** | |
| Nouveau Settlement | 120,842.00 |
| **SubTotal A/R Balance Settlements / Liens** | **120,842.00** |
| | |
| **Development** | |
| Design | 20,000.00 |
| **Total Development** | **20,000.00** |
| | |
| **Construction** | |
| **Construction** | |
| **Total Construction** | **0.00** |
| | |
| **Total 2-week Budgeted Disbursements** | **570,056.47** |

## EXHIBIT 2

**Organizational Structure Chart**

