## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>Hudson 1701/1706, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-11853 (KBO)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 56** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' DIP FINANCING MOTION

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned counsel, objects (this "Objection") to the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Lender; (III) Modifying the Automatic Stay; (IV) Scheduling A Final Hearing and (V) Granting Related Relief* [Dkt. No. 56] (the "DIP Motion")[2] and respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The DIP Motion cannot be approved as currently constructed.  The proposed financing (the "DIP Loan") is to be provided by the Debtors' prepetition lender, Parkview Financial REIT, LP ("Parkview" or the "Prepetition Lender"), which is also the Debtors' equity owner through its affiliate, PV Hudson LLC ("PV Hudson").  Parkview's CEO, Paul Rahimian, signed the written consent that authorized the filing of these cases, and Parkview's CCO, Ted Jung,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190).  The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the DIP Motion.

signed the Debtors' bankruptcy petitions.  Parkview's prepetition counsel, DLA Piper,[3] negotiated the terms of the DIP Loan on behalf of the Debtors and signed the DIP Motion, despite obvious conflicts of interest.  The Debtors' sole purported "independent" manager is Robbin Itkin, a former DLA Piper partner and client of DLA Piper, who was appointed by Parkview on November 7, 2025 (*after* the DIP Loan had been negotiated) and has been granted only illusory control over the Debtors and the project.  The DIP Loan is the quintessential insider transaction and must be viewed with attendant skepticism.

2.      While the Debtors' process in procuring the DIP Loan is very obviously flawed, the proposed price is exorbitant to match.  Parkview clearly leveraged its insider status to improve on its prepetition position.  Onerous terms attached to the DIP Loan include a $32.78 million roll-up of the Debtors' prepetition debt (the "Roll-Up"), the granting of sweeping liens and superpriority claims on all unencumbered assets (which cross-collateralize the Roll-Up) including potential litigation claims against Parkview,[4] broad releases for Parkview, prepayment fees, waivers of estate rights that are intended to safeguard the interests of unsecured creditors, and bloated budgets for professionals (approximately $7 million in a case with an entirely uncertain future).  All of these terms are detrimental to unsecured creditors while providing no identifiable benefit.

---

[3] DLA Piper continues to represent Parkview in various other matters outside of these bankruptcy cases and its engagement letter with the Debtors, signed by Mr. Rahimian, provides that the same attorneys representing the Debtors in these cases may continue to represent Parkview with respect to the project in the future.  The Committee reserves its rights with respect to the proposed DLA Piper retention, which has been adjourned.

[4] The Committee is aware of and intends to investigate potential liability relating to Parkview's failure to fulfill funding requests, which led to delayed payments of suppliers and vendors, and ultimately liens on the project that had a negative impact on its value.  Parkview has been the subject of similar recent allegations, specifically related to two separate projects in Newark and Brooklyn in 2024.  *See 289-301 Washington LLC v. Parkview Financial REIT, LP*, Case No. ESX-L-004427-24, Compl. (Essex Cty., N.J. Super. Ct., June 27, 2024); *Triangle 613, LLC v. Parkview Financial REIT, LP*, Case No. 506965/2024, Summons with Notice (N.Y. Sup. Ct., Kings Cty., Mar. 3, 2024).

3.      None of these "protections" are justified, nor are they necessary to induce Parkview to lend.  Parkview (through the Debtors) made an economic decision that filing bankruptcy and providing postpetition financing was a better option than the out-of-court status quo.  While that might be their prerogative, Parkview cannot now pretend that they require the egregious DIP Loan terms to facilitate their lending.  They chose the forum, and they dictated the terms of the DIP Loan.  An independent fiduciary might have recognized these incentives and pressed Parkview for appropriate terms that do not lock in control of the cases, inhibit, if not preclude, any meaningful examination of the Debtors' prepetition transactions with Parkview, and bury unsecured creditors further under questionable debt.

4.      The DIP Loan also puts these cases on a dangerous trajectory, allowing Parkview to incur some $32.8 million (which is effectively doubled through the Roll-Up) in obligations on the Debtors' behalf without any fiduciary oversight.  There is no plan—Parkview has been in control of the project for five months, nearly two of which have been in bankruptcy.  No progress has been made with respect to the project, and the Debtors have provided no plan or timeline for progress.  The most likely outcome, and the Committee's great fear, is that Parkview will exhaust the liquidity in several months, leaving the estates administratively insolvent and unsecured creditors in a materially worse position with nothing to show for it.

5.      As the Court is aware, debtor-in-possession financing should stabilize and preserve flexibility, not eliminate it before the Committee has had a meaningful chance to perform its duties.  Chapter 11 is intended to promote transparency and ensure that all stakeholders can meaningfully participate in collaborating to find the best path forward.  A DIP facility that preempts that function and consolidates control in an insider lender is inconsistent with both the Bankruptcy Code and

basic principles of fairness.  Accordingly, for these reasons and those detailed below, the Final DIP Order should not be approved without material modifications.

