**<u>Exhibit D</u>**

**Transcript**

1                   UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE

2

3  IN RE:                .  Chapter 11
                      .  Case No. 25-11853 (KBO)

4  HUDSON 1701/1706, LLC,   .
  *et al.*,            .  (Joint Administration Requested)

5                      .

                      .  Courtroom No. 3

6                      .  824 Market Street
          Debtors.    .  Wilmington, Delaware 19801

7                      .

                      .  Monday, November 3, 2025

8  . . . . . . . . . . . . . .  9:03 a.m.

9

10                  TRANSCRIPT OF ZOOM HEARING
            BEFORE THE HONORABLE KAREN B. OWENS
          CHIEF UNITED STATES BANKRUPTCY JUDGE

11

12  <u>APPEARANCES</u>:

13  For the Debtors:      William E. Chipman Jr., Esquire
                      Aaron J. Bach, Esquire

14                      Mark D. Olivere, Esquire
                      CHIPMAN BROWN CICERO & COLE, LLP

15                      Hercules Plaza
                      1313 North Market Street

16                      Suite 5400
                      Wilmington, Delaware 19801

17

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:       Kim Ross, ECRO

21  Transcription Company:   Reliable
                      The Nemours Building

22                      1007 N. Orange Street, Suite 110
                      Wilmington, Delaware 19801

23                      Telephone: (302)654-8080
                      Email:  <u>gmatthews@reliable-co.com</u>

24

25  Proceedings recorded by electronic sound recording,
  transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the Debtors:          Stuart M. Brown, Esquire
                             Marc Silverman, Esquire
3                            DLA PIPER, LLP (US)
                             1201 North Market Street
4                            Suite 2100
                             Wilmington, Delaware 19801
5
   For Alberto Smeke
6  Saba and Salomon
   Smeke Saba:               Michael L. Schein, Esquire
7                            VEDDER PRICE, P.C.
                             1633 Broadway
8                            31st Floor
                             New York, New York 10019
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                  INDEX

2   MOTIONS:                                                   PAGE

3   Agenda
    Item 1:    Motion of the Debtors for Entry of an Order        12
4              (I) Granting Joint Administration of Their
               Chapter 11 Cases and (II) Granting Related
5              Relief [Docket No. 13; Filed October 30, 2025]

6              Court's Ruling:                                    12

7   Agenda
    Item 2:    Debtors' Application for Entry of an Order         14
8              Appointing Kurtzman Carson Consultants, LLC
               dba Verita Global as Claims and Noticing Agent
9              Effective as of the Petition Date
               [Docket No. 14; Filed October 30, 2025]
10
               Court's Ruling:                                    15
11
    Agenda
12  Item 3:    Debtors' Motion for Entry of Interim and Final     16
               Orders (I) Authorizing the Debtors to Pay
13             Certain Prepetition Claims of Life Safety
               Critical Vendors and (II) Granting Related
14             Relief
               [Docket No. 15; Filed October 30, 2025]
15
               Court's Ruling:                                    18
16
    Agenda
17  Item 4:    Declaration of Alan Tantleff in Support of         13
               Debtors' Chapter 11 Petitions, Joint
18             Administration Motion, Retention Application,
               and Life Safety Critical Vendors Motion
19             [Docket No. 16; Filed October 30, 2025]

20             Court's Ruling:                                    13

21  Agenda
    Item 5:    Emergency Motion of the Debtors for Entry of       20
22             an Order Authorizing the Debtors to Conduct
               Rule 2004 Examinations
23             [Docket No. 18; Filed October 30, 3025]

24             Court's Ruling:                                    25

25

4

1                                   EXHIBITS

2    DECLARATIONS:                                              PAGE

3    1 - Declaration of Alan Tantleff                            13

4

5    Transcriptionist's Certificate                              33

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 9:03 a.m.)

2           THE COURT:  Good morning, everyone.

3           This is Judge Owens.  We're gathered for a first

4  day hearing in the Hudson 1701/1706 cases.

5           Mr. Chipman, nice to see you.  As proposed counsel

6  for the Debtors, I'll turn the podium over to you and you can

7  get us started.

8           MR. CHIPMAN:  Thank you, Your Honor.  Good to see

9  you, as well.

10          For the record, William Chipman, on behalf of

11  debtors' Hudson 1702, LLC and Hudson 1701/1706, LLC.

12          Can Your Honor hear me okay?

13          THE COURT:  Yes, I can.  Thank you.

14          MR. CHIPMAN:  Great, thank you.

15          First, I would like to thank Your Honor and your

16  staff for finding the time to hear us this morning; we really

17  appreciate it.  Thank you very much.

