**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>Hudson 1701/1706, LLC, *et al.*,[1]<br><br>　　　　　　Debtors. | Chapter 11<br><br>Case No. 25-11853 (KBO)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 99** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO THE RETENTION APPLICATION OF**
**DLA PIPER LLP (US) AS SPECIAL COUNSEL**

The Official Committee of Unsecured Creditors (the "Committee") appointed pursuant to section 1102 of Title 11 of the United States Code (the "Bankruptcy Code") in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the *Application of the Debtors for Entry of an Order (I) Authorizing the Debtors to Retain DLA Piper LLP (US) as Special Counsel, Effective as of the Petition Date, and (II) Granting Related Relief* [Dkt. No. 99] (the "DLA Retention Application")[2] and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.　　DLA Piper LLP (US) ("DLA Piper") seeks to make an end run around the requirements of section 327(a) of the Bankruptcy Code and DLA Piper's unmistakable conflict of interest through the guise of retention as special counsel under section 327(e) of the Bankruptcy

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the DLA Retention Application.

Code.  The Debtors are ultimately owned by their prepetition lender and proposed DIP lender, creating serious issues related to the Debtors' corporate governance and the existence of an independent fiduciary that truly has the estate's best interest in mind.  These issues are only exacerbated by the relief requested in the DLA Retention Application.

2.     The DLA Retention Application should be denied for three dispositive reasons. *First*, the proposed engagement is not for a "specified special purpose" within the meaning of section 327(e); instead, it encompasses core case administration matters—real estate issues involving the underlying property (the "Property"), general corporate strategy, debtor-in-possession financing, the plan process, and related litigation—amounting to an impermissible end-run around section 327(a)'s safeguards.  *Second*, DLA Piper holds an adverse interest with respect to the very matters for which it seeks employment: it advised Parkview Financial REIT, LP and its affiliates (collectively, "Parkview")—the Debtors' prepetition lender, ultimate equity holder, and largest creditor—with respect to prepetition transactions involving the Debtors, creating a conflict that cannot be cured.  *Third*, the retention is not in the estates' best interests.  The Debtors already have capable Debtors' counsel—Chipman Brown Cicero & Cole, LLP ("Chipman")—who is working with professionals with the requisite institutional knowledge and has already been authorized by the Court to perform the same scope of work, eliminating any alleged efficiency or cost savings arguments.  Accordingly, the Bankruptcy Court should refuse to countenance DLA Piper's transparent attempt to circumvent the safeguards of the Bankruptcy Code and deny the DLA Retention Application.

## BACKGROUND

### I.     The Chapter 11 Cases

1.     On October 22, 2025 (the "Petition Date"), the Debtors, through Parkview affiliate PV Hudson LLC, each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

17699366/1

The Debtors continue to operate their businesses as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

2. On November 12, 2025, the Debtors filed the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B)Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Lender; (III) Modifying the Automatic Stay; (IV) Scheduling A Final Hearing and (V) Granting Related Relief* [Dkt. No. 56] (the "DIP Motion") seeking approval of approximately $65.6 million in debtor-in-possession financing from Parkview (in such capacity, the "DIP Lender"), consisting of $32,762,004 in new-money and a roll-up of $32,770,104 of the prepetition loan obligations.

3. On November 21, 2025, the Debtors filed the DLA Retention Application. *See* Dkt. No. 99.

4. On November 25, 2025, the United States Trustee appointed the Committee. *See* Dkt. No. 104. Thereafter, the Committee selected Seward & Kissel LLP as lead bankruptcy counsel, Morris James as local counsel, and Province, LLC as financial advisor.

5. On December 18, 2025, First American Title Insurance Company, the escrow agent (the "Escrow Agent") under that certain escrow agreement dated August 7, 2025 (the "Escrow Agreement"), filed an adversary proceeding (the "Interpleader Proceeding") against the Debtors, the Debtors' former equity owner, CSC Hudson, LLC ("CSC"), Alberto Smeke Saba and Salomon Smeke Saba (the "Smekes"), and Parkview Financial REIT, LP. *See* Adv. Pro. 25-52468, Dkt. No. 1. In sum, the Escrow Agent claims that there is a dispute with respect to the disbursement of approximately $1,637,500.00 under the Escrow Agreement and whether the Debtors are a party to the Escrow Agreement.

