### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Hudson 1701/1706, LLC, *et al.*,[1] | Case No. 25-11853 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 99** |
| | **Hearing Date: Jan. 13, 2026 at 1:00 p.m. (ET)** |
| | **Obj. Deadline: Dec. 5, 2025 at 4:00 p.m. (ET)[2]** |

### UNITED STATES TRUSTEE'S OBJECTION TO THE APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO RETAIN AND EMPLOY DLA PIPER LLP (US) AS SPECIAL COUNSEL, EFFECTIVE AS OF THE PETITION DATE AND (II) GRANTING RELATED RELIEF

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to the *Application of the Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Employ DLA Piper LLP (US) as Special Counsel, Effective as of the Petition Date and (II) Granting Related Relief* [D.I. 99] (the "Application," or "Appl.").[3] and in support of this Objection respectfully states:

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tentleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

[2] Extended to January 5, 2026 at 12:00 p.m. for the U.S. Trustee by consent of the Debtors.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Application.

## PRELIMINARY STATEMENT

1.      The Court should deny the Application because DLA Piper LLP (US) ("DLA Piper," or the "Firm") cannot satisfy the standards for retention under either section 327(e) or 327(a) of the Bankruptcy Code.

2.      Initially, the Debtors cannot retain DLA Piper under section 327(e)—as they seek to do through the Application—as counsel performing a "specified special purpose." That is because the Firm's proposed services relate to a wide range of activities that are central to the administration of these chapter 11 cases, including, among other things: (a) "real estate matters" (on behalf of the real estate developer Debtors); (b) "corporate and strategic matters"; (c) "all financing matters" (including DIP financing funded by DLA Piper's current client); (d) "plan formulation, negotiation, and confirmation matters"; and (e) "representing the Debtors in investigation and litigation matters" related to the chapter 11 cases. In other words, the Debtors are seeking to retain DLA Piper to provide a full suite of legal services in connection with the conduct of these chapter 11 cases. That is not what section 327(e) contemplates and, accordingly, the Court should not approve the firm's retention thereunder.

3.      Under these facts and circumstances, the Debtors are required to seek approval of DLA Piper's retention under section 327(a). But the Firm is also ineligible for retention under that subsection because it has actual conflicts of interest requiring disqualification and/or lacks disinterestedness. For example, DLA Piper represented Parkview Financial, LLC, an affiliate of Parkview Financial REIT, LP ("Parkview")—the Debtors' prepetition secured lender and now DIP lender and indirect owner—in matters directly pertaining to the Debtors up to the Petition Date. This included representing Parkview in connection with, among other things, (a) negotiating material amendments to the prepetition loan documents and related transactions, and

(b) Parkview's foreclosure upon the equity interests in the Debtors in July 2025. Following that foreclosure, the Firm contends that it represented Parkview and the Debtors concurrently until the Petition Date. But DLA Piper did not enter into its Engagement Letter with the Debtors until the day before the Petition Date, and that Engagement Letter is directed to the founder and CEO of Parkview on the Debtors' behalf. The Firm has never implemented an ethical wall between the attorneys who represented Parkview prepetition on matters involving the Debtors and the attorneys representing the Debtors in these chapter 11 cases, despite significant overlap in the Firm's staffing. In short, the Firm's prepetition connections to Parkview and lack of any postpetition guardrails provide sufficient grounds for the Court to disqualify DLA Piper under section 327(a).

4.      Moreover, upon information and belief, on August 20, 2025 (i.e., post-foreclosure), DLA Piper received a payment of $820,771.65 from Parkview on account of services the Firm provided for and/or related to the Debtors. The Firm did not disclose this payment in connection with the Application. The Firm's incomplete and inaccurate disclosures suggest that it may not have an undivided loyalty to the Debtors' bankruptcy estates and provide a separate and independent basis for the Court to deny the Application.

5.      For the same reasons that the Court should disqualify DLA Piper under section 327(a), the Firm is not disinterested and/or holds or represents interests adverse to the estates or Debtors with respect to the matters on which it is to be employed under section 327(e). Consequently, DLA Piper cannot be retained under section 327(e) even if the Court finds that the proposed special counsel services constitute a "specified special purpose" (which the Court should not do).

6.      Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court deny the Application.

## JURISDICTION AND STANDING

7.     This Court has jurisdiction to hear and determine the Application and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

8.     Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

9.     The U.S. Trustee has standing to be heard on this Objection pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## BACKGROUND

### A.     The Chapter 11 Cases

10.     On October 22, 2025 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code," or "Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing their respective above-captioned chapter 11 cases (the "Chapter 11 Cases").

