## **EXHIBIT A**

Proposed Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HUDSON 1701/1706, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-11853 (KBO)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 203** |

### ORDER GRANTING MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER PURSUANT TO BANKRTUPCY RULE 2004 AUTHORIZING AND DIRECTING PRODUCTION OF DOCUMENTS FROM THE DEBTORS, PARKVIEW FINANCIAL REIT, LP AND ALBERTO SMEKE SABA AND SOLOMON SMEKE SABA

Upon consideration of the Official Committee of Unsecured Creditors' motion for discovery under Fed. R. Bankr. P. 2004 (the "Motion"),[2] and any responses thereto, and after a hearing on the Motion; and upon the record thereof; and after due deliberation thereon; and the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1408 and 1409, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), and (iii) notice of the Motion was sufficient under the circumstances; and the Court having determined that good and sufficient cause having been shown;

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED**.

2.      The Debtors, Parkview and the Smekes are directed to promptly begin producing to the Committee all documents relating to the topics set forth on the Document Requests attached to this Order as **Schedule 1**, **Schedule 2** and **Schedule 3** on a rolling basis, with such document

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

[2]  Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

production to be substantially completed by no later than January 23, 2026, unless an alternative production schedule is consensually agreed to in writing by the parties.

3.      In the course of its investigation, the Committee may identify additional persons or entities from which it requires oral examinations and/or document productions in relation to the Document Requests.  Under such circumstances, the Committee is authorized to file a "Notice of Additional Entities Subject to Rule 2004 Examination" on the docket in the Bankruptcy Cases describing the documents sought from any Additional Rule 2004 Party and, following a meet and confer with such Additional Rule 2004 Party (which meet and confer shall take place no more than forty-eight (48) hours after the filing of such notice), the Committee shall be authorized, without further order of the Court, to issue subpoena(s) to the Additional Rule 2004 Party setting forth the date and time of the oral examination of and document production by such Additional Rule 2004 Party (which, absent further order of this Court or written agreement with such party, will set a date for production that is fourteen (14) days after service of the subpoena(s) and a date for oral examination that is no less than seven (7) days thereafter); *provided, however*, that such Additional Rule 2004 Party shall have five (5) days from the service of such subpoena to object to the relevance, scope, burden or procedure of the document requests included in such subpoena.

4.      The Committee may identify additional persons or entities from which it requires oral examinations and/or document productions in relation to the Document Requests from the Debtors, Parkview, the Smekes or any Additional Rule 2004 Party and is authorized to file a "Notice of Additional Document Production or Oral Examination," without further order of the Court, to issue subpoena(s) to the Debtors, Parkview, the Smekes or the Additional Rule 2004 Party, as applicable, setting forth the date and time of the oral examination of and document production (which, absent further order of this Court or written agreement with such party, will set

a date for production that is fourteen (14) days after service of the subpoena(s) and a date for oral examination that is no less than seven (7) days thereafter); *provided, however*, that the Debtors, Parkview, the Smekes or the Additional Rule 2004 Party, as applicable, shall have five (5) days from the service of such subpoena to object to the relevance, scope, burden or procedure of the document requests included in such subpoena.

5.      Nothing in this Order shall be deemed to limit or restrict the Committee's right to seek further discovery or other additional examinations, including, but not limited to, under Bankruptcy Rule 2004 or in the context of contested matters.

6.      The Committee is authorized to take all actions deemed necessary to effectuate the relief granted in this Order.

7.      The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

8.      The Court shall retain jurisdiction to resolve any disputes arising under or related to this Order, including any discovery disputes that may arise between or among the parties, and to interpret, implement, and enforce the provisions of this Order.

17695656/1

## Schedule 1

(First Request for Production – Debtors)

## **DEFINITIONS**

1.      "*All*," "*each*," and "*any*" shall be construed as encompassing any and all.

2.      "*And*" and "*or*" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

3.      "*Bankruptcy Code*" means the Title 11 of the United States Code.

4.      "*Cash Collateral Agreement*" means that certain cash collateral agreement by and among the Debtors and Parkview dated as of October 22, 2025.

5.      "*CSC*" means CSC Hudson LLC.

6.      "*Chapter 11 Cases*" mean the chapter 11 cases filed by the Debtors in the United States Bankruptcy Court for the District of Delaware (jointly administered under Case Number: 25-11853).

7.      "*Communications*" mean any exchange of information by any means of transmission, including, but not limited to, face-to-face conversations, mail, electronic mail over personal or business accounts, instant or text message over personal or business devices (including SMS/MMS, iMessage, Skype, and WhatsApp), overnight delivery, telephone or facsimile.

8.      "*Concerning*," "*regarding*," or "*relating to*" means in any way, directly or indirectly, alluding to, amending, assisting with, canceling, commenting on, comprising, concerning, confirming, considering, contradicting, describing, discussing, endorsing, evidencing, identifying, incorporating, mentioning, modifying, negating, negotiating, pertaining to, qualifying, referring to, regarding, relating to, relevant to, representing, revoking, showing, suggesting, supplementing, supporting, terminating, underlying, or otherwise involving the subject matter of the specified request.

17695656/1

9.      "***CONH***" means the Certificate of No Harassment application filed by the Debtors with HPD.

10.     "***Cure Application***" means any application to cure harassment concerns with HPD, including that certain cure application submitted by or at the direction of the Smekes.

11.     "***D&O***" means director and officer.

12.     "***Debtors***" mean Hudson 1701/1706, LLC and Hudson 1702, LLC.

13.     "***DOB***" means New York City Department of Buildings.

