## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HUDSON 1701/1706, LLC, *et al.*,[1]<br><br><br>Debtors. | Chapter 11<br><br>Case Nos. 25-11853 (KBO)<br><br>(Jointly Administered)<br><br>**Hearing Date: March 12, 2026, at 9:30 a.m. (ET)**<br>**Objection Deadline: March 5, 2026, at 4:00 p.m. (ET)** |

### DEBTORS' MOTION FOR AN ORDER DETERMINING THAT PURPORTED GROUND LEASE, IF A TRUE LEASE, IS A LEASE OF RESIDENTIAL REAL PROPERTY UNDER SECTION 365 OF THE BANKRUPTCY CODE

Hudson 1701/1706, LLC and Hudson 1702, LLC, as debtors and debtors in possession (collectively, the "**Debtors**"), by and through their undersigned counsel, hereby move (the "**Motion**") this Court for entry of an order determining that the purported ground lease between the Debtors and 356W58 Ground Lessor LLC dated May 4, 2022, if deemed a true lease, constitutes a lease of residential real property and not nonresidential real property under Section 365 of the Bankruptcy Code.[2]  In support of this Motion, the Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

The Debtors submit this Motion seeking a determination by this Court that the purported ground lease between the Debtors and 356W58 Ground Lessor LLC dated May 4, 2022 (the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

[2]  As the Court is aware, the Debtors maintain that the purported ground lease is actually a financing transaction. *See* Adv. Pro. No. 25-52471-KBO, ECF No. 1. This Motion is filed in an abundance of caution, in the event the Court deems the ground lease a true lease. This Motion is not a waiver of the Debtors' arguments for recharacterizing the ground lease as a financing transaction.

"**Purported Ground Lease**" or "**PGL**,") regarding the property at 353-361 West 57th Street (the "**Property**" or the "**Hudson**") constitutes, at most, a lease of "residential real property," as that term is used in Section 365(d)(2) of the Bankruptcy Code.  A copy of the Purported Ground Lease is attached hereto as **Exhibit A** and incorporated herein by reference.

As the Court is aware, the Debtors maintain that the Purported Ground Lease is actually a financing transaction (*see* Adv. Pro. No. 25-52471-KBO ("**Adv. Pro.**"), ECF No. 1.  However, if the Court determines that the Purported Ground Lease is a true lease, the classification of it as residential or non-residential may have significant ramifications for the Debtors' reorganization process.  Among other things, if the Purported Ground Lease is in fact a true lease (it is not), it is governed by the flexible assumption/rejection timeline under Section 365(d)(2), rather than the strict deadline imposed for nonresidential real property leases under Section 365(d)(4).[3]

In considering whether a lease is a lease of residential real property, the significant majority of courts look to the nature of the use of the property. Under this approach, the Purported Ground Lease clearly is residential: the Lease expressly states that the Debtors' "primary purpose" is conversion of the Property into a "Multifamily Project" and requires that, upon conversion, the Debtors will sublease at least 75% of rentable floor space pursuant to "Residential Subleases" for "residential use." (PGL at i.)  Further, the Property is currently the permanent home for 29 Single Room Occupancy ("**SRO**") tenants – *i.e.*, individuals who currently reside at the Property – some of whom have resided there for over 50 years, which undisputedly establishes the Property's residential nature in ordinary meaning and practical reality.

---

[3]  While the deadline to assume or reject the Purported Ground Lease is the impetus for filing this Motion, the Debtors reserve all rights as to the impact of a determination that the Purported Ground Lease is a lease of residential real property upon the application of Section 365(d)(3), in addition to Section 365(d)(4), in these chapter 11 cases.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over these chapter 11 cases (the **"Chapter 11 Cases"**), the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.

2.      This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(O). Pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue of these Chapter 11 Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 365(d)(2), 365(d)(3), and 365(d)(4) of the Bankruptcy Code. Such relief is also appropriate in accordance with Rules 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and Local Rule 9013-1.

## BACKGROUND

5.      On October 22, 2025 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

6.     The Debtors continue to be in possession of their properties, operate their business, and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.     On November 25, 2025, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors [Docket No. 104] (the "**Committee**").   No trustee or examiner has been appointed in these Chapter 11 Cases.

