**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Hudson 1701/1706 LLC, | Case No. 25-11853 (KBO) |
| Debtors.[1] | (Jointly Administered) |

**356W58 GROUND LESSOR LLC'S OBJECTION TO DEBTORS' MOTION FOR AN
ORDER DETERMINING THAT PURPORTED GROUND LEASE, IF A TRUE LEASE,
IS A LEASE OF RESIDENTIAL REAL PROPERTY UNDER
SECTION 365 OF THE BANKRUPTCY CODE**

356W58 Ground Lessor LLC ("Landlord" or "356W58"), through its undersigned counsel, respectfully submits this objection (this "Objection"), together with the Declaration of Matthew B. McGuire, dated March 5, 2026 ("McGuire Declaration"), with exhibits annexed thereto, to the *Debtors' Motion for an Order Determining that Purported Ground Lease, if a True Lease, is a Lease of Residential Real Property Under Section 365 of the Bankruptcy Code* [D.I. 344] (the "Motion") and in support hereof respectfully states as follows:

**PRELIMINARY STATEMENT[2]**

1.      The Motion is the Debtors' and Parkview's most recent attempt to convince the Court that obvious things are not what they seem.  The property at issue in these Chapter 11 Cases is known as the "Hudson Hotel," is permitted by the City of New York only to be a hotel, and is otherwise a construction site as part of a commercial endeavor to make a profit for various

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' headquarters and the mailing address for the Debtors is 11440 San Vicente Boulevard, 2nd Floor, Los Angeles, CA 90045.

[2] Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in *356W58 Ground Lessor LLC's Memorandum of Law in Support of its Motion to Dismiss the Complaint*, Adv. Pro. No. 25-52471 [Adv. Pro. D.I. 16].  All references to Adv. Pro. D.I. refer to the adversary proceeding number 25-52471 (the "Adversary Proceeding").

1

sophisticated investment entities, including Parkview.  Moreover, at present the City of New York would not even allow the property to be operated as a multifamily property.   Nevertheless, the Parkview-controlled Debtors seek to have this Court take the novel position that the Ground Lease should be treated just like an individual debtor's apartment lease.

2.      Make no mistake:  the Motion is nothing more than an effort by the Parkview-controlled Debtors to delay the date by which they must earnestly commit the capital and expend the work and resources needed to complete the Project through an assumption of the Ground Lease. During this period of delay, the Project itself is barely moving forward, while the Debtors engage in misguided litigation (funded by Parkview) in an effort to extract unwarranted economic concessions from Landlord.

3.      The building itself evidences the slow-walking approach of the Debtors and Parkview, who are manifestly reluctant to expend the resources necessary to advance the Project. Although certain improvements have been made in the commercial space that is subleased to L.A. Fitness (as required by the relevant sublease), the rest of the Leased Premises has received little attention.  Apart from the L.A. Fitness space, physical improvements appear limited to some new fire hoses in hallways and a few door locks.  Meanwhile, other important work continues to be ignored and needs to be completed, including those devoted to the safety of the public (e.g. maintenance of the façade as required by New York's Façade Inspection and Safety Program (formerly known as Local Law 11)).

4.      Putting aside the question of *why* the Debtors filed their Motion, the Court should recognize the Motion as meritless, for multiple reasons. *First*, the Motion is an unconstitutional request for an advisory opinion.  Because the Debtors have not sought to assume or reject the Ground Lease, there is no active controversy between the Debtors and Landlord that serves as a

basis for the Court to determine the nature of the contract in question here, and the Debtors and Parkview cannot simply manufacture such a dispute.  In essence, the Debtors are asking for this Court to provide – improperly -- legal advice as to what their deadline should be to make a decision regarding assumption of the Ground Lease.

5.      *Second*, the Motion is procedurally defective in that it seeks declaratory relief and should have been brought, if at all, in the context of the Adversary Proceeding.  In that regard, the Motion is an impermissible attempt to amend the Complaint in contravention of the Scheduling Order entered weeks ago in the Adversary Proceeding.

6.      *Third*, even if the Court were to reach the merits of the dispute, the Ground Lease is clearly a commercial lease pertaining to non-residential real property -- and the Debtors must assume or reject the Ground Lease by May 20, 2026.  Since 1941, the Leased Premises has been used as a hotel (including by the notable hotelier Ian Schrager), and at this point the City of New York would only allow the Leased Premises to be used as a hotel (or, for a part of the Leased Premises, for retail purposes).  The City's Department of Finance publicly confirms that the Leased Premises are "non-residential."  And while the Debtors point to the prospect that the Leased Premises might one day be converted into multifamily property (which would still be a commercial use), that is not the reality today:  the Leased Premises are ***currently*** authorized only for non-residential use, the property remains under construction, and there is a distinct possibility that there might ***never*** be a conversion to a multifamily residential use.

