**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| HUDSON 1701/1706, LLC, *et al.*,[1] | Case Nos. 25-11853 (KBO)<br>(Jointly Administered) |
| Debtors. | Related to Docket No. 354 |
| | Hearing Date: March 12, 2026, at 9:30 a.m. (ET) |

**DEBTORS' REPLY TO 356W58 GROUND LESSOR LLC'S OBJECTION TO DEBTORS' MOTION FOR AN ORDER DETERMINING THAT PURPORTED GROUND LEASE, IF A TRUE LEASE, IS A LEASE OF RESIDENTIAL REAL PROPERTY UNDER SECTION 365 OF THE BANKRUPTCY CODE**

Hudson 1701/1706, LLC and Hudson 1702, LLC, as debtors and debtors in possession (collectively, the "**Debtors**"), by and through their undersigned counsel, hereby submit this reply ("**Reply**") in support of their motion (the "**Motion**" or "**Mot.**") for entry of an order determining that the purported ground lease between the Debtors and 356W58 Ground Lessor LLC (as an affiliate of Montgomery Street Partners, the purported ground lessor shall hereinafter be referred to as "**MSP**") dated May 4, 2022, if deemed a true lease, constitutes a lease of residential real property and not nonresidential real property under Section 365 of the Bankruptcy Code. In support of this Reply, the Debtors respectfully represent as follows:

**PRELIMINARY STATEMENT**

1. MSP's objection (Dkt. No. 354) (the "**Objection**" or "**Opp.**") attempts to sidestep the merits of the Debtors' Motion through jurisdictional and procedural arguments that are misplaced. Contrary to MSP's contentions, the Debtors do not seek an advisory opinion, nor do

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

they attempt to expand the issues in the pending adversary proceeding, *Hudson 1701/1706, LLC, et al. v. 356W58 Ground Lessor LLC*, Case No. 25-52471 (the "**Adversary Proceeding**"). Instead, they ask the Court to resolve a narrow and necessary threshold question: if the purported ground lease (the "**PGL**") is determined to be a true lease, is it residential or nonresidential for purposes of Section 365 of the Bankruptcy Code. That determination governs the operative statutory deadline for assumption or rejection and therefore has immediate consequences for the administration of these Chapter 11 cases. MSP's suggestion that this dispute is hypothetical ignores this practical reality, and a debtor cannot reasonably be required to guess which statutory regime applies and risk forfeiture of a principal asset if it guesses wrong.

2. On the merits, MSP urges adoption of the minority "economic test" to determine whether the PGL is a residential or nonresidential lease. But this test is in the minority for a reason: its ultimate proposition is that only a lease of real property serving as the debtor's residence is governed by section 365(d)(2). This fundamentally distorts the language of section 365 and is patently wrong. The operative facts here are: (i) the PGL itself explicitly states that the Property is intended to function as a multifamily residential project; and (ii) the Property currently houses long-term residents. Under these facts, applying the totality-of-the-circumstances analysis or the majority "property test", the PGL—if a lease at all—must be treated as a lease of residential real property.

## ARGUMENT

**I. MSP'S PROCEDURAL AND JURISDICTIONAL OBJECTIONS ARE MERITLESS**

3. MSP argues that the Motion is not ripe and that it is procedurally defective because the Debtors must seek such relief pursuant to an adversary proceeding. These arguments fail. As to ripeness, MSP's position ignores the practical realities that an issue exists currently. As to the

procedural issue of proceeding via motion or adversary proceeding, MSP misapplies Bankruptcy Rule 7001.

### A.     The Motion Presents a Ripe Controversy

4.     MSP's primary jurisdictional argument is that this Motion is a request for an unconstitutional "advisory opinion" because the Debtors have not yet filed a formal motion to assume or reject the PGL. (Opp. at 8.) According to MSP, until that choice is made, there is no "active controversy" regarding the nature of the PGL. (Opp. at 7.) This argument ignores the immediate legal consequences that the "non-residential" classification would impose upon the Debtors. Under Section 365(d)(4), a lease of non-residential real property is "deemed rejected" and must be "immediately surrendered" if not assumed within 120 days (extendable without landlord consent only once by 90 days for cause). 11 U.S.C. § 365(d)(4). Conversely, if the lease is residential, Section 365(d)(2) permits a debtor to decide whether to assume or reject at any time prior to plan confirmation. 11 U.S.C. § 365(d)(2). Consequently, the classification of the Property is not a hypothetical future concern; it determines which statutory provisions govern what the Debtors must do in the near term.

