**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>HUDSON 1701/1706, LLC, *et al.*,[1]<br><br><br>Debtors. | Chapter 11<br><br>Case Nos. 25-11853 (KBO)<br><br>(Jointly Administered) |

**DECLARATION OF GLENN BRILL IN SUPPORT OF DEBTORS' MOTION
FOR AN ORDER DETERMINING THAT PURPORTED GROUND LEASE,
IF A TRUE LEASE, IS A LEASE OF RESIDENTIAL REAL
PROPERTY UNDER SECTION 365 OF THE BANKRUPTCY CODE**

I, Glenn Brill, hereby declare, under penalty of perjury, that the following is true to the best of my knowledge, information, and belief:

1.      I am a Managing Director of Real Estate Solutions at FTI Consulting, Inc. ("FTI"). FTI has been retained by Hudson 1702, LLC ("Hudson 1702") and Hudson 1701/1706, LLC ("Hudson 1701/1706" and, together with Hudson 1702, the "Debtors").  The Debtors retained FTI, effective as of October 22, 2025 (the "Petition Date"), for FTI personnel to act as Co-Chief Restructuring Officers for the Debtors and for FTI personnel to otherwise support the Debtors' operations.  (*See* ECF No. 149.)

2.      I submit this Declaration in support of the *Debtors' Motion for an Order Determining that the Purported Ground Lease, if a True Lease, is a Lease of Residential Real Property under Section 365 of the Bankruptcy Code*.  (*See* ECF No. 344.)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

1627593077.3

3.      I have over 30 years of experience providing advisory services for real estate development and construction projects for office, retail, multifamily, and mixed-use assets.  My experience includes managing stakeholders and client relations, appraisal review and valuation, benchmarking, project management oversight, and strategic planning for "ground-up" and adaptive reuse development projects including distressed assets.

4.      Except as otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with those reporting directly to and working with me, my review of relevant documents and contemporaneous business records regularly kept and maintained by the Debtors, or my discussions with representatives of various contractors and subcontractors employed by the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

A.      **Background**

5.      Since the Debtors retained FTI in October 2025, I have been responsible for supporting them in connection with their efforts to redevelop the former Hudson Hotel (the "Hudson").  I have worked closely with the Debtors' property manager, land-use counsel, development advisor, designated general contractor and design professionals.  I also oversee expenditures on the redevelopment project ("Project") and have reviewed the history of the Project's construction to date and what remains to be completed.

6.      As explained below, all of these efforts are directed at lifting the current stop work orders and completing the Project's objective, a 444-unit multi-family residential building with a single commercial tenant on a portion of the ground floor and basement.  This is the best possible use for the Hudson given several factors, including its zoning and location, expenditures and construction progress to date, the presence of 29 single room occupancy tenants (the "SRO

Tenants"), and our communications with the New York Department of Housing, Preservation & Development ("HPD") and Department of Buildings ("DOB"), which departments will ultimately lift the stop work orders currently preventing completion of the Project.  The Debtors and FTI are not considering any other use for the Hudson, in part because any such alternative use would not be practical from a market perspective or economically reasonable.

**B.      Project Expenditures**

7.      The Project commenced in May 2022 with the execution of several agreements by the Debtors; CSC Hudson, LLC ("Developer"); Parkview Financial REIT, LP ("Parkview Financial"); 356W58 Ground Lessor LLC ("356W58"), an affiliate of Montgomery Street Partners ("MSP"); and others.  These agreements included:

(a) A Building Loan Agreement between Parkview and the Debtors, dated May 4, 2022 (the "Building Loan Agreement") (*Hudson 1701/1706 et al. v. 356W58 Ground Lessor LLC*, No. 1:25-ap-52471 (hereinafter "Adv. Proc."), ECF No. 17-5);

(b) A Project Loan Agreement between Parkview and the Debtors, dated May 4, 2022 (the "Project Loan Agreement," and with the Building Loan Agreement, the "Parkview Loan Agreements") (Adv. Proc. ECF No. 17-6);

(c) An Assignment, Assumption and Modification of Purchase & Sale Agreement among Developer, 353W57 1704, LLC; 356W58; and EC 58th Street LLC, dated May 3, 2022 (the "Purchase Agreement") (**Exhibit A** hereto);

(d) A Closing Agreement between the Debtors and 356W58, dated May 3, 2022 (the "Closing Agreement") (**Exhibit B** hereto); and

(e) A Ground Lease between 356W58 and the Debtors, dated May 4, 2022 ("Ground Lease") (Adv. Proc. ECF No. 17-3).

