# EXHIBIT A

## ASSIGNMENT, ASSUMPTION AND MODIFICATION OF PURCHASE AND SALE AGREEMENT

THIS ASSIGNMENT, ASSUMPTION AND MODIFICATION OF PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of this 3rd day of May, 2022 (the "Effective Date") by and among **EC 58th Street LLC**, a Delaware limited liability company ("Seller"), **CSC Hudson, LLC**, a Delaware limited liability company ("CSC Purchaser"), **353W57 1704, LLC**, a Delaware limited liability company ("CSC Store Unit Purchaser") and **356W58 Ground Lessor LLC**, a Delaware limited liability company ("MSP Purchaser").

## RECITALS

WHEREAS, CSC Purchaser, as purchaser, and Seller, as seller, entered into that certain Purchase and Sale Agreement, dated as of February 3, 2022, as amended by the First Amendment to Purchase and Sale Agreement dated as of April 19, 2022 (as may be further amended, restated and/or modified from time to time in accordance with this Agreement, the "PSA"), a true, correct and complete copy of which is attached hereto as Exhibit A;

WHEREAS, simultaneously with the Closing under the PSA, (i) MSP Purchaser and Hudson 1702, LLC ("Hudson 1702") and Hudson 1701/1706, LLC ("Hudson 1701/1706"), as Permitted Designees of CSC Purchaser (in such capacity, Hudson 1702 and Hudson 1701/1706 collectively, on a joint and several basis, as "Ground Tenant") are entering into (A) a 99-year ground lease (the "Ground Lease") pursuant to which MSP Purchaser, as landlord shall lease to Ground Tenant, as tenant, the Owned Units and (B) a sublease agreement ("Sublease") pursuant to which MSP Purchaser, as sublessor shall sublease the 10th Floor Unit to Hudson 1701/1706, as sublessee and (ii) Ground Tenant is obtaining a leasehold construction loan (the "Leasehold Loan") from affiliates of Parkview Financial (the "Leasehold Lender"), which Leasehold Loan shall be secured by Ground Tenant's leasehold interests in the Owned Units and subleasehold interest in the 10th Floor Unit (collectively, the "Ground Lease Transaction");

WHEREAS, in accordance with the terms of the PSA, CSC Purchaser desires to assign to CSC Store Unit Purchaser and CSC Store Unit Purchaser desires to assume from CSC Purchaser, all of its right, title and interest in and to the PSA solely with respect to the Store Unit Lease, subject to the terms and conditions of this Agreement and in accordance with the terms of the PSA (and MSP Purchaser shall have no interest therein);

WHEREAS, in connection with the Ground Lease Transaction, in accordance with the terms of the PSA, CSC Purchaser desires to assign to MSP Purchaser, and MSP Purchaser desires to assume from CSC Purchaser, all of its right, title and interest in and to the PSA solely with respect to the Owned Units and the 10th Floor Unit pursuant to the 10th Floor Lease (collectively, the "MSP Property"), subject to the terms and conditions of this Agreement;

WHEREAS, in connection with the Ground Lease Transaction, the Seller, CSC Purchaser, CSC Store Unit Purchaser and the MSP Purchaser desire to modify the PSA as set forth herein;

NOW, THEREFORE, in consideration of the foregoing, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.        Definitions/Recitals Incorporated.  Unless otherwise defined in this Agreement, all capitalized terms used herein shall have the meanings ascribed to such terms in the PSA.  The recitals set forth hereinabove in this Agreement are hereby incorporated into this Agreement as if fully set forth herein.

2.        Assignment and Assumption.  CSC Purchaser hereby transfers, assigns and sets over to MSP Purchaser all of CSC Purchaser's right, title, and interest in, to and under the PSA solely with respect to the MSP Property, and MSP Purchaser hereby accepts such assignment, in each case subject to the terms and conditions set forth herein (the "MSP Assignment"), it being acknowledged and agreed by the CSC Purchaser that from and after the Effective Date, CSC Purchaser shall have no rights or interest with respect to the MSP Property under the PSA (except as otherwise as expressly set forth in this Agreement). CSC Purchaser hereby transfers, assigns and sets over to CSC Store Unit Purchaser all of CSC Purchaser's right, title and interest in, to and under the PSA solely with respect to the Store Unit Lease, it being acknowledged and agreed by the CSC Purchaser and Seller that from and after the Effective Date, MSP Purchaser and CSC Purchaser shall have no rights or interest with respect to the Store Unit Lease under the PSA (the "Store Unit Assignment"; and together with the MSP Assignment, collectively, the "Assignment").  Notwithstanding the foregoing assignment, CSC Purchaser shall not be relieved of and shall remain liable for all obligations of Purchaser under the PSA.  Pursuant to Section 19 of the PSA, Seller acknowledges, agrees and consents to the Assignment and Seller's signature to this Agreement is evidence of Seller's consent to the Assignment in accordance with the PSA.

3.        Modification of PSA. In connection with the Assignment and the Ground Lease Transaction, the parties hereto agree to amend the terms of the PSA as follows:

(a)        Defined Terms. All capitalized terms used herein and defined herein (including all such terms set forth in the recitals hereto) are hereby incorporated into the PSA. In addition, the term "Purchaser" as set forth in the PSA, shall hereinafter refer to CSC Purchaser, CSC Store Unit Purchaser and MSP Purchaser, individually and collectively as the context may require.

(b)        Title.  Section 5.8 of the PSA is hereby deleted in its entirety and the following is inserted in its place:

> At Closing, Seller shall convey, transfer, grant and set over (i) to MSP Purchaser, fee simple title to the Owned Units and leasehold title to the 10th Floor Unit, free and clear of encumbrances, except only the applicable Permitted Exceptions and any other encumbrances and exceptions expressly approved by the MSP Purchaser in writing, and (ii) to CSC Store Unit Purchaser, leasehold title to the Store Unit, free and clear of encumbrances, except only the applicable Permitted Exceptions and any other encumbrances and exceptions expressly approved by the CSC Store Unit Purchaser in writing.

(c)    <u>Closing Obligations</u>. The following modifications shall be made to the Closing obligations set forth in <u>Section 9.1</u> and <u>9.2</u>, respectively, of the PSA:

(i)    Each of the Deeds for the Owned Units shall be made to MSP Purchaser.

(ii)    In accordance with <u>Section 9.1(b)</u> of the PSA, (A) the Assignment and Assumption of Lease with respect to the Store Unit Lease shall be made to CSC Store Unit Purchaser, as assignee, and (B) the Assignment and Assumption of Lease with respect to the 10th Floor Lease shall be made to MSP Purchaser, as assignee. <u>Sections 9.1(b)</u> and <u>9.2(e)</u> of the PSA are further amended by deleting the reference to such deliveries occurring at least fifteen (15) days prior to Closing, with the parties acknowledging and agreeing to deliver the foregoing Assignment and Assumptions of Leases to Title Company on the Closing Date, and not fifteen (15) days prior to Closing. In addition, at Closing, MSP Purchaser, as sublandlord and Hudson 1701/1706, as subtenant shall enter into the Sublease with respect to the 10th Floor Unit (in a form mutually agreed upon between MSP Purchaser and Hudson 1701/1706), with such Sublease to take effect ten (10) days following the Closing Date in order to comply with the provisions of Section 14.03(B) of the 10th Floor Lease. Purchaser hereby acknowledges and agrees that, in accordance with the 10th Floor Lease, a copy of the Sublease, together with a notice of the Sublease in accordance with Section 14.03(B) of the 10th Floor Lease, will be delivered to 10th Floor Lessor on the Closing Date.

(iii)    The bill of sale to be delivered by Seller in accordance with Section 9.1(c) of the PSA shall be bifurcated into two (2) bills of sale, one with respect to all right, title and interest of Seller, if any, in and to all Personal Property, Fixtures, Warranties and Permits appurtenant to the MSP Property (the "<u>MSP Property Bill of Sale</u>") and one with respect to all right, title and interest of Seller, if any, in and to all Personal Property, Fixtures, Warranties and Permits appurtenant to the Store Unit (the "<u>Store Unit Bill of Sale</u>"). The MSP Property Bill of Sale shall be made to the Ground Tenant under the Ground Lease and the Store Unit Bill of Sale shall be made to CSC Store Unit Purchaser.

(iv)    The Assignment of Contracts to be delivered by Seller in accordance with <u>Section 9.1(o)</u> shall be made to Ground Tenant. Seller and Purchaser hereby acknowledge that the Designated Service Contracts to be assumed by CSC Purchaser at Closing are listed on <u>Exhibit B</u>.

(v)    The Confirming Estoppels to be delivered in accordance with Section 9.1(j) shall be delivered as follows: (i) the Confirming Estoppel with respect to the 10th Floor Lease shall be delivered to MSP Purchaser in the form of <u>Exhibit C-1</u> attached hereto, (ii) the Confirming Estoppel with respect to the Owned Units and the Board of Managers shall be delivered to MSP Purchaser and Ground Tenant in the form of <u>Exhibit C-2</u> attached hereto, and (iii) the Confirming Estoppel with respect to the Store Unit Lease shall be delivered to CSC Store Unit Purchaser in the form of <u>Exhibit C-3</u> attached hereto.

(vi)     The assumption of Retainer Agreement to be executed and delivered in accordance with Section 9.2(o) of the PSA shall be executed and delivered to the Tax Cert Attorneys by CSC Store Unit Purchaser and the Ground Tenant.

(vii)     The closing statement to be prepared by Title Company and approved and executed by Seller and Purchaser pursuant to Sections 9.1(r) and 9.2(k) of the PSA shall consist of two (2) closing statements:  one (1) closing statement governing the settlement of the Owned Units and the 10th Floor Unit pursuant to the MSP Assignment, and one (1) closing statement governing the settlement of the Store Unit pursuant to the Store Unit Assignment.  Any and all items subject to apportionment in accordance with Article 11 of the PSA shall be separated by Unit; provided, however, the parties agree to allocate any apportionments pursuant to Article 11 of the PSA that are not, by their nature, allocated to an individual Unit on the basis of the proportion each Allocated Unit Price set forth on Exhibit E bears to the total Purchase Price. With respect to any reconciliation of apportionments or adjustments following the Closing and/or amounts due to Seller for items of revenue that relate to periods prior to the Closing Date in accordance with Article 11 of the PSA, Seller agrees to look solely to (A) Ground Tenant as to any amounts due with respect to the Owned Units, (B) Hudson 1701/1706 as to any amounts due with respect to the 10th Floor Unit, and (C) CSC Store Unit Purchaser as to any amounts due with respect to the Store Unit.

(d)     Board of Managers. In accordance with Section 9.1(k) of the PSA, the parties will cooperate to have the Seller's appointed members of the Board of Managers resign and CSC Store Unit Purchaser and/or Ground Tenant, as applicable, shall designate individuals to be appointed as Purchaser's replacement members of the Board of Managers in accordance with the Condominium Documents and the Ground Lease.

(e)     Retainer Agreement. The parties hereto acknowledge and agree that, in accordance with Section 11.4 of the PSA, Seller has continued to pursue the pending tax certiorari proceedings for the reduction of the assessed value of the Units prior to the Effective Date. In accordance with the Ground Lease, from and after the Effective Date, all such proceedings shall be controlled by Ground Tenant and CSC Store Unit Purchaser, and not MSP Purchaser as landlord under the Ground Lease, and any resulting tax reductions or refunds attributable to periods following the Closing Date shall be the property of Ground Tenant and CSC Store Unit Purchaser (as applicable, according to the respective Unit for which such reduction or refund is applicable) and not MSP Purchaser. As such, Purchaser's obligation to assume the Retainer Agreement in accordance with the PSA shall be satisfied upon such assumption by Ground Tenant and CSC Store Unit Purchaser, on a joint and several basis. To the extent any obligations or liabilities relating to the Retainer Agreement survive the Closing, Seller agrees to look solely to Ground Tenant and/or CSC Store Unit Purchaser, jointly and severally, with respect to such obligations or liabilities.

(f)     Employee Matters.

(i)     Seller and Purchaser hereby acknowledge and agree that (i) the Alternative Agreement consisting of a Memorandum of Agreement between and among EC 58th Street LLC d/b/a The Hudson Hotel, CSC Purchaser and the New York Hotel and Motel Trades Council (the "Union") (such Memorandum of Agreement, the "Alternative Agreement")  has

been executed by CSC Purchaser, Seller and the Union and delivered by CSC Purchaser to Seller and all other parties thereto in accordance with Section 16.5 of the PSA, (ii) a copy of the fully executed Alternative Agreement is annexed hereto as Exhibit D, and (iii) Purchaser's and Seller's obligations with respect to Section 9.1(i) and Section 9.2(f) of the PSA, as applicable, have been satisfied in full.

(ii)    Provided Seller makes the payments described in the April 27, 2022 letter between Seller and the Union on or before Closing, Seller will have fulfilled its obligations with respect to the NYC Severance (as defined in the PSA). Accordingly, Seller and Purchaser hereby acknowledge and agree (i) to forego the escrow contemplated by Section 16.3, and (ii) that Sections 9.1(q), 9.2(n) and Exhibit M (the form of Labor Severance Escrow Agreement) of the PSA are hereby deleted in their entirety. For the avoidance of any doubt, Seller and Purchaser agree that any amounts due pursuant to the NYC Severance will be the responsibility of Seller, and Seller shall indemnify and hold Purchaser harmless for said amounts.

(iii)    All representations, warranties, covenants, rights, obligations, and liabilities of Purchaser with respect to any and all matters set forth in Article 16 of the PSA shall continue to be the right or responsibility of the Ground Tenant under the Ground Lease and the Sublease and CSC Store Unit Purchaser as the tenant under the Store Unit Lease. To the extent any obligations or liabilities relating to any and all matters set forth in Article 16 survive the Closing, Seller shall look to the CSC Purchaser, CSC Store Unit and/or Ground Tenant, jointly and severally, with respect to such obligations and liabilities.

(iv)    The parties acknowledge the enactment of the Displaced Hotel Service Workers and Hotel Service Disruption Notifications Act, section 22-510 of the Administrative Code of New York (the "DHSWNA") and the Displaced Building Service Workers Protection Act, §22-505 of the Administrative Code of the City of New York ("BSWPA"). By this Agreement, the parties agree that the DHSWNA and the BSWPA do not apply to the transaction contemplated by this Agreement or the PSA under §22-510(d)(1) and §22-505(f)(1) of the New York City Administrative Code.

(v)    The provisions of this Section 3(f) shall survive the Closing

(g)    Cycle 8 Local Law 11 Work. The parties acknowledge and agree that the NYC Department of Buildings has not issued a Certificate of Compliance with respect to completion of the Cycle 8 Local Law 11 Work and, accordingly, pursuant to Section 13.9 of the PSA, Seller shall assign the Cycle 8 Local Law 11 Contracts to Purchaser pursuant to the Assignment of Contracts, and Purchaser shall assume all obligations thereunder or otherwise oversee and cause completion of the Cycle 8 Local Law 11 Work in order for NYC Department of Buildings to issue a Certificate of Compliance, provided, however, that in lieu of the escrow required by Section 13.9, Seller shall, at Closing, give MSP Purchaser a credit against the Purchase Price in the amount of $30,000.00 on account of Purchaser's assumption of such obligations. Any and all references to "Purchaser" in Section 13.9 of the PSA and this Section 3(g) shall mean Ground Tenant, jointly and severally, and not MSP Purchaser.

(h)    <u>Transfer Taxes; Closing Costs</u>.

(i)    Any State Transfer Tax or City Transfer Tax that may be due in connection with the creation of the Ground Lease and the Sublease shall be borne by Ground Tenant (any such transfer taxes, the "<u>Ground Lease Transaction Transfer Taxes</u>"). For the sake of clarity, the obligation of Seller under <u>Section 10.1</u> of the PSA to pay State Transfer Tax and the City Transfer Tax upon or payable in connection with the transfer of title to (x) the Owned Units and 10th Floor Unit to MSP Purchaser and (y) the Store Unit to CSC Store Unit Purchaser, shall not be modified by this Section.  CSC Purchaser, CSC Store Unit Purchaser and Ground Tenant, jointly and severally, hereby agree to indemnify, defend and hold Seller and the Seller Related Parties harmless from and against any and all liabilities, damages, losses, claims, demands, judgments, fines, penalties, settlement amounts, payments of amounts demanded, costs and expenses (including, without limitation, reasonable attorneys' fees) and claims arising out of or in any way related to payment of the Ground Lease Transaction Transfer Taxes.

(ii)    All costs and expenses in connection with the Ground Lease Transaction, including, without limitation, the recording of any memoranda of such agreements and the cost of any additional title insurance policies or diligence deliverables shall be paid for by CSC Purchaser, CSC Store Unit Purchaser and/or Ground Tenant.

(iii)    The provisions of this <u>Section 3(h)</u> shall survive the Closing

(i)    <u>Notices</u>. The following notice parties for the MSP Purchaser shall be added to <u>Section 17.1</u> of the PSA:

| | |
|---|---|
| If to MSP Purchaser: | 356W58 GROUND LESSOR LLC<br>c/o MSP Capital Investments, L.L.C.<br>Woodlawn Hall at Old Parkland<br>3953 Maple Ave., Suite 350<br>Dallas, Texas 75219<br>Attn: Luke Pak<br>E-mail:  pak@mspcm.com |
| With a copy to: | 356W58 GROUND LESSOR LLC<br>c/o MSP Capital Investments, L.L.C.<br>Woodlawn Hall at Old Parkland<br>3953 Maple Ave., Suite 350<br>Dallas, Texas 75219<br>Attn: Max Lamont<br>E-mail:  lamont@mspcm.com |
| And with a copy to: | Duval & Stachenfeld LLP<br>555 Madison Avenue, 6th Floor<br>New York, NY 10022<br>Attention: Danielle Ash, Esq.  & File Manager<br>File No. 4308.0014<br>Email: Dash@dsllp.com |

(j)       The Surviving Seller Representations shall be deemed remade by Seller on the Closing Date for the benefit of Ground Tenant, CSC Store Unit Purchaser and MSP Purchaser, provided, however, that in no event shall (i) Seller have any direct liability to MSP Purchaser, (ii) MSP Purchaser have any right to make a claim under the Holdback Escrow Agreement, and (iii) Seller have any duplication of liabilities for the same claim to any of Ground Tenant, CSC Store Unit Purchaser or MSP Purchaser may have with respect to a breach of a Surviving Seller Representation, Seller's obligations under Section 8.2 of the PSA or a claim under the Holdback Escrow Agreement.  Accordingly, the Holdback Escrow Agreement shall be among Seller, Ground Tenant and CSC Store Unit Purchaser, and Escrow Agent shall be instructed to act in accordance with instructions received by the parties thereunder and not MSP Purchaser.  The provisions of this Section 3(j) shall survive the Closing.

(k)       Seller and Purchaser hereby agree to the allocation of the Purchase Price as amongst each of the Units set forth on Exhibit E (the "Allocated Unit Prices").

4.   Closing. In the event that the Ground Lease Transaction does not close on the Closing Date and, as a result thereof, Purchaser defaults in its performance of obligations to be performed on the Closing Date (including, without limitation, failure to pay the Balance on the Closing Date), Seller shall be entitled to exercise the sole and exclusive remedies set forth in Section 15.1 of the PSA, irrespective of whether such default was due to the actions or omissions of CSC Purchaser, MSP Purchaser, CSC Store Unit Purchaser, Ground Tenant or any Permitted Designee of CSC Purchaser or was with respect to any such party's obligations to close the Ground Lease Transaction and/or execute and deliver the Ground Lease or Sublease, which in turn caused Purchaser to default in the performance of its obligations under the PSA and this Agreement on the Closing Date.  In the event that the Closing does not occur due to a default by Seller, MSP Purchaser shall have all the rights and remedies of the Purchaser under Section 15.2 of the PSA; provided, however: (A) if Purchaser elects to pursue the remedy set forth in clause (i) of Section 15.2 of the PSA, the Deposit shall be refunded to CSC Purchaser and in no event shall Seller be liable for Purchaser's Reimbursement Costs in excess of $400,000, in the aggregate, as among MSP Purchaser, CSC Purchaser, CSC Store Unit Purchaser and/or Ground Tenant; (B) if Purchaser elects to pursue the remedy in clause (ii) of Section 15.2 of the PSA, (x) MSP Purchaser may only seek specific performance of Seller's obligations to convey the Owned Units and assign the 10th Floor Lease, in each case, to MSP Purchaser, and (y) CSC Store Unit Purchaser may only seek specific performance of Seller's obligations to convey the Store Unit to CSC Store Unit Purchaser; (C) in the event specific performance is unavailable as a result of Seller having conveyed all or any portion of the Premises to a party other than MSP Purchaser and CSC Store Unit Purchaser as set forth in this Agreement, only CSC Purchaser (on behalf of itself, Ground Tenant and/or CSC Store Unit Purchaser) shall have the right to pursue monetary damages as against Seller; and (D) MSP Purchaser and CSC Store Unit Purchaser shall not make any different election of remedies with respect to a default by Seller (i.e., MSP Purchaser and CSC Store Unit Purchaser shall, collectively, elect to pursue only one remedy under Section 15.2 of the PSA with respect to such default by Seller). The Ground Lease Transaction, and Seller's acknowledgement and consent to the terms of this Agreement, shall in no event be deemed to create a financing contingency or condition to Purchaser's obligations under the PSA on Purchaser's ability to obtain financing or execute on the Ground Lease Transaction.  Purchaser hereby reaffirms and ratifies that the transactions contemplated by the PSA shall be deemed to be

an "all cash" transaction.  The provisions of this <u>Section 4</u> shall survive the Closing or earlier termination of the PSA and/or this Agreement.

5. <u>Ratification</u>.  Except as specifically set forth herein, the PSA is hereby ratified and confirmed.  From and after the Effective Date, references to the PSA shall be deemed to be references to the PSA, as amended by this Agreement.

6. <u>Conflicting Terms</u>.  Wherever the terms and conditions of this Agreement and the terms and conditions of the PSA conflict, the terms of this Agreement shall be deemed to supersede the conflicting terms of the PSA.

7. <u>Miscellaneous</u>. Sections <u>22.6</u> through <u>22.14</u> of the PSA are hereby incorporated into this Agreement in their entirety.

[*Signatures on Next Page*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

CSC PURCHASER:

**CSC HUDSON, LLC,**
a Delaware limited liability company

By: _____
    Name:  Alberto Smeke Saba
    Title:   Authorized Signatory

By: _____
    Name:  Salomon Smeke Saba
    Title:   Authorized Signatory

CSC STORE UNIT PURCHASER:

**353W57 1704, LLC,**
a Delaware limited liability company

By: _____
    Name:  Alberto Smeke Saba
    Title:   Authorized Signatory

By: _____
    Name:  Salomon Smeke Saba
    Title:   Authorized Signatory

[Signatures Continue on Following Page]

[Signature Page to Assignment, Assumption and Modification of Purchase and Sale Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**MSP PURCHASER:**

**356W58 GROUND LESSOR LLC,**
a Delaware limited liability company

By: _____

Name: LUKE PAUL

Title:  Authorized Signatory

*[Signature Page to Assignment, Assumption and Modification of Purchase and Sale Agreement]*

SELLER:

**EC 58TH STREET LLC**,
a Delaware limited liability company

By: _____
Name: Anthony D. Minella
Title:   President

<u>EXHIBIT A</u>

<u>PURCHASE AND SALE AGREEMENT</u>

(attached hereto)

*ACTIVE 64069355v10*

EXECUTION VERSION

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of the 3rd day of February, 2022 (the "Effective Date"), by and between EC 58th Street LLC, a Delaware limited liability company, having an address c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 ("Seller"), and CSC Hudson, LLC, a Delaware limited liability company, having an address c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 ("Purchaser").

## W I T N E S S E T H:

WHEREAS, Seller is the owner of those certain condominium units in the condominium known as 353 West 57th Street Condominium (the "Condominium") in the building (the "Building") known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, designated and described as the "EBC Unit" (which is Unit 1 of the Condominium and which is also identified as Lot 1701) and the "Modified Hotel Unit" (which is Unit 2 of the Condominium and which is also identified as Lot 1702) (the EBC Unit and the Modified Hotel Unit, together with their respective appurtenant undivided interests in the Condominium's common elements shall be referred to herein collectively as the "Owned Units") in that certain declaration of condominium dated April 11, 1985 made by Irving Schatz (the "Original Declaration") pursuant to Article 9-B of the Real Property Law of the State of New York, as amended (the "Condominium Act") establishing a plan for condominium ownership of the Building and the land upon which the Building is situated, which Original Declaration was recorded in the New York County Office of the Register of the City of New York (the "City Register's Office") on April 24, 1985 in Reel 902 Page 1, which Original Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 (the "First Amendment to Original Declaration"), and which Original Declaration was further amended by the Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch (the "A&R Declaration"), which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety), and which A&R Declaration was amended by the Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159 (as such A&R Declaration was amended, collectively, the "Declaration", and together with the By-Laws (the "By-Laws"), Rules and Regulations (the "Rules and Regulations") and all other exhibits and schedules thereto (as amended), collectively, the "Condominium Documents"), and also designated as Tax Lots 1701 and 1702 in Block 1048 in the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York, with the Owned Units more particularly described on Exhibit A attached hereto and incorporated herein;

WHEREAS, Seller is the lessee of (i) that certain condominium unit known as the "Tenth Floor Unit" in the Condominium (which is Unit 6 of the Condominium and which is also identified as Lot 1706), pursuant to that certain Amended and Restated Lease dated as of February 11, 1999 (as amended and assigned pursuant to the following described transfers, the "10th Floor Lease") made by Irving Schatz, as lessor ("10th Floor Lessor"), and Ian Schrager Hotels LLC, as original lessee, as referenced in the memorandum of lease dated as of February 12, 1999 and

*ACTIVE 61730742v13*

recorded March 23, 1999 in Reel 2841 Page 1872, as the 10th Floor Lease was assigned by Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC, as assignor, to Henry Hudson Holdings LLC, as assignee, dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1882, as the 10th Floor Lease was amended by an unrecorded Amendment to Lease made by and between Irving Schatz and Henry Hudson Holdings LLC dated as of August 17, 2004, as the 10th Floor Lease was further assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and Seller, as assignee, dated as of November 24, 2020; and (ii) that certain condominium unit known as the "Store Unit" in the Condominium (which is Unit 4 of the Condominium and which is also identified as Lot 1704), pursuant to that certain Lease dated January 1, 1999 (as amended and assigned pursuant to the following described transfers, the "Store Unit Lease") made by Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch, jointly, as lessor ("Store Unit Lessor", and together with the current 10th Floor Lessor, are herein collectively referred to as the "Lessors") and Henry Hudson Holdings LLC, as original lessee, as evidenced by a memorandum of lease dated as of September 30, 1999 and recorded on October 27, 1999 in Reel 2979 Page 2172, as the Store Unit Lease was amended by unrecorded Amendment to Lease dated as of September 30, 1999, as the Store Unit Lease was further amended by the unrecorded Amendment to Lease dated as of August 13, 2004, as the Store Unit Lease was assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and Seller, as assignee, dated as of November 24, 2020.  The 10th Floor Lease and Store Unit Lease are collectively herein referred to as the "Unit Leases".  Seller acquired title to its leasehold interest in: (A) the 10th Floor Lease as the designee of Henry Hudson Holdings LLC's Leasehold Mortgagee (as that term is defined in the 10th Floor Lease) by an assignment in lieu of foreclosure dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630; and (B) the Store Unit Lease as the designee of Henry Hudson Holdings LLC's Leasehold Mortgagee (as that term is defined in the Store Unit Lease) by an assignment in lieu of foreclosure dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.  Seller's right, title, and leasehold interest in and to the 10th Floor Unit and the Store Unit pursuant to the Unit Leases are herein collectively referred to as the "Leased Units", with the Leased Units more particularly described on Exhibit A attached hereto.  The Owned Units and the Leased Units are herein collectively referred to as the "Units";

NOW, THEREFORE, in consideration of the mutual promises and agreements contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby mutually acknowledged, Seller and Purchaser covenant and agree as follows:

Article 1.    Premises.

1.1    Premises.  Seller shall sell and convey to Purchaser, and Purchaser shall purchase from Seller, upon the terms, covenants and conditions hereinafter set forth all of Seller's right, title and interest in and to:

(i)    the Owned Units and any and all fixtures and improvements owned by Seller erected thereon and therein;

2

ACTIVE 61730742v13

(ii)      the Leased Units and any and all fixtures and improvements owned by Seller erected thereon and therein;

(iii)      any equipment, appliances, building materials, fixtures and other similar personal property attached or appurtenant to the Units, to the extent owned by Seller and not owned by the Condominium or by any occupants occupying the single resident occupancy units set forth on the SRO Schedule (as hereinafter defined) within the Units (such occupants, collectively, "Tenants"), all in their presently existing "as is" condition and state of repair on the date hereof, subject to reasonable wear and tear between the date hereof and Closing Date (as hereinafter defined) (collectively, the "Fixtures");

(iv)      all easements, covenants and other rights adjoining or appurtenant to the Units (together with the Owned Units and the Leased Units, the "Real Property");

(v)      to the extent assignable, all warranties, if any, issued to the Seller by any manufacturer or contractor in connection with construction or installation of equipment or any component of the improvements included as part of the Units (the "Warranties");

(vi)      to the extent assignable, all governmental and public certificates, permits, licenses, entitlements, agreements, development rights, variances, waivers, estoppels, bonds, claims and rights (including those in favor of Seller from any contractor, subcontractor, manufacturer or other person relating to the construction, maintenance, operation or repair of the Real Property or any component thereof), and approvals relating to the operation, use, maintenance or occupancy of the Units, including, without limitation, any certificate(s) of occupancy (collectively, the "Permits");

(vii)      items of tangible personal property including, but not limited to, all furniture, fixtures, machinery, security systems, china, glassware, silverware, kitchen and bar small goods, guest supplies, operating supplies, printing, stationary and uniforms, whether in use or held in reserve storage in connection with the former operation of the Units as a hotel, reserve stock of linens, towels, paper goods, soaps, cleaning supplies and the like with respect to the former operation of the Units as a hotel, and other tangible personal property of every kind and nature located in the Units and owned by Seller (collectively, the "Personal Property") other than the personal property listed on Schedule L attached hereto (the "Excluded Personal Property"); and

(viii)      all management, service and maintenance contracts or other agreements of similar nature affecting the Premises or the operation thereof (collectively, the "Service Contracts") which Purchaser has elected in its sole and absolute discretion at least forty-five (45) days prior to the Closing Date to assume (the "Designated Service Contracts"), and which Designated Service Contracts shall remain in effect after Closing, as the same may be amended, modified or extended from time to time in accordance with the terms of this Agreement.

All of the foregoing shall collectively be referred to herein as the "Premises".

3

*ACTIVE 61730742v13*

Article 2.    Purchase Price.

2.1    The purchase price for the Premises is TWO HUNDRED SEVEN MILLION FIVE HUNDRED THOUSAND and 00/100 DOLLARS ($207,500,000.00) (the "Purchase Price"), and is payable by Purchaser as follows:

(a)    Purchaser shall deposit TEN MILLION and 00/100 DOLLARS ($10,000,000.00) (the "Deposit"), with First American Title Insurance Company ("Escrow Agent"), by wire transfer of immediately available Federal funds, on or before 5:00 P.M. (New York time) on the date that is two (2) Business Days after the execution of this Agreement by Purchaser and Seller, as a downpayment toward the Purchase Price, which Deposit shall be non-refundable (except as otherwise set forth herein) and held and disbursed by Escrow Agent pursuant to the terms and conditions of this Agreement.  Upon receipt by Escrow Agent of the Deposit, Escrow Agent shall cause the Deposit to be deposited into an interest-bearing account at a national bank selected by Escrow Agent.  All interest on the Deposit becomes part of the Deposit and any interest thereon will be applied to payment of the Purchase Price at Closing.

