# EXHIBIT B

# CLOSING AGREEMENT

**THIS CLOSING AGREEMENT** (this "**Agreement**") is dated as of the 3rd day of May, 2022 (the "**Effective Date**"), by and among **CSC HUDSON, LLC**, a Delaware limited liability company ("**CSC Purchaser**"), **HUDSON 1702, LLC**, a Delaware limited liability company ("**CSC Unit 2 Tenant**"), **HUDSON 1701/1706, LLC**, a Delaware limited liability company ("**CSC Unit 1 Tenant**"; and together with CSC Unit 2 Tenant, collectively, "**Ground Tenant**") and **356W58 GROUND LESSOR LLC**, a Delaware limited liability company ("**MSP**"). CSC Purchaser and Ground Tenant are referred to herein, collectively, as "**CSC**".

## WITNESSETH:

**WHEREAS**, CSC Purchaser is a party to that certain Purchase and Sale Agreement by and between EC 58th Street LLC, a Delaware limited liability company ("**Seller**"), as seller, and CSC Purchaser, as purchaser, dated February 3, 2022, as amended by that First Amendment to Agreement of Purchase and Sale dated April 19, 2022 (the "**Original PSA**"), a true, correct and complete copy of which is attached hereto as Exhibit A-1, with respect to the real property known as the Hudson Hotel, having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, as more particularly described in the PSA (the "**Building**");

**WHEREAS,** on the Effective Date, CSC Purchaser assigned all of its right, title and interest in and to the Original PSA to MSP (excluding the Store Unit), and further amended the Original PSA pursuant to that certain Assignment, Assumption and Modification to Purchase and Sale Agreement (the "**PSA Assumption and Amendment**"; and together with the Original PSA, collectively, the "**PSA**"), dated as of the Effective Date, by and among Seller, CSC Purchaser, 353W57 1704, LLC, a Delaware limited liability company ("**CSC Store Purchaser**") and MSP, a true, correct and complete copy of which is attached hereto as Exhibit A-2;

**WHEREAS**, capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in the PSA;

**WHEREAS**, as a condition to the Closing, (i) Ground Tenant and MSP shall enter into a 99-year ground lease in a form to be mutually agreed upon by Ground Tenant and MSP, each in their sole and absolute discretion (the "**Ground Lease**") pursuant to which MSP, as ground landlord (in such capacity, "**Ground Landlord**") shall lease the Owned Units of the Building to Ground Tenant, (ii) Seller shall assign its leasehold interest in the Tenth Floor Unit to MSP and MSP, as sublandlord (in such capacity, "**Sublandlord**"), shall sublease the Tenth Floor Unit to CSC Unit 1 Tenant, as subtenant (in such capacity, "**Subtenant**"), pursuant to a sublease in the form attached hereto as Exhibit C (the "**Sublease**"), (iii) pursuant to the Ground Lease and Sublease, Ground Tenant shall commence renovation of the Building into an approximately 400-unit market rate multifamily development (subject to the SRO Tenants), as further described in the Ground Lease (the "**Project**") and cause Alberto Smeke Saba, an individual, and Salomon Smeke Saba, an individual (collectively, "**Guarantor**") to execute and deliver the Project Guaranties (hereinafter defined) and the Indemnity Agreement (hereinafter defined), each in a form mutually agreed upon by MSP and Guarantor, each in their sole and absolute discretion, and (iv) Ground Tenant shall enter into the Construction Loan (hereinafter defined); and

**WHEREAS**, the Closing under the PSA shall occur on the Closing Date.

4866-0049-6406, v. 12
61458/0006-42946111v5

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto hereby agree as follows:

1.      **Defined Terms.**  All initially capitalized terms used herein and not otherwise expressly defined herein shall have the meanings given to such terms in the PSA.  The parties acknowledge that the recitals set forth above are true and correct and are incorporated into this Agreement. In addition, as used herein, the following terms shall have the following meanings:

"**Affiliate**" means, as to any Person, any other Person that (i) directly or indirectly owns twenty-five percent (25%) or more of all equity interests in such Person and/or (ii) directly or indirectly Controls, is Controlled by or is under common Control with, such Person.

"**Business Day**" shall mean a day on which banks are required to be open for business within the State of New York, and shall not include (i) any Saturday or Sunday, (ii) any national holiday, or (iii) any holiday within the State of New York.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**CONH**" means a Certificate of No Harassment, issued by HPD in accordance with the CONH Regulations.

"**CONH Application**" means the application for a CONH to be filed with HPD in order to satisfy the CONH Requirement.

"**CONH Exemption Application**" shall have the meaning to be set forth in the Ground Lease.

"**CONH Exemption Denial**" shall have the meaning to be set forth in the Ground Lease.

"**CONH Requirement**" means the requirement of HPD that an applicant must obtain either a CONH or CONH Exemption with respect to the subject building prior to commencing certain categories of work at a building if such building is (i) an SRO or contains SRO units, (ii) located in one of the specified geographic anti-harassment areas identified by HPD (including, without limitation, due to the building's location within a Special Zoning District), or (iii) on HPD's Pilot Program List.

"**CONH Regulations**" means, collectively, any and all Legal Requirements governing the CONH Requirement with respect to buildings located in New York City, including, without limitation, the Multiple Dwelling Law, the New York Administrative Code, and HPD internal procedures, as the same may be modified from time to time.

"**Construction Lender**" shall mean Parkview Financial REIT, LP, a Delaware limited partnership.

"**Construction Loan**" shall mean that certain leasehold construction loan, in the aggregate principal amount of $207,000,000.00, made by Construction Lender to Ground Tenant pursuant to the Construction Loan Documents, which Construction Loan will (i) fund the construction and development of the Project and (ii) be secured by a mortgage on each of Ground Tenant's ground leasehold interest in the Owned Units and Subtenant's subleasehold interest in the Tenth Floor Unit.

"**Construction Loan Documents**" shall mean any and all documents, instruments, and agreements evidencing or securing the Construction Loan entered into concurrently with the Closing Date.

4866-0049-6406, v. 12
61458/0006-42946111v5

"**Control**" means, with respect to a Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through voting securities, contract or otherwise. "Controlled", "Controlling" and "under common Control with" shall have correlative meanings.

"**Draw Request**" means a draw request for an advance of the Construction Loan in the form required by the Construction Loan Documents.

"**Ground Landlord REIT**" shall mean The Ground Lease REIT, Inc., a Maryland corporation.

"**HPD**" means the New York City Department of Housing Preservation and Development.

"**Indemnified Parties**" means (i) MSP, The Ground Lease REIT, LP, a Delaware limited partnership, and GLP REIT Advisors, LLC, a Delaware limited liability company and (ii) each of their respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, lenders, Affiliates, subsidiaries, participants, managers, successors and assigns of any and all of the foregoing, including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of MSP's (or any Affiliate of MSP's) assets and business.

"**Indemnity Agreement**" means an indemnity agreement with respect to certain of Ground Tenant's indemnification obligations under the Ground Lease with respect to operation of the Condominium and compliance with the Alternative Agreement, made by Ground Tenant and Guarantor in favor of Landlord.

"**Leasehold Financing Agreement**" means an agreement between MSP and Construction Lender in a form mutually agreed upon by MSP and Construction Lender with respect to priority and enforcement of the Project Guaranties, and such other matters as MSP and Construction Lender shall mutually agree.

"**Losses**" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, taxes, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement and damages of whatever kind or nature (including, without limitation, reasonable attorneys' fees, court costs and other costs of defense).

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust (including a business trust), non-incorporated organization or government or any agency or political subdivision thereof or any other entity.

"**Project**" means the renovation and conversion of the Property into a multifamily residential building in accordance with and subject to the terms of the Ground Lease and the Construction Loan Documents.

"**Project Guaranties**" means, collectively, (i) a completion guaranty with respect to completion of the Project, made by Guarantor in favor of MSP, (ii) a carry guaranty with respect to rent and operating costs with respect to the Property, made by Guarantor in favor of MSP, and (iii) an environmental indemnity agreement with respect to the Property, made by Ground Tenant and Guarantor in favor of MSP.

"**Qualified Institutional Lender**" shall have the meaning to be set forth in the Ground Lease.

3

"**REIT**" means a real estate investment trust within the meaning of Section 856 of the Code and the regulations promulgated thereunder.

"**SRO**" means a Single Room Occupancy multiple dwelling, as defined in the New York Multiple Dwelling Law.

2.   **Purchase Price**.

(a)    Pursuant to and subject to the terms and conditions set forth in the PSA Assumption and Amendment, MSP has agreed to assume certain obligations of the Purchaser under the PSA, including the obligation to pay the Purchase Price on the Closing Date. In settlement of this Purchase Price, MSP shall be responsible for and shall fund $170,000,000 (the "**Purchase Proceeds**") to Escrow Agent at Closing, and the remaining $37,500,000 of the Purchase Price shall be paid by CSC, of which $36,850,000.00 is attributable to Tenant's acquisition of the Personal Property from Seller and a contribution to the consideration paid by Purchaser for the Owned Units and the Tenth Floor Lease (it being agreed that $650,000 is attributable solely to CSC Store Purchaser's acquisition of the Store Unit Lease). Any Deposit funded by CSC prior to the Closing in accordance with the PSA shall be credited towards CSC's funding of its portion of the Purchase Price.

3.   **Closing; Closing Costs**.

(a)    The consummation of the transactions contemplated hereunder and the consummation of the purchase of the Property pursuant to the PSA shall take place simultaneously, at the location specified for the Closing in the PSA on the Closing Date, with TIME BEING OF THE ESSENCE as to MSP and CSC.  MSP and CSC agree that (i) MSP shall timely deliver to the Escrow Agent the Purchase Proceeds and (ii) each of MSP and CSC shall deliver to the Escrow Agent all documentation necessary to consummate the transactions contemplated by this Agreement and the PSA.

(b)    Notwithstanding anything to the contrary set forth in the PSA, any and all closing costs due from Purchaser under the PSA in connection with the Closing shall be paid by CSC.

(c)    In addition, CSC shall be responsible for the following: (i) any applicable state, county, municipal and/or local conveyance taxes with respect to the transactions contemplated by this Agreement and the Ground Lease (but excluding any transfer taxes required to be paid by Seller under the PSA), (ii) all title insurance premiums (including, without limitation, any and all premiums charged by the Title Company for endorsements and affirmative coverages to MSP's title policy), (iii) any escrow fees charged by Escrow Agent to the extent such escrow fees are not required to be paid by Seller under the PSA, (iv) all recording fees and charges for the Memorandum of Ground Lease and Memorandum of Sublease, or otherwise related to the Ground Lease or Sublease, (v) all mortgage taxes and recording fees and other costs, related to the recording and/or filing of the Construction Loan Documents, (vi) any other costs or expenses incurred by MSP in connection with the Closing or the signing of this Agreement (including, without limitation, third party due diligence costs and construction consultant fees incurred by MSP), not to exceed Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) and (vii) Five Hundred and Ninety-Five Thousand and 00/100 Dollars ($595,000.00) on the Closing Date to GLR REIT Advisors, LLC as consideration for advisory and management services rendered to CSC by GLR REIT Advisors, LLC in connection with the execution of this Agreement and consummation of the transactions contemplated herein.

4.   **Violations**. Notwithstanding anything to the contrary set forth in the PSA, following the

4

Closing, Ground Tenant shall be responsible for curing any current or future Violations on the Property in accordance with and pursuant to the terms and conditions set forth in the Ground Lease and Sublease.

5. **Conveyance of Title**. Notwithstanding anything to the contrary set forth in the PSA, the following shall apply with respect to the conveyance of Seller's fee interest in the Owned Units and leasehold interest in the Tenth Floor Unit to MSP:

(a) From and after Closing, pursuant to the Ground Lease and Sublease, MSP shall not be responsible for performing and shall have no liability under any of the Warranties, Permits, or Service Contracts conveyed by Seller pursuant to the PSA and all Personal Property shall be the property of Ground Tenant; and

(b) MSP shall have no right, title or interest in and to the Store Unit or the Store Unit Lease (it being agreed that CSC Store Purchaser shall take assignment of the Store Unit Lease directly from Seller at Closing in accordance with the PSA Assumption and Modification) and any and all continuing liabilities or obligations with respect to the Store Unit or the Store Unit Lease under the PSA shall be the responsibility of CSC Store Purchaser.

6. **Conditions Precedent**. CSC hereby acknowledges and agrees that the obligation of MSP to consummate the transactions contemplated by this Agreement and the PSA are subject to the satisfaction of the following conditions precedent:

(a) the representations and warranties of CSC contained in this Agreement shall be true, correct and accurate on the Closing Date in all material respects;

(b) Construction Lender shall have (i) approved of and consented to the Ground Lease (in the form mutually agreed upon by MSP and CSC) and the transactions contemplated thereby, (ii) executed and delivered the Ground Lease Assignments and Leasehold Financing Agreement, and (iii) irrevocably committed to fund the Construction Loan to Ground Tenant pursuant to the Construction Loan Documents, including, without limitation an amount equal to $34,228,632.15 (the "**Enhanced Severance Escrow Amount**"), which amount shall be deposited with First American Title Insurance Company, as escrow agent ("**Enhanced Severance Escrow Agent**") to be distributed in accordance with the Enhanced Severance Escrow Agreement; and

(c) MSP shall have approved (such approval not to be unreasonably withheld, conditioned or delayed) each of the following with respect to the Project: (1) preliminary plans and specifications, (2) project budget, (3) construction contract(s) (including, without limitation, any general contractor's agreement, construction management agreement or guaranteed maximum price contract), (4) construction schedule, and (5) such other key matters regarding the Project as determined in MSP's reasonable discretion.

7. **Closing Deliveries**.

(a) At the Closing, CSC (on behalf of itself and any other Affiliates of CSC), at its sole cost and expense, shall deliver to MSP (through escrow with Escrow Agent, as applicable), the following:

(i) the Ground Lease, executed by CSC;

4866-0049-6406, v. 12
61458/0006-42946111v5

(ii)       the Memorandum of Ground Lease in the form attached to the Ground Lease, executed by CSC;

(iii)       the Sublease, executed by CSC Unit 1 Tenant;

(iv)       the Memorandum of Sublease in the form attached to the Sublease, executed by CSC;

(v)       the Project Guaranties, each executed by Guarantor;

(vi)       the Indemnity Agreement, executed by Guarantor;

(vii)       such other documents, instruments and agreements as MSP shall reasonably require (which documents shall be in substantially similar forms to those required by Construction Lender) with respect to the assignment and subordination of any construction contracts, including any construction contract with Tenant's general contractor with respect to the Project (collectively, the "**Ground Lease Assignments**"), executed by Ground Tenant and any applicable contractors;

(viii)       a memorandum from Tang Studio Architect, LLC in the form attached hereto as Exhibit B that demonstrates the Project is permitted as-of-right under the zoning classification and regulations applicable to the Building;

(ix)       a memorandum from Kucker Marino Winiarsky & Bittens, LLP in the form attached hereto as Exhibit F that sets forth the procedure by which Ground Tenant intends to pursue satisfaction of the CONH Requirement in accordance with the Ground Lease, together with (A) the completed CONH Exemption Application to be submitted to HPD, in the form attached hereto as Exhibit D-1 (which form may be thereafter amended, which amendment shall be subject to approval by MSP) and (B) the completed CONH Application to be submitted to HPD if the Ground Tenant receives a CONH Exemption Denial, in the form attached hereto as Exhibit D-2 (which form may be thereafter amended, which amendment shall be subject to approval by MSP);

(x)       true, correct and complete copies of all the Construction Loan Documents, which Construction Loan Documents shall be acceptable to MSP in its reasonable discretion;

(xi)       evidence of insurance with respect to the Property required by the terms of the Ground Lease;

(xii)       a copy of the completed Draw Request and such other documents, instruments and agreements as are required pursuant to the Construction Loan Documents for CSC to obtain the initial advance of the Construction Loan; and

(xiii)       the Leasehold Financing Agreement, executed by Construction Lender and Tenant;

(xiv)       the Assignment and Assumption of the Alternative Agreement, executed by CSC;

(xv)       that certain Enhanced Severance Escrow Agreement, in the form attached

6

hereto as <u>Exhibit H</u> (the "**Enhanced Severance Escrow Agreement**"), executed by Tenant, Construction Lender, Enhanced Severance Escrow Agent and acknowledged by Jackson Lewis, P.C.;

(xvi)    such other documents, instruments and/or deliveries as are required to be delivered by CSC or Guarantor pursuant to the terms of this Agreement, the Ground Lease, the Sublease or the PSA Assignment and Assumption Agreement.

(b)    At Closing, in addition to all items required to be delivered by the Purchaser under the PSA which shall be delivered by MSP to Escrow Agent in accordance with the terms of the PSA, MSP is delivering to the CSC or Escrow Agent, as applicable:

(i)    the Ground Lease, executed by MSP;

(ii)    the Memorandum of Ground Lease in the form attached to the Ground Lease, executed by MSP;

(iii)    the Sublease, executed by MSP;

(iv)    the Memorandum of Sublease in the form attached to the Sublease, executed by MSP;

(v)    the Leasehold Financing Agreement, executed by MSP;

(vi)    the Ground Lease Assignments, executed by MSP;

(vii)    the Assignment and Assumption of the Alternative Agreement, executed by MSP;

(viii)    the Enhanced Severance Escrow Agreement, executed by Landlord; and

(ix)    such other documents, instruments and/or deliveries as are required to be delivered by MSP pursuant to the terms of this Agreement or the PSA.

8.    **CSC's Representations and Warranties**.  CSC represents and warrants to MSP that the following are true and correct as of the Effective Date:

(a)    CSC Purchaser is a limited liability company, duly established and validly existing and is, or shall be at the Closing, in good standing under the laws of the State of Delaware and, has the full power and authority to execute and deliver this Agreement, the PSA Assumption and Modification, and all documents executed and delivered by it pursuant to this Agreement (collectively, the "**CSC Purchaser Documents**") and to perform all obligations arising under this Agreement and CSC Purchaser Documents. The execution, delivery and performance of this Agreement and all of the CSC Purchaser Documents at Closing by CSC Purchaser (i) are within CSC Purchaser's limited liability company powers, (ii) have been or will be duly authorized by all necessary limited liability company action, and (iii) do not violate the organizational documents of CSC Purchaser, or, any order, judgment or decree to which CSC Purchaser is a party or by which it is bound.

(b)    CSC Unit 1 Tenant is a limited liability company, duly established and validly existing and is, or shall be at the Closing, in good standing under the laws of the State of Delaware and, has

7

the full power and authority to execute and deliver this Agreement, the Ground Lease, the Sublease and all documents executed and delivered by it pursuant to this Agreement (collectively, the "**CSC Unit 1 Tenant Documents**") and to perform all obligations arising under this Agreement and CSC Unit 1 Tenant Documents.  The execution, delivery and performance of this Agreement and all of the CSC Unit 1 Tenant Documents at Closing by CSC Unit 1 Tenant (i) are within CSC Unit 1 Tenant's limited liability company powers, (ii) have been or will be duly authorized by all necessary limited liability company action, and (iii) do not violate the organizational documents of CSC Unit 1 Tenant, or, any order, judgment or decree to which CSC Unit 1 Tenant is a party or by which it is bound.

(c)  CSC Unit 2 Tenant is a limited liability company, duly established and validly existing and is, or shall be at the Closing, in good standing under the laws of the State of Delaware and, has the full power and authority to execute and deliver this Agreement, the Ground Lease and all documents executed and delivered by it pursuant to this Agreement (collectively, the "**CSC Unit 2 Tenant Documents**") and to perform all obligations arising under this Agreement and CSC Unit 2 Tenant Documents.  The execution, delivery and performance of this Agreement and all of the CSC Unit 2 Tenant Documents at Closing by CSC Unit 2 Tenant (i) are within CSC Unit 2 Tenant's limited liability company powers, (ii) have been or will be duly authorized by all necessary limited liability company action, and (iii) do not violate the organizational documents of CSC Unit 2 Tenant, or, any order, judgment or decree to which CSC Unit 2 Tenant is a party or by which it is bound.

(d)  The copy of the Original PSA and PSA Assumption and Amendment attached hereto as Exhibit A-1 and A-2, respectively, is a true, correct and complete copy of the PSA, and the PSA has not been modified, amended or terminated except as attached hereto, and, to CSC's knowledge, is in full force and effect. To CSC's actual knowledge, there is no default, event of default, or breach under the PSA by CSC, or to CSC's knowledge, by Seller and no event has occurred that with the notice and the expiration of applicable cure or grace period would constitute a default under the PSA.

(e)  CSC is the "Purchaser" and sole holder of the PSA, and has not heretofore assigned, sold, mortgaged, encumbered, pledged or transferred, in whole or in part, its interest in the PSA other than its interest in the Store Unit to CSC Store Purchaser and, except with respect to this Agreement, has not entered into any contract, binding understanding, binding agreement or binding arrangement with any Person to sell, transfer or convey, all or any portion of the PSA or any participation interest therein, other than its interest in the Store Unit to CSC Store Purchaser.  There are no rights of first offer to purchase, rights of first refusal to purchase, purchase options or similar rights entered into by CSC pertaining to the PSA.

(f)  The execution and delivery of this Agreement and the performance by CSC of its obligations hereunder do not require any consent of or filing with or notification to any Governmental Authority by CSC, or violate any foreign, federal, state or local laws, common laws, regulations, rules, ordinances, orders, codes, licenses, permits, decrees and judgments of or by any Governmental Authority to CSC.

(g)  CSC is not a "foreign person" within the meaning of Section 1445 of the Code.

(h)  CSC has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy, admitted in writing its inability to pay its debts as they come due, made an offer of settlement, extension or composition to its creditors generally or, to CSC's knowledge, suffered (i) the filing of any involuntary petition in bankruptcy, (ii) the filing of any involuntary petition by any of its creditors, (iii) the appointment of a receiver to take possession of all, or substantially all, of its assets, (iv) the attachment or other judicial seizure of all, or substantially all, of its assets.

8

(i)       Neither CSC nor any of CSC's affiliates, nor, to CSC's knowledge, any of their respective brokers or other agents acting in any capacity in connection with the transactions contemplated by this Agreement, is or will be (i) conducting any business or engaging in any transaction or dealing with any person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked person" (each a "**Prohibited Person**") (which lists can be accessed at the following web address: http://www.ustreas.gov/offices/enforcement/ofac/), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

(j)       Neither CSC nor any affiliate of CSC is or is acting on behalf of: (i) an "employee benefit plan" within the meaning of Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), (ii) a "plan" within the meaning of Section 4975 of the Code, or (iii) an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. §2510.3-101, as modified by Section 3(42) of ERISA, of any such employee benefit plan or plan.

(k)       The organizational chart of CSC and Ground Tenant attached hereto as Exhibit E is true, complete and correct. CSC has provided to MSP all such financial and other information as is reasonably necessary for MSP to determine the full, anticipated capitalization of the Ground Tenant and the Project.

(l)       The Alternative Agreement is the only written or oral agreement that has been entered into by CSC or any affiliate of CSC with the Hotel Union, 32BJ, L94 (as such terms are defined in the Ground Lease) or any other labor union or organization with respect to the Project (or any employees to be employed at the Project). A true, correct and complete copy of the Alternative Agreement is attached to the PSA Assumption and Amendment.

(m)       CSC (i) has provided to MSP all documents and related information in its possession with respect to the SRO Tenants, (ii) has provided to MSP all documents and related information in its possession with respect to the history of the Building pertinent to Ground Tenant's proposed plans for satisfying the CONH Requirement in accordance with the Ground Lease, and (iii) does not, to its knowledge, know of any material fact or circumstances that would be reasonably likely to result in a CONH Application Denial or finding of harassment with respect to the SRO Tenants.

(n)       CSC acknowledges, understands, warrants and agrees to comply with its continuing obligation to advise MSP of any and all changes in information pertaining to the Building which must be disclosed in the CONH Application and/or CONH Exemption Application. CSC shall update any CONH Application and/or CONH Exemption Application to adjust for any such information prior to Closing (any such changes, modifications or supplements to be approved by MSP in its reasonable discretion) and, after Closing, in accordance with the Ground Lease.

9

Each of the representations set forth in this <u>Section 8</u> shall be deemed to have been remade by CSC at and as of the Closing Date with the same force and effect as it first made on and as of the Effective Date.

9.      **MSP's Representations and Warranties.** MSP represents and warrants to CSC that the following are true and correct as of the Effective Date:

(a)      this Agreement, the Ground Lease, the Sublease and each Closing Document to be executed and delivered by MSP hereunder (collectively, "**MSP's Documents**") constitutes the legal, valid and binding obligation of MSP, enforceable against MSP in accordance with its terms. MSP has taken all necessary limited liability company action to authorize and approve the execution and delivery of this Agreement and all of MSP's Documents and the consummation of the transactions contemplated thereby.

(b)      the execution and delivery of this Agreement and MSP's Documents and the performance by MSP of its obligations hereunder do not and will not (a) conflict with or violate any judgment, order, writ, injunction or decree of any Governmental Authority with jurisdiction over MSP, or (b) violate or constitute a default under any material document or instrument to which MSP is a party or is bound or any of MSP's limited liability company formation or governing documents.

(c)      MSP is a limited liability company validly existing, and is, or shall be at the Closing, in good standing under the laws of the State of Delaware and, has the full power and authority to execute and deliver this Agreement, the Ground Lease, the Sublease and all documents executed and delivered by it pursuant to this Agreement

(d)      MSP is not and is not acting on behalf of: (i) an "employee benefit plan" within the meaning of ERISA, (ii) a "plan" within the meaning of Section 4975 of the Code, or (iii) an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. §2510.3-101, as modified by Section 3(42) of ERISA, of any such employee benefit plan or plan.

(e)      Neither MSP nor any of MSP's affiliates, nor, to MSP's knowledge, any of their respective brokers or other agents acting in any capacity in connection with the transactions contemplated by this Agreement, is or will be (i) conducting any business or engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

Each of the representations set forth in this <u>Section 8</u> shall be deemed to have been remade by MSP at and as of the Closing Date with the same force and effect as it first made on and as of the Effective Date.

10.      **10th Floor Sublease.** Each of CSC and MSP acknowledge and agree that (i) pursuant to the terms of the 10th Floor Lease, 10th Floor Lessor is entitled to ten (10) days' prior written notice of any sublease of the 10th Floor Lease, and (ii) in order to accommodate such obligations, the Sublease shall not

be deemed to be in full force and effect until ten (10) days after the Closing Date. Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement or the Sublease, Subtenant shall be liable for all obligations, indemnities and liabilities under the Sublease immediately upon the Closing Date (including, without limitation, the payment of rent thereunder), but shall not take possession of the 10th Floor Unit until the Sublease becomes effective in accordance with its terms.

11.     **Apportionments.** Any and all amounts apportioned as of the Closing Date in accordance with Section 11 of the PSA to which the Purchaser is entitled with respect to the Owned Units and the 10th Floor Unit shall be retained by CSC in accordance with the Ground Lease and Sublease, as applicable. Any and all amounts apportioned as of the Closing Date in accordance with Section 11 of the PSA to which Seller is entitled with respect to the Owned Units and the 10th Floor Unit, if received by MSP or CSC after the Closing, shall be delivered to Seller in accordance with the terms of the PSA. For the avoidance of doubt, CSC Store Unit Purchaser shall be solely responsible for any and all such amounts (whether due to Seller or CSC Store Unit Purchaser under the PSA) with respect to the Store Unit and MSP shall have no liability therefor.

12.     **Employee Matters**. MSP and CSC hereby acknowledge and agree that, notwithstanding MSP's execution and delivery of the Alternative Agreement Assignment, CSC shall be solely responsible for and shall indemnify and hold harmless MSP and any Indemnified Parties against any Losses resulting from or in any way relating to the performance of all obligations under the Alternative Agreement, as further set forth in the Ground Lease and Indemnity Agreement. The provisions of this <u>Section 12</u> shall survive Closing and any termination of this Agreement.

13.     **Local Law 11 Work.**

(a)     Pursuant to the terms of the PSA Assumption and Amendment, from and after Closing, CSC shall be solely responsible for overseeing and completing any remaining Cycle 8 Local Law 11 Work pursuant to Section 13.9 of the PSA and the PSA Assumption and Amendment. Notwithstanding the foregoing or anything else to the contrary set forth in the PSA, CSC shall keep MSP informed of the progress of CSC's completion of any remaining Cycle 8 Local Law 11 Work.

(b)     If Ground Tenant or Subtenant shall default in any of its obligations under the Ground Lease or Sublease, respectively, and such default shall be continuing beyond any applicable notice and cure period, CSC shall assign all of its rights under the Cycle 8 Local Law 11 Contracts with respect to the remaining Cycle 8 Local Law 11 Work to MSP and, thereafter, MSP shall have sole discretion to make any and all decisions with respect to same. Any out-of-pocket costs and reasonable expenses incurred by MSP in connection with any such assignment of CSC's rights with respect to the Cycle 8 Local Law 11 Work shall be paid by Ground Tenant as Additional Rent under the Ground Lease. MSP may proceed in its own name or in the name of CSC in connection with the enforcement of such agreements, and CSC agrees to execute any and all powers, authorizations, consents and other documents reasonably required by MSP in connection therewith.

(c)     The provisions of this <u>Section 12</u> shall survive Closing.

14.     **Holdback Escrow Agreement; Surviving Seller Representations.**

(a)     Pursuant to the PSA Assumption and Amendment, (i) Seller shall be deemed to remake the Surviving Seller Representations on the Closing Date for the benefit of CSC only, (ii) Seller shall have no liability to MSP for any breach of the Surviving Seller Representations and (iii) any rights of

11

Purchaser under the PSA with respect to the Holdback Escrow Agreement shall be exercised by CSC (and Seller shall only be responsible to CSC with respect to its obligations under the Holdback Escrow Agreement and Section 8.2 of the PSA). Notwithstanding the foregoing, each of CSC and MSP acknowledge and agree that, in the event of a breach of any Surviving Seller Representation, depending on the nature of the breach and the circumstances at the time, such breach may result in and each of MSP and CSC may have reasonable claims for Damages as a result of such breach and, therefore, CSC shall not be permitted to commence a Proceeding with respect to any Damages under Section 8.2 of the PSA or otherwise seek a claim for Damages in accordance with Section 8.2 of the PSA or the Holdback Escrow Agreement without the consent of MSP, which consent shall not be unreasonably withheld.

(b)     Accordingly, if, prior to the termination of the Survival Period, either MSP or CSC receives notice or obtains any other information which indicates that any Surviving Seller Representation set forth in the PSA was not true in any material respect as of the Closing Date (any such notice or information, "Seller Breach Information"), the following shall apply:

i.     Each party shall promptly notify the other of any Seller Breach Information obtained by it (but in no event later than five (5) Business Days following such party's receipt thereof).

ii.     If, after receipt of such Seller Breach Information, either party believes that CSC is entitled to (and should) commence a Proceeding against Seller for Damages with respect to any such Seller Breach Information in accordance with Section 8.2 of the PSA, such party (in such capacity, the "Electing Party") shall notify the other (in such capacity, the "Evaluating Party") of such fact, which notice (the "Proceeding Notice"), shall specify in reasonable detail (i) the nature and scope of the Damages to be claimed in the Proceeding and (ii) any backup documentation, evidence or other information reasonably necessary to demonstrate the validity of such claim.

iii.     For a period of fifteen (15) Business Days following the Evaluating Party's receipt of a Proceeding Notice from the Electing Party (or such shorter period as is reasonably necessary to ensure that any potential Proceeding may be brought prior to termination of the Survival Period in accordance with the PSA), the parties shall negotiate, in good faith, as to (A) whether to commence a Proceeding under the PSA, (B) the amount of the Damages to be sought by CSC (on behalf of CSC and MSP, as applicable) in the Proceeding, and (C) if the parties mutually agree to commence the Proceeding and are successful such that CSC is entitled to a release of any funds from Escrow Agent in accordance with the Holdback Escrow Agreement, how such funds should be allocated as between MSP and CSC in accordance with their respective claims for Damages.

iv.     If the parties mutually agree that CSC should commence a Proceeding in accordance with Section 8.2 of the PSA, CSC shall select legal counsel (which legal counsel shall be reasonably acceptable to MSP) to commence the Proceeding and represent the Purchaser under the PSA. MSP shall have the right to select its own co-counsel to assist in the Proceeding at its sole cost and expense. Any and all strategy discussions, communications or work product prepared by or for CSC or its counsel with respect to any such Proceeding shall be simultaneously shared with MSP and its co-counsel, if applicable, and the parties shall mutually agree on all decisions with respect to such Proceeding and any resulting claim for Damages to be brought in accordance with the Holdback Escrow Agreement.

v.     Any and all out-of-pocket costs and expenses incurred by CSC and MSP

12

with respect to the commencement of any Proceeding, the administration and oversight of such Proceeding, and any coordination with Escrow Agent in obtaining any release of funds pursuant to the Holdback Escrow Agreement (including, without limitation, reasonable attorneys' fees and court costs and escrow fees) shall be borne equally by CSC and MSP (and each party shall provide to the other such backup documentation as is reasonably necessary to confirm such costs and expenses).

(c)     If Ground Tenant or Subtenant shall default in any of its obligations under the Ground Lease or Sublease, respectively, and such default shall be continuing beyond any applicable notice and cure period set forth in the Ground Lease or Sublease (unless the survival period under the Holdback Escrow Agreement will terminate in less than thirty (30) days from the end of such notice and cure period), CSC shall assign all of its rights under the Holdback Escrow Agreement to MSP and, thereafter, MSP shall have sole discretion to make any and all decisions with respect to same. Any out-of-pocket costs and expenses incurred by MSP in connection with any such assignment of CSC's rights with respect to the Holdback Escrow Agreement shall be paid by Ground Tenant as Additional Rent under the Ground Lease. MSP may proceed in its own name or in the name of CSC in connection with any such Proceeding, and CSC agrees to execute any and all powers, authorizations, consents and other documents required by MSP in connection therewith.

(d)     Notwithstanding the foregoing if any claim for Damages relates solely to the Store Unit and does not have any proximate impact on the 10th Floor Unit or any of the Owned Units, the parties acknowledge and agree that the provision of this Section 14 shall not apply to the CSC Store Purchaser solely as to any Damages claim with respect to the Store Unit, provided CSC shall provide MSP with prior written notice of any such claim.

(e)     Any dispute between the Electing Party and the Evaluating Party over whether to pursue a Proceeding under this Section 14, the nature and scope of such Proceeding (including the amount Damages to be claimed), or any of the other matters set forth in this Section 14 shall be resolved by arbitration in accordance with the provisions set forth on Exhibit G attached hereto and made a part hereof.

(f)     The provisions of this Section 14 shall survive Closing.

15.     **Casualty and Condemnation.** If MSP receives a Casualty/Condemnation Notice from Seller with respect to any part of the Property, MSP shall promptly deliver a copy of such Casualty/Condemnation Notice to CSC. In the event that MSP, as the purchaser under the PSA, has the right to terminate the PSA due to damage, destruction or taking of a Significant Portion of the Premises, any such election shall be made in MSP's sole but good faith discretion, following reasonable discussion with CSC (provided that the ultimate election shall be made by MSP and MSP shall have the right to unilaterally send any notice of such election to Seller within the five (5) Business Day timeframe required by the PSA).

16.     **Failure to Close.**

(a)     Pursuant to the PSA Assumption and Amendment, if for any reason (other than by reason of Seller's default in accordance with the PSA, which shall be governed by clauses (c) and (d) below) the Closing does not occur on the Closing Date, Seller is entitled to terminate the PSA and retain the Deposit. In such event, the following shall apply: (i) CSC shall forfeit the Deposit being held by Escrow Agent in accordance with the PSA and MSP shall have no obligation to refund CSC for any portion thereof, (ii) CSC shall pay to MSP all out-of-pocket costs and expenses incurred by MSP in connection with the evaluation, negotiation, diligence and preparation of any documentation of the transactions contemplated

13

4866-0049-6406, v. 12
61458/0006-42946111v5

by this Agreement, the PSA and the Ground Lease, including, without limitation, reasonable attorney's and consultant's fees, not to exceed Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) and (iii) each of MSP and CSC shall have no further obligations under this Agreement and the PSA.

(b)    In the event that the Closing does not occur due to Purchaser's election to terminate the PSA in accordance with Section 12 thereof (following a material casualty or condemnation), the Deposit will be refunded to CSC and CSC shall pay to MSP all out-of-pocket costs and expenses incurred by MSP in connection with the evaluation, negotiation, diligence and preparation of any documentation of the transactions contemplated by this Agreement and the PSA, including, without limitation, reasonable attorney's and consultant's fees, not to exceed Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00).

(c)    In the event that the Closing does not occur due to a default by Seller under the PSA, CSC and MSP shall mutually agree to which remedy CSC shall elect to pursue under Section 15.2 of the PSA (it being acknowledged by MSP and CSC that the PSA Assumption and Amendment provides CSC Purchaser the sole right to pursue a claim against Seller under such circumstance) and the following shall apply: (A) if MSP and CSC collectively elect to pursue the remedy set forth in clause (i) of Section 15.2 of the PSA, the Deposit will be refunded to CSC and CSC shall pay to MSP all out-of-pocket costs and expenses incurred by MSP in connection with the evaluation, negotiation, diligence and preparation of any documentation of the transactions contemplated by this Agreement and the PSA, including, without limitation, reasonable attorney's and consultant's fees, not to exceed Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00); and (B) if MSP and CSC collectively elect to pursue the remedy in clause (ii) of Section 15.2 of the PSA, but specific performance is unavailable, CSC and MSP shall negotiate, in good faith, as to (x) whether to commence a proceeding for monetary damages under the PSA, (y) the amount of the damages to be sought by CSC Purchaser (on behalf of CSC and/or MSP, as applicable) in such proceeding, and (z) the nature and scope of the claims to be brought in such proceeding.

(d)    In the event that CSC and MSP mutually agree to bring a proceeding for monetary damages against Seller in accordance with Section 15.2 of the PSA (and, in such proceeding, CSC Purchaser is only entitled to bring an action for damages on behalf of CSC Purchaser and its Affiliates): (i) CSC's obligations to reimburse MSP for all out-of-pocket costs and expenses incurred by MSP in connection with the evaluation, negotiation, diligence and preparation of any documentation of the transactions contemplated by this Agreement and the PSA, including, without limitation, reasonable attorney's and consultant's fees, shall not be subject to any cap except as follows: (1) the foregoing reimbursement shall be limited to the final amounts, if any, that CSC actually obtains from Seller pursuant to the final resolution of such proceeding for monetary damages against Seller, whether pursuant to a final and non-contingent settlement agreement or final and non-appealable order or judgment, and (2) before MSP is entitled to the foregoing reimbursement, CSC shall first have been refunded the full Deposit amount under the PSA and, further, MSP's reimbursement shall be limited to is equitable share of such final amounts that CSC actually obtains from Seller after CSC has been refunded the full Deposit amount under the PSA and taking into consideration the allocation of such final amounts to be equitably distributed to CSC (collectively, "**MSP Damages Limitations**"); and (ii) MSP shall be entitled to seek from CSC any and all monetary damages, including, without limitation, any special, consequential or punitive damages to which MSP would have been entitled to pursue against Seller under the PSA, also subject to the foregoing MSP Damages Limitations; however, provided that the failure to close under the PSA was due solely to Seller's default, MSP shall not bring a separate, direct action against CSC for such damages unless CSC is awarded such damages in the applicable proceeding and fails to pay same to MSP within ten (10) Business Days of receipt of such award.

(e)    If the parties mutually agree that CSC Purchaser should commence a proceeding in accordance with Section 15.2 of the PSA, CSC shall select legal counsel (which legal counsel shall be

14

reasonably acceptable to MSP) to commence the proceeding and represent CSC Purchaser under the PSA. MSP shall have the right to select its own co-counsel to assist in the proceeding at its sole cost and expense. Any and all strategy discussions, communications or work product prepared by or for CSC Purchaser or its counsel with respect to any such proceeding shall be simultaneously shared with MSP and its co-counsel, if applicable, and the parties shall mutually agree on all decisions with respect to such proceeding and any resulting claim for damages to be brought in accordance with Section 15.2 of the PSA.

(f)     Any and all out-of-pocket costs and expenses incurred by CSC and MSP with respect to the commencement of any such proceeding and the administration and oversight of such proceeding shall be borne equally by CSC and MSP (and each party shall provide to the other such backup documentation as is reasonably necessary to confirm such costs and expenses).

(g)     Any dispute between the MSP and the CSC over which remedy to elect under clause (a) above, whether to commence a proceeding under the PSA or any other matters set forth in this Section 14 shall be resolved by arbitration in accordance with the provisions set forth on Exhibit G attached hereto and made a part hereof.

(h)     The provisions of this Section 16 shall survive termination of this Agreement.

17.     **Notices.** All notices, demands or requests made pursuant to, under or by virtue of this Agreement must be in writing and sent to the party to which the notice, demand or request is being made by (i) certified or registered mail, return receipt requested, (ii) by nationally recognized overnight courier delivery, (iii) by hand delivery, or (iv) by email transmission as follows:

To CSC:

c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013
Attention: Sal Smeke and Alberto Smeke
Email:  ss@csc-coliving.com
              as@csc-coliving.com

with copy to:

Cole Schotz P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attn: Jordan J. Metzger, Esq.
E-mail: jmetzger@coleschotz.com

To MSP:

c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Luke Pak
Telephone: 214-545-5576
E-mail:  pak@mspcm.com

15

c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Max Lamont
Telephone: 214-545-5576
E-mail:  Lamont@mspcm.com

and an additional copy to:

Duval & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, New York 10022
Attention:       Danielle Ash, Esq. and File Manager
File No.:        4308.0014
Email:          Dash@dsllp.com

or to such other address as is specified by a party by notice to the other party given in accordance with the provisions of this Section 14.  Any notice given in accordance with the provisions of this Section 14 shall be deemed given (i) three (3) Business Days after mailing (if sent by certified mail), (ii) one (1) Business Day after deposit of same with a nationally recognized overnight courier service (if delivered by nationally recognized overnight courier service), (iii) on the date delivery is made (if delivered by hand), or (iv) on the date delivery is made (if delivered by email) provided that notice is also sent by option (i), (ii), or (iii) above simultaneously.

18.    **Entire Agreement.**  This Agreement contains all of the terms agreed upon between the parties with respect to the subject matter hereof, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement.

19.    **Amendments.**  This Agreement may not be changed, modified or terminated, except by an instrument executed by the parties hereto who are or will be affected by the terms of such instrument.

20.    **Successors and Assigns.** The stipulations aforesaid shall inure to the benefit of, and shall bind, the heirs, executors, administrators, successors and assigns of the respective parties.

21.    **Section Headings.**   The headings of the various paragraphs of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.

22.    **Governing Law.**  This Agreement shall be governed by the laws of the State of New York, without regard to conflicts of laws principles.

23.    **Submission to Jurisdiction.**  CSC AND MSP HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY NEW YORK STATE COURT OR FEDERAL COURT SITTING IN NEW YORK COUNTY, NEW YORK OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREE THAT VENUE FOR ANY SUCH ACTION OR PROCEEDING SHALL BE IN NEW YORK COUNTY, NEW YORK.  MSP AND SELLER EACH HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO SUCH VENUE AS BEING AN

16

INCONVENIENT FORUM.

24.      **Waiver of Jury Trial.**  CSC AND MSP EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY CSC AND MSP, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  CSC OR MSP, AS APPLICABLE, IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY CSC OR MSP, AS APPLICABLE.

25.      **Enforceability.**  In the event that any portion of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

26.      **Attorneys' Fees.**  In the event of any litigation arising out of this Agreement, and notwithstanding any other limitations on liability set forth in this Agreement, the prevailing party shall be entitled to receive from the losing party an amount equal to the prevailing party's costs incurred in such litigation, including, without limitation, the prevailing party's reasonable attorneys' fees, costs and disbursements.  The provisions of this Section 26 shall survive the Closing or earlier termination of this Agreement.

27.      **Counterparts; Execution by Facsimile Transmission/.PDF/Electronic Signatures.** This Agreement may be executed in two or more counterparts, each of which, when taken together, shall constitute the same instrument and one original. This Agreement may be executed by facsimile transmission or by email via .pdf format, or by other electronic means (including, without limitation, DocuSign and AdobeSign), in each case, with the same force and effect as originals.

28.      **Broker.**  Each of CSC and MSP represent to each other that, other than Meridian Capital Group ("**Broker**"), no broker, finder or other person brought about this transaction.  CSC and MSP shall each indemnify and hold the other free and harmless from and against any damages, costs or expenses (including, but not limited to, reasonable attorneys' fees and disbursements) the indemnified party arising out of a breach of the foregoing representation.  MSP shall pay the brokerage commission due to Broker pursuant to a separate agreement.  The provisions of this Section 28 shall survive the Closing.

29.      **Public Statements.** Unless and until the Closing occurs hereunder and under the PSA, neither MSP nor CSC will make, or permit anyone to make on their behalf, any public statement or public comment with respect to this Agreement, the PSA, the Ground Lease, or the transactions contemplated hereby, that is intended for public distribution or made to any newspaper, trade publication, or other print or other media, without the approval by the other party as to such disclosure and the information to be disclosed, which approval shall not be unreasonably withheld or delayed.

30.      **Surviving Liability**.

(a)      Each of the representations and warranties set forth in Section 8 (collectively, "**CSC's Representations**") shall survive the Closing for a period of one hundred eighty (180) days.  Each

17

of the representations and warranties set forth in <u>Section 9</u> (collectively, "**MSP's Representations**") shall survive the Closing for a period of one hundred eighty (180) days. If any of MSP's Representations or CSC's Representations is discovered to be untrue in any material respect after the Effective Date, and a claim is asserted within the applicable survival period set forth above, then CSC or MSP, as the case may be, shall, subject to <u>Section 30(b)</u> below, have the right to pursue any and all remedies available against CSC or MSP, as the case may be, as a result of such inaccuracy.

(b) Notwithstanding anything to the contrary contained in this Agreement (i) MSP shall not pursue any claim against CSC that causes damage to MSP that is less than ONE HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($125,000.00), (ii) the maximum amount of liability that CSC shall have under any circumstance for any surviving obligation under this Agreement (including, without limitation, any obligation arising out of any CSC's Representation that survives the Closing, any indemnification or other obligation contained herein that is specifically stated to survive the Closing and any liability under any other document or instrument delivered by CSC in connection with this Agreement and/or the PSA) shall not exceed a total aggregate amount of ONE MILLION FIVE HUNDRED THOUSAND and 00/100 Dollars ($1,500,000.00), and (iii) no director, officer, employee, shareholder, member, manager, partner or agent of CSC nor any of the directors, officers, employees, shareholders, members, managers, partners or agents of any of the directors, officers, employees, shareholders, members, managers, partners or agents of CSC nor any other person, partnership, corporation or trust, as principal of CSC (collectively, the "**CSC Exculpated Parties**") shall have any personal obligation or liability hereunder, and MSP shall not seek to assert any claim or enforce any of its rights hereunder against any CSC Exculpated Party. Any damages to which MSP is entitled pursuant to a final non-applicable judgment obtained by MSP from a court of competent jurisdiction in accordance with this <u>Section 30</u>, at MSP's option, may be charged to Ground Tenant as Additional Rent (as such term is defined in the Ground Lease) due under the Ground Lease. The provisions of this <u>Section 30</u> shall constitute the sole and exclusive remedy after Closing for breaches of CSC's Representations under this Agreement.

[SIGNATURE PAGE FOLLOWS]

4866-0049-6406, v. 12
61458/0006-42946111v5

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year set forth above.

<u>CSC:</u>

**CSC HUDSON, LLC,**
a Delaware limited liability company

By: _____
  Name: Alberto Smeke Saba
  Title:  Authorized Signatory

By: _____
  Name: Salomon Smeke Saba
  Title:  Authorized Signatory

**HUDSON 1702, LLC,**
a Delaware limited liability company

By: _____
  Name: Alberto Smeke Saba
  Title:  Authorized Signatory

By: _____
  Name: Salomon Smeke Saba
  Title:  Authorized Signatory

**HUDSON 1701/1706, LLC,**
a Delaware limited liability company

By: _____
  Name: Alberto Smeke Saba
  Title:  Authorized Signatory

By: _____
  Name: Salomon Smeke Saba
  Title:  Authorized Signatory

*[Signature Page to Closing Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the day and year set forth above.

**MSP:**

**356W58 GROUND LESSOR LLC,**
a Delaware limited liability company

By: _____

Name:   LUKE TAN

Title:   Authorized Signatory

*[Signature Page to Closing Agreement]*

Exhibit A-1

Original PSA

(Attached hereto)

21

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of the 3rd day of February, 2022 (the "Effective Date"), by and between EC 58th Street LLC, a Delaware limited liability company, having an address c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 ("Seller"), and CSC Hudson, LLC, a Delaware limited liability company, having an address c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 ("Purchaser").

## W I T N E S S E T H:

WHEREAS, Seller is the owner of those certain condominium units in the condominium known as 353 West 57th Street Condominium (the "Condominium") in the building (the "Building") known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, designated and described as the "EBC Unit" (which is Unit 1 of the Condominium and which is also identified as Lot 1701) and the "Modified Hotel Unit" (which is Unit 2 of the Condominium and which is also identified as Lot 1702) (the EBC Unit and the Modified Hotel Unit, together with their respective appurtenant undivided interests in the Condominium's common elements shall be referred to herein collectively as the "Owned Units") in that certain declaration of condominium dated April 11, 1985 made by Irving Schatz (the "Original Declaration") pursuant to Article 9-B of the Real Property Law of the State of New York, as amended (the "Condominium Act") establishing a plan for condominium ownership of the Building and the land upon which the Building is situated, which Original Declaration was recorded in the New York County Office of the Register of the City of New York (the "City Register's Office") on April 24, 1985 in Reel 902 Page 1, which Original Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 (the "First Amendment to Original Declaration"), and which Original Declaration was further amended by the Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch (the "A&R Declaration"), which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety), and which A&R Declaration was amended by the Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159 (as such A&R Declaration was amended, collectively, the "Declaration", and together with the By-Laws (the "By-Laws"), Rules and Regulations (the "Rules and Regulations") and all other exhibits and schedules thereto (as amended), collectively, the "Condominium Documents"), and also designated as Tax Lots 1701 and 1702 in Block 1048 in the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York, with the Owned Units more particularly described on Exhibit A attached hereto and incorporated herein;

WHEREAS, Seller is the lessee of (i) that certain condominium unit known as the "Tenth Floor Unit" in the Condominium (which is Unit 6 of the Condominium and which is also identified as Lot 1706), pursuant to that certain Amended and Restated Lease dated as of February 11, 1999 (as amended and assigned pursuant to the following described transfers, the "10th Floor Lease") made by Irving Schatz, as lessor ("10th Floor Lessor"), and Ian Schrager Hotels LLC, as original lessee, as referenced in the memorandum of lease dated as of February 12, 1999 and

*ACTIVE 61730742v13*

recorded March 23, 1999 in Reel 2841 Page 1872, as the 10th Floor Lease was assigned by Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC, as assignor, to Henry Hudson Holdings LLC, as assignee, dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1882, as the 10th Floor Lease was amended by an unrecorded Amendment to Lease made by and between Irving Schatz and Henry Hudson Holdings LLC dated as of August 17, 2004, as the 10th Floor Lease was further assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and Seller, as assignee, dated as of November 24, 2020; and (ii) that certain condominium unit known as the "Store Unit" in the Condominium (which is Unit 4 of the Condominium and which is also identified as Lot 1704), pursuant to that certain Lease dated January 1, 1999 (as amended and assigned pursuant to the following described transfers, the "Store Unit Lease") made by Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch, jointly, as lessor ("Store Unit Lessor", and together with the current 10th Floor Lessor, are herein collectively referred to as the "Lessors") and Henry Hudson Holdings LLC, as original lessee, as evidenced by a memorandum of lease dated as of September 30, 1999 and recorded on October 27, 1999 in Reel 2979 Page 2172, as the Store Unit Lease was amended by unrecorded Amendment to Lease dated as of September 30, 1999, as the Store Unit Lease was further amended by the unrecorded Amendment to Lease dated as of August 13, 2004, as the Store Unit Lease was assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and Seller, as assignee, dated as of November 24, 2020. The 10th Floor Lease and Store Unit Lease are collectively herein referred to as the "Unit Leases". Seller acquired title to its leasehold interest in: (A) the 10th Floor Lease as the designee of Henry Hudson Holdings LLC's Leasehold Mortgagee (as that term is defined in the 10th Floor Lease) by an assignment in lieu of foreclosure dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630; and (B) the Store Unit Lease as the designee of Henry Hudson Holdings LLC's Leasehold Mortgagee (as that term is defined in the Store Unit Lease) by an assignment in lieu of foreclosure dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629. Seller's right, title, and leasehold interest in and to the 10th Floor Unit and the Store Unit pursuant to the Unit Leases are herein collectively referred to as the "Leased Units", with the Leased Units more particularly described on Exhibit A attached hereto. The Owned Units and the Leased Units are herein collectively referred to as the "Units";

NOW, THEREFORE, in consideration of the mutual promises and agreements contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby mutually acknowledged, Seller and Purchaser covenant and agree as follows:

Article 1.    Premises.

1.1    Premises. Seller shall sell and convey to Purchaser, and Purchaser shall purchase from Seller, upon the terms, covenants and conditions hereinafter set forth all of Seller's right, title and interest in and to:

(i)    the Owned Units and any and all fixtures and improvements owned by Seller erected thereon and therein;

2

ACTIVE 61730742v13

(ii)     the Leased Units and any and all fixtures and improvements owned by Seller erected thereon and therein;

(iii)     any equipment, appliances, building materials, fixtures and other similar personal property attached or appurtenant to the Units, to the extent owned by Seller and not owned by the Condominium or by any occupants occupying the single resident occupancy units set forth on the SRO Schedule (as hereinafter defined) within the Units (such occupants, collectively, "Tenants"), all in their presently existing "as is" condition and state of repair on the date hereof, subject to reasonable wear and tear between the date hereof and Closing Date (as hereinafter defined) (collectively, the "Fixtures");

(iv)     all easements, covenants and other rights adjoining or appurtenant to the Units (together with the Owned Units and the Leased Units, the "Real Property");

(v)     to the extent assignable, all warranties, if any, issued to the Seller by any manufacturer or contractor in connection with construction or installation of equipment or any component of the improvements included as part of the Units (the "Warranties");

(vi)     to the extent assignable, all governmental and public certificates, permits, licenses, entitlements, agreements, development rights, variances, waivers, estoppels, bonds, claims and rights (including those in favor of Seller from any contractor, subcontractor, manufacturer or other person relating to the construction, maintenance, operation or repair of the Real Property or any component thereof), and approvals relating to the operation, use, maintenance or occupancy of the Units, including, without limitation, any certificate(s) of occupancy (collectively, the "Permits");

(vii)     items of tangible personal property including, but not limited to, all furniture, fixtures, machinery, security systems, china, glassware, silverware, kitchen and bar small goods, guest supplies, operating supplies, printing, stationary and uniforms, whether in use or held in reserve storage in connection with the former operation of the Units as a hotel, reserve stock of linens, towels, paper goods, soaps, cleaning supplies and the like with respect to the former operation of the Units as a hotel, and other tangible personal property of every kind and nature located in the Units and owned by Seller (collectively, the "Personal Property") other than the personal property listed on Schedule L attached hereto (the "Excluded Personal Property"); and

(viii)     all management, service and maintenance contracts or other agreements of similar nature affecting the Premises or the operation thereof (collectively, the "Service Contracts") which Purchaser has elected in its sole and absolute discretion at least forty-five (45) days prior to the Closing Date to assume (the "Designated Service Contracts"), and which Designated Service Contracts shall remain in effect after Closing, as the same may be amended, modified or extended from time to time in accordance with the terms of this Agreement.

All of the foregoing shall collectively be referred to herein as the "Premises".

Article 2.      Purchase Price.

2.1      The purchase price for the Premises is TWO HUNDRED SEVEN MILLION FIVE HUNDRED THOUSAND and 00/100 DOLLARS ($207,500,000.00) (the "Purchase Price"), and is payable by Purchaser as follows:

(a)      Purchaser shall deposit TEN MILLION and 00/100 DOLLARS ($10,000,000.00) (the "Deposit"), with First American Title Insurance Company ("Escrow Agent"), by wire transfer of immediately available Federal funds, on or before 5:00 P.M. (New York time) on the date that is two (2) Business Days after the execution of this Agreement by Purchaser and Seller, as a downpayment toward the Purchase Price, which Deposit shall be non-refundable (except as otherwise set forth herein) and held and disbursed by Escrow Agent pursuant to the terms and conditions of this Agreement. Upon receipt by Escrow Agent of the Deposit, Escrow Agent shall cause the Deposit to be deposited into an interest-bearing account at a national bank selected by Escrow Agent. All interest on the Deposit becomes part of the Deposit and any interest thereon will be applied to payment of the Purchase Price at Closing.

(b)      The balance of the Purchase Price, in an amount equal to the difference between the Purchase Price and the Deposit, subject to adjustments and credits as provided for herein (the "Balance") shall be paid by Purchaser on the Closing Date (as hereinafter defined), by wire transfer of immediately available Federal funds to an account or accounts designated by Seller (which Closing and wire transfer shall be facilitated through Escrow Agent).

(c)      Purchaser and Seller shall exercise commercially reasonable efforts to agree upon the allocation of the Purchase Price between the Real Property, on the one hand, and the Personal Property, Fixtures, Warranties, and Permits, on the other hand, prior to Closing. With respect to the remaining allocation of the Purchase Price allocable to the Real Property, Seller and Purchaser agree to allocate 10-15% to any right, title and interest in and to the land (and land-equivalents) being conveyed, and 85-90% to any right, title and interest in and to the Building being conveyed. If Purchaser and Seller cannot agree upon the allocation of the Purchase Price, each party shall file federal, state and local returns based on each party's own determination of the proper allocations of the Purchase Price, each bearing its own consequences of any discrepancies; provided, however, that Seller's allocation shall be used for all transfer tax and similar filings.

Article 3.      Closing.

3.1      Closing of title to the Premises (the "Closing") shall take place on April 4, 2022, through an escrow-style closing conducted by the Escrow Agent and Title Company, whereby Purchaser and Seller and their respective attorneys consummate the Closing without being physically present at the offices of the Escrow Agent or Title Company to exchange closing documents and required funds through escrow, TIME BEING OF THE ESSENCE with respect to Purchaser's and Seller's obligation to close on or before 3:00 pm EST on such date (such date hereinafter referred to as the "Closing Date"). Notwithstanding the foregoing, Purchaser shall have a one-time right to extend the Closing Date by a period not to exceed thirty (30) days, such right exercisable by giving notice thereof to Seller at least five (5) Business Days before the then-scheduled Closing Date. Notwithstanding the notice methods provided for in Article 17, the

4

foregoing Closing Date extension notice may be provided solely by electronic mail delivery from counsel for Purchaser to counsel for Seller.

Article 4.     Permitted Exceptions.

4.1    The Premises shall be sold and conveyed, and Purchaser shall accept title to the Premises, subject to the following matters (collectively, the "Permitted Exceptions"):

(a)    The matters set forth on Schedule A hereof;

(b)    The Unit Leases;

(c)    All covenants, easements, reservations, restrictions and agreements of record, affecting the Premises, provided same do not prohibit or interfere in any material respect with the current use of the Premises;

(d)    Any and all present and future laws, regulations, restrictions, requirements, ordinances, resolutions and orders affecting the Premises, including, without limitation, any laws relating to zoning, building, environmental protection and the use and occupancy of the Premises;

(e)    Real estate taxes that are a lien, but are not yet due and payable, subject to adjustment at Closing, as provided for herein;

(f)    Grants made prior to the date hereof of licenses or easements or other rights in favor of any public or private utility company or governmental entity for, or pertaining to, utilities, sewers, water mains or drainage, whether or not of record, provided same do not prohibit or interfere in any material respect with the current use of the Premises;

(g)    The state of facts shown on or by the survey prepared by Montrose Surveying Co., LLP., with a survey update date of January 10, 2022 (the "Survey"), and any additional state of facts or physical condition which a current accurate survey or physical inspection of the Premises would disclose, provided same do not prohibit or interfere in any material respect with the current use of the Premises;

(h)    Intentionally omitted;

(i)    The lien of any water charges or sewer rents that are not yet due and payable, subject to adjustment as hereinafter provided;

(j)    Rights of Tenants to occupy rooms or units within the Premises;

(k)    The Condominium Documents;

(l)    Any other matters that would constitute objections to title under Section 5.1 and with respect to which the Title Company (as hereinafter defined) certifies that it will insure title to the Premises free of such matters, at regular rates without the payment of additional premiums, for the Purchaser and Purchaser's successors and assigns; and

5

(m)     The standard printed exceptions appearing on the title policy to be issued by the Title Company.

4.2     The Permitted Exceptions shall not constitute grounds for objection by Purchaser, and Seller shall have no obligation to remove any Permitted Exception as a condition to Purchaser's obligation to purchase the Premises in accordance with this Agreement. Notwithstanding anything to the contrary in this Article 4, on or prior to the Closing Date, Seller shall pay, discharge and otherwise remove of record, at Seller's sole cost and expense, all of the following: (i) any mortgages, deeds of trust or other security instruments for any financing placed by Seller on the Real Property and all of the mortgages as reflected in the Mortgage Schedule of the Commitment (defined herein) and set forth on Schedule E hereof, (ii) taxes that are then due and payable or delinquent as of Closing, (iii) liens and other encumbrances (other than Permitted Exceptions) which Seller has intentionally placed on the Real Property whether existing before or after the date hereof, (iv) any mechanic's lien except (x) those resulting from the acts or omissions of Purchaser or Purchaser's agents and (y) those which are the responsibility of any Unit Lessor under the Unit Leases, (v) all financing statements and other liens or encumbrances that secures indebtedness of Seller including those set forth on  Schedule E hereof, (vi) judgment liens against the Seller, and (vii) any other title exception (which is not a Permitted Exception) that may be removed by payment of an ascertainable and liquidated amount which in the aggregate does not exceed $2,100,000.00 (collectively, the "Mandatory Removal Items").  Seller shall pay, discharge, and otherwise remove of record on or prior to Closing, at Seller's sole cost and expense, all Mandatory Removal Items regardless of whether or not Purchaser provides written notice of the requirement to pay, discharge, and otherwise remove the Mandatory Removal Items.

Article 5.       State of Title; Objections.

5.1     Purchaser acknowledges receipt of (i) that certain Title Examination Report issued by Royal Abstract of New York LLC ("Title Company") as agent for Escrow Agent under Title No. 915047 with effective date of December 8, 2021 (the "Commitment"), and (ii) the Survey.  At Closing, Purchaser may cause title to the Premises to be insured by the Title Company at Purchaser's sole cost and expense.  Except as otherwise expressly provided in this Agreement, Seller shall have no obligation to remove any exception to title other than the Mandatory Removal Items.  Purchaser unconditionally waives any right to object to any matters set forth in the Commitment and the Survey, except for the Mandatory Removal Items and those matters set forth in the Commitment and listed on Schedule E attached hereto and incorporated herein.  If exceptions to title appear on any update or continuation of the Commitment (each a "Continuation") which are not Permitted Exceptions, Purchaser shall notify Seller thereof in writing within the earlier of five (5) Business Days after Purchaser receives such Continuation and the last Business Day prior to the Closing Date, **TIME BEING OF THE ESSENCE**, and Seller shall have five (5) Business Days (with any attendant extension of the Closing Date if Purchaser's written notice if delivered less than five (5) Business Days prior to the then scheduled Closing Date) to elect to attempt to eliminate such exception or not.  If Seller fails to respond after such five (5) Business Day period it shall be deemed that Seller has elected not to eliminate such exceptions.  If Seller is unable, or elects not to attempt, to eliminate such exceptions to title, or if Seller elects to attempt to eliminate any such exceptions to title but is unable to do so or thereafter decides not to eliminate the same, and accordingly, is unable to convey title to the Premises in accordance with the provisions of this Agreement, Seller shall so notify Purchaser and, within five (5) Business Days after receipt of such

6

ACTIVE 61730742v13

notice from Seller, Purchaser shall elect either (i) to terminate this Agreement by notice given to Seller and Escrow Agent (**TIME BEING OF THE ESSENCE** with respect to Purchaser's notice), in which event, neither party to this Agreement shall have any further rights or obligations hereunder, except that Escrow Agent shall refund to Purchaser the Deposit (together with all interest thereon, if any) and except for the rights and obligations hereunder that expressly survive the termination of this Agreement, or (ii) to accept title to the Premises subject to such exceptions, without any abatement of the Purchase Price. If Purchaser shall not notify Seller of such election within such five (5) Business Day period, **TIME BEING OF THE ESSENCE**, Purchaser shall be deemed to have elected clause (ii) above with the same force and effect as if Purchaser had elected clause (ii) within such five (5) Business Day period.  Notwithstanding the notice methods provided for in Article 17, the notices provided for in this Section 5.1 may be provided solely by electronic mail delivery by counsel for either party.

5.2     If the Commitment or any Continuation discloses judgments, bankruptcies or similar returns against persons or entities having names the same as or similar to that of Seller but which returns are not against Seller, Seller, on request, shall deliver to Purchaser and Title Company affidavits reasonably acceptable to Seller and Title Company to the effect that such judgments, bankruptcies or returns are not against Seller, in form and substance sufficient to permit removal of same as exceptions in Purchaser's title policy.

5.3     If the Commitment or any Continuation discloses exceptions (other than the Permitted Exceptions) which (i) may be removed solely by reference to Seller's existing title policy, or (ii) were created, consented to or affirmatively permitted by Seller in writing after the date hereof, then Seller shall remove such exceptions.  Notwithstanding the foregoing, Seller, at its option in lieu of satisfying such exceptions, may deposit with Title Company such amount of money and provide such documentation, affidavits and indemnities as may be reasonably determined by Title Company as being sufficient to induce it to insure Purchaser against collection of such liens and/or encumbrances, including interest and penalties, out of or against the Real Property, in which event such exceptions shall not be objections to title.

5.4     Seller shall be entitled to one or more adjournments of the Closing Date, not to exceed sixty (60) days in the aggregate, to remove any exceptions to title which Seller is obligated to remove under this Agreement or elects to attempt, but is not obligated, to remove.

5.5     Notwithstanding the foregoing provisions of this Article 5, in the event that Title Company or any title company retained by Purchaser shall raise an exception to title which is not a Permitted Exception, Seller shall have no obligation to eliminate such exception and Purchaser shall have no right to terminate the Agreement by reason of such exception (and such exception shall be deemed a Permitted Exception) if Title Company or a nationally recognized title company, as applicable, shall be prepared to insure title to the Premises at regular rates without such exception.

5.6     Purchaser shall pay the costs of examination of title and any owner's or mortgagee's policy of title insurance to be issued insuring Purchaser's title to the Premises, as well as all other title charges, survey fees, recording charges (other than to remove of record or satisfy Mandatory Removal Items and the costs to remove, satisfy or cure such other exceptions and title matters

7

which Seller elects to cure pursuant to Section 5.1) and any and all other title and survey costs or expenses incident to the Closing or in connection therewith.

5.7    Notwithstanding anything in this Article 5 hereof to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller.  The acceptance of the Deed by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for the documents delivered at Closing and such matters which are expressly stated in this Agreement to survive the Closing, to the limit of such survival.

5.8    At Closing, Seller shall convey, transfer, grant and set over to Purchaser, fee simple title to the Owned Units and leasehold title to the Leased Units, free and clear of encumbrances, except only the Permitted Exceptions and any other encumbrances and exceptions expressly approved by Purchaser in writing.

Article 6.    Responsibility for Violations.

6.1    Purchaser shall acquire the Premises subject to all violations of building, fire, sanitary, environmental, housing and similar laws and regulations, whether or not noted or issued on the date hereof or on the Closing Date (collectively, "Violations"), including, but not limited to, those the removal of or compliance with which are the responsibility of Tenants, Unit Lessors under the Unit Leases or the Board of Managers under the Condominium Documents.   Seller shall have no obligation to cure or remove any Violations on or before Closing, except that Seller shall be responsible for, and pay at Closing, any penalties or fines imposed on or before the Closing in connection with any Violations issued with respect to the Premises prior to the Closing Date (it being understood and agreed that it shall be Purchaser's responsibility, at its sole cost and expense, to pay any fines or penalties that accrue or arise after the Closing Date, even if the Violation was assessed or noted prior to the Closing Date).

Article 7.    Condition of the Premises; "As-Is"; Rights of Inspection.

7.1    Purchaser shall accept the Premises at the Closing in its "as is" condition as of the date hereof and as of the Closing Date, reasonable wear and tear and any further deterioration of the condition of the Premises caused by or arising out of any casualty that may have occurred prior to the date hereof excepted, and subject to (x) the provisions of Article 12 hereof in the event of a casualty or condemnation and (y) Seller's compliance with the covenants contained in Article 13 hereof.  Seller shall not be liable for any latent or patent defects in the Premises or bound in any manner whatsoever by any guarantees, promises, projections, operating expenses or other information pertaining to the Premises made, furnished or claimed to have been made or furnished, whether orally or in writing, by Seller, the Boards of Managers of the Condominium (the "Board of Managers") under the Condominium Documents, the Lessors or any other person or entity, or any partner, employee, agent, attorney or other person representing or purporting to represent Seller, except to the extent expressly set forth in this Agreement or in any document or instrument expressly required in this Agreement to be delivered at Closing (collectively, the "Closing Documents").  Purchaser acknowledges that neither Seller nor any of the employees, agents or attorneys of Seller have made or do make any oral or written representations or warranties

8

whatsoever to Purchaser, whether express or implied, except as expressly set forth in this Agreement or in any Closing Document, and, in particular, that no such representations and warranties have been made by Seller with respect to the physical, environmental condition or operation of the Premises, the presence, introduction or effect of hazardous materials at or affecting the Premises, the actual or projected revenue and expenses of the Premises, the zoning and other laws, regulations and rules or environmental laws applicable to the Premises or the compliance of the Premises therewith, the current or future real estate tax liability, assessment or valuation of the Premises, the availability of any financing for the alteration, rehabilitation or operation of the Premises from any source, including, without limitation, any state, city or Federal government or any institutional lender, the current or future use of the Premises, including, without limitation, the use for residential or commercial purposes, the present and future condition and operating state of any and all machinery or equipment in the Premises and the present or future structural and physical condition of the Building or its suitability for rehabilitation or renovation, the ownership or state of title of any Personal Property, the quantity, quality or condition of the Personal Property or Fixtures, the use or occupancy of the Premises or any part thereof, or any other matter or thing affecting or relating to the Premises, or the transactions contemplated hereby, except as specifically set forth in this Agreement or in any Closing Document.

7.2    Purchaser has not relied and is not relying upon any representations or warranties or upon any statements made in any informational materials with respect to the Premises provided by Seller or any other person or entity, or any shareholder, employee, agent, attorney or other person representing or purporting to represent Seller, other than the representations and warranties expressly set forth in this Agreement or in any Closing Document.

7.3    PURCHASER ACKNOWLEDGES THAT SELLER AND CERTAIN OF ITS AFFILIATES, AGENTS, ATTORNEYS, CONSULTANTS AND REPRESENTATIVES PROVIDED TO PURCHASER OR MADE AVAILABLE TO PURCHASER (IN THE DATA ROOM, DELIVERED (VIA EMAIL) DIRECTLY TO PURCHASER AND/OR PURCHASER'S AGENTS AND CONSULTANTS INCLUDING ITS ATTORNEYS, OR CONTAINED IN THE SCHEDULES AND EXHIBITS ANNEXED HERETO), CERTAIN DUE DILIGENCE MATERIALS IN SELLER'S POSSESSION RELATING TO THE PREMISES AND THE USE AND OPERATION THEREOF (WITH ALL SUCH DOCUMENTS AND MATERIALS HERETOFORE PROVIDED TO PURCHASER OR PURCHASER'S AGENTS, TOGETHER WITH ANY COPIES OR REPRODUCTIONS OF SUCH DOCUMENTS OR MATERIALS, OR ANY SUMMARIES, ABSTRACTS COMPILATIONS OR OTHER ANALYSES MADE BY OR FOR PURCHASER BASED ON THE INFORMATION IN SUCH DOCUMENTS OR MATERIALS REFERRED TO COLLECTIVELY HEREIN AS "SELLER DUE DILIGENCE MATERIALS"). PURCHASER ACKNOWLEDGES AND AGREES THAT ANY SELLER DUE DILIGENCE MATERIALS DELIVERED OR TO BE DELIVERED BY ANY SELLER RELATED PARTIES TO PURCHASER ARE BEING MADE AVAILABLE SOLELY AS AN ACCOMMODATION TO PURCHASER AND, OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY CLOSING DOCUMENT, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY SELLER RELATED PARTY AS TO THEIR ACCURACY OR COMPLETENESS OF FACTS OR OPINIONS SET FORTH THEREIN AND THAT ANY RELIANCE BY PURCHASER ON SUCH REPORTS OR OTHER DOCUMENTS IN CONNECTION WITH THE PURCHASE OF THE PREMISES IS UNDERTAKEN AT PURCHASER'S SOLE RISK.  OTHER THAN AS EXPRESSLY SET FORTH IN THIS

9

AGREEMENT OR IN ANY CLOSING DOCUMENT, PURCHASER AGREES THAT NO SELLER RELATED PARTY HAS ANY LIABILITY OR OBLIGATION WHATSOEVER FOR ANY INACCURACY IN OR OMISSION FROM THE SELLER DUE DILIGENCE MATERIALS, OFFERING MATERIALS PREPARED IN CONNECTION WITH THE SALE OF THE PROPERTY OR ANY REPORT OR OTHER DOCUMENTS MADE AVAILABLE TO PURCHASER OR PURCHASER'S AGENTS.  PURCHASER ACKNOWLEDGES THAT SELLER HAS PROVIDED THE OPPORTUNITY FOR PURCHASER TO MAKE INSPECTIONS AND THAT PURCHASER HAS CONDUCTED ITS OWN INVESTIGATION OF THE CONDITION OF THE PREMISES, TO THE EXTENT PURCHASER DEEMS SUCH AN INVESTIGATION TO BE NECESSARY OR APPROPRIATE.

7.4     Without limiting the generality of the foregoing, Purchaser acknowledges that it has had an opportunity to conduct its own investigation of the Premises with regard to Hazardous Materials and compliance of the Premises with Relevant Environmental Laws.  Purchaser agrees to take title to the Premises subject to all costs and liabilities arising out of or in any way relating to Hazardous Materials and Relevant Environmental Laws, and Purchaser acknowledges that Seller shall not have any responsibility for any such costs and liabilities.  Purchaser hereby releases Seller, its principals and affiliates, and their respective officers, directors, members, managers, partners, agents, employees, successors and assigns (collectively, the "Seller Related Parties"), from and against any and all claims, counterclaims and causes of action which Purchaser may now or in the future have against any of the foregoing parties arising out of the existence of Hazardous Materials affecting the Premises.  For purposes of this Agreement: the term "Hazardous Materials" means any mold, solid wastes, toxic or hazardous substances, wastes or contaminants, polychlorinated biphenyls, paint or other materials containing lead, urea formaldehyde foam insulation, radon, asbestos, and asbestos containing material, petroleum product and any fraction thereof as any of these terms is defined in or for the purposes of any Relevant Environmental Laws (as hereinafter defined), and any Pathogen (as hereinafter defined); the term "Pathogen" means any pathogen, toxin or other biological agent or condition, including but not limited to, any fungus, mold, mycotoxin or microbial volatile organic compound; and the term "Relevant Environmental Laws" means  any and all laws, rules, regulations, orders and directives, whether federal, state or local, applicable to the Premises or any part thereof with respect to the environmental condition of the Premises or any part thereof, and any activities conducted on or at the Premises, including by way of example and not limitation: (i) Hazardous Materials; (ii) air emissions, water discharges, and any other environmental, health or safety matter; (iii) the existence of any underground storage tanks that contained or contain Hazardous Materials; and (iv) the existence of pcb contained electrical equipment.

7.5     Intentionally omitted.

7.6     Purchaser hereby releases Seller and the Seller Related Parties, from and against any and all claims, counterclaims and causes of action which Purchaser may now or in the future have against any of the foregoing parties arising out of the existence of Hazardous Materials affecting the Premises.

7.7     Purchaser and/or Purchaser's designees, agents, advisors, representatives, employees, consultants, appraisers, engineers, contractors and prospective lenders and such prospective lenders' agents, advisors and representatives ("Purchaser's Representatives"), from

10

*ACTIVE 61730742v13*

time to time before the Closing and during regular business hours, upon at least two (2) Business Days' prior written notice to Seller, may inspect the Premises, provided that (i) Purchaser shall not communicate with any employees of Seller or  Seller's managers or contractors or with Tenants or occupants of the Premises without, in each instance, the prior written consent of Seller, which consent may be withheld in Seller's sole discretion, (ii) Purchaser shall not perform any tests with respect to such Premises without the prior written consent of Seller in each instance, which consent shall not be unreasonably withheld, conditioned or delayed; provided however, if such tests are invasive Seller shall have the right to withhold its consent to such tests in its sole and absolute discretion, and (iii) Purchaser shall have no additional rights or remedies under this Agreement as a result of such inspection(s) or any findings in connection therewith.  Without limiting the foregoing, Purchaser agrees that it shall not have any so-called "due diligence period" and that it shall have no right to terminate this Agreement or obtain a reduction of the Purchase Price as a result of such inspection(s) or any findings in connection therewith (including relating to the physical condition of the Premises, the operation of the Premises or otherwise).  Any entry upon the Premises shall be performed in a manner which is not disruptive to Tenants or the normal operation of the Premises and shall be subject to the rights of any Tenants or occupants of the Premises.  Purchaser shall (i) exercise reasonable care at all times that Purchaser and/or Purchaser's Representatives shall be present in the Premises, (ii) at Purchaser's expense, observe and comply with all applicable laws and any conditions imposed by any insurance policy then in effect with respect to the Premises and (iii) not engage in any activities which would violate the provisions of any permit or license pertaining to the Premises.  Seller shall have the right to have a representative of Seller accompany Purchaser during any such communication or entry into or upon the Premises.

7.8    Purchaser hereby agrees to indemnify, defend and hold Seller, its officers, shareholders, partners, members, directors, employees, attorneys and agents harmless from and against any and all liability, actual loss, cost, judgment, claim, damages or expense (including, without limitation, attorneys' fees and expenses), resulting from or arising out of the entry upon the Premises before the Closing by Purchaser or Purchaser's Representatives, other than (x) the mere discovery of pre-existing conditions, except to the extent such pre-existing conditions were exacerbated by the entry upon the Premises before the Closing by Purchaser or Purchaser's Representatives, and (y) those resulting from gross negligence or willful misconduct of Seller or its representatives.  The foregoing indemnification shall survive the Closing or the termination of this Agreement.

7.9    As a condition precedent to entering the Premises in connection with any inspection, Purchaser shall maintain or cause to be maintained, at Purchaser's sole cost and expense, a policy of comprehensive general public liability and property damage insurance by an insurer or syndicate of insurers reasonably acceptable to Seller: (A) with a combined single limit of not less than One Million Dollars ($1,000,000.00) general liability and Three Million Dollars ($3,000,000.00) excess umbrella liability, (B) insuring Purchaser, Seller, Existing Manager, each of their respective affiliates, Seller's lender and any other person or entity related to Seller or involved with the transaction contemplated by this Agreement (such additional persons or entities to be designated in writing by Seller), as additional insureds, against any injuries or damages to persons or property that may result from or are related to (x) Purchaser's entry into the Premises or upon the Premises and (y) any inspection or other activity conducted thereon by Purchaser's Representatives and (C) containing a provision to the effect that insurance provided by Purchaser

11

hereunder shall be primary and noncontributing with any other insurance available to Seller or any other additional insured party.  Purchaser shall deliver evidence of such insurance coverage to Seller before the commencement of the first inspection and proof of continued coverage before any subsequent inspection.

7.10    Notwithstanding any provision in this Agreement to the contrary, neither Purchaser nor any of Purchaser's Representatives shall contact any federal, state, county, municipal or other department or governmental agency regarding the Premises without Seller's prior written consent thereto, in each instance; provided, however, that the foregoing shall not prohibit Purchaser from accessing publicly accessible governmental records and databases from time to time or from contacting governmental authorities to obtain zoning verification letters and similar documentation necessary to complete a zoning report.  In addition, if Seller's consent is obtained by Purchaser, Seller shall be entitled to receive at least five (5) Business Days prior written notice of the intended contact and shall be entitled to have a representative present when Purchaser and/or Purchaser's Representatives has any such contact with any governmental official or representative. Notwithstanding the foregoing, Purchaser shall be permitted, at its sole cost and expense, to file applications for permits for the matters described on Schedule J attached hereto (collectively, the "Allowed Applications") prior to the Closing Date as a "contract vendee" (and not as the owner of the Premises), provided that, at least five (5) Business Days prior to the date on which Purchaser anticipates submitting any such Allowed Application, Purchaser provides Seller with a complete copy of the subject Allowed Application, together with all submission materials attendant thereto, for Seller's review.  Purchaser agrees to make such modifications, clarification or corrections reasonably requested by Seller to confirm that the application is being submitted as a "contract vendee" and imposing no obligations or liabilities upon Seller, as the owner of the Premises, provided that Seller provides written notice of such reasonably requested modifications, clarification or corrections to Purchaser within five (5) Business Days after receipt of Purchaser's Allowed Application, together with all submission materials attendant thereto (and failure of Seller to provide written notice of any reasonably requested modifications, clarification or corrections within that five (5) Business Day period shall be deemed Seller's confirmation of the corresponding Allowed Application, together with all submission materials attendant thereto, it being understood that Seller's posing of questions regarding such documentation during the five (5) Business Day period shall mean that the Allowed Application is not deemed confirmed).  Upon satisfying the foregoing, Purchaser shall be permitted to submit such Allowed Application to the appropriate governmental authority. Except for the Allowed Applications, in no event shall Purchaser be permitted to file any applications, requests, certifications or permits (including, without  limitation, any application for a Certificate of No Harassment) with the NYS Department of Housing and Community Renewal, the NYC Department of Housing Preservation and Development, the NYC Department of City Planning, or other governmental agencies, without the prior written consent of Seller, which may be granted or withheld in its sole discretion.  If the Closing does not occur for any reason hereunder, Purchaser agrees to take such steps as are necessary to rescind or otherwise terminate the Allowed Applications submitted and/or the evaluation processes engaged by the applicable governmental agencies associated with the submission of such Allowed Applications.  Any breach of the foregoing covenants shall constitute a default by Purchaser hereunder.  Purchaser agrees to indemnify and hold harmless Seller and the Seller Related Parties for any loss, cost, expense, or damage suffered by Seller as a result of or arising out of (x) any breach or violation of the foregoing covenants and (y) claims made by Tenants or other Persons who become aware of the filing of the Allowed Applications.  The

12

foregoing provisions of this Section 7.10 shall survive the Closing or earlier termination of this Agreement.

7.11    The provisions of this Article 7 shall survive the Closing.

Article 8.        Representations and Warranties.

8.1    Seller hereby represents and warrants to Purchaser that the following are true and correct in all material respects as of the Effective Date:

(a)    This Agreement constitutes, and each document and instrument to be executed and delivered by Seller hereunder (collectively, the "Seller's Documents"), when so executed and delivered, shall constitute, the legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms, covenants and conditions.

(b)    Seller (i) is a limited liability company duly organized in the State of Delaware and licensed and/or qualified to conduct business in the State of New York; (ii) has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby; (iii) has full power and authority to enter into and perform this Agreement and to enter into the documents to be executed and delivered in accordance with the terms hereof; and (iv) has full power and authority to consummate the transactions as contemplated herein.

(c)    Neither the entering into of this Agreement, nor the consummation of the transactions contemplated hereunder, will constitute a violation or breach by Seller of any contract, writ, order, judgment, or other instrument or agreement to which Seller is a party, or to which it is subject to by which any of its assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, ordinance, rule or regulation of any governmental authority affecting Seller.  The execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated hereby, do not require Seller to obtain any consent, authorization, or approval which has not already been obtained.

(d)    Seller is not subject to any pending voluntary or involuntary reorganization, liquidation, receivership, or other proceedings under any federal, state or local insolvency, liquidation, reorganization or similar type laws.  Seller has not applied for, consented to, or is subject to the appointment of a receiver, trustee, custodian, liquidator or other similar official for itself or for all or a substantial part of its assets, and has not made an assignment for the benefit of creditors.

(e)    To Seller's knowledge, Seller has made available to Purchaser true and complete copies of the Unit Leases.  To Seller's knowledge, the Unit Leases are in full force and effect and there are no monetary defaults or material non-monetary defaults of Seller, as lessee, or of Lessors, under the Unit Leases.

(f)    The list of single resident occupancy units set forth on Schedule C (the "SRO Schedule") sets forth the units occupied by Tenants affecting the Premises on the date of this Agreement and is the SRO Schedule relied on by Seller in the ordinary course operation of its business. There are no written lease, license or occupancy agreements evidencing such rights held

13

by Tenants.  There are no security deposits held by Seller on account of the Tenants.  Seller has disclosed to Purchaser that possession of unit number 2253 is in dispute.  Other than the list of units set forth on Schedule C, to Seller's knowledge, the other units within the Real Property are vacant.  To Seller's knowledge, there are no pending or threatened in writing claims of harassment from any occupants of the single resident occupancy units in the Real Property against Seller or the Real Property.

(g)     Seller is not a party to, nor does Seller have actual knowledge of the existence of any, written leases, subleases or licenses affecting the Premises in which Seller holds the lessor's, sublessor's, licensor's or grantor's interest.  The August 28, 2000 Lease between Henry Hudson Holdings LLC (as landlord) and Hudson Leaseco LLC (as tenant) affecting the Real Property has been terminated, and the August 12, 2011 Lease between Henry Hudson Holdings LLC (as landlord) and 58th Street Bar Company, LLC (as tenant) has been terminated.

(h)     There are no tax certiorari proceedings pending with respect to the Premises or any part thereof other than as set forth on Schedule B annexed hereto.

(i)     Seller is not a Prohibited Person (as defined below).  The assets Seller will transfer to Purchaser under this Agreement are not the property of, and are not beneficially owned, directly or indirectly, by a Prohibited Person.  The assets Seller will transfer to Purchaser under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. §1956(c)(7).  For purposes hereof, a "Prohibited Person" means any of the following:  (i) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "Executive Order"); (ii) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") at its official website, http://www.treas.gov/offices/enforcement/ofac; (iv) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (v) a person or entity that is affiliated with any person or entity identified in any of clauses (i), (ii), (iii) and/or (iv) above.

(j)     Seller is not a "foreign person" as defined in the Internal Revenue Code of 1986, as amended (the "Code") Withholding Section.

(k)     To Seller's knowledge, Seller has made available to Purchaser true and complete copies of the Condominium Documents.  A list of each of the Condominium Documents is included on Schedule D annexed hereto.  To Seller's knowledge, the Condominium Documents are in full force and effect and Seller has not delivered a notice of default to the Board of Managers.  There have been no Common Charges (as defined in the Condominium Documents) under the Condominium Documents charged by the Board of Managers for the calendar year period preceding the Effective Date and, accordingly, there are no Common Charges under the Condominium Documents due and payable as of the Effective Date.

(l)     There are no judgments of any kind against Seller unpaid or unsatisfied of record, which would be expected to have a material adverse effect on Seller's ability to perform

14

hereunder or, except as may be set forth in the Commitment, which would be binding on the Premises.  There is no material action, suit or proceeding to which Seller is a party, pending or, to Seller's actual knowledge, threatened in writing against or affecting Seller or the Premises, which, if adversely determined, would (i) have a material adverse effect upon title to the Premises, (ii) prohibit or impair Seller from consummating the transactions contemplated hereby, or (iii) materially adversely affect the use or operation of the Premises.

(m)    Except as set forth on Schedule H, there are no pending, or to Seller's knowledge, threatened in writing, lawsuits, actions, complaints, claims, charges, arbitrations, investigations, grievances, administrative charges or proceedings before any governmental entity under the Labor and Employment Laws (as hereinafter defined), regarding employment discrimination, harassment, retaliation, safety, violations or any other employment-related charges or complaints, wage and hour claims, claims not covered by insurance for workers' compensation or other benefits in connection with or related to the Hotel Employees (as defined in Article 16).

(n)    Seller is not a party to any service, maintenance or similar contracts or agreements with respect to the Premises other than the Service Contracts set forth on Schedule I attached hereto.  Seller has made copies of the Service Contracts available to Purchaser, and to Seller's knowledge, such copies are true, correct and complete in all material respects.  With respect to any Designated Service Contract that Purchaser elects to assume, neither Seller nor, to Seller's knowledge, any other party is in material default under any Service Contract.  Seller is not a party to any property management agreement binding upon the Premises, other than the Existing PMA, of which Seller has made available to Purchaser a true and correct copy and which Existing PMA shall be terminated as of the Closing Date.

(o)    There are no pending or, to Seller's actual knowledge, threatened condemnation or eminent domain proceedings against the Premises.

(p)    Intentionally omitted.

(q)    Seller has not granted to any other person or entity, except Purchaser, any options, rights of first refusal or other purchase rights with respect to the Premises. Seller is not a party to any contract, agreement or commitment to sell, convey, assign, transfer, provide rights of first refusal, option rights or any other similar rights relating to the disposition of the Premises or any portion thereof.

(r)    Seller has not received any written notice of any existing or proposed special assessments against the Premises.

(s)    Except as disclosed by Seller to Purchaser prior to the date hereof and/or as set forth in the Seller Due Diligence Materials, Seller has not received written notice from any governmental authority of the presence of Hazardous Materials on, under or at the Premises in violation of Relevant Environmental Laws.

(t)    Except as set forth on Schedule K, Seller has not received written notice of any Violations.

15

ACTIVE 61730742v13

(u)     Other than the Collective Bargaining Agreement (as defined in Article 16), Seller is not a party to or bound by, and the Premises are not subject to or bound by, any collective bargaining, labor or employment, or development, card check, or neutrality agreement with respect to any employees currently employed to provide services to the Premises or that may in the future be employed to provide services to the Premises, or with respect to the Premises itself.

(v)     Seller has not experienced any strikes, committed any unfair labor practices, and is not aware of any allegations it has committed any unfair labor practice within the period of six months prior to the execution of this Agreement related to the employees represented by the Union.

(w)     Other than the New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund, neither Seller nor any ERISA Affiliate of Seller has contributed or been obligated to contribute to any multiemployer pension plan with respect to the Premises.  For purposes of this Agreement, "ERISA Affiliate" means any entity, trade or business (whether or not incorporated) that is, or has ever been, a member of a "controlled group of corporations" with, or is under "common control" with, or is a member of the same "affiliated service group" with Seller or any of its affiliates, in each case, as defined in Sections 414(b), (c), (m) or (o) of the Code or is, or within the last six years, has been, treated as a single employer for purposes of Section 4001(b)(1) of ERISA.  To Seller's knowledge, Existing Manager has paid all employee benefit contributions due to date required under the Collective Bargaining Agreement to the Union Employee Benefit Funds, and there are no pending or unresolved claims by the Union Employee Benefit Funds or any other multiemployer benefit plan for outstanding or owed contributions, arrears, delinquencies, or for compliance with any audit.  To Seller's knowledge, no complete or partial withdrawal liability under Title IV of ERISA has occurred or been triggered with respect to the Premises during Seller's period of ownership.

(x)     Seller has not received any written notice claiming a breach of the Collective Bargaining Agreement or any violation of any applicable Labor and Employment Laws.

8.2     The representations and warranties of Seller set forth in Section 8.1 (the "Surviving Seller Representations") shall be deemed remade on, and shall be true and accurate in all material respects as of, the Closing Date.  The Surviving Seller Representations shall survive for one hundred fifty (150) days after the Closing Date (the "Survival Period"), provided, however, that if Purchaser makes a claim for a breach of any Surviving Seller Representation on or before the expiration of the Survival Period, the Survival Period shall be extended for those claims timely made until such claims are resolved by binding agreement of the parties or final judgment and expiration of applicable appeal periods. Each Surviving Seller Representation shall automatically be null and void and of no further force and effect after the expiration of the Survival Period unless, prior to the end of the Survival Period, Purchaser shall have asserted in writing a specific claim with respect to the particular Surviving Seller Representation and commenced a legal proceeding (a "Proceeding") within thirty (30) days thereafter against Seller alleging that Seller is in breach of such Surviving Seller Representation and that Purchaser has suffered actual damages ("Damages") as a result thereof.  In no event shall Purchaser be entitled to assert any consequential, special or punitive damages with respect to any claims for a breach of Seller Representations pursuant to this Section 8.2, nor shall it be entitled to any award or payment based on such damages.  If Purchaser timely commences a Proceeding, and a court of competent jurisdiction,

16

pursuant to a final, non-appealable order in connection with such Proceeding, determines that (1) the applicable Surviving Seller Representation was breached as of the date of this Agreement or the Closing Date and (2) Purchaser suffered Damages by reason of such breach and (3) Purchaser did not have knowledge or was not deemed to have knowledge of such breach prior to the Closing, then Purchaser shall be entitled to receive an amount equal to the Damages, but in no event in an amount greater than the Ceiling (as hereinafter defined); provided, however, Purchaser shall not be entitled to pursue any claim against Seller for damage to Purchaser that, when combined with all other claims against Seller for breaches of Surviving Seller Representations, is less than the Floor (as hereinafter defined) in the aggregate. If Purchaser has claim(s) against Seller, in excess of the Floor, then Purchaser shall be entitled to pursue the actual loss suffered by Purchaser in connection with such claim(s) against Seller (including, without limitation, recovery of all amounts below and above the Floor), but in no event shall Seller's liability for any and all claims exceed the Ceiling. For purposes of this Section 8.2, Purchaser shall be deemed to have knowledge of: (i) any matter disclosed in any exhibit or schedule to this Agreement, (ii) any matters disclosed in any document or written materials provided by Seller to Purchaser prior to the Closing (including, without limitation, those materials posted in the electronic data room located at https://app.box.com/folder/152329405383?s=r3cxvlnntp4q8hh46fl0bi6kgzljxtuf), (iii) any other matter disclosed in due diligence reports or inspections obtained by Purchaser in connection with the transactions contemplated by this Agreement, and (iv) any matter disclosed by Seller pursuant to a written update to Seller's representations or warranties in accordance with this Agreement. As used herein, "Floor" shall mean with respect to any claim or claims against Seller for breach of any Surviving Seller Representation, FIFTY THOUSAND AND NO/100 Dollars ($50,000.00), and "Ceiling" shall mean TWO MILLION ONE HUNDRED THOUSAND AND NO/100 Dollars ($2,100,000.00), provided, however, that the Ceiling shall not apply with respect to: (x) all of the credits and prorations Purchaser is entitled to pursuant to this Agreement; and (y) Seller's indemnification obligations of Purchaser pursuant to Section 14.1(b) and Article 16 of this Agreement. The provisions of this Section 8.2 shall constitute the sole and exclusive remedy after Closing for breaches of the Surviving Seller Representations and shall survive the Closing. Seller agrees that at Closing, to secure payment of any claims by Purchaser against Seller for a breach of a representation or warranty in accordance with this Section 8.2, a portion of the Purchase Price in an amount equal to the Ceiling shall be deposited in an escrow account with Title Company, to be held and disbursed by Title Company pursuant to an escrow agreement in the form of Exhibit L attached hereto (the "Holdback Escrow Agreement").

8.3     If, prior to Closing, Purchaser has knowledge of any matter which would constitute a material breach of Seller's representations and warranties, Purchaser shall notify Seller of such material breach within the earlier of five (5) Business Days of learning of same and the Closing Date, failing which Purchaser shall be deemed to waive any such corresponding material breach of Seller's representations and warranties. Seller shall have the right to contest Purchaser's determination as to a pre-Closing material breach of Seller's representations and warranties, and shall have the right to attempt to cure such breach without being obligated to complete such cure. In addition, Seller shall have until the date that is the later of the originally scheduled Closing Date and sixty (60) days from the date of Purchaser's notice to cure any such material breach of Seller's representations and warranties and, at Seller's sole option, the Closing Date shall be extended to such sixtieth (60) day (or any earlier Business Day) after Purchaser's notice of breach, in order to permit such cure by Seller. If Seller fails to cure any such material breach of Seller's representations and warranties, then Purchaser, as its sole and exclusive remedy, shall have the

17

right to terminate this Agreement by written notice to Seller, in which case Escrow Agent shall return the Deposit (together with all interest thereon, if any) to Purchaser, Purchaser shall be entitled to reimbursement by Seller of Purchaser's Reimbursement Costs, subject to the limitations set forth in Section 15.2, and neither party to this Agreement shall thereafter have any further right or obligation hereunder, except for the rights and obligations hereunder that expressly survive the termination of this Agreement.

8.4     The terms "to Seller's actual knowledge," "to the best of Seller's actual knowledge" and phrases of similar import shall mean the actual present knowledge (and not constructive knowledge) of Eric Poretsky, without independent inquiry or investigation, and shall not conclusively mean that Seller or such individual is charged with knowledge of the acts, omissions and/or knowledge of Seller's property manager (or any employee thereof), Seller's other agents or employees or Seller's predecessors in title to the Premises.  The foregoing individual is named solely for the purpose of establishing the scope of knowledge and Seller represents that such person is the representative of Seller who is charged with day-to-day administration of information relating to and asset management of the Premises.  Such individual is not a party to this Agreement and shall have no personal liability for any of the representations or warranties hereunder.

8.5     As of the Effective Date, Purchaser hereby represents and warrants as follows:

(i)     Purchaser is familiar with the source of funds for the Purchase Price of the Premises and represents that all such funds will be derived from legitimate business activities and/or from loans from a banking or financial institution.

(ii)    None of Purchaser, any direct or indirect interest holder in Purchaser (collectively, the "Purchaser Parties"), or any affiliate of Purchaser is (a) subject to sanctions of the United States government, (b) in violation of any provision of OFAC or (c) a Prohibited Person similarly designated under any Executive Orders or OFAC.

(iii)   None of the Purchaser, the Purchaser Parties or any affiliate of Purchaser is listed on the Specially Designated Nationals List maintained by the OFAC, and/or on any other similar lists as a Prohibited Person.

(iv)    Purchaser has, and its Purchaser Parties have, required and shall require, and has/have taken and shall take all reasonable measures to ensure compliance with the requirement that no Purchaser Parties or affiliates of Purchaser is or shall be listed on any lists, be a Prohibited Person, or be in violation of any laws, including any OFAC laws.

(v)     None of Purchaser, the Purchaser Parties or any affiliate of Purchaser is or will (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in, any transaction relating to any property or interest in property blocked pursuant to OFAC or the Patriot Act, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in OFAC or the Patriot Act.

(vi)    This Agreement constitutes, and each document and instrument to be executed and delivered by Purchaser hereunder (collectively, the "Purchaser's Documents"),

18

*ACTIVE 61730742v13*

when so executed and delivered, shall constitute, the legal, valid and binding obligations of Purchaser, enforceable in accordance with their respective terms, covenants and conditions.

(vii)    Purchaser (i) is a limited liability company duly organized in the State of Delaware and as of the Closing Date shall be licensed and/or qualified to conduct business in the State of New York; (ii) has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby; (iii) has full power and authority to enter into and perform this Agreement and to enter into the documents to be executed and delivered in accordance with the terms hereof; and (iv) has full power and authority to consummate the transactions as contemplated herein.

(viii)    Neither the entering into of this Agreement, nor the consummation of the transactions contemplated hereunder, will constitute a violation or breach by Purchaser of any contract, writ, order, judgment, or other instrument or agreement to which Purchaser is a party, or to which it is subject to by which any of its assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, ordinance, rule or regulation of any governmental authority affecting Purchaser.  The execution, delivery and performance of this Agreement by Purchaser, and the consummation of the transactions contemplated hereby, do not require Purchaser to obtain any consent, authorization, or approval which has not already been obtained.

(ix)    Purchaser is not subject to any pending voluntary or involuntary reorganization, liquidation, receivership, or other proceedings under any federal, state or local insolvency, liquidation, reorganization or similar type laws.

8.6    All of the foregoing representations and warranties of Purchaser will be and remain true on and as of the Closing Date and shall survive the Closing.

Article 9.    Closing Obligations.

9.1    At or prior to the Closing, Seller shall execute and/or deliver to Title Company the following:

(a)    Two (2) condominium unit deeds in substantially the form attached hereto as Exhibit B and made a part hereof, and properly executed in the form for recording so as to convey title to each of the Owned Units (each, respectively, the "Deed");

(b)    At least fifteen (15) days prior to Closing, two (2) written agreements pursuant to which Seller shall assign to two (2) separate and distinct Permitted Designees of Purchaser (as designated by Purchaser in its sole and absolute discretion), and such Permitted Designees shall assume and agree to be bound by, all obligations and liabilities of Seller under the 10th Floor Lease and Store Unit Lease, respectively, and otherwise with respect to the Leased Units, in substantially the form of Exhibit C attached hereto (each, respectively, the "Assignment and Assumption of Lease");

(c)    a bill of sale, conveying and transferring to Purchaser all right, title and interest of Seller, if any, in and to all Personal Property, Fixtures, Warranties and Permits, in substantially the form attached hereto as Exhibit D and made a part hereof;

19

ACTIVE 61730742v13

(d)      A Real Property Transfer Tax Return with respect to the New York City Real Property Transfer Tax (the "RPT Form");

(e)      A New York State Real Estate Transfer Tax Return and Credit Line Mortgage Certificate with respect to the New York State Real Estate Transfer Tax (the "Form TP-584");

(f)      A New York State Real Property Transfer Report Form RP-5217 NYC (the "RP-5217");

(g)      Intentionally omitted;

(h)      a written notice in substantially form of Exhibit E attached hereto, executed by Seller or by its agent, advising the Tenants of the sale of the Units to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct;

(i)      if the Alternative Agreement (as defined in Article 16, and attached hereto as Exhibit I-2), has been executed by the Seller, Purchaser and the Union, and a fully executed copy is delivered to Seller at least ten (10) days prior to Closing, then Seller shall deliver the fully executed Alternative Agreement to the Union at least ten (10) days prior to the Closing;

(j)      Confirming Estoppels from each Lessor and the Board of Managers;

(k)      Letters of resignation from all Seller appointed members of the Board of Managers with respect to the Owned Units, effective immediately upon the consummation of the Closing.  The parties will cooperate to have Seller's appointed members of the Board of Managers resign and Purchaser's replacement members appointed in accordance with the Condominium Documents;

(l)      an affidavit of Seller pursuant to Section 1445(b)(2) of the Code in the form attached hereto as Exhibit F and made a part hereof, stating that Seller is not a foreign person within the meaning of such Section;

(m)      evidence reasonably satisfactory to the Title Company that (i) Seller is authorized to consummate the transaction contemplated herein, and (ii) the individual(s) executing the documents on behalf of Seller is/are authorized to do so;

(n)      A certificate with respect to Seller's representations and warranties under Section 8.1 being true and correct in all material respects, subject to changes permitted by Section 9.4(b), in the form of Exhibit J (the "Seller's Bring Down Certificate");

(o)      An assignment and assumption, in substantially the form of Exhibit K, which provides for, as more particularly set forth therein, the assignment by Seller of all of Seller's right, title and interest in and to the Designated Service Contracts and the assumption by Purchaser of all of Seller's obligations under the Designated Service Contracts arising from and after the Closing Date (the "Assignment of Contracts");

(p)      The Holdback Escrow Agreement;

20

ACTIVE 61730742v13

(q)     The Labor Severance Escrow Agreement;

(r)     A closing statement prepared by Title Company and approved by Seller and Purchaser, consistent with the terms of this Agreement;

(s)     To the extent in Seller's possession, all keys, combinations and access devices to any portion of the Premises;

(t)     To the extent in the possession of Seller, all books and records relating to the Premises (other than Seller's internal memoranda, financial projections, appraisals, proposals for work not actually undertaken, accounting and tax records and similar elective or confidential information), including, without limitation, (a) Permits relating to the operation of the Premises and/or issued by any governmental authority, (b) certifications verifying elevator and boiler inspections, (c) survey, architectural plans, building plans or specifications pertaining to the Premises, and (d) rent ledgers pertaining to the SRO units;

(u)     Such affidavits, certificates, agreements and instruments as shall be reasonably required by the Title Company for Seller to comply with its obligations to deliver title to the Premises in accordance with this Agreement;

(v)     An updated SRO Schedule, dated no more than five (5) days prior to the Closing Date;

(w)     Evidence of termination of all Service Contracts that Purchaser has not agreed to assume at Closing (including evidence that Seller has paid all termination and/or cancellation fees, costs, penalties, charges and/or expenses that may result from such terminations which Seller expressly acknowledges and agrees shall be paid by Seller at its sole cost and expense at or prior to the Closing Date); and

(x)     any other documents, instruments or agreements reasonably necessary to effectuate the transactions contemplated hereunder, in accordance with the express terms, covenants and conditions hereof.

9.2     At or prior to the Closing, Purchaser (or the Permitted Designees, as applicable) shall execute and/or deliver to Title Company the following:

(a)     The RPT Form;

(b)     The RP-5217;

(c)     The Form TP-584;

(d)     a Power of Attorney executed by Purchaser and acknowledged by a notary public, in the form required by Exhibit E to the Declaration, in favor of the Board of Managers, as required by Section 16(B) of the Declaration;

(e)     At least fifteen (15) days prior to Closing, two (2) Assignments and Assumptions of Lease, with respect to the Leased Units;

21

ACTIVE 61730742v13

(f)      an assignment and assumption of the Collective Bargaining Agreement in the form attached hereto as <u>Exhibit I-1</u> (the "<u>CBA Assumption Agreement</u>"), executed by Purchaser, unless the Alternative Agreement (as defined in <u>Article 16</u> and attached hereto as <u>Exhibit I-2</u>) has been signed by the Purchaser and the Union and delivered to the Seller at least ten (10) days prior to Closing, in which case Seller shall sign and deliver the Alternative Agreement to the Union;

(g)      the Assignment of Contracts;

(h)      a certificate with respect to Purchaser's representations and warranties set forth in <u>Section 8.5</u> being true and correct as required by <u>Section 9.3(c)</u>;

(i)      all consents and resolutions required to consummate the transactions contemplated hereby, certified to be true and complete by an authorized officer of Purchaser;

(j)      such affidavits, certificates, agreements and instruments as shall be reasonably required by the Title Company;

(k)      a closing statement prepared by Title Company and approved by Seller and Purchaser consistent with the terms of this Agreement;

(l)      all other documents and instruments required by this Agreement and/or the Condominium Documents to be delivered by Purchaser at Closing;

(m)      The Holdback Escrow Agreement;

(n)      The Labor Severance Escrow Agreement;

(o)      An assumption of the Retainer Agreement with the written consent of the Tax Cert Attorneys; and

(p)      A Department of Housing Preservation and Development Registration Statement (the "<u>Multiple Dwelling Registration Statement</u>") required upon change in ownership, containing Purchaser or Purchaser's agent's information to be delivered to the Department of Housing Preservation and Development;

(q)      any other documents, instruments or agreements reasonably necessary to effectuate the transactions contemplated hereunder, in accordance with the express terms, covenants and conditions hereof.

9.3      Seller's obligation to consummate the Closing under this Agreement is subject to satisfaction of the following conditions precedent, which may be waived in whole or in part by Seller, provided such waiver is in writing and signed by Seller on or before the Closing Date:

(a)      Purchaser shall have paid or tendered payment of the Balance to Escrow Agent on or before the Closing Date as provided in <u>Article 2</u> hereof, subject to adjustment as provided in <u>Article 11</u> hereof;

*ACTIVE 61730742v13*

(b)     Purchaser shall have delivered to or for the benefit of Seller, on or before the Closing Date, all of the documents and items required to be delivered by Purchaser pursuant to Section 9.2 of this Agreement, and Purchaser shall have performed in all material respects all of its obligations hereunder to be performed on or before the Closing Date;

(c)     All of Purchaser's representations and warranties made in this Agreement shall be true and correct as of the Effective Date and true and correct as of the Closing Date as if then made; and

(d)     Purchaser shall have complied (or shall be deemed to have complied, upon execution of delivery of the documents set forth in Section 9.2 of this Agreement) with the requirements imposed upon the grantee of a Unit under Article XII of the Declaration.

9.4     Purchaser's obligation to consummate the Closing under this Agreement is subject to the satisfaction of the following conditions precedent, which may be waived in whole or in part by Purchaser, provided such waiver is in writing and signed by Purchaser on or before the Closing Date:

(a)     Seller shall have delivered to or for the benefit of Purchaser, on or before the Closing Date, all of the documents and items required to be delivered by Seller pursuant to Section 9.1 of this Agreement, and Seller shall have performed in all material respects all of its obligations hereunder to be performed on or before the Closing Date;

(b)     Subject to the other provisions of this Agreement, all of Seller's representations and warranties made in this Agreement shall be true and correct in all material respects as of the Effective Date and true and correct in all material respects as of the Closing Date as if then made, other than those representations or warranties made as of a specific date, or with reference to previously dated materials, in which event such representations and warranties shall be true and correct in all material respects as of the date thereof or as of the date of such materials, as applicable.  For purposes hereof, a representation or warranty shall not be deemed to have been breached if the representation or warranty is not true and correct as of the Closing Date by reason of (a) changed facts or circumstances arising after the date hereof, the occurrence of which is not the result of an action by Seller which is prohibited by this Agreement or (b) any matter, including any alleged default, default, claim or proceeding, with respect to the Premises that relates to the Cycle 8 Local Law 11 Work to the extent such alleged default, default, claim or proceeding would be rendered moot upon or will be remedied by the Seller's performance and completion of the Cycle 8 Local Law 11 Work in accordance with this Agreement; and

(c)     Seller shall have complied (or shall be deemed to have complied, upon execution of delivery of the documents set forth in Section 9.1 of this Agreement) with the requirements regarding the conveyance of a Unit under Article XII of the Declaration.

Article 10.     Transfer Taxes, Title Insurance and Other Expenses.

10.1     At Closing, Seller shall pay the New York State Real Estate Transfer Tax imposed pursuant to Article 31 and Section 1402 of the New York Tax Law (the "State Transfer Tax") and the New York City Real Property Transfer Tax imposed pursuant to Title 11, Chapter 21 of the New York City Administrative Code (the "City Transfer Tax"), upon or payable in connection

23

with the transfer of title to the Units and the recordation of each Deed and execution of each Assignment and Assumption of Lease, as applicable.  Seller shall also pay 100% of any escrow fees or charges of Escrow Agent.

10.2    Purchaser shall pay for the following prior to or at the Closing:

(a)    all State, City, County and municipal recording charges with respect to the deed;

(b)    all costs and expenses in connection with Purchaser's financing (if any), and costs for the filing of all documents necessary to complete such financing and related mortgage recording tax (as the same may be applicable), provided, however, nothing herein contained shall be deemed to create a financing contingency or to condition Purchaser's obligations hereunder on Purchaser's ability to obtain financing, and this shall be deemed to be an "all cash" transaction;

(c)    the cost of Purchaser's own survey, survey re-date, engineering studies, environmental studies and other due diligence investigations;

(d)    the cost of obtaining its owner's and/or loan policies of title insurance, including any and all premiums, endorsements and coverage issued in connection with such policies.

10.3    Each party shall pay its own legal fees incidental to the negotiation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

10.4    The provisions of this Article 10 shall survive the Closing.

Article 11.    Apportionments.

11.1    The following shall be apportioned between the parties as of 11:59 P.M. on the day immediately preceding the Closing Date:

(a)    Rents, as and when collected;

(b)    real property taxes and assessments, sewer rents and taxes, water rates and charges, vault charges and taxes, business improvement district taxes and assessments and any other governmental taxes, charges or assessments levied or assessed against the Premises, if any, on the basis of the fiscal year for which assessed;

(c)    charges for water, sewer, electricity, gas, fuel and other utility charges, all of which shall be read as soon as practicable before Closing, unless Seller elects to close its own applicable account, in which event Purchaser shall open its own account and the respective charges shall not be prorated;

(d)    charges for all utility services supplied to the Units (including, without limitation, water, gas, steam and electricity);

24

(e)   amounts prepaid and amounts accrued but unpaid under the Designated Service Contracts;

(f)   accrued wages, salaries, compensation (including but not limited to payroll expenses and taxes, but excluding any severance pay pursuant to the Collective Bargaining Agreement or enhanced severance pay pursuant to the Alternative Agreement, if applicable), benefits, including without limitation, contributions to the Union Employee Benefit Funds (other than the additional health insurance contributions pursuant to the Alternative Agreement, if applicable), vacation pay, holiday pay, sick pay, personal days or other paid time off and salaries of each Bargaining Unit Employee; provided that Purchaser shall pay when due the Seller's portion of the foregoing but receive a closing adjustment therefor, and further provided that any severance pay pursuant to the Collective Bargaining Agreement or enhanced severance pay pursuant to the Alternative Agreement, if applicable (including the additional health insurance contributions pursuant to the Alternative Agreement, if applicable) shall be the responsibility of, and paid by, Purchaser;

(g)   prepaid fees for Permits assigned to Purchaser at the Closing, if any;

(h)   if and to the extent that either or both lessors under the Unit Leases confirm, prior to Closing, that they are holding any amount of "Security Deposit", "Security" or other form of deposit securing the lessees' performance under either or both Unit Leases, all right, title and other beneficial interests in such deposits shall be assigned within the corresponding Assignment and Assumption of Lease and Seller shall receive a credit at Closing corresponding with such confirmed deposited amounts; and

(i)   all other items customarily apportioned in connection with the sale of similar properties similarly located.

11.2   Except as expressly provided to the contrary herein, all apportionments and adjustments shall be made in accordance with the customs and practice of the Real Estate Board of New York. Any taxes due and payable under Section 11.1(b) in the year in which the Closing occurs shall be apportioned based on the portion of the fiscal year which has elapsed prior to the Closing Date. If the Closing Date shall occur before the amount of such taxes for the fiscal year in which Closing occurs has been determined, the apportionment of such taxes shall be made at the Closing Date based on the most recent ascertainable full-year taxes (e.g. the prior year's full-year, second installment tax bill). If any utility apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, within ten (10) Business Days following notice of the determination of such actual reading, readjust such apportionment and Seller shall promptly deliver to Purchaser, or Purchaser shall promptly deliver to Seller, as the case may be, the amount determined to be due upon such adjustment.

11.3   If any past due rents shall be owing by any Tenants on the Closing Date, Seller waives all rights to collect any such past due or delinquent rents from Tenants following the Closing Date and Purchaser shall be entitled to collect and receive all payments for past due rentals.

11.4   Seller is hereby authorized, but is not obligated, to continue any tax certiorari proceedings for reduction of the assessed valuation of the Units that are pending on the Closing

25

Date and (with respect to any such proceedings for tax years prior to the tax year in which the Closing Date shall occur) to settle or compromise the same in Seller's sole discretion. Any settlement or compromise in connection with such proceedings brought with respect to the tax year in which the Closing Date shall occur shall be made by Seller in consultation with, and with the prior written consent of, Purchaser (which consent may be withheld in Purchaser's sole discretion). If a tax refund shall be obtained by reason of an adjustment of the assessed valuation of the Units attributable to a period that ends prior to the Closing Date, the same shall be the property of Seller (less the reasonable costs of collection, including attorneys and accounting fees). If any such refund shall be obtained for a period that includes the Closing Date, the amount of such refund (less the cost of obtaining the same, including, without limitation, reasonable attorneys' and accounting fees) shall be apportioned according to length of the respective portions of such period during which each party owned the Unit and subject to adjustment and apportionment pursuant to the Lease. If any such refund or portion thereof to which Purchaser shall be entitled as hereinbefore provided shall be paid to Seller, Seller shall receive the same for the benefit of Purchaser and shall forthwith remit the same thereto. Purchaser shall, with the consent of the Tax Cert Attorneys, assume the retainer agreement (the "Retainer Agreement") with Ditchik & Ditchik, PLLC (the "Tax Cert Attorneys") and shall be obligated to make any payments due to the Tax Cert Attorneys pursuant to the Retainer Agreement with respect to tax savings realized by Purchaser as a result of any reduction in the transitional assessed valuation and/or the actual assessed valuation of the Real Property, which reduction is implemented over the five year period following the Closing from which Purchaser benefits. As of the Closing Date, Seller shall be released from any obligations to make payments under the Retainer Agreement with the Tax Cert Attorneys, other than payments to the Tax Cert Attorneys related to the tax years prior to the Closing Date.

11.5    The terms, covenants and conditions of this Article 11 shall survive the Closing.

Article 12.    Risk of Loss; Condemnation.

12.1    If, between the date of this Agreement and the Closing Date, the Premises are damaged by fire or other casualty, the provisions of Section 5-1311 of the New York General Obligations Law, or any statute enacted in substitution therefor or in addition thereto, shall not apply. Such provisions are hereby waived, and the provisions of the following Section 12.2 shall apply instead.

12.2    Upon the occurrence of a casualty, condemnation or taking with respect to any Premises between the date of this Agreement and the Closing Date, Seller shall notify Purchaser in writing of same (a "Casualty/Condemnation Notice"). For purposes of this Article 12 hereof, a "Significant Portion of the Premises" shall mean a portion of the Premises, of which the cost to repair is equal to or greater than ten percent (10%) of the Purchase Price, as determined by an architect or engineer selected by Seller and reasonably acceptable to Purchaser. In the event that a Significant Portion of the Premises is damaged or destroyed in any casualty, or a Significant Portion of the Premises is condemned or taken (or notice of any condemnation or taking is issued), then Purchaser may elect to terminate this Agreement by providing written notice of such termination to Seller within five (5) Business Days after Purchaser's receipt of the Casualty/Condemnation Notice, upon which termination, the Deposit shall be immediately returned to Purchaser without objection from Seller and neither party hereto shall have any further rights, obligations or liabilities under this Agreement with respect to the Premises, except as

26

ACTIVE 61730742v13

otherwise expressly set forth herein.  If (a) Purchaser does not elect to terminate this Agreement (provided that Purchaser's failure to timely elect to terminate shall be deemed an election to close), or (b) the portion of the Premises which is (x) taken, or (y) damaged or destroyed is, in either case, not a Significant Portion of the Premises, then there shall be no abatement of the Purchase Price and (x) in the case of a condemnation or taking, Seller shall assign to Purchaser at the Closing the rights of Seller to the claims or awards and Purchaser shall be entitled to receive and keep all such awards; and (y) in the case of a casualty, Seller shall assign to Purchaser at the Closing the rights of Seller to the proceeds under Seller's insurance policies covering such Premises with respect to such damage or destruction (or pay to Purchaser any such proceeds received prior to Closing, less amounts actually paid by Seller for any emergency repairs) and credit to Purchaser the amount of any deductible with respect thereto, and Purchaser shall be entitled to receive and keep any monies received from such insurance policies.

Article 13.   Covenants of Seller.  Between the date hereof and Closing:

13.1   Seller covenants and agrees that, except as otherwise provided in the Agreement, between the date of this Agreement and the Closing Date, Seller (either itself or through an agent) shall continue to manage and operate the Premises in substantially the same manner as Seller has heretofore managed and operated the Premises and in compliance in all material respects with all applicable laws, ordinances, rules and regulations of any governmental authority governing the Real Property, perform in all material respects all of Seller's obligations under the Unit Leases, and to keep (or request the Condominium to keep, to the extent the Condominium is so required) the Units in substantially and materially its same condition and state of repair, subject to reasonable wear and tear and the terms, conditions and requirements of the Condominium Documents and the Unit Leases.

13.2   Seller shall not enter into any new service contract unless the same shall be terminable by Seller prior to Closing.

13.3   Seller shall maintain in full force and effect until the Closing the insurance policies presently in effect or other commercially reasonable policies of insurance affording similar levels of coverage and shall, subject to the provisions of Article 11, continue to pay all utility and service charges accrued through the date of Closing.

13.4   Seller shall notify or, in the case of written notice received by Seller, deliver a copy to, Purchaser of any default under the Condominium Documents or the Unit Leases or from any Tenants, or the receipt of any notice of default received by Seller under the Condominium Documents or the Unit Leases or from any Tenants.

13.5   From and after the date of this Agreement, Seller shall not amend, modify, or terminate the Unit Leases or the Condominium Documents without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole and absolute discretion, nor enter into any new lease, license or other form of occupancy agreement affecting the Premises without the prior written consent of Purchaser, which consent may be withheld in Purchaser's sole and absolute discretion.

27

13.6    Seller shall promptly advise Purchaser of any litigation, arbitration or other judicial or administrative proceeding with respect to the Premises which materially and adversely affects Purchaser's interests under this Agreement.

13.7    Seller shall deliver to (x) Lessors an estoppel certificate substantially in the form attached hereto as Exhibit G, and (y) the Board of Managers an estoppel certificate substantially in the form attached hereto as Exhibit H (each, an "Estoppel" and collectively, the "Estoppels"). Seller shall obtain Confirming Estoppels from each Lessor and the Board of Managers.   For purposes of this Agreement, the term "Confirming Estoppels" shall mean Estoppels that so confirm the applicable matters set forth therein, provided, however, (x) inclusion of qualifications as to knowledge shall not cause the Estoppel to be non-compliant; (y) if the applicable Unit Lease or the Condominium Documents specifies the form or content of an estoppel certificate, then the Estoppel may be in such form or contain only those matters as specified thereby, without giving effect to any requirement regarding "additional information reasonably requested" or words of similar import and (z) an Estoppel shall fail to be a Confirming Estoppel only if they fail to confirm the applicable matters in all material respects and the aggregate adverse economic impact as a result of such failures is equal to or exceeds the Floor (as defined in Section 8.2).

13.8    At or prior to Closing, Seller shall terminate Newmark Knight Frank (the "Existing Manager") the existing property management agreement for the Premises (the "Existing PMA").

13.9    Seller shall oversee the completion, prior to Closing, at Seller's sole cost and expense, of the work (the "Cycle 8 Local Law 11 Work") under the contracts set forth on Schedule G (such contracts, collectively, the "Cycle 8 Local Law 11 Contracts").  Seller shall be obligated to pay all amounts due under the Cycle 8 Local Law 11 Contracts and file (or cause to be filed) a "Safe" report with the NYC Department of Buildings (the "DOB LL 11 Report").  If, at the time of Closing, the Cycle 8 Local Law 11 Work has not been finally completed, the DOB LL 11 Report has not been filed with the NYC Department of Buildings, and/or the NYC Department of Buildings has not issued a Certificate of Compliance with respect to completion of the Cycle 8 Local Law 11 Work, Seller shall assign the Cycle 8 Local Law 11 Contracts, if applicable, to Purchaser at Closing and Purchaser shall assume all obligations thereunder or otherwise oversee and cause completion of the Cycle 8 Local Law 11 Work, provided, however, that Seller shall escrow with Escrow Agent the aggregate sum necessary to address any remaining Cycle 8 Local Law 11 Work, not to exceed Thirty Thousand and NO/100 Dollars ($30,000.00), to which escrow Purchaser shall have access for purposes of requesting disbursements to pay for any remaining costs to complete the Cycle 8 Local Law 11 Work.  Seller makes no representation or warranty regarding the Cycle 8 Local Law 11 Work.   Seller shall not be obligated to perform or pay for any work relating to "Cycle 9" under Local Law 11 and Purchaser assumes all obligations under applicable law (including, without limitation, pursuant to NYC Façade Inspection Safety Program) to perform and pay for any work required to be performed in connection with "Cycle 9".   The provisions of this Section 13.9 shall survive the Closing.

13.10   Seller shall promptly after receipt thereof deliver to Purchaser copies of all written notices from any governmental authority regarding (i) the violation or alleged violation of Relevant Environmental Laws regarding Hazardous Materials affecting the Premises or (ii) any actual or threatened condemnation of the Premises or any portion thereof.

28

13.11   Seller shall promptly notify Purchaser of the filing of any litigation, arbitration, or administrative hearing before any court or governmental agency naming Seller and/or affecting the Premises.

13.12   Other than with respect to the Cycle 8 Local Law 11 Work, Seller shall not make any structural modifications or additions to the Premises, without first obtaining the consent of Purchaser, which consent shall not be unreasonably withheld or delayed by Purchaser, other than with respect to life/safety repairs or in response to an emergency at the Premises.

13.13   At all times from the Effective Date to the Closing Date, Seller will not sell or otherwise transfer title to all or any portion of the Premises, or encumber the Premises with indebtedness secured by the Premises, in each case, without the prior written consent of Purchaser, which may be withheld in Purchaser's sole and absolute discretion.   Notwithstanding the foregoing, Seller shall be permitted to remove the Excluded Personal Property, without the consent of Purchaser.

13.14   Subject to Article 12 hereof, Seller shall not settle or compromise or agree to any settlement or compromise of any insurance or condemnation claim or award without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

13.15   Seller shall not, without the Purchaser's prior written consent in each instance, (i) enter into, renew, or amend the Collective Bargaining Agreement or any collective bargaining agreement with the Union or any labor union or labor organization except for collective bargaining agreements, renewals thereof, or amendments thereto that in any case do not apply specifically and uniquely to the Premises (as distinguished, for example, from city-wide agreements, renewals or amendments), or (ii) except in the ordinary course of business, fill currently open positions (after notice to and approval from the Purchaser which approval will not be unreasonably denied), or increase or decrease the number of Hotel Employees.

Article 14.   Brokerage.

14.1   (a) Purchaser and Seller hereby represent and warrant that they have not hired, retained or dealt with any broker, finder, consultant, person, firm or corporation in connection with the negotiation, execution or delivery of this Agreement or the transactions contemplated hereunder.  Purchaser covenants and agrees that should any claim be made against Seller for any commission or other compensation by any broker, finder, person, firm or corporation, based upon or alleging negotiations, dealings or communications with Purchaser or Purchaser's representative(s) in connection with this transaction or the Premises, Purchaser shall indemnify and hold Seller harmless from and against any and all damages, expenses (including attorneys' fees and disbursements) and liability arising from such claim.

(b)   Seller covenants that should any claim be made against Purchaser for any commission or other compensation by any broker, finder, person, firm or corporation, based upon or alleging negotiations, dealings or communications with Seller or Seller's representative(s) in connection with this transaction or the Premises, Seller shall indemnify and hold Purchaser

29

harmless from any and all damages, expenses (including attorneys' fees and disbursements) and liability arising from such claim.

(c)   The provisions of this <u>Article 14</u> shall survive the Closing or earlier termination of this Agreement.

<u>Article 15.</u>   <u>Remedies.</u>

15.1   If (i) Purchaser defaults in its obligation to pay the Balance on the Closing Date or in the performance of any of its other obligations to be performed on the Closing Date, and Seller is ready, willing and able to Close in accordance with the terms, provisions and conditions of this Agreement, or (ii) Purchaser defaults in any of its other obligations to perform under this Agreement prior to the Closing Date and, with respect to any default under this clause (ii) only, such default shall continue for ten (10) Business Days after written notice of default to Purchaser, Seller's sole and exclusive remedy by reason thereof shall be to terminate this Agreement and, upon such termination, Seller shall be entitled to receive and retain the Deposit, and any interest thereon, as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be difficult or impossible to ascertain, and that the Deposit, and the interest thereon (if any), constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty. Upon such termination, neither party shall thereafter have any further right or obligation hereunder, except for the rights and obligations hereunder that expressly survive the termination of this Agreement.

15.2   If Seller defaults in any of its material obligations under this Agreement and such default is not cured within twenty (20) Business Days of receiving written notice from Purchaser of such alleged default (except with respect to any material obligations that Seller is required to perform on the Closing Date in which case no notice and cure period shall be provided, provided that on such date, Purchaser has satisfied all conditions required to be satisfied by it under this Agreement, is not otherwise in default under this Agreement and is ready, willing and able to perform all of its obligations under this Agreement on the Closing Date and to deliver the Balance due Seller under this Agreement), Purchaser's sole and exclusive remedies shall be: (i) to terminate this Agreement and to receive a refund of the Deposit (together with any interest thereon) as well as reimbursement from Seller to Purchaser for Purchaser's documented, verifiable out-of-pocket costs and expenses and reasonable attorney's fees and costs incurred in connection with this transaction and the due diligence conducted not to exceed Four Hundred Thousand and No/100 Dollars ($400,000) (collectively, and subject to the foregoing limitation on amount, "<u>Purchaser's Reimbursement Costs</u>"), with such reimbursement obligation expressly surviving the termination of this Agreement and which reimbursement shall occur within twenty (20) Business Days after demand by Purchaser therefor, and neither party shall thereafter have any further right or obligation hereunder, except for the rights and obligations hereunder that expressly survive the termination of this Agreement, or (ii) within forty-five (45) days after Seller's failure to perform its obligation to convey the Premises on the Closing Date or failure to otherwise comply with Seller's obligations it is required to perform on the Closing Date (provided that on such date, Purchaser has satisfied all conditions required to be satisfied by it under this Agreement, is not otherwise in default under this Agreement and is ready, willing and able to perform all of its obligations under this Agreement on the Closing Date and to deliver the Balance due Seller under this Agreement), bring an action in equity against Seller for specific performance; it being understood that if Purchaser fails to

30

commence an action for specific performance within such forty-five (45) day period, Purchaser's sole remedy shall be to terminate this Agreement and receive a return of the Deposit and reimbursement of Purchaser's Reimbursement Costs.  Notwithstanding anything to the contrary in this Agreement, in the event that specific performance is not available as a remedy as a result of Seller conveying the Premises to a party other than Purchaser, Purchaser shall have the right to seek monetary damages against Seller to the fullest extent permitted by law.

Article 16.     Employees.

16.1    For purposes of this Agreement, (i) "Hotel Employees" means, collectively, all individuals employed at the Premises by Existing Manager as of the Closing Date, irrespective of whether such individuals are active, on leaves of absence, on layoff or otherwise inactive but still employed at the Premises, and (ii) "Bargaining Unit Employees" shall mean those Hotel Employees employed at the Premises by Existing Manager as of the Closing Date, irrespective of whether such individuals are active, on leaves of absence, on layoff or otherwise inactive but still employed at the Premises, who are represented by the Union and whose employment is subject to the Collective Bargaining Agreement (as hereinafter defined).

16.2    Seller shall cause Existing Manager to deliver to Purchaser at least five (5) Business days prior to Closing (i) a list of all Hotel Employees including position, union status, date of hire, applicable rate of pay (or salary), together with (x) a schedule of those employees that are on any sick leave or leave of absence and those that are on layoff or inactive, and (y) a schedule of accrued and unused vacation, holidays, personal days and sick leave for such employees, and (ii) a list of all layoffs or involuntary terminations (other than terminations for cause or other performance-related reasons) and other losses of employment (other than due to resignations, retirement and other voluntary departures) experienced at the Premises during the ninety (90) day period preceding the Closing.  Seller shall be responsible for accrued compensation and benefits, including without limitation, contributions to any multi-employer benefit plan pursuant to the Collective Bargaining Agreement, vacation pay, holidays, personal days, sick leave or other paid time off and wages and/or salaries (but not including any severance pay pursuant to the Collective Bargaining Agreement or enhanced severance pay under the Alternative Agreement, if applicable) of each Hotel Employee accruing prior to the Closing Date, as required under applicable law or the Collective Bargaining Agreement.  Seller shall cause Existing Manager to make reasonable efforts to provide Purchaser or its manager or operator, information necessary to comply with the successorship obligations under the Collective Bargaining Agreement, including but not limited to I-9 forms (unless otherwise provided by applicable law) and information necessary to provide for uninterrupted employment without loss of seniority, compensation, benefits or fringe benefits and no adverse effect on other terms and conditions of employment.

16.3    From and after the Closing, Purchaser (i) shall be solely responsible for complying or causing compliance with the Collective Bargaining Agreement and the Alternative Agreement, if applicable, all applicable provisions of federal, state and municipal laws and regulations relating to those Hotel Employees remaining in employment at the Hotel upon Closing ("the Rehired Employees"), and any other individuals hired as employees at the Hotel after Closing, including Purchaser's covenants set forth in this Section 16.3, including without limitation compliance with any applicable provisions of the Federal WARN Act, the New York WARN Act or the New York City Hotel Service Workers, Section 4980B of the Internal Revenue Code (COBRA), the Hotel

31

Service Disruption Notification Act ("HSW Act"), and any rules or regulations as have been issued in connection with any of the foregoing and any benefit continuation and/or severance payments pursuant to the Collective Bargaining Agreement and relating to Rehired Employees that may be payable upon any termination of employment of any such Rehired Employees accruing and arising after the Closing, and (ii) hereby agrees to indemnify, defend, protect and hold Seller and its affiliates harmless from and against any and all claims, liabilities, debts, costs, expenses, damages, attorneys' fees and disbursements arising out of any violation of the Collective Bargaining Agreement, and all applicable Labor and Employment Laws, accruing and arising on or after Closing, including but not limited to any violation of the Federal WARN Act, the New York WARN Act, COBRA or the HSW Act and any rules or regulations as have been issued in connection with any of the foregoing in connection with the transaction contemplated by this Agreement, relating to the Hotel Employees or any individuals hired as employees at the Hotel on or after the Closing.  In addition, Purchaser shall be solely responsible for, and shall indemnify and hold Seller harmless from, any claims or payments required to be made to or on behalf of any Bargaining Unit Employees or any former bargaining unit employees of the Hotel, as a result of either this transaction or the Alternative Agreement, including but not limited to any severance pay pursuant to the Collective Bargaining Agreement, Enhanced Severance pursuant to the Alternative Agreement, if applicable, contributions to the Union Employee Benefit Funds under both the Collective Bargaining Agreement and the Alternative Agreement, if applicable.  Seller agrees to indemnify, defend, protect and hold Purchaser and its respective affiliates harmless from and against any and all claims, liabilities, debts, costs, expenses, damages, attorneys' fees and disbursements arising out of any violation of the Collective Bargaining Agreement, and all applicable Labor and Employment Laws, relating to the Hotel Employees, including, but not limited to, Federal WARN Act, the New York WARN Act, COBRA or the HSW Act and any rules or regulations as have been issued in connection with any of the foregoing accruing or arising prior to the Closing and any benefit continuation and/or severance payments pursuant to the Collective Bargaining Agreement relating to Hotel Employees that may be payable upon any termination of employment of any such Hotel Employee accruing or arising prior to the Closing. Notwithstanding anything to the contrary herein, any additional severance due under NYC Local Law Int 2397-2021 (Severance Pay for Hotel Service Employees) ("the NYC Severance") will be the responsibility of Seller.  At Closing, Seller and Purchaser shall establish an escrow with Title Company pursuant to an escrow agreement in substantially the form attached hereto as Exhibit M (the "Labor Severance Escrow Agreement"), whereby Seller shall deposit with Title Company a gross sum equal to the balance of the 30 weeks due under the NYC Severance at $500.00 per week for each employee eligible for the NYC Severance (the "Labor Severance Escrow Account"); said amount shall, in accordance with the Labor Severance Escrow Agreement, be paid by Purchaser or its manager or operator from the Labor Severance Escrow Account to each eligible employee, subject to the terms of the Labor Severance Escrow Agreement.  In the event Purchaser enters into the Alternative Agreement (as hereinafter defined) which requires Purchaser to pay enhanced severance and contributions to the Union Employee Benefit Funds in excess of the amounts accrued up to Closing, Purchaser shall indemnify and hold Seller harmless for said amounts.

16.4    During the period prior to Closing, the parties agree to reasonably cooperate and also to consult on a regular basis and coordinate their activities relating to employee matters so as to facilitate a smooth transition of Premises operations and the continued proper performance by the Hotel Employees of their respective duties up to Closing.  Seller shall promptly deliver to Purchaser copies of any written materials delivered or received relating to Union representation of

32

Bargaining Unit Employees including but not limited to any grievances filed against the Hotel and Seller shall keep Purchaser substantially informed with respect to the status of any discussions with the Union with respect to the Hotel.

16.5    Without limiting any other provision of this Article 16, (i) Seller has informed Purchaser that Seller is a party to and is bound by the terms of that certain Industry Wide Agreement between Hotel Association of New York, Inc. and New York Hotel and Motel Trades Council, AFL-CIO ("Union") which is in effect from July 1, 2012 through June 30, 2026 ("IWA"), including any related written memorandum of understanding and other related agreements, as provided by their terms (collectively, the "Collective Bargaining Agreement"), (ii) a copy of the Collective Bargaining Agreement has previously been delivered or made available to Purchaser for its review, and (iii) Purchaser or Purchaser's property manager, operator or agent shall offer to retain all Bargaining Unit Employees and, if they accept such offers, their employment will continue uninterrupted without loss of seniority, compensation, benefits or fringe benefits and with no adverse effect on other terms and conditions of employment subject to the Collective Bargaining Agreement and applicable law, and (iv) Purchaser will, and shall cause its property manager, operator or agent to, recognize the Union and assume, adopt and be bound by all of the terms, both economic and non-economic, of the Collective Bargaining Agreement from and after the Closing Date. Purchaser further agrees to execute, and shall cause its property manager, operator or agent to execute, at least ten (10) days prior to Closing an assumption agreement acceptable to the Union, which shall be substantially in the form of the IWA Assumption Agreement attached hereto as Exhibit I-1 and made a part hereof to effectuate an assumption of the Collective Bargaining Agreement in its name (without modification or amendment) as of the Closing. Notwithstanding the foregoing obligation to assume the Collective Bargaining Agreement and execute Exhibit I-1, Purchaser will be relieved of said obligation if Purchaser and the Union execute, and deliver to Seller, at least ten (10) days prior to Closing, the agreement attached hereto as Exhibit I-2 ("Alternative Agreement"). The parties acknowledge the enactment of the Displaced Hotel Service Workers and Hotel Service Disruption Notifications Act, section 22-510 of the Administrative Code of New York (the "DHSWNA") and the Displaced Building Service Workers Protection Act, §22-505 of the Administrative Code of the City of New York ("BSWPA"). By this Agreement, including, without limitation, Purchaser's assumption of the Collective Bargaining Agreement, or providing a fully executed copy of the Alternative Agreement, the parties agree that the DHSWNA and the BSWPA do not apply to the transaction contemplated by this Agreement under §22-510(d)(1) and §22-505(f)(1) of the New York City Administrative Code.

16.6    Under the Collective Bargaining Agreement, Seller's Existing Manager currently contributes, on a monthly basis, various amounts under the (i) New York Hotel Trades Council and Hotel Association of New York City, Inc., Health Benefits Fund, (ii) New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund, (iii) New York Hotel Trades Council and Hotel Association of New York City, Inc. Prepaid Legal Services Fund, and (iv) New York Hotel Trades Council and Hotel Association of New York City, Inc., Industry Training and Scholarship Fund (collectively, the "Union Employee Benefit Funds"). At Closing, regular contributions paid or payable with respect to the Union Employee Benefit Funds shall be prorated, with the appropriate party receiving a credit or debit to the Purchase Price, on a pro rata basis based on the Closing Date. In addition, at Closing Purchaser agrees to assume Seller's responsibility to

33

pay any and all vacation and sick pay for the Bargaining Unit Employees, when payable, for which amounts Purchaser shall receive a credit at Closing.

16.7    Retirement Plan.

(a)    The parties intend to comply with section 4204(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and to take any other action required or desirable, so that no withdrawal liability is imposed upon Seller as a result of the consummation of this transaction.

(b)    To that end, at Closing Purchaser shall (or shall cause its property manager, operator or agent to) assume an obligation to make contributions to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund (hereafter, the "Retirement Plan") in accordance with the Collective Bargaining Agreement, for substantially the same number of contribution base units, within the meaning of Section 4001(a)(11) of ERISA, for which Seller or Existing Manager had an obligation to contribute with respect to the Premises prior to the Closing.

(c)    Purchaser agrees to reasonably cooperate with Seller and/or Retirement Plan representatives with respect to any inquiry or reasonable request for information and assistance in order to facilitate the transfer of the contribution obligation with respect to the Retirement Plan from Seller (or the Existing Manager of the Premises) to Purchaser (or the Existing Manager of the Premises).  The parties agree that they will notify the Retirement Plan of their intention that this transaction comply with Section 4204 of ERISA.

(d)    Subject to Section 16.7(g), during the period commencing on the first day of the plan year following the Closing Date and ending on the expiration of the fifth (5th) such plan year (the "Contribution Period"), Purchaser shall provide to the Retirement Plan either a bond, letter of credit, or an escrow in an amount and manner meeting the requirements of Section 4204 of ERISA.  The cost of any bond, letter of credit, or escrow provided under this Section 16.8 (d) shall be paid by Purchaser.

(e)    To the extent required by Section 4204(a)(3) of ERISA, Seller or Existing Manager shall provide to the Retirement Plan a bond or escrow equal to the present value of the withdrawal liability Seller would have had to the Retirement Plan with respect to the assets acquired by Purchaser pursuant to this Agreement (but for the provisions of Section 4204 of ERISA), reduced to the extent provided under Section 4204(a)(3) of ERISA in the event only a portion of Seller' assets are distributed during the Contribution Period.

(f)    If Purchaser at any time withdraws from the Retirement Plan in a complete or partial withdrawal with respect to the assets acquired by Purchaser pursuant to this Agreement during the Contribution Period, Seller shall be secondarily liable for any withdrawal liability Seller would have had to the Retirement Plan with respect to the Premises (but for the provisions of Section 4204 of ERISA) if any withdrawal liability of Purchaser with respect to such Retirement Plan is not paid.  Purchaser agrees to provide Seller with a copy of any notice and demand for

34

payment of withdrawal liability that Purchaser receives from the Retirement Plan with respect to the Premises.

(g)     Notwithstanding anything contained in Section 16.7(d) to the contrary, Purchaser shall not be obligated to provide any bond, letter of credit, or escrow in the event and to the extent Purchaser obtains from the Retirement Plan or the Pension Benefit Guaranty Corporation a variance or exemption under Section 4204(c) of ERISA and the applicable regulations thereunder.

(h)     In the event that, notwithstanding the terms of this Section 16.7, the Retirement Plan assesses withdrawal liability based on this transaction or any event subsequent to the Closing against Seller, Existing Manager and/or any Seller Related Parties, including the assertion of secondary liability pursuant to section (f) above, Purchaser shall indemnify Seller, Existing Manager and any other Seller Related Parties from and against such withdrawal liability.

16.8     Purchaser agrees to indemnify, defend and hold harmless Seller, Existing Manager and any other Seller Related Parties from and against any claim, liability, judgment or arbitration award asserted against any of the Seller Related Parties on account of or with respect to any of the following: (i) any causes of action, damages, complaints, judgments, orders and/or claims, whatsoever, and all costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred in connection therewith, which accrue and arise (or, in the case of omissions, failed to occur) on or after the Closing and may be asserted against any of the Seller Related Parties on account of any violation of the Collective Bargaining Agreement and/or Labor and Employment Laws occurring (or, in the case of omissions, failed to occur) on or after the Closing by Purchaser, or any designee or management company engaged by Purchaser to employ Premises personnel, except to the extent such are based solely on the acts of any Seller Related Parties, and (ii) any claims or liabilities arising (A) under ERISA, as amended and/or any other applicable federal or state law or regulation concerning employee benefit plans with respect to the employment of employees by Purchaser or such designee or management company on or after the Closing, or (B) from or under any employee benefit plan applicable to any Rehired Employee or any other employee hired by Purchaser or such designee or management company to perform services at or for the Premises, to the extent that any such claim or liability accrued or arose during any period of employment on or after the Closing.

16.9     Seller agrees to indemnify, defend and hold harmless Purchaser and its affiliates, or any designee or management company engaged by Purchaser to employ Premises personnel, and their respective officers, directors, members, managers, partners, agents, employees, successors and assigns (herein, the "Purchaser Related Parties") from and against any claim, liability, judgment or arbitration award asserted against any of the Purchaser Related Parties on account of or with respect to any of the following: (i) any causes of action, damages, complaints, judgments, orders and/or claims, whatsoever, and all costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred in connection therewith, which may be asserted against any of the Purchaser Related Parties on account of any violation of the Collective Bargaining Agreement and/or Labor and Employment Laws occurring (or, in the case of omissions, failed to occur)  prior to the Closing by Seller or Existing Manager, except to the extent such are based solely on the acts of any Purchaser Related Parties, or for which a closing adjustment credit has been issued hereunder, and (ii)  any claims or liabilities arising (A) under

35

ACTIVE 61730742v13

ERISA, as amended, and/or any other applicable federal or state law or regulation concerning employee benefit plans with respect to the employment of employees by Seller or Existing Manager up to the Closing, or (B) from or under any employee benefit plan applicable to any Rehired Employee or any other employee hired by Purchaser or such designee or management company to perform services at or for the Premises, to the extent that any such claim or liability accrued or arose during any period of employment prior to the Closing.

16.10   For purposes of this Agreement, the term "Labor and Employment Laws" shall mean all federal, state or local labor and employment statutes, rules, and regulations, including, without limitation, National Labor Relations Act, 29 U.S.C. §§151, et seq., the Families First Coronavirus Response Act, the Fair Labor Standards Act, 29 U.S.C. §§201, et seq., the New York State Labor Law §§650, et seq. and applicable regulations, 12 NYCRR 142-2.2, et seq., the Code, ERISA, Multi-Employer Pension Plan Amendments Act of 1980, Section 1981 through 1988 of Title 42 of the United States Code, Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866, 1871, and 1991, 42 U.S.C. §§2000(e), et seq., the Equal Pay Act, the Americans With Disabilities Act of 1990, 42 U.S.C. §§12101, et seq., the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601, et seq., Genetic Information Nondiscrimination Act of 2008, the Rehabilitation Act, the Immigration Reform Control Act,  Uniformed Services Employment and Reemployment Rights Act, New York State Executive Law §§290, et seq., the New York City Human Rights Code, Administrative Code of the City of New York, §8-101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §§701, et seq., the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§1161, et seq., the Occupational Safety and Health Act, 29 U.S.C. §§651, et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621, et seq., the Older Workers' Benefit Protection Act, the Fair Credit Reporting Act, the Sarbanes-Oxley Act, the New York State Human Rights Law, the New York Executive Law, the New York Civil Rights Law, the New York Equal Pay Law, the New York Legal Activities Law, the New York State Wage and Hour and Wage Payment Laws, the New York Minimum Wage Law, the New York Whistleblower Law,  the New York Worker Health and Safety Act, the Retaliation/Discrimination Provisions of the New York Workers' Compensation Law and the New York State Disabilities Benefits Law,  the New York State Paid Family Leave Benefits Law,  the federal and New York State Worker Adjustment and Retraining Notification Acts (collectively, the "WARN Acts"), the Coronavirus Aid, Relief, and Economic Security Act, the American Rescue Plan of 2021, the DBSWPA, N.Y. Real Property Tax Law § 421-a, New York State Sick Leave Law, New York City Earned Safe and Sick Time Act, the New York Quarantine Leave Law, New York City Fair Chance Act, the New York City Administrative Code and Charter or any other federal, state or local human rights, civil rights, wage-and-hour, wage-payment, pension, labor or employment-related laws, or their respective implementing laws, rules and/or regulation(s) with respect to the Premises and all other statutes, laws, regulations, ordinance or rules regulating the terms and conditions of employment (as amended from time to time, and together with any similar laws now or hereafter enacted), under the common law or in equity (including any claims for wrongful discharge or otherwise), each as amended, or under any policy, agreement, understanding or promise, written or oral, formal or informal.

16.11   Seller and Purchaser (on their own behalf and/or through their respective property managers) agree to cooperate reasonably with each other to the extent legally permissible in the defense of any claims, grievances, lawsuits or other charges brought by or on behalf of any Hotel Employees or former Hotel Employees.  Such cooperation shall include providing: (i) workers'

36

compensation claims processing; (ii) access to and copying of personnel records and other documents that either party has in its possession which related to any such claims, lawsuits or charges to the extent legally permissible regardless of whether such materials are proprietary material (provided that, upon the request of the other party, such accessing party shall execute a customary form of non-disclosure agreement with respect to such access); and (iii) availability of employees of the aforementioned entities for such matters as interviews, depositions and to testify. No party shall have the duty to cooperate with the others if the dispute is between the parties themselves.

16.12   Purchaser's and Seller's obligations under this Article 16 shall survive Closing

Article 17.    Notices.

17.1    Any notice or other communication given by either party hereto to the other relating to this Agreement (a "notice") shall be in writing and sent to the party to which the notice is being made by nationally recognized overnight courier or delivered by hand with receipt acknowledged (provided that in either case a copy of such notice is also delivered on the same day (or earlier) by electronic mail) in writing as follows:

If to Seller, to:

> EC 58th Street LLC
> c/o Cain International US Services LP
> 350 Park Avenue, 14th Floor
> New York, New York 10022
> Attention:  Cain Legal
> Email: legal@cainint.com

with a copy to Seller's attorney:

> Greenberg Traurig, LLP
> One Vanderbilt Avenue
> New York, New York 10017
> Attention:  Farah S. Ahmed, Esq.
> Email: ahmedf@gtlaw.com

If to Purchaser, to:

> CSC Hudson, LLC
> c/o CSC Co-Living
> 6 St. Johns Lane
> New York, New York 10013
> Attention: Sal Smeke and Alberto Smeke
> Email: ss@csc-coliving.com
>            as@csc-coliving.com

37

with a copy to Purchaser's attorney:

>Cole Schotz P.C.
>1325 Avenue of the Americas, 19th Floor
>New York, New York 10019
>Attn: Jordan J. Metzger, Esq.
>E-mail: jmetzger@coleschotz.com

If to Escrow Agent:

>First American Title Insurance Company
>666 Third Avenue, 5th Floor
>New York, New York 10017
>Attention:  Patricia A. LaPorta, Esq.
>Email: plaporta@firstam.com

17.2    Notices or other communications (including agreements) signed by the attorneys for the respective parties shall be deemed binding upon the parties.  Either party may by notice to the other change the person or address for receipt of notices.  Notices sent by hand delivery or recognized overnight courier service shall be effective when received or rejected by the recipient or the recipient's office or firm.

Article 18.    Intentionally omitted.

Article 19.    Assignment.

19.1    Neither this Agreement nor any of the rights of Purchaser hereunder may be assigned or transferred by Purchaser without Seller's prior written consent, which consent may be granted or withheld in Seller's sole and absolute discretion, and any purported assignment or encumbrance without Seller's prior written consent shall be null and void, and shall constitute a default hereunder, which default is not capable of being cured.  Notwithstanding the foregoing, Purchaser shall have the right to assign its rights under this Agreement to one or more Permitted Designees of Purchaser without the consent of Seller so long as Purchaser delivers to Seller a fully executed and effective assignment and assumption agreement conveying to such designee(s) all of Purchaser's right, title and interest in, to and under this Agreement and the Deposit at least fifteen (15) days prior to Closing.  No such assignment to a Permitted Designee shall relieve Purchaser of its obligations under this Agreement.  For the avoidance of doubt: (a) Purchaser shall have the right, without Seller's prior written consent, to designate separate Permitted Designees to take fee simple title and leasehold title, as applicable, to each Unit at Closing; and (b) Seller acknowledges and agrees that at Closing, Purchaser intends to take leasehold title to the Leased Units in the names of two (2) separate and distinct Permitted Designees and, further, that Purchaser intends to take fee title to the Owned Units in one (1) or two (2) additional Permitted Designees, separate and distinct from the Permitted Designees taking leasehold title to the Leased Units.  A "Permitted

38

Designee" shall mean: (i) any other entity that is directly or indirectly (through one or more intermediaries) controlled by Sal Smeke and/or Alberto Smeke, or (ii) any other entity in which Sal Smeke and/or Alberto Smeke has a direct or indirect equity interest in the controlling entity (e.g. the managing member of an entity) of such entity. For purposes of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies or the power to veto major policy decisions whether through the ownership of voting securities, by contract or otherwise.

Article 20.    Escrow.

20.1    Escrow Agent shall hold the Deposit, together with all interest earned thereon, in its interest-bearing escrow account, in accordance with the following:

(a)    Escrow Agent shall hold the Deposit, together with all interest earned thereon, in Escrow Agent's escrow account at a national bank selected by Escrow Agent in its reasonable discretion.  All interest will accrue to and be reported to applicable taxing authorities, including the Internal Revenue Service, for the account of Seller.  Such party shall supply the Escrow Agent with a completed Form W-9, concurrently with the execution of this Agreement. Escrow Agent shall have no liability for any fluctuations in the interest rate paid on the Deposit, and is not a guarantor thereof.  Failure of the parties to provide the W-9 will result in the Deposit being placed in a non-interest bearing account.

(b)    At Closing, the Deposit, together with any interest accrued thereon, shall be credited to the Purchase Price and shall be paid by Escrow Agent to Seller.  At Closing, interest on the Deposit shall be paid to Seller as payment towards the Balance of the Purchase Price.  If Escrow Agent receives a written notice signed by both Seller and Purchaser that this Agreement has been terminated or canceled, Escrow Agent shall deliver the Deposit, together with the interest thereon, as directed therein.

(c)    If Escrow Agent receives a written request signed by Purchaser or Seller (the "Noticing Party") stating that this Agreement has been canceled or terminated and that the Noticing Party is entitled to the Deposit, or that the other party hereto (the "Non-Noticing Party") has defaulted in the performance of its obligations hereunder, Escrow Agent shall overnight by nationally recognized courier and e-mail a copy of such request to the Non-Noticing Party.  The Non-Noticing Party shall have the right to object to such request for the Deposit by written notice of objection delivered to and received by Escrow Agent within ten (10) Business Days after the Non-Noticing Party's receipt of such copy, but not thereafter.  If Escrow Agent shall not have so received a timely written notice of objection from the Non-Noticing Party, Escrow Agent shall deliver the Deposit, together with the interest earned thereon, to the Noticing Party.  If Escrow Agent shall have received a written notice of objection within the time herein prescribed, Escrow Agent shall refuse to comply with any requests or demands from either party and shall continue to hold the Deposit, together with any interest earned thereon, until Escrow Agent receives either (a) a written notice signed by both Seller and Purchaser stating who is entitled to the Deposit (and interest) or (b) a final order of a court of competent jurisdiction directing disbursement of the Deposit (and interest) in a specific manner, in either of which events Escrow Agent shall then disburse the Deposit, together with the interest earned thereon, in accordance with such notice or order.  Escrow Agent shall not be or become liable in any way or to any person for its refusal to

39

comply with any such requests or demands until and unless it has received a direction of the nature described in subdivision (a) or (b) above.

20.2    Any notice to Escrow Agent shall be sufficient only if received by Escrow Agent within the applicable time period set forth herein.  All mailings and notices from Escrow Agent to Seller and/or Purchaser, or from Seller and/or Purchaser to Escrow Agent, provided for in this Article 20 shall be addressed to the party to receive such notice at its notice address set forth in Article 17 above (with copies to be similarly sent to the additional persons therein indicated), but the provisions of Article 17 relating to the manner of giving notices and the effective dates thereof shall have no application to the provisions of this Article 20.

20.3    Notwithstanding the foregoing, if Escrow Agent shall have received a written notice of objection as provided for in Section 20.1(c) above within the time therein prescribed, or shall have received at any time before actual disbursement of the Deposit a written notice signed by either Seller or Purchaser disputing entitlement to the Deposit or shall otherwise believe in good faith at any time that a disagreement or dispute has arisen between the parties hereto over entitlement to the Deposit (whether or not litigation has been instituted), Escrow Agent shall have the right, upon written notice to both Seller and Purchaser, (a) to deposit the Deposit, together with the interest earned thereon with the Clerk of the Court in which any litigation is pending and/or (b) to take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, the depositing of the Deposit, together with the interest earned thereon, with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder, except for any previous gross negligence or willful misconduct.

20.4    Escrow Agent is acting hereunder without charge as an accommodation to Purchaser and Seller, it being understood and agreed that Escrow Agent shall not be liable for any error in judgment or any act done or omitted by it in good faith or pursuant to court order, or for any mistake of fact or law.  Escrow Agent shall not incur any liability in acting upon any document or instrument believed thereby to be genuine.  Escrow Agent is hereby released and exculpated from all liability hereunder, except only for willful misconduct or gross negligence.  Escrow Agent may assume that any person purporting to give it any notice on behalf of any party has been authorized to do so.  Escrow Agent shall not be liable for, and Purchaser and Seller hereby jointly and severally agree to indemnify Escrow Agent against, any loss, liability or expense, including reasonable attorney's fees, arising out of any dispute under this Agreement, including the cost and expense of defending itself against any claim arising hereunder.

20.5    Seller and Purchaser agree that Escrow Agent shall not be liable for any loss or impairment of the Deposit while the Deposit is in the course of collection or of the escrow if such loss or impairment results from the failure, insolvency or suspension of the financial institution in which the Deposit is deposited.

20.6    Escrow Agent shall be entitled to select any and all counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Agreement.

40

20.7    If either Purchaser or Seller becomes subject to a voluntary or involuntary proceeding under the United States Bankruptcy Code, or if Escrow Agent is otherwise served with legal process which directs Escrow Agent to not disburse the funds deposited with Escrow Agent, Escrow Agent shall have the right to place a hold on funds deposited with Escrow Agent until such time as Escrow Agent receives an appropriate court order or other assurances satisfactory to Escrow Agent (in Escrow Agent's reasonable discretion) establishing that the funds may continue to be held or disbursed, as the case may be, according to the instructions contained in this Agreement.

<u>Article 21.</u>      <u>Intentionally omitted.</u>

<u>Article 22.</u>      <u>Miscellaneous.</u>

22.1    Seller and Purchaser each reserve the right to include this transaction as part of one (1) or more Code Section 1031 tax deferred exchange transactions, at no out-of-pocket cost, expense or liability to the other party hereto (other than de minimis legal fees to review the documentation required to effectuate such transactions), including, without limitation, one (1) or more reverse exchange transactions. Seller and Purchaser agree to cooperate with the other party hereto, and to execute any and all documents as are reasonably necessary in connection therewith, provided that the closing of the transaction for the conveyance of the Premises shall not be contingent upon, and shall not be subject to, the completion of such exchange, nor shall such affect the Closing Date hereunder. Purchaser and/or Seller, as applicable, shall be obligated to close title to the Premises on or before the Closing Date whether or not Purchaser and/or Seller, as applicable, shall have consummated a 1031 exchange transaction. Nothing set forth herein shall require Purchaser to take title to any property other than the Premises described herein.

22.2    All understandings and agreements heretofore had between Seller and Purchaser are merged in this Agreement, which alone completely expresses their agreement, and this Agreement is entered into after full investigation, neither party relying upon any statement or representation made by the other and not embodied in this Agreement.

22.3    Purchaser's acceptance of the Deeds and the Assignment and Assumption of Leases to the Units shall be deemed an acknowledgment by Purchaser that Seller has fully complied with all of its obligations hereunder and under any supplements, side letters, modifications, or amendments to this Agreement; that Seller is discharged therefrom (or Purchaser has waived compliance therewith); and that Seller shall have no further obligation or liability with respect to any of the agreements, representations and/or warranties made by Seller in this Agreement, which shall be merged with the Deeds and the Assignment and Assumption of Leases to the Units; except for those provisions of this Agreement and of any supplements, side letters, modifications, or amendments to this Agreement, which, in any case, expressly provide that certain obligations of Seller shall survive the Closing and except as otherwise set forth in the Closing Documents.

22.4    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.

41

22.5    This Agreement does not constitute an offer to sell and shall not bind Seller unless and until Seller elects to be bound hereby by duly executing and delivering to Purchaser an executed original counterpart hereof.

22.6    This Agreement may only be amended, modified, altered, supplemented or, except as otherwise expressly provided herein, terminated, by a written instrument signed by Seller and Purchaser.

22.7    If any provision of this Agreement or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to parties or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and be enforced to the fullest extent permitted by law.

22.8    This Agreement, and the rights, obligations and relations of the parties hereunder, shall be governed by and construed and enforced in accordance with the laws of the State of New York without giving effect to the conflict-of-law rules and principles of that state.

22.9    Purchaser shall not be permitted to record this Agreement and all recordation offices are specifically instructed not to record the same.  Any recordation or attempted recordation shall constitute an immediate default hereunder and shall entitle Seller to terminate this Agreement and retain the Deposit.  Supplementing the other liabilities and indemnities of Purchaser to Seller under this Agreement, and notwithstanding any other provision of this Agreement (including any provision purporting to create a sole and exclusive remedy for the benefit of Seller), Purchaser agrees to indemnify, defend and hold Seller harmless from and against any and all actual losses, costs, actual damages, liens, claims, counterclaims, liabilities or expenses (including, but not limited to, reasonable attorneys' fees, court costs and disbursements) incurred by Seller arising from or by reason of the recording of this Agreement, any memorandum hereof, or any notice of pendency or any other instrument against the Premises in any case, by Purchaser.  Notwithstanding the foregoing, Purchaser may file a lis pendens or other instrument against all or a portion of the Premises in connection with Purchaser's filing of an action for specific performance in accordance with Section 15.2.

22.10   Purchaser and Seller acknowledge and agree that the sale of the Premises contemplated hereunder shall be made in accordance with the terms and conditions of the Condominium Documents.

22.11   Whenever the time for performance of a covenant or condition required to be performed pursuant to the terms of this Agreement falls upon a Saturday, Sunday or Federal or State of New York holiday, such time for performance shall be extended to the next Business Day.  Otherwise, all references herein to "days" shall mean calendar days.  Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included.

22.12   A facsimile, "pdf" and/or electronic copy of a signed original counterpart of this Agreement shall be deemed sufficient to bind the parties, and shall be deemed an original for all

42

purposes.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when combined, shall constitute one (1) fully executed original document.

22.13   THE PARTIES HERETO WAIVE TRIAL BY JURY IN CONNECTION WITH ANY AND ALL MATTERS ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREUNDER.

22.14  IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER, THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN NEW YORK COUNTY AND AGREE NOT TO RAISE ANY OBJECTION TO SUCH JURISDICTION OR TO THE LAYING OR MAINTAINING OF THE VENUE OF ANY SUCH PROCEEDING IN SUCH COURT.

22.15   The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

22.16   Purchaser agrees that, except as otherwise set forth in this Agreement or provided by law, or unless compelled by an order of a court of competent jurisdiction, it shall keep the contents of this Agreement, Seller's Due Diligence Materials, and any information related to the transactions contemplated hereunder, confidential, unless and until the Closing Date shall occur. Seller and Purchaser further agree to refrain from participating in any publicity statement, press release or other public notice regarding this transaction prior to the Closing Date, without the prior written consent of the other party hereto, unless required under applicable law or by a court order. Following the Closing Date, neither party shall disclose the name or identity of the other party or the material terms of the transaction contemplated hereby in any publicity statement, press release or other public notice, without the prior written consent of the other party hereto, unless required under applicable law or by a court order. Notwithstanding the foregoing, the parties hereto shall be permitted to disclose the terms and conditions of this Agreement to their and their affiliates' respective attorneys, employees, agents, representatives, accountants, lenders and prospective lenders, partners and prospective partners, joint venture partners, consultants, financial analysts, bankers, auditors and other similar persons who reasonably require such information, all of whom shall be advised, in writing, of the confidential nature of this Agreement, as well as in connection with the enforcement of this Agreement.  The provisions of this Section 22.16 shall survive Closing or termination of this Agreement.

22.17   If a suit, action, arbitration, mediation or other action is instituted to interpret or enforce this Agreement, or otherwise concerning this Agreement or the transactions contemplated hereby, the prevailing party (regardless of whether such party prevails on substantive or procedural grounds) pursuant to a final and non-appealable order or judgment shall be entitled to recover from the other party all actual and reasonable costs and expenses of any such action, including, but not limited to, attorneys' fees and expenses, including all such costs and expenses incurred in any trial, on any appeal, in any bankruptcy proceeding (including the adjudication of issues peculiar to bankruptcy law) and in any petition for review.  Each party also shall have the right to recover its

*ACTIVE 61730742v13*

costs and attorneys' fees incurred in collecting any sum or debt owed to it by the other party, with or without litigation, if such sum or debt is not paid within fifteen (15) days after written demand following the issuance of the final and non-appealable order or judgment in favor of the prevailing party.  The provisions of this Section 22.17 shall survive Closing or termination of this Agreement.

22.18   Seller and Purchaser will do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices, transfers and assurances as may be reasonably required by the other party for carrying out the intentions or facilitating the consummation of this Agreement.  The provisions of this Section 22.18 shall survive the Closing.

22.19   Notwithstanding anything to the contrary herein, Purchaser on its own behalf and on behalf of Purchaser Related Parties, hereby agrees that in no event or circumstance shall any of the Seller Related Parties have any personal liability under this Agreement.  Seller on its own behalf and on behalf of the Seller Related Parties hereby agrees that in no event shall any of the Purchaser Related Parties have any personal liability under this Agreement.  The provisions of this Section 22.19 shall survive the termination of this Agreement and the Closing.

*[NO FURTHER TEXT ON THIS PAGE.  SIGNATURE PAGE FOLLOWS.]*

44

**IN WITNESS WHEREOF**, Seller and Purchaser have each duly executed this Agreement as of the date first above written.

PURCHASER:

**CSC HUDSON, LLC**,
a Delaware limited liability company

By: _____

Name: Sal Smeke

Title: Authorized Signatory

[Signatures Continue on Following Page]

[Signature Page to Purchase and Sale Agreement]

SELLER:

**EC 58TH STREET LLC**,
a Delaware limited liability company

By: _____
Name:  Anthony D. Minella
Title:   President

[Signatures Continue on Following Page]

[Signature Page to Purchase and Sale Agreement]

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in <u>Article 20</u> hereof:

ESCROW AGENT:

First American Title Insurance Company

By: _____
      Name:
      Title:

[Signature Page to Purchase and Sale Agreement]

## EXHIBIT A

## LEGAL DESCRIPTION OF THE UNITS

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Units Nos. 1, 2 ,4 and 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lots 1701, 1702, 1704 and 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701), **46.94011 %** interest (as to Unit 2, Lot 1702), **0.34577 %** interest (as to Unit 4, Lot 1704) and **3.89067 %** interest (as to Unit 6, Lot 1706) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

As to Unit 1704, the premises hereby insured is the leasehold interest originally demised by that certain Lease dated as of 1/1/1999 made by and between Adrienne Schatz (a/k/a Adrianne Wachsler) and Cheryl Hirsch, as landlord and Henry Hudson Holdings LLC, as tenant, a Memorandum of which was dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2172 (as subsequently amended and assigned).

As to Unit 1706, the premises hereby insured is the leasehold interest originally demised by that Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant, (as subsequently amended and assigned).

*ACTIVE 62699126v2*

**EXHIBIT A**

**ALL THAT CERTAIN** plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of West 57th Street;

RUNNING THENCE easterly along the said northerly side of West 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of West 58th Street;

THENCE westerly along the said southerly side of West 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of West 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel, more or less, with West 58th Street, 20 feet;

THENCE southerly and part of the way through a party wall, 100 feet to the northerly side of West 57th Street, the point or place of BEGINNING.

For Information Only:   Said premises are known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 358-366 West 58th Street, Units 1, 2, 4 and 6, New York, NY and designated as Block 1048 Lots 1701, 1702, 1704 and 1706  as shown on the Tax Map of the City of New York, County of New York

**EXHIBIT B**

**FORM OF CONDOMINIUM UNIT DEED**

Attached

<u>**FORM OF CONDOMINIUM UNIT DEED**</u>

**EC 58TH STREET LLC, GRANTOR**

**TO**

**[_____], GRANTEE**

**CONDOMINIUM UNIT[S] DEED[1]**

353-361 West 57th Street a/k/a 356 West 58th Street
Unit[s] 1 [and 2]
New York, New York 10019

| | |
|---|---|
| **County:** | **New York** |
| **Block:** | **1048** |
| **Lots:** | **1701 [and 1702]** |

**Record and Return To:**

**Cole Schotz P.C.**
**1325 Avenue of the Americas**
**19th Floor**
**New York, NY 10019**
**Attn: Jordan Metzger**

---

[1] Purchaser reserves the right to bifurcate this Deed into separate deeds for each Unit, potentially with different Purchaser entities taking title to each Unit.

61458/0006-42437678v1
*ACTIVE 62692978v3*

## CONDOMINIUM UNIT[S] DEED

**THIS INDENTURE**, made as of the ___ day of _____, 2022, by EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022, (hereinafter referred to as the "**Grantor**") to [_____], a Delaware limited liability company having an address at c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 (hereinafter referred to as the "**Grantee**").

W I T N E S S E T H :

That the Grantor, in consideration of Ten ($10.00) Dollars and other valuable consideration, paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs or successors and assigns of the Grantee, forever:

The Condominium Unit[s] (the "**Unit[s]**") in the premises known as 353 West 57th Street Condominium in the Building (the "**Building**") located and known as and by street address 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, (the "**Property**"), designated and described as Unit No. 1 [and Unit No. 2] in that certain declaration of condominium (the "**Declaration**") establishing a plan for condominium ownership of the Building and the land upon which it is situate (the "**Land**") under Article 9-B of the Real Property Law of the State of New York, dated April 11, 1985 and recorded on April 24, 1985 in Reel 902 Page 1, which Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 and was further amended by the Amended and Restated Declaration, dated as of February 12, 1999 and recorded July 16, 1999 in Reel 2913 Page 1753 and further amended by Amendment to Amended and Restated Declaration dated as of September 30, 1999 and recorded October 27, 1999 in Reel 2979 Page 2159 (which Declaration as amended is hereinafter referred to as the "**Declaration**"). The Unit[s] [is/are] also designated as Tax Lot[s] 1701 [and 1702] in Block 1048 Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of The City of New York and on the Floor Plans of the Building, certified by Butler Rogers Baskett Architects on March 27, 1985 and also filed with the Real Property Assessment Department of the City of New York on April 22, 1985 as Condominium Plan No. 208, and also filed in the New York County Register's Office on April 24, 1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects on December 14, 1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on May 5, 1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on May 11, 1993 as Condominium Map No. 5192.

The Unit[s] together with their undivided percentage interests in common elements and the premises within which the Unit[s] [is/are] located [is/are] more particularly described in Exhibit A attached hereto and made a part hereof. All capitalized terms herein which are not separately defined herein shall have the meanings given to those terms in the Declaration or in the by-laws of 353 West 57th Street Condominium (said by-laws, as the same may be amended from time to time, are hereinafter referred to as the "**By-Laws**").

Being the same premises conveyed to Grantor from Henry Hudson Holdings, LLC by Deed in Lieu of Foreclosure dated 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344628.

Together with the appurtenances and all the estate and rights of the Grantor in and to the Unit[s]; and

Together with, and subject to, the rights, obligations, easements, restrictions and other provisions set forth in the Declaration and the By-Laws, all of which shall constitute covenants running with the Land shall bind any person having at any time any interest or estate in the Unit[s], as though recited and stipulated at length herein.

Subject to such other liens, agreements, covenants, easements, restrictions and other matters of record as pertain to the Unit[s] and/or the Property.

**TO HAVE AND TO HOLD** the premises herein granted unto Grantee, the heirs or successors and assigns of the Grantee, forever.

If any provisions of the Declaration or the By-Laws is invalid under, or would cause the Declaration or the By-Laws to be insufficient to submit the Property to the provisions of the New York Condominium Act, or if any provision· that is necessary to cause the Declaration and the By-Laws to be sufficient to submit the Property to the provisions of the New York Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are insufficient to submit the Property to the provisions of the New York Condominium Act, the applicable provisions of Article 26 of the Declaration shall control.

Except as otherwise provided in the Declaration or the By-Laws, the Unit[s] are intended for any lawful use.

The Grantor, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purposes of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws (and any Rules and Regulations adopted under the By-Laws) and agrees to comply with all the terms and provisions thereof.

The term "Grantee" shall be read as "Grantees" whenever the sense ofthis indenture so require.

**[SIGNATURES PAGE FOLLOWS]**

61458/0006-42437678v1
*ACTIVE 62692978v3*

   **IN WITNESS WHEREOF**, the Grantor has duly executed this deed on the date first above written.

**EC 58TH STREET LLC,**
a Delaware limited liability company


By: _____
      Name:
      Title:

STATE OF NEW YORK      )
                        :      ss.:
COUNTY OF NEW YORK  )

   On the ___ day of _____ 2022 before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public (SEAL)

4

## EXHIBIT A

### Premises

PARCEL I (Unit 1 a/k/a EBC Unit, Lot 1701):

The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 1, also known as EBC Unit, in the building (hereinafter referred to as the "Building") known as 353 West 57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is mor'< particularly described below), and which Declaration was recorded in the Office of the City Register New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot 1701 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/2711985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No.208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium MapNo. 5192.

Together with an undivided 44.05105% interest in the common elements (as such term is defined in The Declaration

[PARCEL II (Unit 2 a/k/a Modified Hotel Unit, Lot 1702):

The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 2, also known as Modified Hotel Unit, in the building (hereinafter referred to as the "Building") known as 353 West57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is more particularly described below), and which Declaration was recorded in the Office of the City Register, New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and

5

61458/0006-42437678v1
ACTIVE 62692978v3

recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot 1702 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/27/1985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the 'New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium Map No. 5192.

Together with an undivided 46.94011% interest in the common elements (as such term is defined in the Declaration.

Which Condominium Unit[s] [is/are] located on the land described below:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street, distant 20 feet easterly from the comer formed by the intersection of the easterly side of Ninth Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street, 135 feet to a point distant 40 feet easterly from the comer formed by the intersection of the southerly side of 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street, 20 feet; and

THENCE southerly and part of the way through another party wall, 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

Premises known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 358-366 West 58th Street, Unit[s] [1 and 2] New York, NY and designated as Block 1048 Lot[s] [1701 and 1702] as shown on the Tax Map of the City of New York, County of New York.

6

61458/0006-42437678v1
*ACTIVE 62692978v3*

## EXHIBIT C

## ASSIGNMENT AND ASSUMPTION OF LEASE

**KNOW ALL MEN BY THESE PRESENTS** that **[_____]** ("**Assignor**"), in consideration of Ten ($10.00) Dollars and other good and valuable consideration in hand paid by [_____], a [_____] ("**Assignee**"), the receipt and sufficiency of which is hereby acknowledged, hereby assigns unto the Assignee all of Assignor's right, title and interest in and to the following:

That certain Lease agreement more fully described on Exhibit A attached hereto and made a part hereof (the "**Unit Lease**") on the land described on Exhibit B attached hereto and made a part hereof, being the same leasehold premises conveyed to Assignor by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as [CRFN 2020000344629] [CRFN 2020000344630]. This Assignment shall include, without limitation, an assignment of Assignor's right, title and interest in and to the "Security" and/or the "Security Deposit" under the Unit Lease (only if and to the extent that the lessor under the Unit Lease ("**Unit Lessor**") is holding any such "**Security**" and/or the "**Security Deposit**"), as well as all options, rights of first refusal, deposits, pre-paid rentals, privileges and other rights of Assignor thereunder.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, from and after the date hereof, subject to the terms, covenants, conditions and provisions contained in the Unit Lease.

1. Assignee on behalf of itself and its legal representatives, successors and assigns, hereby expressly assumes the performance of all of the terms, covenants and conditions of the Unit Lease herein assigned by Assignor to Assignee from and after the date hereof and hereby agrees to be bound by all of the terms, covenants, conditions and provisions contained in the Unit Lease from and after the date hereof.

2. None of the covenants or agreements set forth in this Assignment are for the benefit of, and none of the same shall be enforceable by, any person or entity other than the parties hereto and Unit Lessor, their respective successors and assigns, it being the intention of the parties hereto that no third party is intended to be a beneficiary of or with respect to such covenants and agreements, other than the parties hereto, their respective successors and assigns.

3. Assignor, in compliance with Section 13 of the Lien Law, covenants that Assignor will receive the consideration for this assignment and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any purpose.

4. This Assignment has been made, executed and delivered in and is to be governed, interpreted and construed in accordance with the laws of the State of New York.

61458/0006-42420767v2
*ACTIVE 62692929v3*

5.      Except as may be expressly set forth in that certain Purchase and Sale Agreement dated _____, 2022 between Assignor, as seller, and Assignee as buyer (the "Agreement"), this assignment is made without warranty or representation, express or implied, by or recourse against Assignor of any kind or nature whatever.

6.      No shareholder, member, officer, director, manager or representative of Assignor or Assignee or any other person or entity other than Assignor and Assignee shall have any personal liability or obligation of any kind or nature whatsoever under this Assignment.

This Assignment may be signed in any number of counterparts each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  This Assignment may be executed by facsimile, electronic communications in portable document format (.pdf) or duplicate originals, and the parties agree that their electronically transmitted signatures shall have the same effect as manually transmitted signatures.

[ NO FURTHER TEXT ON THIS PAGE ]

61458/0006-42420767v2
*ACTIVE 62692929v3*

**IN WITNESS WHEREOF**, the parties hereto have set their hands of the _____ day of
_____, 2022.

**ASSIGNOR:**


**By:**_____


**ASSIGNEE:**


**By:**_____


STATE OF NEW YORK     )
                      :       ss.:
COUNTY OF NEW YORK  )

    On the ____ day of _____ 2022 before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



                          _____
                          Notary Public (SEAL)



STATE OF NEW YORK     )
                      :       ss.:
COUNTY OF NEW YORK  )

    On the ____ day of _____ 2022 before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



                          _____
                          Notary Public (SEAL)

**Exhibit A**

61458/0006-42420767v2
*ACTIVE 62692929v3*

**Exhibit B**

Premises known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 358-366 West 58th Street, Unit [4] [6] New York, NY and designated as Block 1048 Lot [1704] [1706] as shown on the Tax Map of the City of New York, County of New York.

61458/0006-42420767v2
*ACTIVE 62692929v3*

**EXHIBIT D**

**FORM OF BILL OF SALE**

**BILL OF SALE**

KNOW ALL MEN BY THESE PRESENTS,

That, subject to the terms and conditions hereinafter set forth, [_____], a Delaware limited liability company having an address c/o [_____] (collectively, "**Seller**") for and in consideration of the sum of Ten Dollars ($10.00), lawful money of the United States, to it in hand paid at or before delivery of these presents by [_____], a Delaware limited liability company having an address at _____ ("**Purchaser**"), the receipt and sufficiency of which Seller hereby acknowledges, has bargained and sold, and by these presents does grant and convey unto Purchaser, its successors and assigns, all right, title and interest of Seller in and to all of the Personal Property, Fixtures, Warranties, and Permits (as such terms are defined in that certain Purchase and Sale Agreement, dated _____, 2022, between Seller and Purchaser (the "**Agreement**")).

Seller grants and conveys the Personal Property, Fixtures, Warranties, and Permits unto Purchaser without recourse and without representation or warranty of any kind, express or implied (except to the extent of and only for so long as any applicable representation and warranty, as is set forth in the Agreement shall survive the closing of title thereafter, and subject to the limitations contained therein).

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns forever.

SELLER HAS MADE NO WARRANTY THAT THE PROPERTY COVERED BY THIS BILL OF SALE IS MERCHANTABLE OR FIT FOR ANY PARTICULAR PURPOSE AND THE SAME IS SOLD IN AN "AS IS" "WHERE IS" CONDITION.  BY ACCEPTANCE HEREOF, PURCHASER AFFIRMS THAT IT HAS NOT RELIED ON ANY WARRANTY OF SELLER WITH RESPECT TO THE PERSONAL PROPERTY AND THAT THERE ARE NO REPRESENTATIONS OR WARRANTEES, EXPRESSED, IMPLIED OR STATUTORY (EXCEPT TO THE EXTENT AND ONLY FOR SO LONG AS ANY APPLICABLE REPRESENTATION AND WARRANTY, IF ANY, IS AS SET FORTH IN THE AGREEMENT SHALL SURVIVE THE CLOSING OF TITLE THEREUNDER, AND SUBJECT TO THE LIMITATIONS CONTAINED THEREIN.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of New York.

This Bill of Sale shall be binding upon, enforceable by and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[Signature page follows immediately]

[_____]

**By:** _____

2

**EXHIBIT E**

**EC 58th Street LLC**

[_____]
[_____]
[_____]


353 West 57th Street
New York, New York 10019

Dear Tenant:

This letter is to notify you that effective _____, 2022, EC 58th Street LLC has sold its interest in [Unit #1, 4 and 6] in 353 West 57th Street, New York, New York to _____.  In connection therewith EC 58th Street LLC has assigned the interest as landlord in all leases and tenancies and transferred all security deposits, if any, to _____.

Please forward all rent checks and inquiries direct to the new owner's representative at the address listed below.

New Owner:          _____

Address:            _____
                    _____

Telephone           _____

Attn:               _____




Very truly yours,

EC 58th Street LLC

By: _____

**EXHIBIT F**

**FORM OF FIRPTA AFFIDAVIT**

**CERTIFICATION OF NON-FOREIGN STATUS**

Section 1445 of the Internal Revenue Code of 1986, as amended, provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person for U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____ a _____ ("Seller"), the undersigned hereby certifies the following on behalf of Seller:

1.  Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.  Seller is not a disregarded entity as defined in Treasury Regulation Section 1.1445-2(b)(2)(iii);

3.  Seller's U.S. tax identification number is _____; and

4.  Seller's office address is _____

Seller understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that the undersigned has examined this certification and to the best of the undersigned's knowledge and belief it is true, correct, and complete, and the undersigned further declares that the undersigned has authority to sign this document on behalf of Seller.

Dated: _____ ___, 2022

_____ a
_____

By:_____

## **EXHIBIT G**

FORM OF UNIT LEASE ESTOPPEL

<u>Attached</u>

## LEASE ESTOPPEL CERTIFICATE

Landlord:      A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 250 West 57th Street, Suite 901, New York, NY 10107

Tenant:      EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee:      _____, a Delaware limited liability company, having an address of _____.

Premises:      353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 4

The undersigned Landlord, A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 250 West 57th Street, Suite 901, New York, NY 10107 (the "Landlord"), successor to Adrienne Schatz and Cheryl Hirsh as fee owner of the condominium unit known as Unit No. 4 (the "Store Unit") in the condominium known as 353 West 57th Street Condominium in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "Premises") and described on Exhibit A attached hereto, is Lessor under that certain Lease dated as of January 1, 1999 made by Adrienne Schatz and Cheryl Hirsh as original Landlord and Henry Hudson Holdings LLC, as original Tenant, as referenced in a memorandum of lease dated as of September 30, 1999 and recorded on October 27, 1999 in Reel 2979 Page 2172 ("Store Unit Lease"), as amended by an unrecorded Amendment to Lease dated as of September 30, 1999, and as further amended by an unrecorded Amendment to Lease dated as of August 13, 2004, and as assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC, as assignee, dated as of November 24, 2020, recorded on December 4, 2020 in CRFN 2020000344629, hereby certifies as follows:

      **1.**      The Store Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented. There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Store Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

      **2.**      The lease term under the Store Unit Lease commenced on January 1, 1999 and expires on December 31, 2098, unless sooner terminated or extended in accordance with the terms of the Store Unit Lease. There are no options to renew.

      **3.**      The amount of Monthly Base Rent under the Store Unit Lease is currently $_____ per month.

4.      The Monthly Base Rent and all other charges (if any) have been paid through _____.

5.      There are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Store Unit Lease other than _____.

6.      Landlord is holding a security deposit under the Store Unit Lease in the amount of $_____.   None of the security deposit has been applied by Landlord to payment of rent or any other amounts due under the Store Unit Lease, except as follows: _____.

7.      There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Store Unit.

8.      As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Store Unit Lease other than as described in the Store Unit Lease exist.

9.      Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, and all of their respective successors and assigns.

10.     Landlord's address for notices under the Store Unit Lease is:

> A & C West 57 LLC
> c/o Schatzco V, LLC
> 250 West 57th Street
> Suite 901
> New York, New York 10107
> Attn: _____
>
> With a copy to:
> [                    ]
> [                    ]
> [                    ]

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Store Unit Lease.

[The remainder of this page is left blank intentionally.]

2

61458/0006-42435628v2
*ACTIVE 62692814v1*

**LANDLORD:**

A & C WEST 57 LLC
a New York limited liability company


By: _____

Name: _____

Title: _____

3

EXHIBIT A

Legal Description of Premises and the Store Unit

The Condominium Unit (the "Unit") known as the Store Unit, also known as Unit No. 4 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Store Unit and also known as Unit No. 4 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16. 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1704 in Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building Containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lyingand being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

**TOGETHER** with an undivided 0.34577 interest in the Common Elements (as such term is defined in the Declaration).

61458/0006-42435628v2
*ACTIVE 62692814v1*

## LEASE ESTOPPEL CERTIFICATE

Landlord:     Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019

Tenant:     EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee:     _____, a Delaware limited liability company, having an address of_____.

Premises:     353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 6

The undersigned Landlord, Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019 (the "Landlord"), successor to Adrienne Schatz and Cheryl Hirsh, as Executrices of the last will and testament of Irving Schatz, as fee owner of the condominium unit known as Unit No. 6 (the "Tenth Floor Unit") in the condominium  known as 353 West 57th Street Condominium, in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "Premises") and described on Exhibit A attached hereto, is Lessor under that certain Amended and Restated Lease dated as of February 11, 1999 made by Irving Schatz, as original Lessor and Ian Schrager Hotels LLC, as original Lessee, as referenced in a memorandum of lease dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1872 (the "Tenth Floor Unit Lease"), as assigned by Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC, as assignor, to Henry Hudson Holdings LLC, as assignee, dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1882, and as amended by an unrecorded Amendment to Lease made by and between Irving Schatz and Henry Hudson Holdings LLC dated as of August 17, 2004, and as further assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC as assignee, dated as of November 24, 2020 and recorded December 4, 2020 in CRFN 2020000344630, hereby certifies as follows:

1.     The Tenth Floor Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented.  There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Tenth Floor Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

**2.**     The lease term under the Tenth Floor Unit Lease commenced on December 1, 1997 and expires on November 30, 2096, unless sooner terminated or extended in accordance with the terms of the Tenth Floor Unit Lease.  There are no options to renew

**3.**     The amount of Monthly Base Rent under the Tenth Floor Unit Lease is currently $_____ per month.

**4.**     The Monthly Base Rent and all other charges (if any) have been paid through _____.

**5.**     There are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Tenth Floor Unit Lease other than _____.

**6.**     Landlord is holding a security deposit under the Tenth Floor Unit Lease in the amount of $_____.  None of the security deposit has been applied by Landlord to payment of rent or any other amounts due under the Tenth Floor Unit Lease, except as follows: _____.

**7.**     There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Tenth Floor Unit.

**8.**     As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Tenth Floor Unit Lease other than as described in the Tenth Floor Unit Lease exist.

**9.**     Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, and all of their respective successors and assigns.

**10.**     Landlord's address for notices under the Tenth Floor Unit Lease is:

> Hudson 10th Floor LLC
> c/o SchatzCo V, LLC
> 1325 Avenue of the Americas, 28th Floor
> New York, New York 10019
>
> With a copy to:
> [                    ]
> [                    ]
> [                    ]

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Tenth Floor Unit Lease.

2

**LANDLORD:**

HUDSON 10TH FLOOR LLC
a Delaware limited liability company


By: _____
        Name:_____
        Title: _____

3

EXHIBIT A

Legal Description of the Premises and Tenth Floor Unit

The Condominium Unit (the "Unit") known as the Tenth Floor Unit, also known as Unit 6 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Tenth Floor and also known as Unit 6 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16, 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1706, Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

4

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

Together with an undivided 3.89067% interest in the Common Elements (as such term is defined in the Declaration).

5

## EXHIBIT H

FORM OF CONDOMINIUM ESTOPPEL

Attached

CONDOMINIUM ESTOPPEL CERTIFICATE

TO:

CSC Hudson LLC ("Purchaser")
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013

Re:     The (i) declaration of condominium dated April 11, 1985 made by Irving Schatz (the "Original Declaration") pursuant to Article 9-B of the Real Property Law of the State of New York, as amended establishing a plan for condominium ownership of which Original Declaration was recorded in the New York County Office of the Register of the City of New York on April 24, 1985 in Reel 902 Page 1, which Original Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 and which Original Declaration was further amended by the Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch (the "A&R Declaration"), which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety), and which A&R Declaration was amended by the Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159 (collectively, the "Declaration"); (ii) by-laws, including the rules and regulations and all other exhibits and schedules attached thereto (the "By-Laws") of 353 West 57th Street Condominium (the "Condominium"); and (iii) Purchase and Sale Agreement (the "PSA"), dated January ___, 2022, by and between the EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (the "Seller"), and CSC Hudson, LLC, a Delaware limited liability company, having an address at c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 ("Purchaser") for the conveyance of Unit 1 and Unit 2 of the Condominium (the "Owned Units") and Unit 4 and Unit 6 of the Condominium (the "Leased Units") (collectively, the "Units"). Capitalized terms used herein and not defined shall have the meaning ascribed to such terms in the Condominium Documents and the PSA.

The undersigned is a duly authorized representative of the Board of Managers of the Condominium (the "Board"). The Board, hereby certifies to Purchaser as follows:

1.      All Common Charges with respect to the Units which are due have been paid in full and, there are no outstanding liens, claims, dues or charges (including, without limitation, Common Charge Liens) due to the Condominium with respect to the Units. There are no pending emergency or special assessments, capital improvements, remedial assessments, unpaid liens or other financial obligations imposed by the Board with respect to the Units, and the Seller is current in regard to all its financial obligations to the Board and the Condominium.

2.     The current total monthly Common Charges for the Units are as follows:

      a.  Unit 1: $0.00.

      b.  Unit 2: $0.00.

      c.  Unit 4: $0.00.

      d.  Unit 6: $0.00.

3.     Neither the Board nor any party to any Condominium Document has a right of first refusal to lease or purchase the Units and Seller may freely without hindrance lease or sell the Units pursuant to the express terms of the Condominium Documents.

4.     The Board has no claims, demands, or offset rights against Seller.

5.     The Declaration and By-Laws are in full force and effect and have not been modified or supplemented or amended except as set forth above.

6.     To the actual knowledge of the undersigned on behalf of the Board, neither the Units nor Seller is in violation or breach of, or in default under, any of the Condominium Documents, and the Board has no actual knowledge of any event or condition which, with the passage of time or the giving of notice or both, would constitute such a violation, breach or default by the Units or Seller. To the best of the knowledge of the undersigned on behalf of the Board, the Board has not received written notice of any claims, demands, causes of action or proceedings, pending or threatened, against the Units or Seller.

7.     The undersigned representative of the Board agrees that this Estoppel Certificate may be relied upon by Purchaser, any assignee of Purchaser's rights under the PSA (collectively, "Assignee"), any mortgagee of Purchaser, any mortgagee of Assignee, and all of their respective successors and assigns.

8.     The undersigned representative of the Board is duly authorized and fully qualified to execute this Estoppel Certificate on behalf of the Board thereby binding the Board and the Condominium.

EXECUTED this _____ day of _____, 2022.


**THE BOARD OF MANAGERS OF
353 WEST 57TH STREET
CONDOMINIUM**


By:_____
     Name:

v4 (71728.00003.001)

" = "1" "" ""
61458/0006-42435629v2
*ACTIVE 62690184v1*

## **EXHIBIT I-1**

FORM OF CBA ASSUMPTION AGREEMENT

<u>Attached</u>

Exhibit I-1

ASSUMPTION AGREEMENT

This Agreement (the "Agreement") made as of this ＿ day of ＿＿＿＿＿＿, 2022, by and between PURCHASER NAME, on its own behalf and on behalf of any affiliated or related entity and any current or future owner, manager or operator, and their respective successors or assigns (collectively, "Purchaser"), and the New York Hotel and Motel Trades Council, AFL-CIO ("Union").

Whereas, Purchaser has agreed to purchase the hotel known as "[HOTEL NAME]" (the "Hotel"), from the current owner, [SELLER NAME] ("Seller"); and

Whereas, Seller is bound to, *inter alia*, Article 59 of the collective bargaining agreement known as the Industry Wide Agreement between the Union and the Hotel Association of New York City, Inc. ("IWA"); and

Whereas, Article 59 of the IWA requires successors, assigns and transferees ("successor") to be bound to the IWA;

Whereas, Purchaser agrees that it will be a successor to the obligations under the IWA;

Now, therefore it is agreed:

1.      Purchaser agrees that it shall retain all current bargaining unit employees, whose employment will continue uninterrupted and without loss of seniority, compensation, benefits or fringe benefits, and with no adverse effect on other terms and conditions of employment, subject to the IWA and applicable law.

2.      Purchaser agrees that, effective as of the date of the closing, it has assumed, adopted and is bound by all of the terms, both economic and non-economic, of the IWA and those agreements and practices supplementing the IWA.

3.      By virtue of the closing, Purchaser acknowledges that no new verification of currently valid I-9 forms will be necessary.

4.      Effective immediately any and all disputes between the parties hereto or regarding the interpretation or application of this Agreement shall be subject to the grievance and arbitration provisions of the IWA, the entirety of which is incorporated herein by reference.

*[Signatures appear on the following page]*

*ACTIVE 62690213v2*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first set forth above herein.

**UNION**

New York Hotel and Motel Trades Council, AFL-CIO

By: _____

Name: _____

Title:_____

Authorized to Sign

Dated:_____

**PURCHASER**

PURCHASER NAME

By: _____

Name: _____

Title:_____

Authorized to Sign

Dated:_____

*ACTIVE 62690213v2*

## EXHIBIT I-2

FORM OF ALTERNATIVE AGREEMENT

Attached

## MEMORANDUM OF AGREEMENT

This Agreement (the "Agreement") is by, between and among **EC 58th Street LLC d/b/a The Hudson Hotel,** as Seller Party on their own behalf and on behalf of any of their related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (hereinafter referred to as the "Seller"), **CSC Hudson LLC** on their own behalf and on behalf of any related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (collectively hereinafter referred to as "Purchaser" or "Employer")  and the New York Hotel and Motel Trades Council, AFL-CIO (the "Union" or "HTC").

WHEREAS, the Seller and the Union are bound to the Hotel Association of New York City, Inc. – New York Hotel and Motel Trades Council, AFL-CIO Industry Wide Collectively Bargaining Unit (the CBA referred to as the "IWA") with respect to the property located at 356 West 58th Street, New York, NY 10019 (the "Property").

WHERAS, HTC represents employees employed by Seller and at the Property ("Bargaining Unit") are currently comprised of employees listed in Attachment A ("Current Employees");

WHEREAS, the Seller and Purchaser have discussed a transaction pursuant to which the Seller will sell the Property upon which the former Hudson Hotel (the "Hotel") was operated, which Hotel is subject to the IWA; and

WHEREAS, the Purchaser intends to renovate the Property and operate it as a residential building.

NOW, THEREFORE, IT IS AGREED:

1. Effective immediately upon the Closing of the transaction, the Purchaser shall offer voluntary enhanced severance pay in the amount of thirty-five days (35) days per year of employment with the Hotel ("Enhanced Severance"), in addition to any Article 52 severance, minus any bridge payments already made, less usual statutory deductions, to all of the Hotel's Current Employees, as listed in Attachment A.  The amount of Enhanced Severance will be calculated in accordance with the provisions of IWA Article 52, using the years of service and wage rate as of today's date.  Only Article 52 severance pay shall be subject to Fund contributions.  The payment of Enhanced Severance to the Hotel's Employees as listed in Attachment A shall constitute full satisfaction of any obligation of the Seller and Purchaser under Articles 52 and 57 of the IWA with respect to any employees or former employees of the Hotel.  All employees accepting Enhanced Severance shall, as a condition of receiving same, execute a general release.

2. The Purchaser shall pay withdrawal liability to the Pension Fund in an amount assessed by the Pension fund using the Segal Blend formula in one lump sum payment within 60 days of the receipt of the demand to pay withdrawal liability from the Pension Fund.

3. Purchaser intends to convert the Hotel into market based residential housing or any other use other than a hotel or private membership club (collectively referred to as "converted use").  Unless and until the Purchaser converts the Property into market based residential housing, the IWA shall continue to apply (e.g., the Purchaser obtains all of the necessary

ACTIVE 62680379v2

ACTIVE 62771130v1

permits and approvals and commence renovations).  No engineers shall be laid off during the renovation of the Property.

4.      If Purchaser, or its successor thereafter operates a hotel, private membership club, or food and beverage operation at the Property, or if the residential building offers leases of less than one (1) year, the former Employees shall be recalled and Purchaser, or its successor, shall be subject to the terms and conditions of the IWA and any agreements or practices supplementing the IWA, including the right to daily room clean.  All current employees shall retain their rights to all fairly claimable bargaining unit work at the Property.

5.      Upon Local 94-94A-94B International Union of Operating Engineers, AFL-CIO ("Local 94") presenting signed authorization cards to the Purchaser demonstrating that Local 94 has the support of the majority of engineering bargaining unit employees, the Purchaser shall recognize Local 94 as the exclusive bargaining representative of bargaining unit employees.

6.      Upon Purchaser's recognition of Local 94 as described above in Paragraph 6, the Purchaser agrees to adopt the terms of the Residential Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Local 94-94A-94B International Union of Operating Engineers, AFL-CIO (Local 94 CBA).  The Purchaser shall sign a separate assent to the Local 94 CBA.  No engineer shall be laid off, suffer a loss of hours, hourly or weekly wages, or suffer any other adverse effect as a result of the execution, assignment, or adoption of this Agreement.  It is understood that the current engineering employees will receive enhanced severance pursuant to Paragraph 1 above.

7.      Upon Local 32BJ SEIU ("32BJ") presenting signed authorization cards to the Purchaser demonstrating that 32BJ has the support of the majority of the non-engineering bargaining unit employees, the Purchaser shall recognize 32BJ as the exclusive bargaining representative of bargaining unit employees.

8.      Upon the Purchaser's recognition of 32BJ as described above in Paragraph 4, the Purchaser agrees to adopt the terms of the Apartment Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Service Employees International Union, Local 32BJ ("32BJ Contract"). The Purchaser shall sign a separate assent to the 32BJ Contract.  Bargaining unit positions in the converted use of the Property shall first be offered to Current Employees by seniority.

9.      The HTC will disclaim interest in the above-described Bargaining Unit, upon the Purchaser's recognition of Local 94 and 32BJ as described above in Paragraphs 6 and 8.

10.     This Agreement shall be binding on Purchaser's successors and assigns in accordance with IWA Article 59, the entirety of which is incorporated herein by reference. Purchaser agrees to adopt and assume the IWA subject to this Agreement. Upon closing of the sale of the Property to Purchaser, Seller shall be deemed to have complied with Article 59 of the IWA by virtue of this Agreement.

11.     With the exception of disputes arising under Paragraphs 6 and 8 above, any disputes between the parties or regarding this Agreement shall be subject to binding arbitration

*ACTIVE 62680379v2*

*ACTIVE 62771130v1*

pursuant to the grievance and arbitration provisions of the IWA, the entirety of such grievance and arbitration provisions being incorporated herein by reference. Disputes arising under Paragraphs 7 or 9 above shall be subject to binding arbitration pursuant to the respective grievance and arbitration provisions of the Local 94 or 32BJ Contract, the entirety of such grievance and arbitration provisions being incorporated herein by reference.

12.     This Agreement shall be subject to ratification by the Union.

Dated: _____, 2021

**SELLER:**                                                          **HTC:**

_____                            _____
By:                                                                 Richard Maroko
Title:                                                              President
Authorized to Sign                                                  Authorized to Sign

**PURCHASER:**                                                       **32BJ:**

_____                            _____
By:                                                                 By:
Title:                                                              Title:
Authorized to Sign                                                  Authorized to Sign

                                                                    **Local 94**

                                                                    _____
                                                                    By:
                                                                    Title:
                                                                    Authorized to Sign

4896-1634-2028, v. 2

*ACTIVE 62680379v2*

*ACTIVE 62771130v1*

## EXHIBIT J

Seller's Bring Down Certificate

## SELLER'S CERTIFICATE

Reference is made to that certain Purchase and Sale Agreement dated as of [_____] [__], 20[__] (the "**Agreement**"), by and between EC 58TH STREET LLC, a Delaware limited liability company, having an address c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (collectively, "**Seller**"), and [_____], having an address c/o [_____] ("**Purchaser**"), for the purchase and sale of the Premises.  All capitalized terms not otherwise defined herein, shall have the meaning ascribed thereto in the Agreement.

Seller hereby certifies to Purchaser that all of the warranties and representations of Seller made in the Agreement are true and correct in all material respects as of the date hereof, except as follows: [_____].

Nothing contained herein shall be deemed to expand the representations and warranties made by Seller under the Agreement or to expand the liability of Seller thereunder.

Dated: _____ __, 20__

[SIGNATURE PAGE FOLLOWS]

*ACTIVE 62709800v2*

**IN WITNESS WHEREOF**, Seller has duly executed this certification the day and year first above written.

**SELLER:**

**EC 58TH STREET LLC**,
a Delaware limited liability company

By:     _____
        Name:
        Title:

# EXHIBIT K

## Form of Assignment and Assumption of Contracts

<u>Attached</u>

### Form of Assignment and Assumption of Contracts

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS (this "**Assignment**"), made as of the [     ] day of [          ], 2022, between EC 58th STREET LLC, a Delaware limited liability company having an address c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (collectively, "**Assignor**") and [              ], a Delaware limited liability company having an address [                    ] ("**Assignee**"):

### RECITALS

WHEREAS, pursuant to that certain Purchase and Sale Agreement dated as of [          ], between Assignor, as seller, and Assignee, as purchaser (the "**Agreement**"), Assignor is selling the Premises (as such term is more particularly described in the Agreement) to Assignee; and

WHEREAS, in connection with the purchase and sale of the Premises, Assignee has elected (in its sole and absolute discretion) to assume from Assignor, and Assignor is therefore obligated to assign to Assignee, the Assumed Contracts (as defined below), and Assignor and Assignee agree that such assignment and assumption shall be subject to the terms and conditions set forth in this Assignment.

NOW THEREFORE, in consideration of the foregoing promises, covenants and undertakings contained in this Assignment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ASSIGNMENT AND ASSUMPTION

1.      Assignor hereby assigns, transfers, sets-over, delivers and conveys unto Assignee all of the rights, title, interest, benefits and privileges of Assignor, as owner, under all of the service, maintenance, supply and other agreements (collectively, the "Assumed Contracts") in effect relating to the operation of the Premises but only to the extent listed on Schedule A annexed hereto and incorporated herein by this reference, TO HAVE AND TO HOLD all and singular subject as aforesaid, unto Assignee.  This Assignment is made without any recourse and without representation or warranty of any kind, express or implied (except to the extent and only for so long as any representation and warranty, if any, regarding the Assumed Contracts as is set forth in the Agreement shall survive the closing of title thereunder, and subject to the limitations contained therein, which are hereby incorporated herein by reference).

2.      Assignee hereby expressly assumes all of the obligations imposed upon the owner of the Premises under the Assumed Contracts which accrue from and after the date hereof.

3.      This Assignment shall be binding upon, enforceable by and shall inure to the benefit of the parties hereto and their respective successors and assigns.

4.      This Assignment may be signed in multiple counterparts which, when taken together and signed by all parties and delivered to any other party hereto, shall constitute a binding

Assignment between the parties.  Facsimile or portable document format (PDF) copies hereof and facsimile or PDF signatures shall have the same force and effect as originals.

5.    This Assignment shall be governed by and construed in accordance with the laws of the State of New York.

2

61458/0006-42442710v1
*ACTIVE 62690147v2*

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this instrument as of the date first set forth above.

**ASSIGNOR**:

**EC 58th STREET LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:

[Signatures Continue on Following Page]

[Signature Page to Assignment and Assumption of Contracts]

3

**ASSIGNEE**:

_____,
a Delaware limited liability company]

By: _____
     Name:
     Title:

[Signature Page to Assignment and Assumption of Contracts]

4

Schedule A to Assignment of Contracts

61458/0006-42442710v1
*ACTIVE 62690147v2*

**EXHIBIT L**

**Form of Holdback Escrow Agreement**

Attached

<u>ESCROW AGREEMENT</u>

This ESCROW AGREEMENT (this "**Escrow Agreement**"), dated as of _____, 2022, is by and among EC 58TH STREET LLC, a Delaware limited liability company ("**Seller**"), [_____], a Delaware limited liability company ("**Purchaser**"), and ROYAL ABSTRACT ("**Escrow Agent**").

RECITALS:

A.      WHEREAS, Seller and Purchaser entered into that certain Purchase and Sale Agreement, effective as of February __, 2022 (the "**Purchase Agreement**").  All initially capitalized terms not otherwise defined in this Escrow Agreement shall have the meaning ascribed to such term in the Purchase Agreement.

B.      WHEREAS, of even date herewith, Seller and Purchaser have consummated the Closing and, in connection therewith, Seller and Purchaser desire to establish an escrow with Escrow Agent pursuant to <u>Section 8.2</u> of the Purchase Agreement.

C.      WHEREAS, Purchaser and Seller desire to appoint Escrow Agent as the escrow agent pursuant to this Escrow Agreement, and Escrow Agent is willing to act as escrow agent hereunder.

D.      WHEREAS, Escrow Agent has agreed to hold and disburse the Escrow Funds (defined below) pursuant to the terms of this Escrow Agreement.

NOW THEREFORE, in consideration of the covenants and agreements contained in this Escrow Agreement, and intending to be legally bound, the parties hereto agree as follows:

AGREEMENT

ARTICLE I
APPOINTMENT OF ESCROW AGENT

The parties hereto hereby appoint the Escrow Agent to act as escrow agent hereunder, and the Escrow Agent hereby agrees to serve as escrow agent upon the terms and conditions set forth herein. Escrow Agent shall hold, invest and disburse the Escrow Funds in accordance with the terms of this Escrow Agreement, which terms shall include, without limitation, the provisions of <u>Article 3</u> below.

ARTICLE II
ESCROW

2.1      <u>Escrow</u>.  Seller hereby deposits TWO MILLION ONE HUNDRED THOUSAND AND NO/100  Dollars ($2,100,000.00), (such deposited funds together with any interest earned thereon are hereinafter referred to as the "**Escrow Funds**") into escrow with the Escrow Agent, and the Escrow Agent hereby acknowledges receipt thereof.  Seller hereby expressly confirms that it has instructed Escrow Agent to retain the Escrow Funds from the net sales proceeds payable to Seller upon the Closing under the Purchase Agreement.  The Escrow Funds, together with the interest

1

*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

thereon, shall be deposited by Escrow Agent into a federally insured, interest bearing account reasonably acceptable to Seller and Purchaser (the "**Holdback Account**").  Escrow Agent hereby agrees that the Escrow Funds shall not be commingled with any other funds.

2.2     Fee; Waiver of Offset.  Escrow Agent was selected as escrow agent and as the title agent, in connection with the Closing under the Purchase Agreement, in part because it agreed to act as Escrow Agent hereunder without any additional consideration due to it, and Escrow Agent acknowledges that it is not due any additional fee for its services hereunder. Escrow Agent agrees that it will not pay or attempt to pay or otherwise satisfy any claim it may have, whether arising under this Agreement or otherwise from the Escrow Funds.

2.3     Disbursement of Escrow Funds.  The Escrow Funds shall be held in escrow by Escrow Agent in accordance with the following terms:

2.3.1.   From time to time up until 5:00 p.m. Eastern Standard time on the one hundred fiftieth (150th) day after the Closing Date (the "**Release Date**"), in the event Purchaser makes a claim for a breach of any Surviving Seller Representation ("**Claim**") as specifically set forth in the Purchase Agreement, Purchaser may request payment from the Escrow Funds by giving written notice of its Claim to Escrow Agent and to Seller (the "**Purchaser Claim Notice**"), certifying in such notice the nature of the Claim, the amount thereof if then ascertainable and, if not then ascertainable, a good faith estimate of the amount thereof and the provision(s) of the Purchase Agreement on which the claim is based.  If Escrow Agent does not receive a written objection (an "**Objection Notice**") from Seller within ten (10) Business Days after Escrow Agent's receipt of a Purchaser Claim Notice, Seller shall be deemed to have authorized payment of the Purchaser Claim Notice from the Escrow Funds, and Escrow Agent shall promptly pay to Purchaser the amount of such Claim to the extent of the balance of the Escrow Funds.  If within such period of ten (10) Business Days, the Escrow Agent shall receive an Objection Notice from Seller, then Escrow Agent shall not pay such claim and reserve and set aside a portion of the Escrow Funds equal to the amount of such Claim (each, a "**Claim Reserve**"); provided, however, that if the corresponding Purchaser Claim Notice specifies that the amount of Claim is not then ascertainable, Escrow Agent shall set aside a portion of the Escrow Funds equal to one hundred ten percent (110%) of the good faith estimate amount set forth in such Claim for such corresponding Claim Reserve.

2.3.2    Upon the receipt by the Escrow Agent of (i) joint written instructions signed by Purchaser and Seller or (ii) a copy of a final and non-appealable determination, finding, judgment and/or award by a court of competent jurisdiction hearing a claim, Escrow Agent shall pay the portion of the Claim Reserve directed to be paid therein to Purchaser or Seller as the case may be.

2.3.3    Delivery of Disbursements.  Unless otherwise notified by the recipient of funds from the Escrow Funds, disbursements shall be made by wire transfer to an account designated by the recipient.

2

2.3.4    On Release Date, the balance of the Escrow Funds, less the Claim Reserve and an amount equal to the amount of all Claims made prior to the Release Date for which the time period permitted for Seller to provide an Objection Notice has not elapsed, if any, shall be paid to Seller.  Upon resolution of all remaining timely provided Purchaser Claim Notices and Objection Notices, the remaining balance of the Escrow Funds shall be paid to Seller.

2.3.5    This Escrow Agreement shall terminate upon the disbursement by Escrow Agent of all of the Escrow Funds in accordance with this Escrow Agreement and Escrow Agent shall thereupon be discharged.

ARTICLE III
LIABILITY OF ESCROW AGENT

3.1    Liability of Escrow Agent.  Escrow Agent shall have no liability or obligation with respect to the Escrow Funds except for Escrow Agent's willful misconduct or gross negligence. Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Escrow Agreement.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds is deposited, this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding.

3.2    Authorization of Escrow Agent.  The Escrow Agent is authorized and instructed to comply with orders issued or process entered by any court of competent jurisdiction with respect to the Escrow Funds.  If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

3.3    Indemnification of Escrow Agent.  Seller and Purchaser hereby agree, jointly and severally, to indemnify and hold harmless the Escrow Agent and its directors, officers and employees from and against any and all losses, liabilities, expenses, claims and demands (including reasonable attorneys' fees and expenses) arising out of or in connection with the

3

*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

performance of the Escrow Agent's obligations in accordance with the provisions of this Escrow Agreement, except for the Escrow Agent's own gross negligence or willful misconduct.  The obligations of Purchaser and Seller under this Section shall survive any termination of this Escrow Agreement.

## ARTICLE IV
## MISCELLANEOUS

4.1     Assignment; Successors and Assigns; Third Parties.  Except as otherwise provided herein, neither Purchaser nor Seller shall convey, assign or otherwise transfer any of its rights or obligations under this Escrow Agreement without the express written consent of the other party.  Any conveyance, assignment or other transfer of any of Escrow Agent's rights and obligations under this Escrow Agreement shall require express written consent of both Purchaser and Seller.  This Escrow Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Escrow Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the parties hereto and their successors and permitted assigns.

4.2     Tax Reporting.  Seller and Purchaser agree that, for tax reporting purposes, all interest or other income earned from the investment of the Escrow Funds in any tax year shall (a) to the extent such interest or other income is distributed by the Escrow Agent to any person or entity pursuant to the terms of this Escrow Agreement during such tax year, be reported as allocated to such person or entity, and (b) otherwise shall be reported as allocated to Seller.

4.3     Entire Agreement.  This Escrow Agreement and the Purchase Agreement set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written.  In the event of any direct conflict of the terms of this Escrow Agreement with the terms of the Purchase Agreement, the terms of this Escrow Agreement shall control and prevail.

4.4     Severability.  If a provision of this Escrow Agreement is deemed to be contrary to law, that provision will be deemed separable from the remaining provisions of this Escrow Agreement, and will not affect the validity, interpretation or effect of the other provisions of either this Escrow Agreement or any agreement executed pursuant to it or the application of that provision to other circumstances not contrary to law.

4.5     Notices.  All notices that are required or permitted hereunder shall be in writing and shall be sufficient if personally delivered or sent by registered or certified mail (return receipt requested and postage prepaid), email or Federal Express or other nationally recognized overnight delivery service; provided, however, if such notice is sent by email, a copy of such notice shall also be sent by one (1) of the other foregoing notice methods within one (1) business day after the day that the email notice is sent.  Any notice shall be deemed given upon the earlier of the date when received at, or the third day after the date when sent by registered or certified mail or the day after the date when sent by Federal Express or the day of when sent by email to, the address or

4

ACTIVE 62599348v3

ACTIVE 62692824v2

email set forth below, unless such address or email is changed by written notice to the other parties in accordance with this Escrow Agreement:

If to Seller:    EC 58th Street LLC
                 c/o Cain International US Services LP
                 350 Park Avenue, 14th Floor
                 New York, New York 10022
                 Attention:  Cain Legal
                 Email: legal@cainint.com

and:             Greenberg Traurig, LLP
                 One Vanderbilt Avenue
                 New York, New York 10017
                 Attention:  Farah S. Ahmed, Esq.
                 Email: ahmedf@gtlaw.com

If to Purchaser:    _____
                 c/o CSC Co-Living
                 6 St. Johns Lane
                 New York, New York 10013
                 Attention: Sal Smeke and Alberto Smeke
                 Email: ss@csc-coliving.com
                       as@csc-coliving.com

With a copy to:  Cole Schotz P.C.
                 1325 Avenue of the Americas, 19th Floor
                 New York, New York 10019
                 Attn: Jordan J. Metzger, Esq.
                 Email: jmetzger@coleschotz.com

If to Escrow Agent:  Royal Abstract
                 125 Park Avenue, Suite 1610
                 New York, NY 10017
                 Attn:  Michael J. Roberts, Esq.
                 Email:  mroberts@royalabstract.com

4.6    Expenses.  Except as otherwise provided for herein, each party shall be responsible for its own costs and expenses with respect to matters involving this Escrow Agreement.

4.7    Governing Law.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York.

4.8    Execution Counterparts.  This Escrow Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

5

*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

4.9     Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction and interpretation hereof.

4.10    Attorneys' Fees.  If any legal action is brought for the enforcement of this Escrow Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding (together with costs of enforcing any judgments or rulings), in addition to any other relief to which it may be entitled.  In all other matters arising hereunder, each party shall bear its own attorneys' fees.

4.11    Further Assurances.  Each party hereto, at the reasonable request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Escrow Agreement and the transactions contemplated hereby.

4.12    Recitals Incorporated.  The foregoing recitals are hereby incorporated within and made an integral part of this Escrow Agreement as if fully set forth herein.

4.13    No Waiver.  No failure on the part of Purchaser or Seller at any time to require the performance by the other of any provision of this Escrow Agreement shall in any way affect the party's rights to require such performance, nor shall any waiver by any party of any provision hereof be taken or held to be a waiver of any other provision hereof.

[Signature pages follow]

6

IN WITNESS WHEREOF, Seller, Purchaser, and Escrow Agent have executed this Escrow Agreement as of _____ __, 2022.

**<u>SELLER</u>**:

EC 58TH STREET LLC,
a Delaware limited liability company

By:_____
Name:
Title:

[signature pages follow]

**<u>PURCHASER</u>**:

[_____],
a Delaware limited liability company


By: _____
Name: _____
Title: _____


[signature page follows]

Escrow Agreement – Signature Page
*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

**ESCROW AGENT**:

ROYAL ABSTRACT

By: _____
Name: _____
Title: _____

Escrow Agreement – Signature Page
*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

## EXHIBIT M

## Form of Labor Severance Escrow Agreement

Attached

<u>ESCROW AGREEMENT</u>

This ESCROW AGREEMENT (this "**Escrow Agreement**"), dated as of _____, 2022, is by and among EC 58TH STREET LLC, a Delaware limited liability company ("**Seller**"), [_____], a Delaware limited liability company ("**Purchaser**"), and ROYAL ABSTRACT ("**Escrow Agent**").

RECITALS:

A.    WHEREAS, Seller and Purchaser entered into that certain Purchase and Sale Agreement, effective as of February __, 2022 (the "**Purchase Agreement**").  All initially capitalized terms not otherwise defined in this Escrow Agreement shall have the meaning ascribed to such term in the Purchase Agreement.

B.    WHEREAS, of even date herewith, Seller and Purchaser have consummated the Closing and, in connection therewith, Seller and Purchaser desire to establish the Labor Severance Escrow with Escrow Agent pursuant to <u>Section 16.3</u> of the Purchase Agreement.

C.    WHEREAS, after the Closing Date, there are [__][1] weeks remaining in the 30 week severance period provided for in NYC Local Law Int. 2397-2021.

D.    WHEREAS, Purchaser and Seller desire to appoint Escrow Agent as the escrow agent pursuant to this Escrow Agreement, and Escrow Agent is willing to act as escrow agent hereunder.

E.    WHEREAS, Escrow Agent has agreed to hold and disburse the Escrow Funds (defined below) pursuant to the terms of this Escrow Agreement.

NOW THEREFORE, in consideration of the covenants and agreements contained in this Escrow Agreement, and intending to be legally bound, the parties hereto agree as follows:

AGREEMENT

ARTICLE I
APPOINTMENT OF ESCROW AGENT

The parties hereto hereby appoint the Escrow Agent to act as escrow agent hereunder, and the Escrow Agent hereby agrees to serve as escrow agent upon the terms and conditions set forth herein. Escrow Agent shall hold, invest and disburse the Escrow Funds in accordance with the terms of this Escrow Agreement, which terms shall include, without limitation, the provisions of <u>Article 3</u> below.

ARTICLE II
ESCROW

2.1    <u>Escrow</u>.  Seller hereby deposits $[_____] (such deposited funds together with any interest earned thereon are hereinafter referred to as the "**Escrow Funds**"), equal to [_____] weeks of

---

[1] To be completed as of Closing Date.

1

*ACTIVE 62701336v4*

severance pay in the gross sum of $500.00 per week for each employee of the Hotel listed on Schedule A hereto (hereafter referred to as the "**Employees**") into escrow with the Escrow Agent, and the Escrow Agent hereby acknowledges receipt thereof.  Seller hereby expressly confirms that it has instructed Escrow Agent to retain the Escrow Funds from the net sales proceeds payable to Seller upon the Closing under the Purchase Agreement.  The Escrow Funds, together with the interest thereon, shall be deposited by Escrow Agent into a federally insured, interest bearing account reasonably acceptable to Seller and Purchaser (the "**Holdback Account**").  Escrow Agent hereby agrees that the Escrow Funds shall not be commingled with any other funds.

2.2    Fee; Waiver of Offset.  Escrow Agent was selected as escrow agent and as the title agent, in connection with the Closing under the Purchase Agreement, in part because it agreed to act as Escrow Agent hereunder without any additional consideration due to it, and Escrow Agent acknowledges that it is not due any additional fee for its services hereunder.  Escrow Agent agrees that it will not pay or attempt to pay or otherwise satisfy any claim it may have, whether arising under this Agreement or otherwise from the Escrow Funds.

2.3    Disbursement of Escrow Funds.  The Escrow Funds shall be held in escrow by Escrow Agent in accordance with the following terms:

2.3.1.  On a weekly basis, commencing on the Purchaser's (or Purchaser's manager's) first regular payroll date following the Closing Date, Purchaser shall, or shall cause Purchaser's manager to, pay to each of the Employees the gross sum of $500.00 per week (the "**Severance Payments**") for [_____] weeks.  Upon Purchaser's submission of a payroll report to Seller and Escrow Agent showing that the Severance Payments have been made, Escrow Agent shall be authorized to release from the Escrow Funds the amount paid in Severance Payments for that week.  Payment of the Severance Payments, and reimbursement of the Purchaser or Purchaser's manager therefor, shall continue for __ weeks.

2.3.2   At the end of [_____] weeks, any balance in the Escrow Funds, including any interest earned, shall be returned to Seller.  This Escrow Agreement shall terminate upon the disbursement by Escrow Agent of all of the Escrow Funds in accordance with this Escrow Agreement and Escrow Agent shall thereupon be discharged.

2.3.3   Delivery of Disbursements.  Unless otherwise notified by the recipient of funds from the Escrow Funds, disbursements shall be made by wire transfer to an account designated by the recipient.

ARTICLE III
LIABILITY OF ESCROW AGENT

3.1    Liability of Escrow Agent.  Escrow Agent shall have no liability or obligation with respect to the Escrow Funds except for Escrow Agent's willful misconduct or gross negligence.  Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any

2

information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Escrow Agreement.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds is deposited, this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding.

3.2     Authorization of Escrow Agent.  The Escrow Agent is authorized and instructed to comply with orders issued or process entered by any court of competent jurisdiction with respect to the Escrow Funds.  If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

3.3     Indemnification of Escrow Agent.  Seller and Purchaser hereby agree, jointly and severally, to indemnify and hold harmless the Escrow Agent and its directors, officers and employees from and against any and all losses, liabilities, expenses, claims and demands (including reasonable attorneys' fees and expenses) arising out of or in connection with the performance of the Escrow Agent's obligations in accordance with the provisions of this Escrow Agreement, except for the Escrow Agent's own gross negligence or willful misconduct.  The obligations of Purchaser and Seller under this Section shall survive any termination of this Escrow Agreement.

ARTICLE IV
MISCELLANEOUS

4.1     Assignment; Successors and Assigns; Third Parties.  Except as otherwise provided herein, neither Purchaser nor Seller shall convey, assign or otherwise transfer any of its rights or obligations under this Escrow Agreement without the express written consent of the other party.  Any conveyance, assignment or other transfer of any of Escrow Agent's rights and obligations under this Escrow Agreement shall require express written consent of both Purchaser and Seller.  This Escrow Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Escrow Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the parties hereto and their successors and permitted assigns.

3

4.2     Tax Reporting.  Seller and Purchaser agree that, for tax reporting purposes, all interest or other income earned from the investment of the Escrow Funds in any tax year shall (a) to the extent such interest or other income is distributed by the Escrow Agent to any person or entity pursuant to the terms of this Escrow Agreement during such tax year, be reported as allocated to such person or entity, and (b) otherwise shall be reported as allocated to Seller.

4.3     Entire Agreement.  This Escrow Agreement and the Purchase Agreement set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written. In the event of any direct conflict of the terms of this Escrow Agreement with the terms of the Purchase Agreement, the terms of this Escrow Agreement shall control and prevail.

4.4     Severability.  If a provision of this Escrow Agreement is deemed to be contrary to law, that provision will be deemed separable from the remaining provisions of this Escrow Agreement, and will not affect the validity, interpretation or effect of the other provisions of either this Escrow Agreement or any agreement executed pursuant to it or the application of that provision to other circumstances not contrary to law.

4.5     Notices.  All notices that are required or permitted hereunder shall be in writing and shall be sufficient if personally delivered or sent by registered or certified mail (return receipt requested and postage prepaid), email or Federal Express or other nationally recognized overnight delivery service; provided, however, if such notice is sent by email, a copy of such notice shall also be sent by one (1) of the other foregoing notice methods within one (1) business day after the day that the email notice is sent.  Any notice shall be deemed given upon the earlier of the date when received at, or the third day after the date when sent by registered or certified mail or the day after the date when sent by Federal Express or the day of when sent by email to, the address or email set forth below, unless such address or email is changed by written notice to the other parties in accordance with this Escrow Agreement:

    If to Seller:           EC 58th Street LLC
                            c/o Cain International US Services LP
                            350 Park Avenue, 14th Floor
                            New York, New York 10022
                            Attention:  Cain Legal
                            Email: legal@cainint.com

    and:                    Greenberg Traurig, LLP
                            One Vanderbilt Avenue
                            New York, New York 10017
                            Attention:  Farah S. Ahmed, Esq.
                            Email: ahmedf@gtlaw.com

4

*ACTIVE 62701336v4*

If to Purchaser:  _____
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013
Attention: Sal Smeke and Alberto Smeke
Email: ss@csc-coliving.com
     as@csc-coliving.com

With a copy to:   Cole Schotz P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attn: Jordan J. Metzger, Esq.
Email: jmetzger@coleschotz.com

If to Escrow Agent:   Royal Abstract
125 Park Avenue, Suite 1610
New York, NY 10017
Attn:  Michael J. Roberts, Esq.
Email:  mroberts@royalabstract.com

4.6     Expenses.  Except as otherwise provided for herein, each party shall be responsible for its own costs and expenses with respect to matters involving this Escrow Agreement.

4.7     Governing Law.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York.

4.8     Execution Counterparts.  This Escrow Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

4.9     Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction and interpretation hereof.

4.10    Attorneys' Fees.  If any legal action is brought for the enforcement of this Escrow Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding (together with costs of enforcing any judgments or rulings), in addition to any other relief to which it may be entitled.  In all other matters arising hereunder, each party shall bear its own attorneys' fees.

4.11    Further Assurances.  Each party hereto, at the reasonable request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Escrow Agreement and the transactions contemplated hereby.

4.12    Recitals Incorporated.  The foregoing recitals are hereby incorporated within and made an integral part of this Escrow Agreement as if fully set forth herein.

*ACTIVE 62701336v4*

4.13     No Waiver.  No failure on the part of Purchaser or Seller at any time to require the performance by the other of any provision of this Escrow Agreement shall in any way affect the party's rights to require such performance, nor shall any waiver by any party of any provision hereof be taken or held to be a waiver of any other provision hereof.

[Signature pages follow]

6

IN WITNESS WHEREOF, Seller, Purchaser, and Escrow Agent have executed this Escrow Agreement as of _____ __, 2022.

**<u>SELLER</u>**:

EC 58TH STREET LLC,
a Delaware limited liability company

By:_____
Name:
Title:

[signature pages follow]

Escrow Agreement – Signature Page
*ACTIVE 62701336v4*

**<u>PURCHASER</u>**:

[_____],
a Delaware limited liability company

By: _____
Name: _____
Title: _____


[signature page follows]

**ESCROW AGENT**:

ROYAL ABSTRACT

By: _____
Name: _____
Title: _____

Schedule A


Employees

## SCHEDULE A

Permitted Exceptions

1.    Restrictive Covenants as recited in Liber 656 of Deeds, Page 133, Liber 658 of Deeds, Page 127, Liber 657 of Deeds, Page 80, Liber 1634 of Deeds, Page 385, Liber 999 of Deeds, Page 239, Liber 1006 of Deeds, Page 40, Liber 1613 of Deeds, Page 85, Liber 1006 of Deeds, Page 45, Liber 1037 of Deeds, Page 165, Liber 1069 of Deeds, Page 123, Liber 1609 of Deeds, Page 160, Liber 1006 of Deeds, Page 43, Liber 1031 of Deeds, Page 428, Liber 1031 of Deeds, Page 426, Liber 1037 of Deeds, Page 168, Liber 1069 of Deeds, Page 125, Liber 642 of Deeds, Page 494 and Liber 644 of Deeds, Page 428.

2.    The terms, conditions and easements set forth in the Declaration of Condominium and By-Laws dated 4/11/1985 and recorded 4/24/1985 in the Office of the City Register of the City of New York, County of New York, in Reel 902 Page 1.

(a)    First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286.

(b)    Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753.

(c)    Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159.

3.    Terms, Covenants, Conditions and Provisions contained in a Lease dated as of 1/1/1999 made by and between Adrienne Schatz (a/k/a Adrianne Wachsler) and Cheryl Hirsch, as landlord and Henry Hudson Holdings LLC, as tenant, a Memorandum of which was dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2172. (affects Lot 1704)

(a)    Unrecorded Amendment to Lease made by and between Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 9/30/1999, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.

(b)    Unrecorded Amendment to Lease made by and between Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch, as lessor, and Henry Hudson Holdings LLC, as lessee, dated as of 8/13/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.

(c)    Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.

4.      Terms, Covenants, Conditions and Provisions contained in a Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant (affects Lot 1706).

(a)      Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872.

(b)      Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882.

(c)      Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630.

(d)      Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630.

## SCHEDULE B

Tax Certiorari Proceedings

<u>Attached</u>

# THE TAX COMMISSION OF THE CITY OF NEW YORK
## ONE CENTRE STREET, ROOM 2400, NEW YORK, NY 10007

TC70-013-01406                    1 - 1048 - 1701                    10/14/2021

DITCHIK & DITCHIK PLLC
ATTN: JOEL  DITCHIK ESQ
370 LEXINGTON AVENUE
NEW YORK NY 10017

0491

Application for 2021/22
Block  1048   Lot  1701 - 1706
Ranges: 3 Lots: 4
Borough of Manhattan

NOTICE OF OFFER AND ACCEPTANCE AGREEMENT NO. 2022-013-01406          PAGE 5 OF 5

Based on its review of your application for correction, the Tax Commission offers to adjust the property's tax assessment as follows:

|  | 21/22 Total | 21/22 Exempt |
|---|---|---|
| ORIGINAL ACTUAL | 61,855,843 | |
| TRANSITIONAL | 79,005,357 | |
| TAX CLASS | 4 | |
| ACTUAL REDUCTION | -16,701,076 | |
| OF WHICH LAND | | |
| OF WHICH PHYSICAL | | |
| PROPOSED ACTUAL | 45,154,767 | |
| TAX CLASS | 4 | |

Offer applies to lots 1701-1702, 1704, 1706

AGREEMENT:  The applicant accepts the proposed assessments and all of the terms printed above and on pages 1 - 4, and certifies that all disclosures required by the agreement have been duly made and that there has been no sale of the property except as so disclosed.

Date  November 5, 2021                                                EC 58TH STREET LLC

X  Signature                                          By (print)   Steven Tishco

Specify authorization   Attorney                     Firm   Ditchik & Ditchik, PLLC

To accept this offer, SIGN and RETURN THIS ENTIRE PAGE. It must be received no later than November 29, 2021.

C1.208-22.2

Calendar Page:      9372
Hearing Date:       September 28, 2021
Property Address:   353 WEST 57 STREET
Boro-Block-Lot:     1-1048-1701
Hearing Officer:    019



#2022-013-01406-0491#

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------|

In the Matter of                                | Index No.
                                                | 258783/21
EC 58TH STREET LLC                              |
                                                |
                                                | Taxes of: 2021/22
                                                |
                          Petitioner,           | Borough: Manhattan
                                                |
          -against-                             | Block: 1048
                                                | Lots:  1701, 1702, 1704 and
THE TAX COMMISSION OF THE CITY OF NEW YORK       |        1706
and THE COMMISSIONER OF FINANCE OF THE CITY      |
OF NEW YORK                                     |
                                                |
                                                |
                          Respondents.          |
------------------------------------------------|

     IT IS HEREBY STIPULATED that the above entitled proceeding be discontinued without costs to either party.

Dated:    New York, NY
          November 5, 2021

                          *Ditchik & Ditchik, PLLC By Steven Tishco*

Ditchik & Ditchik, PLLC
Attorneys for Petitioner
370 Lexington Avenue, Suite 2301
New York, NY 10017

_____

CORPORATION COUNSEL

Attorney for Respondents

Assessment reduced from $61,855,843 to $45,154,767

Index No. 258783/21          Year 2021

_____

NEW YORK SUPREME COURT

COUNTY OF NEW YORK

_____


In the Matter of

EC 58TH STREET LLC


                    Petitioner,

          -against-

THE TAX COMMISSION OF THE CITY OF NEW YORK
and THE COMMISSIONER OF FINANCE OF THE CITY
OF NEW YORK

                    Respondents.

_____

STIPULATION OF DISCONTINUANCE
_____


GEORGIA M. PESTANA
Corporation Counsel
Attorney for Respondents
100 Church Street
New York, N.Y. 10007
(212) 788-0303


_____

## SCHEDULE C

SRO Schedule

Attached

**Schedule C**
*SRO Unit Schedule as of January 27, 2022*

| # | Tenant Floor | Tenant Unit # |
|---|---|---|
| 1 | 11 | 1169 |
| 2 | 15 | 1546 |
| 3 | 17 | 1722 |
| 4 | 18 | 1846 |
| 5 | 18 | 1856 / (1857 & 1855) |
| 6 | 19 | 1916 |
| 7 | 20 | 2017 |
| 8 | 20 | 2031 |
| 9 | 20 | 2039 |
| 10 | 20 | 2045 |
| 11 | 21 | 2106 |
| 12 | 21 | 2107 |
| 13 | 21 | 2114 |
| 14 | 21 | 2129 |
| 15 | 21 | 2135 |
| 16 | 21 | 2138 |
| 17 | 21 | 2139 |
| 18 | 21 | 2140 |
| 19 | 21 | 2145 |
| 20 | 21 | 2146 |
| 21 | 21 | 2155 |
| 22 | 21 | 2157 |
| 23 | 22 | 2204 |
| 24 | 22 | 2206 |
| 25 | 22 | 2207 |
| 26 | 22 | 2211 |
| 27 | 22 | 2212 |
| 28 | 22 | 2227 |
| 29 | 22 | 2231 |
| 30 | 22 | 2232 |
| 31 | 22 | 2235 |
| 32 | 22 | 2236 |
| 33 | 22 | 2239 |
| 34 | 22 | 2244 |
| 35 | 22 | 2245 |
| 36 | 22 | 2253 |
| 37 | 22 | 2255 |

## SCHEDULE D

Condominium Documents

Declaration of condominium dated April 11, 1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York, as establishing a plan for condominium ownership of which Original Declaration was recorded in the New York County Office of the Register of the City of New York on April 24, 1985 in Reel 902 Page 1.

First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286.

Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety).

Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159

By-Laws of 353 West 57th Street Condominium and the Rules and Regulations of 353 West 57th Street Condominium attached thereto.

*ACTIVE 62692700v1*

## SCHEDULE E

Purchaser's title objections that Seller shall cause to be omitted from Purchaser's Title Policy

1. Terms, Covenants, Conditions and Provisions of unrecorded Sub-Lease (Operating Lease) dated 8/28/2000 made by and between Henry Hudson Holdings LLC, as landlord, and Hudson Leaseco LLC, as tenant.
   a. Lease Subordination Agreement made by and between Henry Hudson Holdings LLC, as landlord, Hudson Leaseco LLC, as tenant, and Corus Bank, N.A., as lender, dated as of 11/6/2000 and recorded 2/8/2001 in Reel 3236 Page 955.

2. Terms, Covenants, Conditions and Provisions of unrecorded Supplemental Management Agreement made by and between Hudson Leaseco LLC, as lessee, and Hudson Management Member LLC, as manager, dated as of 8/28/2000, as evidenced by Subordination of Supplemental Management Agreement recorded 2/8/2001 in Reel 3236 Page 1041.
   a. Subordination of Supplemental Management Agreement made by and between Hudson Leaseco LLC and Greenwich Capital Financial Products, Inc. dated as of 8/13/2004 and recorded 5/11/2005 as CRFN 2005000272715.

3. Terms, Covenants, Conditions and Provisions of unrecorded Sub-Lease (Bar Lease) dated 8/12/2011 made by and between Henry Hudson Holdings LLC, as landlord, and 58th Street Bar Company LLC, as tenant.

4. Assignment of Leases and Rents made by Henry Hudson Holdings LLC, 58th Street Bar Company LLC and Hudson Leaseco LLC to Column Financial, Inc. dated as of 2/9/2017 and recorded 2/21/2017 as CRFN 2017000070242. **(affects Fee Estate of Lots 1701 and 1702 Leasehold and Sub-leasehold Estates of Lots 1704 and 1706)**

   a. Assignment of Assignment of Leases and Rents made by Column Financial, Inc. to U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in trust for the holders of CSMC Trust 2017-HD, Commercial Mortgage Pass-Through Certificates 2017-HD dated as of 3/29/2017 and recorded 2/18/2020 as CRFN 2020000061988, as corrected by Corrective Assignment of Assignment of Leases and Rents dated as of 5/15/2020 and recorded 5/22/2020 as CRFN 2020000154472.

   b. Assignment of Assignment of Leases and Rents made by U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in trust for the holders of CSMC Trust 2017-HD, Commercial Mortgage Pass-Through Certificates 2017-HD to Holliday Park, LLC dated as of 3/20/2020 and recorded 3/31/2020 as CRFN 2020000113456.

   c. Assignment of Assignment of Leases and Rents made by Holliday Park, LLC to Security Benefit Life Insurance Company dated 12/18/2020 and recorded 1/4/2021 as CRFN 2021000000917.

5. UCC Financing Statement:
   Secured Party: Column Financial, Inc.

Debtors: Henry Hudson Holdings LLC, 58th Street Bar Company LLC and
Hudson Leaseco LLC
Filed: 2/21/2017
CRFN 2017000070243

As assigned by UCC-3 recorded 10/1/2020 as CRFN 2020000265736
As assigned by UCC-3 recorded 11/17/2020 as CRFN 2020000321336

6. Proof is required from the Board of Managers that there are no unpaid maintenance charges and/or assessments against the Unit to be conveyed or mortgaged.

7. Closing deed shall contain a statement of the use for which the Unit is intended as required by Real Property Law §339-0 (3).

8. Satisfactory proof must be submitted that the Board of Managers has consented to the proposed sale and has waived its right of first refusal, if any, as may be provided for by the By-Laws.

9. A duly acknowledged estoppel certificate is required from the landlord certifying that the lease to be insured has not been assigned, altered, modified or amended, except as set forth herein, and that said lease is in full force and effect and that there are no existing defaults by the tenant in respect to any terms, covenants, conditions and agreements contained in said lease.

10. With respect to **EC 58th Street LLC**, the following proofs and documents must be submitted to this Company for examination prior to closing and upon review additional exceptions may thereafter be raised:

A) Proof that **EC 58th Street LLC** has been validly formed and remains in existence. Note: This may be established by an affidavit from a member or attorney representing, **EC 58th Street LLC**, with knowledge of the facts and should include the submission to this Company of a status letter or other evidence from the Secretary of State to the effect that **EC 58th Street LLC** remains in existence.

B) In addition to the proof required above:

1. A copy of the Articles of Organization, together with any amendments thereto, together with proof of filing of same with the Secretary of State;

2. A fully executed copy of the Operating Agreement, together with any amendments thereto;

3. Resolution of **EC 58th Street LLC** executed by duly authorized member(s) or manager(s) approving the subject

2

61458/0006-42420005v2
*ACTIVE 62690322v2*

transaction, which resolution identifies the person(s) authorized and directed to act for said **EC 58th Street LLC** together with proof that the resolution was adopted in accordance with the Operating Agreement and the Articles of Organization. If the subject transaction involved the sale, exchange, lease or mortgage of all or substantially all of the assets of said **EC 58th Street LLC**, then absent provisions to the contrary in the Operating Agreement, such resolution must also be adopted by the vote of at least two-thirds in interest of the members entitled to vote thereon.

11. A. Satisfactory proof by affidavit must be furnished showing whether any work has been done upon the premises by the City, or any demand made by the City for any work, that may result in charges:
    a. By the New York City Department of Rent and Housing Maintenance, Emergency Services;
    b. By the New York City Department of Environmental Protection for Water Tap Closing or any related work; and
    c. By the New York City Department of Health, whether or not such charges are liens against which this Policy insures.

C)     Satisfactory proof by affidavit must be furnished showing whether any fee for an inspection, re-inspection, examination or service performed the Department of Buildings or permit issued by The Department of Buildings have been levied, charges, created or incurred that may become a lien on the premises, whether or not such charges are liens against which this Policy insures.

12. All mortgages on the Mortgage Schedule included in the Commitment and recited below:

A. Amended and Restated Replacement Mortgage A in the original principal amount of $217,000,000.00 made by Henry Hudson Holdings LLC, Morgans Holdings LLC and Royalton, LLC to Wachovia Bank, National Association dated 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679014. (**Originally affected premises herein and Block 867 Lot 20 and Block 1259 Lot 11**)

Mortgage Tax Paid: $ -0-

NOTE: Said mortgage A was derived from Note and Mortgage Severance Agreement made between Wachovia Bank, National Association, Royalton, LLC, Henry Hudson Holdings LLC and Morgans Holdings LLC dated as of 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679013.
(See Mortgage Exhibit annexed)

1. Said mortgage A was released from Block 867 Lot 20 and Block 1259 Lot 11 by Partial Release of Amended and Restated Replacement Mortgage A made between Wachovia Bank, National Association, Henry Hudson Holdings LLC, Morgans

3

Holdings LLC and Royalton LLC dated as of 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679017.

2. Said mortgage A was amended by Agreement of Consolidation and Modification of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing made between Henry Hudson Holdings LLC and Wachovia Bank, National Association dated as of 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679020.

3. Said mortgage A was assigned by Wachovia Bank, National Association to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8, solely to the extent set forth in the applicable Partition Agreement, the applicable Non-Trust Portion Holder by Assignment of Mortgage dated as of 6/27/2007 and recorded 11/27/2007 as CRFN 2007000587889.

4. Said mortgage A was modified by Modification of Agreement of Consolidation and Modification of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing made between Henry Hudson Holdings LLC and Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8 dated as of 9/30/2010 and recorded 10/14/2010 as CRFN 2010000344286.

5. Said mortgage A was assigned by Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8 to Deutsche Bank Trust Company of Americas, as Administrative Agent, by Assignment of Mortgage dated as of 8/12/2011 and recorded 9/16/2011 as CRFN 2011000329360.

6. Said mortgage A was amended and restated in the reduced amount of $115,000,000.00 by Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Hotel Revenue and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and Deutsche Bank Trust Company of Americas, as Administrative Agent, dated as of 8/12/2011 and recorded 9/16/2011 as CRFN 2011000329361.  (spread to cover the fee estate of Lots 1701 and 1702 and leasehold and sub-leasehold estates of Lots 1704 and 1706)

7. Said mortgage A was amended by First Amendment to Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Hotel Revenue and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and Deutsche Bank Trust Company of Americas, as Administrative Agent, dated as of 12/7/2011 and recorded 2/21/2012 as CRFN 2012000068316.

4

61458/0006-42420005v2
*ACTIVE 62690322v2*

8.  Said mortgage A was assigned by Deutsche Bank Trust Company of Americas, as Administrative Agent to UBS Real Estate Securities Inc. by Assignment of Mortgage dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461819.

B.  Fee and Leasehold Mortgage in the original principal amount of $65,000,000.00 made by Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC to UBS Real Estate Securities Inc. dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461820. (**affects Fee Estate of Lots 1701 and 1702 Leasehold and Sub-leasehold Estates of Lots 1704 and 1706**)

Mortgage Tax Paid: $1,820,000.00

1.  Said mortgages A and B were consolidated to form a single lien of $180,000,000.00 by Consolidated, Amended and Restated Fee and Leasehold Mortgage and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and UBS Real Estate Securities Inc. dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461821.

2.  Said mortgages A and B, as consolidated, were assigned by UBS Real Estate Securities Inc. to Citigroup Global Markets Realty Corp. and Bank of America, N.A. by Assignment of Mortgage dated as of 2/6/2014 and recorded 2/14/2014 as CRFN 2014000058277.

C.  Consolidated, Amended and Restated Fee and Leasehold Mortgage and Security Agreement in the original principal amount of $53,333,333.34 made by Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC to Citigroup Global Markets Realty Corp. and Bank of America, N.A. dated as of 2/6/2014 and recorded 2/14/2014 as CRFN 2014000058278. (**affects Fee Estate of Lots 1701 and 1702 Leasehold and Sub-leasehold Estates of Lots 1704 and 1706**)

Mortgage Tax Paid: $1,493,332.41

1.  Said mortgages A through C were consolidated to form a single lien of $233,333,333.34 by the terms of said mortgage C.

2.  Said mortgages A through C, as consolidated, were assigned by Citigroup Global Markets Realty Corp. and Bank of America, N.A. to Deutsche Bank Trust Company Americas, as Trustee for CGBAM Commercial Mortgage Trust 2014-HD. Commercial Mortgage Pass-Through Certificates, Series 2014-HD and The Companion Loan Holder by Assignment of Mortgage dated 5/28/2014 and recorded 8/4/2014 as CRFN 2014000255044.

3.  Said mortgages A through C, as consolidated, were assigned by Deutsche Bank Trust Company Americas, as Trustee for CGBAM Commercial Mortgage Trust 2014-HD. Commercial Mortgage Pass-Through Certificates, Series 2014-HD and

61458/0006-42420005v2
ACTIVE 62690322v2

The Companion Loan Holder to Column Financial, Inc. by Assignment of Mortgage dated as of 2/9/2017 and recorded 2/21/2017 as CRFN 2017000070240.

4. Said mortgages A through C, as consolidated, were amended and restated in the amount of $225,000,000.00 by Amended and Restated Fee and Leasehold Mortgage and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and Column Financial, Inc. dated as of 2/9/2017 and recorded 2/21/2017 as CRFN 2017000070241.

5. Said mortgages A through C, as consolidated, were assigned by Column Financial, Inc. to U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in Trust for Holders of CSMC Trust 2017-HD Commercial Mortgage Pass-Through Certificates Series 2017-HD by Assignment of Mortgage dated 3/29/2017 and recorded 2/18/2020 as CRFN 2020000061987.

NOTE: Corrective Assignment of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing dated as of 5/15/2020 and recorded 5/22/2020 as CRFN 20200000154471 corrects the Assignment recorded 2/18/2020 as CRFN 2020000061987 to include the complete mortgage schedule and correct the acknowledgement.

6. Said mortgages A through C, as consolidated, were assigned by U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in Trust for Holders of CSMC Trust 2017-HD Commercial Mortgage Pass-Through Certificates Series 2017-HD to Holliday Park, LLC by Assignment of Mortgage dated as of 3/20/2020 and recorded 3/31/2020 as CRFN 2020000113455.

NOTE: Corrective Assignment of Amended and Restated Mortgage and Security Agreement and Other Loan Documents dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344627 corrects the Assignment recorded 3/31/2020 as CRFN 2020000113455 to include the complete mortgage schedule.

NOTE: The above mortgage is held by a private lender. Whenever documents are required from the lender such as a satisfaction, assignment, or subordination, such duly executed instrument must be furnished to the company prior to or at closing.

7. Said mortgages A through C, as consolidated, were assigned by Holliday Park, LLC to Security Benefit Life Insurance Company by Assignment of Amended and Restated Mortgage and Security Agreement and Other Loan Documents dated 12/18/2020 and recorded 1/4/2021 as CRFN 2021000000918.

61458/0006-42420005v2
*ACTIVE 62690322v2*

## SCHEDULE F

Intentionally Omitted

## SCHEDULE G

Cycle 8 Local Law 11 Contracts

<u>Attached</u>

**Schedule G**
*LL 11 Contract Schedule as of January 27, 2022*

| Vendor | Scope of Work | Date of Contract | Termination Option |
|---|---|---|---|
| APCO | Furnish all labor materials, services and equipment to perform work | 2/12/2021 | May be terminated at any time with 30 days notice |
| APCO | Additional Work (northwest bulkhead and PP Canopy window/glass replacement) | 2/17/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #1 | Provide necessary site safety materials | 3/29/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #2 | Provide necessary site safety materials | 3/29/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #3 | Additional Work (masonry on west elevation) | 5/12/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #4 | Additional Work (stucco, cap stone, and skylight repair) | 12/17/2021 | May be terminated at any time with 30 days notice |
| Gardiner and Theobald | Professional monitoring & close out services for the project | 2/17/2021 | May be terminated at any time with 3 days notice |
| ALSA | Provide services during construction, liaison with NYC agencies, amended FISP and Cycle 8B Report & Filing, FISP Inspections/Report and Filing and Cycle 9B | 2/17/2021 | May be terminated at any time with 5 days notice |

## SCHEDULE H

Grievances under Labor and Employment Laws

<u>None</u>

## SCHEDULE I

Service Contracts

<u>Attached</u>

**Schedule I**
*Contracts In-Place as of February 1, 2022*

| Vendor | Service | Start Date | Status |
|---|---|---|---|
| California Crown Energy Services | Operation, maintenance, and minor repairs of boiler, refrigerant, air compression, water filter, fuel oil, automation for HVAC, sanitary sewer, and air distribution systems | Sep-21 | Contract in place |
| Atlas Welding and Boiler Repair | Boiler cleaning and burner overhaul | Dec-20 | Currently Month to Month (MTM) |
| Direct Energy | Utilities | May-21 | Contract in place |
| LL84 Energy Benchmarking (Newmark Contract) | Utility management and energy star reporting software solution, Spectrum | Sep-21 | Contract in place |
| Quality Fire Protection | Prepare the amendment to the fire safety & evacuation plan to be submitted to NYCFD for review and acceptance. Prepare amended building Info Card so it is consistent with requirements of NYCFD in addition to training courses | May-21 | Contract in place |
| Ditchik & Ditchik | Tax Appeal Attorneys | Dec-20 | Contract in place |
| Nouveau Elevator | Oil, grease, and survey traction elevators | Dec-20 | Contract in place |
| Lerch Bates | Provide vertical transportation consulting services to include calls, reviews, meetings, and site visits | Jan-21 | Contract in place |
| New York Hotel and Motel Trades Council, AFL-CIO (Union) | Manager (Newmark) agrees to assume management and employ the Hotel employees represented by the Union | Mar-21 | Contract in place |
| Rosenwach Tank | Clean and inspect steel tank compartment, water test, and water tank inspections | Nov-21 | Contract in place |
| RCN Telecom Services | Communication and telecom services | Oct-21 | Contract in place |
| Spectrum Enterprise | Internet, HBO, and HD Video Tier | Jun-19 | Contract in place |
| NuChem | Water treatment | Nov-21 | Contract in place |
| Johnson Controls / TYCO | Fire Central Station Monitoring | Jul-21 | Contract in place |
| New York Security Systems, Inc. | Security Cameras  Service and Maintenance | Mar-20 | Currently Month to Month (MTM) |
| Metropolitan Recycling | Waste Removal | Jan-22 | Contract pending signature |
| Constellation | Electricity | Oct-19 | Contract in place |
| JPMcHale | Pest Management | Jan-22 | Contract pending signature |
| Windstream | Voice Circuit | | Currently Month to Month (MTM) |
| Fire Service Inc. | Inspect and Maintain Fire Alarm, smoke detectors | Jul-15 | Currently Month to Month (MTM) |
| Allbridge | T-1 circuit for phone system | | Currently Month to Month (MTM) |
| LDI | Copy machine | | Contract in place |
| *Universal Protection Service* | *Security* | | *Contract Pending* |

## **SCHEDULE J**

Allowed Applications

**Filings with DOB**:

1. Interior alterations to common areas
2. Interior alteration for accessibility upgrades to vacant units
3. Exterior work at common areas such as terraces
4. Alterations to MEP systems at common areas and within vacant units
5. Alterations to sprinkler and standpipe systems at common areas and within vacant units

**Filings with FDNY**:

1. Upgrades to existing fire alarm system
2. New ARCS system for residential use

**SCHEDULE K**

List of Violations

Attached

**Schedule K**
*Hudson Open Violations as of January 29, 2022*

| Department | Address | Violation Number | Date | Type |
|---|---|---|---|---|
| DOB | 358 West 58th Street | 021915FISPHAZ75487 | 2/19/2015 | Façade Local Law |
| DOB | 358 West 58th Street | 020617E9028/593396 | 2/6/2017 | Elevator PVT |
| DOB | 358 West 58th Street | 021918E9028/619075 | 2/19/2018 | Elevator PVT |
| DOB | 358 West 58th Street | 021918E9028/619076 | 2/19/2018 | Elevator PVT |
| DOB | 358 West 58th Street | 021918E9028/619078 | 2/19/2018 | Elevator PVT |
| DOB | 358 West 58th Street | 022118FISPHAZ87279 | 2/21/2018 | Façade Local Law |
| DOB | 358 West 58th Street | 021619BENCH00135 | 2/16/2019 | Benchmarking |
| DOB | 358 West 58th Street | 031819EARCX10082 | 3/18/2019 | Local Law 87 Energy |
| DOB | 358 West 58th Street | 050219BENCH00504 | 5/2/2019 | Benchmarking |
| DOB | 358 West 58th Street | 080219BENCH00250 | 8/2/2019 | Benchmarking |
| DOB | 358 West 58th Street | 090619ACC101865 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619ACC101866 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619ACC101867 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619ACC101868 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101869 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101870 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101871 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101872 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 110219BENCH00172 | 11/2/2019 | Benchmarking |
| DOB | 358 West 58th Street | 121919E9027/668819 | 12/19/2019 | Elevator PVT |
| DOB | 358 West 58th Street | 020220BENCH00127 | 2/2/2020 | Benchmarking |
| DOB | 358 West 58th Street | 060520E9027/683208 | 6/5/2020 | Elevator PVT |
| DOB | 358 West 58th Street | 060520E9027/683211 | 6/5/2020 | Elevator PVT |
| DOB | 358 West 58th Street | 062920EARCX00125 | 6/29/2020 | Local Law 87 Energy |
| DOB | 358 West 58th Street | 101420AEUHAZ100047 | 10/14/2020 | AEU Failed to Certify |
| DOB | 358 West 58th Street | 111120AEUHAZ100042 | 11/11/2020 | AEU Failed to Certify |
| DOB | 358 West 58th Street | 032421E9028/697754 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697755 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697757 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697762 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697763 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 033121AEUHAZ100050 | 3/31/2021 | AEU Failed to Certify |
| DOB | 358 West 58th Street | 042921EGRADE2000727 | 4/29/2021 | Energy Grade |
| DOB | 358 West 58th Street | 060221BENCH0277 | 6/2/2021 | Benchmarking |
| DOB | 358 West 58th Street | 062021EARCX00169 | 6/20/2021 | Local Law 87 Energy |
| DOB | 358 West 58th Street | 080221BENCH00174 | 8/2/2021 | Benchmarking |
| DOB | 358 West 58th Street | 280221BENCH00126 | 11/2/2021 | Benchmarking |
| DOB | 358 West 58th Street | 110221EGRADE2100531 | 12/1/2021 | Energy Grade |
| DOB | 358 West 58th Street | 032421E9028/697761 | 3/24/2021 | Elevator PVT |
| Oath/ECB | 353 West 52nd Street | 35635233H | 12/2/2021 | Facade |
| Oath/ECB | 353 West 57nd Street | 39027352R | 8/21/2020 | Plumbing |
| Oath/ECB | 353 West 57nd Street | 39027351P | 8/21/2020 | Plumbing |
| Oath/ECB | 353 West 57nd Street | 35491673L | 7/23/2020 | Construction Safety |
| Oath/ECB | 353 West 57nd Street | 39025513J | 7/16/2020 | Elevator |
| Oath/ECB | 353 West 57nd Street | 39025512H | 7/16/2020 | Elevator |
| Oath/ECB | 1150 Longwood Avenue | 35469596X | 7/10/2020 | Construction Safety |
| HPD | 353 West 57th Street | 14583964 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583965 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583966 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583967 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583968 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583969 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 13945387 7083011 | 2/6/2021 | |
| HPD | 353 West 57th Street | 13945388 7083011 | 2/6/2021 | |
| HPD | 353 West 57th Street | 13945389 7083012 | 2/6/2021 | |
| HPD | 353 West 57th Street | 12974778 6430757 | 3/22/2019 | |

| HPD | 353 West 57th Street | 12974781 6430757 | 3/22/2019 |
|-----|----------------------|------------------|-----------|
| HPD | 353 West 57th Street | 12974782 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974783 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974784 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974786 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974791 6430756 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974793 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12402840 6101206 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402900 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402939 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402960 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402970 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402980 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12403033 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12403073 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12360465 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360466 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360467 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360468 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360469 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360470 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360471 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360472 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360476 6078082 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360479 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12356614 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356616 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356617 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356618 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356619 6076239 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356620 6076239 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356621 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356622 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356623 6076238 | 4/19/2018 |

| HPD | 353 West 57th Street | 12356624 6076239 | 4/19/2018 |
|-----|----------------------|------------------|-----------|
| HPD | 353 West 57th Street | 12356625 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356626 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356627 6076239 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356629 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356632 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356633 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 11827788 5775996 | 6/13/2017 |
| HPD | 353 West 57th Street | 11827792 5775995 | 6/13/2017 |
| HPD | 353 West 57th Street | 10618390 5067019 | 3/4/2015 |
| HPD | 353 West 57th Street | 10201525 4816874 | 4/8/2014 |
| HPD | 353 West 57th Street | 10201554 4816874 | 4/8/2014 |
| HPD | 353 West 57th Street | 10201563 4816874 | 4/8/2014 |
| HPD | 353 West 57th Street | 10026351 4719539 | 11/1/2013 |
| HPD | 353 West 57th Street | 10026365 4719540 | 11/1/2013 |
| HPD | 353 West 57th Street | 10026371 4719540 | 11/1/2013 |
| HPD | 353 West 57th Street | 10026438 4719540 | 11/1/2013 |
| HPD | 353 West 57th Street | 9673031 4535288 | 12/10/2012 |
| HPD | 353 West 57th Street | 9673032 4535288 | 12/10/2012 |
| HPD | 353 West 57th Street | 9673033 4535288 | 12/10/2012 |
| HPD | 353 West 57th Street | 9588710 4492749 | 9/18/2012 |
| HPD | 353 West 57th Street | 9588712 4492749 | 9/18/2012 |
| HPD | 353 West 57th Street | 7726100 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7726101 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7726102 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7726103 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7500040 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500041 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500042 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500043 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500044 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 6905564 3080579 | 8/29/2007 |
| HPD | 353 West 57th Street | 6905565 3080579 | 8/29/2007 |
| HPD | 353 West 57th Street | 6839019 3028321 | 7/17/2007 |
| HPD | 353 West 57th Street | 6839025 3028323 | 7/17/2007 |
| HPD | 353 West 57th Street | 6839026 3028322 | 7/17/2007 |
| HPD | 353 West 57th Street | 6753969 2975912 | 5/18/2007 |
| HPD | 353 West 57th Street | 6753979 2975912 | 5/18/2007 |
| HPD | 353 West 57th Street | 6753984 2975912 | 5/18/2007 |
| HPD | 353 West 57th Street | 6753988 2975913 | 5/18/2007 |

| | | | | |
|---|---|---|---|---|
| HPD | 353 West 57th Street | 6202732 2689172 | 6/7/2006 | |
| HPD | 353 West 57th Street | 6202734 2689173 | 6/7/2006 | |
| HPD | 353 West 57th Street | 5071186 2205265 | 8/12/2004 | |
| HPD | 353 West 57th Street | 5027531 2179698 | 7/12/2004 | |
| HPD | 353 West 57th Street | 2956279 607649 | 7/31/1998 | |
| HPD | 353 West 57th Street | 256276 607647 | 9/8/1995 | |
| Oath/ECB | 353 West 57nd Street | 011714775N | 12/20/2019 | FDNY |
| Oath/ECB | 353 West 57nd Street | 011801427X | 8/12/2021 | FDNY |
| Oath/ECB | 353 West 57nd Street | 0204793106 | 1/3/2019 | Dep Ind Wsdt Ctrl |
| Oath/ECB | 353 West 57nd Street | 0881202035 | 2/20/2020 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881202044 | 2/20/2020 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881202053 | 2/20/2020 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0600214423 | 4/11/2020 | Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214432 | 4/11/2020 | Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214441 | 4/11/2020 | Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214450 | 4/11/2020 | Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214460 | 4/11/2020 | Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214479 | 4/11/2020 | Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 011726107J | 3/10/2020 | FDNY |
| Oath/ECB | 353 West 57nd Street | 0881251838 | 5/14/2021 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251782 | 5/14/2021 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251791 | 5/14/2021 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251800 | 5/14/2021 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251810 | 5/14/2021 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251829 | 5/14/2021 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168256 | 3/27/2029 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168265 | 3/27/2029 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168283 | 3/27/2029 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168292 | 3/27/2029 | DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 011677523K | 2/14/2019 | FDNY |
| Oath/ECB | 353 West 57nd Street | 011746067M | 7/24/2020 | FDNY |
| Oath/ECB | 353 West 57nd Street | 011788741K | 8/10/2021 | FDNY |
| Oath/ECB | 358 West 58th Street | 0871163298 | 4/26/2019 | DOHMH-Water Tank |
| Oath/ECB | 358 West 58th Street | 011620599J | 6/27/2019 | FDNY |
| Oath/ECB | 358 West 58th Street | 011729920X | 12/2/2019 | FDNY |

**SCHEDULE L**

[Excluded Personal Property]

Attached

**Schedule L**

*Hudson Excluded Property as of January 29, 2022*





*ACTIVE 62700745v1*

**FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE**

**THIS FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE** (this "Agreement") is made and entered into as of April 19, 2022 (the "Effective Date"), by and between EC 58TH STREET LLC, a Delaware limited liability company ("Seller"), and CSC HUDSON, LLC, a Delaware limited liability company ("Purchaser").

**RECITALS**

WHEREAS, Purchaser and Seller entered into that certain Agreement of Purchase and Sale dated February 3, 2022 (the "PSA"), for the sale by Seller to Purchaser of property commonly referred to as Units 1, 2, 4 and 6 in the 353 West 57th Street Condominium located at 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, as more particularly described in the PSA.

WHEREAS, Purchaser and Seller have mutually agreed to amend the PSA as set forth herein.

NOW, THEREFORE, in consideration of the agreement set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, the parties agree as follow:

1.      Capitalized Terms.   All capitalized terms used in this Agreement but not otherwise defined shall have their same meanings as set forth in the PSA.

2.      Closing Obligations.   Seller and Purchaser desire to amend and restate Section 9.1(b) of the PSA as follows:

> "Two (2) written agreements pursuant to which Seller shall assign to two (2) separate and distinct Permitted Designees of Purchaser (as designated by Purchaser in its sole and absolute discretion) and/or any other assignee or designee of Purchaser approved by Seller, and such Permitted Designees and/or other approved assignee or designee shall assume and agree to be bound by, all obligations and liabilities of Seller under the 10th Floor Lease and Store Unit Lease, respectively, and otherwise with respect to the Leased Units, in substantially the form of Exhibit C attached hereto (each, respectively, the "Assignment and Assumption of Lease.""

3.      Seller and Purchaser desire to amend and restate Section 9.2(e) of the PSA as follows:

> "Two (2) Assignments and Assumptions of Lease, with respect to the Leased Units."

4.      Seller and Purchaser desire to amend Section 19.1 to amend and restate the second sentence therein as follows:

*ACTIVE 64216220v3*

"Notwithstanding the foregoing, Purchaser shall have the right to assign its rights under this Agreement to one or more Permitted Designees of Purchaser without the consent of Seller so long as Purchaser delivers to Seller a fully executed and effective assignment and assumption agreement conveying such designee(s) all of Purchaser's right, title and interest in, to and under this Agreement and the Deposit at least five (5) Business Days prior to Closing."

5.    Counterparts.    This Agreement may be executed and delivered in multiple counterparts, each of which shall be deemed an original instrument, and all of which, when taken together, shall constitute one and the same original document.  PDF signatures are sufficient to bind Seller and Purchaser with respect to this Agreement.

6.    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

[NO FURTHER TEXT ON THIS PAGE]

*ACTIVE 64216220v4*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

**SELLER**:

**EC 58TH STREET LLC,** a Delaware limited liability company

By: _____
Name:  Anthony D. Minella
Title:   President

[signatures continue on following page]

[Signature page to First Amendment to PSA]

**CSC PURCHASER:**

**CSC HUDSON, LLC**, a Delaware limited liability company

By: _____
Name:   Sal Smeke
Title:   Authorized Signatory

By: _____
Name:   Alberto Smeke
Title:   Authorized Signatory

[Signature page to First Amendment to PSA]

Exhibit A-2

PSA Assumption and Amendment

(Attached hereto)

4866-0049-6406, v. 12
61458/0006-42946111v5

**ASSIGNMENT, ASSUMPTION AND MODIFICATION OF PURCHASE AND SALE AGREEMENT**

THIS ASSIGNMENT, ASSUMPTION AND MODIFICATION OF PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of this 3rd day of May, 2022 (the "Effective Date") by and among **EC 58th Street LLC**, a Delaware limited liability company ("Seller"), **CSC Hudson, LLC**, a Delaware limited liability company ("CSC Purchaser"), **353W57 1704, LLC**, a Delaware limited liability company ("CSC Store Unit Purchaser") and **356W58 Ground Lessor LLC**, a Delaware limited liability company ("MSP Purchaser").

**RECITALS**

**WHEREAS**, CSC Purchaser, as purchaser, and Seller, as seller, entered into that certain Purchase and Sale Agreement, dated as of February 3, 2022, as amended by the First Amendment to Purchase and Sale Agreement dated as of April 19, 2022 (as may be further amended, restated and/or modified from time to time in accordance with this Agreement, the "PSA"), a true, correct and complete copy of which is attached hereto as Exhibit A;

**WHEREAS**, simultaneously with the Closing under the PSA, (i) MSP Purchaser and Hudson 1702, LLC ("Hudson 1702") and Hudson 1701/1706, LLC ("Hudson 1701/1706"), as Permitted Designees of CSC Purchaser (in such capacity, Hudson 1702 and Hudson 1701/1706 collectively, on a joint and several basis, as "Ground Tenant") are entering into (A) a 99-year ground lease (the "Ground Lease") pursuant to which MSP Purchaser, as landlord shall lease to Ground Tenant, as tenant, the Owned Units and (B) a sublease agreement ("Sublease") pursuant to which MSP Purchaser, as sublessor shall sublease the 10th Floor Unit to Hudson 1701/1706, as sublessee and (ii) Ground Tenant is obtaining a leasehold construction loan (the "Leasehold Loan") from affiliates of Parkview Financial (the "Leasehold Lender"), which Leasehold Loan shall be secured by Ground Tenant's leasehold interests in the Owned Units and subleasehold interest in the 10th Floor Unit (collectively, the "Ground Lease Transaction");

**WHEREAS**, in accordance with the terms of the PSA, CSC Purchaser desires to assign to CSC Store Unit Purchaser and CSC Store Unit Purchaser desires to assume from CSC Purchaser, all of its right, title and interest in and to the PSA solely with respect to the Store Unit Lease, subject to the terms and conditions of this Agreement and in accordance with the terms of the PSA (and MSP Purchaser shall have no interest therein);

**WHEREAS**, in connection with the Ground Lease Transaction, in accordance with the terms of the PSA, CSC Purchaser desires to assign to MSP Purchaser, and MSP Purchaser desires to assume from CSC Purchaser, all of its right, title and interest in and to the PSA solely with respect to the Owned Units and the 10th Floor Unit pursuant to the 10th Floor Lease (collectively, the "MSP Property"), subject to the terms and conditions of this Agreement;

**WHEREAS**, in connection with the Ground Lease Transaction, the Seller, CSC Purchaser, CSC Store Unit Purchaser and the MSP Purchaser desire to modify the PSA as set forth herein;

NOW, THEREFORE, in consideration of the foregoing, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Definitions/Recitals Incorporated</u>.  Unless otherwise defined in this Agreement, all capitalized terms used herein shall have the meanings ascribed to such terms in the PSA.  The recitals set forth hereinabove in this Agreement are hereby incorporated into this Agreement as if fully set forth herein.

2. <u>Assignment and Assumption</u>.  CSC Purchaser hereby transfers, assigns and sets over to MSP Purchaser all of CSC Purchaser's right, title, and interest in, to and under the PSA solely with respect to the MSP Property, and MSP Purchaser hereby accepts such assignment, in each case subject to the terms and conditions set forth herein (the "<u>MSP Assignment</u>"), it being acknowledged and agreed by the CSC Purchaser that from and after the Effective Date, CSC Purchaser shall have no rights or interest with respect to the MSP Property under the PSA (except as otherwise as expressly set forth in this Agreement). CSC Purchaser hereby transfers, assigns and sets over to CSC Store Unit Purchaser all of CSC Purchaser's right, title and interest in, to and under the PSA solely with respect to the Store Unit Lease, it being acknowledged and agreed by the CSC Purchaser and Seller that from and after the Effective Date, MSP Purchaser and CSC Purchaser shall have no rights or interest with respect to the Store Unit Lease under the PSA (the "<u>Store Unit Assignment</u>"; and together with the MSP Assignment, collectively, the "<u>Assignment</u>").  Notwithstanding the foregoing assignment, CSC Purchaser shall not be relieved of and shall remain liable for all obligations of Purchaser under the PSA.  Pursuant to <u>Section 19</u> of the PSA, Seller acknowledges, agrees and consents to the Assignment and Seller's signature to this Agreement is evidence of Seller's consent to the Assignment in accordance with the PSA.

3. <u>Modification of PSA</u>. In connection with the Assignment and the Ground Lease Transaction, the parties hereto agree to amend the terms of the PSA as follows:

(a) <u>Defined Terms</u>. All capitalized terms used herein and defined herein (including all such terms set forth in the recitals hereto) are hereby incorporated into the PSA. In addition, the term "<u>Purchaser</u>" as set forth in the PSA, shall hereinafter refer to CSC Purchaser, CSC Store Unit Purchaser and MSP Purchaser, individually and collectively as the context may require.

(b) <u>Title.</u>  <u>Section 5.8</u> of the PSA is hereby deleted in its entirety and the following is inserted in its place:

> At Closing, Seller shall convey, transfer, grant and set over (i) to MSP Purchaser, fee simple title to the Owned Units and leasehold title to the 10th Floor Unit, free and clear of encumbrances, except only the applicable Permitted Exceptions and any other encumbrances and exceptions expressly approved by the MSP Purchaser in writing, and (ii) to CSC Store Unit Purchaser, leasehold title to the Store Unit, free and clear of encumbrances, except only the applicable Permitted Exceptions and any other encumbrances and exceptions expressly approved by the CSC Store Unit Purchaser in writing.

(c)     Closing Obligations. The following modifications shall be made to the Closing obligations set forth in Section 9.1 and 9.2, respectively, of the PSA:

(i)     Each of the Deeds for the Owned Units shall be made to MSP Purchaser.

(ii)     In accordance with Section 9.1(b) of the PSA, (A) the Assignment and Assumption of Lease with respect to the Store Unit Lease shall be made to CSC Store Unit Purchaser, as assignee, and (B) the Assignment and Assumption of Lease with respect to the 10th Floor Lease shall be made to MSP Purchaser, as assignee. Sections 9.1(b) and 9.2(e) of the PSA are further amended by deleting the reference to such deliveries occurring at least fifteen (15) days prior to Closing, with the parties acknowledging and agreeing to deliver the foregoing Assignment and Assumptions of Leases to Title Company on the Closing Date, and not fifteen (15) days prior to Closing. In addition, at Closing, MSP Purchaser, as sublandlord and Hudson 1701/1706, as subtenant shall enter into the Sublease with respect to the 10th Floor Unit (in a form mutually agreed upon between MSP Purchaser and Hudson 1701/1706), with such Sublease to take effect ten (10) days following the Closing Date in order to comply with the provisions of Section 14.03(B) of the 10th Floor Lease. Purchaser hereby acknowledges and agrees that, in accordance with the 10th Floor Lease, a copy of the Sublease, together with a notice of the Sublease in accordance with Section 14.03(B) of the 10th Floor Lease, will be delivered to 10th Floor Lessor on the Closing Date.

(iii)     The bill of sale to be delivered by Seller in accordance with Section 9.1(c) of the PSA shall be bifurcated into two (2) bills of sale, one with respect to all right, title and interest of Seller, if any, in and to all Personal Property, Fixtures, Warranties and Permits appurtenant to the MSP Property (the "MSP Property Bill of Sale") and one with respect to all right, title and interest of Seller, if any, in and to all Personal Property, Fixtures, Warranties and Permits appurtenant to the Store Unit (the "Store Unit Bill of Sale"). The MSP Property Bill of Sale shall be made to the Ground Tenant under the Ground Lease and the Store Unit Bill of Sale shall be made to CSC Store Unit Purchaser.

(iv)     The Assignment of Contracts to be delivered by Seller in accordance with Section 9.1(o) shall be made to Ground Tenant. Seller and Purchaser hereby acknowledge that the Designated Service Contracts to be assumed by CSC Purchaser at Closing are listed on Exhibit B.

(v)     The Confirming Estoppels to be delivered in accordance with Section 9.1(j) shall be delivered as follows: (i) the Confirming Estoppel with respect to the 10th Floor Lease shall be delivered to MSP Purchaser in the form of Exhibit C-1 attached hereto, (ii) the Confirming Estoppel with respect to the Owned Units and the Board of Managers shall be delivered to MSP Purchaser and Ground Tenant in the form of Exhibit C-2 attached hereto, and (iii) the Confirming Estoppel with respect to the Store Unit Lease shall be delivered to CSC Store Unit Purchaser in the form of Exhibit C-3 attached hereto.

(vi)     The assumption of Retainer Agreement to be executed and delivered in accordance with Section 9.2(o) of the PSA shall be executed and delivered to the Tax Cert Attorneys by CSC Store Unit Purchaser and the Ground Tenant.

(vii)     The closing statement to be prepared by Title Company and approved and executed by Seller and Purchaser pursuant to Sections 9.1(r) and 9.2(k) of the PSA shall consist of two (2) closing statements:  one (1) closing statement governing the settlement of the Owned Units and the 10th Floor Unit pursuant to the MSP Assignment, and one (1) closing statement governing the settlement of the Store Unit pursuant to the Store Unit Assignment.  Any and all items subject to apportionment in accordance with Article 11 of the PSA shall be separated by Unit; provided, however, the parties agree to allocate any apportionments pursuant to Article 11 of the PSA that are not, by their nature, allocated to an individual Unit on the basis of the proportion each Allocated Unit Price set forth on Exhibit E bears to the total Purchase Price. With respect to any reconciliation of apportionments or adjustments following the Closing and/or amounts due to Seller for items of revenue that relate to periods prior to the Closing Date in accordance with Article 11 of the PSA, Seller agrees to look solely to (A) Ground Tenant as to any amounts due with respect to the Owned Units, (B) Hudson 1701/1706 as to any amounts due with respect to the 10th Floor Unit, and (C) CSC Store Unit Purchaser as to any amounts due with respect to the Store Unit.

(d)     Board of Managers. In accordance with Section 9.1(k) of the PSA, the parties will cooperate to have the Seller's appointed members of the Board of Managers resign and CSC Store Unit Purchaser and/or Ground Tenant, as applicable, shall designate individuals to be appointed as Purchaser's replacement members of the Board of Managers in accordance with the Condominium Documents and the Ground Lease.

(e)     Retainer Agreement. The parties hereto acknowledge and agree that, in accordance with Section 11.4 of the PSA, Seller has continued to pursue the pending tax certiorari proceedings for the reduction of the assessed value of the Units prior to the Effective Date. In accordance with the Ground Lease, from and after the Effective Date, all such proceedings shall be controlled by Ground Tenant and CSC Store Unit Purchaser, and not MSP Purchaser as landlord under the Ground Lease, and any resulting tax reductions or refunds attributable to periods following the Closing Date shall be the property of Ground Tenant and CSC Store Unit Purchaser (as applicable, according to the respective Unit for which such reduction or refund is applicable) and not MSP Purchaser. As such, Purchaser's obligation to assume the Retainer Agreement in accordance with the PSA shall be satisfied upon such assumption by Ground Tenant and CSC Store Unit Purchaser, on a joint and several basis. To the extent any obligations or liabilities relating to the Retainer Agreement survive the Closing, Seller agrees to look solely to Ground Tenant and/or CSC Store Unit Purchaser, jointly and severally, with respect to such obligations or liabilities.

(f)     Employee Matters.

(i)     Seller and Purchaser hereby acknowledge and agree that (i) the Alternative Agreement consisting of a Memorandum of Agreement between and among EC 58th Street LLC d/b/a The Hudson Hotel, CSC Purchaser and the New York Hotel and Motel Trades Council (the "Union") (such Memorandum of Agreement, the "Alternative Agreement")  has

been executed by CSC Purchaser, Seller and the Union and delivered by CSC Purchaser to Seller and all other parties thereto in accordance with Section 16.5 of the PSA, (ii) a copy of the fully executed Alternative Agreement is annexed hereto as Exhibit D, and (iii) Purchaser's and Seller's obligations with respect to Section 9.1(i) and Section 9.2(f) of the PSA, as applicable, have been satisfied in full.

(ii)     Provided Seller makes the payments described in the April 27, 2022 letter between Seller and the Union on or before Closing, Seller will have fulfilled its obligations with respect to the NYC Severance (as defined in the PSA). Accordingly, Seller and Purchaser hereby acknowledge and agree (i) to forego the escrow contemplated by Section 16.3, and (ii) that Sections 9.1(q), 9.2(n) and Exhibit M (the form of Labor Severance Escrow Agreement) of the PSA are hereby deleted in their entirety. For the avoidance of any doubt, Seller and Purchaser agree that any amounts due pursuant to the NYC Severance will be the responsibility of Seller, and Seller shall indemnify and hold Purchaser harmless for said amounts.

(iii)     All representations, warranties, covenants, rights, obligations, and liabilities of Purchaser with respect to any and all matters set forth in Article 16 of the PSA shall continue to be the right or responsibility of the Ground Tenant under the Ground Lease and the Sublease and CSC Store Unit Purchaser as the tenant under the Store Unit Lease. To the extent any obligations or liabilities relating to any and all matters set forth in Article 16 survive the Closing, Seller shall look to the CSC Purchaser, CSC Store Unit and/or Ground Tenant, jointly and severally, with respect to such obligations and liabilities.

(iv)     The parties acknowledge the enactment of the Displaced Hotel Service Workers and Hotel Service Disruption Notifications Act, section 22-510 of the Administrative Code of New York (the "DHSWNA") and the Displaced Building Service Workers Protection Act, §22-505 of the Administrative Code of the City of New York ("BSWPA"). By this Agreement, the parties agree that the DHSWNA and the BSWPA do not apply to the transaction contemplated by this Agreement or the PSA under §22-510(d)(1) and §22-505(f)(1) of the New York City Administrative Code.

(v)     The provisions of this Section 3(f) shall survive the Closing

(g)     Cycle 8 Local Law 11 Work. The parties acknowledge and agree that the NYC Department of Buildings has not issued a Certificate of Compliance with respect to completion of the Cycle 8 Local Law 11 Work and, accordingly, pursuant to Section 13.9 of the PSA, Seller shall assign the Cycle 8 Local Law 11 Contracts to Purchaser pursuant to the Assignment of Contracts, and Purchaser shall assume all obligations thereunder or otherwise oversee and cause completion of the Cycle 8 Local Law 11 Work in order for NYC Department of Buildings to issue a Certificate of Compliance, provided, however, that in lieu of the escrow required by Section 13.9, Seller shall, at Closing, give MSP Purchaser a credit against the Purchase Price in the amount of $30,000.00 on account of Purchaser's assumption of such obligations. Any and all references to "Purchaser" in Section 13.9 of the PSA and this Section 3(g) shall mean Ground Tenant, jointly and severally, and not MSP Purchaser.

(h)     Transfer Taxes; Closing Costs.

(i)     Any State Transfer Tax or City Transfer Tax that may be due in connection with the creation of the Ground Lease and the Sublease shall be borne by Ground Tenant (any such transfer taxes, the "Ground Lease Transaction Transfer Taxes"). For the sake of clarity, the obligation of Seller under Section 10.1 of the PSA to pay State Transfer Tax and the City Transfer Tax upon or payable in connection with the transfer of title to (x) the Owned Units and 10th Floor Unit to MSP Purchaser and (y) the Store Unit to CSC Store Unit Purchaser, shall not be modified by this Section.  CSC Purchaser, CSC Store Unit Purchaser and Ground Tenant, jointly and severally, hereby agree to indemnify, defend and hold Seller and the Seller Related Parties harmless from and against any and all liabilities, damages, losses, claims, demands, judgments, fines, penalties, settlement amounts, payments of amounts demanded, costs and expenses (including, without limitation, reasonable attorneys' fees) and claims arising out of or in any way related to payment of the Ground Lease Transaction Transfer Taxes.

(ii)     All costs and expenses in connection with the Ground Lease Transaction, including, without limitation, the recording of any memoranda of such agreements and the cost of any additional title insurance policies or diligence deliverables shall be paid for by CSC Purchaser, CSC Store Unit Purchaser and/or Ground Tenant.

(iii)     The provisions of this Section 3(h) shall survive the Closing

(i)     Notices. The following notice parties for the MSP Purchaser shall be added to Section 17.1 of the PSA:

| | |
|---|---|
| If to MSP Purchaser: | 356W58 GROUND LESSOR LLC<br>c/o MSP Capital Investments, L.L.C.<br>Woodlawn Hall at Old Parkland<br>3953 Maple Ave., Suite 350<br>Dallas, Texas 75219<br>Attn: Luke Pak<br>E-mail:  pak@mspcm.com |
| With a copy to: | 356W58 GROUND LESSOR LLC<br>c/o MSP Capital Investments, L.L.C.<br>Woodlawn Hall at Old Parkland<br>3953 Maple Ave., Suite 350<br>Dallas, Texas 75219<br>Attn: Max Lamont<br>E-mail:  lamont@mspcm.com |
| And with a copy to: | Duval & Stachenfeld LLP<br>555 Madison Avenue, 6th Floor<br>New York, NY 10022<br>Attention: Danielle Ash, Esq.  & File Manager<br>File No. 4308.0014<br>Email: Dash@dsllp.com |

(j)       The Surviving Seller Representations shall be deemed remade by Seller on the Closing Date for the benefit of Ground Tenant, CSC Store Unit Purchaser and MSP Purchaser, provided, however, that in no event shall (i) Seller have any direct liability to MSP Purchaser, (ii) MSP Purchaser have any right to make a claim under the Holdback Escrow Agreement, and (iii) Seller have any duplication of liabilities for the same claim to any of Ground Tenant, CSC Store Unit Purchaser or MSP Purchaser may have with respect to a breach of a Surviving Seller Representation, Seller's obligations under Section 8.2 of the PSA or a claim under the Holdback Escrow Agreement.  Accordingly, the Holdback Escrow Agreement shall be among Seller, Ground Tenant and CSC Store Unit Purchaser, and Escrow Agent shall be instructed to act in accordance with instructions received by the parties thereunder and not MSP Purchaser.  The provisions of this Section 3(j) shall survive the Closing.

(k)       Seller and Purchaser hereby agree to the allocation of the Purchase Price as amongst each of the Units set forth on Exhibit E (the "Allocated Unit Prices").

4.   Closing. In the event that the Ground Lease Transaction does not close on the Closing Date and, as a result thereof, Purchaser defaults in its performance of obligations to be performed on the Closing Date (including, without limitation, failure to pay the Balance on the Closing Date), Seller shall be entitled to exercise the sole and exclusive remedies set forth in Section 15.1 of the PSA, irrespective of whether such default was due to the actions or omissions of CSC Purchaser, MSP Purchaser, CSC Store Unit Purchaser, Ground Tenant or any Permitted Designee of CSC Purchaser or was with respect to any such party's obligations to close the Ground Lease Transaction and/or execute and deliver the Ground Lease or Sublease, which in turn caused Purchaser to default in the performance of its obligations under the PSA and this Agreement on the Closing Date.  In the event that the Closing does not occur due to a default by Seller, MSP Purchaser shall have all the rights and remedies of the Purchaser under Section 15.2 of the PSA; provided, however: (A) if Purchaser elects to pursue the remedy set forth in clause (i) of Section 15.2 of the PSA, the Deposit shall be refunded to CSC Purchaser and in no event shall Seller be liable for Purchaser's Reimbursement Costs in excess of $400,000, in the aggregate, as among MSP Purchaser, CSC Purchaser, CSC Store Unit Purchaser and/or Ground Tenant; (B) if Purchaser elects to pursue the remedy in clause (ii) of Section 15.2 of the PSA, (x) MSP Purchaser may only seek specific performance of Seller's obligations to convey the Owned Units and assign the 10th Floor Lease, in each case, to MSP Purchaser, and (y) CSC Store Unit Purchaser may only seek specific performance of Seller's obligations to convey the Store Unit to CSC Store Unit Purchaser; (C) in the event specific performance is unavailable as a result of Seller having conveyed all or any portion of the Premises to a party other than MSP Purchaser and CSC Store Unit Purchaser as set forth in this Agreement, only CSC Purchaser (on behalf of itself, Ground Tenant and/or CSC Store Unit Purchaser) shall have the right to pursue monetary damages as against Seller; and (D) MSP Purchaser and CSC Store Unit Purchaser shall not make any different election of remedies with respect to a default by Seller (i.e., MSP Purchaser and CSC Store Unit Purchaser shall, collectively, elect to pursue only one remedy under Section 15.2 of the PSA with respect to such default by Seller). The Ground Lease Transaction, and Seller's acknowledgement and consent to the terms of this Agreement, shall in no event be deemed to create a financing contingency or condition to Purchaser's obligations under the PSA on Purchaser's ability to obtain financing or execute on the Ground Lease Transaction.  Purchaser hereby reaffirms and ratifies that the transactions contemplated by the PSA shall be deemed to be

an "all cash" transaction.  The provisions of this <u>Section 4</u> shall survive the Closing or earlier termination of the PSA and/or this Agreement.

5. <u>Ratification</u>.  Except as specifically set forth herein, the PSA is hereby ratified and confirmed.  From and after the Effective Date, references to the PSA shall be deemed to be references to the PSA, as amended by this Agreement.

6. <u>Conflicting Terms</u>.  Wherever the terms and conditions of this Agreement and the terms and conditions of the PSA conflict, the terms of this Agreement shall be deemed to supersede the conflicting terms of the PSA.

7. <u>Miscellaneous</u>. Sections <u>22.6</u> through <u>22.14</u> of the PSA are hereby incorporated into this Agreement in their entirety.

[*Signatures on Next Page*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

CSC PURCHASER:

**CSC HUDSON, LLC,**
a Delaware limited liability company

By: _____
      Name: Alberto Smeke Saba
      Title:  Authorized Signatory

By: _____
      Name: Salomon Smeke Saba
      Title:  Authorized Signatory

CSC STORE UNIT PURCHASER:

**353W57 1704, LLC,**
a Delaware limited liability company

By: _____
      Name: Alberto Smeke Saba
      Title:  Authorized Signatory

By: _____
      Name: Salomon Smeke Saba
      Title:  Authorized Signatory

[Signatures Continue on Following Page]

[Signature Page to Assignment, Assumption and Modification of Purchase and Sale Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**MSP PURCHASER:**

**356W58 GROUND LESSOR LLC,**
a Delaware limited liability company

By: _____
Name: LUKE PAUL
Title:  Authorized Signatory

*[Signature Page to Assignment, Assumption and Modification of Purchase and Sale Agreement]*

SELLER:

**EC 58TH STREET LLC**,
a Delaware limited liability company

By: _____
Name: Anthony D. Minella
Title:  President

[Signature Page to Assignment, Assumption and Modification of Purchase and Sale Agreement]

EXHIBIT A

PURCHASE AND SALE AGREEMENT

(attached hereto)

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of the 3rd day of February, 2022 (the "Effective Date"), by and between EC 58th Street LLC, a Delaware limited liability company, having an address c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 ("Seller"), and CSC Hudson, LLC, a Delaware limited liability company, having an address c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 ("Purchaser").

## W I T N E S S E T H:

WHEREAS, Seller is the owner of those certain condominium units in the condominium known as 353 West 57th Street Condominium (the "Condominium") in the building (the "Building") known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, designated and described as the "EBC Unit" (which is Unit 1 of the Condominium and which is also identified as Lot 1701) and the "Modified Hotel Unit" (which is Unit 2 of the Condominium and which is also identified as Lot 1702) (the EBC Unit and the Modified Hotel Unit, together with their respective appurtenant undivided interests in the Condominium's common elements shall be referred to herein collectively as the "Owned Units") in that certain declaration of condominium dated April 11, 1985 made by Irving Schatz (the "Original Declaration") pursuant to Article 9-B of the Real Property Law of the State of New York, as amended (the "Condominium Act") establishing a plan for condominium ownership of the Building and the land upon which the Building is situated, which Original Declaration was recorded in the New York County Office of the Register of the City of New York (the "City Register's Office") on April 24, 1985 in Reel 902 Page 1, which Original Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 (the "First Amendment to Original Declaration"), and which Original Declaration was further amended by the Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch (the "A&R Declaration"), which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety), and which A&R Declaration was amended by the Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159 (as such A&R Declaration was amended, collectively, the "Declaration", and together with the By-Laws (the "By-Laws"), Rules and Regulations (the "Rules and Regulations") and all other exhibits and schedules thereto (as amended), collectively, the "Condominium Documents"), and also designated as Tax Lots 1701 and 1702 in Block 1048 in the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York, with the Owned Units more particularly described on Exhibit A attached hereto and incorporated herein;

WHEREAS, Seller is the lessee of (i) that certain condominium unit known as the "Tenth Floor Unit" in the Condominium (which is Unit 6 of the Condominium and which is also identified as Lot 1706), pursuant to that certain Amended and Restated Lease dated as of February 11, 1999 (as amended and assigned pursuant to the following described transfers, the "10th Floor Lease") made by Irving Schatz, as lessor ("10th Floor Lessor"), and Ian Schrager Hotels LLC, as original lessee, as referenced in the memorandum of lease dated as of February 12, 1999 and

ACTIVE 61730742v13

recorded March 23, 1999 in Reel 2841 Page 1872, as the 10th Floor Lease was assigned by Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC, as assignor, to Henry Hudson Holdings LLC, as assignee, dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1882, as the 10th Floor Lease was amended by an unrecorded Amendment to Lease made by and between Irving Schatz and Henry Hudson Holdings LLC dated as of August 17, 2004, as the 10th Floor Lease was further assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and Seller, as assignee, dated as of November 24, 2020; and (ii) that certain condominium unit known as the "Store Unit" in the Condominium (which is Unit 4 of the Condominium and which is also identified as Lot 1704), pursuant to that certain Lease dated January 1, 1999 (as amended and assigned pursuant to the following described transfers, the "Store Unit Lease") made by Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch, jointly, as lessor ("Store Unit Lessor", and together with the current 10th Floor Lessor, are herein collectively referred to as the "Lessors") and Henry Hudson Holdings LLC, as original lessee, as evidenced by a memorandum of lease dated as of September 30, 1999 and recorded on October 27, 1999 in Reel 2979 Page 2172, as the Store Unit Lease was amended by unrecorded Amendment to Lease dated as of September 30, 1999, as the Store Unit Lease was further amended by the unrecorded Amendment to Lease dated as of August 13, 2004, as the Store Unit Lease was assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and Seller, as assignee, dated as of November 24, 2020. The 10th Floor Lease and Store Unit Lease are collectively herein referred to as the "Unit Leases". Seller acquired title to its leasehold interest in: (A) the 10th Floor Lease as the designee of Henry Hudson Holdings LLC's Leasehold Mortgagee (as that term is defined in the 10th Floor Lease) by an assignment in lieu of foreclosure dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630; and (B) the Store Unit Lease as the designee of Henry Hudson Holdings LLC's Leasehold Mortgagee (as that term is defined in the Store Unit Lease) by an assignment in lieu of foreclosure dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629. Seller's right, title, and leasehold interest in and to the 10th Floor Unit and the Store Unit pursuant to the Unit Leases are herein collectively referred to as the "Leased Units", with the Leased Units more particularly described on Exhibit A attached hereto. The Owned Units and the Leased Units are herein collectively referred to as the "Units";

NOW, THEREFORE, in consideration of the mutual promises and agreements contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby mutually acknowledged, Seller and Purchaser covenant and agree as follows:

Article 1.      Premises.

1.1      Premises. Seller shall sell and convey to Purchaser, and Purchaser shall purchase from Seller, upon the terms, covenants and conditions hereinafter set forth all of Seller's right, title and interest in and to:

(i)      the Owned Units and any and all fixtures and improvements owned by Seller erected thereon and therein;

2

ACTIVE 61730742v13

(ii)      the Leased Units and any and all fixtures and improvements owned by Seller erected thereon and therein;

(iii)     any equipment, appliances, building materials, fixtures and other similar personal property attached or appurtenant to the Units, to the extent owned by Seller and not owned by the Condominium or by any occupants occupying the single resident occupancy units set forth on the SRO Schedule (as hereinafter defined) within the Units (such occupants, collectively, "Tenants"), all in their presently existing "as is" condition and state of repair on the date hereof, subject to reasonable wear and tear between the date hereof and Closing Date (as hereinafter defined) (collectively, the "Fixtures");

(iv)     all easements, covenants and other rights adjoining or appurtenant to the Units (together with the Owned Units and the Leased Units, the "Real Property");

(v)      to the extent assignable, all warranties, if any, issued to the Seller by any manufacturer or contractor in connection with construction or installation of equipment or any component of the improvements included as part of the Units (the "Warranties");

(vi)     to the extent assignable, all governmental and public certificates, permits, licenses, entitlements, agreements, development rights, variances, waivers, estoppels, bonds, claims and rights (including those in favor of Seller from any contractor, subcontractor, manufacturer or other person relating to the construction, maintenance, operation or repair of the Real Property or any component thereof), and approvals relating to the operation, use, maintenance or occupancy of the Units, including, without limitation, any certificate(s) of occupancy (collectively, the "Permits");

(vii)    items of tangible personal property including, but not limited to, all furniture, fixtures, machinery, security systems, china, glassware, silverware, kitchen and bar small goods, guest supplies, operating supplies, printing, stationary and uniforms, whether in use or held in reserve storage in connection with the former operation of the Units as a hotel, reserve stock of linens, towels, paper goods, soaps, cleaning supplies and the like with respect to the former operation of the Units as a hotel, and other tangible personal property of every kind and nature located in the Units and owned by Seller (collectively, the "Personal Property") other than the personal property listed on Schedule L attached hereto (the "Excluded Personal Property"); and

(viii)   all management, service and maintenance contracts or other agreements of similar nature affecting the Premises or the operation thereof (collectively, the "Service Contracts") which Purchaser has elected in its sole and absolute discretion at least forty-five (45) days prior to the Closing Date to assume (the "Designated Service Contracts"), and which Designated Service Contracts shall remain in effect after Closing, as the same may be amended, modified or extended from time to time in accordance with the terms of this Agreement.

All of the foregoing shall collectively be referred to herein as the "Premises".

3

Article 2.    Purchase Price.

2.1    The purchase price for the Premises is TWO HUNDRED SEVEN MILLION FIVE HUNDRED THOUSAND and 00/100 DOLLARS ($207,500,000.00) (the "Purchase Price"), and is payable by Purchaser as follows:

(a)    Purchaser shall deposit TEN MILLION and 00/100 DOLLARS ($10,000,000.00) (the "Deposit"), with First American Title Insurance Company ("Escrow Agent"), by wire transfer of immediately available Federal funds, on or before 5:00 P.M. (New York time) on the date that is two (2) Business Days after the execution of this Agreement by Purchaser and Seller, as a downpayment toward the Purchase Price, which Deposit shall be non-refundable (except as otherwise set forth herein) and held and disbursed by Escrow Agent pursuant to the terms and conditions of this Agreement.  Upon receipt by Escrow Agent of the Deposit, Escrow Agent shall cause the Deposit to be deposited into an interest-bearing account at a national bank selected by Escrow Agent.  All interest on the Deposit becomes part of the Deposit and any interest thereon will be applied to payment of the Purchase Price at Closing.

(b)    The balance of the Purchase Price, in an amount equal to the difference between the Purchase Price and the Deposit, subject to adjustments and credits as provided for herein (the "Balance") shall be paid by Purchaser on the Closing Date (as hereinafter defined), by wire transfer of immediately available Federal funds to an account or accounts designated by Seller (which Closing and wire transfer shall be facilitated through Escrow Agent).

(c)    Purchaser and Seller shall exercise commercially reasonable efforts to agree upon the allocation of the Purchase Price between the Real Property, on the one hand, and the Personal Property, Fixtures, Warranties, and Permits, on the other hand, prior to Closing.  With respect to the remaining allocation of the Purchase Price allocable to the Real Property, Seller and Purchaser agree to allocate 10-15% to any right, title and interest in and to the land (and land-equivalents) being conveyed, and 85-90% to any right, title and interest in and to the Building being conveyed.  If Purchaser and Seller cannot agree upon the allocation of the Purchase Price, each party shall file federal, state and local returns based on each party's own determination of the proper allocations of the Purchase Price, each bearing its own consequences of any discrepancies; provided, however, that Seller's allocation shall be used for all transfer tax and similar filings.

Article 3.    Closing.

3.1    Closing of title to the Premises (the "Closing") shall take place on April 4, 2022, through an escrow-style closing conducted by the Escrow Agent and Title Company, whereby Purchaser and Seller and their respective attorneys consummate the Closing without being physically present at the offices of the Escrow Agent or Title Company to exchange closing documents and required funds through escrow, TIME BEING OF THE ESSENCE with respect to Purchaser's and Seller's obligation to close on or before 3:00 pm EST on such date (such date hereinafter referred to as the "Closing Date").  Notwithstanding the foregoing, Purchaser shall have a one-time right to extend the Closing Date by a period not to exceed thirty (30) days, such right exercisable by giving notice thereof to Seller at least five (5) Business Days before the then-scheduled Closing Date.  Notwithstanding the notice methods provided for in Article 17, the

4

foregoing Closing Date extension notice may be provided solely by electronic mail delivery from counsel for Purchaser to counsel for Seller.

Article 4.      Permitted Exceptions.

4.1      The Premises shall be sold and conveyed, and Purchaser shall accept title to the Premises, subject to the following matters (collectively, the "Permitted Exceptions"):

(a)      The matters set forth on Schedule A hereof;

(b)      The Unit Leases;

(c)      All covenants, easements, reservations, restrictions and agreements of record, affecting the Premises, provided same do not prohibit or interfere in any material respect with the current use of the Premises;

(d)      Any and all present and future laws, regulations, restrictions, requirements, ordinances, resolutions and orders affecting the Premises, including, without limitation, any laws relating to zoning, building, environmental protection and the use and occupancy of the Premises;

(e)      Real estate taxes that are a lien, but are not yet due and payable, subject to adjustment at Closing, as provided for herein;

(f)      Grants made prior to the date hereof of licenses or easements or other rights in favor of any public or private utility company or governmental entity for, or pertaining to, utilities, sewers, water mains or drainage, whether or not of record, provided same do not prohibit or interfere in any material respect with the current use of the Premises;

(g)      The state of facts shown on or by the survey prepared by Montrose Surveying Co., LLP., with a survey update date of January 10, 2022 (the "Survey"), and any additional state of facts or physical condition which a current accurate survey or physical inspection of the Premises would disclose, provided same do not prohibit or interfere in any material respect with the current use of the Premises;

(h)      Intentionally omitted;

(i)      The lien of any water charges or sewer rents that are not yet due and payable, subject to adjustment as hereinafter provided;

(j)      Rights of Tenants to occupy rooms or units within the Premises;

(k)      The Condominium Documents;

(l)      Any other matters that would constitute objections to title under Section 5.1 and with respect to which the Title Company (as hereinafter defined) certifies that it will insure title to the Premises free of such matters, at regular rates without the payment of additional premiums, for the Purchaser and Purchaser's successors and assigns; and

5

ACTIVE 61730742v13

(m)     The standard printed exceptions appearing on the title policy to be issued by the Title Company.

4.2     The Permitted Exceptions shall not constitute grounds for objection by Purchaser, and Seller shall have no obligation to remove any Permitted Exception as a condition to Purchaser's obligation to purchase the Premises in accordance with this Agreement. Notwithstanding anything to the contrary in this Article 4, on or prior to the Closing Date, Seller shall pay, discharge and otherwise remove of record, at Seller's sole cost and expense, all of the following: (i) any mortgages, deeds of trust or other security instruments for any financing placed by Seller on the Real Property and all of the mortgages as reflected in the Mortgage Schedule of the Commitment (defined herein) and set forth on Schedule E hereof, (ii) taxes that are then due and payable or delinquent as of Closing, (iii) liens and other encumbrances (other than Permitted Exceptions) which Seller has intentionally placed on the Real Property whether existing before or after the date hereof, (iv) any mechanic's lien except (x) those resulting from the acts or omissions of Purchaser or Purchaser's agents and (y) those which are the responsibility of any Unit Lessor under the Unit Leases, (v) all financing statements and other liens or encumbrances that secures indebtedness of Seller including those set forth on  Schedule E hereof, (vi) judgment liens against the Seller, and (vii) any other title exception (which is not a Permitted Exception) that may be removed by payment of an ascertainable and liquidated amount which in the aggregate does not exceed $2,100,000.00 (collectively, the "Mandatory Removal Items").  Seller shall pay, discharge, and otherwise remove of record on or prior to Closing, at Seller's sole cost and expense, all Mandatory Removal Items regardless of whether or not Purchaser provides written notice of the requirement to pay, discharge, and otherwise remove the Mandatory Removal Items.

Article 5.     State of Title; Objections.

5.1     Purchaser acknowledges receipt of (i) that certain Title Examination Report issued by Royal Abstract of New York LLC ("Title Company") as agent for Escrow Agent under Title No. 915047 with effective date of December 8, 2021 (the "Commitment"), and (ii) the Survey.  At Closing, Purchaser may cause title to the Premises to be insured by the Title Company at Purchaser's sole cost and expense.  Except as otherwise expressly provided in this Agreement, Seller shall have no obligation to remove any exception to title other than the Mandatory Removal Items.  Purchaser unconditionally waives any right to object to any matters set forth in the Commitment and the Survey, except for the Mandatory Removal Items and those matters set forth in the Commitment and listed on Schedule E attached hereto and incorporated herein.  If exceptions to title appear on any update or continuation of the Commitment (each a "Continuation") which are not Permitted Exceptions, Purchaser shall notify Seller thereof in writing within the earlier of five (5) Business Days after Purchaser receives such Continuation and the last Business Day prior to the Closing Date, **TIME BEING OF THE ESSENCE**, and Seller shall have five (5) Business Days (with any attendant extension of the Closing Date if Purchaser's written notice if delivered less than five (5) Business Days prior to the then scheduled Closing Date) to elect to attempt to eliminate such exception or not.  If Seller fails to respond after such five (5) Business Day period it shall be deemed that Seller has elected not to eliminate such exceptions.  If Seller is unable, or elects not to attempt, to eliminate such exceptions to title, or if Seller elects to attempt to eliminate any such exceptions to title but is unable to do so or thereafter decides not to eliminate the same, and accordingly, is unable to convey title to the Premises in accordance with the provisions of this Agreement, Seller shall so notify Purchaser and, within five (5) Business Days after receipt of such

6

notice from Seller, Purchaser shall elect either (i) to terminate this Agreement by notice given to Seller and Escrow Agent (**TIME BEING OF THE ESSENCE** with respect to Purchaser's notice), in which event, neither party to this Agreement shall have any further rights or obligations hereunder, except that Escrow Agent shall refund to Purchaser the Deposit (together with all interest thereon, if any) and except for the rights and obligations hereunder that expressly survive the termination of this Agreement, or (ii) to accept title to the Premises subject to such exceptions, without any abatement of the Purchase Price. If Purchaser shall not notify Seller of such election within such five (5) Business Day period, **TIME BEING OF THE ESSENCE**, Purchaser shall be deemed to have elected clause (ii) above with the same force and effect as if Purchaser had elected clause (ii) within such five (5) Business Day period.  Notwithstanding the notice methods provided for in Article 17, the notices provided for in this Section 5.1 may be provided solely by electronic mail delivery by counsel for either party.

5.2     If the Commitment or any Continuation discloses judgments, bankruptcies or similar returns against persons or entities having names the same as or similar to that of Seller but which returns are not against Seller, Seller, on request, shall deliver to Purchaser and Title Company affidavits reasonably acceptable to Seller and Title Company to the effect that such judgments, bankruptcies or returns are not against Seller, in form and substance sufficient to permit removal of same as exceptions in Purchaser's title policy.

5.3     If the Commitment or any Continuation discloses exceptions (other than the Permitted Exceptions) which (i) may be removed solely by reference to Seller's existing title policy, or (ii) were created, consented to or affirmatively permitted by Seller in writing after the date hereof, then Seller shall remove such exceptions.  Notwithstanding the foregoing, Seller, at its option in lieu of satisfying such exceptions, may deposit with Title Company such amount of money and provide such documentation, affidavits and indemnities as may be reasonably determined by Title Company as being sufficient to induce it to insure Purchaser against collection of such liens and/or encumbrances, including interest and penalties, out of or against the Real Property, in which event such exceptions shall not be objections to title.

5.4     Seller shall be entitled to one or more adjournments of the Closing Date, not to exceed sixty (60) days in the aggregate, to remove any exceptions to title which Seller is obligated to remove under this Agreement or elects to attempt, but is not obligated, to remove.

5.5     Notwithstanding the foregoing provisions of this Article 5, in the event that Title Company or any title company retained by Purchaser shall raise an exception to title which is not a Permitted Exception, Seller shall have no obligation to eliminate such exception and Purchaser shall have no right to terminate the Agreement by reason of such exception (and such exception shall be deemed a Permitted Exception) if Title Company or a nationally recognized title company, as applicable, shall be prepared to insure title to the Premises at regular rates without such exception.

5.6     Purchaser shall pay the costs of examination of title and any owner's or mortgagee's policy of title insurance to be issued insuring Purchaser's title to the Premises, as well as all other title charges, survey fees, recording charges (other than to remove of record or satisfy Mandatory Removal Items and the costs to remove, satisfy or cure such other exceptions and title matters

7

which Seller elects to cure pursuant to Section 5.1) and any and all other title and survey costs or expenses incident to the Closing or in connection therewith.

5.7     Notwithstanding anything in this Article 5 hereof to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller.  The acceptance of the Deed by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for the documents delivered at Closing and such matters which are expressly stated in this Agreement to survive the Closing, to the limit of such survival.

5.8     At Closing, Seller shall convey, transfer, grant and set over to Purchaser, fee simple title to the Owned Units and leasehold title to the Leased Units, free and clear of encumbrances, except only the Permitted Exceptions and any other encumbrances and exceptions expressly approved by Purchaser in writing.

Article 6.     Responsibility for Violations.

6.1     Purchaser shall acquire the Premises subject to all violations of building, fire, sanitary, environmental, housing and similar laws and regulations, whether or not noted or issued on the date hereof or on the Closing Date (collectively, "Violations"), including, but not limited to, those the removal of or compliance with which are the responsibility of Tenants, Unit Lessors under the Unit Leases or the Board of Managers under the Condominium Documents.   Seller shall have no obligation to cure or remove any Violations on or before Closing, except that Seller shall be responsible for, and pay at Closing, any penalties or fines imposed on or before the Closing in connection with any Violations issued with respect to the Premises prior to the Closing Date (it being understood and agreed that it shall be Purchaser's responsibility, at its sole cost and expense, to pay any fines or penalties that accrue or arise after the Closing Date, even if the Violation was assessed or noted prior to the Closing Date).

Article 7.     Condition of the Premises; "As-Is"; Rights of Inspection.

7.1     Purchaser shall accept the Premises at the Closing in its "as is" condition as of the date hereof and as of the Closing Date, reasonable wear and tear and any further deterioration of the condition of the Premises caused by or arising out of any casualty that may have occurred prior to the date hereof excepted, and subject to (x) the provisions of Article 12 hereof in the event of a casualty or condemnation and (y) Seller's compliance with the covenants contained in Article 13 hereof.  Seller shall not be liable for any latent or patent defects in the Premises or bound in any manner whatsoever by any guarantees, promises, projections, operating expenses or other information pertaining to the Premises made, furnished or claimed to have been made or furnished, whether orally or in writing, by Seller, the Boards of Managers of the Condominium (the "Board of Managers") under the Condominium Documents, the Lessors or any other person or entity, or any partner, employee, agent, attorney or other person representing or purporting to represent Seller, except to the extent expressly set forth in this Agreement or in any document or instrument expressly required in this Agreement to be delivered at Closing (collectively, the "Closing Documents").  Purchaser acknowledges that neither Seller nor any of the employees, agents or attorneys of Seller have made or do make any oral or written representations or warranties

8

whatsoever to Purchaser, whether express or implied, except as expressly set forth in this Agreement or in any Closing Document, and, in particular, that no such representations and warranties have been made by Seller with respect to the physical, environmental condition or operation of the Premises, the presence, introduction or effect of hazardous materials at or affecting the Premises, the actual or projected revenue and expenses of the Premises, the zoning and other laws, regulations and rules or environmental laws applicable to the Premises or the compliance of the Premises therewith, the current or future real estate tax liability, assessment or valuation of the Premises, the availability of any financing for the alteration, rehabilitation or operation of the Premises from any source, including, without limitation, any state, city or Federal government or any institutional lender, the current or future use of the Premises, including, without limitation, the use for residential or commercial purposes, the present and future condition and operating state of any and all machinery or equipment in the Premises and the present or future structural and physical condition of the Building or its suitability for rehabilitation or renovation, the ownership or state of title of any Personal Property, the quantity, quality or condition of the Personal Property or Fixtures, the use or occupancy of the Premises or any part thereof, or any other matter or thing affecting or relating to the Premises, or the transactions contemplated hereby, except as specifically set forth in this Agreement or in any Closing Document.

7.2     Purchaser has not relied and is not relying upon any representations or warranties or upon any statements made in any informational materials with respect to the Premises provided by Seller or any other person or entity, or any shareholder, employee, agent, attorney or other person representing or purporting to represent Seller, other than the representations and warranties expressly set forth in this Agreement or in any Closing Document.

7.3     PURCHASER ACKNOWLEDGES THAT SELLER AND CERTAIN OF ITS AFFILIATES, AGENTS, ATTORNEYS, CONSULTANTS AND REPRESENTATIVES PROVIDED TO PURCHASER OR MADE AVAILABLE TO PURCHASER (IN THE DATA ROOM, DELIVERED (VIA EMAIL) DIRECTLY TO PURCHASER AND/OR PURCHASER'S AGENTS AND CONSULTANTS INCLUDING ITS ATTORNEYS, OR CONTAINED IN THE SCHEDULES AND EXHIBITS ANNEXED HERETO), CERTAIN DUE DILIGENCE MATERIALS IN SELLER'S POSSESSION RELATING TO THE PREMISES AND THE USE AND OPERATION THEREOF (WITH ALL SUCH DOCUMENTS AND MATERIALS HERETOFORE PROVIDED TO PURCHASER OR PURCHASER'S AGENTS, TOGETHER WITH ANY COPIES OR REPRODUCTIONS OF SUCH DOCUMENTS OR MATERIALS, OR ANY SUMMARIES, ABSTRACTS COMPILATIONS OR OTHER ANALYSES MADE BY OR FOR PURCHASER BASED ON THE INFORMATION IN SUCH DOCUMENTS OR MATERIALS REFERRED TO COLLECTIVELY HEREIN AS "SELLER DUE DILIGENCE MATERIALS").  PURCHASER ACKNOWLEDGES AND AGREES THAT ANY SELLER DUE DILIGENCE MATERIALS DELIVERED OR TO BE DELIVERED BY ANY SELLER RELATED PARTIES TO PURCHASER ARE BEING MADE AVAILABLE SOLELY AS AN ACCOMMODATION TO PURCHASER AND, OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY CLOSING DOCUMENT, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY SELLER RELATED PARTY AS TO THEIR ACCURACY OR COMPLETENESS OF FACTS OR OPINIONS SET FORTH THEREIN AND THAT ANY RELIANCE BY PURCHASER ON SUCH REPORTS OR OTHER DOCUMENTS IN CONNECTION WITH THE PURCHASE OF THE PREMISES IS UNDERTAKEN AT PURCHASER'S SOLE RISK.  OTHER THAN AS EXPRESSLY SET FORTH IN THIS

9

ACTIVE 61730742v13

AGREEMENT OR IN ANY CLOSING DOCUMENT, PURCHASER AGREES THAT NO SELLER RELATED PARTY HAS ANY LIABILITY OR OBLIGATION WHATSOEVER FOR ANY INACCURACY IN OR OMISSION FROM THE SELLER DUE DILIGENCE MATERIALS, OFFERING MATERIALS PREPARED IN CONNECTION WITH THE SALE OF THE PROPERTY OR ANY REPORT OR OTHER DOCUMENTS MADE AVAILABLE TO PURCHASER OR PURCHASER'S AGENTS. PURCHASER ACKNOWLEDGES THAT SELLER HAS PROVIDED THE OPPORTUNITY FOR PURCHASER TO MAKE INSPECTIONS AND THAT PURCHASER HAS CONDUCTED ITS OWN INVESTIGATION OF THE CONDITION OF THE PREMISES, TO THE EXTENT PURCHASER DEEMS SUCH AN INVESTIGATION TO BE NECESSARY OR APPROPRIATE.

7.4     Without limiting the generality of the foregoing, Purchaser acknowledges that it has had an opportunity to conduct its own investigation of the Premises with regard to Hazardous Materials and compliance of the Premises with Relevant Environmental Laws. Purchaser agrees to take title to the Premises subject to all costs and liabilities arising out of or in any way relating to Hazardous Materials and Relevant Environmental Laws, and Purchaser acknowledges that Seller shall not have any responsibility for any such costs and liabilities. Purchaser hereby releases Seller, its principals and affiliates, and their respective officers, directors, members, managers, partners, agents, employees, successors and assigns (collectively, the "Seller Related Parties"), from and against any and all claims, counterclaims and causes of action which Purchaser may now or in the future have against any of the foregoing parties arising out of the existence of Hazardous Materials affecting the Premises. For purposes of this Agreement: the term "Hazardous Materials" means any mold, solid wastes, toxic or hazardous substances, wastes or contaminants, polychlorinated biphenyls, paint or other materials containing lead, urea formaldehyde foam insulation, radon, asbestos, and asbestos containing material, petroleum product and any fraction thereof as any of these terms is defined in or for the purposes of any Relevant Environmental Laws (as hereinafter defined), and any Pathogen (as hereinafter defined); the term "Pathogen" means any pathogen, toxin or other biological agent or condition, including but not limited to, any fungus, mold, mycotoxin or microbial volatile organic compound; and the term "Relevant Environmental Laws" means any and all laws, rules, regulations, orders and directives, whether federal, state or local, applicable to the Premises or any part thereof with respect to the environmental condition of the Premises or any part thereof, and any activities conducted on or at the Premises, including by way of example and not limitation: (i) Hazardous Materials; (ii) air emissions, water discharges, and any other environmental, health or safety matter; (iii) the existence of any underground storage tanks that contained or contain Hazardous Materials; and (iv) the existence of pcb contained electrical equipment.

7.5     Intentionally omitted.

7.6     Purchaser hereby releases Seller and the Seller Related Parties, from and against any and all claims, counterclaims and causes of action which Purchaser may now or in the future have against any of the foregoing parties arising out of the existence of Hazardous Materials affecting the Premises.

7.7     Purchaser and/or Purchaser's designees, agents, advisors, representatives, employees, consultants, appraisers, engineers, contractors and prospective lenders and such prospective lenders' agents, advisors and representatives ("Purchaser's Representatives"), from

10

*ACTIVE 61730742v13*

time to time before the Closing and during regular business hours, upon at least two (2) Business Days' prior written notice to Seller, may inspect the Premises, provided that (i) Purchaser shall not communicate with any employees of Seller or  Seller's managers or contractors or with Tenants or occupants of the Premises without, in each instance, the prior written consent of Seller, which consent may be withheld in Seller's sole discretion, (ii) Purchaser shall not perform any tests with respect to such Premises without the prior written consent of Seller in each instance, which consent shall not be unreasonably withheld, conditioned or delayed; provided however, if such tests are invasive Seller shall have the right to withhold its consent to such tests in its sole and absolute discretion, and (iii) Purchaser shall have no additional rights or remedies under this Agreement as a result of such inspection(s) or any findings in connection therewith.  Without limiting the foregoing, Purchaser agrees that it shall not have any so-called "due diligence period" and that it shall have no right to terminate this Agreement or obtain a reduction of the Purchase Price as a result of such inspection(s) or any findings in connection therewith (including relating to the physical condition of the Premises, the operation of the Premises or otherwise).  Any entry upon the Premises shall be performed in a manner which is not disruptive to Tenants or the normal operation of the Premises and shall be subject to the rights of any Tenants or occupants of the Premises.  Purchaser shall (i) exercise reasonable care at all times that Purchaser and/or Purchaser's Representatives shall be present in the Premises, (ii) at Purchaser's expense, observe and comply with all applicable laws and any conditions imposed by any insurance policy then in effect with respect to the Premises and (iii) not engage in any activities which would violate the provisions of any permit or license pertaining to the Premises.  Seller shall have the right to have a representative of Seller accompany Purchaser during any such communication or entry into or upon the Premises.

7.8     Purchaser hereby agrees to indemnify, defend and hold Seller, its officers, shareholders, partners, members, directors, employees, attorneys and agents harmless from and against any and all liability, actual loss, cost, judgment, claim, damages or expense (including, without limitation, attorneys' fees and expenses), resulting from or arising out of the entry upon the Premises before the Closing by Purchaser or Purchaser's Representatives, other than (x) the mere discovery of pre-existing conditions, except to the extent such pre-existing conditions were exacerbated by the entry upon the Premises before the Closing by Purchaser or Purchaser's Representatives, and (y) those resulting from gross negligence or willful misconduct of Seller or its representatives.  The foregoing indemnification shall survive the Closing or the termination of this Agreement.

7.9     As a condition precedent to entering the Premises in connection with any inspection, Purchaser shall maintain or cause to be maintained, at Purchaser's sole cost and expense, a policy of comprehensive general public liability and property damage insurance by an insurer or syndicate of insurers reasonably acceptable to Seller: (A) with a combined single limit of not less than One Million Dollars ($1,000,000.00) general liability and Three Million Dollars ($3,000,000.00) excess umbrella liability, (B) insuring Purchaser, Seller, Existing Manager, each of their respective affiliates, Seller's lender and any other person or entity related to Seller or involved with the transaction contemplated by this Agreement (such additional persons or entities to be designated in writing by Seller), as additional insureds, against any injuries or damages to persons or property that may result from or are related to (x) Purchaser's entry into the Premises or upon the Premises and (y) any inspection or other activity conducted thereon by Purchaser's Representatives and (C) containing a provision to the effect that insurance provided by Purchaser

11

hereunder shall be primary and noncontributing with any other insurance available to Seller or any other additional insured party. Purchaser shall deliver evidence of such insurance coverage to Seller before the commencement of the first inspection and proof of continued coverage before any subsequent inspection.

7.10    Notwithstanding any provision in this Agreement to the contrary, neither Purchaser nor any of Purchaser's Representatives shall contact any federal, state, county, municipal or other department or governmental agency regarding the Premises without Seller's prior written consent thereto, in each instance; provided, however, that the foregoing shall not prohibit Purchaser from accessing publicly accessible governmental records and databases from time to time or from contacting governmental authorities to obtain zoning verification letters and similar documentation necessary to complete a zoning report. In addition, if Seller's consent is obtained by Purchaser, Seller shall be entitled to receive at least five (5) Business Days prior written notice of the intended contact and shall be entitled to have a representative present when Purchaser and/or Purchaser's Representatives has any such contact with any governmental official or representative. Notwithstanding the foregoing, Purchaser shall be permitted, at its sole cost and expense, to file applications for permits for the matters described on Schedule J attached hereto (collectively, the "Allowed Applications") prior to the Closing Date as a "contract vendee" (and not as the owner of the Premises), provided that, at least five (5) Business Days prior to the date on which Purchaser anticipates submitting any such Allowed Application, Purchaser provides Seller with a complete copy of the subject Allowed Application, together with all submission materials attendant thereto, for Seller's review. Purchaser agrees to make such modifications, clarification or corrections reasonably requested by Seller to confirm that the application is being submitted as a "contract vendee" and imposing no obligations or liabilities upon Seller, as the owner of the Premises, provided that Seller provides written notice of such reasonably requested modifications, clarification or corrections to Purchaser within five (5) Business Days after receipt of Purchaser's Allowed Application, together with all submission materials attendant thereto (and failure of Seller to provide written notice of any reasonably requested modifications, clarification or corrections within that five (5) Business Day period shall be deemed Seller's confirmation of the corresponding Allowed Application, together with all submission materials attendant thereto, it being understood that Seller's posing of questions regarding such documentation during the five (5) Business Day period shall mean that the Allowed Application is not deemed confirmed). Upon satisfying the foregoing, Purchaser shall be permitted to submit such Allowed Application to the appropriate governmental authority. Except for the Allowed Applications, in no event shall Purchaser be permitted to file any applications, requests, certifications or permits (including, without limitation, any application for a Certificate of No Harassment) with the NYS Department of Housing and Community Renewal, the NYC Department of Housing Preservation and Development, the NYC Department of City Planning, or other governmental agencies, without the prior written consent of Seller, which may be granted or withheld in its sole discretion. If the Closing does not occur for any reason hereunder, Purchaser agrees to take such steps as are necessary to rescind or otherwise terminate the Allowed Applications submitted and/or the evaluation processes engaged by the applicable governmental agencies associated with the submission of such Allowed Applications. Any breach of the foregoing covenants shall constitute a default by Purchaser hereunder. Purchaser agrees to indemnify and hold harmless Seller and the Seller Related Parties for any loss, cost, expense, or damage suffered by Seller as a result of or arising out of (x) any breach or violation of the foregoing covenants and (y) claims made by Tenants or other Persons who become aware of the filing of the Allowed Applications. The

12

ACTIVE 61730742v13

foregoing provisions of this <u>Section 7.10</u> shall survive the Closing or earlier termination of this Agreement.

7.11    The provisions of this <u>Article 7</u> shall survive the Closing.

<u>Article 8.</u>        <u>Representations and Warranties.</u>

8.1    Seller hereby represents and warrants to Purchaser that the following are true and correct in all material respects as of the Effective Date:

(a)    This Agreement constitutes, and each document and instrument to be executed and delivered by Seller hereunder (collectively, the "<u>Seller's Documents</u>"), when so executed and delivered, shall constitute, the legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms, covenants and conditions.

(b)    Seller (i)  is a limited liability company duly organized in the State of Delaware and licensed and/or qualified to conduct business in the State of New York; (ii) has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby; (iii) has full power and authority to enter into and perform this Agreement and to enter into the documents to be executed and delivered in accordance with the terms hereof; and (iv) has full power and authority to consummate the transactions as contemplated herein.

(c)    Neither the entering into of this Agreement, nor the consummation of the transactions contemplated hereunder, will constitute a violation or breach by Seller of any contract, writ, order, judgment, or other instrument or agreement to which Seller is a party, or to which it is subject to by which any of its assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, ordinance, rule or regulation of any governmental authority affecting Seller.  The execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated hereby, do not require Seller to obtain any consent, authorization, or approval which has not already been obtained.

(d)    Seller is not subject to any pending voluntary or involuntary reorganization, liquidation, receivership, or other proceedings under any federal, state or local insolvency, liquidation, reorganization or similar type laws.  Seller has not applied for, consented to, or is subject to the appointment of a receiver, trustee, custodian, liquidator or other similar official for itself or for all or a substantial part of its assets, and has not made an assignment for the benefit of creditors.

(e)    To Seller's knowledge, Seller has made available to Purchaser true and complete copies of the Unit Leases.  To Seller's knowledge, the Unit Leases are in full force and effect and there are no monetary defaults or material non-monetary defaults of Seller, as lessee, or of Lessors, under the Unit Leases.

(f)    The list of single resident occupancy units set forth on <u>Schedule C</u> (the "<u>SRO Schedule</u>") sets forth the units occupied by Tenants affecting the Premises on the date of this Agreement and is the SRO Schedule relied on by Seller in the ordinary course operation of its business. There are no written lease, license or occupancy agreements evidencing such rights held

13

by Tenants.  There are no security deposits held by Seller on account of the Tenants.  Seller has disclosed to Purchaser that possession of unit number 2253 is in dispute.  Other than the list of units set forth on Schedule C, to Seller's knowledge, the other units within the Real Property are vacant.  To Seller's knowledge, there are no pending or threatened in writing claims of harassment from any occupants of the single resident occupancy units in the Real Property against Seller or the Real Property.

(g)    Seller is not a party to, nor does Seller have actual knowledge of the existence of any, written leases, subleases or licenses affecting the Premises in which Seller holds the lessor's, sublessor's, licensor's or grantor's interest.  The August 28, 2000 Lease between Henry Hudson Holdings LLC (as landlord) and Hudson Leaseco LLC (as tenant) affecting the Real Property has been terminated, and the August 12, 2011 Lease between Henry Hudson Holdings LLC (as landlord) and 58th Street Bar Company, LLC (as tenant) has been terminated.

(h)    There are no tax certiorari proceedings pending with respect to the Premises or any part thereof other than as set forth on Schedule B annexed hereto.

(i)    Seller is not a Prohibited Person (as defined below).  The assets Seller will transfer to Purchaser under this Agreement are not the property of, and are not beneficially owned, directly or indirectly, by a Prohibited Person.  The assets Seller will transfer to Purchaser under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. §1956(c)(7).  For purposes hereof, a "Prohibited Person" means any of the following:  (i) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "Executive Order"); (ii) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") at its official website, http://www.treas.gov/offices/enforcement/ofac; (iv) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (v) a person or entity that is affiliated with any person or entity identified in any of clauses (i), (ii), (iii) and/or (iv) above.

(j)    Seller is not a "foreign person" as defined in the Internal Revenue Code of 1986, as amended (the "Code") Withholding Section.

(k)    To Seller's knowledge, Seller has made available to Purchaser true and complete copies of the Condominium Documents.  A list of each of the Condominium Documents is included on Schedule D annexed hereto.  To Seller's knowledge, the Condominium Documents are in full force and effect and Seller has not delivered a notice of default to the Board of Managers. There have been no Common Charges (as defined in the Condominium Documents) under the Condominium Documents charged by the Board of Managers for the calendar year period preceding the Effective Date and, accordingly, there are no Common Charges under the Condominium Documents due and payable as of the Effective Date.

(l)    There are no judgments of any kind against Seller unpaid or unsatisfied of record, which would be expected to have a material adverse effect on Seller's ability to perform

14

hereunder or, except as may be set forth in the Commitment, which would be binding on the Premises.  There is no material action, suit or proceeding to which Seller is a party, pending or, to Seller's actual knowledge, threatened in writing against or affecting Seller or the Premises, which, if adversely determined, would (i) have a material adverse effect upon title to the Premises, (ii) prohibit or impair Seller from consummating the transactions contemplated hereby, or (iii) materially adversely affect the use or operation of the Premises.

(m)    Except as set forth on Schedule H, there are no pending, or to Seller's knowledge, threatened in writing, lawsuits, actions, complaints, claims, charges, arbitrations, investigations, grievances, administrative charges or proceedings before any governmental entity under the Labor and Employment Laws (as hereinafter defined), regarding employment discrimination, harassment, retaliation, safety, violations or any other employment-related charges or complaints, wage and hour claims, claims not covered by insurance for workers' compensation or other benefits in connection with or related to the Hotel Employees (as defined in Article 16).

(n)    Seller is not a party to any service, maintenance or similar contracts or agreements with respect to the Premises other than the Service Contracts set forth on Schedule I attached hereto.  Seller has made copies of the Service Contracts available to Purchaser, and to Seller's knowledge, such copies are true, correct and complete in all material respects.  With respect to any Designated Service Contract that Purchaser elects to assume, neither Seller nor, to Seller's knowledge, any other party is in material default under any Service Contract.  Seller is not a party to any property management agreement binding upon the Premises, other than the Existing PMA, of which Seller has made available to Purchaser a true and correct copy and which Existing PMA shall be terminated as of the Closing Date.

(o)    There are no pending or, to Seller's actual knowledge, threatened condemnation or eminent domain proceedings against the Premises.

(p)    Intentionally omitted.

(q)    Seller has not granted to any other person or entity, except Purchaser, any options, rights of first refusal or other purchase rights with respect to the Premises. Seller is not a party to any contract, agreement or commitment to sell, convey, assign, transfer, provide rights of first refusal, option rights or any other similar rights relating to the disposition of the Premises or any portion thereof.

(r)    Seller has not received any written notice of any existing or proposed special assessments against the Premises.

(s)    Except as disclosed by Seller to Purchaser prior to the date hereof and/or as set forth in the Seller Due Diligence Materials, Seller has not received written notice from any governmental authority of the presence of Hazardous Materials on, under or at the Premises in violation of Relevant Environmental Laws.

(t)    Except as set forth on Schedule K, Seller has not received written notice of any Violations.

15

(u)    Other than the Collective Bargaining Agreement (as defined in Article 16), Seller is not a party to or bound by, and the Premises are not subject to or bound by, any collective bargaining, labor or employment, or development, card check, or neutrality agreement with respect to any employees currently employed to provide services to the Premises or that may in the future be employed to provide services to the Premises, or with respect to the Premises itself.

(v)    Seller has not experienced any strikes, committed any unfair labor practices, and is not aware of any allegations it has committed any unfair labor practice within the period of six months prior to the execution of this Agreement related to the employees represented by the Union.

(w)    Other than the New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund, neither Seller nor any ERISA Affiliate of Seller has contributed or been obligated to contribute to any multiemployer pension plan with respect to the Premises.  For purposes of this Agreement, "ERISA Affiliate" means any entity, trade or business (whether or not incorporated) that is, or has ever been, a member of a "controlled group of corporations" with, or is under "common control" with, or is a member of the same "affiliated service group" with Seller or any of its affiliates, in each case, as defined in Sections 414(b), (c), (m) or (o) of the Code or is, or within the last six years, has been, treated as a single employer for purposes of Section 4001(b)(1) of ERISA.  To Seller's knowledge, Existing Manager has paid all employee benefit contributions due to date required under the Collective Bargaining Agreement to the Union Employee Benefit Funds, and there are no pending or unresolved claims by the Union Employee Benefit Funds or any other multiemployer benefit plan for outstanding or owed contributions, arrears, delinquencies, or for compliance with any audit.  To Seller's knowledge, no complete or partial withdrawal liability under Title IV of ERISA has occurred or been triggered with respect to the Premises during Seller's period of ownership.

(x)    Seller has not received any written notice claiming a breach of the Collective Bargaining Agreement or any violation of any applicable Labor and Employment Laws.

8.2    The representations and warranties of Seller set forth in Section 8.1 (the "Surviving Seller Representations") shall be deemed remade on, and shall be true and accurate in all material respects as of, the Closing Date.  The Surviving Seller Representations shall survive for one hundred fifty (150) days after the Closing Date (the "Survival Period"), provided, however, that if Purchaser makes a claim for a breach of any Surviving Seller Representation on or before the expiration of the Survival Period, the Survival Period shall be extended for those claims timely made until such claims are resolved by binding agreement of the parties or final judgment and expiration of applicable appeal periods. Each Surviving Seller Representation shall automatically be null and void and of no further force and effect after the expiration of the Survival Period unless, prior to the end of the Survival Period, Purchaser shall have asserted in writing a specific claim with respect to the particular Surviving Seller Representation and commenced a legal proceeding (a "Proceeding") within thirty (30) days thereafter against Seller alleging that Seller is in breach of such Surviving Seller Representation and that Purchaser has suffered actual damages ("Damages") as a result thereof.  In no event shall Purchaser be entitled to assert any consequential, special or punitive damages with respect to any claims for a breach of Seller Representations pursuant to this Section 8.2, nor shall it be entitled to any award or payment based on such damages.  If Purchaser timely commences a Proceeding, and a court of competent jurisdiction,

16

ACTIVE 61730742v13

pursuant to a final, non-appealable order in connection with such Proceeding, determines that (1) the applicable Surviving Seller Representation was breached as of the date of this Agreement or the Closing Date and (2) Purchaser suffered Damages by reason of such breach and (3) Purchaser did not have knowledge or was not deemed to have knowledge of such breach prior to the Closing, then Purchaser shall be entitled to receive an amount equal to the Damages, but in no event in an amount greater than the Ceiling (as hereinafter defined); provided, however, Purchaser shall not be entitled to pursue any claim against Seller for damage to Purchaser that, when combined with all other claims against Seller for breaches of Surviving Seller Representations, is less than the Floor (as hereinafter defined) in the aggregate. If Purchaser has claim(s) against Seller, in excess of the Floor, then Purchaser shall be entitled to pursue the actual loss suffered by Purchaser in connection with such claim(s) against Seller (including, without limitation, recovery of all amounts below and above the Floor), but in no event shall Seller's liability for any and all claims exceed the Ceiling. For purposes of this Section 8.2, Purchaser shall be deemed to have knowledge of: (i) any matter disclosed in any exhibit or schedule to this Agreement, (ii) any matters disclosed in any document or written materials provided by Seller to Purchaser prior to the Closing (including, without limitation, those materials posted in the electronic data room located at https://app.box.com/folder/152329405383?s=r3cxvlnntp4q8hh46fl0bi6kgzljxtuf), (iii) any other matter disclosed in due diligence reports or inspections obtained by Purchaser in connection with the transactions contemplated by this Agreement, and (iv) any matter disclosed by Seller pursuant to a written update to Seller's representations or warranties in accordance with this Agreement. As used herein, "Floor" shall mean with respect to any claim or claims against Seller for breach of any Surviving Seller Representation, FIFTY THOUSAND AND NO/100 Dollars ($50,000.00), and "Ceiling" shall mean TWO MILLION ONE HUNDRED THOUSAND AND NO/100 Dollars ($2,100,000.00), provided, however, that the Ceiling shall not apply with respect to: (x) all of the credits and prorations Purchaser is entitled to pursuant to this Agreement; and (y) Seller's indemnification obligations of Purchaser pursuant to Section 14.1(b) and Article 16 of this Agreement. The provisions of this Section 8.2 shall constitute the sole and exclusive remedy after Closing for breaches of the Surviving Seller Representations and shall survive the Closing. Seller agrees that at Closing, to secure payment of any claims by Purchaser against Seller for a breach of a representation or warranty in accordance with this Section 8.2, a portion of the Purchase Price in an amount equal to the Ceiling shall be deposited in an escrow account with Title Company, to be held and disbursed by Title Company pursuant to an escrow agreement in the form of Exhibit L attached hereto (the "Holdback Escrow Agreement").

8.3     If, prior to Closing, Purchaser has knowledge of any matter which would constitute a material breach of Seller's representations and warranties, Purchaser shall notify Seller of such material breach within the earlier of five (5) Business Days of learning of same and the Closing Date, failing which Purchaser shall be deemed to waive any such corresponding material breach of Seller's representations and warranties. Seller shall have the right to contest Purchaser's determination as to a pre-Closing material breach of Seller's representations and warranties, and shall have the right to attempt to cure such breach without being obligated to complete such cure. In addition, Seller shall have until the date that is the later of the originally scheduled Closing Date and sixty (60) days from the date of Purchaser's notice to cure any such material breach of Seller's representations and warranties and, at Seller's sole option, the Closing Date shall be extended to such sixtieth (60) day (or any earlier Business Day) after Purchaser's notice of breach, in order to permit such cure by Seller. If Seller fails to cure any such material breach of Seller's representations and warranties, then Purchaser, as its sole and exclusive remedy, shall have the

17

right to terminate this Agreement by written notice to Seller, in which case Escrow Agent shall return the Deposit (together with all interest thereon, if any) to Purchaser, Purchaser shall be entitled to reimbursement by Seller of Purchaser's Reimbursement Costs, subject to the limitations set forth in Section 15.2, and neither party to this Agreement shall thereafter have any further right or obligation hereunder, except for the rights and obligations hereunder that expressly survive the termination of this Agreement.

8.4     The terms "to Seller's actual knowledge," "to the best of Seller's actual knowledge" and phrases of similar import shall mean the actual present knowledge (and not constructive knowledge) of Eric Poretsky, without independent inquiry or investigation, and shall not conclusively mean that Seller or such individual is charged with knowledge of the acts, omissions and/or knowledge of Seller's property manager (or any employee thereof), Seller's other agents or employees or Seller's predecessors in title to the Premises.  The foregoing individual is named solely for the purpose of establishing the scope of knowledge and Seller represents that such person is the representative of Seller who is charged with day-to-day administration of information relating to and asset management of the Premises.  Such individual is not a party to this Agreement and shall have no personal liability for any of the representations or warranties hereunder.

8.5     As of the Effective Date, Purchaser hereby represents and warrants as follows:

(i)     Purchaser is familiar with the source of funds for the Purchase Price of the Premises and represents that all such funds will be derived from legitimate business activities and/or from loans from a banking or financial institution.

(ii)     None of Purchaser, any direct or indirect interest holder in Purchaser (collectively, the "Purchaser Parties"), or any affiliate of Purchaser is (a) subject to sanctions of the United States government, (b) in violation of any provision of OFAC or (c) a Prohibited Person similarly designated under any Executive Orders or OFAC.

(iii)     None of the Purchaser, the Purchaser Parties or any affiliate of Purchaser is listed on the Specially Designated Nationals List maintained by the OFAC, and/or on any other similar lists as a Prohibited Person.

(iv)     Purchaser has, and its Purchaser Parties have, required and shall require, and has/have taken and shall take all reasonable measures to ensure compliance with the requirement that no Purchaser Parties or affiliates of Purchaser is or shall be listed on any lists, be a Prohibited Person, or be in violation of any laws, including any OFAC laws.

(v)     None of Purchaser, the Purchaser Parties or any affiliate of Purchaser is or will (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in, any transaction relating to any property or interest in property blocked pursuant to OFAC or the Patriot Act, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in OFAC or the Patriot Act.

(vi)     This Agreement constitutes, and each document and instrument to be executed and delivered by Purchaser hereunder (collectively, the "Purchaser's Documents"),

18

ACTIVE 61730742v13

when so executed and delivered, shall constitute, the legal, valid and binding obligations of Purchaser, enforceable in accordance with their respective terms, covenants and conditions.

(vii)    Purchaser (i)  is a limited liability company duly organized in the State of Delaware and as of the Closing Date shall be licensed and/or qualified to conduct business in the State of New York; (ii) has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby; (iii) has full power and authority to enter into and perform this Agreement and to enter into the documents to be executed and delivered in accordance with the terms hereof; and (iv) has full power and authority to consummate the transactions as contemplated herein.

(viii)    Neither the entering into of this Agreement, nor the consummation of the transactions contemplated hereunder, will constitute a violation or breach by Purchaser of any contract, writ, order, judgment, or other instrument or agreement to which Purchaser is a party, or to which it is subject to by which any of its assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, ordinance, rule or regulation of any governmental authority affecting Purchaser.  The execution, delivery and performance of this Agreement by Purchaser, and the consummation of the transactions contemplated hereby, do not require Purchaser to obtain any consent, authorization, or approval which has not already been obtained.

(ix)    Purchaser is not subject to any pending voluntary or involuntary reorganization, liquidation, receivership, or other proceedings under any federal, state or local insolvency, liquidation, reorganization or similar type laws.

8.6    All of the foregoing representations and warranties of Purchaser will be and remain true on and as of the Closing Date and shall survive the Closing.

Article 9.    Closing Obligations.

9.1    At or prior to the Closing, Seller shall execute and/or deliver to Title Company the following:

(a)    Two (2) condominium unit deeds in substantially the form attached hereto as Exhibit B and made a part hereof, and properly executed in the form for recording so as to convey title to each of the Owned Units (each, respectively, the "Deed");

(b)    At least fifteen (15) days prior to Closing, two (2) written agreements pursuant to which Seller shall assign to two (2) separate and distinct Permitted Designees of Purchaser (as designated by Purchaser in its sole and absolute discretion), and such Permitted Designees shall assume and agree to be bound by, all obligations and liabilities of Seller under the 10th Floor Lease and Store Unit Lease, respectively, and otherwise with respect to the Leased Units, in substantially the form of Exhibit C attached hereto (each, respectively, the "Assignment and Assumption of Lease");

(c)    a bill of sale, conveying and transferring to Purchaser all right, title and interest of Seller, if any, in and to all Personal Property, Fixtures, Warranties and Permits, in substantially the form attached hereto as Exhibit D and made a part hereof;

19

ACTIVE 61730742v13

(d) A Real Property Transfer Tax Return with respect to the New York City Real Property Transfer Tax (the "RPT Form");

(e) A New York State Real Estate Transfer Tax Return and Credit Line Mortgage Certificate with respect to the New York State Real Estate Transfer Tax (the "Form TP-584");

(f) A New York State Real Property Transfer Report Form RP-5217 NYC (the "RP-5217");

(g) Intentionally omitted;

(h) a written notice in substantially form of Exhibit E attached hereto, executed by Seller or by its agent, advising the Tenants of the sale of the Units to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct;

(i) if the Alternative Agreement (as defined in Article 16, and attached hereto as Exhibit I-2), has been executed by the Seller, Purchaser and the Union, and a fully executed copy is delivered to Seller at least ten (10) days prior to Closing, then Seller shall deliver the fully executed Alternative Agreement to the Union at least ten (10) days prior to the Closing;

(j) Confirming Estoppels from each Lessor and the Board of Managers;

(k) Letters of resignation from all Seller appointed members of the Board of Managers with respect to the Owned Units, effective immediately upon the consummation of the Closing. The parties will cooperate to have Seller's appointed members of the Board of Managers resign and Purchaser's replacement members appointed in accordance with the Condominium Documents;

(l) an affidavit of Seller pursuant to Section 1445(b)(2) of the Code in the form attached hereto as Exhibit F and made a part hereof, stating that Seller is not a foreign person within the meaning of such Section;

(m) evidence reasonably satisfactory to the Title Company that (i) Seller is authorized to consummate the transaction contemplated herein, and (ii) the individual(s) executing the documents on behalf of Seller is/are authorized to do so;

(n) A certificate with respect to Seller's representations and warranties under Section 8.1 being true and correct in all material respects, subject to changes permitted by Section 9.4(b), in the form of Exhibit J (the "Seller's Bring Down Certificate");

(o) An assignment and assumption, in substantially the form of Exhibit K, which provides for, as more particularly set forth therein, the assignment by Seller of all of Seller's right, title and interest in and to the Designated Service Contracts and the assumption by Purchaser of all of Seller's obligations under the Designated Service Contracts arising from and after the Closing Date (the "Assignment of Contracts");

(p) The Holdback Escrow Agreement;

20

(q)     The Labor Severance Escrow Agreement;

(r)     A closing statement prepared by Title Company and approved by Seller and Purchaser, consistent with the terms of this Agreement;

(s)     To the extent in Seller's possession, all keys, combinations and access devices to any portion of the Premises;

(t)     To the extent in the possession of Seller, all books and records relating to the Premises (other than Seller's internal memoranda, financial projections, appraisals, proposals for work not actually undertaken, accounting and tax records and similar elective or confidential information), including, without limitation, (a) Permits relating to the operation of the Premises and/or issued by any governmental authority, (b) certifications verifying elevator and boiler inspections, (c) survey, architectural plans, building plans or specifications pertaining to the Premises, and (d) rent ledgers pertaining to the SRO units;

(u)     Such affidavits, certificates, agreements and instruments as shall be reasonably required by the Title Company for Seller to comply with its obligations to deliver title to the Premises in accordance with this Agreement;

(v)     An updated SRO Schedule, dated no more than five (5) days prior to the Closing Date;

(w)     Evidence of termination of all Service Contracts that Purchaser has not agreed to assume at Closing (including evidence that Seller has paid all termination and/or cancellation fees, costs, penalties, charges and/or expenses that may result from such terminations which Seller expressly acknowledges and agrees shall be paid by Seller at its sole cost and expense at or prior to the Closing Date); and

(x)     any other documents, instruments or agreements reasonably necessary to effectuate the transactions contemplated hereunder, in accordance with the express terms, covenants and conditions hereof.

9.2     At or prior to the Closing, Purchaser (or the Permitted Designees, as applicable) shall execute and/or deliver to Title Company the following:

(a)     The RPT Form;

(b)     The RP-5217;

(c)     The Form TP-584;

(d)     a Power of Attorney executed by Purchaser and acknowledged by a notary public, in the form required by Exhibit E to the Declaration, in favor of the Board of Managers, as required by Section 16(B) of the Declaration;

(e)     At least fifteen (15) days prior to Closing, two (2) Assignments and Assumptions of Lease, with respect to the Leased Units;

21

ACTIVE 61730742v13

(f)    an assignment and assumption of the Collective Bargaining Agreement in the form attached hereto as Exhibit I-1 (the "CBA Assumption Agreement"), executed by Purchaser, unless the Alternative Agreement (as defined in Article 16 and attached hereto as Exhibit I-2) has been signed by the Purchaser and the Union and delivered to the Seller at least ten (10) days prior to Closing, in which case Seller shall sign and deliver the Alternative Agreement to the Union;

(g)    the Assignment of Contracts;

(h)    a certificate with respect to Purchaser's representations and warranties set forth in Section 8.5 being true and correct as required by Section 9.3(c);

(i)    all consents and resolutions required to consummate the transactions contemplated hereby, certified to be true and complete by an authorized officer of Purchaser;

(j)    such affidavits, certificates, agreements and instruments as shall be reasonably required by the Title Company;

(k)    a closing statement prepared by Title Company and approved by Seller and Purchaser consistent with the terms of this Agreement;

(l)    all other documents and instruments required by this Agreement and/or the Condominium Documents to be delivered by Purchaser at Closing;

(m)    The Holdback Escrow Agreement;

(n)    The Labor Severance Escrow Agreement;

(o)    An assumption of the Retainer Agreement with the written consent of the Tax Cert Attorneys; and

(p)    A Department of Housing Preservation and Development Registration Statement (the "Multiple Dwelling Registration Statement") required upon change in ownership, containing Purchaser or Purchaser's agent's information to be delivered to the Department of Housing Preservation and Development;

(q)    any other documents, instruments or agreements reasonably necessary to effectuate the transactions contemplated hereunder, in accordance with the express terms, covenants and conditions hereof.

9.3    Seller's obligation to consummate the Closing under this Agreement is subject to satisfaction of the following conditions precedent, which may be waived in whole or in part by Seller, provided such waiver is in writing and signed by Seller on or before the Closing Date:

(a)    Purchaser shall have paid or tendered payment of the Balance to Escrow Agent on or before the Closing Date as provided in Article 2 hereof, subject to adjustment as provided in Article 11 hereof;

22

(b)    Purchaser shall have delivered to or for the benefit of Seller, on or before the Closing Date, all of the documents and items required to be delivered by Purchaser pursuant to Section 9.2 of this Agreement, and Purchaser shall have performed in all material respects all of its obligations hereunder to be performed on or before the Closing Date;

(c)    All of Purchaser's representations and warranties made in this Agreement shall be true and correct as of the Effective Date and true and correct as of the Closing Date as if then made; and

(d)    Purchaser shall have complied (or shall be deemed to have complied, upon execution of delivery of the documents set forth in Section 9.2 of this Agreement) with the requirements imposed upon the grantee of a Unit under Article XII of the Declaration.

9.4    Purchaser's obligation to consummate the Closing under this Agreement is subject to the satisfaction of the following conditions precedent, which may be waived in whole or in part by Purchaser, provided such waiver is in writing and signed by Purchaser on or before the Closing Date:

(a)    Seller shall have delivered to or for the benefit of Purchaser, on or before the Closing Date, all of the documents and items required to be delivered by Seller pursuant to Section 9.1 of this Agreement, and Seller shall have performed in all material respects all of its obligations hereunder to be performed on or before the Closing Date;

(b)    Subject to the other provisions of this Agreement, all of Seller's representations and warranties made in this Agreement shall be true and correct in all material respects as of the Effective Date and true and correct in all material respects as of the Closing Date as if then made, other than those representations or warranties made as of a specific date, or with reference to previously dated materials, in which event such representations and warranties shall be true and correct in all material respects as of the date thereof or as of the date of such materials, as applicable.  For purposes hereof, a representation or warranty shall not be deemed to have been breached if the representation or warranty is not true and correct as of the Closing Date by reason of (a) changed facts or circumstances arising after the date hereof, the occurrence of which is not the result of an action by Seller which is prohibited by this Agreement or (b) any matter, including any alleged default, default, claim or proceeding, with respect to the Premises that relates to the Cycle 8 Local Law 11 Work to the extent such alleged default, default, claim or proceeding would be rendered moot upon or will be remedied by the Seller's performance and completion of the Cycle 8 Local Law 11 Work in accordance with this Agreement; and

(c)    Seller shall have complied (or shall be deemed to have complied, upon execution of delivery of the documents set forth in Section 9.1 of this Agreement) with the requirements regarding the conveyance of a Unit under Article XII of the Declaration.

Article 10.    Transfer Taxes, Title Insurance and Other Expenses.

10.1    At Closing, Seller shall pay the New York State Real Estate Transfer Tax imposed pursuant to Article 31 and Section 1402 of the New York Tax Law (the "State Transfer Tax") and the New York City Real Property Transfer Tax imposed pursuant to Title 11, Chapter 21 of the New York City Administrative Code (the "City Transfer Tax"), upon or payable in connection

23

with the transfer of title to the Units and the recordation of each Deed and execution of each Assignment and Assumption of Lease, as applicable.  Seller shall also pay 100% of any escrow fees or charges of Escrow Agent.

10.2   Purchaser shall pay for the following prior to or at the Closing:

(a)   all State, City, County and municipal recording charges with respect to the deed;

(b)   all costs and expenses in connection with Purchaser's financing (if any), and costs for the filing of all documents necessary to complete such financing and related mortgage recording tax (as the same may be applicable), provided, however, nothing herein contained shall be deemed to create a financing contingency or to condition Purchaser's obligations hereunder on Purchaser's ability to obtain financing, and this shall be deemed to be an "all cash" transaction;

(c)   the cost of Purchaser's own survey, survey re-date, engineering studies, environmental studies and other due diligence investigations;

(d)   the cost of obtaining its owner's and/or loan policies of title insurance, including any and all premiums, endorsements and coverage issued in connection with such policies.

10.3   Each party shall pay its own legal fees incidental to the negotiation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

10.4   The provisions of this Article 10 shall survive the Closing.

Article 11.   Apportionments.

11.1   The following shall be apportioned between the parties as of 11:59 P.M. on the day immediately preceding the Closing Date:

(a)   Rents, as and when collected;

(b)   real property taxes and assessments, sewer rents and taxes, water rates and charges, vault charges and taxes, business improvement district taxes and assessments and any other governmental taxes, charges or assessments levied or assessed against the Premises, if any, on the basis of the fiscal year for which assessed;

(c)   charges for water, sewer, electricity, gas, fuel and other utility charges, all of which shall be read as soon as practicable before Closing, unless Seller elects to close its own applicable account, in which event Purchaser shall open its own account and the respective charges shall not be prorated;

(d)   charges for all utility services supplied to the Units (including, without limitation, water, gas, steam and electricity);

24

ACTIVE 61730742v13

(e)      amounts prepaid and amounts accrued but unpaid under the Designated Service Contracts;

(f)      accrued wages, salaries, compensation (including but not limited to payroll expenses and taxes, but excluding any severance pay pursuant to the Collective Bargaining Agreement or enhanced severance pay pursuant to the Alternative Agreement, if applicable), benefits, including without limitation, contributions to the Union Employee Benefit Funds (other than the additional health insurance contributions pursuant to the Alternative Agreement, if applicable), vacation pay, holiday pay, sick pay, personal days or other paid time off and salaries of each Bargaining Unit Employee; provided that Purchaser shall pay when due the Seller's portion of the foregoing but receive a closing adjustment therefor, and further provided that any severance pay pursuant to the Collective Bargaining Agreement or enhanced severance pay pursuant to the Alternative Agreement, if applicable (including the additional health insurance contributions pursuant to the Alternative Agreement, if applicable) shall be the responsibility of, and paid by, Purchaser;

(g)      prepaid fees for Permits assigned to Purchaser at the Closing, if any;

(h)      if and to the extent that either or both lessors under the Unit Leases confirm, prior to Closing, that they are holding any amount of "Security Deposit", "Security" or other form of deposit securing the lessees' performance under either or both Unit Leases, all right, title and other beneficial interests in such deposits shall be assigned within the corresponding Assignment and Assumption of Lease and Seller shall receive a credit at Closing corresponding with such confirmed deposited amounts; and

(i)      all other items customarily apportioned in connection with the sale of similar properties similarly located.

11.2    Except as expressly provided to the contrary herein, all apportionments and adjustments shall be made in accordance with the customs and practice of the Real Estate Board of New York.  Any taxes due and payable under Section 11.1(b) in the year in which the Closing occurs shall be apportioned based on the portion of the fiscal year which has elapsed prior to the Closing Date.  If the Closing Date shall occur before the amount of such taxes for the fiscal year in which Closing occurs has been determined, the apportionment of such taxes shall be made at the Closing Date based on the most recent ascertainable full-year taxes (e.g. the prior year's full-year, second installment tax bill).  If any utility apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, within ten (10) Business Days following notice of the determination of such actual reading, readjust such apportionment and Seller shall promptly deliver to Purchaser, or Purchaser shall promptly deliver to Seller, as the case may be, the amount determined to be due upon such adjustment.

11.3    If any past due rents shall be owing by any Tenants on the Closing Date, Seller waives all rights to collect any such past due or delinquent rents from Tenants following the Closing Date and Purchaser shall be entitled to collect and receive all payments for past due rentals.

11.4    Seller is hereby authorized, but is not obligated, to continue any tax certiorari proceedings for reduction of the assessed valuation of the Units that are pending on the Closing

25

ACTIVE 61730742v13

Date and (with respect to any such proceedings for tax years prior to the tax year in which the Closing Date shall occur) to settle or compromise the same in Seller's sole discretion. Any settlement or compromise in connection with such proceedings brought with respect to the tax year in which the Closing Date shall occur shall be made by Seller in consultation with, and with the prior written consent of, Purchaser (which consent may be withheld in Purchaser's sole discretion). If a tax refund shall be obtained by reason of an adjustment of the assessed valuation of the Units attributable to a period that ends prior to the Closing Date, the same shall be the property of Seller (less the reasonable costs of collection, including attorneys and accounting fees). If any such refund shall be obtained for a period that includes the Closing Date, the amount of such refund (less the cost of obtaining the same, including, without limitation, reasonable attorneys' and accounting fees) shall be apportioned according to length of the respective portions of such period during which each party owned the Unit and subject to adjustment and apportionment pursuant to the Lease. If any such refund or portion thereof to which Purchaser shall be entitled as hereinbefore provided shall be paid to Seller, Seller shall receive the same for the benefit of Purchaser and shall forthwith remit the same thereto. Purchaser shall, with the consent of the Tax Cert Attorneys, assume the retainer agreement (the "Retainer Agreement") with Ditchik & Ditchik, PLLC (the "Tax Cert Attorneys") and shall be obligated to make any payments due to the Tax Cert Attorneys pursuant to the Retainer Agreement with respect to tax savings realized by Purchaser as a result of any reduction in the transitional assessed valuation and/or the actual assessed valuation of the Real Property, which reduction is implemented over the five year period following the Closing from which Purchaser benefits. As of the Closing Date, Seller shall be released from any obligations to make payments under the Retainer Agreement with the Tax Cert Attorneys, other than payments to the Tax Cert Attorneys related to the tax years prior to the Closing Date.

11.5    The terms, covenants and conditions of this Article 11 shall survive the Closing.

Article 12.    Risk of Loss; Condemnation.

12.1    If, between the date of this Agreement and the Closing Date, the Premises are damaged by fire or other casualty, the provisions of Section 5-1311 of the New York General Obligations Law, or any statute enacted in substitution therefor or in addition thereto, shall not apply. Such provisions are hereby waived, and the provisions of the following Section 12.2 shall apply instead.

12.2    Upon the occurrence of a casualty, condemnation or taking with respect to any Premises between the date of this Agreement and the Closing Date, Seller shall notify Purchaser in writing of same (a "Casualty/Condemnation Notice"). For purposes of this Article 12 hereof, a "Significant Portion of the Premises" shall mean a portion of the Premises, of which the cost to repair is equal to or greater than ten percent (10%) of the Purchase Price, as determined by an architect or engineer selected by Seller and reasonably acceptable to Purchaser. In the event that a Significant Portion of the Premises is damaged or destroyed in any casualty, or a Significant Portion of the Premises is condemned or taken (or notice of any condemnation or taking is issued), then Purchaser may elect to terminate this Agreement by providing written notice of such termination to Seller within five (5) Business Days after Purchaser's receipt of the Casualty/Condemnation Notice, upon which termination, the Deposit shall be immediately returned to Purchaser without objection from Seller and neither party hereto shall have any further rights, obligations or liabilities under this Agreement with respect to the Premises, except as

26

otherwise expressly set forth herein. If (a) Purchaser does not elect to terminate this Agreement (provided that Purchaser's failure to timely elect to terminate shall be deemed an election to close), or (b) the portion of the Premises which is (x) taken, or (y) damaged or destroyed is, in either case, not a Significant Portion of the Premises, then there shall be no abatement of the Purchase Price and (x) in the case of a condemnation or taking, Seller shall assign to Purchaser at the Closing the rights of Seller to the claims or awards and Purchaser shall be entitled to receive and keep all such awards; and (y) in the case of a casualty, Seller shall assign to Purchaser at the Closing the rights of Seller to the proceeds under Seller's insurance policies covering such Premises with respect to such damage or destruction (or pay to Purchaser any such proceeds received prior to Closing, less amounts actually paid by Seller for any emergency repairs) and credit to Purchaser the amount of any deductible with respect thereto, and Purchaser shall be entitled to receive and keep any monies received from such insurance policies.

<u>Article 13.</u>    <u>Covenants of Seller</u>.  Between the date hereof and Closing:

13.1    Seller covenants and agrees that, except as otherwise provided in the Agreement, between the date of this Agreement and the Closing Date, Seller (either itself or through an agent) shall continue to manage and operate the Premises in substantially the same manner as Seller has heretofore managed and operated the Premises and in compliance in all material respects with all applicable laws, ordinances, rules and regulations of any governmental authority governing the Real Property, perform in all material respects all of Seller's obligations under the Unit Leases, and to keep (or request the Condominium to keep, to the extent the Condominium is so required) the Units in substantially and materially its same condition and state of repair, subject to reasonable wear and tear and the terms, conditions and requirements of the Condominium Documents and the Unit Leases.

13.2    Seller shall not enter into any new service contract unless the same shall be terminable by Seller prior to Closing.

13.3    Seller shall maintain in full force and effect until the Closing the insurance policies presently in effect or other commercially reasonable policies of insurance affording similar levels of coverage and shall, subject to the provisions of Article 11, continue to pay all utility and service charges accrued through the date of Closing.

13.4    Seller shall notify or, in the case of written notice received by Seller, deliver a copy to, Purchaser of any default under the Condominium Documents or the Unit Leases or from any Tenants, or the receipt of any notice of default received by Seller under the Condominium Documents or the Unit Leases or from any Tenants.

13.5    From and after the date of this Agreement, Seller shall not amend, modify, or terminate the Unit Leases or the Condominium Documents without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole and absolute discretion, nor enter into any new lease, license or other form of occupancy agreement affecting the Premises without the prior written consent of Purchaser, which consent may be withheld in Purchaser's sole and absolute discretion.

27

13.6    Seller shall promptly advise Purchaser of any litigation, arbitration or other judicial or administrative proceeding with respect to the Premises which materially and adversely affects Purchaser's interests under this Agreement.

13.7    Seller shall deliver to (x) Lessors an estoppel certificate substantially in the form attached hereto as Exhibit G, and (y) the Board of Managers an estoppel certificate substantially in the form attached hereto as Exhibit H (each, an "Estoppel" and collectively, the "Estoppels"). Seller shall obtain Confirming Estoppels from each Lessor and the Board of Managers.  For purposes of this Agreement, the term "Confirming Estoppels" shall mean Estoppels that so confirm the applicable matters set forth therein, provided, however, (x) inclusion of qualifications as to knowledge shall not cause the Estoppel to be non-compliant; (y) if the applicable Unit Lease or the Condominium Documents specifies the form or content of an estoppel certificate, then the Estoppel may be in such form or contain only those matters as specified thereby, without giving effect to any requirement regarding "additional information reasonably requested" or words of similar import and (z) an Estoppel shall fail to be a Confirming Estoppel only if they fail to confirm the applicable matters in all material respects and the aggregate adverse economic impact as a result of such failures is equal to or exceeds the Floor (as defined in Section 8.2).

13.8    At or prior to Closing, Seller shall terminate Newmark Knight Frank (the "Existing Manager") the existing property management agreement for the Premises (the "Existing PMA").

13.9    Seller shall oversee the completion, prior to Closing, at Seller's sole cost and expense, of the work (the "Cycle 8 Local Law 11 Work") under the contracts set forth on Schedule G (such contracts, collectively, the "Cycle 8 Local Law 11 Contracts").  Seller shall be obligated to pay all amounts due under the Cycle 8 Local Law 11 Contracts and file (or cause to be filed) a "Safe" report with the NYC Department of Buildings (the "DOB LL 11 Report").  If, at the time of Closing, the Cycle 8 Local Law 11 Work has not been finally completed, the DOB LL 11 Report has not been filed with the NYC Department of Buildings, and/or the NYC Department of Buildings has not issued a Certificate of Compliance with respect to completion of the Cycle 8 Local Law 11 Work, Seller shall assign the Cycle 8 Local Law 11 Contracts, if applicable, to Purchaser at Closing and Purchaser shall assume all obligations thereunder or otherwise oversee and cause completion of the Cycle 8 Local Law 11 Work, provided, however, that Seller shall escrow with Escrow Agent the aggregate sum necessary to address any remaining Cycle 8 Local Law 11 Work, not to exceed Thirty Thousand and NO/100 Dollars ($30,000.00), to which escrow Purchaser shall have access for purposes of requesting disbursements to pay for any remaining costs to complete the Cycle 8 Local Law 11 Work.  Seller makes no representation or warranty regarding the Cycle 8 Local Law 11 Work.  Seller shall not be obligated to perform or pay for any work relating to "Cycle 9" under Local Law 11 and Purchaser assumes all obligations under applicable law (including, without limitation, pursuant to NYC Façade Inspection Safety Program) to perform and pay for any work required to be performed in connection with "Cycle 9".  The provisions of this Section 13.9 shall survive the Closing.

13.10    Seller shall promptly after receipt thereof deliver to Purchaser copies of all written notices from any governmental authority regarding (i) the violation or alleged violation of Relevant Environmental Laws regarding Hazardous Materials affecting the Premises or (ii) any actual or threatened condemnation of the Premises or any portion thereof.

28

13.11   Seller shall promptly notify Purchaser of the filing of any litigation, arbitration, or administrative hearing before any court or governmental agency naming Seller and/or affecting the Premises.

13.12   Other than with respect to the Cycle 8 Local Law 11 Work, Seller shall not make any structural modifications or additions to the Premises, without first obtaining the consent of Purchaser, which consent shall not be unreasonably withheld or delayed by Purchaser, other than with respect to life/safety repairs or in response to an emergency at the Premises.

13.13   At all times from the Effective Date to the Closing Date, Seller will not sell or otherwise transfer title to all or any portion of the Premises, or encumber the Premises with indebtedness secured by the Premises, in each case, without the prior written consent of Purchaser, which may be withheld in Purchaser's sole and absolute discretion.   Notwithstanding the foregoing, Seller shall be permitted to remove the Excluded Personal Property, without the consent of Purchaser.

13.14   Subject to Article 12 hereof, Seller shall not settle or compromise or agree to any settlement or compromise of any insurance or condemnation claim or award without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

13.15   Seller shall not, without the Purchaser's prior written consent in each instance, (i) enter into, renew, or amend the Collective Bargaining Agreement or any collective bargaining agreement with the Union or any labor union or labor organization except for collective bargaining agreements, renewals thereof, or amendments thereto that in any case do not apply specifically and uniquely to the Premises (as distinguished, for example, from city-wide agreements, renewals or amendments), or (ii) except in the ordinary course of business, fill currently open positions (after notice to and approval from the Purchaser which approval will not be unreasonably denied), or increase or decrease the number of Hotel Employees.

Article 14.   Brokerage.

14.1   (a) Purchaser and Seller hereby represent and warrant that they have not hired, retained or dealt with any broker, finder, consultant, person, firm or corporation in connection with the negotiation, execution or delivery of this Agreement or the transactions contemplated hereunder.   Purchaser covenants and agrees that should any claim be made against Seller for any commission or other compensation by any broker, finder, person, firm or corporation, based upon or alleging negotiations, dealings or communications with Purchaser or Purchaser's representative(s) in connection with this transaction or the Premises, Purchaser shall indemnify and hold Seller harmless from and against any and all damages, expenses (including attorneys' fees and disbursements) and liability arising from such claim.

(b)   Seller covenants that should any claim be made against Purchaser for any commission or other compensation by any broker, finder, person, firm or corporation, based upon or alleging negotiations, dealings or communications with Seller or Seller's representative(s) in connection with this transaction or the Premises, Seller shall indemnify and hold Purchaser

*ACTIVE 61730742v13*

harmless from any and all damages, expenses (including attorneys' fees and disbursements) and liability arising from such claim.

(c)    The provisions of this <u>Article 14</u> shall survive the Closing or earlier termination of this Agreement.

<u>Article 15.</u>    <u>Remedies.</u>

15.1    If (i) Purchaser defaults in its obligation to pay the Balance on the Closing Date or in the performance of any of its other obligations to be performed on the Closing Date, and Seller is ready, willing and able to Close in accordance with the terms, provisions and conditions of this Agreement, or (ii) Purchaser defaults in any of its other obligations to perform under this Agreement prior to the Closing Date and, with respect to any default under this clause (ii) only, such default shall continue for ten (10) Business Days after written notice of default to Purchaser, Seller's sole and exclusive remedy by reason thereof shall be to terminate this Agreement and, upon such termination, Seller shall be entitled to receive and retain the Deposit, and any interest thereon, as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be difficult or impossible to ascertain, and that the Deposit, and the interest thereon (if any), constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty. Upon such termination, neither party shall thereafter have any further right or obligation hereunder, except for the rights and obligations hereunder that expressly survive the termination of this Agreement.

15.2    If Seller defaults in any of its material obligations under this Agreement and such default is not cured within twenty (20) Business Days of receiving written notice from Purchaser of such alleged default (except with respect to any material obligations that Seller is required to perform on the Closing Date in which case no notice and cure period shall be provided, provided that on such date, Purchaser has satisfied all conditions required to be satisfied by it under this Agreement, is not otherwise in default under this Agreement and is ready, willing and able to perform all of its obligations under this Agreement on the Closing Date and to deliver the Balance due Seller under this Agreement), Purchaser's sole and exclusive remedies shall be: (i) to terminate this Agreement and to receive a refund of the Deposit (together with any interest thereon) as well as reimbursement from Seller to Purchaser for Purchaser's documented, verifiable out-of-pocket costs and expenses and reasonable attorney's fees and costs incurred in connection with this transaction and the due diligence conducted not to exceed Four Hundred Thousand and No/100 Dollars ($400,000) (collectively, and subject to the foregoing limitation on amount, "<u>Purchaser's Reimbursement Costs</u>"), with such reimbursement obligation expressly surviving the termination of this Agreement and which reimbursement shall occur within twenty (20) Business Days after demand by Purchaser therefor, and neither party shall thereafter have any further right or obligation hereunder, except for the rights and obligations hereunder that expressly survive the termination of this Agreement, or (ii) within forty-five (45) days after Seller's failure to perform its obligation to convey the Premises on the Closing Date or failure to otherwise comply with Seller's obligations it is required to perform on the Closing Date (provided that on such date, Purchaser has satisfied all conditions required to be satisfied by it under this Agreement, is not otherwise in default under this Agreement and is ready, willing and able to perform all of its obligations under this Agreement on the Closing Date and to deliver the Balance due Seller under this Agreement), bring an action in equity against Seller for specific performance; it being understood that if Purchaser fails to

30

commence an action for specific performance within such forty-five (45) day period, Purchaser's sole remedy shall be to terminate this Agreement and receive a return of the Deposit and reimbursement of Purchaser's Reimbursement Costs. Notwithstanding anything to the contrary in this Agreement, in the event that specific performance is not available as a remedy as a result of Seller conveying the Premises to a party other than Purchaser, Purchaser shall have the right to seek monetary damages against Seller to the fullest extent permitted by law.

Article 16.    Employees.

16.1    For purposes of this Agreement, (i) "Hotel Employees" means, collectively, all individuals employed at the Premises by Existing Manager as of the Closing Date, irrespective of whether such individuals are active, on leaves of absence, on layoff or otherwise inactive but still employed at the Premises, and (ii) "Bargaining Unit Employees" shall mean those Hotel Employees employed at the Premises by Existing Manager as of the Closing Date, irrespective of whether such individuals are active, on leaves of absence, on layoff or otherwise inactive but still employed at the Premises, who are represented by the Union and whose employment is subject to the Collective Bargaining Agreement (as hereinafter defined).

16.2    Seller shall cause Existing Manager to deliver to Purchaser at least five (5) Business days prior to Closing (i) a list of all Hotel Employees including position, union status, date of hire, applicable rate of pay (or salary), together with (x) a schedule of those employees that are on any sick leave or leave of absence and those that are on layoff or inactive, and (y) a schedule of accrued and unused vacation, holidays, personal days and sick leave for such employees, and (ii) a list of all layoffs or involuntary terminations (other than terminations for cause or other performance-related reasons) and other losses of employment (other than due to resignations, retirement and other voluntary departures) experienced at the Premises during the ninety (90) day period preceding the Closing.  Seller shall be responsible for accrued compensation and benefits, including without limitation, contributions to any multi-employer benefit plan pursuant to the Collective Bargaining Agreement, vacation pay, holidays, personal days, sick leave or other paid time off and wages and/or salaries (but not including any severance pay pursuant to the Collective Bargaining Agreement or enhanced severance pay under the Alternative Agreement, if applicable) of each Hotel Employee accruing prior to the Closing Date, as required under applicable law or the Collective Bargaining Agreement.  Seller shall cause Existing Manager to make reasonable efforts to provide Purchaser or its manager or operator, information necessary to comply with the successorship obligations under the Collective Bargaining Agreement, including but not limited to I-9 forms (unless otherwise provided by applicable law) and information necessary to provide for uninterrupted employment without loss of seniority, compensation, benefits or fringe benefits and no adverse effect on other terms and conditions of employment.

16.3    From and after the Closing, Purchaser (i) shall be solely responsible for complying or causing compliance with the Collective Bargaining Agreement and the Alternative Agreement, if applicable, all applicable provisions of federal, state and municipal laws and regulations relating to those Hotel Employees remaining in employment at the Hotel upon Closing ("the Rehired Employees"), and any other individuals hired as employees at the Hotel after Closing, including Purchaser's covenants set forth in this Section 16.3, including without limitation compliance with any applicable provisions of the Federal WARN Act, the New York WARN Act or the New York City Hotel Service Workers, Section 4980B of the Internal Revenue Code (COBRA), the Hotel

31

Service Disruption Notification Act ("HSW Act"), and any rules or regulations as have been issued in connection with any of the foregoing and any benefit continuation and/or severance payments pursuant to the Collective Bargaining Agreement and relating to Rehired Employees that may be payable upon any termination of employment of any such Rehired Employees accruing and arising after the Closing, and (ii) hereby agrees to indemnify, defend, protect and hold Seller and its affiliates harmless from and against any and all claims, liabilities, debts, costs, expenses, damages, attorneys' fees and disbursements arising out of any violation of the Collective Bargaining Agreement, and all applicable Labor and Employment Laws, accruing and arising on or after Closing, including but not limited to any violation of the Federal WARN Act, the New York WARN Act, COBRA or the HSW Act and any rules or regulations as have been issued in connection with any of the foregoing in connection with the transaction contemplated by this Agreement, relating to the Hotel Employees or any individuals hired as employees at the Hotel on or after the Closing.  In addition, Purchaser shall be solely responsible for, and shall indemnify and hold Seller harmless from, any claims or payments required to be made to or on behalf of any Bargaining Unit Employees or any former bargaining unit employees of the Hotel, as a result of either this transaction or the Alternative Agreement, including but not limited to any severance pay pursuant to the Collective Bargaining Agreement, Enhanced Severance pursuant to the Alternative Agreement, if applicable, contributions to the Union Employee Benefit Funds under both the Collective Bargaining Agreement and the Alternative Agreement, if applicable.  Seller agrees to indemnify, defend, protect and hold Purchaser and its respective affiliates harmless from and against any and all claims, liabilities, debts, costs, expenses, damages, attorneys' fees and disbursements arising out of any violation of the Collective Bargaining Agreement, and all applicable Labor and Employment Laws, relating to the Hotel Employees, including, but not limited to, Federal WARN Act, the New York WARN Act, COBRA or the HSW Act and any rules or regulations as have been issued in connection with any of the foregoing accruing or arising prior to the Closing and any benefit continuation and/or severance payments pursuant to the Collective Bargaining Agreement relating to Hotel Employees that may be payable upon any termination of employment of any such Hotel Employee accruing or arising prior to the Closing. Notwithstanding anything to the contrary herein, any additional severance due under NYC Local Law Int 2397-2021 (Severance Pay for Hotel Service Employees) ("the NYC Severance") will be the responsibility of Seller.  At Closing, Seller and Purchaser shall establish an escrow with Title Company pursuant to an escrow agreement in substantially the form attached hereto as Exhibit M (the "Labor Severance Escrow Agreement"), whereby Seller shall deposit with Title Company a gross sum equal to the balance of the 30 weeks due under the NYC Severance at $500.00 per week for each employee eligible for the NYC Severance (the "Labor Severance Escrow Account"); said amount shall, in accordance with the Labor Severance Escrow Agreement, be paid by Purchaser or its manager or operator from the Labor Severance Escrow Account to each eligible employee, subject to the terms of the Labor Severance Escrow Agreement.  In the event Purchaser enters into the Alternative Agreement (as hereinafter defined) which requires Purchaser to pay enhanced severance and contributions to the Union Employee Benefit Funds in excess of the amounts accrued up to Closing, Purchaser shall indemnify and hold Seller harmless for said amounts.

16.4    During the period prior to Closing, the parties agree to reasonably cooperate and also to consult on a regular basis and coordinate their activities relating to employee matters so as to facilitate a smooth transition of Premises operations and the continued proper performance by the Hotel Employees of their respective duties up to Closing.  Seller shall promptly deliver to Purchaser copies of any written materials delivered or received relating to Union representation of

*ACTIVE 61730742v13*

Bargaining Unit Employees including but not limited to any grievances filed against the Hotel and Seller shall keep Purchaser substantially informed with respect to the status of any discussions with the Union with respect to the Hotel.

16.5    Without limiting any other provision of this Article 16, (i) Seller has informed Purchaser that Seller is a party to and is bound by the terms of that certain Industry Wide Agreement between Hotel Association of New York, Inc. and New York Hotel and Motel Trades Council, AFL-CIO ("Union") which is in effect from July 1, 2012 through June 30, 2026 ("IWA"), including any related written memorandum of understanding and other related agreements, as provided by their terms (collectively, the "Collective Bargaining Agreement"), (ii) a copy of the Collective Bargaining Agreement has previously been delivered or made available to Purchaser for its review, and (iii) Purchaser or Purchaser's property manager, operator or agent shall offer to retain all Bargaining Unit Employees and, if they accept such offers, their employment will continue uninterrupted without loss of seniority, compensation, benefits or fringe benefits and with no adverse effect on other terms and conditions of employment subject to the Collective Bargaining Agreement and applicable law, and (iv) Purchaser will, and shall cause its property manager, operator or agent to, recognize the Union and assume, adopt and be bound by all of the terms, both economic and non-economic, of the Collective Bargaining Agreement from and after the Closing Date.   Purchaser further agrees to execute, and shall cause its property manager, operator or agent to execute, at least ten (10) days prior to Closing an assumption agreement acceptable to the Union, which shall be substantially in the form of the IWA Assumption Agreement attached hereto as Exhibit I-1 and made a part hereof to effectuate an assumption of the Collective Bargaining Agreement in its name (without modification or amendment) as of the Closing.   Notwithstanding the foregoing obligation to assume the Collective Bargaining Agreement and execute Exhibit I-1, Purchaser will be relieved of said obligation if Purchaser and the Union execute, and deliver to Seller, at least ten (10) days prior to Closing, the agreement attached hereto as Exhibit I-2 ("Alternative Agreement").   The parties acknowledge the enactment of the Displaced Hotel Service Workers and Hotel Service Disruption Notifications Act, section 22-510 of the Administrative Code of New York (the "DHSWNA") and the Displaced Building Service Workers Protection Act, §22-505 of the Administrative Code of the City of New York ("BSWPA").   By this Agreement, including, without limitation, Purchaser's assumption of the Collective Bargaining Agreement, or providing a fully executed copy of the Alternative Agreement, the parties agree that the DHSWNA and the BSWPA do not apply to the transaction contemplated by this Agreement under §22-510(d)(1) and §22-505(f)(1) of the New York City Administrative Code.

16.6    Under the Collective Bargaining Agreement, Seller's Existing Manager currently contributes, on a monthly basis, various amounts under the (i) New York Hotel Trades Council and Hotel Association of New York City, Inc., Health Benefits Fund, (ii) New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund, (iii) New York Hotel Trades Council and Hotel Association of New York City, Inc. Prepaid Legal Services Fund, and (iv) New York Hotel Trades Council and Hotel Association of New York City, Inc., Industry Training and Scholarship Fund (collectively, the "Union Employee Benefit Funds"). At Closing, regular contributions paid or payable with respect to the Union Employee Benefit Funds shall be prorated, with the appropriate party receiving a credit or debit to the Purchase Price, on a pro rata basis based on the Closing Date.   In addition, at Closing Purchaser agrees to assume Seller's responsibility to

33

pay any and all vacation and sick pay for the Bargaining Unit Employees, when payable, for which amounts Purchaser shall receive a credit at Closing.

16.7    Retirement Plan.

(a)    The parties intend to comply with section 4204(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and to take any other action required or desirable, so that no withdrawal liability is imposed upon Seller as a result of the consummation of this transaction.

(b)    To that end, at Closing Purchaser shall (or shall cause its property manager, operator or agent to) assume an obligation to make contributions to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund (hereafter, the "Retirement Plan") in accordance with the Collective Bargaining Agreement, for substantially the same number of contribution base units, within the meaning of Section 4001(a)(11) of ERISA, for which Seller or Existing Manager had an obligation to contribute with respect to the Premises prior to the Closing.

(c)    Purchaser agrees to reasonably cooperate with Seller and/or Retirement Plan representatives with respect to any inquiry or reasonable request for information and assistance in order to facilitate the transfer of the contribution obligation with respect to the Retirement Plan from Seller (or the Existing Manager of the Premises) to Purchaser (or the Existing Manager of the Premises).  The parties agree that they will notify the Retirement Plan of their intention that this transaction comply with Section 4204 of ERISA.

(d)    Subject to Section 16.7(g), during the period commencing on the first day of the plan year following the Closing Date and ending on the expiration of the fifth (5th) such plan year (the "Contribution Period"), Purchaser shall provide to the Retirement Plan either a bond, letter of credit, or an escrow in an amount and manner meeting the requirements of Section 4204 of ERISA.  The cost of any bond, letter of credit, or escrow provided under this Section 16.8 (d) shall be paid by Purchaser.

(e)    To the extent required by Section 4204(a)(3) of ERISA, Seller or Existing Manager shall provide to the Retirement Plan a bond or escrow equal to the present value of the withdrawal liability Seller would have had to the Retirement Plan with respect to the assets acquired by Purchaser pursuant to this Agreement (but for the provisions of Section 4204 of ERISA), reduced to the extent provided under Section 4204(a)(3) of ERISA in the event only a portion of Seller' assets are distributed during the Contribution Period.

(f)    If Purchaser at any time withdraws from the Retirement Plan in a complete or partial withdrawal with respect to the assets acquired by Purchaser pursuant to this Agreement during the Contribution Period, Seller shall be secondarily liable for any withdrawal liability Seller would have had to the Retirement Plan with respect to the Premises (but for the provisions of Section 4204 of ERISA) if any withdrawal liability of Purchaser with respect to such Retirement Plan is not paid.  Purchaser agrees to provide Seller with a copy of any notice and demand for

34

payment of withdrawal liability that Purchaser receives from the Retirement Plan with respect to the Premises.

(g)     Notwithstanding anything contained in Section 16.7(d) to the contrary, Purchaser shall not be obligated to provide any bond, letter of credit, or escrow in the event and to the extent Purchaser obtains from the Retirement Plan or the Pension Benefit Guaranty Corporation a variance or exemption under Section 4204(c) of ERISA and the applicable regulations thereunder.

(h)     In the event that, notwithstanding the terms of this Section 16.7, the Retirement Plan assesses withdrawal liability based on this transaction or any event subsequent to the Closing against Seller, Existing Manager and/or any Seller Related Parties, including the assertion of secondary liability pursuant to section (f) above, Purchaser shall indemnify Seller, Existing Manager and any other Seller Related Parties from and against such withdrawal liability.

16.8     Purchaser agrees to indemnify, defend and hold harmless Seller, Existing Manager and any other Seller Related Parties from and against any claim, liability, judgment or arbitration award asserted against any of the Seller Related Parties on account of or with respect to any of the following: (i) any causes of action, damages, complaints, judgments, orders and/or claims, whatsoever, and all costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred in connection therewith, which accrue and arise (or, in the case of omissions, failed to occur) on or after the Closing and may be asserted against any of the Seller Related Parties on account of any violation of the Collective Bargaining Agreement and/or Labor and Employment Laws occurring (or, in the case of omissions, failed to occur) on or after the Closing by Purchaser, or any designee or management company engaged by Purchaser to employ Premises personnel, except to the extent such are based solely on the acts of any Seller Related Parties, and (ii) any claims or liabilities arising (A) under ERISA, as amended and/or any other applicable federal or state law or regulation concerning employee benefit plans with respect to the employment of employees by Purchaser or such designee or management company on or after the Closing, or (B) from or under any employee benefit plan applicable to any Rehired Employee or any other employee hired by Purchaser or such designee or management company to perform services at or for the Premises, to the extent that any such claim or liability accrued or arose during any period of employment on or after the Closing.

16.9     Seller agrees to indemnify, defend and hold harmless Purchaser and its affiliates, or any designee or management company engaged by Purchaser to employ Premises personnel, and their respective officers, directors, members, managers, partners, agents, employees, successors and assigns (herein, the "Purchaser Related Parties") from and against any claim, liability, judgment or arbitration award asserted against any of the Purchaser Related Parties on account of or with respect to any of the following: (i) any causes of action, damages, complaints, judgments, orders and/or claims, whatsoever, and all costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred in connection therewith, which may be asserted against any of the Purchaser Related Parties on account of any violation of the Collective Bargaining Agreement and/or Labor and Employment Laws occurring (or, in the case of omissions, failed to occur) prior to the Closing by Seller or Existing Manager, except to the extent such are based solely on the acts of any Purchaser Related Parties, or for which a closing adjustment credit has been issued hereunder, and (ii) any claims or liabilities arising (A) under

35

ERISA, as amended, and/or any other applicable federal or state law or regulation concerning employee benefit plans with respect to the employment of employees by Seller or Existing Manager up to the Closing, or (B) from or under any employee benefit plan applicable to any Rehired Employee or any other employee hired by Purchaser or such designee or management company to perform services at or for the Premises, to the extent that any such claim or liability accrued or arose during any period of employment prior to the Closing.

16.10   For purposes of this Agreement, the term "Labor and Employment Laws" shall mean all federal, state or local labor and employment statutes, rules, and regulations, including, without limitation, National Labor Relations Act, 29 U.S.C. §§151, et seq., the Families First Coronavirus Response Act, the Fair Labor Standards Act, 29 U.S.C. §§201, et seq., the New York State Labor Law §§650, et seq. and applicable regulations, 12 NYCRR 142-2.2, et seq., the Code, ERISA, Multi-Employer Pension Plan Amendments Act of 1980, Section 1981 through 1988 of Title 42 of the United States Code, Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866, 1871, and 1991, 42 U.S.C. §§2000(e), et seq., the Equal Pay Act, the Americans With Disabilities Act of 1990, 42 U.S.C. §§12101, et seq., the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601, et seq., Genetic Information Nondiscrimination Act of 2008, the Rehabilitation Act, the Immigration Reform Control Act,  Uniformed Services Employment and Reemployment Rights Act, New York State Executive Law §§290, et seq., the New York City Human Rights Code, Administrative Code of the City of New York, §8-101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §§701, et seq., the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§1161, et seq., the Occupational Safety and Health Act, 29 U.S.C. §§651, et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621, et seq., the Older Workers' Benefit Protection Act, the Fair Credit Reporting Act, the Sarbanes-Oxley Act, the New York State Human Rights Law, the New York Executive Law, the New York Civil Rights Law, the New York Equal Pay Law, the New York Legal Activities Law, the New York State Wage and Hour and Wage Payment Laws, the New York Minimum Wage Law, the New York Whistleblower Law,  the New York Worker Health and Safety Act, the Retaliation/Discrimination Provisions of the New York Workers' Compensation Law and the New York State Disabilities Benefits Law,  the New York State Paid Family Leave Benefits Law,  the federal and New York State Worker Adjustment and Retraining Notification Acts (collectively, the "WARN Acts"), the Coronavirus Aid, Relief, and Economic Security Act, the American Rescue Plan of 2021, the DBSWPA, N.Y. Real Property Tax Law § 421-a, New York State Sick Leave Law, New York City Earned Safe and Sick Time Act, the New York Quarantine Leave Law, New York City Fair Chance Act, the New York City Administrative Code and Charter or any other federal, state or local human rights, civil rights, wage-and-hour, wage-payment, pension, labor or employment-related laws, or their respective implementing laws, rules and/or regulation(s) with respect to the Premises and all other statutes, laws, regulations, ordinance or rules regulating the terms and conditions of employment (as amended from time to time, and together with any similar laws now or hereafter enacted), under the common law or in equity (including any claims for wrongful discharge or otherwise), each as amended, or under any policy, agreement, understanding or promise, written or oral, formal or informal.

16.11   Seller and Purchaser (on their own behalf and/or through their respective property managers) agree to cooperate reasonably with each other to the extent legally permissible in the defense of any claims, grievances, lawsuits or other charges brought by or on behalf of any Hotel Employees or former Hotel Employees.  Such cooperation shall include providing: (i) workers'

36

compensation claims processing; (ii) access to and copying of personnel records and other documents that either party has in its possession which related to any such claims, lawsuits or charges to the extent legally permissible regardless of whether such materials are proprietary material (provided that, upon the request of the other party, such accessing party shall execute a customary form of non-disclosure agreement with respect to such access); and (iii) availability of employees of the aforementioned entities for such matters as interviews, depositions and to testify. No party shall have the duty to cooperate with the others if the dispute is between the parties themselves.

16.12   Purchaser's and Seller's obligations under this Article 16 shall survive Closing

Article 17.    Notices.

17.1    Any notice or other communication given by either party hereto to the other relating to this Agreement (a "notice") shall be in writing and sent to the party to which the notice is being made by nationally recognized overnight courier or delivered by hand with receipt acknowledged (provided that in either case a copy of such notice is also delivered on the same day (or earlier) by electronic mail) in writing as follows:

If to Seller, to:

>   EC 58th Street LLC
>   c/o Cain International US Services LP
>   350 Park Avenue, 14th Floor
>   New York, New York 10022
>   Attention:  Cain Legal
>   Email: legal@cainint.com

with a copy to Seller's attorney:

>   Greenberg Traurig, LLP
>   One Vanderbilt Avenue
>   New York, New York 10017
>   Attention:  Farah S. Ahmed, Esq.
>   Email: ahmedf@gtlaw.com

If to Purchaser, to:

>   CSC Hudson, LLC
>   c/o CSC Co-Living
>   6 St. Johns Lane
>   New York, New York 10013
>   Attention: Sal Smeke and Alberto Smeke
>   Email: ss@csc-coliving.com
>           as@csc-coliving.com

37

ACTIVE 61730742v13

with a copy to Purchaser's attorney:

> Cole Schotz P.C.
> 1325 Avenue of the Americas, 19th Floor
> New York, New York 10019
> Attn: Jordan J. Metzger, Esq.
> E-mail: jmetzger@coleschotz.com

If to Escrow Agent:

> First American Title Insurance Company
> 666 Third Avenue, 5th Floor
> New York, New York 10017
> Attention:  Patricia A. LaPorta, Esq.
> Email: plaporta@firstam.com

17.2    Notices or other communications (including agreements) signed by the attorneys for the respective parties shall be deemed binding upon the parties.  Either party may by notice to the other change the person or address for receipt of notices.  Notices sent by hand delivery or recognized overnight courier service shall be effective when received or rejected by the recipient or the recipient's office or firm.

Article 18.    Intentionally omitted.

Article 19.    Assignment.

19.1    Neither this Agreement nor any of the rights of Purchaser hereunder may be assigned or transferred by Purchaser without Seller's prior written consent, which consent may be granted or withheld in Seller's sole and absolute discretion, and any purported assignment or encumbrance without Seller's prior written consent shall be null and void, and shall constitute a default hereunder, which default is not capable of being cured.  Notwithstanding the foregoing, Purchaser shall have the right to assign its rights under this Agreement to one or more Permitted Designees of Purchaser without the consent of Seller so long as Purchaser delivers to Seller a fully executed and effective assignment and assumption agreement conveying to such designee(s) all of Purchaser's right, title and interest in, to and under this Agreement and the Deposit at least fifteen (15) days prior to Closing.  No such assignment to a Permitted Designee shall relieve Purchaser of its obligations under this Agreement.  For the avoidance of doubt: (a) Purchaser shall have the right, without Seller's prior written consent, to designate separate Permitted Designees to take fee simple title and leasehold title, as applicable, to each Unit at Closing; and (b) Seller acknowledges and agrees that at Closing, Purchaser intends to take leasehold title to the Leased Units in the names of two (2) separate and distinct Permitted Designees and, further, that Purchaser intends to take fee title to the Owned Units in one (1) or two (2) additional Permitted Designees, separate and distinct from the Permitted Designees taking leasehold title to the Leased Units.  A "Permitted

38

Designee" shall mean: (i) any other entity that is directly or indirectly (through one or more intermediaries) controlled by Sal Smeke and/or Alberto Smeke, or (ii) any other entity in which Sal Smeke and/or Alberto Smeke has a direct or indirect equity interest in the controlling entity (e.g. the managing member of an entity) of such entity. For purposes of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies or the power to veto major policy decisions whether through the ownership of voting securities, by contract or otherwise.

<u>Article 20.</u>     <u>Escrow.</u>

20.1     Escrow Agent shall hold the Deposit, together with all interest earned thereon, in its interest-bearing escrow account, in accordance with the following:

(a)     Escrow Agent shall hold the Deposit, together with all interest earned thereon, in Escrow Agent's escrow account at a national bank selected by Escrow Agent in its reasonable discretion.  All interest will accrue to and be reported to applicable taxing authorities, including the Internal Revenue Service, for the account of Seller.  Such party shall supply the Escrow Agent with a completed Form W-9, concurrently with the execution of this Agreement. Escrow Agent shall have no liability for any fluctuations in the interest rate paid on the Deposit, and is not a guarantor thereof.  Failure of the parties to provide the W-9 will result in the Deposit being placed in a non-interest bearing account.

(b)     At Closing, the Deposit, together with any interest accrued thereon, shall be credited to the Purchase Price and shall be paid by Escrow Agent to Seller.  At Closing, interest on the Deposit shall be paid to Seller as payment towards the Balance of the Purchase Price.  If Escrow Agent receives a written notice signed by both Seller and Purchaser that this Agreement has been terminated or canceled, Escrow Agent shall deliver the Deposit, together with the interest thereon, as directed therein.

(c)     If Escrow Agent receives a written request signed by Purchaser or Seller (the "<u>Noticing Party</u>") stating that this Agreement has been canceled or terminated and that the Noticing Party is entitled to the Deposit, or that the other party hereto (the "<u>Non-Noticing Party</u>") has defaulted in the performance of its obligations hereunder, Escrow Agent shall overnight by nationally recognized courier and e-mail a copy of such request to the Non-Noticing Party.  The Non-Noticing Party shall have the right to object to such request for the Deposit by written notice of objection delivered to and received by Escrow Agent within ten (10) Business Days after the Non-Noticing Party's receipt of such copy, but not thereafter.  If Escrow Agent shall not have so received a timely written notice of objection from the Non-Noticing Party, Escrow Agent shall deliver the Deposit, together with the interest earned thereon, to the Noticing Party.  If Escrow Agent shall have received a written notice of objection within the time herein prescribed, Escrow Agent shall refuse to comply with any requests or demands from either party and shall continue to hold the Deposit, together with any interest earned thereon, until Escrow Agent receives either (a) a written notice signed by both Seller and Purchaser stating who is entitled to the Deposit (and interest) or (b) a final order of a court of competent jurisdiction directing disbursement of the Deposit (and interest) in a specific manner, in either of which events Escrow Agent shall then disburse the Deposit, together with the interest earned thereon, in accordance with such notice or order.  Escrow Agent shall not be or become liable in any way or to any person for its refusal to

39

comply with any such requests or demands until and unless it has received a direction of the nature described in subdivision (a) or (b) above.

20.2    Any notice to Escrow Agent shall be sufficient only if received by Escrow Agent within the applicable time period set forth herein.  All mailings and notices from Escrow Agent to Seller and/or Purchaser, or from Seller and/or Purchaser to Escrow Agent, provided for in this Article 20 shall be addressed to the party to receive such notice at its notice address set forth in Article 17 above (with copies to be similarly sent to the additional persons therein indicated), but the provisions of Article 17 relating to the manner of giving notices and the effective dates thereof shall have no application to the provisions of this Article 20.

20.3    Notwithstanding the foregoing, if Escrow Agent shall have received a written notice of objection as provided for in Section 20.1(c) above within the time therein prescribed, or shall have received at any time before actual disbursement of the Deposit a written notice signed by either Seller or Purchaser disputing entitlement to the Deposit or shall otherwise believe in good faith at any time that a disagreement or dispute has arisen between the parties hereto over entitlement to the Deposit (whether or not litigation has been instituted), Escrow Agent shall have the right, upon written notice to both Seller and Purchaser, (a) to deposit the Deposit, together with the interest earned thereon with the Clerk of the Court in which any litigation is pending and/or (b) to take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, the depositing of the Deposit, together with the interest earned thereon, with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder, except for any previous gross negligence or willful misconduct.

20.4    Escrow Agent is acting hereunder without charge as an accommodation to Purchaser and Seller, it being understood and agreed that Escrow Agent shall not be liable for any error in judgment or any act done or omitted by it in good faith or pursuant to court order, or for any mistake of fact or law.  Escrow Agent shall not incur any liability in acting upon any document or instrument believed thereby to be genuine.  Escrow Agent is hereby released and exculpated from all liability hereunder, except only for willful misconduct or gross negligence.  Escrow Agent may assume that any person purporting to give it any notice on behalf of any party has been authorized to do so.  Escrow Agent shall not be liable for, and Purchaser and Seller hereby jointly and severally agree to indemnify Escrow Agent against, any loss, liability or expense, including reasonable attorney's fees, arising out of any dispute under this Agreement, including the cost and expense of defending itself against any claim arising hereunder.

20.5    Seller and Purchaser agree that Escrow Agent shall not be liable for any loss or impairment of the Deposit while the Deposit is in the course of collection or of the escrow if such loss or impairment results from the failure, insolvency or suspension of the financial institution in which the Deposit is deposited.

20.6    Escrow Agent shall be entitled to select any and all counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Agreement.

ACTIVE 61730742v13

20.7     If either Purchaser or Seller becomes subject to a voluntary or involuntary proceeding under the United States Bankruptcy Code, or if Escrow Agent is otherwise served with legal process which directs Escrow Agent to not disburse the funds deposited with Escrow Agent, Escrow Agent shall have the right to place a hold on funds deposited with Escrow Agent until such time as Escrow Agent receives an appropriate court order or other assurances satisfactory to Escrow Agent (in Escrow Agent's reasonable discretion) establishing that the funds may continue to be held or disbursed, as the case may be, according to the instructions contained in this Agreement.

Article 21.     Intentionally omitted.

Article 22.     Miscellaneous.

22.1     Seller and Purchaser each reserve the right to include this transaction as part of one (1) or more Code Section 1031 tax deferred exchange transactions, at no out-of-pocket cost, expense or liability to the other party hereto (other than de minimis legal fees to review the documentation required to effectuate such transactions), including, without limitation, one (1) or more reverse exchange transactions.  Seller and Purchaser agree to cooperate with the other party hereto, and to execute any and all documents as are reasonably necessary in connection therewith, provided that the closing of the transaction for the conveyance of the Premises shall not be contingent upon, and shall not be subject to, the completion of such exchange, nor shall such affect the Closing Date hereunder.  Purchaser and/or Seller, as applicable, shall be obligated to close title to the Premises on or before the Closing Date whether or not Purchaser and/or Seller, as applicable, shall have consummated a 1031 exchange transaction.  Nothing set forth herein shall require Purchaser to take title to any property other than the Premises described herein.

22.2     All understandings and agreements heretofore had between Seller and Purchaser are merged in this Agreement, which alone completely expresses their agreement, and this Agreement is entered into after full investigation, neither party relying upon any statement or representation made by the other and not embodied in this Agreement.

22.3     Purchaser's acceptance of the Deeds and the Assignment and Assumption of Leases to the Units shall be deemed an acknowledgment by Purchaser that Seller has fully complied with all of its obligations hereunder and under any supplements, side letters, modifications, or amendments to this Agreement; that Seller is discharged therefrom (or Purchaser has waived compliance therewith); and that Seller shall have no further obligation or liability with respect to any of the agreements, representations and/or warranties made by Seller in this Agreement, which shall be merged with the Deeds and the Assignment and Assumption of Leases to the Units; except for those provisions of this Agreement and of any supplements, side letters, modifications, or amendments to this Agreement, which, in any case, expressly provide that certain obligations of Seller shall survive the Closing and except as otherwise set forth in the Closing Documents.

22.4     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.

41

22.5     This Agreement does not constitute an offer to sell and shall not bind Seller unless and until Seller elects to be bound hereby by duly executing and delivering to Purchaser an executed original counterpart hereof.

22.6     This Agreement may only be amended, modified, altered, supplemented or, except as otherwise expressly provided herein, terminated, by a written instrument signed by Seller and Purchaser.

22.7     If any provision of this Agreement or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to parties or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and be enforced to the fullest extent permitted by law.

22.8     This Agreement, and the rights, obligations and relations of the parties hereunder, shall be governed by and construed and enforced in accordance with the laws of the State of New York without giving effect to the conflict-of-law rules and principles of that state.

22.9     Purchaser shall not be permitted to record this Agreement and all recordation offices are specifically instructed not to record the same.  Any recordation or attempted recordation shall constitute an immediate default hereunder and shall entitle Seller to terminate this Agreement and retain the Deposit.  Supplementing the other liabilities and indemnities of Purchaser to Seller under this Agreement, and notwithstanding any other provision of this Agreement (including any provision purporting to create a sole and exclusive remedy for the benefit of Seller), Purchaser agrees to indemnify, defend and hold Seller harmless from and against any and all actual losses, costs, actual damages, liens, claims, counterclaims, liabilities or expenses (including, but not limited to, reasonable attorneys' fees, court costs and disbursements) incurred by Seller arising from or by reason of the recording of this Agreement, any memorandum hereof, or any notice of pendency or any other instrument against the Premises in any case, by Purchaser.  Notwithstanding the foregoing, Purchaser may file a lis pendens or other instrument against all or a portion of the Premises in connection with Purchaser's filing of an action for specific performance in accordance with Section 15.2.

22.10    Purchaser and Seller acknowledge and agree that the sale of the Premises contemplated hereunder shall be made in accordance with the terms and conditions of the Condominium Documents.

22.11    Whenever the time for performance of a covenant or condition required to be performed pursuant to the terms of this Agreement falls upon a Saturday, Sunday or Federal or State of New York holiday, such time for performance shall be extended to the next Business Day.  Otherwise, all references herein to "days" shall mean calendar days.  Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included.

22.12    A facsimile, "pdf" and/or electronic copy of a signed original counterpart of this Agreement shall be deemed sufficient to bind the parties, and shall be deemed an original for all

42

purposes.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when combined, shall constitute one (1) fully executed original document.

22.13   THE PARTIES HERETO WAIVE TRIAL BY JURY IN CONNECTION WITH ANY AND ALL MATTERS ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREUNDER.

22.14   IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER, THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN NEW YORK COUNTY AND AGREE NOT TO RAISE ANY OBJECTION TO SUCH JURISDICTION OR TO THE LAYING OR MAINTAINING OF THE VENUE OF ANY SUCH PROCEEDING IN SUCH COURT.

22.15   The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

22.16   Purchaser agrees that, except as otherwise set forth in this Agreement or provided by law, or unless compelled by an order of a court of competent jurisdiction, it shall keep the contents of this Agreement, Seller's Due Diligence Materials, and any information related to the transactions contemplated hereunder, confidential, unless and until the Closing Date shall occur. Seller and Purchaser further agree to refrain from participating in any publicity statement, press release or other public notice regarding this transaction prior to the Closing Date, without the prior written consent of the other party hereto, unless required under applicable law or by a court order. Following the Closing Date, neither party shall disclose the name or identity of the other party or the material terms of the transaction contemplated hereby in any publicity statement, press release or other public notice, without the prior written consent of the other party hereto, unless required under applicable law or by a court order. Notwithstanding the foregoing, the parties hereto shall be permitted to disclose the terms and conditions of this Agreement to their and their affiliates' respective attorneys, employees, agents, representatives, accountants, lenders and prospective lenders, partners and prospective partners, joint venture partners, consultants, financial analysts, bankers, auditors and other similar persons who reasonably require such information, all of whom shall be advised, in writing, of the confidential nature of this Agreement, as well as in connection with the enforcement of this Agreement.  The provisions of this Section 22.16 shall survive Closing or termination of this Agreement.

22.17   If a suit, action, arbitration, mediation or other action is instituted to interpret or enforce this Agreement, or otherwise concerning this Agreement or the transactions contemplated hereby, the prevailing party (regardless of whether such party prevails on substantive or procedural grounds) pursuant to a final and non-appealable order or judgment shall be entitled to recover from the other party all actual and reasonable costs and expenses of any such action, including, but not limited to, attorneys' fees and expenses, including all such costs and expenses incurred in any trial, on any appeal, in any bankruptcy proceeding (including the adjudication of issues peculiar to bankruptcy law) and in any petition for review.  Each party also shall have the right to recover its

43

costs and attorneys' fees incurred in collecting any sum or debt owed to it by the other party, with or without litigation, if such sum or debt is not paid within fifteen (15) days after written demand following the issuance of the final and non-appealable order or judgment in favor of the prevailing party. The provisions of this Section 22.17 shall survive Closing or termination of this Agreement.

22.18    Seller and Purchaser will do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices, transfers and assurances as may be reasonably required by the other party for carrying out the intentions or facilitating the consummation of this Agreement. The provisions of this Section 22.18 shall survive the Closing.

22.19    Notwithstanding anything to the contrary herein, Purchaser on its own behalf and on behalf of Purchaser Related Parties, hereby agrees that in no event or circumstance shall any of the Seller Related Parties have any personal liability under this Agreement. Seller on its own behalf and on behalf of the Seller Related Parties hereby agrees that in no event shall any of the Purchaser Related Parties have any personal liability under this Agreement. The provisions of this Section 22.19 shall survive the termination of this Agreement and the Closing.

*[NO FURTHER TEXT ON THIS PAGE. SIGNATURE PAGE FOLLOWS.]*

*ACTIVE 61730742v13*

**IN WITNESS WHEREOF**, Seller and Purchaser have each duly executed this Agreement as of the date first above written.

PURCHASER:

**CSC HUDSON, LLC**,
a Delaware limited liability company

By: _____
Name:  Sal Smeke
Title: Authorized Signatory

[Signatures Continue on Following Page]

[Signature Page to Purchase and Sale Agreement]

SELLER:

**EC 58TH STREET LLC**,
a Delaware limited liability company

By: _____

Name: Anthony D. Minella

Title: President

[Signatures Continue on Following Page]

[Signature Page to Purchase and Sale Agreement]

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in <u>Article 20</u> hereof:

<u>ESCROW AGENT</u>:

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
Name: PATRICIA A. LAPORTA
Title: VP, MGE CANGER

[Signature Page to Purchase and Sale Agreement]

## EXHIBIT A

## LEGAL DESCRIPTION OF THE UNITS

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Units Nos. 1, 2 ,4 and 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lots 1701, 1702, 1704 and 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701), **46.94011 %** interest (as to Unit 2, Lot 1702), **0.34577 %** interest (as to Unit 4, Lot 1704) and **3.89067 %** interest (as to Unit 6, Lot 1706) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

As to Unit 1704, the premises hereby insured is the leasehold interest originally demised by that certain Lease dated as of 1/1/1999 made by and between Adrienne Schatz (a/k/a Adrianne Wachsler) and Cheryl Hirsch, as landlord and Henry Hudson Holdings LLC, as tenant, a Memorandum of which was dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2172 (as subsequently amended and assigned).

As to Unit 1706, the premises hereby insured is the leasehold interest originally demised by that Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant, (as subsequently amended and assigned).

**EXHIBIT A**

**ALL THAT CERTAIN** plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of West 57th Street;

RUNNING THENCE easterly along the said northerly side of West 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of West 58th Street;

THENCE westerly along the said southerly side of West 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of West 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel, more or less, with West 58th Street, 20 feet;

THENCE southerly and part of the way through a party wall, 100 feet to the northerly side of West 57th Street, the point or place of BEGINNING.

For Information Only:   Said premises are known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 358-366 West 58th Street, Units 1, 2, 4 and 6, New York, NY and designated as Block 1048 Lots 1701, 1702, 1704 and 1706  as shown on the Tax Map of the City of New York, County of New York

*ACTIVE 62699126v2*

## EXHIBIT B

## FORM OF CONDOMINIUM UNIT DEED

Attached

**FORM OF CONDOMINIUM UNIT DEED**

**EC 58TH STREET LLC, GRANTOR**

**TO**

**[_____], GRANTEE**

**CONDOMINIUM UNIT[S] DEED[1]**

353-361 West 57th Street a/k/a 356 West 58th Street
Unit[s] 1 [and 2]
New York, New York 10019

| | |
|---|---|
| **County:** | **New York** |
| **Block:** | **1048** |
| **Lots:** | **1701 [and 1702]** |

**Record and Return To:**

**Cole Schotz P.C.**
**1325 Avenue of the Americas**
**19th Floor**
**New York, NY 10019**
**Attn: Jordan Metzger**

---

[1] Purchaser reserves the right to bifurcate this Deed into separate deeds for each Unit, potentially with different Purchaser entities taking title to each Unit.

61458/0006-42437678v1
*ACTIVE 62692978v3*

## CONDOMINIUM UNIT[S] DEED

**THIS INDENTURE**, made as of the ___ day of _____, 2022, by EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022, (hereinafter referred to as the "**Grantor**") to [_____], a Delaware limited liability company having an address at c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 (hereinafter referred to as the "**Grantee**").

W I T N E S S E T H:

That the Grantor, in consideration of Ten ($10.00) Dollars and other valuable consideration, paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs or successors and assigns of the Grantee, forever:

The Condominium Unit[s] (the "**Unit[s]**") in the premises known as 353 West 57th Street Condominium in the Building (the "**Building**") located and known as and by street address 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, (the "**Property**"), designated and described as Unit No. 1 [and Unit No. 2] in that certain declaration of condominium (the "**Declaration**") establishing a plan for condominium ownership of the Building and the land upon which it is situate (the "**Land**") under Article 9-B of the Real Property Law of the State of New York, dated April 11, 1985 and recorded on April 24, 1985 in Reel 902 Page 1, which Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 and was further amended by the Amended and Restated Declaration, dated as of February 12, 1999 and recorded July 16, 1999 in Reel 2913 Page 1753 and further amended by Amendment to Amended and Restated Declaration dated as of September 30, 1999 and recorded October 27, 1999 in Reel 2979 Page 2159 (which Declaration as amended is hereinafter referred to as the "**Declaration**"). The Unit[s] [is/are] also designated as Tax Lot[s] 1701 [and 1702] in Block 1048 Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of The City of New York and on the Floor Plans of the Building, certified by Butler Rogers Baskett Architects on March 27, 1985 and also filed with the Real Property Assessment Department of the City of New York on April 22, 1985 as Condominium Plan No. 208, and also filed in the New York County Register's Office on April 24, 1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects on December 14, 1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on May 5, 1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on May 11, 1993 as Condominium Map No. 5192.

The Unit[s] together with their undivided percentage interests in common elements and the premises within which the Unit[s] [is/are] located [is/are] more particularly described in Exhibit A attached hereto and made a part hereof. All capitalized terms herein which are not separately defined herein shall have the meanings given to those terms in the Declaration or in the by-laws of 353 West 57th Street Condominium (said by-laws, as the same may be amended from time to time, are hereinafter referred to as the "**By-Laws**").

61458/0006-42437678v1
*ACTIVE 62692978v3*

Being the same premises conveyed to Grantor from Henry Hudson Holdings, LLC by Deed in Lieu of Foreclosure dated 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344628.

Together with the appurtenances and all the estate and rights of the Grantor in and to the Unit[s]; and

Together with, and subject to, the rights, obligations, easements, restrictions and other provisions set forth in the Declaration and the By-Laws, all of which shall constitute covenants running with the Land shall bind any person having at any time any interest or estate in the Unit[s], as though recited and stipulated at length herein.

Subject to such other liens, agreements, covenants, easements, restrictions and other matters of record as pertain to the Unit[s] and/or the Property.

**TO HAVE AND TO HOLD** the premises herein granted unto Grantee, the heirs or successors and assigns of the Grantee, forever.

If any provisions of the Declaration or the By-Laws is invalid under, or would cause the Declaration or the By-Laws to be insufficient to submit the Property to the provisions of the New York Condominium Act, or if any provision· that is necessary to cause the Declaration and the By-Laws to be sufficient to submit the Property to the provisions of the New York Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are insufficient to submit the Property to the provisions of the New York Condominium Act, the applicable provisions of Article 26 of the Declaration shall control.

Except as otherwise provided in the Declaration or the By-Laws, the Unit[s] are intended for any lawful use.

The Grantor, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purposes of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws (and any Rules and Regulations adopted under the By-Laws) and agrees to comply with all the terms and provisions thereof.

The term "Grantee" shall be read as "Grantees" whenever the sense of this indenture so require.

**[SIGNATURES PAGE FOLLOWS]**

3

61458/0006-42437678v1
*ACTIVE 62692978v3*

**IN WITNESS WHEREOF**, the Grantor has duly executed this deed on the date first above written.

**EC 58TH STREET LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:

STATE OF NEW YORK   )
                :    ss.:
COUNTY OF NEW YORK  )

On the ___ day of _____ 2022 before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public (SEAL)

4

## EXHIBIT A

### Premises

<u>PARCEL I (Unit 1 a/k/a EBC Unit, Lot 1701)</u>:


The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 1, also known as EBC Unit, in the building (hereinafter referred to as the "Building") known as 353 West 57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is mor'< particularly described below), and which Declaration was recorded in the Office of the City Register New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot 1701 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/2711985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No.208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium MapNo. 5192.


Together with an undivided 44.05105% interest in the common elements (as such term is defined in The Declaration

[PARCEL II (Unit 2 a/k/a Modified Hotel Unit, Lot 1702):


The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 2, also known as Modified Hotel Unit, in the building (hereinafter referred to as the "Building") known as 353 West57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is more particularly described below), and which Declaration was recorded in the Office of the City Register, New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and

61458/0006-42437678v1
*ACTIVE 62692978v3*

recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot 1702 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/27/1985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the 'New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium Map No. 5192.

Together with an undivided 46.94011% interest in the common elements (as such term is defined in the Declaration.

Which Condominium Unit[s] [is/are] located on the land described below:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street, 20 feet; and

THENCE southerly and part of the way through another party wall, 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

Premises known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 358-366 West 58th Street, Unit[s] [1 and 2] New York, NY and designated as Block 1048 Lot[s] [1701 and 1702] as shown on the Tax Map of the City of New York, County of New York.

61458/0006-42437678v1
*ACTIVE 62692978v3*

## EXHIBIT C

## ASSIGNMENT AND ASSUMPTION OF LEASE

**KNOW ALL MEN BY THESE PRESENTS** that **[_____]** ("**Assignor**"), in consideration of Ten ($10.00) Dollars and other good and valuable consideration in hand paid by [_____], a [_____] ("**Assignee**"), the receipt and sufficiency of which is hereby acknowledged, hereby assigns unto the Assignee all of Assignor's right, title and interest in and to the following:

That certain Lease agreement more fully described on Exhibit A attached hereto and made a part hereof (the "**Unit Lease**") on the land described on Exhibit B attached hereto and made a part hereof, being the same leasehold premises conveyed to Assignor by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as [CRFN 2020000344629] [CRFN 2020000344630].  This Assignment shall include, without limitation, an assignment of Assignor's right, title and interest in and to the "Security" and/or the "Security Deposit" under the Unit Lease (only if and to the extent that the lessor under the Unit Lease ("**Unit Lessor**") is holding any such "**Security**" and/or the "**Security Deposit**"), as well as all options, rights of first refusal, deposits, pre-paid rentals, privileges and other rights of Assignor thereunder.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, from and after the date hereof, subject to the terms, covenants, conditions and provisions contained in the Unit Lease.

1.     Assignee on behalf of itself and its legal representatives, successors and assigns, hereby expressly assumes the performance of all of the terms, covenants and conditions of the Unit Lease herein assigned by Assignor to Assignee from and after the date hereof and hereby agrees to be bound by all of the terms, covenants, conditions and provisions contained in the Unit Lease from and after the date hereof.

2.     None of the covenants or agreements set forth in this Assignment are for the benefit of, and none of the same shall be enforceable by, any person or entity other than the parties hereto and Unit Lessor, their respective successors and assigns, it being the intention of the parties hereto that no third party is intended to be a beneficiary of or with respect to such covenants and agreements, other than the parties hereto, their respective successors and assigns.

3.     Assignor, in compliance with Section 13 of the Lien Law, covenants that Assignor will receive the consideration for this assignment and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any purpose.

4.     This Assignment has been made, executed and delivered in and is to be governed, interpreted and construed in accordance with the laws of the State of New York.

61458/0006-42420767v2
*ACTIVE 62692929v3*

5.      Except as may be expressly set forth in that certain Purchase and Sale Agreement dated _____, 2022 between Assignor, as seller, and Assignee as buyer (the "Agreement"), this assignment is made without warranty or representation, express or implied, by or recourse against Assignor of any kind or nature whatever.

6.      No shareholder, member, officer, director, manager or representative of Assignor or Assignee or any other person or entity other than Assignor and Assignee shall have any personal liability or obligation of any kind or nature whatsoever under this Assignment.

This Assignment may be signed in any number of counterparts each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  This Assignment may be executed by facsimile, electronic communications in portable document format (.pdf) or duplicate originals, and the parties agree that their electronically transmitted signatures shall have the same effect as manually transmitted signatures.

[ NO FURTHER TEXT ON THIS PAGE ]

61458/0006-42420767v2
*ACTIVE 62692929v3*

**IN WITNESS WHEREOF**, the parties hereto have set their hands of the _____ day of _____, 2022.

**ASSIGNOR:**

**By:**_____

**ASSIGNEE:**

**By:**_____

STATE OF NEW YORK      )
                                        :        ss.:
COUNTY OF NEW YORK  )

On the ____ day of _____ 2022 before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public (SEAL)

STATE OF NEW YORK      )
                                        :        ss.:
COUNTY OF NEW YORK  )

On the ____ day of _____ 2022 before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public (SEAL)

61458/0006-42420767v2
*ACTIVE 62692929v3*

**Exhibit A**

4

**Exhibit B**

Premises known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 358-366 West 58th Street, Unit [4] [6] New York, NY and designated as Block 1048 Lot [1704] [1706] as shown on the Tax Map of the City of New York, County of New York.

5

61458/0006-42420767v2
*ACTIVE 62692929v3*

## EXHIBIT D

## FORM OF BILL OF SALE

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS,

That, subject to the terms and conditions hereinafter set forth, [_____], a Delaware limited liability company having an address c/o [_____] (collectively, "**Seller**") for and in consideration of the sum of Ten Dollars ($10.00), lawful money of the United States, to it in hand paid at or before delivery of these presents by [_____], a Delaware limited liability company having an address at _____ ("**Purchaser**"), the receipt and sufficiency of which Seller hereby acknowledges, has bargained and sold, and by these presents does grant and convey unto Purchaser, its successors and assigns, all right, title and interest of Seller in and to all of the Personal Property, Fixtures, Warranties, and Permits (as such terms are defined in that certain Purchase and Sale Agreement, dated _____, 2022, between Seller and Purchaser (the "**Agreement**")).

Seller grants and conveys the Personal Property, Fixtures, Warranties, and Permits unto Purchaser without recourse and without representation or warranty of any kind, express or implied (except to the extent of and only for so long as any applicable representation and warranty, as is set forth in the Agreement shall survive the closing of title thereafter, and subject to the limitations contained therein).

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns forever.

SELLER HAS MADE NO WARRANTY THAT THE PROPERTY COVERED BY THIS BILL OF SALE IS MERCHANTABLE OR FIT FOR ANY PARTICULAR PURPOSE AND THE SAME IS SOLD IN AN "AS IS" "WHERE IS" CONDITION.  BY ACCEPTANCE HEREOF, PURCHASER AFFIRMS THAT IT HAS NOT RELIED ON ANY WARRANTY OF SELLER WITH RESPECT TO THE PERSONAL PROPERTY AND THAT THERE ARE NO REPRESENTATIONS OR WARRANTEES, EXPRESSED, IMPLIED OR STATUTORY (EXCEPT TO THE EXTENT AND ONLY FOR SO LONG AS ANY APPLICABLE REPRESENTATION AND WARRANTY, IF ANY, IS AS SET FORTH IN THE AGREEMENT SHALL SURVIVE THE CLOSING OF TITLE THEREUNDER, AND SUBJECT TO THE LIMITATIONS CONTAINED THEREIN.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of New York.

This Bill of Sale shall be binding upon, enforceable by and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[Signature page follows immediately]

[_____]

**By:**_____

2

61458/0006-42442731v1
*ACTIVE 62690256v2*

**EXHIBIT E**

**EC 58th Street LLC**

[_____]
[_____]
[_____]

353 West 57th Street
New York, New York 10019

Dear Tenant:

This letter is to notify you that effective _____, 2022, EC 58th Street LLC has sold its interest in [Unit #1, 4 and 6] in 353 West 57th Street, New York, New York to _____. In connection therewith EC 58th Street LLC has assigned the interest as landlord in all leases and tenancies and transferred all security deposits, if any, to _____.

Please forward all rent checks and inquiries direct to the new owner's representative at the address listed below.

New Owner:        _____

Address:           _____
                   _____

Telephone          _____

Attn:              _____

Very truly yours,

EC 58th Street LLC

By: _____

## <u>EXHIBIT F</u>

### FORM OF FIRPTA AFFIDAVIT

### CERTIFICATION OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code of 1986, as amended, provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person for U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____ a _____ ("<u>Seller</u>"), the undersigned hereby certifies the following on behalf of Seller:

1.      Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Seller is not a disregarded entity as defined in Treasury Regulation Section 1.1445-2(b)(2)(iii);

3.      Seller's U.S. tax identification number is _____; and

4.      Seller's office address is _____

Seller understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that the undersigned has examined this certification and to the best of the undersigned's knowledge and belief it is true, correct, and complete, and the undersigned further declares that the undersigned has authority to sign this document on behalf of Seller.

Dated: _____ ___, 2022

_____ a

_____

By:_____

**EXHIBIT G**

FORM OF UNIT LEASE ESTOPPEL

Attached

## LEASE ESTOPPEL CERTIFICATE

Landlord:     A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 250 West 57th Street, Suite 901, New York, NY 10107

Tenant:     EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee:     _____, a Delaware limited liability company, having an address of _____.

Premises:     353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 4

The undersigned Landlord, A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 250 West 57th Street, Suite 901, New York, NY 10107 (the "Landlord"), successor to Adrienne Schatz and Cheryl Hirsh as fee owner of the condominium unit known as Unit No. 4 (the "Store Unit") in the condominium known as 353 West 57th Street Condominium in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "Premises") and described on Exhibit A attached hereto, is Lessor under that certain Lease dated as of January 1, 1999 made by Adrienne Schatz and Cheryl Hirsh as original Landlord and Henry Hudson Holdings LLC, as original Tenant, as referenced in a memorandum of lease dated as of September 30, 1999 and recorded on October 27, 1999 in Reel 2979 Page 2172 ("Store Unit Lease"), as amended by an unrecorded Amendment to Lease dated as of September 30, 1999, and as further amended by an unrecorded Amendment to Lease dated as of August 13, 2004, and as assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC, as assignee, dated as of November 24, 2020, recorded on December 4, 2020 in CRFN 2020000344629, hereby certifies as follows:

1.     The Store Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented. There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Store Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

2.     The lease term under the Store Unit Lease commenced on January 1, 1999 and expires on December 31, 2098, unless sooner terminated or extended in accordance with the terms of the Store Unit Lease. There are no options to renew.

3.     The amount of Monthly Base Rent under the Store Unit Lease is currently $_____ per month.

4.      The Monthly Base Rent and all other charges (if any) have been paid through _____.

5.      There are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Store Unit Lease other than _____.

6.      Landlord is holding a security deposit under the Store Unit Lease in the amount of $_____.  None of the security deposit has been applied by Landlord to payment of rent or any other amounts due under the Store Unit Lease, except as follows: _____.

7.      There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Store Unit.

8.      As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Store Unit Lease other than as described in the Store Unit Lease exist.

9.      Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, and all of their respective successors and assigns.

10.     Landlord's address for notices under the Store Unit Lease is:

> A & C West 57 LLC
> c/o Schatzco V, LLC
> 250 West 57th Street
> Suite 901
> New York, New York 10107
> Attn: _____
>
> With a copy to:
> [                    ]
> [                    ]
> [                    ]

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Store Unit Lease.

[The remainder of this page is left blank intentionally.]

2

**LANDLORD:**

A & C WEST 57 LLC
a New York limited liability company


By: _____

      Name:_____

      Title: _____

3

EXHIBIT A

Legal Description of Premises and the Store Unit

The Condominium Unit (the "Unit") known as the Store Unit, also known as Unit No. 4 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Store Unit and also known as Unit No. 4 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16. 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1704 in Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building Containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lyingand being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

*TOGETHER* with an undivided 0.34577 interest in the Common Elements (as such term is defined in the Declaration).

4

61458/0006-42435628v2
*ACTIVE 62692814v1*

## LEASE ESTOPPEL CERTIFICATE

Landlord:     Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019

Tenant:      EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee:     _____, a Delaware limited liability company, having an address of_____.

Premises:     353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 6

The undersigned Landlord, Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019 (the "Landlord"), successor to Adrienne Schatz and Cheryl Hirsh, as Executrices of the last will and testament of Irving Schatz, as fee owner of the condominium unit known as Unit No. 6 (the "Tenth Floor Unit") in the condominium  known as 353 West 57th Street Condominium, in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "Premises") and described on Exhibit A attached hereto, is Lessor under that certain Amended and Restated Lease dated as of February 11, 1999 made by Irving Schatz, as original Lessor and Ian Schrager Hotels LLC, as original Lessee, as referenced in a memorandum of lease dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1872 (the "Tenth Floor Unit Lease"), as assigned by Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC, as assignor, to Henry Hudson Holdings LLC, as assignee, dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1882, and as amended by an unrecorded Amendment to Lease made by and between Irving Schatz and Henry Hudson Holdings LLC dated as of August 17, 2004, and as further assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC as assignee, dated as of November 24, 2020 and recorded December 4, 2020 in CRFN 2020000344630, hereby certifies as follows:

1.      The Tenth Floor Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented.  There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Tenth Floor Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

*ACTIVE 62692815v1*

61458/0006-42435625v2

**2.**     The lease term under the Tenth Floor Unit Lease commenced on December 1, 1997 and expires on November 30, 2096, unless sooner terminated or extended in accordance with the terms of the Tenth Floor Unit Lease.  There are no options to renew

**3.**     The amount of Monthly Base Rent under the Tenth Floor Unit Lease is currently $_____ per month.

**4.**     The Monthly Base Rent and all other charges (if any) have been paid through _____.

**5.**     There are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Tenth Floor Unit Lease other than _____.

**6.**     Landlord is holding a security deposit under the Tenth Floor Unit Lease in the amount of $_____.  None of the security deposit has been applied by Landlord to payment of rent or any other amounts due under the Tenth Floor Unit Lease, except as follows: _____.

**7.**     There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Tenth Floor Unit.

**8**.     As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Tenth Floor Unit Lease other than as described in the Tenth Floor Unit Lease exist.

**9**.     Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, and all of their respective successors and assigns.

**10.**     Landlord's address for notices under the Tenth Floor Unit Lease is:

> Hudson 10th Floor LLC
> c/o SchatzCo V, LLC
> 1325 Avenue of the Americas, 28th Floor
> New York, New York 10019
>
> With a copy to:
> [                    ]
> [                    ]
> [                    ]

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Tenth Floor Unit Lease.

2

61458/0006-42435625v2
*ACTIVE 62692815v1*

**LANDLORD:**

HUDSON 10TH FLOOR LLC
a Delaware limited liability company


By: _____
        Name:_____
        Title: _____

3

EXHIBIT A

Legal Description of the Premises and Tenth Floor Unit

The Condominium Unit (the "Unit") known as the Tenth Floor Unit, also known as Unit 6 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Tenth Floor and also known as Unit 6 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16, 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1706, Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

4

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

Together with an undivided 3.89067% interest in the Common Elements (as such term is defined in the Declaration).

5

## **EXHIBIT H**

FORM OF CONDOMINIUM ESTOPPEL

<u>Attached</u>

CONDOMINIUM ESTOPPEL CERTIFICATE

TO:

CSC Hudson LLC ("Purchaser")
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013


Re:    The (i) declaration of condominium dated April 11, 1985 made by Irving Schatz (the "Original Declaration") pursuant to Article 9-B of the Real Property Law of the State of New York, as amended establishing a plan for condominium ownership of which Original Declaration was recorded in the New York County Office of the Register of the City of New York on April 24, 1985 in Reel 902 Page 1, which Original Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 and which Original Declaration was further amended by the Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch (the "A&R Declaration"), which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety), and which A&R Declaration was amended by the Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159 (collectively, the "Declaration"); (ii) by-laws, including the rules and regulations and all other exhibits and schedules attached thereto (the "By-Laws") of 353 West 57th Street Condominium (the "Condominium"); and (iii) Purchase and Sale Agreement (the "PSA"), dated January ___, 2022, by and between the EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (the "Seller"), and CSC Hudson, LLC, a Delaware limited liability company, having an address at c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 ("Purchaser") for the conveyance of Unit 1 and Unit 2 of the Condominium (the "Owned Units") and Unit 4 and Unit 6 of the Condominium (the "Leased Units") (collectively, the "Units"). Capitalized terms used herein and not defined shall have the meaning ascribed to such terms in the Condominium Documents and the PSA.

The undersigned is a duly authorized representative of the Board of Managers of the Condominium (the "Board"). The Board, hereby certifies to Purchaser as follows:

1.    All Common Charges with respect to the Units which are due have been paid in full and, there are no outstanding liens, claims, dues or charges (including, without limitation, Common Charge Liens) due to the Condominium with respect to the Units. There are no pending emergency or special assessments, capital improvements, remedial assessments, unpaid liens or other financial obligations imposed by the Board with respect to the Units, and the Seller is current in regard to all its financial obligations to the Board and the Condominium.

" = "1" "" ""
61458/0006-42435629v2
*ACTIVE 62690184v1*

2. The current total monthly Common Charges for the Units are as follows:

      a. Unit 1: $0.00.

      b. Unit 2: $0.00.

      c. Unit 4: $0.00.

      d. Unit 6: $0.00.

3. Neither the Board nor any party to any Condominium Document has a right of first refusal to lease or purchase the Units and Seller may freely without hindrance lease or sell the Units pursuant to the express terms of the Condominium Documents.

4. The Board has no claims, demands, or offset rights against Seller.

5. The Declaration and By-Laws are in full force and effect and have not been modified or supplemented or amended except as set forth above.

6. To the actual knowledge of the undersigned on behalf of the Board, neither the Units nor Seller is in violation or breach of, or in default under, any of the Condominium Documents, and the Board has no actual knowledge of any event or condition which, with the passage of time or the giving of notice or both, would constitute such a violation, breach or default by the Units or Seller. To the best of the knowledge of the undersigned on behalf of the Board, the Board has not received written notice of any claims, demands, causes of action or proceedings, pending or threatened, against the Units or Seller.

7. The undersigned representative of the Board agrees that this Estoppel Certificate may be relied upon by Purchaser, any assignee of Purchaser's rights under the PSA (collectively, "Assignee"), any mortgagee of Purchaser, any mortgagee of Assignee, and all of their respective successors and assigns.

8. The undersigned representative of the Board is duly authorized and fully qualified to execute this Estoppel Certificate on behalf of the Board thereby binding the Board and the Condominium.

EXECUTED this _____ day of _____, 2022.

**THE BOARD OF MANAGERS OF**
**353 WEST 57TH STREET**
**CONDOMINIUM**

By:_____
    Name:

v4 (71728.00003.001)

# EXHIBIT I-1

FORM OF CBA ASSUMPTION AGREEMENT

<u>Attached</u>

Exhibit I-1

ASSUMPTION AGREEMENT

This Agreement (the "Agreement") made as of this _ day of _____, 2022, by and between PURCHASER NAME, on its own behalf and on behalf of any affiliated or related entity and any current or future owner, manager or operator, and their respective successors or assigns (collectively, "Purchaser"), and the New York Hotel and Motel Trades Council, AFL-CIO ("Union").

Whereas, Purchaser has agreed to purchase the hotel known as "[HOTEL NAME]" (the "Hotel"), from the current owner, [SELLER NAME] ("Seller"); and

Whereas, Seller is bound to, *inter alia*, Article 59 of the collective bargaining agreement known as the Industry Wide Agreement between the Union and the Hotel Association of New York City, Inc. ("IWA"); and

Whereas, Article 59 of the IWA requires successors, assigns and transferees ("successor") to be bound to the IWA;

Whereas, Purchaser agrees that it will be a successor to the obligations under the IWA;

Now, therefore it is agreed:

1.     Purchaser agrees that it shall retain all current bargaining unit employees, whose employment will continue uninterrupted and without loss of seniority, compensation, benefits or fringe benefits, and with no adverse effect on other terms and conditions of employment, subject to the IWA and applicable law.

2.     Purchaser agrees that, effective as of the date of the closing, it has assumed, adopted and is bound by all of the terms, both economic and non-economic, of the IWA and those agreements and practices supplementing the IWA.

3.     By virtue of the closing, Purchaser acknowledges that no new verification of currently valid I-9 forms will be necessary.

4.     Effective immediately any and all disputes between the parties hereto or regarding the interpretation or application of this Agreement shall be subject to the grievance and arbitration provisions of the IWA, the entirety of which is incorporated herein by reference.

*[Signatures appear on the following page]*

*ACTIVE 62690213v2*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first set forth above herein.

**UNION**

New York Hotel and Motel Trades Council, AFL-CIO

By: _____

Name: _____

Title:_____

Authorized to Sign

Dated:_____

**PURCHASER**

PURCHASER NAME

By: _____

Name: _____

Title:_____

Authorized to Sign

Dated:_____

## **EXHIBIT I-2**

FORM OF ALTERNATIVE AGREEMENT

<u>Attached</u>

## <u>MEMORANDUM OF AGREEMENT</u>

This Agreement (the "Agreement") is by, between and among **EC 58th Street LLC d/b/a The Hudson Hotel,** as Seller Party on their own behalf and on behalf of any of their related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (hereinafter referred to as the "Seller"), **CSC Hudson LLC**  on their own behalf and on behalf of any related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (collectively hereinafter referred to as "Purchaser" or "Employer")  and the New York Hotel and Motel Trades Council, AFL-CIO (the "Union" or "HTC").

WHEREAS, the Seller and the Union are bound to the Hotel Association of New York City, Inc. – New York Hotel and Motel Trades Council, AFL-CIO Industry Wide Collectively Bargaining Unit (the CBA referred to as the "IWA") with respect to the property located at 356 West 58th Street, New York, NY 10019 (the "Property").

WHERAS, HTC represents employees employed by Seller and at the Property ("Bargaining Unit") are currently comprised of employees listed in Attachment A ("Current Employees");

WHEREAS, the Seller and Purchaser have discussed a transaction pursuant to which the Seller will sell the Property upon which the former Hudson Hotel (the "Hotel") was operated, which Hotel is subject to the IWA; and

WHEREAS, the Purchaser intends to renovate the Property and operate it as a residential building.

NOW, THEREFORE, IT IS AGREED:

1. Effective immediately upon the Closing of the transaction, the Purchaser shall offer voluntary enhanced severance pay in the amount of thirty-five days (35) days per year of employment with the Hotel ("Enhanced Severance"), in addition to any Article 52 severance, minus any bridge payments already made, less usual statutory deductions, to all of the Hotel's Current Employees, as listed in Attachment A.  The amount of Enhanced Severance will be calculated in accordance with the provisions of IWA Article 52, using the years of service and wage rate as of today's date.  Only Article 52 severance pay shall be subject to Fund contributions.  The payment of Enhanced Severance to the Hotel's Employees as listed in Attachment A shall constitute full satisfaction of any obligation of the Seller and Purchaser under Articles 52 and 57 of the IWA with respect to any employees or former employees of the Hotel.  All employees accepting Enhanced Severance shall, as a condition of receiving same, execute a general release.

2. The Purchaser shall pay withdrawal liability to the Pension Fund in an amount assessed by the Pension fund using the Segal Blend formula in one lump sum payment within 60 days of the receipt of the demand to pay withdrawal liability from the Pension Fund.

3. Purchaser intends to convert the Hotel into market based residential housing or any other use other than a hotel or private membership club (collectively referred to as "converted use").  Unless and until the Purchaser converts the Property into market based residential housing, the IWA shall continue to apply (e.g., the Purchaser obtains all of the necessary

ACTIVE 62680379v2

ACTIVE 62771130v1

permits and approvals and commence renovations).  No engineers shall be laid off during the renovation of the Property.

4.      If Purchaser, or its successor thereafter operates a hotel, private membership club, or food and beverage operation at the Property, or if the residential building offers leases of less than one (1) year, the former Employees shall be recalled and Purchaser, or its successor, shall be subject to the terms and conditions of the IWA and any agreements or practices supplementing the IWA, including the right to daily room clean.  All current employees shall retain their rights to all fairly claimable bargaining unit work at the Property.

5.      Upon Local 94-94A-94B International Union of Operating Engineers, AFL-CIO ("Local 94") presenting signed authorization cards to the Purchaser demonstrating that Local 94 has the support of the majority of engineering bargaining unit employees, the Purchaser shall recognize Local 94 as the exclusive bargaining representative of bargaining unit employees.

6.      Upon Purchaser's recognition of Local 94 as described above in Paragraph 6, the Purchaser agrees to adopt the terms of the Residential Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Local 94-94A-94B International Union of Operating Engineers, AFL-CIO (Local 94 CBA).  The Purchaser shall sign a separate assent to the Local 94 CBA.  No engineer shall be laid off, suffer a loss of hours, hourly or weekly wages, or suffer any other adverse effect as a result of the execution, assignment, or adoption of this Agreement.  It is understood that the current engineering employees will receive enhanced severance pursuant to Paragraph 1 above.

7.      Upon Local 32BJ SEIU ("32BJ") presenting signed authorization cards to the Purchaser demonstrating that 32BJ has the support of the majority of the non-engineering bargaining unit employees, the Purchaser shall recognize 32BJ as the exclusive bargaining representative of bargaining unit employees.

8.      Upon the Purchaser's recognition of 32BJ as described above in Paragraph 4, the Purchaser agrees to adopt the terms of the Apartment Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Service Employees International Union, Local 32BJ ("32BJ Contract"). The Purchaser shall sign a separate assent to the 32BJ Contract.  Bargaining unit positions in the converted use of the Property shall first be offered to Current Employees by seniority.

9.      The HTC will disclaim interest in the above-described Bargaining Unit, upon the Purchaser's recognition of Local 94 and 32BJ as described above in Paragraphs 6 and 8.

10.     This Agreement shall be binding on Purchaser's successors and assigns in accordance with IWA Article 59, the entirety of which is incorporated herein by reference. Purchaser agrees to adopt and assume the IWA subject to this Agreement. Upon closing of the sale of the Property to Purchaser, Seller shall be deemed to have complied with Article 59 of the IWA by virtue of this Agreement.

11.     With the exception of disputes arising under Paragraphs 6 and 8 above, any disputes between the parties or regarding this Agreement shall be subject to binding arbitration

ACTIVE 62680379v2

ACTIVE 62771130v1

pursuant to the grievance and arbitration provisions of the IWA, the entirety of such grievance and arbitration provisions being incorporated herein by reference.  Disputes arising under Paragraphs 7 or 9 above shall be subject to binding arbitration pursuant to the respective grievance and arbitration provisions of the Local 94 or 32BJ Contract, the entirety of such grievance and arbitration provisions being incorporated herein by reference.

12.    This Agreement shall be subject to ratification by the Union.

Dated: _____, 2021

**SELLER:**                                                    **HTC:**


_____                          _____
By:                                                              Richard Maroko
Title:                                                           President
Authorized to Sign                                     Authorized to Sign


**PURCHASER:**                                        **32BJ:**


_____                          _____
By:                                                              By:
Title:                                                           Title:
Authorized to Sign                                     Authorized to Sign


                                                                 **Local 94**


                                                                 _____
                                                                 By:
                                                                 Title:
                                                                 Authorized to Sign


4896-1634-2028, v. 2


*ACTIVE 62680379v2*

*ACTIVE 62771130v1*

## EXHIBIT J

Seller's Bring Down Certificate

## SELLER'S CERTIFICATE

Reference is made to that certain Purchase and Sale Agreement dated as of [_____] [___], 20[__] (the "**Agreement**"), by and between EC 58TH STREET LLC, a Delaware limited liability company, having an address c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (collectively, "**Seller**"), and [_____], having an address c/o [_____] ("**Purchaser**"), for the purchase and sale of the Premises.  All capitalized terms not otherwise defined herein, shall have the meaning ascribed thereto in the Agreement.

Seller hereby certifies to Purchaser that all of the warranties and representations of Seller made in the Agreement are true and correct in all material respects as of the date hereof, except as follows: [_____].

Nothing contained herein shall be deemed to expand the representations and warranties made by Seller under the Agreement or to expand the liability of Seller thereunder.

Dated: _____ __, 20__

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Seller has duly executed this certification the day and year first above written.

**SELLER:**

**EC 58TH STREET LLC**,
a Delaware limited liability company


By:   _____
            Name:
            Title:

*ACTIVE 62709800v2*

## EXHIBIT K

## Form of Assignment and Assumption of Contracts

Attached

### Form of Assignment and Assumption of Contracts

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS (this "**Assignment**"), made as of the [    ] day of [         ], 2022, between EC 58th STREET LLC, a Delaware limited liability company having an address c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (collectively, "**Assignor**") and [                 ], a Delaware limited liability company having an address [                         ] ("**Assignee**"):

### RECITALS

WHEREAS, pursuant to that certain Purchase and Sale Agreement dated as of [         ], between Assignor, as seller, and Assignee, as purchaser (the "**Agreement**"), Assignor is selling the Premises (as such term is more particularly described in the Agreement) to Assignee; and

WHEREAS, in connection with the purchase and sale of the Premises, Assignee has elected (in its sole and absolute discretion) to assume from Assignor, and Assignor is therefore obligated to assign to Assignee, the Assumed Contracts (as defined below), and Assignor and Assignee agree that such assignment and assumption shall be subject to the terms and conditions set forth in this Assignment.

NOW THEREFORE, in consideration of the foregoing promises, covenants and undertakings contained in this Assignment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ASSIGNMENT AND ASSUMPTION

1.      Assignor hereby assigns, transfers, sets-over, delivers and conveys unto Assignee all of the rights, title, interest, benefits and privileges of Assignor, as owner, under all of the service, maintenance, supply and other agreements (collectively, the "Assumed Contracts") in effect relating to the operation of the Premises but only to the extent listed on Schedule A annexed hereto and incorporated herein by this reference, TO HAVE AND TO HOLD all and singular subject as aforesaid, unto Assignee.  This Assignment is made without any recourse and without representation or warranty of any kind, express or implied (except to the extent and only for so long as any representation and warranty, if any, regarding the Assumed Contracts as is set forth in the Agreement shall survive the closing of title thereunder, and subject to the limitations contained therein, which are hereby incorporated herein by reference).

2.      Assignee hereby expressly assumes all of the obligations imposed upon the owner of the Premises under the Assumed Contracts which accrue from and after the date hereof.

3.      This Assignment shall be binding upon, enforceable by and shall inure to the benefit of the parties hereto and their respective successors and assigns.

4.      This Assignment may be signed in multiple counterparts which, when taken together and signed by all parties and delivered to any other party hereto, shall constitute a binding

Assignment between the parties.  Facsimile or portable document format (PDF) copies hereof and facsimile or PDF signatures shall have the same force and effect as originals.

5.    This Assignment shall be governed by and construed in accordance with the laws of the State of New York.

2

61458/0006-42442710v1
*ACTIVE 62690147v2*

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this instrument as of the date first set forth above.

**ASSIGNOR**:

**EC 58th STREET LLC,**
a Delaware limited liability company


By: _____
          Name:
          Title:


[Signatures Continue on Following Page]


[Signature Page to Assignment and Assumption of Contracts]

3

**ASSIGNEE**:

_____,
a Delaware limited liability company]

By:  _____
     Name:
     Title:

[Signature Page to Assignment and Assumption of Contracts]

4

Schedule A to Assignment of Contracts

5

61458/0006-42442710v1
*ACTIVE 62690147v2*

# EXHIBIT L

## Form of Holdback Escrow Agreement

Attached

ESCROW AGREEMENT

This ESCROW AGREEMENT (this "**Escrow Agreement**"), dated as of _____, 2022, is by and among EC 58TH STREET LLC, a Delaware limited liability company ("**Seller**"), [_____], a Delaware limited liability company ("**Purchaser**"), and ROYAL ABSTRACT ("**Escrow Agent**").

RECITALS:

A.      WHEREAS, Seller and Purchaser entered into that certain Purchase and Sale Agreement, effective as of February __, 2022 (the "**Purchase Agreement**").  All initially capitalized terms not otherwise defined in this Escrow Agreement shall have the meaning ascribed to such term in the Purchase Agreement.

B.      WHEREAS, of even date herewith, Seller and Purchaser have consummated the Closing and, in connection therewith, Seller and Purchaser desire to establish an escrow with Escrow Agent pursuant to Section 8.2 of the Purchase Agreement.

C.      WHEREAS, Purchaser and Seller desire to appoint Escrow Agent as the escrow agent pursuant to this Escrow Agreement, and Escrow Agent is willing to act as escrow agent hereunder.

D.      WHEREAS, Escrow Agent has agreed to hold and disburse the Escrow Funds (defined below) pursuant to the terms of this Escrow Agreement.

NOW THEREFORE, in consideration of the covenants and agreements contained in this Escrow Agreement, and intending to be legally bound, the parties hereto agree as follows:

AGREEMENT

ARTICLE I
APPOINTMENT OF ESCROW AGENT

The parties hereto hereby appoint the Escrow Agent to act as escrow agent hereunder, and the Escrow Agent hereby agrees to serve as escrow agent upon the terms and conditions set forth herein. Escrow Agent shall hold, invest and disburse the Escrow Funds in accordance with the terms of this Escrow Agreement, which terms shall include, without limitation, the provisions of Article 3 below.

ARTICLE II
ESCROW

2.1      Escrow.  Seller hereby deposits TWO MILLION ONE HUNDRED THOUSAND AND NO/100  Dollars ($2,100,000.00), (such deposited funds together with any interest earned thereon are hereinafter referred to as the "**Escrow Funds**") into escrow with the Escrow Agent, and the Escrow Agent hereby acknowledges receipt thereof.  Seller hereby expressly confirms that it has instructed Escrow Agent to retain the Escrow Funds from the net sales proceeds payable to Seller upon the Closing under the Purchase Agreement.  The Escrow Funds, together with the interest

1

ACTIVE 62599348v3

ACTIVE 62692824v2

thereon, shall be deposited by Escrow Agent into a federally insured, interest bearing account reasonably acceptable to Seller and Purchaser (the "**Holdback Account**"). Escrow Agent hereby agrees that the Escrow Funds shall not be commingled with any other funds.

2.2     Fee; Waiver of Offset. Escrow Agent was selected as escrow agent and as the title agent, in connection with the Closing under the Purchase Agreement, in part because it agreed to act as Escrow Agent hereunder without any additional consideration due to it, and Escrow Agent acknowledges that it is not due any additional fee for its services hereunder. Escrow Agent agrees that it will not pay or attempt to pay or otherwise satisfy any claim it may have, whether arising under this Agreement or otherwise from the Escrow Funds.

2.3     Disbursement of Escrow Funds. The Escrow Funds shall be held in escrow by Escrow Agent in accordance with the following terms:

2.3.1.   From time to time up until 5:00 p.m. Eastern Standard time on the one hundred fiftieth (150th) day after the Closing Date (the "**Release Date**"), in the event Purchaser makes a claim for a breach of any Surviving Seller Representation ("**Claim**") as specifically set forth in the Purchase Agreement, Purchaser may request payment from the Escrow Funds by giving written notice of its Claim to Escrow Agent and to Seller (the "**Purchaser Claim Notice**"), certifying in such notice the nature of the Claim, the amount thereof if then ascertainable and, if not then ascertainable, a good faith estimate of the amount thereof and the provision(s) of the Purchase Agreement on which the claim is based. If Escrow Agent does not receive a written objection (an "**Objection Notice**") from Seller within ten (10) Business Days after Escrow Agent's receipt of a Purchaser Claim Notice, Seller shall be deemed to have authorized payment of the Purchaser Claim Notice from the Escrow Funds, and Escrow Agent shall promptly pay to Purchaser the amount of such Claim to the extent of the balance of the Escrow Funds. If within such period of ten (10) Business Days, the Escrow Agent shall receive an Objection Notice from Seller, then Escrow Agent shall not pay such claim and reserve and set aside a portion of the Escrow Funds equal to the amount of such Claim (each, a "**Claim Reserve**"); provided, however, that if the corresponding Purchaser Claim Notice specifies that the amount of Claim is not then ascertainable, Escrow Agent shall set aside a portion of the Escrow Funds equal to one hundred ten percent (110%) of the good faith estimate amount set forth in such Claim for such corresponding Claim Reserve.

2.3.2   Upon the receipt by the Escrow Agent of (i) joint written instructions signed by Purchaser and Seller or (ii) a copy of a final and non-appealable determination, finding, judgment and/or award by a court of competent jurisdiction hearing a claim, Escrow Agent shall pay the portion of the Claim Reserve directed to be paid therein to Purchaser or Seller as the case may be.

2.3.3   Delivery of Disbursements. Unless otherwise notified by the recipient of funds from the Escrow Funds, disbursements shall be made by wire transfer to an account designated by the recipient.

2

*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

2.3.4    On Release Date, the balance of the Escrow Funds, less the Claim Reserve and an amount equal to the amount of all Claims made prior to the Release Date for which the time period permitted for Seller to provide an Objection Notice has not elapsed, if any, shall be paid to Seller.  Upon resolution of all remaining timely provided Purchaser Claim Notices and Objection Notices, the remaining balance of the Escrow Funds shall be paid to Seller.

2.3.5    This Escrow Agreement shall terminate upon the disbursement by Escrow Agent of all of the Escrow Funds in accordance with this Escrow Agreement and Escrow Agent shall thereupon be discharged.

ARTICLE III
LIABILITY OF ESCROW AGENT

3.1    Liability of Escrow Agent.  Escrow Agent shall have no liability or obligation with respect to the Escrow Funds except for Escrow Agent's willful misconduct or gross negligence. Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Escrow Agreement.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds is deposited, this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding.

3.2    Authorization of Escrow Agent.  The Escrow Agent is authorized and instructed to comply with orders issued or process entered by any court of competent jurisdiction with respect to the Escrow Funds.  If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

3.3    Indemnification of Escrow Agent.  Seller and Purchaser hereby agree, jointly and severally, to indemnify and hold harmless the Escrow Agent and its directors, officers and employees from and against any and all losses, liabilities, expenses, claims and demands (including reasonable attorneys' fees and expenses) arising out of or in connection with the

3

ACTIVE 62599348v3

ACTIVE 62692824v2

performance of the Escrow Agent's obligations in accordance with the provisions of this Escrow Agreement, except for the Escrow Agent's own gross negligence or willful misconduct. The obligations of Purchaser and Seller under this Section shall survive any termination of this Escrow Agreement.

ARTICLE IV
MISCELLANEOUS

4.1    Assignment; Successors and Assigns; Third Parties. Except as otherwise provided herein, neither Purchaser nor Seller shall convey, assign or otherwise transfer any of its rights or obligations under this Escrow Agreement without the express written consent of the other party. Any conveyance, assignment or other transfer of any of Escrow Agent's rights and obligations under this Escrow Agreement shall require express written consent of both Purchaser and Seller. This Escrow Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Escrow Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the parties hereto and their successors and permitted assigns.

4.2    Tax Reporting. Seller and Purchaser agree that, for tax reporting purposes, all interest or other income earned from the investment of the Escrow Funds in any tax year shall (a) to the extent such interest or other income is distributed by the Escrow Agent to any person or entity pursuant to the terms of this Escrow Agreement during such tax year, be reported as allocated to such person or entity, and (b) otherwise shall be reported as allocated to Seller.

4.3    Entire Agreement. This Escrow Agreement and the Purchase Agreement set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written. In the event of any direct conflict of the terms of this Escrow Agreement with the terms of the Purchase Agreement, the terms of this Escrow Agreement shall control and prevail.

4.4    Severability. If a provision of this Escrow Agreement is deemed to be contrary to law, that provision will be deemed separable from the remaining provisions of this Escrow Agreement, and will not affect the validity, interpretation or effect of the other provisions of either this Escrow Agreement or any agreement executed pursuant to it or the application of that provision to other circumstances not contrary to law.

4.5    Notices. All notices that are required or permitted hereunder shall be in writing and shall be sufficient if personally delivered or sent by registered or certified mail (return receipt requested and postage prepaid), email or Federal Express or other nationally recognized overnight delivery service; provided, however, if such notice is sent by email, a copy of such notice shall also be sent by one (1) of the other foregoing notice methods within one (1) business day after the day that the email notice is sent. Any notice shall be deemed given upon the earlier of the date when received at, or the third day after the date when sent by registered or certified mail or the day after the date when sent by Federal Express or the day of when sent by email to, the address or

4

ACTIVE 62599348v3

ACTIVE 62692824v2

email set forth below, unless such address or email is changed by written notice to the other parties in accordance with this Escrow Agreement:

If to Seller: EC 58th Street LLC
c/o Cain International US Services LP
350 Park Avenue, 14th Floor
New York, New York 10022
Attention: Cain Legal
Email: legal@cainint.com

and: Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, New York 10017
Attention: Farah S. Ahmed, Esq.
Email: ahmedf@gtlaw.com

If to Purchaser: _____
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013
Attention: Sal Smeke and Alberto Smeke
Email: ss@csc-coliving.com
    as@csc-coliving.com

With a copy to: Cole Schotz P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attn: Jordan J. Metzger, Esq.
Email: jmetzger@coleschotz.com

If to Escrow Agent: Royal Abstract
125 Park Avenue, Suite 1610
New York, NY 10017
Attn: Michael J. Roberts, Esq.
Email: mroberts@royalabstract.com

4.6     Expenses. Except as otherwise provided for herein, each party shall be responsible for its own costs and expenses with respect to matters involving this Escrow Agreement.

4.7     Governing Law. This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York.

4.8     Execution Counterparts. This Escrow Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

5

*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

4.9     Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction and interpretation hereof.

4.10     Attorneys' Fees.  If any legal action is brought for the enforcement of this Escrow Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding (together with costs of enforcing any judgments or rulings), in addition to any other relief to which it may be entitled.  In all other matters arising hereunder, each party shall bear its own attorneys' fees.

4.11     Further Assurances.  Each party hereto, at the reasonable request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Escrow Agreement and the transactions contemplated hereby.

4.12     Recitals Incorporated.  The foregoing recitals are hereby incorporated within and made an integral part of this Escrow Agreement as if fully set forth herein.

4.13     No Waiver.  No failure on the part of Purchaser or Seller at any time to require the performance by the other of any provision of this Escrow Agreement shall in any way affect the party's rights to require such performance, nor shall any waiver by any party of any provision hereof be taken or held to be a waiver of any other provision hereof.

[Signature pages follow]

6

IN WITNESS WHEREOF, Seller, Purchaser, and Escrow Agent have executed this Escrow Agreement as of _____ __, 2022.

**<u>SELLER</u>**:

EC 58TH STREET LLC,
a Delaware limited liability company

By:_____
Name:
Title:

[signature pages follow]

**PURCHASER**:

[_____],
a Delaware limited liability company

By: _____
Name: _____
Title: _____

[signature page follows]

**ESCROW AGENT**:

ROYAL ABSTRACT

By: _____
Name: _____
Title: _____

Escrow Agreement – Signature Page
*ACTIVE 62599348v3*

*ACTIVE 62692824v2*

## EXHIBIT M

## Form of Labor Severance Escrow Agreement

Attached

<u>ESCROW AGREEMENT</u>

This ESCROW AGREEMENT (this "**Escrow Agreement**"), dated as of _____, 2022, is by and among EC 58TH STREET LLC, a Delaware limited liability company ("**Seller**"), [_____], a Delaware limited liability company ("**Purchaser**"), and ROYAL ABSTRACT ("**Escrow Agent**").

RECITALS:

A.      WHEREAS, Seller and Purchaser entered into that certain Purchase and Sale Agreement, effective as of February __, 2022 (the "**Purchase Agreement**").  All initially capitalized terms not otherwise defined in this Escrow Agreement shall have the meaning ascribed to such term in the Purchase Agreement.

B.      WHEREAS, of even date herewith, Seller and Purchaser have consummated the Closing and, in connection therewith, Seller and Purchaser desire to establish the Labor Severance Escrow with Escrow Agent pursuant to <u>Section 16.3</u> of the Purchase Agreement.

C.      WHEREAS, after the Closing Date, there are [__][1] weeks remaining in the 30 week severance period provided for in NYC Local Law Int. 2397-2021.

D.      WHEREAS, Purchaser and Seller desire to appoint Escrow Agent as the escrow agent pursuant to this Escrow Agreement, and Escrow Agent is willing to act as escrow agent hereunder.

E.      WHEREAS, Escrow Agent has agreed to hold and disburse the Escrow Funds (defined below) pursuant to the terms of this Escrow Agreement.

NOW THEREFORE, in consideration of the covenants and agreements contained in this Escrow Agreement, and intending to be legally bound, the parties hereto agree as follows:

AGREEMENT

ARTICLE I
APPOINTMENT OF ESCROW AGENT
The parties hereto hereby appoint the Escrow Agent to act as escrow agent hereunder, and the Escrow Agent hereby agrees to serve as escrow agent upon the terms and conditions set forth herein. Escrow Agent shall hold, invest and disburse the Escrow Funds in accordance with the terms of this Escrow Agreement, which terms shall include, without limitation, the provisions of <u>Article 3</u> below.

ARTICLE II
ESCROW
2.1      <u>Escrow</u>.  Seller hereby deposits $[_____] (such deposited funds together with any interest earned thereon are hereinafter referred to as the "**Escrow Funds**"), equal to [_____] weeks of

---

[1] To be completed as of Closing Date.

1

severance pay in the gross sum of $500.00 per week for each employee of the Hotel listed on Schedule A hereto (hereafter referred to as the "**Employees**") into escrow with the Escrow Agent, and the Escrow Agent hereby acknowledges receipt thereof.  Seller hereby expressly confirms that it has instructed Escrow Agent to retain the Escrow Funds from the net sales proceeds payable to Seller upon the Closing under the Purchase Agreement.  The Escrow Funds, together with the interest thereon, shall be deposited by Escrow Agent into a federally insured, interest bearing account reasonably acceptable to Seller and Purchaser (the "**Holdback Account**").  Escrow Agent hereby agrees that the Escrow Funds shall not be commingled with any other funds.

2.2    Fee; Waiver of Offset.  Escrow Agent was selected as escrow agent and as the title agent, in connection with the Closing under the Purchase Agreement, in part because it agreed to act as Escrow Agent hereunder without any additional consideration due to it, and Escrow Agent acknowledges that it is not due any additional fee for its services hereunder.  Escrow Agent agrees that it will not pay or attempt to pay or otherwise satisfy any claim it may have, whether arising under this Agreement or otherwise from the Escrow Funds.

2.3    Disbursement of Escrow Funds.  The Escrow Funds shall be held in escrow by Escrow Agent in accordance with the following terms:

2.3.1.  On a weekly basis, commencing on the Purchaser's (or Purchaser's manager's) first regular payroll date following the Closing Date, Purchaser shall, or shall cause Purchaser's manager to, pay to each of the Employees the gross sum of $500.00 per week (the "**Severance Payments**") for [____] weeks.  Upon Purchaser's submission of a payroll report to Seller and Escrow Agent showing that the Severance Payments have been made, Escrow Agent shall be authorized to release from the Escrow Funds the amount paid in Severance Payments for that week.  Payment of the Severance Payments, and reimbursement of the Purchaser or Purchaser's manager therefor, shall continue for __ weeks.

2.3.2   At the end of [____] weeks, any balance in the Escrow Funds, including any interest earned, shall be returned to Seller.  This Escrow Agreement shall terminate upon the disbursement by Escrow Agent of all of the Escrow Funds in accordance with this Escrow Agreement and Escrow Agent shall thereupon be discharged.

2.3.3   Delivery of Disbursements.  Unless otherwise notified by the recipient of funds from the Escrow Funds, disbursements shall be made by wire transfer to an account designated by the recipient.

ARTICLE III
LIABILITY OF ESCROW AGENT

3.1    Liability of Escrow Agent.  Escrow Agent shall have no liability or obligation with respect to the Escrow Funds except for Escrow Agent's willful misconduct or gross negligence.  Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any

2

information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Escrow Agreement. In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages. Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds is deposited, this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding.

3.2     Authorization of Escrow Agent. The Escrow Agent is authorized and instructed to comply with orders issued or process entered by any court of competent jurisdiction with respect to the Escrow Funds. If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

3.3     Indemnification of Escrow Agent. Seller and Purchaser hereby agree, jointly and severally, to indemnify and hold harmless the Escrow Agent and its directors, officers and employees from and against any and all losses, liabilities, expenses, claims and demands (including reasonable attorneys' fees and expenses) arising out of or in connection with the performance of the Escrow Agent's obligations in accordance with the provisions of this Escrow Agreement, except for the Escrow Agent's own gross negligence or willful misconduct. The obligations of Purchaser and Seller under this Section shall survive any termination of this Escrow Agreement.

ARTICLE IV<br>MISCELLANEOUS

4.1     Assignment; Successors and Assigns; Third Parties. Except as otherwise provided herein, neither Purchaser nor Seller shall convey, assign or otherwise transfer any of its rights or obligations under this Escrow Agreement without the express written consent of the other party. Any conveyance, assignment or other transfer of any of Escrow Agent's rights and obligations under this Escrow Agreement shall require express written consent of both Purchaser and Seller. This Escrow Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Escrow Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the parties hereto and their successors and permitted assigns.

3

4.2     Tax Reporting.  Seller and Purchaser agree that, for tax reporting purposes, all interest or other income earned from the investment of the Escrow Funds in any tax year shall (a) to the extent such interest or other income is distributed by the Escrow Agent to any person or entity pursuant to the terms of this Escrow Agreement during such tax year, be reported as allocated to such person or entity, and (b) otherwise shall be reported as allocated to Seller.

4.3     Entire Agreement.  This Escrow Agreement and the Purchase Agreement set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written. In the event of any direct conflict of the terms of this Escrow Agreement with the terms of the Purchase Agreement, the terms of this Escrow Agreement shall control and prevail.

4.4     Severability.  If a provision of this Escrow Agreement is deemed to be contrary to law, that provision will be deemed separable from the remaining provisions of this Escrow Agreement, and will not affect the validity, interpretation or effect of the other provisions of either this Escrow Agreement or any agreement executed pursuant to it or the application of that provision to other circumstances not contrary to law.

4.5     Notices.  All notices that are required or permitted hereunder shall be in writing and shall be sufficient if personally delivered or sent by registered or certified mail (return receipt requested and postage prepaid), email or Federal Express or other nationally recognized overnight delivery service; provided, however, if such notice is sent by email, a copy of such notice shall also be sent by one (1) of the other foregoing notice methods within one (1) business day after the day that the email notice is sent.  Any notice shall be deemed given upon the earlier of the date when received at, or the third day after the date when sent by registered or certified mail or the day after the date when sent by Federal Express or the day of when sent by email to, the address or email set forth below, unless such address or email is changed by written notice to the other parties in accordance with this Escrow Agreement:

If to Seller:          EC 58th Street LLC
                       c/o Cain International US Services LP
                       350 Park Avenue, 14th Floor
                       New York, New York 10022
                       Attention:  Cain Legal
                       Email: legal@cainint.com

and:                   Greenberg Traurig, LLP
                       One Vanderbilt Avenue
                       New York, New York 10017
                       Attention:  Farah S. Ahmed, Esq.
                       Email: ahmedf@gtlaw.com

4

*ACTIVE 62701336v4*

If to Purchaser:              _____

                              c/o CSC Co-Living
                              6 St. Johns Lane
                              New York, New York 10013
                              Attention: Sal Smeke and Alberto Smeke
                              Email: ss@csc-coliving.com
                                       as@csc-coliving.com

With a copy to:               Cole Schotz P.C.
                              1325 Avenue of the Americas, 19th Floor
                              New York, New York 10019
                              Attn: Jordan J. Metzger, Esq.
                              Email: jmetzger@coleschotz.com

If to Escrow Agent:           Royal Abstract
                              125 Park Avenue, Suite 1610
                              New York, NY 10017
                              Attn:  Michael J. Roberts, Esq.
                              Email:  mroberts@royalabstract.com

4.6     Expenses.  Except as otherwise provided for herein, each party shall be responsible for its own costs and expenses with respect to matters involving this Escrow Agreement.

4.7     Governing Law.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York.

4.8     Execution Counterparts.  This Escrow Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

4.9     Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction and interpretation hereof.

4.10    Attorneys' Fees.  If any legal action is brought for the enforcement of this Escrow Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding (together with costs of enforcing any judgments or rulings), in addition to any other relief to which it may be entitled.  In all other matters arising hereunder, each party shall bear its own attorneys' fees.

4.11    Further Assurances.  Each party hereto, at the reasonable request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Escrow Agreement and the transactions contemplated hereby.

4.12    Recitals Incorporated.  The foregoing recitals are hereby incorporated within and made an integral part of this Escrow Agreement as if fully set forth herein.

5

4.13   <u>No Waiver</u>.  No failure on the part of Purchaser or Seller at any time to require the performance by the other of any provision of this Escrow Agreement shall in any way affect the party's rights to require such performance, nor shall any waiver by any party of any provision hereof be taken or held to be a waiver of any other provision hereof.

[Signature pages follow]

6

IN WITNESS WHEREOF, Seller, Purchaser, and Escrow Agent have executed this Escrow Agreement as of _____ __, 2022.

**<u>SELLER</u>**:

EC 58TH STREET LLC,
a Delaware limited liability company


By:_____
Name:
Title:


[signature pages follow]

**PURCHASER**:

[_____],
a Delaware limited liability company


By: _____
Name: _____
Title: _____


[signature page follows]

**<u>ESCROW AGENT</u>**:

ROYAL ABSTRACT

By: _____
Name: _____
Title: _____

Schedule A


Employees

## SCHEDULE A

### Permitted Exceptions

1.      Restrictive Covenants as recited in Liber 656 of Deeds, Page 133, Liber 658 of Deeds, Page 127, Liber 657 of Deeds, Page 80, Liber 1634 of Deeds, Page 385, Liber 999 of Deeds, Page 239, Liber 1006 of Deeds, Page 40, Liber 1613 of Deeds, Page 85, Liber 1006 of Deeds, Page 45, Liber 1037 of Deeds, Page 165, Liber 1069 of Deeds, Page 123, Liber 1609 of Deeds, Page 160, Liber 1006 of Deeds, Page 43, Liber 1031 of Deeds, Page 428, Liber 1031 of Deeds, Page 426, Liber 1037 of Deeds, Page 168, Liber 1069 of Deeds, Page 125, Liber 642 of Deeds, Page 494 and Liber 644 of Deeds, Page 428.

2.      The terms, conditions and easements set forth in the Declaration of Condominium and By-Laws dated 4/11/1985 and recorded 4/24/1985 in the Office of the City Register of the City of New York, County of New York, in Reel 902 Page 1.

(a)      First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286.

(b)      Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753.

(c)      Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159.

3.      Terms, Covenants, Conditions and Provisions contained in a Lease dated as of 1/1/1999 made by and between Adrienne Schatz (a/k/a Adrianne Wachsler) and Cheryl Hirsch, as landlord and Henry Hudson Holdings LLC, as tenant, a Memorandum of which was dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2172. (affects Lot 1704)

(a)      Unrecorded Amendment to Lease made by and between Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 9/30/1999, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.

(b)      Unrecorded Amendment to Lease made by and between Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch, as lessor, and Henry Hudson Holdings LLC, as lessee, dated as of 8/13/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.

(c)      Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344629.

4.      Terms, Covenants, Conditions and Provisions contained in a Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant (affects Lot 1706).

(a)      Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872.

(b)      Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882.

(c)      Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630.

(d)      Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630.

## SCHEDULE B

Tax Certiorari Proceedings


Attached

**THE TAX COMMISSION OF THE CITY OF NEW YORK**
**ONE CENTRE STREET, ROOM 2400, NEW YORK, NY 10007**

TC70-013-01406                    1 - 1048 - 1701                    10/14/2021

DITCHIK & DITCHIK PLLC
ATTN: JOEL  DITCHIK ESQ
370 LEXINGTON AVENUE
NEW YORK NY 10017

0491

Application for 2021/22
Block   1048   Lot   1701 - 1706
Ranges: 3 Lots: 4
Borough of Manhattan

NOTICE OF OFFER AND ACCEPTANCE AGREEMENT NO. 2022-013-01406                    PAGE 5 OF 5

Based on its review of your application for correction, the Tax Commission offers to adjust the property's tax assessment as follows:

|  | 21/22 Total | 21/22 Exempt |
|---|---|---|
| ORIGINAL ACTUAL | 61,855,843 |  |
| TRANSITIONAL | 79,005,357 |  |
| TAX CLASS | 4 |  |
| ACTUAL REDUCTION | -16,701,076 |  |
| OF WHICH LAND |  |  |
| OF WHICH PHYSICAL |  |  |
| PROPOSED ACTUAL | 45,154,767 |  |
| TAX CLASS | 4 |  |

Offer applies to lots 1701-1702, 1704, 1706

AGREEMENT:  The applicant accepts the proposed assessments and all of the terms printed above and on pages 1 - 4, and certifies that all disclosures required by the agreement have been duly made and that there has been no sale of the property except as so disclosed.

Date  November 5, 2021                                        EC 58TH STREET LLC

X  Signature _____        By (print)  Steven Tishco

Specify authorization  Attorney                Firm  Ditchik & Ditchik, PLLC

To accept this offer, SIGN and RETURN THIS ENTIRE PAGE. It must be received no later than November 29, 2021.

C1.208-22.2

Calendar Page:      9372
Hearing Date:       September 28, 2021
Property Address:   353 WEST 57 STREET
Boro-Block-Lot:     1-1048-1701
Hearing Officer:    019


#2022-013-01406-0491#

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------|
In the Matter of                                | Index No.
                                                | 258783/21
EC 58TH STREET LLC                              |
                                                |
                                                | Taxes of: 2021/22
                                                |
                             Petitioner,        | Borough: Manhattan
                                                |
            -against-                           | Block: 1048
                                                | Lots:  1701, 1702, 1704 and
THE TAX COMMISSION OF THE CITY OF NEW YORK       |         1706
and THE COMMISSIONER OF FINANCE OF THE CITY     |
OF NEW YORK                                     |
                                                |
                                                |
                             Respondents.       |
------------------------------------------------|

        IT IS HEREBY STIPULATED that the above entitled proceeding be dis-
continued without costs to either party.

Dated:    New York, NY
          November 5, 2021


                                    _____
                                    Ditchik & Ditchik, PLLC
                                    Attorneys for Petitioner
                                    370 Lexington Avenue, Suite 2301
                                    New York, NY 10017



                                    _____
                                    CORPORATION COUNSEL

                                    Attorney for Respondents


Assessment reduced from $61,855,843 to $45,154,767

Index No. 258783/21          Year 2021

_____

NEW YORK SUPREME COURT

COUNTY OF NEW YORK

_____


In the Matter of

EC 58TH STREET LLC


                    Petitioner,

        -against-

THE TAX COMMISSION OF THE CITY OF NEW YORK
and THE COMMISSIONER OF FINANCE OF THE CITY
OF NEW YORK

                    Respondents.


_____

STIPULATION OF DISCONTINUANCE
_____


GEORGIA M. PESTANA
Corporation Counsel
Attorney for Respondents
100 Church Street
New York, N.Y. 10007
(212) 788-0303


_____

## SCHEDULE C

SRO Schedule

<u>Attached</u>

**Schedule C**
*SRO Unit Schedule as of January 27, 2022*

| # | Tenant Floor | Tenant Unit # |
|---|---|---|
| 1 | 11 | 1169 |
| 2 | 15 | 1546 |
| 3 | 17 | 1722 |
| 4 | 18 | 1846 |
| 5 | 18 | 1856 / (1857 & 1855) |
| 6 | 19 | 1916 |
| 7 | 20 | 2017 |
| 8 | 20 | 2031 |
| 9 | 20 | 2039 |
| 10 | 20 | 2045 |
| 11 | 21 | 2106 |
| 12 | 21 | 2107 |
| 13 | 21 | 2114 |
| 14 | 21 | 2129 |
| 15 | 21 | 2135 |
| 16 | 21 | 2138 |
| 17 | 21 | 2139 |
| 18 | 21 | 2140 |
| 19 | 21 | 2145 |
| 20 | 21 | 2146 |
| 21 | 21 | 2155 |
| 22 | 21 | 2157 |
| 23 | 22 | 2204 |
| 24 | 22 | 2206 |
| 25 | 22 | 2207 |
| 26 | 22 | 2211 |
| 27 | 22 | 2212 |
| 28 | 22 | 2227 |
| 29 | 22 | 2231 |
| 30 | 22 | 2232 |
| 31 | 22 | 2235 |
| 32 | 22 | 2236 |
| 33 | 22 | 2239 |
| 34 | 22 | 2244 |
| 35 | 22 | 2245 |
| 36 | 22 | 2253 |
| 37 | 22 | 2255 |

## SCHEDULE D

Condominium Documents

Declaration of condominium dated April 11, 1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York, as establishing a plan for condominium ownership of which Original Declaration was recorded in the New York County Office of the Register of the City of New York on April 24, 1985 in Reel 902 Page 1.

First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286.

Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety).

Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159

By-Laws of 353 West 57th Street Condominium and the Rules and Regulations of 353 West 57th Street Condominium attached thereto.

*ACTIVE 62692700v1*

## SCHEDULE E

Purchaser's title objections that Seller shall cause to be omitted from Purchaser's Title Policy

1. Terms, Covenants, Conditions and Provisions of unrecorded Sub-Lease (Operating Lease) dated 8/28/2000 made by and between Henry Hudson Holdings LLC, as landlord, and Hudson Leaseco LLC, as tenant.
   a. Lease Subordination Agreement made by and between Henry Hudson Holdings LLC, as landlord, Hudson Leaseco LLC, as tenant, and Corus Bank, N.A., as lender, dated as of 11/6/2000 and recorded 2/8/2001 in Reel 3236 Page 955.

2. Terms, Covenants, Conditions and Provisions of unrecorded Supplemental Management Agreement made by and between Hudson Leaseco LLC, as lessee, and Hudson Management Member LLC, as manager, dated as of 8/28/2000, as evidenced by Subordination of Supplemental Management Agreement recorded 2/8/2001 in Reel 3236 Page 1041.
   a. Subordination of Supplemental Management Agreement made by and between Hudson Leaseco LLC and Greenwich Capital Financial Products, Inc. dated as of 8/13/2004 and recorded 5/11/2005 as CRFN 2005000272715.

3. Terms, Covenants, Conditions and Provisions of unrecorded Sub-Lease (Bar Lease) dated 8/12/2011 made by and between Henry Hudson Holdings LLC, as landlord, and 58th Street Bar Company LLC, as tenant.

4. Assignment of Leases and Rents made by Henry Hudson Holdings LLC, 58th Street Bar Company LLC and Hudson Leaseco LLC to Column Financial, Inc. dated as of 2/9/2017 and recorded 2/21/2017 as CRFN 2017000070242. **(affects Fee Estate of Lots 1701 and 1702 Leasehold and Sub-leasehold Estates of Lots 1704 and 1706)**

   a. Assignment of Assignment of Leases and Rents made by Column Financial, Inc. to U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in trust for the holders of CSMC Trust 2017-HD, Commercial Mortgage Pass-Through Certificates 2017-HD dated as of 3/29/2017 and recorded 2/18/2020 as CRFN 2020000061988, as corrected by Corrective Assignment of Assignment of Leases and Rents dated as of 5/15/2020 and recorded 5/22/2020 as CRFN 2020000154472.

   b. Assignment of Assignment of Leases and Rents made by U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in trust for the holders of CSMC Trust 2017-HD, Commercial Mortgage Pass-Through Certificates 2017-HD to Holliday Park, LLC dated as of 3/20/2020 and recorded 3/31/2020 as CRFN 2020000113456.
   c. Assignment of Assignment of Leases and Rents made by Holliday Park, LLC to Security Benefit Life Insurance Company dated 12/18/2020 and recorded 1/4/2021 as CRFN 2021000000917.

5. UCC Financing Statement:
   Secured Party: Column Financial, Inc.

61458/0006-42420005v2
*ACTIVE 62690322v2*

Debtors: Henry Hudson Holdings LLC, 58th Street Bar Company LLC and Hudson Leaseco LLC
Filed: 2/21/2017
CRFN 2017000070243

As assigned by UCC-3 recorded 10/1/2020 as CRFN 2020000265736
As assigned by UCC-3 recorded 11/17/2020 as CRFN 2020000321336

6. Proof is required from the Board of Managers that there are no unpaid maintenance charges and/or assessments against the Unit to be conveyed or mortgaged.

7. Closing deed shall contain a statement of the use for which the Unit is intended as required by Real Property Law §339-0 (3).

8. Satisfactory proof must be submitted that the Board of Managers has consented to the proposed sale and has waived its right of first refusal, if any, as may be provided for by the By-Laws.

9. A duly acknowledged estoppel certificate is required from the landlord certifying that the lease to be insured has not been assigned, altered, modified or amended, except as set forth herein, and that said lease is in full force and effect and that there are no existing defaults by the tenant in respect to any terms, covenants, conditions and agreements contained in said lease.

10. With respect to **EC 58th Street LLC**, the following proofs and documents must be submitted to this Company for examination prior to closing and upon review additional exceptions may thereafter be raised:

    A) Proof that **EC 58th Street LLC** has been validly formed and remains in existence. Note: This may be established by an affidavit from a member or attorney representing, **EC 58th Street LLC**, with knowledge of the facts and should include the submission to this Company of a status letter or other evidence from the Secretary of State to the effect that **EC 58th Street LLC** remains in existence.

    B) In addition to the proof required above:

        1. A copy of the Articles of Organization, together with any amendments thereto, together with proof of filing of same with the Secretary of State;

        2. A fully executed copy of the Operating Agreement, together with any amendments thereto;

        3. Resolution of **EC 58th Street LLC** executed by duly authorized member(s) or manager(s) approving the subject

2

transaction, which resolution identifies the person(s) authorized and directed to act for said **EC 58th Street LLC** together with proof that the resolution was adopted in accordance with the Operating Agreement and the Articles of Organization. If the subject transaction involved the sale, exchange, lease or mortgage of all or substantially all of the assets of said **EC 58th Street LLC**, then absent provisions to the contrary in the Operating Agreement, such resolution must also be adopted by the vote of at least two-thirds in interest of the members entitled to vote thereon.

11. A. Satisfactory proof by affidavit must be furnished showing whether any work has been done upon the premises by the City, or any demand made by the City for any work, that may result in charges:
  a. By the New York City Department of Rent and Housing Maintenance, Emergency Services;
  b. By the New York City Department of Environmental Protection for Water Tap Closing or any related work; and
  c. By the New York City Department of Health, whether or not such charges are liens against which this Policy insures.

C)    Satisfactory proof by affidavit must be furnished showing whether any fee for an inspection, re-inspection, examination or service performed the Department of Buildings or permit issued by The Department of Buildings have been levied, charges, created or incurred that may become a lien on the premises, whether or not such charges are liens against which this Policy insures.

12. All mortgages on the Mortgage Schedule included in the Commitment and recited below:

A. Amended and Restated Replacement Mortgage A in the original principal amount of $217,000,000.00 made by Henry Hudson Holdings LLC, Morgans Holdings LLC and Royalton, LLC to Wachovia Bank, National Association dated 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679014.  (**Originally affected premises herein and Block 867 Lot 20 and Block 1259 Lot 11**)

Mortgage Tax Paid: $ -0-

NOTE:  Said mortgage A was derived from Note and Mortgage Severance Agreement made between Wachovia Bank, National Association, Royalton, LLC, Henry Hudson Holdings LLC and Morgans Holdings LLC dated as of 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679013.
(See Mortgage Exhibit annexed)

  1. Said mortgage A was released from Block 867 Lot 20 and Block 1259 Lot 11 by Partial Release of Amended and Restated Replacement Mortgage A made between Wachovia Bank, National Association, Henry Hudson Holdings LLC, Morgans

3

Holdings LLC and Royalton LLC dated as of 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679017.

2.  Said mortgage A was amended by Agreement of Consolidation and Modification of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing made between Henry Hudson Holdings LLC and Wachovia Bank, National Association dated as of 10/6/2006 and recorded 12/11/2006 as CRFN 2006000679020.

3.  Said mortgage A was assigned by Wachovia Bank, National Association to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8, solely to the extent set forth in the applicable Partition Agreement, the applicable Non-Trust Portion Holder by Assignment of Mortgage dated as of 6/27/2007 and recorded 11/27/2007 as CRFN 2007000587889.

4.  Said mortgage A was modified by Modification of Agreement of Consolidation and Modification of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing made between Henry Hudson Holdings LLC and Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8 dated as of 9/30/2010 and recorded 10/14/2010 as CRFN 2010000344286.

5.  Said mortgage A was assigned by Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8 to Deutsche Bank Trust Company of Americas, as Administrative Agent, by Assignment of Mortgage dated as of 8/12/2011 and recorded 9/16/2011 as CRFN 2011000329360.

6.  Said mortgage A was amended and restated in the reduced amount of $115,000,000.00 by Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Hotel Revenue and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and Deutsche Bank Trust Company of Americas, as Administrative Agent, dated as of 8/12/2011 and recorded 9/16/2011 as CRFN 2011000329361.  (spread to cover the fee estate of Lots 1701 and 1702 and leasehold and sub-leasehold estates of Lots 1704 and 1706)

7.  Said mortgage A was amended by First Amendment to Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Hotel Revenue and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and Deutsche Bank Trust Company of Americas, as Administrative Agent, dated as of 12/7/2011 and recorded 2/21/2012 as CRFN 2012000068316.

4

61458/0006-42420005v2
*ACTIVE 62690322v2*

8. Said mortgage A was assigned by Deutsche Bank Trust Company of Americas, as Administrative Agent to UBS Real Estate Securities Inc. by Assignment of Mortgage dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461819.

B. Fee and Leasehold Mortgage in the original principal amount of $65,000,000.00 made by Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC to UBS Real Estate Securities Inc. dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461820. (**affects Fee Estate of Lots 1701 and 1702 Leasehold and Sub-leasehold Estates of Lots 1704 and 1706**)

Mortgage Tax Paid: $1,820,000.00

1. Said mortgages A and B were consolidated to form a single lien of $180,000,000.00 by Consolidated, Amended and Restated Fee and Leasehold Mortgage and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and UBS Real Estate Securities Inc. dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461821.

2. Said mortgages A and B, as consolidated, were assigned by UBS Real Estate Securities Inc. to Citigroup Global Markets Realty Corp. and Bank of America, N.A. by Assignment of Mortgage dated as of 2/6/2014 and recorded 2/14/2014 as CRFN 2014000058277.

C. Consolidated, Amended and Restated Fee and Leasehold Mortgage and Security Agreement in the original principal amount of $53,333,333.34 made by Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC to Citigroup Global Markets Realty Corp. and Bank of America, N.A. dated as of 2/6/2014 and recorded 2/14/2014 as CRFN 2014000058278. (**affects Fee Estate of Lots 1701 and 1702 Leasehold and Sub-leasehold Estates of Lots 1704 and 1706**)

Mortgage Tax Paid: $1,493,332.41

1. Said mortgages A through C were consolidated to form a single lien of $233,333,333.34 by the terms of said mortgage C.

2. Said mortgages A through C, as consolidated, were assigned by Citigroup Global Markets Realty Corp. and Bank of America, N.A. to Deutsche Bank Trust Company Americas, as Trustee for CGBAM Commercial Mortgage Trust 2014-HD. Commercial Mortgage Pass-Through Certificates, Series 2014-HD and The Companion Loan Holder by Assignment of Mortgage dated 5/28/2014 and recorded 8/4/2014 as CRFN 2014000255044.

3. Said mortgages A through C, as consolidated, were assigned by Deutsche Bank Trust Company Americas, as Trustee for CGBAM Commercial Mortgage Trust 2014-HD. Commercial Mortgage Pass-Through Certificates, Series 2014-HD and

5

The Companion Loan Holder to Column Financial, Inc. by Assignment of Mortgage dated as of 2/9/2017 and recorded 2/21/2017 as CRFN 2017000070240.

4. Said mortgages A through C, as consolidated, were amended and restated in the amount of $225,000,000.00 by Amended and Restated Fee and Leasehold Mortgage and Security Agreement made between Henry Hudson Holdings LLC, Hudson Leaseco LLC and 58th Street Bar Company LLC and Column Financial, Inc. dated as of 2/9/2017 and recorded 2/21/2017 as CRFN 2017000070241.

5. Said mortgages A through C, as consolidated, were assigned by Column Financial, Inc. to U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in Trust for Holders of CSMC Trust 2017-HD Commercial Mortgage Pass-Through Certificates Series 2017-HD by Assignment of Mortgage dated 3/29/2017 and recorded 2/18/2020 as CRFN 2020000061987.

NOTE: Corrective Assignment of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing dated as of 5/15/2020 and recorded 5/22/2020 as CRFN 20200000154471 corrects the Assignment recorded 2/18/2020 as CRFN 2020000061987 to include the complete mortgage schedule and correct the acknowledgement.

6. Said mortgages A through C, as consolidated, were assigned by U.S. Bank National Association, not in its individual capacity but solely in its capacity as Trustee in Trust for Holders of CSMC Trust 2017-HD Commercial Mortgage Pass-Through Certificates Series 2017-HD to Holliday Park, LLC by Assignment of Mortgage dated as of 3/20/2020 and recorded 3/31/2020 as CRFN 2020000113455.

NOTE: Corrective Assignment of Amended and Restated Mortgage and Security Agreement and Other Loan Documents dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344627 corrects the Assignment recorded 3/31/2020 as CRFN 2020000113455 to include the complete mortgage schedule.

NOTE: The above mortgage is held by a private lender. Whenever documents are required from the lender such as a satisfaction, assignment, or subordination, such duly executed instrument must be furnished to the company prior to or at closing.

7. Said mortgages A through C, as consolidated, were assigned by Holliday Park, LLC to Security Benefit Life Insurance Company by Assignment of Amended and Restated Mortgage and Security Agreement and Other Loan Documents dated 12/18/2020 and recorded 1/4/2021 as CRFN 2021000000918.

61458/0006-42420005v2
*ACTIVE 62690322v2*

## SCHEDULE F

Intentionally Omitted

## SCHEDULE G

Cycle 8 Local Law 11 Contracts

Attached

**Schedule G**
*LL 11 Contract Schedule as of January 27, 2022*

| Vendor | Scope of Work | Date of Contract | Termination Option |
|---|---|---|---|
| APCO | Furnish all labor materials, services and equipment to perform work | 2/12/2021 | May be terminated at any time with 30 days notice |
| APCO | Additional Work (northwest bulkhead and PP Canopy window/glass replacement) | 2/17/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #1 | Provide necessary site safety materials | 3/29/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #2 | Provide necessary site safety materials | 3/29/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #3 | Additional Work (masonry on west elevation) | 5/12/2021 | May be terminated at any time with 30 days notice |
| APCO Change Order #4 | Additional Work (stucco, cap stone, and skylight repair) | 12/17/2021 | May be terminated at any time with 30 days notice |
| Gardiner and Theobald | Professional monitoring & close out services for the project | 2/17/2021 | May be terminated at any time with 3 days notice |
| ALSA | Provide services during construction, liaison with NYC agencies, amended FISP and Cycle 8B Report & Filing, FISP Inspections/Report and Filing and Cycle 9B | 2/17/2021 | May be terminated at any time with 5 days notice |

## SCHEDULE H

Grievances under Labor and Employment Laws

<u>None</u>

## **SCHEDULE I**

Service Contracts

<u>Attached</u>

**Schedule I**
*Contracts In-Place as of February 1, 2022*

| Vendor | Service | Start Date | Status |
|---|---|---|---|
| California Crown Energy Services | Operation, maintenance, and minor repairs of boiler, refrigerant, air compression, water filter, fuel oil, automation for HVAC, sanitary sewer, and air distribution systems | Sep-21 | Contract in place |
| Atlas Welding and Boiler Repair | Boiler cleaning and burner overhaul | Dec-20 | Currently Month to Month (MTM) |
| Direct Energy | Utilities | May-21 | Contract in place |
| LL84 Energy Benchmarking (Newmark Contract) | Utility management and energy star reporting software solution, Spectrum | Sep-21 | Contract in place |
| Quality Fire Protection | Prepare the amendment to the fire safety & evacuation plan to be submitted to NYCFD for review and acceptance. Prepare amended building Info Card so it is consistent with requirements of NYCFD in addition to training courses | May-21 | Contract in place |
| Ditchik & Ditchik | Tax Appeal Attorneys | Dec-20 | Contract in place |
| Nouveau Elevator | Oil, grease, and survey traction elevators | Dec-20 | Contract in place |
| Lerch Bates | Provide vertical transportation consulting services to include calls, reviews, meetings, and site visits | Jan-21 | Contract in place |
| New York Hotel and Motel Trades Council, AFL-CIO (Union) | Manager (Newmark) agrees to assume management and employ the Hotel employees represented by the Union | Mar-21 | Contract in place |
| Rosenwach Tank | Clean and inspect steel tank compartment, water test, and water tank inspections | Nov-21 | Contract in place |
| RCN Telecom Services | Communication and telecom services | Oct-21 | Contract in place |
| Spectrum Enterprise | Internet, HBO, and HD Video Tier | Jun-19 | Contract in place |
| NuChem | Water treatment | Nov-21 | Contract in place |
| Johnson Controls / TYCO | Fire Central Station Monitoring | Jul-21 | Contract in place |
| New York Security Systems, Inc. | Security Cameras  Service and Maintenance | Mar-20 | Currently Month to Month (MTM) |
| Metropolitan Recycling | Waste Removal | Jan-22 | Contract pending signature |
| Constellation | Electricity | Oct-19 | Contract in place |
| JPMcHale | Pest Management | Jan-22 | Contract pending signature |
| Windstream | Voice Circuit | | Currently Month to Month (MTM) |
| Fire Service Inc. | Inspect and Maintain Fire Alarm, smoke detectors | Jul-15 | Currently Month to Month (MTM) |
| Allbridge | T-1 circuit for phone system | | Currently Month to Month (MTM) |
| LDI | Copy machine | | Contract in place |
| *Universal Protection Service* | *Security* | | *Contract Pending* |

## **SCHEDULE J**

Allowed Applications

**Filings with DOB**:

1. Interior alterations to common areas
2. Interior alteration for accessibility upgrades to vacant units
3. Exterior work at common areas such as terraces
4. Alterations to MEP systems at common areas and within vacant units
5. Alterations to sprinkler and standpipe systems at common areas and within vacant units

**Filings with FDNY**:

1. Upgrades to existing fire alarm system
2. New ARCS system for residential use

## **SCHEDULE K**

List of Violations

Attached

**Schedule K**
*Hudson Open Violations as of January 29, 2022*

| Department | Address | Violation Number | Date | Type |
|---|---|---|---|---|
| DOB | 358 West 58th Street | 021915FISPHAZ75487 | 2/19/2015 | Façade Local Law |
| DOB | 358 West 58th Street | 020617E9028/593396 | 2/6/2017 | Elevator PVT |
| DOB | 358 West 58th Street | 021918E9028/619075 | 2/19/2018 | Elevator PVT |
| DOB | 358 West 58th Street | 021918E9028/619076 | 2/19/2018 | Elevator PVT |
| DOB | 358 West 58th Street | 021918E9028/619078 | 2/19/2018 | Elevator PVT |
| DOB | 358 West 58th Street | 022118FISPHAZ87279 | 2/21/2018 | Façade Local Law |
| DOB | 358 West 58th Street | 021619BENCH00135 | 2/16/2019 | Benchmarking |
| DOB | 358 West 58th Street | 031819EARCX10082 | 3/18/2019 | Local Law 87 Energy |
| DOB | 358 West 58th Street | 050219BENCH00504 | 5/2/2019 | Benchmarking |
| DOB | 358 West 58th Street | 080219BENCH00250 | 8/2/2019 | Benchmarking |
| DOB | 358 West 58th Street | 090619ACC101865 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619ACC101866 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619ACC101867 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619ACC101868 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101869 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101870 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101871 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 090619acc101872 | 9/6/2019 | Elevator Affirmation |
| DOB | 358 West 58th Street | 110219BENCH00172 | 11/2/2019 | Benchmarking |
| DOB | 358 West 58th Street | 121919E9027/668819 | 12/19/2019 | Elevator PVT |
| DOB | 358 West 58th Street | 020220BENCH00127 | 2/2/2020 | Benchmarking |
| DOB | 358 West 58th Street | 060520E9027/683208 | 6/5/2020 | Elevator PVT |
| DOB | 358 West 58th Street | 060520E9027/683211 | 6/5/2020 | Elevator PVT |
| DOB | 358 West 58th Street | 062920EARCX00125 | 6/29/2020 | Local Law 87 Energy |
| DOB | 358 West 58th Street | 101420AEUHAZ100047 | 10/14/2020 | AEU Failed to Certify |
| DOB | 358 West 58th Street | 111120AEUHAZ100042 | 11/11/2020 | AEU Failed to Certify |
| DOB | 358 West 58th Street | 032421E9028/697754 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697755 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697757 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697762 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 032421E9028/697763 | 3/24/2021 | Elevator PVT |
| DOB | 358 West 58th Street | 033121AEUHAZ100050 | 3/31/2021 | AEU Failed to Certify |
| DOB | 358 West 58th Street | 042921EGRADE2000727 | 4/29/2021 | Energy Grade |
| DOB | 358 West 58th Street | 060221BENCH0277 | 6/2/2021 | Benchmarking |
| DOB | 358 West 58th Street | 062021EARCX00169 | 6/20/2021 | Local Law 87 Energy |
| DOB | 358 West 58th Street | 080221BENCH00174 | 8/2/2021 | Benchmarking |
| DOB | 358 West 58th Street | 280221BENCH00126 | 11/2/2021 | Benchmarking |
| DOB | 358 West 58th Street | 110221EGRADE2100531 | 12/1/2021 | Energy Grade |
| DOB | 358 West 58th Street | 032421E9028/697761 | 3/24/2021 | Elevator PVT |
| Oath/ECB | 353 West 52nd Street | 35635233H | 12/2/2021 | Facade |
| Oath/ECB | 353 West 57nd Street | 39027352R | 8/21/2020 | Plumbing |
| Oath/ECB | 353 West 57nd Street | 39027351P | 8/21/2020 | Plumbing |
| Oath/ECB | 353 West 57nd Street | 35491673L | 7/23/2020 | Construction Safety |
| Oath/ECB | 353 West 57nd Street | 39025513J | 7/16/2020 | Elevator |
| Oath/ECB | 353 West 57nd Street | 39025512H | 7/16/2020 | Elevator |
| Oath/ECB | 1150 Longwood Avenue | 35469596X | 7/10/2020 | Construction Safety |
| HPD | 353 West 57th Street | 14583964 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583965 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583966 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583967 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583968 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 14583969 7493041 | 9/27/2021 | |
| HPD | 353 West 57th Street | 13945387 7083011 | 2/6/2021 | |
| HPD | 353 West 57th Street | 13945388 7083011 | 2/6/2021 | |
| HPD | 353 West 57th Street | 13945389 7083012 | 2/6/2021 | |
| HPD | 353 West 57th Street | 12974778 6430757 | 3/22/2019 | |

| | | | |
|---|---|---|---|
| HPD | 353 West 57th Street | 12974781 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974782 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974783 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974784 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974786 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974791 6430756 | 3/22/2019 |
| HPD | 353 West 57th Street | 12974793 6430757 | 3/22/2019 |
| HPD | 353 West 57th Street | 12402840 6101206 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402900 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402939 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402960 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402970 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12402980 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12403033 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12403073 6101205 | 5/25/2018 |
| HPD | 353 West 57th Street | 12360465 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360466 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360467 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360468 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360469 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360470 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360471 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360472 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360476 6078082 | 4/27/2018 |
| HPD | 353 West 57th Street | 12360479 6078081 | 4/27/2018 |
| HPD | 353 West 57th Street | 12356614 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356616 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356617 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356618 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356619 6076239 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356620 6076239 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356621 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356622 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356623 6076238 | 4/19/2018 |

| HPD | 353 West 57th Street | 12356624 6076239 | 4/19/2018 |
|---|---|---|---|
| HPD | 353 West 57th Street | 12356625 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356626 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356627 6076239 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356629 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356632 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 12356633 6076238 | 4/19/2018 |
| HPD | 353 West 57th Street | 11827788 5775996 | 6/13/2017 |
| HPD | 353 West 57th Street | 11827792 5775995 | 6/13/2017 |
| HPD | 353 West 57th Street | 10618390 5067019 | 3/4/2015 |
| HPD | 353 West 57th Street | 10201525 4816874 | 4/8/2014 |
| HPD | 353 West 57th Street | 10201554 4816874 | 4/8/2014 |
| HPD | 353 West 57th Street | 10201563 4816874 | 4/8/2014 |
| HPD | 353 West 57th Street | 10026351 4719539 | 11/1/2013 |
| HPD | 353 West 57th Street | 10026365 4719540 | 11/1/2013 |
| HPD | 353 West 57th Street | 10026371 4719540 | 11/1/2013 |
| HPD | 353 West 57th Street | 10026438 4719540 | 11/1/2013 |
| HPD | 353 West 57th Street | 9673031 4535288 | 12/10/2012 |
| HPD | 353 West 57th Street | 9673032 4535288 | 12/10/2012 |
| HPD | 353 West 57th Street | 9673033 4535288 | 12/10/2012 |
| HPD | 353 West 57th Street | 9588710 4492749 | 9/18/2012 |
| HPD | 353 West 57th Street | 9588712 4492749 | 9/18/2012 |
| HPD | 353 West 57th Street | 7726100 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7726101 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7726102 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7726103 3574084 | 2/13/2009 |
| HPD | 353 West 57th Street | 7500040 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500041 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500042 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500043 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 7500044 3475094 | 9/28/2008 |
| HPD | 353 West 57th Street | 6905564 3080579 | 8/29/2007 |
| HPD | 353 West 57th Street | 6905565 3080579 | 8/29/2007 |
| HPD | 353 West 57th Street | 6839019 3028321 | 7/17/2007 |
| HPD | 353 West 57th Street | 6839025 3028323 | 7/17/2007 |
| HPD | 353 West 57th Street | 6839026 3028322 | 7/17/2007 |
| HPD | 353 West 57th Street | 6753969 2975912 | 5/18/2007 |
| HPD | 353 West 57th Street | 6753979 2975912 | 5/18/2007 |
| HPD | 353 West 57th Street | 6753984 2975912 | 5/18/2007 |
| HPD | 353 West 57th Street | 6753988 2975913 | 5/18/2007 |

| | | | |
|---|---|---|---|
| HPD | 353 West 57th Street | 6202732 2689172 | 6/7/2006 |
| HPD | 353 West 57th Street | 6202734 2689173 | 6/7/2006 |
| HPD | 353 West 57th Street | 5071186 2205265 | 8/12/2004 |
| HPD | 353 West 57th Street | 5027531 2179698 | 7/12/2004 |
| HPD | 353 West 57th Street | 2956279 607649 | 7/31/1998 |
| HPD | 353 West 57th Street | 256276 607647 | 9/8/1995 |
| Oath/ECB | 353 West 57nd Street | 011714775N | 12/20/2019 FDNY |
| Oath/ECB | 353 West 57nd Street | 011801427X | 8/12/2021 FDNY |
| Oath/ECB | 353 West 57nd Street | 0204793106 | 1/3/2019 Dep Ind Wsdt Ctrl |
| Oath/ECB | 353 West 57nd Street | 0881202035 | 2/20/2020 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881202044 | 2/20/2020 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881202053 | 2/20/2020 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0600214423 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214432 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214441 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214450 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214460 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 0600214479 | 4/11/2020 Dep-BWSO |
| Oath/ECB | 353 West 57nd Street | 011726107J | 3/10/2020 FDNY |
| Oath/ECB | 353 West 57nd Street | 0881251838 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251782 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251791 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251800 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251810 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881251829 | 5/14/2021 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168256 | 3/27/2029 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168265 | 3/27/2029 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168283 | 3/27/2029 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 0881168292 | 3/27/2029 DOHMH Cooling Twrs |
| Oath/ECB | 353 West 57nd Street | 011677523K | 2/14/2019 FDNY |
| Oath/ECB | 353 West 57nd Street | 011746067M | 7/24/2020 FDNY |
| Oath/ECB | 353 West 57nd Street | 011788741K | 8/10/2021 FDNY |
| Oath/ECB | 358 West 58th Street | 0871163298 | 4/26/2019 DOHMH-Water Tank |
| Oath/ECB | 358 West 58th Street | 011620599J | 6/27/2019 FDNY |
| Oath/ECB | 358 West 58th Street | 011729920X | 12/2/2019 FDNY |

## SCHEDULE L

[Excluded Personal Property]

Attached

**Schedule L**

*Hudson Excluded Property as of January 29, 2022*





<u>EXHIBIT B</u>

<u>DESIGNATED SERVICE CONTRACTS</u>

(attached hereto)

EXHIBIT C-1

FORM OF CONFIRMING ESTOPPEL FOR 10TH FLOOR LEASE

(attached hereto)

## <u>LEASE ESTOPPEL CERTIFICATE</u>

Landlord:      Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019

Tenant:      EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee:      356W58 Ground Lessor LLC, a Delaware limited liability company, having an address of c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219

Premises:      353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 6

The undersigned Landlord, Hudson 10th Floor LLC, a Delaware limited liability company, with an address at c/o SchatzCo V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, New York 10019 (the "<u>Landlord</u>"), successor to Adrienne Schatz and Cheryl Hirsh, as Executrices of the last will and testament of Irving Schatz, as fee owner of the condominium unit known as Unit No. 6 (the "<u>Tenth Floor Unit</u>") in the condominium known as 353 West 57th Street Condominium, in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "<u>Premises</u>") and described on <u>Exhibit A</u> attached hereto, is Lessor under that certain Amended and Restated Lease dated as of February 11, 1999 made by Irving Schatz, as original Lessor and Ian Schrager Hotels LLC, as original Lessee, as referenced in a memorandum of lease dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1872 (the "<u>Tenth Floor Unit Lease</u>"), as assigned by Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC, as assignor, to Henry Hudson Holdings LLC, as assignee, dated as of February 12, 1999 and recorded March 23, 1999 in Reel 2841 Page 1882, and as amended by an unrecorded Amendment to Lease made by and between Irving Schatz and Henry Hudson Holdings LLC dated as of August 17, 2004, and as further assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC as assignee, dated as of November 24, 2020 and recorded December 4, 2020 in CRFN 2020000344630, hereby certifies as follows:

1.      The Tenth Floor Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented. There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Tenth Floor Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

*ACTIVE 62692815v2*

61458/0006-42435625v2

2.      The lease term under the Tenth Floor Unit Lease commenced on December 1, 1997 and expires on November 30, 2096, unless sooner terminated or extended in accordance with the terms of the Tenth Floor Unit Lease.  There are no options to renew

3.      The amount of Monthly Base Rent under the Tenth Floor Unit Lease is currently $57,536.14 per month.

4.      The Monthly Base Rent and all other charges (if any) have been paid through May 2022.

5.      To the best knowledge of Landlord, there are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Tenth Floor Unit Lease.

6.      Landlord is not holding a security deposit under the Tenth Floor Unit Lease but that lease requires that a security deposit in the amount of $250,000.00 be posted with Landlord upon an assignment of the lease.

7.      There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Tenth Floor Unit.

8.      As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Tenth Floor Unit Lease other than as described in the Tenth Floor Unit Lease exist.

9.      Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, any sublessee of Assignee, any mortgagee of any sublessee of Assignee, and all of their respective successors and assigns.

10.     Landlord's address for notices under the Tenth Floor Unit Lease is:

Hudson 10th Floor LLC
c/o SchatzCo V, LLC
1325 Avenue of the Americas, 28th Floor
New York, New York 10019

With a copy to:

Armstrong Teasdale LLP
7 Times Square, 44th Floor
New York, NY  10036
Attention: Howard Schechter, Esq.

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Tenth Floor Unit Lease.

2

**LANDLORD:**

HUDSON 10TH FLOOR LLC
a Delaware limited liability company


By: _____
    Name:_____
    Title: _____

3

61458/0006-42435625v2
*ACTIVE 62692815v2*

EXHIBIT A

Legal Description of the Premises and Tenth Floor Unit

The Condominium Unit (the "Unit") known as the Tenth Floor Unit, also known as Unit 6 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Tenth Floor and also known as Unit 6 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16, 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1706, Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

4

61458/0006-42435625v2
*ACTIVE 62692815v2*

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

Together with an undivided 3.89067% interest in the Common Elements (as such term is defined in the Declaration).

5

61458/0006-42435625v2
*ACTIVE 62692815v2*

EXHIBIT C-2

FORM OF CONFIRMING ESTOPPEL FOR CONDOMINIUM BOARD OF MANAGERS

(attached hereto)

CONDOMINIUM ESTOPPEL CERTIFICATE

TO:

CSC Hudson LLC ("Purchaser")
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013

Re:     The (i) declaration of condominium dated April 11, 1985 made by Irving Schatz (the "Original Declaration") pursuant to Article 9-B of the Real Property Law of the State of New York, as amended establishing a plan for condominium ownership of which Original Declaration was recorded in the New York County Office of the Register of the City of New York on April 24, 1985 in Reel 902 Page 1, which Original Declaration was amended by the First Amendment to Declaration made by Irving Schatz dated January 29, 1993 and recorded May 11, 1993 in Reel 1969 Page 2286 and which Original Declaration was further amended by the Amended and Restated Declaration, dated as of February 12, 1999, made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch (the "A&R Declaration"), which A&R Declaration was recorded July 16, 1999 in Reel 2913 Page 1753 (and which A&R Declaration, by its terms, restated the Original Declaration in its entirety), and which A&R Declaration was amended by the Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999 in Reel 2979 Page 2159 (collectively, the "Declaration"); (ii) by-laws, including the rules and regulations and all other exhibits and schedules attached thereto (the "By-Laws") of 353 West 57th Street Condominium (the "Condominium"); and (iii) Purchase and Sale Agreement (the "PSA"), dated February 3, 2022, by and between the EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022 (the "Seller"), and CSC Hudson, LLC, a Delaware limited liability company, having an address at c/o CSC Co-Living, 6 St. Johns Lane, New York, New York 10013 ("Purchaser") for the conveyance of Unit 1 and Unit 2 of the Condominium (the "Owned Units") and Unit 4 and Unit 6 of the Condominium (the "Leased Units") (collectively, the "Units"). Capitalized terms used herein and not defined shall have the meaning ascribed to such terms in the Condominium Documents and the PSA.

The undersigned is a duly authorized representative of the Board of Managers of the Condominium (the "Board"). The Board, hereby certifies to Purchaser as follows:

1.      All Common Charges with respect to the Units which are due have been paid in full and, there are no outstanding liens, claims, dues or charges (including, without limitation, Common Charge Liens) due to the Condominium with respect to the Units. There are no pending emergency or special assessments, capital improvements, remedial assessments, unpaid liens or other financial obligations imposed by the Board with respect to the Units, and the Seller is current in regard to all its financial obligations to the Board and the Condominium.

2.   The current total monthly Common Charges for the Units are as follows:

      a.   Unit 1: $0.00.

      b.   Unit 2: $0.00.

      c.   Unit 4: $0.00.

      d.   Unit 6: $0.00.

3.   Neither the Board nor any party to any Condominium Document has a right of first refusal to lease or purchase the Units and Seller may freely without hindrance lease or sell the Units pursuant to the express terms of the Condominium Documents.

4.   The Board has no claims, demands, or offset rights against Seller.

5.   The Declaration and By-Laws are in full force and effect and have not been modified or supplemented or amended except as set forth above.

6.   To the actual knowledge of the undersigned on behalf of the Board, neither the Units nor Seller is in violation or breach of, or in default under, any of the Condominium Documents, and the Board has no actual knowledge of any event or condition which, with the passage of time or the giving of notice or both, would constitute such a violation, breach or default by the Units or Seller. To the best of the knowledge of the undersigned on behalf of the Board, the Board has not received written notice of any claims, demands, causes of action or proceedings, pending or threatened, against the Units or Seller.

7.   The undersigned representative of the Board agrees that this Estoppel Certificate may be relied upon by Purchaser, any assignee of Purchaser's rights under the PSA (collectively, "Assignee"), any mortgagee of Purchaser, any mortgagee of Assignee, any lessee or sublessee of Purchaser, any lessee or sublessee of Assignee, any mortgagee of any lessee or sublessee of Purchaser, any mortgagee of any lessee or sublessee of Assignee, and all of their respective successors and assigns.

8.   The undersigned representative of the Board is duly authorized and fully qualified to execute this Estoppel Certificate on behalf of the Board thereby binding the Board and the Condominium.

*[Signatures follow]*

EXHIBIT C-3

FORM OF CONFIRMING ESTOPPEL FOR STORE UNIT LEASE

(attached hereto)

## LEASE ESTOPPEL CERTIFICATE

Landlord: A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 1325 Avenue of the Americas, 28th Floor, New York, NY 10019

Tenant: EC 58th Street LLC, a Delaware limited liability company, having an address at c/o Cain International US Services LP, 350 Park Avenue, 14th Floor, New York, New York 10022

Assignee: 353W57 1704, LLC, a Delaware limited liability company, having an address of _____.

Premises: 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York, Unit No. 4

The undersigned Landlord, A & C West 57 LLC, a New York limited liability company, with an address at c/o Schatzco V, LLC, 250 West 57th Street, Suite 901, New York, NY 10107 (the "Landlord"), successor to Adrienne Schatz and Cheryl Hirsh as fee owner of the condominium unit known as Unit No. 4 (the "Store Unit") in the condominium known as 353 West 57th Street Condominium in the building known as and having the street address of 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York, Borough of Manhattan, City, County and State of New York (the "Premises") and described on Exhibit A attached hereto, is Lessor under that certain Lease dated as of January 1, 1999 made by Adrienne Schatz and Cheryl Hirsh as original Landlord and Henry Hudson Holdings LLC, as original Tenant, as referenced in a memorandum of lease dated as of September 30, 1999 and recorded on October 27, 1999 in Reel 2979 Page 2172 ("Store Unit Lease"), as amended by an unrecorded Amendment to Lease dated as of September 30, 1999, and as further amended by an unrecorded Amendment to Lease dated as of August 13, 2004, and as assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC, as assignee, dated as of November 24, 2020, recorded on December 4, 2020 in CRFN 2020000344629, hereby certifies as follows:

**1.** The Store Unit Lease is now in full force and effect, and has not been further amended, modified or supplemented. There do not exist any other agreements (including subordination, non-disturbance and attornment agreements) concerning the Store Unit, whether oral or written to which Landlord and Tenant (or the predecessors or successors of either) are parties.

**2.** The lease term under the Store Unit Lease commenced on January 1, 1999 and expires on December 31, 2098, unless sooner terminated or extended in accordance with the terms of the Store Unit Lease.  There are no options to renew.

**3.** The amount of Monthly Base Rent under the Store Unit Lease is currently $32,296.53 per month.

**4.** The Monthly Base Rent and all other charges (if any) have been paid through May 2022.

**5.** To the best knowledge of Landlord, there are no existing defaults (or events which, with the passage of time or the giving of notice, or both, would constitute a default) on the part of either Landlord or Tenant in the performance of any covenant, agreement, term, provision or condition contained in the Store Unit Lease.

**6.** Landlord is holding a security deposit under the Store Unit Lease in the amount of $31,250.00.  The security deposit required under the Store Unit Lease is currently $48,444.80. None of the security deposit has been applied by Landlord to payment of rent or any other amounts due under the Store Unit Lease, except as follows: NONE.

**7**. There are currently no mortgages, deeds of trust or other security instruments encumbering the fee interest in the Store Unit.

**8**. As of the date hereof, no options, rights of first refusal, rights to terminate, renew or extend the Store Unit Lease other than as described in the Store Unit Lease exist.

**9**. Landlord agrees that this Estoppel Certificate may be relied upon by Tenant, any mortgagee of Tenant, Assignee, any mortgagee of Assignee, and all of their respective successors and assigns.

**10.** Landlord's address for notices under the Store Unit Lease is:

> A & C West 57 LLC
> c/o SchatzCo V, LLC
> 1325 Avenue of the Americas, 28th Floor
> New York, New York 10019
>
> With a copy to:
>
> Armstrong Teasdale LLP
> 7 Times Square, 44th Floor
> New York, NY  10036
> Attention: Howard Schechter, Esq.

Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Store Unit Lease.

[The remainder of this page is left blank intentionally.]

2

**LANDLORD:**

A & C WEST 57 LLC
a New York limited liability company


By: _____

Name: _____

Title: _____

3

61458/0006-42435628v2
*ACTIVE 62692814v2*

EXHIBIT A

Legal Description of Premises and the Store Unit

The Condominium Unit (the "Unit") known as the Store Unit, also known as Unit No. 4 in the premises known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 356 West 58th Street, Borough of Manhattan, City, County and State of New York, said Unit being designated and described as the Store Unit and also known as Unit No. 4 in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985 and recorded April 24, 1985 in the Office of the Register of The City of New York, County of New York, in Reel 902, Page 1, as amended by the Amendment of Declaration, dated January 29, 1993 and recorded May 11, 1993 in the Office of the Register of the City of New York, in the County of New York, in Reel 1969 and Page 2286, as further amended by the Amended and Restated Declaration, dated February 12, 1999 and recorded July 16. 1999 in the Office of the Register of the City of New York, in the County of New York, in Reel 2913 and Page 1753, and Amendment to Amended and Restated Declaration, dated September 30, 1999 and recorded October 27, 1999 in the Office of the Register of the City of New York, in the County of New York in Reel 2979 and Page 2159 (which Declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated and described as Tax Lot No. 1704 in Block 1048, Section 4, Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building certified by Butler Rogers Baskett Architects, on March 27, 1985 and filed on April 22, 1985 as Condominium Plan No. 208, and on April 24, 1985 as Map No. 4326, as amended on December 14, 1992 and filed on May 5, 1993 as Plan No. 208A (Amendment to Plan No. 208), and on May 11, 1993 as Map No. 5192 in the aforesaid Register's Office.

The land upon which the Building Containing the Unit is erected is described as follows:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lyingand being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE southerly parallel with 9th Avenue and part of the distance through a party wall 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street 20 feet; and

THENCE southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

*TOGETHER* with an undivided 0.34577 interest in the Common Elements (as such term is defined in the Declaration).

61458/0006-42435628v2
*ACTIVE 62692814v2*

## EXHIBT D

## EXECUTED ALTERNATIVE AGREEMENT

(attached hereto)

**Error! Unknown document property name.**
*ACTIVE 64069355v10*

## MEMORANDUM OF AGREEMENT

This Agreement (the "Agreement") is by, between and among **EC 58th Street LLC d/b/a The Hudson Hotel,** as Seller Party on their own behalf and on behalf of any of their related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (hereinafter referred to as the "Seller"), **CSC Hudson LLC** on their own behalf and on behalf of any related and affiliated entities, and any current or future owner, manager, or operator, and their respective successors and assigns (collectively hereinafter referred to as "Purchaser" or "Employer") and the New York Hotel and Motel Trades Council, AFL-CIO (the "Union" or "HTC").

WHEREAS, the Seller and the Union are bound to the Hotel Association of New York City, Inc. – New York Hotel and Motel Trades Council, AFL-CIO Industry Wide Collectively Bargaining Unit (the CBA referred to as the "IWA") with respect to the property located at 356 West 58th Street, New York, NY 10019 (the "Property").

WHERAS, HTC represents employees employed by Seller and at the Property ("Bargaining Unit") are currently comprised of employees listed in Attachment A ("Current Employees");

WHEREAS, the Seller and Purchaser have discussed a transaction pursuant to which the Seller will sell the Property upon which the former Hudson Hotel (the "Hotel") was operated, which Hotel is subject to the IWA; and

WHEREAS, the Purchaser intends to renovate the Property and operate it as a residential building.

NOW, THEREFORE, IT IS AGREED:

1.   Effective immediately upon the Closing of the transaction, the Purchaser shall offer voluntary enhanced severance pay in the amount of thirty-five days (35) days per year of employment with the Hotel ("Enhanced Severance"), in addition to any Article 52 severance, minus any bridge payments already made, less usual statutory deductions, to all of the Hotel's Current Employees, as listed in Attachment A. The amount of Enhanced Severance will be calculated in accordance with the provisions of IWA Article 52, using the years of service and wage rate as of today's date. Only Article 52 severance pay shall be subject to Fund contributions. The payment of Enhanced Severance to the Hotel's Employees as listed in Attachment A shall constitute full satisfaction of any obligation of the Seller and Purchaser under Articles 52 and 57 of the IWA with respect to any employees or former employees of the Hotel. All employees accepting Enhanced Severance shall, as a condition of receiving same, execute a general release.

2.   The Purchaser shall pay withdrawal liability to the Pension Fund in an amount assessed by the Pension fund using the Segal Blend formula in one lump sum payment within 60 days of the receipt of the demand to pay withdrawal liability from the Pension Fund.

3.   Purchaser intends to convert the Hotel into market based residential housing or any other use other than a hotel or private membership club (collectively referred to as "converted use"). Unless and until the Purchaser converts the Property into market based residential housing, the IWA shall continue to apply (e.g., the Purchaser obtains all of the necessary

permits and approvals and commence renovations). No engineers shall be laid off during the renovation of the Property.

4.    If Purchaser, or its successor thereafter operates a hotel, private membership club, or food and beverage operation at the Property, or if the residential building offers leases of less than one (1) year, the former Employees shall be recalled and Purchaser, or its successor, shall be subject to the terms and conditions of the IWA and any agreements or practices supplementing the IWA, including the right to daily room clean. All current employees shall retain their rights to all fairly claimable bargaining unit work at the Property.

5.    Upon Local 94-94A-94B International Union of Operating Engineers, AFL-CIO ("Local 94") presenting signed authorization cards to the Purchaser demonstrating that Local 94 has the support of the majority of engineering bargaining unit employees, the Purchaser shall recognize Local 94 as the exclusive bargaining representative of bargaining unit employees.

6.    Upon Purchaser's recognition of Local 94 as described above in Paragraph 6, the Purchaser agrees to adopt the terms of the Residential Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Local 94-94A-94B International Union of Operating Engineers, AFL-CIO (Local 94 CBA). The Purchaser shall sign a separate assent to the Local 94 CBA. No engineer shall be laid off, suffer a loss of hours, hourly or weekly wages, or suffer any other adverse effect as a result of the execution, assignment, or adoption of this Agreement. It is understood that the current engineering employees will receive enhanced severance pursuant to Paragraph 1 above.

7.    Upon Local 32BJ SEIU ("32BJ") presenting signed authorization cards to the Purchaser demonstrating that 32BJ has the support of the majority of the non-engineering bargaining unit employees, the Purchaser shall recognize 32BJ as the exclusive bargaining representative of bargaining unit employees.

8.    Upon the Purchaser's recognition of 32BJ as described above in Paragraph 4, the Purchaser agrees to adopt the terms of the Apartment Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and Service Employees International Union, Local 32BJ ("32BJ Contract"). The Purchaser shall sign a separate assent to the 32BJ Contract. Bargaining unit positions in the converted use of the Property shall first be offered to Current Employees by seniority.

9.    The HTC will disclaim interest in the above-described Bargaining Unit, upon the Purchaser's recognition of Local 94 and 32BJ as described above in Paragraphs 6 and 8.

10.   This Agreement shall be binding on Purchaser's successors and assigns in accordance with IWA Article 59, the entirety of which is incorporated herein by reference. Purchaser agrees to adopt and assume the IWA subject to this Agreement. Upon closing of the sale of the Property to Purchaser, Seller shall be deemed to have complied with Article 59 of the IWA by virtue of this Agreement.

11.   With the exception of disputes arising under Paragraphs 6 and 8 above, any disputes between the parties or regarding this Agreement shall be subject to binding arbitration

ACTIVE 62680379v2

pursuant to the grievance and arbitration provisions of the IWA, the entirety of such grievance and arbitration provisions being incorporated herein by reference.  Disputes arising under Paragraphs 7 or 9 above shall be subject to binding arbitration pursuant to the respective grievance and arbitration provisions of the Local 94 or 32BJ Contract, the entirety of such grievance and arbitration provisions being incorporated herein by reference.

12.    This Agreement shall be subject to ratification by the Union.

Dated: _____, 2022

**SELLER:**

By: _____ Anthony D. Minella
Title:    President
Authorized to Sign

**HTC:**

_____
Richard Maroko
President
Authorized to Sign

**PURCHASER:**

By: Sal Smeke/ Alberto Smeke
Title:
Authorized to Sign

**32BJ:**

By: _____ 3-8-2022
Title: Vice Pres.
Authorized to Sign

**Local 94**

By: _____
Title:
Authorized to Sign

4896-1634-2028, v. 2

ACTIVE 62680379v2

ACTIVE 62771130v1

pursuant to the grievance and arbitration provisions of the IWA, the entirety of such grievance and arbitration provisions being incorporated herein by reference. Disputes arising under Paragraphs 7 or 9 above shall be subject to binding arbitration pursuant to the respective grievance and arbitration provisions of the Local 94 or 32BJ Contract, the entirety of such grievance and arbitration provisions being incorporated herein by reference.

12.      This Agreement shall be subject to ratification by the Union.


Dated: _____, 2022


**SELLER:**

By:      Anthony D. Minella
Title:   President
Authorized to Sign


**PURCHASER:**

By Sal Smeke/ Alberto Smeke
Title:
Authorized to Sign


**HTC:**

_____
Richard Maroko
President
Authorized to Sign


**32BJ:**

_____
By:
Title:
Authorized to Sign


**Local 94**

By: Robert Brown
Title: Business Manager
Authorized to Sign


4896-1634-2028, v. 2


*ACTIVE 62680379v2*

*ACTIVE 62771130v1*

EXHIBIT E

ALLOCATION OF PURCHASE PRICE

| | |
|---|---|
| EBC Unit | $98,500,000 |
| Modified Hotel Unit | $101,750,000 |
| 10TH Floor Unit | $6,600,000 |
| Store Unit | $650,000 |

23

<u>Exhibit B</u>

<u>Form of Memorandum of Tang Studio Architect, LLC</u>

(Attached hereto)

4866-0049-6406, v. 12
61458/0006-42946111v5

**TANG STUDIO**

Architect, LLC

—

Edwin Tang, AIA, CFM
1452 College Point Blvd
College Point, NY 11356
347.612.3249
office@tangstudiollc.com

April 18, 2022

**Parkview Financial REIT, LP and**
**Parkview Financial 2020, LP,**

℅ Mr. Paul Rahimian

Parkview Financial REIT, LP

11601 Wilshire Blvd, Suite 2100

Los Angeles, CA 90025

&

**356W58 Ground Lessor LLC**

c/o MSP Capital Investments LLC

3953 Maple Avenue, Suite 350

Dallas, Texas 75219

**Re: Zoning Compliance and Tenant Protection Plan for 353 W 57 St, New York NY 10019 (Hudson Hotel)**

Dear Sir or Madam,

**Zoning Compliance**
The subject property is a split lot located in two zoning districts, C6-4 and C1-8 commercial zoning districts, as well as the special Clinton District with a portion in the perimeter area and a portion in the northern sub area of the special Clinton District. Residential use is permitted as of right in both districts. Per the seller's existing zoning analysis prepared by their architect on 8/31/2021, the building contains a total of 437,597 gross square feet, of which 410,602 counts as zoning square footage after taking the as-of-right floor area exemption for mechanical spaces throughout the building.

The lot contains 29,155 square feet, and the buildable floor area ratio (FAR) is 10.0 and 9.0, respectively for the portions of the lot located in the C6-4 and C1-8 districts. Even if fully at the higher 10.0 FAR, only 291,550 sf of floor area would normally be buildable as a maximum. However, since the building was built prior to the current zoning regulations enacted in 1961, the overbuilt floor area is lawfully noncompliant and permitted to be converted from hotel use to market rate residential by electing the provisions of ZR 15-00 and NYS Multiple Dwelling Law section 277, for which the subject lot qualifies by virtue of its existence prior to the current 1961 zoning resolution and by virtue of its location in community district 4 of the borough of Manhattan.

In electing ZR 15-00, MDL Article 7B is invoked, where under section 277 indicates the following:

1 of 4

Any building in any city of more than one million persons which at any time prior to January first, nineteen hundred seventy-seven was occupied for loft, commercial, institutional, public, community facility or manufacturing purposes, may, notwithstanding any other article of this chapter, or any provision of law covering the same subject matter (except as otherwise required by the local zoning law or resolution), be occupied in whole or in part for joint living-work quarters for artists or general residential purposes if such occupancy is in compliance with this article. Such occupancy shall be permitted only if the following conditions are met and complied with.

The above provision allows the existing floor area to be converted to general residential purposes as long as the provisions of MDL 277 are met. The proposed conversion to general residential use will comply with the requirements of MDL section 277.

Under ZR 15-111 "number of permitted dwelling units" it also specifies that where the total floor area on the zoning lot exceeds the maximum floor area permitted by the applicable district regulations, such excess floor area may be converted in its entirety to residences."

The provisions of ZR 15-12 require that at least 30 percent of the gross roof area of a building containing 15 dwelling units shall be provided for recreational use, and fore each additional dwelling unit, 100 square feet of additional roof area shall be provided for recreational use, up to a maximum of 50 percent of gross roof area. The subject building will have up to 440 units, and therefore be subject to providing 50 percent of gross roof area for recreational use. The existing roof areas currently located on floors 3, 4, 14, 17, 20, 21, 23 and 24 total 19,085 sf, of which 16,395 sf will continue to be maintained as recreational areas accessible to all residents in the building. This is well in excess of 50% of gross roof area, and the balance of 2,690 sf is currently private terrace space and will remain so.

The building's legal uses include retail at portions of the cellar and ground floor, and hotel for the remainder of the building. The proposal conversion will leave the commercial spaces intact, and change the use for the hotel portion to market rate residential.

It should also be noted that the building's existing massing exceeds allowable sky exposure planes, but is lawfully noncompliant for the same reason due to the building's existence prior to the current zoning regulations. The proposed conversion to residential will occur within the building and no modifications are proposed to the existing building massing.

No accessory automobile parking or loading is required as part of the residential conversion, however bicycle parking will be required and provided for 50% of the residential unit total of 440.

There are 38 registered single room occupancy (SRO) units in the building that are regulated by the Housing and Preservation Department (HPD), and any

changes of occupancy or changes to unit layouts within the building require HPD to issue a certificate of no harassment (CONH). The proposed conversion will be sequenced into work that does not require a CONH to be filed immediately, such as accessibility upgrades, MEP upgrades and alterations to common areas; and the balance of the work such as changes to use, unit count and layout will occur after a CONH is obtained, which is estimated to be 12 months.

**Tenant Protection Plan (TPP)**

As required by section 28-120.1 of the NYC administrative code for occupied buildings, a tenant protection plan will be filed for each phase of the planned work, and will address the required categories of protection as follows:

- **Egress.** The SRO tenants have their own entrance and lobby on W 57 St, and this lobby will not be impacted by the planned work. All for building exit stairs will be unobstructed and fully accessible by all building occupants.
- **Fire Safety.** The building's sprinkler, standpipe and fire alarm system will be maintained throughout planned work on all floors that have occupancy. Upgrades to such systems will be planned in phases starting with vacant floors. For the occupied units, upgrades will be scheduled in coordination with each tenant, or tenants will be relocated to temporary accommodations before work commences to their spaces. For the period where fire protection systems will be off line for the upgrades, alternative safety measures such as certified fire guard personnel to monitor occupancy safety until such time that fire protections systems come back on line.
- **Health Requirements.** At work areas, dust barriers will be installed to contain dust. Where necessary, asbestos abatement, lead abatement, mold remediation, pest control will be undertaken to address any such conditions that present a hazard to health.
- **Compliance with Housing Standards.** Full compliance with the NYC Housing Maintenance Code will be enforced by the construction management team and ownership, including maintaining sanitary conditions, access to windows for natural light and ventilation, and all other provisions within the rights of tenants.
- **Structural Safety.** No major structural work is planned as part of the conversion. Any minor structural work that may occur or emerge at a later date will be designed and filed with the DOB by a licensed structural engineer, to ensure that at no time are building occupants exposed to any structural safety risks.
- **Noise Restrictions.** All work is planned to occur during business hours on weekdays, at noise levels in compliance with the NYC noise code. The construction management team will take measures to ensure that noise levels are minimized.
- **Maintaining Essential Services.** Building occupants will continue to be provided with heat, hot water, gas, electricity, elevator service and other services they currently enjoy, throughout the course of work. Where planned upgrades to any such services require an unavoidable disruption to such services, notification and coordination with each occupant will be arranged to minimize disruption, with alternatives provided where

appropriate.

- **Notice to Occupants.** Prior to the commencement of work, advance notification will be given to all building occupants in the form of written notices, and posted notices in all lobbies and elevator lobbies that are occupied.

Sincerely,

**Edwin Tang, AIA, CFM**

Exhibit C

Form of Sublease


(Attached hereto)


Exhibit C

**Form of Memorandum of Sublease**

<u>Record and Return to</u>:

Duval & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, NY 10022
Attention: Danielle Ash, Esq. & File Manager
File No.: 4308.0014

## MEMORANDUM OF SUBLEASE

THIS MEMORANDUM OF SUBLEASE (this "<u>Memorandum</u>"), is made as of the _____ day of May, 2022 (the "<u>Execution Date</u>") and is effective as of _____ day of May, 2022 (the "<u>Effective Date</u>"), between **356W58 GROUND LESSOR, LLC**, a Delaware limited liability company ("<u>Sublandlord</u>"), having an address at Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219, and **HUDSON 1701/1706, LLC** , a Delaware limited liability company ("<u>Subtenant</u>"), having an address at c/o CSC Co-Living 6 St. Johns Lane, New York, New York 10013.

## RECITALS

WHEREAS, Hudson 10th Floor LLC, a Delaware limited liability company (as successor-in-interest to Irving Schatz) ("<u>Original Landlord</u>"), as landlord, and EC 58th Street LLC, a Delaware limited liability company (as successor-in-interest to Ian Schrager Hotels, LLC) ("<u>Original Tenant</u>"), as tenant, are parties to that certain Amended and Restated Lease, dated February 11, 1999 (as amended, the "<u>Lease</u>") with respect to certain real property described in <u>Exhibit A</u> attached hereto (the "<u>Leased Premises</u>");

WHEREAS, notice of the Lease was given pursuant to that certain Amended and Restated Memorandum of Lease, dated as of February 12, 1999, which was recorded in the New York County Office of the Register of the City of New York (the "<u>Real Estate Records</u>") on March 23, 1999 in Reel 2841, Page 1872 and amended pursuant to that certain Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC, as assignor, to Henry Hudson Holdings LLC, as assignee, dated as of February 12, 1999 and recorded in the Real Estate Records on March 23, 1999 in Reel 2841 Page 1882, and as amended by an unrecorded Amendment to Lease made by and between Irving Schatz and Henry Hudson Holdings LLC dated as of August 17, 2004, and as further assigned by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by and between Henry Hudson Holdings LLC, as assignor, and EC 58th Street LLC as assignee, dated as of November 24, 2020 and recorded in the Real Estate Records on December 4, 2020 in CRFN 2020000344630 (collectively, the "<u>Memorandum of Lease</u>");

4890-0686-9270, v. 6

WHEREAS, on the Execution Date, Original Tenant, as assignor and Sublandlord, as assignee, have entered into that certain Assignment and Assumption of Lease, which is recorded in the Real Estate Records on May __, 2022 in CRFN _____ (the "Assignment Agreement"), whereby Original Tenant has assigned all of its right, title and interest in and to the Lease to Sublandlord and Sublandlord succeeded to the interest of Original Tenant as tenant under the Lease;

WHEREAS, Sublandlord and Subtenant desire to enter into this Memorandum to be recorded in the Real Estate Records in order that third parties will have notice of the existence of that certain Sublease Agreement, dated as of the Execution Date and effective as of the Effective Date, by and between Sublandlord and Subtenant (as the same may be modified, amended and/or restated from time to time, the "Sublease"), with respect to the Leased Premises.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, and intending to be legally bound hereby, Sublandlord and Subtenant agree as follows:

1.       Recitals Incorporated.  The foregoing recitals are incorporated by reference into this Section as if set forth in the Section in full.

2.       Incorporation of the Sublease.  The Sublease is unrecorded and is herein expressly incorporated by reference for a complete statement of the rights and obligations of Sublandlord and Subtenant with respect to the Leased Premises.  Any conflict between this Memorandum and the Sublease shall be governed by the terms of the Sublease.

3.       Grant of Sublease. Pursuant to that certain Sublease Agreement, Sublandlord has subleased to Subtenant and Subtenant has subleased from Sublandlord the Leased Premises. Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms set forth in the Sublease.

4.       Term of Sublease. The term of the Sublease (the "Term") commences on the Effective Date and will end on November 30, 2096, unless sooner terminated in accordance with its terms. Subtenant has no option to renew the Term of the Sublease.

5.       Release.  If the Sublease terminates or expires, then without requirement of further action, this Memorandum shall automatically terminate; provided, however, in any such event, promptly after a demand from Sublandlord or Subtenant to the other party, each party agrees to execute and cause the recordation of a release of this Memorandum that memorializes such expiration or termination.

6.       Miscellaneous. The parties have executed this Memorandum to be effective as of the Effective Date. This Memorandum may be executed in multiple counterparts, and each counterpart shall be deemed to be an original hereof; accordingly, this Memorandum is binding notwithstanding the execution of separate originals hereof, one by each of the parties hereto.

[Remainder of Page Intentionally Left Blank]

4890-0686-9270, v. 6

IN WITNESS WHEREOF, Sublandlord and Subtenant have executed this Memorandum as of the day and year first above written.

**SUBLANDLORD:**

**356W58 GROUND LESSOR, LLC**,
a Delaware limited liability company

By: _____
    Name:
    Title:

STATE OF _____   )
                         )   ss.:
COUNTY OF _____   )

On the ___ day of _____ in the year 20__ before me, the undersigned, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

*[additional signature(s) follow]*

4890-0686-9270, v. 6

**SUBTENANT:**

**HUDSON 1701/1706, LLC,**
**a Delaware limited liability company**

**By:** _____
**Name: Alberto Smeke Saba**
**Title: Authorized Signatory**

**By:** _____
**Name: Salomon Smeke Saba**
**Title: Authorized Signatory**

STATE OF _____    )
                                              )      ss.:
COUNTY OF _____    )

On the ___ day of _____ in the year 20__ before me, the undersigned, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

EXHIBIT A

Description of the Leased Premises

Lot 1706

The premises demised by that certain Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant; as modified by an Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872; as assigned by an Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882; as modified by an Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630; to wit:

**THE CONDOMINIUM UNIT** (hereinafter referred to as the "Unit") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Unit being designated and described as **Unit No. 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). This Unit is also designated as **Tax Lot 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.
**TOGETHER** with an undivided **3.89067 %** interest in the Common Elements (as such term is defined in the Declaration). 4884-6998-3262, v. 2

**The Land** on which the Building and Unit are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

Exhibit D-1

CONH Exemption Application

(Attached hereto)

**APPLICATION FOR AN EXEMPTION FROM THE CONH REQUIREMENT**                                    **Rev. July 2018**

1.  **Property:** Identify the property that is the subject of this application ("property").

    Borough:        ☒ Manhattan        ☐ Brooklyn        ☐ Bronx        ☐ Queens        ☐ Staten Island

    Block: ___1048___        Lot: _1701/1702_ HPD Registration ID: __117950__        BIN: __1026317__

    Street Address: ___353 West 57th Street, New York, New York 10019_____

2.  **Exemption Sought:** Please indicate the requirement and number designation of the exemption you are seeking. (See instructions.) Please check every box that applies.
    - ☐ Single Room Occupancy multiple dwelling. Exemption Number_____
    - ☒ Special Clinton District. Exemption Number_3_____
    - ☐ Special Hudson Yards District. Exemption Number_____
    - ☐ Preservation Area P-2 of the Special Garment Center District. Exemption Number_____
    - ☐ Greenpoint-Williamsburg anti-harassment area. Exemption Number_____
    - ☐ Special West Chelsea District. Exemption Number_____

3.  **Building Configuration:** Attach either an original certified copy of the certificate of occupancy or original certified letter from the Department of Buildings stating that the building does not have a certificate of occupancy.  Describe the legal and actual configuration of the building below.

| Type of Unit | Legal Configuration - Number of Units | Actual Configuration - Number of Units |
|---|---|---|
| **Apartment Dwelling Units** | 1 | 1 |
| **SRO Dwelling Units** | 959 | 959 |
| **Total Dwelling Units** | 960 | 960 |
| **Commercial Units** | 2 | 2 |

    What is the basis of the legal configuration described above?
    - ☒ Certificate of Occupancy (must attach if this is the basis of the legal configuration)
    - ☐ Original certified letter from the Department of Buildings

4.  **Building Occupancy:**  Is the building currently vacant?
    - ☐ Yes (How long has the building been vacant?) _____.
    - ☒ No (Describe the current occupancy below).

| Type of Unit | Occupied | Vacant | Total |
|---|---|---|---|
| **Apartment Dwelling Units** | 1 | 0 | 1 |
| **SRO Dwelling Units** | 37 | 922 | 959 |
| **Total Dwelling Units** | 38 | 922 | 960 |
| **Commercial Units** | 2 | 0 | 2 |

Printed on paper containing 30% post-consumer material.

1

**APPLICATION FOR AN EXEMPTION FROM THE CONH REQUIREMENT**                    **Rev. July 2018**

5.   **Applicant(s):**  Identify the applicant(s). An applicant must be a natural person, not an entity.

Name (1)  Alberto Smeke                         Name (2)  _____

Social Security Number: _____       Social Security Number: ____/____/_____

Date of Birth: __ /__ /____                    Date of Birth:  ____/____/_____

Mailing Address:  6 St. Johns Lane, New York, NY 10013

Business Telephone Number:  212-419-3149        Mobile Telephone Number:  347-421-3335

Email Address:  as@csc-coliving.com             Fax Number: _____

Relationship to the property (attach documentation):  Managing Member of Ground Lessee

Deed Owner:  356W58 Ground Lessor LLC

Deed Owner Address:  c/o MSP Capital Investments, LLC, 3953 Maple Ave., Ste. 350, Dallas, Texas 75219

6.   **Basis for Exemption**: Please provide a statement detailing the basis for the exemption and all documentation substantiating the claim.

The building is exempt from the requirement of obtaining a Certification of No Harassment on the basis, pursuant to §96-110 (b)(2) of the Zoning Resolution of the City of New York, that the building was initially occupied for residential purposes after January 1, 1974. Here, the certificate of occupancy in effect on January 1, 1974, dated December 14, 1972 and bearing certificate of occupancy number 72773, classified the building as a Class B Hotel. A copy of the certificate of occupancy, dated December 14, 1972, is attached as Exhibit A. This certificate of occupancy was effect until it was amended on June 4, 1976 pursuant to certificate of occupancy number 76793 attached as Exhibit B, which specifically stated it amended certificate of occupancy number 72773. Mult. Dwell Law §4(9) defines a Class B multiple dwelling as a multiple dwelling which is occupied, as a rule transiently. The Zoning Resolution of the City of New York classifies a Class B Hotel as a transient commercial use under Use Group 5 and was permitted only in commercial districts. I refer you to ZR §32-14. Thus, the building is exempt from the requirement of obtaining a Certification of No Harassment.

Printed on paper containing 30% post-consumer material.

2

**APPLICATION FOR AN EXEMPTION FROM THE CONH REQUIREMENT**                                      **Rev. July 2018**

7.    **Prior Applications for the Property:** Has anyone ever submitted an application for an exemption or waiver from the requirement for a certification of no harassment to HPD with respect to the property?

☒  No.

☐  Yes (Indicate the date of the application and any other relevant details).

| Date of the Application | Applicant | Details |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

8.    **Current Ownership**

A.  **Current Owners:** List each current holder of title to the property including individual owners, joint owners and corporate owners:

| Name | Date of Birth | SSN or EIN | Address |
|---|---|---|---|
| 356W58 Ground Lessor LLC |  | EIN: 88-1529701 | c/o MSP Capital Investments, LLC, 3953 Maple Ave., Suite 350, Dallas, Texas 75219 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Printed on paper containing 30% post-consumer material.

3

Rev. July 2018

**B. Current Principals and Officers:** If title to the property is held by an entity rather than by a person, list (i) every director, general partner, managing partner, or managing member of such entity, (ii) every officer of such entity, (iii) every other person authorized to sign for and bind such entity, and (iv) every person or entity holding a 10% or more economic interest in such entity. Provide an opinion of counsel letter which authorizes the individual to file the application.  An opinion of counsel letter is a letter by an attorney stating that the person signing the application for the corporation, partnership or limited liability corporation, is entitled to file and act on behalf of the entity and to make all of the representations and commitments therein.  **You must also provide the supporting documentation as listed in the Instructions to support the below.**

| Name | Date of Birth | SSN or EIN | Relationship to Owner | Address and Telephone Number |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Printed on paper containing 30% post-consumer material.

4

**APPLICATION FOR AN EXEMPTION FROM THE CONH REQUIREMENT**                                    **Rev. July 2018**

**C. Current Management:** List each person who served as a managing agent, a superintendent, collected rents, supervised or ordered repairs, or exercised any other discretion in the management of the property under the current ownership.

| Name and Address | Employer and Role | Period of Service | Nature of Service |
|---|---|---|---|
| Alberto Smeke | HUDSON 1701/1706, LLC<br>Asset Manager | May, 2022 - Present | Asset Management |
| Sal Smeke | HUDSON 1701/1706, LLC<br>Asset Manager | May, 2022 - Present | Asset Management |
| Denise Cruz | HUDSON 1701/1706, LLC<br>Property Manager | 1999 - Present | Property Management |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

9. **Reason for Application:** Briefly describe the reason for this application (e.g., the alteration or demolition work to be performed at the property).

Alterations and renovations of rooms at the building.

_____

_____

_____

_____

**A.** Have any applications for permits been filed with the Department of Buildings for work at the property which would require a certification of no harassment?

    X   No      (Even if no such applications for permits have been filed with the Department of Buildings, HPD may request copies of architectural plans).

    ☐   Yes    (Attach a copy of each such application, stamped by the Department of Buildings, and all attachments thereto).

**B.** Is any construction work currently in progress?

    X   No.

    ☐   Yes (Provide details below).

_____

_____

Printed on paper containing 30% post-consumer material.

5

**APPLICATION FOR AN EXEMPTION FROM THE CONH REQUIREMENT**    **Rev. July 2018**

**Applicant Consent:** The owner of the property hereby consents to permit HPD unfettered access to the property that is the subject of this application at all times and without prior notice. It is understood that the failure to provide such access when requested will prevent the processing of this application and, in the discretion of HPD, may result in the denial of an Exemption from the requirement of obtaining a Certification of No Harassment.

Further, it is understood that the application may be denied if it contains any false or misleading statements, or material omissions.

Further, it is understood that the applicant and/or undersigned must first obtain an Exemption from the requirement of obtaining a Certification of No Harassment from HPD and all necessary permits from the DOB prior to commencing the work at the subject premises, which is the subject of this application.

I, the applicant, have read the within application and attest that its entire contents are true and complete.


_____          _____
Applicant's Signature (1)                 Applicant's Signature (2)

_____          _____
Print Name Above                          Print Name Above

_____          _____
Relationship to the Property              Relationship to the Property



_____
Corporate Entity Designee Signature

_____
Print Name Above

_____
Relationship to the Property




Sworn to this _____ day of
_____, 20___.


_____
Notary

Printed on paper containing 30% post-consumer material.

PAGE 1 of 2 pages

Form 54 C (Rev. 7/64)-33M-703151(67)

# DEPARTMENT OF BUILDINGS

BOROUGH OF    MANHATTAN    , THE CITY OF NEW YORK

Date    December 14, 1972                            No.    72773

# CERTIFICATE OF OCCUPANCY

**NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHALL BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT**

AMENDS
This certificate supersedes C. O. No.    68201

THIS CERTIFIES that the new—altered—existing—building—premises located at

353 West 57th Street                            Block 1048    Lot    2

That the zoning lot and premises above referred to are situated, bounded and described as follows:

BEGINNING at a point on the    **north**    side of    **West 57th Street**
distant    20'    feet    **east**    from the corner formed by the intersection of

**West 57th Street**    and    **9th Avenue**

running thence    east 135'    feet; thence    north 200'-10"    feet;
thence    west 135'    feet; thence    south 200'-10"    feet;
running thence    feet; thence    feet;

to the point or place of beginning. conforms substantially to the approved plans and specifications, and to the requirements of the Building Code, the Zoning Resolution and all other laws and ordinances, and of the rules of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and

CERTIFIES FURTHER that, any provisions of Section 646e of the New York Charter have been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent.

N.B. or Alt. No.—    820-1966                    Construction classification—    **Class 1 Fireproof**
Occupancy classification—Heretofore Erected    Height    26    stories.    244'0"    feet.
Date of completion Existing Class "B" Hotel    Located in    C 4-7, C 1-8 &    Zoning District.
at time of issuance of permit November 1, 1972                R 10

This certificate is issued subject to the limitations hereinafter specified and to the following resolutions of the Board of Standards and Appeals:    } (Calendar numbers to be inserted here)
and The City Planning Commission:

## PERMISSIBLE USE AND OCCUPANCY

Off-Street Parking Spaces

Off-Street Loading Berths

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|
| Sub-Clr. | 120 | 150 | Motion picture studio and offices, swimming pool, men's recreation room (gym) with accessory use, women's lounge, employees' locker rooms, offices, rest room, storage, boiler room, service and utility rooms. |
| Clr. | 120 | 75 | Women's recreation room (gym) with accessory use, helps' locker rooms, pastry shop, carpenter shop, service and utility rooms. |
| 1st | 120 | 1200 | Assembly or ballroom, cocktail lounge, bar and kitchen, hotel offices, newstand, bar and stores and service rooms. |
| 1st Mezz. | 100 & 120 | 550 | Conference and meeting room, doctors' offices, hotel offices, beauty salon, electrolysis, Bermuda room, lockers, storage and service rooms. |
| 2nd | 100 | 600 | Dining and meeting room, kitchen and lounge, music, meeting and sitting rooms, two (2) lounges, cocktail lounge and service pantry. |

—OVER—

Sewage Disposal:
Sanitary Drainage _____ (DOES) (DOES NOT)    Discharge Into Either Sanitary or Combined Sewer

Storm Drainage _____ (DOES) (DOES NOT)    Discharge Into Either Storm or Combined Sewer

Borough Superintendent

OFFICE COPY—DEPARTMENT OF BUILDINGS

## PERMISSIBLE USE AND OCCUPANCY (continued)

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|
| 3rd | 50 | 160 | Offices, photo room, locker rooms and valet. |
| 4th | 40 | | Forty (40) hotel rooms and guest laundry room and maid's locker room. |
| 5th | 40 | | Fifty-six (56) hotel rooms, telephone switchboard room and maids' locker room. |
| 6th | 50 | 240 | Psychiatres office, group therapy rooms and offices for non-profit hospital related facilities--without sleeping accommodations, Use group 4. |
| 7th | 40 | | Sixty-eight (68) hotel rooms, and maids' locker room. |
| 8th | 50 | 100 | Hospital staff offices, maids' locker room. |
| 9th | 50 | 240 | Offices for non-profit hospital related facilities (without sleeping accommodations), Use group 4. |
| 10th | 40 | | Thirty-eight (38) hotel rooms, fifteen (15) hospital staff rooms, maids locker room, lounge, laundry. |
| 11th | 40 | | Twenty (20) hotel rooms, twenty-five (25) hospital staff rooms, maids locker room. |
| 12th | 40 | | Sixty-nine (69) hotel rooms and maids' locker room. |
| 13th | 40 | | Seventy-one (71) hotel rooms, maids' locker room. |
| 14th | 40 | | Forty-three (43) hotel rooms, maids' locker room and solarium. |
| 15th | 40 | | Forty (40) hotel rooms and maids' locker room. |
| 16th | 40 | | Forty-one (41) hotel rooms, maids' locker room. |
| 17th to 19th, incl. | 40 each | | Thirty-seven (37) hotel rooms, maids' locker room, each story. |
| 20th | 40 | | Thirty-four (34) hotel rooms, maids' locker room. |
| 21st | 40 | | Seventeen (17) hotel rooms, nine (9) hospital staff rooms, maids' locker room. |
| 22nd | 40 | | Thirty-six (36) hotel rooms and maids' locker room. |

*Borough Superintendent*

Form 54-C (Rev. 7/64)-33M-705111(67) ----- 345

**Page 2 of 2 pages**

# DEPARTMENT OF BUILDINGS

BOROUGH OF MANHATTAN , THE CITY OF NEW YORK

Date **April 27, 1976**                                                  No. **76696**

## CERTIFICATE OF OCCUPANCY

### NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHALL BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT

This certificate ........ C. O. No. **72773 & Y 75890**

THIS CERTIFIES that the ...... altered ...... building ...... located at
**353-363 West 57th Street**                                    Block **1044**  Lot **1**

That the zoning lot and premises above referred to are situated, bounded and described as follows:

BEGINNING at a point on the **north**                     side of **West 57th Street**

distant                        **0** feet          from the corner formed by the intersection of
                   **9th Avenue**              and **West 57th Street**

running thence **north 200'10"** ........... feet; thence **west 175** ................ feet;

thence **north 200'10"** ................ feet; thence **west 175** ................ feet;

running thence ........................ feet; thence ....................... feet;

to the point or place of beginning, conforms substantially to the approved plans and specifications and to the requirements of the Building Code, the Zoning Resolution and all other laws and ordinances, and of the rules of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and

CERTIFIES FURTHER that, any provisions of Section 646e of the New York Charter have been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent.

Alt. No.— **646-73**                                        Construction classification— **C1-1-Fireproof**

Occupancy classification ...... heretofore erected ...... C1. Height **26** stories, **244** feet.

Date of completion— **4-27-76**                             Located in **C4-7, C1-8, R-10** Zoning District.
at time of issuance of permit.

This certificate is issued subject to the limitations hereinafter specified and to the following resolutions of the Board of Standards and Appeals:                                   (Calendar number to be inserted here)
and The City Planning Commission:

### PERMISSIBLE USE AND OCCUPANCY

Off-Street Parking Spaces _____   **AMENDED C of O # 76793**

Off-Street Loading Berths _____   **DATED 6-4-76**

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|
| .th | 40 | | One-half (1/2) (Manager's) Duplex Apartment, fan and machine rooms. |
| 5th | | | Fan, machine and tank rooms on each story. |
| 6th | | | |

te: This building complies with Section 67 of the Multiple Dwelling Law.

Fire Department Approvals:
Standpipe System April 9, 1953.
Sprinkler System April 13, 1953.
Interior Fire Alarm and Watchman's Time Detector Systems August 31, 1954.

te: This is an amended Certificate of Occupancy for change of use, 1st floor.

THIS CERTIFICATE ...... BE POSTED ...... WITH THE RULES ...... MAR. 15 EST. 1967.

Sewage Disposal:
Sanitary Drainage _____  (DOES) (DOES NOT)  Discharge Into Either Sanitary or Combined Sewer

Storm Drainage _____  (DOES) (DOES NOT)  Discharge Into Either Storm or Combined Sewer

                                                            Borough Superintendent

OFFICE COPY—DEPARTMENT OF BUILDINGS

## PERMISSIBLE USE AND OCCUPANCY (continued)

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|-------|------|------|-----|
| | | | |

Borough Superintendent

PAGE 1 OF 4 PAGES

J-10136-3 CD/cc

**THE CITY OF NEW YORK**

ALT. 1 #101970921

# DEPARTMENT OF BUILDINGS

## CERTIFICATE OF OCCUPANCY

**BOROUGH** Manhattan    **DATE:** MAY 1 7 2001    **NO.** 101970921

This certificate supersedes C.O. No T 121285    ZONING DISTRICT C4-7, C1-8, R1

THIS CERTIFIES that the XXX-altered-XXXXXXXXX building-premises located at

353 West 57th Street    Block 1048    Lot 7502

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS. PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| SUB-CELLAR | 120 | 150 | | | | | SWIMMING POOL, MEN'S RECREATION ROOM (GYM) WITH ACCESSORY USE, WOMAN'S LOUNGE, EMPLOYEES LOCKER ROOMS OFFICES, REST ROOM, STORAGE, BOILER ROOM, SERVICE AND UTILITY ROOM, MECHANICAL EQUIPMENT ROOMS |
| CELLAR | 120 | 75 | | | | | WOMAN'S RECREATION ROOM (GYM) WITH ACCESSORY USE, LOCKER ROOM, SERVICE AND UTILITY RMS., SCENERY LIFT PIT, LAUNDRY RM., STORAGE |
| 1ST FLOOR | | | | | 5 | F-3 | HOTEL LOBBY |
| | 120 | 415 | | | | C | SUPERMARKET |
| | | 202 | | | 6 | C | RETAIL |
| | | 3 | | | | J-1 | SECURITY ROOM |
| | | | | | | | STORAGE |
| | | 4 | | | | | OFFICES |
| 1ST FLOOR MEZZ. | 120 | 26 | | | 5 | J-1 | OFFICES ROOM SERVICE, RECEIVING |
| | | 4 | | | 5 | D-2 | KITCHEN |
| | | 132 | | | | | CONFERENCE SPACE STORAGE PANTRY |
| | | 110 | | | | F-1B | CONFERENCE ROOM 1 |
| | | 1 | | | | | COAT ROOM |
| | | 139 | | | | F-1B | CONFERENCE ROOM 2 |

OPEN SPACE USES _____ **(CONTINUED)**
(SPECIFY-PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGE OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED
THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND
SPECIFICATIONS NOTED ON THE REVERSE SIDE.

Acting Commissioner

BOROUGH SUPERINTENDENT    COMMISSIONER

ORIGINAL    ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS    ☐ COPY



B Form 54 (rev. 8/85)
J-10136-3 db/cc

PAGE 2 OF 4 PAGES



## THE CITY OF NEW YORK

# DEPARTMENT OF BUILDINGS

ALT. 1 #101970921

## CERTIFICATE OF OCCUPANCY

**BOROUGH** Manhattan      **DATE** MAY 17 2001   **NO.** 101970921

This certificate supersedes C.O. No T 121285          ZONING DISTRICT C4-7, C1-8, R1

THIS CERTIFIES that the XXX-altered-XXXXXXXXX building-premises   located at

353 West 57th Street                               Block 1048      Lot 7502

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS. PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| 2ND FLOOR | 100 | 190 |  |  | 5 | F-4 | EATING & DRINKING ESTABLISHMENT |
|  |  | 297 |  |  |  | F-4 | EATING & DRINKING & LIBRARY ESTABLISHMENT (LOUNGE) SERVICE BAR ROOF TERRACE |
|  |  | 39 |  |  |  | F-4 | HOTEL REGISTRATION |
|  |  | 11 |  |  |  | D-2 | KITCHEN |
|  |  | 12 |  |  |  | J-1 | OFFICES (ACC.) |
|  |  | 1 |  |  |  |  | COAT CHECK |
| 3RD FLOOR |  | 119 |  |  | 5 | F-1B | MEETING ROOM 1 |
|  |  | 16 |  |  |  | J-1 | OFFICES (ACC.) |
|  |  |  |  |  |  | D-2 | LAUNDRY ROOM LOCKER ROOMS |
|  |  | 68 |  |  |  | F-1B | MEETING ROOM 2 |
|  |  | 55 |  |  |  | J-1 | LOCKER ROOMS |
| 4TH FLOOR |  |  | 49 |  | 5 | J-1 | FORTY-NINE (49) HOTEL ROOMS |
|  |  | 31 |  |  | 5 | J-1 | ACC. OFFICES |
| 5TH FLOOR |  |  | 63 |  | 5 | J-1 | SIXTY-THREE (63) HOTEL ROOMS |
| 6TH FLOOR |  |  | 68 |  | 5 | J-1 | SIXTY-EIGHT (68) HOTEL ROOMS |
| 7TH FLOOR |  |  | 70 |  | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |
| 8TH FLOOR |  |  | 70 |  | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |

OPEN SPACE USES _____ (CONTINUED)

(SPECIFY-PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGE OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED
THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND
SPECIFICATIONS NOTED ON THE REVERSE SIDE.

_____ P.E.                       _____ R.A
BOROUGH SUPERINTENDENT          Acting Commissioner   M-8
                                                COMMISSIONER

☐ ORIGINAL        ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS        ☐ COPY

B Form 54 (rev. 8/85)

THAT THE ZONING LOT ON WHICH THE PREMISES IS LOCATED IS BOUNDED AS FOLLOWS:

BEGINNING at point on the NORTH     side of WEST 57TH STREET
distant 20'    EAST    feet from the corner formed by the intersection of
9TH AVENUE    and    WEST 57TH STREET

running thence ................................................ feet; thence ................................................ feet;
thence EAST 155'-0" feet; thence NORTH 200'-0" feet;
thence WEST 135'-0" feet; thence SOUTH 100'-0" feet;
thence WEST 20'-0" feet; thence SOUTH 100'-0" feet;
to the point or place of beginning

XXXX ALT. No. 101970921 DATE OF COMPLETION    CONSTRUCTION CLASSIFICATION 1
BUILDING OCCUPANCY GROUP CLASSIFICATION    HEIGHT 26 STORIES, 244' FEET

THE FOLLOWING FIRE DETECTION AND EXTINGUISHING SYSTEMS ARE REQUIRED AND WERE INSTALLED IN COMPLIANCE WITH APPLICABLE LAWS.

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| STANDPIPE SYSTEM | | | AUTOMATIC SPRINKLER SYSTEM | | |
| YARD HYDRANT SYSTEM | | | | | |
| STANDPIPE FIRE TELEPHONE AND SIGNALLING SYSTEM | | | | | |
| SMOKE DETECTOR | | | | | |
| FIRE ALARM AND SIGNAL SYSTEM | | | | | |

STORM DRAINAGE DISCHARGES INTO:
A) STORM SEWER ☐    B) COMBINED SEWER ☐    C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

SANITARY DRAINAGE DISCHARGES INTO:
A) SANITARY SEWER ☐    B) COMBINED SEWER ☐    C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

LIMITATIONS OR RESTRICTIONS:
BOARD OF STANDARDS AND APPEALS CAL. NO _____
CITY PLANNING COMMISSION CAL. NO. _____
OTHERS:

B Form 54 (rev. 8/85)
J-10136-3 cb7cc

PAGE 3 OF 4 PAGES



THE CITY OF NEW YORK

ALT. 1 #101970921

# DEPARTMENT OF BUILDINGS

# CERTIFICATE OF OCCUPANCY

BOROUGH  Manhattan          DATE MAY 1 7 2001     NO.  101970921

This certificate supersedes C.O. No T 121285          ZONING DISTRICT C4-7, C1-8, R1

THIS CERTIFIES that the XXX-altered-XXXXXXXXX building-premises  located at

353 West 57th Street                          Block  1048      Lot 7502

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

## PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS PER SQ. FT. | MAXIMUM NO OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| 9TH FLOOR | | | 70 | | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |
| 10TH FLOOR | | | 70 | | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |
| 11TH FLOOR | | | 48 | | 5 | J-1 | FORTY-EIGHT (48) HOTEL ROOMS |
| 12TH FLOOR | | | 71 | | 5 | J-1 | SEVENTY-ONE (71) HOTEL ROOMS |
| 14TH FLOOR | | | 70 | | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |
| 15TH FLOOR | | | 40 | | 5 | J-1 | FORTY (40) HOTEL ROOMS |
| 16TH FLOOR | | | 39 | | 5 | J-1 | THIRTY-NINE (39) HOTEL ROOMS |
| 17TH FLOOR | | | 39 | | 5 | J-1 | THIRTY-NINE (39) HOTEL ROOMS |
| 18TH FLOOR | | | 33 | | 5 | J-1 | THIRTY-THREE (33) HOTEL ROOMS |
| 19TH FLOOR | | | 40 | | 5 | J-1 | FORTY (40) HOTEL ROOMS |
| 20TH FLOOR | | | 33 | | 5 | J-1 | THIRTY-THREE (33) HOTEL ROOMS |
| 21ST FLOOR | | | 26 | | 5 | J-1 | TWENTY-SIX (26) HOTEL ROOMS |
| 22ND FLOOR | | | 24 | | 5 | J-1 | TWENTY-FOUR (24) HOTEL ROOMS |
| 23RD FLOOR | | | 35 | | 5 | J-1 | THIRTY-FIVE (35) HOTEL ROOMS |
| 24TH FLOOR | | | 9 | | 5 / 5 | J-1 / J-1, E | ONE (1) HOTEL ROOM / ACCESSORY OFFICE PANTRY/STORAGE |

OPEN SPACE USES _____      (CONTINUED)
(SPECIFY PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGE OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED
THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND
SPECIFICATIONS NOTED ON THE REVERSE SIDE.

_____          _____
BOROUGH SUPERINTENDENT            Acting Commissioner
                                  COMMISSIONER

☐ ORIGINAL        ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS      ☐ COPY



B Form 54 (rev. 8/85)
J-16136-3 Ob/cc

PAGE 4 OF 4 PAGES

### THE CITY OF NEW YORK

ALT. 1 #101970921

# DEPARTMENT OF BUILDINGS

# CERTIFICATE OF OCCUPANCY



**BOROUGH** Manhattan  **DATE:** MAY 1 7 2001 **NO.** 101970921

This certificate supersedes C.O. No T 121285   ZONING DISTRICT C4-7, C1-8, R1

THIS CERTIFIES that the XXX-altered-XXXXXXXXX building-premises located at

353 West 57th Street  **Block** 1048  **Lot** 7502

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

## PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS. PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| 25TH FLOOR | | | | | | D-2 | MECHANICAL ROOM |
| 26TH FLOOR | | | | | | D-2 | MECHANICAL ROOM |
| 27TH FLOOR | | | | | | D-2 | MECHANICAL ROOM |
| NOTE: | THIS BUILDING COMPLIES WITH SECTION 67 OF THE MULTIPLE DWELLING LAW. | | | | | | |
| | FIRE DEPARTMENT APPROVALS: | | | | | | |
| | - STANDPIPE SYSTEM - APRIL 9, 1951 | | | | | | |
| | - SPRINKLER SYSTEM - APRIL 13, 1953 | | | | | | |
| | - INTERIOR FIRE ALARM AND WATCHMAN'S TIME DETECTOR SYSTEMS - AUGUST 31, 1954 | | | | | | |

OPEN SPACE USES _____
(SPECIFY: PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGE OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED
THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND
SPECIFICATIONS NOTED ON THE REVERSE SIDE.

_____ P.E.  _____ R.A.
BOROUGH SUPERINTENDENT  Zoning Commissioner

☐ ORIGINAL  ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS  ☐ COPY

JW  11-30-01

### Deed

THIS INDENTURE made the ___18th___ day of December, 1998, between EDUCATIONAL BROADCASTING CORPORATION, a not-for-profit corporation chartered by the Board of Regents of the State of New York, having its principal office at 450 West 33rd Street, New York, New York 10001 (the "Grantor"), and HENRY HUDSON HOLDINGS LLC, a Delaware limited liability company having an address c/o Ian Schrager Hotels LLC, 475 Tenth Avenue, New York, NY 10018 (the "Grantee").

### WITNESSETH:

That the Grantor, in consideration of Ten ($10.00) Dollars and other good and valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs, successors and assigns of the Grantee, forever:

The Condominium Unit (the "Unit") known as Unit No. 1 in the premises known as 353 West 57th Street Condominium and by the street number 353-61 West 57th Street a/k/a 356 West 58 Street, Borough of Manhattan, City, County and State of New York, the ("Condominium"), said Unit being designated and described as the EBC Unit in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985, and recorded in the New York County Office of the Register of the City of New York (the "Register's Office") on April 24, 1985, in Reel 902, Page 1, as amended by First Amendment To Declaration dated January 19, 1993 and recorded in the Register's Office on May 11, 1993 in Reel 1969, Page 2286 (said Declaration, as the same maybe amended from time to time, being hereinafter referred to as the "Declaration") and also designated as Tax Lot 1701 in Block 1048 of Section 4, of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of The City of New York and on the Floor Plans of said Building, certified by Butler Rogers Baskett Architects, on March 27, 1985, and filed on April 22, 1985 with the Real Property Assessment Department of The City of New York as Condominium Plan No. 208 and also filed on April 24, 1985 in the Register's Office as Condominium Map No. 4326, as amended by Amended Floor Plans certified by Butler Rogers Baskett Architects on December 12, 1992, which Amended Floor Plans were also filed in the Real Property Assessment Department of the City of New York on May 5, 1993 as Condominium Plan No. 208A (Amendment to Plan No. 208), and also filed in the Register's Office on May 11, 1993 as Condominium Map No. 5192. The premises within which the EBC Unit is located are more particularly described in Schedule A attached hereto and made a part hereof. All capitalized herein that are not separately defined herein shall have the meanings given to those terms in the Declaration or in the By-Laws of 353 West 57th Street Condominium. (Said By-Laws, as the same may be amended form time to time, are hereinafter referred to as the "By-Laws");

Premises:    353 West 57th Street
             Commercial Unit #1

1

TOGETHER with an undivided 44.05105 percent interest in the Common Elements;

TOGETHER with the appurtenances and all the estate and the right of the Grantor in and to the Unit;

TOGETHER with, and SUBJECT to, the rights, obligations, easements, restrictions and other provisions set forth in the Declaration and the By-Laws, all of which shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit, as though recited and stipulated at length herein;

SUBJECT to such other liens, agreement, covenants, easements, restrictions and other matters as pertain to the Unit and/or the Property.

TO HAVE AND TO HOLD the same unto the Grantee, and the heirs, successors and assigns of the Grantee, forever, and the Grantor covenants Grantor has not done or suffered anything whereby the Unit or the Property have been encumbered in any way whatever.

If any provision of the Declaration or the By-Laws is invalid or would cause the Declaration of the By-Laws to be insufficient to submit the Property to the provisions of the New York Condominium Act, or if any provision that is necessary to cause the Declaration and the By-Laws to submit that Property to the provisions of the New York Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are insufficient to submit the Property to the provisions of the New York Condominium Act, the applicable provisions of Article 26 of the Declaration shall control.

The Grantor, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purposes of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws (and any Rules and Regulations adopted under the By-Laws) and agrees to comply with all the terms and provisions thereof.

The term "Grantee" shall be read as "Grantees" whenever the sense of this Indenture so requires.

The intended use of the Unit is any use permitted under the Declaration.

2

IN WITNESS WHEREOF, the Grantor and the Grantee have duly executed this Indenture as of the day and year first above written.

EDUCATIONAL BROADCASTING CORPORATION, Grantor

Thomas A. Conway
Vice President and Chief Financial Officer

HENRY HUDSON HOLDINGS LLC, Grantee

Name: Peter Ahl
Title: Authorized Signatory

3

STATE OF NEW YORK )
)ss:
COUNTY OF NEW YORK)

On the _18_ day of December, 1998, before me, the undersigned, a notary public in and for the State of New York, personally appeared Thomas A. Conway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
ARIANNE L. GOLUB
Notary Public, State of New York
No. 01GO5038284
Qualified in Nassau County
Commission Expires October 31, 30_22_

STATE OF NEW YORK )
)ss:
COUNTY OF NEW YORK)

On the _17th_ day of December, 1998, before me, the undersigned, a notary public in and for the State of New York, personally appeared _Peter Ahl_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
LASCELLES ELS...
Notary Public, State of New York
No. 01EL6015731
Qualified in Bronx County
Commission Expires Nov...

4

SCHEDULE A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE Easterly along the said northerly side of 57th Street 155 feet;

THENCE Northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE Westerly along the said southerly side of 58th Street 135 feet to the point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE Southerly parallel with 9th Avenue and part of the distant through a party wall 100 feet 10 inches;

THENCE Westerly parallel more or less with 58th Street 20 feet;

THENCE Southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

5

# CITY REGISTER RECORDING AND ENDORSEMENT PAGE
## - NEW YORK COUNTY -
### (This page forms part of the instrument)

Block(s) ___ 1048

Lot(s) ___ 1701

Record & Return to: Skadden, Arps, Slate, Meagher & Flom LLP
919 Third Avenue
New York, New York 10022
Attn: John Davis, Esq.

Title/Agent Company name: **Title Associates Inc.**

Title Company number: TA#98(01) 1101

REEL 2787 PG 0897

---

THE FOREGOING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:

Examined by (▲):

| | |
|---|---|
| Mtge Tax Serial No. | |
| Mtge Amount | $ |
| Taxable Amount | $ |

Exemption (✓) .......... YES ☐   NO ☐

Type: (CIRCLE ONE) [339EE]   [255]   [OTHER _____]

Dwelling Type: (CIRCLE ONE) [1 to 2]   [3]   [4 to 6]   [over 6]

### TAX RECEIVED ON ABOVE MORTGAGE ▼

| | |
|---|---|
| County (basic) | $ |
| City (Addt'l) | $ |
| Spec Addt'l | $ |
| TASF | $ |
| MTA | $ |
| NYCTA | $ |
| **TOTAL TAX** | $ |

Apportionment Mortgage (✓) YES ☐   NO ☐

Joy A. Bobrow, City Register

---

City Register Serial Number ➡   000385

Indexed By (▲):   Verified By (▲):

Block(s) and Lot(s) verified by (✓):
Address ☐✓   Tax Map ☐
Extra Block(s) ___   Lot(s) ___

| | |
|---|---|
| Recording Fee ___ A | $ 47 |
| Affidavit Fee ___(C) | $ |
| TF-584/582 Fee ..(Y) | $ — |
| RPTT Fee ___(R) | $ 25 |

HPD-A ☒   HPD-C ☐

New York State Real Estate Transfer Tax ▼
$ 91760

Serial Number ➡   007118

New York City Real Property Transfer Tax Serial Number ➡   R 0078

New York State Gains Tax Serial Number ➡

---

### RECORDED IN NEW YORK COUNTY
### OFFICE OF THE CITY REGISTER
1999 JAN -5   A 9 32



Witness My Hand and Official Seal

Joy A. Bobrow

City Register

DEED 0156
LID/TL CSRR REPT DATE TIME
1-1   1 42604 Jan 5-99 10:12
47.00

CRGEN96N.EPG 1/98

# DEED

THIS INDENTURE made the ___12___ day of February, 1999 between IAN SCHRAGER HOTELS LLC (f/k/a WEST 57th LLC), a New York limited liability company, having an address at c/o Ian Schrager Hotels LLC, 475 Tenth Avenue, New York, New York 10018 (the "Grantor"), and HENRY HUDSON HOLDINGS LLC, a Delaware limited liability company, having an address at c/o Ian Schrager Hotels LLC, 475 Tenth Avenue, New York, New York 10018 (the "Grantee").

## W I T N E S S E T H:

That the Grantor, in consideration of Ten ($10.00) Dollars and other good and valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs, successors and assigns of the Grantee, forever:

The Condominium Unit (the "Unit") known as Unit No. 2 in the premises known as 353 West 57th Street Condominium and by the street number 353-61 West 57th Street a/k/a 356 West 58 Street, Borough of Manhattan, City, County and State of New York (the "Condominium"), said Unit being designated and described as the Modified Hotel Unit in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated 4/11/85, and recorded in the New York County Office of the Register of the City of New York on 4/24/85, in Reel 902, Page 1, as amended by First Amendment To Declaration dated 1/29/93 and recorded on 5/11/93 in Reel 1969, Page 2286 (said Declaration dated as the same may be amended from time to time, being hereinafter referred to as the "Declaration") and also designated as Tax Lot 1702 in Block 1048 of Section 4, of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of The City of New York and on the Floor Plans of said Building, certified by Butler Rogers Baskett Architects, on 3/27/85, and also filed with the Real Property Assessment Department of The City of New York as Condominium Plan No. 208, Map No. 4326, and Plan No. 208A (Amendment to Plan No. 208), Map No. 5192 respectively on 4/22/85, and on 5/5/93. The

353 West 57th Street, Unit 2

premises within which the Unit is located is more particularly described in Schedule A attached hereto and made a part hereof. All capitalized terms herein that are not separately defined herein shall have the meanings given to those terms in the Declaration or in the By-Laws of 353 West 57th Street Condominium. (Said By-Laws, as the same may be amended from time to time, are hereinafter referred to as the "By-Laws");

TOGETHER with an undivided 46.94011 percent interest in the Common Elements;

TOGETHER with the appurtenances and all the estate and right of the Grantor in and to the Unit;

TOGETHER with, and SUBJECT to, the rights, obligations, easements, restrictions and other provisions set forth in the Declaration and the By-Laws, all of which shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit, as though recited and stipulated at length herein;

SUBJECT to such other liens, agreement, covenants, easements, restrictions and other matters as pertain to the Unit and/or the Property.

TO HAVE AND TO HOLD the same unto the Grantee, and the heirs, successors and assigns of the Grantee, forever.

If any provision of the Declaration or the By-Laws is invalid or would cause the Declaration or the By-Laws to be insufficient to submit the Property to the provisions of the New York Condominium Act, or if any provision that is necessary to cause the Declaration and the By-Laws to submit the Property to the provisions of the New York Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are insufficient to submit the Property to the provisions of the New York Condominium Act, the applicable provisions of Article 26 of the Declaration shall control.

The Grantor covenants that the Grantor has not done or suffered anything to be done whereby, the Unit has been encumbered in any way whatever, except as aforesaid.

REEL 2841 PG 1856

The Grantor, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the Grantor will receive the consideration for this convey- ance and will hold the right to receive such consider- ation as a trust fund for the purposes of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws (and any Rules and Regu- lations adopted under the By-Laws) and agrees to comply with all the terms and provisions thereof.

The term "Grantee" shall be read as "Grantees" whenever the sense of this Deed so requires.

This unit is intended for commercial use.

IN WITNESS WHEREOF, the Grantor and the Grantee have duly executed this Indenture as of the day and year first above written.

IAN SCHRAGER HOTELS LLC,
  Grantor

By: _____
Name: Peter Ahl
Title: Authorized Signatory


HENRY HUDSON HOLDINGS LLC,
  Grantee

By: _____
Name: Peter Ahl
Title: Authorized Signatory

4

STATE OF NEW YORK )
                        ) ss.
COUNTY OF NEW YORK )

        On the _12th_ day of February in the year 1999 before me, the undersigned, a notary public in and for said state, personally appeared _Peter Ahl_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                              _Beatrice S. Williams_
                              Notary Public
                              My commission expires:

[Notary Seal]

                        BEATRICE S. WILLIAMS
                  Notary Public, State of New York
                      No. 01WI6015474
                  Qualified in Queens County
              Commission Expires Nov. 2, 200_

STATE OF NEW YORK )
                        ) ss.
COUNTY OF NEW YORK )

        On the _12th_ day of February in the year 1999 before me, the undersigned, a notary public in and for said state, personally appeared Peter W. Ahl, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                              _Beatrice S. Williams_
                              Notary Public
                              My commission expires:

[Notary Seal]

                        BEATRICE S. WILLIAMS
                  Notary Public, State of New York
                      No. 01WI6015474
                  Qualified in Queens County
              Commission Expires Nov. 2, 200_

STATE OF NEW YORK )
                        ) ss.
COUNTY OF NEW YORK )

5

SCHEDULE A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue and with the northerly side of 57th Street;

RUNNING THENCE Easterly along the said northerly side of 57th Street 155 feet;

THENCE Northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE Westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE Southerly parallel with 9th Avenue and part of the distant through a party wall 100 feet 10 inches;

THENCE Westerly parallel more or less with 58th Street 20 feet;

THENCE Southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

256#31.02-New YorkSEA

16

REEL 2841 PG 1860

# CITY REGISTER RECORDING AND ENDORSEMENT PAGE
## - NEW YORK COUNTY -
*(This page forms part of the instrument)*

Block(s): 1048

Lot(s): 1702

Title/Agent Company Name: Title Associates Inc.

Title Company Number: TA#99(01)054

RECORD & RETURN TO:

NAME ▼
Neil L. Rock, Esq.
Skadden, Arps, Slate, Meager&Flom LLP
ADDRESS ▼
919 Third Avenue
CITY ▼ STATE ▼ ZIP ▼
New York, New York 10022

---

**OFFICE USE ONLY - DO NOT WRITE BELOW THIS LINE**

THE FOREGOING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:

Examined by (✓):

| | |
|---|---|
| Mtge Tax Serial No. | |
| Mtge Amount | $ |
| Taxable Amount | $ |

Exemption (✓) ....... YES ☐ NO ☐

Type: [339EE] [255] [OTHER_____]

Dwelling Type: [1 to 2] [3] [4 to 6] [OVER 6]

**TAX RECEIVED ON ABOVE MORTGAGE ▼**

| | |
|---|---|
| County (basic) | $ |
| City (Add'l) | $ |
| Spec Addt'l | $ |
| TASF | $ |
| MTA | $ |
| NYCTA | $ |
| **TOTAL TAX** | $ |

Apportionment Mortgage (✓) YES ☐ NO ☐

Joy A. Bobrow, City Register

City Register Serial Number → 013562

| | | | |
|---|---|---|---|
| Indexed By (✓): | | Verified By (✓): | |

Block(s) and Lot(s) verified by (✓)

Address ☐ Tax Map ☐

Extra Block(s) _____ Lot(s) _____

| | | |
|---|---|---|
| Recording Fee | $ | 52 |
| Affidavit Fee (C) | $ | |
| TP-584/582 Fee (Y) | $ | |
| RPTT Fee (R) | $ | 25 |
| HPD-A ☐ | | HPD-C ☐ |

New York State Real Estate Transfer Tax ▼
$

Serial Number → 009792

New York City Real Property Transfer Tax Serial Number → R 2799

New York State Gains Tax Serial Number →

DEED 0404 52.00

LO/TL CSHR RECPT DATE TIME
1-1 1 51892 Mar 25 99 13:11

## RECORDED IN NEW YORK COUNTY
## OFFICE OF THE CITY REGISTER

1999 Mar ... 13:52

Witness My Hand and Official Seal

*Joy A. Bobrow*

**City Register**

CRGPA09N.BPG 11/98

45 - H - 002

<table>
<tr><td>

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

</td><td>



2020120200374002002E7430

</td></tr>
</table>

## RECORDING AND ENDORSEMENT COVER PAGE   PAGE 1 OF 11

| | | |
|---|---|---|
| **Document ID:** 2020120200374002 | Document Date: 11-24-2020 | Preparation Date: 12-02-2020 |

Document Type: DEED, OTHER
Document Page Count: 10

| PRESENTER: | RETURN TO: |
|---|---|
| FIRST AMERICAN TITLE INSURANCE CO NCS<br>666 THIRD AVENUE<br>3020-990850NY1AS<br>NEW YORK, NY 10017<br>212-850-0652<br>ASCARPA@FIRSTAM.COM | WEIL GOTSHAL & MANGES LLP<br>767 FIFTH AVE<br>DAVID HERMAN ESQ<br>NEW YORK, NY 10153 |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1048 | 1701 | Entire Lot | 1 | 353 WEST 57TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1048 | 1702 | Entire Lot | 2 | 353 WEST 57TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

### CROSS REFERENCE DATA

CRFN_____ or DocumentID_____ or _____ Year_____ Reel____ Page_____ or File Number_____

### PARTIES

| GRANTOR: | GRANTEE: |
|---|---|
| HENRY HUDSON HOLDINGS, LLC<br>131 SPRING STREET, 4TH FLOOR, SUITE 401-2<br>NEW YORK, NY 10012 | EC 58TH STREET LLC<br>C/O: ELDRIDGE INDUSTRIES LLC, 600 STEAMBOAT ROAD, SUITE 200<br>GREENWICH, CT 06830 |

### FEES AND TAXES

| **Mortgage :** | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | $ | 250.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ | 7,053,998.07 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 1,746,706.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** | |
| NYCTA: | $ | 0.00 | Recorded/Filed      12-04-2020 14:27 | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | |
| TOTAL: | $ | 0.00 | **2020000344628** | |
| Recording Fee: | $ | 90.00 | | |
| Affidavit Fee: | $ | 0.00 | *City Register Official Signature* | |

3020-990850041

## DEED IN LIEU OF FORECLOSURE

This **INDENTURE**, made the 24th day of November, two thousand and twenty

**BETWEEN**

**HENRY HUDSON HOLDINGS, LLC**, a Delaware limited liability company, having an address at 131 Spring Street, 4th Floor, New York, New York,

party of the first part, and

**EC 58TH STREET LLC**, a Delaware limited liability company, having an address at 600 Steamboat Road, Greenwich, Connecticut,

party of the second part,

**WITNESSETH**, that the party of the first part, in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

Tax Map Designation:

Block.: 1048

Lot(s): 1701 and 1702

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, described on Exhibit A hereto:

See Exhibit A attached hereto and incorporated herein by this reference (the "Premises").

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described Premises to the center lines thereof;

**TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said Premises;

**TO HAVE AND TO HOLD** the Premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever;

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvements and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose;

**AND** the party of the first part and the party of the second part (by its acceptance of this Deed) acknowledge and agree that it is their mutual intent that the conveyances and transfers pursuant to this Deed do not and shall not effect a merger of (i) Holliday Park, LLC and its interest in the Property under the mortgages set forth on Exhibit B attached hereto with (ii) the party of the second part's interest in the Property pursuant to this Deed. The party of the first part acknowledges and agrees that this is the (i) the free and voluntary act of the party of the first part, (ii) the conveyance is intended to be an absolute, unconditional and irrevocable conveyance and (iii) the consideration is fair and adequate and is of reasonably equivalent value.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

*[Signature Page Follows.]*

9283/16226-002 CURRENT/119832177V4

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed the day and year first above written.

**HENRY HUDSON HOLDINGS, LLC**

By:    Hudson Delano Senior Mezz LLC,
        its sole member

By:    Hudson Delano Junior Mezz LLC,
        its sole member

By:    Morgans Group, LLC,
        its sole member

By:    Morgans Hotel Group Co. LLC,
        its sole member

By:    SBE ENT Holdings, LLC,
        its sole member

By: _____
Name: Philippe Zrihen
Title: Chief Business Officer

State of ___NEW YORK___ )
                           ) ss.:
County of ___NEW YORK___ )

On the __13__ day of __November__ in the year 2020 before me, the undersigned personally appeared _____Philippe Zrihen_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

**SARA ELIZABETH CODY**
Notary Public, State of New York
No. 01CO6405567
Qualified in New York County
Commission Expires March 9, 2024

*[Signature Page to Bargain and Sale Deed in Lieu of Foreclosure]*

BARGAIN AND SALE DEED WITHOUT
COVENANT AGAINST GRANTOR'S ACT

TITLE
NO. _____

TO


EC 58ᵀᴴ STREET LLC, a Delaware limited liability
company

SECTION:
BLOCK: 1048
LOT(S): 1701 and 1702
COUNTY OR TOWN: New York County
TAX BILLING ADDRESS:

c/o Eldridge Industries, LLC
600 Steamboat Road,
Greenwich, Connecticut 06830

RECORD AND RETURN BY MAIL TO:

| |
|---|
| Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attention: David Herman, Esq. |

9283/16226-002 CURRENT/119832177V4

## EXHIBIT A

### Premises

### PARCEL I (Unit 1 a/k/a EBC Unit, Lot 1701):

The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 1, also known as EBC Unit, in the building (hereinafter referred to as the "Building") known as 353 West 57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is more particularly described below), and which Declaration was recorded in the Office of the City Register, New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot 1701 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/27/1985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium Map No. 5192.

Together with an undivided 44.05105% interest in the common elements (as such term is defined in The Declaration).

### PARCEL II (Unit 2 a/k/a Modified Hotel Unit, Lot 1702):

The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 2, also known as Modified Hotel Unit, in the building (hereinafter referred to as the "Building") known as 353 West 57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is more particularly described below), and which Declaration was recorded in the Office of the City Register, New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot

1702 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/27/1985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium Map No. 5192.

Together with an undivided 46.94011% interest in the common elements (as such term is defined in the Declaration).

Which Condominium Units are located on the land described below:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street, 20 feet; and

THENCE southerly and part of the way through another party wall, 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

356 West 58th Street
New York, New York 10019
Block 1048, Lots 1701 and 1702

## Exhibit B

### Mortgages

### MORTGAGE 'A'

AMENDED AND RESTATED REPLACEMENT MORTGAGE A made by HENRY HUDSON HOLDINGS LLC, MORGANS HOLDINGS LLC, AND ROYALTON, LLC to WACHOVIA BANK, NATIONAL ASSOCIATION in the amount of $217,000,000.00 dated 10/6/2006, recorded 12/11/2006 as CRFN 2006000679014.

*[NOTE- THIS MORTGAGE DERIVED FROM A NOTE AND MORTGAGE SEVERANCE AGREEMEENT RECORDED 12/11/2006 AS CRFN 200600067901]*

PARTIAL RELEASE OF MORTGAGE made by and between HENRY HUDSON HOLDINGS LLC, MORGANS HOLDINGS LLC, AND ROYALTON, LLC and WACHOVIA BANK, NATIONAL ASSOCIATION dated 10/6/2006, recorded 12/11/2006, as CRFN 2006000679017. Releases Royalton Hotel and Morgans Hotel, Block 867 Lot 20 and Block 1259 Lot 11, other premises not made a part hereof, from Mortgage 'A'.

AGREEMENT OF CONSOLIDATION AND MODIFICATION OF MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING made by and between HENRY HUDSON HOLDINGS LLC and WACHOVIA BANK, NATIONAL ASSOCIATION dated as of 10/6/2006, recorded 12/11/2006, as CRFN 2006000679020. Modifies, extends and spreads Mortgage 'A' over those portions of the premises not already covered thereby, and amends and restates same, amount outstanding is $217,000,000.00.

ASSIGNMENT OF MORTGAGE made by WACHOVIA BANK, NATIONAL ASSOCIATION to LASALLE BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WHALE 8, solely to the extent set forth in the applicable Partition Agreement, the applicable Non-Trust Portion Holder dated as of 6/27/2007, recorded 11/27/2007 as CRFN 2007000587889. Assigns Mortgage 'A'.

MODIFICATION OF AGREEMENT OF CONSOLIDATION AND MODIFICATION OF MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING made by and between HENRY HUDSON HOLDINGS LLC and BANK OF AMERICA, NATIONAL ASSOCIATION, AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WHALE 8, dated as of 9/30/2010, recorded 10/14/2010 as CRFN 2010000344286. Modifies Mortgage 'A' as amended and restated by CRFN 2006000679014.

ASSIGNMENT OF MORTGAGE made by BANK OF AMERICA, NATIONAL ASSOCIATION AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WHALE 8 to DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT dated as of 08/12/2011, recorded 09/16/2011 in (as) CRFN 2011000329360. Assigns above Replacement Mortgage 'A'.

AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, HOTEL REVENUE AND SECURITY AGREEMENT made by and between HENRY HUDSON HOLDINGS LLC, HUDSON LEASECO LLC AND 58TH STREET BAR COMPANY LLC and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT dated as of 08/12/2011, recorded 09/16/2011, in (as) CRFN 2011000329361. Amends and restates and spreads the Amended and Restated Replacement Mortgage 'A' into a valid first lien in the amount of $115,000,000.00.

FIRST AMENDMENT TO AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, HOTEL REVENUE AND SECURITY AGREEMENT AND TO ASSIGNMENT OF LEASES AND RENTS AND HOTEL REVENUES made by and between HENRY HUDSON HOLDINGS LLC, HUDSON LEASECO LLC AND 58TH STREET BAR COMPANY LLC and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT dated as of 12/07/2011, recorded 02/21/2012, in (as) CRFN 2012000068316. Amends and Restates the above Amended and Restated Consolidated Mortgage, Assignment of Leases and Rents, Hotel Revenue and Security Agreement.

ASSIGNMENT OF MORTGAGE made by DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT to UBS REAL ESTATE SECURITIES INC., dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461819.

FOR CONSOLIDATION, SEE MORTGAGE 'B'

## MORTGAGE 'B'

FEE AND LEASEHOLD MORTGAGE made by HENRY HUDSON HOLDINGS LLC and HUDSON LEASECO LLC and 58TH STREET BAR COMPANY LLC to UBS REAL ESTATE SECURITIES INC. in the amount of $65,000,000.00 dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461820.

CONSOLIDATED AMENDED AND RESTATED FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by HENRY HUDSON HOLDINGS LLC and HUDSON LEASECO LLC and 58TH STREET BAR COMPANY LLC to UBS REAL ESTATE SECURITIES INC. dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461821. Consolidates Mortgages 'A' and 'B' to form a single lien in the amount of $180,000,000.00.

ASSIGNMENT OF MORTGAGE made by UBS REAL ESTATE SECURITIES INC. to CITIGROUP GLOBAL MARKETS REALTY CORP. AND BANK OF AMERICA, N.A. dated as of 2/6/2014, recorded 2/14/2014 in (as) CRFN 2014000058277. Assigns Mortgage(s) 'A' and 'B' as consolidated.

**FOR CONSOLIDATION, SEE MORTGAGE 'C'**

**MORTGAGE 'C'**

CONSOLIDATED, AMENDED AND RESTATED FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by HENRY HUDSON HOLDINGS LLC, 58TH STREET BAR COMPANY LLC AND HUDSON LEASECO LLC to CITIGROUP GLOBAL MARKETS REALTY CORP. AND BANK OF AMERICA, N.A. in the amount of $$53,333,333.34 dated 2/6/2014, recorded 2/14/2014 in (as) CRFN 2014000058278. This Mortgage, by its terms, was consolidated with Mortgages A and B to form a single lien in the amount of $233,333,333.34.

ASSIGNMENT OF MORTGAGE made by CITIGROUP GLOBAL MARKETS REALTY CORP. AND BANK OF AMERICA, N.A. to DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE FOR CGBAM COMMERCIAL MORTGAGE TRUST ██-HD, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2014-HD, AND THE COMPANION LOAN HOLDER dated as of 5/28/2014, recorded 8/4/2014 in (as) CRFN 2014000255044. Assigns Mortgage(s) 'A', 'B' and 'C', as consolidated.

ASSIGNMENT OF MORTGAGE made by DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE FOR CGBAM COMMERCIAL MORTGAGE TRUST 2014-HD, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2014-HD, AND THE COMPANION LOAN HOLDER to COLUMN FINANCIAL, INC. dated as of 2/9/2017, recorded 2/21/2017 in (as) CRFN 2017000070240. Assigns Mortgage(s) 'A', 'B' and 'C', as consolidated.

AMENDED AND RESTATED FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by and between HENRY HUDSON HOLDINGS LLC, 58TH STREET BAR COMPANY LLC AND HUDSON LEASECO LLC and COLUMN FINANCIAL, INC. dated as of 2/9/2017, recorded 2/21/2017, in (as) CRFN 2017000070241. Amends and Restates Mortgage(s) 'A', 'B', and 'C', as consolidated in the unpaid amount of $225,000,000.00.

ASSIGNMENT OF MORTGAGE made by COLUMN FINANCIAL, INC. to U.S. BANK NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE IN TRUST FOR HOLDERS OF CSMC TRUST 2017-HD COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2017-HD dated 3/29/2017, recorded 2/18/2020 in (as) CRFN 2020000061987. Assigns Mortgage(s) 'A', 'B' and 'C', as consolidated.

CORRECTIVE ASSIGNMENT OF FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by COLUMN FINANCIAL, INC. to U.S. BANK NATIONAL

ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE IN TRUST FOR HOLDERS OF CSMC TRUST 2017-HD COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2017-HD dated as of 05/15/2020, recorded 05/22/2020 in (as) CRFN 2020000154471. (NOTE: This correction Assignment is made to correct the Assignment of Mortgage previously recorded on 02/18/2020 as CRFN 2020000061987 for the purpose of fixing the acknowledgment which was used in connection with the execution of the original assignment as well as to include the complete mortgage schedule which was the subject of said assignment).

ASSIGNMENT OF MORTGAGE made by U.S. BANK NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE IN TRUST FOR HOLDERS OF CSMC TRUST 2017-HD COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2017-HD to HOLLIDAY PARK, LLC  dated as of 3/20/2020 , recorded 3/31/2020  in (as) CRFN 20200000113455.  Assigns Mortgage(s) 'A', 'B' and 'C', as consolidated.

CORRECTIVE ASSIGNMENT OF FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by U.S. BANK NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE IN TRUST FOR HOLDERS OF CSMC TRUST 2017-HD COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2017-HD to HOLLIDAY PARK, LLC dated as of 11/ 24/2020 and being duly recorded in the Office of the New York City Register immediately prior hereto.

9283/16226-002 CURRENT/119832177V4

| NYC DEPARTMENT OF FINANCE<br>OFFICE OF THE CITY REGISTER | <br>2020120200374002002SBAB1 |
|---|---|

| SUPPORTING DOCUMENT COVER PAGE | PAGE 1 OF 1 |
|---|---|

**Document ID: 2020120200374002**  Document Date: 11-24-2020  Preparation Date: 12-02-2020
Document Type: DEED, OTHER

---

**ASSOCIATED TAX FORM ID:**  2020111200180

---

**SUPPORTING DOCUMENTS SUBMITTED:**

Page Count

RP - 5217 REAL PROPERTY TRANSFER REPORT  4

**FOR CITY USE ONLY**

C1. County Code |___|   C2. Date Deed Recorded |___| / |___| / |___|
Month   Day   Year

C3. Book |_____| C4. Page |_____|
OR
C5. CRFN |_____|

**REAL PROPERTY TRANSFER REPORT**
STATE OF NEW YORK
STATE BOARD OF REAL PROPERTY SERVICES
**RP - 5217NYC**

## PROPERTY INFORMATION

**1. Property Location** | 353 | WEST 57TH STREET 1 | MANHATTAN | 10019
STREET NUMBER   STREET NAME   BOROUGH   ZIP CODE

**2. Buyer Name** | EC 58TH STREET LLC
LAST NAME / COMPANY   FIRST NAME

LAST NAME / COMPANY   FIRST NAME

**3. Tax Billing Address** Indicate where future Tax Bills are to be sent if other than buyer address (at bottom of form)
LAST NAME / COMPANY   FIRST NAME

STREET NUMBER AND STREET NAME   CITY OR TOWN   STATE   ZIP CODE

**4. Indicate the number of Assessment Roll parcels transferred on the deed** | 2 | # of Parcels  OR |___| Part of a Parcel

4A. Planning Board Approval - N/A for NYC
4B. Agricultural District Notice - N/A for NYC

**5. Deed Property Size** |_____| X |_____| OR |_____|
FRONT FEET   DEPTH   ACRES

Check the boxes below as they apply:
6. Ownership Type is Condominium [✔]
7. New Construction on Vacant Land [ ]

**8. Seller Name** | HENRY HUDSON HOLDINGS, LLC
LAST NAME / COMPANY   FIRST NAME

LAST NAME / COMPANY   FIRST NAME

**9. Check the box below which most accurately describes the use of the property at the time of sale:**

A [ ] One Family Residential   C [ ] Residential Vacant Land   E [✔] Commercial   G [ ] Entertainment / Amusement   I [ ] Industrial
B [ ] 2 or 3 Family Residential   D [ ] Non-Residential Vacant Land   F [ ] Apartment   H [ ] Community Service   J [ ] Public Service

## SALE INFORMATION

**10. Sale Contract Date** | 11 / 24 / 2020
Month   Day   Year

**11. Date of Sale / Transfer** | 11 / 24 / 2020
Month   Day   Year

**12. Full Sale Price** $ | 2,68,7,23,7,36 |

( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.)  *Please round to the nearest whole dollar amount.*

**13. Indicate the value of personal property included in the sale** |_____|

**14. Check one or more of these conditions as applicable to transfer:**

A [ ] Sale Between Relatives or Former Relatives
B [ ] Sale Between Related Companies or Partners in Business
C [ ] One of the Buyers is also a Seller
D [ ] Buyer or Seller is Government Agency or Lending Institution
E [ ] Deed Type **not** Warranty or Bargain and Sale (Specify Below )
F [ ] Sale of Fractional or Less than Fee Interest ( Specify Below )
G [ ] Significant Change in Property Between Taxable Status and Sale Dates
H [ ] Sale of Business is Included in Sale Price
I [ ] Other Unusual Factors Affecting Sale Price ( Specify Below )
J [✔] None

## ASSESSMENT INFORMATION - Data should reflect the latest Final Assessment Roll and Tax Bill

**15. Building Class** | R,H |   **16. Total Assessed Value (of all parcels in transfer)** | 7,59,46,9,50 |

**17. Borough, Block and Lot / Roll Identifier(s)  ( If more than three, attach sheet with additional identifier(s) )**

| MANHATTAN 1048 1701 | | MANHATTAN 1048 1702 | |

| CERTIFICATION | I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments. |
| --- | --- |

_All attached_ **BUYER**

**BUYER'S ATTORNEY**

BUYER SIGNATURE                                          DATE

C/O: ELDRIDGE INDUSTRIES LLC  600 STEAMBOAT ROAD, SUITE 200

| LAST NAME | FIRST NAME |
| --- | --- |

STREET NUMBER            STREET NAME (AFTER SALE)

AREA CODE            TELEPHONE NUMBER

GREENWICH

CT                06830

**SELLER**

_All attached_

CITY OR TOWN                      STATE            ZIP CODE        SELLER SIGNATURE                          DATE

2020111200180201

**STATE OF NEW YORK, STATE BOARD OF REAL PROPERTY SERVICES
REAL PROPERTY TRANSFER REPORT (RP-5217NYC)**

CERTIFICATION

    I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and I understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

BUYER:

**EC 58TH STREET LLC,**
a Delaware limited liability company

By:_____
    Name: Anthony D. Minella
    Title: President

Dated: *November 24*, 2020

*[Signature Page to Transfer Tax Form (RP-5217) (Deed)]*

## STATE OF NEW YORK, STATE BOARD OF REAL PROPERTY SERVICES
## REAL PROPERTY TRANSFER REPORT (RP-5217NYC)

### CERTIFICATION

I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and I understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

SELLER:

**HENRY HUDSON HOLDINGS, LLC**

By:     Hudson Delano Senior Mezz LLC,
        its sole member

By:     Hudson Delano Junior Mezz LLC,
        its sole member

By:     Morgans Group, LLC,
        its sole member

By:     Morgans Hotel Group Co. LLC,
        its sole member

By:     SBE ENT Holdings, LLC,
        its sole member

By: _____
    Name:  Philippe Zrihen
    Title:  Chief Business Officer

Dated: __NOVEMBER__ __24__, 2020

*[Signature Page to Transfer Tax Form (RP-5217) (Deed)]*

# KUCKER
# MARINO
# WINIARSKY
# & BITTENS, LLP

Alan D. Kucker
James R. Marino
Nativ Winiarsky
Andrew B. Bittens *
William D. Hummell
Catherine A. Helwig *
Craig P. Gambardella
Gregg R. Kurlander
Jason M. Frosch
Lisa Faham-Selzer
Joseph Goldsmith
Vladimir K. Favilukis *
-----------------------
Rachel V. Kramer
Danielle K. Ciraola
Kathleen B. Kelliher *
Rafael D. Dayan
William J. Halkias *
Samara Geller

OF COUNSEL:
Patrick K. Munson
Abner T. Zelman
Nikolaos Preponis
Patrick K. Yu
Nicholas G. Yokos *
Daniel Gewirtz
Tanya M. Owens
Kacey H. Sou
Eric R. McAvey
Jill L. Mandell †
Joel Celso ^

* Also admitted in NJ
† Also admitted in CT
^ Also admitted in DC

May __, 2022

Elizabeth Hernandez
Director, Certification of No Harassment Unit
NYC Department of Housing Preservation & Development
Housing Litigation Division
100 Gold Street, Room 6Z4
New York, NY 10038
Email: hernanel@hpd.nyc.gov

| Re: | | Application for Exemption from the Certificate of No Harassment. |
|---|---|---|
| | Applicant: | Alberto Smeke |
| | Ground Lessee: | HUDSON 1701/1706, LLC and HUDSON 1702, LLC |
| | Owner: | 356W58 Ground Lessor LLC |
| | Premises: | 353 West 57th Street, New York, NY |

Dear Ms. Hernandez:

This firm represents and is Special Counsel to HUDSON 1701/1706, LLC and HUDSON 1702, LLC, the ground lessee of the referenced Premises, and Alberto Smeke, the Applicant. We will be assisting them with the filing of their application for an Exemption from the Certificate of No Harassment. Please forward all notices, correspondence and requests for additional information concerning the instant application to me at the address set forth above. Enclosed please find one (1) original and one (1) copy of the Application with respect to the Premises as well as the requested documentation annexed as the following Exhibits:

A. An Opinion Letter of this office as to the authority of the Applicant;

B. The current Deed, certified by the Office of the City Register of NY;

C. The Memorandum of Lease to HUDSON 1701/1706, LLC and HUDSON 1702, LLC;

D. The Articles of Organization of HUDSON 1701/1706, LLC and HUDSON 1702, LLC;

E. The operating agreement or LLC resolution of HUDSON 1701/1706, LLC and HUDSON 1702, LLC;

F. The NYS filing receipt for HUDSON 1701/1706, LLC and HUDSON 1702, LLC;

T 212.869.5030
F 212.944.5818

747 Third Avenue
New York, NY 10017

Kuckermarino.com

*Page 1 of 2*

G.      Certificate of Good Standing of ownership entity certified by NYS Department of State;

H.      The Certificate of Occupancy in effect on January 1, 1974, dated December 14, 1972 and bearing certificate of occupancy number 72773, classified the building as a Class B Hotel, and the Certificate of Occupancy, dated June 4, 1976 and bearing certificate of occupancy number 76793 which specifically stated it amended certificate of occupancy number 72773, both certified by the NYC Department of Buildings; and

I.      The current Certificate of Occupancy certified by the NYC Department of Buildings.

Thank you for your cooperation in this matter.  Please don't hesitate to contact me if you have questions or concerns.

Sincerely,

Joseph Goldsmith, Esq.

*Page 2 of 2*

# KUCKER
# MARINO
# WINIARSKY
# & BITTENS, LLP

Alan D. Kucker
James R. Marino
Nativ Winiarsky
Andrew B. Bittens *
William D. Hummell
Catherine A. Helwig *
Craig P. Gambardella
Gregg R. Kurlander
Jason M. Frosch
Lisa Faham-Selzer
Joseph Goldsmith
Vladimir K. Favilukis *
-----------------------
Rachel V. Kramer
Danielle K. Ciraola
Kathleen B. Kelliher *
Rafael D. Dayan
William J. Halkias *
Samara Geller

OF COUNSEL:
Patrick K. Munson
Abner T. Zelman
Nikolaos Preponis
Patrick K. Yu
Nicholas G. Yokos *
Daniel Gewirtz
Tanya M. Owens
Kacey H. Sou
Eric R. McAvey
Jill L. Mandell [†]
Joel Celso [^]

*  Also admitted in NJ
[†]  Also admitted in CT
[^]  Also admitted in DC

Elizabeth Hernandez
Director, Certification of No Harassment Unit
NYC Department of Housing Preservation & Development
Housing Litigation Division
100 Gold Street, Room 6Z4
New York, NY 10038
Email: hernanel@hpd.nyc.gov

Re:  Opinion of Counsel
     Application for Exemption from the Certificate of No Harassment.
Applicant:  Alberto Smeke
Ground Lessee: HUDSON 1701/1706, LLC and HUDSON 1702, LLC
Owner:  356W58 Ground Lessor LLC
Premises:  353 West 57th Street, New York, NY

Dear Ms. Hernandez:

Please be advised that, based on the examination of the organizational documents of HUDSON 1701/1706, LLC and HUDSON 1702, LLC, such as the Articles of Organization and Operating Agreement, the Ground Lease, the books and records of HUDSON 1701/1706, LLC and HUDSON 1702, LLC, and considering all of the surrounding facts and circumstances, as well as having consulted with the Applicant, Alberto Smeke, it is my opinion:

(i)    HUDSON 1701/1706, LLC and HUDSON 1702, LLC are in good standing with the Department of State, New York State;

(ii)   The Applicant, Alberto Smeke, is a member of HUDSON 1701/1706, LLC and HUDSON 1702, LLC.

(iii)  The Applicant, Alberto Smeke, is both authorized and entitled to file the instant Exemption from the requirement for a Certificate of No Harassment on behalf of HUDSON 1701/1706, LLC and HUDSON 1702, LLC and the owner, 356W58 Ground Lessor LLC, and to make all representation before HPD on behalf of HUDSON 1701/1706, LLC and HUDSON 1702, LLC and the owner, 356W58 Ground Lessor LLC;

(iv)   The Applicant, Alberto Smeke, is authorized to bind HUDSON 1701/1706, LLC and HUDSON 1702, LLC and the owner, 356W58 Ground Lessor LLC, with regard to the filing of this Exemption from the requirement for a Certificate of No Harassment.

Please be advised that I am serving the Owner as Special Counsel in this matter and you may direct any questions or requests for additional information to me at the address and telephone number listed above. Thank you for your time and consideration.

Sincerely,

Joseph Goldsmith, Esq.

Exhibit D-2

CONH Application

(Attached hereto)

Application for a Certification of No Harassment                                    *Rev. Dec 2018*

**Obligation to Update:** If any information stated in the application changes at any time before HPD makes a final determination regarding whether harassment occurred, the applicant must promptly update the application with such new information and submit it to HPD. If the new information includes a change in ownership or other facts that renders the original applicant ineligible to submit the Application, a new Application, including a new signature page executed by an eligible individual, and all supporting documentation must be submitted to HPD- in such an event, no new processing fee will be collected.

1.    **Property:** Identify the property that is the subject of this application ("property").

Borough:    ☒ Manhattan    ☐ Brooklyn    ☐ Bronx    ☐ Queens    ☐ Staten Island

Block: 1048            Lot: 1701/1702 HPD Registration ID: 117950        BIN: 1026317

Street Address:    353 West 57th Street, New York, New York 10019

Check every box that applies (check both SRO and a Special Zoning District if applicable):
☒    The property contains a Single Room Occupancy multiple dwelling.
☒    The property is located in the Special Clinton District.
☐    The property is located in the Special Hudson Yards District.
☐    The property is located in Preservation Area P-2 of the Special Garment Center District.
☐    The property is located in the Greenpoint-Williamsburg anti-harassment area.
☐    The property is located in the Special West Chelsea District.

2.    **Building Configuration:** Attach either an original certified copy of the certificate of occupancy or original certified letter from the Department of Buildings stating that the building does not have a certificate of occupancy. Describe the legal and actual configuration of the building below.

| Type of Unit | Legal Configuration - Number of Units | Actual Configuration - Number of Units |
|---|---|---|
| Apartment Dwelling Units | 1 | 1 |
| SRO Dwelling Units | 959 | 959 |
| Total Dwelling Units | 960 | 960 |
| Commercial Units | 2 | 2 |

What is the basis of the legal configuration described above?
☒        Certificate of Occupancy (must attach if this is the basis of the legal configuration)
☐        Original certified letter from the Department of Buildings

3.    **Building Occupancy:** Is the building currently vacant?
☐        Yes (How long has the building been vacant?) _____
☒        No (Describe the current occupancy below).

| Type of Unit | Occupied | Vacant | Total |
|---|---|---|---|
| Apartment Dwelling Units | 1 | 0 | 1 |
| SRO Dwelling Units | 37 | 922 | 959 |
| Total Dwelling Units | 38 | 922 | 960 |
| Commercial Units | 2 | 0 | 2 |

♻ Printed on paper containing 30% post-consumer material.

1

Application for a Certification of No Harassment                                       *Rev. Dec 2018*

6.    **Reason For Application:**  Briefly describe the reason for this application (e.g., the alteration or demolition work to be performed at the property).

Alterations and renovation of rooms at the building.

A.  Have any applications for permits been filed with the Department of Buildings for work at the property which would require a certification of no harassment?

    X   No      (Even if no such applications for permits have been filed with the Department of Buildings, HPD may request copies of architectural plans).

    ☐   Yes     (Attach a copy of each such application, stamped by the Department of Buildings, and all attachments thereto).

B.  Is any construction work currently in progress?

    X   No.

    ☐   Yes (Provide details below).

♻ Printed on paper containing 30% post-consumer material.

3

Application for a Certification of No Harassment                                    *Rev. Dec 2018*

4.    **Applicant(s):** Identify the applicant(s). An applicant must be a natural person, not an entity. If the building is owned by more than one deed owner, all the owners need to be named as applicants or a notarized letter signed by each additional deed owner has to be submitted authorizing the applicant to file the application for certificate of no harassment on behalf of that owner. If the application is filed by a Net Lessee, the deed owner has to provide a notarized letter signed by the deed owner authorizing the Net Lessee to file the application for certificate of no harassment on behalf of that owner. In case of a multiple dwelling owned by an entity, the letter has to describe the corporate relationship of the person signing the letter on behalf of the entity.

Name (1) Alberto Smeke                          Name (2) _____

Social Security Number: ████████           Social Security Number: ____/____/_____

Date of Birth: ████████                     Date of Birth: _____/____/_____

Mailing Address: 6 St. Johns Lane, New York, NY 10013

Business Telephone Number: 212-419-3149     Mobile Telephone Number: 347-421-3335

Email Address: as@csc-coliving.com          Fax Number: _____

Relationship to the property (attach documentation): Managing Member of Ground Lessee

Deed Owner: 356W58 Ground Lessor LLC

Deed Owner Address: c/o MSP Capital Investments, LLC, 3953 Maple Ave., Suite 350, Dallas, Texas 75219

5.    **Access Authorizer:** Does the applicant identified in response to Question 4 have legal authority to authorize the Department of Housing Preservation and Development ("HPD") to enter all common areas of the property?

☒    Yes.
☐    No (Identify the person who will sign this application to authorize such access below).

The Access Authorizer listed shall be an individual natural person who either has legal possession of all common areas of the building, or is authorized to sign on behalf of and bind the persons or entities who have legal possession of all common areas of the building.

Name: _____

Social Security Number: _____/____/_____     Date of Birth: ___/____/_____

Mailing Address: _____

Business Telephone Number: _____     Mobile Telephone Number: _____

Email Address: _____     Fax Number: _____

Relationship to the property: _____

♻ Printed on paper containing 30% post-consumer material.                          2

Application for a Certification of No Harassment                              *Rev. Dec 2018*

_____

_____

_____

_____

_____

7.   **Prior Applications For The Property:** Has anyone ever submitted an application for a certification of no harassment (or an exemption or waiver from the requirement for a certification of no harassment) to HPD with respect to the property?

☐   No.

☒   Yes (Indicate the date of the application, whether HPD granted or denied the certification of no harassment, and any other relevant details).

| Date of the Application | Applicant | Granted, Denied, Withdrawn | Other Relevant Detail |
|---|---|---|---|
| February 1998 | Ian Schrager | Granted | Application No. 9/98 |
| | | | |
| | | | |
| | | | |
| | | | |

8.   **Current Ownership**
     A. **Current Owners:** List each current holder of title to the property including individual owners, joint owners and corporate entity:

| Name | Date of Birth | SSN or EIN | Address |
|---|---|---|---|
| 356W58 Ground Lessor LLC | | EIN: 88-1529701 | c/o MSP Capital Investments, L.L.C., 3953 Maple Ave., Suite 350, Dallas, Texas 75219 |
| | | | |
| | | | |
| | | | |
| | | | |

Printed on paper containing 30% post-consumer material.

4

Application for a Certification of No Harassment                                    *Rev. Dec 2018*

**B. Current Principals and Officers:** If title to the property is held by an entity rather than by a person, list (i) every director, general partner, managing partner, or managing member of such entity, (ii) every officer of such entity, (iii) every other person authorized to sign for and bind such entity, and (iv) every person or entity holding a 10% or more economic interest in such entity. Provide an opinion of counsel letter which authorizes the individual to file the application. An opinion of counsel letter is a letter by an attorney stating that the person signing the application for the corporation, partnership or limited liability corporation, is entitled to file and act on behalf of the entity and to make all of the representations and commitments therein. **You must also provide the supporting documentation as listed in the Instructions to support the below.**

| Name | Date of Birth | SSN | Relationship to Owner | Address and Telephone Number |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Printed on paper containing 30% post-consumer material.

Application for a Certification of No Harassment                                    *Rev. Dec 2018*

**C. Current Management:** List each person who served as a managing agent, a superintendent, collected rents, supervised or ordered repairs, or exercised any other discretion in the management of the property under the current ownership.

| Name and Address | Employer and Role | Period of Service |
|---|---|---|
| Alberto Smeke | HUDSON 1701/1706, LLC Asset Manager | May, 2022 - Present |
| Sal Smeke | HUDSON 1701/1706, LLC Asset Manager | May, 2022 - Present |
| Denise Cruz | HUDSON 1701/1706, LLC Property Manager | 1999 - Present |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

9. **Prior Ownership**
   **A. Prior Owners:** Have you been the owner for the entire inquiry period?
   ☐ Yes
   ☒ No (Complete the appropriate sections below).

List each prior holder of title to the property including individual owners, joint owners and corporate owners:

| Name | Period of Ownership | Tax ID (if corporate entity) |
|---|---|---|
| Irving Schatz (Lot 1703) | 1984-12/3/12 | N/A |
| Adrienne Wechsler Cheryl Hirsch (Lot 1704) | 6/15/93-3/20/14 | N/A |
| Irving Schatz (Lot 1705) | 1984-12/3/12 | N/A |
| Irving Schatz (Lot 1706) | 1984-12/3/12 | N/A |
| Henry Hudson Holdings LLC (Lot 1702) | 1999-2020 | 13-4035148 |
| EC 58th Street LLC (Lot 1702) | 11/2020-2022 | |
| | | |
| | | |
| | | |

Printed on paper containing 30% post-consumer material.

6

Application for a Certification of No Harassment

*Rev. Dec 2018*

**B. Principals and Officers Of Prior Owners:** If title to the property was previously held by an entity rather than a person at any time since the referral date, list (i) every director, general partner, managing partner, or managing member of such entity, (ii) every officer of such entity, (iii) every other person authorized to sign for and bind such entity, and (iv) every person or entity holding a 10% or more economic interest in such entity.

| Name | Period of Ownership | Relationship to Owner | Address | Telephone Number |
|------|---------------------|-----------------------|---------|------------------|
| See the schedule annexed hereto as Exhibit C. | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Printed on paper containing 30% post-consumer material.

7

Application for a Certification of No Harassment                                           *Rev. Dec 2018*

**C. Management – Prior Ownership:** List each person who served as a managing agent, a superintendent, collected rents, supervised or ordered repairs, or exercised any other discretion in the management of the property from the referral date under a prior owner.

| Name and Address | Employer and Role | Period of Service |
|---|---|---|
| See the schedule annexed hereto as Exhibit D. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

10. **Criminal Convictions And Proceedings:** Have any of the persons or entities listed above in items 4-9 ever been convicted of a crime, or is any such person or entity currently a defendant in a pending criminal proceeding?

☒ No.

☐ Yes (Provide details below).

| Name | Court | Docket Number | Case Name | Disposition |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Printed on paper containing 30% post-consumer material.

8

Application for a Certification of No Harassment                                    *Rev. Dec 2018*

11.    **Prior Applications By Or On Behalf Of The Owner Or Applicant:** Has the owner, the applicant, or any other representative acting on behalf of the owner ever previously applied for a certification of no harassment for any property other than the subject property?

    ☒     No.

    ☐     Yes (Indicate each property for which the applicant sought a certification of no harassment and the disposition of each such application).

| Borough | Block | Lot | Address | Registration ID |
|---------|-------|-----|---------|-----------------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

12.    **Occupants:** List all current residential and commercial occupants of the property.

| Name | Unit/ Floor No. | Initial Occupancy Date | Phone Number | Monthly Rent | Rent Stabilized (Y/N) | Current Lease (Y/N) |
|------|-----------------|------------------------|--------------|--------------|-----------------------|---------------------|
| See the schedule annexed hereto as Exhibit E. |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Printed on paper containing 30% post-consumer material.

9

Application for a Certification of No Harassment                                  *Rev. Dec 2018*

**12.    Occupants Continued**

| Name | Unit/ Floor No. | Initial Occupancy Date | Phone Number | Monthly Rent | Rent Stabilized (Y/N) | Current Lease (Y/N) |
|------|------|------|------|------|------|------|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

If needed, please add additional pages.
Additional pages added? _____ YES _____ NO

Printed on paper containing 30% post-consumer material.

10

Application for a Certification of No Harassment                    *Rev. Dec 2018*

13.  **Former Occupants:** List each former occupant who vacated a dwelling unit or rooming unit at the property after the referral date, whether through eviction, relocation, surrender of occupancy rights, or any other means.  If such occupant was relocated, please provide a copy of any agreement with respect to the surrender of occupancy rights, if one exists, and any other relevant details.

| Name Of Occupant | Unit | Initial Occupancy Date | Move Out Date | Reason For Moving Out | Current Address And Phone Number | Last Monthly Rent |
|---|---|---|---|---|---|---|
| See the schedule annexed hereto as Exhibit F. | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

If needed, please add additional pages.
Additional pages added?          _____     YES          _____     NO

Printed on paper containing 30% post-consumer material.

11

Application for a Certification of No Harassment                    *Rev. Dec 2018*

**14.    Relocation:** Will any occupants be relocated or displaced as a result of the alteration or demolition work to be performed at the property?

☒    No.
☐    Yes (Provide details below).

| Name | Unit | Monthly Rent | Reason For Relocation or Displacement | Phone Number | Relocated to What Location |
|------|------|--------------|----------------------------------------|--------------|----------------------------|
|      |      |              |                                        |              |                            |
|      |      |              |                                        |              |                            |
|      |      |              |                                        |              |                            |
|      |      |              |                                        |              |                            |
|      |      |              |                                        |              |                            |
|      |      |              |                                        |              |                            |
|      |      |              |                                        |              |                            |
|      |      |              |                                        |              |                            |
|      |      |              |                                        |              |                            |

If needed, please add additional pages.
Additional pages added?            _____    YES    _____    NO

**15.** Has the building been registered annually with New York State Homes and Community Renewal (HCR) during the inquiry period?

☐    No.
☒    Yes (Provide all rent registrations for each unit filed within the inquiry period).

**16.    HCR Proceedings:** During the inquiry period, have there been any harassment proceedings, decrease in service proceedings, or other proceedings with regard to the property before the New York State Homes and Community Renewal (HCR)?

☒    No.
☐    Yes (Provide details below and attach a copy of each complaint and final disposition, if any).

| Party Names | Dates | Docket Number | Nature of Proceeding | Attorneys for Parties | Disposition or Current Status |
|-------------|-------|---------------|----------------------|-----------------------|-------------------------------|
|             |       |               |                      |                       |                               |
|             |       |               |                      |                       |                               |
|             |       |               |                      |                       |                               |
|             |       |               |                      |                       |                               |
|             |       |               |                      |                       |                               |

Printed on paper containing 30% post-consumer material.

12

*Rev. Dec 2018*

17.   <u>Other Administrative Proceedings</u>: During the inquiry period, have there been any administrative proceedings with regard to the property before any governmental or quasi-governmental authority other than the New York State Homes and Community Renewal?

☐      No.

☐      Yes (Provide details below and attach a copy of each complaint and final disposition, if any).

| Party Names | Dates | Docket Number | Nature of Proceeding | Attorneys for Parties | Disposition or Current Status |
|---|---|---|---|---|---|
| See the schedule annexed hereto as Exhibit H. | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

18.   <u>Litigation</u>: During the inquiry period, has there been any litigation with respect to the property?

☐      No.

☒      Yes (Provide details below and attach a copy of each petition and final disposition documents, if any).

| Title and Type of Action | Index No. and Court | Plaintiff/ Petitioner's Attorney | Defendant/ Respondent's Attorney | Disposition or Current Status |
|---|---|---|---|---|
| EC 58TH STREET LLC v. TAX COMMISSION | 258783/2021 | DITCHIK & DITCHIK | | PENDING |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Printed on paper containing 30% post-consumer material.

13

Application for a Certification of No Harassment

*Rev. Dec 2018*

19.   **Coercion:** During the inquiry period, has any title holder or lessee, its agents, employees or other persons acting on its behalf used force, or threatened the use of force, against the person or property of any occupant of a dwelling unit at the property?

    ☒    No.

    ☐    Yes (Provide details).

20.   **Services:** During the inquiry period, has any title holder or lessee, its agents, employees or other persons acting on its behalf interrupted or discontinued any services at the property, including, but not limited to, heat, hot water, cold water, electricity, gas, and elevator service?

    ☒    No.

    ☐    Yes (Provide details).

Printed on paper containing 30% post-consumer material.

14

Application for a Certification of No Harassment                                      *Rev. Dec 2018*

**21.**    **Vacate Orders**: Has any governmental agency issued any vacate orders (full or partial) with respect to all or part of the property during the inquiry period or active if issued prior to the inquiry period?

    ☒    No.

    ☐    Yes (Provide details below and attach certified copies of each vacate order).

Vacate Order Number:_____

Issuing Agency:

☐      HPD

☐      Department of Buildings

☐      Fire Department

☐      Department of Health and Mental Hygiene

☐      Other (Identify): _____

Date Issued: _____

Date Lifted: _____

Basis of Order: _____

Number of Occupants Displaced: _____

Number of Occupants Returned (who were displaced): _____

Describe any other relevant information:

_____

_____

_____

_____

_____

Vacate Order Number:_____

Issuing Agency:

☐      HPD

☐      Department of Buildings

☐      Fire Department

☐      Department of Health and Mental Hygiene

☐      Other (Identify): _____

Date Issued: _____

Date Lifted: _____

Basis of Order: _____

Number of Occupants Displaced: _____

Number of Occupants Returned (who were displaced): _____

Describe any other relevant information:

_____

_____

_____

_____

_____

Application for a Certification of No Harassment

*Rev. Dec 2018*

22.   **Locks**: During the inquiry period, has any title holder or lessee, its agents, employees or other persons acting on its behalf removed the possessions of an occupant from the dwelling unit, removed the door at the entrance to an occupied dwelling unit, removed, plugged, or otherwise rendered the lock on an entrance door inoperable, or changed the lock on an entrance door without supplying the occupant with a key?

☒   No.

☐   Yes (Provide details).

23.   **Other**: Provide any other information relevant to this application.

Concomitantly with the filing of the instant application the Applicant is filing an Application for an exemption from the CONH requirement for the Special Clinton District.

Printed on paper containing 30% post-consumer material.

16

Application for a Certification of No Harassment                                    *Rev. Dec 2018*

**Applicant Consent:** The owner of the property hereby consents to permit HPD unfettered access to the property that is the subject of this application at all times and without prior notice. The purpose of such access is for the investigation of all facts relevant to this application from the date hereof until the date upon which HPD makes a final determination with respect to the grant or denial of the certification pursuant to the application of a Certification of No Harassment.

It is understood that the failure to provide such access when requested will prevent the processing of this application and, in the discretion of HPD, may result in the denial of the issuance of a Certification.

Further, it is understood that the application may be denied if it contains any false or misleading statements, or material omissions.

Further, it is understood that the applicant and/or undersigned must first obtain a Certification of No Harassment from HPD and all necessary permits from the DOB prior to commencing the work at the subject premises, which is the subject of this application.

I, the applicant, have read the within application and attest that its entire contents are true and complete.


| | |
|---|---|
| Applicant's Signature (1) | Applicant's Signature (2) |
| Print Name Above | Print Name Above |
| Relationship to the Property | Relationship to the Property |
| Corporate Entity Designee Signature | Access Authorizer Signature |
| Print Name Above | Print Name Above |
| Relationship to the Owner (title) | Relationship to the Owner (title) |

Sworn to this _____ day of
_____, 20___.


_____
Notary

Printed on paper containing 30% post-consumer material.                                    17

## Deed

THIS INDENTURE made the ___ *18th* ___ day of December, 1998, between EDUCATIONAL BROADCASTING CORPORATION, a not-for-profit corporation chartered by the Board of Regents of the State of New York, having its principal office at 450 West 33rd Street, New York, New York 10001 (the "Grantor"), and HENRY HUDSON HOLDINGS LLC, a Delaware limited liability company having an address c/o Ian Schrager Hotels LLC, 475 Tenth Avenue, New York, NY 10018 (the "Grantee").

### WITNESSETH:

That the Grantor, in consideration of Ten ($10.00) Dollars and other good and valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs, successors and assigns of the Grantee, forever:

The Condominium Unit (the "Unit") known as Unit No. 1 in the premises known as 353 West 57th Street Condominium and by the street number 353-61 West 57th Street a/k/a 356 West 58 Street, Borough of Manhattan, City, County and State of New York, the ("Condominium"), said Unit being designated and described as the EBC Unit in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated April 11, 1985, and recorded in the New York County Office of the Register of the City of New York (the "Register's Office") on April 24, 1985, in Reel 902, Page 1, as amended by First Amendment To Declaration dated January 19, 1993 and recorded in the Register's Office on May 11, 1993 in Reel 1969, Page 2286 (said Declaration, as the same maybe amended from time to time, being hereinafter referred to as the "Declaration") and also designated as Tax Lot 1701 in Block 1048 of Section 4, of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of The City of New York and on the Floor Plans of said Building, certified by Butler Rogers Baskett Architects, on March 27, 1985, and filed on April 22, 1985 with the Real Property Assessment Department of The City of New York as Condominium Plan No. 208 and also filed on April 24, 1985 in the Register's Office as Condominium Map No. 4326, as amended by Amended Floor Plans certified by Butler Rogers Baskett Architects on December 12, 1992, which Amended Floor Plans were also filed in the Real Property Assessment Department of the City of New York on May 5, 1993 as Condominium Plan No. 208A (Amendment to Plan No. 208), and also filed in the Register's Office on May 11, 1993 as Condominium Map No. 5192. The premises within which the EBC Unit is located are more particularly described in Schedule A attached hereto and made a part hereof. All capitalized herein that are not separately defined herein shall have the meanings given to those terms in the Declaration or in the By-Laws of 353 West 57th Street Condominium. (Said By-Laws, as the same may be amended form time to time, are hereinafter referred to as the "By-Laws");

Premises:     353 West 57th Street
              Commercial Unit #1

1

TOGETHER with an undivided 44.05105 percent interest in the Common Elements;

TOGETHER with the appurtenances and all the estate and the right of the Grantor in and to the Unit;

TOGETHER with, and SUBJECT to, the rights, obligations, easements, restrictions and other provisions set forth in the Declaration and the By-Laws, all of which shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit, as though recited and stipulated at length herein;

SUBJECT to such other liens, agreement, covenants, easements, restrictions and other matters as pertain to the Unit and/or the Property.

TO HAVE AND TO HOLD the same unto the Grantee, and the heirs, successors and assigns of the Grantee, forever, and the Grantor covenants Grantor has not done or suffered anything whereby the Unit or the Property have been encumbered in any way whatever.

If any provision of the Declaration or the By-Laws is invalid or would cause the Declaration of the By-Laws to be insufficient to submit the Property to the provisions of the New York Condominium Act, or if any provision that is necessary to cause the Declaration and the By-Laws to submit that Property to the provisions of the New York Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are insufficient to submit the Property to the provisions of the New York Condominium Act, the applicable provisions of Article 26 of the Declaration shall control.

The Grantor, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purposes of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws (and any Rules and Regulations adopted under the By-Laws) and agrees to comply with all the terms and provisions thereof.

The term "Grantee" shall be read as "Grantees" whenever the sense of this Indenture so requires.

The intended use of The Unit is any use permitted under the Declaration.

2

IN WITNESS WHEREOF, the Grantor and the Grantee have duly executed this Indenture as of the day and year first above written.

EDUCATIONAL BROADCASTING CORPORATION, Grantor

_____
Thomas A. Conway
Vice President and Chief Financial Officer

HENRY HUDSON HOLDINGS LLC, Grantee

_____
Name: Peter Ahl
Title: Authorized Signatory

3

STATE OF NEW YORK   )
                           )ss:
COUNTY OF NEW YORK)

On the _18_ day of December, 1998, before me, the undersigned, a notary public in and for the State of New York, personally appeared Thomas A. Conway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                          Notary Public

ARIANNE L. GOLUB
Notary Public, State of New York
No. 01GO5035284
Qualified in Nassau County
Commission Expires October 31, 20_22_

STATE OF NEW YORK   )
                           )ss:
COUNTY OF NEW YORK)

On the _17th_ day of December, 1998, before me, the undersigned, a notary public in and for the State of New York, personally appeared _Peter Ahl_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                          Notary Public

LASCELLES ELCOCK
Notary Public, State of New York
No. 01EL6015731
Qualified in Bronx County
Commission Expires Nov.

4

## SCHEDULE A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the intersection of the easterly side of 9th Avenue with the northerly side of 57th Street;

RUNNING THENCE Easterly along the said northerly side of 57th Street 155 feet;

THENCE Northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE Westerly along the said southerly side of 58th Street 135 feet to the point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE Southerly parallel with 9th Avenue and part of the distant through a party wall 100 feet 10 inches;

THENCE Westerly parallel more or less with 58th Street 20 feet;

THENCE Southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

5

# CITY REGISTER RECORDING AND ENDORSEMENT PAGE
## - NEW YORK COUNTY -
### (This page forms part of the Instrument)

Block(s) 1048

Lot(s) 1701

Record & Return to: Skadden, Arps, Slate, Meagher & Flom LLP
919 Third Avenue
New York, New York 10022
Attn: John Davis, Esq.

Title/Agent Company name: **Title Associates Inc.**

Title Company number: TA#98(01) 1101

---

THE FOREGOING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:

Examined by (▲):

| | |
|---|---|
| Mtge Tax Serial No. | |
| Mtge Amount | $ |
| Taxable Amount | $ |

Exemption (✔)........ YES ☐ NO ☐

Type: (circle one ☞) [339EE] [255] [OTHER_____]

Dwelling Type: (circle one ☞) [1 to 2] [3] [4 to 6] [over 6]

**TAX RECEIVED ON ABOVE MORTGAGE ▼**

| | |
|---|---|
| County (basic) | $ |
| City (Addt'l) | $ |
| Spec Addt'l | $ |
| TASF | $ |
| MTA | $ |
| NYCTA | $ |
| **TOTAL TAX** | $ |

Apportionment Mortgage (✔) YES ☐ NO ☐

Joy A. Bobrow, City Register

City Register Serial Number ➡ 000385

Indexed By (▲):

Verified By (▲):

Block(s) and Lot(s) verified by (✔):

Address ☑ Tax Map ☐

Extra Block(s) _____ Lot(s) _____

| | | |
|---|---|---|
| Recording Fee | A $ 47 |
| Affidavit Fee ...(C) | $ |
| TF-584/582 Fee ..(Y) | $ — |
| RPTT Fee ......(R) | $ 25 |
| HPD-A ☒ | HPD-C ☐ |

New York State Real Estate Transfer Tax ▼

$ 91760

Serial Number ➡ 007118

New York City Real Property Transfer Tax Serial Number ➡ R 0078

New York State Gains Tax Serial Number ➡



**RECORDED IN NEW YORK COUNTY OFFICE OF THE CITY REGISTER**
1999 JAN -5 A 9 32

Witness My Hand and Official Seal

*Joy A. Bobrow*

City Register

DEED 0156
LD/TL CSTR RECPT DATE TIME
1-1 1 42604 Jan 5-99 10:12
47.00

## DEED

THIS INDENTURE made the ___12___ day of February, 1999 between IAN SCHRAGER HOTELS LLC (f/k/a WEST 57TH LLC), a New York limited liability company, having an address at c/o Ian Schrager Hotels LLC, 475 Tenth Avenue, New York, New York 10018 (the "Grantor"), and HENRY HUDSON HOLDINGS LLC, a Delaware limited liability company, having an address at c/o Ian Schrager Hotels LLC, 475 Tenth Avenue, New York, New York 10018 (the "Grantee").

## W I T N E S S E T H:

That the Grantor, in consideration of Ten ($10.00) Dollars and other good and valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs, successors and assigns of the Grantee, forever:

The Condominium Unit (the "Unit") known as Unit No. 2 in the premises known as 353 West 57th Street Condominium and by the street number 353-61 West 57th Street a/k/a 356 West 58 Street, Borough of Manhattan, City, County and State of New York (the "Condominium"), said Unit being designated and described as the Modified Hotel Unit in the Declaration establishing a plan for condominium ownership of said premises under Article 9-B of the Real Property Law of the State of New York (the "New York Condominium Act") dated 4/11/85, and recorded in the New York County Office of the Register of the City of New York on 4/24/85, in Reel 902, Page 1, as amended by First Amendment To Declaration dated 1/29/93 and recorded on 5/11/93 in Reel 1969, Page 2286 (said Declaration dated as the same may be amended from time to time, being hereinafter referred to as the "Declaration") and also designated as Tax Lot 1702 in Block 1048 of Section 4, of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of The City of New York and on the Floor Plans of said Building, certified by Butler Rogers Baskett Architects, on 3/27/85, and also filed with the Real Property Assessment Department of The City of New York as Condominium Plan No. 208, Map No. 4326, and Plan No. 208A (Amendment to Plan No. 208), Map No. 5192 respectively on 4/22/85, and on 5/5/93. The

353 West 57th Street, Unit 2

premises within which the Unit is located is more particularly described in Schedule A attached hereto and made a part hereof.  All capitalized terms herein that are not separately defined herein shall have the meanings given to those terms in the Declaration or in the By-Laws of 353 West 57th Street Condominium.  (Said By-Laws, as the same may be amended from time to time, are hereinafter referred to as the "By-Laws");

TOGETHER with an undivided 46.94011 percent interest in the Common Elements;

TOGETHER with the appurtenances and all the estate and right of the Grantor in and to the Unit;

TOGETHER with, and SUBJECT to, the rights, obligations, easements, restrictions and other provisions set forth in the Declaration and the By-Laws, all of which shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit, as though recited and stipulated at length herein;

SUBJECT to such other liens, agreement, covenants, easements, restrictions and other matters as pertain to the Unit and/or the Property.

TO HAVE AND TO HOLD the same unto the Grantee, and the heirs, successors and assigns of the Grantee, forever.

If any provision of the Declaration or the By-Laws is invalid or would cause the Declaration or the By-Laws to be insufficient to submit the Property to the provisions of the New York Condominium Act, or if any provision that is necessary to cause the Declaration and the By-Laws to submit the Property to the provisions of the New York Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are insufficient to submit the Property to the provisions of the New York Condominium Act, the applicable provisions of Article 26 of the Declaration shall control.

The Grantor covenants that the Grantor has not done or suffered anything to be done whereby, the Unit has been encumbered in any way whatever, except as aforesaid.

REEL 2841 PG 1856

The Grantor, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purposes of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws (and any Rules and Regulations adopted under the By-Laws) and agrees to comply with all the terms and provisions thereof.

The term "Grantee" shall be read as "Grantees" whenever the sense of this Deed so requires.

This unit is intended for commercial use.

IN WITNESS WHEREOF, the Grantor and the Grantee have duly executed this Indenture as of the day and year first above written.

IAN SCHRAGER HOTELS LLC,
   Grantor

By: _____
Name: Peter Ahl
Title: Authorized Signatory

HENRY HUDSON HOLDINGS LLC,
   Grantee

By: _____
Name: Peter Ahl
Title: Authorized Signatory

4

STATE OF NEW YORK ) <br>
                     ) ss. <br>
COUNTY OF NEW YORK )

        On the 12TH day of February in the year 1999 before me, the undersigned, a notary public in and for said state, personally appeared Peter Ahl , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                          *Beatrice S. Williams* <br>
                          Notary Public <br>
                          My commission expires:

[Notary Seal]

                         BEATRICE S. WILLIAMS <br>
                         Notary Public, State of New York. <br>
                         No. 01Wi6015474 <br>
                         Qualified in Queens County <br>
                         Commission Expires Nov. 2, 200-

STATE OF NEW YORK ) <br>
                     ) ss. <br>
COUNTY OF NEW YORK )

        On the 12TH day of February in the year 1999 before me, the undersigned, a notary public in and for said state, personally appeared Peter W. Ahl, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                          *Beatrice S. Williams* <br>
                          Notary Public <br>
                          My commission expires:

[Notary Seal]

                         BEATRICE S. WILLIAMS <br>
                         Notary Public, State of New York <br>
                         No. 01Wi6015474 <br>
                         Qualified in Queens County <br>
                         Commission Expires Nov. 2, 200-

STATE OF NEW YORK ) <br>
                     ) ss. <br>
COUNTY OF NEW YORK )

5

SCHEDULE A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street distant 20 feet easterly from the corner formed by the inter-section of the easterly side of 9th Avenue and with the north-erly side of 57th Street;

RUNNING THENCE Easterly along the said northerly side of 57th Street 155 feet;

THENCE Northerly parallel with 9th Avenue 200 feet 10 inches to the southerly side of 58th Street;

THENCE Westerly along the said southerly side of 58th Street 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of 9th Avenue;

THENCE Southerly parallel with 9th Avenue and part of the distant through a party wall 100 feet 10 inches;

THENCE Westerly parallel more or less with 58th Street 20 feet;

THENCE Southerly and part of the way through another party wall 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

256891.02-New YorkS6A                    16

REEL 2841 PG 1860

# CITY REGISTER RECORDING AND ENDORSEMENT PAGE
## - NEW YORK COUNTY -
*(This page forms part of the instrument)*

Block(s): 1048

Lot(s): 1702

Title/Agent Company Name: Title Associates Inc.

Title Company Number: TA#99(01)054

**RECORD & RETURN TO:**

NAME ▼
Neil L. Rock, Esq.
Skadden,Arps,Slate.Meager&Flom LLP

ADDRESS ▼
919 Third Avenue

CITY ▼   STATE ▼   ZIP ▼
New York, New York   10022

---

**OFFICE USE ONLY - DO NOT WRITE BELOW THIS LINE**

THE FOREGOING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:

Examined by (✓):

| | |
|---|---|
| Mtge Tax Serial No. | |
| Mtge Amount | $ |
| Taxable Amount | $ |

Exemption (✓) ...... YES ☐   NO ☐

Type: [339EE] [255] [OTHER]

Dwelling Type: [1 to 2] [3] [4 to 6] [over 6]

**TAX RECEIVED ON ABOVE MORTGAGE ▼**

| | |
|---|---|
| County (basic) | $ |
| City (Add'l) | $ |
| Spec Add'l | $ |
| TASF | $ |
| MTA | $ |
| NYCTA | $ |
| TOTAL TAX | $ |

Apportionment Mortgage (✓) YES ☐   NO ☐

Joy A. Bobrow, City Register

City Register Serial Number: 013562

Indexed By (✓):   Verified By (✓):

Block(s) and Lot(s) verified by (✓):
Address ☐   Tax Map ☐
Extra Block(s)   Lot(s)

Recording Fee   $ 52
Affidavit Fee (C)   $
TP-584/582 Fee (Y)   $
RPTT Fee (R)   $ 25
HPD-A ☐   HPD-C ☐

New York State Real Estate Transfer Tax ▼
$ 0
Serial Number ▶ 009792

New York City Real Property Transfer Tax Serial Number ▶ R 2799

New York State Gains Tax Serial Number ▶

DEED 0404   52.00
CSHR RECPT DATE TIME
51892 Mar 25 99 13:11

## RECORDED IN NEW YORK COUNTY
## OFFICE OF THE CITY REGISTER

Witness My Hand and Official Seal

*Joy A. Bobrow*

**City Register**

| **NYC DEPARTMENT OF FINANCE**<br>**OFFICE OF THE CITY REGISTER**<br><br>This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document. | <br>2020120200374002002E7430 |
|---|---|

<table>
<tr><td colspan="3" align="center"><b>RECORDING AND ENDORSEMENT COVER PAGE</b></td><td align="right"><b>PAGE 1 OF 11</b></td></tr>
<tr><td><b>Document ID:</b> 2020120200374002</td><td colspan="2" align="center">Document Date: 11-24-2020</td><td>Preparation Date: 12-02-2020</td></tr>
</table>

Document Type: DEED, OTHER
Document Page Count: 10

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| FIRST AMERICAN TITLE INSURANCE CO NCS<br>666 THIRD AVENUE<br>3020-990850NY1AS<br>NEW YORK, NY 10017<br>212-850-0652<br>ASCARPA@FIRSTAM.COM | WEIL GOTSHAL & MANGES LLP<br>767 FIFTH AVE<br>DAVID HERMAN ESQ<br>NEW YORK, NY 10153 |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1048 | 1701 | Entire Lot | 1 | 353 WEST 57TH STREET |

**Property Type:** COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1048 | 1702 | Entire Lot | 2 | 353 WEST 57TH STREET |

**Property Type:** COMMERCIAL CONDO UNIT(S)

### CROSS REFERENCE DATA

CRFN_____  *or*  DocumentID_____  *or*  _____ Year_____ Reel____ Page_____  *or*  File Number_____

### PARTIES

| **GRANTOR:** | **GRANTEE:** |
|---|---|
| HENRY HUDSON HOLDINGS, LLC<br>131 SPRING STREET, 4TH FLOOR, SUITE 401-2<br>NEW YORK, NY 10012 | EC 58TH STREET LLC<br>C/O: ELDRIDGE INDUSTRIES LLC, 600 STEAMBOAT ROAD, SUITE 200<br>GREENWICH, CT 06830 |

### FEES AND TAXES

| **Mortgage :** | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | $ | 250.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ | 7,053,998.07 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 1,746,706.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 90.00 | | |
| Affidavit Fee: | $ | 0.00 | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed        12-04-2020 14:27
City Register File No.(CRFN):
**2020000344628**

*Annette M Hill*

*City Register Official Signature*

3020-990850204

## DEED IN LIEU OF FORECLOSURE

This **INDENTURE**, made the 24th day of November, two thousand and twenty

**BETWEEN**

**HENRY HUDSON HOLDINGS, LLC**, a Delaware limited liability company, having an address at 131 Spring Street, 4th Floor, New York, New York,

party of the first part, and

**EC 58TH STREET LLC**, a Delaware limited liability company, having an address at 600 Steamboat Road, Greenwich, Connecticut,

party of the second part,

**WITNESSETH**, that the party of the first part, in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

Tax Map
Designation:

Block.: 1048

Lot(s): 1701
and 1702

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, described on Exhibit A hereto:

See Exhibit A attached hereto and incorporated herein by this reference (the "Premises").

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described Premises to the center lines thereof;

**TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said Premises;

**TO HAVE AND TO HOLD** the Premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever;

9283/16226-002 CURRENT/119832177V4

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvements and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose;

**AND** the party of the first part and the party of the second part (by its acceptance of this Deed) acknowledge and agree that it is their mutual intent that the conveyances and transfers pursuant to this Deed do not and shall not effect a merger of (i) Holliday Park, LLC and its interest in the Property under the mortgages set forth on Exhibit B attached hereto with (ii) the party of the second part's interest in the Property pursuant to this Deed. The party of the first part acknowledges and agrees that this is the (i) the free and voluntary act of the party of the first part, (ii) the conveyance is intended to be an absolute, unconditional and irrevocable conveyance and (iii) the consideration is fair and adequate and is of reasonably equivalent value.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

*[Signature Page Follows.]*

9283/16226-002 CURRENT/119832177V4

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed the day and year first above written.

**HENRY HUDSON HOLDINGS, LLC**

By:     Hudson Delano Senior Mezz LLC,
        its sole member

By:     Hudson Delano Junior Mezz LLC,
        its sole member

By:     Morgans Group, LLC,
        its sole member

By:     Morgans Hotel Group Co. LLC,
        its sole member

By:     SBE ENT Holdings, LLC,
        its sole member

By: _____
Name: Philippe Zrihen
Title: Chief Business Officer

State of ____NEW YORK_____ )
                              ) ss.:
County of ____NEW YORK_____ )

On the 13 day of November in the year 2020 before me, the undersigned personally appeared ____Philippe Zrihen____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

SARA ELIZABETH CODY
Notary Public, State of New York
No. 01CO6405567
Qualified in New York County
Commission Expires March 9, 2024

*[Signature Page to Bargain and Sale Deed in Lieu of Foreclosure]*

BARGAIN AND SALE DEED WITHOUT
COVENANT AGAINST GRANTOR'S ACT

TITLE
NO. _____

|  |  |
|---|---|
|  | SECTION: |
|  | BLOCK: 1048 |
|  | LOT(S): 1701 and 1702 |
|  | COUNTY OR TOWN: New York County |
| TO | TAX BILLING ADDRESS: |

EC 58TH STREET LLC, a Delaware limited liability
company

c/o Eldridge Industries, LLC
600 Steamboat Road,
Greenwich, Connecticut 06830

RECORD AND RETURN BY MAIL TO:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: David Herman, Esq.

## EXHIBIT A

### Premises

### PARCEL I (Unit 1 a/k/a EBC Unit, Lot 1701):

The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 1, also known as EBC Unit, in the building (hereinafter referred to as the "Building") known as 353 West 57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is more particularly described below), and which Declaration was recorded in the Office of the City Register, New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot 1701 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/27/1985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium Map No. 5192.

Together with an undivided 44.05105% interest in the common elements (as such term is defined in The Declaration).

### PARCEL II (Unit 2 a/k/a Modified Hotel Unit, Lot 1702):

The Condominium Unit (hereinafter referred to as the "Unit") known as Unit 2, also known as Modified Hotel Unit, in the building (hereinafter referred to as the "Building") known as 353 West 57th Street Condominium and by the street number 353 West 57th Street, New York, New York, said Unit being designated and described in a certain Declaration dated 4/11/1985 made by Irving Schatz pursuant to Article 9-B of the Real Property Law of the State of New York establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the building is situated (which land is more particularly described below), and which Declaration was recorded in the Office of the City Register, New York County on 4/24/1985 in Reel 902 Page 1 and amended by First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, further amended by Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999, recorded 10/27/1999 in Reel 2979 Page 2159 (which declaration, as amended, is hereinafter referred to as the "Declaration"). Said Unit is also designated as Tax Lot

1702 in Block 1048 of Section 4 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City Of New York and on the Floor Plans of the Building, Certified by Butler Rogers Baskett Architects, on 3/27/1985 and filed in the Real Property Assessment Department of the City of New York on 4/22/1985 as Condominium Plan No. 208 and also filed in the New York County Register's Office on 4/24/1985 as Condominium Map No. 4326, as amended by amended Floor Plans Certified by Butler Rogers Baskett Architects, on 12/14/1992, which amended Floor Plans were filed in the Real Property Assessment Department of the City of New York on 5/5/1993 as Condominium Plan No. 208A and also filed in the New York County Register's Office on 5/11/1993 as Condominium Map No. 5192.

Together with an undivided 46.94011% interest in the common elements (as such term is defined in the Declaration).

<u>Which Condominium Units are located on the land described below</u>:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of 57th Street;

RUNNING THENCE easterly along the said northerly side of 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of 58th Street;

THENCE westerly along the said southerly side of 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel more or less with 58th Street, 20 feet; and

THENCE southerly and part of the way through another party wall, 100 feet to the northerly side of 57th Street, the point or place of BEGINNING.

356 West 58th Street
New York, New York 10019
Block 1048, Lots 1701 and 1702

9283/16226-002 CURRENT/119832177V4

**Exhibit B**

**Mortgages**


## MORTGAGE 'A'

AMENDED AND RESTATED REPLACEMENT MORTGAGE A made by HENRY HUDSON HOLDINGS LLC, MORGANS HOLDINGS LLC, AND ROYALTON, LLC to WACHOVIA BANK, NATIONAL ASSOCIATION in the amount of $217,000,000.00 dated 10/6/2006, recorded 12/11/2006 as CRFN 2006000679014.

*[NOTE- THIS MORTGAGE DERIVED FROM A NOTE AND MORTGAGE SEVERANCE AGREEMEENT RECORDED 12/11/2006 AS CRFN 200600067901]*

PARTIAL RELEASE OF MORTGAGE made by and between HENRY HUDSON HOLDINGS LLC, MORGANS HOLDINGS LLC, AND ROYALTON, LLC and WACHOVIA BANK, NATIONAL ASSOCIATION dated 10/6/2006, recorded 12/11/2006, as CRFN 2006000679017. Releases Royalton Hotel and Morgans Hotel, Block 867 Lot 20 and Block 1259 Lot 11, other premises not made a part hereof, from Mortgage 'A'.

AGREEMENT OF CONSOLIDATION AND MODIFICATION OF MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING made by and between HENRY HUDSON HOLDINGS LLC and WACHOVIA BANK, NATIONAL ASSOCIATION dated as of 10/6/2006, recorded 12/11/2006, as CRFN 2006000679020. Modifies, extends and spreads Mortgage 'A' over those portions of the premises not already covered thereby, and amends and restates same, amount outstanding is $217,000,000.00.

ASSIGNMENT OF MORTGAGE made by WACHOVIA BANK, NATIONAL ASSOCIATION to LASALLE BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WHALE 8, solely to the extent set forth in the applicable Partition Agreement, the applicable Non-Trust Portion Holder dated as of 6/27/2007, recorded 11/27/2007 as CRFN 2007000587889. Assigns Mortgage 'A'.

MODIFICATION OF AGREEMENT OF CONSOLIDATION AND MODIFICATION OF MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING made by and between HENRY HUDSON HOLDINGS LLC and BANK OF AMERICA, NATIONAL ASSOCIATION, AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WHALE 8, dated as of 9/30/2010, recorded 10/14/2010 as CRFN 2010000344286. Modifies Mortgage 'A' as amended and restated by CRFN 2006000679014.

ASSIGNMENT OF MORTGAGE made by BANK OF AMERICA, NATIONAL ASSOCIATION AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WHALE 8 to DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT dated as of 08/12/2011, recorded 09/16/2011 in (as) CRFN 2011000329360. Assigns above Replacement Mortgage 'A'.

AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, HOTEL REVENUE AND SECURITY AGREEMENT made by and between HENRY HUDSON HOLDINGS LLC, HUDSON LEASECO LLC AND 58TH STREET BAR COMPANY LLC and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT dated as of 08/12/2011, recorded 09/16/2011, in (as) CRFN 2011000329361. Amends and restates and spreads the Amended and Restated Replacement Mortgage 'A' into a valid first lien in the amount of $115,000,000.00.

FIRST AMENDMENT TO AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, HOTEL REVENUE AND SECURITY AGREEMENT AND TO ASSIGNMENT OF LEASES AND RENTS AND HOTEL REVENUES made by and between HENRY HUDSON HOLDINGS LLC, HUDSON LEASECO LLC AND 58TH STREET BAR COMPANY LLC and DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT dated as of 12/07/2011, recorded 02/21/2012, in (as) CRFN 2012000068316. Amends and Restates the above Amended and Restated Consolidated Mortgage, Assignment of Leases and Rents, Hotel Revenue and Security Agreement.

ASSIGNMENT OF MORTGAGE made by DEUTSCHE BANK TRUST COMPANY AMERICAS, AS ADMINISTRATIVE AGENT to UBS REAL ESTATE SECURITIES INC., dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461819.

FOR CONSOLIDATION, SEE MORTGAGE 'B'

**MORTGAGE 'B'**

FEE AND LEASEHOLD MORTGAGE made by HENRY HUDSON HOLDINGS LLC and HUDSON LEASECO LLC and 58TH STREET BAR COMPANY LLC to UBS REAL ESTATE SECURITIES INC. in the amount of $65,000,000.00 dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461820.

CONSOLIDATED AMENDED AND RESTATED  FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by  HENRY HUDSON HOLDINGS LLC and HUDSON LEASECO LLC and 58TH STREET BAR COMPANY LLC to UBS REAL ESTATE SECURITIES INC. dated as of 11/14/2012 and recorded 11/26/2012 as CRFN 2012000461821. Consolidates Mortgages 'A' and 'B' to form a single lien in the amount of $180,000,000.00.

ASSIGNMENT OF MORTGAGE made by UBS REAL ESTATE SECURITIES INC. to CITIGROUP GLOBAL MARKETS REALTY CORP. AND BANK OF AMERICA, N.A. dated as of 2/6/2014, recorded 2/14/2014 in (as) CRFN 2014000058277. Assigns Mortgage(s) 'A' and 'B' as consolidated.

**FOR CONSOLIDATION, SEE MORTGAGE 'C'**

**MORTGAGE 'C'**

CONSOLIDATED, AMENDED AND RESTATED FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by HENRY HUDSON HOLDINGS LLC, 58TH STREET BAR COMPANY LLC AND HUDSON LEASECO LLC to CITIGROUP GLOBAL MARKETS REALTY CORP. AND BANK OF AMERICA, N.A. in the amount of $$53,333,333.34 dated 2/6/2014, recorded 2/14/2014 in (as) CRFN 2014000058278. This Mortgage, by its terms, was consolidated with Mortgages A and B to form a single lien in the amount of $233,333,333.34.

ASSIGNMENT OF MORTGAGE made by CITIGROUP GLOBAL MARKETS REALTY CORP. AND BANK OF AMERICA, N.A. to DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE FOR CGBAM COMMERCIAL MORTGAGE TRUST ███-HD, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2014-HD, AND THE COMPANION LOAN HOLDER dated as of 5/28/2014, recorded 8/4/2014 in (as) CRFN 2014000255044. Assigns Mortgage(s) 'A', 'B' and 'C', as consolidated.

ASSIGNMENT OF MORTGAGE made by DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE FOR CGBAM COMMERCIAL MORTGAGE TRUST 2014-HD, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2014-HD, AND THE COMPANION LOAN HOLDER to COLUMN FINANCIAL, INC. dated as of 2/9/2017, recorded 2/21/2017 in (as) CRFN 2017000070240. Assigns Mortgage(s) 'A', 'B' and 'C', as consolidated.

AMENDED AND RESTATED FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by and between HENRY HUDSON HOLDINGS LLC, 58TH STREET BAR COMPANY LLC AND HUDSON LEASECO LLC and COLUMN FINANCIAL, INC. dated as of 2/9/2017, recorded 2/21/2017, in (as) CRFN 2017000070241. Amends and Restates Mortgage(s) 'A', 'B', and 'C', as consolidated in the unpaid amount of $225,000,000.00.

ASSIGNMENT OF MORTGAGE made by COLUMN FINANCIAL, INC. to U.S. BANK NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE IN TRUST FOR HOLDERS OF CSMC TRUST 2017-HD COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2017-HD dated 3/29/2017, recorded 2/18/2020 in (as) CRFN 2020000061987. Assigns Mortgage(s) 'A', 'B' and 'C', as consolidated.

CORRECTIVE ASSIGNMENT OF FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by COLUMN FINANCIAL, INC. to U.S. BANK NATIONAL

ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE IN TRUST FOR HOLDERS OF CSMC TRUST 2017-HD COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2017-HD dated as of 05/15/2020, recorded 05/22/2020 in (as) CRFN 2020000154471. (NOTE: This correction Assignment is made to correct the Assignment of Mortgage previously recorded on 02/18/2020 as CRFN 2020000061987 for the purpose of fixing the acknowledgment which was used in connection with the execution of the original assignment as well as to include the complete mortgage schedule which was the subject of said assignment).

ASSIGNMENT OF MORTGAGE made by U.S. BANK NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE IN TRUST FOR HOLDERS OF CSMC TRUST 2017-HD COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2017-HD to HOLLIDAY PARK, LLC  dated as of 3/20/2020 , recorded 3/31/2020  in (as) CRFN 20200000113455.  Assigns Mortgage(s) 'A', 'B' and 'C', as consolidated.

CORRECTIVE ASSIGNMENT OF FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT made by U.S. BANK NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE IN TRUST FOR HOLDERS OF CSMC TRUST 2017-HD COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2017-HD to HOLLIDAY PARK, LLC dated as of 11/ 24/2020 and being duly recorded in the Office of the New York City Register immediately prior hereto.

9283/16226-002 CURRENT/119832177V4

| **NYC DEPARTMENT OF FINANCE**<br>**OFFICE OF THE CITY REGISTER** | <br>2020120200374002002SBAB1 |
|---|---|

| **SUPPORTING DOCUMENT COVER PAGE** | **PAGE 1 OF 1** |
|---|---|

**Document ID:** 2020120200374002  Document Date: 11-24-2020  Preparation Date: 12-02-2020
Document Type: DEED, OTHER

**ASSOCIATED TAX FORM ID:**  2020111200180

**SUPPORTING DOCUMENTS SUBMITTED:**

Page Count

RP - 5217 REAL PROPERTY TRANSFER REPORT  4

**FOR CITY USE ONLY**

C1. County Code |___|___|    C2. Date Deed Recorded |___/___/___|
Month  Day  Year

C3. Book OR |___|___|___|___|___|    C4. Page |___|___|___|___|

C5. CRFN |___|___|___|___|___|___|

**REAL PROPERTY TRANSFER REPORT**

STATE OF NEW YORK
STATE BOARD OF REAL PROPERTY SERVICES

# RP - 5217NYC

## PROPERTY INFORMATION

**1. Property Location** | 353 | WEST 57TH STREET 1 | MANHATTAN | 10019
STREET NUMBER | STREET NAME | BOROUGH | ZIP CODE

**2. Buyer Name** | EC 58TH STREET LLC
LAST NAME / COMPANY | FIRST NAME

LAST NAME / COMPANY | FIRST NAME

**3. Tax Billing Address** Indicate where future Tax Bills are to be sent if other than buyer address (at bottom of form)
LAST NAME / COMPANY | FIRST NAME

STREET NUMBER AND STREET NAME | CITY OR TOWN | STATE | ZIP CODE

**4. Indicate the number of Assessment Roll parcels transferred on the deed** | 2 | # of Parcels **OR** [ ] Part of a Parcel

4A. Planning Board Approval - N/A for NYC
4B. Agricultural District Notice - N/A for NYC

**5. Deed Property Size** |_____| X |_____| OR |_____|
FRONT FEET | DEPTH | ACRES

Check the boxes below as they apply:
6. Ownership Type is Condominium [✔]
7. New Construction on Vacant Land [ ]

**8. Seller Name** | HENRY HUDSON HOLDINGS, LLC
LAST NAME / COMPANY | FIRST NAME

LAST NAME / COMPANY | FIRST NAME

**9. Check the box below which most accurately describes the use of the property at the time of sale:**

A [ ] One Family Residential
B [ ] 2 or 3 Family Residential
C [ ] Residential Vacant Land
D [ ] Non-Residential Vacant Land
E [✔] Commercial
F [ ] Apartment
G [ ] Entertainment / Amusement
H [ ] Community Service
I [ ] Industrial
J [ ] Public Service

## SALE INFORMATION

**10. Sale Contract Date** | 11 / 24 / 2020
Month  Day  Year

**11. Date of Sale / Transfer** | 11 / 24 / 2020
Month  Day  Year

**12. Full Sale Price** $ | 2,68,72,37,36

( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.) *Please round to the nearest whole dollar amount.*

**13. Indicate the value of personal property included in the sale** |_____|

**14. Check one or more of these conditions as applicable to transfer:**

A [ ] Sale Between Relatives or Former Relatives
B [ ] Sale Between Related Companies or Partners in Business
C [ ] One of the Buyers is also a Seller
D [ ] Buyer or Seller is Government Agency or Lending Institution
E [ ] Deed Type **not** Warranty or Bargain and Sale (Specify Below )
F [ ] Sale of Fractional or Less than Fee Interest ( Specify Below )
G [ ] Significant Change in Property Between Taxable Status and Sale Dates
H [ ] Sale of Business is Included in Sale Price
I [ ] Other Unusual Factors Affecting Sale Price ( Specify Below )
J [✔] None

## ASSESSMENT INFORMATION  - Data should reflect the latest Final Assessment Roll and Tax Bill

**15. Building Class** | R H |    **16. Total Assessed Value (of all parcels in transfer)** | 7,59,46,950

**17. Borough, Block and Lot / Roll Identifier(s)  ( If more than three, attach sheet with additional identifier(s) )**

| MANHATTAN 1048 1701 | MANHATTAN 1048 1702 | |

| CERTIFICATION | I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments. |
|---|---|

| BUYER | | BUYER'S ATTORNEY | |
|---|---|---|---|
| *All attached* | | | |
| BUYER SIGNATURE                    DATE | | LAST NAME                    FIRST NAME | |

C/O: ELDRIDGE INDUSTRIES LLC  600 STEAMBOAT ROAD, SUITE 200

| STREET NUMBER        STREET NAME (AFTER SALE) | | AREA CODE            TELEPHONE NUMBER | |
|---|---|---|---|

GREENWICH

| | CT | 06830 | SELLER *All attached* | |
|---|---|---|---|---|
| CITY OR TOWN | STATE | ZIP CODE | SELLER SIGNATURE                    DATE | |

2020111200180201

**STATE OF NEW YORK, STATE BOARD OF REAL PROPERTY SERVICES
REAL PROPERTY TRANSFER REPORT (RP-5217NYC)**

CERTIFICATION

I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and I understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

BUYER:

**EC 58TH STREET LLC,**
a Delaware limited liability company

By: _____
    Name: Anthony D. Minella
    Title: President

Dated: _November  24_, 2020

*[Signature Page to Transfer Tax Form (RP-5217) (Deed)]*

**STATE OF NEW YORK, STATE BOARD OF REAL PROPERTY SERVICES**
**REAL PROPERTY TRANSFER REPORT (RP-5217NYC)**

CERTIFICATION

   I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and I understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

SELLER:

**HENRY HUDSON HOLDINGS, LLC**

By:  Hudson Delano Senior Mezz LLC,
   its sole member

By:  Hudson Delano Junior Mezz LLC,
   its sole member

By:  Morgans Group, LLC,
   its sole member

By:  Morgans Hotel Group Co. LLC,
   its sole member

By:  SBE ENT Holdings, LLC,
   its sole member

By: _____
Name: Philippe Zrihen
Title: Chief Business Officer

Dated: _NOVEMBER___ _24_, 2020

*[Signature Page to Transfer Tax Form (RP-5217) (Deed)]*

J-10136-3 CD/cc

PAGE 1 OF 4 PAGES

THE CITY OF NEW YORK

ALT. 1 #101970921

# DEPARTMENT OF BUILDINGS

# CERTIFICATE OF OCCUPANCY

**BOROUGH** Manhattan  **DATE:** MAY 1 7 2001  **NO.** 101970921

This certificate supersedes C.O. No T 121285  **ZONING DISTRICT** C4-7, C1-8, R1

THIS CERTIFIES that the XXX-altered-XXXXXXXXX building-premises located at

353 West 57th Street  **Block** 1048  **Lot** 7502

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

## PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS. PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| SUB-CELLAR | 120 | 150 | | | | | SWIMMING POOL, MEN'S RECREATION ROOM (GYM) WITH ACCESSORY USE, WOMAN'S LOUNGE, EMPLOYEES LOCKER ROOMS OFFICES, REST ROOM, STORAGE, BOILER ROOM, SERVICE AND UTILITY ROOM, MECHANICAL EQUIPMENT ROOMS |
| CELLAR | 120 | 75 | | | | | WOMAN'S RECREATION ROOM (GYM) WITH ACCESSORY USE, LOCKER ROOM, SERVICE AND UTILITY RMS., SCENERY LIFT PIT, LAUNDRY RM., STORAGE |
| 1ST FLOOR | | | | | 5 | F-3 | HOTEL LOBBY |
| | 120 | 415 | | | | C | SUPERMARKET |
| | | 202 | | | 6 | C | RETAIL |
| | | 3 | | | | J-1 | SECURITY ROOM |
| | | | | | | | STORAGE |
| | | 4 | | | | | OFFICES |
| 1ST FLOOR MEZZ. | 120 | 26 | | | 5 | J-1 | OFFICES ROOM SERVICE, RECEIVING |
| | | 4 | | | 5 | D-2 | KITCHEN |
| | | 132 | | | | | CONFERENCE SPACE STORAGE PANTRY |
| | | 110 | | | | F-1B | CONFERENCE ROOM 1 |
| | | 1 | | | | | COAT ROOM |
| | | 139 | | | | F-1B | CONFERENCE ROOM 2 |

OPEN SPACE USES _____  **(CONTINUED)**
(SPECIFY: PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGE OF USE OR OCCUPANCY SHALL BE MADE UNLESS A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND SPECIFICATIONS NOTED ON THE REVERSE SIDE.

_____  _____
BOROUGH SUPERINTENDENT  Acting Commissioner
                                          COMMISSIONER

ORIGINAL  ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS  ☐ COPY



JW  11-30-01

B Form 54 (rev. 8/85)
J-10136-3 db/cc

PAGE 2 OF 4 PAGES



THE CITY OF NEW YORK

# DEPARTMENT OF BUILDINGS

ALT. 1 #101970921

## CERTIFICATE OF OCCUPANCY

**BOROUGH** Manhattan          **DATE** MAY 1 7 2001    **NO,** 101970921

This certificate supersedes C.O. No T 121285          ZONING DISTRICT C4-7, C1-6, R1

THIS CERTIFIES that the XXX-altered-XXXXXXXXX building-premises   located at

353 West 57th Street                    Block 1048      Lot 7502

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

## PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS. PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| 2ND FLOOR | 100 | 190 | | | 5 | F-4 | EATING & DRINKING ESTABLISHMENT |
| | | 297 | | | | F-4 | EATING & DRINKING & LIBRARY ESTABLISHMENT (LOUNGE) SERVICE BAR ROOF TERRACE |
| | | 39 | | | | F-4 | HOTEL REGISTRATION |
| | | 11 | | | | D-2 | KITCHEN |
| | | 12 | | | | J-1 | OFFICES (ACC.) |
| | | 1 | | | | | COAT CHECK |
| 3RD FLOOR | | 119 | | | 5 | F-1B | MEETING ROOM 1 |
| | | 15 | | | | J-1 | OFFICES (ACC.) |
| | | | | | | D-2 | LAUNDRY ROOM LOCKER ROOMS |
| | | 68 | | | | F-1B | MEETING ROOM 2 |
| | | 55 | | | | J-1 | LOCKER ROOMS |
| 4TH FLOOR | | | 49 | | 5 | J-1 | FORTY-NINE (49) HOTEL ROOMS |
| | | 31 | | | 5 | J-1 | ACC. OFFICES |
| 5TH FLOOR | | | 63 | | 5 | J-1 | SIXTY-THREE (63) HOTEL ROOMS |
| 6TH FLOOR | | | 68 | | 5 | J-1 | SIXTY-EIGHT (68) HOTEL ROOMS |
| 7TH FLOOR | | | 70 | | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |
| 8TH FLOOR | | | 70 | | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |

OPEN SPACE USES _____ (CONTINUED) _____
(SPECIFY-PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGE OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED
THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND
SPECIFICATIONS NOTED ON THE REVERSE SIDE.

P.E.

BOROUGH SUPERINTENDENT

R. A
Acting Commissioner    M-0

COMMISSIONER

☐ ORIGINAL       ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS      ☐ COPY

B Form 54 (rev. 8/85)

THAT THE ZONING LOT ON WHICH THE PREMISES IS LOCATED IS BOUNDED AS FOLLOWS:

BEGINNING at point on the NORTH side of WEST 57TH STREET
distant 20' EAST feet from the corner formed by the intersection of
9TH AVENUE and WEST 57TH STREET

running thence ............................................... feet; thence ............................................... feet;
thence EAST 155'-0" ............................. feet; thence NORTH 200'-0" ............................. feet;
thence WEST 135'-0" ............................. feet; thence SOUTH 100'-0" ............................. feet;
thence WEST 20'-0" ............................. feet; thence SOUTH 100'-0" ............................. feet;
to the point or place of beginning

XXXX ALT. No. 101970921 DATE OF COMPLETION      CONSTRUCTION CLASSIFICATION  1
BUILDING OCCUPANCY GROUP CLASSIFICATION      HEIGHT  26  STORIES, 244'  FEET

THE FOLLOWING FIRE DETECTION AND EXTINGUISHING SYSTEMS ARE REQUIRED AND WERE INSTALLED IN COMPLIANCE WITH APPLICABLE LAWS.

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| STANDPIPE SYSTEM | | | AUTOMATIC SPRINKLER SYSTEM | | |
| YARD HYDRANT SYSTEM | | | | | |
| STANDPIPE FIRE TELEPHONE AND SIGNALLING SYSTEM | | | | | |
| SMOKE DETECTOR | | | | | |
| FIRE ALARM AND SIGNAL SYSTEM | | | | | |

STORM DRAINAGE DISCHARGES INTO:
A) STORM SEWER ☐      B) COMBINED SEWER ☐      C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

SANITARY DRAINAGE DISCHARGES INTO:
A) SANITARY SEWER ☐      B) COMBINED SEWER ☐      C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

LIMITATIONS OR RESTRICTIONS:
BOARD OF STANDARDS AND APPEALS CAL. NO _____
CITY PLANNING COMMISSION CAL. NO. _____
OTHERS:

B Form 54 (rev. 8/85)
J-10136-3 c0/cc

PAGE 3 OF 4 PAGES



THE CITY OF NEW YORK

ALT. 1 #101970921

# DEPARTMENT OF BUILDINGS

# CERTIFICATE OF OCCUPANCY

BOROUGH  Manhattan        DATE MAY 1 7 2001   NO.  101970921

This certificate supersedes C.O. No T 121285        ZONING DISTRICT C4-7, C1-8, R1

THIS CERTIFIES that the  XXX-altered-XXXXXXXXX  building-premises   located at
353 West 57th Street                              Block  1048    Lot  7502

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

## PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS PER SQ. FT. | MAXIMUM NO OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| 9TH FLOOR | | | 70 | | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |
| 10TH FLOOR | | | 70 | | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |
| 11TH FLOOR | | | 48 | | 5 | J-1 | FORTY-EIGHT (48) HOTEL ROOMS |
| 12TH FLOOR | | | 71 | | 5 | J-1 | SEVENTY-ONE (71) HOTEL ROOMS |
| 14TH FLOOR | | | 70 | | 5 | J-1 | SEVENTY (70) HOTEL ROOMS |
| 15TH FLOOR | | | 40 | | 5 | J-1 | FORTY (40) HOTEL ROOMS |
| 16TH FLOOR | | | 39 | | 5 | J-1 | THIRTY-NINE (39) HOTEL ROOMS |
| 17TH FLOOR | | | 39 | | 5 | J-1 | THIRTY-NINE (39) HOTEL ROOMS |
| 18TH FLOOR | | | 33 | | 5 | J-1 | THIRTY-THREE (33) HOTEL ROOMS |
| 19TH FLOOR | | | 40 | | 5 | J-1 | FORTY (40) HOTEL ROOMS |
| 20TH FLOOR | | | 33 | | 5 | J-1 | THIRTY-THREE (33) HOTEL ROOMS |
| 21ST FLOOR | | | 26 | | 5 | J-1 | TWENTY-SIX (26) HOTEL ROOMS |
| 22ND FLOOR | | | 24 | | 5 | J-1 | TWENTY-FOUR (24) HOTEL ROOMS |
| 23RD FLOOR | | | 35 | | 5 | J-1 | THIRTY-FIVE (35) HOTEL ROOMS |
| 24TH FLOOR | | | 9 | | 5 | J-1 | ONE (1) HOTEL ROOM |
| | | | | | 5 | J-1, E | ACCESSORY OFFICE PANTRY/STORAGE |

OPEN SPACE USES _____ (CONTINUED)
(SPECIFY PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGE OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED
THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND
SPECIFICATIONS NOTED ON THE REVERSE SIDE.

_____ 3 RE        _____ R.7
BOROUGH SUPERINTENDENT              Acting Commissioner      M-8
                                    COMMISSIONER

☐ ORIGINAL        ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS        ☐ COPY



B Form 54 (rev. 8/85)
J-10136-3 Ob/cc

PAGE 4 OF 4 PAGES

### THE CITY OF NEW YORK

ALT. 1 #101970921

# DEPARTMENT OF BUILDINGS

# CERTIFICATE OF OCCUPANCY

BOROUGH  Manhattan            DATE: MAY 17 2001 NO.  101970921

This certificate supersedes C.O. No T 121285          ZONING DISTRICT C4-7, C1-8, R1
THIS CERTIFIES that the XXX-altered-XXXXXXXXX building-premises   located at
353 West 57th Street                        Block 1048      Lot 7502

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

## PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS. PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| 25TH FLOOR | | | | | | D-2 | MECHANICAL ROOM |
| 26TH FLOOR | | | | | | D-2 | MECHANICAL ROOM |
| 27TH FLOOR | | | | | | D-2 | MECHANICAL ROOM |

NOTE:  THIS BUILDING COMPLIES WITH SECTION 67 OF THE MULTIPLE DWELLING LAW.

FIRE DEPARTMENT APPROVALS:
- STANDPIPE SYSTEM - APRIL 9, 1951
- SPRINKLER SYSTEM - APRIL 13, 1953
- INTERIOR FIRE ALARM AND WATCHMAN'S TIME DETECTOR SYSTEMS - AUGUST 31, 1954

OPEN SPACE USES _____
(SPECIFY PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGE OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED
THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND SPECIFICATIONS NOTED ON THE REVERSE SIDE.

_____ P.E.            _____ R.A.
BOROUGH SUPERINTENDENT                   Acting Commissioner

☐ ORIGINAL        ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS        ☐ COPY



JW          11-30-01

Application for a Certification of No Harassment

*Rev. Dec 2018*

**B. Principals and Officers Of Prior Owners:** If title to the property was previously held by an entity rather than a person at any time since the referral date, list (i) every director, general partner, managing partner, or managing member of such entity, (ii) every officer of such entity, (iii) every other person authorized to sign for and bind such entity, and (iv) every person or entity holding a 10% or more economic interest in such entity.

| Name | Period of Ownership | Relationship to Owner | Address | Telephone Number |
|---|---|---|---|---|
| Sam Nazarian | 11/16-11/20 | Indirect Ownership of more than 10% | c/o sbe, 131 Spring Street, 4th Floor, New York, NY 10012 | (212) 277-4100 |
| Hudson Delano Senior Mezz LLC | 2/14-11/20 | Sole Member of Owner | c/o sbe, 131 Spring Street, 4th Floor, New York, NY 10012 | (212) 277-4100 |
| Henry Hudson Senior Mezz LLC | 2006-2014 | Sole Member of Owner | c/o Morgans Hotel Group, 475 Tenth Avenue, 11th Floor, New York, NY 10018 | (212) 277-4100 |
| MMRDH Senior Mezz Holding Company LLC | 2004-2006 | Sole Member of Owner | c/o Morgans Hotel Group, 475 Tenth Avenue, 11th Floor, New York, NY 10018 | (212) 277-4100 |
| Henry Hudson Holdings Parent LLC | 1999-2004 | Sole Member of Owner | c/o Morgans Hotel Group, 475 Tenth Avenue, 11th Floor, New York, NY 10018 | (212) 277-4100 |
| Philippe Zrihen | 2017-2020 | Authorized Rep. | c/o sbe, 131 Spring Street, 4th Floor, New York, NY 10012 | (212) 277-4100 |
| Richard Szymanski | 2007-2017 | Authorized Rep. | c/o Morgans Hotel Group, 475 Tenth Avenue, 11th Floor, New York, NY 10018 | (212) 277-4100 |
| Edward Scheetz | 2005-2007 | Authorized Rep. | c/o Morgans Hotel Group, 475 Tenth Avenue, 11th Floor, New York, NY 10018 | (212) 277-4100 |
| Ian Schrager | 1999-2005 | CEO of Parent Company | c/o Morgans Hotel Group, 475 Tenth Avenue, 11th Floor, New York, NY 10018 | (212) 277-4100 |
| Todd Boehly | 2020-2022 | Authorized Rep. | 600 Steamboat Road, Suite 200 Greenwich, CT 06830 | (203) 298-5300 |
| Anthony Minella | 2020-2022 | Authorized Rep. | 600 Steamboat Road, Suite 200 Greenwich, CT 06830 | (203)298-5300 |
| John Klein | 2020-2022 | Authorized Rep. | 600 Steamboat Road, Suite 200 Greenwich, CT 06830 | (203) 298-5300 |
| Johann Georg Wyss | 2020-2022 | Authorized Rep. | 600 Steamboat Road, Suite 200 Greenwich, CT 06830 | (203) 298-5300 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Printed on paper containing 30% post-consumer material.

7

Application for a Certification of No Harassment

*Rev. Dec 2018*

**C. Management – Prior Ownership:** List each person who served as a managing agent, a superintendent, collected rents, supervised or ordered repairs, or exercised any other discretion in the management of the property from the referral date under a prior owner.

| Name and Address | Employer and Role | Period of Service |
|---|---|---|
| Todd Scartozzi<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2008 - 2009 |
| Atif Youseef<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2005 - 2008 |
| | | |
| | | |
| Denise Cruz<br>358 West 58th Street, New York, NY 10019 | Irving Schatz<br>property manager | 1999 - 2020 |
| Geoffrey Mills<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2019-2020 |
| Claus Landberg<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2017-2019 |
| Simon Rusconi<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2016-2017 |
| John Beier<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2015-2016 |
| Wald Chlids<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2014 |
| Mike Walsh<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2011-2014 |
| Robert Cartwright<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2010-2012 |
| Simon Mais<br>358 West 58th Street, New York, NY 10019 | Henry Hudson Holdings LLC<br>unknown role | 2009-2010 |

Printed on paper containing 30% post-consumer material.

8

Application for a Certification of No Harassment

*Rev. Dec 2018*

**C. Management – Prior Ownership:** List each person who served as a managing agent, a superintendent, collected rents, supervised or ordered repairs, or exercised any other discretion in the management of the property from the referral date under a prior owner.

| Name and Address | Employer and Role | Period of Service |
|---|---|---|
| Newmark | EC 58th Street LLC manger | 3/1/21-2022 |
| Matt Duthie | Newmark manager | 3/1/21-2022 |
| Frank Mollo | Newmark manager | 3/1/21-2022 |
| Eric Feliciano | Newmark manager | 3/1/21-2022 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Printed on paper containing 30% post-consumer material.

8

SRO TENANTS

| NAME | ROOM # | RENT AMOUN | WEEKLY/ MONTHLY | DOA | EMAIL |
|---|---|---|---|---|---|
| Simmons Arlene | 1169 | 501.11 | Monthly | 9.5.1988 | |
| Radunovich Milan | 1546 | 418.79 | Monthly | 1.13.1977 | TESSR4444@YAHOO.COM |
| Gilbert Fred | 1722 | 277.36 | Monthly | 5.25.1968 | |
| Levi Emil | 1846 | 86.81 | Weekly | 9.4.1979 | EHL100@AOL.COM |
| Leach Ken | 1856 | 501.11 | Monthly | 11.1.1985 | KENLEACH217@AOL.COM |
| Lamb Owen | 1916 | 396.69 | Monthly | 9.10.1979 | OWENLAMB@AOL.COM |
| Magno Zoe | 2017 | 96.81 | Monthly | 11.30.1979 | |
| Carter Teresa | 2031 | 422.27 | Monthly | 5.1.1977 | |
| Palma Flora | 2039 | 402.57 | Monthly | 3.1.1976 | |
| Orturbia Susana | 2045 | 502.26 | Monthly | 2.25.1978 | |
| Khan Kwasa | 2106 | 419.95 | Monthly | 8.19.1977 | |
| Leo Jenkins | 2107 | 130.62 | Weekly | 8.17.1984 | |
| Rodriguez  Yolanda | 2114 | 543.12 | Monthly | 3.5.1980 | |
| Marouils George | 2129 | 429.6 | Monthly | 8.29.1979 | |
| Jay Vanderbilt | 2135 | 255.34 | Monthly | 11.1.2008 | JAY.VANDERBILT@VA.GOV |
| Quioque Caridad | 2138 | 484.88 | Monthly | 8.29.1980 | |
| Rodriquez Maria | 2139 | 340.37 | Monthly | 1.28.1983 | LADYROD57@AOL.COM |
| Brockenborough Pat | 2140 | 393.02 | Monthly | 1.7.1974 | |
| Sanchez Bonifacio | 2145 | 255.34 | Monthly | 10.29.1971 | |
| Ledesma Lucy | 2146 | 278.92 | Weekly | 7.19.1982 | |
| Hirsch Judy | 2155 | 83.47 | Weekly | 9.25.1967 | |
| Schwantes Claudia | 2157 | 419.47 | Monthly | 4.22.1981 | LAUDIABALDONERI@GMAIL.CO |
| Natos Nick | 2204 | 419.51 | Monthly | 5.18.1981 | |
| Cowie Margaret | 2206 | 538.19 | Monthly | 10.3.1982 | MIMIYUYU31@GMAIL.COM |
| Carroll William | 2207 | 419.46 | Monthly | 8.16.1980 | |
| Nathaniel Virginia | 2211 | 404.88 | Monthly | 7.11.1994 | |
| Phyu Hnin Hla | 2212 | 415.32 | Monthly | 5.12.1972 | HNIN.HLA.PHYU@UNDO.ORG |
| Chane Peggy | 2227 | 242.58 | Monthly | 1.14.1969 | PEGGYCHANE@GMAIL.COM |
| Blakely Iris | 2231 | 484.34 | Monthly | 7.2.1978 | |
| Ramos Letcias | 2232 | 454.74 | Monthly | 4.5.1981 | |
| Reddy Kenneth | 2235 | 393.02 | Monthly | 9.1.1982 | |
| Morrow Jenatte | 2236 | 96.81 | Weekly | 12.3.1970 | JEMORROW2236@YAHOO.COM |
| Chin Daisy | 2239 | 402.57 | Monthly | 7.26.1982 | |
| Bendana Renata | 2244 | 506.89 | Monthly | 1.29.1974 | IRBENDANA@GMAIL.COM |

| Evelyn Lagarde | 2245 | 416.47 | Monthly | 10.29.1971 |
| Lavilla Amparo | 2253 | 457.06 | Monthly | 7.7.1981 |
| Danielle Marton | 2255 | 96.82 | Weekly | 8.1.1978 |

**Total of INHOUSE Tena**    **37**

| PHONE NUMBERS | Land Line Phone | phone extension |
|---|---|---|
| 212-554-6469 | 554-6469 | 1169 |
| 917-225-3729 | 554-6163 | 1546 |
| 516-431-7461 | 554-6403 | 1722 |
| 212-956-1231 | 554-6273 | 1846 |
| 917-881-8747 | 554-6453 | 1856 |
| 917-806-0000 | 554-6292 | 1916 |
| 917-678-8901 | 554-6332 | 2017 |
| 212-765-4657 | 554-6339 | 2031 |
| 212-757-6592 | 554-6276 | 2039 |
| 646-418-1498 | 554-2045 | 2045 |
| 212-757-6884 | 554-6270 | 2106 |
| 212-247-4449 | 554-6033 | 2107 |
| 917-887-1696 | 554-6361 | 2114 |
| 212-554-6341 | 554-6341 | 2129 |
| 212-646-7500 EXT 3666 | 554-2135 | 2135 |
| 212-977-3739 | 554-6369 | 2138 |
| 212-245-1022 | 554-6178 | 2139 |
| 212-554-6369 | 554-6363 | 2140 |
| 212-554-6372 | 554-6372 | 2145 |
| 917-678-8065 | 554-2146 | 2146 |
| 212-265-7730 | 554-6135 | 2155 |
| 646-236-6456 | 554-6378 | 2157 |
| 212-586-5863 | 554-6143 | 2204 |
| 212-245-4353 | 554-6382 | 2206 |
| 212-554-6264 | 554-6264 | 2207 |
| 646-498-7332 | 554-2211 | 2211 |
| 917-821-4623 | 554-2212 | 2212 |
| 401-390-4937 | 554-6447 | 2227 |
| 212-554-6391 | 554-6390 | 2231 |
| 347-407-3471 | 554-6391 | 2232 |
| 212-333-5179 | 554-6334 | 2235 |
| 929-216-1058 | 554-6230 | 2236 |
| 212-541-9177 | 554-6394 | 2239 |
| 917-370-0048 | 554-6398 | 2244 |

| | | |
|---|---|---|
| 646-468-7729 | 554-6349 | 2245 |
| 212-554-6401 | 554-6401 | 2253 |
| 917-639-3915 | 554-6241 | 2255 |

**Tenants no longer in Hudson since the year 2019-2022**

Room 2134- Clara Balmeceda passed on **9/2019**

Room 2127- Melody Reed passed on **6/2020**

Room 2240- Vittirio Furgeri passed on **2/2021**

Room 2214- Dominic Carfagna moved out to Nursing home **3/2021**

Room 2253- Amparo Lavilla passed on **12.2021,**

Room 2133- Richelle Panday passed on **8/2022**



New York State Division of Housing and Community Renewal
Office of Rent Administration

2019 Registration Rent Roll Report Effective 04/01/2019 for
Registration Id Number: 117950
353 W 57TH ST
NEW YORK, NEW YORK  10019

Information on this report is as of January 13, 2022

Case 25-11853-KBO   Doc 396-2   Filed 03/31/26   Page 472 of 551

| APARTMENT NUMBER | APT STATUS | LEGAL REG RENT | PREFERENTIAL RENT | ACTUAL RENT PAID | FILING DATE | TENANT NAME | LEASE BEGAN | LEASE ENDS |
|---|---|---|---|---|---|---|---|---|
| 1169 | RS | 501.11 | | | 07/09/19 | ARLENE SIMMONS | | |
| 1516 | RS | 419.51 | | | 07/09/19 | NICK NATOS | | |
| 1546 | RS | 418.79 | | | 07/09/19 | MILAN RADUNOVICH | | |
| 1722 | RS | 277.36 | | | 07/09/19 | FRED GILBERT | | |
| 1753 | RS | 490.18 | | | 07/09/19 | GEORGE BICHAI | | |
| 1812 | RS | 419.48 | | | 07/09/19 | ANTHONY BICHAI | | |
| 1846 | RS | 86.81W | | | 07/09/19 | EMIL LEVI | | |
| 1856 | RS | 501.11 | | | 07/09/19 | KEN LEACH | | |
| 1916 | RS | 396.69 | | | 07/09/19 | OWEN LAMB | | |
| 2017 | RS | 96.81W | | | 07/09/19 | ZOE MAGNO | | |
| 2031 | RS | 422.27 | | | 07/09/19 | TERESA CARTER | | |
| 2039 | RS | 402.57 | | | 07/09/19 | FLORA PALMA | | |
| 2045 | RS | 602.26 | | | 07/09/19 | ALBERTO ORTURBIA | | |
| 2046 | RS | 416.47 | | | 07/09/19 | EVELYN LARGARDE | | |
| 2106 | RS | 419.95 | | | 07/09/19 | KWASA KHAN | | |
| 2107 | RS | 130.62W | | | 07/09/19 | DARYL COOPER | | |
| 2114 | RS | 543.12 | | | 07/09/19 | YOLANDA RODRIGUEZ | | |
| 2127 | RS | 453.41 | | | 07/09/19 | MELODY REED | | |
| 2129 | RS | 429.60 | | | 07/09/19 | GEORGE MAROUILS | | |
| 2133 | RS | 416.47 | | | 07/09/19 | RICHELLE PANDAY | | |
| 2134 | RS | 467.48 | | | 07/09/19 | CLARA BALMECEDA | | |
| 2135 | RS | 183.90 | | | 07/09/19 | JAY VANDERBILT | | |
| 2138 | RS | 484.88 | | | 07/09/19 | YOLANDA QUIOQUE | | |
| 2139 | RS | 340.37 | | | 07/09/19 | MARIA RODRIQUEZ | | |
| 2140 | RS | 393.02 | | | 07/09/19 | PAT BROCKENBOROUGH | | |
| 2145 | RS | 255.34 | | | 07/09/19 | BONIFACIO SANCHEZ | | |
| 2146 | RS | 278.92 | | | 07/09/19 | LUCY LEDESMA | | |
| 2155 | RS | 83.47W | | | 07/09/19 | JUDY HIRSCH | | |
| 2157 | RS | 419.47 | | | 07/09/19 | CLAUDIA SCHWANTES | | |
| 2204 | RS | 431.53 | | | 07/09/19 | JOYCE BROWN | | |
| 2206 | RS | 538.19 | | | 07/09/19 | MARGARET COWIE | | |
| 2207 | RS | 419.46 | | | 07/09/19 | WILLIAM CARROLL | | |
| 2211 | RS | 609.62 | | | 07/09/19 | VIRGINIA NATHANIEL | | |
| 2212 | RS | 415.32 | | | 07/09/19 | HLA PHYN HNIN | | |
| 2214 | RS | 609.62 | | | 07/09/19 | JOSEPH CARFARGNA | | |
| 2227 | RS | 242.58 | | | 07/09/19 | PEGGY CHANE | | |
| 2231 | RS | 484.34 | | | 07/09/19 | FAYE BLAKELY | | |
| 2232 | RS | 454.74 | | | 07/09/19 | LETCIAS RAMOS | | |
| 2235 | RS | 393.02 | | | 07/09/19 | KENNY REDDY | | |
| 2236 | RS | 96.81W | | | 07/09/19 | JEANNETTE MORROW | | |
| 2239 | RS | 402.57 | | | 07/09/19 | DAISY CHIN | | |
| 2240 | RS | 419.96 | | | 07/09/19 | VITTORO FURGERI | | |



New York State.Division of Housing and Community Renewal
Office of Rent Administration

2019 Registration Rent Roll Report Effective 04/01/2019 for
Registration Id Number: 117950
353 W 57TH ST
NEW YORK, NEW YORK  10019

Information on this report is as of January 13, 2022

| APARTMENT NUMBER | APT STATUS | LEGAL REG RENT | PREFERENTIAL RENT | ACTUAL RENT PAID | FILING DATE | TENANT NAME | LEASE BEGAN | LEASE ENDS |
|---|---|---|---|---|---|---|---|---|
| 2244 | RS | 506.89 | | | 07/09/19 | RENATA BENDANA | | |
| 2253 | RS | 457.06 | | | 07/09/19 | AMPARO LAVILLA | | |
| 2255 | RS | 96.82W | | | 07/09/19 | DANIELLE MARTON | | |

Case 25-11853-KBO   Doc 396-2   Filed 03/31/26   Page 473 of 551



New York State Division of Housing and Community Renewal
Office of Rent Administration

2020 Registration Rent Roll Report Effective 04/01/2020 for
Registration Id Number: 117950
353 W 57TH ST
NEW YORK, NEW YORK  10019

Information on this report is as of January 13, 2022

| APARTMENT NUMBER | APT STATUS | LEGAL REG RENT | PREFERENTIAL RENT | ACTUAL RENT PAID | FILING DATE | TENANT NAME | LEASE BEGAN | LEASE ENDS |
|---|---|---|---|---|---|---|---|---|
| 1169 | RS | 501.11 | | | 07/20/20 | ARLENE SIMMONS | | |
| 1516 | RS | 419.51 | | | 07/20/20 | NICK NATOS | | |
| 1546 | RS | 418.79 | | | 07/20/20 | MILAN RADUNOVICH | | |
| 1722 | RS | 277.36 | | | 07/20/20 | FRED GILBERT | | |
| 1753 | RS | 501.11 | | | 07/20/20 | VACANT VACANT | | |
| 1812 | RS | 419.48 | | | 07/20/20 | ANTHONY BICHAI | | |
| 1846 | RS | 86.81W | | | 07/20/20 | EMIL LEVI | | |
| 1856 | RS | 501.11 | | | 07/20/20 | KEN LEACH | | |
| 1916 | RS | 396.69 | | | 07/20/20 | OWEN LAMB | | |
| 2017 | RS | 96.81W | | | 07/20/20 | ZOE MAGNO | | |
| 2031 | RS | 422.27 | | | 07/20/20 | TERESA CARTER | | |
| 2039 | RS | 402.57 | | | 07/20/20 | FLORA PALMA | | |
| 2045 | RS | 502.26 | | | 07/20/20 | SUSANA ORTURBIA | | |
| 2106 | RS | 419.95 | | | 07/20/20 | KWASA KHAN | | |
| 2107 | RS | 130.62W | | | 07/20/20 | DARYL COOPER | | |
| 2114 | RS | 543.12 | | | 07/20/20 | YOLANDA RODRIGUEZ | | |
| 2127 | RS | 453.41 | | | 07/20/20 | MELODY REED | | |
| 2129 | RS | 429.60 | | | 07/20/20 | GEORGE MAROUILS | | |
| 2133 | RS | 416.47 | | | 07/20/20 | RICHELLE PANDAY | | |
| 2134 | RS | 467.48 | | | 07/20/20 | CLARA BALMECEDA | | |
| 2135 | RS | 183.90 | | | 07/20/20 | JAY VANDERBILT | | |
| 2138 | RS | 484.88 | | | 07/20/20 | YOLANDA QUIOQUE | | |
| 2139 | RS | 340.37 | | | 07/20/20 | MARIA RODRIQUEZ | | |
| 2140 | RS | 393.02 | | | 07/20/20 | PAT BROCKENBOROUGH | | |
| 2145 | RS | 255.34 | | | 07/20/20 | BONIFACIO SANCHEZ | | |
| 2146 | RS | 278.92 | | | 07/20/20 | LUCY LEDESMA | | |
| 2155 | RS | 83.47W | | | 07/20/20 | JUDY HIRSCH | | |
| 2157 | RS | 419.47 | | | 07/20/20 | CLAUDIA SCHWANTES | | |
| 2204 | RS | 431.53 | | | 07/20/20 | JOYCE BROWN | | |
| 2206 | RS | 538.19 | | | 07/20/20 | MARGARET COWIE | | |
| 2207 | RS | 419.46 | | | 07/20/20 | WILLIAM CARROLL | | |
| 2211 | RS | 404.88 | | | 07/20/20 | VIRGINIA NATHANIEL | | |
| 2212 | RS | 415.32 | | | 07/20/20 | HLA PHYN HNIN | | |
| 2214 | RS | 609.62 | | | 07/20/20 | JOSEPH CARFARGNA | | |
| 2227 | RS | 242.58 | | | 07/20/20 | PEGGY CHANE | | |
| 2231 | RS | 484.34 | | | 07/20/20 | FAYE BLAKELY | | |
| 2232 | RS | 454.74 | | | 07/20/20 | LETCIAS RAMOS | | |
| 2235 | RS | 393.02 | | | 07/20/20 | KENNY REDDY | | |
| 2236 | RS | 96.81W | | | 07/20/20 | JEANNETTE MORROW | | |
| 2239 | RS | 402.57 | | | 07/20/20 | DAISY LUE CHIN | | |
| 2240 | RS | 419.96 | | | 07/20/20 | VITTORO FURGERI | | |
| 2244 | RS | 506.89 | | | 07/20/20 | RENATA BENDANA | | |

Case 25-11853-KBO   Doc 396-2   Filed 03/31/26   Page 474 of 551



New York State Division of Housing and Community Renewal
Office of Rent Administration

2020 Registration Rent Roll Report Effective 04/01/2020 for
Registration Id Number: 117950
353 W 57TH ST
NEW YORK, NEW YORK  10019

Information on this report is as of January 13, 2022

| APARTMENT NUMBER | APT STATUS | LEGAL REG RENT | PREFERENTIAL RENT | ACTUAL RENT PAID | FILING DATE | TENANT NAME | LEASE BEGAN | LEASE ENDS |
|---|---|---|---|---|---|---|---|---|
| 2245 | RS | 416.47 | | | 07/20/20 | EVELYN LAGARDE | | |
| 2253 | RS | 457.06 | | | 07/20/20 | AMPARO LAVILLA | | |
| 2255 | RS | 96.82W | | | 07/20/20 | DANIELLE MARTON | | |



New York State Division of Housing and Community Renewal
Office of Rent Administration

2021 Registration Rent Roll Report Effective 04/01/2021 for
Registration Id Number: 117950
353 W 57TH ST
NEW YORK, NEW YORK  10019

Information on this report is as of January 13, 2022

| APARTMENT NUMBER | APT STATUS | LEGAL REG RENT | PREFERENTIAL RENT | ACTUAL RENT PAID | FILING DATE | TENANT NAME | LEASE BEGAN | LEASE ENDS |
|---|---|---|---|---|---|---|---|---|
| 1169 | RS | 501.11 | | | 06/30/21 | ARLENE SIMMONS | | |
| 1546 | RS | 418.79 | | | 06/30/21 | MILAN / TESS RADUNOVICH | | |
| 1722 | RS | 277.36 | | | 06/30/21 | FRED GILBERT | | |
| 1846 | RS | 86.81W | | | 06/30/21 | EMIL LEVI | | |
| 1856 | RS | 501.11 | | | 06/30/21 | KEN LEACH | | |
| 1916 | RS | 396.69 | | | 06/30/21 | OWEN LAMB | | |
| 2017 | RS | 96.81W | | | 06/30/21 | ZOE MAGNO | | |
| 2031 | RS | 422.27 | | | 06/30/21 | TERESA CARTER | | |
| 2039 | RS | 402.57 | | | 06/30/21 | FLORA PALMA | | |
| 2045 | RS | 502.26 | | | 06/30/21 | PELAEZ ORTURBIA SUSANA/ CE | | |
| 2106 | RS | 419.95 | | | 06/30/21 | KWASA KHAN | | |
| 2107 | RS | 130.62W | | | 06/30/21 | LEO JENKINS | | |
| 2114 | RS | 543.12 | | | 06/30/21 | YOLANDA RODRIGUEZ | | |
| 2129 | RS | 429.60 | | | 06/30/21 | GEORGE MAROUILS | | |
| 2133 | RS | 416.47 | | | 06/30/21 | RICHELLE PANDAY | | |
| 2135 | RS | 183.90 | | | 06/30/21 | JAY VANDERBILT | | |
| 2138 | RS | 484.88 | | | 06/30/21 | YOLANDA QUIOQUE | | |
| 2139 | RS | 340.37 | | | 06/30/21 | MARIA RODRIQUEZ | | |
| 2140 | RS | 393.02 | | | 06/30/21 | PAT BROCKENBOROUGH | | |
| 2145 | RS | 255.34 | | | 06/30/21 | BONIFACIO SANCHEZ | | |
| 2146 | RS | 278.92 | | | 06/30/21 | LUCY LEDESMA | | |
| 2155 | RS | 83.47W | | | 06/30/21 | JUDY HIRSCH | | |
| 2157 | RS | 419.47 | | | 06/30/21 | CLAUDIA SCHWANTES | | |
| 2204 | RS | 419.51 | | | 06/30/21 | NICK NATOS | | |
| 2206 | RS | 538.19 | | | 06/30/21 | MARGARET COWIE | | |
| 2207 | RS | 419.46 | | | 06/30/21 | WILLIAM CARROLL | | |
| 2211 | RS | 404.88 | | | 06/30/21 | VIRGINIA NATHANIEL | | |
| 2212 | RS | 415.32 | | | 06/30/21 | HLA PHYN HNIN | | |
| 2227 | RS | 242.58 | | | 06/30/21 | PEGGY CHANE | | |
| 2231 | RS | 484.34 | | | 06/30/21 | BLAKELY/LITTLE IRIS | | |



New York State Division of Housing and Community Renewal
Office of Rent Administration

2021 Registration Rent Roll Report Effective 04/01/2021 for
Registration Id Number: 117950
353 W 57TH ST
NEW YORK, NEW YORK  10019

Information on this report is as of January 13, 2022

| APARTMENT NUMBER | APT STATUS | LEGAL REG RENT | PREFERENTIAL RENT | ACTUAL RENT PAID | FILING DATE | TENANT NAME | LEASE BEGAN | LEASE ENDS |
|---|---|---|---|---|---|---|---|---|
| 2232 | RS | 454.74 | | | 06/30/21 | LETCIAS RAMOS | | |
| 2235 | RS | 393.02 | | | 06/30/21 | KENNY REDDY | | |
| 2236 | RS | 96.81W | | | 06/30/21 | JEANNETTE MORROW | | |
| 2239 | RS | 402.57 | | | 06/30/21 | DAISY LUE CHIN | | |
| 2244 | RS | 506.89 | | | 06/30/21 | RENATA BENDANA | | |
| 2245 | RS | 416.47 | | | 06/30/21 | EVELYN LAGARDE | | |
| 2253 | RS | 457.06 | | | 06/30/21 | AMPARO LAVILLA | | |
| 2255 | RS | 96.82W | | | 06/30/21 | DANIELLE MARTON | | |

CERTIFICATION OF COPY OF RECORD
--------------------------------
I am an employee of the New York State Division of Housing and Community Renewal (DHCR) and I am duly authorized by DHCR to make this certification.  I certify that the foregoing is a true copy of the owner's statements made in such owner's 2021 registration(s) on file with DHCR, as recorded and maintained in the computer records of DHCR, with the exception that certain information contained in such registration(s) may have been modified by DHCR for identification purposes only.

1/13/22
DATE

CERTIFYING OFFICER

Print Location: Upper Manhattan BRO

PAGE 240 OF 240





✉ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings
## OATH/ECB Violation Search by Location

Click here for more information about Severity, Violation and Hearing Statuses

**Page: 1 of 2**

| Premises: 353 WEST 57 STREET MANHATTAN | BIN: 1026317   Block: 1048   Lot: 7502   CB: 104 |
|---|---|

| Total Violations | OATH/ECB Hearings |
|---|---|
| Issued = 68   Open (Certificate of Correction Required) = 9 | Completed / Defaulted = 66     Pending = 2 |

| OATH/ECB Number | Certification Status | Respondent | OATH/ECB Hearing Status | Violation Date | Infraction Codes | OATH/ECB Penalty Due |
|---|---|---|---|---|---|---|
| 35647182P | OPEN - NO COMPLIANCE RECORDED<br>**Severity:** CLASS - 2 | HENRY HUDSON HOLDINGS COR<br>**Inspect Unit:** FACADE INSPECTION AND AUDIT UNIT | PENDING | 03/29/2022 | 204<br>**Viol Type:** CONSTRUCTION | $1,250.00 |
| 39056004N | OPEN - NO COMPLIANCE RECORDED<br>**Severity:** CLASS - 1 | HENRY HUDSON HOLDINGS COR<br>**Inspect Unit:** ELEVATOR DIVISION | PENDING | 02/11/2022 | 151<br>**Viol Type:** ELEVATOR | $1,250.00 |
| 35635233H | OPEN - NO COMPLIANCE RECORDED<br>**Severity:** CLASS - 2 | HENRY HUDSON HOLDINGS COR<br>**Inspect Unit:** FACADE INSPECTION AND AUDIT UNIT | IN VIOLATION | 12/02/2021 | 204<br>**Viol Type:** CONSTRUCTION | $625.00 |
| 35551131Z | RESOLVED - CERTIFICATE ACCEPTED<br>**Severity:** CLASS - 1 | APCO GROUP INC<br>GC36732<br>**Inspect Unit:** CONSTRUCTION SAFETY ENFORCEMENT | IN VIOLATION | 03/08/2021 | 1J8 | $0.00 |
| 35551129J | RESOLVED - CERTIFICATE ACCEPTED<br>**Severity:** CLASS - 1 | APCO GROUP INC<br>GC36732<br>**Inspect Unit:** CONSTRUCTION SAFETY ENFORCEMENT | IN VIOLATION | 03/08/2021 | 106, 206<br>**Viol Type:** CONSTRUCTION | $0.00 |
| 35551128H | RESOLVED - CERTIFICATE ACCEPTED<br>**Severity:** CLASS - 1 | APCO GROUP INC<br>GC36732<br>**Inspect Unit:** CONSTRUCTION SAFETY ENFORCEMENT | IN VIOLATION | 03/08/2021 | 209, 115<br>**Viol Type:** CONSTRUCTION | $0.00 |
| 35551130R | RESOLVED - CURE ACCEPTED<br>**Severity:** CLASS - 2 | APCO GROUP INC<br>GC36732<br>**Inspect Unit:** CONSTRUCTION SAFETY ENFORCEMENT | CURED/IN-VIO | 03/08/2021 | 206<br>**Viol Type:** CONSTRUCTION | $0.00 |
| 39027352R | OPEN - NO COMPLIANCE RECORDED<br>**Severity:** CLASS - 1 | HENRY HUDSON HOLDINGS COR<br>**Inspect Unit:** MANHATTAN PLUMBING | IN VIOLATION | 08/21/2020 | 155<br>**Viol Type:** PLUMBING | $1,000.00 |
| 39027351P | OPEN - NO COMPLIANCE RECORDED<br>**Severity:** CLASS - 2 | HENRY HUDSON HOLDINGS COR<br>**Inspect Unit:** MANHATTAN PLUMBING | IN VIOLATION | 08/21/2020 | 202<br>**Viol Type:** CONSTRUCTION | $625.00 |

| 35491673L | OPEN - NO COMPLIANCE RECORDED | HENRY HUDSON HOLDINGS COR | IN VIOLATION | 07/23/2020 | 106, 206 | $-1,250.00 |
| | **Severity:** CLASS - 1 | **Inspect Unit:** CONSTRUCTION SAFETY ENFORCEMENT | | **Viol Type:** CONSTRUCTION | | |
| 39025513J | OPEN - NO COMPLIANCE RECORDED | HENRY HUDSON HOLDINGS COR | IN VIOLATION | 07/16/2020 | 251 | $0.00 |
| | **Severity:** CLASS - 2 | **Inspect Unit:** ELEVATOR DIVISION | | **Viol Type:** ELEVATOR | | |
| 39025512H | OPEN - NO COMPLIANCE RECORDED | HENRY HUDSON HOLDINGS COR | IN VIOLATION | 07/16/2020 | 151 | $0.00 |
| | **Severity:** CLASS - 1 | **Inspect Unit:** ELEVATOR DIVISION | | **Viol Type:** ELEVATOR | | |
| 35469596X | OPEN - NO COMPLIANCE RECORDED | EVEREST SCAFFOLDING INC   GC32158 | DEFAULT | 07/10/2020 | 106 | $12,500.00 |
| | **Severity:** CLASS - 1 | **Inspect Unit:** CONSTRUCTION SAFETY ENFORCEMENT | | **Viol Type:** CONSTRUCTION | | |
| 37019154N | RESOLVED - N/A - DISMISSED | HENRY HUDSON HOLDINGS COR | DISMISSED | 06/03/2020 | 227 | $0.00 |
| | **Severity:** CLASS - 2 | **Inspect Unit:** LOCAL LAW 11/98 | | **Viol Type:** LOCAL LAW | | |
| 35472235H | RESOLVED - CERTIFICATE ACCEPTED | APCO GROUP INC GC36732 | IN VIOLATION | 03/03/2020 | 223 | $0.00 |





If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

Attorney Group No. 491

Index No.            Year 2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------|
In the Matter of the Application of              |
                                                 |
EC 58TH STREET LLC                               |
                                                 |
                                                 |            PETITION
                                                 |
                              Petitioner,        |   Taxes of 2021-22
                                                 |
              -against-                          |
                                                 |
THE TAX COMMISSION OF THE CITY OF NEW YORK       |
and THE COMMISSIONER OF FINANCE OF THE CITY      |
OF NEW YORK                                      |
                              Respondents.       |
-------------------------------------------------|

| Block | Lot  | Address               |
|-------|------|-----------------------|
| 1048  | 1701 | 353-61 WEST 57 STREET |
| 1048  | 1702 | 353-61 WEST 57 STREET |
| 1048  | 1704 | 353-61 WEST 57 STREET |
| 1048  | 1706 | 353-61 WEST 57 STREET |

TO THE SUPREME COURT OF THE STATE OF NEW YORK

The Petitioner above named respectfully shows and alleges that:

1.   At all times hereinafter mentioned, the petitioner was and still is a limited liability company and the Owner of certain real property in the Borough of Manhattan, City of New York, which real property is described in Schedule A hereto annexed and made part hereof, by block and lot number by which the said property was designated on the tax maps of the City of New York for the fiscal year July 1, 2021 to June 30, 2022.

HUDSON

1 of 7

Case 25-11853-KBO    Doc 396-2    Filed 03/31/26    Page 483 of 551

2.    During the time provided for by law, one of the assessors of the Real Property Assessment Bureau of the City of New York, an agency under the jurisdiction of the Commissioner of Finance, in accordance with law, did assess the said real property described in Schedule A and caused the assessed valuations to be entered in detail in the books kept in the office of said Real Property Assessment Bureau as shown in Schedule A.

3.    Between January 15, 2021 and March 1, 2021, the time that said books were open for public inspection, or such further period as provided by law, petitioner, claiming to be aggrieved by said assessed valuation of said real property, duly made application in writing under oath to the Tax Commission of the City of New York, as provided by law to have such assessments corrected, said Tax Commission having been duly constituted by law, to review and correct all assessments of real property for taxation in the City of New York. In said application, petitioner claimed that the assessments were erroneous in that the assessments were excessive (by reason of overvaluation), misclassified, unequal (by reason of inequality), and unlawful(by reason of illegality) and demanded appropriate relief.

4.    Thereafter, on or about May 25, 2021, the Tax Commission duly rendered a final determination on said application, and the assessments were confirmed as final in the amounts shown in Schedule A hereof.

5.    Thereafter, the assessment rolls of the real property subject to taxation in the City of New York for the fiscal year July 1, 2021 to June 30, 2022 were prepared, certified and delivered to the City Council of the City of New York in accordance with law, which assessment rolls contained the said assessments upon petitioner's said real property as shown in Schedule A and the City Council proceeded thereon for the levying and collection of taxes.

6.    The said assessments are excessive in that (a) the assessed valuation exceeds the full value of the real property. The sum for which the said real property would sell under ordinary circumstances on the statutory taxable status date is shown as the claimed value in Column "5" of Schedule A. The extent of over-valuation is the actual total assessment specified for each tax lot (Column "4"), less the claimed correct full value specified for each tax lot as set forth in Column "5" of Schedule A; (b) the taxable assessed value fails to comply with the limitations of increases in assessed value set forth in Real Property Tax Law Section 1805; (c) said real property failed to receive all or a portion of an exemption to which said real property or the owner thereof is entitled pursuant to the law authorizing the exemption; and (d) the assessments are excessive in that the property failed to receive a land only "progress assessment" as a building in the course of construction pursuant to Administrative Code Section 11-209.

7.    Where the subject property is fully or partially exempt from taxation under RPTL Section 489 and the Administrative Code of the City of New York, Section 11-243, the assessment has been unlawfully increased in excess of the assessment of the previous existing dwelling appearing on the assessment rolls after the taxable status date

-2-

immediately preceding the commencement of the alteration and improvements plus the value of the land and any improvements, other than those made under the provisions of RPTL Section 489 and Administrative Code Section 11-243.

8.    The said assessments are erroneous by reason of inequality and are unequal in that they have been made at a higher proportionate valuation than the assessed valuations of (a) other real property on the assessment rolls of the City for the same year, and/or (b) other real property within the same class on the same roll by the same officer. The extent of such inequality and the extent to which said assessments are unequal is equal to the difference between the actual total assessed value as set forth in Schedule A and 15% of the amount specified as the claimed value for each unit set forth in Schedule A.

9.    RPTL Section 720(3) is unlawful, improper and unconstitutional in that it improperly limits the scope of evidence to be adduced by petitioner.

10.    The assessments are illegal and unlawful in that they were made contrary to law.

11.    The assessments are illegal and unlawful in that the property should have been wholly exempt from taxation.

12.    Where a notice increasing the assessments of the subject property was sent during or subsequent to the time the books of the annual record of assessed valuation remained open for public inspection, the notice purporting to increase the assessments is unlawful, improper, defective and void in that it fails to comply with New York City Charter Section 1512 and Administrative Code Section 11-211; Charter Section 1512 is unlawful, improper and unconstitutional in that it discriminates in favor of residential versus commercial property and fails to provide adequate notice of an increased assessment, and unconstitutionally vague in that it fails to adequately define what is meant by residential real estate.

13.    At all times herein relevant, the Constitution of the State of New York, Article 8, Section 10, provides that real estate tax revenues of the City of New York in any fiscal year, exclusive of debt service requirements, shall not exceed 2-1/2% of the average full value of its taxable real estate for the latest five fiscal years. That by discriminating between types of properties, respondents have reduced the value of "taxable" real estate so that the tax rate exceeds the constitutional limitations by reason of their having effectively granted exemptions from taxation to certain premises.

14.    Where petitioner's property is a cooperative or condominium, the assessment has been made contrary to RPTL Section 581 and/or RPL Sec. 339-y.

15.    These assessments and all of the assessments on the assessment rolls of the City of New York are illegal and unlawful in that Section 305(2) of the Real Property Tax law requires that all real property in each assessing unit shall be assessed at a uniform percentage

-3-

Case 25-11853-KBO   Doc 396-2   Filed 03/31/26   Page 485 of 551

of value and that the assessments on said roll are not assessed at such uniform percentage.

16. Where the assessment of the subject parcel has been set based on 45% of gross sales price, the assessment is unlawful in that parcels whose assessment is based on 45% of gross sales price constitute an unlawful and separate class of real property which is not assessed at a uniform percentage of value required by RPTL Section 305(2) and which class is not authorized by RPTL Section 1802 or the New York State and United States Constitutions.

17. The assessments are illegal and unlawful in that respondents have wrongfully denied a hearing to correct the assessment in question pursuant to Administrative Code, Section 11-208.1 that is unconstitutional, on its face and as applied herein.

18. Petitioner's property has been misclassified as being in class two, three or four instead of the appropriate class for petitioner's property; the class designation of petitioner's parcel results in an incorrect allocation of the parcel's assessed valuation between two or more classes; the criteria used by respondents for determination of tax class is arbitrary, capricious and unlawful.

19. The denial of the full and appropriate amount of exemption under RPTL Section 421-A or any applicable statute granting exemption to the subject property is arbitrary, capricious, contrary to law and makes the assessment unequal, unlawful and excessive.

20. By reason of the aforesaid excessive, unequal, erroneous, unlawful and illegal assessments, petitioner has been aggrieved and will be injured thereby, and will be compelled to pay more than its proper share of the taxes of the City of New York.

21. Reference herein to "petitioner" shall be deemed to include the petitioner named herein and all of said petitioner's predecessors in interest.

22. The property's transition assessments are excessive in that they have been (a) calculated in a manner inconsistent with the provisions of Real Property Tax Law, and/or (b) calculated in a manner inconsistent with the transitional assessment calculation for other properties in the City of New York.

23. No previous application has been made for the relief herein sought to this or any other Court or Judge.

-4-

Case 25-11853-KBO    Doc 396-2    Filed 03/31/26    Page 486 of 551

WHEREFORE, your petitioner prays that the Supreme Court review and correct on the merits the aforementioned final determination of the Tax Commission on the grounds set forth in this petition, and that the Court take evidence to enable your petitioner to show the unjust, erroneous, illegal, unlawful, excessive and unequal assessments of said real property and its misclassification to the end that the said assessments may be reduced to the sum for which the said property would sell under ordinary circumstances for land and improvements, and to a valuation proportionate to the assessments of other real property assessed on the same rolls and/or other real property of the same class assessed on the same rolls, for the same year, so that equality of assessments will result, and that all properties shall be assessed at a uniform percentage so that said assessments will not be unequal, and that equality of assessments will result, and so that the assessments not be contrary to law, and so that any excessive transition assessments for current and subsequent tax years be reduced in accordance with law, and for such other and further relief as the Court may deem proper, together with costs.

-5-

EC 58TH STREET LLC

Petitioner

Dated:  New York, NY
August 26 , 2021

By: _____
Anthony Minella, President

Ditchik & Ditchik, PLLC, Attorneys for Petitioner
370 Lexington Avenue, Suite 2301, New York, NY 10017  (212) 661-6400

STATE OF NEW YORK ) *CONNECTICUT*
COUNTY OF NEW YORK ) ss: *FAIRFIELD*

Anthony Minella, being duly sworn, deposes and says:  Deponent is President of the petitioner herein; deponent has read **and knows** the contents of the foregoing petition; the **same** is true of **deponent's** own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters deponent believes it to be true.

That the reason why this verification is made by deponent and not by petitioner is because petitioner is a limited liability company and deponent is President.

Sworn to before me this

26th day of August , 2021.

_____
Anthony Minella

Notary _____

Meeghan O'Donnell
Notary Public, State of Connecticut
My Commission Expires February 28, 2025

SCHEDULE A

For the period commencing July 1, 2021 and ending June 30, 2022

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| | | | ASSESSMENT | |
| Block | Lot | Land($) | Land & Improvements($) | Claimed Value($) |
| 1048 | 1701 | 3,524,815 | 36,956,893 | 12,935,000 |
| 1048 | 1702 | 3,127,751 | 22,445,550 | 7,856,000 |
| 1048 | 1704 | 96,750 | 496,350 | 174,000 |
| 1048 | 1706 | 299,927 | 1,957,050 | 685,000 |

-6-

Case 25-11853-KBO    Doc 396-2    Filed 03/31/26    Page 488 of 551

Attorney Group No. 491

Index No.                Year 2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------|
In the Matter of the Application of             |
                                                |
EC 58TH STREET LLC                              |
                                                |
                                                |
                                                |
                              Petitioner,        |
                                                |
          -against-                             |
                                                |
THE TAX COMMISSION OF THE CITY OF NEW YORK      |
and THE COMMISSIONER OF FINANCE OF THE CITY     |
OF NEW YORK                                     |
                              Respondents.       |
------------------------------------------------|

PETITION FOR REVIEW OF REAL
PROPERTY ASSESSMENTS

Ditchik & Ditchik, PLLC
Attorneys for Petitioner
Office & P.O. Box
370 Lexington Avenue, Suite 2301
New York, NY 10017
(212) 661-6400

By: _____
          Steven Tishco, Esq.

7 of 7

# KUCKER
# MARINO
# WINIARSKY
# & BITTENS, LLP

Alan D. Kucker
James R. Marino
Nativ Winiarsky
Andrew B. Bittens *
William D. Hummell
Catherine A. Helwig *
Craig P. Gambardella
Gregg R. Kurlander
Jason M. Frosch
Lisa Faham-Selzer
Joseph Goldsmith
Vladimir K. Favilukis *
-----------------------
Rachel V. Kramer
Danielle K. Ciraola
Kathleen B. Kelliher *
Rafael D. Dayan
William J. Halkias *
Samara Geller

OF COUNSEL:
Patrick K. Munson
Abner T. Zelman
Nikolaos Preponis
Patrick K. Yu
Nicholas G. Yokos *
Daniel Gewirtz
Tanya M. Owens
Kacey H. Sou
Eric R. McAvey
Jill L. Mandell [†]
Joel Celso [^]

* Also admitted in NJ
[†] Also admitted in CT
[^] Also admitted in DC

Elizabeth Hernandez
Director, Certification of No Harassment Unit
NYC Department of Housing Preservation & Development
Housing Litigation Division
100 Gold Street, Room 6Z4
New York, NY 10038
Email: hernanel@hpd.nyc.gov

Re:  Opinion of Counsel
     Application for a Certificate of No Harassment.
     Applicant:       Alberto Smeke
     Ground Lessee: HUDSON 1701/1706, LLC and HUDSON 1702, LLC
     Owner:          356W58 Ground Lessor LLC
     Premises:       353 West 57th Street, New York, NY

Dear Ms. Hernandez:

Please be advised that, based on the examination of the organizational documents of HUDSON 1701/1706, LLC and HUDSON 1702, LLC, such as the Articles of Organization and Operating Agreement, the Ground Lease, the books and records of HUDSON 1701/1706, LLC and HUDSON 1702, LLC, and considering all of the surrounding facts and circumstances, as well as having consulted with the Applicant, Alberto Smeke, it is my opinion:

(i)   HUDSON 1701/1706, LLC and HUDSON 1702, LLC are in good standing with the Department of State, New York State;

(ii)  The Applicant, Alberto Smeke, is a member of HUDSON 1701/1706, LLC and HUDSON 1702, LLC.

(iii) The Applicant, Alberto Smeke, is both authorized and entitled to file the instant Application for a Certificate of No Harassment on behalf of HUDSON 1701/1706, LLC and HUDSON 1702, LLC and the owner, 356W58 Ground Lessor LLC, and to make all representation before HPD on behalf of HUDSON 1701/1706, LLC and HUDSON 1702, LLC and the owner, 356W58 Ground Lessor LLC;

(iv)  The Applicant, Alberto Smeke, is authorized to bind HUDSON 1701/1706, LLC and HUDSON 1702, LLC and the owner, 356W58 Ground Lessor LLC, with regard to the filing of this Application for a Certificate of No Harassment.

Please be advised that I am serving the Owner as Special Counsel in this matter and you may direct any questions or requests for additional information to me at the address and telephone number listed above. Thank you for your time and consideration.

Sincerely,

Joseph Goldsmith, Esq.

T 212.869.5030   |  747 Third Avenue   |  Kuckermarino.com                *Page 1 of 1*
F 212.944.5818   |  New York, NY 10017

Exhibit E

Organizational Chart of CSC and Ground Tenant

(Attached hereto)

4866-0049-6406, v. 12

**CONFIDENTIAL**

CSC_HUDSON
353 WEST 57TH STREET
NEW YORK, NEW YORK

ORGANIZATIONAL STRUCTURE



1. Qualified in New York.
2. Hudson 1701/1706, LLC will hold ground lessee interest in Hotel Unit #1 and ground sublessee interest in the 10th Floor Unit.

Exhibit F

Form of Memorandum from Kucker Marino Winiarsky & Bittens, LLP

(Attached hereto)

# KUCKER
# MARINO
# WINIARSKY
# & BITTENS, LLP

Alan D. Kucker
James R. Marino
Nativ Winiarsky
Andrew B. Bittens *
William D. Hummell
Catherine A. Helwig *
Craig P. Gambardella
Gregg R. Kurlander
Jason M. Frosch
Lisa Faham-Selzer
Joseph Goldsmith
Vladimir K. Favilukis *
-----------------------
Rachel V. Kramer
Danielle K. Ciraola
Kathleen B. Kelliher *
Rafael D. Dayan
William J. Halkias *
Samara Geller

OF COUNSEL:
Patrick K. Munson
Abner T. Zelman
Nikolaos OF COUNSEL:
Patrick K. Munson
Abner T. Zelman
Nikolaos Preponis
Patrick K. Yu
Nicholas G. Yokos *
Daniel Gewirtz
Tanya M. Owens
Kacey H. Sou
Eric R. McAvey
Jill L. Mandell †
Joel Celso ^

* Also admitted in NJ
† Also admitted in CT
^ Also admitted in DC

April 29, 2022

Parkview Financial REIT, LP and
Parkview Financial 2020, LP,
c/o Mr. Paul Rahimian
Parkview Financial REIT, LP
11601 Wilshire Blvd, Suite 2100
Los Angeles, CA 90025

356W58 Ground Lessor LLC
c/o MSP Capital Investments LLC
3953 Maple Avenue, Suite 350
Dallas, TX 75219

NexBank, its successors and/or assigns
2515 McKinney Ave., Ste. 1100
Dallas, TX, 75201

Re:    Exemption from the Certificate of No Harassment and Certificate of No Harassment
353 West 57th Street, New York, NY

Dear All:

My firm represents CSC Coliving, LLC who, through one of its affiliates, is the contract vendee for the above mentioned building. We are writing on our client's behalf as counsel for this project. This building is located within the Clinton Special Zoning District and is as well a SRO building. As a result, it is incumbent on an owner or operator seeking to undertake certain Covered Categories of Construction Work, such as combining units or changing the use permitted by Certificate of Occupancy to permit Class A apartments, to obtain either a Certification of No Harassment or an exemption from the requirement of obtaining a Certification of No Harassment under both regulations.

Regarding the Clinton Special Zoning District requirement, we have proposed as a step 1 that we prepare for filing an application for an exemption from the requirement of obtaining a Certification of No Harassment on the basis, pursuant to §96-110 (b)(2) of the Zoning Resolution of the City of New York, that the building was initially occupied for residential purposes after January 1, 1974. Here, the Certificate of Occupancy in effect on January 1, 1974, dated December 14, 1972, classified the building as a Class B Hotel. The Zoning Resolution of the City of New York classifies a Class B Hotel as a commercial use under Use Group 5. The required documents for an application for an exemption are:

- Original certified copies of all deeds for all current and prior owners who owned the property since September 5, 1973;

- If the current title to the property is held by an entity, the Articles of Organization, operating agreement or LLC resolution, as well as the NYS filing receipt for the entity and a Certificate of Good standing;
- Original certified copy of the Certificate of Occupancy;
- Original documentation of any net leases for the subject property since September 5, 1973;
- Proof of the exemption, which in this case would be Original certified copy of the Certificate of Occupancy in effect on January 1, 1974, dated December 14, 1972;
- A Completed Application Form; and
- An Opinion of Counsel that:
  - Based on the examination of the Company's organizational documents such as (specifying which documents were consulted), that Counsel represents that the entity is in good standing with the Department of State:
  - The applicant's relationship (official title) to the Entity.
  - The applicant (name of applicant) is authorized to make all representation before DHPD on behalf of the Entity and is authorized to file the Application for Certificate of No Harassment on behalf of the Entity.
  - The applicant (name) is authorized to bind the Entity (name) with regard to the filing of the Application for CONH.

I have reviewed the Zoning Resolution of the City of New York and the Certificate of Occupancy in effect on January 1, 1974 and I believe there is merit to the Application. There is no fee for the filing of an application for an exemption and it has been our experience with HPD in the past that the applications are usually decided within 4-6 weeks. A form copy of the application for an exemption is attached for your review. The application for an exemption, further, is not served on any tenant or occupant of the building and they get no notice that the foregoing was filed. I previously obtained an exemption for the Roger Smith Hotel in 2019, a copy of which is enclosed, and am familiar with the process.

Regarding the SRO requirement, we have discussed before filing an application to wait until a decision is rendered on whether the building is exempt from the requirement of the Clinton Special Zoning District of obtaining a Certification of No Harassment before filing anything. If the exemption from the requirement of the Clinton Special Zoning District of obtaining a Certification of No Harassment is granted, it has been requested that all applications for required permits to complete the Multifamily Project be submitted to the NYC Department of Buildings and, if permits are approved, to move forward with construction. If permits are denied on the basis of needing a Certification of No Harassment pursuant to the SRO requirement, then to apply for a Certification of No Harassment under the SRO requirement.

Before filing an application for a Certification of No Harassment pursuant to the SRO requirement, and while we await the decision on whether the building is exempt from the requirement of the Clinton Special Zoning District, we are proposing we first investigate whether the building qualifies for an exemption from the requirement of obtaining a Certification of No Harassment, as defined in §28-107.2 of the New York Administrative Code, on the possible basis of the building having been a Luxury Hotel. A Luxury Hotel is defined as a single room occupancy multiple dwelling in which the rent on May 5, 1983, exclusive of governmentally assisted rental payment charged for seventy-five percent or more of the total number of occupied individual dwelling units was more than fifty-five dollars ($55.00) per day for each unit rented on a daily basis, or more than two hundred and fifty dollars ($250.00) per week for each unit rented on a weekly basis or more than eight hundred and fifty dollars ($850.00) per month for each unit rented on a monthly basis. In order to establish this

exemption, it would be incumbent for the applicant to establish the rent on May 5, 1983 for the units and we would suggest an investigation be undertaken of the historic rents on that date.

To date we have been unable to ascertain whether the building qualifies for an exemption from the requirement of obtaining a Certification of No Harassment on the possible basis of the building having been a Luxury Hotel. If permits are denied on the basis of needing a Certification of No Harassment pursuant to the SRO requirement and if an investigation reveals that the building does not qualify as a Luxury Hotel or if the time and cost proves to be unreasonable, then we would suggest filing for a Certification of No Harassment under the SRO requirement.

To apply for a Certification of No Harassment under the SRO requirement, a property owner must complete the application and pay the required fee of $160 per existing unit listed on the current Certificate of Occupancy. The inquiry period for Certificate of Occupancy under the SRO requirement is three years before the application is filed. I have done a preliminary review of the last three years and I see and/or understand that the Hotel has been closed and vacant of transient occupants for 1.5 years, that there has been no litigation commenced before the DHCR or before HPD, and I am told that there have been good relations between the SRO tenants and ownership. The required documents for an application for a Certification of No Harassment under the SRO requirement are:

- Original certified copies of all deeds for all current and prior owners who owned the property since three years prior to the application;
- If the current title to the property is held by an entity, the Articles of Organization, operating agreement or LLC resolution, as well as the NYS filing receipt for the entity and a Certificate of Good standing;
- Original certified copy of the Certificate of Occupancy;
- Original documentation of any net leases for the subject property since three years prior to the application;
- A Completed Application Form; and
- An Opinion of Counsel that:
  o Based on the examination of the Company's organizational documents such as (specifying which documents were consulted), that Counsel represents that the entity is in good standing with the Department of State:
  o The applicant's relationship (official title) to the Entity.
  o The applicant (name of applicant) is authorized to make all representation before DHPD on behalf of the Entity and is authorized to file the Application for Certificate of No Harassment on behalf of the Entity.
  o The applicant (name) is authorized to bind the Entity (name) with regard to the filing of the Application for CONH.

It has been my experience with HPD in the past that the applications are usually decided within 12 months, provided HPD does not find probable cause that harassment occurred. A form copy of the application for a Certification of No Harassment is attached for your review. I most recently obtained a Certification for 222 East 12th Street in Manhattan in 2021, a copy of which is enclosed, and am familiar with the process.

If the Certification of No Harassment pursuant to the SRO requirement is granted, it has been requested that all applications for required permits to complete the Multifamily Project be submitted to the NYC Department of Buildings and, if permits are approved, to move forward with construction.

As for a step 2, if exemption from the requirement of the Clinton Special Zoning District of

obtaining a Certification of No Harassment is denied, we have discussed submitting an application pursuant to the Clinton Special Zoning District of a Certification of No Harassment.

To apply for a Certification of No Harassment pursuant to the Clinton Special Zoning District the application and process is entirely alike applying for a Certification of No Harassment pursuant to the SRO requirement except, instead of a 36 month inquiry period, the Zoning Resolution defines inquiry period to mean a period which commences 15 years prior to the application date. Thus, the documentation and information in the application will have to be enlarged to encompass the enlarged inquiry period. We have discussed, before any application for a Certification of No Harassment pursuant to the Clinton Special Zoning District is submitted, that we perform a full administrative review for the Special Clinton District inquiry period, the results of which (together with all backup information pertaining thereto) shall be provided to Landlord and no application shall be submitted without Tenant's and Landlord's mutual, reasonable discretion, that there is no reasonable evidence that would be likely to result (or otherwise support) a Finding of Harassment, such that submitting a application for the Special Clinton District would be detrimental to the Project.

If the Certification of No Harassment pursuant to the Special Clinton District requirement is submitted and granted, it has been requested that all applications for required permits to complete the Multifamily Project be submitted to the NYC Department of Buildings and, if permits are approved, to move forward with construction.

If Certification of No Harassment pursuant to the Special Clinton District requirement or SRO is denied on the basis of a finding of harassment, the same will constitute a Fallback Business Plan Notice and Tenant will need to come up with an alternative business plan within 90 days. Any such alternate business plan may, if applicable, include taking advantage of the "cure" for a Certification of No Harassment denial. To satisfy the requirements of Curing with HPD, the building owner must go through the application process and then enter into a Cure Agreement with HPD that stipulates the construction of permanently affordable Low Income Housing restricted to households earning at or below 80% AMI covering the greater of: (i) 28% of the total residential floor area of any multiple dwelling to be altered or demolished in which harassment has occurred, and (ii) 20% of the total floor area of any new or altered building on the Cure lot.

Please let me know if you have any questions or concerns. Thank you for your time and consideration.

Sincerely,

Joseph Goldsmith, Esq.

cc:    Sal Smeke
       Alberto Smeke
       CSC Coliving, LLC
       6 St. Johns Lane
       New York, NY 10013
       Tel.: (212) 419-3149
       Email: ss@csc-coliving.com
       Email: as@csc-coliving.com

# CITY OF NEW YORK

## DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT

### FINAL DETERMINATION UPON APPLICATION FOR A CERTIFICATION OF NO HARASSMENT PURSUANT TO SECTION 27-2093 OF THE NEW YORK CITY ADMINISTRATIVE

**Application No.:** 35/2021

**Applicant(s):** TERRENCE LOWENBERG

**Premises:** 222 East 12th Street, New York, NY 10003

**Inquiry Period:** April 23, 2018 to the present pursuant to Section 27-2093 of the New York City Administrative Code.

**Action:** Granted

**Duration:** This certification will remain in effect for three (3) years from the Date of Issuance.

**Date:** **November 22, 2021**

_____

Martha A. Weithman, Esq., Assistant Commissioner
Department of Housing Preservation & Development

**CITY OF NEW YORK**
**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**

---

**FINAL DETERMINATION UPON APPLICATION FOR AN EXEMTION FROM
REQUIREMENT TO OBTAIN CERTIFICATION OF NO HARASSMENT PURSUANT
TO SECTION 28-107.2 OF THE NEW YORK CITY ADMINSTRATIVE CODE**


**Application No.:**    79/19


**Applicant(s):**    Phoebe Knowles


**Premises:**    501 Lexington Avenue
New York, New York 10017


**Action:**    Exempt. New York City Administrative Code 28-107.2, Exception: 6.


**Duration:**    This exemption will remain in effect for three years from the date of
issuance.


**Date:**    August 22, 2019


Martha A. Weithman, Esq., Assistant Commissioner - HLD
Department of Housing Preservation & Development

PAGE 1 of 2 pages

Form 54-C (Rev. 7/641-23M-70313167)

# DEPARTMENT OF BUILDINGS

BOROUGH OF   MANHATTAN   , THE CITY OF NEW YORK

Date   December 14, 1972                           No.   72773

## CERTIFICATE OF OCCUPANCY

**NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHALL BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT**

This certificate supersedes/AMENDS C. O. No.   68201
THIS CERTIFIES that the new—altered—existing—building—premises located at
353 West 57th Street                           Block 1048    Lot   2
That the zoning lot and premises above referred to are situated, bounded and described as follows:

BEGINNING at a point on the   **north**   side of   West 57th Street
distant   20'   feet   **east**   from the corner formed by the intersection of
West 57th Street   and   9th Avenue
running thence   east 135'   feet; thence   north 200'-10"   feet;
thence   west 135'   feet; thence   south 200'-10"   feet;
running thence   feet; thence   feet;
to the point or place of beginning, conforms substantially to the approved plans and specifications, and to the requirements of the Building Code, the Zoning Resolution and all other laws and ordinances, and of the rules of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and

CERTIFIES FURTHER that, any provisions of Section 646e of the New York Charter have been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent.

N.B. or Alt. No.—   820-1966                Construction classification—   **Class 1 Fireproof**
Occupancy classification—Heretofore Erected   . Height   26   stories,   244'0"   feet.
Date of completion—Existing Class "B" Hotel   . Located in   **C 4-7, C 1-8 & R 10**   Zoning District.
at time of issuance of permit—November 1, 1972

This certificate is issued subject to the limitations hereinafter specified and to the following resolutions of the Board of Standards and Appeals:
and The City Planning Commission:                  } (Calendar numbers to be inserted here)

### PERMISSIBLE USE AND OCCUPANCY

Off-Street Parking Spaces _____

Off-Street Loading Berths _____

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|
| Sub-Clr. | 120 | 150 | Motion picture studio and offices, swimming pool, men's recreation room (gym) with accessory use, women's lounge, employees' locker rooms, offices, rest room, storage, boiler room, service and utility rooms. |
| Clr. | 120 | 75 | Women's recreation room (gym) with accessory use, helps' locker rooms, pastry shop, carpenter shop, service and utility rooms. |
| 1st | 120 | 1200 | Assembly or ballroom, cocktail lounge, bar and kitchen, hotel offices, newstand, bar and stores and service rooms. |
| 1st Mezz. | 100 & 120 | 550 | Conference and meeting room, doctors' offices, hotel offices, beauty salon, electrolysis, Bermuda room, lockers, storage and service rooms. |
| 2nd | 100 | 600 | Dining and meeting room, kitchen and lounge, music, meeting and sitting rooms, two (2) lounges, cocktail lounge and service pantry. |
| | | —OVER— | |

Sewage Disposal:
Sanitary Drainage _____ (DOES) (DOES NOT) Discharge Into Either Sanitary or Combined Sewer

Storm Drainage _____ (DOES) (DOES NOT) Discharge Into Either Storm or Combined Sewer

OFFICE COPY—DEPARTMENT OF BUILDINGS                    _Borough Superintendent_

## PERMISSIBLE USE AND OCCUPANCY (continued)

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|
| 3rd | 50 | 160 | Offices, photo room, locker rooms and valet. |
| 4th | 40 | | Forty (40) hotel rooms and guest laundry room and maid's locker room. |
| 5th | 40 | | Fifty-six (56) hotel rooms, telephone switchboard room and maids' locker room. |
| 6th | 50 | 240 | Psychiatres office, group therapy rooms and offices for non-profit hospital related facilities-without sleeping accommodations, Use group 4. |
| 7th | 40 | | Sixty-eight (68) hotel rooms, and maids' locker room. |
| 8th | 50 | 100 | Hospital staff offices, maids' locker room. |
| 9th | 50 | 240 | Offices for non-profit hospital related facilities (without sleeping accommodations), Use group 4. |
| 10th | 40 | | Thirty-eight (38) hotel rooms, fifteen (15) hospital staff rooms, maids locker room, lounge, laundry. |
| 11th | 40 | | Twenty (20) hotel rooms, twenty-five (25) hospital staff rooms, maids locker room. |
| 12th | 40 | | Sixty-nine (69) hotel rooms and maids' locker room. |
| 13th | 40 | | Seventy-one (71) hotel rooms, maids' locker room. |
| 14th | 40 | | Forty-three (43) hotel rooms, maids' locker room and solarium. |
| 15th | 40 | | Forty (40) hotel rooms and maids' locker room. |
| 16th | 40 | | Forty-one (41) hotel rooms, maids' locker room. |
| 17th to 19th, incl. | 40 each | | Thirty-seven (37) hotel rooms, maids' locker room, each story. |
| 20th | 40 | | Thirty-four (34) hotel rooms, maids' locker room. |
| 21st | 40 | | Seventeen (17) hotel rooms, nine (9) hospital staff rooms, maids' locker room. |
| 22nd | 40 | | Thirty-six (36) hotel rooms and maids' locker room. |

*Borough Superintendent*

**NYC**

**Department of
Housing Preservation
& Development**
nyc.gov/hpd

Office of Enforcement &
Neighborhood Services
Housing Litigation Division
100 Gold Street
New York, N.Y. 10038

## APPLICATION FOR AN EXEMPTION FROM THE CERTIFICATION OF NO HARASSMENT ("CONH") REQUIREMENT

**INSTRUCTIONS**

This is an application for an Exemption from the requirement of obtaining a Certification of No Harassment ("CONH").   Below is a summary of the possible exemptions for Single Room Occupancy ("SRO") multiple dwellings and multiple dwellings located in a Special Zoning District. Be sure to indicate the requirement type (SRO, Special Zoning District) and number designation of the exemption you are seeking in question 2.

You may seek an exemption from the CONH requirement for SRO buildings if the subject building is one of the following exceptions, as defined in §28-107.2 of the New York Administrative Code:

1.    A College or School Dormitory;
2.    A Clubhouse;
3.    A Luxury Hotel.  This is defined as a single room occupancy multiple dwelling in which the rent on May 5, 1983, exclusive of governmentally assisted rental payment charged for seventy-five percent or more of the total number of occupied individual dwelling units was more than fifty-five dollars ($55.00)  per day for each unit rented on a daily basis, or more than two hundred and fifty dollars ($250.00) per week for each unit rented on a weekly basis or more than eight hundred and fifty dollars ($850.00) per month for each unit rented on a monthly basis;
4.    Residence whose occupancy is restricted to an institutional use such as housing intended for use primarily or exclusively by the employees of a single company or institution;
5.    A City-owned multiple dwelling;
6.    Any multiple dwelling containing fewer than nine class B dwelling units used for single room occupancy unless the total number of such units is more than fifty percent of  the total dwelling units in such multiple dwelling.  For example, a building containing eight single rooms and eight apartments would qualify, but one containing eight single rooms and fewer than eight apartments would not qualify; and
7.    Any class A or B multiple dwelling which is (a) the subject of a program approved by the Commissioner of Housing Preservation and Development and related to the rehabilitation of a single room occupancy multiple dwelling or the provision of housing for persons of low or moderate income, other than a program consisting solely of real property tax abatement or tax exemption and (b) exempted from the provisions by the Commissioner of housing preservation and development.

You may seek an exemption from the Special Zoning District CONH requirement if the subject building is one of the following, as defined in §96-110 (b)(2) of the Zoning Resolution of the City of New York:

1.    Any city-owned multiple dwelling;
2.    Any multiple dwelling which is the subject of a program approved by the Department of Housing Preservation and Development for the provision of housing for persons of low or moderate income and has been exempted from the provisions of this Section by written determination of the Department of Housing Preservation and Development;
3.    Any multiple dwelling initially occupied for residential purposes after January 1, 1974, except for buildings which are or have been interim multiple dwellings pursuant to Article7C of the Multiple Dwelling Law;
4.    Any exempt hotel (for further clarification, see §96-110(a)(6)(i) and (ii));
5.    Any multiple dwelling in which occupancy is restricted to clubhouse or school dormitory use and occupancy was restricted to clubhouse or school dormitory use on the referral date; and
6.    Any exempt institutional residence (for further clarification, see §96-110(a)(7) (i) and (ii))

Printed on paper containing 30% post-consumer material.

Special Zoning Districts include:
- The Special Clinton District- § 96-110; or
- The Special Hudson Yards District- § 93-90; or
- The Special Garment Center District- § 93-90; or
- The Greenpoint-Williamsburg anti-harassment area- § 23-013; or
- The Special West Chelsea District- § 98-70 and § 93-90.

**Required Documents:** Please submit the following documents with your application. Please note that if any of the required documentation is missing, HPD may reject the application.
- Original certified copies of all deeds for all current and prior owners who owned the property since the inquiry period start date.
- If the current title to the property is held by an entity, provide documentation in support:
  - Articles of Organization, operating agreement or LLC resolution, as well as the NYS filing receipt for the entity and a Certificate of Good standing.
- Original certified copy of the Certificate of Occupancy, if one exists.
  - If no Certificate of Occupancy exists, attach an original certified letter from the DOB stating that the building does not have one.
- Original documentation of any net leases for the subject property during the inquiry period.
- HPD, at its discretion, may require a copy of the architectural plans.

**Work**: Regardless of the type or location of the property, a CONH is not required for all types of work. You should refer directly to the Administrative Code and/or the New York City Zoning Resolution to determine whether a CONH is required. You may also consult with the Department of Buildings.

**Completing the Application:** *All sections must be fully completed.* You must enter the BIN in question 1. The BIN can be found by searching the address through the Department of Building's Building Information system at nyc.gov/buildings. This version of the application must be used effective March 1, 2018.

**Who May Apply**: The applicant must be an individual natural person and must be either (i) a title holder, a contract vendee in possession, or a net lessee under a lease with at least 10 years remaining in its term ("owner"), or (ii) a principal or officer of an owner who is authorized to sign on behalf of and bind such owner. If the applicant does not have legal authority to authorize the Department of Housing Preservation and Development ("HPD") to enter all common areas of the property (for example, if the applicant is a contract vendee or is an owner who has leased the property to someone else), then the application must also be signed by an individual natural person who has such authority. If the applicant is a contract vendee, then the application must also be signed by an individual natural person who is authorized to sign on behalf of the title holder.

**Opinion of Counsel**: If title to the property is held by an entity rather than by a natural person, submit a letter from an attorney stating that:
- Based on the examination of the Company's organizational documents such as (specify which documents were consulted), you represent that the entity (name of entity) is in good standing with the Department of State, New York State.
- The applicant's relationship (official title) to the Entity.
- The applicant (name of applicant) is authorized to make all representation before DHPD on behalf of the Entity and is authorized to file the Application for Certificate of No Harassment on behalf of the Entity.
- The applicant (name) is authorized to bind the Entity (name) with regard to the filing of the Application for CONH.

**Number of Copies**: Submit one original and one copy of this application and all supporting documents.

**Fee**: There are no fees to process this application.

**Submission Method and Location:** Submit the application by mail (regular, certified, or registered), private courier, or hand delivery. **Hand deliveries are only accepted Monday- Friday from 9 a.m. to 11 a.m.**

Printed on paper containing 30% post-consumer material.

**<u>Submission Location:</u>**  Submit the application to the Anti-Harassment Unit, Department of Housing Preservation and Development, 100 Gold Street, Room 6P6 New York, NY  10038, Attention: Rhonda Waldon.

**<u>Inquiries</u>**: Direct all inquiries regarding this application to: **(212) 863-8266**.

**<u>Additional Pages</u>:**  If the answer to any question in this application requires additional space, please add pages to the application as necessary.  For each such page, (i) clearly indicate the number of the question to which it pertains at the top of the page, and (ii) insert the page into the application immediately following that question.

Printed on paper containing 30% post-consumer material.

**APPLICATION FOR AN EXEMPTION FROM THE CONH REQUIREMENT**                           **Rev. July 2018**

1. **Property:** Identify the property that is the subject of this application ("property").

    Borough:  ☐ Manhattan   ☐ Brooklyn   ☐ Bronx   ☐ Queens   ☐ Staten Island

    Block: _____   Lot: _____   HPD Registration ID: _____   BIN: _____

    Street Address: _____

2. **Exemption Sought:** Please indicate the requirement and number designation of the exemption you are seeking. (See instructions.) Please check every box that applies.
    - ☐ Single Room Occupancy multiple dwelling. Exemption Number_____
    - ☐ Special Clinton District. Exemption Number_____
    - ☐ Special Hudson Yards District. Exemption Number_____
    - ☐ Preservation Area P-2 of the Special Garment Center District. Exemption Number_____
    - ☐ Greenpoint-Williamsburg anti-harassment area. Exemption Number_____
    - ☐ Special West Chelsea District. Exemption Number_____

3. **Building Configuration:** Attach either an original certified copy of the certificate of occupancy or original certified letter from the Department of Buildings stating that the building does not have a certificate of occupancy. Describe the legal and actual configuration of the building below.

| Type of Unit | Legal Configuration - Number of Units | Actual Configuration - Number of Units |
|---|---|---|
| **Apartment Dwelling Units** | | |
| **SRO Dwelling Units** | | |
| **Total Dwelling Units** | | |
| **Commercial Units** | | |

    What is the basis of the legal configuration described above?
    - ☐ Certificate of Occupancy (must attach if this is the basis of the legal configuration)
    - ☐ Original certified letter from the Department of Buildings

4. **Building Occupancy:** Is the building currently vacant?
    - ☐ Yes (How long has the building been vacant?) _____.
    - ☐ No (Describe the current occupancy below).

| Type of Unit | Occupied | Vacant | Total |
|---|---|---|---|
| **Apartment Dwelling Units** | | | |
| **SRO Dwelling Units** | | | |
| **Total Dwelling Units** | | | |
| **Commercial Units** | | | |

Printed on paper containing 30% post-consumer material.

1

**APPLICATION FOR AN EXEMPTION FROM THE CONH REQUIREMENT**          **Rev. July 2018**

5.     **Applicant(s):**  Identify the applicant(s). An applicant must be a natural person, not an entity.

Name (1) _____        Name (2) _____

Social Security Number: ____/____/_____        Social Security Number: ____/____/_____

Date of Birth:  ____/____/_____        Date of Birth:  ____/____/_____

Mailing  Address: _____

Business Telephone Number: _____        Mobile Telephone Number: _____

Email Address: _____        Fax Number: _____

Relationship to the property (attach documentation): _____

Deed Owner: _____

Deed Owner Address: _____

6.     **Basis for Exemption**: Please provide a statement detailing the basis for the exemption and all documentation substantiating the claim.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Printed on paper containing 30% post-consumer material.          2

**APPLICATION FOR AN EXEMPTION FROM THE CONH REQUIREMENT**      **Rev. July 2018**

7.   **Prior Applications for the Property:**  Has anyone ever submitted an application for an exemption or waiver from the requirement for a certification of no harassment to HPD with respect to the property?
  ☐   No.
  ☐   Yes (Indicate the date of the application and any other relevant details).

| Date of the Application | Applicant | Details |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

8.   **Current Ownership**
  **A.   Current Owners:** List each current holder of title to the property including individual owners, joint owners and corporate owners:

| Name | Date of Birth | SSN or EIN | Address |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Printed on paper containing 30% post-consumer material.

3

**B. Current Principals and Officers:** If title to the property is held by an entity rather than by a person, list (i) every director, general partner, managing partner, or managing member of such entity, (ii) every officer of such entity, (iii) every other person authorized to sign for and bind such entity, and (iv) every person or entity holding a 10% or more economic interest in such entity. Provide an opinion of counsel letter which authorizes the individual to file the application. An opinion of counsel letter is a letter by an attorney stating that the person signing the application for the corporation, partnership or limited liability corporation, is entitled to file and act on behalf of the entity and to make all of the representations and commitments therein. **You must also provide the supporting documentation as listed in the Instructions to support the below.**

| Name | Date of Birth | SSN or EIN | Relationship to Owner | Address and Telephone Number |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Printed on paper containing 30% post-consumer material.

4

**C. Current Management:** List each person who served as a managing agent, a superintendent, collected rents, supervised or ordered repairs, or exercised any other discretion in the management of the property under the current ownership.

| Name and Address | Employer and Role | Period of Service | Nature of Service |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

9. **Reason for Application:** Briefly describe the reason for this application (e.g., the alteration or demolition work to be performed at the property).

_____

_____

_____

_____

_____

_____

**A.** Have any applications for permits been filed with the Department of Buildings for work at the property which would require a certification of no harassment?
☐ No (Even if no such applications for permits have been filed with the Department of Buildings, HPD may request copies of architectural plans).
☐ Yes (Attach a copy of each such application, stamped by the Department of Buildings, and all attachments thereto).

**B.** Is any construction work currently in progress?
☐ No.
☐ Yes (Provide details below).

_____

_____

Printed on paper containing 30% post-consumer material.

5

**Applicant Consent:** The owner of the property hereby consents to permit HPD unfettered access to the property that is the subject of this application at all times and without prior notice. It is understood that the failure to provide such access when requested will prevent the processing of this application and, in the discretion of HPD, may result in the denial of an Exemption from the requirement of obtaining a Certification of No Harassment.

Further, it is understood that the application may be denied if it contains any false or misleading statements, or material omissions.

Further, it is understood that the applicant and/or undersigned must first obtain an Exemption from the requirement of obtaining a Certification of No Harassment from HPD and all necessary permits from the DOB prior to commencing the work at the subject premises, which is the subject of this application.

I, the applicant, have read the within application and attest that its entire contents are true and complete.


_____          _____
Applicant's Signature (1)                Applicant's Signature (2)

_____          _____
Print Name Above                         Print Name Above

_____          _____
Relationship to the Property             Relationship to the Property



_____
Corporate Entity Designee Signature

_____
Print Name Above

_____
Relationship to the Property




Sworn to this _____ day of
_____, 20___.


_____
Notary

Printed on paper containing 30% post-consumer material.



**Office of Enforcement &**
**Neighborhood Services**
**Housing Litigation Division**
**100 Gold Street**
**New York, N.Y. 10038**

**Department of**
**Housing Preservation**
**& Development**
nyc.gov/hpd

**Version Effective 8/1/2018**

## APPLICATION FOR A CERTIFICATION OF NO HARASSMENT ("CONH")

### FILING INSTRUCTIONS

**Requirements**: A certification of no harassment ("CONH") may be required to obtain a permit from the Department of Buildings for certain types of work based on either or both of the following:
- the type of building (an SRO multiple dwelling) pursuant to Administrative Code §28-107.2 and §27-2093; and/or
- the location of the property pursuant to New York City Zoning Resolution §96-110, §93-90, §98-70, and/or §23-013.

One application may be filed if the building is both an SRO multiple dwelling and located within one of the areas required to file for a Certification of No Harassment by the Zoning Resolution.

Regardless of why a CONH is required, (i) the application process is governed by rules set forth in Chapter 10 of Title 28 of the Rules of the City of New York, and (ii) you must use this form to apply for the CONH.

**Property**: You should only seek a CONH if the property for which you seek a CONH is:
1. A Single Room Occupancy ("SRO") multiple dwelling)
For the purposes of this application, "SRO multiple dwelling" has the meaning specified in Administrative Code §28-107.2. A single room occupancy multiple dwelling means:
  - A "class A multiple dwelling" used in whole or part as a "rooming house" or "furnished room house," or for "single room occupancy" pursuant to section 248 of the New York state multiple dwelling law;
  - A "class A multiple dwelling" containing "rooming units"; or
  - A "class B multiple dwelling."
And/Or

2. A multiple dwelling or interim multiple dwelling located in one of the following geographic areas (as specified in the New York City Zoning Resolution):
  - The Special Clinton District - § 96-110; or
  - The Special Hudson Yards District – § 93-90; or
  - The Special Garment Center District – § 93-90; or
  - The Greenpoint-Williamsburg anti-harassment area – § 23-013; or
  - The Special West Chelsea District – § 98-70 and § 93-90.

If the property fits one of the SRO exceptions as outlined in Administrative Code §28-107.2 and is not located in any of the geographic areas specified above, you may file an "Application for an Exemption from the Certification of No Harassment Requirement." This application can be found at nyc.gov/hpd.

If the property does not fall into any of these categories, a CONH is not required.

**Work:** Regardless of the type or location of the property, a CONH is not required for all types of work. You should refer directly to the Administrative Code and/or the New York City Zoning Resolution to determine whether a CONH is required. You may also consult with the Department of Buildings.

**Completing the Application:** *All sections must be fully completed.* You must enter the BIN in question 1. The BIN can be found by searching the address through the Department of Building's Building Information system at nyc.gov/buildings. This version of the application must be used effective August 1, 2018.

Printed on paper containing 30% post-consumer material.

**Who May Apply:** The applicant must be an individual natural person and must be either (i) a title holder, a contract vendee in possession, or a net lessee under a lease with at least 10 years remaining in its term ("owner"), or (ii) a principal or officer of an owner who is authorized to sign on behalf of and bind such owner. If the applicant does not have legal authority to authorize the Department of Housing Preservation and Development ("HPD") to enter all common areas of the property (for example, if the applicant is a contract vendee or is an owner who has leased the property to someone else), then the application must also be signed by an individual natural person who has such authority. If the applicant is a contract vendee, then the application must also be signed by an individual natural person who is authorized to sign on behalf of the title holder.

**Opinion of Counsel:** If title to the property is held by an entity rather than by a natural person, submit a letter from an attorney stating that:

- Based on the examination of the Company's organizational documents such as (specify which documents were consulted), you represent that the entity (name of entity) is in good standing with the Department of State, New York State.
- The applicant's relationship (official title) to the Entity.
- The applicant (name of applicant) is authorized to make all representation before DHPD on behalf of the Entity and is authorized to file the Application for Certificate of No Harassment on behalf of the Entity.
- The applicant (name) is authorized to bind the Entity (name) with regard to the filing of the Application for CONH.

**Number of Copies:** Submit one original and one copy of this application and all supporting documents.

**Fee:** Enclose a certified or bank check or a money order payable to "NYC Commissioner of Finance" for the following amount: $160 **per dwelling unit** in the building. (The total dwelling unit count used to calculate the total fee for the building should match the certificate of occupancy, original certified letter from the Department of Buildings submitted with the application or HPD's record of the building configuration.

**Inquiry Period:** As used below, "inquiry period" means:

- Three years before the date of the application if the property contains an SRO multiple dwelling, unless it is located in one of the five geographic areas described below (in which case the "inquiry period" as used in this application is the date specified for that geographic area);
- September 5, 1973 if the property is located in the Special Clinton District;
- June 21, 2004 if the property is located in the Special Hudson Yards District;
- June 21, 2004 if the property is located in Preservation Area P-2 of the Special Garment Center District;
- October 4, 2004 if the property is located in the Greenpoint-Williamsburg anti-harassment area; or
- December 20, 2004 if the property is located in the Special West Chelsea District.

**You must indicate if a building is BOTH an SRO AND located in one of the Special Zoning Districts by checking each applicable box in question 1 of the application. You must use the earliest inquiry period start date as the date from which to provide applicable information.**

**Required Documents:** Please submit the following documents with your application. Please note that if any of the required documentation is missing, HPD may reject the application.

- In conjunction with questions 8 and 9:
  - Original certified copies of all recorded deeds from the Department of Finance for current and prior owners who owned the property since the inquiry period start date.
- In conjunction with question 8, if the current title to the property is held by an entity, provide documentation in support:
  - Articles of Organization, operating agreement or LLC resolution, as well as the NYS filing receipt for the entity and a Certificate of Good standing.
- Copy of your permit application to the Department of Buildings ("DOB") (if one was submitted).
- Original certified copy of the Certificate of Occupancy, if one exists.
  - If no Certificate of Occupancy exists, attach an original certified letter from the DOB stating that the building does not have one.
- Original documentation of mortgages and any net leases for the subject property during the inquiry period.

 Printed on paper containing 30% post-consumer material.

- Supporting documentation of any criminal convictions and proceedings (see question 17).
- HPD, at its discretion, may require a copy of the architectural plans.
- Rent registrations filed with HCR within the inquiry period.

**Submission Method:** Submit the application and fee by mail (regular, certified, or registered), private courier, or hand delivery. **Hand deliveries are only accepted Monday through Friday from 9 a.m. to 11 a.m.**

**Submission Location:** Submit the application and fee to Anti-Harassment Unit, Department of Housing Preservation and Development, 100 Gold Street, Room 6Z New York, NY 10038, Attention: Rhonda Waldon.

**Inquiries:** Direct all inquiries regarding this application to: **(212) 863-8266**.

**Additional Pages:** If the answer to any question in this application requires additional space, please add pages to the application as necessary. For each such page, (i) clearly indicate the number of the question to which it pertains at the top of the page, and (ii) insert the page into the application immediately following that question.

**Obligation to Update:** If any information stated in the application changes at any time before HPD makes a final determination regarding whether harassment occurred, the applicant must promptly update the application with such new information and submit it to HPD. If the new information includes a change of ownership or any other facts that make the original applicant ineligible to submit the application, HPD may require that the amended application be executed by an eligible individual.

**Withdrawal:** An application may not be withdrawn after HPD issues either (i) an initial determination that there is reasonable cause to believe that harassment occurred, or (ii) a final determination that harassment occurred.

Printed on paper containing 30% post-consumer material.

Application for a Certification of No Harassment

*Rev. Dec 2018*

**Obligation to Update:** If any information stated in the application changes at any time before HPD makes a final determination regarding whether harassment occurred, the applicant must promptly update the application with such new information and submit it to HPD. If the new information includes a change in ownership or other facts that renders the original applicant ineligible to submit the Application, a new Application, including a new signature page executed by an eligible individual, and all supporting documentation must be submitted to HPD- in such an event, no new processing fee will be collected.

1.    **Property:** Identify the property that is the subject of this application ("property").

Borough:    ☐ Manhattan    ☐ Brooklyn    ☐ Bronx    ☐ Queens    ☐ Staten Island

Block: _____    Lot: _____    HPD Registration ID: _____    BIN: _____

Street Address: _____

Check every box that applies (check both SRO and a Special Zoning District if applicable):
☐    The property contains a Single Room Occupancy multiple dwelling.
☐    The property is located in the Special Clinton District.
☐    The property is located in the Special Hudson Yards District.
☐    The property is located in Preservation Area P-2 of the Special Garment Center District.
☐    The property is located in the Greenpoint-Williamsburg anti-harassment area.
☐    The property is located in the Special West Chelsea District.

2.    **Building Configuration:** Attach either an original certified copy of the certificate of occupancy or original certified letter from the Department of Buildings stating that the building does not have a certificate of occupancy. Describe the legal and actual configuration of the building below.

| Type of Unit | Legal Configuration - Number of Units | Actual Configuration - Number of Units |
|---|---|---|
| Apartment Dwelling Units | | |
| SRO Dwelling Units | | |
| Total Dwelling Units | | |
| Commercial Units | | |

What is the basis of the legal configuration described above?
☐    Certificate of Occupancy (must attach if this is the basis of the legal configuration)
☐    Original certified letter from the Department of Buildings

3.    **Building Occupancy:** Is the building currently vacant?
☐    Yes (How long has the building been vacant?) _____
☐    No (Describe the current occupancy below).

| Type of Unit | Occupied | Vacant | Total |
|---|---|---|---|
| Apartment Dwelling Units | | | |
| SRO Dwelling Units | | | |
| Total Dwelling Units | | | |
| Commercial Units | | | |

Printed on paper containing 30% post-consumer material.

1

Application for a Certification of No Harassment

*Rev. Dec 2018*

6.   **Reason For Application:** Briefly describe the reason for this application (e.g., the alteration or demolition work to be performed at the property).

_____

A.   Have any applications for permits been filed with the Department of Buildings for work at the property which would require a certification of no harassment?
  ☐   No   (Even if no such applications for permits have been filed with the Department of Buildings, HPD may request copies of architectural plans).
  ☐   Yes   (Attach a copy of each such application, stamped by the Department of Buildings, and all attachments thereto).

B.   Is any construction work currently in progress?
  ☐   No.
  ☐   Yes (Provide details below).

♻ Printed on paper containing 30% post-consumer material.

3

Application for a Certification of No Harassment

*Rev. Dec 2018*

4. **Applicant(s):** Identify the applicant(s). An applicant must be a natural person, not an entity. If the building is owned by more than one deed owner, all the owners need to be named as applicants or a notarized letter signed by each additional deed owner has to be submitted authorizing the applicant to file the application for certificate of no harassment on behalf of that owner. If the application is filed by a Net Lessee, the deed owner has to provide a notarized letter signed by the deed owner authorizing the Net Lessee to file the application for certificate of no harassment on behalf of that owner. In case of a multiple dwelling owned by an entity, the letter has to describe the corporate relationship of the person signing the letter on behalf of the entity.

Name (1) _____   Name (2) _____

Social Security Number: ____/____/_____   Social Security Number: ____/____/_____

Date of Birth: ____/____/_____   Date of Birth: ____/____/_____

Mailing Address: _____

Business Telephone Number: _____   Mobile Telephone Number: _____

Email Address: _____   Fax Number: _____

Relationship to the property (attach documentation): _____

Deed Owner: _____

Deed Owner Address: _____

5. **Access Authorizer:** Does the applicant identified in response to Question 4 have legal authority to authorize the Department of Housing Preservation and Development ("HPD") to enter all common areas of the property?

☐   Yes.

☐   No (Identify the person who will sign this application to authorize such access below).

The Access Authorizer listed shall be an individual natural person who either has legal possession of all common areas of the building, or is authorized to sign on behalf of and bind the persons or entities who have legal possession of all common areas of the building.

Name: _____

Social Security Number: ____/____/_____   Date of Birth: ____/____/_____

Mailing Address: _____

Business Telephone Number: _____   Mobile Telephone Number: _____

Email Address: _____   Fax Number: _____

Relationship to the property: _____

Printed on paper containing 30% post-consumer material.

2

Application for a Certification of No Harassment

*Rev. Dec 2018*

_____

_____

_____

_____

_____

_____

7.  **Prior Applications For The Property:** Has anyone ever submitted an application for a certification of no harassment (or an exemption or waiver from the requirement for a certification of no harassment) to HPD with respect to the property?

☐      No.

☐      Yes (Indicate the date of the application, whether HPD granted or denied the certification of no harassment, and any other relevant details).

| Date of the Application | Applicant | Granted, Denied, Withdrawn | Other Relevant Detail |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

8.  **Current Ownership**

A. **Current Owners:** List each current holder of title to the property including individual owners, joint owners and corporate entity:

| Name | Date of Birth | SSN or EIN | Address |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

♻ Printed on paper containing 30% post-consumer material.

4

Application for a Certification of No Harassment

*Rev. Dec 2018*

**B. Current Principals and Officers:** If title to the property is held by an entity rather than by a person, list (i) every director, general partner, managing partner, or managing member of such entity, (ii) every officer of such entity, (iii) every other person authorized to sign for and bind such entity, and (iv) every person or entity holding a 10% or more economic interest in such entity. Provide an opinion of counsel letter which authorizes the individual to file the application. An opinion of counsel letter is a letter by an attorney stating that the person signing the application for the corporation, partnership or limited liability corporation, is entitled to file and act on behalf of the entity and to make all of the representations and commitments therein. **You must also provide the supporting documentation as listed in the Instructions to support the below.**

| Name | Date of Birth | SSN | Relationship to Owner | Address and Telephone Number |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Printed on paper containing 30% post-consumer material.

5

Application for a Certification of No Harassment

*Rev. Dec 2018*

**C. Current Management:** List each person who served as a managing agent, a superintendent, collected rents, supervised or ordered repairs, or exercised any other discretion in the management of the property under the current ownership.

| Name and Address | Employer and Role | Period of Service |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

9.  **Prior Ownership**

    **A. Prior Owners:** Have you been the owner for the entire inquiry period?
    - ☐ Yes
    - ☐ No (Complete the appropriate sections below).

List each prior holder of title to the property including individual owners, joint owners and corporate owners:

| Name | Period of Ownership | Tax ID (if corporate entity) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Printed on paper containing 30% post-consumer material.

6

Application for a Certification of No Harassment

*Rev. Dec 2018*

**B. Principals and Officers Of Prior Owners:** If title to the property was previously held by an entity rather than a person at any time since the referral date, list (i) every director, general partner, managing partner, or managing member of such entity, (ii) every officer of such entity, (iii) every other person authorized to sign for and bind such entity, and (iv) every person or entity holding a 10% or more economic interest in such entity.

| Name | Period of Ownership | Relationship to Owner | Address | Telephone Number |
|------|---------------------|-----------------------|---------|------------------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Printed on paper containing 30% post-consumer material.

7

Application for a Certification of No Harassment                                    *Rev. Dec 2018*

**C. Management – Prior Ownership:** List each person who served as a managing agent, a superintendent, collected rents, supervised or ordered repairs, or exercised any other discretion in the management of the property from the referral date under a prior owner.

| Name and Address | Employer and Role | Period of Service |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

10.  **Criminal Convictions And Proceedings:** Have any of the persons or entities listed above in items 4-9 ever been convicted of a crime, or is any such person or entity currently a defendant in a pending criminal proceeding?

☐   No.

☐   Yes (Provide details below).

| Name | Court | Docket Number | Case Name | Disposition |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Printed on paper containing 30% post-consumer material.

Application for a Certification of No Harassment

*Rev. Dec 2018*

11.    **Prior Applications By Or On Behalf Of The Owner Or Applicant:** Has the owner, the applicant, or any other representative acting on behalf of the owner ever previously applied for a certification of no harassment for any property other than the subject property?

☐      No.

☐      Yes (Indicate each property for which the applicant sought a certification of no harassment and the disposition of each such application).

| Borough | Block | Lot | Address | Registration ID |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

12.    **Occupants:** List all current residential and commercial occupants of the property.

| Name | Unit/ Floor No. | Initial Occupancy Date | Phone Number | Monthly Rent | Rent Stabilized (Y/N) | Current Lease (Y/N) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Printed on paper containing 30% post-consumer material.

9

Application for a Certification of No Harassment

*Rev. Dec 2018*

12.    **Occupants Continued**

| Name | Unit/ Floor No. | Initial Occupancy Date | Phone Number | Monthly Rent | Rent Stabilized (Y/N) | Current Lease (Y/N) |
|------|------|------|------|------|------|------|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

If needed, please add additional pages.
Additional pages added?          _____    YES          _____    NO

Printed on paper containing 30% post-consumer material.

10

Application for a Certification of No Harassment

*Rev. Dec 2018*

13.  **Former Occupants:** List each former occupant who vacated a dwelling unit or rooming unit at the property after the referral date, whether through eviction, relocation, surrender of occupancy rights, or any other means.  If such occupant was relocated, please provide a copy of any agreement with respect to the surrender of occupancy rights, if one exists, and any other relevant details.

| Name Of Occupant | Unit | Initial Occupancy Date | Move Out Date | Reason For Moving Out | Current Address And Phone Number | Last Monthly Rent |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

If needed, please add additional pages.
Additional pages added?          _____   YES          _____   NO

Printed on paper containing 30% post-consumer material.

11

Application for a Certification of No Harassment

*Rev. Dec 2018*

14. **Relocation**: Will any occupants be relocated or displaced as a result of the alteration or demolition work to be performed at the property?

    ☐    No.

    ☐    Yes (Provide details below).

| Name | Unit | Monthly Rent | Reason For Relocation or Displacement | Phone Number | Relocated to What Location |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

If needed, please add additional pages.

Additional pages added? _____ YES _____ NO

15. Has the building been registered annually with New York State Homes and Community Renewal (HCR) during the inquiry period?

    ☐    No.

    ☐    Yes (Provide all rent registrations for each unit filed within the inquiry period).

16. **HCR Proceedings**: During the inquiry period, have there been any harassment proceedings, decrease in service proceedings, or other proceedings with regard to the property before the New York State Homes and Community Renewal (HCR)?

    ☐    No.

    ☐    Yes (Provide details below and attach a copy of each complaint and final disposition, if any).

| Party Names | Dates | Docket Number | Nature of Proceeding | Attorneys for Parties | Disposition or Current Status |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

♻ Printed on paper containing 30% post-consumer material.

Application for a Certification of No Harassment

*Rev. Dec 2018*

17. **Other Administrative Proceedings:** During the inquiry period, have there been any administrative proceedings with regard to the property before any governmental or quasi-governmental authority other than the New York State Homes and Community Renewal?

☐ No.

☐ Yes (Provide details below and attach a copy of each complaint and final disposition, if any).

| Party Names | Dates | Docket Number | Nature of Proceeding | Attorneys for Parties | Disposition or Current Status |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

18. **Litigation:** During the inquiry period, has there been any litigation with respect to the property?

☐ No.

☐ Yes (Provide details below and attach a copy of each petition and final disposition documents, if any).

| Title and Type of Action | Index No. and Court | Plaintiff/ Petitioner's Attorney | Defendant/ Respondent's Attorney | Disposition or Current Status |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Printed on paper containing 30% post-consumer material.

Application for a Certification of No Harassment

*Rev. Dec 2018*

19.    **Coercion:** During the inquiry period, has any title holder or lessee, its agents, employees or other persons acting on its behalf used force, or threatened the use of force, against the person or property of any occupant of a dwelling unit at the property?

☐    No.

☐    Yes (Provide details).

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

20.    **Services:** During the inquiry period, has any title holder or lessee, its agents, employees or other persons acting on its behalf interrupted or discontinued any services at the property, including, but not limited to, heat, hot water, cold water, electricity, gas, and elevator service?

☐    No.

☐    Yes (Provide details).

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Printed on paper containing 30% post-consumer material.

14

21. **<u>Vacate Orders</u>**: Has any governmental agency issued any vacate orders (full or partial) with respect to all or part of the property during the inquiry period or active if issued prior to the inquiry period?

☐     No.

☐     Yes (Provide details below and attach certified copies of each vacate order).

Vacate Order Number:_____
Issuing Agency:
☐     HPD
☐     Department of Buildings
☐     Fire Department
☐     Department of Health and Mental Hygiene
☐     Other (Identify): _____
Date Issued: _____
Date Lifted: _____
Basis of Order: _____
Number of Occupants Displaced: _____
Number of Occupants Returned (who were displaced): _____
Describe any other relevant information:

_____

_____

_____

_____

_____

Vacate Order Number:_____
Issuing Agency:
☐     HPD
☐     Department of Buildings
☐     Fire Department
☐     Department of Health and Mental Hygiene
☐     Other (Identify): _____
Date Issued: _____
Date Lifted: _____
Basis of Order: _____
Number of Occupants Displaced: _____
Number of Occupants Returned (who were displaced): _____
Describe any other relevant information:

_____

_____

_____

_____

Printed on paper containing 30% post-consumer material.

Application for a Certification of No Harassment

Rev. Dec 2018

22. **Locks:** During the inquiry period, has any title holder or lessee, its agents, employees or other persons acting on its behalf removed the possessions of an occupant from the dwelling unit, removed the door at the entrance to an occupied dwelling unit, removed, plugged, or otherwise rendered the lock on an entrance door inoperable, or changed the lock on an entrance door without supplying the occupant with a key?

☐　　No.
☐　　Yes (Provide details).

_____

_____

_____

_____

_____

_____

_____

_____

_____

23. **Other:** Provide any other information relevant to this application.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Printed on paper containing 30% post-consumer material.

Application for a Certification of No Harassment

*Rev. Dec 2018*

**Applicant Consent:** The owner of the property hereby consents to permit HPD unfettered access to the property that is the subject of this application at all times and without prior notice. The purpose of such access is for the investigation of all facts relevant to this application from the date hereof until the date upon which HPD makes a final determination with respect to the grant or denial of the certification pursuant to the application of a Certification of No Harassment.

It is understood that the failure to provide such access when requested will prevent the processing of this application and, in the discretion of HPD, may result in the denial of the issuance of a Certification.

Further, it is understood that the application may be denied if it contains any false or misleading statements, or material omissions.

Further, it is understood that the applicant and/or undersigned must first obtain a Certification of No Harassment from HPD and all necessary permits from the DOB prior to commencing the work at the subject premises, which is the subject of this application.

I, the applicant, have read the within application and attest that its entire contents are true and complete.

_____
Applicant's Signature (1)

_____
Applicant's Signature (2)

_____
Print Name Above

_____
Print Name Above

_____
Relationship to the Property

_____
Relationship to the Property

_____
Corporate Entity Designee Signature

_____
Access Authorizer Signature

_____
Print Name Above

_____
Print Name Above

_____
Relationship to the Owner (title)

_____
Relationship to the Owner (title)

Sworn to this _____ day of
_____, 20___.

_____
Notary

♺ Printed on paper containing 30% post-consumer material.

17

Exhibit G

Arbitration Procedures

(a)    In such cases where this Agreement provides for the settlement of a dispute or question (each, a "Dispute") by arbitration, such Dispute shall be resolved by final and binding arbitration. The arbitration shall be in accordance with the then prevailing Expedited Procedures of the Arbitration Rules for the Real Estate Industry of the American Arbitration Association ("AAA") or the successor of said procedures, except that the procedures shall be modified as follows:

(i)    There shall be three arbitrators.

(ii)    The party commencing arbitration (the "First Party") shall specify the name and address of the person to act as the arbitrator on the First Party's behalf.

(iii)    Within five (5) Business Days after the service of the demand for arbitration, the party receiving service of demand for arbitration from the First Party (the "Second Party") shall give notice to the First Party specifying the name and address of the person designated by the Second Party to act as arbitrator on its behalf, which arbitrator shall be similarly qualified.

(iv)    No arbitrator under this Exhibit B shall be an employee of or counsel to MSP or CSC (or of an Affiliate of MSP or CSC), and each arbitrator under this Exhibit B shall have at least twenty (20) years of experience in the County of New York, City and State of New York in commercial real estate.

(b)    Within five (5) Business Days after the appointment of the arbitrator of the Second Party, the two party-appointed arbitrators so chosen shall appoint a third arbitrator, who shall be a competent and impartial person with qualifications satisfying those required of the first two arbitrators pursuant to Section (a) of this Exhibit B.  If they are unable to agree upon such appointment within five (5) Business Days after expiration of such five (5) Business Day period, the third arbitrator shall be selected by the parties themselves within five (5) Business Days after expiration of the foregoing five (5) Business Day period.

(c)    If any arbitrator appointment is not made timely under this Exhibit B, then either party may request the appointment be made within five (5) Business Days by the AAA or its successor. Each party shall pay the fees and expenses of its respective arbitrator and both shall share equally the fees and expenses of the third arbitrator.  Attorneys' fees and expenses of counsel and of witnesses for the respective parties shall be paid by the respective party engaging such counsel or calling such witnesses.

(d)    In the event of a failure, refusal or inability of any arbitrator to act, his or her successor shall be appointed, within five (5) Business Days, by MSP or CSC in the case of the party-appointed arbitrators, and jointly by the parties in the case of the third arbitrator.  If an appointment is not made timely pursuant to this Section (d) of this Exhibit B, the arbitrator shall be appointed, at the request of any party, within five (5) Business Days, by the AAA or its successor.

(e)    Any award issued by the arbitrators shall be final and binding on the parties. Judgment on the award rendered by the arbitrators may be enforced and entered in any court having jurisdiction.

4866-0049-6406, v. 12

(f)    By agreeing to arbitration, the parties do not intend to deprive any court of its jurisdiction under Section (g) of this Exhibit B to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings.  In the exercise of their authority to resolve the merits of any Dispute, the arbitral tribunal shall have full authority to grant provisional remedies or to order the parties to request that a court modify or vacate any temporary or preliminary relief issued by a court, and to award damages for the failure of any party to respect the arbitral tribunal's orders.

(g)    The parties irrevocably consent and agree that (i) any action brought to compel arbitration or in aid of arbitration in accordance with the terms of this Agreement, (ii) any action confirming and entering judgment upon any arbitration award, and (iii) any action for temporary injunctive relief to maintain the status quo or prevent irreparable harm, may be brought in the courts of the State of New York in New York County or the United States District Court for the Southern District of New York and for that purpose each of the parties hereby expressly and irrevocably submits itself to the jurisdiction of such courts.  Each party irrevocably waives any objection to venue or jurisdiction on its person or assets, including any objection to the laying of venue or based on the grounds of *forum non conveniens* or any right of objection to jurisdiction on account of its place of incorporation or domicile.

Exhibit H

Form of Enhanced Severance Escrow Agreement

(Attached hereto)

4866-0049-6406, v. 12

ENHANCED SEVERANCE ESCROW AGREEMENT

This ENHANCED SEVERANCE ESCROW AGREEMENT (this "Agreement"), is dated the _____ day of May, 2022 (the "Effective Date"), and is by and among, HUDSON 1701/1706, LLC, a Delaware limited liability company, having an address at c/o CSC Co-Living 6 St. Johns Lane, New York, New York 10013 ("Tenant 1701/1706"), HUDSON 1702, LLC, a Delaware limited liability company, having an address at c/o CSC Co-Living 6 St. Johns Lane, New York, New York 10013 ("Tenant 1702"; and together with Tenant 1701/1706, collectively and jointly and severally, "Tenant"), 356W58 GROUND LESSOR LLC, a Delaware limited liability company, having an address at c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219 ("Landlord"), PARKVIEW FINANCIAL REIT, LP, a Delaware limited partnership, having an address at c/o 11601 Wilshire Boulevard, Suite 2100, Los Angeles, California 90025 ("Lender") and FIRST AMERICAN TITLE INSURANCE COMPANY, having an office at 666 Third Avenue, New York, New York 10017 ("Escrow Agent").

W I T N E S S E T H:

WHEREAS, simultaneously with the Effective Date, (i) Landlord and Tenant are entering into that certain Ground Lease (as the same may be amended, restated, and/or supplemented from time to time, the "Ground Lease"), with respect to the EBC Unit and the Modified Hotel Unit of that certain 353 West 57th Street Condominium (the "Condominium"), established pursuant to that certain Amended and Restated Declaration pursuant to Article 9-B of the Real Leased Premises Law of the State of New York, dated February 12, 1999, and recorded on July 16, 1999, in Reel 2913 Page 1753, as amended by that certain Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999, in Reel 2979 Page 2159 (, as the same may be amended, restated, and/or supplemented by from time to time, the "Condominium Declaration"), located at 353-361 West 57th Street, New York, New York (collectively, the "Ground Leased Premises"), (ii) Landlord, as sublandlord, and Tenant 1701/1706, as subtenant, are entering into that certain Sublease (as the same may be amended, restated, and/or supplemented from time to time, the "Sublease"; and together with the Ground Lease, collectively, the "Lease") with respect to the 10th Floor Unit of the Condominium (the "Subleased Premises"; and together with the Ground Leased Premises, collectively, the "Leased Premises"), and (iii) Tenant is obtaining a leasehold construction loan in the aggregate original principal amount of up to $207,000,000 (the "Loan") from Lender, which Loan is secured by one or more leasehold mortgages on Tenant's leasehold and subleasehold interest in the Leased Premises, as further set forth in the documents, instruments and agreements governing the Loan (collectively, the "Loan Documents"); and

WHEREAS, pursuant to the Lease, Tenant is responsible for performing all obligations under the that certain Memorandum of Agreement, dated March 8, 2022, by and among CSC Hudson, LLC ("CSC Hudson"), as purchaser or employer, and EC 58th Street LLC, a Delaware limited liability company, as seller party, and the New York Hotel and Motel Trades Council, AFL-CIO (the "Hotel Union"), as assumed by Tenant and Landlord pursuant to that certain Assumption Agreement, made as of the Effective Date, by and among Landlord, Tenant, CSC Hudson, 353W57 1704, LLC, a Delaware limited liability company, and the Hotel Union (as may be further amended, restated, supplemented or otherwise modified from time to time, the "Union MOA"), including, without limitation, the payment of certain enhanced severance (collectively, the "Enhanced Severance") to the employees of the Hudson Hotel described on Attachment A of the Union MOA (the "Hotel Employees"), previously operated at the Leased Premises;

WHEREAS, as set forth in the Union MOA, as a condition to any Hotel Employee receiving Enhanced Severance, such Hotel Employee must execute a general release to the Tenant in the form approved by the Hotel Union (each, a "Release");

WHEREAS, (i) Jackson Lewis, P.C. ("Labor Counsel") has been engaged by Tenant to coordinate with the Hotel Union with respect to collecting the Releases from each Hotel Employee and otherwise advise with regards to administering Tenant's obligations under the Union MOA and (ii) following the Effective Date, Tenant shall appoint a payroll provider (the "Payroll Provider") in accordance with Paragraph 7 of this Agreement to administer payment to each Hotel Employee of their applicable Enhanced Severance less usual statutory deductions due in respect of such Enhanced Severance (any such deductions, a "Tax Withholding");

WHEREAS, in furtherance of Tenant's obligations to pay the Enhanced Severance to Hotel Employees pursuant to the Union MOA, Lender is hereby advancing $34,228,632.15 (the "Escrow Funds") of the Loan to Tenant, which amount shall be deposited with Escrow Agent on the Effective Date and held and disbursed by Escrow Agent in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord, Tenant, Lender and Escrow Agent agree as follows:

1.      Recitals Incorporated; Defined Terms.   The recitals set forth hereinabove in this Agreement are hereby incorporated into this Agreement as if fully set forth herein.  Capitalized terms used herein, and not otherwise defined herein, shall have the meanings ascribed to such terms in the Union MOA, a true, correct and complete copy of which is attached hereto as Exhibit A.

2.      Escrow Amount.  Tenant agrees that, on the Effective Date, the Escrow Funds, in the amount of $34,228,632.15, shall be deposited by Escrow Agent into an interest bearing account with Escrow Agent (the "Enhanced Severance Escrow") out of the proceeds of the Loan, which funds shall be held in accordance with this Agreement. Any interest earned on the Enhanced Severance Escrow shall be earned and distributable to Tenant.  Tenant shall deliver a W9 to Escrow Agent simultaneously with the execution of this Agreement.

3.      Appointment of Escrow Agent.   Landlord, Tenant and Lender hereby appoint Escrow Agent as escrow agent pursuant to the terms of this Agreement and Escrow Agent hereby accepts said appointment pursuant to the express terms, conditions, and provisions of this Agreement and agrees to act in accordance with such terms, conditions and provisions of this Agreement with respect to the Enhanced Severance Escrow. Escrow Agent's fee for administering the Enhanced Severance Escrow is $500, to be paid by Tenant upon execution of this Agreement.

4.      Term.

(a)     The obligations of Escrow Agent under this Agreement shall terminate on the earliest to occur of: (a) complete disbursement of the Enhanced Severance Escrow pursuant to Paragraph 5 hereof, or (b) December 31, 2023 (the "Termination Date"), in which case all funds remaining in the Enhanced Severance Escrow shall be distributed to Tenant or Landlord in accordance with Section 4(b).

(b)     If, as of the Termination Date, any Escrow Funds have not been disbursed in accordance with Paragraph 4 and, therefore, remain in Escrow Agent's possession, such remaining escrow Funds (the "Remaining Funds") shall be disbursed to Tenant in accordance with the instructions provided by Tenant at least two (2) business days prior to the Termination Date; provided, however, in

the event that Landlord has notified Escrow Agent in writing that an event of default has occurred under the Lease on or prior to the Termination Date, such Remaining Funds shall be disbursed to Landlord in accordance with the instructions provided by Landlord. In furtherance of the foregoing, Landlord and Tenant hereby agree as follows:

(i)     Tenant shall hold the Remaining Funds in a segregated, interest bearing Eligible Account (as defined in the Ground Lease) held by an Eligible Institution (as defined in the Ground Lease), which Eligible Account shall be jointly controlled by Landlord and Tenant (except upon the occurrence of an event of default under the Lease, at which point, such Eligible Account shall be controlled solely by Landlord);

(ii)     Tenant shall not withdraw any of the Remaining Funds except to satisfy any Enhanced Severance obligation in accordance with the Union MOA, which withdrawal shall be subject to the receipt of a Release, as further set forth in Paragraph 5 hereof (it being agreed that any withdrawal of Remaining Funds for any other purpose shall be an immediate Event of Default under the Ground Lease);

(iii)     Such Eligible Account shall be transferrable to any assignee permitted pursuant to the Lease or any Successor Tenant (as defined in the Ground Lease) of the Lease and, as a condition to any such assignee or Successor Tenant succeeding to Tenant's interests under the Lease, Tenant shall transfer possession of such Eligible Account to the applicable assignee or Successor Tenant; and

(iv)     Except in connection with any permitted assignment of the Lease to a Qualified Transferee (as defined in the Ground Lease) or Successor Tenant pursuant to its terms, Tenant shall not assign or encumber, or attempt to assign or encumber, the Remaining Funds or the Eligible Account in which such Remaining Funds are deposited, and neither Landlord nor its successors or assigns shall be bound by any such actual or attempted assignment or encumbrance.

(c)     Upon the termination of this Agreement, in accordance with this Paragraph 4, Escrow Agent shall be relieved from all duties, obligations, liabilities and responsibilities hereunder other than those that accrued prior to such termination.

5.     Disbursement of Enhanced Severance Escrow.

(a)     The Enhanced Severance Escrow shall be disbursed as follows:

(i)     Tenant shall coordinate with Labor Counsel and the Hotel Union to obtain a Release from each Hotel Employee and, as to the Enhanced Severance due to any Hotel Employee who has delivered a Release in accordance with the Union MOA, direct disbursement of such Enhanced Severance pursuant to a notice (the "Disbursement Notice") in the form attached hereto as Exhibit B. Pursuant to the Disbursement Notice, Tenant shall direct (i) Escrow Agent to disburse to Payroll Provider Escrow Funds in the aggregate amount of Enhanced Severance for all Hotel Employees for whom a Release has been obtained and (ii) Payroll Provider to disburse such Escrow Funds, upon receipt, in the amounts set forth on Schedule 1 (less any applicable Tax Withholding) to the applicable Hotel Employees. Each Disbursement Notice may include direction as to one or more Enhanced Severance payments to one or more Hotel Employees who have provided the applicable Release.

(ii)    Within two (2) business days of receipt of a Disbursement Notice, Escrow Agent shall disburse the amount of Escrow Funds identified in the Disbursement Notice to Payroll Provider at the wiring instructions set forth in the Disbursement Notice.

(iii)    Upon receipt of such Escrow Funds, Payroll Provider shall (i) calculate the applicable Tax Withholding on each such Enhanced Severance payment, (ii) disburse such Escrow Funds in the amounts and to the applicable Hotel Employees identified in the Disbursement Notice, which amounts and Hotel Employees are set forth on Schedule 1, in each case, less any Tax Withholding, and (iii) pay any Tax Withholding to the applicable governmental authorities to which such Tax Withholding is due.

(iv)    Within one (1) business day of the disbursement of any portion of the Escrow Funds in accordance with this Section 5, Escrow Agent shall notify Landlord and Lender of such disbursement and the remaining Escrow Funds on deposit with Escrow Agent. Notwithstanding anything contained herein to the contrary such notice may be sent via email only.

(b)    Tenant hereby acknowledges and agrees that delivery of a Disbursement Notice to Escrow Agent shall constitute a representation and warranty from Tenant to Landlord that (i) Tenant has received an executed Release from the applicable Hotel Employee identified in the Disbursement Notice in the form approved by the Hotel Union, and (ii) seven (7) calendar days have elapsed from the date such Release was executed by the Hotel Employee.

(c)    In addition, notwithstanding any default or event of default by Tenant under the Lease or the Loan Documents, (i) Tenant is hereby directed by Landlord and Lender to continue to obtain such Releases and send Disbursement Notices as to any Enhanced Severance due from Tenant in accordance with the Union MOA and any applicable Release and (ii) Escrow Agent is hereby directed to comply with any Disbursement Notice delivered by Tenant in accordance with this Agreement and (iii) Escrow Agent is directed to ignore any objection to a Disbursement Notice.

(d)    If requested by Landlord, Tenant shall deliver to Landlord a true, correct and complete copy of any Release obtained with respect to any Hotel Employee.

6.    Terms of Escrow. The following terms and conditions shall also apply to the Enhanced Severance Escrow:

(a)    The Enhanced Severance Escrow shall be invested by Escrow Agent in an FDIC-insured, interest-bearing bank account.

(b)    It is agreed by and among Landlord, Tenant, Lender and Escrow Agent that:

(i)    the duties of Escrow Agent are only as herein specifically provided and are purely ministerial in nature, and Escrow Agent shall incur no liability whatever except for willful misconduct (including, without limitation, willful disregard of the terms of this Agreement) or gross negligence, as long as Escrow Agent has acted in good faith;

(ii)    in the performance of its duties hereunder, Escrow Agent shall be entitled to rely upon any document, instrument or signature believed by it to be genuine and signed by Landlord, Tenant, Lender or their respective successors;

(iii)    Escrow Agent may assume that any person on behalf of Landlord, Tenant, or Lender purporting to give any notice of instructions in accordance with the provisions hereof has been duly authorized to do so;

(iv)    Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless in writing and signed by it, the Landlord, Tenant and Lender;

(v)    Tenant shall jointly and severally reimburse and indemnify Escrow Agent for, and hold it harmless against, any and all loss, liability, costs or expenses in connection herewith, including reasonable attorneys' fees and disbursements, incurred without willful misconduct (including, without limitation, willful disregard of the terms of this Agreement) or gross negligence on the part of Escrow Agent arising out of or in connection with its acceptance of, or the performance of its duties and obligations under, this Agreement, as well as the reasonable costs and expenses of defending against any claim or liability arising out of or relating to this Agreement; and

(vi)    Tenant, Landlord and Lender each hereby release Escrow Agent from any act done or omitted to be done by Escrow Agent without gross negligence or willful misconduct (including, without limitation, willful disregard of the terms of this Agreement) in the performance of its duties hereunder.

(c)    Escrow Agent is acting as a stake-holder only with respect to the Enhanced Severance Escrow. Upon making delivery of all of the Enhanced Severance Escrow in the manner provided in this Agreement, Escrow Agent shall have no further liability hereunder, except from any claims arising out of the gross negligence or willful misconduct (including, without limitation, willful disregard of the terms of this Agreement) by Escrow Agent in the performance of its duties hereunder.

(d)    By execution of this Agreement, Escrow Agent hereby acknowledges and agrees that notwithstanding anything to the contrary contained in this Agreement, Escrow Agent shall not take any action whatsoever with respect to the Enhanced Severance Escrow unless (i) Escrow Agent is directed to take such action by Tenant pursuant to a Disbursement Notice, (ii) Escrow Agent is directed to disburse the Remaining Funds on the Termination Date in accordance with Paragraph 4 hereof, or (iii) Escrow Agent is directed to take such action by a court of competent jurisdiction by order that is not subject to appeal.

(e)    In the event that Escrow Agent incurs any costs or expenses hereunder, including, without limitation, costs of Escrow Agent, then Escrow Agent shall be entitled to reimbursement for such costs from Tenant within thirty (30) days after receipt of demand from Escrow Agent (provided that Escrow Agent shall provide Tenant copies of bills, invoices, receipts or other documentation that evidences the reimbursement amount).

7.    Payroll Provider.

(a)    Within ten (10) business days following the Effective Date, Tenant shall select a Payroll Provider, which Payroll Provider shall be reasonably acceptable to Landlord pursuant to a payroll agreement or similar engagement letter in form and substance reasonably satisfactory to Landlord. Once approved by Landlord, Landlord shall deliver written notice of such approval to Escrow Agent and Tenant and Tenant shall, within ten (10) business days thereafter, cause such Payroll Provider to (i) execute and deliver a counterpart signature page to this Agreement, and (ii) deliver notice to each of the parties hereto identifying such Payroll Provider's notice address for all future notices and providing wiring instructions to be included as Schedule A to the form of Disbursement Notice. Tenant's failure to select an acceptable Payroll Provider and deliver such Payroll Provider's counterpart signature page to

4875-5896-2974, v. 7

this Agreement within thirty (30) days following receipt of written notice of such default by Landlord, may, at Landlord's option, constitute an event of default under the Lease.

(b)     Landlord hereby acknowledges and agrees that Tenant (i) is currently in discussions with Newmark Knight Frank, which prior to the Effective Date, handled payroll for the Hotel Employees at the Leased Premises and (ii) if selected by Tenant as the Payroll Provider, Newmark Knight Frank shall be acceptable to Landlord, subject to Landlord's review and approval of the applicable payroll agreement or engagement letter (not to be unreasonably withheld, conditioned or delayed).

(c)     In no event shall Tenant deliver a Disbursement Notice (or Escrow Agent be obligated to disburse in accordance with any such Disbursement Notice) prior to the appointment of a Payroll Provider and such Payroll Provider's delivery of a counterpart signature page to this Agreement in accordance with Paragraph 7(a) hereof.

8.     All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given or made (i) upon the date of personal delivery (if notice is delivered by personal delivery), (ii) on the date of delivery (if notice is delivered by email transmission), provided that (A) any such email transmittal occurs prior to 4:00 P.M. (New York time) and (B) a copy of such email notice must also be sent concurrently to the recipient via either delivery method set forth in clause (i) or clause (iii) in order for such email notice to be deemed delivered, (iii) on the day one (1) business day after deposit with a nationally recognized overnight courier service (if notice is delivered by nationally recognized overnight courier service), or (iv) on the third (3rd) business day following mailing from within the United States by first class United States mail, postage prepaid, certified mail return receipt requested (if notice is given in such manner), and in any case addressed to the parties at the addresses set forth below:

If to Landlord:

356W58 GROUND LESSOR LLC
c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Luke Pak
Telephone: 214-545-5576
E-mail:  pak@mspcm.com

With a copy to:

356W58 GROUND LESSOR LLC
c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Max Lamont
Telephone: 214-545-5577
E-mail:  lamont@mspcm.com

And with a copy to:

Duval & Stachenfeld LLP

4875-5896-2974, v. 7

555 Madison Avenue, 6th Floor
New York, NY 10022
Attention: Danielle Ash, Esq.  & File Manager
File No. 4308.0014
Email: Dash@dsllp.com

If to Tenant:

HUDSON 1701/1706, LLC and
HUDSON 1702, LLC
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013
Attention: Saloman Smeke Saba and Alberto Smeke Saba
Email: ss@csc-coliving.com ;
as@csc-coliving.com

With a copy to:

Cole Schotz P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attn: Jordan J. Metzger, Esq.
E-mail: jmetzger@coleschotz.com

If to Lender:

Parkview Financial REIT, LP
11601 Wilshire Boulevard, Suite 2100
Los Angeles, California 90025
Attention: Paul S. Rahimian


If to Escrow Agent:

First American Title Insurance Company
666 Third Avenue
New York, NY 10017
Attention:  Matt Clay
Email: mclay@firstam.com
Tel:  917-710-2174
Reference Number: 1118978

With a copy to:

First American Title Insurance Company
666 Third Avenue
New York, NY 10017
Attention:  Andrew Jaeger
Email: ajaeger@firstam.com
Tel:  212-551-9433

Reference Number: 1118978

9.      This Agreement shall be governed by and construed in accordance with the laws of the State of New York, and shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors in interests and assigns.  The parties hereto hereby waive trial by jury in connection with any matter arising out of or relating to this Agreement.  The provisions of this Paragraph 9 shall survive the termination of this Agreement.

10.      This Agreement may be executed by the parties hereto in more than one counterpart, each of which, when executed and delivered, shall be deemed to be an original and all of which shall constitute together but one and the same document.  Signatures to this Agreement which are delivered via emailed pdf file or via facsimile transmission shall be treated as original signatures.

[Remainder of Page Intentionally Left Blank]

4875-5896-2974, v. 7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

ESCROW AGENT:

FIRST AMERICAN TITLE INSURANCE COMPANY


By:    _____
       Name:
       Title:

4875-5896-2974, v. 7

LANDLORD:

[INSERT SIGNATURE PAGE]

TENANT:

[INSERT SIGNATURE PAGE]

4875-5896-2974, v. 7

LENDER:

[INSERT SIGNATURE PAGE]

Acknowledged and agreed to
solely with respect to Section 5
of this Agreement on this
_____ day of _____, 2022:

PAYROLL PROVIDER:

[_____]

By:      _____
      Name:
      Title:

EXHIBIT A

Copy of Union MOA

(See Attached)

4875-5896-2974, v. 7

<u>EXHIBIT B</u>

Form of Disbursement Notice

[TENANT LETTERHEAD]

*VIA E-MAIL:*

First American Title Insurance Company ("<u>Escrow Agent</u>")
666 Third Avenue
New York, NY 10017
Attention:  Matt Clay
Email: mclay@firstam.com; ajaeger@firstam.com
Tel:  917-710-2174
Reference Number: 1118978

[PAYROLL PROVIDER]
[_____]
[_____]
Attention: [_____]
Email: [_____]

      Re:    Enhanced Severance Escrow Agreement (the "<u>Agreement</u>"), dated May ___, 2022, by and among HUDSON 1701/1706, LLC, a Delaware limited liability company ("<u>Tenant 1701/1706</u>"), HUDSON 1702, LLC, a Delaware limited liability company ("<u>Tenant 1702</u>"; and together with Tenant 1701/1706, collectively and jointly and severally, "<u>Tenant</u>"), 356W58 GROUND LESSOR LLC, a Delaware limited liability company ("<u>Landlord</u>"), PARKVIEW FINANCIAL REIT, LP, a Delaware limited partnership ("<u>Lender</u>") and First American Title Insurance Company ("<u>Escrow Agent</u>")

To Whom it May Concern:

Reference is hereby made to the Agreement. Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Agreement.  Pursuant to Section 5(a) of the Agreement, this letter shall constitute a Disbursement Notice with the following instruction:

1.  Escrow Agent is hereby directed to disburse $[_____] of the Escrow Funds to Payroll Provider at the wiring instructions set forth on <u>Schedule A</u> attached hereto.

2.  Upon receipt of such Escrow Funds, Payroll Provider is hereby directed to disburse to each Hotel Employee the amount of Enhanced Severance set forth opposite such Hotel Employee's name set forth on <u>Schedule B</u> attached hereto, less the applicable Tax Withholding calculated with respect to such Hotel Employee's Enhanced Severance.

Please reach out should you have any questions or concerns.

4875-5896-2974, v. 7

Sincerely,

<u>TENANT</u>

HUDSON 1702, LLC,
a Delaware limited liability company


By:     _____
        Name:
        Title:

By:     _____
        Name:
        Title:


HUDSON 1701/1706, LLC,
a Delaware limited liability company


By:     _____
        Name:
        Title:


By:     _____
        Name:
        Title:


Cc:     Danielle Ash (Dash@dsllp.com)
        Jordan Metzger (JMetzger@coleschotz.com)
        Jeff Fritz (jlevin@FarrellFritz.com)

Schedule A to Disbursement Notice

[Payroll Provider Wiring Instructions]

4875-5896-2974, v. 7

<u>Schedule B to Disbursement Notice</u>

[Schedule of Hotel Employees and Enhanced Severance Amount]

4875-5896-2974, v. 7

Schedule 1

Enhanced Severance Schedule

(See Attached)

4875-5896-2974, v. 7