**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| HUDSON 1701/1706, LLC, *et al.*,[1] | Case Nos. 25-11853 (KBO) |
|  | (Jointly Administered) |
| Debtors. |  |

**DECLARATION OF ABE KOHN IN SUPPORT OF DEBTORS' MOTION
FOR AN ORDER DETERMINING THAT PURPORTED GROUND
LEASE, IF A TRUE LEASE, IS A LEASE OF RESIDENTIAL REAL
PROPERTY UNDER SECTION 365 OF THE BANKRUPTCY CODE**

I, Abe Kohn, hereby declare, under penalty of perjury, that the following is true to the best of my knowledge, information, and belief:

1.    I am a Vice President of Construction in the New York, New York offices of Parkview Financial, LLC ("Parkview").  Since July 2025, my work for Parkview has involved the debtors in this jointly administered bankruptcy case, Hudson 1702, LLC ("Hudson 1702") and Hudson 1701/1706, LLC ("Hudson 1701/1706" and, together with Hudson 1702, the "Debtors"), and the Debtors' construction project (the "Project") at the former Hudson Hotel on West 58th Street in Manhattan (the "Hudson").  An affiliate of Parkview, PV Hudson, LLC ("PV Hudson"), is currently the owner of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

1627593077.3

2.      I submit this Declaration in support of the *Debtors' Motion for an Order Determining that the Purported Ground Lease, if a True Lease, is a Lease of Residential Real Property under Section 365 of the Bankruptcy Code*.  (*See* ECF No. 344.)

3.      I have over 13 years of experience in the construction of multifamily, industrial, office, and retail real estate development projects and have managed construction projects from acquisition through completion.  My work focuses on ensuring construction projects remain on schedule, within budget, and in compliance with all regulatory and lender requirements.  I also have responsibility for maintaining communications with project stakeholders, including investors, public officials, community interests and tenants.

4.      Except as otherwise stated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with those reporting directly to and working with me, my review of relevant documents and contemporaneous business records regularly kept and maintained by Parkview or the Debtors, or my discussions with representatives of various contractors and subcontractors employed by Parkview or the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

A.      **Background**

5.      As discussed in more detail in the accompanying Declaration of Glenn Brill, Parkview became involved with the Hudson in May 2022 through an affiliate, Parkview Financial REIT, LLC ("Parkview Financial").  At that time, Parkview Financial entered into two loan agreements with the developer on the Project, CSC Hudson, LLC ("Developer"), that provided a total of $207 million in financing for the Project.  In May 2022, the Developer was the owner of the Debtors.

6.    By July 2025, the two loans were in default, and Parkview Financial foreclosed on the equity in the Debtors.  At that point, PV Hudson became the Debtors' owner, and my work at the Hudson and on the Project commenced.  My role on the Project is, in conjunction with the Debtors, to oversee day-to-day activities and report progress to the Parkview Financial executive team. I coordinate with all parties involved to ensure that all actions and costs are aligned with the objective of Parkview Financial and the Debtors to execute on a profitable redevelopment plan.

7.    From May 2022 to the present, the plan for the Hudson has, at all times, been to convert it from a hotel to an apartment complex.  Specifically, in May 2022, it was anticipated that the Project would result in 444 multi-family apartments with a single commercial lease for a fitness center.  Although the Project is currently subject to stop work orders, all efforts and expenditures with respect to the Project are aimed at lifting those stop work orders and making the Hudson construction ready for an almost identical development: *i.e.*, a multi-family residential building with 444 apartments and one commercial lease.  The only significant change since May 2022 is that 138 of the apartments will now be at below-market rental rates.

8.    Although other concepts for the Hudson have been considered over time, none were adopted, and all current expenditures and efforts have been and remain focused on a multi-family residential development.

**B.    Efforts to Lift the Stop Work Orders and Move the Project Forward**

9.    A significant part of my work at the Hudson has been directed at removing the stop work orders that currently preclude any real progress on the Project.  The NYC Department of Buildings imposed these stop work orders before the Debtors were owned by, and under the management of, PV Hudson and before my involvement in the Project.

3

10. I and the Debtors' co-CRO, Alan Tantleff, have worked closely with Rivkin Radler LLP ("HPD Counsel"), a law firm the Debtors' retained to assist in communications with the New York City Department of Housing Preservation and Development ("HPD") about the Project and the stop work orders. In December 2025, I assisted HPD Counsel in filing a "cure" application with the HPD, which application seeks to lift the stop work orders by demonstrating compliance with several HPD preconditions. HPD counsel has communicated frequently and extensively with the HPD regarding the cure application.

11. I have also interacted with community interests and local politicians to hear and address their thoughts. I made a presentation at a community meeting on February 5, 2026, regarding the Hudson and the anticipated completion of the Project and received numerous positive responses. A local newsletter published an article about that meeting, which is attached hereto as **Exhibit A**.

