**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Hudson 1701/1706 LLC, | Case No. 25-11853 (KBO) |
| Debtors.[1] | (Jointly Administered) |

**356W58 GROUND LESSOR LLC'S OBJECTION TO DEBTORS'
MOTON TO INCREASE DIP COMMITMENT AND MODIFY AND
EXTEND APPROVED DIP BUDGET UNDER FINAL DIP ORDER**

356W58 Ground Lessor LLC ("Landlord"), through its undersigned counsel, respectfully submits this objection (this "Objection") to the *Motion of the Debtors to Increase DIP Commitment and Modify and Extend Approved DIP Budget Under Final Dip Order* [Docket No. 400] (the "DIP Increase Motion") and in support thereof respectfully states as follows:

**PRELIMINARY STATEMENT**[2]

1.     Acting under Parkview's evident control, the Debtors have (i) disregarded this Court's Final DIP Order, (ii) refrained from pursuing the Construction Project in a meaningful way, and (iii) ignored obligations under the Lease while pursuing misguided litigation against the Landlord. The DIP Increase Motion does not address any of the problems plaguing the Debtors' cases, but instead only continues the charade that the Debtors are somehow independent of Parkview – their owner and leasehold lender.

2.     The Final DIP Order included case milestones that were designed to ensure that the Construction Project would be appropriately pursued. As the product of extensive negotiation, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' headquarters and the mailing address for the Debtors is 11440 San Vicente Boulevard, 2nd Floor, Los Angeles, CA 90045.

[2] Terms utilized but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them in the body of this Objection.

milestones were the predicate for Committee and Landlord consent. Among other things, the milestones included a deadline for the Debtors to submit the critical Fallback Business Plan, which would detail when, how, and by what means the Construction Project would be pursued and achieved (including through the submission of, among other things, a detailed construction budget). Without any advance notice or discussion, the Debtors failed to submit any portion of a Fallback Business Plan or even a construction budget, and have made it clear they have no intention of doing so. And the Debtors appear to take the position that Parkview had the right to waive this milestone, rather than the Court or any other party.

3.      Meanwhile, because Parkview wants the Debtors to devote efforts to litigation, the Debtors are not devoting funds or significant efforts towards the Construction Project. The budget attached to the DIP Increase Motion demonstrates that no funds for construction are currently being expended, even though the Debtors appear to have ample cash resources without any increase in the DIP facility, and future expenditures are minimal. Putting aside that the Debtors should have been able to achieve a removal of the Stop Work Order by now, that order is itself limited and does not impede other necessary or project-related work from being legally pursued. The Debtors are also not pursuing a plan at this time (as confirmed in footnote 4 of the DIP Increase Motion) and because they are beholden to Parkview, they have done nothing to seek third-party financing for the Construction Project (as confirmed in a response to Landlord's document request).

4.      Further, the Debtors are failing to communicate appropriately with HPD to effectuate a cure of the circumstances that led to the CONH denial. The Debtors are repeatedly violating the Lease's requirement to keep Landlord in the loop on all communications with HPD (and thus violating Section 365(d)(3) of the Bankruptcy Code). Worse, the Debtors appear to be

making inappropriate and economically irrational promises to SRO occupants and the local community board that the Debtors will not be able to keep.

5.      In light of the control being exerted by Parkview, and the improper way in which Parkview is directing the Debtors' activities, the DIP Increase Motion should be denied, and any additional funds from Parkview – if they are actually necessary – should be injected as equity contributions.

## BACKGROUND

### A.  *Relationship Between Debtors and Landlord*

6.      On May 4, 2022, Hudson 1701/1706, LLC and Hudson 1702, LLC (collectively, the "Debtors"), as tenants, and Landlord, as landlord, entered into the Ground Lease for certain premises located at 353 West 57th Street in New York, New York for a period of 99 years (as amended, the "Lease") [Adv. Proc. No. 25-52471 (KBO) Docket No. 1 at Ex. A].

