**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| HUDSON 1701/1706, LLC, *et al.*,[1] | Case No. 25-11853 (KBO) |
| Debtors. | (Jointly Administered) |

**THE DEBTORS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR MOTION FOR AN ORDER DETERMINING AMOUNT OF PROSPECTIVE POST-PETITION MONTHLY RENT DUE AS AN ADMINISTRATIVE EXPENSE CLAIM**

Pursuant to the Court's August 3, 2026, Order (Dkt. 616) setting forth a pretrial schedule for the September 9, 2026, evidentiary hearing in this matter, the above-captioned debtors and debtors in possession (the **"Debtors"**), by and through their undersigned counsel, file this supplemental memorandum in support of their motion seeking an order determining the amount of prospective post-petition monthly rent due to 356W58 Ground Lessor LLC (the "**Ground Lessor**"), pursuant to sections 105 and 503(b)(1)(A) of the Bankruptcy Code (Dkt. 524), and without prejudice to the determination that the Ground Lease is not a true lease.

## RELEVANT BACKGROUND

As set forth in the Debtors' prior filings, the Debtors have incurred $5,104,169 under their debtor-in-possession financing facility (the "**DIP Facility**") to fund the full amount of contractual monthly rent provided for in the Ground Lease through May 2026, an excessive administrative

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

expense burden in these pending chapter 11 cases (the **"Chapter 11 Cases"**).[2] Accordingly, on June 2, 2026, the Debtors filed their Motion for an Order Determining Amount of Prospective Post-Petition Monthly Rent Due as an Administrative Expense Claim (Dkt. 524, the "**Rent Motion**").[3]

The Debtors demonstrated in their opening papers that the current rent is excessive given the circumstances that have befallen the Hudson property (the "**Property**") since 2022. For example, the hotel-to-apartment conversion project (the "**Project**") is currently subject to two stop work orders, which have suspended work on the residential units at the Property prior to and then during the entire post-petition period, leaving the Property in a state of incomplete development. (Dkt. 524 ¶¶ 27, 29.) As such, the Property is not currently operating as the multi-family housing complex contemplated by the parties, and the Debtors generate only a small amount of revenue from the Property's single room occupancy apartments occupied by long-term tenants (the "**SRO Tenants**"). (Dkt. 524 at 1-2; ¶ 29.) Moreover, the Debtors have borrowed approximately $17,755,378 under the DIP Facility to fund the expenses of operating and maintaining the Property and must continue funding significant expenses from the DIP Facility necessary to ensure the

---

[2] In the Court's April 2026 ruling, the Court held that the lease, if a true lease, was a residential real property lease, and "Section 365(d)(2) of the Bankruptcy Code is applicable to such Purported Ground Lease rather than sections 365(d)(3) and (4) of the Bankruptcy Code." (Dkt. 443 at 2.) Therefore, the Debtors are not required to pay rent in accordance with the terms of the purported lease. Instead, the proper framework for postpetition rent is section 503(b), which permits administrative expenses only for the actual, necessary costs and expenses that preserve the estate. The Ground Lessor must prove the actual value, if any, conferred on the estates by the postpetition use or occupancy; the contract rate is not self-proving.

[3] The Rent Motion and this supplemental memorandum are without prejudice to, and do not waive, any rights or remedies available to the estates with respect to amounts already paid to the Ground Lessor if the Ground Lease is ultimately recharacterized as something other than a true lease, including disgorgement and offset against amounts that may otherwise be payable to the Ground Lessor under a plan.

health, safety, and welfare of the SRO Tenants and to prevent waste to the Property (Dkt. 524 ¶¶ 29, 32), but without receiving a concomitant benefit and while further depleting the limited liquidity available to preserve the estates and pursue a feasible reorganization.

After filing the Rent Motion, the Debtors retained an expert, Greg Eidson, to assist the Debtors in ascertaining the reasonable value for the use and occupancy of the Property. Mr. Eidson drafted an expert report opining that the current annual ground rent, $8,750,000, exceeds any reasonable market rent of the Property, and that the appropriate annual rent of the Property is $2,437,555. Mr. Eidson's expert report is attached hereto as **Exhibit A**. Ground Lessor separately retained an expert, Daniel Mizukovski, who submitted an expert rebuttal report opining that the appropriate ground rent is purportedly greater than even the contractual rent set forth in the Ground Lease. Mr. Mizukovski's redacted expert rebuttal report is attached hereto as **Exhibit B**. Mr. Eidson subsequently submitted an expert rebuttal report, attached hereto as **Exhibit C**.

