# EXHIBIT D

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

CASE NUMBER

25-11853 (KBO)

In Re:

Hudson 1701/1706, LLC, et al.,

Debtors.

VIRTUAL DEPOSITION OF GREG EIDSON

SEPTEMBER 1, 2026

12:14 P.M.

The deposition of GREG EIDSON was taken virtually before Jessica Pitts, CCR, on September 1, 2026, by Kirk L. Brett, commencing at approximately 12:14 P.M., whereupon all parties appeared virtually, pursuant to the stipulations set forth herein.

Q. Okay. So -- and stabilized assumes that the -- that the project, whatever construction work was -- is underway, has been completed and is over, correct?
A. That is correct, yes.
Q. Okay. So the fact that the property is currently under construction did not factor into your analysis here, correct?
A. That is correct.
MS. SU: Objection.
Q. Okay. And what did you mean by "financeable"?
A. Well, I meant that there -- there has to be -- in short, a lender -- the structure would be such that a lender would be interested in financing this project, and that would be the long-term financing on the project as opposed to the construction loan on the project.
Q. So -- so if I understand you, the assumption -- excuse me -- the assumption here is that there is a loan on the property and -- and that that is -- that's sort of the

predicate of the opinion, correct?
A. That's correct.
Q. Okay. So is that the same thing in your mind as analyzing what the market rate of rent is for the property?
MS. SU: Objection.
A. Well, that's part of the -- that would be part of the equation to arrive at what a market rent would be on the building --
Q. How so?
A. -- or the property I should say.
Q. How so?
A. Well, there's -- within the context of the stable property, there's income, there's expenses, and then there's the debt on the property. And for -- for the property to function economically with a loan on it, these factors have to work in harmony with each other or the deal doesn't work. You know, for example, if there's not enough cash flow to pay the debt, well, the debt doesn't work.
So in my analysis, I took the debt into consideration and the cash flow that was

projected into consideration and developed a ground rent that would work within those parameters.

Q. Okay. So -- and I recall that you said in your second report -- and I don't know how you phrased it -- how you refer to your second report. You said, "Reverse engineering is a fair term for what I did."

That -- does that describe -- is that consistent with what you just described, that you took the debt and looked at the expenses and then came up with the rent?

A. That's a fair assessment, yes.

Q. Okay. How would you determine rent if there were no debt on the property?

A. Well, if there were no debt on the property, it would be analyzed in a little bit different way. Now we don't have a lender involved that needs a return on the property, but we do have an owner-operator of the -- the property itself, and their equity would need a return. So the ground less -- the ground owner needs a return, the equity owner needs a

return.

Q. Okay. And what kind of return does the ground owner need?

A. Well, I don't think that's a specific number.

Q. Okay. Is there a range?

A. I'm going to say no, there's a -- there's a -- you know, and the reason I'm saying no is the -- the time period matters.

Q. What -- what time period do you mean?

A. Well, I mean at what point in time -- there's different rates of return in the marketplace. You know, we went through a period of relatively low interest rates in the early '21, '20 -- 2021 period and then things climbed quite a bit. So expectations changed. It had impact on everything, property values to the terms that were put in place.

So I think in the bigger picture, the rates of return, I'm not comfortable just putting a number on it without knowing how it affects the entire project.

Q. Okay. So -- but you're -- but if I

interest would seek entering into a transaction in 2022?

A. As measured against 2026, the -- everything was lower in '22 than it was in '26.

Q. Right. I -- I -- yeah, I -- I understand.

But do you -- do you have a view as to what kind of a rate or yield they would be seeking?

A. I didn't specifically look at that, no.

Q. Okay. Okay. Same question but for 2024. Do you have a view as to what kind of a return an investor in a leased fee interest would seek entering into a transaction in 2024?

A. No, I don't.

Q. Okay. Couldn't help but to ask for the sake of completeness.

A. Yes, sir, I understand.

Q. Okay. Okay. So there's a paragraph in your initial report. It's in 1.2 paragraph eight, and it's one, two, three -- I think it's the fourth bullet point.

MS. SU: I'm not seeing it on the screen, Mr. Brett. Do you want put it up for the witness so that he can see?

MR. BRETT: No, that's okay.

Q. You wrote, "A ground rent that is too low may fail to provide the landowner with an adequate return."

Do you remember that -- do you remember writing that?

A. I have a copy of it here. Can I reference that?

Q. Sure, of course. It's -- it's on page three. It's the top bullet point. And the full sentence actually continues. It says, "While a ground rent that is too high may reduce project cash flow to a level that prevents the achievement of required debt -- debt coverage ratios and other underwriting metrics."

