# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - x

In re:
HUDSON 1701/1706, LLC, et al.,
Debtors.

- - - - - - - - - - - - - - - - - - - - - x

HUDSON 1701/1706, LLC, a Delaware limited liability company, and HUDSON 1702, LLC, a Delaware limited liability company,

Plaintiffs,

Chapter 11
Case Nos. 25-11853 (KBO)

-against-

356W58 GROUND LESSOR, LLC, a Delaware limited liability company,

Defendant.

- - - - - - - - - - - - - - - - - - - - - x

Videotaped Deposition of DANIEL MIZUKOVSKI, taken pursuant to notice, was held at the law offices of Boies Schiller Flexner LLP, 55 Hudson Yards, New York, New York, commencing September 2, 2026 at 1:10 p.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

- - -

D. Mizukovski

A. I don't understand that question.

Q. What does your client own, do you know?

A. My client owns several condominium interests.

Q. Correct. Three condominiums in a condominium building, right?

A. Yes.

Q. So the underlying land upon which the condominium sits, your client does not own, right?

MR. O'CONNOR: Objection to form.

A. A condominium owns its own undivided interest in land, so my client would own the land associated with those condominium interests.

Q. But your client doesn't own all of the condos?

A. Right.

Q. So how could it own the land?

A. It's an interest in the land. The condominium has an interest in the land.

Q. But the condominium association owns that land, not your client?

D. Mizukovski

MR. O'CONNOR: Objection to form.

A. Okay.

Q. The other thing too about this property is you can't tear the building down, right?

A. You would know better than I.

Q. The SRO tenants make that impossible.

A. Okay.

Q. So just like me with my brownstone, you are stuck with this building, correct?

A. Okay.

Q. Have you visited the site?

A. I haven't been inside.

Q. But you've seen it from the outside?

A. Yes, I was inside when it was the Hudson Hotel.

Q. As was I. Those were the days.

It was quite the establishment, some 25 years ago maybe.

A. Right.

Q. I want to turn to page 9 of your report.

D. Mizukovski

A. Okay.

Q. And I'm looking at paragraph 23. The assumptions underlying Mr. Eidson's hypothetical loan are, themselves, problematic, independent of the flawed methodology they support.

In paragraph 21 of the report, Mr. Eidson explains that it is an analysis that uses the $207 million Parkview loan amount, the original 2022 construction finance to calculate annual debt service, which annual service itself is based on purportedly market terms as of 2024. This is inconsistent with what should be the purpose of the Eidson report which is determine appropriate ground rent as of today, a metric that is not impacted, nor reflective of the level of leasehold financing, real or hypothetical.

Did I read that right?

A. Yes.

Q. How is it possible to look at this project, the Hudson project, without taking into consideration the construction loan?

A. The issue with this analysis and in

D. Mizukovski

language that you read is that Mr. Eidson starts with the loan to determine the ground rent.

Q. Okay. But let's say he didn't start with it, at some point, it should be considered, correct?

A. Correct.

Q. Where do you consider it?

A. I consider it in the overall economics of the project of the situation.

Q. If I interpret your report correctly, you, you look at the original investment by the ground lessor, 178 million, you talk about return which is as often is the case, the risk-free rate plus some multiplier, some additional group of BPs, basis points, and then towards the end of your report, you look at potential NOI from the stabilized project and you say there is enough NOI to cover this, so there it is.

I don't see the Parkview loan ever coming into consideration during your analysis.

MR. O'CONNOR: Objection to form.

D. Mizukovski

A. I do consider and I say it in this report, that on a secondary basis, as a secondary consideration, a loan should be considered.

I don't talk about the Parkview loan being considered, but I talk about financing on the leasehold being considered, something that the lessee needs to consider in the context of the overall set of economics.

Q. But in this transaction, in May of 2022, your client entered into three different contracts, all of which required that the debtors enter into the $207 million worth of construction loans with Parkview?

MR. O'CONNOR: Objection to form.

Q. Have you ever looked at the closing agreement?

A. No.

Q. It is actually a condition precedent to the closing that the debtors enter into the construction loans with Parkview.

Are you aware of that?

D. Mizukovski

A. I am.

Q. In the ground lease, the ground lease specifically refers to the requirement that the debtors complete the construction project for which that construction loan was obtained, right?

A. Okay.

Q. And then there is also attached to the ground lease, a project budget that shows sources and uses, including a construction loan, including the ground lease and including some equity from the developer, right?

