**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Hudson 1701/1706 LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-11853 (KBO)<br><br>(Jointly Administered) |

**356W58 GROUND LESSOR LLC'S RENT MOTION PRE-HEARING BRIEF**

Dated: September 4, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Katherine S. Dute (No. 6788)
Soumya P. Venkateswaran (No. 7278)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
mcguire@lrclaw.com
dute@lrclaw.com
venkateswaran@lrclaw.com

**ADLER & STACHENFELD LLP**
Kirk L. Brett (admitted *pro hac vice*)
Patrick O'Connor (admitted *pro hac vice*)
555 Madison Avenue, 6th floor
New York, New York 10022
Telephone: (212) 883-1700
Facsimile: (212) 883-8883
Email: kbrett@adstach.com
poconnor@adstach.com

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' headquarters and the mailing address for the Debtors is 11440 San Vicente Boulevard, 2nd Floor, Los Angeles, CA 90045.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................ 1

ARGUMENT ........................................ 3

I. Landlord is Entitled to an Administrative Expense Claim for the Full Amount of Base Rent Under the Lease ........................................ 3

A. Debtors – Not Landlord – Have the Burden of Producing Evidence to Rebut the Contract Rate ........................................ 4

B. Debtors Have Not Rebutted the Presumption that the Contract Rate is Market ........................................ 5

i. Mr. Eidson is Not a Ground Lease Expert and Does Not Offer Comparisons to Other Properties Subject to Ground Leases ........................................ 5

ii. The Eidson Report Does Not Focus on the Correct Inquiry ........................................ 6

iii. The Contract Rate is the Product of Extensive Negotiations Between Sophisticated Parties: Landlord, Debtors, and Parkview ........................................ 9

II. Landlord's Expert Confirms that the Contract Rate is Fair Market Value ........................................ 10

CONCLUSION ........................................ 12



#25004413v1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Matter of Cont'l Airlines, Inc.*
146 B.R. 520 (Bankr. D. Del. 1992) ........ 8

*In re DVI, Inc.*,
308 B.R. 703 (Bankr. D. Del. 2004) ........ 3, 4, 6

*In re JLM Couture, Inc.*,
661 B.R. 862 (Bankr. D. Del. 2024) ........ 3, 4, 6, 8

*Matter of Cont'l Airlines, Inc.*
146 B.R. 520 (Bankr. D. Del. 1992) ........ 8

*In re Sportsman's Warehouse, Inc.*,
436 B.R. 308 (Bankr. D. Del. 2009) ........ 3, 4

*United States v. Cartwright*,
411 U.S. 546 (1973) ........ 4, 9

*Zagata Fabricators, Inc. v. Superior Air Products*,
893 F.2d 624 (3d Cir. 1990) ........ 3

*In re ZB Co., Inc.*,
302 B.R. 316 (Bankr. D. Del. 2003) ........ 4

## Regulations

Treas. Reg. § 20.2031—1(b) ........ 9

356W58 Ground Lessor LLC ("Landlord"), through its undersigned counsel, respectfully submits this brief, together with the Declaration of Matthew B. McGuire (the "McGuire Declaration"), dated September 4, 2026, with exhibits annexed thereto[2] in advance of the hearing scheduled for September 9, 2026 concerning Debtors' Motion for an Order Determining Amount of Prospective Post-Petition Monthly Rent Due as an Administrative Expense Claim (the "Rent Motion") [D.I. 524].[3]

## PRELIMINARY STATEMENT

The authority in this district is clear: when a debtor occupies and uses a premises post-petition, the landlord is entitled to an administrative claim in the amount of the contract rate unless the debtor proves that the fair market value for the use and occupancy of the premises is less than the contract rate. The presumption that the contract rate should apply makes sense because it is the byproduct of market forces: it arose from the negotiation among parties to the lease. And here, the negotiations over ground rent involved not just landlord and tenant, but also the tenant's leasehold lender (which, at the time, was unaffiliated with the tenant), and such negotiations occurred not all that long ago – with the last round of negotiations occurring in 2024.

