# EXHIBIT A

GlassRatner
250 Park Avenue
New York, NY 10171
glassratner.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>HUDSON 1701/1706, LLC, *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 25-11853 (KBO) |

**Expert Report of Greg Eidson**
**July 27, 2026**

GlassRatner

# CONTENTS

1.0 Introduction and Summary Conclusion ........ 1

1.1 Introduction ........ 1

1.2 Summary Opinion ........ 2

2.0 Professional Qualifications and Background of Greg Eidson ........ 4

3.0 Scope of Work ........ 5

4.0 Background ........ 5

5.0 The Financeable Ground Lease ........ 7

5.1 Analysis of Ground Lease and Fourth Amendment ........ 10

6.0 Basis for the Valuation Cash Flow ........ 10

7.0 The Feasibility of the Ground Lease ........ 11

7.1 Ground Rent Effects on Loan Terms ........ 11

Appendix 1 ........ 14

Greg Eidson CV ........ 14

Appendix 2 ........ 19

Documents Considered ........ 19

Appendix 3 ........ 20

# 1.0 Introduction and Summary Conclusion

## 1.1 Introduction

1. GlassRatner Advisory & Capital Group, LLC ("**GlassRatner**") was retained by Boies Schiller Flexner LLP ("**Counsel**"), on behalf of Debtors Hudson 1701/1706, LLC and Hudson 1702, LLC (together, "**Debtors**") in connection with Debtors' pending chapter 11 bankruptcy cases (collectively, the "**Bankruptcy Cases**") commenced on October 22, 2025 (the "**Petition Date**").

2. On May 4, 2022, the Debtors and 356W58 Ground Lessor LLC (the "**Ground Lessor**") entered into an agreement described as a ground lease ("**Ground Lease**") in connection with the Debtors' redevelopment project for the former Hudson Hotel located at 358-366 West 58th Street, New York, New York (the "**Hudson Project**").[1] The Ground Lease was further amended on March 29, 2024 (the "**Fourth Amendment**") wherein the Ground Lease annual rent payments (the "**Ground Rent**") were substantially increased.

3. I have been asked by Counsel to determine a financeable stabilized Ground Rent for the completed project. Based on the current construction status of the project, the stabilized Ground Rent is a hypothetical condition, as it assumes completion of construction and stabilization of the property cash flow. This condition is necessary to develop the analysis that distinguishes the "market" rent from the rent the Debtors have paid.

4. To perform this engagement, I relied on other GlassRatner professionals with extensive experience in financial analysis, forensic accounting, property valuation, solvency analysis and corporate finance, all of whom worked under my direct supervision and control. I have relied on the work of the GlassRatner team to support my review of information related to this matter, and any references to "our" and "we" recognize this reliance.

5. Any minor differences in the amounts calculated or referenced in supporting documentation or schedules to this report are due to rounding.

[1] I understand that the Debtors dispute that the Ground Lease is a true lease. For purposes of analyzing market rate "rent", I will assume solely for such purposes that the Ground Lease is indeed a ground lease.

6. The hourly rates charged by GlassRatner for professional services provided in this matter range from $225 to $795. My time is billed at $695 per hour. I do not have a financial interest in this dispute, and our compensation is not dependent on the outcome of this matter.

7. I reserve the right to revise and supplement my analyses, opinions and report to the extent additional relevant information becomes available. I also reserve the right to produce a rebuttal or response report related to any analyses or reports submitted on behalf of the Defendants.

## 1.2 Summary Opinion

8. Based on the analyses contained herein, my opinions are that:

- **The current Ground Rent is above market rent**. The current Ground Rent is higher than the hypothetical stable cash flow can support as market rent.
  - The Ground Rent required under the Ground Lease prior to entry into the Fourth Amendment was $6,400,000 annually. Pursuant to the Fourth Amendment, the Ground Rent was increased to $8,750,000 annually ($729,166.97 per month).

  - The current rent required by the Fourth Amendment to the Ground Lease is not market rent for the Project, nor is the rent required by the Ground Lease prior to the Fourth Amendment market rent for the Project.
    1. **Current Annual Ground Rent = $8,750,000**
    2. **Market Annual Rent = $2,437,555**

- The property does not have cash flow that covers expenses above an acceptable market debt coverage ratio ("**DCR**")[2,3]. Published sources may use the phrase Debt Service Coverage Ratio ("**DSCR**"). DCR and DSCR are synonymous. I will use DSCR in this report.

---

[2] Apers, Ground Lease Underwriting: Leasehold vs. Fee Simple Valuation, April 2026, Francis Huang.

[3] Fannie Mae minimum DSCR approximately 1.25. https://multifamily.fanniemae.com/financing-options/conventional-properties/near-stabilization-financing/near-stabilization-execution-term-sheet

- In practice, lenders serve an important market discipline function in ground lease transactions. Because lenders are independent providers of capital whose repayment depends upon the economic viability of the project, their underwriting standards establish a practical test of whether the lease economics are balanced. A ground rent that is too low may fail to provide the landowner an adequate return, while a ground rent that is too high may reduce project cash flow to a level that prevents the achievement of required debt coverage ratios and other underwriting metrics. The range of rents that support lender-required coverage ratios therefore represents the market zone in which the interests of the fee owner, leasehold owner, and lender are brought into alignment and the project remains economically financeable.

- The Ground Rent required under the original Ground Lease and the Fourth Amendment are both so aggressive as to make the Project financially infeasible with a traditional lender.

- The Ground Rent required under the original Ground Lease and the Fourth Amendment put a financial burden on the Project that it cannot overcome through cash flow appreciation.

9. **Comparison of Contract Rent vs. Calculated Rent**. Table 1 reflects the excess rent (rent above market) charged on an annual basis and for the first seven months of the Debtors' Bankruptcy Cases, which assumes the property is operating at a stabilized rent level. For the months of November through May, my understanding is that the Debtors paid rent at the full Fourth Amendment rate of $8,750,000 annually, or $5,104,167 paid in total. Accordingly, the total above-market rent paid during the first seven months of the bankruptcy case was **$3,682,260**. This amount equates to **18.1 months of excess rent paid post-petition**.

