# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>HUDSON 1701/1706, LLC, et al.,<br>*Debtors.* | Chapter 11<br>Case Nos. 25-11853 (KBO)<br>(Jointly Administered) |
| HUDSON 1701/1706, LLC, a Delaware limited liability company; and HUDSON 1702, LLC, a Delaware limited liability company,<br>*Plaintiffs,*<br><br>-against-<br><br>356W58 GROUND LESSOR LLC, a Delaware limited liability company,<br>*Defendant.* | Adv. Proc. No. 25-52471-KBO |

**EXPERT REBUTTAL REPORT OF DANIEL MIZUKOVSKI**

**AUGUST 14, 2026**

**CONTENTS**

I. INTRODUCTION

II. SUMMARY OF REBUTTAL AND AFFIRMATIVE OPINION POINTS

III. BACKGROUND, QUALIFICATIONS & COMPENSATION

IV. REBUTTAL POINTS

V. AFFIRMATIVE OPINION POINTS

VI. CONCLUSION

EXHIBIT A – DANIEL MIZUKOVSKI CURRICULUM VITAE

EXHIBIT B – MATERIALS REVIEWED

# I. INTRODUCTION

1. I have reviewed the Expert Report of Greg Eidson dated July 27, 2026 (the "Eidson Report"), submitted on behalf of Hudson 1701/1706, LLC and Hudson 1702, LLC (collectively, the "Tenant" or "Debtors"). I have been engaged by 356W58 Ground Lessor LLC (the "Landlord") to respond to the Eidson Report. Tenant and Landlord are parties to a ground lease dated May 4, 2022 and four amendments to such ground lease (collectively, the "Ground Lease") in connection with 353 West 57th Street Condominium, Condominium Units 1, 2 and 6, in New York, NY.

2. The scope of my engagement is to address the Eidson Report and to opine on the appropriate ground rent under the Ground Lease in today's market, during the timeframe of Debtors' bankruptcy proceedings, taking into account the investment Landlord made to acquire the leased fee interest.

3. This rebuttal report ("Rebuttal Report") proceeds in several parts. First, I identify the core flaw underlying the Eidson Report. Then, I address specific points raised by Mr. Eidson in his description of the methodology he employed to determine ground rent. Finally, I set forth my own opinion as to the appropriate ground rent, together with the methodology supporting that opinion.

4. My decision not to respond to each point made in the Eidson Report should not be construed as agreement with the points I did not address. Rather, I have focused my response on those aspects of the Eidson Report that I consider most significant to the determination of ground rent, and I reserve all rights with respect to any point not specifically addressed herein.

5. In preparing this Rebuttal Report, I have relied upon the Eidson Report, the materials listed in Exhibit B hereto, the additional sources cited below and my professional experience in the ground lease field. I reserve the right to supplement this Rebuttal Report as additional information becomes available.

## II. SUMMARY OF REBUTTAL AND AFFIRMATIVE OPINION POINTS

6. As set forth more fully below, the fundamental flaw in the Eidson Report is one of methodology, and it begins with a mischaracterization of the task at hand. Mr. Eidson states that he was "asked by Counsel to determine a financeable stabilized Ground Rent for the completed project." (See Eidson Report at ¶ 3). That is not the correct inquiry. The task at hand is to determine the appropriate ground rent today, during the timeframe of Debtors' bankruptcy proceedings, considering the investment Landlord made to acquire the leased fee interest. Establishing the ground rent is the starting point from which a tenant can then determine how much leasehold financing the resulting cash flow can support, and, therefore, how much equity is required – not the other way around.

7. Mr. Eidson's approach inverts this analysis. Rather than determine the appropriate ground rent as an independent function of the investment in Landlord's leased fee interest, Mr. Eidson begins with a hypothetical leasehold construction loan (based on the purported $207 million "Parkview Loan") (See Eidson Report at ¶ 21) and a target lender debt service coverage ratio, and then solves backwards to derive ground rent based on whatever cash flow remains after satisfying the leasehold lender's target debt service coverage ratio. Under this approach, ground rent – which is the senior, controlling variable in a ground lease – is not a function of the investment in the

leased fee interest at all. Rather, it is merely a plug, calculated as whatever amount is left over after the hypothetical loan's debt service payment is multiplied by the debt service coverage ratio, and is then subtracted from projected fee simple cash flow. This is backwards. It prioritizes the loan over all other considerations, is not consistent with market convention and does not answer the question that has been posed. Simply put, Mr. Eidson posits that the more Tenant borrows against the leasehold, the lower ground rent should be. I address this flaw, and its consequences for Mr. Eidson's numerical conclusions, in Section IV below.

