# EXHIBIT C

GlassRatner

250 Park Avenue
New York, NY 10171
glassratner.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:**<br>**HUDSON 1701/1706, LLC, et al.,**<br>***Debtors.*** | **Chapter 11**<br>**Case Nos. 25-11853 (KBO)**<br>**(Jointly Administered)** |

**Expert Rebuttal Report of Greg Eidson**
**August 24, 2026**

GlassRatner

# CONTENTS


1.0 Introduction and Summary Conclusion .................... 1

1.1 Introduction .................... 1

1.2 Summary Opinion .................... 1

2.0 Professional Qualifications and Background of Greg Eidson .................... 6

3.0 Scope of Work .................... 7

4.0 Background .................... 8

5.0 Expert Rebuttal Report of Daniel Mizukovski, August 14, 2026 .................... 9

6.0 Summary Opinions .................... 18

Appendix 1 .................... 20

Greg Eidson CV .................... 20

Appendix 2 Documents Considered .................... 25

# 1.0 Introduction and Summary Conclusion

## 1.1 Introduction

1. GlassRatner Advisory & Capital Group, LLC ("**GlassRatner**") was retained by Boies Schiller Flexner LLP ("**Counsel**"), on behalf of Debtors Hudson 1701/1706, LLC and Hudson 1702, LLC (together, the "**Debtors**") in connection with the Debtors' pending chapter 11 bankruptcy cases (collectively, the "**Bankruptcy Cases**") commenced on October 22, 2025 (the "**Petition Date**").

2. Daniel Mizukovski prepared a rebuttal ("**Mizukovski Rebuttal**") of my report which was dated July 27, 2026. I have reviewed the Mizukovski Rebuttal and offer my comments and clarifications in this report.

3. The scope of this rebuttal of the Mizukovski Rebuttal is to correct inaccuracies and misstatements in the Mizukovski Rebuttal as well as offer my opinions on Mr. Mizukovski's methodology of estimating market ground rent.

4. Any minor differences in the amounts calculated or referenced in supporting documentation or schedules to this report are due to rounding.

5. The hourly rates charged by GlassRatner for professional services provided in this matter range from $225 to $795. My time is billed at $695 per hour. I do not have a financial interest in this dispute, and our compensation is not dependent on the outcome of this matter.

6. I reserve the right to revise and supplement my analyses, opinions, and report to the extent additional relevant information becomes available. I also reserve the right to produce a rebuttal or response report related to any analyses or reports submitted on behalf of the Defendants.

## 1.2 Summary Opinion

7. My opinions are presented in two parts: 1) my response to Mr. Mizukovski's comments on my report and 2) my opinions on Mr. Mizukovski's methodology and conclusions.

GlassRatner

8. Based on the analyses contained herein, my opinions are that:

- **Mr. Mizukovski describes my analysis as a mischaracterization of the task**. The task is to estimate the Ground Rent applicable during the bankruptcy period from October 1, 2025 to the present.
  - Mr. Mizukovski opines that my methodology, which considers the entire real estate ecosystem[1] (a phrase adopted from Safehold), is reverse engineering the ground rent.
    1. Reverse engineering can be defined as the process of working backward from a known output, solution, data set, or final behavior to find the original equation, parameters, or governing rules. Instead of solving forward (input to output), you reconstruct the hidden logic from the results.
    2. Reverse engineering is a fair term for what I did. I used the known cash flow calculations from the BBG Appraisal 2022,[2] estimated the debt obligations with market terms, relied on published multifamily lending measures, and estimated how much ground rent the property could support at this point in time.
    3. In paragraph 34 of his report, Mr. Mizukovski reverse engineered the current ground rent ($8,750,00) with the investors purchase of $178,000,000 (2021-2022) to arrive at a return of 4.92%. Mr. Mizukovski reports that this return is below market. The property was purchased when the 30-year Treasury rate was 2.10%. By this measure, 4.92% would be a market or above market return. Comparing a purchase in 2021-2022 with the 2025-2026 market is not a fair and just comparison. The cost of debt has increased, Treasury rates of return have increased, and the cost of development and operating costs have all increased. Mr.

[1] In the context of Safehold and commercial real estate, "**ecosystem**" refers to the interconnected network of professional participants, capital providers, and regulatory structures that cooperate to buy, build, finance, and manage properties.

[2] BBG 2022 was used because the timing of the development would put stabilization near the current bankruptcy period.

Mizukovski did not explore the real possibility that the property may not command the same price in 2025-2026 as it did in 2021-2022.

- Mr. Mizukovski would like to make this process as simple as calculating a return on the property land purchase, a return described by Mr. Mizukovski as "required" by investors. Investors may desire a return, but that return needs to be considered in the large ecosystem of the deal.

- In paragraph 23 of Mr. Mizukovski's report, he suggests that the appropriate ground rent should not be influenced by property-level financing and then quickly contradicts that statement. If the ground rent is not impacted by the level of leasehold financing, why would he state that my projections do not reflect current pro-formas for determining the appropriate ground rent?

1. Mr. Mizukovski says: *This is inconsistent with what should be the purpose of the Eidson Report, which is to determine the appropriate ground rent as of today**—a metric that is not impacted nor reflective of the level of leasehold financing, real or hypothetical.** Similarly, Mr. Eidson relies on a pro-forma (a cash flow projection) prepared by the appraisal firm BBG in 2022 to develop his estimate of the project's stabilized income and expenses**—a four-year-old projection that does not reflect more current pro-formas, prepared on Tenant's behalf, for determining the appropriate ground rent today***. In two sentences, Mr. Mizukovski both rejects and then incorporates leasehold financing.
2. To further clarify the point of my analysis: the four-year-old projection was used because it was the most reliable forward-looking presentation of cash flow available. The number in this cash flow was projected forward, from 2022 through 2026, at market rates. The construction and lease-up time were also considered.
3. The other reports we were provided with were, in my opinion, either unrealistic (the BBG Hotel component) or

their forecast stabilization was well beyond this period of October 2025 to the present.

a. BBG Appraisal 2024 forecasted stabilization in 2026.
b. Colliers Appraisal 2025 forecasted stabilization in 2029.

