# EXHIBIT D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
CASE NUMBER
25-11853 (KBO)

In Re:

Hudson 1701/1706, LLC, et al.,
Debtors.

VIRTUAL DEPOSITION OF GREG EIDSON
SEPTEMBER 1, 2026
12:14 P.M.

The deposition of GREG EIDSON was taken virtually before Jessica Pitts, CCR, on September 1, 2026, by Kirk L. Brett, commencing at approximately 12:14 P.M., whereupon all parties appeared virtually, pursuant to the stipulations set forth herein.



S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of GREG EIDSON, may be taken before Jessica Pitts, Certified Court Reporter, Notary Public, State of Alabama at large, whereupon all parties appeared virtually, on September 1, 2026, commencing at approximately 12:14 P.M.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions and that counsel for the parties may make objections and assign



grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of the deposition by the Commissioner is waived.



I N D E X

EXAMINATION INDEX

PAGE
EXAMINATION OF GREG EIDSON
BY MR. KIRK. . . . . . . . . . . 9

EXHIBIT INDEX

(No exhibits were marked.)

A P P E A R A N C E S

VIRTUALLY APPEARING ON BEHALF OF: Ground Lessor 356W58 Ground Lessor, LLC

KIRK L. BRETT
Attorney at Law
PATRICK O'CONNOR
Attorney at Law
Adler & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, New York 10022

VIRTUALLY APPEARING ON BEHALF OF: The Debtors
VIRGINIA SU
Attorney at Law
Boies Schiller Flexner LLP
55 Hudson Yards, 20th Floor
New York, New York 10001

ALSO PRESENT:
Wendy Blackwell, videographer
Max Nipon



I, Jessica Pitts, a Certified Court Reporter, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me, via videoconference, commencing at approximately 12:14 P.M. on September 1, 2026, GREG EIDSON, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: We are now on the record. The time is 12:14 p.m. Central Time on September 1st, 2026. This begins the videoconference deposition of Greg Eidson taken in the matter of In Re: Hudson 1701/1706, et al., filed in the United States Bankruptcy Court for the District of Delaware. Case number of which is 25-11853KBO.

My name is Wendy Blackwell. I am your remote videographer. The court reporter is Jessica Pitts. We are representing Esquire



Deposition Solutions. Will everyone present please identify themselves and state whom you represent, after which the witness will be sworn in.

MS. SU: Virginia Su from Boies Schiller Flexner on behalf of the debtors. I don't know if Kirk is -- Mr. Brett, are you -- can you hear me? He seems frozen.

(At which time, Mr. Brett left the videoconference deposition.)

THE VIDEOGRAPHER: He does seem frozen. Would you like me to take us off real quick so we can resolve this?

MR. O'CONNOR: Yeah. Why don't we go off the record.

THE VIDEOGRAPHER: We are now going off the record. The time is 12:15 Central.

(Break.)

(At which time, Mr. Brett re-entered



the videoconference deposition.)

THE VIDEOGRAPHER: We are now back on the record. The time is 12:17 Central. Will everyone present please identify themselves and state whom you represent?

MS. SU: Virginia Su Boies Schiller Flexner on behalf of the debtors.

MR. BRETT: My name is Kirk Brett and I'm from Adler & Stachenfeld. I represent the Ground Lessor 356W58 Ground Lessor, LLC.

MR. O'CONNOR: Patrick O'Conner corner also of Adler & Stachenfeld on behalf of the of the Ground Lessor 356W58 Ground Lessor, LLC.

THE VIDEOGRAPHER: Okay. The court reporter will now put some stipulations on the record and swear in the witness.

(Witness sworn.)

THE COURT REPORTER: Okay. You can put your hand down.

Usual stipulations?
MR. BRETT: Yes, please.
MS. SU: Yes, agreed.

GREG EIDSON,
being first duly sworn, was examined
and testified as follows:

EXAMINATION

BY MR. BRETT:
Q. Okay. Good afternoon, Mr. Eidson. My name is Kirk Brett. And before we get going, I just want to make sure that I have the pronunciation of your name correct. Is it Eidson?
A. Eidson is just fine.
Q. Okay. Thank you very much.
So, Mr. Eidson, I -- I -- I take it you've been deposed before?
A. Yes, I have.
Q. Okay. So -- so you know, then, that answers -- that I'll be asking you a series of questions here today. I'd appreciate if you



would answer audibly for the court reporter. Even though we are also being videoed, we do need a written record. Is that okay?
A. That is -- that's great.
Q. Okay. And, Mr. Eidson, I will endeavor to be clear, or as clear as I can be in my questioning, but if there's anything that is, you know, unclear or vague, what -- what have you, please just speak up. This is not a game of gotcha, this is not a game of trickery, I just seek to ask questions and have answers and have a record that's as clear as possible, okay?
A. That's fine.
Q. Okay. And if you do answer questions, I will assume that you understand them. That's fair too?
A. That's fair. I'll ask -- I may ask you to repeat it if I don't understand it.
Q. Okay. Very well.
So, Mr. Eidson, where are you sitting right now?
A. I am sitting in my office in Daphne,