**BACKGROUND**

**I.     The Chapter 11 Cases**

1.      On October 22, 2025 (the "Petition Date"), the Debtors, through Parkview affiliate PV Hudson, each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The filing of the voluntary petitions, which were signed by Ted Jung, Parkview's CCO, were authorized by a written consent of PV Hudson (the "Written Consent"), which was signed by Paul Rahimian, Parkview's CEO.

2.      The Debtors continue to operate their businesses as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

3.      On November 12, 2025, the Debtors filed the DIP Motion.  *See* Dkt. No. 56.

4.      On November 17, 2025, the Court held a hearing on the DIP Motion and entered an order approving it on an interim basis (the "Interim DIP Order"), in accordance with a budget attached thereto (the "Interim DIP Budget").  *See* Dkt. No. 82.

5.      On November 25, 2025, the United States Trustee appointed the Committee.  *See* Dkt. No. 104.  On December 4, 2025, the Committee retained Seward & Kissel LLP as lead bankruptcy counsel, and thereafter Morris James as local counsel and Province as financial advisor.

**II.    The Debtors' Capital Structure**

6.      As of the Petition Date, the Debtors represent that they owe approximately $146,108,651.25 (plus accrued and unpaid interest and fees, expenses, charges, indemnities, and

4

other obligations) to Parkview, consisting of amounts outstanding under (i) a Building Loan Agreement dated May 4, 2022, (ii) a Project Loan Agreement dated May 4, 2022 (together with the Building Loan Agreement, the "Prepetition Loan Agreement"), and (iii) a Cash Collateral Agreement dated October 22, 2025 (together with the Prepetition Loan Agreement, the "Prepetition Obligations"). *See* Dkt. No. 60 ¶¶ 39-41.

7.      The Prepetition Obligations were reduced based on Parkview's foreclosure on all equity interests in the Debtors pledged as collateral under the Prepetition Loan Agreement on July 25, 2025.  At the foreclosure sale, Parkview successfully credit bid $80 million of the then outstanding Prepetition Obligations, which was named the winning bid.  It subsequently assigned its acquired equity interests to PV Hudson, which became and is the sole member and owner of the Debtors.  Parkview owns and controls PV Hudson.  *See* Dkt. No. 60, Ex. 2.

8.      Under the Cash Collateral Agreement, Parkview advanced $1 million to fund limited operating needs of the Debtors (the "Bridge Loan").  The Bridge Loan was signed by Paul Rahimian, as Parkview's CEO.  The Cash Collateral Agreement was terminated and superseded by the Interim DIP Order.  *See* DIP Mot. ¶ 14.

### III.    The DIP Motion

9.      The DIP Motion seeks final approval (the "Final DIP Order")[5] of approximately $65.6 million in debtor-in-possession financing, consisting of $32,762,004 in new-money and a roll-up of $32,770,104 of the Prepetition Obligations.  Already, $12,270,387 is available to the Debtors under the Interim DIP Order, with the remaining made available after entry of the Final

---

[5] A Final DIP Order was not attached to the DIP Motion.  Thus, the Committee relies on the terms of the Interim DIP Order and presumes the Final DIP Order will track those terms unless and the Debtors' state otherwise.

DIP Order.  The financing effectively elevates a portion (approximately 22%) of the Prepetition

Obligations to DIP secured and superpriority status.

10.     As security for the DIP Loan, Parkview would receive liens and superpriority

claims on all of the Debtors' assets including unencumbered assets such as avoidance actions,

commercial tort claims, tax refunds, D&O claims, claims against insiders (*i.e.*, Parkview), as well

as insurance policies and the proceeds thereof (the "DIP Collateral") that may be the only source

of recovery for unsecured creditors.  Additionally, the DIP Loan includes broad releases favoring

Parkview and provides an insufficient investigation budget (just $25,000), which constrains the

Committee's ability to evaluate the propriety of Parkview's liens and potential claims against

them.  As adequate protection, Parkview, as Prepetition Lender, will be granted replacement liens

and superpriority claims, to the extent of any diminution in value, on the DIP Collateral.

## OBJECTION

11.     The Debtors have not met their burden to establish that the insider DIP Loan, as

currently proposed, is entirely fair and in the best interests of their estates.[6]  The proposed Final

DIP Order includes provisions that prejudice the rights and powers that the Bankruptcy Code

confers on the Court, the Debtors, creditors, and the Committee.  It unjustifiably benefits insider

Parkview at the expense of the Debtors' unsecured creditors.  Further, the DIP Loan includes broad

releases, extensive protections, and other terms that benefit Parkview, while also limiting the

Committee's ability to conduct a meaningful and independent investigation into potential estate

claims, including claims that may exist against Parkview.

---

[6] Notably the DIP Motion focuses on the business judgment standard, which is inappropriate considering the insider DIP Loan.