18          Before we get started on the agenda, if I could

19  make a few introductions?

20          THE COURT:  That would be great, thank you.

21          MR. CHIPMAN:  Thank you, Your Honor.

22          My colleagues Mark Olivere and Aaron Bach are

23  present in the Zoom hearing today and will be handling some

24  of the motions.

25          THE COURT:  Okay.

1          MR. CHIPMAN:  Our co-counsel, DLA Piper is on, as

2    well; they're going to serve as proposed special litigation

3    and corporate counsel to the Debtors.

4          THE COURT:  Okay.

5          MR. CHIPMAN:  Your Honor, Alan Tantleff with FTI

6    is our first day declarant and he should be on, as well.

7          THE COURT:  Okay.

8       (Laughter)

9          THE COURT:  I'm not seeing anyone, but I assume

10   they are on, and welcome.

11         MR. CHIPMAN:  Thank you, Your Honor.

12         Yeah, I'm not sure if he's on one of the phone

13   lines or not.

14         THE COURT:  I see Mr. Brown.

15         MR. BROWN:  Good morning.  I didn't --

16         THE COURT:  Mr. Brown, good to see you.

17         MR. BROWN:  -- I didn't want to -- yeah, it's good

18   to see you, as well.  I didn't want to disappoint.  Good

19   morning.

20         And I'll -- I won't be speaking, so I'll go back

21   on non-video.

22         THE COURT:  Okay.

23         MR. BROWN:  Thank you, Your Honor.

24         THE COURT:  Thank you, Your Honor.

25         MR. CHIPMAN:  Your Honor, before I get started,

1   these cases are a little unusual.  We did not come into court

2   with a full set of first day pleadings, as Your Honor saw

3   from the agenda.  We're seeking very limited relief today.

4   As we get more information, we are likely going to ask for

5   another first day-type hearing to discuss DIP financing,

6   utilities, insurance, maybe taxes, and any other relief the

7   Debtors may need going forward.

8           Your Honor, the company was formed in March 2022

9   to redevelop and operate the historic Hudson Hotel as a

10  multifamily residential property; originally anticipated to

11  include approximately 440 market-rate rental units, complete

12  with commercial space and a penthouse.

13          Redevelopment and construction at the Hudson

14  commenced quickly after the company's formation was expected

15  to conclude in May 2024.  Unfortunately, regulatory issues,

16  construction delays, and attendant litigation and liquidity

17  constraints have impacted the project since its inception; as

18  a result, the Debtors have been able to complete their

19  development of the project and construction is currently

20  subject to a stop-work order due to regulatory issues

21  stemming from disputes with certain of the Hudson's 32,

22  single-room occupancy tenants.

23          In connection with the development of the Hudson,

24  the company and its prepetition secured lender, Parkview

25  Financial REIT, LP entered into certain loan agreements.  The

1 building loan agreement, dated May -- as May 4th, 2022 was in

2 the principal amount of in excess of $81.7 million and there

3 was also a project loan agreement of the same date in the

4 principal amount of in excess of $125 million.  In total, a

5 total of $207 million was initially available under the

6 prepetition loan agreements.

7       On or about July 5th, 2025, the prepetition lender

8 foreclosed on all the equity interests in the Debtors, which

9 were pledged as collateral, with respect to the project loan,

10 thereby, transferring ownership of the Debtors to PV Hudson

11 LLC, now, the sole member of the Debtors.  In connection with

12 the foreclosure, the prepetition lender credit bid $80

13 million of the then-outstanding obligations resulting in

14 approximately $146 million remaining outstanding as of the

15 petition date.

16       Your Honor, the regulatory issues, construction

17 delays, funding issues, and the stop-work order necessitated

18 the commencement of these Chapter 11 cases.  The Debtors are

19 working tirelessly to address the regulatory issues and

20 obtain approval to restart development of the Hudson, all

21 while continuing negotiations with the vary stakeholders

22 groups, including governmental authorities, unions,

23 contractors, and materialmen.

24       Your Honor, the Debtors do not have any employees,

25 therefore, there was no need to a typical wage motion;

1  however, Tri-Hill Management is the current project

2  management company that oversees normal day-to-day operations

3  at the property, including providing, among other things,

4  security, maintenance, and front-desk services for the

5  residents.

6          Your Honor, Taconic Development Advisors, LLC is

7  working for the Debtors to resolve the issues to restart and

8  remobilize the construction project; additionally, the

9  Debtors and their advisors are currently negotiating a

10  proposed DIP facility with the prepetition lender that will

11  fund these cases going forward.