17699366/1

6.      On December 22, 2025, the Debtors filed an adversary complaint (the "Ground Lessor Proceeding") against 356W58 Ground Lessor, LLC (the "Ground Lessor").  The complaint initiating the Ground Lessor Proceeding is signed only by DLA Piper.  In sum, the Debtors, through DLA Piper, seek a declaratory judgment that the ground lease (the "Ground Lease") associated with the Property is a disguised financing arrangement and, as a result, the Ground Lessor is either a secured or unsecured creditor with a priority of payment that the Court must determine.  *See generally* Adv. Pro. 25-52471, Dkt. No. 1.  The Debtors also seek to avoid the Debtors' obligations under the Fourth Amendment to the Ground Lease, dated as of March 29, 2024, and recover payments made to the Ground Lessor thereunder.  *Id.*

## II.     DLA Piper's Connections with the Debtors and Parkview

7.      Since at least early 2024, DLA Piper, as counsel to the Debtors' prepetition lender, Parkview Financial REIT, LP, and its affiliates Parkview Financial REIT, GP, Parkview Financial, LLC, and PV Hudson LLC, has "assisted in the management and restructuring of the Hudson and the related leasehold interest, including negotiating loan document amendments in May 2024 and addressing mechanic lien issues up to the Petition Date."  Brown Decl. ¶ 9.

8.      Although not expressly disclosed in the declaration filed in support of the DLA Retention Application, upon information and belief, DLA Piper was involved in negotiating and documenting the Ground Lease, including certain later amendments thereto that are expressly acknowledged and agreed to by Parkview.  Moreover, upon information and belief, DLA Piper was involved in negotiating and executing that certain settlement agreement (the "Union Settlement") dated as of January 25, 2024 by and between the Debtors, CSC, the Ground Lessor, the New York Hotel and Gaming Trades Council, AFL-CIO, and Parkview.  *See Amended and Restated Declaration of Alan Tantleff in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Dkt. No. 60] (the "Tantleff Declaration") ¶ 26.

4

9.      Following the maturity of the Debtors' prepetition loans (the "Prepetition Loans") in November 2024, "DLA Piper advised Parkview on forbearance and the exercise of remedies, culminating in scheduling and noticing a UCC sale of the pledged equity interests in the Debtors." Brown Decl. ¶ 9.   After Parkview foreclosed on the equity interests in the Debtors on July 25, 2025, DLA Piper, now on behalf of the Debtors and Parkview, through a wholly owned subsidiary, PV Hudson LLC, "engaged in discussions with counsel to the ground lessor regarding alleged defaults under the ground lease and proposed adjustments to the Debtors' fallback business plan." *Id.*

10.     Although not expressly disclosed in the declaration filed in support of the DLA Retention Application, upon information and belief, DLA Piper played a major role in negotiating and executing that certain settlement agreement dated as of August 7, 2025 (the "Smeke Settlement") by and between the Debtors, the Smekes, CSC, and Parkview.  *See* Tantleff Decl. ¶ 38.  The Smeke Settlement provided for valuable releases by the Smekes against Parkview.  *See id.*  The Escrow Agreement was executed in conjunction with the Smeke Settlement and provides for various financial commitments with respect to the Smeke Settlement.  *See* Adv. Pro. 25-52468, Dkt. No. 1 ¶¶ 12-17.