11.     The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

12.     On November 25, 2025, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee"). D.I. 104.

13.     As of the date hereof, no trustee or examiner has been appointed in the Chapter 11 Cases.

**B.      DLA Piper's Prepetition Connections to Parkview Related to the Debtors**

      **i.      The Prepetition Loans**

14.     The Debtors "were formed in March 2022 to redevelop and operate certain condominium units within the historic Hudson Hotel[.]" *Amended and Restated Declaration of Alan Tantleff in Support of Debtors' Chapter 11 Petitions and First Day Motions*, D.I. 60 (the "Tantleff Declaration," or "Tantleff Decl."), ¶ 9.

15.     In connection with their development of the Hudson, the Debtors entered into two loan agreements with Parkview: (i) a *Building Loan Agreement* dated as of May 4, 2022 in the maximum principal amount of $81,782,527.00 (the "Building Loan"); and (ii) a *Project Loan Agreement* dated as of May 4, 2022 in the maximum principal amount of $125,217,473.00 (the "Project Loan," and together with the Building Loan the "Prepetition Loans"). *Id.* at ¶ 12. Alberto Smeke Saba and Salomon Smeke Saba (together, the "Smekes") formed the Debtors' prior sole member, managed the construction project and guaranteed the Debtors' obligations under the Prepetition Loans. *Id.* at ¶ 14.

16.     Upon information and belief, DLA Piper represented Parkview in connection with amendments to the Prepetition Loans and related transactions beginning in or around April 2024. This included representation related to: (i) a *Second Omnibus Amendment to Loan Documents* dated May 10, 2024; and (ii) a *Third Omnibus Amendment to Loan Documents* dated June 5, 2024. *See Declaration of Stuart M. Brown*, D.I. 99-2 (the "Brown Declaration," or "Brown Decl."), ¶ 9

5

(disclosing the Firm's representation of Parkview in connection with "negotiating loan document amendments in May 2024").

17.    The Prepetition Loans matured on November 1, 2024. Tantleff Decl., ¶ 12. But the Debtors were "unable to make payment by that time[.]" *Id.* at ¶ 33. Thereafter, "DLA Piper advised Parkview on forbearance and the exercise of remedies, culminating in scheduling and noticing a UCC sale of the pledged equity interests in the Debtors." Brown Decl., ¶ 9.

18.    More specifically, DLA Piper represented Parkview in connection with a *Financial Agreement* between Parkview, the Debtors, CSC Hudson, LLC ("CSC," i.e., the Debtors' prior equity owner), the Smekes, and the Ground Lessor (defined herein) dated April 10, 2025 (the "Financial Agreement"). *Id.* at ¶ 34. Among other things, the Financial Agreement adjourned the scheduled UCC sale of the equity interests in the Debtors, which interests CSC had pledged as collateral in connection with the Prepetition Loans. *Id.*

19.    On June 30, 2025, after the Debtors defaulted under the Financial Agreement, Parkview filed a lawsuit (the "State Court Action") against the Smekes alleging, among other things, that the Smekes "mismanaged construction of the project" and caused the Debtors to default on the Prepetition Loan obligations by failing to pay all amounts owed when due. *Id.* at ¶ 36. Upon information and belief, DLA Piper represented Parkview in the State Court Action.

20.    On July 25, 2025, Parkview conducted a UCC foreclosure sale of the equity interests in the Debtors. *Id.* at ¶ 37. DLA Piper represented Parkview in connection with the foreclosure. Brown Decl., ¶ 9. Parkview "obtained [the equity interests in the Debtors] in exchange for a credit bid in the amount of $80,000,000[.]" Tantleff Decl., ¶ 37. All of the Debtors' equity interests are now owned by PV Hudson LLC ("PV Hudson"). *Id.* at ¶ 44. Parkview wholly owns PV Hudson and, indirectly, the Debtors. *Id.* at Ex. 2.

21.     On August 7, 2025, the Debtors, Parkview, the Smekes and CSC entered into a *Settlement and Release Agreement* related to the State Court Action (the "Settlement Agreement"). *Id.* at ¶ 38. Upon information and belief, DLA Piper represented Parkview and/or the Debtors in connection with the Settlement Agreement. Among other things, the Settlement Agreement provided that Parkview would place into escrow a "Cure Delivery Fee" in the amount of $4,637,500 for the benefit of the Smekes. *Id.* The Cure Delivery Fee would be released to the Smekes if certain conditions were met. *Id.* Prior to the Petition Date, Parkview funded the full Cure Delivery Fee into escrow. *Id.* As of the Petition Date, $1,637,500 remained in escrow. *Id.*

22.     On November 4, 2025, DLA Piper, on behalf of the Debtors, "advised the escrow agent not to release the remaining funds under the escrow agreement due to the filing of these Chapter 11 Cases." *Id.*

### ii.     The Ground Lease

23.     On May 4, 2022, contemporaneously with the execution of the Prepetition Loans, the Debtors entered into a *Ground Lease* with 356W58 Ground Lessor, LLC (the "Ground Lessor"). Tantleff Decl., ¶ 10.