14.     "***Document(s)***" means all writings, audio recordings and videos of any nature whatsoever (including, specifically, all drafts), whether originals or copies, including all non-identical copies (whether different from the original because of notes made on or attached to them or otherwise), whether drafts, preliminary, proposed or final versions, whether printed, recorded, produced or reproduced by any other mechanical or electronic process, whether written or produced by hand, within Your possession, custody or control, including without limitation, contracts, agreements, arrangements, understandings, Communications, correspondence, records, reports, studies, memoranda (including memoranda of telephone, personal or intra-office conversations and memoranda of conferences, notes, advertisements, notices, facsimile Communications), Phone Records, Videoconferencing Records, diaries, forecasts, accountants' work papers, graphs, summaries, lists, tabulations, charts, diagrams, blueprints, tables, indices, pictures, recordings, tapes, charges, accounts, minutes, press releases, stenographic, handwritten or any other notes, projections, working papers, checks, check stubs, receipts, or any other document or writings of whatever description, including, without limitation, e-mails, instant messages, text messages, ESI or other electronic chats or messages and any information contained

2

in any computer or memory system, although not yet printed out, or any material underlying, supporting or used in the preparation of any such documents.

15.    "***ESI***" or "***Electronically Stored Information***" means information or data that is generated, received, processed, and recorded by computers and other electronic devices, and includes, without limitation, system metadata (e.g., author, recipient, file creation date, file modification date) and user-generated metadata (e.g., spreadsheet formulas).  "ESI" further includes, without limitation, the following: (i) output resulting from the use of any software program, such as word processing documents, spreadsheets, database files, charts, graphs, and outlines, (ii) electronic mail, (iii) message logs from Google Chat, AOL Instant Messenger, Facebook, Twitter, WhatsApp, Telegram, and similar programs, (iv) audio and video files, (v) internal (intranet) or external websites, and (vi) activity listings of electronic mail receipts and/or transmittals.  "ESI" includes electronic information or data wherever it resides, including, without limitation, (i) Facebook, Instagram or other social media, (ii) in an active file on a computer network, an individual computer's hard drive or in a Cloud storage facility, (ii) in a deleted file or file fragment, (iii) on backup/storage media, (iv) on removable media, such as a floppy disk, memory stick, portable hard drive, or zip drive, and (v) on a smart phone or personal digital assistant.  "ESI" also includes Documents, containers and labels appended to or concerning any physical storage device associated with responsive electronic information or data.

16.    "***Fallback Plan***" means the Fallback Business Plan as defined in the Ground Lease.

17.    "***Financial Agreement***" means that certain financial agreement dated April 10, 2025 by and between CSC, the Debtors, the Smekes, the Ground Lessor, and Parkview.

18.    "***Foreclosure Sale***" means the July 25, 2025 foreclosure sale of all the equity in the Debtors.

19.     "***Ground Lease***" means the ground lease agreement between the Debtors and Ground Lessor, dated May 4, 2022.

20.     "***Ground Lessor***" means 356W58 Ground Lessor LLC.

21.     "***HPD***" means New York City Department of Housing and Preservation Development.

22.     "***Identify***" means (a) with respect to persons, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment; (b) with respect to documents, either (i) to give, to the extent known, the (A) type of document; (B) general subject matter; (C) date of the document; and (D) author(s), addressee(s) and recipient(s); or (ii) to produce the documents, together with sufficient identifying information to satisfy Federal Rule of Civil Procedure 33(d).

23.     "***Including***," "***include***," or "***includes***" shall mean "including, without limitation."

24.     "***Parkview***" means Parkview Financial REIT, LP, Parkview Financial Fund GP, Inc., PV Hudson, Parkview Financial, LLC, and/or any of their affiliated entities other than the Debtors.

25.     "***Person***" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

26.     "***Petition Date***" means the Chapter 11 Cases filed by the Debtors on October 22, 2025.

27.     "***Phone Records***" mean all Documents, including telephone bills, recordings, transcripts, call summaries, telephone logs, and/or invoices for telephone conferencing services, that identify the date, time, duration, participants, telephone numbers, and/or proposed or actual subject matter of any telephone call.

28.    "***Prepetition Loan Agreements***" mean the Building Loan Agreement, dated on May 4, 2022, and the Project Loan Agreement, dated May 4, 2022.

29.    "***Prepetition Loan***" means the loans issued under the Prepetition Loan Agreements.

30.    "***Property***" means the real property known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 358-366 West 58th Street located in New York, New York and all improvements thereon.

31.    "***PV Hudson***" means PV Hudson, LLC.

32.    "***Reflecting***" means constituting, embodying, memorializing, representing, or containing in any manner.

33.    "***Request***" means any request for the production of documents set forth herein.

34.    "***Settlement Agreement***" means that certain settlement and release agreement dated as of August 7, 2025 by and between the Debtors, Parkview, the Smekes, and CSC.

35.    "***Smekes***" mean Alberto Smeke Saba and Solomon Smeke Saba.

36.    "***Stop Work Order***" means the partial stop work order issued by the City of New York on the Property.

37.    "***UCC***" means Uniform Commercial Code.

38.    "***Union MOA***" means the memorandum of agreement between CSC and EC 58th Street LLC.

39.    "***Union Settlement Agreement***" means that certain settlement agreement dated as of January 25, 2024 by and between the Debtors, the hotel union, CSC, the Ground Lessor, and Parkview.

40.    "***Videoconferencing Records***" mean all Documents, including bills, call or video summaries, transcripts, recordings, meeting logs, and/or invoices for conferencing services that

17695656/1

identify the date, time, duration, participants, telephone numbers, planned or actual subject matter, and any Documents uploaded and/or accessed through any videoconferencing call or service.

41.     "*You*" and "*Your*" means Parkview.

## **INSTRUCTIONS**

1.     Unless otherwise indicated in a particular Request, the date range of these Requests shall be January 1, 2022 through the date of the response hereto.

2.     Documents shall be produced as they have been kept in the ordinary course of business.  In this respect, the file folder in which the documents are contained is deemed an integral part of the document and shall also be produced.  You are specifically requested to produce any excel spreadsheets in native format.

3.     The singular shall include the plural and the plural shall include the singular; the conjunctive shall include the disjunctive and the disjunctive shall include the conjunctive.

4.     If any document is withheld, in whole or in part, on the basis of privilege, the producing party shall provide a proper privilege log at the time of the document production.

5.     These Requests extend to all documents in a producing party's possession, custody and/or control, or in the possession, custody or control of persons or entities under the producing party's control, whether or not such documents were created or prepared by the producing party. The terms "possession," "custody," and "control" mean possession, custody or control, or rights to possession, custody or control, of documents by producing party, including Documents in the possession of any attorneys, without limitation, and documents in the custody, possession or control of any of the producing party's accountants, advisers, representatives and/or other agents of same.