8.     Additional factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in the *Amended and Restated Declaration of Alan Tantleff in Support of Debtors' Chapter 11 Petitions and Day Motions* [Docket No. 60] (the "**First Day Declaration**"), which is fully incorporated herein by reference.

## RELIEF REQUESTED

9.     The Debtors respectfully request entry of an order determining that, if the Court concludes that the Purported Ground Lease is a true lease, it is a lease of residential real property for purposes of section 365 and its assumption or rejection is governed by Section 365(d)(2) and not Section 365(d)(4) of the Bankruptcy Code.

## FACTS

### I.     The Property and Residents

10.     The Property consists of condominium units within the building formerly known as the Hudson Hotel.  The Debtors' leasehold interest covers Units 1701, 1702, and 1706.

11.     When the Debtors commenced development and construction, the Property contained 39 SRO units.  Today, the Property houses 29 SRO tenants who are beneficiaries of

rent-stabilization laws.  Some SRO tenants have lived at the Property for over 50 years. (*See* PGL, Ex. K)

12.     On December 1, 2022, the Debtors entered into a single retail lease (the "**Retail Lease**"), as landlord, with Fitness International, LLC, a California limited liability company that owns and operates LA Fitness, as tenant.   Aside from this single Retail Lease, there are no other commercial leases held by the Debtors, and the vast majority of the square footage in the Property is dedicated to the SRO units and the planned 399 additional residential units.

## II.    The Terms of the Purported Ground Lease

13.     The text of the Purported Ground Lease explicitly manifests a residential intent. Under the "Purpose of Lease" subsection, as it appears in the "Basic Ground Lease Information" section, the Purported Ground Lease states:

> It is the intention of Tenant [i.e., the Debtors] that the primary purpose of this Lease is the conversion of the Leased Premises into the *Multifamily* Project in accordance with and subject to the terms and conditions of this Lease (the "Conversion"). Upon the Conversion, Tenant shall sublease at least 75% of the rentable floor space of the Leased Premises pursuant to the *Residential Subleases* for subtenants to use *for residential purposes*.

(PGL at i (emphases added)) The Purported Ground Lease also defines the "Project" as "the renovation and Conversion of the Leased Premises into the Multifamily Project with the intent that at least 75% or more of the rentable floor space of the Leased Premises shall be subleased pursuant to the Residential Subleases." (*Id.* at 22)

## LEGAL STANDARD

14.     Under Section 365(d)(2) of the Bankruptcy Code, the general rule is that a debtor may assume or reject executory contracts and unexpired leases of residential real property at any time before the confirmation of a plan.  In contrast, Section 365(d)(4) carves out from Section 365(d)(2) leases of nonresidential real property and requires a debtor to assume or reject a lease in

this specific class within 120 days after the petition date, which deadline may be extended for an additional 90 days by the bankruptcy court for cause shown. Any further extension of this deadline may only be granted upon the "prior written consent of the lessor." Accordingly, Section 365(d)(4) creates a much more stringent and inflexible regime for the assumption and rejection of leases of nonresidential real property. The Bankruptcy Code does not define "residential" and "nonresidential."

15.     Because Section 365(d)(4) is an exception to the general policy of flexibility in reorganization, courts construe it narrowly. *See In re Indep. Village, Inc*., 52 B.R. 715, 722 (Bankr. E.D. Mich. 1985) ("When the Code establishes both a rule and its exceptions, the exception should be construed narrowly") (finding lease was residential); *In re Care Givers, Inc*., 113 B.R. 263, 267 (Bankr. N.D. Tex. 1989) (same). *See generally In re Warren*, 93 B.R. 710, 712 (Bankr. C.D. Cal. 1988) (holding that exceptions to "the general rule in bankruptcy that creditors are to be treated equally" should be narrowly construed).

16.     Here, the Purported Ground Lease does not fit within a "nonresidential" definition, and this Court should enter an order determining that the general rule of Section 365(d)(2) should apply to its assumption or rejection.