7.      The Debtors and Parkview also wrongly point to the presence of the 29 "SRO tenants" as support for their argument that the Leased Premises are, today, used for residential

purposes.[3]  This argument must fail, however, in light of the origin and nature of those individuals' occupancy, because SRO tenants are not residential tenants as that term is traditionally understood. The SRO tenants' occupancy arose from the Leased Premises' use as a *hotel*, under the peculiarities of New York City laws that allowed individuals staying in a hotel to become permanent occupants of the property under certain circumstances.  Under New York City's Rent Stabilization Code, these permanent SRO tenants cannot be evicted regardless of any change in ownership of the property, and regardless of whether the Ground Lease exists.  The Court is therefore *not* faced with any possibility that a decision reached in this matter (or in the Adversary Proceeding) could result in the SRO Tenants being evicted and becoming unhoused.

8.      This Court should not countenance the ongoing gamesmanship and intellectual dishonesty that the Debtors and Parkview are promulgating.  The relief requested in the Motion should thus be denied forthwith.

## BACKGROUND

### A.  Origin of the Ground Lease

9.      On May 4, 2022, Hudson 1701/1706, LLC and Hudson 1702, LLC (collectively, the "Debtors"), as tenants, and Landlord, as landlord, entered into a lease for certain premises located at 353 West 57th Street in New York, New York for a period of 99 years.  *See* Declaration of Matthew B. McGuire [Adv. Pro. D.I. 17] ("McGuire Adversary Declaration"), at Ex. C (the "Ground Lease").

10.     The premises covered by the Ground Lease was converted into the historic Henry Hudson Hotel in 1941, later renamed "The Hudson" by renowned hotelier Ian Schrager.  Amended

---

[3] The term "SRO" refers to "single room occupancy."  These are typically one room spaces with limited kitchenette areas.  Bathroom facilities are provided down a hallway, and are shared with other SRO occupants.

and Restated Decl. of Alan Tantleff in Support of Debtors' Chapter 11 Petitions and First Day

Motions at ¶¶ 18-19.

11.     Pursuant to a nuance in New York City housing law, occupants of hotel rooms at

the Hudson became "Permanent tenants" of the property for life under New York City's Rent

Stabilization Code. These SRO tenants, which are the product of the Leased Premises' existence

as a hotel, may not be evicted except via a warrant of eviction or other order of a court of competent

jurisdiction or a governmental vacate order.

12.     To date, the entire Leased Premises remains classified as non-residential space by

the New York City Department of Finance:

- Unit 1701 is classified as a "**Non-Residential**" and the NYC Department of Finance states "Your property is a condo hotel[.]" *See* Ex. A ("Building Class: RH Units: 1 Non-Residential").

- Unit 1702 is classified as a "**Non-Residential**" and the NYC Department of Finance states "Your property is a condo hotel[.]" *See* Ex. B ("Building Class: RH Units: 1 Non-Residential").

- Unit 1706 is classified as a "**Non-Residential**" and the NYC Department of Finance states "Your property is a condo hotel[.]" *See* Ex. F ("Building Class: RH Units: 1 Non-Residential").

13.     Under the Ground Lease, the Debtors were obligated to construct and complete an

agreed upon project at the premises (the "Construction Project").  The Construction Project as

initially conceived was the conversion of the Leased Premises from a hotel into approximately 400

residential units to be rented at market rates.  To date, that project remains unfinished and the

Leased Premises remain non-residential spaces. *See* McGuire Declaration, Exs. A–C.

14.     The Debtors were required to substantially complete the initial project on or before

May 4, 2024.  *See id* at 86 (§ 21(d)), 149 (definition of "Required Substantial Completion Date"),

152 (§ 6(b)), 153 (§ 10(a)).

15.     The Ground Lease allowed for the possibility that the Debtors would not be able to complete the project on or before the May 4, 2024 deadline.  In that event, Section 48 of the Ground Lease obligated the Debtors to formulate and submit a Fallback Business Plan and pursue a Fallback Project.  *See id*. at 121-123 (§ 48).

16.     Before commencing certain construction on the project, the Debtors were required by law to obtain a Certificate of No Harassment from the New York City Department of Housing Preservation and Development ("HPD") verifying that no tenant harassment occurred at the property during a prescribed look-back period, or an exemption therefrom (the "CONH Requirement").  *Id*. at § 49.  Following receipt of certain HPD notices dated July 1, 2022 and September 25, 2023, it became apparent that the Debtors could not satisfy the CONH Requirement. *See id*. at 86 (§ 21(d)).  As a result, pursuant to the terms of the Ground Lease, the Debtors proposed two Fallback Business Plans on January 11, 2024, which Landlord could approve or deny in its sole and absolute discretion.  One of the proposed Fallback Business Plans involves transforming a portion of the Premises into an extended-stay hotel (an entirely commercial building).