5.     Ironically, the case law cited in MSP's own Objection regarding ripeness supports the Debtors' position. The Objection cites to *In re Cubic Energy, Inc.,* 587 B.R. 849, 855 (Bankr. D. Del. 2018) for the proposition that under Article III of the Constitution federal courts may not address "'questions that cannot affect the rights of the litigants in the case before them'" (quotation cite omitted here). In this matter, it is beyond dispute that the issue of whether assumption or rejection of the PGL is governed by Section 365(d)(2) or (d)(4) of the Bankruptcy Code not only can (as opposed to "cannot") but *does* affect the parties' rights. MSP also cites to *Texas v. United States,* 523 U.S. 296, 300 (1998) for the proposition that a matter is not ripe for adjudication if "it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at

all'" (quotation cite omitted here). However, there is nothing "contingent" or speculative about the occurrence of these Chapter 11 cases reaching the 120th day postpetition. Thus, the question arising of whether Section 365(d)(4) applies to the assumption or rejection of the PGL as of that date is a certainty and not contingent or speculative in the least.

6. MSP's assertion that there is no dispute "if Debtors assume or reject in a timely manner" is circular and specious. The definition of "timely" is precisely what is being litigated. Article III does not require a debtor to risk automatic rejection of its most significant asset, or be forced to prematurely assume it, as the price of obtaining judicial clarity.

### B. Contested Motion is the Correct Procedural Vehicle

7. MSP further argues that the relief sought is a declaratory judgment regarding MSP's interest in the PGL and the Property and must be brought via an adversary proceeding under Bankruptcy Rule 7001. (Opp. ¶¶ 27–34.) This argument mischaracterizes the relief sought and misapplies Rule 7001.

8. As MSP states, Rule 7001(b) covers "a proceeding to determine the validity, priority, or extent of . . . [an] interest in property". However, the Motion only seeks to determine the applicable deadline under Section 365 for assuming or rejecting the PGL and in no way seeks to determine the validity, priority, or extent of MSP's interest in the PGL and the Property. MSP also relies on Rule 7001(i) because the Motion seeks declaratory relief. However, Rule 7001(i) only requires an adversary proceeding to "obtain a declaratory judgment ***relating to any of the foregoing*** [enumerated issues in Rule 7001(a)-(h)]" (emphasis added). Because the Motion does not involve an issue enumerated in Rule 7001(a)-(h), Rule 7001(i) likewise does not apply here.

9. In *In re PNW Healthcare Holdings, LLC,* 617 B.R. 354 (Bankr. W.D. Wash. 2020), the bankruptcy court addressed precisely the same type of motion (*i.e.,* to determine if a lease was residential or nonresidential) and the same argument under Rule 7001. In that case, the court came

to precisely this conclusion—that the relief sought did not fall under Rule 7001(b) (fka Rule 7001(2)) and therefore also did not implicate Rule 7001(i) (fka Rule 7001(9)). *See PNW Healthcare,* 617 B.R. at 358 ("the Court's threshold determination regarding the nature of the Master Subleases [as residential or nonresidential] is not a proceeding under rule 7001(2). . . . Therefore, Rule 7001(9), governing declaratory judgments, also is inapplicable.").

10. The Third Circuit addressed a similar procedural issue in *In re O'Brien Environmental Energy, Inc.*, 188 F.3d 116 (3d Cir. 1999). In *O'Brien*, a creditor argued that a debtor's request to establish cure amounts in connection with the assumption of a contract required an adversary proceeding because it sought "declaratory and injunctive relief." *Id.* at 123. The Third Circuit rejected this broad characterization of the relief requested and the attempt to bring it within the ambit of Rule 7001. The court noted that many orders contain an equitable or injunctive element but urged scrutiny of the essential nature of the relief requested. *Id.* Ultimately, the court focused on the definition of a contested matter that may be brought by motion under Bankruptcy Rule 9014 as encompassing relief "not otherwise governed by these rules" and found that the determination of a cure amount was not governed by Rule 7001 and therefore was properly brought before the court via motion pursuant to Rule 9014. 188 F.3d at 124. The same reasoning applies here.