(All of these Agreements are referred to collectively as the "Project Agreements").

8.      Each of the Project Agreements worked together and anticipated a Project that would be an adaptive reuse of the Hudson from a hotel with over 800 rooms into a multi-family apartment rental complex with approximately 444 one-, two-, and three-bedroom units for residential occupancy.

9.      Attached to the Ground Lease (Adv. Proc. ECF No. 17-3) as Exhibit C, Schedule I was an initial budget (the "Initial Budget") for the Project.  That Initial Budget showed the following uses and sources of funds:

| PROJECT BUDGET | | | | | |
|---|---|---|---|---|---|
| Uses | Total | Per Unit | PGSF | PRSF | % of Costs |
| Purchase Price | $207,500,000 | $473,744 | $444 | $677 | 50.3% |
| Hard Costs | $52,301,277 | $119,409 | $112 | $171 | 12.7% |
| Hard Cost Contingency | $4,300,000 | $9,817 | $9 | $14 | 1.0% |
| Soft Costs | $21,521,250 | $49,135 | $46 | $70 | 5.2% |
| Soft Cost Contingency | $1,500,000 | $3,425 | $3 | $5 | 0.4% |
| Closing & Financing Costs | $19,657,985 | $44,881 | $42 | $64 | 4.8% |
| Ground Rent Reserve | $12,800,000 | $29,224 | $27 | $42 | 3.1% |
| Parkview Interest Reserve | $29,593,125 | $67,564 | $63 | $97 | 7.2% |
| 10th Floor Buyout | $13,000,000 | $29,680 | $28 | $42 | 3.2% |
| Union Severance, Pension and Healthcare | $47,250,000 | $107,877 | $101 | $154 | 11.5% |
| Developer Fee | $2,724,460 | $6,220 | $6 | $9 | 0.7% |
| **Total Uses** | **$412,148,097** | **$940,977** | **$881** | **$1,345** | **100.0%** |

| Sources | Total | Per Unit | PGSF | PRSF | % of Costs |
|---|---|---|---|---|---|
| GLR Ground Lease - Funds at Close | $170,000,000 | $388,128 | $364 | $555 | 41.2% |
| GLR Ground Lease - 10th Floor | $8,000,000 | $18,265 | $17 | $26 | 1.9% |
| Parkview Leasehold Financing | $207,000,000 | $472,603 | $443 | $676 | 50.2% |
| Developer Equity | $27,148,097 | $61,982 | $58 | $89 | 6.6% |
| **Total Sources** | **$412,148,097** | **$940,977** | **$881** | **$1,345** | **100.0%** |

10.      The $207.5 million "Purchase Price" references the purchase price of two condominium units in the Hudson, Units 1701 and 1702, and the leasing of a third condominium unit, Unit 1706, from the then-current owner of the unit, with an option to purchase (collectively, the "Units").  The purchase price for the Units was funded with $170 million from 356W58 and

4

$37.5 million from the Developer.[2] The Hudson Hotel formerly occupied the Units until late 2020, and the Project will be completed within those Units.

11. The $47.25 million "Union Severance, Pension and Healthcare" use references an obligation that the Hudson owed to the hotel employee labor union (the "Union") that had represented the former Hudson hotel's workers. Payment of this obligation was necessary in order to convert the Hudson from a hotel to a multi-family apartment complex. Those monies were paid to the Union pursuant to a settlement agreement.

12. The "10th Floor Buyout" references the exercise of the option to purchase Unit 1706, which occurred in January 2023. That buyout was financed with $8 million from 356W58 and $5 million from the Developer.

13. The hard and soft costs listed in the Initial Budget were related to the construction of the Project's 444 apartment units.