(b)    The balance of the Purchase Price, in an amount equal to the difference between the Purchase Price and the Deposit, subject to adjustments and credits as provided for herein (the "Balance") shall be paid by Purchaser on the Closing Date (as hereinafter defined), by wire transfer of immediately available Federal funds to an account or accounts designated by Seller (which Closing and wire transfer shall be facilitated through Escrow Agent).

(c)    Purchaser and Seller shall exercise commercially reasonable efforts to agree upon the allocation of the Purchase Price between the Real Property, on the one hand, and the Personal Property, Fixtures, Warranties, and Permits, on the other hand, prior to Closing.  With respect to the remaining allocation of the Purchase Price allocable to the Real Property, Seller and Purchaser agree to allocate 10-15% to any right, title and interest in and to the land (and land-equivalents) being conveyed, and 85-90% to any right, title and interest in and to the Building being conveyed.  If Purchaser and Seller cannot agree upon the allocation of the Purchase Price, each party shall file federal, state and local returns based on each party's own determination of the proper allocations of the Purchase Price, each bearing its own consequences of any discrepancies; provided, however, that Seller's allocation shall be used for all transfer tax and similar filings.

Article 3.    Closing.

3.1    Closing of title to the Premises (the "Closing") shall take place on April 4, 2022, through an escrow-style closing conducted by the Escrow Agent and Title Company, whereby Purchaser and Seller and their respective attorneys consummate the Closing without being physically present at the offices of the Escrow Agent or Title Company to exchange closing documents and required funds through escrow, TIME BEING OF THE ESSENCE with respect to Purchaser's and Seller's obligation to close on or before 3:00 pm EST on such date (such date hereinafter referred to as the "Closing Date").  Notwithstanding the foregoing, Purchaser shall have a one-time right to extend the Closing Date by a period not to exceed thirty (30) days, such right exercisable by giving notice thereof to Seller at least five (5) Business Days before the then-scheduled Closing Date.  Notwithstanding the notice methods provided for in Article 17, the

4

ACTIVE 61730742v13

foregoing Closing Date extension notice may be provided solely by electronic mail delivery from counsel for Purchaser to counsel for Seller.

Article 4.    Permitted Exceptions.

4.1    The Premises shall be sold and conveyed, and Purchaser shall accept title to the Premises, subject to the following matters (collectively, the "Permitted Exceptions"):

(a)    The matters set forth on Schedule A hereof;

(b)    The Unit Leases;

(c)    All covenants, easements, reservations, restrictions and agreements of record, affecting the Premises, provided same do not prohibit or interfere in any material respect with the current use of the Premises;

(d)    Any and all present and future laws, regulations, restrictions, requirements, ordinances, resolutions and orders affecting the Premises, including, without limitation, any laws relating to zoning, building, environmental protection and the use and occupancy of the Premises;

(e)    Real estate taxes that are a lien, but are not yet due and payable, subject to adjustment at Closing, as provided for herein;

(f)    Grants made prior to the date hereof of licenses or easements or other rights in favor of any public or private utility company or governmental entity for, or pertaining to, utilities, sewers, water mains or drainage, whether or not of record, provided same do not prohibit or interfere in any material respect with the current use of the Premises;

(g)    The state of facts shown on or by the survey prepared by Montrose Surveying Co., LLP., with a survey update date of January 10, 2022 (the "Survey"), and any additional state of facts or physical condition which a current accurate survey or physical inspection of the Premises would disclose, provided same do not prohibit or interfere in any material respect with the current use of the Premises;

(h)    Intentionally omitted;

(i)    The lien of any water charges or sewer rents that are not yet due and payable, subject to adjustment as hereinafter provided;

(j)    Rights of Tenants to occupy rooms or units within the Premises;

(k)    The Condominium Documents;

(l)    Any other matters that would constitute objections to title under Section 5.1 and with respect to which the Title Company (as hereinafter defined) certifies that it will insure title to the Premises free of such matters, at regular rates without the payment of additional premiums, for the Purchaser and Purchaser's successors and assigns; and

5

(m)    The standard printed exceptions appearing on the title policy to be issued by the Title Company.

4.2    The Permitted Exceptions shall not constitute grounds for objection by Purchaser, and Seller shall have no obligation to remove any Permitted Exception as a condition to Purchaser's obligation to purchase the Premises in accordance with this Agreement. Notwithstanding anything to the contrary in this Article 4, on or prior to the Closing Date, Seller shall pay, discharge and otherwise remove of record, at Seller's sole cost and expense, all of the following: (i) any mortgages, deeds of trust or other security instruments for any financing placed by Seller on the Real Property and all of the mortgages as reflected in the Mortgage Schedule of the Commitment (defined herein) and set forth on Schedule E hereof, (ii) taxes that are then due and payable or delinquent as of Closing, (iii) liens and other encumbrances (other than Permitted Exceptions) which Seller has intentionally placed on the Real Property whether existing before or after the date hereof, (iv) any mechanic's lien except (x) those resulting from the acts or omissions of Purchaser or Purchaser's agents and (y) those which are the responsibility of any Unit Lessor under the Unit Leases, (v) all financing statements and other liens or encumbrances that secures indebtedness of Seller including those set forth on  Schedule E hereof, (vi) judgment liens against the Seller, and (vii) any other title exception (which is not a Permitted Exception) that may be removed by payment of an ascertainable and liquidated amount which in the aggregate does not exceed $2,100,000.00 (collectively, the "Mandatory Removal Items").  Seller shall pay, discharge, and otherwise remove of record on or prior to Closing, at Seller's sole cost and expense, all Mandatory Removal Items regardless of whether or not Purchaser provides written notice of the requirement to pay, discharge, and otherwise remove the Mandatory Removal Items.

Article 5.    State of Title; Objections.

5.1    Purchaser acknowledges receipt of (i) that certain Title Examination Report issued by Royal Abstract of New York LLC ("Title Company") as agent for Escrow Agent under Title No. 915047 with effective date of December 8, 2021 (the "Commitment"), and (ii) the Survey.  At Closing, Purchaser may cause title to the Premises to be insured by the Title Company at Purchaser's sole cost and expense.  Except as otherwise expressly provided in this Agreement, Seller shall have no obligation to remove any exception to title other than the Mandatory Removal Items.  Purchaser unconditionally waives any right to object to any matters set forth in the Commitment and the Survey, except for the Mandatory Removal Items and those matters set forth in the Commitment and listed on Schedule E attached hereto and incorporated herein.  If exceptions to title appear on any update or continuation of the Commitment (each a "Continuation") which are not Permitted Exceptions, Purchaser shall notify Seller thereof in writing within the earlier of five (5) Business Days after Purchaser receives such Continuation and the last Business Day prior to the Closing Date, **TIME BEING OF THE ESSENCE**, and Seller shall have five (5) Business Days (with any attendant extension of the Closing Date if Purchaser's written notice if delivered less than five (5) Business Days prior to the then scheduled Closing Date) to elect to attempt to eliminate such exception or not.  If Seller fails to respond after such five (5) Business Day period it shall be deemed that Seller has elected not to eliminate such exceptions.  If Seller is unable, or elects not to attempt, to eliminate such exceptions to title, or if Seller elects to attempt to eliminate any such exceptions to title but is unable to do so or thereafter decides not to eliminate the same, and accordingly, is unable to convey title to the Premises in accordance with the provisions of this Agreement, Seller shall so notify Purchaser and, within five (5) Business Days after receipt of such

6

notice from Seller, Purchaser shall elect either (i) to terminate this Agreement by notice given to Seller and Escrow Agent (**TIME BEING OF THE ESSENCE** with respect to Purchaser's notice), in which event, neither party to this Agreement shall have any further rights or obligations hereunder, except that Escrow Agent shall refund to Purchaser the Deposit (together with all interest thereon, if any) and except for the rights and obligations hereunder that expressly survive the termination of this Agreement, or (ii) to accept title to the Premises subject to such exceptions, without any abatement of the Purchase Price. If Purchaser shall not notify Seller of such election within such five (5) Business Day period, **TIME BEING OF THE ESSENCE**, Purchaser shall be deemed to have elected clause (ii) above with the same force and effect as if Purchaser had elected clause (ii) within such five (5) Business Day period.  Notwithstanding the notice methods provided for in Article 17, the notices provided for in this Section 5.1 may be provided solely by electronic mail delivery by counsel for either party.

5.2     If the Commitment or any Continuation discloses judgments, bankruptcies or similar returns against persons or entities having names the same as or similar to that of Seller but which returns are not against Seller, Seller, on request, shall deliver to Purchaser and Title Company affidavits reasonably acceptable to Seller and Title Company to the effect that such judgments, bankruptcies or returns are not against Seller, in form and substance sufficient to permit removal of same as exceptions in Purchaser's title policy.

5.3     If the Commitment or any Continuation discloses exceptions (other than the Permitted Exceptions) which (i) may be removed solely by reference to Seller's existing title policy, or (ii) were created, consented to or affirmatively permitted by Seller in writing after the date hereof, then Seller shall remove such exceptions.  Notwithstanding the foregoing, Seller, at its option in lieu of satisfying such exceptions, may deposit with Title Company such amount of money and provide such documentation, affidavits and indemnities as may be reasonably determined by Title Company as being sufficient to induce it to insure Purchaser against collection of such liens and/or encumbrances, including interest and penalties, out of or against the Real Property, in which event such exceptions shall not be objections to title.

5.4     Seller shall be entitled to one or more adjournments of the Closing Date, not to exceed sixty (60) days in the aggregate, to remove any exceptions to title which Seller is obligated to remove under this Agreement or elects to attempt, but is not obligated, to remove.

5.5     Notwithstanding the foregoing provisions of this Article 5, in the event that Title Company or any title company retained by Purchaser shall raise an exception to title which is not a Permitted Exception, Seller shall have no obligation to eliminate such exception and Purchaser shall have no right to terminate the Agreement by reason of such exception (and such exception shall be deemed a Permitted Exception) if Title Company or a nationally recognized title company, as applicable, shall be prepared to insure title to the Premises at regular rates without such exception.

5.6     Purchaser shall pay the costs of examination of title and any owner's or mortgagee's policy of title insurance to be issued insuring Purchaser's title to the Premises, as well as all other title charges, survey fees, recording charges (other than to remove of record or satisfy Mandatory Removal Items and the costs to remove, satisfy or cure such other exceptions and title matters

7

which Seller elects to cure pursuant to Section 5.1) and any and all other title and survey costs or expenses incident to the Closing or in connection therewith.

5.7     Notwithstanding anything in this Article 5 hereof to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller.  The acceptance of the Deed by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for the documents delivered at Closing and such matters which are expressly stated in this Agreement to survive the Closing, to the limit of such survival.

5.8     At Closing, Seller shall convey, transfer, grant and set over to Purchaser, fee simple title to the Owned Units and leasehold title to the Leased Units, free and clear of encumbrances, except only the Permitted Exceptions and any other encumbrances and exceptions expressly approved by Purchaser in writing.

Article 6.     Responsibility for Violations.

6.1     Purchaser shall acquire the Premises subject to all violations of building, fire, sanitary, environmental, housing and similar laws and regulations, whether or not noted or issued on the date hereof or on the Closing Date (collectively, "Violations"), including, but not limited to, those the removal of or compliance with which are the responsibility of Tenants, Unit Lessors under the Unit Leases or the Board of Managers under the Condominium Documents.   Seller shall have no obligation to cure or remove any Violations on or before Closing, except that Seller shall be responsible for, and pay at Closing, any penalties or fines imposed on or before the Closing in connection with any Violations issued with respect to the Premises prior to the Closing Date (it being understood and agreed that it shall be Purchaser's responsibility, at its sole cost and expense, to pay any fines or penalties that accrue or arise after the Closing Date, even if the Violation was assessed or noted prior to the Closing Date).

Article 7.     Condition of the Premises; "As-Is"; Rights of Inspection.

7.1     Purchaser shall accept the Premises at the Closing in its "as is" condition as of the date hereof and as of the Closing Date, reasonable wear and tear and any further deterioration of the condition of the Premises caused by or arising out of any casualty that may have occurred prior to the date hereof excepted, and subject to (x) the provisions of Article 12 hereof in the event of a casualty or condemnation and (y) Seller's compliance with the covenants contained in Article 13 hereof.  Seller shall not be liable for any latent or patent defects in the Premises or bound in any manner whatsoever by any guarantees, promises, projections, operating expenses or other information pertaining to the Premises made, furnished or claimed to have been made or furnished, whether orally or in writing, by Seller, the Boards of Managers of the Condominium (the "Board of Managers") under the Condominium Documents, the Lessors or any other person or entity, or any partner, employee, agent, attorney or other person representing or purporting to represent Seller, except to the extent expressly set forth in this Agreement or in any document or instrument expressly required in this Agreement to be delivered at Closing (collectively, the "Closing Documents").  Purchaser acknowledges that neither Seller nor any of the employees, agents or attorneys of Seller have made or do make any oral or written representations or warranties

8

whatsoever to Purchaser, whether express or implied, except as expressly set forth in this Agreement or in any Closing Document, and, in particular, that no such representations and warranties have been made by Seller with respect to the physical, environmental condition or operation of the Premises, the presence, introduction or effect of hazardous materials at or affecting the Premises, the actual or projected revenue and expenses of the Premises, the zoning and other laws, regulations and rules or environmental laws applicable to the Premises or the compliance of the Premises therewith, the current or future real estate tax liability, assessment or valuation of the Premises, the availability of any financing for the alteration, rehabilitation or operation of the Premises from any source, including, without limitation, any state, city or Federal government or any institutional lender, the current or future use of the Premises, including, without limitation, the use for residential or commercial purposes, the present and future condition and operating state of any and all machinery or equipment in the Premises and the present or future structural and physical condition of the Building or its suitability for rehabilitation or renovation, the ownership or state of title of any Personal Property, the quantity, quality or condition of the Personal Property or Fixtures, the use or occupancy of the Premises or any part thereof, or any other matter or thing affecting or relating to the Premises, or the transactions contemplated hereby, except as specifically set forth in this Agreement or in any Closing Document.

7.2     Purchaser has not relied and is not relying upon any representations or warranties or upon any statements made in any informational materials with respect to the Premises provided by Seller or any other person or entity, or any shareholder, employee, agent, attorney or other person representing or purporting to represent Seller, other than the representations and warranties expressly set forth in this Agreement or in any Closing Document.

7.3     PURCHASER ACKNOWLEDGES THAT SELLER AND CERTAIN OF ITS AFFILIATES, AGENTS, ATTORNEYS, CONSULTANTS AND REPRESENTATIVES PROVIDED TO PURCHASER OR MADE AVAILABLE TO PURCHASER (IN THE DATA ROOM, DELIVERED (VIA EMAIL) DIRECTLY TO PURCHASER AND/OR PURCHASER'S AGENTS AND CONSULTANTS INCLUDING ITS ATTORNEYS, OR CONTAINED IN THE SCHEDULES AND EXHIBITS ANNEXED HERETO), CERTAIN DUE DILIGENCE MATERIALS IN SELLER'S POSSESSION RELATING TO THE PREMISES AND THE USE AND OPERATION THEREOF (WITH ALL SUCH DOCUMENTS AND MATERIALS HERETOFORE PROVIDED TO PURCHASER OR PURCHASER'S AGENTS, TOGETHER WITH ANY COPIES OR REPRODUCTIONS OF SUCH DOCUMENTS OR MATERIALS, OR ANY SUMMARIES, ABSTRACTS COMPILATIONS OR OTHER ANALYSES MADE BY OR FOR PURCHASER BASED ON THE INFORMATION IN SUCH DOCUMENTS OR MATERIALS REFERRED TO COLLECTIVELY HEREIN AS "SELLER DUE DILIGENCE MATERIALS"). PURCHASER ACKNOWLEDGES AND AGREES THAT ANY SELLER DUE DILIGENCE MATERIALS DELIVERED OR TO BE DELIVERED BY ANY SELLER RELATED PARTIES TO PURCHASER ARE BEING MADE AVAILABLE SOLELY AS AN ACCOMMODATION TO PURCHASER AND, OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY CLOSING DOCUMENT, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY SELLER RELATED PARTY AS TO THEIR ACCURACY OR COMPLETENESS OF FACTS OR OPINIONS SET FORTH THEREIN AND THAT ANY RELIANCE BY PURCHASER ON SUCH REPORTS OR OTHER DOCUMENTS IN CONNECTION WITH THE PURCHASE OF THE PREMISES IS UNDERTAKEN AT PURCHASER'S SOLE RISK.  OTHER THAN AS EXPRESSLY SET FORTH IN THIS

9

AGREEMENT OR IN ANY CLOSING DOCUMENT, PURCHASER AGREES THAT NO SELLER RELATED PARTY HAS ANY LIABILITY OR OBLIGATION WHATSOEVER FOR ANY INACCURACY IN OR OMISSION FROM THE SELLER DUE DILIGENCE MATERIALS, OFFERING MATERIALS PREPARED IN CONNECTION WITH THE SALE OF THE PROPERTY OR ANY REPORT OR OTHER DOCUMENTS MADE AVAILABLE TO PURCHASER OR PURCHASER'S AGENTS.  PURCHASER ACKNOWLEDGES THAT SELLER HAS PROVIDED THE OPPORTUNITY FOR PURCHASER TO MAKE INSPECTIONS AND THAT PURCHASER HAS CONDUCTED ITS OWN INVESTIGATION OF THE CONDITION OF THE PREMISES, TO THE EXTENT PURCHASER DEEMS SUCH AN INVESTIGATION TO BE NECESSARY OR APPROPRIATE.

7.4    Without limiting the generality of the foregoing, Purchaser acknowledges that it has had an opportunity to conduct its own investigation of the Premises with regard to Hazardous Materials and compliance of the Premises with Relevant Environmental Laws.  Purchaser agrees to take title to the Premises subject to all costs and liabilities arising out of or in any way relating to Hazardous Materials and Relevant Environmental Laws, and Purchaser acknowledges that Seller shall not have any responsibility for any such costs and liabilities.  Purchaser hereby releases Seller, its principals and affiliates, and their respective officers, directors, members, managers, partners, agents, employees, successors and assigns (collectively, the "Seller Related Parties"), from and against any and all claims, counterclaims and causes of action which Purchaser may now or in the future have against any of the foregoing parties arising out of the existence of Hazardous Materials affecting the Premises.  For purposes of this Agreement: the term "Hazardous Materials" means any mold, solid wastes, toxic or hazardous substances, wastes or contaminants, polychlorinated biphenyls, paint or other materials containing lead, urea formaldehyde foam insulation, radon, asbestos, and asbestos containing material, petroleum product and any fraction thereof as any of these terms is defined in or for the purposes of any Relevant Environmental Laws (as hereinafter defined), and any Pathogen (as hereinafter defined); the term "Pathogen" means any pathogen, toxin or other biological agent or condition, including but not limited to, any fungus, mold, mycotoxin or microbial volatile organic compound; and the term "Relevant Environmental Laws" means  any and all laws, rules, regulations, orders and directives, whether federal, state or local, applicable to the Premises or any part thereof with respect to the environmental condition of the Premises or any part thereof, and any activities conducted on or at the Premises, including by way of example and not limitation: (i) Hazardous Materials; (ii) air emissions, water discharges, and any other environmental, health or safety matter; (iii) the existence of any underground storage tanks that contained or contain Hazardous Materials; and (iv) the existence of pcb contained electrical equipment.

7.5    Intentionally omitted.

7.6    Purchaser hereby releases Seller and the Seller Related Parties, from and against any and all claims, counterclaims and causes of action which Purchaser may now or in the future have against any of the foregoing parties arising out of the existence of Hazardous Materials affecting the Premises.

7.7    Purchaser and/or Purchaser's designees, agents, advisors, representatives, employees, consultants, appraisers, engineers, contractors and prospective lenders and such prospective lenders' agents, advisors and representatives ("Purchaser's Representatives"), from

10

time to time before the Closing and during regular business hours, upon at least two (2) Business Days' prior written notice to Seller, may inspect the Premises, provided that (i) Purchaser shall not communicate with any employees of Seller or Seller's managers or contractors or with Tenants or occupants of the Premises without, in each instance, the prior written consent of Seller, which consent may be withheld in Seller's sole discretion, (ii) Purchaser shall not perform any tests with respect to such Premises without the prior written consent of Seller in each instance, which consent shall not be unreasonably withheld, conditioned or delayed; provided however, if such tests are invasive Seller shall have the right to withhold its consent to such tests in its sole and absolute discretion, and (iii) Purchaser shall have no additional rights or remedies under this Agreement as a result of such inspection(s) or any findings in connection therewith.  Without limiting the foregoing, Purchaser agrees that it shall not have any so-called "due diligence period" and that it shall have no right to terminate this Agreement or obtain a reduction of the Purchase Price as a result of such inspection(s) or any findings in connection therewith (including relating to the physical condition of the Premises, the operation of the Premises or otherwise).  Any entry upon the Premises shall be performed in a manner which is not disruptive to Tenants or the normal operation of the Premises and shall be subject to the rights of any Tenants or occupants of the Premises.  Purchaser shall (i) exercise reasonable care at all times that Purchaser and/or Purchaser's Representatives shall be present in the Premises, (ii) at Purchaser's expense, observe and comply with all applicable laws and any conditions imposed by any insurance policy then in effect with respect to the Premises and (iii) not engage in any activities which would violate the provisions of any permit or license pertaining to the Premises.  Seller shall have the right to have a representative of Seller accompany Purchaser during any such communication or entry into or upon the Premises.

7.8    Purchaser hereby agrees to indemnify, defend and hold Seller, its officers, shareholders, partners, members, directors, employees, attorneys and agents harmless from and against any and all liability, actual loss, cost, judgment, claim, damages or expense (including, without limitation, attorneys' fees and expenses), resulting from or arising out of the entry upon the Premises before the Closing by Purchaser or Purchaser's Representatives, other than (x) the mere discovery of pre-existing conditions, except to the extent such pre-existing conditions were exacerbated by the entry upon the Premises before the Closing by Purchaser or Purchaser's Representatives, and (y) those resulting from gross negligence or willful misconduct of Seller or its representatives.  The foregoing indemnification shall survive the Closing or the termination of this Agreement.

7.9    As a condition precedent to entering the Premises in connection with any inspection, Purchaser shall maintain or cause to be maintained, at Purchaser's sole cost and expense, a policy of comprehensive general public liability and property damage insurance by an insurer or syndicate of insurers reasonably acceptable to Seller: (A) with a combined single limit of not less than One Million Dollars ($1,000,000.00) general liability and Three Million Dollars ($3,000,000.00) excess umbrella liability, (B) insuring Purchaser, Seller, Existing Manager, each of their respective affiliates, Seller's lender and any other person or entity related to Seller or involved with the transaction contemplated by this Agreement (such additional persons or entities to be designated in writing by Seller), as additional insureds, against any injuries or damages to persons or property that may result from or are related to (x) Purchaser's entry into the Premises or upon the Premises and (y) any inspection or other activity conducted thereon by Purchaser's Representatives and (C) containing a provision to the effect that insurance provided by Purchaser

11

hereunder shall be primary and noncontributing with any other insurance available to Seller or any other additional insured party.  Purchaser shall deliver evidence of such insurance coverage to Seller before the commencement of the first inspection and proof of continued coverage before any subsequent inspection.

7.10    Notwithstanding any provision in this Agreement to the contrary, neither Purchaser nor any of Purchaser's Representatives shall contact any federal, state, county, municipal or other department or governmental agency regarding the Premises without Seller's prior written consent thereto, in each instance; provided, however, that the foregoing shall not prohibit Purchaser from accessing publicly accessible governmental records and databases from time to time or from contacting governmental authorities to obtain zoning verification letters and similar documentation necessary to complete a zoning report.  In addition, if Seller's consent is obtained by Purchaser, Seller shall be entitled to receive at least five (5) Business Days prior written notice of the intended contact and shall be entitled to have a representative present when Purchaser and/or Purchaser's Representatives has any such contact with any governmental official or representative. Notwithstanding the foregoing, Purchaser shall be permitted, at its sole cost and expense, to file applications for permits for the matters described on <u>Schedule J</u> attached hereto (collectively, the "<u>Allowed Applications</u>") prior to the Closing Date as a "contract vendee" (and not as the owner of the Premises), provided that, at least five (5) Business Days prior to the date on which Purchaser anticipates submitting any such Allowed Application, Purchaser provides Seller with a complete copy of the subject Allowed Application, together with all submission materials attendant thereto, for Seller's review.  Purchaser agrees to make such modifications, clarification or corrections reasonably requested by Seller to confirm that the application is being submitted as a "contract vendee" and imposing no obligations or liabilities upon Seller, as the owner of the Premises, provided that Seller provides written notice of such reasonably requested modifications, clarification or corrections to Purchaser within five (5) Business Days after receipt of Purchaser's Allowed Application, together with all submission materials attendant thereto (and failure of Seller to provide written notice of any reasonably requested modifications, clarification or corrections within that five (5) Business Day period shall be deemed Seller's confirmation of the corresponding Allowed Application, together with all submission materials attendant thereto, it being understood that Seller's posing of questions regarding such documentation during the five (5) Business Day period shall mean that the Allowed Application is not deemed confirmed).  Upon satisfying the foregoing, Purchaser shall be permitted to submit such Allowed Application to the appropriate governmental authority. Except for the Allowed Applications, in no event shall Purchaser be permitted to file any applications, requests, certifications or permits (including, without  limitation, any application for a Certificate of No Harassment) with the NYS Department of Housing and Community Renewal, the NYC Department of Housing Preservation and Development, the NYC Department of City Planning, or other governmental agencies, without the prior written consent of Seller, which may be granted or withheld in its sole discretion.  If the Closing does not occur for any reason hereunder, Purchaser agrees to take such steps as are necessary to rescind or otherwise terminate the Allowed Applications submitted and/or the evaluation processes engaged by the applicable governmental agencies associated with the submission of such Allowed Applications.  Any breach of the foregoing covenants shall constitute a default by Purchaser hereunder.  Purchaser agrees to indemnify and hold harmless Seller and the Seller Related Parties for any loss, cost, expense, or damage suffered by Seller as a result of or arising out of (x) any breach or violation of the foregoing covenants and (y) claims made by Tenants or other Persons who become aware of the filing of the Allowed Applications.  The

12

foregoing provisions of this Section 7.10 shall survive the Closing or earlier termination of this Agreement.

7.11    The provisions of this Article 7 shall survive the Closing.

Article 8.    Representations and Warranties.

8.1    Seller hereby represents and warrants to Purchaser that the following are true and correct in all material respects as of the Effective Date:

(a)    This Agreement constitutes, and each document and instrument to be executed and delivered by Seller hereunder (collectively, the "Seller's Documents"), when so executed and delivered, shall constitute, the legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms, covenants and conditions.

(b)    Seller (i) is a limited liability company duly organized in the State of Delaware and licensed and/or qualified to conduct business in the State of New York; (ii) has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby; (iii) has full power and authority to enter into and perform this Agreement and to enter into the documents to be executed and delivered in accordance with the terms hereof; and (iv) has full power and authority to consummate the transactions as contemplated herein.

(c)    Neither the entering into of this Agreement, nor the consummation of the transactions contemplated hereunder, will constitute a violation or breach by Seller of any contract, writ, order, judgment, or other instrument or agreement to which Seller is a party, or to which it is subject to by which any of its assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, ordinance, rule or regulation of any governmental authority affecting Seller.  The execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated hereby, do not require Seller to obtain any consent, authorization, or approval which has not already been obtained.

(d)    Seller is not subject to any pending voluntary or involuntary reorganization, liquidation, receivership, or other proceedings under any federal, state or local insolvency, liquidation, reorganization or similar type laws.  Seller has not applied for, consented to, or is subject to the appointment of a receiver, trustee, custodian, liquidator or other similar official for itself or for all or a substantial part of its assets, and has not made an assignment for the benefit of creditors.

(e)    To Seller's knowledge, Seller has made available to Purchaser true and complete copies of the Unit Leases.  To Seller's knowledge, the Unit Leases are in full force and effect and there are no monetary defaults or material non-monetary defaults of Seller, as lessee, or of Lessors, under the Unit Leases.

(f)    The list of single resident occupancy units set forth on Schedule C (the "SRO Schedule") sets forth the units occupied by Tenants affecting the Premises on the date of this Agreement and is the SRO Schedule relied on by Seller in the ordinary course operation of its business. There are no written lease, license or occupancy agreements evidencing such rights held

13

by Tenants.  There are no security deposits held by Seller on account of the Tenants.  Seller has disclosed to Purchaser that possession of unit number 2253 is in dispute.  Other than the list of units set forth on Schedule C, to Seller's knowledge, the other units within the Real Property are vacant.  To Seller's knowledge, there are no pending or threatened in writing claims of harassment from any occupants of the single resident occupancy units in the Real Property against Seller or the Real Property.

(g)      Seller is not a party to, nor does Seller have actual knowledge of the existence of any, written leases, subleases or licenses affecting the Premises in which Seller holds the lessor's, sublessor's, licensor's or grantor's interest.  The August 28, 2000 Lease between Henry Hudson Holdings LLC (as landlord) and Hudson Leaseco LLC (as tenant) affecting the Real Property has been terminated, and the August 12, 2011 Lease between Henry Hudson Holdings LLC (as landlord) and 58th Street Bar Company, LLC (as tenant) has been terminated.

(h)      There are no tax certiorari proceedings pending with respect to the Premises or any part thereof other than as set forth on Schedule B annexed hereto.

(i)      Seller is not a Prohibited Person (as defined below).  The assets Seller will transfer to Purchaser under this Agreement are not the property of, and are not beneficially owned, directly or indirectly, by a Prohibited Person.  The assets Seller will transfer to Purchaser under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. §1956(c)(7).  For purposes hereof, a "Prohibited Person" means any of the following:  (i) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "Executive Order"); (ii) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") at its official website, http://www.treas.gov/offices/enforcement/ofac; (iv) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (v) a person or entity that is affiliated with any person or entity identified in any of clauses (i), (ii), (iii) and/or (iv) above.

(j)      Seller is not a "foreign person" as defined in the Internal Revenue Code of 1986, as amended (the "Code") Withholding Section.

(k)      To Seller's knowledge, Seller has made available to Purchaser true and complete copies of the Condominium Documents.  A list of each of the Condominium Documents is included on Schedule D annexed hereto.  To Seller's knowledge, the Condominium Documents are in full force and effect and Seller has not delivered a notice of default to the Board of Managers.  There have been no Common Charges (as defined in the Condominium Documents) under the Condominium Documents charged by the Board of Managers for the calendar year period preceding the Effective Date and, accordingly, there are no Common Charges under the Condominium Documents due and payable as of the Effective Date.

(l)      There are no judgments of any kind against Seller unpaid or unsatisfied of record, which would be expected to have a material adverse effect on Seller's ability to perform

14

hereunder or, except as may be set forth in the Commitment, which would be binding on the Premises. There is no material action, suit or proceeding to which Seller is a party, pending or, to Seller's actual knowledge, threatened in writing against or affecting Seller or the Premises, which, if adversely determined, would (i) have a material adverse effect upon title to the Premises, (ii) prohibit or impair Seller from consummating the transactions contemplated hereby, or (iii) materially adversely affect the use or operation of the Premises.

(m)     Except as set forth on Schedule H, there are no pending, or to Seller's knowledge, threatened in writing, lawsuits, actions, complaints, claims, charges, arbitrations, investigations, grievances, administrative charges or proceedings before any governmental entity under the Labor and Employment Laws (as hereinafter defined), regarding employment discrimination, harassment, retaliation, safety, violations or any other employment-related charges or complaints, wage and hour claims, claims not covered by insurance for workers' compensation or other benefits in connection with or related to the Hotel Employees (as defined in Article 16).