12. We have been working closely with Manhattan Community Board 4 ("MCB4") to determine the safest way to temporarily relocate the current 29 tenants (the "SRO Tenants") during construction because a major renovation like this creates unavoidable health and safety risks. A letter from MCB4 discussing these efforts and other matters is attached hereto as **Exhibit B** (Mar. 25, 2026 Ltr. from L. Boghosian-Murphy to Commissioner D. Levy).[2]

13. I have also met with representatives of the SRO Tenants directly and worked toward addressing their complaints regarding services provided to them and the disruption caused by prior and future construction. We reviewed temporary housing options with the SRO Tenants and

---

[2] In its letter to HPD, MCB4 wrote, among other things, that "MCB4 thanks Parkview Financial, Taconic Development Advisors, Goddard Riverside Law Project, and the Hudson Tenants Association for continuous collaboration to ensure the long-term protection and stability of the existing Hudson Hotel tenants, and to move forward with the proposed renovation of the building." (Ex. B at 10.)

explained what they can expect regarding their permanent units once construction is complete. In addition, we discussed the timing and process for reimbursing the SRO Tenants for rent going back to when the Developer began construction. Throughout this process, multiple members of the Hudson Tenant Association have recognized, and expressed appreciation for, our efforts to prioritize tenant health, safety, and overall well-being.  We believe we have made significant progress in addressing the SRO Tenants' concerns and will have their support for lifting the stop work orders.

**C.    The Highest and Best Use of the Hudson**

14.    In my opinion, completing the Project's objective of a multi-family residential building is the highest and best use for the Hudson.  A number of factors weigh in favor of this conclusion:

(a)  **Existing Residential Occupancy:** There are currently 29 single room occupancy SRO Tenants residing in the building, almost entirely elderly and low-income individuals. As SRO Tenants, they have rights under New York law to remain in their individual units.  There is no known precedent for converting a hotel property to commercial office or retail use while such tenants remain in occupancy. The presence of these residents reinforces the property's continued residential classification and use.

(b) **Approved and Submitted Plans:** All architectural plans and design documents submitted to New York City authorities to date – both those already approved and those currently under review – reflect a hotel-to-multi-family residential conversion. At no point have any filings or approvals contemplated a commercial office or retail use.

(c) **Financing and Capital Structure:** The Project's "capital stack," including all financing to date, has been underwritten and structured based on a residential multi-

5

family conversion. This includes financing provided by both Parkview Financial and an affiliate of Montgomery Street Partners, 356W58 Ground Lessor, LLC. (The initial Project Budget for the Hudson shows this financing. (*Hudson 1701/1706 et al. v. 356W58 Ground Lessor LLC*, No. 1:25-ap-52471 (hereinafter "Adv. Proc."), ECF No. 17-3 at Ex. C, Sched. 1))

(d) **Economic and Timing Constraints:** A conversion of the Hudson to a commercial office or retail use is not economically or logistically viable. Such a conversion would require approximately 24 to 30 months to develop a new business plan, secure approvals, and obtain permits, during which time the property would continue to incur significant carrying costs, including real estate taxes and other charges. Additionally, the hard costs associated with converting the building to office or retail use would likely be double the cost of completing the currently planned residential conversion, as the current build-out configuration would require substantial modification to accommodate such alternative use. Finally, such a conversion would need to incorporate units for the SRO Tenants, creating an unattractive office or retail space and significantly lowering its expected value. Also, in the event that the Debtors seek strategic partners to help carry the Project forward, for precisely the reasons discussed above, new investors do not typically invest in distressed assets with the intent of fundamentally changing the asset class, particularly where substantial progress has already been made toward a defined redevelopment plan. Therefore, any contemplated change in use would discourage rather than encourage participation of new investors.

(e) **Regulatory Constraints and HPD Cure Process:** The current cure process with the HPD is predicated on reserving 28 percent of the Project's condominium area (or 138

6

units) for affordable, below-market rate housing.  The City will not lift the existing stop work orders until the cure requirements are satisfied, effectively precluding any alternative redevelopment plans from proceeding.

(f) **Market Conditions and Financing Feasibility:** Current market conditions in New York City do not support conversion of properties from other asset classes into commercial office or retail use. Such projects are widely viewed as economically unfavorable, with limited exceptions for high-end Class A office developments. Even in those limited cases, there is no known precedent for converting hotel properties into office or retail use. Accordingly, securing financing for such a conversion would be highly unlikely.

(g) **Physical Constraints of the Building:**  The building's existing infrastructure, layout, and configuration are not conducive to office or retail use. Significant structural and mechanical modifications would be required, further undermining the feasibility of such a conversion.

(h) **Ongoing Tenant Protection and Property Management Efforts:**  The Debtors and PV Hudson have implemented a tenant protection plan to ensure that current SRO Tenants remain in a safe, habitable, and code-compliant environment. This reflects a continued and substantial investment in maintaining the property as a residential building and underscores the commitment to its intended use.

15.     Given these factors, among others, the Debtors and PV Hudson are not considering any other use for the Hudson.  The Debtors and PV Hudson's current plan is to get the Project construction-ready, improve its financials as much as possible by lowering costs, and then seek

additional capital and/or a joint venture partner for the completion of the Project.  Current estimates are that an additional $68 million is needed to get the Project to completion.

16.     Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 31, 2026                    By: _____
New York, New York                       Abe Kohn

8