7.      Under the Lease, the Debtors were obligated to construct and complete an agreed upon project at the premises (the "Construction Project"). The initial Construction Project was the conversion of the Leased Premises from a hotel into approximately 400 residential units to be rented at market rates. The Debtors were required to substantially complete the initial project on or before May 4, 2024.

8.      Before commencing certain work comprising the Construction Project, Debtors were required by law to obtain a Certificate of No Harassment from the New York City Department of Housing Preservation and Development ("HPD") verifying that no tenant harassment occurred at the subject property during a prescribed look-back period – or an

exemption therefrom (the "CONH Requirement").[3] Following receipt of certain HPD notices dated July 1, 2022, and September 25, 2023, it became apparent that Debtors could not satisfy the CONH Requirement, effectively nullifying their ability to legally pursue the Construction Project as originally conceived.[4] Debtors thus elected, pursuant to the Lease, to submit a Fallback Business Plan in order to pursue a Fallback Project[5], but such plans were significantly deficient and thus rejected.

9.      Concurrently with the execution of the Lease, Debtors obtained a Construction Loan from Parkview. In addition to a leasehold mortgage, Parkview obtained a pledge of the membership interests in the Debtors to secure the Debtors' obligations under Construction Loan documents.

10.      Prior to 2025, the Lease was amended four times, and the Parkview Construction Loan documents also were also amended. By the Summer of 2025, the Debtors were in default under both the Lease and the Parkview Construction Loan. Parkview effectuated a UCC foreclosure sale of the Debtors' membership interests, and became the sole owner of the Debtors through a credit bid of only a portion of its debt (leaving the remainder outstanding).

11.      The Parkview-controlled Debtors were required under the Lease to submit a replacement Fallback Business Plan to Landlord for its approval by October 23, 2025. On October 22, 2025 – the day before the Debtors were required to provide Landlord with a Fallback Business Plan – the Debtors instead filed for bankruptcy. Debtors submitted an interim Fallback Business

---

[3] "[I]n order for Tenant to achieve Substantial Completion of the [initial Construction Project] in accordance with Legal Requirements, Tenant must (i) satisfy the CONH Requirement with respect to the entire Leased Premises" no later than the CONH Requirement Outside Date of July 8, 2024. Lease at § 49(a), (c).

[4] Lease at § 21(d).

[5] The terms "Fallback Business Plan" and "Fallback Project" are defined in the Lease. They refer to an anticipated revision to the tenant's proposed business plan and related changes in configuration of the building. The Lease specifies the various elements required of a Fallback Business Plan, including financial projections and design plans.

Plan post-petition that did not meet the standards required by the Lease and was thus not acceptable, and the Construction Project is woefully incomplete.

## B.  Bankruptcy Case Procedural History, and Interim DIP Financing

12.     On October 22, 2025 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors are authorized to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     On November 25, 2025, the Office of the United States Trustee for the District of Delaware appointed the Committee of Unsecured Creditors (the "Committee") in these chapter 11 cases. The Committee is comprised of three members, including Landlord.[6]

14.     On November 12, 2025, the Debtors filed the DIP Motion, seeking approval to borrow over $32 million (the "DIP Financing"). On November 17, 2025, the Court entered an Order [D.I. 82] approving the DIP Motion on an interim basis (the "Interim Order").

15.     Pursuant to the Interim Order, the Debtors sought and were granted authority to borrow up to $12,270,387 (the "Interim Amount") for use from November 3, 2025, to December 15, 2025 (the "Interim Period"). The Debtors sought and were granted authority to "roll up" the entirety of the Interim Amount regardless of whether the Interim Amount was actually spent during the Interim Period. The Debtors further sought and were granted liens and priming liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on and against substantially all of the Debtors' assets (the "DIP Liens").