## SUBSEQUENT TESTIMONY BEARING ON THE RENT MOTION'S DISPOSITION

Pursuant to the Court's August 3, 2026 Order (Dkt. 616), the Parties have now taken deposition testimony of Messrs. Eidson and Mizukovski. (*See* **Exhibit D** ("**Eid. Tr.**") and **Exhibit E** ("**Miz. Tr.**") hereto.) Taken as a whole, the expert testimony confirms that the appropriate rate of prospective post-petition monthly rent is substantially below the contract rate, and the Ground Lessor's contract-rate demand would impose an unjustifiable burden on the Debtors' estates.

### I. The Reasonable Market Value Rent is $2,437,555 Annually

As Mr. Eidson has testified, ground rent that is too low may fail to provide the landowner with an adequate return, while ground rent that is too high can impair operations and constrain construction loan size due to reduced available cash flow. (*See* Eid. Tr. at 27:5-20.) To avoid both

economically untenable results, the participants in the project's "ecosystem"[4]—the landowner, tenant, and lender—must account for each party's interests while pursuing a rent that the Project can actually support. (*See* Eid. Tr. at 50:23-51:20; 52:13-53:1.) For a ground rent rate to be feasible within such an ecosystem, the rate must not "overly burden the property," by depressing stabilized cash flow to the point that the tenant cannot service debt. (Eid. Tr. at 21:13-22:3; 30:6-21; 32:8-14.)

Accordingly, for the Hudson to "function economically," Mr. Eidson calculated a market ground rent rate that "work[s] in harmony" with the "other parts of the property," taking into account the Project's financing obligations and projected stabilized cash flow upon completion of the Project. (Eid. Tr. at 21:13-22:3; 32:8-14.) That methodology directly accounts for the actual constraints confronting the estates. Considering the Debtors' obligations related to the Project and a reasonable projection of net operating income ("**NOI**") upon completion of the Project, Mr. Eidson undertook a pro-forma cash flow analysis and calculated the reasonable market rent for the Project under its current circumstances and debt structure to be $2,437,555. (*See* Eid. Tr. at 32:1-14.) Applying that rental rate to the post-petition periods of Chapter 11 Cases, Mr. Eidson calculated that the Debtors have already overpaid ground rent by $3,682,260 through the first seven months of the Chapter 11 Cases. (Eidson Report ¶ 36; *see also* Eid. Tr. at 55:20-56:4.)

## II. A Reasonable Rent Cannot Be Determined <u>By Ignoring The Economic Realities Of The Underlying Project</u>

The Ground Lessor's expert, Mr. Daniel Mizukovski, calculates rent based on only two considerations: the original $178 million investment by the Ground Lessor, and an investor-

---

[4] Mr. Eidson adopted this term from Safehold, Inc., a publicly traded institutional ground lease company that Mr. Mizukovski cites in his report. (*See, e.g.,* Eidson Rebuttal Report at 2, 4-5.)

desired yield that he calculates at 6.25 percent. (Miz. Tr. at 41:5-9.) This leads to a rent of $11,125,000, almost 30 percent more than the current contract rate of $8.75 million and almost 75 percent more than the $6.4 million in rent originally provided for under the Ground Lease, an amount that would impose an even more extreme and unsustainable burden on an already liquidity-constrained estate. Mr. Mizukovski ultimately suggests that rent should just remain at the contract rate and does not explain this disparity. Then, he uses an unreasonable 2024 hotel-based projection of annual NOI ($23.3 million) to argue that the Project, upon stabilization, will generate sufficient monies to pay even that amount. (Miz. Tr. at 24:23-25:17, 32:5-13.)

Remarkably, Mr. Mizukovski does not include any consideration of the Debtors' obligations other than the Ground Lease, such as the considerable construction financing that all parties agreed to in the Project Budget attached to the Ground Lease. The original transaction documents for the Project were executed in May 2022 and included, among others, the Ground Lease and the Closing Agreement between Ground Lessor and the Debtors. (*See* Dkts. 396-2, 524-2.) In the Closing Agreement, the Ground Lessor required, as a condition precedent to the transaction, that Debtors obtain $207 million in construction loan financing (the "**Construction Loan**") for the purposes of developing the Project. (Closing Agreement, § 6(b).) Further, in the Ground Lease, the Ground Lessor specifically required the Debtors to complete the construction contemplated by the Construction Loan and included a "Project Budget" that recognized the Ground Lease and the Construction Loan as "sources" of financing for the Project. (Ground Lease § 48(a), Ex. C, Schedule 1.)