A. Yes, I recall that.

Q. Okay. So do you have a view as to what an inadequate return would be for a landowner?

A. No, I do not.
Q. Okay. And let me just -- for the sake of completeness, would your answer be the same if I said entering into a transaction in 2026, do you have a view as to what an inadequate return would be to provide for a landowner?
A. Same answer, I do not.
Q. Okay. So if a -- if -- if a tenant were to say to the landowner, I will only pay you rent that will give you an amount that you view -- you, landowner, view as inadequate, the -- the transaction wouldn't occur, correct?
MS. SU: Objection.
A. Most likely, yes, you're correct.
Q. Right. Okay. In other words, if a landowner were considering entering into a ground lease and the tenant were only willing to pay an amount that would provide an inadequate return, the likely result would be that the landowner would just simply not enter into the transaction with that tenant?
MS. SU: Objection.

Q. Does that sound right?
A. That is the likely scenario, yes.
Q. But you don't know what that range would be, what would be inadequate in terms of a rate of return for the landowner?
A. No, I do not.
MS. SU: Objection.
Q. Okay. Okay. Now let's get to the -- let's -- let's now layer in debt into the equation. In the initial report on page 11 in paragraph 32, you wrote in the middle -- and I'll let you turn to it. And I understand you are looking at that -- by the way, what -- do you have other paper in front of you besides the report?
A. No. I have -- I have a sheet of blank notepaper over here, and then I have the report sitting here.
Q. Okay. And you probably -- you probably also have your reply report, right?
A. Yes.
Q. Okay. But a sheet of blank paper and the two reports, and that's it?

A. That's correct.
Q. Okay. Good. That's fine. That's one of those questions we have to ask when we're doing remote depositions, so thank you for that.
You wrote in the middle of that paragraph 32, "Because lenders underwrite the ground rent as a fixed obligation that ranks ahead of equity distributions, comma, an excessive ground lease burden can materially reduce net operating income available for debt service, construct -- constrain loan proceeds, and increase refinancing risk."
Okay. Do you remember writing that?
A. Okay. Yes.
Q. Yeah. Okay. So can you explain what that -- what that means?
A. Well, that just means if the -- basically, if the expenses are too high, there's not enough revenue to make a lender comfortable with covering the debt service.
Q. Okay. So from the lender's perspective, the rent has to -- has to get paid

first, correct?
A. You mean the ground rent has to be paid in the context to the other expenses?
Q. Correct.
A. Yes.
Q. Okay. Okay. And then just a couple of other clarifications on your report, if I can. I'm sorry to do this, but can we skip back to -- paragraph 25 is -- I know I got ahead a little bit. Paragraph 25, the last sentence reads, "Consequently, market standard financeable ground leases generally contain provisions that allocate risks and rights in a manner that preserves the economic expectations of all three stakeholders while providing sufficient certainty and security to support long-term investment and mortgage financing."
Okay. Did you review the ground lease in this case?
A. I did read the ground lease, yes.
Q. Okay. Did it contain provisions that would protect a leasehold lender?
A. I don't specifically recall.

Q. Okay. Okay. Now, the -- in your conclusion -- and I'm all the way at the back now on paragraph 37. You wrote, "Market rent equals 2,437,555." Do you see that?

A. I did, yes.

Q. Okay. And you called that "market rent." Why did you call that market rent?

A. I called that market rent because under the -- in the -- in the bigger picture of the whole property, that's the rent that works to support the other parts of the property. It -- it doesn't overly burden the property. There's -- the lender has the debt coverage ratio that they would typically need.

Q. Okay. But you wrote in paragraph three, and we talked about this already, that you were asked to determine a finance -- a financeable, stabilized ground rent for the completed project. But later, you didn't write that the financeable, stabilized ground rent for the completed project would be 2,437,555. Instead, you wrote market rent, and so I'm trying to understand.

Did you mean in market rent really what you were asked to provide, which was the financeable, stabilized ground rent for the completed project?

A. Yes. I am looking at -- at the two as being the same thing. I think this is the market rent that works under these circumstances.

Q. Okay. And what are the circumstances that you refer to when you say it's the "rent that works under these circumstances"?

A. I'm referring to the -- the stabilized income and expenses and debt service of the property.

Q. Okay. And -- okay. And that's based upon some of the assumptions and numbers that are in the rest of the report, which I know we're -- we're going to go through but I just want to make sure I -- I understand.

That's the amount based upon these assumptions and the amounts you've put in the report, that's the amount that works?

A. That's correct.

put together a projection. The business plan is no longer possible and yet you used the projection. So it seems like you used a projection that is totally irrelevant, but -- but you used it, and so I -- I -- I want to understand why you used it in the context of a business plan that could no longer be achievable.

MS. SU: Objection.

A. Well, it was -- that was an assumption along with the assumption that it's actually complete now and it's not. So I -- you know, we had a number of different assumptions we had to make to fit into this time frame that we're working with. And I agree with you that there were changes that most likely would have had a -- a negative effect on the property's cash flow going forward because they were -- there was a reduction in the amount of rent that could be collected on some of the units.

But to pick a point in time, I felt like the BBG report, it made a lot of sense.