A. Okay.

Q. So this is a project that required the construction loan.

How can you not include the necessity of debt service under that loan in your rent analysis?

MR. O'CONNOR: Objection to form.

A. As I said, I consider that a loan would be required by the lessee to build this project.

What I said in this report is that

D. Mizukovski

asking me.

I'm telling you that financing is important to the overall framework of a ground lease and a new project that is to be built. I considered that. That's a vital -- that's a valid consideration from a lessee's perspective and I said as much so financing is necessary to think about.

Q. But you didn't -- in your calculation, you don't have any element that is debt service coverage, right?

A. I don't have a debt service coverage ratio because, again, that is not how market ground rent is determined.

Market ground rent is determined first and when you think about it in the context of ground leases and what the lessee is able to finance based on cash flow after payment of ground rent, you think about it more in the context of coverage ratio of cash flow NOI before ground rent to ground rent and that gives you a sense of what is financeable.

Debt service coverage ratio is

D. Mizukovski

specific to a loan and a leasehold. You don't lead with that in this kind of a situation.

Q. But again, this is not a ground lease creation, this is an existing project, right?

A. Again, I don't know what you mean by that. A ground lease was created here.

Q. Four years ago, right?

A. Right.

Q. Okay. And things have changed in those four years?

A. Okay.

Q. Interest rates are up?

A. Okay.

Q. Significantly, right?

A. Yes.

Q. Stop work orders, right?

A. Okay.

Q. Okay. Delays in construction?

A. Okay.

Q. SRO tenants that weren't very happy for a while, right?

A. Okay.

D. Mizukovski

Q. None of that matters to determining today a reasonable market ground rent?

A. Those are all lessee issues. Your comment about interest rates going up, sure, just like yield expectations on investment have gone up as well, from the ground lessor's perspective.

Q. But the ground lessor here required the construction loan, so how is it that the ground lessor can require a rent in 2026 that doesn't take into account any amount to pay existing debt service when that ground lessor required the loan?

MR. O'CONNOR: Objection to form.

A. As I said, the ground lessor and the ground lessee should think about a number of things. Financing should be thought about. Secondarily, not in determining ground rent.

You just described a situation where parties sat around a table and agreed on something, on a lease, a certain rent, a certain loan amount based on the cash flow after payment of that rent on a project that

D. Mizukovski

was contemplated. From there, they determined the amount of the loan that they can get, so all the parties agreed on that.

I'm thinking about it in the context of today. What's the market ground rent for this type of a project today?

Q. And the 11 million number that you come up with is based solely on a calculation of the risk-free rate plus some additional amount to that times 178 million, right?

A. Yes, but I also say that when you think about everything in totality, what makes more sense in the context of this project and in thinking about things like financing for the leasehold, what makes sense is to just keep the contract rent in place.

Q. Okay. So then you say 8.75 million, we should just keep that?

A. Right.

Q. You deduct nothing for debt service?

A. I don't need to duct anything for debt service because I'm not coming up with what the loan amount is and then figuring out

D. Mizukovski

the market ground rent.

I am figuring out the market ground rent and then saying, okay, lessee, you, based on whatever your project is that you are going to build and the cash flow that is remaining after you pay ground rent and your coverage ratio of cash flow to ground rent, you are going to be able to finance this.

There are going to be situations in which if you didn't have enough cash flow, it would be harder to finance, but in the context of the market ground rent that I think is appropriate and based on -- the business plan isn't done, but based on pro formas that I have seen, I think that that leasehold is financeable.

Q. Okay. But there is already financing and it's financing that your client required?

A. But that's neither here, nor there.

Q. You don't care about it?

A. It's not a function of me caring or not caring. I'm just telling you what market is.

D. Mizukovski

Q. So to you, determining a market rent now does not take into consideration what the lessee is going to have to pay in the future on the construction loans it used to build the Hudson project, right?

MR. O'CONNOR: Objection to form, asked and answered.

A. Construction loans in the future to build a future project, yes. Not the construction loan that was already taken out, but construction loans or a loan in the future to build whatever this project will be, yes.

As I have said before, I have thought about making sure that that leasehold is a financeable leasehold going forward.

Q. But what about the 207 million debt that the lessee has for the construction that has already taken place, that doesn't factor into market rent at all?

A. It does not.

MR. O'CONNOR: Objection to form, asked and answered.

Q. I just want to hear that one more

D. Mizukovski

time. The $207 million construction loan that was entered into in May of 2022 does not factor into the determination of market rent now in 2026, is that your testimony?