The Debtors here understand that they carry the burden of disproving the contract rate (*see* Rent Motion at ¶ 23), but the Debtors are incapable of doing so. The Debtors intend to rely solely upon the testimony of a purported expert, even though that individual has never advised a party to

---

[2] Unless otherwise stated, all citations to exhibits are to those included in the McGuire Declaration.

[3] In addition to the Rent Motion, the Court will also hear oral argument on September 9 on Landlord's motion to dismiss [Adv. Pro. D.I. 93] the Amended Complaint filed by Debtors [Adv. Pro. D.I. 91]. However, the parties have not learned any new facts since filing their respective briefs on the motion to dismiss because discovery concerning the Amended Complaint has not commenced and the parties' Rent Motion experts did not opine on the claims in the Amended Complaint or the parties' motion to dismiss arguments. Therefore, this pre-hearing brief focuses solely on issues before the Court on the Rent Motion.

a ground lease as to how ground rent should be determined. The purported expert does not even opine as to what "market" ground rent should be, or how market participants determine how to calculate ground rent. Instead, his report suggests that the leasehold loan payments to Parkview should be paid first – "off the top" – and that ground rent should then consist of whatever amount is left over from anticipated income. This "analysis" is backwards, as it disregards (or reverses) the priority scheme of a ground lease. And it leads to the absurd proposition that ground rent would fluctuate depending upon how much a tenant chooses to borrow.

The false methodology employed by the Debtors' purported expert also led him to suggest a rental rate that he later admitted would never be agreed upon by a landlord. In his report, Debtors' expert asserted that annual rent for the property should be only $2,437,555, which is about 1.37% of Landlord's $178,000,000 investment in the Property and about one-quarter of the contract rate. Under Debtors' proposed rent, Landlord would not *recoup* its investment until the seventy-third (73) year of the lease term. The purported expert's admission that no landlord would accept such a rate of rent necessitates a finding that such rent cannot possibly be "market."

The Debtors, therefore, have not and cannot overcome the presumption that the contractual ground rent should apply. Rather than move to exclude Debtors' expert – his report and testimony are plainly not credible – Landlord submits that the Court is capable of recognizing that Debtors cannot rebut the contract rate on evidence so unconvincing (including because Debtors' expert has little faith in his own report's conclusion).

While Debtors' failure to rebut the contract rate presumption should end the analysis, the Landlord intends to offer the testimony of its own expert. As will be shown at the hearing on this matter, Landlord's expert is deeply involved in ground leasing in New York City. He will explain what the Court likely knows already: that market participants determine ground rent based upon

the amount invested by the landlord, and that ground lease parties expect landlords to achieve a market-based yield on its investment (which yield exceeds the risk-free 30-year Treasury rate). He will also explain that ground rent is the senior obligation, and that the amount a tenant can borrow depends upon the fixed ground rent – not the other way around. The conclusion of Landlord's expert is that a "market" ground rent is at least the contract rate in the Ground Lease, if not more – which confirms that the market forces acted as intended, and the wisdom of presuming that the contract rate should apply.

Accordingly, the Court should deny the Debtors' request to re-evaluate the rental rate for the property, and should direct the Debtors to immediately pay all accrued ground rent for the months of June, July, August and September.

## ARGUMENT

### I. Landlord is Entitled to an Administrative Expense Claim for the Full Amount of Base Rent Under the Lease.

While it is Landlord's burden to "establish its claim is for an actual and necessary expense…[the] mere fact that the Debtors are occupying the landlord's premises is sufficient, in and of itself, to establish that payment for that use and occupancy is an actual, necessary expense of preserving a debtor's estate under section 503(b)(1)." *In re JLM Couture, Inc.*, 661 B.R. 862, 867 (Bankr. D. Del. 2024) (citing *In re Sportsman's Warehouse, Inc.*, 436 B.R. 308, 312 (Bankr. D. Del. 2009)); *In re DVI, Inc.*, 308 B.R. 703, 707–08 (Bankr. D. Del. 2004) ("A landlord is entitled to an administrative claim in the amount of the fair market value of the premises when a debtor occupies and uses them post-petition.") (citing *Zagata Fabricators, Inc. v. Superior Air Products*, 893 F.2d 624, 627 (3d Cir. 1990).