GlassRatner

**Table 1**

| Excess Ground Rent- Postpetition | | | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Contract Rent[1] | $ 8,750,000 | Monthly Rent | $ 729,167 | $ 729,167 | $ 729,167 | $ 729,167 | $ 729,167 | $ 729,167 | $ 729,167 |
| Annual Market Rent[2] | $ 2,437,555 | Monthly Rent | $ 203,130 | $ 203,130 | $ 203,130 | $ 203,130 | $ 203,130 | $ 203,130 | $ 203,130 |
| | | Monthly Overage Rent Paid | $ 526,037 | $ 526,037 | $ 526,037 | $ 526,037 | $ 526,037 | $ 526,037 | $ 526,037 |
| | | Total Overage Rent | $3,682,260 | | | | | | |

1. The annual contract rent is based on the Fourth Amendment adjustment to an annual rate of $8,750,000
2. The annual market rent on a hypothetical assumption that the property is operating at a stable occupancy level.

## 2.0 Professional Qualifications and Background of Greg Eidson

10. This report was prepared by Greg Eidson, a Managing Director in the Atlanta office of GlassRatner. My work address is 3445 Peachtree Road NE, Suite 1225, Atlanta, Georgia.

11. I hold a BS in Finance from Auburn University (1986), an MAI Designation from the Appraisal Institute (1995), a CCIM Designation from the CCIM Institute (1997), and a real estate sales license in Georgia and a real estate associate broker's license in Alabama.

12. I have 40 years of experience in the real property valuation, brokerage, and consulting industry. My education includes a Bachelor of Finance from Auburn University, the MAI Designation from the Appraisal Institute and the CCIM Designation from the CCIM Institute. I have particular appraisal experience in multi-family, student-housing, free standing and multi-tenant retail, extended-stay hotels, limited service and full-service hotels, office buildings, industrial properties, special purpose properties and self-storage facilities, residential subdivisions, conservation easements, mitigation banks, recreational and timber land, right-of-way for public and private utilities and state and local transportation clients. Clients range from individual and regional investors, developers, national and regional lenders, pension fund advisors, insurance companies, government agencies, CPAs, attorneys and Fortune 500 chief financial officers.

13. My valuation opinions have been used in the context of mortgage lending, right-of-way acquisitions, bankruptcy court, buy/sell decisions, purchase price allocation, loan monitoring, forced disposition, portfolio performance monitoring and litigation support. My C.V. is attached hereto as **Appendix 1**, further documenting my experience and expert witness testimony.

14. I have no previous relationship with any of the parties to this matter and am independent of these parties.

## 3.0 Scope of Work

15. The opinions and conclusions set out herein are based on my review of documents, information and data produced in this matter, as well as independent research. The documents that I rely upon in this Report are listed in **Appendix 2**. For ease of reference, in footnotes to this Report, I have cited the documents (or other information) on which I have relied.

16. My analysis includes the preparation of various cash flow calculations and conclusions. All of the analyses and methodologies applied herein are fully consistent with generally accepted bodies of knowledge related to real estate valuation.

17. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

## 4.0 Background[4]

18. On or around February 3, 2022, CSC Hudson LLC ("**CSC**") entered into a purchase and sale agreement to purchase certain condominium units in the Hudson Project, specifically:

    a) <u>Unit 1701</u>: 203,585 square feet of the Hudson Project, including the mezzanine and floors 2 through 9 and 25 ("**Unit 1701**");
    b) <u>Unit 1702</u>: 216,937 square feet of the Hudson Project, including floors 11 through 22 and portions of floors 23, 24 and 26 ("**Unit 1702**"); and
    c) <u>Unit 1706</u>: 17,981 square feet of the Hudson Project consisting of the 10th floor ("**Unit 1706**"). The purchase and sale agreement included a lease agreement for Unit 1706, with an option to purchase.

[4] The events discussed in this section are not intended to represent an exhaustive history of all relevant facts and events surrounding this dispute. We provide this information to aid in the understanding of this Report, and we may cite to the operative pleadings in this case for that purpose. In doing so, we do not express any legal opinion on the allegations or the facts alleged in these pleadings.

19. CSC subsequently assigned the purchase and sale agreement for the Hudson Project to the Ground Lessor. On May 4, 2022, the Ground Lessor acquired Unit 1701 and Unit 1702, along with a purchase option for Unit 1706. On or around January 3, 2023, the Ground Lessor acquired Unit 1706.

***Ground Lease***

20. On the same date, May 4, 2022, the Debtors entered into the Ground Lease with the Ground Lessor. The Ground Lease, upon issuance, had the following terms:

a) Ground Rent was $6,000,000 annually (payable in $500,000 monthly installments). The annual Ground Rent was subsequently increased to $6,400,000 when the Ground Lessor purchased Unit 1706 in January 2023;
b) Ground Rent increased 10% in years six and eleven and then at least 2% annually for the next 88 years.[5]

21. As part of the redevelopment plan for the Hudson Project, on or around May 4, 2022, Plaintiffs received an aggregate $207 million in development and construction financing ("**Parkview Loan**") from Parkview Financial REIT LP ("**Parkview**"). The Loan matured on November 1, 2024 (the "**Parkview Maturity Date**").

a) The Parkview Loan amount is used in this analysis to calculate the annual debt service. The annual debt service is based on market terms as of 2024.[6] Additionally, the pro forma presented by the appraisal firm BBG[7] is used to develop the estimate of stabilized income and expenses of the completed development. These two documents (Parkview Loan and BBG appraisal) are instrumental in the calculation of the market ground rent. The ground rent is an expense that, when coupled with all operating expenses of the Project and deducted from the effective gross income, equals the operating cash flow (net operating income) that is available for debt service. As will be presented herein, lenders prefer a minimum DSCR of 1.25. The calculation of the DSCR is $DSCR = Operating\ Cash\ Flow/Debt\ Service$. This means the lender wants as a minimum a cash flow that is 25% greater than the debt service.