8. Market convention, by contrast, determines ground rent by reference to what investors in leased fee interests are seeking to achieve in terms of current yield on their acquisition cost / investment or land/property contribution[1] and is not a function of what a hypothetical leasehold financing will render available after satisfying such leasehold lender's debt service coverage requirement. The current yield that such leased fee investors seek is a spread above the 30-Year Treasury Rate – a common risk-free benchmark for long-duration investments such as 99-year ground leases.[2] I describe this market-convention approach, and the resulting determination of the appropriate ground rent, in Section V below.

9. Applying this market convention, I believe the appropriate ground rent for the leased fee interest is greater than the contractual rent set forth in the Ground Lease, currently $8,750,000 per annum; however, it is my understanding that Landlord is not seeking a

---

[1] Safehold Inc., Q1 2026 Earnings Results (investor presentation) at 5; Safehold Inc., Annual Report (Form 10-K) (for fiscal year ended Dec. 31, 2025, filed February 12, 2026) at 6.
[2] Shaun Libou, "Ground Level: The Case for Ground Leases and Long-Term Capital," Summit Journal (AFIRE), Issue No. 16 (Dec. 16, 2024) at Note 4.

rent greater than the contractual rent. The basis for, and support underlying, this opinion is set forth in Section V below.

10. My opinions are based on the materials reviewed, my analysis and my professional experience as described herein, and are subject to the qualifications and reservations of rights set forth in Section I above.

## III. BACKGROUND, QUALIFICATIONS & COMPENSATION

11. I have twenty-eight years of experience as an investment banker, advisor and investor providing financial services to the real estate industry, all of which has been at Wells Hill Partners ("WHP"), a boutique real estate investment banking, advisory and principal investment firm founded in 1983 and located at 515 Madison Avenue in New York, NY. I am a senior partner at WHP.

12. Since its founding, WHP has advised on or acted as agent in the ground leasing, financing, restructuring, acquisition, disposition and development of over $30 billion worth of real estate across most property uses. WHP's principals are also active investors in real estate, having developed and acquired residential projects, office buildings, shopping centers, hotels, seniors' housing, bank branches and mixed-use properties valued in excess of $1.5 billion.

13. Over the course of my career at WHP, I have been directly involved in the successful completion of real estate transactions involving approximately $20 billion worth of real estate located in cities throughout the United States, with a particular focus on NYC. These transactions have spanned most real estate uses and have attracted capital from both domestic and foreign capital markets, and have included ground

leases, debt and equity placements, joint ventures, restructurings and recapitalizations, and investment sales and acquisitions.

14. I am involved in all aspects of WHP's activities, from working with clients to define their strategic objectives and set priorities, to generating and evaluating alternative plans based on what is feasible in the current real estate and capital markets, to assisting clients in selecting an optimal plan and executing it. My responsibilities include structuring transactions, formulating valuations, undertaking informal pre-marketing and formal marketing, selecting and negotiating with counterparties, coordinating due diligence, leading marketing efforts, working closely with client counsel to negotiate transaction documents and closing transactions. I have been involved in executing nearly all of the firm's transactions during my time there, including those on the principal investment side.

15. Ground lease structuring has been a particular focus of my practice. I have employed ground lease structures on behalf of owners of valuable property seeking to realize or restructure the inherent value in their holdings, recognizing that the design of a project capitalization involving a long-term ground lease is highly specific to the objectives and facts of each circumstance, and that the related documentation is necessarily detailed and comprehensive given the long-term nature of the relationships such leases create.

16. I have been integral to WHP's ground lease practice over the past 28 years, which has involved over $10 billion worth of real estate. The practice has included the creation of new ground leases, the restructuring of existing ground leases, the financing of leased fee and leasehold interests, and the sale of leased fee and leasehold interests.

Through this experience, I have helped WHP become a key player in the evolution of the ground lease market, which includes modernizing lease structures in ways that increase leased fee value while simultaneously protecting leasehold value, and vice-versa. I am able to draw upon extensive experience creating, restructuring, financing, selling, arbitrating and operating fee and leasehold interests created by ground leases.