- Mr. Mizukovski references Safehold thirteen times in his report. However, he references Safehold for data that is beneficial and ignores Safehold for data that is not. For example:

1. Paragraph 8: *Market convention, by contrast, determines ground rent by reference to what investors in leased fee interests are seeking to achieve in terms of current yield on their acquisition cost / investment or land/property contribution.* Safehold is quoted as the source.
2. Safehold defines the 'market convention' by completely flipping it. Historically, the market convention for establishing a ground lease rate was to calculate a fixed return percentage against the appraised fair market value (FMV) of the land, heavily reliant on periodic, litigious resets. Instead, Safehold sets its own institutional convention based on combined property metrics, capital stack optimization, and absolute predictability. In short, Safehold evaluates and pitches its rate structure through specific market-based benchmarks. On their website, *Safeholdinc.com*, Safehold describes reduced upfront equity requirements, reduced cost of capital with a low-cost, long-term, flexible structure and lender friendly structure approved by banks, CMBS, debt funds, life companies and agencies. Clearly, Safehold takes all parties into consideration.
3. This model used by Safehold is the point of my analysis. All property metrics must be considered to create a ground lease that both serves the Landlord and makes the

development successful. It does not matter what return the Landlord wants if that return creates a burden on the property ownership and lenders. Conventional ground leases focus entirely on the land. Safehold's convention looks at the **entire real estate ecosystem.**

4. Safehold breaks market convention by framing their rate not as a 'landlord's rent,' but as a cost of capital. "Because ground rent is treated as an above-the-line expense rather than debt, the property's income is more appealing to a permanent lender."[3] "After resizing the permanent loan based on net operating income after ground rent, the combination of ground lease proceeds and debt typically leaves developers with 10% to 20% more total capital than they'd have in a traditional deal."[4] This paragraph reiterates what I have previously stated. The ground lease is not a static calculation. The rate of return and ultimate annual rent must fit into the entire real estate ecosystem. As this process relates to the current bankruptcy proceedings, the rent must be examined at the stage of completion and stabilization this project was expected to be.

- The phrases, *Hypothetical Leasehold Loan or Hypothetical Loan,* are used by Mr. Mizukovski twenty-four times in his rebuttal report.

1. **Merriam-Webster** defines "hypothetical" as "an adjective meaning based on a hypothesis, assumption, or imagined idea rather than on real facts or proven evidence."
2. **The Dictionary of Real Estate Appraisal, 7th Edition, (Appraisal Institute)**, defines "hypothetical" as "A condition that is presumed to be true when it is known to be false. (SVP) at 2. A condition, directly related to a specific assignment, which is contrary to what is known by the

[3] Why the modern Ground lease has become an affordable housing gap filler, Insight, May 20, 2026

[4] Why the modern Ground lease has become an affordable housing gap filler, Insight, May 20, 2026

appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis." *Comment*: "Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2020-2021 ed.)"

3. Under the strict interpretation of this definition, the task of estimating the market rent on a building under construction and estimating what the rent would be if construction were complete and the building occupied and stable at this time is hypothetical. We know the building has not been completed, is unoccupied (other than a few tenants), and has no meaningful cash flow. In the larger picture, we are developing a hypothetical analysis, but, in the details, I am using actual or market data to develop credible conclusions.
4. The construction loans (what I refer to as the "**Parkview Loan**" below) are not hypothetical; they are part of the Hudson Project, necessary for its development, and were required by the terms of the ground lease at issue here.
5. The terms of lending are not hypothetical, rather all market-derived for the period that I estimated the construction loan would start.
6. Estimating loan terms on a development project does require assumptions, each deal has its own unique characteristics, but they will fall into market parameters. These assumptions do not make it hypothetical; they simply make it a reflection of the market.
7. The cash flows used are not hypothetical. They are sourced from the BBG appraisal that I reviewed and found reliable.

## 2.0 Professional Qualifications and Background of Greg Eidson

9. This report was prepared by Greg Eidson, a Managing Director in the Atlanta office of GlassRatner. My work address is 3445 Peachtree Road NE, Suite 1225, Atlanta, Georgia.

10. I hold a B.S. in Finance from Auburn University (1986), an MAI Designation from the Appraisal Institute (1995), a CCIM Designation from the CCIM Institute (1997), a real estate sales license in Georgia, and a real estate associate broker's license in Alabama.

11. I have forty years of experience in the real property valuation, brokerage, and consulting industry. My education includes a Bachelors in Finance from Auburn University, the MAI Designation from the Appraisal Institute, and the CCIM Designation from the CCIM Institute. I have particular appraisal experience in multi-family, student-housing, free standing and multi-tenant retail, extended-stay hotels, limited service and full-service hotels, office buildings, industrial properties, special purpose properties and self-storage facilities, residential subdivisions, conservation easements, mitigation banks, recreational and timber land, and right-of-way for public and private utilities and state and local transportation clients. Clients range from individual and regional investors, developers, national and regional lenders, pension fund advisors, insurance companies, government agencies, CPAs, attorneys, and Fortune 500 chief financial officers.

12. My valuation opinions have been used in the context of mortgage lending, right-of-way acquisitions, bankruptcy court, buy/sell decisions, purchase price allocation, loan monitoring, forced disposition, portfolio performance monitoring, and litigation support. My C.V. is attached hereto as **Appendix 1**, further documenting my experience and expert witness testimony.

13. I have no previous relationship with any of the parties to this matter and am independent of these parties.

## 3.0 Scope of Work

14. The opinions and conclusions set out herein are based on my review of the *Expert Rebuttal Report of Daniel Mizukovski, August 14, 2026*. The documents that I rely upon in this Report are listed in **Appendix 2**. For ease of reference, in footnotes to this Report, I have cited the documents (or other information) on which I have relied upon.

15. My analysis includes the preparation of various cash flow calculations and conclusions. All of the analyses and methodologies applied herein are fully consistent with generally accepted bodies of knowledge related to real estate valuation.

16. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

## 4.0 Background[5]

17. On or around February 3, 2022, CSC Hudson LLC ("**CSC**") entered into a purchase and sale agreement to purchase certain condominium units in the Hudson Project, specifically:

   a) Unit 1701: 203,585 square feet of the Hudson Project, including the mezzanine, floors 2 through 9, and floor 25 ("**Unit 1701**");
   b) Unit 1702: 216,937 square feet of the Hudson Project, including floors 11 through 22 and portions of floors 23, 24, and 26 ("**Unit 1702**"); and
   c) Unit 1706: 17,981 square feet of the Hudson Project consisting of the 10th floor ("**Unit 1706**"). The purchase and sale agreement included a lease agreement for Unit 1706, with an option to purchase. Units 1701, 1702 and 1706 are collectively referred to as the "**Hudson Project**."

18. CSC subsequently assigned the purchase and sale agreement for the Hudson Project to the Ground Lessor. On May 4, 2022, the Ground Lessor acquired Unit 1701 and Unit 1702, along with a purchase option for Unit 1706. On or around January 3, 2023, the Ground Lessor acquired Unit 1706.