Alabama.
Q. Okay. Is -- is that where you live, Mr. Eidson?
A. I live in Fairhope, Alabama.
Q. Okay. Is there anyone else in the room with you, Mr. Eidson?
A. There is not.
Q. Okay. Do you have any computer screens that are accessible to other people open right now besides the one for this Zoom?
A. No.
Q. Okay. Mr. Eidson, have -- have you ever been to New York City?
A. I have.
Q. Okay. About how many times?
A. Probably about a dozen.
Q. And were -- were your dozen or so visits to New York City for business or pleasure?
A. Always business.
Q. Okay. And what kind of business did you engage in in New York City?
A. It's always valuation of real estate



in some form or fashion.
Q. Okay. Can you describe for me, please -- well, when was the last time you were in New York City?
A. The last time I was there, about three weeks ago.
Q. Okay. Was that for this case?
A. No, it wasn't.
Q. Okay. Did you visit New York City in connection with this case?
A. I did, yes.
Q. Okay. Did you -- did you tour the Hudson Hotel property that's the focus of this case?
A. I did, yes.
Q. Okay. Mr. Eidson, have you been involved with ground leases before?
A. Yes.
Q. In what capacity?
A. In that capacity would be the estimating the value of that lease, maybe estimating the impact of the value of -- or the cost of the lease, I should say, on a cash

Page 13

flow.
Q. Okay. Now, I should have mentioned -- apart from this case, would your answer be the same?
A. It would be, yes, sir.
Q. Okay. So you have valued the -- a ground lease, is that what you said?
A. Yes, I have.
Q. And did you value -- what -- what part of the ground lease did you value?
A. Historically speaking?
Q. Right. I'm trying to understand your experience with ground leases, and so I -- I'm -- I'm wondering what you have done -- what -- what -- what kind of valuation you were doing.
A. My task may have been to estimate the market value of that ground lease or the task may have been to estimate the value of -- or the impact of that lease on the property itself. Sometimes these situations may be lending, sometimes they may be a -- a -- a bankruptcy or a restructuring. So there's a

Page 14

variety of situations where the ground lease is explored.
Q. Okay. So I just want to clarify, and I hate -- I hate to do this because, you know, I don't mean to be -- to nitpick. But when you say "may have been," do you mean was -- that you were involved in those matters or that you're not sure and you're wondering whether they were in connection with those -- those --
A. I'm just -- I'm speaking in generalities. Yes, they -- those are matters that I have been involved in.
Q. Okay. So when you valued a ground lease in the past, did you value the ground lease from the perspective of the landlord or the tenant or some other party?
A. I don't recall the specifics. I could say that in the one instance that I remember it -- it was the -- the landlord. I think in -- maybe in another it was neither party, a third party that may have had an interest in being involved in the property.
So generally speaking, since I've

Page 15

been in this business for about 40 years, I have looked at ground leases from several different perspectives; you know, for -- for the -- for the owners -- for the land owner, for the tenant, or maybe a third party.
Q. Okay. Okay. And about how many times do you think you've valued a ground lease, you know, for -- for any party?
A. Wow. I haven't thought about that. It has to be at least a couple of dozen times.
Q. Okay. Okay. And -- but each time -- sorry. Strike that. Let me start over.
So these were efforts to value an existing ground lease, correct? Or...
A. Well, they would be efforts to value the existing ground lease as opposed to a lease that's not in place yet.
Q. Right. I guess what I'm -- what I was getting at, and it wasn't -- it wasn't the best question.
But have you ever advised a party who is considering entering into a ground lease?
A. I honestly don't recall at this -- as

Page 16

we sit here if one of those involved that or not.
Q. Okay. But your -- your expertise is in valuing real estate, correct?
A. That's correct.
Q. Okay. And sometimes you value fee interest, sometimes you value ground lease interest; is that right?
A. I would say sometimes fee, yes, sometimes a leasehold interest or a lease fee interest, or maybe another slice -- you know, a sub-leasehold interest.
Q. Okay. But you're -- but you're not someone that advises someone who is trying to structure a ground lease before it's entered into, correct?
MS. SU: Objection to form.
A. I would have to say I don't recall that if I've -- if that's been a scope of something in the past.
Q. Okay. Okay. But it -- okay. So you don't -- you don't recall whether or not you have ever advised someone who is considering

Page 17

entering into a ground lease?
MS. SU: Objection.
A. You are correct, I don't recall that.
Q. Okay. Okay. I just wanted to understand what your -- what you have done in the past on -- on ground leasing.
On the ground leases that you have valued, do you recall whether any of them were in New York City?
A. We've -- I have valued property that is subject to a ground lease in New York City. As far as pulling the ground lease out of that equation, I don't recall that, no.
Q. Okay. So you have -- so just to clarify, you have valued New York City property that is subject to a ground lease?
A. Yes.
Q. Okay. About how many times?
A. I would say six to eight.
Q. Okay. Do you recall the properties offhand?
A. I couldn't give you the addresses right now, no.