12.     Transactions between a debtor and its insiders are subject to heightened scrutiny. *See, e.g.*, *Pepper v. Litton*, 308 U.S. 295, 306 (1939) (controlling shareholder's "dealings with the corporation are subjected to rigorous scrutiny"); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."). In such circumstances, the debtor's decision is not entitled to review using the business judgment standard. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) ("By definition, the business judgment rule is not applicable to transactions among a debtor and an insider of the debtor."). Instead, the debtor bears the burden of showing the "entire fairness" of the proposed transaction by showing that both (a) the process leading to the transaction and (b) the price and terms of the transaction "not only appear fair but are fair." *LATAM*, 620 B.R. at 769 (*quoting In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)).

13.     For the reasons more fully set forth below, the DIP Loan does not satisfy the heightened standard and violates the Debtors' fiduciary obligations to the estates. As such, the Committee respectfully submits that the DIP Loan must be denied. Nonetheless, if the Court is inclined to grant the DIP Motion on a final basis, the Final DIP Order should only be approved if material changes are made.

## I.     The Debtors Lack Independent Governance

14.     The DIP Loan is unquestionably an insider transaction that warrants heightened scrutiny. Not only is Parkview a statutory insider under the Bankruptcy Code, the Debtors' corporate governance is devoid of any fiduciary with exclusive authority that is independent from Parkview and its advisors. Parkview is the sole member of PV Hudson, the Debtors' sole member. *See Declaration of Alan Tantleff dated November 12, 2025* [Dkt. No. 60] (the "First Day Declaration") ¶¶ 12-13. Messrs. Paul Rahimian and Ted Jung, who are empowered to take any

and all actions on behalf of the Debtors in these Chapter 11 Cases, are also officers and authorized agents of both PV Hudson and Parkview.  *See* Written Consent.[7]

15.     Parkview, through PV Hudson, appointed Robbin Itkin as a purported "independent manager" for the Debtors on November 7, 2025—well after these cases were filed and negotiations concerning the DIP Facility were underway.  *Compare Declaration of Alan Tantleff dated October 30, 2025* [Dkt. No. 16] ¶ 13, *with* First Day Decl. ¶ 47.  Notably, Ms. Itkin does not have exclusive authority over the Debtors' decisions with respect to the DIP Loan, or any other conflict matters involving Parkview, and there is no factual record demonstrating that Parkview officials were screened from Debtor-side discussions.  What is more, it is not entirely clear that Ms. Itkin is herself independent of Parkview, having previously been a partner at and former client of DLA Piper, who acted as Parkview's prior counsel leading up to the Chapter 11 Cases.[8]  Accordingly, heightened scrutiny of the DIP Loan is not only legally required—it is overwhelmingly necessary—in order to protect the interests of the estates.

**II.     <u>The DIP Loan Is Not a Product of a Fair Process</u>**

16.     The Debtors have not satisfied their burden to establish that the DIP Loan was the product of a fair process.  The entire fairness standard requires that debtors robustly market the terms of a proposed insider transaction to third parties.  *See In re Los Angeles Dodgers, LLC*, 457 B.R. at 313 (denying approval of insider DIP loan that benefitted controlling shareholder where debtors failed to seek alternative financing and "refused to engage [alternative lender] in

---

[7] Further evidencing Parkview's insider status, Mr. Rahimian executed the Bridge Loan on behalf of both the Debtors and Parkview.  *See* Dkt. No. 16, Attach 1.

[8] Making matters worse, DLA Piper appears to be taking the lead role for the Debtors with respect to the DIP Loan negotiations as set forth in the *Application of the Debtors for Entry of an order (I) Authorizing the Debtors to Retain DLA Piper LLP (US) as Special Counsel, Effective as of the Petition Date, and (II) Granting Related Relief* [Dkt. No. 99] the "<u>DLA Retention Application</u>").  DLA Piper signed the DIP Motion and appeared for the Debtors in support of interim approval of the DIP Motion at the hearing held on November 17, 2025.

negotiations"); *In re Innkeepers USA Tr.,* 442 B.R. at 231 (insider plan support agreement not approved where term sheet was not "shopped" prior to signing); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997) (for an insider transaction, there must be a "concerted effort to shop the debtors *before* the debtors selected a purchaser") (emphasis in original).

17.      While the Debtors represent that they "conducted a market test to determine if third-party alternative financing was a feasible option," it appears that their advisors only "solicited three third-party lenders seeking alternative funding." First Day Decl. ¶ 63. This process appears to be more of a "check the box" to enable Parkview's financing of the DIP Loan, rather than a legitimate attempt to obtain alternative financing from non-insider lenders.[9]

18.      Additionally, given the Debtors' lack of independence, they cannot establish that the DIP Loan was negotiated at arms' length.[10] Indeed, the Debtors rely only on conclusory statements and provide no factual basis by which the Court can determine that the DIP Loan was approved by an independent fiduciary not under the influence of Parkview. Instead, the evidence suggests that the DIP Loan was effectively crafted by Parkview for its own benefit. This is further supported by the one-sided terms that inure to the benefit of the insider lender, as described more fully below. Failure to establish a fair process in connection with approval of the DIP Loan is, alone, a sufficient basis to deny the DIP Motion.