12          The Debtors expect the DIP facility will provide

13  the Debtors with sufficient liquidity to support the

14  completion of the efforts to lift the stop-work order, finish

15  redevelopment of the Hudson, and to effectuate a

16  restructuring through confirmation of a plan.

17          Prior to the Chapter 11 filing, the Debtors and

18  the prepetition lender negotiated a cash collateral

19  agreement, which was annexed as Exhibit 1 to the first day

20  declaration.  Through the cash collateral agreement, the

21  prepetition lender extended up to a million dollars to be

22  used by the Debtors solely in accordance with the budget

23  attached thereto.  As of the petition date, after giving

24  effect to the credit bid and the new advance, the Debtors are

25  obligated to the prepetition lender in the aggregate amount

1  of approximately $146 million.

2          And, Your Honor, if I could turn a little bit to

3  the history of the company at this point and give Your Honor

4  a little bit of background; I know it was in the first day

5  declaration, but it's always good to go over it again at the

6  first day hearing.

7          As previously --

8          THE COURT:  That would be fine.

9          MR. CHIPMAN:  Thank you.

10         As previously stated, the company was formed on

11  March 12th, 2022, to redevelop the Hudson Hotel property.

12  The Debtors occupy the property under a 2022, 99-year ground

13  lease.  Construction to convert the Hudson back to

14  residential use began in or around June 2022.  At that time,

15  the company's sole member was CSC Hudson, LLC.  CSC was

16  formed by Alberto Smeke Saba and Salomon Smeke Saba, who

17  controlled the company and the project during the period from

18  inception through July 5th, 2025.

19         In connection with the improvements at the Hudson,

20  the company obtained financing from the prepetition lender on

21  the prepetition loan agreements.  The Smekes were guarantors

22  on the loan and separately executed completion guarantees,

23  jointly and severally guaranteeing the completion of the

24  improvements to the Hudson.  When the company commenced

25  development and then construction, the Hudson contained 39,

1   single-room-occupancy units, many of which were, and continue

2   to be occupied by the single-group-room-occupancy tenants,

3   who are beneficiaries of rent stabilization under New York

4   City law.

5          Because the Hudson is also located within the

6   Clinton Special District [sic], New York City Zoning

7   regulations require the New York City Department of Housing &

8   Preservation Development issue a certificate of no harassment

9   following an investigation and survey of the tenants residing

10   at the Hudson.  The certificate of no harassment certifies

11   that a building owner is not harassing the tenants.  The

12   company required a certificate of no harassment from the

13   Department of Buildings before making any alterations to the

14   Hudson.  On September 7th, 2023, the single-room-occupancy

15   tenants presented four alleged incidents of harassment,

16   including:  inadequate notice of water and electricity

17   shutdowns; inadequate pest control; positive testing for

18   lead; and exposed wiring and cables.

19          The Department of Housing & Preservation

20   Development made an initial determination finding that there

21   was reasonable cause to believe that harassment occurred, and

22   on September 25th, 2023, issued a notice of hearing and

23   petitioned for the company to be heard before the Office of

24   Administrative Trials and Hearings.  The Department of

25   Housing & Preservation Development also recommended the

1  Administrative Office deny the company's application for a

2  certificate of no harassment.

3          When the Department of Housing & Preservation

4  Development issued the initial determination, the company was

5  still controlled by the Smekes.  As of February 2024,

6  construction on the existing residential floors was subject

7  to the partial stop-work order that remains in place today.

8          The Debtors currently are incurring obligations to

9  various suppliers, trade vendors, utility providers, and

10  service providers, among others.  Certain of the debtors'

11  suppliers and vendors provide goods and services necessary to

12  protect the single-room-occupancy tenants -- excuse me, Your

13  Honor -- and the Hudson from fire and life safety, including

14  fire hoses, boiler maintenance, and elevator maintenance.

15          As reflected in the first day declaration, the

16  Debtors are seeking very limited relief today.  We have four

17  motions -- the joint administration order, Your Honor already

18  entered; thank you for that -- retention of Verita, as the

19  notice and claims agent; a limited critical vendor motion,

20  dealing with the health and safety issues; and a 2004 motion.

21          Your Honor, at this point, unless you have any

22  questions for me, I would like to move the first day

23  declaration into evidence in support of the first day relief

24  the Debtors are seeking today; that's at Docket 16.

25          I believe Mr. Tantleff is in the Zoom meeting and

1  available for cross-examination.

2          So, unless Your Honor has any questions, that's

3  what I would propose at this point.