11.     On October 21, 2025, a day prior to the filing of these Chapter 11 Cases, the Debtors executed an engagement letter with DLA Piper (the "Engagement Letter"), which formally engaged DLA Piper as special corporate and litigation counsel, "including in connection with adversary proceedings, chapter 11 plan and financing matters, and certain contested matters." Dkt. No. 99-4 at 2.  The Engagement Letter is signed on behalf of the Debtors by Parkview's CEO, Paul Rahimian.  *Id.* at 5.  The Engagement Letter sets forth the Debtors' agreement for DLA Piper "to continue representing Parkview in ongoing and future matters, including in matters related to

17699366/1

Hudson as borrower provided, however, that conflicts counsel will be retained to represent Client's interests in the event they become adverse to Parkview's interests." *Id.* at 3.

12.     Additionally, per the terms of the Engagement Letter, on October 21, 2025, DLA Piper received a $250,000 retainer from the Debtors. *See* Brown Decl. ¶ 21. As of the Petition Date, the entire retainer remained unapplied, and DLA Piper has represented that it will only be applied to any fees allowed by this Court. *Id.* ¶ 23.

13.     On the Petition Date, the Debtors' sole member, PV Hudson LLC, issued an omnibus written consent (the "Written Consent") directing Paul Rahimian and Ted Jung—both of whom are also officers of Parkview—to employ DLA Piper as special corporate and litigation counsel "to represent and assist the Companies in carrying out their duties under the Bankruptcy Code, and to take any and all actions to advance the Companies' rights and perform the Companies' obligations, including filing any complaints, answers, dispositive motions, cross motions, counterclaims, motions, objections, replies, applications or other papers and any related discovery." Dkt. No. 1 at 7. The Written Consent does not set forth any limit to DLA Piper's representation or set forth any services from which DLA Piper would be walled off. The Written Consent was signed on behalf of PV Hudson LLC by Paul Rahimian on behalf of Parkview Financial REIT, LP and Parkview Financial Fund GP, Inc.

14.     Robbin Itkin, the purported independent manager of the Debtors, was appointed by PV Hudson LLC on November 7, 2025, after the Engagement Letter and Written Consent were executed. Ms. Itkin "served as a partner at DLA Piper from approximately October 2017 through August 2020," Brown Decl. ¶ 12, and was a former client of DLA Piper, *id.* Schedule 2. Upon information and belief, DLA Piper was instrumental in selecting Ms. Itkin to serve as independent manager.

17699366/1

15.     On an undisclosed date, DLA Piper purported to have "terminated its matter-level relationship with [Parkview Financial REIT, LP] for all matters concerning the Debtors." DLA Ret. App. ¶ 19. DLA Piper, however, represents that it continues to represent Parkview affiliates, Parkview Financial, LLC, Parkview Financial REIT, LP, and PV Hudson LLC, in matters purportedly unrelated to the Debtors or the Chapter 11 Cases. *See* Brown Decl., Schedule 2.[3]

### III.     The DLA Retention Application

16.     The DLA Retention Application seeks to retain DLA Piper as "special counsel" for the Debtors pursuant to section 327(e) of the Bankruptcy Code. Specifically, DLA Piper seeks court authority to render the following professional services:

>    (a) representing the Debtors in connection with real estate matters;
>
>    (b) representing the Debtors in connection with corporate and strategic matters that may arise during these Chapter 11 Cases;
>
>    (c) representing the Debtors in connection with any and all financing matters, including debtor in possession financing and cash collateral matters, including negotiation, documentation, and implementation of DIP financing arrangements;
>
>    (d) representing the Debtors in connection with plan formulation, negotiation, and confirmation matters; and
>
>    (e) . . . representing the Debtors in investigation and litigation matters arising in or related to these Chapter 11 Cases.

DLA Ret. App. Proposed Order ¶ 3.

### OBJECTION

17.     Through the DLA Retention Application, DLA Piper seeks to be retained as special counsel pursuant to section 327(e) of the Bankruptcy Code, which provides:

>    The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate,

---

[3] It is dubious at best that any work performed by DLA Piper for PV Hudson LLC (which was created for the sole purpose of holding Parkview's equity interest in the Debtors and which has no other business purpose) can be "unrelated to the Debtors or the Chapter 11 Cases."