24.     The Ground Lease required substantial completion of the Hudson project by May 4, 2024. *Id.* That did not occur. *Id.* On May 7, 2024, the Ground Lessor noticed a default under the Ground Lease. *Id.* The Ground Lessor subsequently noticed additional defaults related to, among other things, over $8,000,000 in mechanics' liens filed against the Hudson. *Id.* DLA Piper represented Parkview in "addressing mechanic lien issues up to the Petition Date." Brown Decl., ¶ 9.

25.     Following the UCC sale, the Debtors—now owned indirectly by Parkview and under its control—"shared a proposal to restructure the Ground Lease with the Ground Lessor." Tantleff Decl., ¶ 54. The Ground Lessor purportedly rejected the proposal in its entirety. *Id.* Due

to their change in management, the Debtors were required to submit a "Fallback Business Plan" to the Ground Lessor by October 23, 2025. *Id.* The Debtors were unable to meet that deadline. *Id.* at ¶ 57. The Debtors filed these Chapter 11 Cases on October 22 and represented that they submitted "a fulsome draft Fallback Business Plan to the Ground Lessor on October 23[.]" *Id.*

26.     DLA Piper represented Parkview and the Debtors "in discussions with counsel to the [Ground Lessor] regarding alleged defaults under the [Ground Lease] and proposed adjustments to the Debtors' fallback business plan." Brown Decl., ¶ 9.[4]

27.     The Debtors commenced these Chapter 11 Cases "after extensive efforts to recommence construction at the Hudson and resolve issues with [Parkview], Ground Lessor and mechanics and materialmen." Tantleff Decl., ¶ 45. In particular, the Debtors "were exposed to the risk that the Ground Lessor might terminate the Ground Lease at any time by virtue of the existing defaults." *Id.* at ¶ 46. Termination "could have eliminated the Debtors' property interests and all efforts to redevelop the property." *Id.*

**C.     The DIP Motion**

28.     On November 12, 2025, DLA Piper—together with the Debtors' general bankruptcy counsel, Chipman Brown Cicero & Cole, LLP—filed on the Debtors' behalf the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Lender; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [D.I. 56] (the "DIP Motion").

---

[4] The Application does not specify which of the services described in paragraph 9 of the Brown Declaration were provided to the Debtors or Parkview. Upon information and belief, all of the services described in paragraph 9 of the Brown Declaration were provided on behalf of Parkview, while the services in connection with the Fallback Business Plan and related developmental milestones were purportedly provided on behalf of Parkview and the Debtors.

29.     By and through the DIP Motion, the Debtors sought the entry of interim and final orders authorizing them to enter into a postpetition senior secured, priming, first-lien and superpriority multi-draw debtor-in-possession term loan credit facility (the "DIP Facility") with Parkview as DIP Lender.

30.     DLA Piper participated in negotiations with the U.S. Trustee regarding the terms and provisions of the DIP Facility and proposed orders granting the DIP Motion. The Firm also presented the DIP Motion to the Court at the continued "first day" hearing on November 17, 2025.

31.     On November 17, the Court entered an order approving the DIP Motion on an interim basis and setting a final hearing for December 12, 2025 [D.I. 82] (the "Interim DIP Order").

32.     On December 10, 2025, the Committee objected to final approval of the DIP Motion. D.I. 144. At the December 12 hearing, the Debtors announced on the record that they had agreed with the Committee to adjourn the hearing on final approval of the DIP Motion to facilitate further negotiations.

33.     As of the date of this Objection, the Court has not yet entered an order approving the DIP Motion on a final basis.

**D.     The Adversary Proceedings**

**i.     The Interpleader Action**

34.     On December 18, 2025, First American Title Insurance Company ("First American") commenced an adversary proceeding in the Chapter 11 Cases styled *First American Title Insurance Co v. Hudson 1701/1706, LLC et al. (In re Hudson 1701/1706, LLC et al.)*, Adv. Pro. No. 25-52468-KBO (the "Interpleader Action"). In its *Complaint for Interpleader* [D.I. 177] (the "Interpleader Complaint," or "Interpleader Compl."), First American alleges that it "has received conflicting directions" from the Debtors, Smekes and Parkview with regard to certain

"Escrow Funds." Interpleader Compl., Preamble. The Escrow Funds in question are the remaining balance of the Cure Delivery Fee. *Id.* at ¶¶ 12-14.