6.     Each reference to a corporation, partnership, joint venture, unincorporated association, government agency or other fictitious person shall be deemed to include each and all

6

of its subsidiaries, affiliates, predecessors and successors, and with respect to each of such entities, its officers, directors, shareholders, employees, partners, limited partners, representatives, agents, accountants, attorneys and any other person who acted or purported to act on its behalf.

7.      Each reference to a natural person shall be deemed to include that person's agents, attorneys, representatives and any other person who acted or purported to act on that person's behalf.

8.      In responding to these Requests, which are continuing in nature, the producing party shall produce all responsive documents in their possession, custody and/or control and shall promptly supplement and/or correct its responses if the producing party comes into possession, custody or control of additional documents, or learns or determines additional information, after the service of its response.

9.      If, after a reasonable and thorough investigation using due diligence, the producing party is unable to furnish a document or part thereof because a document is not available to the producing party, the producing party shall provide a list of each document so lost, destroyed or otherwise unavailable, together with the following information: (a) date or origin; (b) brief description of such document; (c) author of the document; (d) date upon which the document was lost or destroyed; and (e) brief statement of the manner in which such document was lost or destroyed.

10.     Electronic data should be produced with all native files and metadata intact, in full-text searchable format.  Any responsive, electronically stored data shall be converted/processed to TIFF files and Bates numbered, and include fully searchable text.  Additionally, email and native file collections should include linked native files.  Documents must be produced with load files necessary to load such documents onto Relativity.  Images should be single-page TIFF files and

7

file names cannot contain embedded spaces.  The text and metadata of emails and the attachments, and native file document collections should be extracted and provided in a .DAT file.  Searchable text of the entire document must be provided for every record, at the document level, and extracted text must be provided for documents that originated in electronic format.

11.    If there are no documents responsive to a category in this Request, so state in writing.

12.    The producing party shall follow all deadlines and procedures under applicable law. Objecting to a portion of a Request does not relieve the producing party of the duty to respond to those parts of the Request to which the producing party does not object.

## REQUESTS

1.    Documents and Communications relating to any insolvency opinions, whether formal or informal, or other analyses with respect to solvency, rendered with respect to the Debtors.

2.    Documents relating to any transactions, receivable/payable balances, or write-offs with insiders, members, managers, related parties, affiliated companies, or companies held by insiders.

3.    Documents relating to audited financials for each Debtor entity.

4.    Documents relating to any financial reporting, analysis, or presentations generated by the Debtors.

5.    Documents showing list of affiliates and their relationships with each Debtor.

6.    Documents relating to any agreement with any insider, member, manager, related party, agent, representative or affiliate of the Debtor.

17695656/1

7.      Documents relating to organizational documents of each Debtor entity, PV Hudson, and CSC, including all prior agreements in existence from 2022 to present and amendments thereto.

8.      Documents relating to the Debtors' insurance policies, including D&O policies, currently in force.

9.      Documents and Communications relating to the Debtors' decision to purchase or extend its most recent D&O policy coverage.

10.     Documents showing a list of the officers, authorized signatories, and managers of each Debtor, including a copy of their resumes or curriculum vitae and their dates of service.

11.     Documents showing a list of all officers, authorized signatories, and managers of PV Hudson, including a copy of their resumes or curriculum vitae and their dates of service.

12.     Documents of all minutes, consents, resolutions of and materials provided to or prepared for any member(s), managers, or representatives of the Debtors.

13.     Documents relating to compensation for executives, members, managers, agents or representatives of the Debtors.

14.     Documents and Communications relating to any investigation by any regulatory body regarding the Debtors or their members, executives, managers, or agents.

15.     Documents relating to all cash receipts and disbursements to any insiders, affiliated entities, member, manager, representative or agent, including distributions, dividends, management fees, intercompany loans or similar transfers (in Excel format).

16.     Documents and Communications related to the Prepetition Loan Agreements.

17.     Documents and Communications related to any payments made, due, or owed to Parkview in connection with the Prepetition Loan.

18.    Documents and Communications between the Debtors and Parkview related to Parkview failing to release funds, causing development delays, or otherwise breaching any of its responsibilities under the Prepetition Loan.

19.    Documents showing the use of funds advanced under the Prepetition Loan.

20.    Documents and Communications relating to notices of default received under the Prepetition Loan.

21.    Documents and Communications relating to forbearance agreements with respect to the Prepetition Loan.

22.    Documents and Communications relating to the Financial Agreement.

23.    Documents and Communications relating to the Foreclosure Sale, including all marketing and sale materials, notices, bids received, auction transcript, and purchase agreement.

24.    Documents and Communications relating to the decision to execute the Settlement Agreement.

25.    Documents and Communications concerning any efforts by or on behalf of the Debtors or any other party to sell the Debtors as a going concern, to sell all or substantially all of the Debtors' assets, or to raise financing of any type, including but not limited to, all teasers, confidential information memoranda, indications of interest, letters of intent, offers, or other similar documents prepared by or on behalf of, or received by or on behalf of, the Debtors.

26.    Documents showing the amount outstanding under the Prepetition Loan as of the Petition Date, broken out by principal amount, and by all interest and fees owed on each obligation as of the Petition Date.

27.    Documents relating to any outstanding letters of credit including beneficiary, amount, purpose, expiration date, renewal or non-renewal provisions.

28.    Documents relating to any UCC financing statements filed related to the perfection of the security interests of Parkview and results from any UCC lien and litigation searches.

29.    Documents relating to any intercompany debt (including intercompany trade claims and intercompany notes) and intercompany loan agreements.

30.    Documents and Communications relating to any agreements by and between the Debtors and the Ground Lessor, including any prior lease documents and amendments thereto.

31.    Documents and Communications regarding any notice of default under the Ground Lease and any threatened termination of the Ground Lease.