## **ARGUMENT**

### III.    **Under A Totality-of-the-Circumstances Approach, the Purported Ground Lease is Residential**

17.     As stated, the Bankruptcy Code does not define "residential" and "nonresidential." Consequently, courts have struggled to categorize leases that may involve some commercial elements but also serve residential purposes. In the absence of a definition, courts have generally coalesced around three analytical frameworks: the "property test," the "economic test," and, most

recently by a bankruptcy court in the Third Circuit,[4] a "totality-of-the-circumstances test." A significant majority of courts have endorsed and applied the property test (discussed below) rather than the economic test (also discussed below).  After canvassing the case law applying these tests, the bankruptcy court in *In re Guardian Elder Care*, 665 B.R. 270 (Bankr. W.D. Pa. 2024), synthesized these tests into a totality-of-the-circumstances analysis.

18.    For the reasons discussed below, the Debtors submit that either the totality-of-the-circumstances test articulated in the well-reasoned decision by the court in *Guardian* or the property test applied by a majority of courts should be followed by this Court, and application of either of those tests leads to a determination that the Purported Ground Lease is a lease of residential real property that is subject to Section 365(d)(2), not Section 365(d)(4), of the Bankruptcy Code. Conversely, the Debtors submit that the economic test applied by a minority of courts should not be followed here.

19.    In *Guardian*, the bankruptcy court confronted two competing single-factor tests: (i) the property test (favored by most courts), examining the nature of the use of the property; and (ii) the economic test (the minority test), examining whether the intent of the lease was commercial. The court in *Guardian* recognized the limitations of the binary choice between the property test and economic test. For these reasons, the *Guardian* court adopted a test that looks to the "totality of the circumstances." 665 B.R. at 277.[5]  This approach requires the court to examine "the specific facts and practical realities of each case." *Id*. at 277. The factors to be weighed include:

---

[4] The Debtors have not been able to locate any cases squarely addressing this issue in the district or bankruptcy courts in the District of Delaware.

[5] The *Guardian* court notes that, if forced to choose between the property test and the economic test, it would – like the majority of the courts – choose the property test. *See* 665 B.R. at 275 ("the Court finds that the 'property test' is more persuasive among the dichotomy of choices presented by the parties. The Court's conclusion in this regard is particularly acute since bankruptcy courts are tasked with a mandate to prioritize substance over mere form, and in this vein should adopt an interpretation of § 365 (d)(3) that is aligned with the plain language of the statute and the practical realities at hand").

(i)     the primary use of the property;

(ii)    the intended purpose as expressed in the lease agreement;

(iii)   the nature of the occupancy by residents;

(iv)    applicable regulatory requirements;

(v)     the economic and commercial aspects of the lease; and

(vi)    the legislative history of Section 365.

*Id*. As discussed below, applying the *Guardian* factors, the Purported Ground Lease must be deemed a lease of residential real property under Section 365 of the Bankruptcy Code.

### A.  The Primary Use of the Property is Residential

20.     *Guardian*'s first factor – the primary use of the property – weighs in favor of a residential determination.  The Hudson currently houses 29 SRO tenants and, upon completion of the Project, will be home to hundreds more individuals and families in 399 new residential units. The residential nature of the Property can also be inferred from the apportionment of square footage: the one commercial use, LA Fitness, has 51,474 square feet of space, while the rental space of the entire property is approximately 362,800 square feet, making the LA Fitness space less than 15 percent of the overall square footage.

21.     Even the PGL lessor, in briefing in this bankruptcy case, has described the primary planned use of the Property as residential:

> Under the Lease, the Debtors were obligated to construct and complete an agreed upon project at the premises (the "Construction Project"). The Construction Project as initially conceived was the conversion of the Leased Premises from a hotel *into approximately 400 residential units* to be rented at market rates.

Adv. Pro. ECF No. 16 at 3–4 (emphasis added). The primary use of the Property is clearly residential.

## B. The Intended Purpose as Expressed in the Purported Ground Lease is Residential

22.     Under *Guardian*'s second factor, the court closely examined the actual language of the governing lease to ascertain the nature of the property. 665 B.R. at 279. The court explained that the lease itself "strongly implies a purpose rooted in a 'residence'": provisions requiring the facilities to be operated as skilled nursing facilities, "emphasi[zing] patient occupancy and continuity of the primary intended use of the premises," showed that both parties understood the property to function as a residence. The court emphasized that the agreement was structured to preserve a "residential home care character of the premises." *Id.*

23.     The same reasoning applies here, but even more compellingly. In the Purported Ground Lease, the residential character is not merely implied; it is expressly stated. The Lease identifies the tenant's "primary purpose" as converting the premises into a multifamily project and requires that at least 75% of the rentable floor space be subleased pursuant to "Residential Subleases" for "residential purposes." (PGL at i)