17.     To date, the Leased Premises remains under construction with no definitive long-term purpose on the horizon, and no active Fallback Business Plan has been proposed or approved.

**B.  Bankruptcy Case Procedural History**

18.     On October 22, 2025 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors are authorized to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

19.     On November 25, 2025, the Office of the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Committee") in these chapter 11 cases.  The Committee is comprised of three members, including Landlord.[4]

20.     On November 20, 2025, approximately three months before asserting that the Ground Lease is for residential real property, the Debtors filed the *Debtors' Motion for Extension of Time for Performance of Obligations Under Ground Lease Pursuant to Bankruptcy Code Section 365(d)(3)* [D.I. 94], implicitly recognizing that the Ground Lease is for non-residential real property under Section 365(d)(3).

21.     On December 22, 2025—two months after filing the bankruptcy petition—the Debtors filed a complaint in the Adversary Proceeding [Adv. Pro. 1] (the "Complaint"), seeking to attack the validity of the Ground Lease and recharacterize the Ground Lease as a loan.

22.     On February 24, 2026, the Debtors filed the Motion, presenting identical facts to the Complaint, also attacking the validity of the Ground Lease.

## OBJECTION

### I.     The Motion is an Impermissible Request for an Advisory Opinion

23.     The Debtors have not sought to assume, reject, sell, or otherwise use the Ground Lease in such a manner that requires this Court to determine the underlying nature of the Ground Lease as residential or non-residential.  While it may be convenient for the Debtors to receive guidance from the Court in advance of their May 20 deadline to assume non-residential leases, they have not sought to assume or reject, and there is no active controversy regarding the nature of the Ground Lease.  As the Court is well aware, Federal courts do not have jurisdiction to issue

---

[4] For the avoidance of doubt, the instant Objection is brought on behalf of Landlord in its individual capacity, not in its capacity as a Committee member.

advisory opinions. "Article III of the Constitution restricts the Judicial Power of the United States to 'cases' and 'controversies,' and prevents federal courts from deciding 'questions that cannot affect the rights of litigants in the case before them.'" *In re Cubic Energy, Inc.*, 587 B.R. 849, 855 (Bankr. D. Del. 2018) (quoting *Unalachtigo Band of the Nanticoke Lenni Lenape Nation v. Corzine*, 606 F.3d 126, 129 (3d Cir. 2010)). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–581 (1985).

24.     Courts apply these principles in the bankruptcy context when parties request judicial intervention when no live controversy exists. *See Coffin v. Malvern Fed. Sav. Bank*, 90 F.3d 851, 853-54 (3d Cir. 1996) (holding that a determination over the enforceability of a lender's lien following confirmation of a plan was an advisory opinion because there was no live controversy regarding the lien); *Cubic Energy*, 587 B.R. at 855 (rejecting motion to interpret whether confirmed plan's terms encompassed causes of action because, despite litigation between the parties on the plan terms being "imminent," it had yet to occur).

25.     Through the Motion, the Debtors are expressly requesting an advisory opinion because, although a dispute about the assumption of the Ground Lease may occur in the future, no litigation or dispute is currently pending.[5]  Further, there is every possibility that no dispute will arise if Debtors assume or reject in a timely manner.  Court intervention at this stage will not change the rights of the parties: either the Ground Lease is nonresidential and must be assumed or

---

[5] The Debtors request for a determination regarding the nature of the property is akin to a debtor seeking an opinion, at a disclosure statement hearing, that the plan to be solicited complies with section 1129 of the Bankruptcy Code.  That kind of advanced guidance might be helpful to the Debtor in providing comfort that the plan to be solicited will be confirmed – but it would be clearly improper.

rejected by May 20, or it is not.  Any relief granted by the Court would merely serve as a guide to the parties in determining future rights and actions. A judgment would not adjudicate any rights actually in dispute.

26.    The Court should therefore deny the Motion as an impermissible advisory opinion.

## II.    The Motion Improperly Seeks Declaratory Relief that Should be Sought Via Adversary Proceeding

27.    In addition, the relief requested in the Motion is procedurally improper.

28.    "[A] declaratory judgment action is an 'action seeking a determination of rights.' . . . [it is a] 'remedy for the determination of a justiciable controversy where the plaintiff is in doubt as to his [or her] legal rights.  A binding adjudication of the rights and status of litigants even though no consequential relief is awarded.'" *Nat'l Union Fire Ins. Co. v. City Sav., F.S.B.*, 28 F.3d 376, 385 (3d Cir. 1994) (quoting Black's Law Dictionary 409 (6th ed. 1990)).