    **C.    The Prior Motion to Extend the Section 365(d)(4) Deadline Was Not a Concession**

11. On January 27, 2026, the Debtors filed a *Motion for Entry of an Order Extending the Time to Assume or Reject Unexpired Leases of Nonresidential Real* Property (Dkt. 281) (the "**Extension Motion**"). Paragraph 4 of the Extension Motion stated:

> For the avoidance of doubt, this Motion is filed solely out of an abundance of caution, and nothing in this Motion, and no relief requested or granted hereby shall prejudice, waive, or otherwise affect the rights, claims, defenses, or arguments of the Debtors, the DIP Lender, or the Prepetition

5

>Secured Parties with respect to the characterization of the Purported Ground Lease, including the position that such agreement is, in substance, a financing arrangement rather than a true lease *or pertains to residential real property rather than non-residential real property*. (emphasis added.)

12. No objections to the Extension Motion were filed. Accordingly, on February 9, 2026, the Court entered an order approving the Extension Motion (Dkt. 308) (the "**Extension Order**"). Paragraph 5 of the Extension Order provides:

>Nothing in this Order, the Motion, or the Debtors' actions in connection herewith shall constitute an admission by any party, including the Debtors, the DIP Lender, or the Prepetition Secured Parties, as to whether the Purported Ground Lease is a "lease" for purposes of section 365 of the Bankruptcy Code *or pertains to residential real property rather than non-residential real property*. (emphasis added).

Paragraph 6 of the Extension Order provides:

>Any payments made or to be made on account of the Purported Ground Lease during the pendency of the Adversary Proceeding or otherwise during the Chapter 11 cases shall be made under a full reservation of rights and shall not constitute an admission regarding the characterization, validity, priority, or enforceability of the Purported Ground Lease, nor shall they be used as evidence of same.

13. A similar reservation of rights appears at footnote 15 of the Debtors' Complaint in the Adversary Proceeding. (A.P. Dkt. No. 1)

14. Thus, it is clear that under the Extension Motion and the Extension Order, as well as the Complaint in the Adversary Proceeding, the issue raised in the current Motion was preserved. MSP argues that the Debtors' prior motion regarding making lease payments under the PGL pursuant to Section 365(d)(3) (Dkt. No. 94) constituted the Debtors "essentially conceding" that the PGL pertains to nonresidential real property. (Opp. ¶ 35.) However, the Debtors' motion under Section 365(d)(3) was merely preventative in nature, seeking to avoid any argument by MSP that the Debtors were somehow in default postpetition under the PGL. Nowhere in that motion do the Debtors assert that the PGL is a lease of nonresidential real property for purposes of section

6

365(d)(4). Waiver of such substantive rights cannot be implied so tacitly. *See In re Sears Holdings Corp.*, 2024 WL 5113165, at *4 (2d Cir. Dec. 16. 2024) ("'conduct said to constitute a waiver must be clear and unequivocal, as waivers are never to be lightly inferred'" (quotation cite omitted here) . . . "We cannot infer from Transform's and Sears's stipulation to treat the MOAC Lease as a shopping center lease under *another* subsection, Section 365(d)(3), that they *intentionally* relinquished their right to argue that the MOAC Lease was not a 'true lease' under Section 365(d)(4)" (emphasis in original)).

### D. The Motion is Entirely Distinct from the Adversary Proceeding

15. MSP argues that the Debtors should have sought the relief in the Motion within the context of the Adversary Proceeding and that the Motion is an "impermissible attempt to amend the Complaint". (Opp. ¶ 5.)  This argument conflates two distinct legal issues.  The Adversary Proceeding seeks recharacterization of the PGL as a financing transaction—meaning the Debtors argue it is not a lease at all.  The instant Motion asks a narrower, alternative question: if the Court ultimately finds that the PGL is a true lease, is it residential or non-residential? These are two distinct and separate inquiries, and while the recharacterization issue must be litigated pursuant to Rule 7001, for the reasons discussed in section I.B above, the issue presented in the Motion is properly brought by motion.

16. The Court should see MSP's objections for what they are: a strategic attempt to hold the Debtors hostage to an uncertain assumption/rejection deadline. The Motion is ripe, the procedural vehicle is correct, and the Debtors have consistently reserved all rights regarding the character of the PGL. Accordingly, the Court should dismiss these meritless objections and proceed to the merits of the classification.