C. **Initial Construction Efforts**

14. Between May 2022 and late 2023, approximately $24 million of the hard costs listed in the initial Project Budget were spent on the Project. As a result, approximately 90 percent of the necessary demolition of the former hotel is complete. Among other things, that demolition removed the ground floor escalators which had originally provided hotel guests egress from the ground floor to reception, check-in and hotel amenity areas on the second floor. Escalator removal created ground floor egress for the occupancy of the Project's one commercial tenant, LA Fitness

---

[2] 356W58's contribution is shown in the Initial Budget. Both 356W58 and the Developer's contributions are addressed in Section 2(a) of the Closing Agreement. The Developer's contribution was funded by the Parkview Loan Agreements and is encompassed by the source "Parkview Leasehold Funding" in the Initial Budget.

("LAF"), and the build-out of LAF's space effectively eliminated practical redesign of egress for a hotel use.

15. In addition, between May 2022 and late 2023, approximately 40 percent of the room-to-apartment conversion work was completed. The photographs attached as **Exhibit C** hereto show some of this work.

16. In late 2023, the Project was the subject of two separate stop work orders, one of which arose from complaints made by the SRO Tenants. Those stop work orders remain in place, and no significant construction work towards completing the Project has been undertaken since the orders were issued. Construction has continued on the space that LAF intends to lease.

17. In March 2025, Parkview Financial commissioned an appraisal of the Project by Colliers International Valuation & Advisory Services (the "Colliers Appraisal") (**Exhibit D** hereto). The Colliers Appraisal concluded that the "highest and best use" of the Hudson was "renovation into a mixed-use, apartment and retail, building." (*Id.* at 67)

**D.     The Debtors' Efforts Since The Petition Date**

18. Since October 2025, the Debtors and FTI have worked diligently on actions needed to lift the stop work orders so that the Project can be completed. In furtherance of that goal, the Debtors filed an updated "cure" application with HPD on or about December 24, 2025 (the "Cure Application"). The Cure Application seeks the HPD's approval for an agreed-upon multi-family use and includes the introduction of a defined amount of residential square footage dedicated to permanent "affordable housing." In this regard, the Project will be completed as a multi-family apartment complex with 444 apartments – 138 of which will be permanent afforded housing leased at below-market rents – and the LAF commercial retail lease, which provides the Project with a significant amenity.

19.     The Debtors have also retained Tri-Hill Management LLC ("Tri-Hill") to act as the Property Manager for the Hudson.  Tri-Hill's responsibilities include daily operations, staffing, maintenance and repairs, rent collections, and bookkeeping services. Tri-Hill is a key point of contact with the SRO Tenants, and I work closely with Tri-Hill on tenant matters.  With my oversight, Tri-Hill has focused on maintaining building services and has replaced carpet, increased housekeeping services, held social events for the SRO Tenants, and installed holiday decorations. My personal focus has been and continues to be the safety and security of the SRO Tenants.  To that end, I ensured that the Project has a satisfactory tenant protection plan ("TPP"), including new fire hoses, enhanced fire watch services, installation of panic door hardware, maintained and inspected fire alarm and sprinkler systems and other life safety measures. The continued presence and protection of the SRO Tenants independently constitute a residential real property operation, separate and apart from the ongoing redevelopment efforts.

20.     Tri-Hill and FTI's efforts have been, and continue to be, critical in rebuilding trust with the SRO Tenants and community stakeholders and to positively position the Debtors in connection with the Cure Application and negotiations with HPD.  Ultimately, a "cure agreement" will remedy previous management's failure to achieve a Certificate of No-Harassment ("CONH") due to tenant harassment that occurred prior to the stop work orders. The SRO Tenants, supported by community stakeholders, need to be reasonably satisfied in order for a cure agreement to be finalized. Once a cure agreement is in place, DOB will lift the stop work orders.

21.     I also work with PV Hudson, LLC ("PV Hudson"), the owner of the Debtors, which has employees working in New York on the Project.  PV Hudson and the Debtors have retained Taconic Development Advisors, LLC ("Taconic") to act as the Debtors' development advisor for the completion of the Project.  Under FTI's oversight, Taconic and the Project's designated general

contractor, DeSimone Builders ("DeSimone"), have surveyed the work in place, assessed conformance with existing construction drawings and building codes, evaluated the workmanship of completed work, identified material inventories, and developed a highly detailed estimate of the cost-to-complete the Project – specifically as a multi-family residential complex. The Debtors have also re-engaged important contributors to the Project.