(n)     Seller is not a party to any service, maintenance or similar contracts or agreements with respect to the Premises other than the Service Contracts set forth on Schedule I attached hereto. Seller has made copies of the Service Contracts available to Purchaser, and to Seller's knowledge, such copies are true, correct and complete in all material respects. With respect to any Designated Service Contract that Purchaser elects to assume, neither Seller nor, to Seller's knowledge, any other party is in material default under any Service Contract. Seller is not a party to any property management agreement binding upon the Premises, other than the Existing PMA, of which Seller has made available to Purchaser a true and correct copy and which Existing PMA shall be terminated as of the Closing Date.

(o)     There are no pending or, to Seller's actual knowledge, threatened condemnation or eminent domain proceedings against the Premises.

(p)     Intentionally omitted.

(q)     Seller has not granted to any other person or entity, except Purchaser, any options, rights of first refusal or other purchase rights with respect to the Premises. Seller is not a party to any contract, agreement or commitment to sell, convey, assign, transfer, provide rights of first refusal, option rights or any other similar rights relating to the disposition of the Premises or any portion thereof.

(r)     Seller has not received any written notice of any existing or proposed special assessments against the Premises.

(s)     Except as disclosed by Seller to Purchaser prior to the date hereof and/or as set forth in the Seller Due Diligence Materials, Seller has not received written notice from any governmental authority of the presence of Hazardous Materials on, under or at the Premises in violation of Relevant Environmental Laws.

(t)     Except as set forth on Schedule K, Seller has not received written notice of any Violations.

15

(u)      Other than the Collective Bargaining Agreement (as defined in Article 16), Seller is not a party to or bound by, and the Premises are not subject to or bound by, any collective bargaining, labor or employment, or development, card check, or neutrality agreement with respect to any employees currently employed to provide services to the Premises or that may in the future be employed to provide services to the Premises, or with respect to the Premises itself.

(v)      Seller has not experienced any strikes, committed any unfair labor practices, and is not aware of any allegations it has committed any unfair labor practice within the period of six months prior to the execution of this Agreement related to the employees represented by the Union.

(w)      Other than the New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund, neither Seller nor any ERISA Affiliate of Seller has contributed or been obligated to contribute to any multiemployer pension plan with respect to the Premises.  For purposes of this Agreement, "ERISA Affiliate" means any entity, trade or business (whether or not incorporated) that is, or has ever been, a member of a "controlled group of corporations" with, or is under "common control" with, or is a member of the same "affiliated service group" with Seller or any of its affiliates, in each case, as defined in Sections 414(b), (c), (m) or (o) of the Code or is, or within the last six years, has been, treated as a single employer for purposes of Section 4001(b)(1) of ERISA.  To Seller's knowledge, Existing Manager has paid all employee benefit contributions due to date required under the Collective Bargaining Agreement to the Union Employee Benefit Funds, and there are no pending or unresolved claims by the Union Employee Benefit Funds or any other multiemployer benefit plan for outstanding or owed contributions, arrears, delinquencies, or for compliance with any audit.  To Seller's knowledge, no complete or partial withdrawal liability under Title IV of ERISA has occurred or been triggered with respect to the Premises during Seller's period of ownership.

(x)      Seller has not received any written notice claiming a breach of the Collective Bargaining Agreement or any violation of any applicable Labor and Employment Laws.

8.2      The representations and warranties of Seller set forth in Section 8.1 (the "Surviving Seller Representations") shall be deemed remade on, and shall be true and accurate in all material respects as of, the Closing Date.  The Surviving Seller Representations shall survive for one hundred fifty (150) days after the Closing Date (the "Survival Period"), provided, however, that if Purchaser makes a claim for a breach of any Surviving Seller Representation on or before the expiration of the Survival Period, the Survival Period shall be extended for those claims timely made until such claims are resolved by binding agreement of the parties or final judgment and expiration of applicable appeal periods. Each Surviving Seller Representation shall automatically be null and void and of no further force and effect after the expiration of the Survival Period unless, prior to the end of the Survival Period, Purchaser shall have asserted in writing a specific claim with respect to the particular Surviving Seller Representation and commenced a legal proceeding (a "Proceeding") within thirty (30) days thereafter against Seller alleging that Seller is in breach of such Surviving Seller Representation and that Purchaser has suffered actual damages ("Damages") as a result thereof.  In no event shall Purchaser be entitled to assert any consequential, special or punitive damages with respect to any claims for a breach of Seller Representations pursuant to this Section 8.2, nor shall it be entitled to any award or payment based on such damages.  If Purchaser timely commences a Proceeding, and a court of competent jurisdiction,

16

pursuant to a final, non-appealable order in connection with such Proceeding, determines that (1) the applicable Surviving Seller Representation was breached as of the date of this Agreement or the Closing Date and (2) Purchaser suffered Damages by reason of such breach and (3) Purchaser did not have knowledge or was not deemed to have knowledge of such breach prior to the Closing, then Purchaser shall be entitled to receive an amount equal to the Damages, but in no event in an amount greater than the Ceiling (as hereinafter defined); provided, however, Purchaser shall not be entitled to pursue any claim against Seller for damage to Purchaser that, when combined with all other claims against Seller for breaches of Surviving Seller Representations, is less than the Floor (as hereinafter defined) in the aggregate.  If Purchaser has claim(s) against Seller, in excess of the Floor, then Purchaser shall be entitled to pursue the actual loss suffered by Purchaser in connection with such claim(s) against Seller (including, without limitation, recovery of all amounts below and above the Floor), but in no event shall Seller's liability for any and all claims exceed the Ceiling.  For purposes of this Section 8.2, Purchaser shall be deemed to have knowledge of: (i) any matter disclosed in any exhibit or schedule to this Agreement, (ii) any matters disclosed in any document or written materials provided by Seller to Purchaser prior to the Closing (including, without limitation, those materials posted in the electronic data room located at https://app.box.com/folder/152329405383?s=r3cxvlnntp4q8hh46fl0bi6kgzljxtuf), (iii) any other matter disclosed in due diligence reports or inspections obtained by Purchaser in connection with the transactions contemplated by this Agreement, and (iv) any matter disclosed by Seller pursuant to a written update to Seller's representations or warranties in accordance with this Agreement. As used herein, "Floor" shall mean with respect to any claim or claims against Seller for breach of any Surviving Seller Representation, FIFTY THOUSAND AND NO/100 Dollars ($50,000.00), and "Ceiling" shall mean TWO MILLION ONE HUNDRED THOUSAND AND NO/100 Dollars ($2,100,000.00), provided, however, that the Ceiling shall not apply with respect to: (x) all of the credits and prorations Purchaser is entitled to pursuant to this Agreement; and (y) Seller's indemnification obligations of Purchaser pursuant to Section 14.1(b) and Article 16 of this Agreement.  The provisions of this Section 8.2 shall constitute the sole and exclusive remedy after Closing for breaches of the Surviving Seller Representations and shall survive the Closing.  Seller agrees that at Closing, to secure payment of any claims by Purchaser against Seller for a breach of a representation or warranty in accordance with this Section 8.2, a portion of the Purchase Price in an amount equal to the Ceiling shall be deposited in an escrow account with Title Company, to be held and disbursed by Title Company pursuant to an escrow agreement in the form of Exhibit L attached hereto (the "Holdback Escrow Agreement").

8.3     If, prior to Closing, Purchaser has knowledge of any matter which would constitute a material breach of  Seller's representations and warranties, Purchaser shall notify Seller of such material breach within the earlier of five (5) Business Days of learning of same and the Closing Date, failing which Purchaser shall be deemed to waive any such corresponding material breach of Seller's representations and warranties.  Seller shall have the right to contest Purchaser's determination as to a pre-Closing material breach of Seller's representations and warranties, and shall have the right to attempt to cure such breach without being obligated to complete such cure. In addition, Seller shall have until the date that is the later of the originally scheduled Closing Date and sixty (60) days from the date of Purchaser's notice to cure any such material breach of Seller's representations and warranties and, at Seller's sole option, the Closing Date shall be extended to such sixtieth (60) day (or any earlier Business Day) after Purchaser's notice of breach, in order to permit such cure by Seller.  If Seller fails to cure any such material breach of Seller's representations and warranties, then Purchaser, as its sole and exclusive remedy, shall have the

17

right to terminate this Agreement by written notice to Seller, in which case Escrow Agent shall return the Deposit (together with all interest thereon, if any) to Purchaser, Purchaser shall be entitled to reimbursement by Seller of Purchaser's Reimbursement Costs, subject to the limitations set forth in Section 15.2, and neither party to this Agreement shall thereafter have any further right or obligation hereunder, except for the rights and obligations hereunder that expressly survive the termination of this Agreement.

8.4     The terms "to Seller's actual knowledge," "to the best of Seller's actual knowledge" and phrases of similar import shall mean the actual present knowledge (and not constructive knowledge) of Eric Poretsky, without independent inquiry or investigation, and shall not conclusively mean that Seller or such individual is charged with knowledge of the acts, omissions and/or knowledge of Seller's property manager (or any employee thereof), Seller's other agents or employees or Seller's predecessors in title to the Premises. The foregoing individual is named solely for the purpose of establishing the scope of knowledge and Seller represents that such person is the representative of Seller who is charged with day-to-day administration of information relating to and asset management of the Premises. Such individual is not a party to this Agreement and shall have no personal liability for any of the representations or warranties hereunder.

8.5     As of the Effective Date, Purchaser hereby represents and warrants as follows:

(i)     Purchaser is familiar with the source of funds for the Purchase Price of the Premises and represents that all such funds will be derived from legitimate business activities and/or from loans from a banking or financial institution.

(ii)     None of Purchaser, any direct or indirect interest holder in Purchaser (collectively, the "Purchaser Parties"), or any affiliate of Purchaser is (a) subject to sanctions of the United States government, (b) in violation of any provision of OFAC or (c) a Prohibited Person similarly designated under any Executive Orders or OFAC.

(iii)     None of the Purchaser, the Purchaser Parties or any affiliate of Purchaser is listed on the Specially Designated Nationals List maintained by the OFAC, and/or on any other similar lists as a Prohibited Person.

(iv)     Purchaser has, and its Purchaser Parties have, required and shall require, and has/have taken and shall take all reasonable measures to ensure compliance with the requirement that no Purchaser Parties or affiliates of Purchaser is or shall be listed on any lists, be a Prohibited Person, or be in violation of any laws, including any OFAC laws.

(v)     None of Purchaser, the Purchaser Parties or any affiliate of Purchaser is or will (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in, any transaction relating to any property or interest in property blocked pursuant to OFAC or the Patriot Act, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in OFAC or the Patriot Act.

(vi)     This Agreement constitutes, and each document and instrument to be executed and delivered by Purchaser hereunder (collectively, the "Purchaser's Documents"),

18

*ACTIVE 61730742v13*

when so executed and delivered, shall constitute, the legal, valid and binding obligations of Purchaser, enforceable in accordance with their respective terms, covenants and conditions.

(vii)    Purchaser (i)  is a limited liability company duly organized in the State of Delaware and as of the Closing Date shall be licensed and/or qualified to conduct business in the State of New York; (ii) has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby; (iii) has full power and authority to enter into and perform this Agreement and to enter into the documents to be executed and delivered in accordance with the terms hereof; and (iv) has full power and authority to consummate the transactions as contemplated herein.

(viii)    Neither the entering into of this Agreement, nor the consummation of the transactions contemplated hereunder, will constitute a violation or breach by Purchaser of any contract, writ, order, judgment, or other instrument or agreement to which Purchaser is a party, or to which it is subject to by which any of its assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, ordinance, rule or regulation of any governmental authority affecting Purchaser.  The execution, delivery and performance of this Agreement by Purchaser, and the consummation of the transactions contemplated hereby, do not require Purchaser to obtain any consent, authorization, or approval which has not already been obtained.

(ix)    Purchaser is not subject to any pending voluntary or involuntary reorganization, liquidation, receivership, or other proceedings under any federal, state or local insolvency, liquidation, reorganization or similar type laws.

8.6    All of the foregoing representations and warranties of Purchaser will be and remain true on and as of the Closing Date and shall survive the Closing.

Article 9.    Closing Obligations.

9.1    At or prior to the Closing, Seller shall execute and/or deliver to Title Company the following:

(a)    Two (2) condominium unit deeds in substantially the form attached hereto as Exhibit B and made a part hereof, and properly executed in the form for recording so as to convey title to each of the Owned Units (each, respectively, the "Deed");

(b)    At least fifteen (15) days prior to Closing, two (2) written agreements pursuant to which Seller shall assign to two (2) separate and distinct Permitted Designees of Purchaser (as designated by Purchaser in its sole and absolute discretion), and such Permitted Designees shall assume and agree to be bound by, all obligations and liabilities of Seller under the 10th Floor Lease and Store Unit Lease, respectively, and otherwise with respect to the Leased Units, in substantially the form of Exhibit C attached hereto (each, respectively, the "Assignment and Assumption of Lease");

(c)    a bill of sale, conveying and transferring to Purchaser all right, title and interest of Seller, if any, in and to all Personal Property, Fixtures, Warranties and Permits, in substantially the form attached hereto as Exhibit D and made a part hereof;

19

ACTIVE 61730742v13

(d)      A Real Property Transfer Tax Return with respect to the New York City Real Property Transfer Tax (the "RPT Form");

(e)      A New York State Real Estate Transfer Tax Return and Credit Line Mortgage Certificate with respect to the New York State Real Estate Transfer Tax (the "Form TP-584");

(f)      A New York State Real Property Transfer Report Form RP-5217 NYC (the "RP-5217");

(g)      Intentionally omitted;

(h)      a written notice in substantially form of Exhibit E attached hereto, executed by Seller or by its agent, advising the Tenants of the sale of the Units to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct;

(i)      if the Alternative Agreement (as defined in Article 16, and attached hereto as Exhibit I-2), has been executed by the Seller, Purchaser and the Union, and a fully executed copy is delivered to Seller at least ten (10) days prior to Closing, then Seller shall deliver the fully executed Alternative Agreement to the Union at least ten (10) days prior to the Closing;

(j)      Confirming Estoppels from each Lessor and the Board of Managers;

(k)      Letters of resignation from all Seller appointed members of the Board of Managers with respect to the Owned Units, effective immediately upon the consummation of the Closing.  The parties will cooperate to have Seller's appointed members of the Board of Managers resign and Purchaser's replacement members appointed in accordance with the Condominium Documents;

(l)      an affidavit of Seller pursuant to Section 1445(b)(2) of the Code in the form attached hereto as Exhibit F and made a part hereof, stating that Seller is not a foreign person within the meaning of such Section;

(m)      evidence reasonably satisfactory to the Title Company that (i) Seller is authorized to consummate the transaction contemplated herein, and (ii) the individual(s) executing the documents on behalf of Seller is/are authorized to do so;

(n)      A certificate with respect to Seller's representations and warranties under Section 8.1 being true and correct in all material respects, subject to changes permitted by Section 9.4(b), in the form of Exhibit J (the "Seller's Bring Down Certificate");

(o)      An assignment and assumption, in substantially the form of Exhibit K, which provides for, as more particularly set forth therein, the assignment by Seller of all of Seller's right, title and interest in and to the Designated Service Contracts and the assumption by Purchaser of all of Seller's obligations under the Designated Service Contracts arising from and after the Closing Date (the "Assignment of Contracts");

(p)      The Holdback Escrow Agreement;

20

(q)     The Labor Severance Escrow Agreement;

(r)     A closing statement prepared by Title Company and approved by Seller and Purchaser, consistent with the terms of this Agreement;

(s)     To the extent in Seller's possession, all keys, combinations and access devices to any portion of the Premises;

(t)     To the extent in the possession of Seller, all books and records relating to the Premises (other than Seller's internal memoranda, financial projections, appraisals, proposals for work not actually undertaken, accounting and tax records and similar elective or confidential information), including, without limitation, (a) Permits relating to the operation of the Premises and/or issued by any governmental authority, (b) certifications verifying elevator and boiler inspections, (c) survey, architectural plans, building plans or specifications pertaining to the Premises, and (d) rent ledgers pertaining to the SRO units;

(u)     Such affidavits, certificates, agreements and instruments as shall be reasonably required by the Title Company for Seller to comply with its obligations to deliver title to the Premises in accordance with this Agreement;

(v)     An updated SRO Schedule, dated no more than five (5) days prior to the Closing Date;

(w)     Evidence of termination of all Service Contracts that Purchaser has not agreed to assume at Closing (including evidence that Seller has paid all termination and/or cancellation fees, costs, penalties, charges and/or expenses that may result from such terminations which Seller expressly acknowledges and agrees shall be paid by Seller at its sole cost and expense at or prior to the Closing Date); and

(x)     any other documents, instruments or agreements reasonably necessary to effectuate the transactions contemplated hereunder, in accordance with the express terms, covenants and conditions hereof.

9.2     At or prior to the Closing, Purchaser (or the Permitted Designees, as applicable) shall execute and/or deliver to Title Company the following:

(a)     The RPT Form;

(b)     The RP-5217;

(c)     The Form TP-584;

(d)     a Power of Attorney executed by Purchaser and acknowledged by a notary public, in the form required by Exhibit E to the Declaration, in favor of the Board of Managers, as required by Section 16(B) of the Declaration;

(e)     At least fifteen (15) days prior to Closing, two (2) Assignments and Assumptions of Lease, with respect to the Leased Units;

21

(f)     an assignment and assumption of the Collective Bargaining Agreement in the form attached hereto as Exhibit I-1 (the "CBA Assumption Agreement"), executed by Purchaser, unless the Alternative Agreement (as defined in Article 16 and attached hereto as Exhibit I-2) has been signed by the Purchaser and the Union and delivered to the Seller at least ten (10) days prior to Closing, in which case Seller shall sign and deliver the Alternative Agreement to the Union;

(g)     the Assignment of Contracts;

(h)     a certificate with respect to Purchaser's representations and warranties set forth in Section 8.5 being true and correct as required by Section 9.3(c);

(i)     all consents and resolutions required to consummate the transactions contemplated hereby, certified to be true and complete by an authorized officer of Purchaser;

(j)     such affidavits, certificates, agreements and instruments as shall be reasonably required by the Title Company;

(k)     a closing statement prepared by Title Company and approved by Seller and Purchaser consistent with the terms of this Agreement;

(l)     all other documents and instruments required by this Agreement and/or the Condominium Documents to be delivered by Purchaser at Closing;

(m)     The Holdback Escrow Agreement;

(n)     The Labor Severance Escrow Agreement;

(o)     An assumption of the Retainer Agreement with the written consent of the Tax Cert Attorneys; and

(p)     A Department of Housing Preservation and Development Registration Statement (the "Multiple Dwelling Registration Statement") required upon change in ownership, containing Purchaser or Purchaser's agent's information to be delivered to the Department of Housing Preservation and Development;

(q)     any other documents, instruments or agreements reasonably necessary to effectuate the transactions contemplated hereunder, in accordance with the express terms, covenants and conditions hereof.

9.3     Seller's obligation to consummate the Closing under this Agreement is subject to satisfaction of the following conditions precedent, which may be waived in whole or in part by Seller, provided such waiver is in writing and signed by Seller on or before the Closing Date:

(a)     Purchaser shall have paid or tendered payment of the Balance to Escrow Agent on or before the Closing Date as provided in Article 2 hereof, subject to adjustment as provided in Article 11 hereof;

*ACTIVE 61730742v13*

(b)     Purchaser shall have delivered to or for the benefit of Seller, on or before the Closing Date, all of the documents and items required to be delivered by Purchaser pursuant to Section 9.2 of this Agreement, and Purchaser shall have performed in all material respects all of its obligations hereunder to be performed on or before the Closing Date;

(c)     All of Purchaser's representations and warranties made in this Agreement shall be true and correct as of the Effective Date and true and correct as of the Closing Date as if then made; and

(d)     Purchaser shall have complied (or shall be deemed to have complied, upon execution of delivery of the documents set forth in Section 9.2 of this Agreement) with the requirements imposed upon the grantee of a Unit under Article XII of the Declaration.

9.4     Purchaser's obligation to consummate the Closing under this Agreement is subject to the satisfaction of the following conditions precedent, which may be waived in whole or in part by Purchaser, provided such waiver is in writing and signed by Purchaser on or before the Closing Date:

(a)     Seller shall have delivered to or for the benefit of Purchaser, on or before the Closing Date, all of the documents and items required to be delivered by Seller pursuant to Section 9.1 of this Agreement, and Seller shall have performed in all material respects all of its obligations hereunder to be performed on or before the Closing Date;

(b)     Subject to the other provisions of this Agreement, all of Seller's representations and warranties made in this Agreement shall be true and correct in all material respects as of the Effective Date and true and correct in all material respects as of the Closing Date as if then made, other than those representations or warranties made as of a specific date, or with reference to previously dated materials, in which event such representations and warranties shall be true and correct in all material respects as of the date thereof or as of the date of such materials, as applicable.  For purposes hereof, a representation or warranty shall not be deemed to have been breached if the representation or warranty is not true and correct as of the Closing Date by reason of (a) changed facts or circumstances arising after the date hereof, the occurrence of which is not the result of an action by Seller which is prohibited by this Agreement or (b) any matter, including any alleged default, default, claim or proceeding, with respect to the Premises that relates to the Cycle 8 Local Law 11 Work to the extent such alleged default, default, claim or proceeding would be rendered moot upon or will be remedied by the Seller's performance and completion of the Cycle 8 Local Law 11 Work in accordance with this Agreement; and

(c)     Seller shall have complied (or shall be deemed to have complied, upon execution of delivery of the documents set forth in Section 9.1 of this Agreement) with the requirements regarding the conveyance of a Unit under Article XII of the Declaration.

Article 10.     Transfer Taxes, Title Insurance and Other Expenses.

10.1     At Closing, Seller shall pay the New York State Real Estate Transfer Tax imposed pursuant to Article 31 and Section 1402 of the New York Tax Law (the "State Transfer Tax") and the New York City Real Property Transfer Tax imposed pursuant to Title 11, Chapter 21 of the New York City Administrative Code (the "City Transfer Tax"), upon or payable in connection

23

with the transfer of title to the Units and the recordation of each Deed and execution of each Assignment and Assumption of Lease, as applicable.  Seller shall also pay 100% of any escrow fees or charges of Escrow Agent.

10.2    Purchaser shall pay for the following prior to or at the Closing:

(a)    all State, City, County and municipal recording charges with respect to the deed;

(b)    all costs and expenses in connection with Purchaser's financing (if any), and costs for the filing of all documents necessary to complete such financing and related mortgage recording tax (as the same may be applicable), provided, however, nothing herein contained shall be deemed to create a financing contingency or to condition Purchaser's obligations hereunder on Purchaser's ability to obtain financing, and this shall be deemed to be an "all cash" transaction;

(c)    the cost of Purchaser's own survey, survey re-date, engineering studies, environmental studies and other due diligence investigations;

(d)    the cost of obtaining its owner's and/or loan policies of title insurance, including any and all premiums, endorsements and coverage issued in connection with such policies.

10.3    Each party shall pay its own legal fees incidental to the negotiation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

10.4    The provisions of this Article 10 shall survive the Closing.

Article 11.    Apportionments.

11.1    The following shall be apportioned between the parties as of 11:59 P.M. on the day immediately preceding the Closing Date:

(a)    Rents, as and when collected;

(b)    real property taxes and assessments, sewer rents and taxes, water rates and charges, vault charges and taxes, business improvement district taxes and assessments and any other governmental taxes, charges or assessments levied or assessed against the Premises, if any, on the basis of the fiscal year for which assessed;

(c)    charges for water, sewer, electricity, gas, fuel and other utility charges, all of which shall be read as soon as practicable before Closing, unless Seller elects to close its own applicable account, in which event Purchaser shall open its own account and the respective charges shall not be prorated;

(d)    charges for all utility services supplied to the Units (including, without limitation, water, gas, steam and electricity);

24

ACTIVE 61730742v13

(e)      amounts prepaid and amounts accrued but unpaid under the Designated Service Contracts;

(f)      accrued wages, salaries, compensation (including but not limited to payroll expenses and taxes, but excluding any severance pay pursuant to the Collective Bargaining Agreement or enhanced severance pay pursuant to the Alternative Agreement, if applicable), benefits, including without limitation, contributions to the Union Employee Benefit Funds (other than the additional health insurance contributions pursuant to the Alternative Agreement, if applicable), vacation pay, holiday pay, sick pay, personal days or other paid time off and salaries of each Bargaining Unit Employee; provided that Purchaser shall pay when due the Seller's portion of the foregoing but receive a closing adjustment therefor, and further provided that any severance pay pursuant to the Collective Bargaining Agreement or enhanced severance pay pursuant to the Alternative Agreement, if applicable (including the additional health insurance contributions pursuant to the Alternative Agreement, if applicable) shall be the responsibility of, and paid by, Purchaser;

(g)      prepaid fees for Permits assigned to Purchaser at the Closing, if any;

(h)      if and to the extent that either or both lessors under the Unit Leases confirm, prior to Closing, that they are holding any amount of "Security Deposit", "Security" or other form of deposit securing the lessees' performance under either or both Unit Leases, all right, title and other beneficial interests in such deposits shall be assigned within the corresponding Assignment and Assumption of Lease and Seller shall receive a credit at Closing corresponding with such confirmed deposited amounts; and

(i)      all other items customarily apportioned in connection with the sale of similar properties similarly located.

11.2    Except as expressly provided to the contrary herein, all apportionments and adjustments shall be made in accordance with the customs and practice of the Real Estate Board of New York.  Any taxes due and payable under Section 11.1(b) in the year in which the Closing occurs shall be apportioned based on the portion of the fiscal year which has elapsed prior to the Closing Date.  If the Closing Date shall occur before the amount of such taxes for the fiscal year in which Closing occurs has been determined, the apportionment of such taxes shall be made at the Closing Date based on the most recent ascertainable full-year taxes (e.g. the prior year's full-year, second installment tax bill).  If any utility apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, within ten (10) Business Days following notice of the determination of such actual reading, readjust such apportionment and Seller shall promptly deliver to Purchaser, or Purchaser shall promptly deliver to Seller, as the case may be, the amount determined to be due upon such adjustment.

11.3    If any past due rents shall be owing by any Tenants on the Closing Date, Seller waives all rights to collect any such past due or delinquent rents from Tenants following the Closing Date and Purchaser shall be entitled to collect and receive all payments for past due rentals.

11.4    Seller is hereby authorized, but is not obligated, to continue any tax certiorari proceedings for reduction of the assessed valuation of the Units that are pending on the Closing

25

Date and (with respect to any such proceedings for tax years prior to the tax year in which the Closing Date shall occur) to settle or compromise the same in Seller's sole discretion.  Any settlement or compromise in connection with such proceedings brought with respect to the tax year in which the Closing Date shall occur shall be made by Seller in consultation with, and with the prior written consent of, Purchaser (which consent may be withheld in Purchaser's sole discretion).  If a tax refund shall be obtained by reason of an adjustment of the assessed valuation of the Units attributable to a period that ends prior to the Closing Date, the same shall be the property of Seller (less the reasonable costs of collection, including attorneys and accounting fees).  If any such refund shall be obtained for a period that includes the Closing Date, the amount of such refund (less the cost of obtaining the same, including, without limitation, reasonable attorneys' and accounting fees) shall be apportioned according to length of the respective portions of such period during which each party owned the Unit and subject to adjustment and apportionment pursuant to the Lease.  If any such refund or portion thereof to which Purchaser shall be entitled as hereinbefore provided shall be paid to Seller, Seller shall receive the same for the benefit of Purchaser and shall forthwith remit the same thereto.  Purchaser shall, with the consent of the Tax Cert Attorneys, assume the retainer agreement (the "Retainer Agreement") with Ditchik & Ditchik, PLLC (the "Tax Cert Attorneys") and shall be obligated to make any payments due to the Tax Cert Attorneys pursuant to the Retainer Agreement with respect to tax savings realized by Purchaser as a result of any reduction in the transitional assessed valuation and/or the actual assessed valuation of the Real Property, which reduction is implemented over the five year period following the Closing from which Purchaser benefits.  As of the Closing Date, Seller shall be released from any obligations to make payments under the Retainer Agreement with the Tax Cert Attorneys, other than payments to the Tax Cert Attorneys related to the tax years prior to the Closing Date.

11.5    The terms, covenants and conditions of this Article 11 shall survive the Closing.

Article 12.    Risk of Loss; Condemnation.

12.1    If, between the date of this Agreement and the Closing Date, the Premises are damaged by fire or other casualty, the provisions of Section 5-1311 of the New York General Obligations Law, or any statute enacted in substitution therefor or in addition thereto, shall not apply.  Such provisions are hereby waived, and the provisions of the following Section 12.2 shall apply instead.

12.2    Upon the occurrence of a casualty, condemnation or taking with respect to any Premises between the date of this Agreement and the Closing Date, Seller shall notify Purchaser in writing of same (a "Casualty/Condemnation Notice").  For purposes of this Article 12 hereof, a "Significant Portion of the Premises" shall mean a portion of the Premises, of which the cost to repair is equal to or greater than ten percent (10%) of the Purchase Price, as determined by an architect or engineer selected by Seller and reasonably acceptable to Purchaser.  In the event that a Significant Portion of the Premises is damaged or destroyed in any casualty, or a Significant Portion of the Premises is condemned or taken (or notice of any condemnation or taking is issued), then Purchaser may elect to terminate this Agreement by providing written notice of such termination to Seller within five (5) Business Days after Purchaser's receipt of the Casualty/Condemnation Notice, upon which termination, the Deposit shall be immediately returned to Purchaser without objection from Seller and neither party hereto shall have any further rights, obligations or liabilities under this Agreement with respect to the Premises, except as

26

otherwise expressly set forth herein. If (a) Purchaser does not elect to terminate this Agreement (provided that Purchaser's failure to timely elect to terminate shall be deemed an election to close), or (b) the portion of the Premises which is (x) taken, or (y) damaged or destroyed is, in either case, not a Significant Portion of the Premises, then there shall be no abatement of the Purchase Price and (x) in the case of a condemnation or taking, Seller shall assign to Purchaser at the Closing the rights of Seller to the claims or awards and Purchaser shall be entitled to receive and keep all such awards; and (y) in the case of a casualty, Seller shall assign to Purchaser at the Closing the rights of Seller to the proceeds under Seller's insurance policies covering such Premises with respect to such damage or destruction (or pay to Purchaser any such proceeds received prior to Closing, less amounts actually paid by Seller for any emergency repairs) and credit to Purchaser the amount of any deductible with respect thereto, and Purchaser shall be entitled to receive and keep any monies received from such insurance policies.

Article 13.      Covenants of Seller.  Between the date hereof and Closing:

13.1     Seller covenants and agrees that, except as otherwise provided in the Agreement, between the date of this Agreement and the Closing Date, Seller (either itself or through an agent) shall continue to manage and operate the Premises in substantially the same manner as Seller has heretofore managed and operated the Premises and in compliance in all material respects with all applicable laws, ordinances, rules and regulations of any governmental authority governing the Real Property, perform in all material respects all of Seller's obligations under the Unit Leases, and to keep (or request the Condominium to keep, to the extent the Condominium is so required) the Units in substantially and materially its same condition and state of repair, subject to reasonable wear and tear and the terms, conditions and requirements of the Condominium Documents and the Unit Leases.

13.2     Seller shall not enter into any new service contract unless the same shall be terminable by Seller prior to Closing.

13.3     Seller shall maintain in full force and effect until the Closing the insurance policies presently in effect or other commercially reasonable policies of insurance affording similar levels of coverage and shall, subject to the provisions of Article 11, continue to pay all utility and service charges accrued through the date of Closing.

13.4     Seller shall notify or, in the case of written notice received by Seller, deliver a copy to, Purchaser of any default under the Condominium Documents or the Unit Leases or from any Tenants, or the receipt of any notice of default received by Seller under the Condominium Documents or the Unit Leases or from any Tenants.

13.5     From and after the date of this Agreement, Seller shall not amend, modify, or terminate the Unit Leases or the Condominium Documents without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole and absolute discretion, nor enter into any new lease, license or other form of occupancy agreement affecting the Premises without the prior written consent of Purchaser, which consent may be withheld in Purchaser's sole and absolute discretion.