---

[6] For the avoidance of doubt, the instant Objection is brought on behalf of Landlord in its individual capacity, not in its capacity as a Committee member.

C.  *The Final DIP Order, and Required Case Milestones*

16.  The Committee and Landlord objected to approval of the DIP Loan. *See Objection of the Official Committee of Unsecured Creditors to the Debtors' DIP Financing Motion* [Docket No. 144]; *356W58 Ground Lessor LLC's Objection and Reservation of Rights to the Motion of the Debtors for Entry of a Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Lender; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [Docket No. 139]. Among other things, the objections expressed concern regarding the Debtors' commitment to pursue the Construction Project.

17.  Following negotiations among the parties, the Debtors agreed to ensure that rent payments required by the Lease would be made (consistent with the Debtors' obligation to comply with the Lease under Section 365(d)(3) of the Bankruptcy Code). In addition, the Debtors agreed to abide by certain case milestones in order to give the Committee and Landlord a measure of comfort that the Debtor would pursue the Construction Project diligently.

18.  During the January 13, 2026 hearing to consider approval of the DIP Loan on a final basis, Debtors' counsel confirmed that the milestones were agreed upon in order to keep the case on track.

> Your Honor -- as Your Honor saw, attached to the proposed final DIP order there were certain case milestones agreed to that were set forth as an exhibit just to kind of keep the case on certain guiderails or certain milestones that were proposed and agreed to.

January 13, 2026 Hearing Tr. at 9:8-12.

19.  The Final DIP Order made it clear that the milestones were a predicate to approval of the DIP Loan.

> Notwithstanding anything to the contrary in the DIP Term Sheet or Interim Order, the DIP Facility and Chapter 11 Cases are subject to the milestones set forth in Exhibit 3 (collectively, the "Case Milestones").

*Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Lender; (III) Modifying the Automatic Stay; And (IV) Granting Related Relief* [Docket No. 255] (the "Final DIP Order") at ¶ 29.

20.     The Case Milestones included the requirement that the Debtors would prepare and complete a Fallback Business Plan as contemplated in the Lease. The Final DIP Order established March 31, 2026 as the deadline for the Debtors to submit the completed Fallback Business Plan. *See* Final DIP Order at Ex. 3.

21.     The hearing to consider the DIP Loan also included the Debtors' motion to retain DLA Piper as counsel (which motion was denied). In addition to purporting to be independent of Parkview, the Debtors presented themselves as being focused on the Construction Project – as they indicated that the litigation against Landlord was not the "main issue" in the case.

> This litigation isn't driving this case. What this litigation -- what this case is about is trying to get the project back on track, trying to complete the project so that we can go out and find some exit financing to confirm a plan, eventually, okay. . . . The litigations that we're talking about here are kind of off to the side at this point. The lease is a six-to-nine-million-dollar-a-year issue. There's $200 million already invested. There's probably going to be a lot more money that has to be invested. The DIP is $32 million. So, yes, while the lease is important, we're on our back. As Your Honor knows, we can either assume the lease or we can try and get it recharacterized to reduce the payment. But, by all means, it's not the main issue in this case anymore. It was prepetition, because they could have terminated everything.

January 13, 2026 Hearing Tr. at 127:19-128:10.

**OBJECTION**

***Debtors are Ignoring the Final DIP Order and Lease Requirements***

22.     As mentioned above, the case milestones in the Final DIP Order required the Debtors to submit the Fallback Business Plan by March 31, 2026. Notwithstanding that deadline, the Debtors failed or refused to provide a Fallback Business Plan – and they provided no warning or advance notice that they would do so. A fundamental predicate of the Final DIP Order – and the Committee's and Landlord's consent to the Final DIP Order – was simply ignored.