Despite the fact that $207 million in construction financing was required by his client, the Ground Lessor, this fact was "neither here nor there" to Mr. Mizukovski. (*See* Miz. Tr. at 25:18-21.) Mr. Mizukovski is only concerned about hypothetical "construction loans in the future to

build a future project" (Miz. Tr. at 26:2-22), and he ignores the sunk costs of construction to date. Accordingly, his simple calculation fails to account for the need to service the current Construction Loan (Miz. Tr. at 26:2-22) or the significant costs needed to finish the Project (Miz. Tr. at 28:22-29:13).

Mr. Mizukovski's calculation is simply based on the return on investment that his client's investors would want to see; it bears no relation to what the market would pay in rent based on the capital structure and state of development of the Property as it actually exists. As such, his analysis is fundamentally divorced from the task at hand and the reality of the Property's current state.

Mr. Mizukovski's calculation is neither reasonable nor reliable. By excluding any consideration of the construction loans that the Ground Lessor required for the Project, and incorporated into the Ground Lease, he is denying the economic realities of the Project before this Court. Further, Mr. Mizukovski revealed that prior to calculating his ground rent rate, he never toured the Project, was unaware of "what the [Project's] business plan is," had not reviewed the Court's April 2026 decision holding that the Ground Lease was a residential lease, and was unaware of the fact that all hotel components in the Hudson have been removed and that no hotel was planned for the Property. (Miz. Tr. at 14:14-15, 31:6-32:21). Mr. Mizukovski then admitted that if the Ground Lessor's own commissioned December 2025 appraisal was right—and the projected NOI for the Project was $15 million based on a multi-apartment conversion and not a hotel—that was a factor he "definitely" needed to consider. (S*ee* Miz. Tr. at 32:22-33:6.)

As for specific facts associated with the Project—such as the stop work orders, construction delays, SRO tenant complaints, and rising interest rates—none of these facts mattered because "these are all lessee issues." (Miz. Tr. at 22:5-23:4.) Financing, according to Mr. Mizukovski, is a lessee consideration (Miz. Tr. at 17:2-11), even though his client required that financing in order

to develop the Project (which, in turn, was expected to create the NOI to fund the rent). Taking this position to its natural end, Mr. Mizukovski testified that if a debt load becomes excessive, resulting in low or negative cashflow, that risk falls solely on the lessee. (Miz. Tr. at 39:3-25.) That position ignores the economic bargain the Ground Lessor required and cannot support a reasonable rent determination.

Mr. Mizukovski's position does not account for how the marketplace, taking the circumstances and cost structure as they exist, would calculate fair rent. And, under section 503(b)(1) of the Bankruptcy Code, that is the calculation that is required here. Mr. Mizukovski's testimony falls far short of rebutting Mr. Eidson's analysis. The Court should find that Mr. Eidson's calculated rent—$2,437,555—is the reasonable fair market rent for the Property during the Chapter 11 Cases.

**CONCLUSION**

While both experts' testimony will be further developed at the September 9, 2026 evidentiary hearing, the Debtors submit that the balanced, whole "ecosystem" approach by Mr. Eidson is the appropriate methodology for calculating the market rent. Given the Court's prior ruling, the Debtors do not owe contractual rent under section 365(d)(3) and should not be compelled to pay excessive rent. Such an expense without any concomitant benefit to the Property would unnecessarily and improperly burden estate assets and exacerbate current challenges stemming from incomplete development and minimal cash flow. For the reasons stated herein, the Debtors respectfully request an order from this Court determining that the reasonable amount of post-petition rent due to the Ground Lessor be set at an annual rate of $2,437,555.

DATED: Wilmington, Delaware
September 4, 2026

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Adam Cole (admitted *pro hac vice*)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email: chipman@chipmanbrown.com
olivere@chipmanbrown.com
cole@chipmanbrown.com

-and-

BOIES SCHILLER FLEXNER LLP
Michael M. Fay (admitted *pro hac vice*)
Robert Gordon (admitted *pro hac vice*)
Jenny H. Kim (admitted *pro hac vice*)
Sabina Mariella (admitted *pro hac vice*)
Jeffrey Waldron (admitted *pro hac vice*)
Katherine Zhang (admitted *pro hac vice*)
55 Hudson Yards
New York, New York 10001

Telephone: (212) 446-2300
Email: rgordon@bsfllp.com
mfay@bsfllp.com
jkim@bsfllp.com
smariella@bsfllp.com
jwaldron@bsfllp.com
kzhang@bsfllp.com