And if I had gone with one of the more current reports, it was just -- it was -- of course I could have done then, but then there would have been another level of assumptions that I would have to make to get the property ramped up -- you know, get the construction completed, get it ramped up, and then discount that number back to the period that we're talking about.

Q. Okay. Okay. In the -- the second report -- I want to talk to you a little bit about the second report if we can.

A. Okay.

Q. Okay. So you spent some time talking about I think what you call the ecosystem, right?

A. Yes, I do.

Q. And that's a term that I think -- did you create that term?

A. No, I did not. I -- I -- I adopted that term. I -- I felt like it was a -- a very descriptive term of all of the parties working together to make a deal work.

Q. Okay. So what does that mean when

you say the ecosystem is all the parties working together to make a deal work? Can you --

A. Well, I mean the -- the owner of the land, the owner of the building, the construction loan, the lenders. All of these parties would work together to figure out what works for the -- I mean, if the deal is going to work, they're all going to have to work together. And if they don't work together, if one of them demands something the other ones can't do, then it just doesn't happen.

Q. Okay. So -- so for the ecosystem to work, all three parties have to be -- or the interests of all three parties have to be considered, correct?

A. Correct.

Q. And that the ultimate deal has to work for all three parties, correct?

A. Yes.

Q. And by "all three parties," we mean the ground lessor, the ground tenant, and the leasehold lender, right?

A. That's correct.

Q. Okay. So what confuses me about that is that in your initial report, and we talked about this, you looked at the debt amount and you looked at the projection amount, the projections from 2022, but then you said that the ground lessor interest didn't matter.

So how -- how were you using -- or did you use a -- an ecosystem analysis when you performed the -- when you -- of the analysis you did in your initial report?

MS. SU: Objection.

A. Well, I didn't -- I didn't mean to say they don't matter. I just meant to say that they're all part of the same puzzle, and just because one party -- and it doesn't matter if it's the -- the debtor or the ground lessor or maybe the -- the owner of the building and an equity requirement they want, it's -- you know, it's not necessarily what you want, it's what you can get based on all of these properties working together -- I mean, not properties -- but all the interests working

together.
Q. Okay. So but -- but there you kept the $207 million constant and you lowered the rent based upon what the property could have -- could afford if it's affording debt service on a $207 million loan. And you also said that if you -- all things being equal, if you reduce the debt, then the rent goes up.
But how does that -- why doesn't the debt amount go down? Why is your analysis not something along the lines of, well, if you keep the investment amount and the rent constant, then the debt amount should go down, the amount that the ground tenant can borrow should be reduced?
MS. SU: Objection.
A. That could happen, yes. That is -- that's a scenario that could happen.
Q. But that's not what you were asked to review, correct -- or analyze, rather, correct?
A. That's correct. I -- I was working with the debt amount that -- that I was aware of.

Q. Okay. But you were also aware of the investment by the ground lessor, correct?
A. That's correct.
Q. Okay. All right. Mr. Eidson, this is probably a good time to break if --
A. Okay.
Q. -- if you're ready for one?
A. Sure, yes.
Q. Okay. All right. We'll -- so let's take us off the record, please.
THE VIDEOGRAPHER: We are going off the record. The time is 1:24 Central Time.

(Break.)

THE VIDEOGRAPHER: We are now on the record. The time is 1:34 p.m. Central.
Q. (By Mr. Brett:) Okay. Mr. Eidson, back on the record. You understand you are still under oath, right?
A. Yes, yes.
Q. Okay. Okay. I just want to turn to -- your initial report indicated that the

rent -- well, you called it the market value of rent but we -- we -- we talked about what -- what that might mean.

But you -- you said it should be 2,437,555, right?

A. That's correct, I did.

Q. And you stood by that number in the second report, correct?

A. In the second report, I -- I believe that number changed just slightly.

Q. Okay.

A. Ever so slightly.

Q. Let's see. Paragraph 40 of your second report, the last paragraph reads, "Accordingly, my opinion of the excess rent remain unchanged."

I don't think you -- well, let me know. Did -- did your -- so your initial report -- okay.

Your initial report said you used the market rate -- market rent as you determined it as to be 2,437,555, and then using that figure, you calculated the excess rent. That's --

that's what you determined -- what you indicated was the amount from November through May to be in excess of market, right?

A. You're correct.

Q. And so -- and then in the second report, you said your view of that amount remains unchanged. So does -- does that -- so I -- I guess I took it to mean that you were also standing by the amount that you determined to be market rent -- rent in paragraph 37 of your initial report to be 2,437,555.

So it -- I guess I'm asking you, is that still your view?

A. That's -- that's correct, you are correct.

Q. Okay. Okay. So have you calculated what return that amount of rent would provide to the ground lessor in this matter?

A. I have not, I don't think so, no.

Q. Okay. So the ground lessor initial investment was $178 million. And you indicated -- well, let me pause there.

You're aware of that, right? I think