MR. O'CONNOR: Objection to form, asked and answered.

A. I don't know whether...

Q. You can answer.

MR. O'CONNOR: You can answer.

A. Not the $207 million loan, but construction financing in the future, new construction financing, I have thought about that.

Q. I want you to answer my question, okay?

My question is, the $207 million in construction loans that the lessee obtained from Parkview, it is your testimony that that does not come into play, is not a consideration in the determination of market rent for the Hudson today, correct?

MR. O'CONNOR: Objection to form, asked and answered.

And please let the witness finish

D. Mizukovski

his answer before asking another question.

A. Correct.

Q. Okay. Let's take a look at paragraphs 36 and 37 of your report.

So if I understand your approach to calculating a market rent, the first thing you did is basically set forth in paragraph 34, right, you took the ground lessor's investment and then you applied a yield to it which comes to 6.25 percent and then you come to a ground rent of 11,125,000 annually, correct?

A. Correct.

Q. Then this is your point, then you go on to say in the continuation of the paragraph on page 14 that, let's just stay with the current contract rent of 8,750,000, right?

A. Correct.

Q. So the factors in your calculation are the landlord's original investment, the treasury rate plus an applicable risk base spread which gives you a ground rent of

D. Mizukovski

11.125 million and then the last thing you considered is the actual ground lease itself and you say it has a contract rate of 8.75 million and let's stick with that, right?

A. Correct.

Q. No mention of the Parkview loans, no mention of anything else, right?

A. Correct.

Q. No mention of any of the costs needed to finish the project, right?

MR. O'CONNOR: Objection to form.

A. Correct.

Q. Then beginning at paragraph 36, you start considering what kinds of monies can this property generate, right?

A. Correct.

Q. NOI, net operating income, right?

A. Uh-huh.

Q. You refer to some pro formas.

Pro formas is a way of referring to projections, right?

A. Right.

Q. You refer to some pro formas between 2022 and 2024 that projected NOI,

D. Mizukovski

annual NOI of 23.3 to 31.6 million, right?
A. Right.
Q. Then you refer to an appraisal that was commissioned by your client, right?
A. Right.
Q. In December of 2025?
A. Right.
Q. And that projects an annual NOI of 15 million, right?
A. Right.
Q. Then you say, Given this continued uncertainty as to the tenant's business plan and the resulting economics of the leasehold, I have used approximately the midpoint of this range of stabilized NOI figures for purposes of the coverage ratio analysis that follows, right?
A. Right.
Q. Have you read the National Valuation Consultant Appraisal?
A. I have.
Q. That's based on the current actual plan for the Hudson, right?
A. I don't think so.

D. Mizukovski

Q. It refers to the build-out of a multi-apartment complex with 28 percent of the leasable real estate being used for below-market apartments, right?

A. I said I don't think so because I'm under the impression that there is no business plan that's been set.

Q. Okay. Who told you that?

A. Counsel.

Q. There was a hearing in April in this case to determine whether this building met the definition of a residential leased property versus a nonresidential leased property.

Have you reviewed anything from that hearing?

A. I have reviewed some material. I don't know whether it was from that hearing.

Q. Two witnesses testified at that hearing, Abe Kohn from Parkview and Glenn Brill from FTI.

Have you read their testimony?

A. No, I'm not familiar with that.

Q. Did you read the judge's ruling

D. Mizukovski

with respect to the property after that testimony?

A. I don't believe so.

Q. For example, you say in paragraph 37 that your midpoint is consistent with a pro forma from August 2024 which projects a stabilized NOI of approximately 23 million for a mixed use development comprising 61 hotel rooms and 140 affordable residential units and 242 market rate residential units, right?

A. Right.

Q. There is not going to be any hotel rooms in this project, right?

MR. O'CONNOR: Objection to form.

A. I'm not aware of what the business plan is.

Q. All the components of a hotel have been ripped out of the building, right?

A. I'm not aware of that.

Q. But that would change your analysis, wouldn't it? If it turns out that NVC's estimate of 15 million is the actual reasonable NOI that can be generated from

D. Mizukovski

this property upon stabilization, that would change your analysis, wouldn't it?

MR. O'CONNOR: Objection to form.