"Generally, the fair market value is the price at which a willing buyer will pay a willing seller when neither party is compelled to buy or sell the property." *Id*. at 708 (citing *United States v. Cartwright*, 411 U.S. 546, 551 (1973)).

### A. Debtors – Not Landlord – Have the Burden of Producing Evidence to Rebut the Contract Rate

"Absent evidence to the contrary, the contract rate is presumed to be the fair rental value." *In re JLM Couture, Inc.*, 661 B.R. at 867–68 (citing *In re ZB Co., Inc.*, 302 B.R. 316, 319 (Bankr. D. Del. 2003) and *Sportsman's Warehouse, Inc.*, 436 B.R. at 315); *see also In re DVI, Inc.*, 308 B.R. at 708 ("The contract rate is presumed to be the fair market value unless the presumption is rebutted. Accordingly, [debtor] has the burden of showing why the contract rate was not the fair market value for the rental of the Premises.") (citing *In re ZB Co.*, 302 B.R. at 319).

Debtors themselves admit that they have the burden of producing evidence to rebut the contract rate. *See* Rent Motion at ¶ 23 ("Nonetheless, the ***debtor*** can submit evidence that the benefit to the estate is lower that the contract rate.") (citing *In re JLM Couture, Inc.*, 661 B.R. at 869) (emphasis added).

Evidence sufficient to overcome the presumption that the contract rate is fair market value may include witness testimony provided that the witness demonstrates an adequate assessment of the real estate market or sufficient knowledge of comparable properties in the vicinity. *See In re JLM Couture, Inc.*, 661 B.R. at 868. Evidence may also include credible market surveys and testimony from experts provided that such testimony has the probative value of a real estate or leasing expert. *Id*. at 868-69.

### B. Debtors Cannot Rebut the Presumption that the Contract Rate is Market

In their Rent Motion, Debtors have not rebutted the presumption that the ground rent contract rate is the fair market value, and the evidence that Debtors will rely upon at the Rent Motion hearing is wholly insufficient to rebut the presumption.

In their Rent Motion, Debtors promised that they would rebut the presumption by offering evidence concerning (a) the current state of the Property,[4] and (b) "the fact that the rent under the Ground Lease was not calculated by reference to the actual rental market, but was linked to a particular return for the Ground Lessor's investors." Rent Motion at ¶ 25.

Instead, Debtors will rely exclusively on testimony of a purported expert, Mr. Greg Eidson, who submitted an Expert Report of Greg Eidson ("Eidson Report") (McGuire Declaration Ex. A) and an Expert Rebuttal Report of Greg Eidson (McGuire Declaration Ex. C). However, the Eidson Report does not answer the question at hand, and it is neither credible nor reliable. The Debtors cannot, therefore, rebut the presumption that the contract rate of rent applies.

#### *i. Mr. Eidson is Not a Ground Rent Expert and Does Not Offer Comparisons to Other Properties Subject to Ground Leases*

Mr. Eidson purports to have 40 years of real property valuation experience. *See* Ex. A (Eidson Report) at ¶ 12. Yet, Mr. Eidson admits that he does not recall ever advising someone who is considering entering into a ground lease. *See* Eidson Tr. (McGuire Declaration Ex. D) at 15:21-17:3. And while Mr. Eidson may have experience valuing properties that are subject to ground leases generally, his report and deposition testimony confirm that he lacks any experience

[4] The Rent Motion makes only a passing reference to the state of the Property. *See* Rent Motion at ¶ 27 ("Currently, the Property is in a state of incomplete development[.]"). Debtors have provided no update as to when they expect the stop work orders to be lifted or when the Cure Agreement will be executed even though they represented to the Court that both events would happen in June 2026. *See* April 21, 2026 Hr'g Tr. at 20:12-21:1. The Eidson Report makes no references to the state of the Property.

determining ground rent. *See id*. at 12:16-17:3; Ex. A (Eidson Report) at Appendix 1. Furthermore, Mr. Eidson's report and testimony do not rely upon any comparisons between the ground rent at issue here with the ground rent paid by tenants under other ground leases (in New York City or elsewhere).