[5] Ground Lease dated May 4, 2022.

[6] 2024 Mortgage Survey Report, April 18, 2024, by New York City Rent Guidelines Board

[7] BBG Appraisal Report, March 25, 2022.

22. On **March 29, 2024**, the Debtors and Ground Lessor entered into the Fourth Amendment to the Ground Lease. **Ground Rent increased to $8,750,000 annually** ($729,166.97 per month). The Fourth Amendment also allowed for more frequent adjustments to the Ground Rent to account for inflation and ensured that increases were no less than 2% per year, regardless of inflation.[8]

## 5.0 The Financeable Ground Lease

23. In practice, lenders serve an important market discipline function in ground lease transactions. Because lenders are independent providers of capital whose repayment depends upon the economic viability of the project, their underwriting standards establish a practical test of whether the lease economics are balanced. A ground rent that is too low may fail to provide the landowner an adequate return, while a ground rent that is too high may reduce project cash flow to a level that prevents the achievement of required debt coverage ratios and other underwriting metrics. The range of rents that support lender-required coverage ratios therefore represents the market zone in which the interests of the fee owner, leasehold owner, and lender are brought into alignment, and the project remains economically financeable.

24. A ground lease does not become financeable merely because it grants a tenant the right to occupy and develop land; rather, it must allocate rights and risks in a manner that provides lenders with a predictable, secure, and enforceable collateral interest in the leasehold estate. From the perspective of institutional lenders and investors, the lease must be structured so that the value of the improvements and the leasehold interest are protected against forfeiture, unexpected termination, and other events that could impair repayment of the debt secured by the project. Consequently, the financeability of a ground lease is determined by a combination of provisions relating to lease term, renewal rights, lender protections, cure rights, transferability, condemnation and casualty proceeds, estoppel requirements, and other protections that preserve the continuity and value of the leasehold estate throughout the financing term. The following discussion examines the principal lease provisions that are generally considered necessary to support mortgage financing of a leasehold development project. My goal in this report is to explain what the

[8] Fourth Amendment to Ground Lease dated March 29, 2024.

Ground Rent should be in order for the project to be financed and feasible for all parties involved.

25. In my opinion, the financeability of a ground lease depends upon whether the lease creates a commercially reasonable balance among the interests of the fee owner, the leasehold owner, and the leasehold mortgage lender. Each party has legitimate but different objectives: the ground owner seeks protection of its land and rental stream, the leasehold owner seeks the ability to develop, operate, and realize the economic value of the improvements, and the lender seeks a secure and enforceable collateral interest that will support repayment of its loan. A ground lease that disproportionately favors one party often undermines the willingness of one of the other parties to participate in the transaction. Consequently, market-standard financeable ground leases generally contain provisions that allocate risks and rights in a manner that preserves the economic expectations of all three stakeholders while providing sufficient certainty and security to support long-term investment and mortgage financing.

26. The common measures used by the market are:

a) **DSCR**. The DSCR is calculated as the quotient resulting from dividing net operating income (after the Ground Lease payment) ("**NOI**") by the debt service on traditional mortgage financing. Fannie Mae uses different ratios for different Tier levels (a Tier is a risk-based category).[9] The baseline DSCR is 1.25.

i) **Tier 1**: Used for specific lower-risk or specialized affordable housing executions with tailored credit criteria.

ii) **Tier 2**: Moderate-high risk. It allows higher loan-to-value ("**LTV**") ratios (up to 80% for purchases) and a lower DSCR (around 1.25x)[10].

iii) **Tier 3**: Moderate-low risk. It features stricter LTV limits (around 56%–65%) and a moderate DSCR (around 1.35x).

[9] Described in Commercial Loan Direct. https://commercialloandirect.com/fannie-mae-multifamily-mortgages

[10] The LTV ratio on the Parkview Loan was 72.5%.

iv) **Tier 4**: Lowest risk level. It requires a high DSCR (often 1.55x or higher) and a low LTV (55% or less).

b) Multi-Family Market Debt

i) For 2024 New York City multifamily properties, the NYC Rent Guidelines Board's Mortgage Survey reported that the average interest rate for new multifamily mortgages was 7.00 [11]

ii) Average LTV ratio of 71.8%[12]

iii) The following is the calculation of the annual debt obligation for the Subject. The importance of this calculation is explained in paragraph 21(a).

**Table 2**

| **Annual Mortgage Debt Payment Calculations[1]** | | | | |
|---|---|---|---|---|
| | Debt | | | |
| | Based on Const. Loan | | $ | 207,000,000 |
| | | | $ | - |
| | | | $ | - |
| | | | $ | 207,000,000 |
| Debt | | 71.80% | $ | 148,626,000 |
| Equity | | 28.20% | $ | 58,374,000 |
| Mortgage Rate | | 7.00% | | |
| Amortization (yrs) | | 30 | | |
| | **Annual Payment** | | | **$11,977,235** |

1. 2024 Mortgage Survey Report, April 18, 2024
by the New York Rent Guidelines Board
Note: The period of this loan assumes completion of the project in 2024
and permanent financing from 2024 forward.

[11] 2024 Mortgage Survey Report, April 18, 2024, by New York City Rent Guidelines Board

[12] 2024 Mortgage Survey Report, April 18, 2024, by New York City Rent Guidelines Board

## 5.1 Analysis of Ground Lease and Fourth Amendment

27. Under the May 2022 Ground Lease, upon acquiring all three condominium units, the Ground Rent calculation included (1) $6,400,000 annual Ground Rent starting in year 1; (2) 10% increase of Ground Rent in years 6 and 11; (3) 2% annual increase in years 12 to 99; and (4) CPI adjustments every ten years beginning in year 21.[13]

28. On March 29, 2024, the Debtors and Ground Lessor agreed to the **Fourth Amendment** and a change in the Ground Rent calculation, including (1) an increase to $8,750,000 of annual base rent beginning in 12-months after the Fourth Amendment Date (April 2025); (2) a 10% increase in base rent in each of years 6 and 11; (3) a 2% annual increase in each of years 12 to 99; and (4) CPI adjustments every five years beginning in year 11.[14]

## 6.0 Basis for the Valuation Cash Flow

29. I use a pro-forma cash flow analysis of market rent for the Hudson Project for two related purposes. First, it provides a forward-looking measure of the property's anticipated income and expenses once the redevelopment is completed and stabilized. Second, it allows me to test the level of ground rent that the project can support while still satisfying the underwriting standards lenders typically apply to similar projects, including the DSCR. This analysis is necessary because ground rent is a fixed obligation that reduces the cash flow available for debt service; therefore, the pro-forma cash flow provides the basis for determining whether the ground lease payments are financeable and economically sustainable.