17. A representative list of my ground lease transaction experience includes the following:

| Property | Location | Use | Client | Nature of Engagement |
| --- | --- | --- | --- | --- |
| 114 Fifth Ave. | New York, NY | Office | Landlord | • Ground lease creation<br>• Leased fee financing<br>• Ground lease restructuring |
| 680 Madison Ave. | New York, NY | Retail | Tenant | • Ground lease restructuring |
| 666 Greenwich St. (The Archive Building) | New York, NY | Residential | Landlord | • Ground lease restructuring |
| 333 E. Ontario St. (McClurg Court) | Chicago, IL | Residential | Landlord | • Ground lease restructuring |
| 50/55 Hudson St. | Jersey City, NJ | Residential | Landlord | • Leased fee interest sale |
| 295 Fifth Ave. | New York, NY | Office | Tenant | • Ground lease creation<br>• Leasehold financing |
| 1245 Broadway | New York, NY | Office | Landlord | • Ground lease creation |
| 150 E. 42nd St. | New York, NY | Office | Landlord | • Acquisition of minority interest<br>• Ground lease restructuring<br>• Leasehold interest sale<br>• Long-term leased fee financing |
| 400 W. 113th St. (Enclave at the Cathedral) | New York, NY | Residential | Landlord | • Ground lease creation<br>• Long-term leased fee financing |

| Property | Location | Use | Client | Nature of Engagement |
|---|---|---|---|---|
| | | | | • Leased fee interest sale |
| 1 Morningside Dr. (Avalon Morningside Park) | New York, NY | Residential | Landlord | • Ground lease creation<br>• Long-term leased fee financing<br>• Leased fee interest sale |
| 425 Park Ave. | New York, NY | Office | Landlord | • Short- and long-term leased fee financings<br>• Ground lease restructuring<br>• Leased fee interest sale |
| Princeton University (Merwick Stanworth) | Princeton, NJ | Residential | Landlord | • Ground lease creation |
| 720 Fifth Ave. | New York, NY | Office | Landlord | • Ground lease creation |
| 7 Bryant Park | New York, NY | Office | Landlord | • Ground lease creation |
| 21 E. 12th St. | New York, NY | Retail | Tenant | • Ground lease restructuring |
| 301 Binney St. & 320 Bent St. | Cambridge, MA | Life Sciences | Landlord | • Ground lease restructuring |
| 885 Third Ave. (Lipstick Building) | New York, NY | Office | Tenant | • Leased fee acquisition advisory |
| 405 Lexington Ave. (Chrysler Building) | New York, NY | Office | Tenant | • Ground lease restructuring advisory |
| 300 E. 46th St. | New York, NY | Residential | Landlord | • Ground lease restructuring advisory |
| 27 E. 65th St. | New York, NY | Retail | Tenant | • Ground lease restructuring advisory |

18. My professional background, education and affiliations are further set forth in my Curriculum Vitae, attached hereto as Exhibit A.

19. I am being compensated at a flat fee of $175,000 for my time and professional services in connection with this matter, plus reimbursement of associated expenses.

My compensation is not contingent in any way upon the substance of my opinions or the outcome of this matter.

## IV. REBUTTAL POINTS

20. Mr. Eidson's analysis is flawed at its foundation. In Paragraph 3 of his report, Mr. Eidson states that he was "asked by Counsel to determine a financeable stabilized Ground Rent for the completed project." However, this framing mistakes the core question. The task at hand is to determine the appropriate ground rent today, during the timeframe of Debtors' bankruptcy proceedings, considering Landlord's investment in the leased fee interest. Market convention and the senior nature of the leased fee interest and obligations therein would require that once ground rent is established, a tenant can then determine how much leasehold financing a leasehold interest and its leasehold cash flow will support and, therefore, how much equity is required. Mr. Eidson's methodology proceeds in exactly the opposite direction – he begins with a hypothetical leasehold loan (further described in paragraph 24 below) and derives ground rent as the difference between net operating income ("NOI") and the amount necessary to service the loan considering an assumed debt service coverage ratio (1.25x). That approach is backwards and does not reflect market convention.