***Ground Lease***

19. On the same date, May 4, 2022, the Debtors entered into the Ground Lease with the Ground Lessor. The Ground Lease, upon issuance, had the following terms:

   a) Ground Rent was $6,000,000 annually (payable in $500,000 monthly installments). The annual Ground Rent was subsequently increased to $6,400,000 when the Ground Lessor purchased Unit 1706 in January 2023;
   b) Ground Rent increased 10% in years six and eleven, and then at least 2% annually for the next 88 years.[6]

[5] The events discussed in this section are not intended to represent an exhaustive history of all relevant facts and events surrounding this dispute. We provide this information to aid in the understanding of this Report, and we may cite to the operative pleadings in this case for that purpose. In doing so, we do not express any legal opinion on the allegations or the facts alleged in these pleadings.

[6] Ground Lease dated May 4, 2022.

20. As part of the redevelopment plan for the Hudson Project, on or around May 4, 2022, Plaintiffs received an aggregate $207 million in development and construction financing ("**Parkview Loan**") from Parkview Financial REIT LP ("**Parkview**"). The Loan matured on November 1, 2024 (the "**Parkview Maturity Date**").

a) The Parkview Loan amount is used in my analysis to calculate the annual debt service. The annual debt service is based on market terms as of 2024.[7] Additionally, the pro forma presented by the appraisal firm BBG[8] is used to develop the estimate of stabilized income and expenses of the completed development. These two documents (Parkview Loan and BBG appraisal) are instrumental in the calculation of the market ground rent. The ground rent is an expense that, coupled with all operating expenses of the Project and deducted from the effective gross income, equals the operating cash flow (net operating income) that is available for debt service. As will be presented herein, lenders prefer a minimum debt service coverage ratio ("**DSCR**") of 1.25. The calculation of the DSCR is $DSCR = Operating\ Cash\ Flow/Debt\ Service$. This means the lender wants a minimum cash flow that is 25% greater than the debt service.

21. On **March 29, 2024**, the Debtors and Ground Lessor entered into the Fourth Amendment to the Ground Lease. **Ground Rent increased to $8,750,000 annually** ($729,166.97 per month). The Fourth Amendment also allowed for more frequent adjustments to the Ground Rent to account for inflation and ensured that increases were no less than 2% per year, regardless of inflation.[9]

## 5.0 Expert Rebuttal Report of Daniel Mizukovski, August 14, 2026

22. Mr. Mizukovski prepared a rebuttal of my expert report ("**Eidson Report**") dated July 27, 2026. Mr. Mizukovski's report will be referred to herein as the "**Mizukovski Rebuttal**." I have reviewed this report, and the following is my rebuttal in the order of the points presented in the Mizukovski Rebuttal. Paragraph numbers from that Rebuttal are presented followed by my opinion points.

[7] 2024 Mortgage Survey Report, April 18, 2024, by New York City Rent Guidelines Board.

[8] BBG Appraisal Report, March 25, 2022.

[9] Fourth Amendment to Ground Lease dated March 29, 2024.

23. Mizukovski Rebuttal ¶ 6. Mr. Mizukovski criticizes my methodology, defines the task I should have used, and states that the ground rent amount is the base from which the leasehold financing is determined.

a) Mr. Mizukovski attempts to determine current ground rent in 2026 by relying on a purchase price from 2022. This approach assumes that land values today are unchanged from 2022, while Mr. Mizukovski also acknowledges that what he calls "investor-required returns" have increased significantly. Between January 2022 and August 2026, the 30-year U.S. Treasury rate increased by approximately 3.09%, rising from 2.10% at the start of 2022 to 5.19%. As a result, borrowing costs increased materially. *See* Debt Cost Table below.

**Debt Cost Comparison: 2022 vs. 2026**

The table below contrasts standard fixed-rate permanent agency debt (e.g., Fannie Mae or Freddie Mac) for a stabilized New York apartment building:[1]

| Financial Metric | 2022 Market Standard | 2026 Current Market | Impact on Project Execution |
|---|---|---|---|
| **10-Year U.S. Treasury** | ~1.60% – 2.50% | **~4.71%** | Baseline reference index has surged over 220 bps. |
| **All-In Fixed Interest Rate** | 3.25% – 4.25% | **5.65% – 6.25%** | Borrowing capital costs are nearly twice as high. |
| **Max Loan-to-Value (LTV)** | 75% – 80% | **55% – 65%** | Lenders require substantially more upfront equity. |
| **Req. Debt Service Coverage** | 1.25x | **1.35x – 1.55x** | Projects must generate more cash flow to justify the same loan size. |
| **Underwriting Focus** | Aggressive forward rent growth | **Proved historical NOI & expense control** | Paper projections are discounted; strict underwriting is mandatory. |

[1] https://www.northmarq.com/insights/rates-spreads

b) In addition, the multifamily market in New York submarkets has changed materially since 2022. A review of the Midtown West submarket (data by CoStar) indicates that property values have declined by approximately 22%, *see* Hudson0044841, while NOI remains

unchanged. The primary driver of this decline is the increase in capitalization rates, which has been influenced by higher borrowing costs and increased risk associated with slower rent growth, new construction, and increased development costs.

24. Mizukovski Rebuttal ¶ 7. Mr. Mizukovski disagrees with my methodology. The accusation is that I am not using an independent method to arrive at the market ground rent.

a) In estimating the ground rent during this bankruptcy period, assumptions are required. Mr. Mizukovski states that the appropriate measure is a return on the Landlord's investment. He then estimates a ground rent based on the 2022 purchase price with 2026 rates of return, and no consideration for the financial dynamics of the surrounding market. The use of the 2022 purchase price as a base assumption is flawed without also adjusting for the time. As I have noted and will repeat, the market dynamics changed a lot from 2022 to 2026. Mr. Mizukovski makes this point by illustrating the rapid increase in Treasury rates. Those same rates have a negative impact on property value because they increase the cost of borrowing and reduce the money available to pay the ground rent.

b) The Parkview Loan is not hypothetical. It is part of the ground lease. Without financing the development deal does not move forward. Without financing there is no return for the Landlord's investment. Mr. Mizukovski treats the ground lease as if it were unrelated to the development of the property. The ground lease is an integral part of the development, as is the debt service, gross income, expenses, and cost of stabilization. All are important factors that were designed to work together to achieve a positive outcome for all parties.