Page 18

Q. Do you recall what kinds of properties they were?
A. Yes. They were generally multifamily properties.
Q. Were they -- do you recall which borough of New York City they were in?
A. Some are in the -- geographically as we look at the Hudson building on a map, north and west of Central Park -- really a few blocks north of the Hudson, and then others in the eastern midtown area.
Q. Okay. And when was the last time that you valued a New York City property?
A. I'm currently working on -- outside of this, I'm currently working on a few right now.
Q. A few?
A. Yes.
Q. Are they all ground leases?
A. No, I don't think so.
Q. Are -- are any of them ground leases?
A. Yes.
Q. How many?

Page 19

A. Well, I'll -- I'll -- are -- are they ground leases that I'm valuing, that, I don't -- I'm not a hundred percent sure of the answer of that yet. It may come to that. I know that some of these properties are encumbered by ground leases.
Q. Okay. Okay. So let's just -- so I appreciate that. Thank you.
I want to actually get to some of your report. In your initial report, in paragraph three you wrote, "I have been asked by counsel to determine a financeable, stabilized ground rent for the completed project."
You -- do you recall those words?
A. Yes, I do.
Q. Okay. What did you mean by "stabilized"?
A. Well, I meant that the -- the property itself would have a stabilized cash flow, a stable occupancy, which basically means it has gone through its renovation and it's -- it is now complete and it's occupied.

Page 20

Q. Okay. So -- and stabilized assumes that the -- that the project, whatever construction work was -- is underway, has been completed and is over, correct?
A. That is correct, yes.
Q. Okay. So the fact that the property is currently under construction did not factor into your analysis here, correct?
A. That is correct.
MS. SU: Objection.
Q. Okay. And what did you mean by "financeable"?
A. Well, I meant that there -- there has to be -- in short, a lender -- the structure would be such that a lender would be interested in financing this project, and that would be the long-term financing on the project as opposed to the construction loan on the project.
Q. So -- so if I understand you, the assumption -- excuse me -- the assumption here is that there is a loan on the property and -- and that that is -- that's sort of the

Page 21

predicate of the opinion, correct?
A. That's correct.
Q. Okay. So is that the same thing in your mind as analyzing what the market rate of rent is for the property?
MS. SU: Objection.
A. Well, that's part of the -- that would be part of the equation to arrive at what a market rent would be on the building --
Q. How so?
A. -- or the property I should say.
Q. How so?
A. Well, there's -- within the context of the stable property, there's income, there's expenses, and then there's the debt on the property. And for -- for the property to function economically with a loan on it, these factors have to work in harmony with each other or the deal doesn't work. You know, for example, if there's not enough cash flow to pay the debt, well, the debt doesn't work.
So in my analysis, I took the debt into consideration and the cash flow that was

Page 22

projected into consideration and developed a ground rent that would work within those parameters.
Q. Okay. So -- and I recall that you said in your second report -- and I don't know how you phrased it -- how you refer to your second report. You said, "Reverse engineering is a fair term for what I did."
That -- does that describe -- is that consistent with what you just described, that you took the debt and looked at the expenses and then came up with the rent?
A. That's a fair assessment, yes.
Q. Okay. How would you determine rent if there were no debt on the property?
A. Well, if there were no debt on the property, it would be analyzed in a little bit different way. Now we don't have a lender involved that needs a return on the property, but we do have an owner-operator of the -- the property itself, and their equity would need a return. So the ground less -- the ground owner needs a return, the equity owner needs a

Page 23

return.
Q. Okay. And what kind of return does the ground owner need?
A. Well, I don't think that's a specific number.
Q. Okay. Is there a range?
A. I'm going to say no, there's a -- there's a -- you know, and the reason I'm saying no is the -- the time period matters.
Q. What -- what time period do you mean?
A. Well, I mean at what point in time -- there's different rates of return in the marketplace. You know, we went through a period of relatively low interest rates in the early '21, '20 -- 2021 period and then things climbed quite a bit. So expectations changed. It had impact on everything, property values to the terms that were put in place.
So I think in the bigger picture, the rates of return, I'm not comfortable just putting a number on it without knowing how it affects the entire project.
Q. Okay. So -- but you're -- but if I

Page 24

understand you correctly, and I'm not sure I do, so please correct me if I'm wrong, the ground owner does expect a return on its investment, correct?
A. Yes.
Q. And the -- that return, in terms of the quantification in numbers, might depend upon the interest rate environment; is that correct?
A. I would say it could.
Q. Okay. Okay. But you're -- but you don't -- do you have a view as to what kind of a guideline an investor in -- in a leased fee interest might seek by way of a return?
A. Are we talking just in general outside of just a leased fee interest?
Q. Correct.
A. Well, there's -- for leased fee returns, there are published guides. People like Pricewaterhouse produce surveys of that type of thing. RealtyRates.com produces surveys of expectations of returns. And then what feeds into those expectations, you know,

Page 25

has a lot to do with what capitalization rates are, what the growth in income and expenses would be.

You know, all of these factors are working kind of like a soup. They're working with each other and sometimes they're working against each other to produce a return.

Q. Okay. So if -- have you reviewed materials like you just referenced, the Pricewaterhouse, or what was -- what was the other one you mentioned?

A. Oh, the other one was RealtyRates --

Q. RealtyRates?

A. -- .com.

Q. Right.

A. Have I reviewed it for this, no.

Q. Okay. So if -- do you have a view as to what kind of a return an investor in a leased fee interest would seek entering into a transaction today?