---

[9] The Committee requested basic diligence materials from the Debtors on December 5, 2025 regarding the prepetition marketing of DIP financing as well as negotiations regarding the DIP Loan. To date, the Committee has received no documents responsive to these requests.

[10] Given the lack of evidence regarding the arms' length nature of the negotiations, the Committee submits that the good faith findings requested in the Final DIP Order are currently inappropriate.

III.     **The Terms of the DIP Loan Are Not Fair**

19.     The Debtors also cannot satisfy their burden to establish that the economic terms of the DIP Loan are entirely fair.  The DIP Loan ignores the interests of the estates and other creditors and seeks to lay the groundwork for a process that gives Parkview *de facto* control over these cases.  Accordingly, as set forth below, the following terms of the DIP Loan must be denied or otherwise modified to reflect inherent fairness to the Debtors and their estates.

A.     The Debtors Fail to Justify the DIP Budget with a Business Plan

20.     Seven weeks into these Chapter 11 Cases, the Debtors have yet to present a definitive timeline or actionable strategy demonstrating that the proposed $32.78 million new money commitment will support a successful restructuring.  Although the DIP Loan has a 12-month term, it provides, at best, only three to four months of liquidity—which is insufficient to formulate and execute a plan to emerge from bankruptcy, particularly given the unresolved issues surrounding the underlying project that underpins these cases and that will shape the Debtors' restructuring alternatives.  Without a credible business plan for restarting and redeveloping the failed project, the DIP Loan appears to be a bridge to nowhere that will only layer additional secured debt on the project and drive all creditors, except for Parkview, further away from a recovery.

21.     The Debtors currently maintain only limited operations, have not resumed construction, and have failed to produce a business plan consistent with their ground lease requirements.  While the Committee supports funding to pay the necessary costs of these Chapter 11 Cases—including administrative expenses and postpetition rent obligations—it is skeptical that the requested financing is warranted at this time.  The Debtors assert that they only recently

obtained their own books and records, and key financial information remains outstanding—further undermining confidence in the proposed budget.[11]

22.     Until the Debtors put forth an acceptable business plan that sets forth credible timing and real funding needs, the Debtors should be permitted to borrow *only* what is necessary to move the Chapter 11 Cases to their next phase, with such amounts determined in consultation with the Committee.  Parkview cannot be given *carte blanche* to spend nearly $33 million (doubled through the Roll-Up), providing the Prepetition Lender complete control over these Chapter 11 Cases.

    B.      The Roll-Up Should be Eliminated

23.     The DIP Motion seeks approval of the $32.78 million Roll-Up, elevating this portion of the debt to superpriority lien and claim status without sufficient justification. Bankruptcy courts generally view roll-ups unfavorably and require debtors to demonstrate a compelling necessity before granting approval.  *See In re Verasun*, Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 3, 2008), Hr'g. Tr. 32:20-25 [Dkt. No. 316] (noting that this Court and bankruptcy courts in other judicial districts have found that "roll-ups are not favored.  They are strongly discouraged on day one, and the bottom line is that for approval a substantial showing [of need for the financing] has to be made[.]"); *see also In re Wildcat Met Mining, Inc.*, Case No. 1:22-bk-10080, 2024 Bankr. LEXIS 586, at *29-30 (Bankr. S.D. W. Va. Mar. 8, 2024) (finding that "proposed 'roll-up' was patently unapprovable[, as r]oll-ups are generally disfavored and this particular 'roll-up' would have unquestionably elevated [lender's] prepetition claim . . . to the detriment of other creditors"); *In re Bruin E&P Partners, LLC*, No. 20-33605 (Bankr. S.D. Tex.

---

[11] The Committee professionals have only this week received requested financial materials from the Debtors. Additional time for Committee professionals to review and analyze the financial information, and consult with the Debtors' professionals, would materially improve its ability to understand and validate the DIP Budget and assess the true financing needs of these cases.