4          THE COURT:  Okay.  Does anyone object to the

5  admission of the first day declaration for purposes of

6  supporting the entry of the first day relief today?

7      (No verbal response)

8          THE COURT:  All right.  I'm hearing no objection.

9          Does anyone wish to cross-examine the first day

10 declarant on the substance of his testimony today?

11     (No verbal response)

12         THE COURT:  All right.  Thank you very much.  I'm

13 not hearing anyone.

14         It is admitted, and we can move forward.

15     (Tantleff Declaration received in evidence)

16         MR. CHIPMAN:  Thank you, Your Honor.

17         Your Honor, at this podium -- at this point, I'd

18 like to cede the podium to Mr. Bach from our office to begin

19 to walk Your Honor through a couple of the first day motions.

20         THE COURT:  That would be fine.

21         Good morning, Mr. Bach.

22         MR. BACH:  Good morning, Your Honor.

23         Can you hear me okay?

24         THE COURT:  Yes, I can.

25         MR. BACH:  Wonderful, thank you.

1    The next item on the agenda is the application for

2 entry of an order for the appointment of Kurtzman Carson

3 Consultants, LLC, d/b/a, Verita Global, as claims and

4 noticing agent, effective as of the petition date.  For this

5 application, the Debtors rely upon the first day declaration

6 and the declaration of Evan Gershbein that was attached at

7 the application as Exhibit B.

8    The Debtors anticipate that there are in excess

9 of 200 creditors or parties in interest and, additionally,

10 the Debtors believe that the appointment of Verita is in the

11 best interests of the estate, as they will help facilitate

12 the efficient administration of these cases, while

13 alleviating the burdens for the Clerk of the Court.

14    As set forth in the application, the debtors'

15 selection of Verita satisfied the Court's protocol for the

16 employment of claims and noticing agents under

17 28 U.S.C. §156(c), and that the Debtors have obtained and

18 reviewed engagement proposals from a total of three Court-

19 approved claims and noticing agents to ensure selection

20 through a competitive process.  The Debtors submit that based

21 on all engagement proposals obtained and reviewed, Verita's

22 rates are competitive and reasonable, given Verita's quality

23 of services and expertise.  The terms of Verita's retention

24 are set forth in the engagement agreement, which is attached

25 to the application.

1          As the Court is aware, the Debtors received

2    informal comments from the United States Trustee and a

3    revised form of order was submitted under certification of

4    counsel in advance of this hearing at Docket 38.  No other

5    comments have been received, and unless the Court has any

6    questions or comments to the revised order, we respectfully

7    request entry of the order.

8          The revised order has been uploaded.

9          THE COURT:  Okay.  Thank you very much.

10         Does anyone wish to be heard in connection with

11   the retention of Verita, as claims and noticing agent?

12      (No verbal response)

13         THE COURT:  All right.  I'm not hearing anyone.

14         I've had the opportunity to review the

15   application, as well as the revised form of order that was

16   filed; I appreciate you all filing that on the docket with a

17   redline.  I have no questions or concerns and I understand

18   why the relief is appropriate and necessary and I will have

19   the order entered as soon as possible.  Thank you.

20         MR. BACH:  Thank you, Your Honor.

21         I'll turn it over to Mark Olivere.  Thank you.

22         THE COURT:  You're welcome.

23         Good morning.

24         MR. OLIVERE:  Good morning, Your Honor.

25         For the record, Mark Olivere of Chipman Brown, on

1  behalf of the Debtors.

2         Your Honor, the next item on the agenda is the

3  debtors' life safety critical vendor motion; again, Your

4  Honor, for this motion, the Debtors rely on the first day

5  declaration by Mr. Tantleff.

6         Your Honor, as set forth in the motion and in the

7  Tantleff declaration, by this motion, we are, today, seeking

8  entry of an interim order authorizing the Debtors to make

9  payments toward life safety critical vendors, up to an

10 aggregate amount of $250,000 on an interim basis and subject

11 to a final hearing, up to one million on a final basis.

12 Basically, Your Honor, we're seeking relief to pay what the

13 company -- with the assistance of its advisors, has

14 determined to be critical vendors, suppliers, or service

15 providers, whose services pay a crucial role in maintaining

16 life safety at the property for residents, employees, and

17 contractors.

18         And to pause here for a second, as you heard from

19 Mr. Chipman and you'll hear, probably in connection with

20 the 2004, given the information we have available now, we've

21 narrowly tailored this application or this motion to just

22 life safety, dealing with fire- and elevator-related

23 services.  So we anticipate we may need to come back at a --

24 whether it's a subsequent first day or on another full-

25 noticed hearing on another critical vendor motion.  So this

1    one is just tailored to life safety measures.