7

and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

18.    Pursuant to section 327(e), it is the proponent's burden to satisfy the following conditions: (i) the proposed counsel is employed for a special purpose, (ii) the proposed counsel previously represented the debtor, (iii) the employment of the proposed counsel is in the best interest of the estate, and (iv) the proposed counsel does not represent or hold an interest adverse to the debtor or the estate with respect to the matter for which they are to be employed. *See In re Rubin & Rubin, P.A. v. Office of the United States Tr. (In re NNN 400 Capitol Ctr. 16 LLC)*, 632 B.R. 243, 255-56 (D. Del. 2021). Whether a debtor has satisfied this burden is a fact-intensive inquiry that requires the examination of several relevant considerations, including but not limited to, the nature of the debtor's business, the scope and necessity of the proposed counsel's services, the history and relationship between the debtor and proposed counsel, the expense of hiring replacement counsel, the potential for conflicts of interest, and the role of general counsel. *See Stapleton v. Woodworkers Warehouse, Inc. (In re Woodworkers Warehouse, Inc.)*, 323 B.R. 403, 406 (D. Del. 2005).

19.    As explained below, the DLA Retention Application fails to satisfy a number of these requirements and should be denied.

I.      **DLA Piper's Proposed Retention is Not for a Specified Special Purpose**

20.    Courts have interpreted the requirement that proposed counsel be retained only for a "specified special purpose" to mean that special counsel must be retained for a purpose distinct from the general administration of the bankruptcy case to avoid "unnecessary duplication of services at the expense of the estate." *See In re Woodworkers Warehouse, Inc.*, 323 B.R. at 407; *Century Indem. Co. v. Congoleum Corp. (In re Congoleum Corp.)*, 426 F.3d 675, 692 (3d Cir.

2005) (holding that section 327(e) cannot be utilized to employ counsel that actively participates in drafting of a chapter 11 plan of reorganization and the general administration of the estate).

21.     Section 327(e) does not authorize the employment of an attorney to represent the estate generally or to represent the trustee in "conducting the case."  The reference to "conducting the case" includes all matters that form a part of the administration of the case under the Bankruptcy Code.   In a reorganization case, these matters generally include assisting in formulating a plan and assisting the trustee in carrying out required investigations; in a liquidation case, these matters generally include examining the validity of liens and claims and collecting the assets of the estate when legal action is required.  *See* 3 Collier on Bankruptcy P 327.04 (16th 2025).  Therefore, the focus is on whether the proposed services are sufficiently narrow.

22.     Courts have refused to allow the employment of special counsel whose services would overlap with the services customarily reserved for bankruptcy counsel—"regardless of how much familiarity with and understanding of the debtor's affairs special counsel brings to the case." *In re Roper & Twardowsky, LLC*, 566 B.R. 734, 750 (Bankr. D.N.J. 2017) (finding proposed retention of special counsel exceeded the scope of section 327(e) because special counsel would represent the debtor in every major remaining legal action affecting the distribution of funds and liquidation of the estate and retention was not for a special purpose other than to represent the trustee in conducting the case); *see also In re Hempstead Realty Assocs.*, 34 B.R. 624, 625 (Bankr. S.D.N.Y. 1983) (finding retention of special counsel to provide debtor broad legal services including basic legal advice with respect to its powers and duties as debtor-in-possession, the preparation of applications, answers, orders, reports, and assistance in preparing a plan of arrangement was improper); *In re S. Shore Golf Club Holding Co., Inc.*, 182 B.R. 94, 95 (Bankr. W.D.N.Y. 1995) (finding retention of special counsel to prepare disclosure statement and plan of

9

reorganization improper); *In re Tidewater Mem'l Hosp., Inc.*, 110 B.R. 221, 227-28 (Bankr E.D. Va. 1989) (finding retention of special counsel to advertise and negotiate proposals for the sale or reorganization of debtor's primary asset, including assisting the debtor with its plan of reorganization, improper).