35.     First American further alleges that on November 3, 2025, DLA Piper wrote a letter to First American on the Debtors' behalf and "demanded that First American refrain from disbursing any Escrow Funds currently being held by First American until receipt of joint written instructions to do so from all parties to the Escrow Agreement." *Id.* at ¶ 20.

36.     First American further alleges that on December 11, 2025, the Smekes (through counsel) "reiterated [their] position that the Debtors are not parties under the Escrow Agreement and have no interest in the Escrow Funds[.]" *Id.* at ¶ 28.

37.     Thereafter, First American alleges, Hogan Lovells US LLP wrote a letter to First American on December 12, 2025 on behalf of Parkview and "directed First American not to disburse any of the Escrow Funds[.]" *Id.* at ¶ 30.

38.     First American seeks judgment, among other things, "directing that Defendants be required to interplead and settle between themselves their rights to the Escrow Funds[.]" *Id.*, Prayer for Relief, ¶ A.

39.     Attached to the Interpleader Complaint as Exhibit B is an executed Escrow Agreement. *Id.* at Ex. B. DLA Piper is listed as a notice party for Parkview and the Debtors in connection with the Escrow Agreement; thus, it appears that DLA Piper represented Parkview and/or the Debtors in connection with the Escrow Agreement. *Id.* at Ex. B, § 9.

**ii.     The Recharacterization Action**

40.     On December 22, 2025, the Debtors commenced an adversary proceeding in the Chapter 11 Cases styled *Hudson 1701/1706, LLC et al. v. 356W58 Ground Lessor LLC (In re Hudson 1701/1706, LLC et al.)*, Adv. Pro. No. 25-52471-KBO (the "Recharacterization Action").

DLA Piper signed the *Complaint* filed at Docket No. 1 of the Recharacterization Action (the "Recharacterization Complaint," or "Recharacterization Compl.").

41.     The Debtors are seeking recharacterization of the Ground Lease "to reflect its actual substance" as a "disguised financial product." Recharacterization Compl., ¶ 2.

42.     The Recharacterization Complaint includes five counts. Count I is for a declaratory judgment that the Ground Lease is not a "true lease." Counts II and III are for avoidance of fraudulent transfers related to payments made under the Fourth Amendment to the Ground Lease. Count IV is for recovery of a fraudulent transfer pursuant to section 550 of the Bankruptcy Code. Count V is for disallowance of the Ground Lessor's claims in the Chapter 11 Cases pursuant to section 502(d) of the Code.

**E.     The Application**

43.     On November 21, 2025, the Debtors filed the Application seeking to retain DLA Piper as special counsel to the Debtors pursuant to section 327(e) of the Bankruptcy Code.

44.     Attached to the Application as Exhibit D is an Engagement Letter between the Debtors and the Firm dated as of October 21, 2025. The Engagement Letter is addressed to Paul Rahimian. Appl., Ex. D, p. 1. Mr. Rahimian "is the CEO and founder of Parkview Financial[.]"[5] Upon information and belief, no prior engagement letter between the Debtors and DLA Piper exists. The Engagement Letter is dated one day before the Petition Date.

45.     The Engagement Letter provides, among other things, that DLA Piper "is permitted to continue representing Parkview in ongoing and future matters, including in matters related to Hudson as borrower provided, however, that conflicts counsel will be retained to represent [the Debtors'] interests in the event they become adverse to Parkview's interests." *Id.* at p. 2.

---

[5] *See* https://www.parkviewfinancial.com/paul-rahimian (last visited Jan. 2, 2026).

46.    The Application provides that DLA Piper will provide the following services to the

Debtors in the Chapter 11 Cases:

(a)    representing the Debtors in connection with real estate
matters;

(b)    representing the Debtors in connection with corporate and
strategic matters that may arise during these Chapter 11
Cases;

(c)    representing the Debtors in connection with any and all
financing matters, including debtor in possession financing
and cash collateral matters, including negotiation,
documentation, and implementation of DIP financing
arrangements;

(d)    representing the Debtors in connection with plan
formulation, negotiation, and confirmation matters; and

(e)    due to DLA Piper's historic representation of the Debtors,
including certain investigations respecting prepetition
contracts and services obtained by the Debtors from third
parties, representing the Debtors in investigation and
litigation matters arising in or related to these Chapter 11
Cases.

Appl., ¶ 14.

47.    DLA Piper continues to represent Parkview "in matters unrelated to the Debtors

and the Hudson project[.]" Brown Decl., ¶ 10. The Firm has proposed that if it is asked in the

future "to represent Parkview in any matter related to the Debtors, it will undertake to create a

separate team of professionals and paraprofessionals to represent Parkview in such matter[.]" *Id.*

DLA Piper will also, in such a scenario, "establish an ethical wall" between Firm professionals

working on these Chapter 11 Cases and the Firm professionals representing Parkview. *Id.* Upon

information and belief: (i) the Firm has not implemented an ethical wall between, on the one side,

Firm attorneys who represented Parkview prepetition in matters related to the Debtors and the

Hudson, and on the other side, Firm attorneys who now represent the Debtors in connection with

the Chapter 11 Cases; and (ii) multiple Firm attorneys who represented Parkview prepetition in

such matters now represent the Debtors in the Chapter 11 Cases.