32.    Documents and Communications regarding mechanics' liens filed against the Property.

33.    Documents and Communications related to the Debtors' proposal(s) to restructure or renegotiate the Ground Lease.

34.    Documents and Communications relating to the Fallback Plan, including drafts or prior versions of the same.

35.    Documents and Communications relating to any summary memorandum or presentation explaining the Fallback Plan.

36.    Documents and Communications regarding alleged incidents of harassment presented to the Manhattan Community Board on September 7, 2023.

37.    Documents and Communications regarding the initial determination of harassment and the notice of hearing and petition issued by HPD.

38.    Documents and Communications relating to the Cure Application.

39.    Documents and Communications related to the Stop Work Order.

40.     Documents and Communications relating to reconfigured building plans submitted to the DOB or HPD.

41.     Documents and Communications relating to the Union MOA.

42.     Documents and Communications related to the Hotel Union Pension Fund Demand Letter received on or about September 29, 2022.

43.     Documents and Communications relating to the Union Settlement Agreement.

44.     Documents relating to recent consolidated pro forma for the completed development of the Property showing stabilized residential and commercial income, operating expenses (with line item detail as you usually present), net operating income, and any key underwriting assumptions (lease-up period, vacancy, rent growth, exit cap rate, and financing assumptions).

45.     Documents relating to any third-party reports relied on for these figures, such as contractor GMPs, quantity surveyor or cost consultant reports, and significant change order summaries.

46.     Documents relating to a lease abstract or summary for the LA Fitness lease associated with the Property.

47.     Documents relating to an internal analysis on how the LA Fitness lease associated with the Property was modeled in the project pro forma.

48.     Documents and Communications regarding tenant improvement cost estimates and timing of completion of LA Fitness at the Property.

49.     Documents showing payments made to creditors 90 days before the Petition Date, and insiders one year before the Petition Date, including payment terms (noting if terms were significantly changed from prior payments to creditor).

12

50.    Documents showing the Debtors' statement of financial affairs and schedules (in Excel format).

51.    Documents identifying the value of the Debtors' claims under chapter 5 of the Bankruptcy Code.

52.    Documents identifying any claims for relief, rights of action, causes of action, or potential litigation claims of the Debtors as of the Petition Date or arising after the Petition Date, including any analysis performed by the Debtors' management, professionals, member(s), or manager(s).

53.    Documents concerning any financial projections made with respect to marketing the Debtors' assets for sale.

54.    Documents showing a list of tangible & intangible assets, as well as all estimated / appraised values and book carrying values over time (to the extent this changed), inclusive of dates of those valuations and any changes from last valuation to the extent available.

**<u>Schedule 2</u>**

(First Request for Production - Parkview Financial REIT, LLP)

## DEFINITIONS

42.    "*All*," "*each*," and "*any*" shall be construed as encompassing any and all.

43.    "*And*" and "*or*" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

44.    "*Bankruptcy Code*" means the Title 11 of the United States Code.

45.    "*Cash Collateral Agreement*" means that certain cash collateral agreement by and among the Debtors and Parkview dated as of October 22, 2025.

46.    "*CSC*" means CSC Hudson LLC.

47.    "*Chapter 11 Cases*" mean the chapter 11 case filed by the Debtors in the United States Bankruptcy Court for the District of Delaware (jointly administered under Case Number: 25-11853).

48.    "*Communications*" mean any exchange of information by any means of transmission, including, but not limited to, face-to-face conversations, mail, electronic mail over personal or business accounts, instant or text message over personal or business devices (including SMS/MMS, iMessage, Skype, and WhatsApp), overnight delivery, telephone or facsimile.

49.    "*Concerning*," "*regarding*," or "*relating to*" means in any way, directly or indirectly, alluding to, amending, assisting with, canceling, commenting on, comprising, concerning, confirming, considering, contradicting, describing, discussing, endorsing, evidencing, identifying, incorporating, mentioning, modifying, negating, negotiating, pertaining to, qualifying, referring to, regarding, relating to, relevant to, representing, revoking, showing, suggesting, supplementing, supporting, terminating, underlying, or otherwise involving the subject matter of the specified request.

17695656/1

50.    "*CONH*" means Certificate of No Harassment application filed by the Debtors with HPD.

51.    "*Cure Application*" means any application to cure harassment concerns with HPD, including that certain cure application submitted by or at the direction of the Smekes.

52.    "*Debtors*" mean Hudson 1701/1706, LLC and Hudson 1702, LLC.

53.    "*DIP Financing*" means debtor-in-possession financing.

54.    "*DIP Loan Documents*" mean the agreements, instruments, certificates, and other documents executed in connection with the DIP Term Sheet and DIP Order.

55.    "*DIP Term Sheet*" means that certain senior secured priming superpriority DIP Financing term sheet by and among the Debtors and Parkview dated as of November 12, 2025.

56.    "*Document(s)*" means all writings, audio recordings and videos of any nature whatsoever (including, specifically, all drafts), whether originals or copies, including all non-identical copies (whether different from the original because of notes made on or attached to them or otherwise), whether drafts, preliminary, proposed or final versions, whether printed, recorded, produced or reproduced by any other mechanical or electronic process, whether written or produced by hand, within Your possession, custody or control, including without limitation, contracts, agreements, arrangements, understandings, Communications, correspondence, records, reports, studies, memoranda (including memoranda of telephone, personal or intra-office conversations and memoranda of conferences, notes, advertisements, notices, facsimile Communications), Phone Records, Videoconferencing Records, diaries, forecasts, accountants' work papers, graphs, summaries, lists, tabulations, charts, diagrams, blueprints, tables, indices, pictures, recordings, tapes, charges, accounts, minutes, press releases, stenographic, handwritten or any other notes, projections, working papers, checks, check stubs, receipts, or any other

document or writings of whatever description, including, without limitation, e-mails, instant messages, text messages, ESI or other electronic chats or messages and any information contained in any computer or memory system, although not yet printed out, or any material underlying, supporting or used in the preparation of any such documents.

57.     "*DLA Piper*" means DLA Piper LLP (US).