24.     Furthermore, the fact that the Purported Ground Lease is styled as a "ground lease" does not render it nonresidential. In *In re Bonita Glen II*, 152 B.R. 751 (Bankr. S.D. Cal. 1993), the court held that a ground lease upon which a debtor constructed an apartment building was not a lease of nonresidential real property. *Id.* at 754. The court explicitly rejected the argument that the commercial purpose of the ground lease (generating rent for the debtor) made it nonresidential. *Id.*; *accord Guardian*, 665 B.R. at 279 (lease was residential "even where economic and business objectives are at play"). The Debtors' Purported Ground Lease is explicitly predicated on "residential purposes." The intended use, as expressed in the Purported Ground Lease, is residential.

### C.  The Nature of Occupancy of the Property is Residential

25.    LA Fitness does not currently occupy the Property.  The sole occupants of the Property at the inception of the Purported Ground Lease were 37 SRO tenants, of which 29 SRO tenants remain.  The vast majority of these SRO tenants assumed their leases in the 1970s or 1980s. These are not transient hotel guests; they are protected rent-stabilized tenants for whom the Hudson is exclusively a home.  The presence of actual current residents with continuous, significant reliance on the Property for shelter weighs heavily in favor of a residential classification.

26.    In *Guardian*, the court held that the nursing facility was residential because "[t]he properties house . . . residents who live there full-time, relying on these facilities . . . for shelter, stability, and community – attributes fundamental to any residence." 665 B.R. at 281.  The occupancy of the Hudson supports the same conclusion.  Thus, the third factor for concluding that the Property is residential under the *Guardian* test is satisfied.

### D.  Applicable Regulatory Requirements Require Finding the Property is Residential

27.    The residential character of the Hudson is further confirmed by the specific regulatory regime governing it – the fourth factor articulated in *Guardian*. 665 B.R. at 277 (considering "applicable regulatory requirements").  The Hudson is subject to the jurisdiction of the New York City Department of Housing Preservation and Development ("**HPD**") and the Rent Stabilization Code, and the Purported Ground Lease expressly obligates the Debtors to obtain a "Certificate of No Harassment" ("**CONH**") to protect the SRO tenants before development can proceed.  These protections – designed to safeguard occupants' living conditions and prevent displacement – apply to residential dwellings, not commercial space.  Furthermore, New York City records classify the Hudson as residential building, which also supports treating the Property as a residential property under the *Guardian* analysis.  For example, the New York City's Housing

Preservation & Development website has assigned a multiple dwelling registration number to the Property, which is not assigned to commercial properties, and the Real Estate Finance Bureau database shows that the building is occupied as "Split/Residential".  See attached **Exhibit B.**

### E.  The Economic and Commercial Aspects of the Purported Ground Lease Do Not Support Classification as Nonresidential

28.     The fifth factor identified by the court in *Guardian* does not change the conclusion here.  As stated above, the one commercial tenant, LA Fitness, will have 51,474 square feet of space, while the rental space of the entire property is approximately 362,800 square feet, making the LA Fitness space less than 15 percent of the overall square footage.  Notably, the Purported Ground Lease does not provide any specific requirements for the development of any commercial space at the Property.  Indeed, under the Purpose of Lease section, the only requirement is that the Debtors "sublease *at least* 75% of the rentable floor space . . . for residential purposes." (PGL at i) (emphasis added). Thus, under the Purported Ground Lease, the majority of the floor space must be used for residential purposes, and conceivably all of the space could be used for residential purposes. Under the Purported Ground Lease, there is no requirement for any commercial activity at the Property.