29.    Under the Bankruptcy Rules, "a proceeding to determine the validity, priority, or extent of a lien or other interest in property[,]" "a proceeding to obtain an injunction or other equitable relief[,]" and "a proceeding to obtain a declaratory judgment related to [the same]" must be brought via an adversary proceeding.  Fed. R. Bankr. P. 7001(b), (g), and (i).

30.    While the Debtors decline to use the words "declaratory judgment" or "determination of interest in property," that is clearly what the Motion seeks.  The "relief requested" by the Debtors is "an order determining . . . the Purported Ground Lease . . . is a lease of residential real property[.]"  Motion ¶ 9.  In short, the Debtors are seeking a declaratory judgment to "determine . . . [the Debtors'] interest in property" and such relief must be sought through an adversary proceeding.  Fed. R. Bankr. P. 7001(b) and (i).

31.    Further, the factual underpinnings of the Motion are identical to the factual underpinnings of the Adversary Proceeding: both rely on the creation, history, and nature of the

Ground Lease. *See, e.g.*, Complaint and Motion. If the Debtors wanted declaratory relief regarding whether the Ground Lease is residential, they should be restricted to seeking such relief in the Adversary Proceeding. *Fox v. Cong. Fin. Corp. (In re Target Induss., Inc.)*, 328 B.R. 99, 116 (Bankr. D.N.J. 2005) (quoting *Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 337-38 (3d Cir. 2000)) (a cause of action could be barred where "the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum."). Basic principles of judicial economy dictate that Debtors should have consolidated claims their claims and included all of them in the Adversary Proceeding.

32.     Rather than proceeding by motion, the Debtors should have amended the Complaint to add a count for the declaratory relief sought. This would have satisfied Fed. R. Bankr. P. 7001 and protected Landlord's due process rights. However, the Debtors chose to ignore the required procedures and try to force through this relief via motion. It is clear they have done so because the Debtors have painted themselves into a corner. The statutory deadline by which the Debtors must assume the Ground Lease is May 20, 2026. *See* 11 USC. § 365(d)(4). Under the Adversary Proceeding schedule—which the Debtors proposed—in this matter does not begin until May 19, 2026. *See* Scheduling Order [Adv. Pro. 34]. To avoid the repercussions of failing to act in a timely manner—the case has been pending for over four months and the Debtors could have sought to adjudicate this relief months ago—the Debtors are now trying to deprive Landlord of its procedural protections guaranteed by the Bankruptcy Rules.

33.     This is not a situation of harmless error. Landlord is entitled to the protections of the Bankruptcy Rules, including the taking of necessary discovery in the Adversary Proceeding. In addition to jeopardizing Landlord's rights, under the Scheduling Order ***that the Debtors***

*proposed*, the Debtors are time barred from amending their Complaint to even add a new count. *See* Scheduling Order at ¶ 4 ("All motions to join other parties and to amend or supplement the pleadings shall be filed on or before February 20, 2026.").

34.     The Debtors are now improperly seeking relief via motion because they mismanaged their time and can no longer properly seek relief through the Adversary Proceeding, none of which is Landlord's fault.  Landlord should not be penalized for the Debtors' failure to act in a timely manner, and the Court should not reward the Debtors' gamesmanship, especially at the expense of Landlord's due process rights.  The Court should thus deny the Motion as procedurally improper.

### III.     The Motion Should Be Denied on the Merits as the Ground Lease is for Non-Residential Real Property

35.     Despite filing the *Debtors' Motion for Extension of Time for Performance of Obligations Under Ground Pursuant to Bankruptcy Code Section 365(d)(3)* [D.I. 94] and seeking an extension of the time period to perform their obligations under the Ground Lease pursuant to § 365(d)(3)—which *only* applies to *nonresidential* real property leases—and essentially conceding that the Ground Lease is a lease of nonresidential real property, now, for the first time, the Debtors argue that the Ground Lease is a residential real property lease.

36.     Neither this Court nor the District Court for the District of Delaware has adopted a test for determining whether a lease is one of residential or non-residential property. The Debtors also recognize this in their Motion and identify three tests that have been applied by other courts.

37.     The "property test" focuses on whether people reside at the leased location (the "Property Test").  *In re Passage Midland Meadows Operations, LLC*, 578 B.R. 367, 378 (Bankr. S.D. W. Va. 2017).  On the other hand, the "economic test" focuses on whether the intent of the lease is to provide income for the commercial lessee (the "Economic Test").  *Id.*  In 2024, the

11

Bankruptcy Court for the Western District of Pennsylvania adopted a new "totality-of-the-circumstances test" (the "Totality Test").  *In re Guardian Elder Care at Johnstown, LLC*, 665 B.R. 270, 276 (Bankr. W.D. Pa. 2024).