## II. THE PROPERTY IS RESIDENTIAL UNDER THE "TOTALITY OF THE CIRCUMSTANCES" TEST

17. MSP's primary substantive argument is that the PGL is a "commercial" instrument because it was entered into by sophisticated parties for a profit-making endeavor. (Opp. ¶¶ 6, 47–49, 52.) However, as the court in *In re Guardian Elder Care at Johnstown, LLC*, 665 B.R. 270 (Bankr. W.D. Pa. 2024) recently held, the term "nonresidential" in Section 365 is not synonymous with "commercial." *Id.* at 279 (lease was residential "even where economic and business objectives are at play"). Rather than applying a rigid, single-factor test, the *Guardian* court synthesized prior case law into a "totality of the circumstances" test focused on the "specific facts and practical realities of each case." *Id.* at 277. Applying the *Guardian* factors here demonstrates that the Property is residential. MSP's attempt to characterize a building that currently houses 29 long-term residents and is contractually dedicated to housing nearly 400 more as a "nonresidential" commercial property is a distortion of both the facts and the law.

### A. The Primary Use and Intended Purpose of the Property are Indisputably Residential

18. The first two *Guardian* factors—(i) the primary use of the property and (ii) the intended purpose as expressed in the lease—weigh heavily in favor of the Debtors. (*See* Mot. ¶¶ 20–26.) The PGL explicitly defines its core objective in residential terms. The "Purpose of Lease" clause states that the "primary purpose" is the conversion of the premises into a "Multifamily Project." (*See* Mot. ¶ 23 (citing PGL at i).) Furthermore, the PGL mandates that, upon conversion, the Debtors shall sublease at least 75% of the rentable floor space pursuant to "Residential Subleases" for residential purposes. (*Id.*) Notably, the PGL contains no corresponding requirement for the development of any commercial space. (*See* Mot. ¶ 28.)

19. MSP attempts to evade this clear contractual intent by pointing to the building's historical status as a hotel since 1941 and its current status as an allegedly "inactive construction site." (Opp. ¶¶ 6, 47.) These arguments are red herrings. First, the Property's prior use as a hotel is not relevant. Courts do not look to historical uses of real property in characterizing a leased property as nonresidential or residential. *See, e.g.*, *In re Bonita Glen II*, 152 B.R. 751, 754 (Bankr. S.D. Cal. 1993) ("[The landlord] cannot now argue that the property is nonresidential because *at one time* the property was unimproved land") (emphasis added). In this instance, the Property has not functioned as a hotel since the Debtors took control. Indeed, if the Court were to look further back in history, it would find that the Property originally served as a residence: from 1928 to 1941, the American Women's Association operated the Property as a clubhouse and residence for young women, with 959 SRO units.

20. Similarly, MSP's argument about the current allegedly "inactive" state of the Property is misplaced. First, there are currently 29 SRO tenants living at the Property. As to these residential tenants, the Property is not "inactive". Second, under the totality-of-the-circumstances test, the court must look at the intent of the parties to the specific instrument before it. As in *In re Bonita Glen II*, where the court found a ground lease residential because the parties "*contemplated* that an apartment building would be constructed," the PGL is predicated on the creation of a residential complex. 152 B.R. at 754. The fact that construction is currently incomplete does not convert the contemplated "Multifamily Project" (PGL at i) into a commercial enterprise. [2]

---

[2] MSP mentions the fact that one of the proposed (but not yet adopted) Fallback Business Plans might involve an "extended-stay hotel," which it characterizes as "an entirely commercial building." (Opp. ¶ 47.) First, as long as the SRO tenants still reside at the Property, even the hotel-version Fallback Business Plan would not be an entirely commercial operation. And depending on how long the extended-stay residents reside at the Property, it is possible that their use of the Property could also qualify as residential (it is at least an open issue). Further, the second of the two Fallback Business Plans is to have multifamily residential housing. (*See* Adv. Proc., Dkt. No. 17-16 (discussing the "Multifamily Fallback Business

### B.   The Nature of Occupancy and Resident Welfare Overwhelmingly Favor a Residential Classification

21.     The third *Guardian* factor focuses on the "nature of the occupancy by residents" and the "human factual element." 665 B.R. at 275, 277. The Property is the permanent home of 29 Single Room Occupancy ("**SRO**") tenants, many of whom have lived there for decades. These are not transient guests; they are protected rent-stabilized tenants for whom the Property is exclusively a home. Their presence is so fundamental to the PGL that it identifies them by name in Exhibit K and includes specific covenants protecting their rights. (PGL, Ex. K.)

22.     MSP argues that because these tenants have independent legal protections under New York City law and cannot be evicted even if the PGL is rejected, there is no "homelessness" risk and thus no policy reason for a residential classification. This argument fails for three independent reasons. First, the SRO tenants are themselves residential tenants: they hold rent-stabilized tenancies under New York City's Rent Stabilization Code—a quintessentially residential protection scheme. MSP cannot invoke rent-stabilization protections to minimize eviction risk while simultaneously denying that those protections reflect the residential character of the Property.