- Rivkin Radler has been re-engaged as the Debtor's counsel for cure negotiations.

- Tang Studio Architect ("Tang") has been re-engaged as the Project architect.  Tang was originally engaged under the Debtors' previous management and developed the construction drawings for the Project, specifically as a multi-family residential complex. Examples of Tang's current floor-by-floor drawings – which continue to reflect a multi-family residential complex – are attached hereto as Exhibit E and Exhibit F.

- In conjunction with Tang, the Debtor has retained Jams Consultants, Inc. to provide building code analyses and to expedite the reopening of existing building permits once the HPD cure agreement is executed.

- MG Engineering D.P.C. ("MGE") has also been re-engaged as the Project's mechanical, electrical and plumbing engineer.  MGE was originally engaged under the Debtors' previous management and developed the engineering drawings for the Project.

- The Debtors have also engaged Douglas Elliman, LLC as their multi-family market advisor in coordination with Taconic to provide assistance with respect to marketing of the property as a multi-family apartment complex.

22.     Since the Petition Date, FTI and those that FTI supervises have also performed other work on behalf of the Debtors, all of which is aimed at advancing and restarting the Project specifically as a multi-family residential complex, including:

- planning future construction staging with DeSimone including vertical transportation necessary to support tenant building services, construction and other activities;

- communications with HPD and community stakeholders including Community Board 4 ("CB 4"), Clinton Housing Corp, and Goddard Riverside Law Project resulting in a letter of "thanks" from CB 4 for the continuous collaboration between stakeholders to "ensure the long-term protection and stability of the existing

Hudson Hotel tenants, and to move forward with the proposed renovation of the building";[3]

- reviewing and resolving existing violations on the Hudson with various government agencies, including HPD, DOB, the Department of Transportation, and the New York City Fire Department;

- ongoing revisions to the Hudson's TPP as needed for a dormant and to-be-active construction site to ensure continued habitability and life-safety compliance for residential occupants;

- completing the landlord improvements for the LAF gym, which is on track to open in or around Summer 2026, resulting in approximately $2 million per annum net rent to the Hudson and an attractive amenity to draw future residential tenants;

- ensuring repairs and updates to existing elevators;

- appealing real estate tax assessments on the Hudson; and

- regularly inspecting the Hudson for safety and compliance purposes.

E.    **The Highest and Best Use of the Hudson**

23.    There are no plans to build anything at the Hudson other than the apartment complex discussed above and in the attached drawings, and any other construction options (*e.g.,* offices, another hotel, retail) would be costly and highly unrealistic.  For example, an office or retail building would be an unattractive and impractical use, given the presence of the SRO Tenants and the significant age and design of the Hudson.  In fact, an office building at the Hudson – assuming *arguendo* that such a building could even be constructed – would be viewed as Class B or even lower from its opening, in a market with low demand for this product type.

24.    In addition, converting back to another hotel would be unrealistic given the demolition that has already occurred throughout approximately 90 percent of the building and the amount of money that has already been spent – including approximately $24 million for hard construction costs (labor and material) and the $47 million payment to the Union – on the current

---

[3] *See* **Exhibit G** hereto (Letter to Dina Levy, HPD Commissioner, from NYC Manhattan Community Board No. 4, Leslie Boghosian-Murphy Chair, Joe Restuccia & Maria Ortiz, Co-Chairs Housing, Health & Human Services Committee).

conversion.  These already-incurred costs, combined with labor requirements applicable to hotel operations, and current market demand, make any non-residential use economically unreasonable. Further, if the building was converted to another hotel, Union employees would have to be used for the hotel – which would be an almost prohibitive cost for what would likely be a tourist class hotel in a market more focused on luxury product.  Indeed, because of these considerations, among others, it is my opinion that any use of the Hudson that is not a multi-family residential complex would be economically unreasonable and likely to fail to attract investor interest.

26. I agree with the Colliers Appraisal that the highest and best use of the Hudson is exactly what the Debtors are currently pursuing:  the Project, a multi-family residential complex with a commercial tenant.  Based on my experience in real estate development and investment, and the ongoing strength of the Manhattan multi-family market, I believe the market would be willing to provide additional capital to support completion of the Project once it is in a construction-ready state.

26. Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 31, 2026                                      By: _____
New York, New York                                        Glenn Brill