27

13.6    Seller shall promptly advise Purchaser of any litigation, arbitration or other judicial or administrative proceeding with respect to the Premises which materially and adversely affects Purchaser's interests under this Agreement.

13.7    Seller shall deliver to (x) Lessors an estoppel certificate substantially in the form attached hereto as Exhibit G, and (y) the Board of Managers an estoppel certificate substantially in the form attached hereto as Exhibit H (each, an "Estoppel" and collectively, the "Estoppels"). Seller shall obtain Confirming Estoppels from each Lessor and the Board of Managers.   For purposes of this Agreement, the term "Confirming Estoppels" shall mean Estoppels that so confirm the applicable matters set forth therein, provided, however, (x) inclusion of qualifications as to knowledge shall not cause the Estoppel to be non-compliant; (y) if the applicable Unit Lease or the Condominium Documents specifies the form or content of an estoppel certificate, then the Estoppel may be in such form or contain only those matters as specified thereby, without giving effect to any requirement regarding "additional information reasonably requested" or words of similar import and (z) an Estoppel shall fail to be a Confirming Estoppel only if they fail to confirm the applicable matters in all material respects and the aggregate adverse economic impact as a result of such failures is equal to or exceeds the Floor (as defined in Section 8.2).

13.8    At or prior to Closing, Seller shall terminate Newmark Knight Frank (the "Existing Manager") the existing property management agreement for the Premises (the "Existing PMA").

13.9    Seller shall oversee the completion, prior to Closing, at Seller's sole cost and expense, of the work (the "Cycle 8 Local Law 11 Work") under the contracts set forth on Schedule G (such contracts, collectively, the "Cycle 8 Local Law 11 Contracts").  Seller shall be obligated to pay all amounts due under the Cycle 8 Local Law 11 Contracts and file (or cause to be filed) a "Safe" report with the NYC Department of Buildings (the "DOB LL 11 Report").  If, at the time of Closing, the Cycle 8 Local Law 11 Work has not been finally completed, the DOB LL 11 Report has not been filed with the NYC Department of Buildings, and/or the NYC Department of Buildings has not issued a Certificate of Compliance with respect to completion of the Cycle 8 Local Law 11 Work, Seller shall assign the Cycle 8 Local Law 11 Contracts, if applicable, to Purchaser at Closing and Purchaser shall assume all obligations thereunder or otherwise oversee and cause completion of the Cycle 8 Local Law 11 Work, provided, however, that Seller shall escrow with Escrow Agent the aggregate sum necessary to address any remaining Cycle 8 Local Law 11 Work, not to exceed Thirty Thousand and NO/100 Dollars ($30,000.00), to which escrow Purchaser shall have access for purposes of requesting disbursements to pay for any remaining costs to complete the Cycle 8 Local Law 11 Work.  Seller makes no representation or warranty regarding the Cycle 8 Local Law 11 Work.   Seller shall not be obligated to perform or pay for any work relating to "Cycle 9" under Local Law 11 and Purchaser assumes all obligations under applicable law (including, without limitation, pursuant to NYC Façade Inspection Safety Program) to perform and pay for any work required to be performed in connection with "Cycle 9".   The provisions of this Section 13.9 shall survive the Closing.

13.10    Seller shall promptly after receipt thereof deliver to Purchaser copies of all written notices from any governmental authority regarding (i) the violation or alleged violation of Relevant Environmental Laws regarding Hazardous Materials affecting the Premises or (ii) any actual or threatened condemnation of the Premises or any portion thereof.

28

13.11   Seller shall promptly notify Purchaser of the filing of any litigation, arbitration, or administrative hearing before any court or governmental agency naming Seller and/or affecting the Premises.

13.12   Other than with respect to the Cycle 8 Local Law 11 Work, Seller shall not make any structural modifications or additions to the Premises, without first obtaining the consent of Purchaser, which consent shall not be unreasonably withheld or delayed by Purchaser, other than with respect to life/safety repairs or in response to an emergency at the Premises.

13.13   At all times from the Effective Date to the Closing Date, Seller will not sell or otherwise transfer title to all or any portion of the Premises, or encumber the Premises with indebtedness secured by the Premises, in each case, without the prior written consent of Purchaser, which may be withheld in Purchaser's sole and absolute discretion.   Notwithstanding the foregoing, Seller shall be permitted to remove the Excluded Personal Property, without the consent of Purchaser.

13.14   Subject to Article 12 hereof, Seller shall not settle or compromise or agree to any settlement or compromise of any insurance or condemnation claim or award without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

13.15   Seller shall not, without the Purchaser's prior written consent in each instance, (i) enter into, renew, or amend the Collective Bargaining Agreement or any collective bargaining agreement with the Union or any labor union or labor organization except for collective bargaining agreements, renewals thereof, or amendments thereto that in any case do not apply specifically and uniquely to the Premises (as distinguished, for example, from city-wide agreements, renewals or amendments), or (ii) except in the ordinary course of business, fill currently open positions (after notice to and approval from the Purchaser which approval will not be unreasonably denied), or increase or decrease the number of Hotel Employees.

Article 14.   Brokerage.

14.1   (a) Purchaser and Seller hereby represent and warrant that they have not hired, retained or dealt with any broker, finder, consultant, person, firm or corporation in connection with the negotiation, execution or delivery of this Agreement or the transactions contemplated hereunder.  Purchaser covenants and agrees that should any claim be made against Seller for any commission or other compensation by any broker, finder, person, firm or corporation, based upon or alleging negotiations, dealings or communications with Purchaser or Purchaser's representative(s) in connection with this transaction or the Premises, Purchaser shall indemnify and hold Seller harmless from and against any and all damages, expenses (including attorneys' fees and disbursements) and liability arising from such claim.

(b)   Seller covenants that should any claim be made against Purchaser for any commission or other compensation by any broker, finder, person, firm or corporation, based upon or alleging negotiations, dealings or communications with Seller or Seller's representative(s) in connection with this transaction or the Premises, Seller shall indemnify and hold Purchaser

29

harmless from any and all damages, expenses (including attorneys' fees and disbursements) and liability arising from such claim.

(c)     The provisions of this <u>Article 14</u> shall survive the Closing or earlier termination of this Agreement.

<u>Article 15.</u>     <u>Remedies.</u>

15.1     If (i) Purchaser defaults in its obligation to pay the Balance on the Closing Date or in the performance of any of its other obligations to be performed on the Closing Date, and Seller is ready, willing and able to Close in accordance with the terms, provisions and conditions of this Agreement, or (ii) Purchaser defaults in any of its other obligations to perform under this Agreement prior to the Closing Date and, with respect to any default under this clause (ii) only, such default shall continue for ten (10) Business Days after written notice of default to Purchaser, Seller's sole and exclusive remedy by reason thereof shall be to terminate this Agreement and, upon such termination, Seller shall be entitled to receive and retain the Deposit, and any interest thereon, as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be difficult or impossible to ascertain, and that the Deposit, and the interest thereon (if any), constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty. Upon such termination, neither party shall thereafter have any further right or obligation hereunder, except for the rights and obligations hereunder that expressly survive the termination of this Agreement.

15.2     If Seller defaults in any of its material obligations under this Agreement and such default is not cured within twenty (20) Business Days of receiving written notice from Purchaser of such alleged default (except with respect to any material obligations that Seller is required to perform on the Closing Date in which case no notice and cure period shall be provided, provided that on such date, Purchaser has satisfied all conditions required to be satisfied by it under this Agreement, is not otherwise in default under this Agreement and is ready, willing and able to perform all of its obligations under this Agreement on the Closing Date and to deliver the Balance due Seller under this Agreement), Purchaser's sole and exclusive remedies shall be: (i) to terminate this Agreement and to receive a refund of the Deposit (together with any interest thereon) as well as reimbursement from Seller to Purchaser for Purchaser's documented, verifiable out-of-pocket costs and expenses and reasonable attorney's fees and costs incurred in connection with this transaction and the due diligence conducted not to exceed Four Hundred Thousand and No/100 Dollars ($400,000) (collectively, and subject to the foregoing limitation on amount, "<u>Purchaser's Reimbursement Costs</u>"), with such reimbursement obligation expressly surviving the termination of this Agreement and which reimbursement shall occur within twenty (20) Business Days after demand by Purchaser therefor, and neither party shall thereafter have any further right or obligation hereunder, except for the rights and obligations hereunder that expressly survive the termination of this Agreement, or (ii) within forty-five (45) days after Seller's failure to perform its obligation to convey the Premises on the Closing Date or failure to otherwise comply with Seller's obligations it is required to perform on the Closing Date (provided that on such date, Purchaser has satisfied all conditions required to be satisfied by it under this Agreement, is not otherwise in default under this Agreement and is ready, willing and able to perform all of its obligations under this Agreement on the Closing Date and to deliver the Balance due Seller under this Agreement), bring an action in equity against Seller for specific performance; it being understood that if Purchaser fails to

30

commence an action for specific performance within such forty-five (45) day period, Purchaser's sole remedy shall be to terminate this Agreement and receive a return of the Deposit and reimbursement of Purchaser's Reimbursement Costs.  Notwithstanding anything to the contrary in this Agreement, in the event that specific performance is not available as a remedy as a result of Seller conveying the Premises to a party other than Purchaser, Purchaser shall have the right to seek monetary damages against Seller to the fullest extent permitted by law.

Article 16.      Employees.

16.1    For purposes of this Agreement, (i) "<u>Hotel Employees</u>" means, collectively, all individuals employed at the Premises by Existing Manager as of the Closing Date, irrespective of whether such individuals are active, on leaves of absence, on layoff or otherwise inactive but still employed at the Premises, and (ii) "<u>Bargaining Unit Employees</u>" shall mean those Hotel Employees employed at the Premises by Existing Manager as of the Closing Date, irrespective of whether such individuals are active, on leaves of absence, on layoff or otherwise inactive but still employed at the Premises, who are represented by the Union and whose employment is subject to the Collective Bargaining Agreement (as hereinafter defined).

16.2    Seller shall cause Existing Manager to deliver to Purchaser at least five (5) Business days prior to Closing (i) a list of all Hotel Employees including position, union status, date of hire, applicable rate of pay (or salary), together with (x) a schedule of those employees that are on any sick leave or leave of absence and those that are on layoff or inactive, and (y) a schedule of accrued and unused vacation, holidays, personal days and sick leave for such employees, and (ii) a list of all layoffs or involuntary terminations (other than terminations for cause or other performance-related reasons) and other losses of employment (other than due to resignations, retirement and other voluntary departures) experienced at the Premises during the ninety (90) day period preceding the Closing.  Seller shall be responsible for accrued compensation and benefits, including without limitation, contributions to any multi-employer benefit plan pursuant to the Collective Bargaining Agreement, vacation pay, holidays, personal days, sick leave or other paid time off and wages and/or salaries (but not including any severance pay pursuant to the Collective Bargaining Agreement or enhanced severance pay under the Alternative Agreement, if applicable) of each Hotel Employee accruing prior to the Closing Date, as required under applicable law or the Collective Bargaining Agreement.  Seller shall cause Existing Manager to make reasonable efforts to provide Purchaser or its manager or operator, information necessary to comply with the successorship obligations under the Collective Bargaining Agreement, including but not limited to I-9 forms (unless otherwise provided by applicable law) and information necessary to provide for uninterrupted employment without loss of seniority, compensation, benefits or fringe benefits and no adverse effect on other terms and conditions of employment.

16.3    From and after the Closing, Purchaser (i) shall be solely responsible for complying or causing compliance with the Collective Bargaining Agreement and the Alternative Agreement, if applicable, all applicable provisions of federal, state and municipal laws and regulations relating to those Hotel Employees remaining in employment at the Hotel upon Closing ("<u>the Rehired Employees</u>"), and any other individuals hired as employees at the Hotel after Closing, including Purchaser's covenants set forth in this Section 16.3, including without limitation compliance with any applicable provisions of the Federal WARN Act, the New York WARN Act or the New York City Hotel Service Workers, Section 4980B of the Internal Revenue Code (COBRA), the Hotel

31

Service Disruption Notification Act ("HSW Act"), and any rules or regulations as have been issued in connection with any of the foregoing and any benefit continuation and/or severance payments pursuant to the Collective Bargaining Agreement and relating to Rehired Employees that may be payable upon any termination of employment of any such Rehired Employees accruing and arising after the Closing, and (ii) hereby agrees to indemnify, defend, protect and hold Seller and its affiliates harmless from and against any and all claims, liabilities, debts, costs, expenses, damages, attorneys' fees and disbursements arising out of any violation of the Collective Bargaining Agreement, and all applicable Labor and Employment Laws, accruing and arising on or after Closing, including but not limited to any violation of the Federal WARN Act, the New York WARN Act, COBRA or the HSW Act and any rules or regulations as have been issued in connection with any of the foregoing in connection with the transaction contemplated by this Agreement, relating to the Hotel Employees or any individuals hired as employees at the Hotel on or after the Closing.  In addition, Purchaser shall be solely responsible for, and shall indemnify and hold Seller harmless from, any claims or payments required to be made to or on behalf of any Bargaining Unit Employees or any former bargaining unit employees of the Hotel, as a result of either this transaction or the Alternative Agreement, including but not limited to any severance pay pursuant to the Collective Bargaining Agreement, Enhanced Severance pursuant to the Alternative Agreement, if applicable, contributions to the Union Employee Benefit Funds under both the Collective Bargaining Agreement and the Alternative Agreement, if applicable.  Seller agrees to indemnify, defend, protect and hold Purchaser and its respective affiliates harmless from and against any and all claims, liabilities, debts, costs, expenses, damages, attorneys' fees and disbursements arising out of any violation of the Collective Bargaining Agreement, and all applicable Labor and Employment Laws, relating to the Hotel Employees, including, but not limited to, Federal WARN Act, the New York WARN Act, COBRA or the HSW Act and any rules or regulations as have been issued in connection with any of the foregoing accruing or arising prior to the Closing and any benefit continuation and/or severance payments pursuant to the Collective Bargaining Agreement relating to Hotel Employees that may be payable upon any termination of employment of any such Hotel Employee accruing or arising prior to the Closing. Notwithstanding anything to the contrary herein, any additional severance due under NYC Local Law Int 2397-2021 (Severance Pay for Hotel Service Employees) ("the NYC Severance") will be the responsibility of Seller.  At Closing, Seller and Purchaser shall establish an escrow with Title Company pursuant to an escrow agreement in substantially the form attached hereto as Exhibit M (the "Labor Severance Escrow Agreement"), whereby Seller shall deposit with Title Company a gross sum equal to the balance of the 30 weeks due under the NYC Severance at $500.00 per week for each employee eligible for the NYC Severance (the "Labor Severance Escrow Account"); said amount shall, in accordance with the Labor Severance Escrow Agreement, be paid by Purchaser or its manager or operator from the Labor Severance Escrow Account to each eligible employee, subject to the terms of the Labor Severance Escrow Agreement.  In the event Purchaser enters into the Alternative Agreement (as hereinafter defined) which requires Purchaser to pay enhanced severance and contributions to the Union Employee Benefit Funds in excess of the amounts accrued up to Closing, Purchaser shall indemnify and hold Seller harmless for said amounts.

16.4    During the period prior to Closing, the parties agree to reasonably cooperate and also to consult on a regular basis and coordinate their activities relating to employee matters so as to facilitate a smooth transition of Premises operations and the continued proper performance by the Hotel Employees of their respective duties up to Closing.  Seller shall promptly deliver to Purchaser copies of any written materials delivered or received relating to Union representation of

32

ACTIVE 61730742v13

Bargaining Unit Employees including but not limited to any grievances filed against the Hotel and Seller shall keep Purchaser substantially informed with respect to the status of any discussions with the Union with respect to the Hotel.

16.5    Without limiting any other provision of this Article 16, (i) Seller has informed Purchaser that Seller is a party to and is bound by the terms of that certain Industry Wide Agreement between Hotel Association of New York, Inc. and New York Hotel and Motel Trades Council, AFL-CIO ("Union") which is in effect from July 1, 2012 through June 30, 2026 ("IWA"), including any related written memorandum of understanding and other related agreements, as provided by their terms (collectively, the "Collective Bargaining Agreement"), (ii) a copy of the Collective Bargaining Agreement has previously been delivered or made available to Purchaser for its review, and (iii) Purchaser or Purchaser's property manager, operator or agent shall offer to retain all Bargaining Unit Employees and, if they accept such offers, their employment will continue uninterrupted without loss of seniority, compensation, benefits or fringe benefits and with no adverse effect on other terms and conditions of employment subject to the Collective Bargaining Agreement and applicable law, and (iv) Purchaser will, and shall cause its property manager, operator or agent to, recognize the Union and assume, adopt and be bound by all of the terms, both economic and non-economic, of the Collective Bargaining Agreement from and after the Closing Date.  Purchaser further agrees to execute, and shall cause its property manager, operator or agent to execute, at least ten (10) days prior to Closing an assumption agreement acceptable to the Union, which shall be substantially in the form of the IWA Assumption Agreement attached hereto as Exhibit I-1 and made a part hereof to effectuate an assumption of the Collective Bargaining Agreement in its name (without modification or amendment) as of the Closing.    Notwithstanding the foregoing obligation to assume the Collective Bargaining Agreement and execute Exhibit I-1, Purchaser will be relieved of said obligation if Purchaser and the Union execute, and deliver to Seller, at least ten (10) days prior to Closing, the agreement attached hereto as Exhibit I-2 ("Alternative Agreement").  The parties acknowledge the enactment of the Displaced Hotel Service Workers and Hotel Service Disruption Notifications Act, section 22-510 of the Administrative Code of New York (the "DHSWNA") and the Displaced Building Service Workers Protection Act, §22-505 of the Administrative Code of the City of New York ("BSWPA").  By this Agreement, including, without limitation, Purchaser's assumption of the Collective Bargaining Agreement, or providing a fully executed copy of the Alternative Agreement, the parties agree that the DHSWNA and the BSWPA do not apply to the transaction contemplated by this Agreement under §22-510(d)(1) and §22-505(f)(1) of the New York City Administrative Code.

16.6    Under the Collective Bargaining Agreement, Seller's Existing Manager currently contributes, on a monthly basis, various amounts under the (i) New York Hotel Trades Council and Hotel Association of New York City, Inc., Health Benefits Fund, (ii) New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund, (iii) New York Hotel Trades Council and Hotel Association of New York City, Inc. Prepaid Legal Services Fund, and (iv) New York Hotel Trades Council and Hotel Association of New York City, Inc., Industry Training and Scholarship Fund (collectively, the "Union Employee Benefit Funds"). At Closing, regular contributions paid or payable with respect to the Union Employee Benefit Funds shall be prorated, with the appropriate party receiving a credit or debit to the Purchase Price, on a pro rata basis based on the Closing Date.  In addition, at Closing Purchaser agrees to assume Seller's responsibility to

33

ACTIVE 61730742v13

pay any and all vacation and sick pay for the Bargaining Unit Employees, when payable, for which amounts Purchaser shall receive a credit at Closing.

16.7    Retirement Plan.

(a)    The parties intend to comply with section 4204(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and to take any other action required or desirable, so that no withdrawal liability is imposed upon Seller as a result of the consummation of this transaction.

(b)    To that end, at Closing Purchaser shall (or shall cause its property manager, operator or agent to) assume an obligation to make contributions to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund (hereafter, the "Retirement Plan") in accordance with the Collective Bargaining Agreement, for substantially the same number of contribution base units, within the meaning of Section 4001(a)(11) of ERISA, for which Seller or Existing Manager had an obligation to contribute with respect to the Premises prior to the Closing.

(c)    Purchaser agrees to reasonably cooperate with Seller and/or Retirement Plan representatives with respect to any inquiry or reasonable request for information and assistance in order to facilitate the transfer of the contribution obligation with respect to the Retirement Plan from Seller (or the Existing Manager of the Premises) to Purchaser (or the Existing Manager of the Premises).  The parties agree that they will notify the Retirement Plan of their intention that this transaction comply with Section 4204 of ERISA.

(d)    Subject to Section 16.7(g), during the period commencing on the first day of the plan year following the Closing Date and ending on the expiration of the fifth (5th) such plan year (the "Contribution Period"), Purchaser shall provide to the Retirement Plan either a bond, letter of credit, or an escrow in an amount and manner meeting the requirements of Section 4204 of ERISA.  The cost of any bond, letter of credit, or escrow provided under this Section 16.8 (d) shall be paid by Purchaser.

(e)    To the extent required by Section 4204(a)(3) of ERISA, Seller or Existing Manager shall provide to the Retirement Plan a bond or escrow equal to the present value of the withdrawal liability Seller would have had to the Retirement Plan with respect to the assets acquired by Purchaser pursuant to this Agreement (but for the provisions of Section 4204 of ERISA), reduced to the extent provided under Section 4204(a)(3) of ERISA in the event only a portion of Seller' assets are distributed during the Contribution Period.

(f)    If Purchaser at any time withdraws from the Retirement Plan in a complete or partial withdrawal with respect to the assets acquired by Purchaser pursuant to this Agreement during the Contribution Period, Seller shall be secondarily liable for any withdrawal liability Seller would have had to the Retirement Plan with respect to the Premises (but for the provisions of Section 4204 of ERISA) if any withdrawal liability of Purchaser with respect to such Retirement Plan is not paid.  Purchaser agrees to provide Seller with a copy of any notice and demand for

34

ACTIVE 61730742v13

payment of withdrawal liability that Purchaser receives from the Retirement Plan with respect to the Premises.

(g)   Notwithstanding anything contained in Section 16.7(d) to the contrary, Purchaser shall not be obligated to provide any bond, letter of credit, or escrow in the event and to the extent Purchaser obtains from the Retirement Plan or the Pension Benefit Guaranty Corporation a variance or exemption under Section 4204(c) of ERISA and the applicable regulations thereunder.

(h)   In the event that, notwithstanding the terms of this Section 16.7, the Retirement Plan assesses withdrawal liability based on this transaction or any event subsequent to the Closing against Seller, Existing Manager and/or any Seller Related Parties, including the assertion of secondary liability pursuant to section (f) above, Purchaser shall indemnify Seller, Existing Manager and any other Seller Related Parties from and against such withdrawal liability.

16.8   Purchaser agrees to indemnify, defend and hold harmless Seller, Existing Manager and any other Seller Related Parties from and against any claim, liability, judgment or arbitration award asserted against any of the Seller Related Parties on account of or with respect to any of the following: (i) any causes of action, damages, complaints, judgments, orders and/or claims, whatsoever, and all costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred in connection therewith, which accrue and arise (or, in the case of omissions, failed to occur) on or after the Closing and may be asserted against any of the Seller Related Parties on account of any violation of the Collective Bargaining Agreement and/or Labor and Employment Laws occurring (or, in the case of omissions, failed to occur) on or after the Closing by Purchaser, or any designee or management company engaged by Purchaser to employ Premises personnel, except to the extent such are based solely on the acts of any Seller Related Parties, and (ii) any claims or liabilities arising (A) under ERISA, as amended and/or any other applicable federal or state law or regulation concerning employee benefit plans with respect to the employment of employees by Purchaser or such designee or management company on or after the Closing, or (B) from or under any employee benefit plan applicable to any Rehired Employee or any other employee hired by Purchaser or such designee or management company to perform services at or for the Premises, to the extent that any such claim or liability accrued or arose during any period of employment on or after the Closing.

16.9   Seller agrees to indemnify, defend and hold harmless Purchaser and its affiliates, or any designee or management company engaged by Purchaser to employ Premises personnel, and their respective officers, directors, members, managers, partners, agents, employees, successors and assigns (herein, the "Purchaser Related Parties") from and against any claim, liability, judgment or arbitration award asserted against any of the Purchaser Related Parties on account of or with respect to any of the following: (i) any causes of action, damages, complaints, judgments, orders and/or claims, whatsoever, and all costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred in connection therewith, which may be asserted against any of the Purchaser Related Parties on account of any violation of the Collective Bargaining Agreement and/or Labor and Employment Laws occurring (or, in the case of omissions, failed to occur) prior to the Closing by Seller or Existing Manager, except to the extent such are based solely on the acts of any Purchaser Related Parties, or for which a closing adjustment credit has been issued hereunder, and (ii) any claims or liabilities arising (A) under

35

ERISA, as amended, and/or any other applicable federal or state law or regulation concerning employee benefit plans with respect to the employment of employees by Seller or Existing Manager up to the Closing, or (B) from or under any employee benefit plan applicable to any Rehired Employee or any other employee hired by Purchaser or such designee or management company to perform services at or for the Premises, to the extent that any such claim or liability accrued or arose during any period of employment prior to the Closing.

16.10   For purposes of this Agreement, the term "Labor and Employment Laws" shall mean all federal, state or local labor and employment statutes, rules, and regulations, including, without limitation, National Labor Relations Act, 29 U.S.C. §§151, et seq., the Families First Coronavirus Response Act, the Fair Labor Standards Act, 29 U.S.C. §§201, et seq., the New York State Labor Law §§650, et seq. and applicable regulations, 12 NYCRR 142-2.2, et seq., the Code, ERISA, Multi-Employer Pension Plan Amendments Act of 1980, Section 1981 through 1988 of Title 42 of the United States Code, Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866, 1871, and 1991, 42 U.S.C. §§2000(e), et seq., the Equal Pay Act, the Americans With Disabilities Act of 1990, 42 U.S.C. §§12101, et seq., the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601, et seq., Genetic Information Nondiscrimination Act of 2008, the Rehabilitation Act, the Immigration Reform Control Act,  Uniformed Services Employment and Reemployment Rights Act, New York State Executive Law §§290, et seq., the New York City Human Rights Code, Administrative Code of the City of New York, §8-101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §§701, et seq., the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§1161, et seq., the Occupational Safety and Health Act, 29 U.S.C. §§651, et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621, et seq., the Older Workers' Benefit Protection Act, the Fair Credit Reporting Act, the Sarbanes-Oxley Act, the New York State Human Rights Law, the New York Executive Law, the New York Civil Rights Law, the New York Equal Pay Law, the New York Legal Activities Law, the New York State Wage and Hour and Wage Payment Laws, the New York Minimum Wage Law, the New York Whistleblower Law,  the New York Worker Health and Safety Act, the Retaliation/Discrimination Provisions of the New York Workers' Compensation Law and the New York State Disabilities Benefits Law,  the New York State Paid Family Leave Benefits Law,  the federal and New York State Worker Adjustment and Retraining Notification Acts (collectively, the "WARN Acts"), the Coronavirus Aid, Relief, and Economic Security Act, the American Rescue Plan of 2021, the DBSWPA, N.Y. Real Property Tax Law § 421-a, New York State Sick Leave Law, New York City Earned Safe and Sick Time Act, the New York Quarantine Leave Law, New York City Fair Chance Act, the New York City Administrative Code and Charter or any other federal, state or local human rights, civil rights, wage-and-hour, wage-payment, pension, labor or employment-related laws, or their respective implementing laws, rules and/or regulation(s) with respect to the Premises and all other statutes, laws, regulations, ordinance or rules regulating the terms and conditions of employment (as amended from time to time, and together with any similar laws now or hereafter enacted), under the common law or in equity (including any claims for wrongful discharge or otherwise), each as amended, or under any policy, agreement, understanding or promise, written or oral, formal or informal.

16.11   Seller and Purchaser (on their own behalf and/or through their respective property managers) agree to cooperate reasonably with each other to the extent legally permissible in the defense of any claims, grievances, lawsuits or other charges brought by or on behalf of any Hotel Employees or former Hotel Employees.  Such cooperation shall include providing: (i) workers'

36

compensation claims processing; (ii) access to and copying of personnel records and other documents that either party has in its possession which related to any such claims, lawsuits or charges to the extent legally permissible regardless of whether such materials are proprietary material (provided that, upon the request of the other party, such accessing party shall execute a customary form of non-disclosure agreement with respect to such access); and (iii) availability of employees of the aforementioned entities for such matters as interviews, depositions and to testify. No party shall have the duty to cooperate with the others if the dispute is between the parties themselves.

16.12   Purchaser's and Seller's obligations under this <u>Article 16</u> shall survive Closing

<u>Article 17.</u>   <u>Notices.</u>

17.1   Any notice or other communication given by either party hereto to the other relating to this Agreement (a "<u>notice</u>") shall be in writing and sent to the party to which the notice is being made by nationally recognized overnight courier or delivered by hand with receipt acknowledged (provided that in either case a copy of such notice is also delivered on the same day (or earlier) by electronic mail) in writing as follows:

If to Seller, to:

EC 58th Street LLC
c/o Cain International US Services LP
350 Park Avenue, 14th Floor
New York, New York 10022
Attention:  Cain Legal
Email: legal@cainint.com

with a copy to Seller's attorney:

Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, New York 10017
Attention:  Farah S. Ahmed, Esq.
Email: ahmedf@gtlaw.com

If to Purchaser, to:

CSC Hudson, LLC
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013
Attention: Sal Smeke and Alberto Smeke
Email: ss@csc-coliving.com
          as@csc-coliving.com

37

*ACTIVE 61730742v13*

with a copy to Purchaser's attorney:

> Cole Schotz P.C.
> 1325 Avenue of the Americas, 19th Floor
> New York, New York 10019
> Attn: Jordan J. Metzger, Esq.
> E-mail: jmetzger@coleschotz.com

If to Escrow Agent:

> First American Title Insurance Company
> 666 Third Avenue, 5th Floor
> New York, New York 10017
> Attention:  Patricia A. LaPorta, Esq.
> Email: plaporta@firstam.com

17.2    Notices or other communications (including agreements) signed by the attorneys for the respective parties shall be deemed binding upon the parties.  Either party may by notice to the other change the person or address for receipt of notices.  Notices sent by hand delivery or recognized overnight courier service shall be effective when received or rejected by the recipient or the recipient's office or firm.

Article 18.    Intentionally omitted.

Article 19.    Assignment.

19.1    Neither this Agreement nor any of the rights of Purchaser hereunder may be assigned or transferred by Purchaser without Seller's prior written consent, which consent may be granted or withheld in Seller's sole and absolute discretion, and any purported assignment or encumbrance without Seller's prior written consent shall be null and void, and shall constitute a default hereunder, which default is not capable of being cured.  Notwithstanding the foregoing, Purchaser shall have the right to assign its rights under this Agreement to one or more Permitted Designees of Purchaser without the consent of Seller so long as Purchaser delivers to Seller a fully executed and effective assignment and assumption agreement conveying to such designee(s) all of Purchaser's right, title and interest in, to and under this Agreement and the Deposit at least fifteen (15) days prior to Closing.  No such assignment to a Permitted Designee shall relieve Purchaser of its obligations under this Agreement.  For the avoidance of doubt: (a) Purchaser shall have the right, without Seller's prior written consent, to designate separate Permitted Designees to take fee simple title and leasehold title, as applicable, to each Unit at Closing; and (b) Seller acknowledges and agrees that at Closing, Purchaser intends to take leasehold title to the Leased Units in the names of two (2) separate and distinct Permitted Designees and, further, that Purchaser intends to take fee title to the Owned Units in one (1) or two (2) additional Permitted Designees, separate and distinct from the Permitted Designees taking leasehold title to the Leased Units.  A "Permitted

*ACTIVE 61730742v13*

Designee" shall mean: (i) any other entity that is directly or indirectly (through one or more intermediaries) controlled by Sal Smeke and/or Alberto Smeke, or (ii) any other entity in which Sal Smeke and/or Alberto Smeke has a direct or indirect equity interest in the controlling entity (e.g. the managing member of an entity) of such entity. For purposes of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies or the power to veto major policy decisions whether through the ownership of voting securities, by contract or otherwise.

Article 20.    Escrow.

20.1    Escrow Agent shall hold the Deposit, together with all interest earned thereon, in its interest-bearing escrow account, in accordance with the following:

(a)    Escrow Agent shall hold the Deposit, together with all interest earned thereon, in Escrow Agent's escrow account at a national bank selected by Escrow Agent in its reasonable discretion.  All interest will accrue to and be reported to applicable taxing authorities, including the Internal Revenue Service, for the account of Seller.  Such party shall supply the Escrow Agent with a completed Form W-9, concurrently with the execution of this Agreement. Escrow Agent shall have no liability for any fluctuations in the interest rate paid on the Deposit, and is not a guarantor thereof.  Failure of the parties to provide the W-9 will result in the Deposit being placed in a non-interest bearing account.