23.     The Debtors have provided no justification for their refusal to prepare and submit a Fallback Business Plan, and have instead stated only that Parkview purportedly waived the requirement. However, Parkview has no authority to unilaterally waive the Court-directed case milestones. The Court's approval of the DIP Loan was expressly "subject to" the case milestones including the requirement to submit a Fallback Business Plan. *See* Final DIP Order at ¶ 29 (directing that "the DIP Facility and Chapter 11 Cases are subject to the milestones . . .").

24.     The Debtors have disregarded other obligations to Landlord including by failing to comply with the Lease in violation of Bankruptcy Code 365(d)(3). The Lease clearly requires that the Debtors keep Landlord's specialty counsel "in the loop" on all communications with HPD. *See* Fourth Amendment to Lease, Section 2(e) (stating that "Tenant shall ensure that Landlord's counsel . . . is afforded a reasonable opportunity to participate in all meetings, calls and videoconferences with HPD and copied on all email and other written correspondence with HPD regarding the Cure Election and Cure Documents."). This requirement was included in the Fourth Amendment (and consented to by Parkview at the time) in recognition of Landlord's consent rights regarding any Cure agreement. Nevertheless, it is apparent that Debtors have repeatedly excluded Landlord's specialty counsel from communications with HPD.

25.     In December 2025, Debtors submitted a cure application to HPD without any prior notice of, or even a copy to, Landlord. After being excluded from further communications between Debtors and HPD, on February 20, 2026, Landlord convened a call with the Debtors' representatives (including Alan Tantleff and Debtors' real estate counsel) to remind them of their obligations under the Lease. Nevertheless, Debtors' refusal to keep Landlord informed has continued – including by Debtors' transmission to HPD on April 6, 2026 of draft relocation agreements that would be proposed for the occupants of the SRO units.[7] Further, although Landlord propounded a document request seeking (among other things) all communications with HPD, Debtor are improperly refusing the request as being too burdensome.

26.     The Debtors are also retreating from advancing the Construction Project in a meaningful way. Although the Debtors represented to the Court that advancement of the Construction Project (rather than litigating with Landlord) would be their main priority, little has been done in the nearly six months that have passed since the Petition Date. The Debtors have satisfied, in part, tenant improvement allowance obligations under the commercial sublease to L.A. Fitness, but that sublease has still not been assumed. Otherwise, the work on the rest of the premises has been meager.

27.     The Debtors' own financial projection tell the true story in the Chapter 11 Cases. In the Debtors' previous budget forecast annexed to the Final DIP Order, the Debtors projected they would spend $2.46 million on Construction Project related matters (Life Safety, Critical vendors) and another $2.17 million on Construction through the end of April. Instead, the Debtors

---

[7] Making matters worse, the Debtors are floating a relocation proposal to the local community board and HPD that would clearly be objectionable and economically detrimental to the Construction Project. In particular, the Debtors suggested that SRO occupants would be relocated to units otherwise designated as "cure" units, which risks having those units locked in to the significantly lower SRO rents in perpetuity. Because Debtors did not discuss the proposal with Landlord first, the Debtors risk causing harm to whatever goodwill the Debtors may believe they have developed with those third parties and HPD if Landlord declines to consent on a permanent financial condition that is certain to impair property value.

have spent *nothing* on construction and less than half of the budgeted amount for Life Safety/Vendors through the end of March. *See* DIP Increase Motion at Ex. 1 (Amended Budget). Going forward, the currently suggested budget provides nothing for Life Safety/Vendors and a mere $776,000 for construction over the next five months, with no indication of how these meager expenditures will be utilized. *Id*. In other words, little to no money is being invested into the property.

28.     The Debtors may offer the Stop Work Order as their excuse for doing such a small amount of work. Nevertheless, there is much that the Debtors could be doing to advance the project if they wanted to – including by performing the anticipated work on the lobby, common areas, elevators, amenity floor, and the façade – which require substantial further investment and would not be restrained by the Stop Work Order. The Debtors are slow-walking the Construction Project while waiting to see how the litigation turns out.