A. I would definitely have to consider that.

Q. You've said a couple of times, you figure out the rent first, right?

A. Right.

Q. Then you have to figure out what the lessee is capable of paying, right?

A. Right.

Q. And in a project like this, that will be whatever the property can generate itself, right?

A. That is a consideration.

Q. And if after paying the rent and paying all other costs associated with the property, the lessee has negative cash flow, the deal is not going to get done, right?

A. What deal are you referring to?

Q. The ground lease. If we look at this as a new project?

A. Uh-huh, right.

Q. If after paying what the ground

D. Mizukovski

lessor says it wants for rent and all other projected costs for the property, cash flow is negative, the deal is not going to get done, right?

MR. O'CONNOR: Objection to form.

A. Cash flow is negative for how long?

Q. Forever.

A. Well, of course not.

Q. Okay, right. You cite to Safe Hold a number of times in your report, right?

A. Right.

Q. Safe Hold is a publicly traded institutional ground lease enterprise, correct?

A. Right.

Q. One of the things and you cite to page 50 of their annual report and one of the things that Safe Hold says there is that increased interest rates, inflation and competition could result in Safe Hold not doing deals, right?

MR. O'CONNOR: Objection to form.

A. Okay.

Q. Right. So if I want a rent that is

D. Mizukovski

component and there is an equity funding and that's what pays for the entirety of the costs.

It didn't, all of a sudden, wind up spending $280 million, not knowing what his ground rent obligation was. He created this capital stack based on the ground rent obligation.

Q. And sometimes things don't go the way they are supposed to go, right?

A. Right.

Q. So four years into a project, things may be very different, right?

A. Right.

Q. So five years, let's say the project was supposed to be done in three years, it takes five years?

A. Okay.

Q. It's supposed to be done 200 million, it took 280 million.

A. Okay.

Q. Five years in, we are done. NOI was supposed to be 30 million, it's 15 million.

A. Okay.

Q. So now, five years in, we have 280 million in sunk construction costs, we have 15 million in projected NOI. That 280 million it took us to get there, to get that 15 million, we can just chop that out of the analysis?

MR. O'CONNOR: Objection to form.

A. That's a risk the lessee takes. The lessee is a developer and that's a risk every lessee in the market takes.

If their project goes the other way, that's their risk, hence, why the leased fee interest is senior to the leasehold interest.

Q. And that happens even where the lessor required that expenditure?

A. Of course.

Q. And that happens even though the lessor's only hope of collecting its rent is from the project that all that money went to building?

MR. O'CONNOR: Objection to form.

A. That is how a ground lease works.

D. Mizukovski

Q. Did you take into consideration the possibility that the ground lessor overpaid for these three condominium units?

MR. O'CONNOR: Objection to form.

A. I didn't take into consideration that they overpaid. I took into consideration what they invest in.

Q. That is not my point.

My point is, did they invest too much?

A. I don't know the answer to that.

Q. And did you take into consideration whether they invested too much, both in 2022 and with hindsight today, in 2026?

MR. O'CONNOR: Objection to form.

A. I don't know what that means. What do you mean in 2022 and in 2026?

Q. Looking back -- let's try this. Did you analyze whether $178 million was too much for the three condominium units as of May of 2022?

A. I did not.

Q. Did you analyze whether 178 million for the three condominium units was too much

D. Mizukovski

as of August of 2026?

A. I don't know whether it is or it isn't too much.

Q. Looking back at your paragraph 34, your calculation involves two numbers, right, the 178 million and then a return of 6.25 percent, right?

A. Right.

Q. Either one of those numbers could change your analysis, right? If you decided you wanted a different return, either higher or lower or if the market value of the property was either greater or less than 178 million, right?

A. Yes.

Q. If you wanted to determine, as of May 2022, what was the value of the three condominium units, what would you do?

A. Meaning, what is the -- what was the value in the context of this project that was created in 2022?

Q. Yes.

A. I would analyze what the value of the land, the land and building, the real

D. Mizukovski

estate is at the time. I would analyze the -- what's the yield in the market, the yield expectations on the value of that real estate. I would look at the pro forma for the project and I think those would really be the ways in which I would think about the appropriate ground rent.

Q. I'm not asking for ground rent. I'm asking about the value of what was purchased, the actual condominium units.

How would you go about valuing those three units?

A. The three, but again, you are asking me -- just please clarify. The value for whom under what -- in what context? The value of the fee simple condominium units, the value of the leased fee position that was created, the value of the leasehold position? What are you asking me?

Q. The value of what the ground lessor purchased from Cain International, the three units, no development, no nothing, just the three units.

A. But they were purchased under -- my