Accordingly, Mr. Eidson's opinion is of no consequence to the Court's determination of the fair market value of the ground rent. *See In re JLM Couture, Inc.*, 661 B.R. at 868 (finding that witness lacked adequate knowledge to form a judgment on the fair market rental value of a lease because he "did not demonstrate an adequate assessment of the market or sufficient knowledge of the purported comparable properties in the vicinity.").

***ii. The Eidson Report Does Not Focus on the Correct Inquiry***

The Eidson Report does not answer (or attempt to answer) the question that is before the Court on this Rent Motion. The correct inquiry is what the appropriate ground rent should be during the bankruptcy proceedings, as Debtors themselves acknowledge. *See* Rent Motion at 1 ("The Debtors are seeking an order from this Court determining the reasonable amount of prospective post-petition monthly rent due to the Ground Lessor during the pendency of these chapter 11 cases…"); *see also In re JLM Couture, Inc.*, 661 B.R. at 867; *In re DVI, Inc.*, 308 B.R. 703, 707 (Bankr. D. Del. 2004).

Ignoring that question, the Eidson Report states that Mr. Eidson was "asked by Counsel to determine a financeable stabilized Ground Rent for the completed project." *See* Ex. A (Eidson Report) at ¶ 3. The Eidson Report goes on to engage in an analysis that is backwards, and which inverts the priority scheme of the capital stack. In particular, the Eidson Report first determines the amount of debt service that would be required to service the original amount of Parkview's loan, and then determines what the Ground Rent would be from the remaining cash flow. In other

words, Mr. Eidson treats Parkview's loan as senior to the landlord's ground rent, with the ground rent being whatever is left over after paying Parkview's loan.

Mr. Eidson's analysis is nonsensical, as it ignores the fundamental concept that a landlord's position is senior to that of a leasehold lender.[5] Under the analysis posited by Mr. Eidson, the amount of ground rent would go up or down depending upon the amount of money the tenant chooses to borrow. Indeed, Mr. Eidson acknowledged that ground rent would increase if the leasehold loan were decreased. *See* Ex. D (Eidson Tr.) at 35:19-36:19. This analysis has no basis whatsoever in market practice, as discussed below and in the Expert Rebuttal Report of Daniel Mizukovski. *See* McGuire Declaration Ex. B (the "Mizukovski Report").

Mr. Eidson's prioritization of Parkview's loan over all other considerations is perhaps not surprising given Parkview's control of the Debtors. Nonetheless, the Eidson Report's bias in favor of Parkview necessarily produced a result that is not helpful to determining the issue at hand. Rather than opine on the market rate of rent, Mr. Eidson's report only indicates what the Parkview-controlled Debtors would like the rent to be after servicing Parkview's leasehold loan in full.

In reality, market actors such as landlords and tenants simply do not agree to reduce ground rent when tenants borrow more against the leasehold. Rather, market ground rent is determined by reference to what investors in leased fee interests are seeking to achieve in terms of current yield on their acquisition cost or property contribution. Ground rent is not a function of the leftovers following satisfaction of a leasehold lender's debt service coverage requirement.

In his deposition, Mr. Eidson admitted that the rental amount in his report would not be realistic. Mr. Eidson acknowledged that a landlord requires a return on its investment (a yield),

---

[5] In his deposition, Mr. Eidson contradicted the premise of his report by stating that leasehold lenders understand and expect that ground rent must be paid *before* debt service. *See* Ex. D (Eidson Tr.) at 30:22-31:5. The landlord's position is senior to the leasehold lender.

and that if the yield offered by a prospective tenant is too low, the transaction would not occur. *See* Ex. D (Eidson Tr.) at 23:23-24:5; 28:9-29:2; *see also* Ex. A (Eidson Report) at p. 3.