30. The starting point for this cash flow analysis is the BBG Real Estate Services appraisal dated March 25, 2022, which provides the contemporaneous valuation framework for the Hudson Project as of the project's inception. I relied specifically on the Income Approach section of that appraisal, beginning on page 65, and used the pro forma presented on page 78 (the "**BBG Pro Forma**") as the base for my projected cash flow.

31. As a starting point, I have used the BBG Pro Forma to project a cash flow. The BBG Pro Forma did not expand into a multi-year cash flow. I have used it as the base, or starting

[13] Ground Lease dated May 4, 2022, Exhibit H.

[14] Fourth Amendment to Ground Lease dated March 29, 2024, Exhibit B.

point, and have increased the income and expense projections at the same rate of growth throughout my projection.

## 7.0 The Feasibility of the Ground Lease

32. For the ground rent to be at a feasible level (dollar amount) it must be financeable within the context of the improvements developed on it. For a hotel-to-multifamily conversion in Manhattan, the structure and magnitude of the ground lease payment are critical to the project's financeability. Ground rent must be set at a level—or tied to a percentage of stabilized cash flow—that preserves sufficient debt service coverage, operating flexibility, and investor returns throughout the life of the loan. Because lenders underwrite the ground rent as a fixed obligation that ranks ahead of equity distributions, an excessive ground lease burden can materially reduce net operating income available for debt service, constrain loan proceeds, and increase refinancing risk. Establishing ground rent that remains reasonable relative to projected cash flow helps ensure the project maintains lender-required coverage ratios, supports long-term asset value, and enhances the likelihood of attracting both construction and permanent financing. In practice, aligning the ground rent with a sustainable share of stabilized cash flow creates a capital structure that is durable through market cycles and provides lenders with confidence that the converted multifamily asset can consistently meet all of its financial obligations

## 7.1 Ground Rent Effects on Loan Terms

33. For a hotel-to-multifamily conversion in Manhattan, lenders will closely analyze the relationship between stabilized net operating income and the ground lease payment. If the ground rent consumes too large a share of project cash flow, lenders may conclude that the asset's ability to withstand vacancies, operating cost increases, or market downturns is impaired. Conversely, a ground lease structured at a sustainable dollar amount or as a modest percentage of cash flow can support stronger debt service coverage ratios, higher proceeds, more favorable pricing, and greater refinancing flexibility. As a result, maintaining ground rent at a level that leaves ample cash flow for debt service is often a key factor in achieving attractive financing terms and maximizing project value.

34. In the market, ground rent is structured at a level that allows the project to maintain a healthy DSCR, typically in the range of 1.25x to 1.55x[15] or greater on a stabilized basis.

35. Based on the analyses contained herein, my opinions are that:

- **The current Ground Rent is above market rent**. The current Ground Rent is higher than the hypothetical stable cash flow can support as market rent.
    - The property does not have a cash flow that covers expenses above an acceptable market DSCR[16].[17]
- The Ground Lease terms are so aggressive as to make the project financially infeasible with a traditional lender.
- The Ground Lease puts a financial burden on the property that it cannot overcome through cash flow appreciation.

36. Table 3 reflects the excess rent (rent above market) charge, as if the property were operating at a stable level. Based on the foregoing, from November 2025 through May 2026 (the first seven months of the Debtors' bankruptcy case), the Debtors paid **$3,682,260** in excess of market rent. **This excess rent is equivalent to the payment of rent for an additional 18.1 months at market rent ($3,682,260/$203,130)**.

## Table 3

| Excess Ground Rent- Postpetition | | | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Contract Rent[1] | $ 8,750,000 | Monthly Rent | $ 729,167 | $ 729,167 | $ 729,167 | $ 729,167 | $ 729,167 | $ 729,167 | $ 729,167 |
| Annual Market Rent[2] | $ 2,437,555 | Monthly Rent | $ 203,130 | $ 203,130 | $ 203,130 | $ 203,130 | $ 203,130 | $ 203,130 | $ 203,130 |
| | | Monthly Overage Rent Paid | $ 526,037 | $ 526,037 | $ 526,037 | $ 526,037 | $ 526,037 | $ 526,037 | $ 526,037 |
| | | Total Overage Rent | $3,682,260 | | | | | | |

1. The annual contract rent is based on the Fourth Amendment adjustment to an annual rate of $8,750,000
2. The annual market rent on a hypothetical assumption that the property is operating at a stable occupancy level.

[15] Fannie Mae Underwriting Guidelines

[16] Apers, Ground Lease Underwriting: Leasehold vs. Fee Simple Valuation, April 2026, Francis Huang.

[17] Fannie Mae minimum DSCR approximately 1.25. https://multifamily.fanniemae.com/financing-options/conventional-properties/near-stabilization-financing/near-stabilization-execution-term-sheet

## 8.0 Summary Opinions

37. Based on the analyses contained herein, my opinions are that:

- The Ground Rent required under the Ground Lease prior to entry into the Fourth Amendment was $6,400,000 annually. Pursuant to the Fourth Amendment, the Ground Rent was increased to $8,750,000 annually ($729,166.97 per month).

- The current rent required by the Fourth Amendment to the Ground Lease is not market rent for the Project, nor is the rent required by the Ground Lease prior to the Fourth Amendment market rent for the Project.
  1. Current Ground Rent = $8,750,000
  2. Market Rent = $2,437,555

38. Accordingly, from November 2025 through May 2026 (the first seven months of the Debtors' bankruptcy case), the Debtors paid **$3,682,260** in excess of market rent.