21. Ground rent is the senior, controlling variable in a ground lease.[3] As the owner of the leased fee interest, Landlord sits in the senior-most position in the capital structure – ground rent must be paid first, and the amount of leasehold financing available to

---

[3] Shaun Libou, "Ground Level: The Case for Ground Leases and Long-Term Capital," Summit Journal (AFIRE), Issue No. 16 (Dec. 16, 2024) at 96.

Tenant is properly derived from cash flow after payment of that ground rent, not the reverse. Mr. Eidson's approach improperly inverts this hierarchy – rather than deriving the leasehold loan amount from cash flow after ground rent, he derives the ground rent from what a hypothetical leasehold lender would require for lending a hypothetical amount. This inversion is not a matter of stylistic preference – it produces a fundamentally different, and incorrect, result for the reasons discussed below.

22. The Eidson Report's conclusion that ground rent should be $2,437,555 during the timeframe of Debtors' bankruptcy proceedings is the result of this flaw. Mr. Eidson derives a hypothetical leasehold loan amount and a set of loan assumptions that he characterizes as reflective of the financing market and then applies a purportedly "market" debt service coverage ratio ("DSCR") to that hypothetical loan to back into what he deems to be the appropriate ground rent. In Paragraph 9 and Table 1 of the report, and repeated in Paragraph 36 and Table 3, Mr. Eidson uses this reverse-engineered figure to calculate the alleged overpayment of ground rent during the first seven months of Debtors' bankruptcy case, comparing the contractual ground rent actually paid to the ground rent he has derived.

23. The assumptions underlying Mr. Eidson's hypothetical loan are themselves problematic, independent of the flawed methodology they support. In Paragraph 21 of the report, Mr. Eidson explains that his analysis uses the $207,000,000 "Parkview Loan amount" – the original 2022 construction financing – to calculate annual debt service, which annual debt service itself is based on purportedly market terms as of 2024. This is inconsistent with what should be the purpose of the Eidson Report,

which is to determine the appropriate ground rent as of today – a metric that is not impacted nor reflective of the level of leasehold financing, real or hypothetical. Similarly, Mr. Eidson relies on a pro-forma (a cash flow projection) prepared by the appraisal firm BBG in 2022 to develop his estimate of the project's stabilized income and expenses – a four-year-old projection that does not reflect more current pro-formas, prepared on Tenant's behalf, for determining the appropriate ground rent today.

24. Table 2 of the report shows how Mr. Eidson arrives at the debt service for this hypothetical loan, which I presume he believes is an appropriate amount of leasehold financing on the project. Mr. Eidson starts with the $207,000,000 Parkview Loan amount and applies a purportedly "market" 71.8% loan-to-value ("LTV") ratio, arriving at a hypothetical loan amount of $148,626,000. This calculation only makes sense if one infers (though Mr. Eidson never says so directly) that he is treating the stabilized value of the leasehold as equivalent to the $207,000,000 Parkview Loan amount, and that this hypothetical loan represents a refinancing of the Parkview Loan. Under that reading, Tenant would need to contribute $58,374,000 of equity simply to right-size the $207,000,000 Parkview Loan down to the hypothetical $148,626,000 loan amount. Mr. Eidson then applies a "market" interest rate of 7% and a 30-year amortization period to arrive at a hypothetical annual debt service of $11,977,235.

25. Mr. Eidson's actual derivation of the $2,437,555 ground rent figure appears nowhere in the narrative body of his report. It appears only in Appendix 3, and even there it is not transparent – it requires reverse-engineering to identify the ground rent as a plug figure, derived from the hypothetical loan described above, rather than as an

independently determined amount derived from Landlord's investment in the leased fee interest.

26. Working backwards through Appendix 3 illustrates the point. Mr. Eidson's pro-forma, built from the 2022 BBG appraisal, shows a stabilized leasehold NOI of \$14,971,544 after deduction of \$2,437,555 of "Market Ground Rent." Adding the ground rent figure back to this NOI yields \$17,409,099 of fee simple NOI before "Market Ground Rent." Mr. Eidson then takes the derived \$11,977,235 of debt service on his hypothetical loan and multiplies it by his target 1.25 DSCR (\$11,977,235 × 1.25) to arrive at a minimum required NOI of \$14,971,544. The difference between the \$17,409,099 of fee simple NOI before ground rent and the \$14,971,544 minimum NOI required to satisfy the DSCR on the hypothetical loan – a difference of \$2,437,555 – is Mr. Eidson's "Market Ground Rent."