25. Mizukovski Rebuttal ¶ 8. This paragraph is another critique of my methodology: *Market convention, by contrast, determines ground rent by reference to what investors in leased fee interests are seeking to achieve in terms of current yield on their acquisition cost / investment or land/property contribution and is not a function of what a hypothetical leasehold financing will render available after satisfying such leasehold lender's debt service coverage requirement.*

a) "*Seeking to achieve*" is a wishful objective. There is a difference in what the market will pay for an investment as compared to what the investors are "*seeking to achieve*." The most recent submarket analysis prepared by CoStar of the subject's market

illustrates this. From the 2nd Quarter of 2016 to the 4th Quarter of 2022, capitalization rates were in a tight range of 3.5% to 3.8%. In the 1st Quarter of 2023, these rates started to increase until the 2nd Quarter of 2024. The year-to-date 2026 the average capitalization rate is 4.5%. [10] As capitalization rates go up and the net operating income remains unchanged, the property value goes down.

26. Mizukovski Rebuttal ¶ 17. A list of ground lease transactions is presented but no details are provided.

a) The details of each of these transactions should be provided for our review.

27. Mizukovski Rebuttal ¶ 20. This paragraph contains a repeating theme that "market convention," on establishing a ground lease amount, is not followed in my analysis.

a) Once again, "market convention," as defined by Mr. Mizukovski in paragraph 8, *determines ground rent by reference to what investors in leased fee interests are seeking to achieve in terms of current yield on their acquisition cost / investment or land/property contribution and is not a function of what a hypothetical leasehold financing will render available after satisfying such leasehold lender's debt service coverage requirement.*

b) Safehold, which Mr. Mizukovski references repeatedly, sets its own institutional convention. Safehold defines the "market convention" by completely flipping it. Historically, the market convention for establishing a ground lease rate was to calculate a fixed return percentage against the appraised fair market value (FMV) of the land, heavily reliant on periodic resets. "Safehold, the lessor, acquires the fee interest with proceeds at a premium to the underlying land value, funding both the land cost and a tenant improvement allowance, which serves as an additional funding source for the project. According to Wylder (Steve Wylder, executive vice president and head of investments at Safehold), the lease rate—Safehold's cost of capital—is 'well inside of conventional permanent debt, which typically helps to drive a 10% to 20% increase in permanent proceeds after including ground rent as an 'above the line' operating expense and resizing the debt accordingly.'"[11] Instead, Safehold sets its own

[10] CoStar Midtown West Multi Family DataTable.xls

[11] Ground Lease 101; What Developers Need to Know, Affordable Housing Finance, Donna Kimura, Jan. 12, 2026.

institutional convention based on combined property metrics, capital stack optimization, and absolute predictability. Unlike Mr. Mizukovski, Safehold evaluates and pitches its rate structure through several specific benchmarks.

c) This model used by Safehold is the point of my analysis. All property metrics must be considered to create a ground lease that both serves the Landlord and makes the development successful. It does not matter what return the Landlord wants if that return creates a burden on the property ownership and lenders.

d) Conventional ground leases focus entirely on the land. Safehold's convention, like mine, looks at the entire real estate ecosystem.

e) Safehold reiterates what I have previously stated. The ground lease is not a static calculation. The rate of return and ultimate annual rent must fit into the entire real estate ecosystem. As this process relates to the current bankruptcy proceedings, the rent must be examined at the stage of completion and stabilization this project was expected to be.

28. Mizukovski Rebuttal ¶ 21. This paragraph states: *Ground rent is the senior, controlling variable in a ground lease*.

a) This phrase is sourced from a marketing piece for the Raymond James brokerage. It is an article on why one should invest in ground leases. This is not an authority on ground leases.

29. Mizukovski Rebuttal ¶ 23. This paragraph states: *The assumptions underlying Mr. Eidson's hypothetical loan are themselves problematic, independent of the flawed methodology they support. In Paragraph 21 of the report, Mr. Eidson explains that his analysis uses the $207,000,000 "Parkview Loan amount"—the original 2022 construction financing—to calculate annual debt service, which annual debt service itself is based on purportedly market terms as of 2024. This is inconsistent with what should be the purpose of the Eidson Report, which is to determine the appropriate ground rent as of today**—a metric that is not impacted nor reflective of the level of leasehold financing, real or hypothetical**. Similarly, Mr. Eidson relies on a pro-forma (a cash flow projection) prepared by the appraisal firm BBG in 2022 to develop his estimate of the project's stabilized income and expenses**—a four-year-old projection that does not reflect more***

***current pro-formas, prepared on Tenant's behalf, for determining the appropriate ground rent today.***

a) The bold parts of this paragraph provide an interesting contrast. In the middle of the paragraph, we are told the metric I use is not reflective of the market. At the end of the paragraph, he writes that current pro-formas are used in **"determining the appropriate ground rent today."** We are in agreement that pro-formas (cash flow projections) are important in the ecosystem of a development that benefits all parties involved. There is no reason that debt obligations would not be a part of the pro forma. However, these two statements contradict contentions made throughout the Mizukovski Rebuttal that the ground rent is based only on the investors' required return. The ground rent is not an isolated calculation. What the investor wants does not matter if the property cannot support it.

30. Mizukovski Rebuttal ¶ 23. Additionally, this same paragraph in the Mizukovski Rebuttal has concluded the use of the 2022 construction financing and the 2024 market terms of a construction loan are inconsistent. The Mizukovski Rebuttal is also critical of the use of the pro forma from the 2022 BBG Appraisal.

a) I used the 2024 market terms to coincide with the loan terms being permanent at the same time as the hypothetical development is completed. The timing does create higher debt service than what would have happened if the property had shifted from a construction loan to permanent loan in the 2022 time period. That was not the case, and modeling it that way would not have been an accurate representation of the construction schedule.

b) I used the BBG 2022 appraisal for these reasons:

1. This report had a timeline that concluded completion in 2023 and stabilization in 2024. Meaning the cash flow would be stable at the time of the bankruptcy in 2025-2026.
2. This was the valuation of an apartment development. My research suggested that this was, and is, the most appropriate and likely use.
3. The BBG 2024 appraisal did not forecast stabilization until November 2026.

4. The Colliers 2025 appraisal did not forecast stabilization unit March 2029. The Colliers 2025 appraisal produces a stable NOI of $9,313,254 after ground rent and $15,713,254 before ground rent. When these numbers are discounted back to 2026, they are not materially different from the BBG 2022 projections at the same point in time.

c) Considering what happened with the Hudson Project's permitted apartment mix, 172 units reduced to 80% AMI, the 2022 pro forma would have produced a higher cash flow and thus more revenue for ground rent than would the most current pro forma.