A. I haven't looked at that, no.

Q. Okay. Do you have a view as to what kind of a return an investor in a leased fee

Page 26

interest would seek entering into a transaction in 2022?

A. As measured against 2026, the -- everything was lower in '22 than it was in '26.

Q. Right. I -- I -- yeah, I -- I understand.

But do you -- do you have a view as to what kind of a rate or yield they would be seeking?

A. I didn't specifically look at that, no.

Q. Okay. Okay. Same question but for 2024. Do you have a view as to what kind of a return an investor in a leased fee interest would seek entering into a transaction in 2024?

A. No, I don't.

Q. Okay. Couldn't help but to ask for the sake of completeness.

A. Yes, sir, I understand.

Q. Okay. Okay. So there's a paragraph in your initial report. It's in 1.2 paragraph eight, and it's one, two, three -- I think it's the fourth bullet point.

Page 27

MS. SU: I'm not seeing it on the screen, Mr. Brett. Do you want put it up for the witness so that he can see?

MR. BRETT: No, that's okay.

Q. You wrote, "A ground rent that is too low may fail to provide the landowner with an adequate return."

Do you remember that -- do you remember writing that?

A. I have a copy of it here. Can I reference that?

Q. Sure, of course. It's -- it's on page three. It's the top bullet point. And the full sentence actually continues. It says, "While a ground rent that is too high may reduce project cash flow to a level that prevents the achievement of required debt -- debt coverage ratios and other underwriting metrics."

A. Yes, I recall that.

Q. Okay. So do you have a view as to what an inadequate return would be for a landowner?

Page 28

A. No, I do not.

Q. Okay. And let me just -- for the sake of completeness, would your answer be the same if I said entering into a transaction in 2026, do you have a view as to what an inadequate return would be to provide for a landowner?

A. Same answer, I do not.

Q. Okay. So if a -- if -- if a tenant were to say to the landowner, I will only pay you rent that will give you an amount that you view -- you, landowner, view as inadequate, the -- the transaction wouldn't occur, correct?

MS. SU: Objection.

A. Most likely, yes, you're correct.

Q. Right. Okay. In other words, if a landowner were considering entering into a ground lease and the tenant were only willing to pay an amount that would provide an inadequate return, the likely result would be that the landowner would just simply not enter into the transaction with that tenant?

MS. SU: Objection.

Page 29

Q. Does that sound right?
A. That is the likely scenario, yes.
Q. But you don't know what that range would be, what would be inadequate in terms of a rate of return for the landowner?
A. No, I do not.
MS. SU: Objection.
Q. Okay. Okay. Now let's get to the -- let's -- let's now layer in debt into the equation. In the initial report on page 11 in paragraph 32, you wrote in the middle -- and I'll let you turn to it. And I understand you are looking at that -- by the way, what -- do you have other paper in front of you besides the report?
A. No. I have -- I have a sheet of blank notepaper over here, and then I have the report sitting here.
Q. Okay. And you probably -- you probably also have your reply report, right?
A. Yes.
Q. Okay. But a sheet of blank paper and the two reports, and that's it?

Page 30

A. That's correct.
Q. Okay. Good. That's fine. That's one of those questions we have to ask when we're doing remote depositions, so thank you for that.
You wrote in the middle of that paragraph 32, "Because lenders underwrite the ground rent as a fixed obligation that ranks ahead of equity distributions, comma, an excessive ground lease burden can materially reduce net operating income available for debt service, construct -- constrain loan proceeds, and increase refinancing risk."
Okay. Do you remember writing that?
A. Okay. Yes.
Q. Yeah. Okay. So can you explain what that -- what that means?
A. Well, that just means if the -- basically, if the expenses are too high, there's not enough revenue to make a lender comfortable with covering the debt service.
Q. Okay. So from the lender's perspective, the rent has to -- has to get paid

Page 31

first, correct?
A. You mean the ground rent has to be paid in the context to the other expenses?
Q. Correct.
A. Yes.
Q. Okay. Okay. And then just a couple of other clarifications on your report, if I can. I'm sorry to do this, but can we skip back to -- paragraph 25 is -- I know I got ahead a little bit. Paragraph 25, the last sentence reads, "Consequently, market standard financeable ground leases generally contain provisions that allocate risks and rights in a manner that preserves the economic expectations of all three stakeholders while providing sufficient certainty and security to support long-term investment and mortgage financing."
Okay. Did you review the ground lease in this case?
A. I did read the ground lease, yes.
Q. Okay. Did it contain provisions that would protect a leasehold lender?
A. I don't specifically recall.

Page 32

Q. Okay. Okay. Now, the -- in your conclusion -- and I'm all the way at the back now on paragraph 37. You wrote, "Market rent equals 2,437,555." Do you see that?
A. I did, yes.
Q. Okay. And you called that "market rent." Why did you call that market rent?
A. I called that market rent because under the -- in the -- in the bigger picture of the whole property, that's the rent that works to support the other parts of the property. It -- it doesn't overly burden the property. There's -- the lender has the debt coverage ratio that they would typically need.
Q. Okay. But you wrote in paragraph three, and we talked about this already, that you were asked to determine a finance -- a financeable, stabilized ground rent for the completed project. But later, you didn't write that the financeable, stabilized ground rent for the completed project would be 2,437,555. Instead, you wrote market rent, and so I'm trying to understand.