2020), July 17, 2020 Hr'g Tr. at 67:9-10 [Dkt. No. 79] (finding that roll-ups are "heavily disfavored

under the Bankruptcy Code"); *In re Caccamise*, Case No. 09-17165-SSM, 2009 Bankr. LEXIS

4174, at \*10-11 (Bankr. E.D. Va. Dec. 22, 2009) (noting that "roll-ups" are not favored).[12]

24.    The Debtors have failed to put forth <u>any</u> evidence demonstrating the need or

propriety of the Roll-Up.  As the Debtors' equity owner, Parkview is already compelled to lend to

protect its investment.  The Roll-Up provides no benefit to the estates whatsoever.  Instead, the

Roll-Up allows insider Parkview to secure a priority over other creditors, further elevating their

influence in plan negotiations and reducing the estates' flexibility to pursue competing plans.[13]

Under these circumstances, one can only conclude that the Roll-Up serves primarily to improve

Parkview's position, instead of advancing the Debtors' restructuring needs.  Without any evidence

that the insider Roll-Up is essential to obtaining financing, it is impermissible and should not be

approved.[14]

---

[12] Courts are generally reluctant to approve postpetition financing that converts prepetition debt into postpetition obligations, because such conversions go against "the general bankruptcy principle favoring equal treatment of similarly situated creditors and disfavoring payment of prepetition debt outside of a reorganization plan." *See, e.g.*, *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *In re Tenney Vill. Co.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989) (holding that Bankruptcy Code section 364 does not authorize the granting of administrative expense priority for prepetition debt); *see also* 3 Collier on Bankruptcy ¶ 364.06[2].

[13] Nor has there been a showing that Parkview is fully secured.  *See In re Wildcat Met Mining, Inc.*, 2024 Bankr. LEXIS 586, at \*29-30 (proposed "roll-up" that would have elevated claim from an unsecured to superpriority was "patently unapprovable").

[14] Alternatively, if the Court determines that some roll-up amount is required to secure liquidity for the Debtors on a final basis, the Committee requests that amount be substantially reduced to mitigate any prejudice on the estates and unsecured creditors, and the Court should not permit any cross-collateralization on otherwise unencumbered assets. *See, e.g., In re Mondee Holdings, Inc.*, Case No. 25-10047 (JKS) (Bankr. D. Del. Feb. 27, 2025), Hr'g Tr. at 7:9-14 [Dkt. No. 399] (denying liens and claims on account of roll-up loans that extend to any assets that were "not part of the prepetition secured lenders' collateral package, as of the petition date").  Additionally, any roll-up should be conditioned on the Committee's ability to unwind the roll-up upon a subsequent determination by this Court that the liens are invalid or that Parkview is undersecured.  *See, e.g., In re LodgeNet Interactive Corp. et al.,* Case No. 13-10238 (SCC), [Dkt. No. 159] (Bankr. S.D.N.Y. Feb. 27, 2013) (roll-up could be unwound upon successful challenge to the prepetition debt or a determination that prepetition debt was undersecured).

C.    Insider Parkview Should Not Receive Liens on Unencumbered Assets

25.    The Final DIP Order impermissibly seeks to grant Parkview liens on, and superpriority claims payable from, assets that traditionally remain unencumbered for the benefit of unsecured creditors. *See* Interim DIP Order ¶¶ 9, 11. Those liens include avoidance actions, commercial tort claims, tax refunds, D&O claims, claims against insiders like Parkview, as well as insurance policies and the proceeds thereof. *Id.* ¶ 9. These assets are the primary, if not only, potential sources of recovery for unsecured creditors in these cases and encumbering them offends well-established principles that unencumbered assets and the proceeds thereof should be reserved for unsecured creditors. For this reason, DIP financing orders in this District and elsewhere regularly exclude avoidance actions and other unencumbered assets, and their proceeds, from DIP and adequate protection liens and claims.[15]

26.    The Debtors have failed to explain why the broad liens and claims in favor of insider Parkview are appropriate. As stated, Parkview is already incentivized to lend and is well aware of the risk profile of this project. Parkview has chosen to protect its "sunk cost" in the project by opting for bankruptcy and making the DIP Loan. It should not be permitted to

---

[15]  *See, e.g., In re YogaWorks, Inc.*, Case No. 20-12599 (KBO) (Bankr. D. Del. Nov. 9, 2020), ¶ 3(a) [Dkt. No. 133] (excluding avoidance action proceeds from DIP collateral); *In re Emerge Energy Services LP*, Case No. 19-11563 (KBO) (Bankr. D. Del. Aug. 14, 2019), ¶ 13(a)(i) [Dkt. No. 209] (same); *see also In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. Jun. 15, 2020) ¶ 7 [Dkt. No. 179] (excluding avoidance action proceeds, except for postpetition transfers under section 549 of the Bankruptcy Code); *In re Pronerve Holdings, LLC*, Case No. 15-10373 (KJC) (Bankr. D. Del. Mar. 20, 2015), ¶ 7 [Dkt. No. 115] (excluding avoidance action proceeds from DIP collateral); *In re Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del. Feb. 11, 2015), ¶ 14 [Dkt. No. 117] (same); *In re LSP Energy Limited Partnership*, Case No. 12-10460 (MFW) (Bankr. D. Del. Feb. 27, 2012), ¶ 13(a) [Dkt. No. 79] (same); *In re Goold Electronics Corp.*, No. 93 C 4196, 1993 U.S. Dist. LEXIS 14318, at *11 (N.D. Ill. Sept. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions); UCC § 9- 109(d)(8) (Article 9 does not apply to "a transfer of an interest in or an assignment of a claim under a policy of insurance"); *Brown v. Nationscredit Commercial*, No. 99 Civ. 00592, 2000 U.S. Dist. LEXIS, at *14-15 (D. Conn. June 23, 2000) ("The Security Agreement gives NCC all interest in collateral to secure [the debtor's] obligations under the Financing Documents. Lawsuits against companies and/or its officer and directors could never be considered as 'collateral,' as they plainly are considered to be liabilities and insurance policies covering such liabilities simply cannot be fit into the definition of 'collateral.'"); *In re Main Street Bus. Funding, LLC*, 642 B.R. 141, 153 (Bankr. D. Del. 2022) (Under the UCC, "security interests in commercial tort claims must be specifically identified or described in the security agreement." Moreover, "[i]n order for a security interest in a commercial tort claim to attach, the claim must be in existence when the security agreement is authenticated.").