2              THE COURT:  Okay.

3              MR. OLIVERE:  So these, the life safety critical

4    vendors provide a variety of fire-suppression, elevator, and

5    other safety-related goods and services; all of which are

6    required to provide for the health, safety, and welfare of

7    the residents and workers.  The vendors are, by and large,

8    specialized service providers or provide specialized safety

9    services and materials.

10             Your Honor, in some cases, local, state, or

11   federal law requires the Debtors to comply with certain

12   regulatory requirements of which these critical vendors

13   supply the necessary goods and services.

14             As identified in the first day declaration and in

15   the motion, the Debtors would use the new advances to be used

16   under the cash collateral agreement to fund the interim order

17   relief.  With respect to the relief requested, today, again,

18   as identified in the motion, the Debtors believe that

19   immediate and irreparable harm would result if the relief was

20   not granted.

21             Your Honor, as with the other motions, we did

22   consult with the Office of the United States Trustee.  We

23   received comments from Mr. Hackman and incorporated those

24   into the revised form of order, which was submitted to

25   chambers as a blackline on Friday and the identical, the same

1   order was submitted as a notice of filing yesterday on the

2   docket.

3           So, Your Honor, I'm happy to let anyone else be

4   heard or answer any questions; otherwise, we would request

5   entry of the order.

6           I do know that we need to insert a second day or a

7   final hearing date in the order, so we can address that or

8   any questions you may have.

9           THE COURT:  Okay.  Why don't I hear from parties

10  that wish to be heard in connection with the relief and then

11  we'll talk about second day.

12      (No verbal response)

13          THE COURT:  Okay.  I'm not seeing anyone.

14          I reviewed the application and I understand the

15  relief that you're seeking and I understand its necessity,

16  relying on the first day declaration.  It's critical and

17  necessary to be entered today.

18          Let's talk about second day.  When are you looking

19  for your second day?

20          MR. OLIVERE:  Right.  So we did contact chambers

21  this morning.  We're looking about, we were thinking about 40

22  days out, because the home is that we'll have subsequent

23  first days and then tie all of that together as a second, as

24  a unified second day.  So chambers provided, I'm hoping

25  December 12th at 10:00 a.m. --

1              THE COURT:  Okay.

2              MR. OLIVERE:  -- is what Ms. Lopez provided.

3              THE COURT:  That would be fine.  If that's the

4    date that you want, that works for me.

5              MR. OLIVERE:  Can I ask --

6              THE COURT:  So, it would be Friday, December 12th

7    at 10:00 a.m.?

8              MR. OLIVERE:  Yes.

9              THE COURT:  Okay.

10             MR. OLIVERE:  Thank you.

11             THE COURT:  So, if you insert the second day

12   hearing and the relevant objection deadline into the order

13   and upload it, that is fine; I will go ahead and enter the

14   order once it has been uploaded.  I don't think you need to

15   do another redline just to reflect the second day hearing and

16   objection deadline.

17             MR. OLIVERE:  Thank you, Your Honor.

18             Do you have any -- I mean, it's pretty far out --

19   preference on when the objection deadline is?  Could we just

20   maybe give 21 days' notice?  I don't think we need it a week

21   beforehand, but we'll defer to you.

22             THE COURT:  Yeah, that would be fine.

23             MR. OLIVERE:  Okay.  We'll make the objection

24   deadline November 24th.

25             THE COURT:  That would be fine, thank you.

1          MR. OLIVERE:  Okay.  Thank you, Your Honor.

2          With that, I think the next item on the agenda is

3    the 2004 motion and someone at DLA is handling that.

4          THE COURT:  Okay.

5          MR. BROWN:  Good morning, Your Honor.

6          Stuart Brown, DLA Piper.  I'd like to introduce my

7    colleague Marc Silverman, who's been admitted *pro hac vice*.

8    He'll be handling the 2004 motion this morning, Your Honor.

9    Thank you.

10         THE COURT:  Thank you.

11         Good morning, Mr. Silverman.

12         MR. SILVERMAN:  Good morning, Your Honor.

13         Can you see and hear me?

14         THE COURT:  Yep.  We're all good.

15         MR. SILVERMAN:  Okay.  Great, thank you.

16         As our colleagues at Chipman advised, we represent

17   the Debtors as special counsel.  We are here on the 2004

18   motion simply to get information, documents, books and

19   records that are owned by the Debtor.  There's no disputing

20   that the Smekes, CSC, and their agents have this information

21   and their agents have this information.  And there's no

22   disputing that the Debtor is entitled to this information.