23.    Although the Debtors represent that DLA Piper will provide "discreet [sic] legal services," DLA Ret. App. ¶ 14, it is difficult to understand what matters are not within the extremely broad scope of DLA Piper's proposed services. *See* DLA Ret. App. Proposed Order ¶ 3. The proposed scope of DLA Piper's retention encompasses virtually every aspect of these Chapter 11 Cases—real estate, corporate strategy, financing, plan confirmation, and litigation. *Id.* This is not "special counsel" for a discrete matter but rather an outright assumption of general bankruptcy counsel duties, effectively circumventing the Bankruptcy Code's conflict safeguards.[4]

24.    DLA Piper—with its clear conflict stemming from its representation of Parkview— would be unable to obtain this relief under section 327(a).[5] DLA Piper should not be allowed to dodge the Bankruptcy Code requirements of section 327(a) to obtain the same relief under section 327(e). *See In re Enviva Inc.,* Case No. 24-10453-BFK, 2024 WL 3285781, at *7 (Bankr. E.D. Va. July 2, 2024) ("Section 327(e) is not to be employed as an end-run around Section 327(a)'s more general requirement of disinterestedness."); *In re Hart Oil & Gas, Inc.*, Case No. 11-12-13558 TA, 2013 WL 3992252, at *4 (Bankr. D.N.M. Aug. 2, 2013) ("Counsel who are not disinterested cannot bypass § 327(a), while seeking to perform general bankruptcy work, by obtaining employment under § 327(e).").

---

[4] The expansive scope of the DLA Piper retention is emphasized by the Debtors' DIP Budget, which has a line item of multiple millions for DLA Piper's work, far more than any other professional.

[5] Courts routinely deny retention under section 327(a) where the proposed attorney's conflicts go to central elements of a case. *See In re Enviva Inc.*, No. 24-10453-BFK, 2024 WL 2795274, at *7 (Bankr. E.D. Va. May 30, 2024); *In re WM Distribution, Inc.*, 571 B.R. 866, 873 (Bankr. D.N.M. 2017); *In re Project Orange Assocs., LLC*, 431 B.R. 363, 376 (Bankr. S.D.N.Y. 2010).

17699366/1

## II. DLA Piper Holds an Interest Adverse to the Debtors with respect to the Matters for which it Seeks to be Employed

25.     While there should be no dispute that DLA Piper would be disqualified under section 327(a) of the Bankruptcy Code because of its conflicts of interest central to the case, it should also be disqualified for the same reason with respect to the matters for which it seeks retention under section 327(e).  Although section 327(e) does not require disinterestedness with respect to all matters related to the bankruptcy cases, it prohibits the appointment of an attorney who "represent[s] or hold[s] any interest adverse to the debtor or to the estate with respect to the matter" on which the attorney is employed.  11 U.S.C. § 327(e).  The Third Circuit has interpreted "interest adverse" to include both actual and potential conflicts of interest.  *In re NNN 400 Capitol Ctr. 16 LLC*, 632 B.R. at 259–60 ("Although the Bankruptcy Code does not define 'adverse interest,' the Third Circuit examines the phrase in terms of whether an attorney has a potential or actual conflict of interest that could interfere with its representation of the estate.").  An attorney has an interest adverse to the estate if it is found to have "a competing economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant."  *Id.* at 260.  While the court has discretion to disqualify attorneys who possess a potential conflict of interest, where an actual conflict is found, the court must disqualify the attorney.  *In re Congoleum Corp.*, 426 F.3d at 692; *In re Marvel Entm't Grp.*, 140 F.3d 463, 476 (3d Cir. 1998) ("Section 327(a), as well as [section] 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest.").