48.    The Application further provides that "[d]uring the 90-day period prior to the

Petition Date, DLA Piper received the Retainer" in the amount of $250,000. Brown Decl., ¶ 23.

Upon information and belief, on August 20, 2025, the Firm received a payment from Parkview in

the amount of $820,771.65 on account of work for and/or related to the Debtors and the Hudson.

This payment is not disclosed in the Application.

## OBJECTION

49.    The Court should deny the Application because: (i) DLA Piper is ineligible to be

retained pursuant to section 327(e) for a "specified special purpose"; (ii) the Firm cannot satisfy

the requirements for retention under section 327(a); (iii) the Firm's mandatory disclosures under

Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") are inadequate;

and (iv) the Debtors cannot retain the Firm under section 327(e) because it holds or represents an

interest adverse to the Debtors or their estates and/or lacks disinterestedness with respect to the

matters upon which the Firm is to be retained.

## I.    The Debtors Cannot Retain DLA Piper Pursuant to Section 327(e) to Represent the Estates Generally

50.    The Debtors seek to retain DLA Piper pursuant to section 327(e) of the Bankruptcy

Code. That section provides that:

> The trustee … may employ, *for a specified special purpose, other than to represent the trustee in conducting the case*, an attorney that has represented the debtor, if in the best interest of the estate, *and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed*.

11 U.S.C. § 327(e) (emphasis added).

13

51.     Thus, under section 327(e), special counsel may be appointed if: (i) the representation is in the best interest of the estate; (ii) the attorney represented the debtor in the past; (iii) the attorney is for a specific purpose approved by the court, other than to represent the debtor in conducting the case; and (iv) the attorney does not represent or hold an interest adverse to the debtor or the debtor's estate. *See, e.g.*, *In re Roper and Twardowsky, LLC*, 56 B.R. 734, 750 (Bankr. D.N.J. 2017) (citations omitted).

52.     The "special purpose" requirement of section 327(e) means that "the trustee is not permitted to use this section to employ counsel to assist him in the general administration of the estate." *Id.* (citing *In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005)); *see also In re First Am. Health Care of Ga., Inc.*, Nos. 96-20188, 9620190, 96-20218, 1996 WL 33404562, at *3 (Bankr. S.D. Ga. Apr. 18, 1996) ("the phrase, 'specified special purpose,' is in the singular, suggesting that it may be limited to cases involving a single lawsuit or a discrete and specialized advisory role (i.e. tax, securities, antitrust, etc.)."). The plain language of section 327(e) indicates that it is "crucial" that the proposed employment not relate to the trustee's duty of conducting the case. *See, e.g.*, *In re Neuman*, 138 B.R. 683, 686 (S.D.N.Y. 1992).

53.     Indeed, the legislative history specifically notes that section 327(e) "does not authorize the employment of the debtor's attorney to represent the estate generally or represent the trustee in the conduct of the bankruptcy case." *See In re First Am. Health Care of Ga., Inc.*, 1996 WL 33404562 at *3 (quoting and citing H.R. Rep. No. 595, 95th Cong., 1st Sess. at 328 (1977); S. Rep. No. 989 95th Cong. 2nd Sess. at 38-39 (1978), U.S. Code Cong. & Admin News 1978, pp. 5787, 5824-5825, 6284-6285). Instead, Congress contemplated that section 327(e) "will most likely be used when the debtor is involved in complex litigation, and changing attorneys in the

middle of the case after the bankruptcy case has commenced would be detrimental to the progress of that litigation." *Id.* (citations omitted).

54.     Here, the Debtors do not seek to retain DLA Piper for a "specified special purpose." Rather, the Debtors are essentially seeking to retain the Firm as their general bankruptcy co-counsel. The Firm's proposed services include, among other things: (a) "real estate matters"; (b) "corporate and strategic matters"; (c) "all financing matters"; (d) "plan formulation, negotiation, and confirmation matters"; and (e) "representing the Debtors in investigation and litigation matters" related to the chapter 11 cases. Appl., ¶ 14. Real estate matters (on behalf of these developer Debtors), case financing (from Parkview, whom DLA Piper represented in its capacity as the prepetition lender up to the Petition Date) and the development of a plan all facially relate to assisting or representing the Debtors in the conduct of the Chapter 11 Cases generally. In fact, they are the central matters remaining to be addressed in these Chapter 11 Cases.