58.     "*ESI*" or "*Electronically Stored Information*" means information or data that is generated, received, processed, and recorded by computers and other electronic devices, and includes, without limitation, system metadata (e.g., author, recipient, file creation date, file modification date) and user-generated metadata (e.g., spreadsheet formulas).  "ESI" further includes, without limitation, the following: (i) output resulting from the use of any software program, such as word processing documents, spreadsheets, database files, charts, graphs, and outlines, (ii) electronic mail, (iii) message logs from Google Chat, AOL Instant Messenger, Facebook, Twitter, WhatsApp, Telegram, and similar programs, (iv) audio and video files, (v) internal (intranet) or external websites, and (vi) activity listings of electronic mail receipts and/or transmittals.  "ESI" includes electronic information or data wherever it resides, including, without limitation, (i) Facebook, Instagram or other social media, (ii) in an active file on a computer network, an individual computer's hard drive or in a Cloud storage facility, (ii) in a deleted file or file fragment, (iii) on backup/storage media, (iv) on removable media, such as a floppy disk, memory stick, portable hard drive, or zip drive, and (v) on a smart phone or personal digital assistant.  "ESI" also includes Documents, containers and labels appended to or concerning any physical storage device associated with responsive electronic information or data.

59.     "*Financial Agreement*" means that certain financial agreement dated April 10, 2025 by and between CSC, the Debtors, the Smekes, the Ground Lessor, and Parkview.

3

60.     "***Foreclosure Sale***" means the July 25, 2025 foreclosure sale of all the equity in the Debtors.

61.     "***Ground Lessor***" means 356W58 Ground Lessor LLC.

62.     "***HPD***" means New York City Department of Housing and Preservation Development.

63.     "***Identify***" means (a) with respect to persons, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment; (b) with respect to documents, either (i) to give, to the extent known, the (A) type of document; (B) general subject matter; (C) date of the document; and (D) author(s), addressee(s) and recipient(s); or (ii) to produce the documents, together with sufficient identifying information to satisfy Federal Rule of Civil Procedure 33(d).

64.     "***Including***," "***include***," or "***includes***" shall mean "including, without limitation."

65.     "***Parkview***" means Parkview Financial REIT, LP, Parkview Financial Fund GP, Inc., PV Hudson, Parkview Financial, LLC, and/or any of their affiliated entities other than the Debtors.

66.     "***Person***" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

67.     "***Petition Date***" means the Chapter 11 Cases filed by the Debtors on October 22, 2025.

68.     "***Phone Records***" mean all Documents, including telephone bills, recordings, transcripts, call summaries, telephone logs, and/or invoices for telephone conferencing services, that identify the date, time, duration, participants, telephone numbers, and/or proposed or actual subject matter of any telephone call.

69.    "***Prepetition Loan Agreements***" mean the Building Loan Agreement, dated on May 4, 2022, and the Project Loan Agreement, dated May 4, 2022.

70.    "***Prepetition Loan***" means the loans issued under the Prepetition Loan Agreements.

71.    "***Property***" means the real property known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 358-366 West 58th Street located in New York, New York and all improvements thereon.

72.    "***PV Hudson***" means PV Hudson, LLC.

73.    "***Reflecting***" means constituting, embodying, memorializing, representing, or containing in any manner.

74.    "***Request***" means any request for the production of documents set forth herein.

75.    "***Settlement Agreement***" means that certain settlement and release agreement dated as of August 7, 2025 by and between the Debtors, Parkview, the Smekes, and CSC.

76.    "***Smekes***" mean Alberto Smeke Saba and Solomon Smeke Saba.

77.    "***Stop Work Order***" means the partial stop work order issued by the City of New York on the Property.

78.    "***Union Settlement Agreement***" means that certain settlement agreement dated as of January 25, 2024 by and between the Debtors, the hotel union, CSC, the Ground Lessor, and Parkview.

79.    "***Videoconferencing Records***" mean all Documents, including bills, call or video summaries, transcripts, recordings, meeting logs, and/or invoices for conferencing services that identify the date, time, duration, participants, telephone numbers, planned or actual subject matter, and any Documents uploaded and/or accessed through any videoconferencing call or service.

80.    "***You***" and "***Your***" means Parkview.

5

## <u>INSTRUCTIONS</u>

1.      Unless otherwise indicated in a particular Request, the date range of these Requests shall be January 1, 2022 through the date of the response hereto.

2.      Documents shall be produced as they have been kept in the ordinary course of business.  In this respect, the file folder in which the documents are contained is deemed an integral part of the document and shall also be produced.  You are specifically requested to produce any excel spreadsheets in native format.

3.      The singular shall include the plural and the plural shall include the singular; the conjunctive shall include the disjunctive and the disjunctive shall include the conjunctive.

4.      If any document is withheld, in whole or in part, on the basis of privilege, the producing party shall provide a proper privilege log at the time of the document production.

5.      These Requests extend to all documents in a producing party's possession, custody and/or control, or in the possession, custody or control of persons or entities under the producing party's control, whether or not such documents were created or prepared by the producing party. The terms "possession," "custody," and "control" mean possession, custody or control, or rights to possession, custody or control, of documents by producing party, including Documents in the possession of any attorneys, without limitation, and documents in the custody, possession or control of any of the producing party's accountants, advisers, representatives and/or other agents of same.

6.      Each reference to a corporation, partnership, joint venture, unincorporated association, government agency or other fictitious person shall be deemed to include each and all of its subsidiaries, affiliates, predecessors and successors, and with respect to each of such entities, its officers, directors, shareholders, employees, partners, limited partners, representatives, agents, accountants, attorneys and any other person who acted or purported to act on its behalf.

6

7.      Each reference to a natural person shall be deemed to include that person's agents, attorneys, representatives and any other person who acted or purported to act on that person's behalf.

8.      In responding to these Requests, which are continuing in nature, the producing party shall produce all responsive documents in their possession, custody and/or control and shall promptly supplement and/or correct its responses if the producing party comes into possession, custody or control of additional documents, or learns or determines additional information, after the service of its response.