### F.  Bankruptcy Code Section 365's Legislative History and Statutory Interpretation  Demonstrate that the Purported Ground Lease is Residential

29.     As for *Guardian's* sixth factor, Section 365's legislative history indicates that a "nonresidential" lease was not meant to encompass mixed-use multifamily residential projects such as the Property.  As discussed in *Guardian* and other case law and treatises, the Bankruptcy Code's 1984 amendments – which introduced the strict assumption/rejection rules for

nonresidential leases – principally concerned shopping mall landlords and their tenants.[6] *See* H.R. Conf. Rep. 98-882 (1984), as reprinted in 1984 U.S.C.C.A.N. 576, 598–99 (titling the section "Shopping Center Bankruptcy Amendments" and noting that the provisions are "intended to remedy serious problems caused [to] shopping centers and their solvent tenants by the administration of the Bankruptcy Code").  Congress adopted these protections to address "the peculiar vulnerabilities of the commercial retail context," focused on shopping centers and mall landlords, while "leaving residential leases unaddressed." *Guardian*, 665 B.R. 278; *see also In re Lippman*, 122 B.R. 206, 211 (Bankr. S.D.N.Y. 1990) (noting Congress was concerned with "pure business environments"); *In re Historical Locust St. Dev. Assocs.*, 246 B.R. 218, 223 (E.D. Pa. 2000) ("[R]esidential realty was not included in § 365 (d)(4) because of a policy of protecting residents of real property, whether they be debtors or nondebtors").

30.     In short, the Purported Ground Lease at the Hudson is "far removed from the archetypical shopping center lease situation" to which Section 365(d)(4) was intended to apply according to the legislative history. *See Guardian*, 665 B.R. at 278.  Thus, the sixth factor of the *Guardian* test also unequivocally supports the conclusion that the Purported Ground Lease is not subject to Section 365(d)(4) of the Bankruptcy Code.

## IV.  Even Under the Single-Factor "Property Test," the Property is Residential

31.     While the court in *Guardian* chose to apply a totality-of-the-circumstances approach, reasoning that the single-factor property test and economic test may each lead to

---

[6] *See Guardian* 665 B.R. at 278–80; *In re PNW Healthcare Holdings*, 617 B.R. 354 (Bankr. W.D. Wash. 2020) (reciting legislative history of § 365, from the 1984 addition of the residential/nonresidential distinction through the 2005 amendments, concluding that the consistent concern of Congress was the status of bankrupt shopping malls); *Bonita Glen II*, 152 B.R. at 753 (the 1984 amendments to Section 365 "dubbed the 'shopping center amendments'"); 3 Baxter Dunaway, Law of Distressed Real Estate § 40:7, Distinction between Residential Leases and Nonresidential Leases (May 2025 ("Congress' concern about the uncertainty and delay for lessors in shopping centers [] led to § 365 being amended to require a debtor to assume or reject a nonresidential lease within sixty days after the date of the order for relief").

unsatisfactory results, nevertheless, the Debtors would still prevail under the majority position applying the so-called "property test."

32.     Most courts to date have adopted the property test. *See Guardian*, 665 B.R. at 275 n.3 (collecting cases that apply the property test). The property test "focus[es] on the nature of the leased property and whether people reside on such property," rather than the commercial nature of the lease instrument. *In re PNW Healthcare Holdings, Inc.*, 617 B.R. 354, 362 (Bankr. W.D. Wash. 2020); *see, e.g.*, *In re Care Givers, Inc.*, 113 B.R. 263, 266 (Bankr. N.D. Tex. 1989) (holding that because patients lived in the nursing home, the property was residential); *In re Independence Village, Inc.*, 52 B.R. 715, 722 (Bankr. E.D. Mich. 1985) (holding that a life-care facility was residential because "people resided on the property").

33.     Proponents of the property test rely on the plain language of Section 365 (d)(4), noting that, in the statute, the modifier "nonresidential" applies to "real property," not to "lease." *See In re Lippman*, 122 B.R. 206, 210 (Bankr. S.D.N.Y. 1990) (holding that the "nature of the *property*, and not the nature of the *lease*, governs whether a lease is nonresidential") (emphasis added). Courts ground this reading in standard methods of statutory interpretation:

> For the statute to have the meaning movants contend the adjective "nonresidential" should be transmuted into "commercial" and moved back before the word "lease." Congress could have so provided, but did not. The plain meaning of the phrase used in the statute, "lease of nonresidential real property," is not synonymous with the phrase "commercial lease of real property." In the statute the adjective "nonresidential" modifies "real property" thereby focusing on the character of the real property, not the character of the lease.