38.     Although the Debtors argue that this Court should apply the Totality Test, Landlord respectfully submits that the Economic Test best conforms to the text and purpose of Bankruptcy Code §§ 365(d)(3) and (d)(4).  Each test is discussed below, followed by an application of each test to the case at hand.  Regardless of whether the Court adopts the Economic Test, Property Test, or Totality Test, the outcome is the same: the Ground Lease is a lease of non-residential real property because the Leased Premises is a hotel undergoing construction.

### i.     The Economic Test

39.     The Economic Test gives effect to the entirety of the language in §§ 365(d)(3) and (d)(4) by focusing on the Debtors' use of the relevant real property. See *In re Passage Midland Meadows Operations, LLC*, 578 B.R. at 378 (Bankr. S.D. W. Va. 2017) ("one cannot so easily dispense with the actual ***use*** to which the debtor will put the demised premises personally while still giving effect to the entirety of the language used in the statutory provisions.  The substance of the lease, namely the precise purpose the lessee has for the property, must find its way into the analysis.").

40.     The Economic Test aligns with the purpose and legislative history of §§ 365(d)(3) and (d)(4).  Sections 365(d)(3) and (d)(4) were enacted to protect lessors—like 356W58—from the financial uncertainty of a debtor-tenant's bankruptcy. *See In re Tri-Glied, Ltd.*, 179 B.R. 1014, 1019 (Bankr. E.D.N.Y. 1995) ("The primary purpose of enacting 11 U.S.C. § 365(d)(4) was ***to protect lessors*** . . . from delay and uncertainty by forcing a trustee or a debtor in possession to decide quickly whether to assume unexpired leases." (citation and internal quotation marks

omitted) (emphasis added)); *In re LPM Corp.*, 300 F.3d 1134, 1138 (9th Cir. 2002) ("Congress

added § 365(d)(3) in 1984 ***to protect real property lessors*** during the period between the date the

petition is filed and the date the debtor assumes or rejects a pre-petition lease." (emphasis added));

*In re Iron Age Corp.*, 378 B.R. 419, 423 (Bankr. D. Mass. 2007) ("[Section 365(d)(3)] was added

to the Code to alleviate the unique financial strains the Code placed upon the commercial lessor,

namely that the lessor was formerly unable to collect rent from the debtor-tenant while at the same

time prevented from taking any action to re-let the premises." (citation and internal quotation

marks omitted)).[6]

41.    The Economic Test "focuses on the nature of the lease and includes all commercial

leases where the debtor/lessee is in the business of generating income[.]"  *In re PNW Healthcare*

*Holdings, LLC*, 617 B.R. 354, 362 (Bankr. W.D. Wash. 2020).  If a "lease contemplate[s] a

commercial use of the property," it is a non-residential real property lease.  *In re Sonora*

*Convalescent Hosp., Inc.*, 69 B.R. 134, 136 (Bankr. E.D. Cal. 1986).

### ii.    The Totality Test

42.    The *Guardian* court adopted the Totality Test to determine whether a lease involves

non-residential real property under § 365 of the Bankruptcy Code.  665 B.R. at 277.  In that case,

the court emphasized that "no single factor is dispositive," and stated that "the factors considered

---

[6] While §§ 365(d)(3) and (d)(4) are sometimes referred to as the "Shopping Center Amendments," the text of the statute and relevant legislative history confirm that they apply equally to commercial landlords like Landlord.  *See In re Care Givers, Inc.*, 113 B.R. 263, 267 (Bankr. N.D. Tex. 1989) ("The language of § 365(d)(4) does not restrict its provisions to shopping centers, but refers to 'nonresidential real property.'"); 130 Cong. Rec. S8890 (1984) (Statement of Senator Dole) (stating that the amendments provided "measures that correct problems for owners of shopping centers and their tenants, ***and other owners of real estate***, whose leases are tied up in reorganization proceedings") (emphasis added).  Thus, contrary to the Debtors' assertion that § 365(d)(4) provides "protection to non-debtor shopping center landlords" (Motion ¶ 37), nothing in the text or history of that provision suggests it would not protect Landlord.

include but are not limited to:

> (a) The primary use of the property;
>
> (b) The intended purpose as expressed in the lease agreement;
>
> (c) The nature of occupancy by residents;
>
> (d) Applicable regulatory requirements;
>
> (e) The economic and commercial aspects of the lease;
>
> (f) The relationship between the residents and the property; and
>
> (g) The legislative history and statutory interpretation of § 365."