23.     Second, physical eviction is not the only policy concern. A nonresidential classification would, among other things, force the Debtors to move to assume or reject the PGL by May 20, 2026, even prior to a determination by the Court regarding the Debtors' adversary proceeding seeking to recharacterize the PGL as a financing instrument.  This would create significant challenges to the Debtors' reorganization efforts.  In turn, this could threaten the uninterrupted operation of the Property and the stability of the residential environment for the SRO

---

Plan").) Regardless, at this juncture, neither Fallback Business Plan should be dispositive of this Motion, as the intended use of the Property as of the Petition Date and currently is a "Multifamily Project."

10

tenants. Apart from eviction, these circumstances implicate the same policy concerns and militate in favor of a residential classification of the Property.

24. Indeed, the *Guardian* court explicitly rejected the notion that physical eviction is the only concern, holding that a residential classification is necessary to safeguard the "continuity necessary for [resident] welfare" and to allow a debtor to prioritize "critical operational needs" over immediate commercial rent demands.

> Under § 365(d)(3) of the Bankruptcy Code, landlords of nonresidential real property are entitled to immediate payment of all post-petition rent and charges, which gives them substantial leverage over the debtor. This leverage . . . imposes significant cash flow burdens on the debtor, potentially causing it to divert resources away from critical operational needs (and patient needs) . . . . By contrast, **treating the Master Lease as a residential lease alters this dynamic.** A residential landlord is not automatically entitled to immediate rent payments under § 365(d)(3) . . . . This more flexible framework allows the debtor to allocate financial resources strategically and **prioritize patient care, staffing, and regulatory compliance**, all of which are essential components of running skilled nursing facilities. This flexibility is **crucial for maintaining the viability of the facilities [and] ensuring the continued provision of care to residents** . . . .

665 B.R. at 279–80 (emphasis). The same reasoning applies to this matter.

### C. Applicable Regulatory Requirements and Tax Classifications Confirm the Residential Character

25. The fourth *Guardian* factor considers "applicable regulatory requirements." The Property is subject to a uniquely residential regulatory regime: the jurisdiction of the NYC Department of Housing Preservation and Development ("**HPD**"),[3] the Rent Stabilization Code, and the CONH requirement. These mandates are designed specifically to protect residential

---

[3] MSP states: "HPD has not granted any permit allowing the Leased Premises to become a residential property" (Opp. ¶ 51). The absence of a residential use permit is a consequence of the construction phase, not evidence of nonresidential character. The PGL itself mandates the residential conversion; the incomplete conversion cannot be used by MSP to bootstrap a nonresidential classification. Moreover, the HPD multiple dwelling registration (*see* Mot., Ex. B.) *is* a residential designation—it is HPD's own official recognition that this building falls within its residential oversight jurisdiction.

occupants and are wholly absent from the "pure business environments" Congress intended to regulate under § 365(d)(4). *In re Lippman*, 122 B.R. 206, 211 (Bankr. S.D.N.Y. 1990).

26. MSP relies heavily on the NYC Department of Finance ("DOF") classification of the units as "Non-Residential" and "RH" (*i.e.,* an abbreviation used for "condo hotels") to argue for a commercial characterization. It ignores a more apposite designation: HPD has assigned the Property a multiple dwelling registration number, which HPD issues exclusively to residential buildings subject to the Multiple Dwelling Law. (See Mot., Ex. B.) That registration carries more probative weight than a DOF tax label because HPD—not DOF—is the agency charged with residential housing oversight. Regardless, MSP's reliance is misplaced.

27. Municipal tax categories are revenue administration systems, not occupancy determinations for federal bankruptcy law. The Debtors have not found, nor has MSP cited, any case law that uses tax categories as a basis for determination of nonresidential versus residential status for the purposes of Section 365(d)(4).

### D. The Economic and Commercial Aspects Do Not Negate the Residential Use

28. The fifth *Guardian* factor examines the economic aspects of the lease. MSP argues that because the PGL is an investment vehicle designed to generate profit, it must be non-residential. This is the very definition of the economic test that *Guardian* rejected as under-valuing the "human factual element." 665 B.R. at 277. Virtually every master lease for a nursing home or a large apartment complex is an investment vehicle for the lessee. If "generating revenue" were the dispositive factor, no lease of real property for a housing project or similar operation would ever be deemed residential, and Section 365(d)(2) would be rendered inapplicable to any real property lease other than a lease of a debtor's own residence. This highlights the flaw of the "economic test" propounded by MSP, discussed below. The PGL's economic reality is tied to

"Residential Subleases". The LA Fitness lease comprises less than 15% of the total rentable square footage and does support a nonresidential classification for purposes of Section 365.