(b)    At Closing, the Deposit, together with any interest accrued thereon, shall be credited to the Purchase Price and shall be paid by Escrow Agent to Seller.  At Closing, interest on the Deposit shall be paid to Seller as payment towards the Balance of the Purchase Price.  If Escrow Agent receives a written notice signed by both Seller and Purchaser that this Agreement has been terminated or canceled, Escrow Agent shall deliver the Deposit, together with the interest thereon, as directed therein.

(c)    If Escrow Agent receives a written request signed by Purchaser or Seller (the "Noticing Party") stating that this Agreement has been canceled or terminated and that the Noticing Party is entitled to the Deposit, or that the other party hereto (the "Non-Noticing Party") has defaulted in the performance of its obligations hereunder, Escrow Agent shall overnight by nationally recognized courier and e-mail a copy of such request to the Non-Noticing Party.  The Non-Noticing Party shall have the right to object to such request for the Deposit by written notice of objection delivered to and received by Escrow Agent within ten (10) Business Days after the Non-Noticing Party's receipt of such copy, but not thereafter.  If Escrow Agent shall not have so received a timely written notice of objection from the Non-Noticing Party, Escrow Agent shall deliver the Deposit, together with the interest earned thereon, to the Noticing Party.  If Escrow Agent shall have received a written notice of objection within the time herein prescribed, Escrow Agent shall refuse to comply with any requests or demands from either party and shall continue to hold the Deposit, together with any interest earned thereon, until Escrow Agent receives either (a) a written notice signed by both Seller and Purchaser stating who is entitled to the Deposit (and interest) or (b) a final order of a court of competent jurisdiction directing disbursement of the Deposit (and interest) in a specific manner, in either of which events Escrow Agent shall then disburse the Deposit, together with the interest earned thereon, in accordance with such notice or order.  Escrow Agent shall not be or become liable in any way or to any person for its refusal to

39

comply with any such requests or demands until and unless it has received a direction of the nature described in subdivision (a) or (b) above.

20.2    Any notice to Escrow Agent shall be sufficient only if received by Escrow Agent within the applicable time period set forth herein.  All mailings and notices from Escrow Agent to Seller and/or Purchaser, or from Seller and/or Purchaser to Escrow Agent, provided for in this Article 20 shall be addressed to the party to receive such notice at its notice address set forth in Article 17 above (with copies to be similarly sent to the additional persons therein indicated), but the provisions of Article 17 relating to the manner of giving notices and the effective dates thereof shall have no application to the provisions of this Article 20.

20.3    Notwithstanding the foregoing, if Escrow Agent shall have received a written notice of objection as provided for in Section 20.1(c) above within the time therein prescribed, or shall have received at any time before actual disbursement of the Deposit a written notice signed by either Seller or Purchaser disputing entitlement to the Deposit or shall otherwise believe in good faith at any time that a disagreement or dispute has arisen between the parties hereto over entitlement to the Deposit (whether or not litigation has been instituted), Escrow Agent shall have the right, upon written notice to both Seller and Purchaser, (a) to deposit the Deposit, together with the interest earned thereon with the Clerk of the Court in which any litigation is pending and/or (b) to take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, the depositing of the Deposit, together with the interest earned thereon, with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder, except for any previous gross negligence or willful misconduct.

20.4    Escrow Agent is acting hereunder without charge as an accommodation to Purchaser and Seller, it being understood and agreed that Escrow Agent shall not be liable for any error in judgment or any act done or omitted by it in good faith or pursuant to court order, or for any mistake of fact or law.  Escrow Agent shall not incur any liability in acting upon any document or instrument believed thereby to be genuine.  Escrow Agent is hereby released and exculpated from all liability hereunder, except only for willful misconduct or gross negligence.  Escrow Agent may assume that any person purporting to give it any notice on behalf of any party has been authorized to do so.  Escrow Agent shall not be liable for, and Purchaser and Seller hereby jointly and severally agree to indemnify Escrow Agent against, any loss, liability or expense, including reasonable attorney's fees, arising out of any dispute under this Agreement, including the cost and expense of defending itself against any claim arising hereunder.

20.5    Seller and Purchaser agree that Escrow Agent shall not be liable for any loss or impairment of the Deposit while the Deposit is in the course of collection or of the escrow if such loss or impairment results from the failure, insolvency or suspension of the financial institution in which the Deposit is deposited.

20.6    Escrow Agent shall be entitled to select any and all counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Agreement.

ACTIVE 61730742v13

20.7    If either Purchaser or Seller becomes subject to a voluntary or involuntary proceeding under the United States Bankruptcy Code, or if Escrow Agent is otherwise served with legal process which directs Escrow Agent to not disburse the funds deposited with Escrow Agent, Escrow Agent shall have the right to place a hold on funds deposited with Escrow Agent until such time as Escrow Agent receives an appropriate court order or other assurances satisfactory to Escrow Agent (in Escrow Agent's reasonable discretion) establishing that the funds may continue to be held or disbursed, as the case may be, according to the instructions contained in this Agreement.

Article 21.    Intentionally omitted.

Article 22.    Miscellaneous.

22.1    Seller and Purchaser each reserve the right to include this transaction as part of one (1) or more Code Section 1031 tax deferred exchange transactions, at no out-of-pocket cost, expense or liability to the other party hereto (other than de minimis legal fees to review the documentation required to effectuate such transactions), including, without limitation, one (1) or more reverse exchange transactions.  Seller and Purchaser agree to cooperate with the other party hereto, and to execute any and all documents as are reasonably necessary in connection therewith, provided that the closing of the transaction for the conveyance of the Premises shall not be contingent upon, and shall not be subject to, the completion of such exchange, nor shall such affect the Closing Date hereunder.  Purchaser and/or Seller, as applicable, shall be obligated to close title to the Premises on or before the Closing Date whether or not Purchaser and/or Seller, as applicable, shall have consummated a 1031 exchange transaction.  Nothing set forth herein shall require Purchaser to take title to any property other than the Premises described herein.

22.2    All understandings and agreements heretofore had between Seller and Purchaser are merged in this Agreement, which alone completely expresses their agreement, and this Agreement is entered into after full investigation, neither party relying upon any statement or representation made by the other and not embodied in this Agreement.

22.3    Purchaser's acceptance of the Deeds and the Assignment and Assumption of Leases to the Units shall be deemed an acknowledgment by Purchaser that Seller has fully complied with all of its obligations hereunder and under any supplements, side letters, modifications, or amendments to this Agreement; that Seller is discharged therefrom (or Purchaser has waived compliance therewith); and that Seller shall have no further obligation or liability with respect to any of the agreements, representations and/or warranties made by Seller in this Agreement, which shall be merged with the Deeds and the Assignment and Assumption of Leases to the Units; except for those provisions of this Agreement and of any supplements, side letters, modifications, or amendments to this Agreement, which, in any case, expressly provide that certain obligations of Seller shall survive the Closing and except as otherwise set forth in the Closing Documents.

22.4    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.

41

22.5    This Agreement does not constitute an offer to sell and shall not bind Seller unless and until Seller elects to be bound hereby by duly executing and delivering to Purchaser an executed original counterpart hereof.

22.6    This Agreement may only be amended, modified, altered, supplemented or, except as otherwise expressly provided herein, terminated, by a written instrument signed by Seller and Purchaser.

22.7    If any provision of this Agreement or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to parties or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and be enforced to the fullest extent permitted by law.

22.8    This Agreement, and the rights, obligations and relations of the parties hereunder, shall be governed by and construed and enforced in accordance with the laws of the State of New York without giving effect to the conflict-of-law rules and principles of that state.

22.9    Purchaser shall not be permitted to record this Agreement and all recordation offices are specifically instructed not to record the same.  Any recordation or attempted recordation shall constitute an immediate default hereunder and shall entitle Seller to terminate this Agreement and retain the Deposit.  Supplementing the other liabilities and indemnities of Purchaser to Seller under this Agreement, and notwithstanding any other provision of this Agreement (including any provision purporting to create a sole and exclusive remedy for the benefit of Seller), Purchaser agrees to indemnify, defend and hold Seller harmless from and against any and all actual losses, costs, actual damages, liens, claims, counterclaims, liabilities or expenses (including, but not limited to, reasonable attorneys' fees, court costs and disbursements) incurred by Seller arising from or by reason of the recording of this Agreement, any memorandum hereof, or any notice of pendency or any other instrument against the Premises in any case, by Purchaser.  Notwithstanding the foregoing, Purchaser may file a lis pendens or other instrument against all or a portion of the Premises in connection with Purchaser's filing of an action for specific performance in accordance with Section 15.2.

22.10   Purchaser and Seller acknowledge and agree that the sale of the Premises contemplated hereunder shall be made in accordance with the terms and conditions of the Condominium Documents.

22.11   Whenever the time for performance of a covenant or condition required to be performed pursuant to the terms of this Agreement falls upon a Saturday, Sunday or Federal or State of New York holiday, such time for performance shall be extended to the next Business Day.  Otherwise, all references herein to "days" shall mean calendar days.  Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included.

22.12   A facsimile, "pdf" and/or electronic copy of a signed original counterpart of this Agreement shall be deemed sufficient to bind the parties, and shall be deemed an original for all

42

purposes. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when combined, shall constitute one (1) fully executed original document.

22.13   THE PARTIES HERETO WAIVE TRIAL BY JURY IN CONNECTION WITH ANY AND ALL MATTERS ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREUNDER.

22.14   IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER, THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN NEW YORK COUNTY AND AGREE NOT TO RAISE ANY OBJECTION TO SUCH JURISDICTION OR TO THE LAYING OR MAINTAINING OF THE VENUE OF ANY SUCH PROCEEDING IN SUCH COURT.

22.15   The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

22.16   Purchaser agrees that, except as otherwise set forth in this Agreement or provided by law, or unless compelled by an order of a court of competent jurisdiction, it shall keep the contents of this Agreement, Seller's Due Diligence Materials, and any information related to the transactions contemplated hereunder, confidential, unless and until the Closing Date shall occur. Seller and Purchaser further agree to refrain from participating in any publicity statement, press release or other public notice regarding this transaction prior to the Closing Date, without the prior written consent of the other party hereto, unless required under applicable law or by a court order. Following the Closing Date, neither party shall disclose the name or identity of the other party or the material terms of the transaction contemplated hereby in any publicity statement, press release or other public notice, without the prior written consent of the other party hereto, unless required under applicable law or by a court order. Notwithstanding the foregoing, the parties hereto shall be permitted to disclose the terms and conditions of this Agreement to their and their affiliates' respective attorneys, employees, agents, representatives, accountants, lenders and prospective lenders, partners and prospective partners, joint venture partners, consultants, financial analysts, bankers, auditors and other similar persons who reasonably require such information, all of whom shall be advised, in writing, of the confidential nature of this Agreement, as well as in connection with the enforcement of this Agreement. The provisions of this Section 22.16 shall survive Closing or termination of this Agreement.

22.17   If a suit, action, arbitration, mediation or other action is instituted to interpret or enforce this Agreement, or otherwise concerning this Agreement or the transactions contemplated hereby, the prevailing party (regardless of whether such party prevails on substantive or procedural grounds) pursuant to a final and non-appealable order or judgment shall be entitled to recover from the other party all actual and reasonable costs and expenses of any such action, including, but not limited to, attorneys' fees and expenses, including all such costs and expenses incurred in any trial, on any appeal, in any bankruptcy proceeding (including the adjudication of issues peculiar to bankruptcy law) and in any petition for review. Each party also shall have the right to recover its

43

costs and attorneys' fees incurred in collecting any sum or debt owed to it by the other party, with or without litigation, if such sum or debt is not paid within fifteen (15) days after written demand following the issuance of the final and non-appealable order or judgment in favor of the prevailing party.  The provisions of this Section 22.17 shall survive Closing or termination of this Agreement.

22.18    Seller and Purchaser will do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices, transfers and assurances as may be reasonably required by the other party for carrying out the intentions or facilitating the consummation of this Agreement.  The provisions of this Section 22.18 shall survive the Closing.

22.19    Notwithstanding anything to the contrary herein, Purchaser on its own behalf and on behalf of Purchaser Related Parties, hereby agrees that in no event or circumstance shall any of the Seller Related Parties have any personal liability under this Agreement.  Seller on its own behalf and on behalf of the Seller Related Parties hereby agrees that in no event shall any of the Purchaser Related Parties have any personal liability under this Agreement.  The provisions of this Section 22.19 shall survive the termination of this Agreement and the Closing.

*[NO FURTHER TEXT ON THIS PAGE.  SIGNATURE PAGE FOLLOWS.]*

*ACTIVE 61730742v13*

**IN WITNESS WHEREOF**, Seller and Purchaser have each duly executed this Agreement as of the date first above written.

PURCHASER:

**CSC HUDSON, LLC,**
a Delaware limited liability company

By: _____
Name:   Sal Smeke
Title: Authorized Signatory

[Signatures Continue on Following Page]

[Signature Page to Purchase and Sale Agreement]

SELLER:

**EC 58TH STREET LLC**,
a Delaware limited liability company

By: _____
Name:  Anthony D. Minella
Title:   President

[Signatures Continue on Following Page]

[Signature Page to Purchase and Sale Agreement]

The undersigned has executed this Agreement
solely to confirm its acceptance of the duties of
Escrow Agent as set forth in <u>Article 20</u> hereof:

<u>ESCROW AGENT</u>:

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
      Name: PATRICIA A. LAPORTA
      Title: VP, MS CANCER

[Signature Page to Purchase and Sale Agreement]

## EXHIBIT A

## LEGAL DESCRIPTION OF THE UNITS

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Units Nos. 1, 2 ,4 and 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lots 1701, 1702, 1704 and 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701), **46.94011 %** interest (as to Unit 2, Lot 1702), **0.34577 %** interest (as to Unit 4, Lot 1704) and **3.89067 %** interest (as to Unit 6, Lot 1706) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

As to Unit 1704, the premises hereby insured is the leasehold interest originally demised by that certain Lease dated as of 1/1/1999 made by and between Adrienne Schatz (a/k/a Adrianne Wachsler) and Cheryl Hirsch, as landlord and Henry Hudson Holdings LLC, as tenant, a Memorandum of which was dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2172 (as subsequently amended and assigned).

As to Unit 1706, the premises hereby insured is the leasehold interest originally demised by that Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant, (as subsequently amended and assigned).

**EXHIBIT A**

**ALL THAT CERTAIN** plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of West 57th Street;

RUNNING THENCE easterly along the said northerly side of West 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of West 58th Street;

THENCE westerly along the said southerly side of West 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of West 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel, more or less, with West 58th Street, 20 feet;

THENCE southerly and part of the way through a party wall, 100 feet to the northerly side of West 57th Street, the point or place of BEGINNING.

For Information Only:   Said premises are known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 358-366 West 58th Street, Units 1, 2, 4 and 6, New York, NY and designated as Block 1048 Lots 1701, 1702, 1704 and 1706  as shown on the Tax Map of the City of New York, County of New York

## EXHIBIT B

## FORM OF CONDOMINIUM UNIT DEED

Attached

<u>**FORM OF CONDOMINIUM UNIT DEED**</u>

**EC 58TH STREET LLC, GRANTOR**

**TO**

**[_____], GRANTEE**

**CONDOMINIUM UNIT[S] DEED[1]**

353-361 West 57th Street a/k/a 356 West 58th Street
Unit[s] 1 [and 2]
New York, New York 10019

|  |  |
|---|---|
| **County:** | **New York** |
| **Block:** | **1048** |
| **Lots:** | **1701 [and 1702]** |

**Record and Return To:**

**Cole Schotz P.C.**
**1325 Avenue of the Americas**
**19th Floor**
**New York, NY 10019**
**Attn: Jordan Metzger**

---

[1] Purchaser reserves the right to bifurcate this Deed into separate deeds for each Unit, potentially with different Purchaser entities taking title to each Unit.

61458/0006-42437678v1
*ACTIVE 62692978v3*

## CONDOMINIUM UNIT[S] DEED

**THIS INDENTURE**, made as of the ___ day of _____, 2022, by EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022, (hereinafter referred to as the "**Grantor**") to [_____], a Delaware limited liability company having an address at c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 (hereinafter referred to as the "**Grantee**").

W I T N E S S E T H :

That the Grantor, in consideration of Ten ($10.00) Dollars and other valuable consideration, paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs or successors and assigns of the Grantee, forever:

The Condominium Unit[s] (the "**Unit[s]**") in the premises known as 353 West 57th Street Condominium in the Building (the "**Building**") located and known as and by street address 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, (the "**Property**"), designated and described as Unit No. 1 [and Unit No. 2] in that certain declaration of condominium (the "**Declaration**") establishing a plan for condominium ownership of the Building and the land upon which it is situate (the "**Land**") under Article 9-B of the Real Property Law of the State of New York, dated April 11, 1985 and recorded on April 24, 1985 in Reel 902 Page 1, which Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page  2286 and was further amended by the Amended and Restated Declaration, dated as of February 12, 1999 and recorded July 16, 1999 in Reel 2913 Page 1753 and further amended by Amendment to Amended and Restated Declaration dated as of September 30, 1999 and recorded October 27, 1999 in Reel 2979 Page 2159 (which Declaration as amended is hereinafter referred to as the "**Declaration**"). The Unit[s] [is/are] also designated as Tax Lot[s] 1701 [and 1702] in Block 1048 Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of The City of New York and on the Floor Plans of the  Building, certified by Butler Rogers Baskett Architects on March 27, 1985  and also filed with the Real Property Assessment Department of the City of New York on April 22, 1985 as Condominium Plan No. 208, and also filed in the New York County Register's Office on April 24, 1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects on December 14, 1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on May 5, 1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on May 11, 1993 as Condominium Map No. 5192.

The Unit[s] together with their undivided percentage interests in common elements and the premises within which the Unit[s] [is/are] located [is/are] more particularly described in Exhibit A attached hereto and made a part hereof.  All capitalized terms herein which are not separately defined herein shall have the meanings given to those terms in the Declaration or in the by-laws of 353 West 57th Street Condominium (said by-laws, as the same may be amended from time to time, are hereinafter referred to as the "**By-Laws**").

61458/0006-42437678v1
*ACTIVE 62692978v3*

Being the same premises conveyed to Grantor from Henry Hudson Holdings, LLC by Deed in Lieu of Foreclosure dated 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344628.

Together with the appurtenances and all the estate and rights of the Grantor in and to the Unit[s]; and

Together with, and subject to, the rights, obligations, easements, restrictions and other provisions set forth in the Declaration and the By-Laws, all of which shall constitute covenants running with the Land shall bind any person having at any time any interest or estate in the Unit[s], as though recited and stipulated at length herein.

Subject to such other liens, agreements, covenants, easements, restrictions and other matters of record as pertain to the Unit[s] and/or the Property.

**TO HAVE AND TO HOLD** the premises herein granted unto Grantee, the heirs or successors and assigns of the Grantee, forever.

If any provisions of the Declaration or the By-Laws is invalid under, or would cause the Declaration or the By-Laws to be insufficient to submit the Property to the provisions of the New York Condominium Act, or if any provision· that is necessary to cause the Declaration and the By-Laws to be sufficient to submit the Property to the provisions of the New York Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are insufficient to submit the Property to the provisions of the New York Condominium Act, the applicable provisions of Article 26 of the Declaration shall control.

Except as otherwise provided in the Declaration or the By-Laws, the Unit[s] are intended for any lawful use.

The Grantor, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purposes of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws (and any Rules and Regulations adopted under the By-Laws) and agrees to comply with all the terms and provisions thereof.

The term "Grantee" shall be read as "Grantees" whenever the sense ofthis indenture so require.

**[SIGNATURES PAGE FOLLOWS]**

3

61458/0006-42437678v1
*ACTIVE 62692978v3*

**IN WITNESS WHEREOF**, the Grantor has duly executed this deed on the date first above written.

**EC 58TH STREET LLC,**
a Delaware limited liability company

By: _____
       Name:
       Title:

STATE OF NEW YORK    )
                  :      ss.:
COUNTY OF NEW YORK  )

On the ___ day of _____ 2022 before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                         _____
                                         Notary Public (SEAL)

4

## EXHIBIT A

### Premises

PARCEL I (Unit 1 a/k/a EBC Unit, Lot 1701):

The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 1, also known as EBC Unit, in the building (hereinafter referred to as the "Building") known as 353 West 57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is mor'< particularly described below), and which Declaration was recorded in the Office of the City Register New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot 1701 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/2711985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No.208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium MapNo. 5192.

Together with an undivided 44.05105% interest in the common elements (as such term is defined in The Declaration

[PARCEL II (Unit 2 a/k/a Modified Hotel Unit, Lot 1702):

The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 2, also known as Modified Hotel Unit, in the building (hereinafter referred to as the "Building") known as 353 West57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is more particularly described below), and which Declaration was recorded in the Office of the City Register, New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and

61458/0006-42437678v1
*ACTIVE 62692978v3*

recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot 1702 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/27/1985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the 'New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium Map No. 5192.

Together with an undivided 46.94011% interest in the common elements (as such term is defined in the Declaration.

Which Condominium Unit[s] [is/are] located on the land described below:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street, distant 20 feet easterly from the comer formed by the intersection of the easterly side of Ninth Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street, 135 feet to a point distant 40 feet easterly from the comer formed by the intersection of the southerly side of 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street, 20 feet; and

THENCE southerly and part of the way through another party wall, 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

Premises known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 358-366 West 58th Street, Unit[s] [1 and 2] New York, NY and designated as Block 1048 Lot[s] [1701 and 1702] as shown on the Tax Map of the City of New York, County of New York.

6

## EXHIBIT C

## ASSIGNMENT AND ASSUMPTION OF LEASE

**KNOW ALL MEN BY THESE PRESENTS** that **[_____]** ("**Assignor**"), in consideration of Ten ($10.00) Dollars and other good and valuable consideration in hand paid by [_____], a [_____] ("**Assignee**"), the receipt and sufficiency of which is hereby acknowledged, hereby assigns unto the Assignee all of Assignor's right, title and interest in and to the following:

That certain Lease agreement more fully described on <u>Exhibit A</u> attached hereto and made a part hereof (the "**Unit Lease**") on the land described on <u>Exhibit B</u> attached hereto and made a part hereof, being the same leasehold premises conveyed to Assignor by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as [CRFN 2020000344629] [CRFN 2020000344630].  This Assignment shall include, without limitation, an assignment of Assignor's right, title and interest in and to the "Security" and/or the "Security Deposit" under the Unit Lease (only if and to the extent that the lessor under the Unit Lease ("**Unit Lessor**") is holding any such "**Security**" and/or the "**Security Deposit**"), as well as all options, rights of first refusal, deposits, pre-paid rentals, privileges and other rights of Assignor thereunder.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, from and after the date hereof, subject to the terms, covenants, conditions and provisions contained in the Unit Lease.

1.      Assignee on behalf of itself and its legal representatives, successors and assigns, hereby expressly assumes the performance of all of the terms, covenants and conditions of the Unit Lease herein assigned by Assignor to Assignee from and after the date hereof and hereby agrees to be bound by all of the terms, covenants, conditions and provisions contained in the Unit Lease from and after the date hereof.

2.      None of the covenants or agreements set forth in this Assignment are for the benefit of, and none of the same shall be enforceable by, any person or entity other than the parties hereto and Unit Lessor, their respective successors and assigns, it being the intention of the parties hereto that no third party is intended to be a beneficiary of or with respect to such covenants and agreements, other than the parties hereto, their respective successors and assigns.

3.      Assignor, in compliance with Section 13 of the Lien Law, covenants that Assignor will receive the consideration for this assignment and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any purpose.

4.      This Assignment has been made, executed and delivered in and is to be governed, interpreted and construed in accordance with the laws of the State of New York.

5.      Except as may be expressly set forth in that certain Purchase and Sale Agreement dated _____, 2022 between Assignor, as seller, and Assignee as buyer (the "Agreement"), this assignment is made without warranty or representation, express or implied, by or recourse against Assignor of any kind or nature whatever.

6.      No shareholder, member, officer, director, manager or representative of Assignor or Assignee or any other person or entity other than Assignor and Assignee shall have any personal liability or obligation of any kind or nature whatsoever under this Assignment.

This Assignment may be signed in any number of counterparts each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  This Assignment may be executed by facsimile, electronic communications in portable document format (.pdf) or duplicate originals, and the parties agree that their electronically transmitted signatures shall have the same effect as manually transmitted signatures.

[ NO FURTHER TEXT ON THIS PAGE ]

**IN WITNESS WHEREOF**, the parties hereto have set their hands of the _____ day of _____, 2022.

**ASSIGNOR:**

**By:**_____

**ASSIGNEE:**

**By:**_____

STATE OF NEW YORK       )
                                              :        ss.:
COUNTY OF NEW YORK   )

     On the ____ day of _____ 2022 before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public (SEAL)

STATE OF NEW YORK       )
                                              :        ss.:
COUNTY OF NEW YORK   )

     On the ____ day of _____ 2022 before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public (SEAL)

61458/0006-42420767v2
*ACTIVE 62692929v3*

**Exhibit A**

4

61458/0006-42420767v2
*ACTIVE 62692929v3*

**Exhibit B**

Premises known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 358-366 West 58th Street, Unit [4] [6] New York, NY and designated as Block 1048 Lot [1704] [1706] as shown on the Tax Map of the City of New York, County of New York.

5

61458/0006-42420767v2
*ACTIVE 62692929v3*

**EXHIBIT D**

**FORM OF BILL OF SALE**

**BILL OF SALE**

KNOW ALL MEN BY THESE PRESENTS,

That, subject to the terms and conditions hereinafter set forth, [_____], a Delaware limited liability company having an address c/o [_____] (collectively, "**Seller**") for and in consideration of the sum of Ten Dollars ($10.00), lawful money of the United States, to it in hand paid at or before delivery of these presents by [_____], a Delaware limited liability company having an address at _____ ("**Purchaser**"), the receipt and sufficiency of which Seller hereby acknowledges, has bargained and sold, and by these presents does grant and convey unto Purchaser, its successors and assigns, all right, title and interest of Seller in and to all of the Personal Property, Fixtures, Warranties, and Permits (as such terms are defined in that certain Purchase and Sale Agreement, dated _____, 2022, between Seller and Purchaser (the "**Agreement**")).

Seller grants and conveys the Personal Property, Fixtures, Warranties, and Permits unto Purchaser without recourse and without representation or warranty of any kind, express or implied (except to the extent of and only for so long as any applicable representation and warranty, as is set forth in the Agreement shall survive the closing of title thereafter, and subject to the limitations contained therein).

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns forever.

SELLER HAS MADE NO WARRANTY THAT THE PROPERTY COVERED BY THIS BILL OF SALE IS MERCHANTABLE OR FIT FOR ANY PARTICULAR PURPOSE AND THE SAME IS SOLD IN AN "AS IS" "WHERE IS" CONDITION.  BY ACCEPTANCE HEREOF, PURCHASER AFFIRMS THAT IT HAS NOT RELIED ON ANY WARRANTY OF SELLER WITH RESPECT TO THE PERSONAL PROPERTY AND THAT THERE ARE NO REPRESENTATIONS OR WARRANTEES, EXPRESSED, IMPLIED OR STATUTORY (EXCEPT TO THE EXTENT AND ONLY FOR SO LONG AS ANY APPLICABLE REPRESENTATION AND WARRANTY, IF ANY, IS AS SET FORTH IN THE AGREEMENT SHALL SURVIVE THE CLOSING OF TITLE THEREUNDER, AND SUBJECT TO THE LIMITATIONS CONTAINED THEREIN.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of New York.

This Bill of Sale shall be binding upon, enforceable by and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[Signature page follows immediately]

[_____]


**By:** _____

2

61458/0006-42442731v1
*ACTIVE 62690256v2*

**EXHIBIT E**

**EC 58th Street LLC**

[_____]
[_____]
[_____]


353 West 57th Street
New York, New York 10019

Dear Tenant:

This letter is to notify you that effective _____, 2022, EC 58th Street LLC has sold its interest in [Unit #1, 4 and 6] in 353 West 57th Street, New York, New York to _____. In connection therewith EC 58th Street LLC has assigned the interest as landlord in all leases and tenancies and transferred all security deposits, if any, to _____.

Please forward all rent checks and inquiries direct to the new owner's representative at the address listed below.

New Owner:          _____

Address:            _____
                    _____

Telephone           _____

Attn:               _____


Very truly yours,

EC 58th Street LLC

By: _____

**EXHIBIT F**

**FORM OF FIRPTA AFFIDAVIT**

**CERTIFICATION OF NON-FOREIGN STATUS**

Section 1445 of the Internal Revenue Code of 1986, as amended, provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person for U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____ a _____ ("Seller"), the undersigned hereby certifies the following on behalf of Seller:

1.      Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Seller is not a disregarded entity as defined in Treasury Regulation Section 1.1445-2(b)(2)(iii);

3.      Seller's U.S. tax identification number is _____; and

4.      Seller's office address is _____

Seller understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that the undersigned has examined this certification and to the best of the undersigned's knowledge and belief it is true, correct, and complete, and the undersigned further declares that the undersigned has authority to sign this document on behalf of Seller.

Dated: _____ ___, 2022

_____ a
_____

By:_____

**EXHIBIT G**

FORM OF UNIT LEASE ESTOPPEL

<u>Attached</u>

## LEASE ESTOPPEL CERTIFICATE

Landlord: A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 250 West 57th Street, Suite 901, New York, NY 10107

Tenant: EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee: _____, a Delaware limited liability company, having an address of _____.

Premises: 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 4

  The undersigned Landlord, A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 250 West 57th Street, Suite 901, New York, NY 10107 (the "Landlord"), successor to Adrienne Schatz and Cheryl Hirsh as fee owner of the condominium unit known as Unit No. 4 (the "Store Unit") in the condominium known as 353 West 57th Street Condominium in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "Premises") and described on Exhibit A attached hereto, is Lessor under that certain Lease dated as of January 1, 1999 made by Adrienne Schatz and Cheryl Hirsh as original Landlord and Henry Hudson Holdings LLC, as original Tenant, as referenced in a memorandum of lease dated as of September 30, 1999 and recorded on October 27, 1999 in Reel 2979 Page 2172 ("Store Unit Lease"), as amended by an unrecorded Amendment to Lease dated as of September 30, 1999, and as further amended by an unrecorded Amendment to Lease dated as of August 13, 2004, and as assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC, as assignee, dated as of November 24, 2020, recorded on December 4, 2020 in CRFN 2020000344629, hereby certifies as follows:

  **1.** The Store Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented. There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Store Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

  **2.** The lease term under the Store Unit Lease commenced on January 1, 1999 and expires on December 31, 2098, unless sooner terminated or extended in accordance with the terms of the Store Unit Lease. There are no options to renew.

  **3.** The amount of Monthly Base Rent under the Store Unit Lease is currently $_____ per month.

4.      The Monthly Base Rent and all other charges (if any) have been paid through
_____.

5.      There are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Store Unit Lease other than _____.

6.      Landlord is holding a security deposit under the Store Unit Lease in the amount of $_____.   None of the security deposit has been applied by Landlord to payment of rent or any other amounts due under the Store Unit Lease, except as follows: _____.

7.      There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Store Unit.

8.      As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Store Unit Lease other than as described in the Store Unit Lease exist.

9.      Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, and all of their respective successors and assigns.

10.     Landlord's address for notices under the Store Unit Lease is:

> A & C West 57 LLC
> c/o Schatzco V, LLC
> 250 West 57th Street
> Suite 901
> New York, New York 10107
> Attn: _____
>
> With a copy to:
> [                    ]
> [                    ]
> [                    ]

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Store Unit Lease.