**_Any Additional Funds from Parkview Should Be Invested as Equity_**

29.     It is abundantly clear that the Debtors have become a mere instrumentality, and are under the full control of Parkview. The Debtors are not independently pursuing any financing to continue the Construction Project, and are instead deferring entirely to their owner and lender, Parkview.[8] The Debtors' main focus is on litigating with Landlord, which is for the benefit of Parkview's loan position and is in no way designed to maximize value for all stakeholders. *See Statement and Reservation of Rights By the Official Committee of Unsecured Creditors Regarding Debtors' Motion for an Order Determining that Purported Ground Lease, if a True Lease, is a Lease of Residential Real Property Under Section 365 of the Bankruptcy Code* [Docket No. 357].

---

[8] In response to a request for documents pertaining to this topic, Debtors' counsel confirmed that they have none.

30.     The Construction Project itself is being overseen by a Parkview employee. *See Declaration of Abe Kohn in Support of Debtors' Motion for an Order Determining that Purported Ground Lease, if a True Lease, is a Lease of Residential Real Property Under Section 365 of the Bankruptcy Code* [Docket No. 397] at ¶¶ 1, 6 (stating that "I am a Vice President of Construction in the New York, New York offices of Parkview Financial, LLC. . . . My role on the Project is, in conjunction with the Debtors, to oversee day-to-day activities and report progress to the Parkview Financial executive team. I coordinate with all parties involved to ensure that all actions and costs are aligned with the objective of Parkview Financial and the Debtors to execute on a profitable redevelopment plan."). And although the Debtors suggest that they retained Taconic Development Advisors, LLC ("Taconic") as the Debtors' development advisor,[9] there is no retention application on file with the Court. Instead, the applicable engagement letter reveals that Taconic was engaged by PV Hudson LLC (the non-debtor parent of the Debtors, wholly owned by Parkview), and the premise of that engagement was that the "client" would be Parkview itself.[10]

31.     The suggestion that the Debtors are somehow separate and independent of Parkview is, at best, an illusion and at worst, a gross misrepresentation. The Debtors are under Parkview's direction and control, and thus, at a minimum, Parkview should be required to fund the Debtors through equity contributions, without sur-charging creditors and stakeholders.

32.     Finally, the Debtors do not even appear to have a need for additional financing at this time. The Debtors have approximately $8.5 million of availability under the current DIP facility, and the Debtors are holding approximately $7.5 million in cash – for a total of $16 million.

---

[9] *See Declaration of Glenn Brill in Support of Debtors' Motion for an Order Determining that Purported Ground Lease, if a True Lease, is a Lease of Residential Real Property Under Section 365 of the Bankruptcy Code* [Docket No. 396] at ¶ 21.

[10] *See* Letter Agreement dated August 27, 2025 between PV Hudson LLC and Taconic Development Advisors, LLC, a copy of which is annexed hereto as **Exhibit A**.

Their monthly expenditures amount to approximately $2.4 million, which means that the Debtors have several months of "runway" before they might require additional funds.

WHEREFORE, Landlord objects on the basis stated above to the relief requested in the DIP Increase Motion and reserves its right to raise any additional objections at the hearing on same.

Dated: April 14, 2026
         Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Katherine S. Dute (No. 6788)
Soumya P. Venkateswaran (No. 7278)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450
Email: landis@lrclaw.com
         mcguire@lrclaw.com
         dute@lrclaw.com
         venkateswaran@lrclaw.com

– and –

**ADLER & STACHENFELD LLP**
Kirk L. Brett (admitted *pro hac vice*)
Patrick O'Connor (admitted *pro hac vice*)
555 Madison Avenue, 6th floor
New York, New York 10022
Telephone: (212)883-1700
Facsimile: (212)883-8883
Email: kbrett@adstach.com
         poconnor@adstach.com

*Counsel to Landlord 356W58 Ground Lessor LLC*

# EXHIBIT A

**(FILED UNDER SEAL)**