Critically, Mr. Eidson stated that the annual rent he submits is the market rate – $2,437,555 – would not be acceptable to a landlord because the yield on the landlord's investment would be too low. *See* Ex. D (Eidson Tr.) at 56:16-58:3. Therefore, Mr. Eidson's proposed rent is *not* market and no such transaction would occur.

This admission calls attention to the only case cited in Debtors' Rent Motion in which a court valued a lessor's administrative claim for rent at less than the contract rate. In *Matter of Cont'l Airlines, Inc.*, the bankruptcy court analyzed recent, comparable deals with hard metrics to determine "what any other customer would have to pay under the same circumstances." 146 B.R. 520, 529–30 (Bankr. D. Del. 1992) (internal quotations omitted). The *Continental* Court specifically rejected a lower amount proposed where "no evidence was presented of a lessor who would accept such a rent." *Id*. at 529. The *Continental* valuation was rejected because no lessor would accept such a rent payment if it involved rent that was 58% of the contract rate. *Id*.

The Debtors here propose a rental rate that is only 28% of the contract rate and have not even attempted to provide evidence that any lessor would accept such a rate. And Mr. Eidson agrees that no landlord would agree to enter into a deal in which it would be so grossly underpaid. *See* Ex. D (Eidson Tr.) at 57:21-58:3.

Thus, the flawed methodology and impractical result set forth in the Eidson Report provide no support to upset the established contract rate of rent in the Ground Lease. *See In re JLM Couture, Inc.*, 661 B.R. at 868 (finding that debtor-tenant did not rebut the contract rate because debtor-tenant's witness "did not demonstrate an adequate assessment of the market….").

***iii. The Contract Rate is the Product of Extensive Negotiations Between Sophisticated Parties: Landlord, Debtors, and Parkview***

Debtors are unable to present other evidence to rebut the presumption that the contract rate is the reasonable, fair market value of the ground rent. And Debtors point to no caselaw – and Landlord is unaware of any – in which a court reduced the contract rate without some presentation of evidence rebutting the presumption.

Landlord has consistently maintained that, in 2022, Debtors and Landlord agreed to the Base Rent amount following extensive negotiations and pursuant to market forces. Later, in 2024, Debtors and Landlord negotiated and agreed upon the Base Rent under the Fourth Amendment—and Parkview approved the Base Rent and executed the Fourth Amendment. *See* 356W58 Ground Lessor LLC's Memorandum of Law in Support of its Motion to Dismiss the Complaint [Adv. Pro. D.I. 16] at 9–11; *see also* Declaration of Matthew B. McGuire in Support of 356W58 Ground Lessor LLC's Motion to Dismiss the Complaint, Ex. Q [Adv. Pro. D.I. 17-17] (the "Fourth Amendment"). The fact that the purchase price paid by the Landlord acted as a basis for the Base Rent negotiations, and that Landlord desired an attractive rent amount commensurate with its risks, do not suggest that the Base Rent is not the byproduct of market conditions. In fact, it demonstrates that market actors adhered to conventions and obtained a deal agreeable to Parkview, Debtors, and Landlord. *See United States v. Cartwright*, 411 U.S. 546, 551 (1973) ("The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.") (quoting Treas. Reg. § 20.2031—1(b)).[6]

[6] In his own words, Mr. Eidson testified in his deposition that "the market rate is – it's a rate agreed upon by two parties to a transaction." *See* Ex. D (Eidson Tr.) at 38:22-39:4.

Thus, the Debtors are unable to rebut the presumption that the contract rate of rent should apply, and Landlord is entitled to an administrative expense claim for the full amount of Base Rent under the Lease.[7]

## II. Landlord's Expert Confirms that the Contract Rate is Fair Market Value

Even though Debtors have not met their burden to overcome the contract rate, Landlord has offered an expert with specialized ground leasing knowledge to help the Court understand the Eidson Report and appreciate how market actors set ground lease rents. *See* Ex. B (Mizukovski Report).