Respectfully submitted,

Greg Eidson, MAI, CCIM
Managing Director
GlassRatner Advisory & Capital Group, LLC

GlassRatner

## Appendix 1
## Greg Eidson CV

# GREG EIDSON MAI,CCIM

geidson@glassratner.com
(470) 346-6825

In the late 1990s prior to the formation of his own firm, Greg worked for The Highland Group Hotel Investment Advisors. This boutique style consulting firm is a specialist in the market analysis of hospitality properties. Greg prepared valuation reports for full-service, limited-service and extended-stay properties. These reports were used for the purpose of development decisions, purchase decisions, feasibility and financing. Geographically, these hotel projects were typically located in the Midwest, East Coast and the Southern states. My tenure with The Highland Group was an excellent education in the analysis of hotel feasibility. The most valuable takeaway from this experience was gaining a greater depth of understanding in the development of demand studies.

In the late 1980s to the 1990s, Greg worked in the Real Estate Advisory Group of American Appraisal Associates. Greg started with American Appraisal Associates as a junior level appraiser and was the Manager of the Atlanta office of the Real Estate Advisory Group when in departed the company in the mid-1990s. During his tenure with the company Greg prepared and managed appraisal assignments for pension funds, insurance companies, portfolio managers, lenders, attorneys and Fortune 500 companies. These valuation assignments were used for purchase price allocation, investment portfolio analysis, mortgage loans, property tax appeals, and cost segregation studies. Greg was recognized by the company for his ability to address client needs in a timely and professional manner. The experience with American Appraisal was invaluable to my education in managing people and projects and learning to balance the expectations of our clients with the human and technological resources. Geographically, Greg travelled throughout the United States and Caribbean and personally handled residential subdivision developments in Southern California; mixed-use high rise buildings in downtown San Francisco; high rise office buildings in Dallas, Denver, Chicago, and Boston; regional malls in Texas; movie theaters in New York; shipping facilities in Houston; industrial manufacturing and distribution buildings in states from California to Connecticut to Georgia; multi-family apartment developments in North Carolina to Florida and hotels in California and the Caribbean.

Greg has completed two of the Appraisal Institute's Professional Development Programs and appears in the Institute's Registry for:

- Litigation Appraising: Specialized Topics and Applications
- Valuation of Conservation Easements

Greg maintains a General Certified Real Property Appraisal License in Alabama, Georgia and Florida. He can obtain temporary licensing permits in other states on a case by case basis. Greg is also a Realtor with a broker's license in Alabama and a salesperson's license in Georgia.

Greg's formal education consists of a Bachelor of Science in Finance from Auburn University, the MAI Designation from the Appraisal Institute and the CCIM (Certified Commercial Investment Member) Designation from the CCIM Institute. The MAI Designation is an appraisal designation presented to those that complete the required experience, extensive coursework in specific valuation related material and pass a comprehensive exam. The CCIM Designation is awarded to those who through coursework, experience and a comprehensive exam are recognized expert in the commercial and investment real estate industry. The designation process ensures that CCIMs are proficient not only in theory, but also in practice.

glassratner.com GlassRatner

GlassRatner

# GREG EIDSON

MANAGING DIRECTOR

MAI, CCIM

geidson@glassratner.com
(470) 346-6825



**Specialties:**
Borrower & Lender Advisory
Cash Flow Projections
Construction Litigation
Due Diligence
Expert Witness
Feasibility Studies
Litigation Support
Market Analysis
Purchase Price Allocation
Real Estate Appraisal
Real Estate Brokerage
Valuation

**Industries:**
Real Estate

## Prominent Matters

- Damages/Expert Witness to Valuation - Dolly Ridge Point Owners Association, Inc., et al v. Turner & Schoel, LLC, et al.
- Valuation/Expert Witness - Joon, LLC. D/B/A Ajin USA v. Albert Kahn Associates, Inc./ International Industrial Contracting Corp./Qualico Steel Company, Inc.
- OSI, Inc. v United States, et al. Case No. 98-00920-CV-2-MEF-WC.
- Stallings & Sons, Inc. v Tulane Revitalization 1, LP, et al. Case No. 2:19-CV-392-WKW.
- Charlotte Student Housing, DST, et al v Choate Construction Company. Mediation.
- Fredmark, LLC. V. Zax, LLC. Civil Action No. 1:20-cv-1848-TCB.
- Valuation/Expert Witness - State of Alabama v. Harry Joseph Painter et al.

Mr. Eidson is a veteran of the valuation industry with more than 30 years of experience in the real property valuation, brokerage, and consulting industry. Mr. Eidson has particular appraisal experience with industrial real estate that includes heavy and light manufacturing, warehousing, distribution, and special purpose such as meat processing plants, timber processing, automotive and steel manufacturing. More general appraisal experience includes free standing and multi-tenant retail, extended-stay hotels, limited service and full service hotels, office buildings, industrial properties, special purpose properties, multi-family and self-storage facilities, residential subdivisions, conservation easements, mitigation banks, recreational and timber land, right-of-way for public and private utilities and state and local transportation clients.