27. In other words, ground rent in Mr. Eidson's analysis is not derived from Landlord's investment in the leased fee interest at all; it is simply whatever amount of net operating income is left over once the hypothetical loan's debt service requirements have been satisfied.

28. The logical consequence of Mr. Eidson's approach is untenable. Extrapolating his methodology, the more Tenant borrows against the leasehold, the lower ground rent should be – because a larger hypothetical loan means larger required debt service, which leaves less cash flow available for ground rent. Under this framework, as Tenant increases the value it extracts from its leasehold interest through additional leverage, it necessarily does so to the detriment of Landlord's value in the leased fee interest. This gets the relationship between the two interests exactly backwards. Mr.

Eidson's methodology does not recognize the seniority of the leased fee position, nor does it recognize that Landlord is entitled to realize the value of its interest – determined according to market convention, as described in Section V below – before Tenant's financing capacity is determined at all.

## V. AFFIRMATIVE OPINION POINTS

29. Having addressed the flaws in Mr. Eidson's methodology, I turn to my own opinion as to the ground rent. As stated in Section II above, the task at hand is to determine the appropriate ground rent as an independent function of Landlord's investment in the leased fee interest.

30. Market convention determines ground rent by reference to what investors are seeking to achieve in terms of current yield on their investment or land/property contribution.[4] The current yield that such investors seek is equal to the 30-Year Treasury Rate plus a risk-based spread.[5]

31. The 30-Year Treasury Rate is a conventional benchmark for a risk-free investment over a 30-year horizon, often acting as a duration proxy for longer-term investments such as ground leases.[6] The risk-based spread reflects the incremental return an investor expects, over and above the risk-free Treasury Rate, as compensation for taking certain investment risk.[7]

32. This risk-based spread is not static – it varies with the risk profile of the underlying project. The spread over the 30-Year Treasury Rate required by the market is greater

[4] Safehold Inc., Q1 2026 Earnings Results (investor presentation) at 5; Safehold Inc., Annual Report (Form 10-K) (for fiscal year ended Dec. 31, 2025, filed February 12, 2026) at 6.
[5] Safehold Inc., Annual Report (Form 10-K) (for fiscal year ended Dec. 31, 2025, filed February 12, 2026) at 30.
[6] E. Napoletano, "The Risk-Free Rate," Forbes Advisor (June 28, 2022) at 1, 3.
[7] E. Napoletano, "The Risk-Free Rate," Forbes Advisor (June 28, 2022) at 1.

for development projects than for existing, stabilized or cash-flowing properties, given the additional risks inherent in development. Overall spreads range from approximately 15 to 150 basis points, from stabilized to development projects, respectively. This range is evidenced by the promotional materials of a representative group of institutional investors in leased fee interests – NewPoint, Safehold, Haven, Twain, USQ and Montgomery Street Partners (the parent company of Landlord).

33. The 30-Year Treasury Rate as of the date of this report is approximately 5.2%.[8] Applying the risk-based spread described above, market leased fee investors require a total current yield on their investment of approximately 5.35% to 6.70% (5.2% plus 15 to 150 basis points). For a development project such as the Hudson Hotel, the expected market yield sought by such investors falls at the higher end of this range, reflecting the greater risk associated with an incomplete, in-process redevelopment/conversion project.[9]

34. Landlord's investment in the leased fee interest against which this market yield should be applied is $178,000,000, the purchase price of the leased fee interest. Applying the market-convention methodology described above, the appropriate ground rent today is properly calculated by multiplying the leased fee investment by the market investor yield – the 30-Year Treasury Rate plus the applicable risk-based spread. Considering the $178,000,000 investment and a combined rate of 6.25% (reflecting the higher end of the range applicable to a development project such as this one), the resulting market ground rent would be $11,125,000 annually

[8] Treasury Yield 30 Years (^TYX) Charts, Data & News, Yahoo Finance (as of August 14, 2026).
[9] Shaun Libou, "Ground Level: The Case for Ground Leases and Long-Term Capital," Summit Journal (AFIRE), Issue No. 16 (Dec. 16, 2024) at 99.