31. Mizukovski Rebuttal ¶ 33. *The 30-Year Treasury Rate as of the date of this report is approximately 5.2%. Applying the risk-based spread described above, market leased fee investors require a total current yield on their investment of approximately 5.35% to 6.70% (5.2% plus 15 to 150 basis points). For a development project such as the Hudson Hotel, the expected market yield sought by such investors falls at the higher end of this range, reflecting the greater risk associated with an incomplete, in-process redevelopment/conversion project.*

a) The source used by Mr. Mizukovski for this increase over development risk uses 50 basis points, not 150. Thus, Mr. Mizukovski overstates the risk/reward requested by the market. This overstatement has the impact of increasing the returns to the landowner. Using the 50 basis points referenced in the source document means the rate goes down to 5.7%, not up to 6.7%.

32. Mizukovski Rebuttal ¶ 34. The market ground rent is calculated to be $11,125,000.

a) This calculation has no consideration for other market dynamics. These would include the increases in market vacancies and cap rates since 2022. These market dynamics typically put downward pressure on land prices. Mr. Mizukovski's use of the 2022 property purchase and the current proposed rates of return distort the estimated ground rent.

b) Additionally, with no consideration for the other market dynamics, particularly the cost of debt, Mr. Mizukovski's ground rent estimate would put the property in a position of

negative cash flow. This is not a financeable position that benefits any party to this development deal.

33. Mizukovski Rebuttal ¶ 35. This paragraph states: *Once ground rent is properly established under this methodology, **it is appropriate, though secondary, to consider the level and cost of leasehold financing proceeds that a tenant can obtain against that ground rent**. A relevant measure of leasehold financeability is the coverage ratio of stabilized NOI before ground rent to the ground rent itself, with stabilized NOI reflecting a nearly fully leased project. An appropriate coverage ratio for optimizing leasehold financing proceeds is generally 3.0x or greate*r.

a) Mr. Mizukovski sees the consideration of the cost of debt to be secondary. This contrasts with his favorite report source, Safehold, which considers the entire ecosystem of the deal. The ecosystem would include all parties to the development.

b) I agree with the examination of the NOI coverage ratio in addition to well established ratios, such as the debt service coverage ratio. A NOI/ground rent ratio of 3.0x or greater is an industry standard. It is a guide, but this ratio or a multiple does not carry the reliability and weight of the DSCR, which provides a direct indicator of the cash flow's ability to cover debt service. As this ratio goes down, it means there is less cash flow to pay the debt and a higher probability of default on the debt.

c) Mr. Mizukovski states that an appropriate DSCR is 3.0x or greater. With his calculated rent of $11,125,000, the DSCR for the Hudson Project would be 1.35x based on annual pre-debt service NOI of $15 million, which is unacceptable and results in a property that, after debt service, has negative cash flow.

34. Mizukovski Rebuttal ¶ 36. Stabilized NOI before ground rent is discussed.

a) There is no reference in this paragraph as to when stabilization will occur. There are no footnotes as to which reports are referenced. I do not see the 2025 National Valuation Consultants appraisal in our files. I do see a 2025 Colliers Appraisal report reflecting a stabilized NOI (2029) of $9,313,254, after $6,400,000 in ground rent is paid.

35. Mizukovski Rebuttal ¶ 37. This paragraph states: *Such midpoint happens to be reflected in the pro-forma presented by Tenant to Landlord dated August 2024, which projects a*

*stabilized NOI of approximately $23.3M for a mixed-use development comprising 61 hotel rooms, 140 affordable residential units and 242 market-rate residential units. At the contract annual ground rent of $8,750,000, the coverage ratio of stabilized NOI before ground rent to ground rent is approximately 2.66x*.

a) First, this referenced report is vaguely defined. It is not available for our review. Secondly, the stabilization period is not defined. Stabilization might be the year of the report, 2024, or a future date. Timing matters because a future date would need to be discounted back to the bankruptcy time period. Third, Mr. Mizukovski uses this August 2024 pro forma with no opinion on the feasibility of a mixed-use hospitality/residential development. Fourth, the "coverage ratio" of 2.66x is only a measure of the cash flow covering the actual ground rent. Mr. Mizukovski's own measure of the ground rent ($11,250,00) would produce a coverage ratio of 2.07x, which is well below the 3.0x Mr. Mizukovski reported to be optimal. There is also no discussion of the referenced cash flow to carry any debt service.

36. Mizukovski Rebuttal ¶ 38. *I have personally structured ground leases with similar or lower stabilized coverage ratios that have proven successful. One such lease is at 295 Fifth Avenue in Manhattan, where the pro-forma stabilized coverage ratio at origination, and again recently, was roughly 2.4x. Another such lease is at 114 Fifth Avenue in Manhattan.*

a) Mr. Mizukovski is familiar with these deals and should present the terms. The presentation of specific deals he has worked on with the isolation of one measure without providing context to the entire deal comes across as deceptive and disingenuous.

37. Mizukovski Rebuttal ¶ 41. *Ground rent is not, and has never been, a function of what a leasehold lender is willing to permit. It is a function of what an investor in the leased fee interest requires by way of current yield on that investment in the current investment environment.*

a) This statement reads if the leased fee interest does not get what it "requires," there will be no development deal. When this happens the leased fee interest must either be willing to sit on the land with no return or work with the other parties in the development to find common ground, returns, and incentives that work for all parties involved. This is what Safehold means when they describe working with the entire

real estate ecosystem. The terms of a purchase or development deal must work for all parties involved or it does not work for anyone. Any “required” return or yield is like everything else, subject to negotiation.

## 6.0 Summary Opinions

38. Based on the analyses contained herein, my opinions of the Mizukovski Rebuttal are that:

- Mr. Mizukovski presents a view of the development world in which only one thing matters, the returns required by the leased fee interest. In his opinion, the receipt of this return to the leased fee interest trumps all other terms of a development deal. Based on his experience with ground lease deals, I would expect that this is not his true and actual experience.
- Mr. Mizukovski relies on references to Safehold throughout his report. He does not recognize that Safehold has a completely different approach to ground leases than he does. “Safehold sets its own institutional convention based on combined property metrics, capital stack optimization, and absolute predictability.” This cooperation among vested parties is how I estimated the rent in my analysis.
- Mr. Mizukovski uses the term “hypothetical” throughout his report to distinguish my analysis from his. In reality, both analyses rely on third-party reports, assumptions, and estimates to reach conclusions. In an incomplete real estate redevelopment, numerous variables require estimates based on research, analysis, and experience.

39. Based on my review of the Mizukovski Rebuttal, this report is heavily biased toward the leased fee interest, putting the supposed returns of the leased fee interest in a bubble. There is no consideration for the other parties to the redevelopment who ultimately drive the success of a project.