Page 33

Did you mean in market rent really what you were asked to provide, which was the financeable, stabilized ground rent for the completed project?
A. Yes. I am looking at -- at the two as being the same thing. I think this is the market rent that works under these circumstances.
Q. Okay. And what are the circumstances that you refer to when you say it's the "rent that works under these circumstances"?
A. I'm referring to the -- the stabilized income and expenses and debt service of the property.
Q. Okay. And -- okay. And that's based upon some of the assumptions and numbers that are in the rest of the report, which I know we're -- we're going to go through but I just want to make sure I -- I understand.
That's the amount based upon these assumptions and the amounts you've put in the report, that's the amount that works?
A. That's correct.

Page 34

Q. Okay. Okay. So now if we can, let's go through some of the numbers. First, if I understand you -- your report correctly, you took the projected net operating income or -- or -- or projected revenue for the property based upon a 2022 report, correct?
A. That's correct.
Q. Okay. And you took a debt amount of 207 million, correct?
A. That's correct.
Q. Now, why did you use -- and why did you use the 207 million?
A. Because it's my understanding that was the -- the construction loan.
Q. Okay. As of 2022?
A. Yes.
Q. Okay. Why -- but -- but you did not examine -- when you came up with this, you did not examine the amount invested by the ground lessor, correct?
A. That's correct.
Q. Why not?
A. Well, I didn't feel like the amount

Page 35

outside of -- outside of the stabilizing this cash flow and looking at the debt so you can see what the -- the ground lease could be -- things that are occurring outside of that didn't matter to that equation.
Q. So -- so, no -- I'm sorry, I -- I didn't really understand that, so I -- and I'm -- I'm going to try to rephrase it --
A. Okay. Fair enough.
Q. -- to see if I understand it. So -- but I'm not trying to put words in your mouth.
So outside of the debt amount, it -- it doesn't matter what the amount invested by the ground lessor was; is that fair?
A. That's fair in -- yes, in the context of my objective to try to figure out which -- what type of rent fit into this cash flow and debt service at the time.
Q. Okay. So -- so the mission, then, was to figure out what rent could be afforded with a loan amount of 207 million; is that right?
A. Yes.

Page 36

Q. Okay. And then so if your assumptions were to change in -- and the lender with the construction loan were, say, 150 million, you would have a larger rent?
MS. SU: Objection.
A. That is a possibility.
Q. Well, what -- when you say it's "a possibility," is there something holding you back from saying yes? Because I -- I feel like what you -- what you were saying was, that based upon a loan of 207 million, you were figuring out what the property could afford by way of ground rent. And so if I reduce the debt, why doesn't the ground rent go up?
A. Right. I think if -- if all things remain the same except for that one piece of the equation, yes --
Q. Okay.
A. -- it would -- it would go up.
Q. Okay. Now -- okay. And why -- why did you look at the debt amount as of 2022 -- on the construction loan as of 2022 as opposed to -- and just so you know where I'm going --

Page 37

as opposed to, say, what the debt is today?
A. I don't recall seeing what the debt is today. I do -- I was working with the number of 207. And so once it gets to stabilization, I -- you know, I'm having to make some assumptions here because, you know, clearly the building is not finished so we're -- we're making some assumptions that some things are happening, one of which is the construction loan would roll over into permanent financing when the building is stabilized.
Q. Okay. So you're not aware that the debt amount was reduced over time?
A. I am not, no.
Q. Okay. Okay. And that in here -- in this report, you have a assumed mortgage rate of 7 percent and an amortization of 30 years. And how -- how did you come up with the -- those figures?
A. I -- I sourced those figures from published information that that was the -- the average during this period. I understand that

Page 38

it -- in certain situations it can be more or it could be less, but this was what was most typical.
Q. Okay. Have you seen construction loans with a 30-year term before?
A. I've seen -- okay. So construction loan, no.
Q. But this was a construction loan that you were trying to address, correct? The 207 million was intended as a construction loan?
A. Well, when -- when the property reaches stabilization, I am essentially converting that construction loan to permanent financing.
Q. Okay. Okay. So you assumed that basically the $207 million construction loan would be converted to a $207 million permanent loan with a 30-year amortization?
A. That's correct.
Q. Okay. That's why I just want to understand it.
Okay. So what -- what role in your mind is played -- well, what do -- what does

Page 39

market -- like a market rate mean to you?
A. In general terms, the -- the market rate is -- it's a rate agreed upon by two parties in a transaction.
Q. Okay. So you looked at the debt that was entered into in 2022 and you looked at a pro forma from 2022, but you did not -- it sounds like you did not take into account the amount agreed upon between the two parties to the transaction; is that right?
MS. SU: Objection.
A. When you say "the amount agreed upon," are we talking about construction loan amount or --
Q. No. I'm sorry. I'm looking at -- going back to determining rent, okay, and what a market rate of rent is. And you said determining a market is, you know, looking at two parties, what they agree upon. And -- and you didn't say it, but I'm assuming you mean you know, acting -- you know, neither acting under compulsion, right?
A. Correct.