concurrently improve its position to the detriment of other creditors. Granting Parkview liens on all unencumbered assets that should be preserved for the benefit of unsecured creditors does precisely that. At a minimum, the Final DIP Order should exclude estate claims against Parkview and the proceeds thereof, which the Debtors otherwise purport to release. *See In re SFX Entertainment, Inc.*, No. 16-10238, Mar. 7, 2016 Hr'g Tr. at 17:15–21; 20:4-9; 21:17–20 [Dkt. No. 198] (Bankr. D. Del. 2016) (Walrath, J.) (rejecting liens on claims against lender itself where parties already agreed to release those claims under a restructuring support agreement).

       D.    Further Protections for the Committee Are Necessary

     27.    Given the Debtors' lack of independent governance, protections in favor of the Committee (at the very least) are necessary. Absent minimal budget and investigative protections, these Chapter 11 Cases are at risk of being converted from a process designed to benefit all creditors, to one designed for the sole benefit of the Debtors' insider lender. *See, e.g.*, *Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (citing *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989)) (holding that the terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of one creditor); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) ("In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, i.e., the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.").

     28.    First, the Committee professionals must be provided with a budget commensurate with those of other professionals in these cases. As currently proposed, the final DIP Budget allocates nearly $7 million to the Debtors' professionals and an additional $650,000 to new counsel

for Parkview. Comparatively, the final DIP Budget allocates $150,000 for Committee professionals—less than 2% of that budgeted for the Debtors' professionals. This disparity is untenable. *See In re Channel Master Holdings, Inc.*, No. 03-13004(MFW), 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004) (holding cap on official committee's professional fees under DIP facility was unreasonable relative to larger budgets for other professionals in case and determining cap on the committee's fees provided for inadequate compensation). Parkview should not be permitted to impose an artificially small budget on Committee professionals as a tactic to undermine creditor participation and deprive them of meaningful rights in the Chapter 11 Cases.[16] Under the circumstances here, the Committee submits that a market budget is appropriate, to be agreed upon when the Debtors' proposed professional spend is rationalized.

29.     Second, the Committee's budget to investigate Parkview's liens and claims, and to scrutinize the various prepetition transactions, should be increased to $250,000. A $25,000 investigation budget is woefully inadequate and would inhibit the Committee's fiduciary obligations if it is allocated a small fraction of the resources provided to the Debtors' advisors, particularly in light of Parkview's insider status and attendant conflict issues.

30.     Finally, to ensure that the Committee has the opportunity to perform its fiduciary duties, the Committee should be given automatic standing to pursue claims against Parkview—an

---

[16] At a minimum, no less than 35% of the funds budgeted for all other estate professionals should be allocated for the Committee's professionals. *See, e.g., In re Cal Div Int'l., Inc.*, Case No. 15-10548 (CSS), 2015 Bankr. LEXIS 4355, at *9-10 (Bankr. D. Del. Dec. 28, 2015) (approving interim fee application for committee counsel of approximately 30% of all counsel fees incurred*); In re Eastern Outfitters, LLC*, Case No. 17-10243 (LSS) (Bankr. D. Del. Mar. 31, 2017) [Dkt. No. 260] (approving final DIP financing order where the budget reflected committee professional fees of approximately 35% of the Debtors' professional fee budget); *In re Pacific Sunwear of California, Inc.*, Case No. 16-10882 (LSS) (Bankr. D. Del. Apr. 7, 2016) (committee counsel and financial advisor fee budget approved at approximately 35% of debtors' budget for counsel and financial advisor); *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW) (Bankr. D. Del. Sept. 6, 2011), Hr'g Tr. at 42-51 [Dkt. No. 189] (declining to apply the debtor's proposed caps and instead, substituted substituting a general pool for all professionals from which debtor and committee professionals could recover fees on a *pro rata* basis); *In re Blink Holdings, Inc.*, Case No. 24-11686 (JKS) (Bank. D. Del. Sept. 10, 2024) Hr'g Tr. at 65:22-66:4 [Dkt. No. 376] (refusing to restrict committee budget to budgeted amount and requiring all estate professionals to share pro rata from a fund).