23   But the problem is we just haven't gotten that information

24   from the Smekes, the former owners, and their agents, and

25   there's no indication that they will, absent a subpoena.

1          As Counsel has stated before, the prepetition

2    lender took over and foreclosed on the interest in July 2025;

3    at the same time, they requested all books and records.  But

4    since then, they've gotten nothing and, in fact, they didn't

5    get anything until Friday night, in which the former owners,

6    one of them, Alberto, self-selected and produced partially-

7    responsive documents.  This did not include information from

8    CSC or Salomon Smeke.  It does not include tax returns or

9    related schedules, which, in fact, if you've seen their

10   prices, letter Exhibit A, the former owners' accountants,

11   Burnett, claims it will not provide to CSC or us.  It does

12   not include bank account information, which would include

13   rent payments and insurance payments.  We didn't get the

14   insurance documents.  We didn't get any emails from the email

15   accounts.  And they've said that there are no email accounts,

16   even though we have seen emails from the Smekes at domains

17   ending in "cscre.us" and "csccoliving.com."

18          What we did get was limited financial information

19   on Friday night, which includes some financial information,

20   ledgers, a balance sheet, and one income statement for each

21   Debtor that included information only from January 2025 to

22   April 2025, which is three months before the UCC sale, and,

23   obviously, is missing three years of their records before

24   that.

25          At this point, you know, the subpoena is

1  necessary.  It appears that we will not get voluntary

2  compliance, full voluntary compliance, and that a subpoena is

3  necessary to ensure that we get full compliance and get all

4  the information we need for the Debtor.

5           And at that point, I will stop there and see if

6  you have any questions.

7           THE COURT:  There has been -- and I don't want to

8  make the argument for the Smekes and the related entities --

9  but there has been an allegation that the time is too short.

10 I understand from reading the 2004 motion that some of the

11 information, or perhaps all of the information is required as

12 soon as possible, but have you thought about a staggered

13 schedule that you would, that would be a preferred

14 prioritization of the information that you need?

15          MR. SILVERMAN:  We would be willing to work with

16 them, but I think the issue is, is a subpoena is really

17 necessary so that we have all the proper rights in place and

18 that we can negotiate and meet and confer on these things.

19 Because as you know, since July, the prepetition lenders have

20 been seeking this information and really has just not gotten

21 full information and we haven't gotten real commitment or

22 transparency.

23          And so, really, we just want the subpoena to

24 issue.  We can work out those issues, I think, with counsel,

25 and make sure that they're, you know, fully giving us

1  custodians and all the information that we need.  But we'd be

2  happy to negotiate those terms.

3            THE COURT:  Okay.  All right.

4            Well, thank you very much.

5            I'm happy to hear from, I think it's Vedder Price

6  that represents the parties, and is that you, Mr. Schein?

7            MR. SCHEIN:  Yes.  Good morning, Your Honor.  Nice

8  to speak to you.

9            Michael Schein, Vedder Price, on behalf of Alberto

10 and Salomon Smeke Saba.

11            My first question, Your Honor, which I think you

12 answered, is that you did read our objection; I know it was

13 filed only yesterday.

14            THE COURT:  You made it short for me, so 5 pages

15 is not a problem.  I did read that, thank you.

16            MR. SCHEIN:  That was definitely our intention,

17 Your Honor.

18            Your Honor, I think what's most important here is

19 the request was completely unreasonable.  If this was an

20 adversary, we would have more time and we're kind of puzzled

21 why it's not a turnover action in an adversary, to begin

22 with.

23            But what's not accurate here, Your Honor, is, when

24 the UCC sale happened and then they issued that July 24th

25 informal request, the parties, then, entered into a

1  settlement agreement, which they attached to their

2  declaration, settling the disputes and issues there, which

3  included mutual releases.  There was no further discovery

4  discussions until, Your Honor, we received a letter on

5  October 23rd from DLA.

6          So there has been -- it's not that we've avoided

7  responding; there was no communication, in fact, my counsel,

8  who's on the line here, Mr. Salame, had tried to reach out to

9  DLA on a few occasions on unrelated matters and didn't get

10 any response.

11         So, once we got it, we told them -- and you can

12 see that from the email chains that DLA attaches to the Brown

13 declaration -- we never said we weren't giving anything.  We

14 asked questions.  We said we'd work on it and in a couple of

15 days, we did produce over 650 records.

16         Obviously, the biggest question here is:  Why

17 doesn't the Debtors have all of this?