26.     An actual conflict of interest exists when "the specific facts before the bankruptcy court suggest that it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest."  *In re Boy Scouts of Am.*, 35 F.4th 149, 158 (3d Cir. 2022) (internal quotations omitted).  Actual conflicts of interest cannot be waived to

11

satisfy section 327 requirements.  *See In re Invitae Corp.*, No. 24-11362, 2024 Bankr. 2024 WL

2230069, at *4  (Bankr. D.N.J. May 16, 2024) ("The Court is mindful that K&E cannot draft

engagement letters so as to avoid the requirements of § 327."); *In re Ibridge Cloud Sols.*, No. 24-

11105 KHT, 2025 WL 2924353, at *2 (Bankr. D. Colo. Oct. 14, 2025) (holding that the

Bankruptcy Code does not permit a waiver of an actual conflict of interest).[6]  Whether an applicant

represents or holds an interest adverse to the estate requires a factual determination of "all relevant

facts surrounding the debtor's case, including, but not limited to, the nature of the debtor's

business, all foreseeable employment of special counsel, [and] the expense of replacement

counsel." *In re Woodworkers Warehouse, Inc.*, 323 B.R. at 406.

> A.    DLA Piper Represents an Adverse Interest on all Parkview Matters

27.    The DLA Retention Application seeks retention as special counsel for matters that

are necessarily adverse to Parkview, including representing the Debtors in connection with (i) any

and all financing matters, including debtor in possession financing and cash collateral matters;

(ii) plan formulation, negotiation, and confirmation matters; and (iii) investigation and litigation

matters, to the extent that they implicate prepetition transactions involving Parkview.

Representation of the Debtors on these matters creates an actual conflict of interest that mandates

disqualification of DLA Piper.[7]

---

[6]  Under the Delaware Rules of Professional Conduct, DLA Piper's ongoing representation of Parkview creates a "concurrent conflict of interest" that can only be waived with informed consent.  *See* Rule 1.7(a), (b).  Given that Parkview controls the Debtors, the Debtors are hopelessly conflicted and are therefore unable to give informed consent.  Accordingly, the client waiver that DLA Piper relies on is inadequate to cure the conflict even under state law.

[7]  The ethical wall that DLA Piper proposes putting in place *in the future* (*see* Dkt. No. 99, Attach. 4 at 3) fails to remedy this conflict.  *See In re Franchise Group*, No. 24-12480 (LSS), Dkt. No. 975 [Hr'g Tr. 19:21-20:4] (Bankr. Del. Feb. 12, 2025) (explaining that proposed ethical walls put in place after work already performed failed to prevent knowledge gained from representation to be imputed on firm as a whole so as to cure conflict issues); *In re Enviva Inc.*, No. 24-10453-BFK, 2024 WL 2795274, at *9 (Bankr. E.D. Va. May 30, 2024) (finding it impossible to erect "ethical walls" when the same attorneys had already worked on both sides).

28.     As set forth in the DLA Retention Application, DLA Piper represented Parkview, the Debtors' prepetition lender, largest creditor, and equity holder, with respect to various prepetition transactions related to the Property that are squarely at issue in these Chapter 11 Cases. Parkview is now the proposed DIP Lender.  Negotiation of the postpetition financing and any plan will necessarily be adverse to the Debtors' DIP Lender, largest secured creditor and equity holder. DLA Piper's representation of Parkview creates inherently divided loyalties that undermine its duty to the estate and precludes meaningful impartiality.  Courts consistently find actual conflict scenarios to be disqualifying under section 327(e).  *See, e.g., In re NNN 400 Capitol Ctr.*, 632 B.R. at 259-60; *In re Austin Temp. Servs.*, No. 07-11888-FM, 2008 WL 4692368, at *3-5 (Bankr. W.D. Tex. Oct. 21, 2008).