55.     Section 327(e) is not a back door through which counsel disqualified under section 327(a) can be retained to represent a debtor in the conduct of the case. And a debtor cannot for the sake of efficiency ignore the limitations imposed under section 327(e). In particular, presiding over case financing and participating in the formulation of a chapter 11 plan are not appropriate for section 327(e) counsel. *See generally In re Congoleum Corp.*, 426 F.3d at 691-92 (finding that participating in formulation and revision of a pre-packaged chapter 11 plan was "far too expansive an assignment to be appropriate for an appointment under § 327(e)."); *In re Running Horse, L.L.C.*, 371 B.R. 446, 453 (Bankr. E.D. Cal. 2007) (finding that "conducting the case" is not defined in the Code but includes matters related to formulating a chapter 11 plan or liquidating a debtor's assets); *In re Interstate Distrib. Ctr. Assocs. (A), Ltd.*, 137 B.R. 826, 833 (Bankr. D. Colo. 1992)

15

(assisting in the construction of a chapter 11 plan and disclosure statement "are duties clearly beyond the scope and intent of section 327(e).").

56.     Likewise, DLA Piper's representation of the Debtors in the Recharacterization Action constitutes assistance with the conduct of the cases. The Debtors filed these Chapter 11 Cases because they "have been unable to complete the project within the time required by the Ground Lease." Tantleff Decl., ¶ 45. The Debtors needed the protection of the automatic stay because they were "exposed to the risk that the Ground Lessor might terminate the Ground Lease at any time by virtue of the existing defaults," which "could have eliminated the Debtors' property interests and all efforts to redevelop the property." *Id.* at ¶ 46. The central purpose of the Chapter 11 Cases is for the Debtors to "seek appropriate relief with respect to the Ground Lease and complete the redevelopment and construction at the Hudson." *Id.* In other words, the Recharacterization Action is not a mere continuation of complex litigation in which the Firm represented the Debtors prepetition; it is a newly filed action serving as the foundation for the reorganization strategy that the Debtors have elected to pursue in the Chapter 11 Cases.

57.     Therefore, the Firm's proposed special counsel services go well beyond the "specified special purpose" required for retention under section 327(e), and DLA Piper is ineligible for retention under that subsection.

## II.     The Debtors Cannot Retain DLA Piper Under Section 327(a) Because the Firm Holds or Represents Interests Adverse to the Debtors or Estates and/or is Not Disinterested

58.     Section 327(a) of the Bankruptcy Code authorizes a debtor to employ attorneys "that do not hold or represent an interest adverse to the estate," and that are "disinterested persons." 11 U.S.C. § 327(a). Courts have interpreted the language "interest adverse to the estate" to mean:

> (i)     to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or

16

<dl><dd>

(ii)   to possess a predisposition under circumstances that render such a bias against the estate.

</dd></dl>

*See I.G. Petroleum, L.L.C. v. Fenasci (In re West Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005) (citations omitted); *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005).

59.    The United States Court of Appeals for the Third Circuit has neatly reduced conflicts analysis for attorneys proposed to be retained under section 327(a) to a basic set of principles: actual conflicts of interest require disqualification; potential conflicts of interest may be disqualifying in the exercise of the Court's discretion; and the mere appearance of conflict, without more, is insufficient to disqualify counsel. *See In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 476 (3d Cir. 1998).

60.    In addition, the term "disinterested person" includes, among others, a person who "*does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders*, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C) (emphasis added). This provision, better known as the "catch-all" provision, "has been held broad enough to include anyone who in the slightest degree might have some interest or relationship that might faintly color the independence and impartial attitude required by the Code and the Bankruptcy Rules." *In re BH & P, Inc.*, 949 F.2d 1300, 1309 (3rd Cir. 1991) (cleaned up) (citation omitted).

61.    Here, the Court should deny the Application because DLA Piper holds or represents interests adverse to the Debtors or their estates and/or the Firm lacks disinterestedness.

62.    Initially, the Firm's prepetition representation of Parkview creates an actual conflict of interest requiring disqualification. DLA Piper represented Parkview in connection with the Prepetition Loans for eighteen months, from April 2024 up to the Petition Date. That representation included, among other things, multiple amendments of the Prepetition Loans,

negotiation of the Financial Agreement and related forbearance, the State Court Action, the Settlement Agreement and ultimately the exercise of remedies that led to Parkview taking ownership and control of the Debtors via credit bid. In that capacity, DLA Piper represented an interest adverse to the Debtors and their estates.[6] The fact that the Firm also "represented" the Debtors in connection with the Prepetition Loans appears to have been an administrative convenience following Parkview's foreclosure. Indeed, DLA Piper did not have an engagement agreement with the Debtors until October 21, 2025.[7] With the exception of the preparation of the Fallback Business Plan and related milestones, all of the prepetition work referenced in the Application on behalf of the Debtors was apparently for the benefit of Parkview. The Firm cannot now simply turn around and represent the Debtors, who hold fiduciary duties to their estates and creditors, in matters like case financing and plan formulation where they are adverse to Parkview.