9.      If, after a reasonable and thorough investigation using due diligence, the producing party is unable to furnish a document or part thereof because a document is not available to the producing party, the producing party shall provide a list of each document so lost, destroyed or otherwise unavailable, together with the following information: (a) date or origin; (b) brief description of such document; (c) author of the document; (d) date upon which the document was lost or destroyed; and (e) brief statement of the manner in which such document was lost or destroyed.

10.     Electronic data should be produced with all native files and metadata intact, in full-text searchable format.  Any responsive, electronically stored data shall be converted/processed to TIFF files and Bates numbered, and include fully searchable text.  Additionally, email and native file collections should include linked native files.  Documents must be produced with load files necessary to load such documents onto Relativity.  Images should be single-page TIFF files and file names cannot contain embedded spaces.  The text and metadata of emails and the attachments, and native file document collections should be extracted and provided in a .DAT file.  Searchable

text of the entire document must be provided for every record, at the document level, and extracted text must be provided for documents that originated in electronic format.

11.    If there are no documents responsive to a category in this Request, so state in writing.

12.    The producing party shall follow all deadlines and procedures under applicable law. Objecting to a portion of a Request does not relieve the producing party of the duty to respond to those parts of the Request to which the producing party does not object.

## <u>REQUESTS</u>

1.    Documents and Communications relating to the Prepetition Loan Agreements, including any notice of defaults or forbearance agreements related thereto.

2.    Documents and Communications relating to the Financial Agreement, including any notice of defaults, forbearance agreements and financing related thereto.

3.    Documents and Communications relating to the Cure Application.

4.    Documents and Communications related to the Union Settlement Agreement.

5.    Documents and Communications related to the Foreclosure Sale, including all marketing and sale materials, notices, bids received, auction transcript, and purchase agreement.

6.    Documents and Communications relating to the Settlement Agreement.

7.    Documents and Communications sufficient to show the role of DLA Piper, Paul Rahimian, and Ted Jung with respect to the Prepetition Loan Agreements, Financial Agreement, Union Settlement Agreement, Cure Application, Foreclosure Sale, and Settlement Agreement.

8.    Documents relating to of all minutes, consents, resolutions of and materials provided to or prepared for PV Hudson, post-Foreclosure Sale.

9.      Documents and Communications relating to funding requests received from the Debtors under the Prepetition Loan Agreements and their uses.

10.     Documents and Communications between Parkview and/or its advisors, on the other hand, and the Debtors and/or its advisors, on the other hand, related to any allegations concerning Parkview failing to release funds, causing project delays, or otherwise breaching any of its responsibilities under the Prepetition Loan Agreements, Financial Agreement, or Settlement Agreement.

11.     Documents and Communications related to any complaints filed or served by Parkview against CSC or the Smekes, including the complaint filed by Parkview on or around June 30, 2025.

12.     Documents sufficient to show any amounts outstanding under the Prepetition Loan as of the Petition Date, broken out by principal amount, and by all interest and fees owed on each obligation as of the Petition Date.

13.     Communications between the Debtors and Parkview concerning the commencement of the Chapter 11 Cases, the Cash Collateral Agreement, the DIP Term Sheet, and the DIP Loan Documents.

14.     Documents and Communications concerning any efforts by Parkview to sell or assist the Debtors in selling the Debtors as a going concern or Parkview's interests in the Property, or to raise financing of any type, including but not limited to, all teasers, confidential information memoranda, indications of interest, letters of intent, offers, or other similar documents prepared by or on behalf of, or received by or on behalf of, Parkview.

15.     Documents and Communications concerning any internal analysis performed by Parkview to determine the Debtors' financing needs with respect to the development of the

9

Property, including lifting the Stop Work Order, resolving issues raised by the HPD or any other regulatory body, and funding the Chapter 11 Cases.

16.     Documents sufficient to identify any advisor, independent contractor, appraiser, valuation expert, or other professional hired by Parkview to conduct an analysis, valuation, appraisal, feasibility study, or other report regarding the development of the Property, and the scope of their services.

17.     Any analysis, valuation, appraisal, feasibility study, or other report prepared by or received from any person or entity identified in Request No. 16 regarding the development of the Property.

18.     Documents and Communications concerning PV Hudson's decision to fund, reimburse, or otherwise finance demolition work at the Property.

19.     Documents and Communications relating to any third party financing obtained by PV Hudson in connection with the Property for the Debtors.

## Schedule 3

(First Request for Production - Alberto Smeke Saba and Solomon Smeke Saba)

## DEFINITIONS

1.      "*All*," "*each*," and "*any*" shall be construed as encompassing any and all.

2.      "*And*" and "*or*" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

3.      "*Bankruptcy Code*" means the Title 11 of the United States Code.

4.      "*CSC*" means CSC Hudson LLC.

5.      "*Chapter 11 Cases*" mean the chapter 11 case filed by the Debtors in the United States Bankruptcy Court for the District of Delaware (jointly administered under Case Number: 25-11853).

6.      "*Communications*" mean any exchange of information by any means of transmission, including, but not limited to, face-to-face conversations, mail, electronic mail over personal or business accounts, instant or text message over personal or business devices (including SMS/MMS, iMessage, Skype, and WhatsApp), overnight delivery, telephone or facsimile.

7.      "*Concerning*," "*regarding*," or "*relating to*" means in any way, directly or indirectly, alluding to, amending, assisting with, canceling, commenting on, comprising, concerning, confirming, considering, contradicting, describing, discussing, endorsing, evidencing, identifying, incorporating, mentioning, modifying, negating, negotiating, pertaining to, qualifying, referring to, regarding, relating to, relevant to, representing, revoking, showing, suggesting, supplementing, supporting, terminating, underlying, or otherwise involving the subject matter of the specified request.

8.      "*CONH*" means Certificate of No Harassment application filed by the Debtors with HPD.

9.      "***Cure Application***" means any application to cure harassment concerns with HPD, including that certain cure application submitted by or at the direction of the Smekes.

10.     "***Debtors***" mean Hudson 1701/1706, LLC and Hudson 1702, LLC.