*PNW*, 617 B.R. at 362–63 (citing *Care Givers*, 113 B.R. at 266. Therefore, under this test, if a debtor uses the property for a commercial purpose (e.g., subleasing apartments for profit), the lease is still residential if people reside on the real property. *Id.*

13

34.     If this Court were to apply the property test, the Purported Ground Lease is clearly residential. The Property is not an office building, manufacturing plant, warehouse, or shopping center; it is the current residence of 29 SRO tenants and, under the terms of the Purported Ground Lease, the future home to hundreds of more individuals and families.  The current SRO tenants do not merely visit the Property; they live there, and some have done so for decades. *See In re Bonita Glen II*, 152 B.R. 751, 754 (Bankr. S.D. Cal. 1993) (adopting property test over economic test and finding a ground lease to be residential where the parties contemplated the construction of an apartment building). Because human beings currently reside on the Property, it cannot be classified as "nonresidential" under this test.

## V.   The Single-Factor "Economic Test" Should Not Be Followed

35.     A minority of courts apply the "economic test" (sometimes called the "lease test"), which "considers the contractual intent behind the lease (that is, whether the lease is for commercial purposes or whether the lease is for non-commercial purposes." *Guardian*, 665 B.R. at 275; *see also id.* at 275 n.3 (collecting cases applying the economic test); *see In re Passage Midland Meadows Ops., LLC*, 578 B.R. 367, 378 (Bankr. S.D.W. Va. 2017) ("The nature-of-the-lease test focuses instead on whether the intent of the lease is to provide income for the commercial lessee"); *In re Sonora Convalescent Hosp., Inc*., 69 B.R. 134, 136 (Bankr. E.D. Cal. 1986 (holding that the commercial intent of the lease is determinative even though patients resided on the property). This test prioritizes the intended financial relationship between the landlord and debtor over the physical use of the property.

36.     Ironically, like the proponents of the property test, the proponents of the economic test also rely on methods of statutory interpretation for their position.  However, the Debtors submit

that the statutory interpretation applied by these courts is strained and not nearly as straightforward as the reasoning under the property test.

37.    Moreover, by focusing on the commercial interests of the debtor as lessee, these cases fail to recognize fundamentally the clear legislative intent for Section 365(d)(4) to provide protection to non-debtor shopping center landlords, with no view to the nature of the debtor's business. And, in turn, these cases fail to recognize the tenet that an exception to a general rule and treatment of creditors (under Section 365(d)(2)) should be construed narrowly.[7] As such, the Debtors submit that the economic test espoused by a minority of courts should not be followed by this Court.

*[Remainder of Page Intentionally Left Blank]*

---

[7]  *See In re Indep. Village, Inc.*, 52 B.R. 715, 722 (Bankr. E.D. Mich. 1985) ("When the Code establishes both a rule and its exceptions, the exception should be construed narrowly") (finding lease was residential); *In re Care Givers, Inc.*, 113 B.R. 263, 267 (Bankr. N.D. Tex. 1989 (same). *See generally In re Warren*, 93 B.R. 710, 712 (Bankr. C.D. Cal. 1988 (holding that exceptions to "the general rule in bankruptcy that creditors are to be treated equally" should be narrowly construed).

## **CONCLUSION**

For the foregoing reasons, the Debtors respectfully request entry of an order determining that, if the Court concludes that the Purported Ground Lease is a true lease, it is a lease of residential real property for purposes of section 365 and its assumption or rejection is governed by Section 365(d)(2) and not Section 365(d)(4) of the Bankruptcy Code.

Dated: February 24, 2026
Wilmington, Delaware

CHIPMAN BROWN CICERO & COLE, LLP

*/s/ William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Aaron J. Bach (No. 7364)
Alison R. Maser (No. 7430)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Email: chipman@chipmanbrown.com
       olivere@chipmanbrown.com
       bach@chipmanbrown.com
       maser@chipmanbrown.com

-and-

BOIES SCHILLER FLEXNER LLP
Robert Gordon (admitted *pro hac vice*)
Michael M. Fay (admitted *pro hac vice*)
Jenny H. Kim (admitted *pro hac vice*)
Jeffrey Waldron (admitted *pro hac vice*
Katherine Zhang (admitted *pro hac vice*)
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 446-2300
Email: rgordon@bsfllp.com
       mfay@bsfllp.com
       jkim@bsfllp.com
       jwaldron@bsfllp.com
       kzhang@bsfllp.com

*Counsel for Debtors and Debtors in Possession*

16