### iii.   The Property Test

43.     As mentioned above, the Property Test examines only whether people reside on the leased property.  In *In re Passage*, the court found the Property Test to be overly narrow, and observed that several provisions of the Bankruptcy Code using the phrase "nonresidential real property" are limited to leases under which the debtor is the lessee of the relevant property:

> Section 365(c)(3): "The trustee may not assume . . . any . . . unexpired lease of the debtor . . . if . . . such lease is of *nonresidential real property* and has been terminated under applicable nonbankruptcy law prior to the order for relief."
>
> Section 365(d)(4)(A): "Subject to subparagraph (B), an unexpired lease of *nonresidential real property* under which the debtor is the lessee shall be deemed rejected . . . ."
>
> Section 541(b)(2): "(b) Property of the estate does not include . . . any interest of the debtor as a lessee under a lease of *nonresidential real property* that has terminated at the expiration of the stated term of such lease before the commencement of the case . . . ."
>
> Section 362(b)(10): "The filing of a petition . . . does not operate as a stay . . . by a lessor to the debtor under a lease of *nonresidential real property* that has terminated by the expiration of the stated term of the lease before the commencement of . . . a case . . . to obtain possession of such property . . . ."

*Passage*, 578 B.R. at 379 (emphases in original).

44.    Based on the language in the above provisions, the *Passage* court found that the "property test does not give effect to the entirety of the statutory provisions set out above, namely the debtor-focused provisions, and, in the process, runs contrary to the aforementioned, long-settled canon of construction." *Id.* at 380.

### iv.    Applying the Economic Test, the Ground Lease is for Nonresidential Purposes

45.    Under the Economic Test, the Ground Lease is a non-residential real property lease. Under the Ground Lease, both the Debtors and Landlord agreed that the primary purpose of the Ground Lease was the conversion of the Leased Premises from a hotel into a rent generating space, ideally a multifamily property with units to be rented at market rates. *See* Ground Lease at i. This is a commercial use of the property. *See, e.g.*, *id.* (holding that the lease of property for use as a convalescent home was non-residential due to the commercial purpose of the lease, especially the nature of the lease as income-producing); *In re Condo. Admin. Servs., Inc.*, 55 B.R. 792, 795 (Bankr. M.D. Fla. 1985) (holding that a mobile home park lease was non-residential based on the nature of the lease, not the use of the property as a residence); *In re Emory Properties, Ltd.*, 106 B.R. 318, 320-21 (Bankr. N.D. Ga. 1989) (holding that a hotel lease was non-residential even though 3 employees resided on the property).

### v.    Applying the Totality Test, the Ground Lease is for Nonresidential Purposes

46.    Applying the Totality Test factors, the Court should conclude that the Ground Lease is a non-residential real property lease under § 365.

### a.  The Primary Use of the Property is Non-Residential

47.    The primary use of the property is ***not*** residential. Here, the Leased Premises are approved only for non-residential use as a hotel, retail, or office space. *See* McGuire Declaration, Exs. A–C. It is not currently authorized for use as a residential space. *Id*.    Apart from 29

permanent SRO tenants (who are exceptional because they cannot be evicted from the property no matter the circumstances), no one resides or can reside at the property. The property **might** be multifamily in the future "upon completion of the Project" if there is construction of residential units. Motion ¶ 20. However, the property may serve some entirely different function depending on the nature and substance of the required submission of a Fallback Business Plan and what is ultimately approved. Regardless of what the property may ultimately become, it is currently approved only for non-residential use as a hotel, retail, or office space and is no more than an inactive construction site.[7] Additionally, the property includes over 50,000 square feet of commercial space for use by LA Fitness.

48.     In *Northstar Somerset Management, LLC*, a case from the Bankruptcy Court for the District of New Jersey, the landlord filed a motion pursuant to § 365(d)(4) seeking an order compelling the debtor to immediately surrender possession of real property on which the debtor operated a hotel and conference center pursuant to a ground lease. No. 19-20274-CMG (Bankr. D.N.J. 2019) at D.I. 56-1, 66. Among other things, the landlord maintained that (i) the debtor failed to show that the hotel, which included the operation of a restaurant business and other hotel amenities, was used as a residence in its present state, and (ii) the debtor agreed to operate the property as a hotel, agreed not to change the use of the property without the landlord's prior written consent, and was not permitted to use the hotel as a residence. *Id.* at D.I. 69. The *Northstar* court ultimately granted the landlord's motion to compel. *See id.* at D.I. 84. Like *Northstar*, here, the property involves commercial components and, apart from the permanent SRO tenants, the

---

[7] Even if the Leased Premises are ultimately converted to a multifamily use, the Ground Lease would remain a commercial lease, as the tenant would not be using the Leased Premises as a residence but instead for commercial purposes -- and thus Landlord submits that Section 365(d)(4) of the Bankruptcy Code would apply. Because such a conversion has not happened and may never happen, the Court need not address that question in order to rule upon the Motion.