### III.  THE COURT SHOULD APPLY THE TOTALITY-OF-THE-CIRCUMSTANCES TEST OR THE PROPERTY TEST

29. The Debtors maintain that the appropriate test is the totality-of-the-circumstances approach advanced in *Guardian* or the property test applied by a majority of courts prior to the *Guardian* decision. Under either of these tests, the Court should classify the PGL as a lease of residential real property governed by Section 365(d)(2) and not Sections 365(d)(3) and (4).

30. MSP argues, following the minority position in *In re Passage Midland Meadows Ops., LLC*, 578 B.R. 367, 379 (Bankr. S.D.W. Va. 2018)—a case that is not from the Third Circuit and is not controlling on this Court—that the term "nonresidential" must be interpreted as any property where the debtor does not personally reside. Taken to its logical conclusion, this reading would render Section 365(d)(2) inapplicable to every corporate debtor—since a legal entity cannot "personally reside" anywhere—yet Congress plainly contemplated that corporate-owned nursing homes, affordable housing projects, and similar facilities could qualify as residential real property under Section 365(d)(2).

31. As a matter of statutory interpretation, this approach has been rejected by multiple courts. As the courts in *Care Givers* and *PNW* observed, the adjectives "residential" and "nonresidential" in Section 365(d) modify "real property," not "lease." Accordingly, if the *property* serves a residential purpose, then that is the determinative factor, regardless of whether the debtor's *lease* is to operate the property as a business. Reflecting the majority analysis, *Care Givers* and *PNW* offer a more convincing reading of the plain language of Section 365(d)(4), grounding this reading in standard methods of statutory interpretation:

13

> For the statute to have the meaning movants contend the adjective "nonresidential" should be transmuted into "commercial" and moved back before the word "lease." Congress could have so provided, but did not. The plain meaning of the phrase used in the statute, "lease of nonresidential real property," is not synonymous with the phrase "commercial lease of real property." In the statute the adjective "nonresidential" modifies "real property" thereby focusing on the character of the real property, not the character of the lease.

*PNW*, 617 B.R. at 362–63 (citing *Care Givers*, 113 B.R. at 266).

32. Under the majority analysis, the Property should be classified as residential notwithstanding that the PGL enables the Debtors to operate the Property as a business. The Debtors submit that the majority analysis and application of the property test, or the totality-of-the-circumstances test, present far better reasoned and legally sound approaches than the minority economic test.

(*Remainder of Page Intentionally Blank*)

**CONCLUSION**

For the foregoing reasons, the Debtors respectfully request entry of an order determining that, if the Court concludes that the Purported Ground Lease is a true lease, it is a lease of residential real property for purposes of Section 365 and its assumption or rejection is governed by Section 365(d)(2) and not Section 365(d)(4) of the Bankruptcy Code.

| | |
|---|---|
| Dated: March 9, 2026<br>Wilmington, Delaware | **CHIPMAN BROWN CICERO & COLE, LLP**<br><br>*/s/ William E. Chipman, Jr.*<br>William E. Chipman, Jr. (No. 3818)<br>Mark D. Olivere (No. 4291)<br>Aaron J. Bach (No. 7364)<br>Alison R. Maser (No. 7430)<br>Hercules Plaza<br>1313 North Market Street, Suite 5400<br>Wilmington, Delaware 19801<br>Telephone: (302) 295-0191<br>Email: chipman@chipmanbrown.com<br>olivere@chipmanbrown.com<br>bach@chipmanbrown.com<br>maser@chipmanbrown.com<br>-and-<br><br>**BOIES SCHILLER FLEXNER LLP**<br>Robert Gordon (admitted *pro hac vice*)<br>Michael M. Fay (admitted *pro hac vice*)<br>Jenny H. Kim (admitted *pro hac vice*)<br>Jeffrey Waldron (admitted *pro hac vice*)<br>Katherine Zhang (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, New York 10001<br>Telephone: (212) 446-2300<br>Email: rgordon@bsfllp.com<br>mfay@bsfllp.com<br>jkim@bsfllp.com<br>jwaldron@bsfllp.com<br>kzhang@bsfllp.com<br><br>*Counsel for Debtors and Debtors in Possession* |