[The remainder of this page is left blank intentionally.]

2

61458/0006-42435628v2
*ACTIVE 62692814v1*

**LANDLORD:**

A & C WEST 57 LLC
a New York limited liability company


By: _____

Name: _____

Title: _____

3

61458/0006-42435628v2
*ACTIVE 62692814v1*

EXHIBIT A

Legal Description of Premises and the Store Unit

The Condominium Unit (the "Unit") known as the Store Unit, also known as Unit No. 4 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Store Unit and also known as Unit No. 4 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16. 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1704 in Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building Containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lyingand being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

***TOGETHER*** with an undivided 0.34577 interest in the Common Elements (as such term is defined in the Declaration).

61458/0006-42435628v2
*ACTIVE 62692814v1*

## <u>LEASE ESTOPPEL CERTIFICATE</u>

Landlord:     Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019

Tenant:     EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee:     _____, a Delaware limited liability company, having an address of_____.

Premises:     353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 6

The undersigned Landlord, Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019 (the "<u>Landlord</u>"), successor to Adrienne Schatz and Cheryl Hirsh, as Executrices of the last will and testament of Irving Schatz, as fee owner of the condominium unit known as Unit No. 6 (the "<u>Tenth Floor Unit</u>") in the condominium known as 353 West 57th Street Condominium, in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "<u>Premises"</u>) and described on <u>Exhibit A</u> attached hereto, is Lessor under that certain Amended and Restated Lease dated as of February 11, 1999 made by Irving Schatz, as original Lessor and Ian Schrager Hotels LLC, as original Lessee, as referenced in a memorandum of lease dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1872 (the "<u>Tenth Floor Unit Lease</u>"), as assigned by Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC, as assignor, to Henry Hudson Holdings LLC, as assignee, dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1882, and as amended by an unrecorded Amendment to Lease made by and between Irving Schatz and Henry Hudson Holdings LLC dated as of August 17, 2004, and as further assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC as assignee, dated as of November 24, 2020 and recorded December 4, 2020 in CRFN 2020000344630, hereby certifies as follows:

**1.**     The Tenth Floor Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented.  There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Tenth Floor Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

2.      The lease term under the Tenth Floor Unit Lease commenced on December 1, 1997 and expires on November 30, 2096, unless sooner terminated or extended in accordance with the terms of the Tenth Floor Unit Lease.  There are no options to renew

3.      The amount of Monthly Base Rent under the Tenth Floor Unit Lease is currently $_____ per month.

4.      The Monthly Base Rent and all other charges (if any) have been paid through _____.

5.      There are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Tenth Floor Unit Lease other than _____.

6.      Landlord is holding a security deposit under the Tenth Floor Unit Lease in the amount of $_____.   None of the security deposit has been applied by Landlord to payment of rent or any other amounts due under the Tenth Floor Unit Lease, except as follows: _____.

7.      There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Tenth Floor Unit.

8.      As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Tenth Floor Unit Lease other than as described in the Tenth Floor Unit Lease exist.

9.      Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, and all of their respective successors and assigns.

10.     Landlord's address for notices under the Tenth Floor Unit Lease is:

> Hudson 10th Floor LLC
> c/o SchatzCo V, LLC
> 1325 Avenue of the Americas, 28th Floor
> New York, New York 10019
>
> With a copy to:
> [                    ]
> [                    ]
> [                    ]

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Tenth Floor Unit Lease.

2

**LANDLORD:**

HUDSON 10TH FLOOR LLC
a Delaware limited liability company

By: _____
   Name:_____
   Title: _____

3

EXHIBIT A

Legal Description of the Premises and Tenth Floor Unit

The Condominium Unit (the "Unit") known as the Tenth Floor Unit, also known as Unit 6 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Tenth Floor and also known as Unit 6 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16, 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1706, Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

4

61458/0006-42435625v2
*ACTIVE 62692815v1*

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

Together with an undivided 3.89067% interest in the Common Elements (as such term is defined in the Declaration).

5

## **EXHIBIT H**

FORM OF CONDOMINIUM ESTOPPEL

<u>Attached</u>

CONDOMINIUM ESTOPPEL CERTIFICATE

TO:

CSC Hudson LLC ("Purchaser")
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013

Re:     The (i) declaration of condominium dated April 11, 1985 made by Irving Schatz (the "Original Declaration") pursuant to Article 9-B of the Real Property Law of the State of New York, as amended establishing a plan for condominium ownership of which Original Declaration was recorded in the New York County Office of the Register of the City of New York on April 24, 1985 in Reel 902 Page 1, which Original Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 and which Original Declaration was further amended by the Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch (the "A&R Declaration"), which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety), and which A&R Declaration was amended by the Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159 (collectively, the "Declaration"); (ii) by-laws, including the rules and regulations and all other exhibits and schedules attached thereto (the "By-Laws") of 353 West 57th Street Condominium (the "Condominium"); and (iii) Purchase and Sale Agreement (the "PSA"), dated January ___, 2022, by and between the EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (the "Seller"), and CSC Hudson, LLC, a Delaware limited liability company, having an address at c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 ("Purchaser") for the conveyance of Unit 1 and Unit 2 of the Condominium (the "Owned Units") and Unit 4 and Unit 6 of the Condominium (the "Leased Units") (collectively, the "Units"). Capitalized terms used herein and not defined shall have the meaning ascribed to such terms in the Condominium Documents and the PSA.

The undersigned is a duly authorized representative of the Board of Managers of the Condominium (the "Board"). The Board, hereby certifies to Purchaser as follows:

1.      All Common Charges with respect to the Units which are due have been paid in full and, there are no outstanding liens, claims, dues or charges (including, without limitation, Common Charge Liens) due to the Condominium with respect to the Units. There are no pending emergency or special assessments, capital improvements, remedial assessments, unpaid liens or other financial obligations imposed by the Board with respect to the Units, and the Seller is current in regard to all its financial obligations to the Board and the Condominium.

2.　　The current total monthly Common Charges for the Units are as follows:

      a.　Unit 1: $0.00.

      b.　Unit 2: $0.00.

      c.　Unit 4: $0.00.

      d.　Unit 6: $0.00.

3.　　Neither the Board nor any party to any Condominium Document has a right of first refusal to lease or purchase the Units and Seller may freely without hindrance lease or sell the Units pursuant to the express terms of the Condominium Documents.

4.　　The Board has no claims, demands, or offset rights against Seller.

5.　　The Declaration and By-Laws are in full force and effect and have not been modified or supplemented or amended except as set forth above.

6.　　To the actual knowledge of the undersigned on behalf of the Board, neither the Units nor Seller is in violation or breach of, or in default under, any of the Condominium Documents, and the Board has no actual knowledge of any event or condition which, with the passage of time or the giving of notice or both, would constitute such a violation, breach or default by the Units or Seller. To the best of the knowledge of the undersigned on behalf of the Board, the Board has not received written notice of any claims, demands, causes of action or proceedings, pending or threatened, against the Units or Seller.

7.　　The undersigned representative of the Board agrees that this Estoppel Certificate may be relied upon by Purchaser, any assignee of Purchaser's rights under the PSA (collectively, "Assignee"), any mortgagee of Purchaser, any mortgagee of Assignee, and all of their respective successors and assigns.

8.　　The undersigned representative of the Board is duly authorized and fully qualified to execute this Estoppel Certificate on behalf of the Board thereby binding the Board and the Condominium.

EXECUTED this _____ day of _____, 2022.


**THE BOARD OF MANAGERS OF**
**353 WEST 57TH STREET**
**CONDOMINIUM**


By:_____
    Name:

v4 (71728.00003.001)

" = "1" "" ""
61458/0006-42435629v2
*ACTIVE 62690184v1*

# EXHIBIT I-1

FORM OF CBA ASSUMPTION AGREEMENT

Attached

Exhibit I-1

ASSUMPTION AGREEMENT

This Agreement (the "Agreement") made as of this _ day  of  _____, 2022,  by  and between PURCHASER NAME, on its own behalf and on behalf of any affiliated or related entity and any current or future owner, manager or operator, and their respective successors or assigns (collectively, "Purchaser"), and the New York Hotel and Motel Trades Council, AFL-CIO ("Union").

Whereas, Purchaser has agreed to purchase the hotel known as "[HOTEL NAME]" (the "Hotel"), from the current owner, [SELLER NAME] ("Seller"); and

Whereas, Seller is bound to, *inter alia*, Article 59 of the collective bargaining agreement known as the Industry Wide Agreement between the Union and the Hotel Association of New York City, Inc. ("IWA"); and

Whereas, Article 59 of the IWA requires successors, assigns and transferees ("successor") to be bound to the IWA;

Whereas, Purchaser agrees that it will be a successor to the obligations under the IWA;

Now, therefore it is agreed:

1.      Purchaser agrees that it shall retain all current bargaining unit employees, whose employment will continue uninterrupted and without loss of seniority, compensation, benefits or fringe benefits, and with no adverse effect on other terms and conditions of employment, subject to the IWA and applicable law.

2.      Purchaser agrees that, effective as of the date of the closing, it has assumed, adopted and is bound by all of the terms, both economic and non-economic, of the IWA and those agreements and practices supplementing the IWA.

3.      By virtue of the closing, Purchaser acknowledges that no new verification of currently valid I-9 forms will be necessary.

4.      Effective immediately any and all disputes between the parties hereto or regarding the interpretation or application of this Agreement shall be subject to the grievance and arbitration provisions of the IWA, the entirety of which is incorporated herein by reference.

*[Signatures appear on the following page]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first set forth above herein.

**UNION**

**PURCHASER**

New York Hotel and Motel Trades Council, AFL-CIO

PURCHASER NAME

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

Authorized to Sign

Authorized to Sign

Dated: _____

Dated: _____

**EXHIBIT I-2**

FORM OF ALTERNATIVE AGREEMENT

<u>Attached</u>

## <u>MEMORANDUM OF AGREEMENT</u>

This Agreement (the "Agreement") is by, between and among **EC 58th Street LLC d/b/a The Hudson Hotel,** as Seller Party on their own behalf and on behalf of any of their related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (hereinafter referred to as the "Seller"), **CSC Hudson LLC** on their own behalf and on behalf of any related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (collectively hereinafter referred to as "Purchaser" or "Employer") and the New York Hotel and Motel Trades Council, AFL-CIO (the "Union" or "HTC").

WHEREAS, the Seller and the Union are bound to the Hotel Association of New York City, Inc. – New York Hotel and Motel Trades Council, AFL-CIO Industry Wide Collectively Bargaining Unit (the CBA referred to as the "IWA") with respect to the property located at 356 West 58th Street, New York, NY 10019 (the "Property").

WHERAS, HTC represents employees employed by Seller and at the Property ("Bargaining Unit") are currently comprised of employees listed in Attachment A ("Current Employees");

WHEREAS, the Seller and Purchaser have discussed a transaction pursuant to which the Seller will sell the Property upon which the former Hudson Hotel (the "Hotel") was operated, which Hotel is subject to the IWA; and

WHEREAS, the Purchaser intends to renovate the Property and operate it as a residential building.

NOW, THEREFORE, IT IS AGREED:

1. Effective immediately upon the Closing of the transaction, the Purchaser shall offer voluntary enhanced severance pay in the amount of thirty-five days (35) days per year of employment with the Hotel ("Enhanced Severance"), in addition to any Article 52 severance, minus any bridge payments already made, less usual statutory deductions, to all of the Hotel's Current Employees, as listed in Attachment A. The amount of Enhanced Severance will be calculated in accordance with the provisions of IWA Article 52, using the years of service and wage rate as of today's date. Only Article 52 severance pay shall be subject to Fund contributions. The payment of Enhanced Severance to the Hotel's Employees as listed in Attachment A shall constitute full satisfaction of any obligation of the Seller and Purchaser under Articles 52 and 57 of the IWA with respect to any employees or former employees of the Hotel. All employees accepting Enhanced Severance shall, as a condition of receiving same, execute a general release.

2. The Purchaser shall pay withdrawal liability to the Pension Fund in an amount assessed by the Pension fund using the Segal Blend formula in one lump sum payment within 60 days of the receipt of the demand to pay withdrawal liability from the Pension Fund.

3. Purchaser intends to convert the Hotel into market based residential housing or any other use other than a hotel or private membership club (collectively referred to as "converted use"). Unless and until the Purchaser converts the Property into market based residential housing, the IWA shall continue to apply (e.g., the Purchaser obtains all of the necessary

*ACTIVE 62680379v2*

*ACTIVE 62771130v1*

permits and approvals and commence renovations). No engineers shall be laid off during the renovation of the Property.

4. If Purchaser, or its successor thereafter operates a hotel, private membership club, or food and beverage operation at the Property, or if the residential building offers leases of less than one (1) year, the former Employees shall be recalled and Purchaser, or its successor, shall be subject to the terms and conditions of the IWA and any agreements or practices supplementing the IWA, including the right to daily room clean. All current employees shall retain their rights to all fairly claimable bargaining unit work at the Property.

5. Upon Local 94-94A-94B International Union of Operating Engineers, AFL-CIO ("Local 94") presenting signed authorization cards to the Purchaser demonstrating that Local 94 has the support of the majority of engineering bargaining unit employees, the Purchaser shall recognize Local 94 as the exclusive bargaining representative of bargaining unit employees.

6. Upon Purchaser's recognition of Local 94 as described above in Paragraph 6, the Purchaser agrees to adopt the terms of the Residential Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Local 94-94A-94B International Union of Operating Engineers, AFL-CIO (Local 94 CBA). The Purchaser shall sign a separate assent to the Local 94 CBA. No engineer shall be laid off, suffer a loss of hours, hourly or weekly wages, or suffer any other adverse effect as a result of the execution, assignment, or adoption of this Agreement. It is understood that the current engineering employees will receive enhanced severance pursuant to Paragraph 1 above.

7. Upon Local 32BJ SEIU ("32BJ") presenting signed authorization cards to the Purchaser demonstrating that 32BJ has the support of the majority of the non-engineering bargaining unit employees, the Purchaser shall recognize 32BJ as the exclusive bargaining representative of bargaining unit employees.

8. Upon the Purchaser's recognition of 32BJ as described above in Paragraph 4, the Purchaser agrees to adopt the terms of the Apartment Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Service Employees International Union, Local 32BJ ("32BJ Contract"). The Purchaser shall sign a separate assent to the 32BJ Contract. Bargaining unit positions in the converted use of the Property shall first be offered to Current Employees by seniority.

9. The HTC will disclaim interest in the above-described Bargaining Unit, upon the Purchaser's recognition of Local 94 and 32BJ as described above in Paragraphs 6 and 8.

10. This Agreement shall be binding on Purchaser's successors and assigns in accordance with IWA Article 59, the entirety of which is incorporated herein by reference. Purchaser agrees to adopt and assume the IWA subject to this Agreement. Upon closing of the sale of the Property to Purchaser, Seller shall be deemed to have complied with Article 59 of the IWA by virtue of this Agreement.

11. With the exception of disputes arising under Paragraphs 6 and 8 above, any disputes between the parties or regarding this Agreement shall be subject to binding arbitration

*ACTIVE 62680379v2*

*ACTIVE 62771130v1*

pursuant to the grievance and arbitration provisions of the IWA, the entirety of such grievance and arbitration provisions being incorporated herein by reference.  Disputes arising under Paragraphs 7 or 9 above shall be subject to binding arbitration pursuant to the respective grievance and arbitration provisions of the Local 94 or 32BJ Contract, the entirety of such grievance and arbitration provisions being incorporated herein by reference.

12.     This Agreement shall be subject to ratification by the Union.

Dated: _____, 2021

**SELLER:**                                                    **HTC:**

_____                       _____
By:                                                            Richard Maroko
Title:                                                         President
Authorized to Sign                              Authorized to Sign

**PURCHASER:**                                       **32BJ:**

_____                       _____
By:                                                            By:
Title:                                                         Title:
Authorized to Sign                              Authorized to Sign

                                                               **Local 94**

                                                               _____
                                                               By:
                                                               Title:
                                                               Authorized to Sign

4896-1634-2028, v. 2

*ACTIVE 62680379v2*

*ACTIVE 62771130v1*

## EXHIBIT J

Seller's Bring Down Certificate

## SELLER'S CERTIFICATE

Reference is made to that certain Purchase and Sale Agreement dated as of [_____] [__], 20[__] (the "**Agreement**"), by and between EC 58TH STREET LLC, a Delaware limited liability company, having an address c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (collectively, "**Seller**"), and [_____], having an address c/o [_____] ("**Purchaser**"), for the purchase and sale of the Premises. All capitalized terms not otherwise defined herein, shall have the meaning ascribed thereto in the Agreement.

Seller hereby certifies to Purchaser that all of the warranties and representations of Seller made in the Agreement are true and correct in all material respects as of the date hereof, except as follows: [_____].

Nothing contained herein shall be deemed to expand the representations and warranties made by Seller under the Agreement or to expand the liability of Seller thereunder.


Dated: _____ __, 20__


[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Seller has duly executed this certification the day and year first above written.

        **SELLER:**

        **EC 58TH STREET LLC**,
        a Delaware limited liability company


    By:    _____
          Name:
          Title:

## **EXHIBIT K**

## **Form of Assignment and Assumption of Contracts**

<u>Attached</u>

## Form of Assignment and Assumption of Contracts

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS (this "**Assignment**"), made as of the [    ] day of [         ], 2022, between EC 58th STREET LLC, a Delaware limited liability company having an address c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (collectively, "**Assignor**") and [              ], a Delaware limited liability company having an address [                    ] ("**Assignee**"):

## RECITALS

WHEREAS, pursuant to that certain Purchase and Sale Agreement dated as of [         ], between Assignor, as seller, and Assignee, as purchaser (the "**Agreement**"), Assignor is selling the Premises (as such term is more particularly described in the Agreement) to Assignee; and

WHEREAS, in connection with the purchase and sale of the Premises, Assignee has elected (in its sole and absolute discretion) to assume from Assignor, and Assignor is therefore obligated to assign to Assignee, the Assumed Contracts (as defined below), and Assignor and Assignee agree that such assignment and assumption shall be subject to the terms and conditions set forth in this Assignment.

NOW THEREFORE, in consideration of the foregoing promises, covenants and undertakings contained in this Assignment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ASSIGNMENT AND ASSUMPTION

1.      Assignor hereby assigns, transfers, sets-over, delivers and conveys unto Assignee all of the rights, title, interest, benefits and privileges of Assignor, as owner, under all of the service, maintenance, supply and other agreements (collectively, the "Assumed Contracts") in effect relating to the operation of the Premises but only to the extent listed on Schedule A annexed hereto and incorporated herein by this reference, TO HAVE AND TO HOLD all and singular subject as aforesaid, unto Assignee. This Assignment is made without any recourse and without representation or warranty of any kind, express or implied (except to the extent and only for so long as any representation and warranty, if any, regarding the Assumed Contracts as is set forth in the Agreement shall survive the closing of title thereunder, and subject to the limitations contained therein, which are hereby incorporated herein by reference).

2.      Assignee hereby expressly assumes all of the obligations imposed upon the owner of the Premises under the Assumed Contracts which accrue from and after the date hereof.

3.      This Assignment shall be binding upon, enforceable by and shall inure to the benefit of the parties hereto and their respective successors and assigns.

4.      This Assignment may be signed in multiple counterparts which, when taken together and signed by all parties and delivered to any other party hereto, shall constitute a binding

Assignment between the parties.  Facsimile or portable document format (PDF) copies hereof and facsimile or PDF signatures shall have the same force and effect as originals.

5.      This Assignment shall be governed by and construed in accordance with the laws of the State of New York.

2

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this instrument as of the date first set forth above.

**ASSIGNOR**:

**EC 58th STREET LLC,**
a Delaware limited liability company


By: _____
       Name:
       Title:


[Signatures Continue on Following Page]

[Signature Page to Assignment and Assumption of Contracts]

3

**ASSIGNEE**:

_____,
a Delaware limited liability company]

By:  _____
     Name:
     Title:

[Signature Page to Assignment and Assumption of Contracts]

4

Schedule A to Assignment of Contracts

61458/0006-42442710v1
*ACTIVE 62690147v2*

**EXHIBIT L**

**Form of Holdback Escrow Agreement**

Attached

ESCROW AGREEMENT

This ESCROW AGREEMENT (this "**Escrow Agreement**"), dated as of _____, 2022, is by and among EC 58TH STREET LLC, a Delaware limited liability company ("**Seller**"), [_____], a Delaware limited liability company ("**Purchaser**"), and ROYAL ABSTRACT ("**Escrow Agent**").

RECITALS:

A.      WHEREAS, Seller and Purchaser entered into that certain Purchase and Sale Agreement, effective as of February __, 2022 (the "**Purchase Agreement**").  All initially capitalized terms not otherwise defined in this Escrow Agreement shall have the meaning ascribed to such term in the Purchase Agreement.

B.      WHEREAS, of even date herewith, Seller and Purchaser have consummated the Closing and, in connection therewith, Seller and Purchaser desire to establish an escrow with Escrow Agent pursuant to Section 8.2 of the Purchase Agreement.

C.      WHEREAS, Purchaser and Seller desire to appoint Escrow Agent as the escrow agent pursuant to this Escrow Agreement, and Escrow Agent is willing to act as escrow agent hereunder.

D.      WHEREAS, Escrow Agent has agreed to hold and disburse the Escrow Funds (defined below) pursuant to the terms of this Escrow Agreement.

NOW THEREFORE, in consideration of the covenants and agreements contained in this Escrow Agreement, and intending to be legally bound, the parties hereto agree as follows:

AGREEMENT

ARTICLE I
APPOINTMENT OF ESCROW AGENT

The parties hereto hereby appoint the Escrow Agent to act as escrow agent hereunder, and the Escrow Agent hereby agrees to serve as escrow agent upon the terms and conditions set forth herein. Escrow Agent shall hold, invest and disburse the Escrow Funds in accordance with the terms of this Escrow Agreement, which terms shall include, without limitation, the provisions of Article 3 below.

ARTICLE II
ESCROW

2.1      Escrow.  Seller hereby deposits TWO MILLION ONE HUNDRED THOUSAND AND NO/100  Dollars ($2,100,000.00), (such deposited funds together with any interest earned thereon are hereinafter referred to as the "**Escrow Funds**") into escrow with the Escrow Agent, and the Escrow Agent hereby acknowledges receipt thereof.  Seller hereby expressly confirms that it has instructed Escrow Agent to retain the Escrow Funds from the net sales proceeds payable to Seller upon the Closing under the Purchase Agreement.  The Escrow Funds, together with the interest

1

ACTIVE 62599348v3

ACTIVE 62692824v2

thereon, shall be deposited by Escrow Agent into a federally insured, interest bearing account reasonably acceptable to Seller and Purchaser (the "**Holdback Account**").  Escrow Agent hereby agrees that the Escrow Funds shall not be commingled with any other funds.

2.2     Fee; Waiver of Offset.  Escrow Agent was selected as escrow agent and as the title agent, in connection with the Closing under the Purchase Agreement, in part because it agreed to act as Escrow Agent hereunder without any additional consideration due to it, and Escrow Agent acknowledges that it is not due any additional fee for its services hereunder. Escrow Agent agrees that it will not pay or attempt to pay or otherwise satisfy any claim it may have, whether arising under this Agreement or otherwise from the Escrow Funds.

2.3     Disbursement of Escrow Funds.  The Escrow Funds shall be held in escrow by Escrow Agent in accordance with the following terms:

2.3.1.  From time to time up until 5:00 p.m. Eastern Standard time on the one hundred fiftieth (150th) day after the Closing Date (the "**Release Date**"), in the event Purchaser makes a claim for a breach of any Surviving Seller Representation ("**Claim**") as specifically set forth in the Purchase Agreement, Purchaser may request payment from the Escrow Funds by giving written notice of its Claim to Escrow Agent and to Seller (the "**Purchaser Claim Notice**"), certifying in such notice the nature of the Claim, the amount thereof if then ascertainable and, if not then ascertainable, a good faith estimate of the amount thereof and the provision(s) of the Purchase Agreement on which the claim is based.  If Escrow Agent does not receive a written objection (an "**Objection Notice**") from Seller within ten (10) Business Days after Escrow Agent's receipt of a Purchaser Claim Notice, Seller shall be deemed to have authorized payment of the Purchaser Claim Notice from the Escrow Funds, and Escrow Agent shall promptly pay to Purchaser the amount of such Claim to the extent of the balance of the Escrow Funds.  If within such period of ten (10) Business Days, the Escrow Agent shall receive an Objection Notice from Seller, then Escrow Agent shall not pay such claim and reserve and set aside a portion of the Escrow Funds equal to the amount of such Claim (each, a "**Claim Reserve**"); provided, however, that if the corresponding Purchaser Claim Notice specifies that the amount of Claim is not then ascertainable, Escrow Agent shall set aside a portion of the Escrow Funds equal to one hundred ten percent (110%) of the good faith estimate amount set forth in such Claim for such corresponding Claim Reserve.

2.3.2   Upon the receipt by the Escrow Agent of (i) joint written instructions signed by Purchaser and Seller or (ii) a copy of a final and non-appealable determination, finding, judgment and/or award by a court of competent jurisdiction hearing a claim, Escrow Agent shall pay the portion of the Claim Reserve directed to be paid therein to Purchaser or Seller as the case may be.

2.3.3   Delivery of Disbursements.  Unless otherwise notified by the recipient of funds from the Escrow Funds, disbursements shall be made by wire transfer to an account designated by the recipient.

2

*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

2.3.4    On Release Date, the balance of the Escrow Funds, less the Claim Reserve and an amount equal to the amount of all Claims made prior to the Release Date for which the time period permitted for Seller to provide an Objection Notice has not elapsed, if any, shall be paid to Seller.  Upon resolution of all remaining timely provided Purchaser Claim Notices and Objection Notices, the remaining balance of the Escrow Funds shall be paid to Seller.

2.3.5    This Escrow Agreement shall terminate upon the disbursement by Escrow Agent of all of the Escrow Funds in accordance with this Escrow Agreement and Escrow Agent shall thereupon be discharged.

ARTICLE III<br>LIABILITY OF ESCROW AGENT

3.1    <u>Liability of Escrow Agent</u>.  Escrow Agent shall have no liability or obligation with respect to the Escrow Funds except for Escrow Agent's willful misconduct or gross negligence.  Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Escrow Agreement.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds is deposited, this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding.

3.2    <u>Authorization of Escrow Agent</u>.  The Escrow Agent is authorized and instructed to comply with orders issued or process entered by any court of competent jurisdiction with respect to the Escrow Funds.  If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

3.3    <u>Indemnification of Escrow Agent</u>.  Seller and Purchaser hereby agree, jointly and severally, to indemnify and hold harmless the Escrow Agent and its directors, officers and employees from and against any and all losses, liabilities, expenses, claims and demands (including reasonable attorneys' fees and expenses) arising out of or in connection with the

3

*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

performance of the Escrow Agent's obligations in accordance with the provisions of this Escrow Agreement, except for the Escrow Agent's own gross negligence or willful misconduct. The obligations of Purchaser and Seller under this Section shall survive any termination of this Escrow Agreement.

ARTICLE IV
MISCELLANEOUS

4.1     <u>Assignment; Successors and Assigns; Third Parties</u>.  Except as otherwise provided herein, neither Purchaser nor Seller shall convey, assign or otherwise transfer any of its rights or obligations under this Escrow Agreement without the express written consent of the other party. Any conveyance, assignment or other transfer of any of Escrow Agent's rights and obligations under this Escrow Agreement shall require express written consent of both Purchaser and Seller. This Escrow Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Escrow Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the parties hereto and their successors and permitted assigns.

4.2     <u>Tax Reporting</u>.  Seller and Purchaser agree that, for tax reporting purposes, all interest or other income earned from the investment of the Escrow Funds in any tax year shall (a) to the extent such interest or other income is distributed by the Escrow Agent to any person or entity pursuant to the terms of this Escrow Agreement during such tax year, be reported as allocated to such person or entity, and (b) otherwise shall be reported as allocated to Seller.

4.3     <u>Entire Agreement</u>.  This Escrow Agreement and the Purchase Agreement set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written. In the event of any direct conflict of the terms of this Escrow Agreement with the terms of the Purchase Agreement, the terms of this Escrow Agreement shall control and prevail.

4.4     <u>Severability</u>.  If a provision of this Escrow Agreement is deemed to be contrary to law, that provision will be deemed separable from the remaining provisions of this Escrow Agreement, and will not affect the validity, interpretation or effect of the other provisions of either this Escrow Agreement or any agreement executed pursuant to it or the application of that provision to other circumstances not contrary to law.

4.5     <u>Notices</u>.  All notices that are required or permitted hereunder shall be in writing and shall be sufficient if personally delivered or sent by registered or certified mail (return receipt requested and postage prepaid), email or Federal Express or other nationally recognized overnight delivery service; provided, however, if such notice is sent by email, a copy of such notice shall also be sent by one (1) of the other foregoing notice methods within one (1) business day after the day that the email notice is sent. Any notice shall be deemed given upon the earlier of the date when received at, or the third day after the date when sent by registered or certified mail or the day after the date when sent by Federal Express or the day of when sent by email to, the address or

4

*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

email set forth below, unless such address or email is changed by written notice to the other parties in accordance with this Escrow Agreement:

If to Seller:   EC 58th Street LLC
c/o Cain International US Services LP
350 Park Avenue, 14th Floor
New York, New York 10022
Attention:  Cain Legal
Email: legal@cainint.com

and:   Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, New York 10017
Attention:  Farah S. Ahmed, Esq.
Email: ahmedf@gtlaw.com

If to Purchaser:   _____
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013
Attention: Sal Smeke and Alberto Smeke
Email: ss@csc-coliving.com
as@csc-coliving.com

With a copy to:   Cole Schotz P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attn: Jordan J. Metzger, Esq.
Email: jmetzger@coleschotz.com

If to Escrow Agent:   Royal Abstract
125 Park Avenue, Suite 1610
New York, NY 10017
Attn:  Michael J. Roberts, Esq.
Email:  mroberts@royalabstract.com

4.6   Expenses.  Except as otherwise provided for herein, each party shall be responsible for its own costs and expenses with respect to matters involving this Escrow Agreement.

4.7   Governing Law.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York.

4.8   Execution Counterparts.  This Escrow Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

5

4.9     Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction and interpretation hereof.

4.10    Attorneys' Fees.  If any legal action is brought for the enforcement of this Escrow Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding (together with costs of enforcing any judgments or rulings), in addition to any other relief to which it may be entitled.  In all other matters arising hereunder, each party shall bear its own attorneys' fees.

4.11    Further Assurances.  Each party hereto, at the reasonable request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Escrow Agreement and the transactions contemplated hereby.

4.12    Recitals Incorporated.  The foregoing recitals are hereby incorporated within and made an integral part of this Escrow Agreement as if fully set forth herein.

4.13    No Waiver.  No failure on the part of Purchaser or Seller at any time to require the performance by the other of any provision of this Escrow Agreement shall in any way affect the party's rights to require such performance, nor shall any waiver by any party of any provision hereof be taken or held to be a waiver of any other provision hereof.


[Signature pages follow]


6

IN WITNESS WHEREOF, Seller, Purchaser, and Escrow Agent have executed this Escrow Agreement as of _____ __, 2022.

**<u>SELLER</u>**:

EC 58TH STREET LLC,
a Delaware limited liability company

By:_____
Name:
Title:

[signature pages follow]

**PURCHASER**:

[_____],
a Delaware limited liability company


By: _____
Name: _____
Title: _____


[signature page follows]

**ESCROW AGENT**:

ROYAL ABSTRACT

By: _____
Name: _____
Title: _____

**EXHIBIT M**

**Form of Labor Severance Escrow Agreement**

Attached

<u>ESCROW AGREEMENT</u>

This ESCROW AGREEMENT (this "**Escrow Agreement**"), dated as of _____, 2022, is by and among EC 58TH STREET LLC, a Delaware limited liability company ("**Seller**"), [_____], a Delaware limited liability company ("**Purchaser**"), and ROYAL ABSTRACT ("**Escrow Agent**").