Daniel Mizukovski is a senior partner at real estate investment banking, advisory and principal investment firm Wells Hill Partners ("WHP") with over twenty-eight (28) years of New York City ground leasing experience. Mr. Mizukovski has been an integral member of WHP's ground lease practice, which has involved over $10 billion worth of real estate in Mr. Mizukovski's twenty-eight year tenure. Mr. Mizukovski's experience includes the creation of new ground leases, the restructuring of existing ground leases, the financing of leased fee and leasehold interests, and the sale of leased fee and leasehold interests.

Mr. Mizukovski confirms that market convention determines ground rent in part by the yield on investment required by owners of leased fee interests.[8] Leased fee investors employ the 30-Year Treasury rate as their risk-free benchmark for long-duration investments such as 99-year

---

[7] The Eidson Report and Debtors' counsel have insinuated that in the event the prospective rent due to Landlord is reduced (it should not be) the Debtors will have "prepaid" future ground rent in this bankruptcy. *See* June 17, 2026 Hr'g Tr. at 13:5–12; Ex. A (Eidson Report) at ¶ 9. That is not the case. Debtors are not entitled to any credit for or setoff regarding rent already paid if they prevail on the Rent Motion.

[8] The Court has already recognized that landlords enter into ground leases to maximize their return on investment. *See* April 21, 2026 Hr'g Tr. at 144:9-11 ("Because leases are financing tools that are utilized by all parties to maximize their return on a project such as this.").

ground leases and seek a premium on that risk-free rate. Development projects (such as the Construction Project at issue here) are inherently riskier investments compared to stabilized, cash generating properties, and thus command higher premiums over the risk-free rate. While an owner of a leased fee interest of a stabilized property may accept a spread of 15 basis points over the risk-free rate, an owner of a leased fee interest of a development project will expect a spread of up to 150 basis points over the risk-free rate. Mr. Mizukovski's application of a 105 basis point spread over the risk-free rate is thus a conservative interpretation of market expectations. The 105 basis point spread over the 30-Year Treasury rate is approximately 6.25%.

Applying that spread to Landlord's investment, Mr. Mizukovski confirms that the contract rate of ground rent is well within market convention because 6.25% of $178,000,000 is $11,125,000 in annual ground rent – far more than the $8,750,000 annual ground rent that the parties negotiated and agreed.

Only after ground rent is established under the methodology described by Mr. Mizukovski do market actors consider the level and cost of leasehold financing proceeds that a tenant can obtain.

Mr. Mizukovski's authoritative analysis confirms that the contract rate is on the *low* end of market value of rent.

**CONCLUSION**

For the foregoing reasons, Ground Lessor respectfully requests that the Court enter an order (i) granting Ground Lessor an administrative expense claim in the amounts permitted under the Ground Lease, including the currently outstanding Base Rent of $729,166.67 per month; (ii) ordering the payment of such amounts; (iii) ordering payment of monthly Base Rent in accordance with the Ground Lease on an ongoing basis, subject to further Order of this Court; and (iv) granting such other and further relief as is just and proper.

Dated: September 4, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Katherine S. Dute*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Katherine S. Dute (No. 6788)
Soumya P. Venkateswaran (No. 7278)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
mcguire@lrclaw.com
dute@lrclaw.com
venkateswaran@lrclaw.com

– and –

**ADLER & STACHENFELD LLP**
Kirk L. Brett (admitted *pro hac vice*)
Patrick O'Connor (admitted *pro hac vice*)
555 Madison Avenue, 6th floor
New York, New York 10022
Telephone: (212) 883-1700
Facsimile: (212) 883-8883
Email: kbrett@adstach.com
poconnor@adstach.com

*Counsel to 356W58 Ground Lessor LLC*