Greg's valuation opinions have been used in the context of mortgage lending, right-of-way acquisition, bankruptcy court, buy/sell decisions, purchase price allocation, loan monitoring, forced disposition, portfolio performance monitoring and litigation support.
Prior to merging his firm into GlassRatner in late 2018, Greg ran The Eidson Company and focused his practice on conservation easements, mitigation banks, mortgage loans, right of way, and litigation support. During the 18 years that Greg ran his own firm some of his assignments included;

- Residual insurance valuation for a British insurance company who insured the difference between market and contract rents on properties such as Walgreens and CVS Pharmacy occupied properties.
- Right of way valuation for the Alabama Department of Transportation, Georgia Department of Transportation, municipal utilities, the National Park Service, and the Sabal Trail Pipeline.
- Litigation support weighted toward deposition and testimony with the Department of Transportation and also includes support for lawsuits that involved property damaged by flooding (land, residential and multifamily projects), contamination (medical waste, dry cleaning solvents), and construction defects (residential construction, office building damage, hotel water leaks, multi-family construction, industrial manufacturing construction). Greg has testified to property taxation issues and conservation easements in Federal Tax Court.
- Preparation of appraisals for bankruptcy and foreclosure proceedings, and,
- Preparation of appraisals for Mortgage loans encompasses subdivision developments, hotels, mixed use developments, retail, industrial, office, special purpose, and timber land.

glassratner.com GlassRatner

GlassRatner

GlassRatner

3445 Peachtree Road, Suite 1225
Atlanta, GA 30326
Tel: (470) 346-6800
glassratner.com

Testimony Experience

**NANCY B. PARKER & ELLIS J. PARKER, Plaintiff,**
**vs.**
**U.S. TRUST COMPANY, N.A. & BANK OF AMERICA, N.A. Defendant**
**Plaintiff Firm – HENRICHSEN LAW GROUP, PLLC**
**Defendant Firm - McGuireWoods LLP.**
**Deposition: January 15, 2026**
**Comments: Opinions of 3rd Party Appraisal in metro Washington, D.C.**
----------------------------------------------------------------------------------------------

**Peachtree Associates, LLLP and GPH Aspire, LLC, v. MCG Charleston Apartments, LLC, ...**
**Plaintiff Firm – MORRIS MANNING & MARTIN, LLP**
**Defendant Firm - URICCHIO, HOWE, KRELL, JACOBSON, TOPOREK, & KEITH, P.A.**
**Deposition: August 7, 2025**
**Comments: Dispute over undisclosed assets in purchase of muti-family property**
----------------------------------------------------------------------------------------------

**Lora Drycksback v McBride's RV Storage LLC, McBride's RV and Boat Storage LLC, Andrew McBride, Benjamin McBride, Charles McBridge and Does**
Defendant Firm: Freeman, Freeman & Smiley,
LLP
Plaintiff Firm – McCune Law Group
Deposition: October 19, 2023
**Comments:** Review of 3rd Party Appraisal
----------------------------------------------------------------------------------------------

**Waler F. Scott III (Agent for Taxpayer) v Alabama Department of Revenue**
Defendant Firm: Adams and Reese, LLP
Plaintiff Firm – Galloway Scott & Hancock, LLC
Deposition: August 30, 2023
**Comments:** Property Tax Matter in Mobile County, AL
----------------------------------------------------------------------------------------------

**Lake Jordan Holdings, LLC v Commissioner of Internal Revenue**
Defendant Firm: Chamberlain, Hrdlicka, White,
Williams & Aughtry
Plaintiff Firm – U.S. Justice Department
Trial: July 24, 2023
**Comments:** Valuation of Easement Donation
----------------------------------------------------------------------------------------------

**Seabrook Property, LLC v Commissioner of Internal Revenue**
Defendant Firm: Dentons-Sirote
Plaintiff Firm – U.S. Justice Department
Trial: June 26, 2023
**Comments:** Valuation of Easement Donation
----------------------------------------------------------------------------------------------

**Outokumpu Stainless USA, LLC v Mobile County Board of Equalization ET**
Defendant Firm: Adams & Reese Law, LLC
Plaintiff Firm – Burr & Forman, LLP
Trial: February 22, 2023
**Comments:** Property tax matter.
----------------------------------------------------------------------------------------------

GlassRatner

3445 Peachtree Road, Suite 1225
Atlanta, GA 30326
Tel: (470) 346-6800
glassratner.com

**Lekker, LLC v Capital City Real Estate, LLC, Capital City Construction, LLC and Airline Street, LLC**
Defendant Firm: Swift, Currie, McGhee & Hiers, LLP and Knight Palmer Law
Plaintiff Firm – Wolfe Law, LLC
Deposition: March 15, 2023
Deposed by Monica L. Wingler w/Swift, Currie, McGhee & Hiers, LLP
**Comments:** The matter involved alleged damage caused by construction on adjoining property.

---

**Victory Entertainment: Ehrenberg vs. Hala enterprises, LLC and Agassi Halajyan**
Defendant Firm: Law Offices of Leland Wahl, Oberg Law Group
Plaintiff Firm – Law Offices of Paul A Beck
Deposition: November 14, 2022
Deposed by Leland Wahl, of Law Office of Leland Wahl
**Comments:** The matter involved market rent of a retail building in North Hollywood, CA

---

**Charlotte Student Housing, DST, et al, v Choate Construction Company.**
Defendant Firm: Kilpatrick Townsend & Stockton, LLP
Plaintiff Firm - Katten Muchin Roseman, LLP
Deposition: January 13, 2021
Deposed by Yonaton M. Rosenzweig with Katten Muchin Roseman, LLP
**Comments:** This matter was decided in arbitration. The defendant was successful. The matter involved alleged fraud and construction defects.

---

**Fredmark, LLC v. Zax, LLC (Civil Action File No. 1:20-cv-1848-TCB).**
Defendant Firm: Fortson, Bentley and Griffin, P.A.
Plaintiff Firm – Balch & Bingham, LLP
Expert Report: September 2020
**Comments:** Prepared an expert report testifying to damages incurred by Fredmark, LLC as a result of Zax, LLC vacating a fast-food property and refusing to pay rent and expenses. The Plaintiff was successful, they were awarded lost rent and expenses.

---

**Chapter 11 Bankruptcy of West Pace, LLC**
United States Bankruptcy Court Middle District of Alabama
John D. Elrod, Attorney for U.S. Bank, Bankruptcy Administrator U.S. Bank, N.A.
Greenberg Traurig, LLP, Atlanta, GA
Comments: Appraisal of real property and rebuttal of debtor appraisal.
*Upon review of the testimony and evidence presented at trial, the Court concludes that the testimony and appraisal provided by Mr. Eidson offer the most thorough and accurate assessment as to the value of the Property.*

---

**Anthony A. Cecchini and Betty Cecchini v Boran Craig Barber Engel Construction Co., Inc. et al**
Civil Action No. CV-14-901295
Defendant Firm: Kilpatrick Townsend & Stockton, LLP
Plaintiff Firm: Capell & Howard, LP
Deposition: March 2016
**Comments:** The matter involved alleged construction defects. Settled favorable to Plaintiff.