($178,000,000 × 6.25%). Notwithstanding this calculation, it is my understanding that Landlord is not seeking a rent greater than the current contract rent of $8,750,000 annually, which represents a yield of only 4.92% on Landlord's leased fee investment. In other words, the existing contract rent produces a yield level below what the market otherwise requires for a project of this risk profile, underscoring that the current contract rent is, if anything, conservative from Landlord's perspective, not excessive.

35. Once ground rent is properly established under this methodology, it is appropriate, though secondary, to consider the level and cost of leasehold financing proceeds that a tenant can obtain against that ground rent. A relevant measure of leasehold financeability is the coverage ratio of stabilized NOI before ground rent to the ground rent itself, with stabilized NOI reflecting a nearly fully leased project. An appropriate coverage ratio for optimizing leasehold financing proceeds is generally 3.0x or greater.[10]

36. Because Tenant has not yet presented a final business plan for the project that is acceptable to Landlord, certain assumptions are necessary to calculate the coverage ratio discussed above. Between 2022 and 2024, Tenant presented Landlord with pro-formas reflecting stabilized NOI before ground rent ranging from $23.3 million to $31.6 million. In 2025, National Valuation Consultants, Inc. prepared an appraisal that included a pro-forma reflecting stabilized NOI before ground rent of $15 million. Given this continued uncertainty as to Tenant's business plan and the resulting

[10] Safehold – Multifamily Market Sheet.

economics of the leasehold, I have used approximately the midpoint of this range of stabilized NOI figures for purposes of the coverage ratio analysis that follows.

37. Such midpoint happens to be reflected in the pro-forma presented by Tenant to Landlord dated August 2024, which projects a stabilized NOI of approximately $23.3M for a mixed-use development comprising 61 hotel rooms, 140 affordable residential units and 242 market-rate residential units. At the contract annual ground rent of $8,750,000, the coverage ratio of stabilized NOI before ground rent to ground rent is approximately 2.66x. It bears emphasis that while the market-convention yield methodology would support a ground rent of $11,125,000 per annum, it is my understanding that Landlord is not seeking a rent greater than the current contract rent of $8,750,000 annually.

38. A 2.66x coverage ratio, while below the optimal 3.0x threshold, is neither unusual nor inconsistent with viable, market-standard ground leases.[11] I have personally structured ground leases with similar or lower stabilized coverage ratios that have proven successful. One such lease is at [redacted] in Manhattan,[12] where the pro-forma stabilized coverage ratio at origination, and again recently, was roughly 2.4x. Another such lease is at [redacted] in Manhattan,[13] where the stabilized coverage ratio at origination was and currently is less than 2.0x. Both properties reflect viable, successful leased fee and leasehold interests structured at market ground rent. Both would benefit from greater NOI-to-ground-rent coverage to achieve optimal financeability, and the tenants at both properties have recognized as much –

[11] Safehold Inc., Annual Report (Form 10-K) (for fiscal year ended Dec. 31, 2025, filed February 12, 2026) at 6, 52; Safehold Inc., Q1 Earnings Results (investor presentation) at 6.
[12] The address of this building is confidential in the context of having provided the coverage ratio.
[13] The address of this building is confidential in the context of having provided the coverage ratio.

one has already bought down its ground rent to achieve a more optimal coverage ratio, and the other is presently in the final stages of doing so.

39. The lesson of these transactions is instructive here. Rather than reverse-engineering ground rent downward to accommodate the leasehold financing, as Mr. Eidson's methodology does, Tenant should instead first recognize the seniority of the leased fee interest and Landlord's corresponding entitlement to a market yield, determined as described above. The level of leasehold financing proceeds available to Tenant is properly a function of that ground rent, not the reverse. To the extent Tenant wishes to optimize its leasehold financing proceeds, the appropriate mechanism for doing so is not to understate the ground rent owed to Landlord, but rather to buy down the ground rent to a level at which stabilized NOI before ground rent covers the ground rent by 3.0x or more, an option expressly provided for under the existing Ground Lease.