40. Accordingly, my opinion of the excess rent remain unchanged. From November 2025 through May 2026 (the first seven months of the Debtors’ bankruptcy case), the Debtors paid **$3,682,260** in excess of market rent.

Respectfully submitted,

Greg Eidson, MAI, CCIM
Managing Director
GlassRatner Advisory & Capital Group, LLC

GlassRatner

## Appendix 1
## Greg Eidson CV

# GREG EIDSON MAI,CCIM

geidson@glassratner.com
(470) 346-6825

In the late 1990s prior to the formation of his own firm, Greg worked for The Highland Group Hotel Investment Advisors. This boutique style consulting firm is a specialist in the market analysis of hospitality properties. Greg prepared valuation reports for full-service, limited-service and extended-stay properties. These reports were used for the purpose of development decisions, purchase decisions, feasibility and financing. Geographically, these hotel projects were typically located in the Midwest, East Coast and the Southern states. My tenure with The Highland Group was an excellent education in the analysis of hotel feasibility. The most valuable takeaway from this experience was gaining a greater depth of understanding in the development of demand studies.

In the late 1980s to the 1990s, Greg worked in the Real Estate Advisory Group of American Appraisal Associates. Greg started with American Appraisal Associates as a junior level appraiser and was the Manager of the Atlanta office of the Real Estate Advisory Group when in departed the company in the mid-1990s. During his tenure with the company Greg prepared and managed appraisal assignments for pension funds, insurance companies, portfolio managers, lenders, attorneys and Fortune 500 companies. These valuation assignments were used for purchase price allocation, investment portfolio analysis, mortgage loans, property tax appeals, and cost segregation studies. Greg was recognized by the company for his ability to address client needs in a timely and professional manner. The experience with American Appraisal was invaluable to my education in managing people and projects and learning to balance the expectations of our clients with the human and technological resources. Geographically, Greg travelled throughout the United States and Caribbean and personally handled residential subdivision developments in Southern California; mixed-use high rise buildings in downtown San Francisco; high rise office buildings in Dallas, Denver, Chicago, and Boston; regional malls in Texas; movie theaters in New York; shipping facilities in Houston; industrial manufacturing and distribution buildings in states from California to Connecticut to Georgia; multi-family apartment developments in North Carolina to Florida and hotels in California and the Caribbean.

Greg has completed two of the Appraisal Institute's Professional Development Programs and appears in the Institute's Registry for:

- Litigation Appraising: Specialized Topics and Applications
- Valuation of Conservation Easements

Greg maintains a General Certified Real Property Appraisal License in Alabama, Georgia and Florida. He can obtain temporary licensing permits in other states on a case by case basis. Greg is also a Realtor with a broker's license in Alabama and a salesperson's license in Georgia.

Greg's formal education consists of a Bachelor of Science in Finance from Auburn University, the MAI Designation from the Appraisal Institute and the CCIM (Certified Commercial Investment Member) Designation from the CCIM Institute. The MAI Designation is an appraisal designation presented to those that complete the required experience, extensive coursework in specific valuation related material and pass a comprehensive exam. The CCIM Designation is awarded to those who through coursework, experience and a comprehensive exam are recognized expert in the commercial and investment real estate industry. The designation process ensures that CCIMs are proficient not only in theory, but also in practice.

glassratner.com GlassRatner

GlassRatner

# GREG EIDSON

MANAGING DIRECTOR

MAI, CCIM

geidson@glassratner.com

(470) 346-6825



### Prominent Matters

- Damages/Expert Witness to Valuation - Dolly Ridge Point Owners Association, Inc., et al v. Turner & Schoel, LLC, et al.
- Valuation/Expert Witness - Joon, LLC. D/B/A Ajin USA v. Albert Kahn Associates, Inc./ International Industrial Contracting Corp./Qualico Steel Company, Inc.
- OSI, Inc. v United States, et al. Case No. 98-00920-CV-2-MEF-WC.
- Stallings & Sons, Inc. v Tulane Revitalization 1, LP, et al. Case No. 2:19-CV-392-WKW.
- Charlotte Student Housing, DST, et al v Choate Construction Company. Mediation.
- Fredmark, LLC. V. Zax, LLC. Civil Action No. 1:20-cv-1848-TCB.
- Valuation/Expert Witness - State of Alabama v. Harry Joseph Painter et al.

**Specialties:**

Borrower & Lender Advisory
Cash Flow Projections
Construction Litigation
Due Diligence
Expert Witness
Feasibility Studies
Litigation Support
Market Analysis
Purchase Price Allocation
Real Estate Appraisal
Real Estate Brokerage
Valuation

**Industries:**

Real Estate

Mr. Eidson is a veteran of the valuation industry with more than 30 years of experience in the real property valuation, brokerage, and consulting industry. Mr. Eidson has particular appraisal experience with industrial real estate that includes heavy and light manufacturing, warehousing, distribution, and special purpose such as meat processing plants, timber processing, automotive and steel manufacturing. More general appraisal experience includes free standing and multi-tenant retail, extended-stay hotels, limited service and full service hotels, office buildings, industrial properties, special purpose properties, multi-family and self-storage facilities, residential subdivisions, conservation easements, mitigation banks, recreational and timber land, right-of-way for public and private utilities and state and local transportation clients.

Greg's valuation opinions have been used in the context of mortgage lending, right-of-way acquisition, bankruptcy court, buy/sell decisions, purchase price allocation, loan monitoring, forced disposition, portfolio performance monitoring and litigation support.
Prior to merging his firm into GlassRatner in late 2018, Greg ran The Eidson Company and focused his practice on conservation easements, mitigation banks, mortgage loans, right of way, and litigation support. During the 18 years that Greg ran his own firm some of his assignments included;

- Residual insurance valuation for a British insurance company who insured the difference between market and contract rents on properties such as Walgreens and CVS Pharmacy occupied properties.
- Right of way valuation for the Alabama Department of Transportation, Georgia Department of Transportation, municipal utilities, the National Park Service, and the Sabal Trail Pipeline.
- Litigation support weighted toward deposition and testimony with the Department of Transportation and also includes support for lawsuits that involved property damaged by flooding (land, residential and multifamily projects), contamination (medical waste, dry cleaning solvents), and construction defects (residential construction, office building damage, hotel water leaks, multi-family construction, industrial manufacturing construction). Greg has testified to property taxation issues and conservation easements in Federal Tax Court.
- Preparation of appraisals for bankruptcy and foreclosure proceedings, and,
- Preparation of appraisals for Mortgage loans encompasses subdivision developments, hotels, mixed use developments, retail, industrial, office, special purpose, and timber land.