Page 40

Q. That that is -- that is how -- how one thinks of a market, right?
A. Right.
Q. Okay. So in 2022, two parties came together and entered into a ground lease, and you did not take into account what those two parties agreed upon --
MS. SU: Objection.
Q. -- am I right?
A. I would say that -- that I considered that. But then when I started my analysis, I realized that that agreed-upon number was more than the property could support.
Q. And -- and that's -- so what I'm getting at is what you said was the mission, which was instead of figuring out what the market rate is, you were figuring out the rent that would be affordable for a financeable ground lease; is that fair?
MS. SU: Objection.
A. Well, that's true. And in my view of it, that's the number that -- that would also reflect the market if you're going to have --

Page 41

if this thing is going to be developed; otherwise, it doesn't work.
Q. All right. Now, also in 2022, there was a third party to the transaction, right? There was the -- there was a ground lessor, there was a ground lessee, and there was a construction lender, and all three agreed upon a particular number for the ground -- ground rent.
So, again, I go back to why is that -- if we're looking at market rate, isn't that what a market rate would be --
MS. SU: Objection.
Q. -- what they agreed upon?
A. Well, I think that that -- I'll -- I'll assume for a minute that all that made sense in -- at the time that they did it. And then we fast forward to the period that we're in now, and under the projections for the property that I relied on, that number didn't -- it didn't make sense anymore.
Q. Okay. So if I'm understanding you correctly, then, someone got a bad deal in

Page 42

2022; is that right?
MS. SU: Objection.
A. I wouldn't say that someone got a bad deal in 2022, I would just say that things changed.
Q. Okay. Now, then, again in 2024, you had three -- are you aware that the -- the rent was changed in 2024?
A. Yes.
Q. Okay. Do you know why the rent was changed in 2024?
A. The motivation for changing the rent, no.
Q. Okay. Do you -- are you familiar with the terms of the amendment that effectuated the increase in rent?
A. I don't recall them as we sit here now.
Q. Okay. But -- but you know that the rent went up, but you don't know the other terms, right?
A. That's correct.
Q. Okay. And are you aware that the --

Page 43

there were three parties that approved that rent?
A. I'm -- I don't recall that, no.
Q. Okay. And so -- so by the three parties, just -- just so I'm clear, there was a ground lessor and a ground lessee and a construction lender, the leasehold lender, Parkview. All three signed an amendment that increased the rent. Are you -- are you aware of that?
A. I understand that, yes.
Q. Okay. And, again, we were talking about what it means to be market, and we talked about how if two parties, or in this case three parties, come together and agree, that that is an indicator of market --
MS. SU: Objection.
Q. -- right?
A. Well, I think that, yes, that is one indicator of market. The other part is -- for me, is looking at the projections of that property, you know, what it can support.
Q. Okay. Because that -- and when

Page 44

you're looking at that, you're looking at what -- what can be afforded as oppose -- but that sounds different than what market is. Because if market is what two parties would agree upon, then that doesn't seem to be consistent with -- or the same thing, rather, I should say, what -- what -- the same thing as what projections would support?
MS. SU: Objection.
A. Well, what I -- what I don't know in the context of this is the -- the arm's length nature of the discussion between these three parties and the motivations of those three parties.
Q. Okay. So the implication is that if they were not acting at arm's length, that -- that would corrupt the market analysis --
MS. SU: Objection.
Q. -- is that right?
A. Well, it would put it into question, yes. I mean, ideally, I would like to be in a position to talk to all these people and understand what happened, but --

Page 45

Q. Okay.
A. -- that wasn't done.
Q. Okay. Okay. By the way, Mr. Eidson, I should have said this upfront. If you need a break at any time, you can raise your hand and take a break. I can keep going but I --
A. Well, I didn't -- I didn't want to interrupt you and I saw -- I was looking at the clock, and I saw, well, about 15 more minutes I will be ready to stretch my legs a little bit.
Q. Okay. Well, I can go a few more minutes and we can stop then or -- you know, again, this is -- this is not a gotcha game and it's not an endurance contest, okay?
A. Why -- why don't you continue and then we'll take a break in about 15 minutes.
Q. Okay. That sounds fine.
Okay. So let's go back to the 2022 pro forma. Why did you -- you have other pro formas and projections available to you, right? You've -- you've seen others in this matter?
A. Correct. I think there were three, maybe four others.

Page 46

Q. Okay. And -- but you didn't use any of those other ones?
A. I read all of those. I felt like this one made the most sense given the time period that we're talking about.
Q. Okay. Why did this one make the most sense given the time period we're talking about?
A. Well, the -- I believe this -- this was the appraisal prepared by BBG, and the -- their schedule for stabilization of the property occurred, you know, roughly about the same time that these events are happening where, some of the others, their projections of the property actually stabilizing were beyond where we are today.
Q. And why does it matter that the stabilization would happen roughly in 2026 or so -- or 2025, 2026 rather than some later date?
A. Well, I was trying to select the one that -- that had a time period that fit into what we're doing as opposed to a stabilization,