insider against which there may be estate claims that could unlock value to unsecured creditors. The Committee should not be required to file a motion to obtain standing given that the Committee is the only independent fiduciary in these cases, and Parkview controls the Debtors. Requesting that the Debtors investigate or bring claims against Parkview is a farce, and is simply a waste of time and resources. Courts in this jurisdiction and others have granted a creditors' committee standing in post-petition financing orders to bring a challenge to prepetition liens and claims.[17]

E.    No Waivers of Sections 506(c), 552(b), and Marshalling Rights

31.    The Final DIP Order seeks to waive the Debtors' rights under section 506(c) of the Bankruptcy Code, the equities of the case exception under section 552(b) of the Bankruptcy Code, and the doctrine of marshalling. *See* Interim DIP Order ¶ 48. These waivers are inappropriate and should not be approved.

32.    Section 506(c) of the Bankruptcy Code exists to ensure that a debtor may recover from a secured creditor the reasonable and necessary costs incurred in preserving or disposing of that creditor's collateral. *See In re Visual Industries, Inc.*, 57 F.3d 321, 325-26 (3d Cir. 1995); 11 U.S.C. § 506(c). The provision serves to prevents a "a windfall to the secured creditor at the expense of the claimant." *Id.* (citing *IRS v. Boatmen's First Nat'l Bank of Kansas City*, 5 F.3d 1157, 1159 (8th Cir. 1993)). Courts have historically viewed section 506(c) waivers skeptically, and they are routinely rejected.[18]

---

[17] *See, e.g., YogaWorks*, (Bankr. D. Del. Nov. 9, 2020) [Dkt. No. 133 ¶ 19(a)] ("The Committee shall have automatic standing to commence a Challenge as to the validity, extent, priority, perfection and enforceability of the Prepetition Liens."); *In re Patriot Well Solutions LLC*, Case No. 20-33642 (DRJ) (Bankr. S.D. Tex. Aug. 12, 2020) [Dkt. No. 167] (granting Committee standing to commence a Challenge Action without being required to file a motion or other request for such standing); *In re Lockwood Holdings*, Case No. 18-30197 (DRJ) (Bankr. S.D. Tex. Apr. 30, 2018) [Dkt. No. 359] (granting Committee automatic standing to file a Challenge Action without the need for further Court order).

[18] *See, e.g., In re Mortg. Lenders Network USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Mar. 20, 2007), Dkt. No. 346, Hr'g Tr. at 21:7-13 (the court noting: "If the Committee doesn't agree with the waiver, it doesn't happen."); *In re NEC Holdings Corp.*, Case No. 10-11890 (KG), (Bankr. D. Del. Jul. 13, 2010), Dkt. No. 224, Hr'g Tr. at 101:7-

33.     Section 552(b) of the Bankruptcy Code allows a court to refuse, based on the equities of a case, to extend a prepetition lien to postpetition "proceeds, products, offspring or profits" of prepetition collateral.  11 U.S.C. § 552(b)(1).  "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustees/debtor-in-possessions use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value."  *In re Airport Inn Assoc., Ltd.*, 132 B.R. 951, 959 (Bankr. Colo. 1990) (internal citations omitted).  For similar reasons, the doctrine of marshaling requires a "senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit."  *In re Advanced Marketing Servs., Inc.*, 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007).  These waivers are also routinely rejected.[19]

34.     Given the insider status of Parkview and the Debtors' lack of independent corporate governance, the Debtors have again failed to provide justification for the section 506(c), 552(b), and marshalling waivers.  The Debtors should not be permitted to waive the estates' rights at this stage, especially when no one knows what unsecured creditors may recover *or* whether they will recover anything at all.  The Debtors' insider lender should not be permitted to improperly capture postpetition value that should remain available for the estates.

---

13 ("[Y]ou don't give a 506[(c)] waiver over an objection by the committee . . . So I would not be inclined to give a 506(c) waiver.").

[19] *See, e.g.*, *In re Linn Energy, LLC*, Case No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jul. 28, 2016), Hr'g Tr. at 134:19-25 [Dkt. No. 746] (noting that preservation of the official committee's right to seek application of section 552(b) exception "really just conforms with applicable Circuit law anyway"); *In re Gen. Maritime Corp.*, Case No. 11-15285 (MG) (Bankr. S.D.N.Y. Nov. 18, 2011), Hr'g Tr. at 74:15-24 [Dkt. No. 54] ("[T]he parties cannot limit the Court's power with respect to the doctrine of the equities of the case. The debtor can agree that it will not assert the equities of the case doctrine under 552(b), but you can't preclude [the Court] from applying it."); *In re The Colad Grp. Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (finding "no basis to eviscerate the equitable doctrine of marshaling" because "[w]hile the debtor may seek authority to waive its own rights, it cannot waive the marshaling rights of parties who have not consented and may not even have received notice of the debtor's motion.").