18         The lender is the owner of the sole-managing

19 member.  It's been three months and they've obviously had a

20 lot of these documents, as the lender, over several years

21 with all of the foreclosure action.  So we're a little

22 puzzled.  They don't indicate -- they just indicate, We have

23 nothing.  We kind of find that hard.

24         That being said, Your Honor, we're willing to work

25 on a cooperative schedule that our clients can work to and

1  produce, which is what you would normally do in an adversary

2  proceeding.  But they turn around and they're just trying to

3  paint my client is a position that's not accurate and we were

4  foreclosed out.  We no longer own the company; we are not the

5  Debtors.  And we'll work to cooperate, but it's got to be on

6  a reasonable schedule; not five calendar days from entry of

7  the order for a production that was well beyond a reasonable

8  scope.

9          THE COURT:  Okay.  I don't want to cut you off.

10         MR. SCHEIN:  No, I just -- well, I say, Your

11 Honor, I don't want to repeat everything that's in our

12 objection; I think it's speaks for itself.

13         But our client is willing to work with the

14 Debtors, but we first -- we're kind of puzzled how they have

15 nothing and they haven't explained to this Court why they had

16 nothing.  We're willing to work on a reasonable schedule, but

17 the subpoenas attached are not reasonable; they're well

18 beyond the scope and an unreasonable time frame.  Any

19 adversary and turnover action would have the parties sitting

20 down, figuring out terms, working through a staggered

21 production, as Your Honor mentioned.  None of that is what's

22 before this Court today and we're still questioning why it's

23 a 2004.  That's what they're really seeking is a turnover.

24         THE COURT:  Okay.  Here's what I'd like to do.

25 I'd like to continue this to the next hearing that we have in

1  the case, whether it be an interim second day or the second

2  day.

3         In the meantime, I'm going to take you at your

4  word, Mr. Schein, that you are -- you and your clients are

5  going to work with the Debtor to get these necessary, all the

6  necessary operational documents, financial documents that the

7  Debtor needs to run this case smoothly to them.

8         MR. SCHEIN:  Yes.

9         THE COURT:  And I'm going to hold the parties to

10  the meet-and-confer on a productive schedule and a

11  prioritization of that.

12         If the parties can get there and the documents

13  start producing, then, you know, it is what it is, but

14  otherwise, I'm going to deal with the actual disputes, then,

15  at the next hearing on this.  But I'm going to hold everybody

16  to their word and we'll see how this goes and I'll get a good

17  understanding of the parties, based on what you do in the

18  interim.  Okay?

19         So, meet and confer on a productive schedule and

20  we'll see where it goes.

21         MR. SCHEIN:  Thank you, Your Honor.

22         THE COURT:  Okay.

23         MR. CHIPMAN:  Thank you, Your Honor.

24         THE COURT:  This would apply to all of the -- just

25  to be clear, this is all of your clients.  Well, it would be

1  the Smekes -- I apologize if I'm not pronouncing the last

2  name correctly; I think you all said, "Smekes" -- and their

3  related entities.

4       Okay.  Mr. Chipman, you had set an interim second

5  day.  What -- I mean, what -- give me some disclosure about

6  what is anticipated to happen, because you usually get one

7  first day; the rest go out on notice.  So give me some

8  information here and what are you looking for and what do you

9  expect?

10       MR. CHIPMAN:  Yeah, so, Your Honor, it's kind of

11  hard, because we need that information to complete the full

12  suite of first days, that we haven't gotten from the Smekes.

13  So, but at this point, what we're going to -- I know we're

14  going to need is a DIP motion at some point.  I think that's

15  still being negotiated, but it should be done in a few days.

16  I'm not sure, maybe Mr. Brown may have a little bit more

17  information on that, as well, but I think what I would

18  propose is that we reach out to chambers once we have that

19  DIP motion finalized with the DIP terms.

20       And whatever other motions we can get on file,

21  maybe we can call it an "interim second day."  But we are

22  going to need -- so, we're going to run out of money at some

23  point.  We only have a million dollars use of cash

24  collateral, consensual, and then we have to switch over to a

25  DIP motion.  So I'm thinking we need an interim DIP order at

1  some point and then we need a final DIP order, and that's why

2  Mr. Olivere suggested maybe 40 days out, to give us, you

3  know, a couple of days to a week to get the DIP done, get

4  that, and then we could reach out to chambers and set a

5  hearing that works for everybody.

6          I don't know if that works for Your Honor, but

7  that's my proposal.

8          THE COURT:  That works.  That's fine.

9          I'm just looking at my calendar over the next week

10 and I do have availability, so we should be able to get you

11 scheduled.