29.     Moreover, DLA Piper advised Parkview on a number of prepetition transactions that must be examined by the Debtors as fiduciaries to the estates and their creditors.  Specifically, DLA Piper advised Parkview concerning the Prepetition Loans, including entry into forbearance agreements and exercise of remedies and the foreclosure sale that transferred the equity in the Debtors to Parkview.  DLA Piper then advised the Debtors and Parkview with respect to the Union Settlement, the Smeke Settlement, and the Escrow Agreement.  Any estate claims involving these agreements would be directly adverse to Parkview, as a party to the agreements, and to DLA Piper, as the attorneys who negotiated and structured the agreements.[8]  What is more, DLA Piper also advised Parkview in connection with Ground Lessor negotiations.  DLA Piper, having advised Parkview with respect to negotiations with the Ground Lessor, cannot now provide advice to the

---

[8]  Certain of the litigation that has already been commenced in these Chapter 11 Cases underscores the conflict.  In the Interpleader Proceedings, there is a dispute as to whether the Debtors are party to the Escrow Agreement.  *See* Adv. Pro. 25-52468, Dkt. No. 1 ¶¶ 32, 34, 37.  Resolution of the Interpleader Proceeding will necessarily involve decisions by the Debtors, advised by DLA Piper, that diverge with the interests of Parkview.  DLA Piper—who is listed as counsel for both Parkview and the Debtors under the Escrow Agreement—cannot be entrusted to advise the Debtors in connection with these decisions.

17699366/1

Debtor regarding the Ground Lease. *See In re Licking River Mining*, LLC, 562 B.R. 351, 361 (Bankr. E.D. Ky. 2016) (finding an adverse interest and denying special counsel retention in adversary proceedings that challenged transactions that were the subject matter of the services that law firm provided to its former client); *cf. In re Filene's Basement, Inc.,* 239 B.R. 850, 858 (Bankr. D. Mass. 1999) (finding counsel held an actual adverse interest and was disqualified from representing debtor under section 327(a) where contracts prepared by counsel for both debtor and creditor were the subject of litigation and lawsuit involved the interpretation of those contracts and possible testimony by counsel).

30.     Accordingly, DLA Piper's actual conflicts of interest with Parkview disqualify its retention on any matters directly adverse to Parkview. For this reason alone, DLA Piper should be disqualified from representing the Debtors on matters related to the DIP Motion, any plan, or any investigation involving Parkview or transactions which implicate Parkview.

B.      DLA Piper Represents an Adverse Interest on
        Case Determinative Litigation Matters

31.     DLA Piper's proposed representation of the Debtors in connection with other case central investigation and litigation matters is similarly problematic. Even where Parkview is not a named party in the applicable investigation or litigation, DLA Piper's representation of and loyalty to Parkview gives it an incentive to pursue outcomes for Parkview's benefit that may not be in the best interests of the estates. *See In re The Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) ("[I]f it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate."); *In re Daigle*, No. 09-50144, 2011 WL 182892, at *2 (Bankr. W.D. La. Jan. 19, 2011) (denying retention where the court was suspicious that the "primary beneficiary of any attack" was the former client and not the estate).

17699366/1

32.     For example, DLA Piper seeks to represent the Debtors with respect to the Ground Lessor Proceeding.  As noted, DLA Piper participated in every prepetition interaction between Parkview and the Ground Lessor.  DLA Piper cannot now impartially advise the Debtors with respect to those interactions.  Further, it is currently unclear what the implications of that recharacterization are, to the extent it is successful.  The Ground Lessor Proceeding simply asks the Court for relief without specifying what that relief might be.  That litigation—which will be time consuming and costly—necessarily implicates Parkview's interests.  The Debtors will have to take a position at some point with respect to the priority status of the Ground Lessor's interests vis-a-vis Parkview, and Parkview has a unique interest in ensuring that the Prepetition Loan is senior to any lien of the Ground Lessor.

33.     Similarly, prepetition shortcomings with respect to the development of the Property are front and center of these cases and should not be subject to an investigation by DLA Piper. Parkview alleges that the Smekes' misconduct created the stop work order that precipitated these cases, while the Smekes have pointed to Parkview misconduct—including short funding and other breaches of their obligations under the Prepetition Loans—as the reason for the stop work order. Importantly, the Debtors have a duty to fully and fairly investigate these allegations, which may result in valuable estate claims.  Parkview's incentive, however, is clearly to avoid liability.