63.     Further, the Firm represented Parkview in the State Court Action and apparently represented both Parkview and the Debtors in connection with the related Settlement Agreement and Escrow Agreement with the Smekes. Almost immediately after the Petition Date, DLA Piper attempted to leverage the Chapter 11 Cases and automatic stay to intervene in the dispute between Parkview and the Smekes over the remaining Cure Delivery Fee. This resulted in the commencement of the Interpleader Action, in which DLA Piper now seeks to represent the Debtors. But where the Debtors' and Parkview's interests in this dispute may have aligned

---

[6] The Firm continues to represent Parkview in matters unrelated to these Chapter 11 Cases.

[7] It is unclear when the Debtors and the Firm entered into their engagement agreement. The Engagement Letter is dated as of October 21, 2025, but in response to inquiries from the U.S. Trustee, DLA Piper disclosed that it had not entered into an engagement agreement with the Debtors until October 22 (the Petition Date). Thus, notwithstanding certain indications that DLA Piper may have represented the Debtors in connection with the Settlement Agreement and Escrow Agreement, it remains an open question whether the Firm "represented" the Debtors at all prepetition. If not, then this is a separate and independent basis upon which the Court can deny the Firm's retention under section 327(e).

prepetition, the filing of the Chapter 11 Cases imposes on the Debtors fiduciary duties to all creditors, not simply Parkview. This is yet another basis upon which the Court can find an actual conflict requiring disqualification.

64.     Importantly, DLA Piper has never implemented an ethical wall between Firm attorneys who represented Parkview in connection with the Prepetition Loans and Firm attorneys representing the Debtors in these Chapter 11 Cases. To the contrary, the Firm appears to have simply expanded its Parkview roster by adding DLA Piper bankruptcy and restructuring attorneys. Thus, the client confidences entrusted to DLA Piper in connection with the Prepetition Loans and related matters described above are properly imputed to the entire Firm. Against that backdrop, the Debtors now propose that DLA Piper advise and represent them in connection with, among other things, postpetition financing from Parkview that "rolls up" the Prepetition Loans and the formulation of a chapter 11 plan. Put simply, the Firm is disqualified from providing those services due to its prepetition representation of Parkview.

## III.    The Court Should Deny the Application Because DLA Piper Has Failed to Provide Complete and Accurate Disclosures

65.     Bankruptcy Rule 2014 provides that an application for employment of professional persons "must state specific facts showing … (A) the need for the employment … (E) any proposed arrangement for compensation; and (F) to the best of the applicant's knowledge, all of the person's connections with: the debtor, creditors, [and] any other party in interest[.]" Fed. R. Bankr. P. 2014(a)(2).

66.     Disclosure "goes to the heart of the integrity of the bankruptcy system." *In re eToys, Inc.*, 331 B.R. at 189 (quoting *In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 236 (Bankr. E.D. Cal. 1988)). In *In re eToys*, Judge Walrath observed that:

> [T]he duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an

> attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interest of the estate. [Citations.] The bankruptcy court must be given timely and complete disclosure by the debtor's attorney of all connections with parties in interest in the case to exercise its own ongoing affirmative responsibility to root out impermissible conflicts of interest under Bankruptcy Code §§ 327(a) and 328(c).

*Id.* (cleaned up).

67.     Courts have strictly construed the disclosure requirements of Bankruptcy Rule 2014(a) in furtherance of the Rule's protective function. *See In re Jore Corp.*, 298 B.R. 703, 725 (Bankr. D. Mont. 2003). Accordingly, any and all information which has any bearing on a professional's eligibility for employment must be disclosed. *See id.* (finding that the disclosure requirements of Rule 2014(a) "do not give the attorney the right to withhold information because it is not apparent to him or her that a conflict exists").[8] This Court is under no obligation to sift through the record for the purposes of policing professional conflicts of interest; under Bankruptcy Rule 2014(a), it is the professional's exclusive duty to bring the requisite information to the Court's attention. *See In re BH & P, Inc.*, 949 F.2d at 1317-18.

68.     To protect the integrity of the self-reporting system established by Bankruptcy Rule 2014(a), courts have strictly enforced Rule 2014's requirements both at the employment stage and after entry of an employment order. *See, e.g., United States v. Azevedo (In re Azevedo)*, 92 B.R.