11.     "***Document(s)***" mean all writings, audio recordings and videos of any nature whatsoever (including, specifically, all drafts), whether originals or copies, including all non-identical copies (whether different from the original because of notes made on or attached to them or otherwise), whether drafts, preliminary, proposed or final versions, whether printed, recorded, produced or reproduced by any other mechanical or electronic process, whether written or produced by hand, within Your possession, custody or control, including without limitation, contracts, agreements, arrangements, understandings, Communications, correspondence, records, reports, studies, memoranda (including memoranda of telephone, personal or intra-office conversations and memoranda of conferences, notes, advertisements, notices, facsimile Communications), Phone Records, Videoconferencing Records, diaries, forecasts, accountants' work papers, graphs, summaries, lists, tabulations, charts, diagrams, blueprints, tables, indices, pictures, recordings, tapes, charges, accounts, minutes, press releases, stenographic, handwritten or any other notes, projections, working papers, checks, check stubs, receipts, or any other document or writings of whatever description, including, without limitation, e-mails, instant messages, text messages, ESI or other electronic chats or messages and any information contained in any computer or memory system, although not yet printed out, or any material underlying, supporting or used in the preparation of any such documents.

12.     "***ESI***" or "***Electronically Stored Information***" means information or data that is generated, received, processed, and recorded by computers and other electronic devices, and includes, without limitation, system metadata (e.g., author, recipient, file creation date, file

modification date) and user-generated metadata (e.g., spreadsheet formulas). "ESI" further includes, without limitation, the following: (i) output resulting from the use of any software program, such as word processing documents, spreadsheets, database files, charts, graphs, and outlines, (ii) electronic mail, (iii) message logs from Google Chat, AOL Instant Messenger, Facebook, Twitter, WhatsApp, Telegram, and similar programs, (iv) audio and video files, (v) internal (intranet) or external websites, and (vi) activity listings of electronic mail receipts and/or transmittals. "ESI" includes electronic information or data wherever it resides, including, without limitation, (i) Facebook, Instagram or other social media, (ii) in an active file on a computer network, an individual computer's hard drive or in a Cloud storage facility, (ii) in a deleted file or file fragment, (iii) on backup/storage media, (iv) on removable media, such as a floppy disk, memory stick, portable hard drive, or zip drive, and (v) on a smart phone or personal digital assistant. "ESI" also includes Documents, containers and labels appended to or concerning any physical storage device associated with responsive electronic information or data.

13. "***Financial Agreement***" means that certain financial agreement dated April 10, 2025 by and between CSC, the Debtors, the Smekes, the Ground Lessor, and Parkview.

14. "***Foreclosure Sale***" means the July 25, 2025 foreclosure sale of all the equity in the Debtors.

15. "***Ground Lessor***" means 356W58 Ground Lessor LLC.

16. "***HPD***" means New York City Department of Housing and Preservation Development.

17. "***Identify***" means (a) with respect to persons, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment; (b) with respect to documents, either

3

(i) to give, to the extent known, the (A) type of document; (B) general subject matter; (C) date of the document; and (D) author(s), addressee(s) and recipient(s); or (ii) to produce the documents, together with sufficient identifying information to satisfy Federal Rule of Civil Procedure 33(d).

18.    "*Including*," "*include*," or "*includes*" shall mean "including, without limitation."

19.    "*Parkview*" means Parkview Financial REIT, LP, Parkview Financial Fund GP, Inc., PV Hudson, Parkview Financial, LLC, and/or any of their affiliated entities other than the Debtors.

20.    "*Person*" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

21.    "*Petition Date*" means the Chapter 11 Cases filed by the Debtors on October 22, 2025.

22.    "*Phone Records*" mean all Documents, including telephone bills, recordings, transcripts, call summaries, telephone logs, and/or invoices for telephone conferencing services, that identify the date, time, duration, participants, telephone numbers, and/or proposed or actual subject matter of any telephone call.

23.    "*Prepetition Loan Agreements*" mean the Building Loan Agreement, dated on May 4, 2022, and the Project Loan Agreement, dated May 4, 2022.

24.    "*Prepetition Loan*" means the loans issued under the Prepetition Loan Agreements.

25.    "*Property*" means the real property known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 358-366 West 58th Street located in New York, New York and all improvements thereon.

26.    "*PV Hudson*" means PV Hudson, LLC.

27.     "*Reflecting*" means constituting, embodying, memorializing, representing, or containing in any manner.

28.     "*Request*" means any request for the production of documents set forth herein.

29.     "*Rule 2004 Request*" means that certain *Emergency Motion of the Debtors for Entry of an Order Authorizing the Debtors to Conduct Rule 2004 Examinations* filed at docket number 18 in the Chapter 11 Cases, or any additional information request made by the Debtors related thereto.

30.     "*Settlement Agreement*" means the Settlement and Release Agreement dated August 7, 2025.

31.     "*Smekes*" mean Alberto Smeke Saba and Solomon Smeke Saba.

32.     "*Stop Work Order*" means the partial stop work order issued by the City of New York on the Property.

33.     "*Videoconferencing Records*" mean all Documents, including bills, call or video summaries, transcripts, recordings, meeting logs, and/or invoices for conferencing services that identify the date, time, duration, participants, telephone numbers, planned or actual subject matter, and any Documents uploaded and/or accessed through any videoconferencing call or service.

34.     "*You*" and "*Your*" means the Smekes.

## INSTRUCTIONS

1.      Unless otherwise indicated in a particular Request, the date range of these Requests shall be January 1, 2022 through the date of the response hereto.

2.      Documents shall be produced as they have been kept in the ordinary course of business.  In this respect, the file folder in which the documents are contained is deemed an integral part of the document and shall also be produced.  You are specifically requested to produce any excel spreadsheets in native format.

5

3.      The singular shall include the plural and the plural shall include the singular; the conjunctive shall include the disjunctive and the disjunctive shall include the conjunctive.

4.      If any document is withheld, in whole or in part, on the basis of privilege, the producing party shall provide a proper privilege log at the time of the document production.