Debtors have not shown the property is—or could legally be—a residence in its present state.  The property is approved only for non-residential use as a hotel (like the property in *Northstar*), retail, or office space. *See* McGuire Declaration, Exs. A–C.

### b.  The Intended Purpose as Expressed in the Ground Lease is Non-Residential

49.     The Ground Lease expresses a commercial purpose: the conversion of the Leased Premises into, in the first instance, approximately 399 rentable units, but in the event that conversion is abandoned, the Leased Premises will be converted for some other agreed-upon use. The purpose of the Ground Lease therefore is to lease the space in whatever form it ultimately becomes for the purpose of generating revenue.

### c.  The Nature of Occupancy of the Property is Non-Residential

50.     Debtors occupy the Leased Premises in order to sublease the property to make a profit.  As mentioned above, besides the permanent SRO tenants, the property has no residents and is approved only for non-residential use. *See* McGuire Declaration, Exs. A–C.  Additionally, it is currently a construction site, and no apartments have yet been built and may never be built. Permanent SRO tenants have unique housing circumstances and strict protections under New York City Law and therefore should not be treated the same as other residents.  The Debtors refer only to the nursing home property in *Guardian*, which is distinct from the property at issue in this case, as support for this factor.  Motion ¶ 26.

### d.  Applicable Regulatory Requirements Evidence the Property is Non-Residential

51.     The Leased Premises' regulators acknowledge that the Ground Lease is nonresidential. *See* McGuire Declaration, Exs. A–C. In addition, HPD has not granted any permit allowing the Leased Premises to become a residential property. The Leased Premises is a hotel and is not approved for residential use. *See* McGuire Declaration, Exs. A–C.

e. **The Economic and Commercial Aspects of the Ground Lease Support Classification as Non-Residential**

52.    The parties entered into the Ground Lease to generate revenue.  This economic aspect sufficiently satisfies this factor.  Furthermore, the Ground Lease allocates over 50,000 square feet of rental space for a commercial tenant—LA Fitness—which is key to the Debtors' reorganization. Additionally, the property is not currently approved for residential use. *See* McGuire Declaration, Exs. A–C.

f. **There is No Relationship Between the Residents and the Property**

53.    Besides the SRO tenants (who are not the typical tenants and should not be treated as such), there are no residents at the Leased Premises. The Debtors failed to address this factor in their Motion.

g. **The Legislative History and Statutory Interpretation of § 365**

54.    As discussed earlier in this Objection, sections 365's legislative history suggests that sections 365(d)(3) and (d)(4) were enacted to protect lessors—including a commercial lessor like Landlord—***broadly***.  *See, e.g.*, *Care Givers,* 113 B.R. at 267 ("The language of § 365(d)(4) does not restrict its provisions to shopping centers, but refers to 'nonresidential real property.'"); *see also Lippman*, 122 B.R. at 211-12 ("In drafting broader language, Congress hoped to ameliorate the detriment to landlords of other 'nonresidential *structures'* from a debtor's unjustified failure promptly to assume or reject a lease . . . .").  Though the Ground Lease is not a shopping center lease, it is still subject to § 365(d)(4) because it is a non-residential real property lease.

55.    Further, the public policy of preventing people from becoming homeless does not apply here because, as discussed above, the SRO tenants will remain as occupants of their units regardless of the outcome of this Court's decision. *See In re Care Givers, Inc.*, 113 B.R. 263, 268

(Bankr. N.D. Tex. 1989) (in "those cases where the debtor argued that the leased property was residential, the residents in the real property did not face the risks involved in this case.").

### vi.   Applying the Property Test, the Ground Lease is for Nonresidential Purposes

56.     Even if the Court concluded that the Property Test applied, the Ground Lease is not a residential real property lease.  As mentioned above, the Property Test examines the nature of the leased property and whether people reside on such property.  *See PNW Healthcare*, 617 B.R. at 362.

57.     Here, the property is approved only for non-residential use as a hotel, retail, or office space. *See* McGuire Declaration, Exs. A–C.  It is not currently authorized for use as a residential space.  *Id*.

58.     Additionally, the property is still under construction.  In their Motion, the Debtors acknowledge that the property is "the *future* home to hundreds of . . . individuals and families." Motion ¶ 34 (emphasis added).  Regardless of what the property may become in the future, currently it is an inactive construction site.  No permit has been issued to convert the property to residential use, the property is currently only approved for non-residential use, and construction at the site is incomplete.