RECITALS:

A.      WHEREAS, Seller and Purchaser entered into that certain Purchase and Sale Agreement, effective as of February __, 2022 (the "**Purchase Agreement**").   All initially capitalized terms not otherwise defined in this Escrow Agreement shall have the meaning ascribed to such term in the Purchase Agreement.

B.      WHEREAS, of even date herewith, Seller and Purchaser have consummated the Closing and, in connection therewith, Seller and Purchaser desire to establish the Labor Severance Escrow with Escrow Agent pursuant to <u>Section 16.3</u> of the Purchase Agreement.

C.      WHEREAS, after the Closing Date, there are [__][1] weeks remaining in the 30 week severance period provided for in NYC Local Law Int. 2397-2021.

D.      WHEREAS, Purchaser and Seller desire to appoint Escrow Agent as the escrow agent pursuant to this Escrow Agreement, and Escrow Agent is willing to act as escrow agent hereunder.

E.      WHEREAS, Escrow Agent has agreed to hold and disburse the Escrow Funds (defined below) pursuant to the terms of this Escrow Agreement.

NOW THEREFORE, in consideration of the covenants and agreements contained in this Escrow Agreement, and intending to be legally bound, the parties hereto agree as follows:

AGREEMENT

ARTICLE I
APPOINTMENT OF ESCROW AGENT

The parties hereto hereby appoint the Escrow Agent to act as escrow agent hereunder, and the Escrow Agent hereby agrees to serve as escrow agent upon the terms and conditions set forth herein. Escrow Agent shall hold, invest and disburse the Escrow Funds in accordance with the terms of this Escrow Agreement, which terms shall include, without limitation, the provisions of <u>Article 3</u> below.

ARTICLE II
ESCROW

2.1      <u>Escrow</u>.  Seller hereby deposits $[_____] (such deposited funds together with any interest earned thereon are hereinafter referred to as the "**Escrow Funds**"), equal to [_____] weeks of

---

[1] To be completed as of Closing Date.

1

severance pay in the gross sum of $500.00 per week for each employee of the Hotel listed on Schedule A hereto (hereafter referred to as the "**Employees**") into escrow with the Escrow Agent, and the Escrow Agent hereby acknowledges receipt thereof.  Seller hereby expressly confirms that it has instructed Escrow Agent to retain the Escrow Funds from the net sales proceeds payable to Seller upon the Closing under the Purchase Agreement.  The Escrow Funds, together with the interest thereon, shall be deposited by Escrow Agent into a federally insured, interest bearing account reasonably acceptable to Seller and Purchaser (the "**Holdback Account**").  Escrow Agent hereby agrees that the Escrow Funds shall not be commingled with any other funds.

2.2    Fee; Waiver of Offset.  Escrow Agent was selected as escrow agent and as the title agent, in connection with the Closing under the Purchase Agreement, in part because it agreed to act as Escrow Agent hereunder without any additional consideration due to it, and Escrow Agent acknowledges that it is not due any additional fee for its services hereunder.  Escrow Agent agrees that it will not pay or attempt to pay or otherwise satisfy any claim it may have, whether arising under this Agreement or otherwise from the Escrow Funds.

2.3    Disbursement of Escrow Funds.  The Escrow Funds shall be held in escrow by Escrow Agent in accordance with the following terms:

2.3.1.  On a weekly basis, commencing on the Purchaser's (or Purchaser's manager's) first regular payroll date following the Closing Date, Purchaser shall, or shall cause Purchaser's manager to, pay to each of the Employees the gross sum of $500.00 per week (the "**Severance Payments**") for [_____] weeks.  Upon Purchaser's submission of a payroll report to Seller and Escrow Agent showing that the Severance Payments have been made, Escrow Agent shall be authorized to release from the Escrow Funds the amount paid in Severance Payments for that week.  Payment of the Severance Payments, and reimbursement of the Purchaser or Purchaser's manager therefor, shall continue for __ weeks.

2.3.2    At the end of [_____] weeks, any balance in the Escrow Funds, including any interest earned, shall be returned to Seller.  This Escrow Agreement shall terminate upon the disbursement by Escrow Agent of all of the Escrow Funds in accordance with this Escrow Agreement and Escrow Agent shall thereupon be discharged.

2.3.3    Delivery of Disbursements.  Unless otherwise notified by the recipient of funds from the Escrow Funds, disbursements shall be made by wire transfer to an account designated by the recipient.

ARTICLE III
LIABILITY OF ESCROW AGENT

3.1    Liability of Escrow Agent.  Escrow Agent shall have no liability or obligation with respect to the Escrow Funds except for Escrow Agent's willful misconduct or gross negligence.  Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any

2

*ACTIVE 62701336v4*

information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Escrow Agreement.   In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages.   Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds is deposited, this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding.

3.2     Authorization of Escrow Agent.  The Escrow Agent is authorized and instructed to comply with orders issued or process entered by any court of competent jurisdiction with respect to the Escrow Funds.  If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

3.3     Indemnification of Escrow Agent.  Seller and Purchaser hereby agree, jointly and severally, to indemnify and hold harmless the Escrow Agent and its directors, officers and employees from and against any and all losses, liabilities, expenses, claims and demands (including reasonable attorneys' fees and expenses) arising out of or in connection with the performance of the Escrow Agent's obligations in accordance with the provisions of this Escrow Agreement, except for the Escrow Agent's own gross negligence or willful misconduct.   The obligations of Purchaser and Seller under this Section shall survive any termination of this Escrow Agreement.

ARTICLE IV
MISCELLANEOUS

4.1     Assignment; Successors and Assigns; Third Parties.  Except as otherwise provided herein, neither Purchaser nor Seller shall convey, assign or otherwise transfer any of its rights or obligations under this Escrow Agreement without the express written consent of the other party. Any conveyance, assignment or other transfer of any of Escrow Agent's rights and obligations under this Escrow Agreement shall require express written consent of both Purchaser and Seller. This Escrow Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Escrow Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the parties hereto and their successors and permitted assigns.

3

*ACTIVE 62701336v4*

4.2     Tax Reporting.  Seller and Purchaser agree that, for tax reporting purposes, all interest or other income earned from the investment of the Escrow Funds in any tax year shall (a) to the extent such interest or other income is distributed by the Escrow Agent to any person or entity pursuant to the terms of this Escrow Agreement during such tax year, be reported as allocated to such person or entity, and (b) otherwise shall be reported as allocated to Seller.

4.3     Entire Agreement.  This Escrow Agreement and the Purchase Agreement set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written. In the event of any direct conflict of the terms of this Escrow Agreement with the terms of the Purchase Agreement, the terms of this Escrow Agreement shall control and prevail.

4.4     Severability.  If a provision of this Escrow Agreement is deemed to be contrary to law, that provision will be deemed separable from the remaining provisions of this Escrow Agreement, and will not affect the validity, interpretation or effect of the other provisions of either this Escrow Agreement or any agreement executed pursuant to it or the application of that provision to other circumstances not contrary to law.

4.5     Notices.  All notices that are required or permitted hereunder shall be in writing and shall be sufficient if personally delivered or sent by registered or certified mail (return receipt requested and postage prepaid), email or Federal Express or other nationally recognized overnight delivery service; provided, however, if such notice is sent by email, a copy of such notice shall also be sent by one (1) of the other foregoing notice methods within one (1) business day after the day that the email notice is sent.  Any notice shall be deemed given upon the earlier of the date when received at, or the third day after the date when sent by registered or certified mail or the day after the date when sent by Federal Express or the day of when sent by email to, the address or email set forth below, unless such address or email is changed by written notice to the other parties in accordance with this Escrow Agreement:

If to Seller:        EC 58th Street LLC
                     c/o Cain International US Services LP
                     350 Park Avenue, 14th Floor
                     New York, New York 10022
                     Attention:  Cain Legal
                     Email: legal@cainint.com

and:                 Greenberg Traurig, LLP
                     One Vanderbilt Avenue
                     New York, New York 10017
                     Attention:  Farah S. Ahmed, Esq.
                     Email: ahmedf@gtlaw.com

4

*ACTIVE 62701336v4*

If to Purchaser:        _____
                        c/o CSC Co-Living
                        6 St. Johns Lane
                        New York, New York 10013
                        Attention: Sal Smeke and Alberto Smeke
                        Email: ss@csc-coliving.com
                              as@csc-coliving.com

With a copy to:         Cole Schotz P.C.
                        1325 Avenue of the Americas, 19th Floor
                        New York, New York 10019
                        Attn: Jordan J. Metzger, Esq.
                        Email: jmetzger@coleschotz.com

If to Escrow Agent:     Royal Abstract
                        125 Park Avenue, Suite 1610
                        New York, NY 10017
                        Attn:  Michael J. Roberts, Esq.
                        Email:  mroberts@royalabstract.com

4.6     Expenses.  Except as otherwise provided for herein, each party shall be responsible for its own costs and expenses with respect to matters involving this Escrow Agreement.

4.7     Governing Law.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York.

4.8     Execution Counterparts.  This Escrow Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

4.9     Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction and interpretation hereof.

4.10    Attorneys' Fees.  If any legal action is brought for the enforcement of this Escrow Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding (together with costs of enforcing any judgments or rulings), in addition to any other relief to which it may be entitled.  In all other matters arising hereunder, each party shall bear its own attorneys' fees.

4.11    Further Assurances.  Each party hereto, at the reasonable request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Escrow Agreement and the transactions contemplated hereby.

4.12    Recitals Incorporated.  The foregoing recitals are hereby incorporated within and made an integral part of this Escrow Agreement as if fully set forth herein.

5

4.13    <u>No Waiver</u>.  No failure on the part of Purchaser or Seller at any time to require the performance by the other of any provision of this Escrow Agreement shall in any way affect the party's rights to require such performance, nor shall any waiver by any party of any provision hereof be taken or held to be a waiver of any other provision hereof.

[Signature pages follow]

6

IN WITNESS WHEREOF, Seller, Purchaser, and Escrow Agent have executed this Escrow Agreement as of _____ __, 2022.

**<u>SELLER</u>**:

EC 58TH STREET LLC,
a Delaware limited liability company

By:_____
Name:
Title:

[signature pages follow]

**PURCHASER**:

[_____],
a Delaware limited liability company


By: _____
Name: _____
Title: _____


[signature page follows]

**ESCROW AGENT**:

ROYAL ABSTRACT


By:  _____
Name:  _____
Title:  _____

<u>Schedule A</u>

Employees

## <u>SCHEDULE A</u>

<u>Permitted Exceptions</u>

1.      Restrictive Covenants as recited in Liber 656 of Deeds, Page 133, Liber 658 of Deeds, Page 127, Liber 657 of Deeds, Page 80, Liber 1634 of Deeds, Page 385, Liber 999 of Deeds, Page 239, Liber 1006 of Deeds, Page 40, Liber 1613 of Deeds, Page 85, Liber 1006 of Deeds, Page 45, Liber 1037 of Deeds, Page 165, Liber 1069 of Deeds, Page 123, Liber 1609 of Deeds, Page 160, Liber 1006 of Deeds, Page 43, Liber 1031 of Deeds, Page 428, Liber 1031 of Deeds, Page 426, Liber 1037 of Deeds, Page 168, Liber 1069 of Deeds, Page 125, Liber 642 of Deeds, Page 494 and Liber 644 of Deeds, Page 428.

2.      The terms, conditions and easements set forth in the Declaration of Condominium and By-Laws dated 4/11/1985 and recorded 4/24/1985 in the Office of the City Register of the City of New York, County of New York, in Reel 902 Page 1.

        (a)      First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286.

        (b)      Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753.

        (c)      Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159.

3.      Terms, Covenants, Conditions and Provisions contained in a Lease dated as of 1/1/1999 made by and between Adrienne Schatz (a/k/a Adrianne Wachsler) and Cheryl Hirsch, as landlord and Henry Hudson Holdings LLC, as tenant, a Memorandum of which was dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2172. (affects Lot 1704)

        (a)      Unrecorded Amendment to Lease made by and between Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 9/30/1999, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.

        (b)      Unrecorded Amendment to Lease made by and between Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch, as lessor, and Henry Hudson Holdings LLC, as lessee, dated as of 8/13/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.

        (c)      Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.

4.      Terms, Covenants, Conditions and Provisions contained in a Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant (affects Lot 1706).

(a)      Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872.

(b)      Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882.

(c)      Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630.

(d)      Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630.

## SCHEDULE B

Tax Certiorari Proceedings


Attached

# THE TAX COMMISSION OF THE CITY OF NEW YORK
## ONE CENTRE STREET, ROOM 2400, NEW YORK, NY 10007

TC70-013-01406 | 1 - 1048 - 1701 | 10/14/2021

DITCHIK & DITCHIK PLLC
ATTN: JOEL  DITCHIK ESQ
370 LEXINGTON AVENUE
NEW YORK NY 10017

0491

Application for 2021/22
Block  1048   Lot   1701 - 1706
Ranges: 3 Lots:  4
Borough of Manhattan

NOTICE OF OFFER AND ACCEPTANCE AGREEMENT NO. 2022-013-01406          PAGE 5 OF 5

Based on its review of your application for correction, the Tax Commission offers to adjust the property's tax assessment as follows:

|  | 21/22 Total | 21/22 Exempt |
|---|---|---|
| ORIGINAL ACTUAL | 61,855,843 | |
| TRANSITIONAL | 79,005,357 | |
| TAX CLASS | 4 | |
| ACTUAL REDUCTION | -16,701,076 | |
| OF WHICH LAND | | |
| OF WHICH PHYSICAL | | |
| PROPOSED ACTUAL | 45,154,767 | |
| TAX CLASS | 4 | |

Offer applies to lots 1701-1702, 1704, 1706

AGREEMENT:  The applicant accepts the proposed assessments and all of the terms printed above and on pages 1 - 4, and certifies that all disclosures required by the agreement have been duly made and that there has been no sale of the property except as so disclosed.

Date  November 5, 2021                                     EC 58TH STREET LLC

X  Signature _____   By (print)  Steven Tishco

Specify authorization  Attorney              Firm  Ditchik & Ditchik, PLLC

To accept this offer, SIGN and RETURN THIS ENTIRE PAGE. It must be received no later than November 29, 2021.

C1.208-22.2

Calendar Page:      9372
Hearing Date:       September 28, 2021
Property Address:   353 WEST 57 STREET
Boro-Block-Lot:     1-1048-1701
Hearing Officer:    019



#2022-013-01406-0491#

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------|

In the Matter of

EC 58TH STREET LLC

                                     Petitioner,

            -against-

THE TAX COMMISSION OF THE CITY OF NEW YORK
and THE COMMISSIONER OF FINANCE OF THE CITY
OF NEW YORK

                                     Respondents.

------------------------------------------------|

Index No.
258783/21

Taxes of: 2021/22

Borough: Manhattan

Block: 1048
Lots:  1701, 1702, 1704 and
       1706

    IT IS HEREBY STIPULATED that the above entitled proceeding be dis-
continued without costs to either party.

Dated:   New York, NY
         November 5, 2021

Ditchik & Ditchik, PLLC
Attorneys for Petitioner
370 Lexington Avenue, Suite 2301
New York, NY 10017

_____

CORPORATION COUNSEL

Attorney for Respondents

Assessment reduced from $61,855,843 to $45,154,767

Index No. 258783/21          Year 2021

_____

NEW YORK SUPREME COURT

COUNTY OF NEW YORK

_____


In the Matter of

EC 58TH STREET LLC


                          Petitioner,

          -against-

THE TAX COMMISSION OF THE CITY OF NEW YORK
and THE COMMISSIONER OF FINANCE OF THE CITY
OF NEW YORK

                          Respondents.


_____

            STIPULATION OF DISCONTINUANCE
_____


GEORGIA M. PESTANA
Corporation Counsel
Attorney for Respondents
100 Church Street
New York, N.Y. 10007
(212) 788-0303


_____

**SCHEDULE C**

SRO Schedule

<u>Attached</u>

**Schedule C**
*SRO Unit Schedule as of January 27, 2022*

| # | Tenant Floor | Tenant Unit # |
|---|---|---|
| 1 | 11 | 1169 |
| 2 | 15 | 1546 |
| 3 | 17 | 1722 |
| 4 | 18 | 1846 |
| 5 | 18 | 1856 / (1857 & 1855) |
| 6 | 19 | 1916 |
| 7 | 20 | 2017 |
| 8 | 20 | 2031 |
| 9 | 20 | 2039 |
| 10 | 20 | 2045 |
| 11 | 21 | 2106 |
| 12 | 21 | 2107 |
| 13 | 21 | 2114 |
| 14 | 21 | 2129 |
| 15 | 21 | 2135 |
| 16 | 21 | 2138 |
| 17 | 21 | 2139 |
| 18 | 21 | 2140 |
| 19 | 21 | 2145 |
| 20 | 21 | 2146 |
| 21 | 21 | 2155 |
| 22 | 21 | 2157 |
| 23 | 22 | 2204 |
| 24 | 22 | 2206 |
| 25 | 22 | 2207 |
| 26 | 22 | 2211 |
| 27 | 22 | 2212 |
| 28 | 22 | 2227 |
| 29 | 22 | 2231 |
| 30 | 22 | 2232 |
| 31 | 22 | 2235 |
| 32 | 22 | 2236 |
| 33 | 22 | 2239 |
| 34 | 22 | 2244 |
| 35 | 22 | 2245 |
| 36 | 22 | 2253 |
| 37 | 22 | 2255 |

**SCHEDULE D**

Condominium Documents

Declaration of condominium dated April 11, 1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York, as establishing a plan for condominium ownership of which Original Declaration was recorded in the New York County Office of the Register of the City of New York on April 24, 1985 in Reel 902 Page 1.

First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286.

Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety).

Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159

By-Laws of 353 West 57th Street Condominium and the Rules and Regulations of 353 West 57th Street Condominium attached thereto.

## SCHEDULE E

Purchaser's title objections that Seller shall cause to be omitted from Purchaser's Title Policy

1. Terms, Covenants, Conditions and Provisions of unrecorded Sub-Lease (Operating Lease) dated 8/28/2000 made by and between Henry Hudson Holdings LLC, as landlord, and Hudson Leaseco LLC, as tenant.
   a. Lease Subordination Agreement made by and between Henry Hudson Holdings LLC, as landlord, Hudson Leaseco LLC, as tenant, and Corus Bank, N.A., as lender, dated as of 11/6/2000 and recorded 2/8/2001 in Reel 3236 Page 955.

2. Terms, Covenants, Conditions and Provisions of unrecorded Supplemental Management Agreement made by and between Hudson Leaseco LLC, as lessee, and Hudson Management Member LLC, as manager, dated as of 8/28/2000, as evidenced by Subordination of Supplemental Management Agreement recorded 2/8/2001 in Reel 3236 Page 1041.
   a. Subordination of Supplemental Management Agreement made by and between Hudson Leaseco LLC and Greenwich Capital Financial Products, Inc. dated as of 8/13/2004 and recorded 5/11/2005 as CRFN 2005000272715.

3. Terms, Covenants, Conditions and Provisions of unrecorded Sub-Lease (Bar Lease) dated 8/12/2011 made by and between Henry Hudson Holdings LLC, as landlord, and 58th Street Bar Company LLC, as tenant.

4. Assignment of Leases and Rents made by Henry Hudson Holdings LLC, 58th Street Bar Company LLC and Hudson Leaseco LLC to Column Financial, Inc. dated as of 2/9/2017 and recorded 2/21/2017 as CRFN 2017000070242. **(affects Fee Estate of Lots 1701 and 1702 Leasehold and Sub-leasehold Estates of Lots 1704 and 1706)**

   a. Assignment of Assignment of Leases and Rents made by Column Financial, Inc. to U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in trust for the holders of CSMC Trust 2017-HD, Commercial Mortgage Pass-Through Certificates 2017-HD dated as of 3/29/2017 and recorded 2/18/2020 as CRFN 2020000061988, as corrected by Corrective Assignment of Assignment of Leases and Rents dated as of 5/15/2020 and recorded 5/22/2020 as CRFN 2020000154472.

   b. Assignment of Assignment of Leases and Rents made by U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in trust for the holders of CSMC Trust 2017-HD, Commercial Mortgage Pass-Through Certificates 2017-HD to Holliday Park, LLC dated as of 3/20/2020 and recorded 3/31/2020 as CRFN 2020000113456.

   c. Assignment of Assignment of Leases and Rents made by Holliday Park, LLC to Security Benefit Life Insurance Company dated 12/18/2020 and recorded 1/4/2021 as CRFN 2021000000917.

5. UCC Financing Statement:
   Secured Party: Column Financial, Inc.

Debtors: Henry Hudson Holdings LLC, 58th Street Bar Company LLC and
Hudson Leaseco LLC
Filed: 2/21/2017
CRFN 2017000070243

As assigned by UCC-3 recorded 10/1/2020 as CRFN 2020000265736
As assigned by UCC-3 recorded 11/17/2020 as CRFN 2020000321336

6. Proof is required from the Board of Managers that there are no unpaid maintenance charges and/or assessments against the Unit to be conveyed or mortgaged.

7. Closing deed shall contain a statement of the use for which the Unit is intended as required by Real Property Law §339-0 (3).

8. Satisfactory proof must be submitted that the Board of Managers has consented to the proposed sale and has waived its right of first refusal, if any, as may be provided for by the By-Laws.

9. A duly acknowledged estoppel certificate is required from the landlord certifying that the lease to be insured has not been assigned, altered, modified or amended, except as set forth herein, and that said lease is in full force and effect and that there are no existing defaults by the tenant in respect to any terms, covenants, conditions and agreements contained in said lease.

10. With respect to **EC 58th Street LLC**, the following proofs and documents must be submitted to this Company for examination prior to closing and upon review additional exceptions may thereafter be raised:

> A) Proof that **EC 58th Street LLC** has been validly formed and remains in existence. Note: This may be established by an affidavit from a member or attorney representing, **EC 58th Street LLC**, with knowledge of the facts and should include the submission to this Company of a status letter or other evidence from the Secretary of State to the effect that **EC 58th Street LLC** remains in existence.

> B) In addition to the proof required above:

>> 1. A copy of the Articles of Organization, together with any amendments thereto, together with proof of filing of same with the Secretary of State;

>> 2. A fully executed copy of the Operating Agreement, together with any amendments thereto;

>> 3. Resolution of **EC 58th Street LLC** executed by duly authorized member(s) or manager(s) approving the subject

2

61458/0006-42420005v2
*ACTIVE 62690322v2*

transaction, which resolution identifies the person(s) authorized and directed to act for said **EC 58th Street LLC** together with proof that the resolution was adopted in accordance with the Operating Agreement and the Articles of Organization. If the subject transaction involved the sale, exchange, lease or mortgage of all or substantially all of the assets of said **EC 58th Street LLC**, then absent provisions to the contrary in the Operating Agreement, such resolution must also be adopted by the vote of at least two-thirds in interest of the members entitled to vote thereon.

11. A. Satisfactory proof by affidavit must be furnished showing whether any work has been done upon the premises by the City, or any demand made by the City for any work, that may result in charges:
    a. By the New York City Department of Rent and Housing Maintenance, Emergency Services;
    b. By the New York City Department of Environmental Protection for Water Tap Closing or any related work; and
    c. By the New York City Department of Health, whether or not such charges are liens against which this Policy insures.

C)      Satisfactory proof by affidavit must be furnished showing whether any fee for an inspection, re-inspection, examination or service performed the Department of Buildings or permit issued by The Department of Buildings have been levied, charges, created or incurred that may become a lien on the premises, whether or not such charges are liens against which this Policy insures.

12. All mortgages on the Mortgage Schedule included in the Commitment and recited below:

A. Amended and Restated Replacement Mortgage A in the original principal amount of $217,000,000.00 made by Henry Hudson Holdings LLC, Morgans Holdings LLC and Royalton, LLC to Wachovia Bank, National Association dated 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679014.  (**Originally affected premises herein and Block 867 Lot 20 and Block 1259 Lot 11**)

Mortgage Tax Paid: $ -0-

NOTE:  Said mortgage A was derived from Note and Mortgage Severance Agreement made between Wachovia Bank, National Association, Royalton, LLC, Henry Hudson Holdings LLC and Morgans Holdings LLC dated as of 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679013.
(See Mortgage Exhibit annexed)

1. Said mortgage A was released from Block 867 Lot 20 and Block 1259 Lot 11 by Partial Release of Amended and Restated Replacement Mortgage A made between Wachovia Bank, National Association, Henry Hudson Holdings LLC, Morgans

3

61458/0006-42420005v2
*ACTIVE 62690322v2*

Holdings LLC and Royalton LLC dated as of 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679017.

2. Said mortgage A was amended by Agreement of Consolidation and Modification of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing made between Henry Hudson Holdings LLC and Wachovia Bank, National Association dated as of 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679020.

3. Said mortgage A was assigned by Wachovia Bank, National Association to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8, solely to the extent set forth in the applicable Partition Agreement, the applicable Non-Trust Portion Holder by Assignment of Mortgage dated as of 6/27/2007 and recorded 11/27/2007 as CRFN 2007000587889.

4. Said mortgage A was modified by Modification of Agreement of Consolidation and Modification of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing made between Henry Hudson Holdings LLC and Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8 dated as of 9/30/2010 and recorded 10/14/2010 as CRFN 2010000344286.

5. Said mortgage A was assigned by Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8 to Deutsche Bank Trust Company of Americas, as Administrative Agent, by Assignment of Mortgage dated as of 8/12/2011 and recorded 9/16/2011 as CRFN 2011000329360.

6. Said mortgage A was amended and restated in the reduced amount of $115,000,000.00 by Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Hotel Revenue and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and Deutsche Bank Trust Company of Americas, as Administrative Agent, dated as of 8/12/2011 and recorded 9/16/2011 as CRFN 2011000329361.  (spread to cover the fee estate of Lots 1701 and 1702 and leasehold and sub-leasehold estates of Lots 1704 and 1706)

7. Said mortgage A was amended by First Amendment to Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Hotel Revenue and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and Deutsche Bank Trust Company of Americas, as Administrative Agent, dated as of 12/7/2011 and recorded 2/21/2012 as CRFN 2012000068316.

4

8.  Said mortgage A was assigned by Deutsche Bank Trust Company of Americas, as Administrative Agent to UBS Real Estate Securities Inc. by Assignment of Mortgage dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461819.

B.  Fee and Leasehold Mortgage in the original principal amount of $65,000,000.00 made by Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC to UBS Real Estate Securities Inc. dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461820. (**affects Fee Estate of Lots 1701 and 1702 Leasehold and Sub-leasehold Estates of Lots 1704 and 1706**)

Mortgage Tax Paid: $1,820,000.00

1.  Said mortgages A and B were consolidated to form a single lien of $180,000,000.00 by Consolidated, Amended and Restated Fee and Leasehold Mortgage and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and UBS Real Estate Securities Inc. dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461821.

2.  Said mortgages A and B, as consolidated, were assigned by UBS Real Estate Securities Inc. to Citigroup Global Markets Realty Corp. and Bank of America, N.A. by Assignment of Mortgage dated as of 2/6/2014 and recorded 2/14/2014 as CRFN 2014000058277.

C.  Consolidated, Amended and Restated Fee and Leasehold Mortgage and Security Agreement in the original principal amount of $53,333,333.34 made by Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC to Citigroup Global Markets Realty Corp. and Bank of America, N.A. dated as of 2/6/2014 and recorded 2/14/2014 as CRFN 2014000058278. (**affects Fee Estate of Lots 1701 and 1702 Leasehold and Sub-leasehold Estates of Lots 1704 and 1706**)

Mortgage Tax Paid: $1,493,332.41

1.  Said mortgages A through C were consolidated to form a single lien of $233,333,333.34 by the terms of said mortgage C.

2.  Said mortgages A through C, as consolidated, were assigned by Citigroup Global Markets Realty Corp. and Bank of America, N.A. to Deutsche Bank Trust Company Americas, as Trustee for CGBAM Commercial Mortgage Trust 2014-HD. Commercial Mortgage Pass-Through Certificates, Series 2014-HD and The Companion Loan Holder by Assignment of Mortgage dated 5/28/2014 and recorded 8/4/2014 as CRFN 2014000255044.

3.  Said mortgages A through C, as consolidated, were assigned by Deutsche Bank Trust Company Americas, as Trustee for CGBAM Commercial Mortgage Trust 2014-HD. Commercial Mortgage Pass-Through Certificates, Series 2014-HD and

61458/0006-42420005v2
ACTIVE 62690322v2

The Companion Loan Holder to Column Financial, Inc. by Assignment of Mortgage dated as of 2/9/2017 and recorded 2/21/2017 as CRFN 2017000070240.

4. Said mortgages A through C, as consolidated, were amended and restated in the amount of $225,000,000.00 by Amended and Restated Fee and Leasehold Mortgage and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and Column Financial, Inc. dated as of 2/9/2017 and recorded 2/21/2017 as CRFN 2017000070241.

5. Said mortgages A through C, as consolidated, were assigned by Column Financial, Inc. to U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in Trust for Holders of CSMC Trust 2017-HD Commercial Mortgage Pass-Through Certificates Series 2017-HD by Assignment of Mortgage dated 3/29/2017 and recorded 2/18/2020 as CRFN 2020000061987.

NOTE: Corrective Assignment of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing dated as of 5/15/2020 and recorded 5/22/2020 as CRFN 20200000154471 corrects the Assignment recorded 2/18/2020 as CRFN 2020000061987 to include the complete mortgage schedule and correct the acknowledgement.

6. Said mortgages A through C, as consolidated, were assigned by U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in Trust for Holders of CSMC Trust 2017-HD Commercial Mortgage Pass-Through Certificates Series 2017-HD to Holliday Park, LLC by Assignment of Mortgage dated as of 3/20/2020 and recorded 3/31/2020 as CRFN 2020000113455.

NOTE: Corrective Assignment of Amended and Restated Mortgage and Security Agreement and Other Loan Documents dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344627 corrects the Assignment recorded 3/31/2020 as CRFN 2020000113455 to include the complete mortgage schedule.

NOTE: The above mortgage is held by a private lender. Whenever documents are required from the lender such as a satisfaction, assignment, or subordination, such duly executed instrument must be furnished to the company prior to or at closing.

7. Said mortgages A through C, as consolidated, were assigned by Holliday Park, LLC to Security Benefit Life Insurance Company by Assignment of Amended and Restated Mortgage and Security Agreement and Other Loan Documents dated 12/18/2020 and recorded 1/4/2021 as CRFN 2021000000918.