---

**Callaway et al v. Garner et al.**
Plaintiff Firm – Ken Hodges Law
Defendant Firm- Mateer & Harbert, P.C./ Chad K. Alvaro
Deposition: None
Circuit Court of Harris County, Georgia.
February 2017.
**Comments**: Property valuation

---

GlassRatner

3445 Peachtree Road, Suite 1225
Atlanta, GA 30326
Tel: (470) 346-6800
glassratner.com

**Billy Dozier v. APAC MID-SOUTH, INC. and OLDCASTLE MATERIALS SOUTHEAST, INC.**
Plaintiff Firm - Fuller & Copeland, Montgomery, AL/ James Doyle Fuller
Deposition: December 15, 2014
Deposed by Blake L. Oliver of Adams, White, Oliver, Short & Forbus, LLP, Opelika, AL
Circuit Court of Lee County, Alabama. Jury found in favor of Mr. Dozier
**Comments:** Mr. Fuller represents the plaintiff, Mr. Dozier. Mr. Dozier's property was flooded by water coming from a mining operation.

---

**Dolly Ridge Point Owners Association, Inc., et al v. Turner & Schoel, LLC, et al.**
CV-2008-902750
Plaintiff Firm – Arthur Edge, III
Defendant Firm - Simpson, McMahan, Glick & Burford, PLLC/Smith, Spires & Peddy, P.C./Wallace, Jordan, Ratliff & Brandt, LLC/Wilson Berryhill, P.C.
Deposition: May 2014
Deposed by Arthur Edge, III
Case Settled
**Comments:** Ann McMahan with Simpson, McMahan, Glick & Burford was my primary contact. This case involved 80 homes in Birmingham, AL that allegedly suffered from construction defects due to poor soil compaction.

---

**JOON, LLC. D/B/A AJIN USA v. ALBERT KAHN ASSOCIATES, INC./INTERNATIONAL INDUSTRIAL CONTRACTING CORP./QUALICO STEEL COMPANY, INC.**
CV-2009-90019, Circuit Court Chambers County, Alabama
Construction Defects
Plaintiff Firm – J. Lister Hubbard, Capell & Howard, P.C.
Defendant Firm –Jefferson C. Orr, Smith Cashion & Orr, P.C./Robert W. Heath, Porterfield Harper Mills Motlow & Ireland/John A. Ruemenapp, Weisman Young & Reumenapp, P.C./William L. Smith, Law Offices of William L. Smith/Robert B. Stewart, Smith Spires & Peddy/Daniel F. Johnson, Lewis Brackin Flowers & Johnson/R. Mac Freeman Jr., Rushton Stakely/Jack P. Russell, Spain & Gillon, LLC/Howard K. Glick/ Simpson McMahan Glick & Burford/Heather M. Houston, Carr Allison
Deposition: August 2014
Trial: 2016
**Comments**: Prepared appraisal report outlining the construction defects on a 1st tier automotive supplier building.

---

**George Earl Russell, et al vs. Russel Oil Company & Thomas E. Russell et al.**
Civil Action No. CV-2003-3227
Defendant Firm: NA
Plaintiff Firm – Holtsford Gilliland Higgins & Hitson

**Comments:** The matter involved the value of Russell Oil Co. assets.

---

**Charles Atkins, et al, v Breckenridge Homeowners Association, Inc./Goodwyn, Mills & Cawood, et al.**
Civil Action No. 2009-901479; Circuit Court, Montgomery
Plaintiff Firm - F. Inge Johnstone/ Webster, Henry, Lyons, White, Bradwell & Black, P.C./ Kirby Johnson, P.C
Defendant Firm – Capell & Howard, P.C./Ball, Ball, Matthews & Novak, P.A./Jason C. Paulk/Wallace Mills/Scott, Sullivan, Streetman & Fox, P.C./Lloyd, Gray & Whitehead
Deposed: Yes
Settled out of court
**Comments**: Prepared appraisal report regarding change in property value from the time of the alleged damage until the day of court. Primary contact was with Lister Hubbard and Brooke Lawson with Capell & Howard. Prepared a review of the opposition's expert report.

---

**Dixie Sailing Club v Russell Lands**
Ground Lease Cancellation
Plaintiff Firm – Robert Drummond, Jr.
Deposed: No
Testified in Circuit Court of Elmore County