## VI. CONCLUSION

40. For the reasons set forth above, the analytical foundation of the Eidson Report does not hold up. Mr. Eidson should have been retained to determine the appropriate ground rent today considering the investment Landlord made to acquire the leased fee interest but instead answered a different question: what ground rent a hypothetical leasehold lender would tolerate given a hypothetical loan of Mr. Eidson's own construction. That approach inverts the proper analytical sequence, treats ground rent as a plug number rather than an independently derived amount and rests on financing assumptions – a 2022 pro-forma, 2024 loan terms and an unstated presumption that Tenant's $207,000,000 construction loan represents the as-is value of the leasehold,

none of which can support a determination of the appropriate ground rent today. The result, an opinion of Mr. Eidson that Tenant's ground rent obligation should fall by more than 70% to $2,437,555 annually, is not a market rent conclusion at all. It is an artifact of the hypothetical loan Mr. Eidson chose to construct, and it would only grow smaller still if that hypothetical loan were made larger, an outcome that exposes the methodology as untethered to Landlord's leased fee investment.

41. Ground rent is not, and has never been, a function of what a leasehold lender is willing to permit. It is a function of what an investor in the leased fee interest requires by way of current yield on that investment in the current investment environment. Applying that convention here, a risk-based spread over the 30-Year Treasury Rate, applied to Landlord's $178,000,000 investment, confirms that the appropriate ground rent for this development-stage project falls above the current contract rent of $8,750,000 annually. Indeed, properly calculated, the market-convention methodology would support a materially higher ground rent than the annual contract rent already reflects. The existing $8,750,000 ground rent, which reflects a yield of only 4.92% on Landlord's leased fee investment (a negative spread to the current 30-Year Treasury Rate), is therefore a conservative and fully supportable market rent, not, as Mr. Eidson contends, "a financial burden on the Project." (See Eidson Report at ¶ 8).

42. Nor does the resulting leasehold coverage ratio undermine this conclusion. A stabilized coverage ratio of approximately 2.66x NOI to ground rent based on Tenant's August 2024 pro-forma, while below the 3.0x threshold for optimizing leasehold financing proceeds, is consistent with coverage ratios I have structured and

observed in successful Manhattan ground lease transactions. To the extent Tenant seeks more optimal leasehold financing, the Ground Lease itself provides the appropriate mechanism, a ground rent buydown, rather than trying to reduce Landlord's contractual rent through litigation.

43. It is therefore my opinion, based on the materials reviewed, my analysis and my professional experience as set forth herein, that the appropriate ground rent today for the leased fee interest is greater than the contractual rent set forth in the Ground Lease, currently $8,750,000 per annum; however, it is my understanding that Landlord is not seeking a rent greater than the contractual rent.

44. I reserve the right to supplement, revise or amend the opinions set forth in this Rebuttal Report to the extent additional relevant information becomes available, including in response to any further reports, testimony or discovery in this matter.

Daniel Mizukovski

Daniel Mizukovski
Managing Director
Wells Hill Partners, Ltd.

**EXHIBIT A**

**CURRICULUM VITAE**

## BACKGROUND

Mr. Mizukovski is an accomplished real estate professional with twenty-eight years of industry experience. He has expertise in structuring and executing complex real estate transactions, including ground leases, debt and equity placements, financial restructurings, joint ventures, acquisitions, investment sales and development projects.

## EXPERIENCE

**WELLS HILL PARTNERS, LTD.,** New York, NY August 1998 – Present

*Managing Director & Principal*

Wells Hill is a boutique investment banking firm providing advisory and capital market services to the real estate industry. The firm is dedicated to serving as a catalyst for creating and maximizing real estate value. Since its formation in 1983, Wells Hill has advised on or acted as agent in the ground leasing, financing, restructuring, acquisition, disposition and development of over $30 billion worth of real estate, involving most uses. The principals of Wells Hill also are involved as active investors in the real estate industry, having developed and acquired residential projects, office buildings, shopping centers, hotels, seniors' housing, bank branches and mixed-use properties valued in excess of $1.5 billion.

Mr. Mizukovski is involved in all aspects of the firm's activities, from working with clients to define objectives and set strategy to managing and executing transactions to generating and evaluating new business opportunities for the firm. His responsibilities also include leading the marketing efforts for projects, negotiating with counterparties, reviewing legal documentation and closing the transactions. He has been involved in executing nearly all the firm's transactions, including those on the principal investment side.

Mr. Mizukovski has been an integral part of all the ground lease transactions accomplished by the firm over the past 28 years, involving approximately $10 billion of real estate, including the

creation of new ground leases, restructuring of existing ones, financing of leased fee and leasehold interests, and sale of leased fee and leasehold interests.