glassratner.com GlassRatner

GlassRatner

GlassRatner

3445 Peachtree Road, Suite 1225
Atlanta, GA 30326
Tel: (470) 346-6800
glassratner.com

Testimony Experience

**NANCY B. PARKER & ELLIS J. PARKER, Plaintiff,**
**vs.**
**U.S. TRUST COMPANY, N.A. & BANK OF AMERICA, N.A. Defendant**
**Plaintiff Firm – HENRICHSEN LAW GROUP, PLLC**
**Defendant Firm - McGuireWoods LLP.**
**Deposition: January 15, 2026**
**Comments: Opinions of 3rd Party Appraisal in metro Washington, D.C.**
--------------------------------------------------------------------------------------------

**Peachtree Associates, LLLP and GPH Aspire, LLC, v. MCG Charleston Apartments, LLC, ...**
**Plaintiff Firm – MORRIS MANNING & MARTIN, LLP**
**Defendant Firm - URICCHIO, HOWE, KRELL, JACOBSON, TOPOREK, & KEITH, P.A.**
**Deposition: August 7, 2025**
**Comments: Dispute over undisclosed assets in purchase of muti-family property**
--------------------------------------------------------------------------------------------

**Lora Drycksback v McBride's RV Storage LLC, McBride's RV and Boat Storage LLC, Andrew McBride, Benjamin McBride, Charles McBridge and Does**
Defendant Firm: Freeman, Freeman & Smiley, LLP
Plaintiff Firm – McCune Law Group
Deposition: October 19, 2023
**Comments:** Review of 3rd Party Appraisal
--------------------------------------------------------------------------------------------

**Waler F. Scott III (Agent for Taxpayer) v Alabama Department of Revenue**
Defendant Firm: Adams and Reese, LLP
Plaintiff Firm – Galloway Scott & Hancock, LLC
Deposition: August 30, 2023
**Comments:** Property Tax Matter in Mobile County, AL
--------------------------------------------------------------------------------------------

**Lake Jordan Holdings, LLC v Commissioner of Internal Revenue**
Defendant Firm: Chamberlain, Hrdlicka, White, Williams & Aughtry
Plaintiff Firm – U.S. Justice Department
Trial: July 24, 2023
**Comments:** Valuation of Easement Donation
--------------------------------------------------------------------------------------------

**Seabrook Property, LLC v Commissioner of Internal Revenue**
Defendant Firm: Dentons-Sirote
Plaintiff Firm – U.S. Justice Department
Trial: June 26, 2023
**Comments:** Valuation of Easement Donation
--------------------------------------------------------------------------------------------

**Outokumpu Stainless USA, LLC v Mobile County Board of Equalization ET**
Defendant Firm: Adams & Reese Law, LLC
Plaintiff Firm – Burr & Forman, LLP
Trial: February 22, 2023
**Comments:** Property tax matter.
--------------------------------------------------------------------------------------------

GlassRatner

GlassRatner

3445 Peachtree Road, Suite 1225
Atlanta, GA 30326
Tel: (470) 346-6800
glassratner.com

**Lekker, LLC v Capital City Real Estate, LLC, Capital City Construction, LLC and Airline Street, LLC**
Defendant Firm: Swift, Currie, McGhee & Hiers, LLP and Knight Palmer Law
Plaintiff Firm – Wolfe Law, LLC
Deposition: March 15, 2023
Deposed by Monica L. Wingler w/Swift, Currie, McGhee & Hiers, LLP
**Comments:** The matter involved alleged damage caused by construction on adjoining property.
------------------------------------------------------------------------------------------------

**Victory Entertainment: Ehrenberg vs. Hala enterprises, LLC and Agassi Halajyan**
Defendant Firm: Law Offices of Leland Wahl, Oberg Law Group
Plaintiff Firm – Law Offices of Paul A Beck
Deposition: November 14, 2022
Deposed by Leland Wahl, of Law Office of Leland Wahl
**Comments:** The matter involved market rent of a retail building in North Hollywood, CA
------------------------------------------------------------------------------------------------

**Charlotte Student Housing, DST, et al, v Choate Construction Company.**
Defendant Firm: Kilpatrick Townsend & Stockton, LLP
Plaintiff Firm - Katten Muchin Roseman, LLP
Deposition: January 13, 2021
Deposed by Yonaton M. Rosenzweig with Katten Muchin Roseman, LLP
**Comments:** This matter was decided in arbitration. The defendant was successful. The matter involved alleged fraud and construction defects.
------------------------------------------------------------------------------------------------

**Fredmark, LLC v. Zax, LLC (Civil Action File No. 1:20-cv-1848-TCB).**
Defendant Firm: Fortson, Bentley and Griffin, P.A.
Plaintiff Firm – Balch & Bingham, LLP
Expert Report: September 2020
**Comments:** Prepared an expert report testifying to damages incurred by Fredmark, LLC as a result of Zax, LLC vacating a fast-food property and refusing to pay rent and expenses. The Plaintiff was successful, they were awarded lost rent and expenses.
------------------------------------------------------------------------------------------------

**Chapter 11 Bankruptcy of West Pace, LLC**
United States Bankruptcy Court Middle District of Alabama
John D. Elrod, Attorney for U.S. Bank, Bankruptcy Administrator U.S. Bank, N.A.
Greenberg Traurig, LLP, Atlanta, GA
Comments: Appraisal of real property and rebuttal of debtor appraisal.
*Upon review of the testimony and evidence presented at trial, the Court concludes that the testimony and appraisal provided by Mr. Eidson offer the most thorough and accurate assessment as to the value of the Property.*
------------------------------------------------------------------------------------------------

**Anthony A. Cecchini and Betty Cecchini v Boran Craig Barber Engel Construction Co., Inc. et al**
Civil Action No. CV-14-901295
Defendant Firm: Kilpatrick Townsend & Stockton, LLP
Plaintiff Firm: Capell & Howard, LP
Deposition: March 2016
**Comments:** The matter involved alleged construction defects. Settled favorable to Plaintiff.
------------------------------------------------------------------------------------------------

**Callaway et al v. Garner et al.**
Plaintiff Firm – Ken Hodges Law
Defendant Firm- Mateer & Harbert, P.C./ Chad K. Alvaro
Deposition: None
Circuit Court of Harris County, Georgia.
February 2017.
**Comments**: Property valuation
------------------------------------------------------------------------------------------------

GlassRatner

3445 Peachtree Road, Suite 1225
Atlanta, GA 30326
Tel: (470) 346-6800
glassratner.com

**Billy Dozier v. APAC MID-SOUTH, INC. and OLDCASTLE MATERIALS SOUTHEAST, INC.**
Plaintiff Firm - Fuller & Copeland, Montgomery, AL/ James Doyle Fuller
Deposition: December 15, 2014
Deposed by Blake L. Oliver of Adams, White, Oliver, Short & Forbus, LLP, Opelika, AL
Circuit Court of Lee County, Alabama. Jury found in favor of Mr. Dozier
**Comments:** Mr. Fuller represents the plaintiff, Mr. Dozier. Mr. Dozier's property was flooded by water coming from a mining operation.