Page 47

say, in -- in 2029 and then having to discount those numbers back to the present.
Q. Okay. But the -- a lot changed between 2022 and -- and -- and now, right --
MS. SU: Objection.
Q. -- in terms of the occurrences at the property, the interest rate, I mean; is that correct?
A. You are correct, yes.
Q. Okay. And I think earlier we said that you're looking at stabilization when you're looking at how to calculate what rent could be afforded, that you are looking at it from the perspective of what the numbers would be when the project is completed and stable, right?
A. That's correct.
Q. So why does it matter when that stabilization would occur as opposed to just what the dollar amounts are upon stabilization?
A. Well, I think it matters when because the -- the -- like for example, the revenue from renting the apartments, well, it's going

Page 48

to -- it's forecast to increase every year. So the further we get away from today, for example, the higher that number will get. Now, balancing that out somewhat is also increases in expenses.
But as opposed to trying discount a future number back to the present, I elected to go with one that -- that tended to model where we were in the current cycle. So this is what was -- what in the BBG appraisal they expected to happen. And I thought, you know, that that made -- that -- for me, that made a lot of sense to me, to just stick with that schedule.
Q. But other occurrences happened at the property, correct? I mean, they're -- they're -- the -- the proposed business plan in 2022 did not come to pass and is unlikely to come to pass, correct?
MS. SU: Objection.
A. That's correct.
Q. Okay. So the -- what I struggle with is -- when I -- when I see that is, it seems that in 2022 there was a business plan and BBG

Page 49

put together a projection. The business plan is no longer possible and yet you used the projection. So it seems like you used a projection that is totally irrelevant, but -- but you used it, and so I -- I -- I want to understand why you used it in the context of a business plan that could no longer be achievable.

MS. SU: Objection.

A. Well, it was -- that was an assumption along with the assumption that it's actually complete now and it's not. So I -- you know, we had a number of different assumptions we had to make to fit into this time frame that we're working with. And I agree with you that there were changes that most likely would have had a -- a negative effect on the property's cash flow going forward because they were -- there was a reduction in the amount of rent that could be collected on some of the units.

But to pick a point in time, I felt like the BBG report, it made a lot of sense.

Page 50

And if I had gone with one of the more current reports, it was just -- it was -- of course I could have done then, but then there would have been another level of assumptions that I would have to make to get the property ramped up -- you know, get the construction completed, get it ramped up, and then discount that number back to the period that we're talking about.

Q. Okay. Okay. In the -- the second report -- I want to talk to you a little bit about the second report if we can.

A. Okay.

Q. Okay. So you spent some time talking about I think what you call the ecosystem, right?

A. Yes, I do.

Q. And that's a term that I think -- did you create that term?

A. No, I did not. I -- I -- I adopted that term. I -- I felt like it was a -- a very descriptive term of all of the parties working together to make a deal work.

Q. Okay. So what does that mean when

Page 51

you say the ecosystem is all the parties working together to make a deal work? Can you --

A. Well, I mean the -- the owner of the land, the owner of the building, the construction loan, the lenders. All of these parties would work together to figure out what works for the -- I mean, if the deal is going to work, they're all going to have to work together. And if they don't work together, if one of them demands something the other ones can't do, then it just doesn't happen.

Q. Okay. So -- so for the ecosystem to work, all three parties have to be -- or the interests of all three parties have to be considered, correct?

A. Correct.

Q. And that the ultimate deal has to work for all three parties, correct?

A. Yes.

Q. And by "all three parties," we mean the ground lessor, the ground tenant, and the leasehold lender, right?

Page 52

A. That's correct.

Q. Okay. So what confuses me about that is that in your initial report, and we talked about this, you looked at the debt amount and you looked at the projection amount, the projections from 2022, but then you said that the ground lessor interest didn't matter.

So how -- how were you using -- or did you use a -- an ecosystem analysis when you performed the -- when you -- of the analysis you did in your initial report?

MS. SU: Objection.

A. Well, I didn't -- I didn't mean to say they don't matter. I just meant to say that they're all part of the same puzzle, and just because one party -- and it doesn't matter if it's the -- the debtor or the ground lessor or maybe the -- the owner of the building and an equity requirement they want, it's -- you know, it's not necessarily what you want, it's what you can get based on all of these properties working together -- I mean, not properties -- but all the interests working

together.
Q. Okay. So but -- but there you kept the $207 million constant and you lowered the rent based upon what the property could have -- could afford if it's affording debt service on a $207 million loan. And you also said that if you -- all things being equal, if you reduce the debt, then the rent goes up.
But how does that -- why doesn't the debt amount go down? Why is your analysis not something along the lines of, well, if you keep the investment amount and the rent constant, then the debt amount should go down, the amount that the ground tenant can borrow should be reduced?
MS. SU: Objection.
A. That could happen, yes. That is -- that's a scenario that could happen.
Q. But that's not what you were asked to review, correct -- or analyze, rather, correct?
A. That's correct. I -- I was working with the debt amount that -- that I was aware of.



Q. Okay. But you were also aware of the investment by the ground lessor, correct?
A. That's correct.
Q. Okay. All right. Mr. Eidson, this is probably a good time to break if --
A. Okay.
Q. -- if you're ready for one?
A. Sure, yes.
Q. Okay. All right. We'll -- so let's take us off the record, please.
THE VIDEOGRAPHER: We are going off the record. The time is 1:24 Central Time.