F.    Other Objectionable Provisions

35.    The balance of the Committee's objections to the Final DIP Order are:

     i.    <u>Early Termination Fee</u>.  Like the other onerous terms of the DIP Loan, the Early Termination Fee in favor of insider Parkview should be eliminated.  *See* Interim DIP Order ¶ 7.  Parkview controls the Debtors and effectively dictates the timing of repayment of the DIP Loan.  Under the circumstances, Parkview should not be entitled to an additional bonus as a direct result of its own actions.

     ii.    <u>Amendments</u>.  The Committee should receive advanced notice of any proposed amendments to the DIP Loan Documents, and the Final DIP Order should clearly state that all material amendments of same should be approved by the Court after notice and a hearing.  *See* id ¶ 22.

     iii.    <u>Reporting Requirements</u>.  All notices and reports provided for under the Final DIP Order should be contemporaneously provided to the Committee.  *See id.* ¶ 23.

     iv.    <u>Credit Bid</u>.  The Final DIP Order provides an absolute right for Parkview to credit bid the full amount of the obligations under the DIP Loan, including the Roll-Up.  *See id.* ¶ 28.  A credit bid that includes the Roll-Up would chill competitive bidding to the detriment of the Debtors' estates.  This point is underscored by Parkview's prepetition foreclosure sale, where the lender's $80 million credit bid already deterred any competing bids.  Letting Parkview add another $32.78 million through a roll-up would further chill bidding and reduce the likelihood of a value maximizing auction.

     v.    <u>Indemnification</u>.    The Final DIP Order should not include the indemnification provisions in their current form.  *See id.* ¶ 39.  As drafted, the indemnification is overbroad and could extend to parties and actions that have no nexus to the DIP Loan.  The Debtors' estate could have claims against some parties that may yield value for unsecured creditors and extending the broad indemnification provisions at this stage of the cases risks impairing the Committee's ability to pursue such recoveries.  Accordingly, the Final DIP Order should remove any indemnification provisions that would extend to parties based on conduct unrelated to the DIP Loan itself.

     vi.    <u>Challenge Period</u>.  The Final DIP Order provides that the challenge period expires 75 days after entry of the Interim DIP Order.  *See id.* ¶ 43.  This deadline should be revised to run 75 days from the Committee's appointment, not from the entry of the Interim DIP Order.

vii.   Releases.  The releases granted to Parkview should be expressly limited to Parkview in its capacity as DIP Loan lender.  Moreover, such releases should not be extended to each of these parties' affiliates, owners, agents, financial advisors, attorneys, consultants, professionals, officers, directors, members, managers, and employees and their respective successors and assigns except for in their specific capacity as related to the DIP Loan.  *See id.* ¶ 48.

## RESERVATION OF RIGHTS

36.    The Committee reserves all its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, to raise additional objections and introduce evidence during the final hearing on the DIP Motion.

## NOTICE

37.    Notice of this Objection will be provided to: (i) counsel to the Debtors (ii) the U.S. Trustee; (iii) the Debtors' top twenty (20) unsecured creditors; (iv) counsel to Parkview; (v) all other known holders of prepetition liens, encumbrances or security interests against the Debtors' property; (vi) the Internal Revenue Service; (vii) New York Secretary of State; (viii) New York City Department of Housing Preservation and Development; (ix) the Delaware Secretary of State; (x) the Delaware Secretary of the Treasury; (xi) any party that has requested notice under Bankruptcy Rule 2002; and (xii) any other party required to be provided notice under Local Rule 9013-1.  Under the circumstances, the Committee submits that such notice is sufficient, and no further notice of this Objection is required.

## CONCLUSION

38.    For the foregoing reasons, the Court should sustain the Objection and deny the

relief requested in DIP Motion.

Dated: December 10, 2025
       Wilmington, Delaware

Respectfully submitted,

**MORRIS JAMES LLP**

*/s/ Eric J. Monzo*
Eric J. Monzo (DE Bar No. 5214)
Siena B. Cerra (DE Bar No. 7290)
3205 Avenue North Blvd., Suite 100
Wilmington, DE 19803
Telephone: (302) 888-6800
Email: emonzo@morrisjames.com
      scerra@morrisjames.com

-and-

**SEWARD & KISSEL LLP**
Robert J. Gayda (admitted *pro hac vice*)
Catherine V. LoTempio (admitted *pro hac vice*)
Andrew J. Matott (admitted *pro hac vice*)
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile:  (212) 450-8421
Email:  gayda@sewkis.com
      lotempio@sewkis.com
      matott@sewkis.com

*Proposed Counsel to the Official Committee of*
*Unsecured Creditors*