12         In text of information that's necessary for

13 interim first day relief, and I'll use insurance as an

14 example, you know, really, you should meet and confer and

15 just get the information to the Debtors.  I understand, Mr.

16 Schein, you're questioning of why they don't have that

17 information.  You need the insurance motion.  We need the

18 insurance relief.  And the fact that it hasn't been filed for

19 such an extensive property, you know, really is, to me, the

20 evidence that they don't have what they need.  So we need to

21 prioritize this information and get it to the Debtors ASAP,

22 to the extent that it's available so that we can get this

23 type of, the first day relief on file.

24         MR. CHIPMAN:  Your Honor, this is Mister --

25         MR. SCHEIN:  Sure, Your Honor --

1          MR. CHIPMAN:  We also -- sorry, go ahead.

2          MR. SCHEIN:  Sorry.

3          Your Honor, Michael Schein.

4          One thing to just clarify, I mean, I think there's

5  a lender counsel on the call.  I'm puzzled that the lenders

6  would not have all the insurance documentation, given this is

7  their collateral.  Again, no, the Debtors have not answered,

8  and we will cooperate, Your Honor, but we find it hard, in

9  three months, when the lender has been here for three years,

10 that they have zero documentation and putting all the burden

11 on my client.

12         MR. SILVERMAN:  Your Honor, if I could speak?

13         THE COURT:  Sure.

14         MR. SILVERMAN:  I think in response to what

15 Mr. Schein said before and what he's saying now, it's clear

16 that we really need the subpoena.  They're going to be

17 challenging scope.  It's been three months since they've, you

18 know, not given us the information.

19         They are trying to, I think, you know, make it

20 difficult, but we are --

21         THE COURT:  Well, let me just interrupt you.

22         I mean, what evidence do you have?  You asked for

23 this information after the settlement agreement.  I have

24 none.  I have -- I mean --

25         MR. SCHEIN:  The lender --

1          MR. SILVERMAN:  And the settlement agreement --

2          THE COURT:  So, I'm not -- listen, listen, I'm not

3  going to get into it.  I read the pleadings.  I made my

4  decision and you all are going to meet and confer and you're

5  going to move forward.  And I'm going to hear this as a

6  status, you know, at the next interim.

7          And you know what?  If it proves that these

8  statements are untrue, then I'll deal with it.  But it's a

9  first day hearing and they agreed to produce, so we're moving

10  forward.

11          MR. SCHEIN:  Thank you.

12          THE COURT:  And I'm really going to get a sense of

13  who everybody is at the next hearing, and we'll move along

14  accordingly.  Okay?

15          So, let's just move on with that mutual

16  understanding and get the insurance information, to the

17  extent the Debtor has it.  If they have it and the lender has

18  it, then I'm going to be very disappointed.  But we're going

19  to have this just work out on its own and I'll see you at the

20  next hearing, okay.

21          So I think that this will not be -- I think that

22  by the time it gets to me, I expect the parties to narrow it,

23  narrow these -- have narrowed these issues and we'll discuss

24  scope and we'll discuss timing of the undisputed issues,

25  okay.

1             All right.  Mr. Chipman, let me ask you -- or I

2    shouldn't ask you, but -- because you don't know -- but, do

3    you think it would be, maybe, this week that you would get

4    the DIP on file or would it be, maybe, you're looking maybe

5    towards the end of the week, more towards the beginning of

6    next week?

7             MR. CHIPMAN:  I'm hopeful we get it on file this

8    week, Your Honor, but I can't commit to that.  But we're

9    going to do our best to get it on file this week --

10            THE COURT:  Okay.

11            MR. CHIPMAN:  -- to the extent we can.

12            THE COURT:  That's great.

13            I have time at the end of the week, so we'll move

14   forward accordingly.  Let me know as soon as it's filed.

15            MR. CHIPMAN:  Will do, Your Honor.

16            And I believe that's all we have on the agenda for

17   today.  We really do appreciate Your Honor's time.

18            THE COURT:  Perfect.

19            MR. CHIPMAN:  Thank you very much.

20            THE COURT:  Okay.  Well, nice to see all of you

21   and I look forward to seeing you at the next hearing; until

22   then, I wish you well and I'll see you at the next hearing.

23            Everyone be well and take care, we're adjourned.

24            MR. SCHEIN:  Thank you, Your Honor; you, as well.

25            THE COURT:  Thank you.

1            MR. CHIPMAN:  Thank you, Your Honor.

2            COUNSEL:  Thank you, Your Honor.

3       (Proceedings concluded at 9:38 a.m.)

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ William J. Garling                    November 15, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25