34.     DLA Piper represents an adverse interest with respect to the Ground Lessor Proceeding and any major case investigation involving the Smekes, and its retention on these matters should be denied.  The Debtors require an independent fiduciary to assess what is ultimately in the best interest of all creditors, not just in the interest of Parkview.

### III.     DLA Piper's Retention is Not in the Best Interest of the Estates

35.     The Debtors assert that, given DLA Piper's "institutional knowledge, and familiarity with the Debtors' business, . . . it would be most efficient and cost-effective for DLA

17699366/1

Piper to continue to assist the Debtors in connection with the services to be provided." DLA Ret. App. ¶ 13. There is no factual basis, however, to support the conclusory statement that "[i]f the Debtors were required to . . . utilize the services of Chipman for these matters, the Debtors would have to expend significant resources and expense in ensuring that such counsel becomes familiar with the Debtors' business affairs and historical involvement in the redevelopment of the Hudson." *Id.*

36.    Chipman has been retained since at least October 2025 and has adequately familiarized itself with the Property and prepetition matters that DLA Piper was involved in. *See* Dkt. No. 96-3 ¶ 8 ("[Chipman] is familiar with the Debtors and with many of the potential legal issues which may arise in the context of the Chapter 11 Cases and has the necessary background and knowledge to represent the Debtors in the Chapter 11 Cases in an effective and efficient manner."). The scope of Chipman's approved retention already covers all matters that DLA Piper seeks to be retained to handle. *See* Dkt. No. 96-2 ¶ 3 (outlining professional services that are largely identical to those for which DLA Piper seeks to be retained to provide).

37.    Additionally, while not legal counsel, FTI has been engaged by the Debtors with respect to the development of the Hudson since September 28, 2025. *See* Dkt. No. 97-2 at 1. FTI has provided the Debtors with Co-Chief Restructuring Officers and has been retained, among other things, to "[l]ead completion of the existing remodeling project at the Hudson Hotel." Dkt. No. 97 ¶ 16. FTI itself has suggested that it has "a thorough understanding of the Debtors' business and the turnaround and restructuring strategy the Debtors implemented prior to the Petition Date." *Id.* ¶ 34. There is no basis to believe that Chipman could not rely on FTI, as well as other historical professionals who are slated to be retained as ordinary course professionals, to answer any unresolved background questions it has with respect to the Debtors.

17699366/1

38.     In sum, there is no evidence that retaining DLA Piper would provide any meaningful efficiency or cost savings to the estates.  The Debtors' other professionals already possess the requisite knowledge to represent the Debtors for all case administration matters, and DLA Piper has not demonstrated any unique institutional insight relevant to the matters for which it seeks to be employed.  When weighed against the significant conflicts described above that threaten to prioritize Parkview's interests over those of the estates, DLA Piper's retention is not in the best interests of the estates.

## RESERVATION OF RIGHTS

39.     The Committee reserves all its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, to raise additional objections and introduce evidence during the final hearing on the DLA Retention Application.

*[Remainder of Page Intentionally Left Blank]*

17699366/1

## CONCLUSION

40.     For the foregoing reasons, the Court should sustain the Objection and deny the

relief requested in DLA Retention Application.

Dated: January 2, 2026
      Wilmington, Delaware

Respectfully submitted,

**MORRIS JAMES LLP**

/s/ Siena B. Cerra
Eric J. Monzo (DE Bar No. 5214)
Siena B. Cerra (DE Bar No. 7290)
3205 Avenue North Blvd., Suite 100
Wilmington, DE 19803
Telephone: (302) 888-6800
Email: emonzo@morrisjames.com
      scerra@morrisjames.com

-and-

**SEWARD & KISSEL LLP**
Robert J. Gayda (admitted *pro hac vice*)
Catherine V. LoTempio (admitted *pro hac vice*)
Andrew J. Matott (admitted *pro hac vice*)
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 450-8421
Email: gayda@sewkis.com
      lotempio@sewkis.com
      matott@sewkis.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

17699366/1