---

[8] The authorities in support of this proposition are legion. *See generally In re Southmark Corp.*, 181 B.R. 291, 296 (Bankr. N.D. Tex. 1995) ("The professional person must disclose and continue to disclose all connections that may effect [sic] employment eligibility") (citation omitted); *In re The Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) ("All facts that may have any bearing on the disinterestedness of a professional must be disclosed"); *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D. Okla. 1992) (finding that in complying with disclosure obligations, professionals are not free to "pick and choose which connections are irrelevant and trivial"); *In re Molten Metal Tech., Inc.*, 289 B.R. 505, 511 (Bankr. D. Mass. 2003) ("Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed. R. Bankr. P. 2014(a), court-appointed counsel proceed at their own risk").

910, 910-11 (Bankr. E.D. Cal. 1988) (denying employment application for failure to comply with Rule 2014(a)). Courts have also consistently held that a professional's failure to disclose connections constitutes grounds for termination of employment and disallowance/disgorgement of compensation and reimbursement sought by and/or paid to the professional. *See Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 836 (7th Cir. 1998) ("Though [Bankruptcy Rule 2014(a)] allows the fox to guard the proverbial hen house, counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation") (quoted in *I.G. Petroleum, L.L.C. v. Fenasci*, 432 F.3d at 355); *Leslie Fay*, 175 B.R. at 533 ("So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees") (quoted in *In re eToys*, 331 B.R. at 190).

69.     Here, DLA Piper's disclosures regarding the prepetition payment it received from Parkview on account of the Debtors are inadequate. To determine whether payments that proposed debtor's counsel received from insiders create an actual or potential conflict of interest or entail a lack of disinterestedness, some courts have adopted a five-part test, which includes the following elements:

> (i)     the arrangement must be fully disclosed to the debtor/client and the third-party payor/insider;
>
> (ii)    the debtor must expressly consent to the arrangement;
>
> (iii)   the third-party payor/insider must retain independent legal counsel and must understand that the attorney's duty of undivided loyalty is owed exclusively to the debtor/client;
>
> (iv)    the factual and legal relationship between the third-party payor/insider, the debtor, the respective attorneys, and their contractual arrangement concerning the fees, must be fully disclosed to the Court at the outset of the debtor's bankruptcy representation; and

> (v) the debtor's attorney/applicant must demonstrate and represent to the Court's satisfaction the absence of facts which would otherwise create non-disinterestedness, actual conflict, or impermissible potential for a conflict of interest.

*Bergrin v. Eerie World Entm't, LLC*, 03 CIV. 4501 (SAS), 2003 WL 22861948, at *4 n.9 (S.D.N.Y. Dec. 2, 2003) (citing *In re Lotus Props. LP*, 200 B.R. 388, 393 (Bankr. C.D. Cal. 1996)); *see also In re Kelton*, 109 B.R. 641, 658 (Bankr. D. Vt. 1989).

70. Here, DLA Piper has failed to provide sufficient disclosures regarding Parkview's funding of over $800,000 in payments to the Firm on account of the Debtors during the ninety days preceding the Petition Date. The Application fails to disclose, among other things: what these payments related to; when they were made; whether Parkview retained separate counsel; or if and when the Debtors' prepetition management approved the payment. The payment suggests that DLA Piper may not be sufficiently independent from Parkview and also creates concerns about the Firm's ability to represent the estates and creditors with undivided loyalty.

71. Accordingly, the Court should deny the Application because the Debtors and DLA Piper have failed to meet their burden under section 327(a) and Bankruptcy Rule 2014(a).

## IV. The Debtors Cannot Retain DLA Piper Pursuant to Section 327(e) Because the Firm Holds or Represents an Interest Adverse to the Debtors or Their Estates with Respect to the Matters Upon Which the Firm is Proposed to Be Employed

72. If the Court determines that the proposed special counsel services constitute a "specified special purpose" under section 327(e) (which the Court should not do), the Court should nonetheless deny the Application pursuant to that subsection. That is because, for the same reasons articulated in Section II and Section III above, DLA Piper holds or represents an interest adverse to the Debtors or their estates with respect to the matters upon which the Firm is proposed to be employed.

## RESERVATION OF RIGHTS

73.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights to, among other things: (i) amend or supplement this Objection; and (ii) conduct discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying the Application; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: January 5, 2026

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/ Malcolm M. Bates*
Malcolm M. Bates
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (302) 573-6491
Email:   Malcolm.M.Bates@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Malcolm M. Bates, hereby certify that on January 5, 2026, I caused to be served a copy of the foregoing Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were served via email on parties in interest.

Dated: January 5, 2026                    */s/ Malcolm M. Bates*
                                                            Malcolm M. Bates