5.      These Requests extend to all documents in a producing party's possession, custody and/or control, or in the possession, custody or control of persons or entities under the producing party's control, whether or not such documents were created or prepared by the producing party. The terms "possession," "custody," and "control" mean possession, custody or control, or rights to possession, custody or control, of documents by producing party, including Documents in the possession of any attorneys, without limitation, and documents in the custody, possession or control of any of the producing party's accountants, advisers, representatives and/or other agents of same.

6.      Each reference to a corporation, partnership, joint venture, unincorporated association, government agency or other fictitious person shall be deemed to include each and all of its subsidiaries, affiliates, predecessors and successors, and with respect to each of such entities, its officers, directors, shareholders, employees, partners, limited partners, representatives, agents, accountants, attorneys and any other person who acted or purported to act on its behalf.

7.      Each reference to a natural person shall be deemed to include that person's agents, attorneys, representatives and any other person who acted or purported to act on that person's behalf.

8.      In responding to these Requests, which are continuing in nature, the producing party shall produce all responsive documents in their possession, custody and/or control and shall promptly supplement and/or correct its responses if the producing party comes into possession,

custody or control of additional documents, or learns or determines additional information, after the service of its response.

9.    If, after a reasonable and thorough investigation using due diligence, the producing party is unable to furnish a document or part thereof because a document is not available to the producing party, the producing party shall provide a list of each document so lost, destroyed or otherwise unavailable, together with the following information: (a) date or origin; (b) brief description of such document; (c) author of the document; (d) date upon which the document was lost or destroyed; and (e) brief statement of the manner in which such document was lost or destroyed.

10.    Electronic data should be produced with all native files and metadata intact, in full-text searchable format.  Any responsive, electronically stored data shall be converted/processed to TIFF files and Bates numbered, and include fully searchable text.  Additionally, email and native file collections should include linked native files.  Documents must be produced with load files necessary to load such documents onto Relativity.  Images should be single-page TIFF files and file names cannot contain embedded spaces.  The text and metadata of emails and the attachments, and native file document collections should be extracted and provided in a .DAT file.  Searchable text of the entire document must be provided for every record, at the document level, and extracted text must be provided for documents that originated in electronic format.

11.    If there are no documents responsive to a category in this Request, so state in writing.

12.    The producing party shall follow all deadlines and procedures under applicable law. Objecting to a portion of a Request does not relieve the producing party of the duty to respond to those parts of the Request to which the producing party does not object.

17695656/1

## REQUESTS

1.      Documents produced to the Debtors in response to the Rule 2004 Request.

2.      Documents relating to the organizational structure of the Debtors before the Foreclosure Sale.

3.      Documents relating to shared services, profit-sharing arrangements and payment arrangements between the Debtors, CSC and the Smekes before the Foreclosure Sale.

4.      Documents relating to agreements between the Debtors and the Debtors' members, managers, directors and/or officers before the Foreclosure Sale.

5.      Documents relating to compensation for all executives, members, managers, directors, officers, and employees of the Debtors before the Foreclosure Sale.

6.      Documents relating to the Debtors' insurance policies, including D&O policies, before the Foreclosure Sale.

7.      Communications relating to the Debtors' decision, prior to the Foreclosure Sale, to purchase or extend the Debtors' D&O policy coverage.

8.      Documents relating to minutes, consents and resolutions of the Debtors before the Foreclosure Sale.

9.      Documents and Communications relating to the Prepetition Loan Agreements, including any notice of defaults or forbearance agreements related thereto.

10.     Documents and Communications relating to the Financial Agreement, including any notice of defaults, forbearance agreements and financing related thereto.

20.     Documents and Communications relating to the Cure Application.

21.     Documents and Communications relating to efforts to contest HPD's determination of harassment of tenants on the Property.

8

22.     All Documents and Communications relating to efforts to lift the Stop Work Order and resume construction on the Property.

23.     Documents and Communications related to the Union Settlement Agreement.

24.     Documents and Communications related to the Foreclosure Sale, including all marketing and sale materials, notices, bids received, auction transcript, and purchase agreement.

25.     Documents and Communications relating to the Settlement Agreement.

26.     Documents and Communications relating to funding requests sent to Parkview, prior to the Foreclosure Sale, under the Prepetition Loan Agreements and their uses.

27.     Documents and Communications between the Debtors and Parkview, prior to the Foreclosure Sale, related to any allegations concerning Parkview failing to release funds, causing project delays, or otherwise breaching any of its responsibilities under the Prepetition Loan Agreements, Financial Agreement, Settlement Agreement, or any other agreement.

28.     Documents and Communications related to any complaints filed or served by Parkview against CSC or the Smekes, including the complaint filed by Parkview on or around June 30, 2025.

29.     Documents and Communications concerning any efforts to sell or assist the Debtors in selling the Debtors as a going concern or any interests in the Property, or to raise financing of any type, including but not limited to, all teasers, confidential information memoranda, indications of interest, letters of intent, offers, or other similar documents prepared by or on behalf of, or received by or on behalf of, the Smekes, CSC, or the Debtors.

30.     Documents and Communications concerning any internal analysis performed by the Smekes, CSC, or the Debtors to determine the Debtors' financing needs with respect to the

development of the Property, including lifting the Stop Work Order, and otherwise resolving issues raised by HPD or any other regulatory body.

31.     Documents sufficient to identify any advisor, independent contractor, appraiser, valuation expert, or other professional hired by the Debtors, the Smekes, or CSC to conduct an analysis, valuation, appraisal, feasibility study, or other report regarding the development of the Property, and the scope of their services.

32.     Any analysis, valuation, appraisal, feasibility study, or other report prepared by or received from any person or entity identified in Request No. 29 regarding the development of the Property.

33.     Documents relating to any distributions, payments, transfers of funds made by or to the Smekes, including any affiliated entities of the Smekes.

34.     Documents and Communications sufficient to show how funds received in connection with the Property were used, including construction costs, operating expenses, professional fees, reimbursements and any other expenditures.

35.     Documents and Communications concerning the decision to undertake demolition on the Property, the scope of work and costs incurred.

36.     Documents and Communications relating to funding for any demolition work on the Property.

37.     Documents and Communications concerning the impact of demolition activities on tenants at the Property, including complaints, notices or discussions regarding tenant habitability issues.

17695656/1