59.     The present case is distinguishable from the *In re Bonita Glen II* case cited by the Debtors, in which the Property Test applied and the court found that a ground lease was residential because the parties contemplated the construction of an apartment building.  152 B.R. 751, 754 (Bankr. S.D. Cal. 1993).  In *Bonita Glen*, the ground lease stated that the lessee would construct an apartment building on the real property, and the lessee in fact *did* build an apartment building. *Id.* at 752. Here, nothing has been built.  The Debtors also cite to *In re Lippman*, where the Property Test applied.  However, in *Lippman* an individual debtor leased 3 specific apartments which were

lived in and "provided homes for human beings." 122 B.R. 206, 207, 212 (Bankr. S.D.N.Y. 1990). The *Lippman* Court "reach[ed] this conclusion reluctantly" to avoid "the practical effect of evicting" a person from his residence. *Id*. at 212-13. This is unlike the case at hand where the only current tenants are commercial (LA Fitness) or permanent (SRO tenants who cannot be evicted regardless of the Court's conclusion here).

60.     The Debtors argue that the Ground Lease is "clearly residential" under the Property Test because the property is the current residence of 29 permanent SRO tenants. *See* Motion at 11, 12, 20, 21, 25, 26, 27, 34. However, the existence of these units, which arose as a result of the building's use as a hotel and endure under the peculiarities of New York City law, should not factor into this Court's residential/nonresidential analysis because the SRO tenants cannot be evicted by any owner or successor-owner of the property. The SRO tenants will remain as occupants of the property regardless of this Court's decision on this motion.

61.     SRO Hotel units are rooms in hotels that generally do not contain a bathroom or kitchen. The SRO tenants at the Hudson Hotel are "Permanent tenants" under New York City's Rent Stabilization Code and may not be evicted except "pursuant to a warrant of eviction or other order of a court of competent jurisdiction or a governmental vacate order." *See Guira v. Audthan LLC*, 48 Misc. 3d 1217(A), 20 N.Y.S.3d 291 (N.Y. Civ. Ct. 2015) (citing NYC Admin. Code § 26-521). Generally, as long as Permanent tenants pay rent, they may remain in the SRO Hotel units. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 2524.1; NYC Admin. Code § 26-521; H N.Y. Prac, Landlord and Tenant Practice in New York § 18:203.

62.     None of the cases cited by the Debtors involve permanent SRO tenants, and policy considerations (*i.e.*, eviction of people from their housing) contemplated by courts confronted by the consequences of Section 365 questions are not at issue here. For example, the court in *Care*

*Givers*, 113 B.R. at 267 held that six nursing home leases operated by the debtor were "residential" pursuant to Section 365(d)(2) because, if Section 365(d)(4) applied, "no licensed entity would have been in a position to operate the nursing homes. The plain language of the statute would have produced an unsensible and unintended circumstance by requiring immediate surrender of real property where people live and depend upon a licensed operator." In other words, a finding that the leases were nonresidential would mean that the nursing home residents would be left in the cold, and the court determined that Congress could not have intended such a result. No such consequences would result here because the permanent SRO tenants occupy a hotel and are entitled to occupy their units regardless of whether the Ground Lease is terminated, recharacterized, or held to be a residential lease.

63.    *Care Givers*—Debtors' own case—recognized that the consequences a Section 365 decision (whether the bankruptcy process should cause people to be unhoused) should be a factor in a residential/nonresidential analysis by distinguishing cases in which Section 365(d)(4) applied to leases. *See In re Care Givers, Inc.*, 113 B.R. 263, 268 (Bankr. N.D. Tex. 1989) (in "those cases where the debtor argued that the leased property was residential, the residents in the real property did not face the risks involved in this case."). The risks involved in these cases are similarly absent here.

## **CONCLUSION**

For the foregoing reasons, Landlord respectfully requests that the Court (i) deny the Motion and (ii) grant such other and further relief as is just and proper.

Dated: March 5, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Katherine S. Dute (No. 6788)
Soumya P. Venkateswaran (No. 7278)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
        mcguire@lrclaw.com
        dute@lrclaw.com
        venkateswaran@lrclaw.com

– and –

**ADLER & STACHENFELD LLP**
Kirk L. Brett (admitted *pro hac vice*)
Patrick O'Connor (admitted *pro hac vice*)
555 Madison Avenue, 6th floor
New York, New York 10022
Telephone: (212)883-1700
Facsimile: (212)883-8883
Email: kbrett@adstach.com
        poconnor@adstach.com

*Counsel to 356W58 Ground Lessor LLC*