6

61458/0006-42420005v2
*ACTIVE 62690322v2*

## SCHEDULE F

Intentionally Omitted

## **SCHEDULE G**

Cycle 8 Local Law 11 Contracts

<u>Attached</u>

**Schedule G**
*LL 11 Contract Schedule as of January 27, 2022*

| Vendor | Scope of Work | Date of Contract | Termination Option |
|---|---|---|---|
| APCO | Furnish all labor materials, services and equipment to perform work | 2/12/2021 | May be terminated at any time with 30 days notice |
| APCO | Additional Work (northwest bulkhead and PP Canopy window/glass replacement) | 2/17/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #1 | Provide necessary site safety materials | 3/29/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #2 | Provide necessary site safety materials | 3/29/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #3 | Additional Work (masonry on west elevation) | 5/12/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #4 | Additional Work (stucco, cap stone, and skylight repair) | 12/17/2021 | May be terminated at any time with 30 days notice |
| Gardiner and Theobald | Professional monitoring & close out services for the project | 2/17/2021 | May be terminated at any time with 3 days notice |
| ALSA | Provide services during construction, liaison with NYC agencies, amended FISP and Cycle 8B Report & Filing, FISP Inspections/Report and Filing and Cycle 9B | 2/17/2021 | May be terminated at any time with 5 days notice |

## **SCHEDULE H**

Grievances under Labor and Employment Laws

<u>None</u>

## SCHEDULE I

Service Contracts

<u>Attached</u>

**Schedule I**
*Contracts In-Place as of February 1, 2022*

| Vendor | Service | Start Date | Status |
|---|---|---|---|
| California Crown Energy Services | Operation, maintenance, and minor repairs of boiler, refrigerant, air compression, water filter, fuel oil, automation for HVAC, sanitary sewer, and air distribution systems | Sep-21 | Contract in place |
| Atlas Welding and Boiler Repair | Boiler cleaning and burner overhaul | Dec-20 | Currently Month to Month (MTM) |
| Direct Energy | Utilities | May-21 | Contract in place |
| LL84 Energy Benchmarking (Newmark Contract) | Utility management and energy star reporting software solution, Spectrum | Sep-21 | Contract in place |
| Quality Fire Protection | Prepare the amendment to the fire safety & evacuation plan to be submitted to NYCFD for review and acceptance. Prepare amended building Info Card so it is consistent with requirements of NYCFD in addition to training courses | May-21 | Contract in place |
| Ditchik & Ditchik | Tax Appeal Attorneys | Dec-20 | Contract in place |
| Nouveau Elevator | Oil, grease, and survey traction elevators | Dec-20 | Contract in place |
| Lerch Bates | Provide vertical transportation consulting services to include calls, reviews, meetings, and site visits | Jan-21 | Contract in place |
| New York Hotel and Motel Trades Council, AFL-CIO (Union) | Manager (Newmark) agrees to assume management and employ the Hotel employees represented by the Union | Mar-21 | Contract in place |
| Rosenwach Tank | Clean and inspect steel tank compartment, water test, and water tank inspections | Nov-21 | Contract in place |
| RCN Telecom Services | Communication and telecom services | Oct-21 | Contract in place |
| Spectrum Enterprise | Internet, HBO, and HD Video Tier | Jun-19 | Contract in place |
| NuChem | Water treatment | Nov-21 | Contract in place |
| Johnson Controls / TYCO | Fire Central Station Monitoring | Jul-21 | Contract in place |
| New York Security Systems, Inc. | Security Cameras  Service and Maintenance | Mar-20 | Currently Month to Month (MTM) |
| Metropolitan Recycling | Waste Removal | Jan-22 | Contract pending signature |
| Constellation | Electricity | Oct-19 | Contract in place |
| JPMcHale | Pest Management | Jan-22 | Contract pending signature |
| Windstream | Voice Circuit | | Currently Month to Month (MTM) |
| Fire Service Inc. | Inspect and Maintain Fire Alarm, smoke detectors | Jul-15 | Currently Month to Month (MTM) |
| Allbridge | T-1 circuit for phone system | | Currently Month to Month (MTM) |
| LDI | Copy machine | | Contract in place |
| *Universal Protection Service* | *Security* | | *Contract Pending* |

## **SCHEDULE J**

Allowed Applications

**Filings with DOB**:

1. Interior alterations to common areas
2. Interior alteration for accessibility upgrades to vacant units
3. Exterior work at common areas such as terraces
4. Alterations to MEP systems at common areas and within vacant units
5. Alterations to sprinkler and standpipe systems at common areas and within vacant units

**Filings with FDNY**:

1. Upgrades to existing fire alarm system
2. New ARCS system for residential use

**SCHEDULE K**

List of Violations

Attached

**Schedule K**
*Hudson Open Violations as of January 29, 2022*

| Department | Address | Violation Number | Date | Type |
|---|---|---|---|---|
| DOB | 358 West 58th Street | 021915FISPHAZ75487 | 2/19/2015 | Façade Local Law |
| DOB | 358 West 58th Street | 020617E9028/593396 | 2/6/2017 | Elevator PVT |
| DOB | 358 West 58th Street | 021918E9028/619075 | 2/19/2018 | Elevator PVT |
| DOB | 358 West 58th Street | 021918E9028/619076 | 2/19/2018 | Elevator PVT |
| DOB | 358 West 58th Street | 021918E9028/619078 | 2/19/2018 | Elevator PVT |
| DOB | 358 West 58th Street | 022118FISPHAZ87279 | 2/21/2018 | Façade Local Law |
| DOB | 358 West 58th Street | 021619BENCH00135 | 2/16/2019 | Benchmarking |
| DOB | 358 West 58th Street | 031819EARCX10082 | 3/18/2019 | Local Law 87 Energy |
| DOB | 358 West 58th Street | 050219BENCH00504 | 5/2/2019 | Benchmarking |
| DOB | 358 West 58th Street | 080219BENCH00250 | 8/2/2019 | Benchmarking |
| DOB | 358 West 58th Street | 090619ACC101865 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619ACC101866 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619ACC101867 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619ACC101868 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101869 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101870 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101871 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101872 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 110219BENCH00172 | 11/2/2019 | Benchmarking |
| DOB | 358 West 58th Street | 121919E9027/668819 | 12/19/2019 | Elevator PVT |
| DOB | 358 West 58th Street | 020220BENCH00127 | 2/2/2020 | Benchmarking |
| DOB | 358 West 58th Street | 060520E9027/683208 | 6/5/2020 | Elevator PVT |
| DOB | 358 West 58th Street | 060520E9027/683211 | 6/5/2020 | Elevator PVT |
| DOB | 358 West 58th Street | 062920EARCX00125 | 6/29/2020 | Local Law 87 Energy |
| DOB | 358 West 58th Street | 101420AEUHAZ100047 | 10/14/2020 | AEU Failed to Certify |
| DOB | 358 West 58th Street | 111120AEUHAZ100042 | 11/11/2020 | AEU Failed to Certify |
| DOB | 358 West 58th Street | 032421E9028/697754 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697755 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697757 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697762 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697763 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 033121AEUHAZ100050 | 3/31/2021 | AEU Failed to Certify |
| DOB | 358 West 58th Street | 042921EGRADE2000727 | 4/29/2021 | Energy Grade |
| DOB | 358 West 58th Street | 060221BENCH0277 | 6/2/2021 | Benchmarking |
| DOB | 358 West 58th Street | 062021EARCX00169 | 6/20/2021 | Local Law 87 Energy |
| DOB | 358 West 58th Street | 080221BENCH00174 | 8/2/2021 | Benchmarking |
| DOB | 358 West 58th Street | 280221BENCH00126 | 11/2/2021 | Benchmarking |
| DOB | 358 West 58th Street | 110221EGRADE2100531 | 12/1/2021 | Energy Grade |
| DOB | 358 West 58th Street | 032421E9028/697761 | 3/24/2021 | Elevator PVT |
| Oath/ECB | 353 West 52nd Street | 35635233H | 12/2/2021 | Facade |
| Oath/ECB | 353 West 57nd Street | 39027352R | 8/21/2020 | Plumbing |
| Oath/ECB | 353 West 57nd Street | 39027351P | 8/21/2020 | Plumbing |
| Oath/ECB | 353 West 57nd Street | 35491673L | 7/23/2020 | Construction Safety |
| Oath/ECB | 353 West 57nd Street | 39025513J | 7/16/2020 | Elevator |
| Oath/ECB | 353 West 57nd Street | 39025512H | 7/16/2020 | Elevator |
| Oath/ECB | 1150 Longwood Avenue | 35469596X | 7/10/2020 | Construction Safety |
| HPD | 353 West 57th Street | 14583964 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583965 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583966 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583967 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583968 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583969 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 13945387 7083011 | 2/6/2021 | |
| HPD | 353 West 57th Street | 13945388 7083011 | 2/6/2021 | |
| HPD | 353 West 57th Street | 13945389 7083012 | 2/6/2021 | |
| HPD | 353 West 57th Street | 12974778 6430757 | 3/22/2019 | |

| HPD | 353 West 57th Street | 12974781 6430757 | 3/22/2019 |
|-----|----------------------|-------------------|-----------|
| HPD | 353 West 57th Street | 12974782 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974783 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974784 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974786 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974791 6430756 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974793 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12402840 6101206 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402900 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402939 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402960 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402970 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402980 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12403033 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12403073 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12360465 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360466 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360467 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360468 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360469 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360470 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360471 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360472 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360476 6078082 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360479 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12356614 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356616 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356617 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356618 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356619 6076239 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356620 6076239 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356621 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356622 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356623 6076238 | 4/19/2018 |

| HPD | 353 West 57th Street | 12356624 6076239 | 4/19/2018 |
|-----|----------------------|------------------|-----------|
| HPD | 353 West 57th Street | 12356625 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356626 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356627 6076239 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356629 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356632 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356633 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 11827788 5775996 | 6/13/2017 |
| HPD | 353 West 57th Street | 11827792 5775995 | 6/13/2017 |
| HPD | 353 West 57th Street | 10618390 5067019 | 3/4/2015 |
| HPD | 353 West 57th Street | 10201525 4816874 | 4/8/2014 |
| HPD | 353 West 57th Street | 10201554 4816874 | 4/8/2014 |
| HPD | 353 West 57th Street | 10201563 4816874 | 4/8/2014 |
| HPD | 353 West 57th Street | 10026351 4719539 | 11/1/2013 |
| HPD | 353 West 57th Street | 10026365 4719540 | 11/1/2013 |
| HPD | 353 West 57th Street | 10026371 4719540 | 11/1/2013 |
| HPD | 353 West 57th Street | 10026438 4719540 | 11/1/2013 |
| HPD | 353 West 57th Street | 9673031 4535288 | 12/10/2012 |
| HPD | 353 West 57th Street | 9673032 4535288 | 12/10/2012 |
| HPD | 353 West 57th Street | 9673033 4535288 | 12/10/2012 |
| HPD | 353 West 57th Street | 9588710 4492749 | 9/18/2012 |
| HPD | 353 West 57th Street | 9588712 4492749 | 9/18/2012 |
| HPD | 353 West 57th Street | 7726100 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7726101 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7726102 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7726103 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7500040 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500041 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500042 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500043 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500044 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 6905564 3080579 | 8/29/2007 |
| HPD | 353 West 57th Street | 6905565 3080579 | 8/29/2007 |
| HPD | 353 West 57th Street | 6839019 3028321 | 7/17/2007 |
| HPD | 353 West 57th Street | 6839025 3028323 | 7/17/2007 |
| HPD | 353 West 57th Street | 6839026 3028322 | 7/17/2007 |
| HPD | 353 West 57th Street | 6753969 2975912 | 5/18/2007 |
| HPD | 353 West 57th Street | 6753979 2975912 | 5/18/2007 |
| HPD | 353 West 57th Street | 6753984 2975912 | 5/18/2007 |
| HPD | 353 West 57th Street | 6753988 2975913 | 5/18/2007 |

| | | | |
|---|---|---|---|
| HPD | 353 West 57th Street | 6202732 2689172 | 6/7/2006 |
| HPD | 353 West 57th Street | 6202734 2689173 | 6/7/2006 |
| HPD | 353 West 57th Street | 5071186 2205265 | 8/12/2004 |
| HPD | 353 West 57th Street | 5027531 2179698 | 7/12/2004 |
| HPD | 353 West 57th Street | 2956279 607649 | 7/31/1998 |
| HPD | 353 West 57th Street | 256276 607647 | 9/8/1995 |
| Oath/ECB | 353 West 57nd Street | 011714775N | 12/20/2019 FDNY |
| Oath/ECB | 353 West 57nd Street | 011801427X | 8/12/2021 FDNY |
| Oath/ECB | 353 West 57nd Street | 0204793106 | 1/3/2019 Dep Ind Wsdt Ctrl |
| Oath/ECB | 353 West 57nd Street | 0881202035 | 2/20/2020 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881202044 | 2/20/2020 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881202053 | 2/20/2020 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0600214423 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214432 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214441 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214450 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214460 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214479 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 011726107J | 3/10/2020 FDNY |
| Oath/ECB | 353 West 57nd Street | 0881251838 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251782 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251791 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251800 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251810 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251829 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168256 | 3/27/2029 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168265 | 3/27/2029 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168283 | 3/27/2029 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168292 | 3/27/2029 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 011677523K | 2/14/2019 FDNY |
| Oath/ECB | 353 West 57nd Street | 011746067M | 7/24/2020 FDNY |
| Oath/ECB | 353 West 57nd Street | 011788741K | 8/10/2021 FDNY |
| Oath/ECB | 358 West 58th Street | 0871163298 | 4/26/2019 DOHMH-Water Tank |
| Oath/ECB | 358 West 58th Street | 011620599J | 6/27/2019 FDNY |
| Oath/ECB | 358 West 58th Street | 011729920X | 12/2/2019 FDNY |

## SCHEDULE L

[Excluded Personal Property]

Attached

**Schedule L**

*Hudson Excluded Property as of January 29, 2022*





<u>EXHIBIT B</u>

<u>DESIGNATED SERVICE CONTRACTS</u>

(attached hereto)

**Schedule A**
*Contracts to be Assumed by Buyer*

| Vendor | Service | Start Date | Status |
|---|---|---|---|
| Atlas Welding and Boiler Repair | Boiler cleaning and burner overhaul | Dec-20 | Currently Month to Month (MTM) |
| Direct Energy | Utilities | May-21 | Contract in place |
| Constellation | Electricity | Oct-19 | Contract in place |
| Rosenwach Tank | Clean and inspect steel tank compartment, water test, and water tank inspections | Nov-21 | Contract in place |
| NuChem | Water treatment | Nov-21 | Contract in place |
| Fire Service Inc. | Inspect and Maintain Fire Alarm, smoke detectors | Jul-15 | Currently Month to Month (MTM) |
| Ditchik & Ditchik | Tax Appeal Attorneys | Dec-20 | Contract in place |
| Nouveau Elevator | Oil, grease, and survey traction elevators | Dec-20 | Contract in place |
| RJS Pest Control (Acquired by JP McHale) | Pest Management | | RJS acquired by JP McHale. No contract in place currently and is Month to Month (MTM). JP McHale contract provided to Buyer and is pending signature |
| Metropolitan Recycling | Waste Removal | Jan-22 | Contract pending signature |
| California Crown Energy Services | Operation, maintenance, and minor repairs of boiler, refrigerant, air compression, water filter, fuel oil, automation for HVAC, sanitary sewer, and air distribution systems | Sep-21 | Contract in place |
| **LL 11 Contracts** | | | |
| APCO | LL 11 Repair Work | Feb-21 | Contract in place |
| ALSA | LL 11 liason with NYC and construction service | Feb-21 | Contract in place |
| Gardiner and Theobald | Professional monitoring & close out services for the project | Feb-21 | Contract in place |

EXHIBIT C-1

FORM OF CONFIRMING ESTOPPEL FOR 10TH FLOOR LEASE

(attached hereto)

## LEASE ESTOPPEL CERTIFICATE

Landlord:      Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019

Tenant:      EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee:      356W58 Ground Lessor LLC, a Delaware limited liability company, having an address of c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219

Premises:      353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 6

The undersigned Landlord, Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019 (the "Landlord"), successor to Adrienne Schatz and Cheryl Hirsh, as Executrices of the last will and testament of Irving Schatz, as fee owner of the condominium unit known as Unit No. 6 (the "Tenth Floor Unit") in the condominium  known as 353 West 57th Street Condominium, in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "Premises") and described on Exhibit A attached hereto, is Lessor under that certain Amended and Restated Lease dated as of February 11, 1999 made by Irving Schatz, as original Lessor and Ian Schrager Hotels LLC, as original Lessee, as referenced in a memorandum of lease dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1872 (the "Tenth Floor Unit Lease"), as assigned by Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC, as assignor, to Henry Hudson Holdings LLC, as assignee, dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1882, and as amended by an unrecorded Amendment to Lease made by and between Irving Schatz and Henry Hudson Holdings LLC dated as of August 17, 2004, and as further assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC as assignee, dated as of November 24, 2020 and recorded December 4, 2020 in CRFN 2020000344630, hereby certifies as follows:

1.      The Tenth Floor Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented.  There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Tenth Floor Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

*ACTIVE 62692815v2*

61458/0006-42435625v2

2.      The lease term under the Tenth Floor Unit Lease commenced on December 1, 1997 and expires on November 30, 2096, unless sooner terminated or extended in accordance with the terms of the Tenth Floor Unit Lease.  There are no options to renew

3.      The amount of Monthly Base Rent under the Tenth Floor Unit Lease is currently $57,536.14 per month.

4.      The Monthly Base Rent and all other charges (if any) have been paid through May 2022.

5.      To the best knowledge of Landlord, there are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Tenth Floor Unit Lease.

6.      Landlord is not holding a security deposit under the Tenth Floor Unit Lease but that lease requires that a security deposit in the amount of $250,000.00 be posted with Landlord upon an assignment of the lease.

7.      There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Tenth Floor Unit.

8.      As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Tenth Floor Unit Lease other than as described in the Tenth Floor Unit Lease exist.

9.      Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, any sublessee of Assignee, any mortgagee of any sublessee of Assignee, and all of their respective successors and assigns.

10.     Landlord's address for notices under the Tenth Floor Unit Lease is:

> Hudson 10th Floor LLC
> c/o SchatzCo V, LLC
> 1325 Avenue of the Americas, 28th Floor
> New York, New York 10019
>
> With a copy to:
>
> Armstrong Teasdale LLP
> 7 Times Square, 44th Floor
> New York, NY  10036
> Attention: Howard Schechter, Esq.

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Tenth Floor Unit Lease.

2

**LANDLORD:**

HUDSON 10TH FLOOR LLC
a Delaware limited liability company


By: _____
        Name:_____
        Title: _____

3

EXHIBIT A

Legal Description of the Premises and Tenth Floor Unit

The Condominium Unit (the "Unit") known as the Tenth Floor Unit, also known as Unit 6 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Tenth Floor and also known as Unit 6 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16, 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1706, Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

4

61458/0006-42435625v2
*ACTIVE 62692815v2*

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

Together with an undivided 3.89067% interest in the Common Elements (as such term is defined in the Declaration).

5

EXHIBIT C-2

FORM OF CONFIRMING ESTOPPEL FOR CONDOMINIUM BOARD OF MANAGERS

(attached hereto)

CONDOMINIUM ESTOPPEL CERTIFICATE

TO:

CSC Hudson LLC ("Purchaser")
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013

Re:     The (i) declaration of condominium dated April 11, 1985 made by Irving Schatz (the "Original Declaration") pursuant to Article 9-B of the Real Property Law of the State of New York, as amended establishing a plan for condominium ownership of which Original Declaration was recorded in the New York County Office of the Register of the City of New York on April 24, 1985 in Reel 902 Page 1, which Original Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 and which Original Declaration was further amended by the Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch (the "A&R Declaration"), which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety), and which A&R Declaration was amended by the Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159 (collectively, the "Declaration"); (ii) by-laws, including the rules and regulations and all other exhibits and schedules attached thereto (the "By-Laws") of 353 West 57th Street Condominium (the "Condominium"); and (iii) Purchase and Sale Agreement (the "PSA"), dated February 3, 2022, by and between the EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (the "Seller"), and CSC Hudson, LLC, a Delaware limited liability company, having an address at c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 ("Purchaser") for the conveyance of Unit 1 and Unit 2 of the Condominium (the "Owned Units") and Unit 4 and Unit 6 of the Condominium (the "Leased Units") (collectively, the "Units"). Capitalized terms used herein and not defined shall have the meaning ascribed to such terms in the Condominium Documents and the PSA.

        The undersigned is a duly authorized representative of the Board of Managers of the Condominium (the "Board"). The Board, hereby certifies to Purchaser as follows:

1.      All Common Charges with respect to the Units which are due have been paid in full and, there are no outstanding liens, claims, dues or charges (including, without limitation, Common Charge Liens) due to the Condominium with respect to the Units. There are no pending emergency or special assessments, capital improvements, remedial assessments, unpaid liens or other financial obligations imposed by the Board with respect to the Units, and the Seller is current in regard to all its financial obligations to the Board and the Condominium.

2.      The current total monthly Common Charges for the Units are as follows:

        a.   Unit 1: $0.00.

        b.   Unit 2: $0.00.

        c.   Unit 4: $0.00.

        d.   Unit 6: $0.00.

3.      Neither the Board nor any party to any Condominium Document has a right of first refusal to lease or purchase the Units and Seller may freely without hindrance lease or sell the Units pursuant to the express terms of the Condominium Documents.

4.      The Board has no claims, demands, or offset rights against Seller.

5.      The Declaration and By-Laws are in full force and effect and have not been modified or supplemented or amended except as set forth above.

6.      To the actual knowledge of the undersigned on behalf of the Board, neither the Units nor Seller is in violation or breach of, or in default under, any of the Condominium Documents, and the Board has no actual knowledge of any event or condition which, with the passage of time or the giving of notice or both, would constitute such a violation, breach or default by the Units or Seller. To the best of the knowledge of the undersigned on behalf of the Board, the Board has not received written notice of any claims, demands, causes of action or proceedings, pending or threatened, against the Units or Seller.

7.      The undersigned representative of the Board agrees that this Estoppel Certificate may be relied upon by Purchaser, any assignee of Purchaser's rights under the PSA (collectively, "Assignee"), any mortgagee of Purchaser, any mortgagee of Assignee, any lessee or sublessee of Purchaser, any lessee or sublessee of Assignee, any mortgagee of any lessee or sublessee of Purchaser, any mortgagee of any lessee or sublessee of Assignee, and all of their respective successors and assigns.

8.      The undersigned representative of the Board is duly authorized and fully qualified to execute this Estoppel Certificate on behalf of the Board thereby binding the Board and the Condominium.

*[Signatures follow]*

EXHIBIT C-3

FORM OF CONFIRMING ESTOPPEL FOR STORE UNIT LEASE

(attached hereto)

## LEASE ESTOPPEL CERTIFICATE

Landlord:     A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, NY 10019

Tenant:     EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee:     353W57 1704, LLC, a Delaware limited liability company, having an address of _____.

Premises:     353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 4

The undersigned Landlord, A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 250 West 57th Street, Suite 901, New York, NY 10107 (the "Landlord"), successor to Adrienne Schatz and Cheryl Hirsh as fee owner of the condominium unit known as Unit No. 4 (the "Store Unit") in the condominium known as 353 West 57th Street Condominium in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "Premises") and described on Exhibit A attached hereto, is Lessor under that certain Lease dated as of January 1, 1999 made by Adrienne Schatz and Cheryl Hirsh as original Landlord and Henry Hudson Holdings LLC, as original Tenant, as referenced in a memorandum of lease dated as of September 30, 1999 and recorded on October 27, 1999 in Reel 2979 Page 2172 ("Store Unit Lease"), as amended by an unrecorded Amendment to Lease dated as of September 30, 1999, and as further amended by an unrecorded Amendment to Lease dated as of August 13, 2004, and as assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC, as assignee, dated as of November 24, 2020, recorded on December 4, 2020 in CRFN 2020000344629, hereby certifies as follows:

1.     The Store Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented. There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Store Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

2.     The lease term under the Store Unit Lease commenced on January 1, 1999 and expires on December 31, 2098, unless sooner terminated or extended in accordance with the terms of the Store Unit Lease.  There are no options to renew.

3.     The amount of Monthly Base Rent under the Store Unit Lease is currently $32,296.53 per month.

ACTIVE 62692814v2

61458/0006-42435628v2

4.      The Monthly Base Rent and all other charges (if any) have been paid through May 2022.

5.      To the best knowledge of Landlord, there are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Store Unit Lease.

6.      Landlord is holding a security deposit under the Store Unit Lease in the amount of $31,250.00.  The security deposit required under the Store Unit Lease is currently $48,444.80. None of the security deposit has been applied by Landlord to payment of rent or any other amounts due under the Store Unit Lease, except as follows: NONE.

7.      There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Store Unit.

8.      As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Store Unit Lease other than as described in the Store Unit Lease exist.

9.      Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, and all of their respective successors and assigns.

10.     Landlord's address for notices under the Store Unit Lease is:

> A & C West 57 LLC
> c/o SchatzCo V, LLC
> 1325 Avenue of the Americas, 28th Floor
> New York, New York 10019
>
> With a copy to:
>
> Armstrong Teasdale LLP
> 7 Times Square, 44th Floor
> New York, NY  10036
> Attention: Howard Schechter, Esq.

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Store Unit Lease.

[The remainder of this page is left blank intentionally.]

2

**LANDLORD:**

A & C WEST 57 LLC
a New York limited liability company


By: _____
  Name:_____
  Title: _____

3

EXHIBIT A

Legal Description of Premises and the Store Unit

The Condominium Unit (the "Unit") known as the Store Unit, also known as Unit No. 4 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Store Unit and also known as Unit No. 4 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16. 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1704 in Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building Containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lyingand being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

***TOGETHER*** with an undivided 0.34577 interest in the Common Elements (as such term is defined in the Declaration).

4

EXHIBT D

EXECUTED ALTERNATIVE AGREEMENT

(attached hereto)

## MEMORANDUM OF AGREEMENT

This Agreement (the "Agreement") is by, between and among **EC 58th Street LLC d/b/a The Hudson Hotel,** as Seller Party on their own behalf and on behalf of any of their related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (hereinafter referred to as the "Seller"), **CSC Hudson LLC** on their own behalf and on behalf of any related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (collectively hereinafter referred to as "Purchaser" or "Employer") and the New York Hotel and Motel Trades Council, AFL-CIO (the "Union" or "HTC").

WHEREAS, the Seller and the Union are bound to the Hotel Association of New York City, Inc. – New York Hotel and Motel Trades Council, AFL-CIO Industry Wide Collectively Bargaining Unit (the CBA referred to as the "IWA") with respect to the property located at 356 West 58th Street, New York, NY 10019 (the "Property").

WHERAS, HTC represents employees employed by Seller and at the Property ("Bargaining Unit") are currently comprised of employees listed in Attachment A ("Current Employees");

WHEREAS, the Seller and Purchaser have discussed a transaction pursuant to which the Seller will sell the Property upon which the former Hudson Hotel (the "Hotel") was operated, which Hotel is subject to the IWA; and

WHEREAS, the Purchaser intends to renovate the Property and operate it as a residential building.

NOW, THEREFORE, IT IS AGREED:

1.  Effective immediately upon the Closing of the transaction, the Purchaser shall offer voluntary enhanced severance pay in the amount of thirty-five days (35) days per year of employment with the Hotel ("Enhanced Severance"), in addition to any Article 52 severance, minus any bridge payments already made, less usual statutory deductions, to all of the Hotel's Current Employees, as listed in Attachment A. The amount of Enhanced Severance will be calculated in accordance with the provisions of IWA Article 52, using the years of service and wage rate as of today's date. Only Article 52 severance pay shall be subject to Fund contributions. The payment of Enhanced Severance to the Hotel's Employees as listed in Attachment A shall constitute full satisfaction of any obligation of the Seller and Purchaser under Articles 52 and 57 of the IWA with respect to any employees or former employees of the Hotel. All employees accepting Enhanced Severance shall, as a condition of receiving same, execute a general release.

2.  The Purchaser shall pay withdrawal liability to the Pension Fund in an amount assessed by the Pension fund using the Segal Blend formula in one lump sum payment within 60 days of the receipt of the demand to pay withdrawal liability from the Pension Fund.

3.  Purchaser intends to convert the Hotel into market based residential housing or any other use other than a hotel or private membership club (collectively referred to as "converted use"). Unless and until the Purchaser converts the Property into market based residential housing, the IWA shall continue to apply (e.g., the Purchaser obtains all of the necessary

*ACTIVE 62680379v2*

permits and approvals and commence renovations). No engineers shall be laid off during the renovation of the Property.

4.      If Purchaser, or its successor thereafter operates a hotel, private membership club, or food and beverage operation at the Property, or if the residential building offers leases of less than one (1) year, the former Employees shall be recalled and Purchaser, or its successor, shall be subject to the terms and conditions of the IWA and any agreements or practices supplementing the IWA, including the right to daily room clean. All current employees shall retain their rights to all fairly claimable bargaining unit work at the Property.

5.      Upon Local 94-94A-94B International Union of Operating Engineers, AFL-CIO ("Local 94") presenting signed authorization cards to the Purchaser demonstrating that Local 94 has the support of the majority of engineering bargaining unit employees, the Purchaser shall recognize Local 94 as the exclusive bargaining representative of bargaining unit employees.

6.      Upon Purchaser's recognition of Local 94 as described above in Paragraph 6, the Purchaser agrees to adopt the terms of the Residential Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Local 94-94A-94B International Union of Operating Engineers, AFL-CIO (Local 94 CBA). The Purchaser shall sign a separate assent to the Local 94 CBA. No engineer shall be laid off, suffer a loss of hours, hourly or weekly wages, or suffer any other adverse effect as a result of the execution, assignment, or adoption of this Agreement. It is understood that the current engineering employees will receive enhanced severance pursuant to Paragraph 1 above.

7.      Upon Local 32BJ SEIU ("32BJ") presenting signed authorization cards to the Purchaser demonstrating that 32BJ has the support of the majority of the non-engineering bargaining unit employees, the Purchaser shall recognize 32BJ as the exclusive bargaining representative of bargaining unit employees.

8.      Upon the Purchaser's recognition of 32BJ as described above in Paragraph 4, the Purchaser agrees to adopt the terms of the Apartment Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Service Employees International Union, Local 32BJ ("32BJ Contract"). The Purchaser shall sign a separate assent to the 32BJ Contract. Bargaining unit positions in the converted use of the Property shall first be offered to Current Employees by seniority.

9.      The HTC will disclaim interest in the above-described Bargaining Unit, upon the Purchaser's recognition of Local 94 and 32BJ as described above in Paragraphs 6 and 8.

10.     This Agreement shall be binding on Purchaser's successors and assigns in accordance with IWA Article 59, the entirety of which is incorporated herein by reference. Purchaser agrees to adopt and assume the IWA subject to this Agreement. Upon closing of the sale of the Property to Purchaser, Seller shall be deemed to have complied with Article 59 of the IWA by virtue of this Agreement.

11.     With the exception of disputes arising under Paragraphs 6 and 8 above, any disputes between the parties or regarding this Agreement shall be subject to binding arbitration

pursuant to the grievance and arbitration provisions of the IWA, the entirety of such grievance and arbitration provisions being incorporated herein by reference. Disputes arising under Paragraphs 7 or 9 above shall be subject to binding arbitration pursuant to the respective grievance and arbitration provisions of the Local 94 or 32BJ Contract, the entirety of such grievance and arbitration provisions being incorporated herein by reference.

12.    This Agreement shall be subject to ratification by the Union.


Dated: _____, 2022


**SELLER:**

By:    Anthony D. Minella
Title:    President
Authorized to Sign

**HTC:**

Richard Maroko
President
Authorized to Sign

**PURCHASER:**

By: Sal Smeke/ Alberto Smeke
Title:
Authorized to Sign

**32BJ:**

3-8-2022
By:
Title: Vice Pres.
Authorized to Sign


**Local 94**

By:
Title:
Authorized to Sign


4896-1634-2028, v. 2


*ACTIVE 62680379v2*

*ACTIVE 62771130v1*

pursuant to the grievance and arbitration provisions of the IWA, the entirety of such grievance and arbitration provisions being incorporated herein by reference. Disputes arising under Paragraphs 7 or 9 above shall be subject to binding arbitration pursuant to the respective grievance and arbitration provisions of the Local 94 or 32BJ Contract, the entirety of such grievance and arbitration provisions being incorporated herein by reference.

12. This Agreement shall be subject to ratification by the Union.

Dated: _____, 2022

**SELLER:**

By:    Anthony D. Minella
Title:   President
Authorized to Sign

**PURCHASER:**

By: Sal Smeke/ Alberto Smeke
Title:
Authorized to Sign

**HTC:**

_____
Richard Maroko
President
Authorized to Sign

**32BJ:**

_____
By:
Title:
Authorized to Sign

**Local 94**

By: Robert Brown
Title: Business Manager
Authorized to Sign

4896-1634-2028, v. 2

*ACTIVE 62680379v2*

*ACTIVE 62771130v1*

EXHIBIT E

ALLOCATION OF PURCHASE PRICE

| EBC Unit | $98,500,000 |
|---|---|
| Modified Hotel Unit | $101,750,000 |
| 10TH Floor Unit | $6,600,000 |
| Store Unit | $650,000 |