# Appendix 2
# Documents Considered

| # | Description |
|---|---|
| **Pleadings & Related Court Filings** | |
| 1. | Complaint (and related Exhibits) dated December 22, 2025 |
| 2. | Declaration of Matthew B. McGuire is support of 356W58 Ground Lessor LLC's Motion to Dismiss the Complaint (and related Exhibits) dated February 4, 2026 |
| 3. | Declaration of Glenn Brill dated March 31, 2026 |
| 4. | Declaration of Abe Kohn dated March 31, 2026 |
| **Agreements & Other Hudson Documents** | |
| 5. | Purchase and Sale Agreement dated February 3, 2022 |
| 6. | Closing Agreement dated May 3, 2022 |
| 7. | Settlement Statement dated May 4, 2022 |
| 8. | Ground Lease dated May 4, 2022 |
| 9. | Project Loan Agreement dated May 4, 2022 |
| 10. | Leasehold Financing Agreement dated May 4, 2022 |
| 11. | Fourth Amendment to Ground Lease dated March 29, 2024 |
| **Financial Statements, Appraisals and Other Related Information** | |
| 12. | Schedule of Ground Rent payments (Hudson MSP Payments.xlsx) |
| 13. | Hudson Appraisal dated March 25, 2022 (2022-03-25 Appraisal (Parkview, BBG).pdf) |
| 14. | Hudson Appraisal dated May 2, 2022 (Hudson Hotel Conversion - 5-2-22.pdf) |
| 15. | Hudson Appraisal dated May 23, 2024 (2024-05-23 Appraisal (Parkview, BBG).pdf) |
| 16. | Hudson Appraisal dated March 22, 2025 (2025-03-22 Appraisal (Parkview, Colliers).pdf) |
| **Research** | |
| 17. | Wall Street Journal, *Rates are Up. We're Just Starting to Feel the Heat* , September 1, 2023 |
| 18. | Wall Street Journal, *Real-Estate Doom Loop Threatens America's Banks* , September 6, 2023 |
| 19. | 2025 Mortgage Survey Report, New York Rent Guideliens Board, April 17, 2025 |
| 20. | 2024 Mortgage Survey Report, New York Rent Guideliens Board, April 18, 2024 |
| 21. | 2023 Mortgage Survey Report, New York Rent Guideliens Board, April 20, 2023 |
| 22. | 2022 Mortgage Survey Report, New York Rent Guideliens Board, April 14, 2022 |
| 23. | Ground Leases and Leasehold Interests in CMBS, Morningstar, February 10, 2021 |
| 24. | Ground Lease Underwriting: How Leasehold FinancingComplicates Your Cap Rate, LTV, and Exit Assumptions, RealValue, May 29, 2026 |
| 25. | Ground Lease Underwriting: Leasehold vs FeeSimple Valuation, Apers, April 2026 |
| 26. | The Most Important Issue in Every Ground Lease, NYSBA N.Y. Real Poreprty Law Journal, Winter 2014, Vol. 42, No.1, Joshua Stein |
| 27. | Ground Leases and Value-Based Rent Resets: An Alternate Reality, Mary E. Flynn & Bret Dockwell, November 12, 2013 edition of the New York Law Journal |
| 28. | The Problem of Ground Leases, The Appraisal Journal • Issue 4 \| 2023, by Jerome D. Whalen, JD, |
| 29. | Trepp Ground Lease Report, August 2022 |
| 30. | Trepp - Ground Lease 101-7 Things Every Commercial Real Estate Professional Should Know |

GlassRatner

# Appendix 3
# Calculation of Fair Market Rent

| | | | | Renovation Period | | | | STABLE YEAR |
|---|---|---|---|---|---|---|---|---|
| **Partial Cash Flow to Stabilized Year** | | | | | | | | |
| **Based on BBG Appraisal 2022** | | | | 0% | 0% | 0% | 0% | 0% |
| | | | | 1 | 2 | 3 | 4 | 5 |
| | | | | 5/4/2023 | 5/3/2024 | 5/3/2025 | 5/3/2026 | 5/3/2027 |
| | Ground Rent | | | $ 6,400,000 | $ 6,400,000 | $ 8,750,000 | $ 8,750,000 | $ 8,750,000 |
| | Stable | $ 25,536,000 | | | | | | |
| 100% | 39.00 Units | SRO | $210,600 | $210,600 | $210,600 | $210,600 | $210,600 | $210,600 |
| 50% | 399.00 Units | Contract Rent | $25,325,400 | | | $12,662,700.0 | $12,915,954 | **$27,961,288** |
| | 438.00 Units | Ancillary | $970,000 | | | $989,400 | $1,009,188 | $1,029,372 |
| **2%** | Annual Growth | | $26,506,000 | $210,600 | $210,600 | $13,862,700 | $14,135,742 | $29,201,260 |
| | | **5% Vacancy** | | $10,530 | $10,530 | $693,135 | $706,787 | $1,460,063 |
| | | **EGI** | | $200,070 | $200,070 | $13,169,565 | $13,428,955 | **$27,741,197** |
| | **Assumptions** | | | | | | | |
| | | Real Estate Taxes | $ 14,289.10 | $ 6,258,625 | $ 6,383,798 | $ 6,511,473 | $ 6,641,703 | $ 6,774,537 |
| | | Insurance | $ 57.15 | $ 25,031 | $ 25,532 | $ 26,042 | $ 26,563 | $ 27,094 |
| | | Utilities | $ 923.24 | $ 404,380 | $ 412,468 | $ 420,717 | $ 429,131 | $ 437,714 |
| | | Repair & Maintenance | $ 1,320.89 | $ 578,550 | $ 590,121 | $ 601,923 | $ 613,962 | $ 626,241 |
| | | Management | $ 2,320.99 | $ 1,016,592 | $ 1,036,924 | $ 1,057,662 | $ 1,078,816 | $ 1,100,392 |
| | | Payroll | $ 1,965.75 | $ 860,997 | $ 878,217 | $ 895,781 | $ 913,697 | $ 931,971 |
| | | G&A | $ 615.72 | $ 269,687 | $ 275,081 | $ 280,582 | $ 286,194 | $ 291,918 |
| | | Replacement Reserves | $ 300.00 | $ 131,400 | $ 134,028 | $ 136,709 | $ 139,443 | $ 142,232 |
| | | Market Ground Rent | | $ - | $ - | $ - | $ - | **$ 2,437,555** |
| | | | | $ 9,545,262 | $ 9,736,167 | $ 9,930,891 | $ 10,129,508 | $ 12,769,653 |
| | | | NOI | $ (9,345,192) | $ (9,536,097) | $ 3,238,674 | $ 3,299,447 | $ 14,971,544 |
| | | Loan payment | Debt Service | $ 11,977,235 | $ 11,977,235 | $ 11,977,235 | $ 11,977,235 | $ 11,977,235 |
| | | | After Debt Cash Flor | $ (21,322,427) | $ (21,513,332) | $ (8,738,560) | $ (8,677,788) | $ 2,994,309 |
| | | | DCR | -0.780246205 | -0.796185212 | 1.25 | 1.25 | **1.25** |
| | | | IS DCR Positive | NO | NO | YES | YES | YES |
| | | | | | | 0.270 | 0.275 | 1.25 |
| | | | | | | | Stable Year | **5** |
| | | | | | | | Contract Rent | $ 8,750,000 |
| | | | | | | | Calculated Rent | $ 2,437,555 |
| | | | | | | | Variance | $ 6,312,445 |