**EDUCATION**

**THE WHARTON SCHOOL, UNIVERSITY OF PENNSYLVANIA,** Philadelphia, PA

- Bachelor of Science in Economics with a concentration in Real Estate, May 1998
- Founder and President, The Wharton Futures, Options, and Hedging Strategies Club

**PROFESSIONAL AFFILIATIONS**

- Member, Urban Land Institute
- Licensed New York State Real Estate Broker

**SPEAKING ENGAGEMENTS (GROUND LEASE RELATED)**

- Association of University Real Estate Officials (AUREO) – Boise State University
- Association of University Real Estate Officials (AUREO) – University of New Brunswick
- Mortgage Bankers Association of New York

# EXHIBIT B

## MATERIALS REVIEWED

**Expert Report:**

- Expert Report of Greg Eidson dated July 27, 2026

**Legal Agreements:**

- Ground Lease dated May 4, 2022 between 356W58 Ground Lessor LLC as Landlord and Hudson 1701/1706, LLC and Hudson 1702, LLC as Tenant

- First Amendment to Ground Lease dated January 3, 2023 between 356W58 Ground Lessor LLC as Landlord and Hudson 1701/1706, LLC and Hudson 1702, LLC as Tenant

- Second Amendment to Ground Lease dated May 1, 2023 between 356W58 Ground Lessor LLC as Landlord and Hudson 1701/1706, LLC and Hudson 1702, LLC as Tenant

- Third Amendment to Ground Lease dated December 1, 2023 between 356W58 Ground Lessor LLC as Landlord and Hudson 1701/1706, LLC and Hudson 1702, LLC as Tenant

- Fourth Amendment to Ground Lease dated March 29, 2024 between 356W58 Ground Lessor LLC as Landlord and Hudson 1701/1706, LLC and Hudson 1702, LLC as Tenant

**Case Documents:**

- Debtors' Motion for an Order Determining Amount of Prospective Post-Petition Monthly Rent Due as an Administrative Expense Claim (filed on June 2, 2026)

- 356W58 Ground Lessor LLC's Objection to Debtors' Motion for an Order Determining Amount of Prospective Post-Petition Monthly Rent Due as an Administrative Expense Claim (filed on June 16, 2026)

- Magna Legal Services Transcript of Videotaped Deposition of Max Nipon (MSP) on April 30, 2026

**Supporting Documents:**

- E-mail Chain, A. Smeke (CSC), S. Smeke (CSC), M. Nipon (MSP), M. Bartmann (MSP), from 12/22/2023 to 2/12/2024 (356W58GROUNDLESSOR_00050133-0148)
- CSC Pro-forma and Analysis dated 3/8/2022 (356W58GROUNDLESSOR_00031103)
- CSC Pro-forma and Analysis dated 2/12/2024 (356W58GROUNDLESSOR_00050133)
- CSC Pro-forma and Analysis dated 8/12/2024 (356W58GROUNDLESSOR_00053454)
- CSC Pro-forma and Analysis dated 9/11/2024 (356W58GROUNDLESSOR_00053453)
- MSP Pro-forma and Analysis dated 5/4/2022 (356W58GROUNDLESSOR_00053455)
- Appraisal Report dated November 7, 2025 prepared by National Valuation Consultants, Inc. (356W58GROUNDLESSOR_00053099-3285)
- Safehold Inc., Q1 2026 Earnings Results (investor presentation)
- Shaun Libou, "Ground Level: The Case for Ground Leases and Long-Term Capital," Summit Journal (AFIRE), Issue No. 16 (Dec. 16, 2024)
- E. Napoletano, "The Risk-Free Rate," Forbes Advisor (June 28, 2022)
- Treasury Yield 30 Years (^TYX) Charts, Data & News, Yahoo Finance (as of August 14, 2026)
- Safehold Inc., Annual Report (Form 10-K) (for fiscal year ended Dec. 31, 2025, filed February 12, 2026)

**Ground Lease Industry Material:**

- NewPoint Real Estate Capital – Proprietary Solution: Ground Lease Financing
- Safehold – Fixed Income Update Q1'26 [not cited]
- Safehold – Multifamily Market Sheet
- Twain Financial Partners – Ground Lease Capital
- Haven Capital – Haven Ground Lease
- Haven Capital – Fully Amortizing Ground Lease

- Haven Capital – Development Ground Lease
- USQ – Development Ground Leases
- USQ – Ground Lease Market Update