---

**Dolly Ridge Point Owners Association, Inc., et al v. Turner & Schoel, LLC, et al.**
CV-2008-902750
Plaintiff Firm – Arthur Edge, III
Defendant Firm - Simpson, McMahan, Glick & Burford, PLLC/Smith, Spires & Peddy, P.C./Wallace, Jordan, Ratliff & Brandt, LLC/Wilson Berryhill, P.C.
Deposition: May 2014
Deposed by Arthur Edge, III
Case Settled
**Comments:** Ann McMahan with Simpson, McMahan, Glick & Burford was my primary contact. This case involved 80 homes in Birmingham, AL that allegedly suffered from construction defects due to poor soil compaction.

---

**JOON, LLC. D/B/A AJIN USA v. ALBERT KAHN ASSOCIATES, INC./INTERNATIONAL INDUSTRIAL CONTRACTING CORP./QUALICO STEEL COMPANY, INC.**
CV-2009-90019, Circuit Court Chambers County, Alabama
Construction Defects
Plaintiff Firm – J. Lister Hubbard, Capell & Howard, P.C.
Defendant Firm –Jefferson C. Orr, Smith Cashion & Orr, P.C./Robert W. Heath, Porterfield Harper Mills Motlow & Ireland/John A. Ruemenapp, Weisman Young & Reumenapp, P.C./William L. Smith, Law Offices of William L. Smith/Robert B. Stewart, Smith Spires & Peddy/Daniel F. Johnson, Lewis Brackin Flowers & Johnson/R. Mac Freeman Jr., Rushton Stakely/Jack P. Russell, Spain & Gillon, LLC/Howard K. Glick/ Simpson McMahan Glick & Burford/Heather M. Houston, Carr Allison
Deposition: August 2014
Trial: 2016
**Comments**: Prepared appraisal report outlining the construction defects on a 1st tier automotive supplier building.

---

**George Earl Russell, et al vs. Russel Oil Company & Thomas E. Russell et al.**
Civil Action No. CV-2003-3227
Defendant Firm: NA
Plaintiff Firm – Holtsford Gilliland Higgins & Hitson

**Comments:** The matter involved the value of Russell Oil Co. assets.

---

**Charles Atkins, et al, v Breckenridge Homeowners Association, Inc./Goodwyn, Mills & Cawood, et al.**
Civil Action No. 2009-901479; Circuit Court, Montgomery
Plaintiff Firm - F. Inge Johnstone/ Webster, Henry, Lyons, White, Bradwell & Black, P.C./ Kirby Johnson, P.C
Defendant Firm – Capell & Howard, P.C./Ball, Ball, Matthews & Novak, P.A./Jason C. Paulk/Wallace Mills/Scott, Sullivan, Streetman & Fox, P.C./Lloyd, Gray & Whitehead
Deposed: Yes
Settled out of court
**Comments**: Prepared appraisal report regarding change in property value from the time of the alleged damage until the day of court. Primary contact was with Lister Hubbard and Brooke Lawson with Capell & Howard. Prepared a review of the opposition's expert report.

---

**Dixie Sailing Club v Russell Lands**
Ground Lease Cancellation
Plaintiff Firm – Robert Drummond, Jr.
Deposed: No
Testified in Circuit Court of Elmore County

## Appendix 2
## Documents Considered

| | Description |
|---|---|
| **Reports** | |
| 1. | Expert Rebuttal Report of Danile Mizukovksi, August 14, 2026 |
| 2. | Colliers Appraisal 2025 |
| **Agreements & Other Hudson Documents** | |
| 3. | Purchase and Sale Agreement dated February 3, 2022 |
| 4. | Closing Agreement dated May 3, 2022 |
| 5. | Settlement Statement dated May 4, 2022 |
| 6. | Ground Lease dated May 4, 2022 |
| 7. | Project Loan Agreement dated May 4, 2022 |
| 8. | Leasehold Financing Agreement dated May 4, 2022 |
| 9. | Fourth Amendment to Ground Lease dated March 29, 2024 |
| **Financial Statements, Appraisals and Other Related Information** | |
| 10. | Hudson Appraisal dated March 25, 2022 (2022-03-25 Appraisal (Parkview, BBG).pdf) |
| 11. | Hudson Appraisal dated May 2, 2022 (Hudson Hotel Conversion - 5-2-22.pdf) |
| 12. | Hudson Appraisal dated May 23, 2024 (2024-05-23 Appraisal (Parkview, BBG).pdf) |
| 13. | Hudson Appraisal dated March 22, 2025 (2025-03-22 Appraisal (Parkview, Colliers).pdf) |
| **Research** | |
| 14. | Safehold, Investor Presentation, July 2026 |
| 15. | Haven Ground Lease Program |
| 16. | Ground Leases and Leasehold Interests in CMBS, Morningstar, February 10, 2021 |
| 17. | Ground Lease Underwriting: How Leasehold FinancingComplicates Your Cap Rate, LTV, and Exit Assumptions, RealValue, May 29, 2026 |
| 18. | Ground Lease Underwriting: Leasehold vs FeeSimple Valuation, Apers, April 2026 |
| 19. | The Most Important Issue in Every Ground Lease, NYSBA N.Y. Real Poreprty Law Journal, Winter 2014, Vol. 42, No.1, Joshua Stein |
| 20. | Ground Leases and Value-Based Rent Resets: An Alternate Reality, Mary E. Flynn & Bret Dockwell, November 12, 2013 edition of the New York Law Journal |
| 21. | The Problem of Ground Leases, The Appraisal Journal • Issue 4 \| 2023, by Jerome D. Whalen, JD, |
| 22. | How Safehold's Ground Lease is Unlocking Umtifamily Development, Commercial Observer, June 15, 2026 |
| 23. | United States Multifamily Capital Markets Report, Newmark, 4Q22 |
| 24. | United States Multifamily Capital Markets Report, Newmark, 1Q25 |
| 25. | CoStar Midtown West Multi Family DataTable.xls |
| 26. | Why the modern Ground lease has become an affordable housing gap filler, Insight, May 20, 2026 |
| 27. | Ground Lease 101; What Developers Need to Know, Affordable Housing Finance, Donna Kimura, Jan. 12, 2026 |