(Break.)

THE VIDEOGRAPHER: We are now on the record. The time is 1:34 p.m. Central.
Q. (By Mr. Brett:) Okay. Mr. Eidson, back on the record. You understand you are still under oath, right?
A. Yes, yes.
Q. Okay. Okay. I just want to turn to -- your initial report indicated that the



rent -- well, you called it the market value of rent but we -- we -- we talked about what -- what that might mean.
But you -- you said it should be 2,437,555, right?
A. That's correct, I did.
Q. And you stood by that number in the second report, correct?
A. In the second report, I -- I believe that number changed just slightly.
Q. Okay.
A. Ever so slightly.
Q. Let's see. Paragraph 40 of your second report, the last paragraph reads, "Accordingly, my opinion of the excess rent remain unchanged."
I don't think you -- well, let me know. Did -- did your -- so your initial report -- okay.
Your initial report said you used the market rate -- market rent as you determined it as to be 2,437,555, and then using that figure, you calculated the excess rent. That's --



that's what you determined -- what you indicated was the amount from November through May to be in excess of market, right?
A. You're correct.
Q. And so -- and then in the second report, you said your view of that amount remains unchanged. So does -- does that -- so I -- I guess I took it to mean that you were also standing by the amount that you determined to be market rent -- rent in paragraph 37 of your initial report to be 2,437,555.
So it -- I guess I'm asking you, is that still your view?
A. That's -- that's correct, you are correct.
Q. Okay. Okay. So have you calculated what return that amount of rent would provide to the ground lessor in this matter?
A. I have not, I don't think so, no.
Q. Okay. So the ground lessor initial investment was $178 million. And you indicated -- well, let me pause there.
You're aware of that, right? I think

you said you --
A. Yes, I'm aware of that.
Q. And then you said that the rent should be 2,437,555. So what would that -- what does that equate to in terms of a return to the landlord?
A. Can I get out a calculator?
Q. Sure.
A. For that period of time, that's less than a percent.
Q. Okay. And the 30-year treasury rate as of today is roughly 5.2 percent?
A. That sounds like it would be accurate.
Q. Okay. So would you expect -- I'm recalling the testimony and the discussion we had about if the ground rent is too small, that it would be an inadequate return for the landlord. Would you expect a ground lessor to enter into a -- or -- or strike that.
Would you expect a prospective investor in a leased fee interest to enter into a ground lease that involves a return of less



than one percent?
MS. SU: Objection.
A. No.
Q. Okay. All right. Thank you, Mr. Eidson. I appreciate it. And I have no further questions at this time. So I'll -- you're -- you're free to go.
THE COURT REPORTER: Ms. Su?
MS. SU: I have nothing further either. Thank you.
THE COURT REPORTER: Before we go off the record, who all would like to order a copy of the transcript?
MR. BRETT: Yes --
MS. SU: Yes.
MR. BRETT: -- we would. This is -- I would. I'm Kirk for the ground lessor. Yes, please.
THE COURT REPORTER: And Ms. Su?
MR. BRETT: And can we have a rough today, by the way, please?
THE COURT REPORTER: Yes.
MS. SU: Yes. And -- oh, I'm sorry.



A same-day rough for me as well.
THE WITNESS: Is it okay if I sign off at this point?
MR. BRETT: Yes, it is, Mr. Eidson. This is just administerial stuff. I thank you for your time today, and I'll probably see you next week at the -- at the hearing.
THE WITNESS: Nice to meet you, Mr. Brett.
MR. BRETT: Right back to you. Right back to you.
THE COURT REPORTER: Just for clarification --
MR. BRETT: Yes.
MS. SU: Yes.
THE COURT REPORTER: -- we want the same-day roughs and then the regular transcript at a normal turnaround time, or does the final version need to be expedited?

(At which time, the court reporter left the videoconference deposition and then re-entered.)



MR. BRETT: So we were saying, please, a same-day rough and then a two-day final because we -- we -- both sides need this by Thursday.
THE COURT REPORTER: So by 9/3?
MR. O'CONNOR: Correct.
MR. BRETT: Yeah.
THE COURT REPORTER: And that's both sides?
MR. BRETT: Yeah.
MS. SU: Yes.
THE COURT REPORTER: And the video?
MR. BRETT: The video, Ms. -- Ms. Su asked for the video to be synced regular, and I said I was reflecting upon whether or not we want the video or not. We're thinking about it.

(At which time, the deposition concluded at 1:45 p.m. Central.)

C E R T I F I C A T E

STATE OF ALABAMA
AT LARGE

I hereby certify that the above and foregoing deposition of GREG EIDSON was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription; transcribed by me or overseen by me, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

I further certify that I am duly licensed by the Alabama Board of Court Reporting as a Certified Court Reporter as evidenced by the ACCR number following my name found below.

So certified on this date, September 1, 2026.

Jessica Pitts

/s/ Jessica Pitts, CCR
Jessica Pitts, CCR
ACCR #635, Expires 9/30/2026
Commissioner for the State
Of Alabama at Large
My Commission Expires 5/21/2027